RECORD NO. 18-4138

*In The*

# United States Court of Appeals

### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

## NICHOLAS YOUNG,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA, No. 1:16-cr-265-LMB
HON. LEONIE M. BRINKEMA**

————————

## JOINT APPENDIX
## VOLUME I OF V
### (Pages 1 – 435)

————————

Nicholas D. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, Virginia 22314
(703) 822-1086

Gordon D. Kromberg
Assistant U.S. Attorney
OFFICE OF THE U.S. ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 229-3721

*Counsel for Appellant*

*Counsel for Appellee*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS
## VOLUME I OF V

**Appendix Page**

Docket Entries...........................................................................1

**Criminal Complaint**
    **filed August 2, 2016**................................................ 31

**Affidavit in Support of Criminal Complaint**
    **filed August 2, 2016**................................................ 32

**Indictment**
    **filed December 15, 2016**......................................... 49

**Exhibit to Motion to Suppress**
    **filed February 15, 2017:**

    **Exhibit:**

    1.    **Search and Seizure Warrant**
          **dated August 2, 2016**............................ 54

**Transcript of Motion Hearing before**
**The Honorable Leonie M. Brinkema**
    **on March 10, 2017** ..................................... 67

**Order of**
**The Honorable Leonie M. Brinkema**
**Re: Denying Defendant's Motion to Suppress**
**Items Unconstitutionally Seized**
    **filed March 10, 2017** .................................. 92

**Government's Motion for Protective Order and to**
**Delete Certain Classified Information from Discovery**
    **filed September 25, 2017** ........................... 93

**Redacted Protective Order of**
**The Honorable Leonie M. Brinkema**
    **filed September 26, 2017** ........................... 94

**Government's Opposition to Defendant's Omnibus Motion in Limine**
 filed October 10, 2017.................................................................97

**Transcript of Motion Hearing before**
**The Honorable Leonie M. Brinkema**
 on October 27, 2017 .............................................................. 126

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Denying in Part Defendant's Omnibus Motion in Limine**
 filed October 27, 2017 ........................................................... 150

**Government's Notice of Expert Testimony**
 filed November 17, 2017 ..........................................................151

**Defendant's Memorandum in Support of Motion to Exclude**
**Two Expert Witnesses from Trial**
 filed November 25, 2017 ......................................................... 154

**Curriculum Vitae of Dr. Gartenstein-Ross**
 filed November 29, 2017 ......................................................... 175

**Defendant's Motion to Strike Witnesses Due to the Government's Failure to**
**Comply with *Jencks* and Discovery Order**
 filed November 30, 2017 ......................................................... 185

**Transcript of Motions Hearing before**
**The Honorable Leonie M. Brinkema**
 on December 1, 2017 .............................................................. 189

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Denying Defendant's Motion in *Limine* to Exclude**
**Two Expert Witnesses from Trial**
 filed December 1, 2017 ........................................................... 220

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Ordering Government to Provide Unredacted Copies of**
**Material at Issue in Defendant's Second Motion to Strike Witnesses**
 filed December 4, 2017 ........................................................... 221

Order of
The Honorable Leonie M. Brinkema
Re:  Court's Ability to Ensure a Fair Trial
  filed December 4, 2017 ................................................................ 222

Transcript of Status Conference before
The Honorable Leonie M. Brinkema
  on December 5, 2017 .................................................................... 223

Order of
The Honorable Leonie M. Brinkema
Re:  Denying Defendant's Motion to Strike Each Witness as to
Whom the Government has Failed to Comply With the *Jencks* Deadline
and Second Motion to Strike Witnesses for Continued Failure to Produce
Complete *Jencks* Material
  filed December 5, 2017 ................................................................ 277

Order of
The Honorable Leonie M. Brinkema
Re:  Overruling Defendant's Oral Objections to *Jencks* Redactions
  filed December 6, 2017 ................................................................ 278

Washington Post Article "Man Who Patrolled D.C. Metro
Awaits Terrorism Trial"
  filed December 8, 2017 ................................................................ 279

Order of
The Honorable Leonie M. Brinkema
Re:  Denying in Part Motion for Judicial Notice
  filed December 11, 2017 ................................................................ 281

Transcript of Jury Selection and Opening Statements
The Honorable Leonie M. Brinkema
  on December 11, 2017 .................................................................... 283

# TABLE OF CONTENTS
## VOLUME II OF V

**Appendix Page**

Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
        on December 12, 2017 ............................................................ 436

### Testimony of "Khalil Sullivan":

Direct Examination by Mr. Kromberg ..................................... 450
Cross Examination by Ms. Moreno ......................................... 510
Redirect Examination by Mr. Kromberg ................................. 526

### Testimony of John Gervino:

Direct Examination by Mr. Turgeon ........................................ 529
Cross Examination by Ms. Moreno .......................................... 535
Redirect Examination by Mr. Turgeon .................................... 538

### Testimony of SA John Richard Minichello:

Direct Examination by Mr. Gibbs ............................................ 545
Cross Examination by Mr. Smith ............................................ 566
Redirect Examination by Mr. Gibbs ........................................ 624
Recross Examination by Mr. Smith ......................................... 621

### Testimony of "Mo":

Direct Examination by Mr. Gibbs ............................................ 629
Cross Examination by Mr. Smith ............................................ 663

Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
    on December 13, 2017 ...................................................................... 708

**Testimony of "Mo": (Resumed)**

Cross Examination by Mr. Smith .................................................... 713
Redirect Examination by Mr. Gibbs ............................................... 731
Recross Examination by Mr. Smith................................................. 736

**Testimony of Agent Cameron Siegfried:**

Direct Examination by Mr. Gibbs ................................................... 740
Cross Examination by Mr. Smith ..................................................... 784

**Testimony of "SA Smith":**

Direct Examination by Mr. Gibbs ................................................... 815
Cross Examination by Ms. Moreno.................................................. 828

# TABLE OF CONTENTS
## VOLUME III OF V

**Appendix Page**

**Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
        on December 13, 2017, continued:**

**<u>Testimony of SA John Sikorski</u>:**

**Direct Examination by Mr. Gibbs** ..................................................... 841
**Cross Examination by Mr. Smith** ...................................................... 896
**Redirect Examination by Mr. Gibbs** .................................................. 908

**<u>Testimony of SA John Minichello</u>: (Recalled)**

**Direct Examination by Mr. Gibbs** ...................................................... 910
**Cross Examination by Mr. Smith** ........................................................ 924

**<u>Testimony of Paul Lee</u>:**

**Direct Examination by Mr. Turgeon** ................................................... 930
**Cross Examination by Ms. Moreno** ..................................................... 965
**Redirect Examination by Mr. Turgeon** ................................................ 967

**<u>Testimony of Ian Paul Campbell</u>:**

**Direct Examination by Mr. Kromberg** .................................................. 970
**Cross Examination by Mr. Smith** ......................................................... 983

Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
    on December 14, 2017 ................................................................1021

Testimony of Kenneth James McNulty:

Direct Examination by Mr. Kromberg .................................................1026
Cross Examination by Mr. Smith .......................................................1037
Redirect Examination by Mr. Kromberg.............................................1063
Recross Examination by Mr. Smith....................................................1067

Testimony of Brian Michael Menzies:

Direct Examination by Mr. Kromberg .................................................1069
Cross Examination by Ms. Moreno ....................................................1084

Testimony of Joanne Dill:

Direct Examination by Mr. Kromberg .................................................1093
Cross Examination by Mr. Moreno ....................................................1097

Testimony of Dr. Daveed Gartenstein-Ross:

Direct Examination by Mr. Kromberg .................................................1090
Cross Examination by Mr. Smith ...................................................... 1111

Testimony of SA Nicholas A. Caslen:

Direct Examination by Mr. Kromberg .................................................1277

# TABLE OF CONTENTS
## VOLUME IV OF V

**Appendix Page**

Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
 on December 15, 2017 ...................................................................1334

 Testimony of SA Nicholas A. Caslen: (Resumed)

 Direct Examination by Mr. Kromberg ..................................1362
 Cross Examination by Mr. Smith ........................................1393
 Redirect Examination by Mr. Kromberg...........................1462

 Government's Closing Argument ........................................1524
 Defendant's Closing Argument .........................................1538
 Government's Rebuttal ...................................................... 1565

 Court Instructs the Jury...................................................1575

Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
 on December 18, 2017 ...................................................................1619

 Jury Asks a Predisposition Question ....................................1621

 Government's Exhibits:

 1-201.  December 17, 2014 Email from Young .......................1631

 3-110. Photograph ..........................................................1632

 4-203. Photograph ..........................................................1633

 4-300. Photograph ..........................................................1634

**Government's Exhibits, continued:**

10-231.    Photograph ....................................................1635

10-241.    Photograph ....................................................1636

10-252.    Photograph ....................................................1637

10-700.    Photograph ....................................................1638

10-701.    Photograph ....................................................1639

10-706.    Photograph ....................................................1640

10-863.    Photograph ....................................................1641

10-903.    Photograph ....................................................1643

11-401.    Photograph ....................................................1644

**Defendant's Exhibits:**

2-8.    Photographs ....................................................1645

14-24. Photographs ....................................................1652

Redacted Verdict Form
    filed December 18, 2017 ....................................................1663

**Jury Instructions**
      filed December 18, 2017 ...................................................................1664

**Defendant's Sentencing Memorandum,**
**With Exhibits,**
      filed February 16, 2018 ...................................................................1712

      Exhibits:

      **A.    Character References**
                  various dates .......................................................................1743


      **B.    Psychological Evaluation**
                  dated December 5, 2016 ...............................................1796

**Letter to**
**The Honorable Leonie M. Brinkma from**
**Nicholas Young**
      undated .......................................................................1805

**Transcript of Sentencing Hearing before**
**The Honorable Leonie M. Brinkema**
      on February 23, 2018 .......................................................................1807

**Judgment in a Criminal Case**
      filed February 23, 2018 .......................................................................1832

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Denying Motions for a New Trial and Judgment of Acquittal**
      filed February 23, 2018 .......................................................................1837

**Defendant's Notice of Appeal**
      filed February 28, 2018 .......................................................................1838

# TABLE OF CONTENTS
## VOLUME V OF V – UNDER SEAL

**Appendix Page**

**Defendant's Second Motion to Strike Witnesses Due to**
**Refusal to Produce Complete *Jencks* Materials,**
**With Attachments,**
    **filed December 2, 2017** .........................................................................1840

**Presentence Investigation Report**
    **filed January 25, 2018** ...........................................................................1872

**Statement of Reasons**
    **filed February 23, 2018**.........................................................................1894

APPEAL,CLOSED

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CRIMINAL DOCKET FOR CASE #: 1:16-cr-00265-LMB-1

Case title: USA v. Young                    Date Filed: 12/15/2016
Magistrate judge case number: 1:16-mj-00355-JFA    Date Terminated: 02/23/2018

Assigned to: District Judge Leonie M.
Brinkema

Appeals court case number: 18-4138 4th
Circuit

**Defendant (1)**

**Nicholas Young**                    represented by    **Danny C. Onorato**
*TERMINATED: 02/23/2018*                               Schertler & Onorato LLP
                                                       575 7th Street NW
                                                       Suite 300 South
                                                       Washington, DC 20004
                                                       **NA**
                                                       (202) 628-4199
                                                       *TERMINATED: 07/05/2017*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: CJA Appointment*

                                                       **James W. Hundley**
                                                       BrigliaHundley PC (Tysons)
                                                       1921 Gallows Rd
                                                       Suite 750
                                                       Tysons Corner, VA 22182
                                                       (703) 883-0880
                                                       Fax: (703) 883-0899
                                                       Email: jhundley@brigliahundley.com
                                                       *TERMINATED: 09/26/2017*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: CJA Appointment*

                                                       **Nicholas D. Smith**
                                                       David B Smith PLLC
                                                       108 North Alfred Street
                                                       Alexandria, VA 22314

703-548-8912
Fax: 703-548-8935
Email: nds@davidbsmithpllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Stuart Alexander Sears**
Schertler & Onorato LLP
1101 Pennsylvania Ave NW
Suite 1100
Washington, DC 20004
202-628-4199
Fax: 202-628-4177
Email: ssears@schertlerlaw.com
*TERMINATED: 07/05/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**David Benjamin Smith**
David B. Tatge, PLLC
13000 Grey Friars Place
Oak Hill, VA 20171
(703) 548-8911
Fax: (703) 548-8935
Email: dbs@davidbsmithpllc.com
*TERMINATED: 05/25/2017*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:2339B Attempt to Provide Material Support to a Designated Foreign Terrorist Organzation (1) | BOP: 180 months with credit for time served (each count, concurrent); 15 years supervised release (15 yrs count 1, 3 years counts 2 and 4, concurrent); $300.00. |
| 18:1512(c)(2) Obstruction of Justice (2) | BOP: 180 months with credit for time served (each count, concurrent); 15 years supervised release (15 yrs count 1, 3 years counts 2 and 4, concurrent); $300.00. |
| 18:1512(b)(3) Obstruction of Justice (3) | Dismissed by order dated 12/1/17 |
| 18:1512(c)(2) Obstruction of Justice (4) | BOP: 180 months with credit for time served (each count, concurrent); 15 years supervised release (15 yrs count 1, 3 years counts 2 and 4, concurrent); $300.00. |

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                              **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                                    **Disposition**

18:2339B Attempt to Provide Material
Support to a Designated Foreign Terroist
Organization

---

**Interested Party**

**Yahoo!inc**                            represented by   **Jonathan Stanley Frankel**
                                                          ZwillGen PLLC
                                                          1900 M Street NW
                                                          Washington, DC 20036
                                                          202-296-3585
                                                          Fax: 202-706-5298
                                                          Email: jon@zwillgen.com
                                                          *TERMINATED: 07/14/2017*
                                                          *LEAD ATTORNEY*
                                                          *Designation: Retained*

---

**Plaintiff**

**USA**                                  represented by   **Gordon D. Kromberg**
                                                          United States Attorney's Office
                                                          2100 Jamieson Ave
                                                          Alexandria, VA 22314
                                                          (703)299-3700
                                                          Email: gordon.kromberg@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: US Attorney*

                                                          **John T. Gibbs**
                                                          US Attorney's Office (Alexandria-NA)
                                                          2100 Jamieson Avenue

Alexandria, VA 22314
**NA**
Email: john.gibbs@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

**Evan N. Turgeon**
US Attorney's Office (Alexandria-NA)
2100 Jamieson Avenue
Alexandria, VA 22314
NA
703-299-3700
Email: evan.n.turgeon@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/02/2016 | 1 | SEALED COMPLAINT as to Nicholas Young (1). (pmil, ) [1:16-mj-00355-JFA] (Entered: 08/02/2016) |
| 08/02/2016 | 2 | AFFIDAVIT by USA as to Nicholas Young in Support of 1 Complaint (Sealed) (pmil, ) [1:16-mj-00355-JFA] (Entered: 08/02/2016) |
| 08/02/2016 | 3 | Redacted Criminal Case Cover Sheet (pmil, ) [1:16-mj-00355-JFA] (Entered: 08/02/2016) |
| 08/02/2016 | 5 | MOTION to Seal Case by USA as to Nicholas Young. (pmil, ) [1:16-mj-00355-JFA] (Entered: 08/02/2016) |
| 08/02/2016 | 6 | ORDER granting 5 Motion to Seal Case **until deft is arrested** as to Nicholas Young (1). Signed by Magistrate Judge Theresa Carroll Buchanan on 08/02/16. (pmil, ) Modified on 8/3/2016 to add text(pmil, ). [1:16-mj-00355-JFA] (Entered: 08/02/2016) |
| 08/02/2016 | 7 | Arrest Warrant Issued by Magistrate Judge Theresa Carroll Buchanan in case as to Nicholas Young. (pmil, ) [1:16-mj-00355-JFA] (Entered: 08/02/2016) |
| 08/03/2016 | | Arrest of Nicholas Young (tfitz, ) [1:16-mj-00355-JFA] (Entered: 08/03/2016) |
| 08/03/2016 | 8 | Arrest Warrant Returned Executed on 8/3/16 in case as to Nicholas Young. (tfitz, ) [1:16-mj-00355-JFA] (Entered: 08/03/2016) |
| 08/03/2016 | | Case unsealed as to Nicholas Young (tfitz, ) [1:16-mj-00355-JFA] (Entered: 08/03/2016) |
| 08/03/2016 | 9 | Minute Entry for proceedings held before Magistrate Judge Theresa Carroll Buchanan:Initial Appearance as to Nicholas Young held on 8/3/2016. USA appeared through J. Gibbs and G. Kromberg. Deft appeared w/o counsel. Deft informed of rights, charges and penalties. Court to appoint counsel (CJA). USA seeks detention-GRANTED. Matter set for a Status Conference on 8/4/2016 at 02:00 PM in Alexandria Courtroom 500 before Magistrate Judge Theresa Carroll Buchanan. Deft |

| | | |
|---|---|---|
| | | remanded to the custody of the USMS.(Tape #FTR.)(tfitz, ) [1:16-mj-00355-JFA] (Entered: 08/03/2016) |
| 08/03/2016 | 10 | Temporary Detention Order as to Nicholas Young. Signed by Magistrate Judge Theresa Carroll Buchanan on 8/3/16. (tfitz, ) [1:16-mj-00355-JFA] (Entered: 08/03/2016) |
| 08/03/2016 | | CJA 20 as to Nicholas Young :Appointment of Attorney David Benjamin Smith for Nicholas Young. Signed by Magistrate Judge Theresa Carroll Buchanan on 08/03/2016. (lbru, ) [1:16-mj-00355-JFA] (Entered: 08/03/2016) |
| 08/04/2016 | 11 | Minute Entry for proceedings held before Magistrate Judge Theresa Carroll Buchanan: USA appeared through J. Gibbs and G. Kromberg. Deft appeared w/counsel D. Smith. Status Conference as to Nicholas Young held on 8/4/2016. PH waived orally. PC found. Matter continued for further proceedings before the grand jury. Deft requests additional time to prepare for detention hearing; USA does not oppose-GRANTED. Detention Hearing set for 8/11/2016 at 02:00 PM in Alexandria Courtroom 501 before Magistrate Judge John F. Anderson. Deft remanded.(Tape #FTR.)(tfitz, ) [1:16-mj-00355-JFA] (Entered: 08/05/2016) |
| 08/04/2016 | 12 | Temporary Detention Order as to Nicholas Young. Signed by Magistrate Judge Theresa Carroll Buchanan on 8/4/16. (tfitz, ) [1:16-mj-00355-JFA] (Entered: 08/05/2016) |
| 08/09/2016 | 13 | NOTICE *OF WITHDRAWAL OF REQUEST FOR BAIL HEARING* by Nicholas Young (Smith, David) [1:16-mj-00355-JFA] (Entered: 08/09/2016) |
| 08/09/2016 | 14 | ORDER re 13 Notice of withdrawal of request for bail hearing (See order for details). Signed by Magistrate Judge John F. Anderson on 8/9/16. (krob, ) [1:16-mj-00355-JFA] (Entered: 08/09/2016) |
| 08/11/2016 | 15 | Minute Entry for proceedings held before Magistrate Judge John F. Anderson:Detention Hearing as to Nicholas Young held on 8/11/2016. US appeared through: Gordon Kromberg. Deft appeared with counsel: David Smith. Deft waives his right to a detention hearing. Deft remanded. (Tape #FTR.)(wgar, ) [1:16-mj-00355-JFA] (Entered: 08/11/2016) |
| 08/11/2016 | 16 | **ORDER OF DETENTION** as to Nicholas Young. Signed by Magistrate Judge John F. Anderson on 08/11/2016. (wgar, ) [1:16-mj-00355-JFA] (Entered: 08/11/2016) |
| 08/17/2016 | 17 | Joint MOTION for Protective Order *regarding Sensitive Discovery Materials* by USA as to Nicholas Young. (Attachments: # 1 Proposed Order Sensitive Discovery Materials)(Kromberg, Gordon) [1:16-mj-00355-JFA] (Entered: 08/17/2016) |
| 08/17/2016 | 18 | Consent MOTION for Speedy Trial *Extension of Time for Indictment* by USA as to Nicholas Young. (Attachments: # 1 Proposed Order for Extension of Time for Indictment)(Kromberg, Gordon) [1:16-mj-00355-JFA] (Entered: 08/17/2016) |
| 08/17/2016 | 19 | CONSENT MOTION to Extend Time for Indictment through and including 11/02/16 by USA, Nicholas Young as to Nicholas Young. (Attachments: # 1 Proposed Order) (pmil, ) [1:16-mj-00355-JFA] (Entered: 08/17/2016) |

| 08/18/2016 | 20 | ORDER granting 19 Motion for Extension of Time to Indictment upto and including November 2, 2016 as to Nicholas Young (1). Signed by District Judge Leonie M. Brinkema on 8/18/16. (krob, ) [1:16-mj-00355-JFA] (Entered: 08/18/2016) |
| --- | --- | --- |
| 09/22/2016 | 24 | EX PARTE AND UNDER SEAL ORDER as to Nicholas Young. Signed by District Judge Leonie M. Brinkema on 09/22/16. (Copy sent to deft atty per LMB chambers) (pmil, ) [1:16-mj-00355-JFA] (Entered: 09/22/2016) |
| 09/23/2016 | 25 | PROTECTIVE ORDER as to Nicholas Young (1). Signed by District Judge Leonie M. Brinkema on 09/23/16. (pmil, ) [1:16-mj-00355-JFA] (Entered: 09/26/2016) |
| 10/06/2016 | 26 | EX PARTE UNDER SEAL DOCUMENT (pmil, ) [1:16-mj-00355-JFA] (Entered: 10/06/2016) |
| 10/14/2016 | 27 | Sealed Document (pmil, ) [1:16-mj-00355-JFA] (Entered: 10/17/2016) |
| 10/18/2016 | 28 | EX PARTE UNDER SEAL Document (pmil, ) [1:16-mj-00355-JFA] (Entered: 10/18/2016) |
| 10/20/2016 | 29 | Consent MOTION for Extension of Time to Indict *(Second)* by USA as to Nicholas Young. (Attachments: # 1 Proposed Order To Extend Time to Indict)(Kromberg, Gordon) (Main Document 29 replaced on 10/20/2016) (pmil, ). (Attachment 1 replaced on 10/20/2016) (pmil, ). [1:16-mj-00355-JFA] (Entered: 10/20/2016) |
| 10/20/2016 | | Notice of Correction re: 29 Consent MOTION for Extension of Time to Indict *(Second)*. The filing user has been notified to file this document in paper form with the Clerk's Office as it is exempt from ECF. The document has been removed. (pmil, ) [1:16-mj-00355-JFA] (Entered: 10/20/2016) |
| 10/20/2016 | 30 | UNOPPOSED MOTION for Issuance of Subpoenas *Pretrial* by Nicholas Young. (Attachments: # 1 Exhibit 1)(Smith, David) Modified on 10/20/2016 to add text (pmil, ). [1:16-mj-00355-JFA] (Entered: 10/20/2016) |
| 10/20/2016 | 31 | SECOND CONSENT MOTION to Extend Time to Indict by USA, Nicholas Young as to Nicholas Young. (Attachments: # 1 Proposed Order)(pmil, ) [1:16-mj-00355-JFA] (Entered: 10/20/2016) |
| 10/20/2016 | 32 | ORDER granting 31 Motion to Extend Time to Indict up to and including 12/15/16 as to Nicholas Young (1). No further extension will be granted. Signed by District Judge Leonie M. Brinkema on 10/20/16. (pmil, ) [1:16-mj-00355-JFA] (Entered: 10/20/2016) |
| 11/23/2016 | 34 | ORDER granting 30 Unopposed Motion for Issuance of Pretrial Subpoena Duces Tecum as to Nicholas Young (1). Signed by District Judge Leonie M. Brinkema on 11/23/16. (pmil, ) [1:16-mj-00355-JFA] (Entered: 11/23/2016) |
| 11/28/2016 | 35 | Subpoena issued (pmil, ) [1:16-mj-00355-JFA] (Entered: 11/28/2016) |
| 12/05/2016 | 36 | EX PARTE AND UNDER SEAL MOTION by Nicholas Young. (Attachments: # 1 Cover Letter)(pmil, ) [1:16-mj-00355-JFA] (Entered: 12/07/2016) |
| 12/14/2016 | 37 | Subpoena(s) Returned as to Nicholas Young. (Smith, David) [1:16-mj-00355-JFA] (Entered: 12/14/2016) |

CM/ECF - vaed                                https://ecf.vaed.uscourts.gov/cgi-bin/DktRpt.pl?111370113507397-L_1_0-1

| | | |
|---|---|---|
| 12/15/2016 | 38 | INDICTMENT as to Nicholas Young (1) count(s) 1, 2, 3, 4. (jlan) (Entered: 12/15/2016) |
| 12/15/2016 | 41 | Redacted Criminal Case Cover Sheet (jlan) (Entered: 12/15/2016) |
| 12/15/2016 | | Set Hearing as to Nicholas Young: Arraignment set for 12/19/2016 at 10:00 AM in Alexandria Courtroom 600 before District Judge Leonie M. Brinkema. (jlan) (Entered: 12/15/2016) |
| 12/16/2016 | 42 | Motion to appear Pro Hac Vice by Nicholas David Smith and Certification of Local Counsel David Smith (Filing fee $ 75 receipt number 0422-5296015.) by Nicholas Young. (Smith, David) (Entered: 12/16/2016) |
| 12/16/2016 | 43 | EX PARTE AND UNDER SEAL ORDER as to Nicholas Young. Signed by District Judge Leonie M. Brinkema on 12/16/16. (Copy mailed to deft's counsel per LMB chambers; copy given to Financial Dept.) (pmil, ) Modified on 12/16/2016 to edit/add text (pmil, ). (Entered: 12/16/2016) |
| 12/19/2016 | 44 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Arraignment as to Nicholas Young (1) Count 1,2,3,4 held on 12/19/2016. U.S. appeared through Gordon Kromberg & John Gibbs. Deft appeared with counsel David Smith. Deft WFA, PNG, and demanded a trial by Jury. Court is advised of case status. Court finds case is complex. Trial date to be set a status hearing. Status Conference set for 1/27/2017 at 09:00 AM in Alexandria Courtroom 600 before District Judge Leonie M. Brinkema. Deft remanded.(Court Reporter A. Thomson.) (yguy) (Entered: 12/19/2016) |
| 12/19/2016 | 45 | ORDER granting 42 Motion for Pro hac vice as to Nicholas Young (1). Signed by District Judge Leonie M. Brinkema on 12/19/16. (pmil, ) (Entered: 12/19/2016) |
| 12/22/2016 | 46 | Consent MOTION to Compel *Compliance with Rule 17 Subpoena* by Nicholas Young. (Attachments: # 1 Proposed Order)(Smith, David) (Entered: 12/22/2016) |
| 12/22/2016 | 47 | ORDER granting 46 Motion to Compel as to Nicholas Young (1); Yahoo! Inc. produce to Mr. Young all emails sent in June 2011 from freedomforlibya777@yahoo.com to Mohamed_2060@yahoo.com.Signed by District Judge Leonie M. Brinkema on 12/22/16. (pmil, ) (Entered: 12/22/2016) |
| 12/26/2016 | 48 | MOTION for Order to Show Cause *Why Yahoo Should Not Be Held in Contempt* by Nicholas Young. (Attachments: # 1 Affidavit, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3)(Smith, David) Modified on 1/13/2017 - (Show Cause has been satisfied (yguy). (Entered: 12/26/2016) |
| 12/27/2016 | 49 | NOTICE *of Filing of Certificate of Service* by Nicholas Young re 48 MOTION for Order to Show Cause *Why Yahoo Should Not Be Held in Contempt* (Attachments: # 1 Certificate of Service)(Smith, David) (Entered: 12/27/2016) |
| 01/05/2017 | 50 | Opposition by Yahoo!inc as to Nicholas Young re 46 Consent MOTION to Compel *Compliance with Rule 17 Subpoena* (Frankel, Jonathan) (Entered: 01/05/2017) |
| 01/05/2017 | 51 | Opposition by Yahoo!inc as to Nicholas Young re 48 MOTION for Order to Show Cause *Why Yahoo Should Not Be Held in Contempt* (Attachments: # 1 Affidavit Hsia |

| | | |
|---|---|---|
| | | in opposition to motion for Order to Show Cause, # 2 Exhibit Hsia 1, # 3 Exhibit Hsia 2, # 4 Exhibit Hsia 3, # 5 Exhibit Hsia 4, # 6 Exhibit Hsia 5, # 7 Exhibit Hsia 6, # 8 Exhibit Hsia 7, # 9 Exhibit Hsia 8, # 10 Exhibit Hsia 9, # 11 Exhibit Hsia 10, # 12 Exhibit Hsia 11, # 13 Affidavit Lyon in Opposition to Motion for Order to Show Cause, # 14 Exhibit Lyon 1, # 15 Exhibit Lyon 2, # 16 Exhibit Lyon 3)(Frankel, Jonathan) (Entered: 01/05/2017) |
| 01/05/2017 | 52 | Notice of Hearing Date set for January 13, 2017 re 48 MOTION for Order to Show Cause *Why Yahoo Should Not Be Held in Contempt* (Smith, David) (Entered: 01/05/2017) |
| 01/06/2017 | 53 | Reply by Nicholas Young re 48 MOTION for Order to Show Cause *Why Yahoo Should Not Be Held in Contempt* (Attachments: # 1 Affidavit, # 2 Exhibit 1)(Smith, David) (Entered: 01/06/2017) |
| 01/06/2017 | | Set Deadlines re Motion or Report and Recommendation in case as to Nicholas Young 48 MOTION for Order to Show Cause *Why Yahoo Should Not Be Held in Contempt*. Motion Hearing set for 1/13/2017 at 09:00 AM in Alexandria Courtroom 600 before District Judge Leonie M. Brinkema. (klau, ) (Entered: 01/06/2017) |
| 01/09/2017 | | Notice of Correction re: 53 Reply. The filing user has been notified to file a signed Certificate of Service. (pmil, ) (Entered: 01/09/2017) |
| 01/09/2017 | 54 | CERTIFICATE of Service *(Signed)* re 53 Reply (Attachments: # 1 Signed Certificate of Service)(Smith, David) (Entered: 01/09/2017) |
| 01/09/2017 | 55 | Motion to appear Pro Hac Vice by Jui-Ting Anna Hsia and Certification of Local Counsel Jonathan Frankel (Filing fee $ 75 receipt number 0422-5323336.) by Yahoo!inc as to Nicholas Young. (Frankel, Jonathan) (Entered: 01/09/2017) |
| 01/10/2017 | 56 | ORDER granting 55 Motion for Pro hac vice as to Nicholas Young (1). Signed by District Judge Leonie M. Brinkema on 01/10/17. (pmil, ) (Entered: 01/10/2017) |
| 01/13/2017 | 57 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Motion Hearing as to Nicholas Young held on 1/13/2017. U.S. appeared through Gordon Kromberg. Deft appeared with counsels David Smith & Nicholas Smith. Jonathan Frankel appeared for Yahoo. 48 MOTION for Order to Show Cause *Why Yahoo Should Not Be Held in Contempt is argued in open court. Yahoo responded to the Motion for an Order to Show Cause and was not found to be in contempt. Defense counsel has been advised that the Court will issue an order requiring Yahoo to produce the requested info once defendant has filed the appropriate affidavit. Deft remanded. (order to follow) (Court Reporter A. Thomson.)(yguy) (Entered: 01/13/2017)* |
| 01/17/2017 | 58 | MOTION for Protective Order *(Regarding Classified Information)* by USA as to Nicholas Young. (Attachments: # 1 Proposed Order Protective Order, # 2 Exhibit Memoraundum of Understanding)(Kromberg, Gordon) (Entered: 01/17/2017) |
| 01/17/2017 | 59 | Protective Order as to Nicholas Young. Signed by District Judge Leonie M. Brinkema on 1/17/2017. (rban, ) (Entered: 01/17/2017) |

| 01/17/2017 | 60 | NOTICE *of Intent to Use FISA Information* by USA as to Nicholas Young (Kromberg, Gordon) (Entered: 01/17/2017) |
| 01/17/2017 | 61 | Consent MOTION for Discovery *Order* by USA as to Nicholas Young. (Attachments: # 1 Proposed Order for Discovery)(Kromberg, Gordon) (Entered: 01/17/2017) |
| 01/18/2017 | 62 | Agreed Discovery Order as to Nicholas Young. Signed by District Judge Leonie M. Brinkema on 1/18/2017. (rban, ) (Entered: 01/18/2017) |
| 01/26/2017 | 63 | Memorandum by Nicholas Young re 58 MOTION for Protective Order *(Regarding Classified Information) Memorandum of Understanding for Nicholas D. Smith* (Smith, David) (Entered: 01/26/2017) |
| 01/27/2017 | 64 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Status Conference as to Nicholas Young held on 1/27/2017. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon. Deft appeared with counsels David Smith & Nicholas Smith. Court is advised of case status. Deft shall file motion to suppress by close of business Tuesday, 1/31/17. Deft remanded. (Court Reporter A. Thomson.) (yguy) (Entered: 01/27/2017) |
| 01/31/2017 | 65 | MOTION to Suppress *FISA Evidence and/or Disclosure of Certain Materials* by Nicholas Young. (Attachments: # 1 Memorandum in Support, # 2 Affidavit Declaration in Support, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3)(Smith, David) (Entered: 01/31/2017) |
| 01/31/2017 | 66 | ORDER that the government file a response within sixty (60) days re: 65 Motion to Suppress as to Nicholas Young (1). Signed by District Judge Leonie M. Brinkema on 01/31/17. (pmil, ) (Entered: 02/01/2017) |
| 02/01/2017 | 67 | Sealed Motion by USA as to Nicholas Young. (rban, ) (Entered: 02/02/2017) |
| 02/01/2017 | 68 | Sealed Order as to Nicholas Young. Signed by District Judge Leonie M. Brinkema on 2/1/2017. (rban, ) (Entered: 02/02/2017) |
| 02/15/2017 | 69 | MOTION to Suppress *Documents, Records, and Objects Seized Pursuant to August 2016 Warrants* by Nicholas Young. (Attachments: # 1 Memorandum in Support, # 2 Declaration in Support, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8)(Smith, David) (Entered: 02/15/2017) |
| 02/22/2017 | 70 | NOTICE *of Yahoo Affidavit Per Court's Instructions* by Nicholas Young (Attachments: # 1 Affidavit Nicholas Young Yahoo Affidavit, # 2 Proposed Order Proposed Order Compelling Production)(Smith, David) (Entered: 02/22/2017) |
| 02/22/2017 | 71 | ORDER, for the reasons stated in Court during the hearing on January 13,2017, it is, ORDERED that Yahoo! Inc. shall produce to Defendant's Young's counsel all the emails sent from freedomforlibya777@yahoo.com to mohamed_2060@yahoo.com (see Order for details). Signed by District Judge Leonie M. Brinkema on 02/22/17. (pmil, ) (Entered: 02/22/2017) |
| 03/01/2017 | 72 | Notice of Hearing Date set for March 10, 2017 re 69 MOTION to Suppress *Documents, Records, and Objects Seized Pursuant to August 2016 Warrants* (Smith, |

| | | David) (Entered: 03/01/2017) |
|---|---|---|
| 03/02/2017 | | Set Deadlines re Motion or Report and Recommendation in case as to Nicholas Young 69 MOTION to Suppress *Documents, Records, and Objects Seized Pursuant to August 2016 Warrants*. Motion Hearing set for 3/10/2017 at 09:00 AM in Alexandria Courtroom 600 before District Judge Leonie M. Brinkema. (clar, ) (Entered: 03/02/2017) |
| 03/03/2017 | 73 | ORDER that by close of business, Monday, 03/06/17 the government SHOW CAUSE why the motion should not be granted as to Nicholas Young (see Order for details). Signed by District Judge Leonie M. Brinkema on 03/03/17. (pmil, ) (Entered: 03/03/2017) |
| 03/03/2017 | 74 | RESPONSE TO ORDER TO SHOW CAUSE by USA (Kromberg, Gordon) (Entered: 03/03/2017) |
| 03/03/2017 | 75 | RESPONSE in Opposition by USA as to Nicholas Young re 69 MOTION to Suppress *Documents, Records, and Objects Seized Pursuant to August 2016 Warrants* (Attachments: # 1 Exhibit Criminal Complaint, # 2 Exhibit Affidavit in Support of Criminal Complaint, # 3 Exhibit Application for Search Warrant - Backpack, # 4 Exhibit Application for Search Warrant - Truck, # 5 Exhibit Application for Search Warrant - Phone, # 6 Exhibit Application for Search Warrant - Locker, # 7 Exhibit Body Armor - 10 Pieces)(Kromberg, Gordon) (Entered: 03/03/2017) |
| 03/06/2017 | 76 | Reply to Motion by Nicholas Young re 69 MOTION to Suppress *Documents, Records, and Objects Seized Pursuant to August 2016 Warrants* (Smith, David) (Entered: 03/06/2017) |
| 03/10/2017 | 77 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Motion Hearing as to Nicholas Young held on 3/10/2017. U.S. appeared through Gordon Kromberg, John Gibb, Evan Turgeon. Deft appeared with counsels Nicholas Smith & David Smith. Deft's 69 MOTION to Suppress *Documents, Records, and Objects Seized Pursuant to August 2016 Warrants is argued in open court and DENIED. Deft remanded. (Govt exh 1 (small black binder photos 1-10) (Court Reporter A. Thomson.)(yguy) (Entered: 03/10/2017)* |
| 03/10/2017 | 78 | ORDER as to Nicholas Young (1): For the reasons stated in open court, it is hereby ORDERED that defendant's Motion to Suppress Items Unconstitutionally Seized from his Residence, Backpack, Pickup Truck, and Worplace [sic] Locker [Dkt. No, 69] be and is DENIED. Signed by District Judge Leonie M. Brinkema on 3/10/17. (yguy) (Entered: 03/10/2017) |
| 03/13/2017 | 79 | TRANSCRIPT of Proceedings held on 3/10/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may** |

| | | |
|---|---|---|
| | | be obtained through PACER Redaction Request due 4/12/2017. Redacted Transcript Deadline set for 5/15/2017. Release of Transcript Restriction set for 6/12/2017.(thomson, anneliese) (Entered: 03/13/2017) |
| 03/22/2017 | 80 | NOTICE *of Filing* by Nicholas Young re 69 MOTION to Suppress *Documents, Records, and Objects Seized Pursuant to August 2016 Warrants* (Attachments: # 1 Exhibit 1)(Smith, David) (Entered: 03/22/2017) |
| 03/31/2017 | 81 | MOTION for Leave to File Excess Pages by USA as to Nicholas Young. (Attachments: # 1 Proposed Order Granting Leave to File Excess Pages)(Kromberg, Gordon) (Entered: 03/31/2017) |
| 03/31/2017 | 82 | RESPONSE in Opposition by USA as to Nicholas Young re 65 MOTION to Suppress *FISA Evidence and/or for Disclosure of Certain Materials Half-Sheet* (Attachments: # 1 Exhibit Unclassified and Redacted Version of Government's Opposition to Motion for Disclosure of FISA-Related Material and/or to Suppress, # 2 Exhibit Declaration and Claim of Privilege of the Attorney General of the United States)(Kromberg, Gordon) (Entered: 03/31/2017) |
| 03/31/2017 | 83 | RESPONSE in Opposition by USA as to Nicholas Young re 65 MOTION to Suppress *FISA Evidence and/or for Disclosure of Certain Materials Half Sheet* (Kromberg, Gordon) (Entered: 03/31/2017) |
| 04/06/2017 | 84 | Reply by Nicholas Young re 69 MOTION to Suppress *Documents, Records, and Objects Seized Pursuant to August 2016 Warrants*, 65 MOTION to Suppress *FISA Evidence and/or for Disclosure of Certain Materials (Half-Sheet for Classified Filing)* (Smith, David) (Entered: 04/06/2017) |
| 04/11/2017 | 85 | ORDER granting 81 Motion for Leave to File Excess Pages as to Nicholas Young (1). Signed by District Judge Leonie M. Brinkema on 4/11/17. (krob, ) (Entered: 04/11/2017) |
| 04/13/2017 | 86 | ORDER as to Nicholas Young: On April 6,2017, defendant filed a document entitled "Classified Reply in Support of Motion for Disclosure of FISA-Related Material and/or to Suppress the Fruits or Derivatives of Electronic Surveillance and Physical Search Pursuant to FISA; and Motion for Reconsideration of March 10,2017 Order." [Dkt. No. 84]. Having reviewed the Motion for Reconsideration, the Court finds that a statement of the government's position would be of value. Accordingly, it is hereby ORDERED that the government file a response to defendant's Motion forReconsideration within ten (10) days. Signed by District Judge Leonie M. Brinkema on 4/13/17. (yguy) (Entered: 04/13/2017) |
| 04/24/2017 | 87 | RESPONSE by USA as to Nicholas Young re 84 Reply, *Opposition to Motion for Reconsideration - Half Sheet (original filed with CISO)* (Kromberg, Gordon) (Entered: 04/24/2017) |
| 04/26/2017 | 88 | Reply by Nicholas Young re 84 Reply, *in Support of Motion for Reconsideration of March 10, 2017 Order (Classified Half-Sheet)* (Smith, David) (Entered: 04/26/2017) |
| 05/05/2017 | 89 | NOTICE *of Notification From United States Marshals Service* by USA as to Nicholas Young (Kromberg, Gordon) (Entered: 05/05/2017) |

| 05/07/2017 | 90 | RESPONSE by Nicholas Young re 89 Notice (Other) (Smith, David) (Entered: 05/07/2017) |
| 05/09/2017 | 91 | MEMORANDUM OPINION re: 69 Motion to Suppress and 84 Motion for reconsideration as to Nicholas Young. Signed by District Judge Leonie M. Brinkema on 5/9/17. (c/s) (krob, ) (Entered: 05/09/2017) |
| 05/09/2017 | 92 | ORDERED that defendant's Motion for Reconsideration of March 10, 2017 Order (Dkt. No. 84) be and is DENIED. Signed by District Judge Leonie M. Brinkema on 5/9/17. (krob, ) (Entered: 05/09/2017) |
| 05/09/2017 | 93 | MEMORANDUM OPINION as to Nicholas Young. Signed by District Judge Leonie M. Brinkema on 5/9/17. (krob, ) (Main Document 93 replaced on 5/11/2017) (rban, ). (Entered: 05/09/2017) |
| 05/09/2017 | 94 | ORDER denying 65 Motion for Disclosure of PISA-Related Material and/or to Suppress the Fruits or Derivatives of Electronic Surveillance and Physical Search Pursuant to FISA and it is hereby ORDERED that, in light of the pretrial matters having been resolved, the parties confer as to a mutually available time for a status hearing to set the trial date in this case and notice the hearing for Friday, May 12, Friday, May 19, or Thursday, May 25 at 9:00 a.m. Signed by District Judge Leonie M. Brinkema on 5/9/17. (krob, ) (Entered: 05/09/2017) |
| 05/12/2017 | | Set/Reset Hearings as to Nicholas Young: Status Conference set for 5/25/2017 at 09:00 AM in Alexandria Courtroom 600 before District Judge Leonie M. Brinkema. (yguy) (Entered: 05/12/2017) |
| 05/22/2017 | 95 | MOTION by USA as to Nicholas Young (Half-Sheet for Classified Filing). (gwalk, ) (Entered: 05/23/2017) |
| 05/23/2017 | 96 | ORDER that the government need not produce the materials identified in the motion to counsel for the deft. Signed by District Judge Leonie M. Brinkema on 05/23/17. (pmil, ) (Entered: 05/23/2017) |
| 05/25/2017 | 97 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Status Conference as to Nicholas Young held on 5/25/2017. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon. Deft appeared with counsels David Smith and Nicholas Smith. Counsel advised of the Court's concerns. Counsel advised the Court of case status. Court orders attorneys Nicholas Smith and David Smith released from case. Court to appoint new counsel. Deft remanded. (order to follow) (Court Reporter A. Thomson.)(yguy) (Entered: 05/25/2017) |
| 05/25/2017 | 98 | ORDER as to Nicholas Young: For the reasons stated in a sealed courtroom, it is hereby ORDERED that David B. Smith and Nicholas D. Smith be and are released from further representation of the defendant; and it is furtherORDERED that pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A, Stuart Alexander Sears and Danny C. Onorato be and are appointed to represent the defendant. Signed by District Judge Leonie M. Brinkema on 5/25/17. (yguy) (Entered: 05/25/2017) |
| 05/25/2017 | 99 | Sealed Document (gwalk, ) (Entered: 05/25/2017) |
| 05/25/2017 | 100 | Sealed Document (gwalk, ) (Entered: 05/25/2017) |

| 05/25/2017 | 101 | Sealed Document (gwalk, ) (Entered: 05/25/2017) |
|---|---|---|
| 06/12/2017 | 103 | NOTICE *of Memorandum of Understanding as to Stuart Sears and Danny Onorato* by Nicholas Young (Sears, Stuart) (Entered: 06/12/2017) |
| 06/29/2017 | 105 | MOTION to Withdraw as Attorney by STUART A. SEARS and DANNY C. ONORATO. by Nicholas Young. (Attachments: # 1 Proposed Order)(Sears, Stuart) (Entered: 06/29/2017) |
| 06/30/2017 | 106 | EX PARTE AND UNDER SEAL MOTION by Nicholas Young as to Nicholas Young. (pmil, ) (Entered: 06/30/2017) |
| 07/05/2017 | 107 | ORDER granting 105 Motion to Withdraw as Attorney. Danny C. Onorato and Stuart Alexander Sears are relieved as counsel of record in this case as to Nicholas Young (1). Subject to a conflict review, James W. Hundley be and is provisionally appointed to represent the deft; this case be and is scheduled for a status conference on Friday, 07/07/17 at 9:00 a.m. Signed by District Judge Leonie M. Brinkema on 07/05/17. (c/s to James Hundley and USMS per LMB chambers) (pmil, ) (Entered: 07/05/2017) |
| 07/05/2017 | | Set Hearing as to Nicholas Young: Status Conference set for 7/7/2017 at 09:00 AM in Alexandria Courtroom 600 before District Judge Leonie M. Brinkema. (pmil, ) (Entered: 07/05/2017) |
| 07/07/2017 | 108 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Status Conference as to Nicholas Young held on 7/7/2017. U.S. appeared through Gordon Kromberg & John Gibbs. Deft appeared with counsel James Hundley. Attorney Hundley advises the Court that he has no conflicts & accepts the appointment. Deft housing status is also discussed. Court orders another status hearing set to give new counsel time to review case. Status Conference set for 8/11/2017 at 09:00 AM in Alexandria Courtroom 600 before District Judge Leonie M. Brinkema. If possible, Court would like to set trial date at next status hearing. Deft remanded.(Court Reporter A. Thomson.)(yguy) (Entered: 07/07/2017) |
| 07/11/2017 | 109 | UNDER SEAL Transcript of Proceedings before District Judge Leonie M. Brinkema 5/25/2017. (rban, ) (Entered: 07/11/2017) |
| 07/14/2017 | 110 | Sealed Order as to Nicholas Young. Signed by District Judge Leonie M. Brinkema on 07/14/17. (c/s per LMB chambers) (pmil, ) (Entered: 07/14/2017) |
| 08/10/2017 | 111 | Memorandum by Nicholas Young *of Understanding* (Hundley, James) (Entered: 08/10/2017) |
| 08/11/2017 | 112 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Status Conference as to Nicholas Young held on 8/11/2017. U.S. appeared through Gordon Kromberg. Deft appeared with counsel James Hundley. Court is advised of case status. Counsel to give trial estimate & if motion hearing is needed at next status hearing. Status Conference set for 8/25/2017 at 09:00 AM in Alexandria Courtroom 600 before District Judge Leonie M. Brinkema. Deft remanded.(Court Reporter A. Thomson.) (yguy) (Entered: 08/11/2017) |
| 08/25/2017 | 113 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Status Conference as to Nicholas Young held on 8/25/2017. U.S. appeared through Gordon |

| | | |
|---|---|---|
| | | Kromberg. Deft appeared with counsel James Hundley. Court is advised of case status. Trial estimate is 1-2 weeks. Counsel has 30 days to file motions and 2 weeks to respond. Motion Hearing set for 10/27/2017 at 09:00 AM in Alexandria Courtroom 600 before District Judge Leonie M. Brinkema. Jury Trial set for 12/5/2017 at 10:00 AM in Alexandria Courtroom 600 before District Judge Leonie M. Brinkema. Deft remanded. (Court Reporter A. Thomson.)(yguy) (Entered: 08/25/2017) |
| 09/05/2017 | | Reset Deadlines re Motion or Report and Recommendation in case as to Nicholas Young Motion Hearing set for 10/27/2017 at 09:00 AM in Alexandria Courtroom **700** before District Judge Leonie M. Brinkema. (clar, ) (Entered: 09/05/2017) |
| 09/06/2017 | 114 | NOTICE OF ATTORNEY APPEARANCE: Nicholas D. Smith appearing for Nicholas Young *as Retained Local Counsel* (Smith, Nicholas) (Entered: 09/06/2017) |
| 09/06/2017 | 115 | Motion to appear Pro Hac Vice by Linda Moreno and Certification of Local Counsel Nicholas David Smith (Filing fee $ 75 receipt number 0422-5697866.) by Nicholas Young. (Smith, Nicholas) (Entered: 09/06/2017) |
| 09/06/2017 | 116 | ORDER granting 115 Motion for Pro hac vice as to Nicholas Young (1). Signed by District Judge Leonie M. Brinkema on 09/06/17. (pmil, ) (Entered: 09/06/2017) |
| 09/24/2017 | 117 | First MOTION in Limine by Nicholas Young. (Attachments: # 1 Memorandum in Support, # 2 Declaration in Support, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Proposed Order) (Smith, Nicholas) (Entered: 09/24/2017) |
| 09/25/2017 | 118 | NOTICE *of Filing with Classified Information Security Officer of Motion For Protective Order and to Delete Certain Classified Information from Discovery* by USA as to Nicholas Young (Kromberg, Gordon) (Entered: 09/25/2017) |
| 09/25/2017 | 119 | Memorandum by Nicholas Young re 59 Protective Order *Linda Moreno's Memorandum of Understanding* (Smith, Nicholas) (Entered: 09/25/2017) |
| 09/25/2017 | 120 | NOTICE *of Unopposed and Unclassified CIPA Status Update for the Court* by Nicholas Young (Smith, Nicholas) (Entered: 09/25/2017) |
| 09/25/2017 | 121 | MOTION to Withdraw as Attorney *for Nicholas Young* by James W. Hundley. by Nicholas Young. (Attachments: # 1 Proposed Order)(Hundley, James) (Entered: 09/25/2017) |
| 09/25/2017 | 122 | PRETRIAL MEMORANDUM *Regarding Motion for Juror Questionnaire* by Nicholas Young (Attachments: # 1 Exhibit A)(Smith, Nicholas) (Entered: 09/25/2017) |
| 09/26/2017 | 123 | ORDER granting 121 Motion to Withdraw as Attorney. James W. Hundley withdrawn from case as to Nicholas Young (1). Signed by District Judge Leonie M. Brinkema on 09/26/17. (c/s: CISO Maura Peterson) (pmil, ) (Entered: 09/26/2017) |
| 09/26/2017 | 124 | ORDER that deft's Motion for Juror Questionnaire and Attorney-Conducted Voir Dire 122 be and is DENIED. Signed by District Judge Leonie M. Brinkema on 09/26/17. (c/s: CISO per LMB chambers) (pmil, ) (Entered: 09/26/2017) |
| 09/26/2017 | 125 | Under Seal Order as to Nicholas Young. Signed by District Judge Leonie M. Brinkema on 9/26/17. (yguy) (Entered: 09/26/2017) |

| | | |
|---|---|---|
| 09/26/2017 | 126 | ORDER: Now before the Court is the government's Motion for Protective Order and to Delete Certain Classified Information from Discovery. For the reasons stated in the government's motion and in light of the information contained in the classified declaration submitted therewith, and finding good cause shown, it is hereby ORDERED (see order for details) Signed by District Judge Leonie M. Brinkema on 9/26/17. (yguy) (Entered: 09/26/2017) |
| 10/10/2017 | 127 | RESPONSE in Opposition by USA as to Nicholas Young re 117 First MOTION in Limine (Attachments: # 1 Exhibit Report of Dr. Daveed Gartenstein-Ross, # 2 Exhibit Exhibits Related to Nazis, # 3 Exhibit Exhibits Related to White Supremacy, # 4 Exhibit Exhibits Related to Haj Amin Al-Hussaini, # 5 Exhibit Selected Websites Bookmarked by Young, # 6 Exhibit Exhibits related to Emerson Begolly, # 7 Exhibit Photos from January and February 2006, # 8 Exhibit Exhibits Related to Hitler and his Birthday, # 9 Exhibit Exhibits Related to Jew-Hatred, # 10 Exhibit Exhibits Relating to Stormtrooper Klaus Dusselkamp, # 11 Exhibit International money transfers, # 12 Exhibit Photo of Young's iPod, # 13 Exhibit Screenshots of Messages regarding Young's Desire to Buy a Slave)(Kromberg, Gordon) (Entered: 10/10/2017) |
| 10/11/2017 | 128 | Reply by Nicholas Young re 117 First MOTION in Limine (Smith, Nicholas) (Entered: 10/11/2017) |
| 10/27/2017 | 129 | Subpoenas issued (krob, ) (Entered: 10/27/2017) |
| 10/27/2017 | 130 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Motion Hearing as to Nicholas Young held on 10/27/2017. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon. Deft appeared with counsels Nicholas Smith & Linda Moreno. Deft's 117 First MOTION in Limine is argued in open court and GRANTED IN PART AND DENIED IN PART. (order to follow) (Court Reporter A. Thomson.)(yguy) (Entered: 10/27/2017) |
| 10/27/2017 | 131 | ORDER as to Nicholas Young (1): For the reasons stated in open court, it is hereby ORDERED that defendant's Omnibus Motion In Limine [Dkt. No. 117] be and is GRANTED IN PART and DENIED IN PART. Signed by District Judge Leonie M. Brinkema on 10/27/17. (yguy) (Entered: 10/27/2017) |
| 10/31/2017 | 132 | Redacted version of 84 Reply, filed by Nicholas Young, 88 Reply filed by Nicholas Young (Smith, Nicholas) (Entered: 10/31/2017) |
| 11/05/2017 | 133 | TRANSCRIPT of Proceedings held on 10/27/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 12/5/2017. Redacted Transcript Deadline set for 1/5/2018. Release of Transcript Restriction set for 2/5/2018.**(thomson, anneliese) (Entered: 11/05/2017) |

| 11/14/2017 | 134 | ORDER that by Friday, 11/17/17 the parties advise the Court of any CIPA issues which must be resolved pretrial or any evidentiary issues not previously addressed as to Nicholas Young. Signed by District Judge Leonie M. Brinkema on 11/14/17. (c/s to CISO per LMB chambers) (pmil, ) (Entered: 11/14/2017) |
|---|---|---|
| 11/17/2017 | 135 | NOTICE *of Expert Testimony* by USA as to Nicholas Young (Attachments: # 1 Exhibit CV of Paul Lee, # 2 Exhibit CV of Alan Vanderplog, # 3 Exhibit CV of Conroy Jett, # 4 Exhibit Expert Report of Daveed Gartenstein-Ross)(Kromberg, Gordon) (Entered: 11/17/2017) |
| 11/17/2017 | 136 | NOTICE *in Response to November 14, 2017 Order* by Nicholas Young re 134 Order, (Smith, Nicholas) (Entered: 11/17/2017) |
| 11/17/2017 | 137 | MOTION in Limine *Concerning Evidence Produced on November 7, 2017* by Nicholas Young. (Attachments: # 1 Memorandum in Support, # 2 Declaration in Support, # 3 Exhibit 1, # 4 Exhibit 2)(Smith, Nicholas) (Entered: 11/17/2017) |
| 11/17/2017 | 138 | MOTION to Amend/Correct *Indictment* by USA as to Nicholas Young. (Kromberg, Gordon) (Entered: 11/17/2017) |
| 11/19/2017 | 139 | RESPONSE in Opposition by Nicholas Young re 138 MOTION to Amend/Correct *Indictment* (Smith, Nicholas) (Entered: 11/19/2017) |
| 11/20/2017 | 140 | ORDER that the parties appear before the Court at 9 a.m. on Friday, 12/01/17 for a hearing on 137 MOTION in Limine *Concerning Evidence Produced on November 7, 2017* filed by Nicholas Young and 138 MOTION to Amend/Correct *Indictment* filed by USA. Signed by District Judge Leonie M. Brinkema on 11/20/17. (pmil, ) (Entered: 11/20/2017) |
| 11/20/2017 | | Set Deadlines as to Motions in case as to Nicholas Young re: 137 MOTION in Limine *Concerning Evidence Produced on November 7, 2017* and 138 MOTION to Amend/Correct *Indictment*. Motion Hearing set for 12/1/2017 at 10:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (pmil, ) (Entered: 11/20/2017) |
| 11/20/2017 | | Reset Deadlines re Motion or Report and Recommendation in case as to Nicholas Young 138 MOTION to Amend/Correct *Indictment*, 137 MOTION in Limine *Concerning Evidence Produced on November 7, 2017*. Motion Hearing set for 12/1/2017 at **09:00 AM** in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (clar, ) (Entered: 11/20/2017) |
| 11/20/2017 | 141 | NOTICE OF ATTORNEY APPEARANCE Evan N. Turgeon appearing for USA. (Turgeon, Evan) (Entered: 11/20/2017) |
| 11/25/2017 | 142 | MOTION in Limine *to Exclude Two Expert Witnesses from Trial* by Nicholas Young. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1)(Smith, Nicholas) (Entered: 11/25/2017) |
| 11/27/2017 | 143 | Consent MOTION for the use of courtroom technology by USA as to Nicholas Young. (Kromberg, Gordon) (Entered: 11/27/2017) |

| | | |
|---|---|---|
| 11/28/2017 | 144 | MOTION for Electronic Device Application *for Linda Moreno & Nicholas Smith* by Nicholas Young. (Smith, Nicholas) (Entered: 11/28/2017) |
| 11/28/2017 | 145 | Proposed Jury Instructions by USA as to Nicholas Young (Turgeon, Evan) (Entered: 11/28/2017) |
| 11/28/2017 | 146 | EXHIBIT LIST by USA as to Nicholas Young (Kromberg, Gordon) (Entered: 11/28/2017) |
| 11/28/2017 | 147 | Proposed Jury Instructions by Nicholas Young (Smith, Nicholas) (Entered: 11/28/2017) |
| 11/28/2017 | 152 | TRIAL EXHIBIT CUSTODY FORM filed by USA (pmil, ) (Entered: 11/29/2017) |
| 11/29/2017 | 148 | Proposed Voir Dire by Nicholas Young (Smith, Nicholas) (Entered: 11/29/2017) |
| 11/29/2017 | 149 | ORDER denying 144 Motion for Electronic Device Application as to Nicholas Young (1). Defense counsel confer as to which attorney will be responsible for bringing in the one MacBook Pro device and submit a new Request for Authorization (see Order for details). Signed by District Judge Leonie M. Brinkema on 11/29/17. (pmil, ) (Entered: 11/29/2017) |
| 11/29/2017 | 150 | RESPONSE in Opposition by USA as to Nicholas Young re 142 MOTION in Limine *to Exclude Two Expert Witnesses from Trial* (Attachments: # 1 Exhibit Pages 1-10 of Dr. Gartenstein-Ross's Report, # 2 Exhibit Memorandum Opinion, Foley v. Syrian Arab Republic, # 3 Exhibit Al-Timimi's Motion to Bar Expert Testimony, # 4 Exhibit Transcript, US v. Al-Timimi, March 18, 2005, # 5 Exhibit Order, US v. Hausa, February 10, 2017, # 6 Exhibit US v. Damra, Order, June 9, 2004, # 7 Exhibit Discovery Letter #24, November 17, 2017)(Kromberg, Gordon) (Entered: 11/29/2017) |
| 11/29/2017 | 151 | MOTION for Electronic Device Application by USA as to Nicholas Young. (Kromberg, Gordon) (Entered: 11/29/2017) |
| 11/29/2017 | 153 | ORDER granting in part and denying in part 151 Motion for Electronic Device Application as to Nicholas Young (1). Signed by District Judge Leonie M. Brinkema on 11/29/2017. (jlan) (Entered: 11/29/2017) |
| 11/30/2017 | 154 | MOTION for Electronic Device Application by USA as to Nicholas Young. (Kromberg, Gordon) (Entered: 11/30/2017) |
| 11/30/2017 | 155 | ORDER denying 143 and 151 Motions/Requests for use of courtroom technology as to Nicholas Young (1). Defense Counsel immediately arrange with Court Technology Administrator Lance Bachman, to make sure that the one device for which they need to resubmit a Request for Authorization to bring into the courtroom will work with the system. Courtroom 700 will not be available for any test runs on Monday, 12/04/17; therefore, if counsel are not familiar with how the courtroom technology operates, they must promptly arrange an orientation with Mr. Bachman. Due to the recent pretrial publicity surrounding this case an expanded jury pool has been ordered and voir dire will be conducted in courtroom 900. Once the jury is selected the remainder of the trial will be conducted in courtroom 700. Signed by District Judge Leonie M. Brinkema on 11/30/17. (pmil, ) (Entered: 11/30/2017) |

| | | |
|---|---|---|
| 11/30/2017 | 156 | ORDER granting 154 Motion for Electronic Device Application as to Nicholas Young (1). Signed by District Judge Leonie M. Brinkema on 11/30/17. (pmil, ) (Entered: 11/30/2017) |
| 11/30/2017 | 157 | Reply by Nicholas Young re 142 MOTION in Limine *to Exclude Two Expert Witnesses from Trial* (Smith, Nicholas) (Entered: 11/30/2017) |
| 11/30/2017 | 158 | MOTION to Strike *each Witness as to Whom the Government Has Failed to Comply with the Jencks Deadline* by Nicholas Young. (Smith, Nicholas) (Entered: 11/30/2017) |
| 12/01/2017 | 159 | MOTION for Electronic Device Application by Nicholas Young. (pmil, ) (Entered: 12/01/2017) |
| 12/01/2017 | 160 | ORDER granting 159 Motion for Electronic Device Application as to Nicholas Young (1) (IT Clearance not waived). Signed by District Judge Leonie M. Brinkema on 12/01/17. (pmil, ) (Entered: 12/01/2017) |
| 12/01/2017 | 161 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Motion Hearing as to Nicholas Young held on 12/1/2017. U.S. appeared through Gordon Kromberg, John Gobbs & Evan Turgeon. Deft appeared with counsels Nicholas Smith & Linda Moreno. Govt's 138 MOTION to Amend/Correct *Indictment is argued and DENIED. Court orders count 3 of the indictment dismissed. Deft's 142 MOTION in Limine to Exclude Two Expert Witnesses from Trial is argued and GRANTED IN PART AND DENIED IN PART. (order to follow) (Court Reporter A. Thomson.)(yguy) (Entered: 12/01/2017)* |
| 12/01/2017 | 162 | ORDER as to Nicholas Young (1): For the reasons stated in open court, the United States of America's Motion to Amend/Correct Indictment [Dkt. No. 138] is DENIED and defendant's Motion in Limine to Exclude Two Expert Witness from Trial [Dkt. No. 142] is GRANTED IN PART AND DENIED IN PART, and it is hereby ORDERED that Count 3 of the Indictment [Dkt. No. 38] be and is DISMISSED. Signed by District Judge Leonie M. Brinkema on 12/01/17. (yguy) (Entered: 12/01/2017) |
| 12/01/2017 | | Set/Reset Hearings as to Nicholas Young: CIPA Hearing set for 12/1/2017 at 02:30 PM before District Judge Leonie M. Brinkema. (yguy) (Entered: 12/01/2017) |
| 12/01/2017 | 167 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:CIPA Hearing held on 12/1/2017. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon. Deft appeared through counsel Linda Moreno. (Court Reporter A. Thomson.)(yguy) (Entered: 12/04/2017) |
| 12/01/2017 | 197 | DISMISSAL OF COUNT 3 as to Nicholas Young. (yguy) (Entered: 12/18/2017) |
| 12/02/2017 | 163 | Second MOTION to Strike *Witnesses for Continued Failure to Produce Complete Jencks Materials* by Nicholas Young. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Smith, Nicholas) (Entered: 12/02/2017) |
| 12/03/2017 | 164 | NOTICE *Errata* by Nicholas Young re 163 Second MOTION to Strike *Witnesses for Continued Failure to Produce Complete Jencks Materials* (Smith, Nicholas) (Entered: 12/03/2017) |

| 12/03/2017 | 165 | MOTION to Seal *Second Motion to Strike Witnesses and Two Exhibits Attached Thereto (ECF 163, 163-1, 163-2)* by Nicholas Young. (Attachments: # 1 Proposed Order)(Smith, Nicholas) (Entered: 12/03/2017) |
| 12/03/2017 | 166 | NOTICE *Regarding Proposed Voir Dire Questions* by USA as to Nicholas Young (Kromberg, Gordon) (Entered: 12/03/2017) |
| 12/04/2017 | 168 | ORDER as to Nicholas Young: To avoid delaying voir dire, it is hereby ORDERED that the government provide unredacted copies of all the materials at issue in defendant's Second Motion to Strike Witnesses [Dkt. No. 163] to the Court for an ex parte in camera review by noon today. Signed by District Judge Leonie M. Brinkema on 12/4/17. (yguy) (Entered: 12/04/2017) |
| 12/04/2017 | 169 | Letter to Court as to Nicholas Young (yguy) (Entered: 12/04/2017) |
| 12/04/2017 | 170 | ORDER as to Nicholas Young (1):On December 2,2017, Defendant Nicholas Young filed a Second Motion to Strike Witnesses for Continued Failure to Produce Jencks Materials (the "Motion"). (ECF No. 163.)Two exhibits were attached thereto. (ECF Nos. 163-1; 163-2.) On December 3,2017,Defendant Young filed a motion to seal the Motion, and its two exhibits. (ECF No. 165.) The government has no objection. Accordingly, it is ORDERED that docket numbers 163,163-1, and 163-2 be placed under seal. Signed by District Judge Leonie M. Brinkema on 12/4/17. (yguy) (Entered: 12/04/2017) |
| 12/04/2017 | 171 | (Ex Parte) NOTICE *of Filing* by USA as to Nicholas Young re 168 Order, (Turgeon, Evan) Modified on 12/4/2017 to edit security and add text (pmil, ). (Entered: 12/04/2017) |
| 12/04/2017 | 172 | STIPULATION by USA and Nicholas Young (Attachments: # 1 Exhibit Stipulations 1-37)(Turgeon, Evan) (Entered: 12/04/2017) |
| 12/04/2017 | 173 | ORDER that the parties appear in Courtroom 600 at 10:00 a.m. tomorrow for a status hearing. Signed by District Judge Leonie M. Brinkema on 12/04/17. (pmil, ) (Entered: 12/04/2017) |
| 12/04/2017 | | Set Hearing as to Nicholas Young: Status Conference set for 12/5/2017 at 10:00 AM in Alexandria Courtroom 600 before District Judge Leonie M. Brinkema. (pmil, ) (Entered: 12/04/2017) |
| 12/04/2017 | | CORRECTION: PLEASE NOTE - Status Conference scheduled for 12/05/17 with Judge Brinkema to be held in **Courtroom 700** at 10:00 a.m. (pmil, ) (Entered: 12/04/2017) |
| 12/05/2017 | 175 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Status Conference as to Nicholas Young held on 12/5/2017. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon. Deft appeared with counsels Nicholas Smith and Linda Moreno. Case status discussed. Deft pretrial issues raised and argued. **Status Conference(Charging Conference) before Trial set for 12/8/2017 at 01:00 PM before District Judge Leonie M. Brinkema. Jury Trial reset for 12/11/2017 at 02:00 PM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema.** (Court Reporter A. Thomson.)(yguy) Modified on 12/5/2017 (yguy, ). |

| | | (Entered: 12/05/2017) |
|---|---|---|
| 12/05/2017 | 176 | ORDER as to Nicholas Young (1): For the reasons stated in open court, defendant's Motion to Strike Each Witness as to Whom the Government Has Failed to Comply with the Jencks Deadline [Dkt. No. 158] and Second Motion to Strike Witnesses for Continued Failure to Produce Complete Jencks Materials[Dkt. No. 163] are DENIED; and it is hereby ORDERED that the parties appear in Courtroom 700 at 1:00 p.m. on Friday, December 8 for a status hearing; and it is further ORDERED that the jury trial in this case be and is set to begin at 2:00 p.m. on Monday, December 11 in Courtroom 700. Signed by District Judge Leonie M. Brinkema on 12/5/17. (yguy) (Entered: 12/05/2017) |
| 12/05/2017 | 177 | (Ex Parte) NOTICE *of Filing* by USA as to Nicholas Young (Turgeon, Evan) Modified on 12/6/2017 to edit security and add text (pmil, ). (Entered: 12/05/2017) |
| 12/05/2017 | 178 | TRANSCRIPT of Proceedings held on 12/5/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 1/4/2018. Redacted Transcript Deadline set for 2/5/2018. Release of Transcript Restriction set for 3/5/2018.(thomson, anneliese) (Entered: 12/05/2017)** |
| 12/06/2017 | 179 | ORDER that deft's oral objection to the redactions be and is OVERRULED. Signed by District Judge Leonie M. Brinkema on 12/06/17. (pmil, ) (Entered: 12/06/2017) |
| 12/06/2017 | 180 | Proposed Jury Instructions by Nicholas Young (Attachments: # 1 Exhibit A)(Smith, Nicholas) (Entered: 12/06/2017) |
| 12/07/2017 | 181 | *First Amended* EXHIBIT LIST by USA as to Nicholas Young (Kromberg, Gordon) (Entered: 12/07/2017) |
| 12/08/2017 | 182 | TRANSCRIPT of CIPA Proceedings held on 12/1/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 1/8/2018. Redacted Transcript Deadline set for 2/7/2018. Release of Transcript Restriction set for 3/8/2018.(thomson, anneliese) (Entered: 12/08/2017)** |

| | | |
|---|---|---|
| 12/08/2017 | 183 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Status Conference as to Nicholas Young held on 12/8/2017. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon. Deft appeared with counsels Nicholas Smith & Linda Moreno. Objections to jury instructions and how jury selection will be done is discussed. Deft remanded. (Court Reporter A. Thomson.)(yguy) (Entered: 12/08/2017) |
| 12/08/2017 | 184 | Subpoenas issued (pmil, ) (Entered: 12/08/2017) |
| 12/08/2017 | 185 | Washington Post Article (yguy) (Entered: 12/08/2017) |
| 12/10/2017 | 186 | NOTICE *of Motion for Judicial Notice* by USA as to Nicholas Young (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5)(Turgeon, Evan) (Entered: 12/10/2017) |
| 12/11/2017 | | Notice of Correction re: 186 Notice (Other). The filing user has been notified to re-file the document using the correct Motion event. (pmil, ) (Entered: 12/11/2017) |
| 12/11/2017 | 187 | MOTION *for Judicial Notice* by USA as to Nicholas Young. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5)(Turgeon, Evan) (Entered: 12/11/2017) |
| 12/11/2017 | 188 | ORDER that the government's 187 Motion for Judicial Notice be and is GRANTED IN PART AND DENIED IN PART as to Nicholas Young (1) (see Order for details). Signed by District Judge Leonie M. Brinkema on 12/11/17. (pmil, ) (Entered: 12/11/2017) |
| 12/11/2017 | 189 | *Second Amended* EXHIBIT LIST by USA as to Nicholas Young (Kromberg, Gordon) (Entered: 12/11/2017) |
| 12/11/2017 | 190 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Voir Dire/Jury Trial (day 1) held on 12/11/2017 as to Nicholas Young. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon & case agent Nicholas Caslen. Deft appeared with counsels Nicholas Smith & Linda Moreno. Jurors appeared as summoned and were examined on voir dire. 14 jurors were selected and affirmed to try the issues. (Jury List provided to Jury Clerk). Rule on witnesses. Opening statements. Jury excused at 5:45pm to return 12/12/17 at 9:00am. Jury Trial(day 2) set for 12/12/2017 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. Deft remanded.(Court Reporter N. Linnell.)(yguy) (Entered: 12/12/2017) |
| 12/12/2017 | 191 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Jury Trial(day 2) as to Nicholas Young held on 12/12/2017. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon & case agent Nicholas Caslen. Deft appeared with counsels Nicholas Smith & Linda Moreno. Jurors appeared as previous. Govt and deft used laptop and courtroom evidence presentation system. Govt continued to adduce evidence. Jury excused to return 12/13/17 at 9:00am. Jury Trial(day 3) set for 12/13/2017 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. Court adjourned. Deft remanded.(Court Reporter A. Thomson.)(yguy) (Entered: 12/13/2017) |

| 12/13/2017 | 192 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Jury Trial(day 3) as to Nicholas Young held on 12/13/2017. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon & case agent Nicholas Caslen. Deft appeared with counsels Nicholas Smith & Linda Moreno. Jurors appeared as previous. Govt and deft used laptop and courtroom evidence presentation system. Govt continued to adduce evidence. Jury excused to return 12/14/17 at 9:00am. Jury Trial (day 4)set for 12/14/2017 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. Court adjourned. Deft remanded.(Court Reporter A. Thomson.)(yguy) (Entered: 12/14/2017) |
|---|---|---|
| 12/14/2017 | 193 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Jury Trial (day 4) as to Nicholas Young held on 12/14/2017. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon & case agent Nicholas Caslen. Deft appeared with counsels Nicholas Smith & Linda Moreno. Jurors appeared as previous. Govt and deft used laptop and courtroom evidence presentation system. Govt continued to adduce evidence. Jury excused to return 12/15/17 at 9:30am. Jury Trial(day 5) set for 12/15/2017 at 09:30 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. Court adjourned. Deft remanded.(Court Reporter A. Thomson.)(yguy) (Entered: 12/15/2017) |
| 12/15/2017 | 194 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Jury Trial (day 5) as to Nicholas Young held on 12/15/2017. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon & case agent Nicholas Caslen. Deft appeared with counsels Nicholas Smith & Linda Moreno. Jurors appeared as previous. Govt and deft used laptop and courtroom evidence presentation system. Govt continued to adduce evidence and rests. Deft rule 29 motion argued at bench conference - denied. Deft rests. Jury excused for lunch. Charging conference. Court finds deft has made a knowing and voluntary waiver to not testify. Jury in court after lunch. Closing arguments. Rebuttal argument. Jury instructed. At bench conference, jurors #70 and #90 selected as alternate jurors and excused. Jury retired to select foreperson. Jury excused at 5:30pm to return 12/18/17 at 9:30am. Jury Trial (day 6-deliberations)set for 12/18/2017 at 09:30 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. Court adjourned. Deft remanded.(Court Reporter A. Thomson.)(yguy) (Entered: 12/18/2017) |
| 12/18/2017 | 195 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Jury Trial(day 6-deliberations) as to Nicholas Young held on 12/18/2017. U.S. appeared through Gordon Kromberg, John Gibbs, Evan Turgeon & case agent Nicholas Caslen. Deft appeared with counsels Nicholas Smith & Linda Moreno. Jurors appeared as previous and began with deliberations. Court in session regarding jury notes 3 & 4. Jury returned at 12:41pm with a verdict. Deft is found Guilty as to all counts (1, 2, & 4). Jury Verdict filed in open court. Jury is not polled. Jurors excused. Matter referred to USPO for PSIR. 14 days to file any post-trial motions. Sentencing set for 2/23/2018 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. Court adjourned. Deft remanded. (Attachments: # 1 Certificate of Review, # 2 Govt Witness List, # 3 Govt Admitted Exhibit List, # 4 Deft Admitted List)(Court Reporter A. Thomson.)(yguy) (Entered: 12/18/2017) |

| 12/18/2017 | 196 | REDACTED JURY VERDICT as to Nicholas Young (1) Guilty on Count 1,2,4. (yguy) (Entered: 12/18/2017) |
| 12/18/2017 | 198 | Jury Instructions as to Nicholas Young (yguy) (Entered: 12/18/2017) |
| 12/18/2017 | 199 | Sealed Jury Notes (yguy) (Entered: 12/18/2017) |
| 12/22/2017 | 200 | TRANSCRIPT excerpt of Proceedings (Vol. A) held on 12/14/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 1/22/2018. Redacted Transcript Deadline set for 2/21/2018. Release of Transcript Restriction set for 3/22/2018.(thomson, anneliese) (Entered: 12/22/2017)** |
| 12/22/2017 | 201 | TRANSCRIPT excerpt of Proceedings (Vol. B) held on 12/15/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 1/22/2018. Redacted Transcript Deadline set for 2/21/2018. Release of Transcript Restriction set for 3/22/2018.(thomson, anneliese) (Entered: 12/22/2017)** |
| 12/29/2017 | 202 | Letter from the Court to Counsel (c/s per LMB chambers) (pmil, ) (Entered: 12/29/2017) |
| 01/02/2018 | 203 | TRANSCRIPT excerpt of Proceedings (Vol. C) held on 12/12/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/1/2018. Redacted Transcript Deadline set for 3/5/2018. Release of Transcript Restriction set for 4/2/2018.(thomson, anneliese) (Entered: 01/02/2018)** |

| 01/02/2018 | 204 | TRANSCRIPT excerpt of Proceedings (Vol. D) held on 12/13/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/1/2018. Redacted Transcript Deadline set for 3/5/2018. Release of Transcript Restriction set for 4/2/2018.(thomson, anneliese) (Entered: 01/02/2018)** |
| --- | --- | --- |
| 01/02/2018 | 205 | MOTION for Acquittal *Pursuant to Rule 29(c)* by Nicholas Young. (Attachments: # 1 Memorandum in Support, # 2 Declaration in Support, # 3 Exhibit 1, # 4 Exhibit 2)(Smith, Nicholas) (Entered: 01/02/2018) |
| 01/02/2018 | 206 | MOTION for New Trial by Nicholas Young. (Attachments: # 1 Memorandum in Support, # 2 Declaration in Support, # 3 Exhibit 1)(Smith, Nicholas) (Entered: 01/02/2018) |
| 01/08/2018 | 207 | TRANSCRIPT excerpt of Proceedings held on 12/15/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/7/2018. Redacted Transcript Deadline set for 3/12/2018. Release of Transcript Restriction set for 4/9/2018.(thomson, anneliese) (Entered: 01/08/2018)** |
| 01/16/2018 | 208 | RESPONSE in Opposition by USA as to Nicholas Young re 205 MOTION for Acquittal *Pursuant to Rule 29(c)* (Kromberg, Gordon) (Entered: 01/16/2018) |
| 01/16/2018 | 209 | RESPONSE in Opposition by USA as to Nicholas Young re 206 MOTION for New Trial (Kromberg, Gordon) (Entered: 01/16/2018) |
| 01/18/2018 | 210 | TRANSCRIPT excerpt of Proceedings held on 12/12/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/20/2018.** |

|  |  | **Redacted Transcript Deadline set for 3/20/2018. Release of Transcript Restriction set for 4/18/2018.(thomson, anneliese) (Entered: 01/18/2018)** |
|---|---|---|
| 01/19/2018 | [211](#) | Reply by Nicholas Young re [205](#) MOTION for Acquittal *Pursuant to Rule 29(c)* (Attachments: # [1](#) Exhibit 1)(Smith, Nicholas) (Entered: 01/19/2018) |
| 01/21/2018 | [212](#) | TRANSCRIPT excerpt of Proceedings held on 12/13/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/20/2018. Redacted Transcript Deadline set for 3/23/2018. Release of Transcript Restriction set for 4/23/2018.(thomson, anneliese) (Entered: 01/21/2018)** |
| 01/23/2018 | [213](#) | Reply by Nicholas Young re [206](#) MOTION for New Trial (Smith, Nicholas) (Entered: 01/23/2018) |
| 01/25/2018 | [214](#) | PRESENTENCE INVESTIGATION REPORT (Disclosed Presentence Investigation Report) (SEALED - government and defense counsel) as to Nicholas Young. Objections to PSI due 02/12/2018. (koch, shanna) (Entered: 01/25/2018) |
| 02/01/2018 | [215](#) | TRANSCRIPT excerpt of Proceedings held on 12/14/2017, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 3/5/2018. Redacted Transcript Deadline set for 4/3/2018. Release of Transcript Restriction set for 5/2/2018.(thomson, anneliese) (Entered: 02/01/2018)** |
| 02/07/2018 | [216](#) | Letter to the Court by Tony Digiovanni re: Nicholas E. Young (c/s USPO per LMB chambers) (pmil, ) (Entered: 02/08/2018) |
| 02/15/2018 | [217](#) | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED - government and defense counsel) as to Nicholas Young. (Attachments: # [1](#) Letter PSR addendum/correction/new information ltr)(palya, mary) (Entered: 02/15/2018) |
| 02/16/2018 | [219](#) | SENTENCING MEMORANDUM by Nicholas Young (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B)(Smith, Nicholas) (Entered: 02/16/2018) |

| | | |
|---|---|---|
| 02/16/2018 | 220 | Position on Sentencing by USA as to Nicholas Young (Kromberg, Gordon) (Entered: 02/16/2018) |
| 02/19/2018 | 221 | Letter from Nicholas Young (Smith, Nicholas) (Entered: 02/19/2018) |
| 02/21/2018 | 222 | RESPONSE by Nicholas Young re 220 Position on Sentencing (Smith, Nicholas) (Entered: 02/21/2018) |
| 02/23/2018 | 223 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Sentencing/Motion Hearing held on 2/23/2018 for Nicholas Young (1). U.S. appeared through G. Kromberg, J. Gibbs, E. Turgeon, N. Caslen. Deft appeared with counsels Nicholas Smith & Linda Moreno. Deft's objections to psir are overruled. Deft's 205 MOTION for Acquittal *Pursuant to Rule 29(c and 206 MOTION for New Trial are argued in open court and DENIED. Deft is committed to the custody of the BOP to serve a term of: 180 months with credit for time served (each count, concurrent); 15 years supervised release (15 yrs count 1, 3 years counts 2 and 4, concurrent); $300.00. Special conditions: 1)deft must remain drug free and submit to mandatory drug testing. deft must satisfactorily participate in and, complete, any inpatient or outpatient drug treatment to which deft is directed by the probation officer. deft shall waive all rights of confidentiality regarding drug treatment to allow the release of information to the United States Probation Office and authorize communication between the probation officer and the treatment provider. deft to pay all costs as able, as directed by the probation officer; 2)deft shall undergo a mental health evaluation and, if recommended, participate in a program approved by the United States Probation Office for mental health treatment, which program may include residential treatment and testing, all as directed by the probation officer. deft shall take all medications as prescribed and waive all rights of confidentiality regarding mental health treatment to allow the release of information to the United States Probation Office and authorize communication between the probation officer and the treatment provider. deft to pay all costs as able, as directed by the probation officer; 3) deft shall be barred from associating or communicating with any known terrorists or terrorist organization, including any individuals involved in the instant offense. All communications, including electronic or telephonic with such individuals or groups, are prohibited; 4) deft shall comply with the requirements of the Computer Monitoring Program as administered by the Probation Office. deft shall consent to the installation of computer monitoring software on any computer to which deft has access. Installation shall be performed by the probation officer. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. deft shall also notify others of the existence of the monitoring software. deft shall not remove, tamper with, reverse engineer, or in any way circumvent the software. The costs of the monitoring shall be paid by the defendant;5) deft shall not possess any destructive weapons, firearms, knives, or body armor. Recommendation to BOP: deft to be designated to a facility as close to this area as possible. Deft was orally advised of his right to appeal his conviction and sentence. Deft remanded. (Attachments: # 1 Deft Exhibit)(Court Reporter A. Thomson.)(yguy) (Entered: 02/23/2018) |

| 02/23/2018 | 224 | JUDGMENT as to Nicholas Young (1), Count(s) 1,2,4 BOP: 180 months with credit for time served (each count, concurrent); 15 years supervised release (15 yrs count 1, 3 years counts 2 and 4, concurrent); $300.00. Count 3, Dismissed by order dated 12/1/17. Signed by District Judge Leonie M. Brinkema on 2/23/18. (yguy) (Entered: 02/23/2018) |
|---|---|---|
| 02/23/2018 | 225 | Sealed Statement of Reasons as to Nicholas Young (yguy) (Entered: 02/23/2018) |
| 02/23/2018 | 226 | ORDER as to Nicholas Young: For the reasons stated in open court, it is hereby ORDERED that defendant's Motion for Acquittal [Dkt. No. 205] and Motion for a New Trial [Dkt. No. 206] be and are DENIED. Signed by District Judge Leonie M. Brinkema on 2/23/18. (yguy) (Entered: 02/23/2018) |
| 02/28/2018 | 227 | TRANSCRIPT (Partial - Opening Statements) of proceedings held on 12-11-2017 before Judge Brinkema. Court reporter Norman Linnell, telephone number 703-549-4626. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** <br><br> **Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 3/30/2018. Redacted Transcript Deadline set for 4/30/2018. Release of Transcript Restriction set for 5/29/2018.(linnell, norman) (Entered: 02/28/2018)** |
| 02/28/2018 | 228 | NOTICE OF APPEAL by Nicholas Young re 224 Judgment, Filing fee $505, receipt number 0422-5968718. (Smith, Nicholas) (Entered: 02/28/2018) |
| 03/01/2018 | 229 | TRANSCRIPT of Proceedings held on 2/23/2018, before Judge Leonie M. Brinkema. Court reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 4/2/2018. Redacted Transcript Deadline set for 5/1/2018. Release of Transcript Restriction set for 5/30/2018.(thomson, anneliese) (Entered: 03/01/2018)** |
| 03/06/2018 | 230 | Transmission of Notice of Appeal to 4CCA as to Nicholas Young to US Court of Appeals re 228 Notice of Appeal - Final Judgment (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (lcre, ) (Main Document 230 replaced on 3/6/2018) (lcre, ). (Entered: 03/06/2018) |

| 03/06/2018 | 231 | USCA Case Number 18-4138 4th Circuit Case Manager C. Bennett for 228 Notice of Appeal - Final Judgment filed by Nicholas Young. (lcre, ) (Entered: 03/06/2018) |
|---|---|---|
| 03/30/2018 | 232 | TRANSCRIPT (Vol 1) of jury trial as to Nicholas Young for the date of 12-11-2017 before Judge L.M. Brinkema, re 228 Notice of Appeal - Final Judgment. Court Reporter Norman Linnell, telephone number 703-549-4626. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter? y* Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 4/30/2018. Redacted Transcript Deadline set for 5/30/2018. Release of Transcript Restriction set for 6/28/2018.(linnell, norman) (Entered: 03/30/2018)** |
| 04/15/2018 | 233 | TRANSCRIPT of proceedings (Vol. II) as to Nicholas Young for date of 12/12/2017 before Judge Leonie M. Brinkema, re 228 Notice of Appeal - Final Judgment Court Reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter? n* Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/15/2018. Redacted Transcript Deadline set for 6/15/2018. Release of Transcript Restriction set for 7/16/2018.(thomson, anneliese) (Entered: 04/15/2018)** |
| 04/15/2018 | 234 | TRANSCRIPT of proceedings (Vol. III) as to Nicholas Young for date of 12/13/2017 before Judge Leonie M. Brinkema, re 228 Notice of Appeal - Final Judgment Court Reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter? n* Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/15/2018. Redacted Transcript Deadline set for 6/15/2018. Release of Transcript Restriction set for 7/16/2018.(thomson, anneliese) (Entered: 04/15/2018)** |

| 05/16/2018 | 235 | TRANSCRIPT (Vol. IV) of proceedings as to Nicholas Young for date of 12/14/2017 before Judge Leonie M. Brinkema, re 228 Notice of Appeal - Final Judgment Court Reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? n* **Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/15/2018. Redacted Transcript Deadline set for 7/16/2018. Release of Transcript Restriction set for 8/14/2018.(thomson, anneliese) (Entered: 05/16/2018)** |
| --- | --- | --- |
| 05/16/2018 | 236 | TRANSCRIPT (Vol. V) of proceedings as to Nicholas Young for date of 12/15/2017 before Judge Leonie M. Brinkema, re 228 Notice of Appeal - Final Judgment Court Reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? n* **Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/15/2018. Redacted Transcript Deadline set for 7/16/2018. Release of Transcript Restriction set for 8/14/2018.(thomson, anneliese) (Entered: 05/16/2018)** |
| 05/16/2018 | 237 | TRANSCRIPT (Vol. VI) of proceedings as to Nicholas Young for date of 12/18/2017 before Judge Leonie M. Brinkema, re 228 Notice of Appeal - Final Judgment Court Reporter Anneliese Thomson, Telephone number 703-299-8595. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/15/2018. Redacted Transcript Deadline set for 7/16/2018. Release of Transcript Restriction set for 8/14/2018.(thomson, anneliese) (Entered: 05/16/2018)** |

**PACER Service Center**

CM/ECF - vaed                                    https://ecf.vaed.uscourts.gov/cgi-bin/DktRpt.pl?111370113507397-L_1_0-1

| Transaction Receipt | | | |
|---|---|---|---|
| 05/21/2018 15:11:44 | | | |
| PACER Login: | tl0027:2646207:0 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:16-cr-00265-LMB |
| Billable Pages: | 23 | Cost: | 2.30 |

Case 1:16-cr-00265-LMB  Document 1  Filed 08/02/16  Page 1 of 1 PageID# 1

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Nicholas Young | ) | Case No.: 1:16mj 355 |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | | |

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  October 2014 through July 28, 2016,  in the county of _____Fairfax_____  in the

____Eastern____  District of  Virginia and elsewhere , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. section 2339B | Attempt to provide Material Support to a designated foreign terrorist organization |

This criminal complaint is based on these facts:

See  Attached Affidavit

☐ Continued on the attached sheet.

Reviewed by AUSA/SAUSA:

Assistant United States Attorney Gordon D. Kromberg

_Complainant's signature_

DAVID MARTINEZ / S.
_Printed name and title_

David Martinez, Special Agent, FBI

Sworn to before me and signed in my presence.

/s/

Theresa Carroll Buchanan
United States Magistrate Judge

Date: ____08/02/2016____

_Judge's signature_

City and state: _____Alexandria, Virginia_____

Theresa Carroll Buchanan, U.S. Magistrate Judge
_Printed name and title_

-31-

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

AUG 2 , 2016

|                          |     |                  |
|--------------------------|-----|------------------|
| UNITED STATES OF AMERICA | )   |                  |
|                          | )   |                  |
| v.                       | )   | No. 1:16mj 355   |
|                          | )   |                  |
| NICHOLAS YOUNG           | )   |                  |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, David Martinez, after being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Washington Field Office, Joint Terrorism Task Force ("JTTF"). I have been an FBI Special Agent since 2010. As part of my duties, I investigate terrorist activities. I have participated in numerous counterterrorism investigations, during the course of which I have conducted physical surveillance, executed court authorized search warrants and arrest warrants, and used other investigative techniques to secure relevant information regarding various crimes.

2. This affidavit is submitted in support of a criminal complaint charging Nicholas Young with attempting to provide material support and resources to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.

3. I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. I have also received information from other law enforcement and government officials related to this investigation. The statements contained in this affidavit are based on my own observations, review of documents, recordings, and reliable information provided to me by other law enforcement officials.

4. This affidavit is being submitted for the limited purpose of obtaining a criminal complaint and arrest warrant. As a result, it does not include each and every fact observed by me or known to the government. This affidavit summarizes the content of certain recorded communications, which were recorded pursuant to the consent of at least one party to the communication. When I assert that a statement was made by an individual, that statement is described in substance and in part, but my assertion is not intended to constitute a verbatim recitation of the entire statement. When I assert that an event occurred or a communication was made on a certain date, I mean that the event occurred or the communication was made "on or about" that date.

I.       The Relevant Statute and ISIL

5. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al Islamiyya fi al-'Iraq wa'sh'Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. Although the group has never called itself "Al-Qaeda in Iraq," this name has frequently been used to describe it through its history. On September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL, and ISIS. To date, ISIL remains a designated FTO.

2

-33-

6. Pursuant to Title 18, United States Code, Section 2339B, it is unlawful for any person to attempt to provide material support or resources to an FTO. ·

7. Based on my training and experience, I know that: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, are traveling to Syria and Iraq to join ISIL and commonly enter Syria by crossing the border from Turkey; (b) foreign fighters from Western countries are traveling to locations in Turkey, including Istanbul, and then traveling to towns closer to the border where they enter into Syria to join ISIL; (c) Abu Baker al-Baghdadi is the current leader of ISIL; and (d) ISIL is also frequently referred to as ISIS (an acronym for the Islamic State of Iraq and al-Sham or the Islamic State of Iraq and Syria).

II.    Young, Chesser, Khalifi, and Libya

8. Nicholas Young is a United States citizen who resides in Fairfax, Virginia, and is employed as a police officer by the Washington Metropolitan Transportation Authority, where he has been so employed since 2003.

9. On September 12, 2010, FBI agents interviewed Young in connection with the arrest of Young's acquaintance, Zachary Chesser. Chesser had been arrested earlier in 2010 for attempting to provide material support to al-Shabaab, another designated FTO. During the interview, Young said that he was shocked by the charges. Young said that it would be Young's religious and personal duty to tell someone if Young became aware of terrorist activity.

10. On January 24, 2011, an undercover law enforcement officer ("UCO") reported on a conversation that UCO had with Young (while UCO was acting in an undercover capacity). Young said that he was wary of surveillance, and frequently took the battery out of his cell phone when he wants to go somewhere to talk. UCO reported that Young told UCO about an occasion

3

when Young aimed an AK-47 style rifle out of the window of his residence while Young was
scanning for what he believed was law enforcement surveillance against him.

11. On February 28, 2011, UCO reported on another conversation with Young. UCO
reported that Young stated that if he (Young) ever was betrayed by someone, that person's life
expectancy would be greatly diminished. That same evening, Young told UCO that, if Young
ever was betrayed, that person's head would be in a cinder block at the bottom of Lake
Braddock. In a discussion about FBI surveillance, Young said "we" should pour gasoline on
their cars and light them.

12. On March 10, 2011, UCO reported on another conversation with Young. UCO
reported that Young said that Young used to torture animals when he was a child. UCO reported
that Young said that Young despised the FBI, and that someone with Young's skills could attack
an FBI establishment. UCO reported that Young said that firearms are not allowed to be brought
into the federal courthouse in Alexandria, but described a method that Young could bring
multiple guns into the courthouse undetected in order to distribute them to others inside.

13. UCO reported that, on March 21, 2011, he met with Young, Amine El Khalifi, and
another individual, and spoke about the fundamentals of marksmanship.

14. UCO reported that, also on March 21, 2011, he shared a restaurant meal with Young
and Amine El Khalifi. UCO reported that Khalifi said that Khalifi's Facebook page had been
taken down because Khalifi posted mujahidin information on it. UCO reported that UCO and
Young told Khalifi to be careful about his on-line posts, and that Chesser recently had been
arrested for his posts on-line.

15. UCO reported that, also on March 21, 2011, Young said that he was angry with the
FBI for contacting Young's family members and co-workers before speaking to him. UCO

4

reported that Young spoke about finding out where the FBI Special Agent who questioned him lived, and then kidnapping and torturing her. UCO reported that UCO doubted that Young seriously intended to act upon those words.

16. That same day, UCO reported that Young said that he was paranoid about cell phones, and he felt that the FBI was investigating him. Young said that he had several "burner phones," which I understand to refer to phones that can be used temporarily and then discarded and that are difficult to trace back to any particular user.

17. UCO reported that, on April 1, 2011, UCO and Young again shared a restaurant meal with Khalifi. UCO reported that Khalifi said that this life is just a test, and that Khalifi was not concerned with any worldly possessions. UCO reported that Khalifi spoke of how shaheeds (meaning martyrs; in this context, those who die while conducting violent jihad) are sent to the highest level of heaven. UCO reported that Khalifi said that Khalifi had a mission from Allah, but did not state what it was. Young said that one of the greatest shaheeds is a convert who eventually fights the kaffirs for the Muslims.

18. UCO reported, also on April 1, 2011, that Young said that he had recently received a moving violation for an illegal u-turn in Falls Church, but that Young did not tell the officer that Young was himself a police officer because Young feared that the traffic cop would check with Young's department and find out that Young had already called in and said that he was on duty when he was not. My FBI colleagues obtained a copy of the traffic citation that actually was issued to Young, and also the records of the Washington Metropolitan Transit Police Department that indicate that Young was scheduled to be on duty at the time that traffic ticket was issued.

19. UCO reported that, on April 4, 2011, UCO and Young again shared a restaurant meal with Khalifi. UCO reported that UCO told Young of UCO's concern for Khalifi that Khalifi

5

was posting mujahidin propaganda on Facebook.  UCO reported that, in response, Young said

that Young would never talk about the things that Young was going to do, and that people would

find out what he was going to do after it happened.  Young said that if law enforcement searched

Young's home, they would have issues because Young was stockpiling weapons.  Apparently

indicating what actions he would take against law enforcement personnel who attempted to

search his house, Young told UCO that is what amphetamines, ballistic vests and assault rifles

were for.

20.  According to an interview with the FBI on September 10, 2011, Young said that he

had traveled to Libya twice in 2011 and had been with rebels attempting to overthrow the

Qaddafi regime.  Baggage searches conducted by Customs and Border Protection on his

outbound travel revealed that Young traveled with body armor, a kevlar helmet, and several

other military-style items. Young was searched upon his return after the May trip, and was found

to have brought the body armor back with him.  Young said that on his second trip, he was

initially turned away at the Libyan border by Egyptian authorities, but that he then took a one-

way flight to Tunisia, and made his way into Libya from there.

21.  UCO reported that, on January 26, 2012, Young said that he was paranoid that the

U.S. government was spying on Young through Young's electronic devices.

22.  In February 2012, Khalifi was arrested and charged with attempting to use a weapon

of mass destruction (an improvised explosive device) in connection with his attempt to detonate

himself in the U.S. Capitol Building in Washington, D.C.  That same day, the other individual

with whom Khalifi and UCO discussed the fundamentals of marksmanship on March 21, 2011,

was arrested for possession of a firearm by a convicted felon.

6

23. In a conversation recorded by UCO on February 26, 2012, Young said that Muslims should actively try to uncover the informants who led to Khalifi's arrest.

II.    Young and CHS

24. In 2014, Young met on about 20 separate occasions an FBI Confidential Human Source ("CHS"). CHS posed as a U.S. military reservist of Middle Eastern descent, who was becoming more religious and eager to leave the U.S. military as a result of having had to fight against Muslims during his deployment to Iraq.

25. As part of a conversation recorded by CHS on August 10, 2014, CHS told Young that CHS wanted to join ISIS. CHS stated that, based on what ISIS was doing right now, it was "becoming an obligation for us to go." When CHS asked, "how long can we stay and wait?" Young answered, "Exactly." Young advised CHS to watch out for informants, and not to discuss his plans with others. To minimize any suspicions on the part of law enforcement or Customs officials in the United States and Turkey that CHS was traveling to join ISIL, Young further advised CHS to sign up with a tour group through a travel agency, and not carry with him more than $10,000.

26. As part of a conversation recorded by CHS on September 11, 2014, Young again warned CHS against trusting people with knowledge of CHS's plans to travel to join ISIL. Young told the CHS that undercover personnel will make contact with a person of interest to law enforcement, assess them, and introduce them to other law enforcement personnel who investigate and ultimately make an arrest. Young described to CHS a specific type of recording device used by law enforcement to record conversations. Young also showed CHS a pro-ISIL video on YouTube.

7

27. As part of that same conversation recorded by CHS on September 11, 2014, CHS asked Young for Young's opinion on CHS's plan to join ISIL. Young told CHS that CHS was good to go, but that CHS should avoid putting any information on-line or communicating by email, because emails leave a trail for law enforcement to follow. Young advised CHS to reserve a hotel and keep a copy of the reservation to show authorities who might become suspicious of CHS's overseas travel.

28. As part of a conversation recorded by CHS on October 2, 2014, Young suggested that CHS contact representatives of ISIL through social media. Young recommended that CHS use a "burner" phone from wireless hotspots. Young suggested that CHS pack sturdy boots, socks, and cold weather gear for his trip to join ISIL. Young also recommended bringing sandals so CHS's feet weren't in boots all the time. Young warned that binoculars might raise suspicion, but getting a quality zoom camera could serve the same purpose. Young said that CHS could spend from a week to two months trying to get across the border from Turkey into Syria.

29. As part of a conversation recorded by CHS on October 9, 2014, Young reminded CHS that CHS did not need to join ISIL now. Young said that "either way you're not at the end of a plank, you have breathing room. It's a lot of responsibility in either case. There is no one with a gun to your head that is counting down."

30. As part of a conversation recorded by CHS on October 10, 2014, Young told CHS to trust no one, and reminded him about Chesser being sentenced for making postings on-line. On that same date, Young warned CHS to plan on getting stopped by authorities during his travels; Young advised CHS to remain calm and to stick to his story that he was traveling as part of a tour group, because the authorities would not know any different even if they acted as if they did.

8

31.  As part of a conversation recorded by CHS on October 17, 2014, Young repeated his advice to CHS that he should plan on being stopped and questioned by authorities, but that CHS simply should stick to his story that he was with a tour group for his vacation.  As part of a conversation recorded by CHS on October 23, 2014, Young role-played with CHS what to say to the border authorities in Turkey, and advised CHS that, if he got questioned, he should ask questions about whether it was safe in Turkey, and say, "I am joining a tour and I make friends easily."

32.  As part of that same conversation on October 23, 2014, Young told CHS that when law enforcement discovers that CHS may have traveled to Syria, law enforcement authorities will look through CHS's phone records to see who CHS was in contact with.  Young said that, in a couple of weeks, he would send CHS a text asking whether CHS was back from CHS's vacation yet; Young told CHS not to respond to that text because the text would be designed to be found by the investigators looking into who CHS was in contact with before CHS's overseas trip.

33.  As part of a conversation recorded by CHS on October 24, 2014, Young and CHS discussed what was planned to be CHS's imminent departure from the United States.  Young reiterated his warning that CHS should avoid creating a trail on Facebook or Twitter that would enable the authorities to prove that he attempted to join ISIL.  Young repeated that CHS was likely to be stopped and questioned by authorities during his travels, but that CHS also would be allowed to proceed so long as CHS stuck to CHS's story. As part of a conversation recorded by CHS on October 25, 2014, Young repeated the warning that CHS would not get in trouble unless CHS talked about or admitted his plans to join ISIL.

9

-40-

34.   As part of that same conversation on October 25, 2014, Young and CHS traveled to a FedEx Office store and set up email accounts for use in communicating only with each other once CHS made it to ISIL.  Young set up an email account with the address that I will refer to as Essakobayashi@xxxx.com, and CHS set up an email account with the address that I will refer to as V4Vendetta@xxxx.com.

35.   CHS then led Young to believe that CHS left the United States for ISIL, and later actually joined ISIL.  In reality, once CHS led Young to believe that CHS had reached ISIL, CHS had no further contact with Young.  All further communications between Young and CHS's email account were actually communications between Young and FBI personnel posing as CHS.  In the remainder of this affidavit, I will refer to the FBI personnel posing as CHS as "UCO2" (for Under Cover Officer 2).

36.   Consistent with the ruse that Young discussed with the CHS on October 23, 2014, Young sent a text message to CHS's cell phone on November 20, 2014, stating "Salam. Hope you had a good vacation.  If you want to grab lunch after jumma hit me up."  On this same date, UCO2 sent a message from the V4Vendetta@xxxx.com address  to Young at the Essakobayashi@xxxx.com address, indicating that CHS had reached ISIL, saying, "Essa, Salaam Alaykum. I made it to dawlah! Mashallah words cannot explain...."

37.   On December 17, 2014, video surveillance captured Young using a computer at a FedEx store in Fairfax, Virginia.  At that same time, UCO2 received through the V4Vendetta@xxxx.com address a message from Young at the Essakobayashi@xxxx.com address, congratulating CHS for making it to ISIL.  Young sent another email from the Essakobayashi@xxxx.com address to the V4Vendetta@xxxx.com account on December 24, 2014, describing for CHS how Young told some of CHS's friends that CHS had made it to ISIL.

10

38.   On January 9, 2015, UCO2 received through the V4Vendetta@xxxx.com account a message from Young's Essakobayashi@xxxx.com account, expressing Young's thanks that CHS was safe. In his message, Young proudly referenced the murders of the staff of the Charlie Hebdo magazine in France that had occurred just days earlier:

> Glad to hear things are going well and that you are safe. If you are unable to write or get injured perhaps you could give this email address to one of your commanders so someone on this side of the world knows your status . . . yeah, I can imagine they are monitoring communications as much as they can to try and cause harm to you all…well, if you are in a comfortable situation down the road and want to set something up to chat just let me know. Safety and security first though of course.:)  May Allah make it easy on you….Not sure if you got the news there yet…A couple brothers…were named in an assault on a french newspaper…Hopefully now people understand there are some lines you don't cross.

39.   Between February and July 2015, Young periodically used the Essakobayashi@xxxx.com account to exchange messages with the V4Vendetta@xxxx.com account that he believed was controlled by CHS. Young asked CHS to notify Young if CHS encountered any of the mujahideen that Young served with in Libya in the "Abo Salem Suhada Brig." Based on my training, experience, and knowledge of various terrorist organizations, I believe Young's reference to "Abo Salem Suhada Brig" was a reference to a militia group in Libya that has possible links to al-Qaeda and that is known as the Abu Salim Martyrs Brigade.

40.   On June 15, 2015, from Young's Essakobayashi@xxxx.com account, Young emailed CHS at the V4Vendetta@xxxx.com account a request that CHS ask CHS's commanders for advice as to how Young could move Young's money out of the United States. Young explained that he needed the advice because "[u]nfortunately I have enough flags on my name that I can't even buy a plane ticket without little alerts ending up in someone's hands, so I imagine banking transactions are automatically monitored and will flag depending on what is

11

-42-

going on." Young emailed CHS again on June 26, 2015, repeating Young's request that CHS ask his commanders about "a more advanced way of sending money."

41.  On March 21 and 22, 2015, Young participated during off-duty hours in a weapons training event provided by another Metro Transit Police Department officer. The officer observed Young bring a large amount of ammunition to the training, and operate Young's own firearms, including an Egyptian AK-47, a Kimber 1911 .45 caliber pistol, and an AK-47 AMD rifle. On June 11, 2015, the training officer stated that Young said that Young also owned a semi-automatic 5.45 variant AK-47 RPK, an 8mm Mauser rifle, and a World War II-era Russian Negant rifle. The officer reported that Young once told the officer that Young wanted to buy a crate of Negant rifles to hand out if things went bad.

42.  On June 1, 2015, Young was interviewed at his residence by law enforcement regarding an allegation of domestic violence. In the course of the interview, Young described dressing up as "Jihadi John" for a 2014 Halloween party that he attended with a friend. Young said that, as part of his costume, Young stuffed an orange jumpsuit with paper to portray a headless hostage, and he carried that around with him throughout the party. Young also said he has dressed up as a Nazi before and collects Nazi memorabilia. Young showed a tattoo of a German eagle on his neck. Young agreed that he knew that ISIS is a terrorist organization.

43.  On December 3, 2015, the FBI interviewed Young, ostensibly in connection with an investigation into the whereabouts of CHS. Young said that CHS had left the United States to go on a vacation tour in Turkey approximately one year ago. Young said that he last saw CHS in October 2014, and had had no contact with CHS since October 2014. Young stated that Young had hung out with CHS only about three to six times. Young said that CHS did not talk about anything specific related to Syria that stuck out in Young's mind. Young said that he knew of no

12

one in the United States or overseas who helped CHS cross the Turkish border into Syria. In

response to a request for an email address at which CHS might be reached, Young said that the

address was something like the name by which Young knew CHS (which was nothing like

"V4Vendetta"), and named an internet service provider that was not the service provider for the

V4Vendetta account through which Young believed that he had actually been in contact with

CHS.

44. On December 5, 2015, the FBI again interviewed Young, at his residence in Fairfax,

Virginia. Young again said that he believed that CHS had left the United States to go on a

vacation tour in Turkey approximately one year earlier, and that Young was unaware of anyone

that CHS could have spoken with for travel guidance or advice. Young said that he had expected

to hear from CHS once CHS returned to the United States from his vacation, but that Young no

longer had any contact information for CHS.

45. On January 14, 2016, UCO2 sent an email to Young through the Essakobayashi

email address that Young had set up with CHS on October 25, 2014. Among other things, the

message said that CHS's mother had been questioned about CHS's whereabouts. On February

17, 2016, Young responded to that message, sending an email from the Essakobayashi account to

the V4Vendetta address. Young wrote that his reply had been delayed because he was being

careful in his communications. Young wrote that Young, too, had been questioned about CHS

by law enforcement in December 2015.

46. That same day, Young also responded to an earlier email that UCO2 had sent from

the V4Vendetta account, dated November 15, 2015. In this reply, Young discussed, among other

things, the Paris attacks that had occurred just days earlier (resulting in approximately 130

13

-44-

people killed and nearly 400 others injured), and how the attackers were misunderstood, and how this gave the West a taste of what Muslims face every day.

III.    Purchase of Gift Cards for Use by ISIL in Obtaining Mobile Messaging Software

47.    On April 18, 2016, UCO2 (posing as CHS) sent an email message from the V4Vendetta account to Young's Essakobayashi account, stating that Young could communicate securely with CHS in the future by using a particular mobile messaging application to contact a specific account CHS set up through that application.   For ease of reference, I will refer to the particular account that UCO2 specified as the account through which to contact CHS as "CHS's MM Account."

48.    On July 14, 2016, UCO2 received a message through CHS's MM Account from an account set up through that same mobile messaging application.   The message expressed a prayer that "the situation is better than the news portrays," and included the sender's statement that he should have access to the mobile messaging account daily.  As noted below, this message was sent by Young.

49.    On July 15, 2016, UCO2 received an email on the V4Vendetta account from Young's Essakobayashi account, ostensibly notifying CHS that "Salam alikom brother, I messaged you on the app…"  Inasmuch as (a) the address for CHS's MM Account had been provided by the FBI to no one other than Young; and (b) the message received by UCO2 on July 14, 2016, was the only message that CHS's MM Account had received (other than messages sent from the account provider or test messages from within the FBI), I know that the email that Young sent on July 15, 2016, was designed to ensure that CHS knew that the message received by CHS's MM Account the previous day was sent by Young.  For ease of reference, I will refer to the specific account used by Young on July 14, 2016, as "Young's First MM Account."

14

50. On July 18, 2016, UCO2 responded to Young through Young's First MM Account. UCO2 wrote that ISIL used mobile messaging accounts to talk to individuals in the West seeking to join ISIL, and purchased the mobile messaging accounts through the use of gift cards (provided by an internet service provider) purchased in the West. UCO2 wrote that ISIL needed help in obtaining more gift cards (that could be used to set up more mobile messaging accounts to communicate with more individuals in the West seeking to join ISIL) because the individuals in the United Kingdom who previously had purchased the cards for ISIL (and then sent the codes on the back of the cards to ISIL) no longer were doing so. UCO2 wrote that ISIL used each mobile messaging account only one time, and that ISIL had only a few codes remaining. UCO2 wrote that, with only a few codes left, ISIL would be unable to set up accounts for all of the individuals in the West who wanted to communicate with ISIL in order to join it. UCO2 wrote,

> If u can only send couple codes this okay we understand I would not be where im today without u and Allah. May Allah swt reward our brothers in west and reward you for ur efforts.

51. On July 21, 2016, UCO2 received through CHS's MM Account another message from Young's First MM Account. In the course of that message, Young wrote "Interesting about the cards. Why were the brothers in UK told to stop? Inshallah more codes will come your way. Many sting operations and setups in this area."

52. On July 28, 2016, UCO2 sent another message to Young's First MM Account, explaining that the individuals in the United Kingdom stopped getting codes so they could save for their travel to ISIL, and later they were brought to ISIL because their computer skills were needed there. UCO2 wrote that "we still trying to get more code cards from few contacts in west

15

-46-

but it difficult to trust anyone in the west anymore.  Any codes u can get will helpful and allow us to help many make hijrah.  Only need a few right now."

53.  On July 28, 2016, CHS's MM Account received a message from a mobile messaging account that was *not* Young's First MM Account.  The message included 22 sixteen-digit codes.  The codes were accompanied by the message, "Respond to verify receipt . . . may not answer depending on when as this device will be destroyed after all are sent to prevent the data being possibly seen on this end in the case of something unfortunate."  The codes were from gift cards through the internet service provider referenced earlier by UCO2 on July 18, 2016, and redeemed by the FBI for $245.  For ease of reference, I will refer to the specific account used by Young on July 28, 2016, as "Young's Second MM Account."

54.  On July 29, 2016, UCO2 sent a message to Young's First MM Account, stating "MashaAllah may Allah reward you for efforts.  This will help the brothers from Sudan seeking to fight in path of Allh in khilafah."

55.  On July 30, 2016, UCO2 received through CHS's MM Account a message from Young's Second MM Account, stating "Glad it came through. Getting rid of device now...fo real. Gonna eat the Sim card. Have a good day."  UCO2 also received through CHS's MM Account a message from Young's First MM Account, stating  "Allah bless you. Stay safe. Waalikom Salam."

### Conclusion

56.  Based on the foregoing, there is probable cause to believe that, between in or about October 2014, and on or about July 28, 2016, in Fairfax County in the Eastern District of Virginia, Nicholas Young knowingly attempted to provide material support and resources to a

16

designated foreign terrorist organization, namely the Islamic State of Iraq and the Levant (ISIL),

in violation of 18 U.S.C. § 2339B.

Wherefore, I request the issuance of an arrest warrant pursuant to the Federal Rules of

Criminal Procedure.

FURTHER THIS AFFIANT SAYETH NOT.

David Martinez
Special Agent, FBI

Subscribed to and sworn before me on this 2nd day of August 2016.

/s/

Theresa Carroll Buchanan
United States Magistrate Judge

THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

17

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

DEC 1 5 2016

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 1:16cr 265 |
| v. | ) |
| | ) Count 1:    18 U.S.C. § 2339B |
| NICHOLAS YOUNG, | )              Attempt to Provide Material Support |
| | )              to a Designated Foreign Terrorist |
| Defendant. | )              Organization |
| | ) |
| | ) Counts 2 - 4:  18 U.S.C. § 1512 |
| | )                Obstruction of Justice |

INDICTMENT

December 2016 Term -- At Alexandria

THE GRAND JURY CHARGES THAT:

COUNT 1

ATTEMPT TO PROVIDE MATERIAL SUPPORT OR RESOURCES
(18 U.S.C. § 2339B)

1. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq

("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization

("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially

Designated Global Terrorist under section 1(b) of Executive Order 13224.

2. On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq

("AQI") as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and

Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of

Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its

primary name.  The Secretary also added the following aliases to the ISIL listing: the Islamic

State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq

wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  On

September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State,

ISIL, and ISIS.  To date, ISIL remains a designated FTO.

3.  Between on or about December 3, 2015, and on or about August 2, 2016, in Fairfax

County in the Eastern District of Virginia and elsewhere, defendant NICHOLAS YOUNG did

knowingly and unlawfully attempt to provide "material support and resources," as that term is

defined in Title 18, United States Code, Section 2339A(b), including personnel, money, property

and services, to a foreign terrorist organization, to wit,  the Islamic State of Iraq and the Levant

(ISIL), which at all relevant times was designated by the Secretary of State as a foreign terrorist

organization, knowing that ISIL had been designated as a foreign terrorist organization, and

knowing that ISIL had engaged in, and was engaging in, terrorist activity and terrorism.

4.  As part of his attempt to provide material support to ISIL, among other things, when

the Federal Bureau of Investigation ("FBI") interviewed YOUNG about the whereabouts of an

individual with whom YOUNG associated and communicated (herein referred to as "M"), and

whom YOUNG believed had traveled from the United States to Syria to join ISIL, YOUNG

attempted to provide misleading information to the FBI in order to protect M's ability to avoid

capture and continue to serve ISIL.  In addition, understanding and believing that ISIL needed

assistance in obtaining gift cards to facilitate the recruitment of others to join ISIL, YOUNG

provided gift cards (and gift card codes) to M understanding and intending that the funds held in

those gift cards would be provided to ISIL and used by ISIL to facilitate the recruitment of others

to join ISIL.

(All in violation of Title 18, United States Code, Section 2339B.)

2

## COUNT 2

### OBSTRUCTION OF JUSTICE

1. Paragraphs 1 and 2 of Count 1 of this Indictment are incorporated by reference.

2. Between on or about December 3, 2015, and December 5, 2015, in Fairfax County, in the Eastern District of Virginia, defendant NICHOLAS YOUNG did knowingly, unlawfully, and corruptly attempt to obstruct and impede an official proceeding.  In specific, NICHOLAS YOUNG knew that the FBI was investigating the circumstances of what YOUNG believed to be the attempt of an individual referred to here as "M" to travel to join ISIL, a designated foreign terrorist organization.  Nevertheless, in an attempt to thwart the investigation and prosecution of M and of NICHOLAS YOUNG, himself, for attempting to provide material support to ISIL, NICHOLAS YOUNG attempted to deceive investigators with respect to the destination and purpose of what YOUNG believed to be M's travel overseas in 2014.

(All in violation of Title 18, United States Code, Section 1512(c)(2).)

## COUNT 3

### OBSTRUCTION OF JUSTICE

1. Paragraphs 1 and 2 of Count 1 of this Indictment are incorporated by reference.

2. Between on or about December 3, 2015, and December 5, 2015, in Fairfax County, in the Eastern District of Virginia, defendant NICHOLAS YOUNG did knowingly and unlawfully attempt to corruptly persuade another person, and engage in misleading conduct toward another person, with intent to hinder, delay, and prevent the communication to a law enforcement officer or judge of the United States of information relating to the possible commission of a federal offense.

3. In specific, NICHOLAS YOUNG believed that particular special agents of the FBI's Joint Terrorism Task Force ("JTTF") were investigating whether an individual referred to here as "M" had joined or conspired to join the designated foreign terrorist organization known as ISIL; to hinder, delay, and prevent those special agents of the JTTF from communicating to a law enforcement officer or judge of the United States information for a search warrant or an arrest warrant involving the possible commission by M of an attempt to provide material support to ISIL, YOUNG falsely told the JTTF special agents that (a) M had left the United States to go on a vacation tour in Turkey approximately one year earlier, when YOUNG instead believed that M had gone to Turkey to go from there to join and fight for ISIL; and (b) YOUNG knew of no one with whom M had spoken to for guidance on making his travel, when YOUNG instead knew that YOUNG himself had given extensive guidance to M on how to travel overseas from the United States to join ISIL.

(All in violation of Title 18, United States Code, Section 1512(b)(3).)

4

## COUNT 4

### OBSTRUCTION OF JUSTICE

1. Paragraphs 1 and 2 of Count 1 of this Indictment are incorporated by reference.

2. On or about November 20, 2014, in Fairfax County in the Eastern District of Virginia and elsewhere, defendant NICHOLAS YOUNG did knowingly, unlawfully, and corruptly attempt to obstruct, influence, and impede an official proceeding of the Grand Jury.  In specific, NICHOLAS YOUNG sent a text message to a cell phone that YOUNG believed to be used by an individual referred to here as "M" in order to make it falsely appear to the FBI that M had left the United States to go on a vacation tour in Turkey when, instead, NICHOLAS YOUNG believed that M had gone to Turkey to go from there to Syria in order to join and fight for the designated foreign terrorist organization known as ISIL.

(All in violation of Title 18, United States Code, Sections 1512(c)(2).)

A TRUE BILL:

*rant to the * *overnment Act,*
*riginal of this * *e has been * d*
*nder seal in the Clerk's Offic...*

FOREPERSON OF THE GRAND JURY

Dana Boente
United States Attorney

By: _____
John T. Gibbs
Gordon D. Kromberg
Assistant United States Attorneys

5

-53-

USCA4 Appeal: 18-4138    Doc: 24-1    Filed: 06/21/2018    Pg: 66 of 447

# EXHIBIT 1

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The real property and premises known as<br>12737 Heron Ridge Drive, in Fairfax, Virginia | ) )<br>) )<br>) )   Case No.   1:16sw 440<br>) )<br>) )<br>) ) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ Eastern _____ District of _____ Virginia _____
*(identify the person or describe the property to be searched and give its location):*

The premises known as 12737 Heron Ridge Dr., in Fairfax, VA, is the 2nd (from the east) of 7 townhouses on the north side
of Heron Ridge Dr., northwest of the intersection of Fairfax County Parkway and Lee Highway. It is a 1-family, 3-level town
house with beige siding & dark-colored shutters next to 3 of the 4 windows on the front side, above a red brick 1-car garage.
Above the white garage door is a light-colored placard attached to the brick, bearing the black numbers "12737". A walkway
leads from the driveway to a dark colored front door by a small porch area with 2 white pillars supporting a small overhang.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment A

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 16, 2016 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____ Theresa Carroll Buchanan _____
                                                                                                          *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
   ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____

                                                                          /s/
Date and time issued:      08/02/2016   3:30 pm          Theresa Carroll Buchanan
                                                        United States Magistrate Judge
                                                                     *Judge's signature*

City and state:      Alexandria, VA                     Theresa Carroll Buchanan, U.S. Magistrate Judge
                                                                     *Printed name and title*

ATTACHMENT  A

ITEMS TO BE SEIZED

1.  All records and documents, however maintained, that concern the international transfer of money or assets, or the procurement of any item that may have been involved in or in support of terrorist or violent acts, including photographs, correspondence, and safe deposit keys.

2.  All records and documents, however maintained, referring or relating to identities or aliases of  Nicholas Young.

3.  All records and documents, however maintained, referring or relating to past travel or planned travel by Nicholas Young, including airline tickets, credit card bills, bank records, checks, itineraries, passports, and visas.

4.  Any and all records, documents, invoices and materials that concern any accounts with any internet service provider;

5.  All records, documents, and paraphernalia, however maintained, relating to ISIL/ISIS (or any of its aliases), other designated terrorist groups, or any individual or group engaged in terrorism or terrorist activity, or communications with or involving such groups and/or individuals.

6.  All contact lists, however maintained (including but not limited to names, addresses, phone numbers, Internet accounts or usernames, photographs or other identifying information) of individuals associated with Nicholas Young and/or foreign terrorist groups.

7.  All records and documents, however maintained, referring or relating to the purchase or use of gift cards, encryption programs, or applications that may be used for clandestine or covert communications.

8.  All records and documents, however maintained, referring or relating to any storage facilities, safety deposit boxes, mailboxes, or other locations where any of the foregoing items may be located.

9.  Any and all firearms, ammunition, body armor, military-style equipment, or explosive materials or their precursors.

10.  Any communications or electronic device capable of storing any of the items to be seized, including but not limited to all cellular phones, smart phones, electronic data processing and storage devices, computers and computer systems, keyboards and other associated peripherals, Central Processing Units, external and/or internal drives, portable drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs, software and manuals, passwords, test keys, encryption codes or similar codes that are necessary to access computer programs, and the stored contents of the items described in this paragraph, which may be searched for only the items listed above.

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

AUG 2  2016

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The real property and premises known as<br>12737 Heron Ridge Drive, in Fairfax, Virginia | )<br>)<br>)   Case No. 1:16sw 440<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
The real property and premises known as 12737 Heron Ridge Drive, in Fairfax, Virginia

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2339B | Attempt to provide material support to a designated foreign terrorist organization |
| 18 U.S.C. § 1512 | Obstruction of Justice |
| 18 U.S.C. § 1001 | False Statements |

The application is based on these facts:
See Attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

David Martinez, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____08/02/2016_____

_____
*Judge's signature*

City and state:  Alexandria, VA

Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

AUG 2  2016

| | | |
|---|---|---|
| IN RE: SEARCH OF THE PREMISES | ) | |
| AT 12737 HERON RIDGE DRIVE, | ) | 1:16sw 440 |
| FAIRFAX, VIRGINIA | ) | |

<u>AFFIDAVIT IN SUPPORT OF SEARCH WARRANT</u>

I, David Martinez, after being duly sworn, depose and state as follows:

1. I was the affiant on the affidavit in support of a criminal complaint and arrest warrant, charging Nicholas Young with attempting to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, Case No. 1:16mj355. I hereby incorporate the contents of that affidavit ("the Criminal Complaint Affidavit") as though fully set forth herein.

2. This affidavit is submitted in support of an application to search the residence of Nicholas Young, at 12737 Heron Ridge Drive, in Fairfax, Virginia. Based on the facts set forth in this affidavit (and incorporating the facts contained in the Criminal Complaint Affidavit), there is probable cause that within that property is evidence, more particularly described in Attachment A, of violations of federal law, including attempting to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B; aiding and abetting another's attempts to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B and 2; making false statements to the FBI, in violation of 18 U.S.C. § 1001; and obstruction of justice, in violation of 18 U.S.C. §§ 1512(c)(2), 1512(b)(1), and 1512(b)(3).

3. This affidavit is being submitted for the limited purpose of obtaining a search warrant. As a result, it does not include each and every fact observed by me or known to the government. When I assert that a statement was made by an individual, that statement is described in substance and in part, but my assertion is not intended to constitute a verbatim recitation of the entire statement. When I assert that an event occurred or a communication was made on a certain date, I mean that the event occurred or the communication was made "on or about" that date.

4. In addition to the information contained in the Criminal Complaint Affidavit, I bring to the Court's attention also the following facts:

A. Young Resides at 12737 Heron Ridge Drive in Fairfax, Virginia

5. On May 9, 2015, the FBI interviewed an individual who was until recently a close friend of Young. This individual, who I will refer to here as CW, consented to the search of CW's electronic devices, which reflected numerous communications with and photographs of Young. CW allowed the investigators to take photographs of CW's communications with Young. CW said that Young resided in a house that Young had inherited from his parents, at 12737 Heron Ridge Drive, in Fairfax, Virginia. CW said that CW had been at Young's residence on many occasions, and that Young maintains several firearms in a gun safe in his residence. CW said that Young once asked CW about the chemical components of gun powder, but that CW refused to answer the question for fear that Young would attempt to make something in CW's residence.

6. As noted in the Criminal Complaint Affidavit, Young was interviewed by law enforcement officials on June 1, 2015, and again on December 5, 2015. Both of those interviews took place at Young's residence, at 12737 Heron Ridge Drive in Fairfax, Virginia.

2

7. According to the records of the Metro Transit Police, as of July 31, 2016, Young resides at 12737 Heron Ridge Drive in Fairfax, Virginia. According to records of BB&T Bank, Nicholas Young deposited a check on February 25, 2016, and provided his address to the bank as 12737 Heron Ridge Dr, Fairfax, Virginia.

8. According to the records of the Virginia Department of Motor Vehicles, as of July 31, 2016, Nicholas Young, of 12737 Heron Ridge Drive, Fairfax, Virginia, was the registered owner of one 2003 black Dodge, bearing Vehicle Identification Number 1D7HG38N23S289168, and Virginia license tags WITNSME. On July 31, 2016, Fairfax County police observed Young's 2013 black Dodge, bearing Virginia license tags WITNSME, parked by his house at 12737 Heron Ridge Drive in Fairfax, Virginia.

B.    Evidence Is Likely to be Found in the Residence

9. Based on my knowledge, training and experience, as well as that of other agents assigned to this investigation from the FBI, I know that individuals generally keep important documents and financial records in their home or office. Inasmuch as Young is employed at various locations for the transit police so that he does not have a permanent office at any particular site, I believe that his residence is the location in which he keeps his important records. These records include records relating to income, assets, and expenditures, and are likely to be relevant to his purchase of gift cards for transmission to CHS and ISIL in July 2016, as well as assets that he sought to send overseas in 2015. Such records are also likely to be relevant to his contacts with terrorist groups in the past, and his past travel or attempts to travel overseas to fight on behalf of terrorist groups.

10. Based on my knowledge, training and experience, as well as that of other agents assigned to this investigation from the FBI, I know that these important records are often

3

maintained in hard copy and/or digital form, such as on computers and other electronic devices. This application seeks permission to search and seize records that might be found in Young's residence, in whatever form they are found. One form in which records might be found is stored on the hard drive or other storage media of a computer or other electronic devices. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

11.  I know that Young uses electronic devices and is sophisticated about computer matters. As described in the Criminal Complaint Affidavit, Young not only showed a pro-ISIL video to CHS on YouTube and later explained to CHS how to set up an email account that would be difficult to trace back to CHS, but also communicated with UCO2 through a text message, through that email account, and later through a mobile messaging application. Young told UCO2 that Young used "burner" phones, and appeared to use one such "burner" phone in order to transmit the codes from the gift cards to UCO2 last month; after all, he used two different accounts of the mobile messaging application in order to communicate with CHS's Mobile Messaging Account. In addition, Young told UCO2 that Young believed that the U.S. government was spying on Young through Young's electronic devices.

12.  Moreover, as described in the Criminal Complaint Affidavit, Young spoke to FBI agents in September 2010; on that occasion, he told the FBI that he maintained a Facebook page. As described in the Criminal Complaint Affidavit, he also spoke to law enforcement authorities on June 1, 2015; on that occasion, he told the interviewing officers that he used an internet dating site. Further, in June 2012, a fellow officer in the Metro Transit Police who was then close

friends with Young told the FBI that Young regularly used the internet and blogged on websites that he visited.

13.   Finally, in May 2015, CW provided the FBI with the addresses of Young's Facebook page and an email account.   CW also said that Young played Battlefield 4 on a Playstation 4 at Young's residence.   Based on my knowledge and experience, Playstation 4s have the ability to send other Playstation 4 users messages similar to emails. Playstation 4s also have the ability to browse the internet and login into email and other communication services to communicate with others online.

14.   Based on the information described above, Young is likely to use and maintain electronic media equipment. Based on my training and experience, he is likely to use and maintain such equipment in his residence.   There is probable cause to believe evidence will be found in such electronic media for at least the following reasons:

a.   Based on my knowledge and training, I know that computer files or remnants of computer files can be recovered months or even years after they have  been downloaded onto a storage medium, deleted, or viewed via the Internet.   Electronic files downloaded to a storage medium can be stored for years at little or no cost.   Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file op a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the storage medium that is not currently being used by an active file - for long periods of time before they are overwritten.   In addition, a

5

computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media- in particular, computers' internal hard drives - contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

15.   In light of these concerns, I request authority to seize the computer hardware, storage media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence. I further seek authority to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.

6

16. Based on the visit of FBI agents to Young's residence in December 2015, I know that the residence at 12737 Heron Ridge Drive, Fairfax, Virginia, is the second (from the east) of seven townhouses on the north side of Heron Ridge Drive, northwest of the intersection of Fairfax County Parkway and Lee Highway. The residence is a single family, three-level town house with beige siding and dark-colored shutters next to three of the four windows on the front side, above a red brick one-car garage. Above the white garage door is a light-colored placard attached to the brick, bearing the black numbers "12737". A walkway leads from the driveway to a dark colored front door by a porch area with two white pillars supporting a small overhang.

Conclusion

17. Based on the foregoing (and incorporating the information in the Criminal Complaint Affidavit), there is probable cause to believe that evidence of violations of federal law, including attempting to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B; aiding and abetting another's attempts to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B and 2; making false statements to the FBI, in violation of 18 U.S.C. § 1001; and obstruction of justice, in violation of 18 U.S.C. §§ 1512(c)(2), 1512(b)(1), and 1512(b)(3), more particularly described on Attachment A, will be found in the residence at 12737 Heron Ridge Drive in Fairfax, Virginia.

7

Wherefore, I request the issuance of a search warrant pursuant to the Federal Rules of Criminal Procedure.

FURTHER THIS AFFIANT SAYETH NOT.

_____
David Martinez
Special Agent, FBI

Subscribed to and sworn before me on this 2nd day of August 2016.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

_____
THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

8

ATTACHMENT  A

ITEMS TO BE SEIZED

1.  All records and documents, however maintained, that concern the international transfer of money or assets, or the procurement of any item that may have been involved in or in support of terrorist or violent acts, including photographs, correspondence, and safe deposit keys.

2.  All records and documents, however maintained, referring or relating to identities or aliases of Nicholas Young.

3.  All records and documents, however maintained, referring or relating to past travel or planned travel by Nicholas Young, including airline tickets, credit card bills, bank records, checks, itineraries, passports, and visas.

4.  Any and all records, documents, invoices and materials that concern any accounts with any internet service provider;

5.  All records, documents, and paraphernalia, however maintained, relating to ISIL/ISIS (or any of its aliases), other designated terrorist groups, or any individual or group engaged in terrorism or terrorist activity, or communications with or involving such groups and/or individuals.

6.  All contact lists, however maintained (including but not limited to names, addresses, phone numbers, Internet accounts or usernames, photographs or other identifying information) of individuals associated with Nicholas Young and/or foreign terrorist groups.

7.  All records and documents, however maintained, referring or relating to the purchase or use of gift cards, encryption programs, or applications that may be used for clandestine or covert communications.

8.  All records and documents, however maintained, referring or relating to any storage facilities, safety deposit boxes, mailboxes, or other locations where any of the foregoing items may be located.

9.  Any and all firearms, ammunition, body armor, military-style equipment, or explosive materials or their precursors.

10.  Any communications or electronic device capable of storing any of the items to be seized, including but not limited to all cellular phones, smart phones, electronic data processing and storage devices, computers and computer systems, keyboards and other associated peripherals, Central Processing Units, external and/or internal drives, portable drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs, software and manuals, passwords, test keys, encryption codes or similar codes that are necessary to access computer programs, and the stored contents of the items described in this paragraph, which may be searched for only the items listed above.

9

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .     Criminal No. 1:16cr265
                              .
     vs.                      .     Alexandria, Virginia
                              .     March 10, 2017
NICHOLAS YOUNG,               .     9:01 a.m.
                              .
           Defendant.         .
                              .
.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          JOHN T. GIBBS, AUSA
                             GORDON D. KROMBERG, AUSA
                             EVAN N. TURGEON, SAUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314

FOR THE DEFENDANT:           DAVID B. SMITH, ESQ.
                             David B. Smith, PLLC
                             108 North Alfred Street
                             Alexandria, VA 22314
                               and
                             NICHOLAS D. SMITH, ESQ.
                             David B. Smith, PLLC
                             7 East 20th Street
                             New York, NY 10003

ALSO PRESENT:                SA NICHOLAS CASLEN

OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595

(Pages 1 - 25)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

```
 1                    P R O C E E D I N G S

 2                      (Defendant present.)

 3            THE CLERK:  Criminal Case 16-265, United States of

 4    America v. Nicholas Young.  Would counsel please note their

 5    appearances for the record.

 6            MR. KROMBERG:  Good morning, Your Honor.  Gordon

 7    Kromberg, John Gibbs, and Evan Turgeon for the United States.

 8    With us in front of the bar is FBI Special Agent Nicholas

 9    Caslen.

10            THE COURT:  Good morning.

11            MR. NICHOLAS SMITH:  Good morning.  Nick Smith on

12    behalf of defendant Nick Young.  My cocounsel, David Smith, is

13    at a hearing in front of Judge Lee.

14            THE COURT:  We're aware of that.  He'll get here as

15    soon as he can.

16            All right, this matter comes before the Court on the

17    defendant's motion to suppress various items which the

18    defendant alleges were unconstitutionally seized from his

19    residence, backpack, pickup truck, and workplace.

20            Mr. Young, I want to hear from you first, and I want

21    to first of all chastise you because in your initial motion,

22    although you attached the search warrants and the search

23    warrant affidavits that were at issue, you did not include

24    among your attachments the criminal complaint affidavit, which

25    was extensively referenced and incorporated in all those search
```

3

1  warrant affidavits.  That's part of the totality of the

2  information that was before the magistrate judge.

3         MR. NICHOLAS SMITH:  Absolutely, Your Honor, and, in

4  fact, we -- the affidavit was incorporated by reference into

5  the warrants, and we extensively discussed that affidavit and

6  the fact --

7         THE COURT:  Yeah, but you didn't include it, and it

8  clearly was a relevant piece of information.  Now, of course,

9  the Court ultimately got it, but we had to go to the docket and

10 pull it.  That should have been included in your materials,

11 because when the magistrate judge is issuing the affidavit --

12 issuing the warrant and he or she is reviewing the affidavit,

13 if the affidavit is incorporating another affidavit, the

14 magistrate judge also looks at that.

15        So the totality of the information in evaluating the

16 adequacy of probable cause is not just what was written in the

17 confines of the affidavit for the search warrant, but it

18 incorporates the affidavit for the complaint as well.  That

19 should have been included with your packet of exhibits.

20        MR. NICHOLAS SMITH:  We apologize for the omission,

21 Your Honor, and we absolutely agree with the Court that that

22 information should have been considered and was considered by

23 the magistrate.  Our position is that taken in the totality of

24 the circumstances, all of the facts in that affidavit and the

25 special affidavits for the warrant applications do not

4

1  constitute probable cause to seize any of the objects under

2  consideration.

3         THE COURT:  And I must tell you any commonsense

4  reading of the complaint in the context of -- especially in

5  context of what's added to in the search warrant affidavits,

6  there's tons of probable cause.

7         Go ahead.

8         MR. NICHOLAS SMITH:  May I proceed with our argument?

9         THE COURT:  Well, no, you're responding to the

10  Court's questions.  Why do you think there is not adequate

11  probable cause to support the searches in this case?

12         MR. NICHOLAS SMITH:  Okay.  I'd like to take a step

13  back and --

14         THE COURT:  No.  No, you answer the Court's question.

15  Why do you think there is inadequate probable cause to support

16  the searches in this case?

17         MR. NICHOLAS SMITH:  We believe there's inadequate

18  probable cause because the standard is whether there is

19  probable cause to establish that the items to be seized in the

20  warrant to satisfy the particularity requirement have to be

21  evidence of crimes or contraband.  If you take a look at the

22  crimes that are alleged in the affidavit in support of the

23  complaint and the affidavits in support of the search warrants,

24  there is only one cognizable, actionable crime, which is the

25  provision of gift cards, alleged provision of gift cards to an

5

 1  informant after a five-year investigation.

 2          Now, there are other --

 3          THE COURT:  Wait.  That statement in and of itself is

 4  not accurate.  That's not the crime.  The crime is providing

 5  material support to a terrorist organization, in this case

 6  ISIS.  Plus, as the government properly points out, there are

 7  also references to obstruction of justice and clearly

 8  statements -- making false statements to federal law

 9  enforcement officers.

10          MR. NICHOLAS SMITH:  Those are the statutes, Your

11  Honor, charged in the criminal complaint and the indictment.

12          THE COURT:  Correct.

13          MR. NICHOLAS SMITH:  And the factual predicate for

14  those statements is what constitutes the crime that's alleged

15  in the indictment.  Now, even if we assume for the sake of

16  argument that it's the statute and not the facts as charged

17  that constitute the crime, there is no link in any of the

18  affidavits under the Court's consideration that the firearms

19  are evidence of that crime.

20          The affidavits state that all firearms and body armor

21  in the defendant's possession, regardless of whether it's

22  legally owned, are in their nature inherently related to a

23  statute.  There's no legal support for that proposition.

24  There's no attempt in the affidavits to link legally owned

25  firearms to the crimes.

6

1           THE COURT:  Well --

2           MR. NICHOLAS SMITH:  That's the particularity

3    requirement.

4           THE COURT:  The problem --

5           MR. NICHOLAS SMITH:  That's what *Millender* holds.

6           THE COURT:  The problem you've got with that argument

7    given the facts of this case -- now, *Millender* is, first of

8    all, it's a Ninth Circuit case.  This is the Fourth Circuit.

9    The law is quite different in many respects in the Fourth

10   Circuit.  But in *Millender,* the court had a very narrow reading

11   of probable cause under the facts of that particular case which

12   involved a specifically described shotgun.

13           That's not what you have here.  You have all kinds of

14   references, and I'll just point a few of them out to you.

15   You've got Young telling the undercover that he aimed an

16   AK-47-style rifle out of a window of his residence once while

17   scanning for law enforcement.  You've got Young sharing with

18   the UCO a method for smuggling firearms into this courthouse.

19   You've got statements to the -- that he made concerning

20   discussing marksmanship fundamentals with Amine El-Khalifi, who

21   was later arrested for attempting to detonate an IED at the

22   U.S. Capitol Building.

23           You've got the defendant telling the undercover that

24   he was stockpiling weapons and would use those weapons against

25   law enforcement personnel if they attempted to search his home.

7

1   You have evidence -- and this is not disputed by you-all --

2   that Young traveled to Libya in 2011, when he had body armor, a

3   Kevlar helmet, and several other military-style items with him;

4   that Young attended a weapons training event and had large

5   amounts of ammunition and four firearms ranging from an

6   Egyptian AK-47 to a .45 caliber pistol, and he stated that he

7   owned three more weapons; and he asked one of the cooperators

8   about the chemical components of gun powder, which led that

9   individual to believe that Young wanted to make something.

10          Now, that's not proof beyond a reasonable doubt, and

11  maybe not any of those are themselves specifically crimes, but

12  when a magistrate is issuing a warrant, it's a practical --

13  it's a reasonable, commonsense, practical exercise, and you're

14  looking at the relevance of the material that's being sought to

15  criminal activity described in the complaint, and if that's not

16  enough to allow for a search of any and all weapons and

17  firearms, I don't know what is.  It's a very powerful

18  affidavit.

19          MR. NICHOLAS SMITH:  We have two responses to those

20  statements, Your Honor.  The first is that Your Honor will see

21  that those statements, alleged statements were made over five

22  years before the warrant --

23          THE COURT:  What difference does that make?

24          MR. NICHOLAS SMITH:  What difference does that make?

25  There's a timeliness consideration.  Plenty of things happen in

8

 1    the state of mind of someone in five years.

 2              THE COURT:  Yeah, but your client was involved with

 3    the gift cards right up until the very last minutes.

 4              MR. NICHOLAS SMITH:  Your Honor, we respectfully

 5    disagree and believe the gift cards have nothing -- the gift

 6    cards are a nonviolent charged crime.

 7              THE COURT:  All right.

 8              MR. NICHOLAS SMITH:  The weapons -- and there's one

 9    more point.  If Your Honor looks at the *Mora* decision from the

10    Fourth Circuit that the Court cites, that decision indicates a

11    circumstance in which an immediate seizure of all firearms in

12    the defendant's possession is proper for public safety-related

13    reasons.

14              This is not a case where the government is arguing

15    that these weapons needed to be seized immediately in order to

16    protect law enforcement or the public.

17              THE COURT:  No.  They were being seized as evidence

18    of criminal activity.

19              MR. NICHOLAS SMITH:  As a part of an investigation

20    that went dormant for four years or more.  Then later on --

21    this is why understanding the larger context of this

22    investigation is absolutely critical for this motion.  More

23    than five years before the warrant affidavits were filed,

24    Nicholas Young was investigated for alleged links to terrorism.

25    During this entire investigation, Mr. Young remained on law

9

1    enforcement with the Washington Metro Transit Authority,

2    carrying a firearm as a part of his duties on the job.  The

3    government knew about this.  Nothing was done.  No charges were

4    filed, he wasn't arrested, while carrying a weapon at work.

5              So jump forward five years.  No charges are ever

6    levied against Mr. Young for those -- for any of these crimes

7    that are supposedly the ones that are linked to the firearms.

8              Take his trip to Libya.  The government represents in

9    the affidavits to search the home that Mr. Young had terrorist

10   contacts and that traveled overseas to fight on behalf of

11   terrorist groups.  That's false.  That's a false

12   representation.

13             The terrorist groups that the government has to

14   allege in the statute for the affidavits is support for a

15   foreign terrorist organization.  There's no factual support

16   before the Court that there is support for a foreign terrorist

17   organization.

18             THE COURT:  All right, move on to your books and

19   papers argument.  Again, you have argued that the warrants that

20   requested searches for any and all documents are themselves

21   overly broad.  Again, there's plenty of probable cause to

22   support a search for those materials.

23             MR. NICHOLAS SMITH:  The materials are untethered to

24   terrorism crimes.  The documents -- several categories of the

25   documents and records authorized the government to seize all

10

1    lists of contacts with Nicholas Young, all documents related to

2    any service provider unconnected to a terrorism crime, all

3    electronic devices in his home that constitute any of those --

4    comprise any of those categories, and all documents related to

5    travel overseas and attempts to send money overseas.

6            If you read the government's opposition, there's no

7    attempt to link those categories of information to the specific

8    charged terrorism crime.

9            THE COURT:  Well, now look.  There were eight

10   specific items listed in the appendix for those search

11   warrants.  They say, for example, all records and documents

12   that concern the international transfer of money or assets, or

13   the procurement of any item that may have been involved in or

14   in support of terrorist or violent acts.

15           That's narrow.  That means if, you know, you're just

16   sending flowers internationally to somebody in England, that's

17   not going to get picked up.

18           The next one, all records and documents referring or

19   relating to identifiers or aliases of Nicholas Young.  There's

20   nothing wrong with that.

21           All documents referring or relating to past travel or

22   planned travel by Young.  Now, it's clear Young has traveled to

23   Libya.  Plus, there are all those discussions with the

24   undercover about the undercover traveling to Turkey and how if

25   you travel with a group of tourists, you're less likely to be

11

1   picked up as somebody trying to get into Syria.  So your client

2   has -- that's in the affidavit.

3           So each one of these categories of documents or

4   records which are sought, I find, are adequately narrowly

5   limited and linked to the types of crimes that are being

6   investigated and the probable cause that's in these affidavits.

7   You just don't have it.

8           MR. NICHOLAS SMITH:  It seems like the Court is going

9   back to -- instead of the gift card crime as authorizing the

10  probable cause for all of these searches and seizures, it seems

11  that the Court is falling back on the what are called crimes in

12  the period between 2011 and, let's say, 2014, when the gift

13  card piece of the investigation began, but if you -- if the

14  Court is concerned about those charged crimes, the question one

15  has to ask is why did this investigation end?  Why were these

16  so-called crimes never indicted and charged?

17          There's a tension here between saying those crimes

18  authorized these sweeping searches and seizures and saying

19  those crimes were never charged.  The overall question is why

20  were they not charged?

21          THE COURT:  Well, that's the kind of question in

22  these types of cases that's not appropriate.  The only real

23  Fourth Amendment question in my view is whether or not the

24  issuing magistrate judges were presented with sufficient facts

25  to establish probable cause of specific criminal activity and

12

1   that the search warrants called for a search of items

2   reasonably expected to be related to that type of activity, and

3   I don't find anything in your pleadings other than one category

4   that creates an issue.

5          So let's move on to the argument you've made that the

6   seizure of Nazi paraphernalia and the Confederate flag was

7   beyond the scope of the warrants.

8          MR. NICHOLAS SMITH:  Correct.

9          THE COURT:  All right.  And, Mr. Kromberg, I want to

10  hear from you on that.  You know, one of the things that, that

11  Mr. Smith has complained about is that he requested that you

12  under rule 12, you know, advise the defense as to what evidence

13  you were going to use, because obviously, if you're not going

14  to use a particular quantity of evidence that came from a

15  search warrant, there's no need to file a motion to suppress.

16         So I want to know about your approach to that.

17         MR. KROMBERG:  Right.  So when Mr. Smith asked for

18  that notification, I wasn't ready to provide it because I

19  didn't know, because we've been providing documents and

20  evidence in discovery to the Smiths of extensive evidence even

21  within the last two weeks, including evidence that we were

22  going to use.

23         We are now at a point where we can make decisions on

24  what we're going to use and what we're not going to use.  The

25  Confederate flag, for example, with what's described as a dog

13

1   in the middle, it's a snarling dog with the words "Rebel Blood
2   in My Veins, Yankee Blood in My Yard."

3           So, so it's not just a Confederate flag, but we're
4   not going to use that because we now know.  But at the time --
5   because remember, Judge, this is not an issue of is it a 403 --
6   is the probative value outweighed by the prejudicial value.
7   This is is it encompassed.

8           Well, we were talking, the warrant allowed us to
9   seize information about terrorist groups, so I'll pass up to
10  you -- in fact, I'm going to pass a book up to you if that's
11  okay, because it might make it easier than to pass up
12  individual documents.

13          The first document in the book, Judge, is a roster or
14  a contact list, so we -- that is included in the scope of the
15  attachment to the warrant because it has, it has contacts and
16  it also has aliases.  If you look down to the fourth name on
17  the left-hand column --

18          MR. NICHOLAS SMITH:  Your Honor, I have to object.
19  Were these exhibits submitted in connection already, or are
20  these just being filed for the first time?

21          THE COURT:  They just were filed today, and I assume
22  these are materials that were seized from the defendant?

23          MR. KROMBERG:  That's correct, Judge.

24          THE COURT:  So these are among the items that you
25  want suppressed.

14

1          MR. NICHOLAS SMITH:  Some of these do not relate to

2     Nazi memorabilia or the Confederate flag.

3          THE COURT:  Well, we haven't heard what Mr. Kromberg

4     is doing with this yet, but I guess the first question,

5     Mr. Kromberg, are all ten of these items things that were

6     seized during these searches?

7          MR. KROMBERG:  There is one page in here that I

8     downloaded from the Internet this week.  Other than that, they

9     are all items that were seized from the defendant.

10          MR. NICHOLAS SMITH:  Your Honor, this is a sandbag.

11     We didn't have any notice that the government would present

12     argument on the --

13          THE COURT:  Well --

14          MR. NICHOLAS SMITH:  -- collection of images which

15     it's curating right now.

16          THE COURT:  But you made the issue -- you raised the

17     issue in your papers that the seizure, the agents' seizure of

18     Nazi-related paraphernalia was beyond the scope of the

19     warrants.  I assume you've seen this stuff, right?

20          MR. NICHOLAS SMITH:  This is a procedural objection

21     I'm raising right now.

22          THE COURT:  I understand that.

23          MR. NICHOLAS SMITH:  We've asked the government

24     innumerable times to tell us whether it would be using this

25     evidence.  Not only has it refused to cobble together a

15

 1   argument; it won't answer our e-mails about this question.

 2          THE COURT:  Mr. Smith, have a seat.  Let me hear what

 3   Mr. Kromberg has to say.

 4          MR. KROMBERG:  Your Honor, our position is that a

 5   determination of whether individual items are within the scope

 6   of the warrant should be held for later.  If and when the

 7   government says we're going to move to introduce it, then the

 8   defense says, well, no, this is outside the scope.

 9          At that point, the government would say, well, even

10   if it's outside the scope, it was within plain view.

11          So we -- I don't think it's appropriate to talk about

12   evidence in general categories, and what I'm trying to get to

13   now is to show why you can't do that very effectively, because

14   here is a document about Nazis that's also a contact list.  So

15   do we count that as a document about Nazis, or do we count it

16   as a contact list?  So that's the first page.

17          By the way, the second page is a redacted version

18   because the first page, obviously, has names and addresses of

19   people that perhaps should not be publicly filed.

20          THE COURT:  All right.

21          MR. KROMBERG:  But that's the significance of that.

22          It also has the -- if you notice on the first page,

23   it has the death's head logo at the top.  So it's not just

24   Nazi; it's SS.

25          THE COURT:  All right, go ahead.

16

1          MR. KROMBERG:  And you'll also notice that the alias

2    used, the name used by Nicholas Young on the first page on the

3    fourth box is Storm Trooper Düsselkamp, Klaus Düsselkamp.

4    That's an alias.  So it's not just a contact list.  It's not

5    just a Nazi thing.  It's an alias.

6          The -- on document 2, that is a page I downloaded

7    from the Internet this week.  I went on LiveLeak, and I -- and

8    here is that Düsselkamp is accused by someone in Iraq of being

9    an ISIS supporter.

10          Now, again, this is not a matter -- this is not

11    seized from him.  It's just the point of this Düsselkamp is not

12    just some Nazi thing.  You go on farther in category 2, and

13    these are items that we provided to the defense that we -- that

14    were not seized from him but we provided to him in the

15    discovery as part of the government's investigation to show

16    that Düsselkamp is his identity.  He was using the identity of

17    Düsselkamp to post pro-ISIS matters online.

18          He's saying he was entrapped.  He's saying that the

19    government has to show he was predisposed.  If he's using the

20    identity of Düsselkamp to post pro-ISIS videos, everything

21    about Düsselkamp is admissible.

22          And if you page through No. 2, these various items,

23    it will show that Düsselkamp is him, and it even has his

24    profile picture of a dog that he -- Mr. Charles, and the last

25    page is a seized photo that he had of -- that we seized of

17

1  Charles.  And that's only to show that it's not just some other

2  Düsselkamp.  This is this defendant posing as Düsselkamp

3  online, posting pro-ISIS videos, justifying the burning of the

4  Jordanian pilot, and saying that ISIS hasn't done anything

5  contrary to Islam.

6          Now, No. 3 is an item that was seized, Ku Klux Klan

7  stuff.  Now, once we find Ku Klux Klan stuff, that has to do

8  with -- now, that's a terrorist group.  It fits within the

9  rubric on the appendix to the affidavit of a terrorist group.

10 Once you find Ku Klux Klan stuff, and you find a book, which is

11 the second page on No. 3, the *Serpent's Walk*, that is published

12 by the National Alliance, it's a white supremacist organization

13 with the swastika on it, once you find that, that's part of a

14 terrorist group.

15         And once -- keep in mind -- go to No. 4.  No. 4 is a

16 document seized from him where it says on the second page there

17 that the SS is the logo of white supremacist groups and

18 neo-Nazis.  Third page is his book *The SS:  Hitler's Instrument*

19 *of Terror*.

20         So in our view, I think the agents' view, they see a

21 book that says *Hitler's Instrument of Terror*, the attachment to

22 the warrant allows them to seize items that have to do with

23 terror groups, they seize his book, *Hitler's Instrument of*

24 *Terror:  The SS*.

25         No. 5, him as Storm Trooper Klaus Düsselkamp, wearing

18

1    a death's head logo, in an SS uniform.  Second page, same

2    thing:  Storm Trooper Klaus Düsselkamp.

3         No. 6 is SS tie tack found in his car.  This wasn't

4    something from way back in his youth.  This was found in his

5    truck when his, when his truck was searched in August 2016.

6         Second page on No. 6, again, a death's head logo, SS.

7    That has to do with a terrorist group.

8         I could -- there's more, Judge.  I could go on, but

9    in response to the question about Nazi stuff, I don't think we

10   can talk about Nazi stuff generally because I bet you there is

11   some Nazi stuff that maybe is not necessarily included within

12   the ambit of the warrant, but individual Nazi things that we

13   have found and we plan to use was found with -- excuse me, was

14   within the warrant not only because it has to do with a

15   terrorist group but because it has to do with him having a

16   firearm.

17        For example, I think -- I have a picture of -- if you

18   go to No. --

19        THE COURT:  It was 4 or 5, I think.  In the uniform?

20        MR. KROMBERG:  Right.  Okay.  Turn to No. 10 for a

21   moment.  Now, 10, Storm Trooper Düsselkamp with the SS logo on

22   it in front of the swastika flag; No. 11 -- excuse me, next

23   page is he's there in Muslim garb.  Now the -- and the page

24   after that, in Muslim garb with a rifle.

25        The interesting thing about that is the metadata from

19

1    the first page on No. 10 is January 28, 2006.  The metadata for

2    the second two pages is February 2, 2006.  So there's not only

3    a similarity in ideology about certain parts of the ideology,

4    but chronologically, this was happening at the very same time.

5          So you go back to No. 2, one of the pages on No. 2,

6    he's being -- Düsselkamp is being accused on LiveLeak of being

7    a Muslim-Nazi scum.  Now, whether or not that's true, I don't

8    know the answer to that, but the point is that the Nazi stuff

9    in this case is very much related to the, to the ISIS stuff.

10         For example, take a look at No. 9 -- I'm sorry,

11   No. 8, No. 8.  No. 8 looks like a World War II propaganda

12   poster, and you think, well, that's just historical, but then

13   look at the date:  1939 to 2004.  I don't know if the Court

14   speaks German, I had to get this translated, but it says, "The

15   Alliance 1939 to 2004.  The Worldwide Association of Islamists

16   and Nazis."

17         Well, all of a sudden, you're beginning to think,

18   well, wait a minute now.  Is there something else going on

19   here?

20         If you look at -- let's see here -- I was supposedly

21   going in order, but I guess I didn't -- the individual on the

22   second page of No. 8 is, on the left is Amin Haj Husayni, who

23   is -- Mohammad Amin al-Husayni, who is the second page on

24   No. 8, which is Nicholas Young's Facebook page.  It's a "like."

25   He likes Mohammad Amin al-Husayni.  That's the individual

20

1    depicted in the Alliance photo.

2          And the next page, third page, that's another photo

3    of Mohammad Haj al-Husayni, also known as the Mufti of

4    Jerusalem during World War II for his alliance with Hitler,

5    that was taken from his computer.

6          Go on to No. 9, that is the Mufti of Jerusalem

7    meeting with Hitler.  Second page of No. 9 is Hitler.

8          These -- without going over these things item by

9    item, you cannot make a call that, oh, Nazi memorabilia or Nazi

10   paraphernalia is outside the scope of the warrant.  Some of

11   it's within the scope of the warrant, some of it may be outside

12   the scope of the warrant, but on the other hand, it's a

13   terrorist organization, and it's related to Storm Trooper Klaus

14   Düsselkamp.

15         Then if we go down that road, Judge, of trying to

16   determine item by item, we have to talk about plain view.  If

17   the agents were there lawfully and they see a portrait of

18   Hitler, which is on No. 9, page 2, well, is that -- is the

19   incriminating nature of the portrait of Hitler plainly

20   apparent?

21         Well, in this case, the evidence will be, and the

22   agents knew this because it was on tape, when Mr. Young went to

23   the Kinko's to set up an e-mail account with the CHS before the

24   CHS was going allegedly to Syria, they were setting up the

25   e-mail accounts, they had to put in contact information, this

21

1    defendant said, "Hey, I'm going to use Hitler's birthday."

2              CHS -- the CHS says, "Yes, here's a recording of when

3    we're talking about getting the e-mail account set up, and the

4    guy who said he was going to use Hitler's birthday" -- and, in

5    fact, the records do show 4-20-89, Hitler's birthday -- of

6    course, it was 1889, not 1989 -- but that was what was used to

7    set up the essakobayashi e-mail account used by this defendant,

8    well, this portrait of Hitler is good corroboration for when

9    then CHS says, "It was that man right there who I went with to

10   the Kinko's."

11             So my point is, Judge, every one of these items can

12   only be figured out whether it's admissible or not, and 403

13   analysis, 404 analysis, and predisposition relevance, that can

14   only be done item by item once, once we say what we're going to

15   use, but as a category for within the warrant or without the

16   warrant, it's within the warrant, but even if it wasn't within

17   the warrant, you can't look at it -- we can't make

18   determinations on whether they're within the warrant or without

19   the warrant at this point.

20             There are other exhibits in here which I might have

21   missed, but I think Your Honor has the picture of what was

22   going on here.

23                       (Mr. David Smith present.)

24             THE COURT:  Well, I think -- I think you're wrong on

25   one point, Mr. Kromberg, and that is, the Court, when it's

22

1  evaluating a motion to suppress, doesn't wait until the trial.

2  You do it in the context of what's within the four corners of

3  the affidavit, what are the reasonable inferences that can be

4  drawn from what's within the four corners of the affidavit, and

5  at this point, I'm satisfied that these affidavits were more

6  than sufficient to allow for the seizure of any information or

7  materials that could be arguably related to terrorist activity.

8        And although whether or not the American Nazi party

9  is officially designated as a terrorist organization, there

10 certainly is enough evidence in my view to find that it would

11 be reasonable to deem it to be sufficiently terroristic in its

12 orientation and philosophy that it would have entitled a law

13 enforcement officer to seize any materials related to it under

14 the warrants as they were issued.  So for these reasons, I'm

15 denying the defendant's motion to suppress.

16       I do agree that there are potential 404 -- 403 issues

17 here because the potential prejudicial impact may outweigh the

18 probative value especially given all the other evidence that

19 you appear to have based upon what's in the affidavit, but

20 we'll face that issue when we come to it.

21       But your motions are denied, Mr. Young -- Mr. Smith,

22 sorry, and we're going to proceed.  I want to take care of one

23 logistical matter with this case as well.

24       MR. NICHOLAS SMITH:  May I just make some points on

25 the record on some of the factual representations of

23

1    Mr. Kromberg?

2             THE COURT:  Very briefly.

3             MR. NICHOLAS SMITH:  So these exhibits were not in

4    the opposition papers.  Mr. Young was faulted for not attaching

5    some exhibits that were on the docket sheet.  These exhibits

6    submitted were, were nowhere to be found, the arguments were

7    nowhere to be found in the opposition papers.

8             Mr. Kromberg made an argument that the plain view

9    might justify the seizure of these Nazi materials even though

10   the warrants plainly did not authorize their seizure.  However,

11   FBI 302 documents submitted in discovery show that the agents

12   themselves did not believe that the warrant authorized the

13   seizure of these documents.  They had to call Gordon Kromberg,

14   who authorized them to seize the Nazi materials.

15            The standard for plain view is whether the materials

16   were incriminatory on their face, immediately apparent.  The

17   very fact that the agents did not know whether they were

18   incriminating on their face suggests they were not.

19            The Nazi -- we don't believe it's necessary to

20   address why these Nazi materials were where they are, but we

21   would like to note for the record that Mr. Young has been

22   participating in world war reenactments for many years.  Many

23   of the individuals listed in these documents participated in

24   war reenactments.

25            There was materials found in Mr. Young's office that

24

1   did not relate to the Nazis but were war memorabilia.  These

2   items were selectively not chosen, which colors what the

3   significance of these materials certainly --

4        THE COURT:  I think the argument on that could be

5   that shows the discretion the officers were making, in fact,

6   that they were not taking everything related to World War II;

7   they were taking everything that they understood were related

8   to potential terrorist activities.

9        MR. NICHOLAS SMITH:  And we would note that there are

10  documents in the record from the FBI indicating the agents

11  themselves did not believe that these materials were

12  incriminating immediately apparently, which vitiates the plain

13  view argument.

14       THE COURT:  All right.  Well, you've made your

15  record, but I'm not satisfied, and so as I said, I'm denying

16  the motions to suppress.

17       I am concerned about keeping this case on track.  We

18  don't yet have a trial date, and I think we held that up

19  because of some discovery and other types of issues.

20       Mr. Kromberg, do you expect at this point to meet the

21  deadline on the FISA information?  Do you have any sense?

22       MR. KROMBERG:  Yes, we do expect to meet the deadline

23  on FISA information.

24       THE COURT:  Excellent.  All right, so once I have

25  that for in camera review, once that's been evaluated, is there

25

1    any reason at that point we can't set a trial date?

2            MR. KROMBERG:  I would think that that would be the

3    time to have a motions date and a trial date set at that point,

4    Judge.

5            THE COURT:  All right, that's fine.  So as soon as I

6    get that material, we can start moving this case along.

7            Anything further before we recess for the ten o'clock

8    docket?

9            MR. KROMBERG:  First, I would like to apologize for

10   missing the deadline myself.  I know that although the

11   defendant wasn't prejudiced, the Court was prejudiced by having

12   less time to analyze things, and for that I do apologize, and

13   it will not happen again.

14           THE COURT:  All right, that's fine.

15           All right, we'll recess court until ten o'clock.

16                          (Which were all the proceedings

17                           had at this time.)

18

19                   CERTIFICATE OF THE REPORTER

20       I certify that the foregoing is a correct transcript of

21   the record of proceedings in the above-entitled matter.

22

23

24   _____
                       /s/
                 Anneliese J. Thomson

25

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:16-cr-265 (LMB) |
| | ) | |
| NICHOLAS YOUNG, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

For the reasons stated in open court, it is hereby

ORDERED that defendant's Motion to Suppress Items Unconstitutionally Seized from his Residence, Backpack, Pickup Truck, and Worplace [sic] Locker [Dkt. No. 69] be and is DENIED.

The Clerk is directed to forward a copy of this order to counsel of record.

Entered this _10_ day of March, 2017.

Alexandria, Virginia

_____ /s/ _____
Leonie M. Brinkema
United States District Judge

-92-

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 1:16-CR-00265 |
| v. | **FILED IN CAMERA AND UNDER** |
| | **SEAL WITH THE CLASSIFIED** |
| NICHOLAS YOUNG | **INFORMATION SECURITY** |
| | **OFFICER OR DESIGNEE** |

GOVERNMENT'S MOTION FOR PROTECTIVE ORDER AND TO DELETE
CERTAIN CLASSIFIED INFORMATION FROM DISCOVERY

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA

v.

NICHOLAS YOUNG

Criminal No. 1:16-CR-00265

### ORDER

Now before the Court is the government's Motion for Protective Order and to Delete Certain Classified Information from Discovery. For the reasons stated in the government's motion and in light of the information contained in the classified declaration submitted therewith, and finding good cause shown, it is hereby

ORDERED that:

1. The CHS, the UCE, ███████, and ███████ may use pseudonyms when testifying at trial, without disclosing publically their true identities, and the government may delete information concerning their true identities from discovery;

2. The defense, including the defendant should he decide to testify, shall be prohibited from referring to ███████ or ███████ using either individual's true name at trial or in pretrial pleadings or hearings;

3. The defense, including the defendant should he decide to testify, shall be prohibited from referring to or asking questions concerning the authorities under which searches and surveillance in this matter were authorized;

4. The defense shall be prohibited from asking questions or otherwise seeking information concerning the CHS's, ███████, or ███████ true identity, family, ongoing investigations, or investigative history, and the government may delete this information

1

from discovery;

5. The defense shall be prohibited from asking questions or otherwise seeking information concerning the UCE's true identity, family, ongoing investigations, or investigative history, and the government may delete this information from discovery, with the exception that the defense may ask questions concerning the UCE's involvement in previous investigations of Amine El-Khalifi, Liban Mohammed, and Saleh Albarmawi, and the government may not delete this information from discovery;

6. The CHS, the UCE, ████████, and ████████ shall be permitted to use a non-public entrance and exit to the courthouse and the courtroom;

7. The CHS, the UCE, ████████, and ████████ shall be permitted to testify behind a screen that shields them from public view, but allows the Court, essential personnel, the jury, Young and his counsel, and the government's trial team to see the CHS, the UCE, ████████, and ████████;

8. The defense shall be prohibited from asking questions or otherwise seeking information concerning the FBI's CHS program, UCE program, OCE program, or TACOPS program and associated protocols, and the government may delete this information from discovery; and

2

-95-

9. The defense shall be prohibited from asking questions or otherwise seeking information concerning communications platforms used by OCEs or the characteristics or mechanics of recording devices used by the CHS and the UCE, and the government may delete this information from discovery.

The Clerk is directed to forward a copy of this order to counsel of record.

Entered this 26 day of ~~October~~ September, 2017.

Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge

3

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:16-CR-265 |
| | ) | |
| NICHOLAS YOUNG | ) | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S OMNIBUS MOTION IN LIMINE

Defendant Young asserts that he was entrapped into supporting terrorists and obstructing justice, Young's Brief at 2,[1] but moves to bar much of the government's evidence of his predisposition to do so on the grounds or relevance or undue prejudice.   His motion should be denied.  The defense in this case is based on a claim of entrapment.  In light of that defense, the evidence at issue is relevant, and its probative value outweighs the risk of undue prejudice.

### Background

In December 2016, Young was indicted for attempting to provide material support to the Islamic State ("ISIS") and obstruction of justice.  In essence, the indictment alleges that, to keep the government from learning that his friend ("Mo") had joined ISIS in November 2014 - - and that Young was still in regular contact with him - - Young tried to mislead the FBI in December 2015 about his contacts with Mo over the previous 18 months.   The indictment further alleged that, in July 2016, Young attempted to send money to ISIS by transmitting gift card codes to an account that Young believed was controlled by Mo.

---

[1] "Young's Brief at __" refers to  "Memorandum in Support of Defendant Nicholas Young's Omnibus Motion in Limine," Docket #117-1.

Young claims that he was entrapped.  As a result, the government must show that he was predisposed to support ISIS.  As best we can tell, Young will argue that his contact with an undercover officer known to him as "Khalil" between 2010 and 2012 contributed to his "entrapment" in 2016.  *See* Young's Brief at p.1 ("the government will also attempt to prove he had a predisposition to materially support the FTO before the criminal investigation began, in 2010 or earlier").   As a result - - at least according to Young - - the government's proof of predisposition must predate his encounter with Khalil.  In light of that argument, the government's proof of Young's predisposition will include evidence that pre-dates 2010.

Months ago, the government produced to the defense a draft list of its trial exhibits, many of which will be used not only to establish Young's motive to support ISIS, but also to rebut his claim that he was entrapped into attempting to do so.  Young moved to exclude numerous of those exhibits. Dkt. 117.  That motion is not supported by the law, and should be denied.

<u>Argument</u>

In his moving pleading, Young cites to a variety of cases holding that various types of evidence were inadmissible in those cases as irrelevant or unduly prejudicial.  As far as we could tell, only one of those cases involved a defense of entrapment.  This distinction is vital because, when submitted to prove predisposition, evidence of prior bad acts is not subject to the constraints on the admission of such evidence that are ordinarily applied pursuant to Rule 404(b).

Young seeks to have his cake and eat it too:  he puts his mindset at issue by claiming entrapment, but simultaneously claims that the government's evidence of his mindset should be barred as unduly prejudicial.  Settled authority precludes this tactic.  As the Supreme Court held years ago, "if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that

issue.  If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense."  *Sorrells v. United States,* 287 U.S. 435, 451 (1932), *quoted in United States v. McLaurin*, 764 F.3d 372, 381 (4th Cir. 2014).  Evidence of Young's support for terrorism is, therefore, admissible to rebut his own claim that his desire to support ISIS was implanted in him by the government.

Because Young's arguments in support of his motion virtually ignore entrapment law, they rest on propositions that are inapplicable to his case.  As explained below, the exhibits in question are indisputably relevant.  Their probative value outweighs any risk of unfair prejudice, and they should be admitted - - at the least - - to prove his predisposition to support terrorists.

I.    Character Evidence Is Relevant and Admissible in Entrapment Cases

Relevant evidence is any evidence that "has any tendency to make a fact more or less probable than it would be without the evidence," so long as "the fact is of consequence in determining the action."  Fed.R.Evid. 401.  All relevant evidence is admissible, except as otherwise provided by the Constitution, by Act of Congress, or by applicable rule.  Fed.R.Evid. 402.  Evidence of other bad acts may be admissible to prove intent or motive.  Fed. R. Evid. 404(b).  Indeed, "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

While evidence of other bad acts may be admissible to prove intent or motive, Rule 404 generally prohibits such evidence to prove the defendant's character - - except in cases involving claims of entrapment.  Indeed, Rule 404(b)'s requirements are relaxed when the defendant claims entrapment.  When a defendant claims entrapment, "there is no doubt that proving

predisposition is one of the purposes for which bad-act evidence may be admissible." *United*

*States v. McLaurin,* 764 F.3d 372, 380 (4th Cir. 2014).

"Predisposition is itself a broad concept, and a broad swath of evidence, including aspects

of the defendant's character and criminal past, is relevant to proving predisposition." *Id.* at 381.

As a result, and "[g]iven the range of evidence that is relevant to the predisposition issue, certain

bad-act evidence may be admissible under Rule 404(b) in entrapment cases that would not be

admissible in cases where entrapment is not an issue." *Id*.  As the *McLaurin* panel stated:

> Proving disposition to commit a crime is very close to proving "criminal
> propensity," the very type of prejudice against which the general prohibi-
> tion on admission of evidence of other crimes is directed.  In an entrap-
> ment case, however, the issue is precisely whether the accused, at the
> time of the government inducement, had a propensity to commit crimes
> of the nature charged — that is, whether he was predisposed to do so.

*Id*.[2]  Thus, "assertion of an entrapment defense does not justify admission of every bad act ever

done by the defendant, but distinguishing the unwary innocent from the unwary criminal

nonetheless requires a "searching inquiry." *Id.  See also United States v. Thomas*, 134 F.3d 975,

980 (9th Cir. 1998) (since character is an essential element of the entrapment defense, "even if

the proffered evidence were not admissible under Rule 404(b), we would still hold that it is

admissible [in an entrapment case] under Rule 405(b)").

Young's claim that this case is just a "gift card" case, Young's Brief at 1, is an epic

understatement of the conduct at issue.  The indictment charges that Young attempted to provide

material support to ISIS, both by trying to protect an individual that he believed to be an ISIS

fighter, and also by sending money for the purpose of financing ISIS's recruitment of other

---

[2] Internal quotations and citations are omitted from quotations throughout this pleading.

fighters.  Nevertheless, even if Young's characterization were true, his claim that this is just a

"gift card" case would not limit the predisposition evidence that would be admissible.

When used to show predisposition in a terrorism case, the relevant prior design to commit

the crime or similar crimes need be only a rather generalized idea or intent to inflict harm on

interests of the United States.  *United States v. Cromitie*, 727 F.3d 194, 207 (2d Cir. 2013).  *See*

*United States v. Hackley*, 662 F.3d 671, 682 (4th Cir. 2011) ("Predisposition is not limited only

to crimes specifically contemplated by the defendant prior to government suggestion").  Evidence

of conduct occurring both before and after the defendant was contacted by the government is

admissible to prove predisposition.  *United States v. Squillacote*, 221 F.3d 542, 566 (4th Cir.

2000).

By claiming entrapment, Young asserts that his desire to support ISIS was implanted by

the government.  As discussed below, evidence of Young's support for terrorism in general (or

ISIS in specific) is relevant and admissible to disprove this assertion.

II.    Evidence of Young's Predisposition Is Not Unfairly Prejudicial

Young claims that numerous categories of evidence are unfairly prejudicial.  "Where the

evidence is probative, [however,] the balance under Rule 403 should be struck in favor of admis-

sibility, and evidence should be excluded only sparingly."  *United States v. Lentz*, 524 F.3d 501,

525–26 (4th Cir. 2008).  "Evidence which tends to rebut a defendant's claim of innocent action is

unlikely to be unduly prejudicial."  *United States v. El-Mezain*, 664 F.3d 467, 509–11 (5th Cir.

2011) (in a terrorist financing case, affirming the admission of videotapes of demonstrators

destroying American flags and violent images of the aftermath of Hamas suicide bombings).

When evidence in terrorism cases is probative, it properly is admitted even though it may

be "alarming," *United States v. Benkahla,* 530 F.3d 300, 310 (4th Cir. 2008); "disturbing,"

*United States v. Salameh*, 152 F.3d 88, 122 (2d Cir. 1998); or even "blood curdling." *United States v. Mubayyid,* 658 F.3d 35, 56 (1st Cir. 2011).  This is so because such evidence is "directly related to the nature of the crimes that the defendant has set out to commit." *United States v. Mehanna,* 735 F.3d 32, 64 (1st Cir. 2013).  "Terrorism trials are not to be confused with high tea at Buckingham Palace." *Id.*

      In short, emotionally-charged evidence that might be barred in a different context is admitted in terrorism cases, because such evidence is no more inflammatory than the emotionally-charged crimes with which the defendant has been charged in the first place. *See, e.g., United States v. Abu–Jihaad*, 630 F.3d 102, 132–33 (2d Cir. 2010) ("[W]e conclude that the recorded discussions were both highly probative of the charged crime and, to the extent they referenced uncharged contemporaneous support for jihad, no more inflammatory than the charges alleged in the indictment.").

      As discussed below, none of the government's evidence in this case is more prejudicial than the charges for which Young was indicted.   Even if there were a risk of undue prejudice, the court could cure it by instructing jurors on the purpose for which they may consider the government's evidence of predisposition. *United States v. Sterling*, 860 F.3d 233, 248 (4th Cir. 2017) (affirming this Court's limiting instruction that effectively mitigated any risk of unfair prejudice from prior bad act evidence).

III.    <u>The Government's Exhibits Are Admissible</u>

      In his motion, Young moves to bar admission of hundreds of separate exhibits, but justifies their exclusion only to the extent that they fit within categories he specifies.  In doing so, he would have the Court sweep with an improperly broad brush.  Individual exhibits are

probative of motive and predisposition for multiple reasons.  As a result, they are not as easily characterized as Young suggests.

For example, Young moves to bar the government from introducing the explosives and components of explosives seized from his residence, as well as the approximately 19 firearms; 18,000 rounds of ammunition; 70 pieces of body armor; and 60 knives, daggers, and swords that were seized there as well.  Possession of such an arsenal surely is probative of a predisposition to support terrorists.  *See, e.g., United States v. Lampley,* 127 F.3d 1231, 1243 (10th Cir. 1997) (defendant's carrying of guns was proof of his predisposition to enter a conspiracy to bomb buildings in Texas and Alabama).  Indeed, possession of that arsenal is admissible to establish simply a motive to support terrorists regardless of any entrapment defense.  *United States v. Hassan,* 742 F.3d 103, 143 (4th Cir. 2014) (knowledge that his co-conspirator "was stockpiling weapons" was probative of the defendant's involvement in a conspiracy to support terrorists).[3]

Yet, Young's possession of individual items within that arsenal is probative of his predisposition and intent, regardless of their inclusion within the stockpile as a whole.  For example, included within the arsenal are individual weapons that also appeared in photos of Young wearing traditional Arab or Muslim garb, and in photos of Young in the uniform of Nazi SS Stormtrooper Klaus Dusselkamp.  Among the seized weapons are knives that bear Nazi insignia.  Other knives were designed so that they can be smuggled past metal detectors; they are relevant not only because they were parts of Young's arsenal, but also because they lend color and credence to Khalil's expected testimony that Young bragged about his ability to smuggle weapons into the Alexandria Federal Courthouse.

---

[3] Young claims that he possessed this arsenal as an investor, Young's Brief at 22, but this is an argument as to the weight of the evidence, not to its admissibility.  In any event, the 18,000 rounds of ammunition (enough to fire one round per second continuously for more than five hours) that Young possessed does not appreciate in value.

In short, individual exhibits fall within multiple categories, and may be admissible for multiple reasons. The admissibility of each exhibit merits consideration in its own right, but, in the space of this one pleading, we cannot address all the reasons for the admissibility of each exhibit. As a result, we can bring to the Court's attention just a handful of the exhibits that would be barred by Young's generalized arguments. Accordingly, we request the opportunity to address with specificity in the future the admissibility of any particular exhibit that, in light of the present motion, the Court is inclined to bar.

A. Evidence of Young's Support for Nazis and White Supremacists

Regardless of whether support for Nazis is always relevant to prove a defendant's support for terrorists, it surely can be relevant when a defendant puts his motivation to support terrorism at issue by claiming entrapment. As discussed below, the evidence in this case will establish that Young supported both Nazis and ISIS, and that his motivation to do so was the hatred of Jews that he shared with both. As a result, evidence of Young's support for Nazis is relevant to establish his predisposition to support ISIS. *See United States v. Mahon*, CR 09–712 PHX–DGC, No. 2010 WL 4038763, at *11 (D. Ariz. Oct. 14, 2010) (holding that defendant's "allegiance to [white supremacist] groups that advocated violence" constituted evidence of predisposition to commit violent crimes), *aff'd*, 793 F.3d 1115 (9th Cir. 2011). *See also United States v. Magleby*, 241 F.3d 1306, 1319 (10th Cir. 2001) (admitting racist song lyrics on white supremacist CD owned by the defendant in a non-entrapment case because the defendant's state of mind was at issue); *United States v. Mostafa*, 16 F. Supp. 3d 236, 260, 266 (S.D.N.Y. 2014) (admitting defendant's statement, "these dirty Jews, Christians, most of them homosexual

persons," in a non-entrapment case, but not admitting other disparaging statements on the ground that they were cumulative).[4]

Exhibit 1 to this pleading is a report by Dr. Daveed Gartenstein-Ross, titled *Report on the Relationship Between Affinity for Nazism and Inclination to Support Militant Islamist Groups*. With a Ph.D in World Politics (and a law degree), Dr. Gartenstein-Ross has extensively researched, written, lectured, and taught about Islamist militancy and terrorism; white separatists and Neo-Nazis, and radicalization processes.  Exhibit 1, at 1-9.[5]

As detailed in Dr. Gartenstein-Ross's report, the mechanisms of radicalization that attract individuals to neo-Nazism and to militant Islam are highly similar.  Exhibit 1, at 10-18.  The report also details multiple areas of convergence and ideological similarities between Nazi and Islamist militant movements, and the historical precedent for this convergence.  *Id.* at 18-22. The report details the centrality of Jew-hatred to both movements, and discusses numerous cases where extremists motivated by hatred of Jews, like Young, embraced both ideologies simultaneously, or moved fluidly from one to the other.  *Id.* at 23-39.

The report also explains that, when individuals convert to Islam after having been immersed in or attracted to Nazism, they often dive right into the extremist end of the spectrum of Islamic ideology.  In short, in Exhibit 1, Dr. Gartenstein-Ross explains why evidence of an

---

[4] Young characterizes the decision in *United States v. Bowman,* 302 F.3d 1228 (11th Cir. 2002), as "reversing trial court over inclusion of 'white pride' t-shirt." Def. Br. at 19.  To the contrary, the decision affirmed the conviction, and no such t-shirt is discussed in the opinion. The Eleventh Circuit did agree that evidence of a motorcycle club's whites-only policy was not admissible evidence, because the defendant's "allegiance to a racist organization is not relevant to his guilt or innocence in this case."  *Id.* at 1239.  In contrast, Young's entrapment defense renders his own allegiances very much at issue.

[5] As a convert to Islam, Dr. Gartenstein-Ross's first book, *My Year Inside Radical Islam,* was about his time employed by the American branch of a Saudi charity that was designated by the United States as a provider of financial and material support to al-Qaeda.  Exhibit 1, at 2.

individual's attraction to Nazism is related to the question of whether that individual is predisposed to supporting Islamist terrorists.  *Id.* at 35.

In this context, evidence of the relationship between Naziism and radical Islamists, as well Young's attraction to Nazis, is probative of whether Young's support for ISIS was implanted in him by the government, or the product of his own predisposition to support terrorists that hate Jews just like he does.  This includes evidence of Young's involvement with Nazis and radical Islam at the same time.

Exhibit 2 consists of trial exhibits that are probative of Young's intense interest in terrorism - - of the Nazi variety.  These include:

> Government Exhibit ("GX") 10-220, two slides found in Young's computer, explaining that the lightning bolt symbol of the SS is "used in various tattoos mainly by the Neo-Nazi and Racist skinheads" and "characterizes the belief of these extremist groups in Anti-Semitism, White Supremacy, and Fascism."  While possession of such slides obviously does not establish one to be Nazi sympathizer, such possession is probative of whether the owner understands the symbolism of the SS lightning bolts;

> GX 10-701, a book seized from Young's residence, titled "The SS: Hitler's Instrument of Terror", with the SS lightning bolt symbol on its cover.  Again, possession of such a book obviously does not establish one to be Nazi sympathizer, but such possession is probative of whether the owner understands the nature of the Nazi SS;

> GX 3-110, a tie-tac seized from Young's truck in August 2016, in the shape of the Nazi SS lightning bolt symbol;

> GX 10-903, a photo first saved on his home computer in 2007, showing Young in his Nazi SS uniform and holding a pistol;

> GX 10-905, a photo first saved on his home computer in 2007, showing Young and his associates in their Nazi SS uniforms in front of a Nazi flag;

> GX 10-907, a photo of Young in his Nazi SS uniform, with his "death's head" logo;

GX 4-300, a booking photo of Young's arm tattoo taken after his arrest in August 2016, showing the official insignia of the 9th SS Panzer Division "Hohenstaufen;"[6]

GX 10-714, a flag seized from Young's house, known as the "reichskriegsflagge," and typically used by Neo-Nazis.[7] Use of this flag by Neo-Nazis stems from its earlier use by the Freikorps, a precursor of the Nazis that, following World War I, sought to use brutality against their enemies in Germany (particularly Jews) as political expression. Many Freikorps officers became prominent Nazi officials, including Rudolf Höss, a commander of the Auschwitz concentration camp;[8]

GX 11-400, a photo of Young' truck, with the license plate "FRI-KRP," a reference to the Freikorps;[9] and

GX 10-459 and GX 10-495, two of the approximately 50 knives seized from Young's house; these knives bear the Nazi swastika and eagle.[10]

Exhibit 3 includes GX 13-105, a book found in Young's residence in 2016. The book,

*Serpent's Walk,* is by a leader of the American Neo-Nazi movement known as the National

Alliance, and is about an underground Nazi revolutionary movement (led by the SS) to reverse

the results of World War II. In short, the book is propaganda for the National Alliance. Trial

---

[6] *See, e.g.,* Patrick Hook, *Hohenstaufen: 9th SS Panzer Division* (Surrey, UK: Ian Allan Publishing, 2005).

[7] Anti-Defamation League, "Imperial German Flag" (n.d.), available at https://www.adl.org/education/references/hate-symbols/imperial-german-flag.

[8] *See, e.g.,* http://www.nytimes.com/1987/06/21/books/the-women-they-feared.html*;* Robert Gerwarth, *"The Central European Counter-Revolution: Paramilitary Violence in Germany, Austria, and Hungary after the Great War,"* Past and Present 200:1 (2008), pp. 179-81.

[9] Also visible in the photo is the bumper sticker on Young's truck that states "Boycott the Terrorist State of Israel."

[10] Young's suggestion that he was merely a participant in World War II reenactments goes to the weight of the evidence, but not their admissibility. In any event, Young did not merely assume the identity of an ordinary soldier in the German army, but that of a member of a Nazi SS unit, with the "death's head" insignia on his headgear. Moreover, as some of the exhibits attached to this pleading establish, he did not assume the Dusselkamp identity solely for the purpose of participating in battle reenactments.

evidence will show that, in approximately 2010, Young gave another copy of that same book to a friend.

Exhibit 3 also includes GX 10-862 and GX 10-863, both seized from Young's residence in 2016.  GX 10-862 is a pamphlet titled "Who Rules America," and published by National Vanguard Books, the publishing arm of the National Alliance.  In the pamphlet, William Pierce (the actual author of *Serpent's Walk)* argues that "there is nothing  - - plague, famine, economic collapse, even nuclear war - - more dangerous to the future of our people" than the "Jewish control of the American mass media."

*Serpent's Walk* and *Who Rules America* are probative of Young's interest in terrorism - - of the Neo-Nazi variety.  As such, they are admissible to show his predisposition to support terrorism.  *See United States v. Siraj*, No. 07–0224–CR, 2008 WL 2675826 at *2 (2d Cir. July 9, 2008) (affirming admission into evidence of books and videos recommended by the defendant despite claims that they were unduly prejudicial).

In *Siraj*, the defendant ("Matin") claimed that he was entrapped into a conspiracy to support terrorism.  He argued that the probative value of books the government sought to introduce at trial was outweighed by their prejudicial value, but the district judge rejected his argument.  On appeal, the Second Circuit agreed that the books were properly admitted, on the grounds that, "[t]o the extent that Matin recommended the books, they were relevant to show predisposition; and to the extent the books were for sale in the shop where Matin worked, they tended to rebut Matin's assertion that the cooperating witness first exposed him to radical Islam and violent jihad."  *Id*.  The same reasoning applies to the books and videos that Young gifted, recommended (on Facebook or otherwise) or simply maintained in his possession.

GX 10-863 is a flyer depicting two Klansmen burning a cross, with the caption, "Burning Cross Records, Your Newest White Power Music Source."  Notwithstanding the relevance of the flyer inherent in Young's possession of it in 2016, its admission also will corroborate the testimony of a witness who is expected to testify about Young's ideological journey after college, including that he observed Young listening to "white power" music.

Evidence at trial will include evidence of Young's support for terrorism based on the convergence of the Jew-hatred commonly espoused by Nazis and radical Islamists.  We expect to present testimony from a former friend of Young that, after attending a gathering of Neo-Nazis in approximately 2000, Young said words to the effect of "don't discount an alliance with Muslims to combat the Jews."

Exhibit 4 includes selected exhibits that, along the same lines, we expect to introduce to establish Young's interest in the *convergence* of Nazis and Islamists. Many of these involve Haj Amin al-Husseini, the Mufti of Jerusalem during World War II.  As noted in Exhibit 1 (at page 33), "Perhaps no other figure did more to foster ties between rightwing extremism and militant Islam."  As explained by Dr. Gartenstein-Ross, Husseini made pro-Axis radio broadcasts to the Arab world in which he implored Muslims to aid the Nazi slaughter, and stressed the ideological affinities between German National Socialism and Islam.  In one broadcast, he urged Muslims to "kill the Jews wherever you find them. This pleases God."  Exhibit 1, at 34.

Exhibit 4 includes GX 10-231, a photo of al-Husseini with Hitler, that was saved on Young's computer media in 2007.  As explained in the report of Dr. Gartenstein-Ross, during the meeting with al-Husseini, Hitler assured him of the Nazis' commitment to exterminating the Jews, and promised eventually to make Husseini the "Arab führer."  Exhibit 1, at 34.

Following the meeting with Hitler, Husseini played an important role for the Nazis. In 1943, he helped organize the 13th Waffen Mountain Division of the SS Handschar, a volunteer force composed predominantly of Bosnian Muslims. Exhibit 1, at 34. Exhibit 3 includes GX 10-232 and 10-240, photos found in Young's media, of Husseini inspecting the Muslim SS troops. GX 10-238 and GX 10-237 also were found in Young's media; the former shows Muslim SS troops, and the latter shows them reading a booklet authored by Husseini, "Islam und Judentum." According to Dr. Gartenstein-Ross, that booklet was intended to inspire Muslim SS units, and promote their involvement in the Jewish genocide. Exhibit 1, at 34.

Exhibit 4 also includes GX 10-230, a poster saved to Young's computer media in December 2007. Depicting Husseini shaking hands with a Nazi, the poster bears the words (translated into English), "Worldwide Association of Nazis and Islamists." The poster is not a collector's item from World War II; according to the poster, the alliance started in 1939, but it was still active as of 2004. Also in Exhibit 4 is GX 8-107, which is a screenshot from Young's Facebook page (in the name of Ciaphas Cain) referencing Mohammad Amin al-Husayni.[11]

Exhibit 5 is GX 14-180, a partial list of the websites that Young had bookmarked on his home computer in 2011. Listed chronologically, the list shows that, during the same time period that Young bookmarked websites related to Jew-hatred, Neo-Nazis, and Hitler, he also bookmarked websites related to Bin Laden, Anwar Awlaki, and other radical Islamists.[12]

---

[11] Of all of Young's materials related to Husseini, none reflected any context other than his relationship to Hitler, Nazis, and the Muslim SS troops that Husseini recruited.

[12] One bookmark was to a webpage regarding Alois Brunner, a Nazi who converted to Islam. As detailed on the webpage bookmarked by Young, Brunner had been an assistant to Adolf Eichmann, and an SS officer responsible for sending around 100,000 Jews to concentration camps.

Exhibit 6 consists of GX 8-108 and GX 8-109, reflecting that Young linked his Facebook page to a news article about the 2011 arrest in Pittsburgh of Emerson Begolly, an American Neo-Nazi who converted to Islam and called on-line for Jews to be slaughtered.  Begolly, who was sentenced to 102 months in prison for soliciting crimes of violence, is a subject of Dr. Gartenstein-Ross's report.  *See* Exhibit 1, at 24.

Exhibit 7 consists of the juxtaposition of GX 14-113 and GX 14-114, which show Young in his SS uniform before a Nazi flag (and his colleagues performing a "sieg heil" salute) in photos saved to his computer media on January 28, 2006, and GX 14-117 and GX 14-119, which show Young dressed in Muslim garb in photos saved to his computer five days later.  In GX 14-119, Young is holding a rifle.

Proof at trial will show that Young manifested his support for Naziism *at the same time* as he manifested his support for ISIS.  For example, when Young created an email account in October 2014, in order to be able to communicate covertly with "Mo" (who Young believed would be serving with ISIS in Syria), Young set it up under the name under the name "Essakobayashi."  Required to provide the internet service provider ("ISP") with a date of birth in order to create the new account, Young provided *Hitler*'s birthday:  4/20/89.  Exhibit 8 includes GX-100 and GX 6-109-5T; the former is the ISP record reflecting the date of birth that Young used, and the latter is the transcript of the part of the conversation in which Young told Mo that Young using Hitler's birthday as the birthdate for "Essakobayashi."

Exhibit 8 also includes GX 4-203, a graphic found on the phone seized from Young incident to his arrest.  Describing it as stating, over a picture of billowing smokestacks, that

"Together we can finish what Hitler started" does not do it justice, so we include it here (in color,

as it was found on Young's phone):



Exhibit 8 further includes:

> GX 14-107, a photo found in Young's computer media in 2011 and again in 2016,
> showing obviously Muslim women marching with a sign stating "God Bless
> Hitler";

> GX 10-700, a photo of a framed portrait of Hitler found in Young's residence in
> August 2016; and

> GX 10-711:  two posters found in Young's residence in August 2016, with a photo
> of Hitler and the words, "When I come back, no more Mr. Nice Guy."

Also included Exhibit 8 are GX 10-814 and GX 10-815.  GX 10-814 is a document found

among Young's possessions in August 2016, which appears to contain a list of people for whom

he prayed.  Along with members of his family, friends, and co-workers, the list includes five

leaders from modern times:  Hitler, Mussolini, Saddam Hussein, Haj Amin Al-Husaini, and

"Skorzeny."  GX 10-815 is a photo of Skorzeny found in Young's computer media.

As Dr. Gartenstein-Ross explains, Otto Skorzeny was a Nazi who fled Germany for

Egypt after the fall of Hitler, and later organized Palestinian terrorist forays into Israel.   Exhibit

1, at 34.  According to his Wikipedia entry, Skornezy was believed to have set up an

organization that helped hundreds of SS war criminals escape from Germany after Nazi

Germany fell.  *See* https://en.wikipedia.org/wiki/Otto_Skorzeny.

Exhibit 9 consists of selected trial exhibits that are probative of the hatred for Jews that is

a common link between Young's support for Nazis and his predisposition to support ISIS.

GX 11-401 is a photo of the Israeli flag that Young used as a doormat for the entrance to his

residence.  The following exhibits were saved in Young's computer media:

> GX 10-250, a cartoon with Arabic writing and depicting the
> American military as under the whip of a crazed Jew;
>
> GX 10-251, a cartoon with Arabic writing and depicting
> Colin Powell as a puppet of a stereotypical Jew;
>
> GX 10-252, a cartoon depicting a pig with the face of a
> stereotypical Jew, titled "Jewish Swine"; and
>
> GX 14-138, a picture of a swastika imposed on an Israeli flag,
> with the caption "The Greatest Devil".

Exhibit 10 consists of trial exhibits that are probative of Young's affiliation with Nazism

and his support for ISIS at the same time, including:

> GX 706, a (redacted) roster of "5 Kompanie B 19. Panzergrenadier Rgt.,
> reflecting that Young's alias on that roster was Stormtrooper Klaus Dusselkamp:
>
> GX 8-500, screenshots of the Liveleak website, showing that "Dusselkamp"
> created the channel in 2007, and posted on it as late as May 7, 2015; and
>
> GX 8-501, screenshots of the Liveleak website, showing that "Dusselkamp"
> justified the burning alive by ISIS of the captured Jordanian pilot.

In short, the evidence sampled above shows that Young's support for Nazis was intertwined with

his support for Islamic extremists, and that both were motivated by hatred of Jews.

Young claims that the Nazi materials should not be admitted because the government

seized only Nazi-related materials from his house, and did not seize other collectibles that Young

possessed.  Whether the government cherry-picked Young's Nazi paraphernalia is a matter for

argument at trial, and does not bear on their admissibility.  We expect, however, that the

evidence will show that (1) the only foreign leader whose birthdate Young used for his own

contact information was Hitler; (2) the only framed portrait of a foreign leader from modern

times that Young had in his house was Hitler's; (3) the only historical identity that Young used

for postings on Liveleak in support of ISIS was Stormtrooper Klaus Dusselkamp; and (4) the

only leaders from modern history included on Young's prayer list were Hitler, Mussolini, and

Saddam Hussein.[13]

Young's claim that the government's evidence of his adherence to Nazi ideology is

unduly prejudicial also must fail.  Courts routinely admit evidence more prejudicial than that

which Young challenges, including defendants' prior convictions and even serious uncharged

crimes.  *See*, *e.g.*, *McLaurin*, 764 F.3d at 382-84 (upholding admission of defendants' prior

robbery conviction and firearm possession to prove their predisposition).  *See also United States

v. Abu–Jihaad*, 630 F.3d 102, 132–33 (2d Cir. 2010) (upholding admission of bad-act evidence

over Rule 403 objection because evidence was "no more inflammatory than the charges alleged

in the indictment").

Young also argues that evidence of his pre-2010 adherence to Nazi ideology is not

necessary because the government possesses evidence of his post-2010 adherence to ISIS

ideology.  Young's entrapment defense undercuts the logic of this argument as well.  After all,

Young asserts that the government must prove his predisposition before Young met Khalil in

2010 - - and ISIS was not even formed until 2014.  To the extent that evidence of predisposition

---

[13]  In light of Young's argument that the seized Nazi material was only a fraction of his
memorabilia collection, the volume and scope of the seized material is at issue.  As a result, none
of the Nazi material could be cumulative; all is relevant and necessary to rebut Young's claim
that the Nazi-related exhibits were cherry-picked from a bigger collection of memorabilia.

before 2010 is essential to refute Young's entrapment claim, evidence of his adherence to Nazi

ideology before 2010 is necessary to show predisposition. *United States v. Queen*, 132 F.3d 991,

998 (4th Cir. 1997) (evidence is necessary where, considered in the "light of other evidence

available to the government," it is an "essential part of the crimes on trial, or where it furnishes

part of the context of the crime").

The cases upon which Young relies do not support the outcome he seeks because

virtually none are entrapment cases. Cases actually involving entrapment show the weakness of

his argument. *See, e.g., United States v. Mohamud*, 843 F.3d 420, 434 (9th Cir. 2016) (affirming

admission of evidence that the defendant supported Osama Bin Laden and the September 11

attacks); *United States v. Cromitie,* 727 F.3d 194, 212-13 (2d Cir. 2013) (affirming admission of

evidence that the defendant wanted to bomb a police car); *United States v. Siraj*, 2008 WL

2675826 (2d Cir. July 9, 2008) (affirming admission of extremist videos); *United States v.

Higham*, 98 F.3d 285, 291 (7th Cir. 1996) (affirming admission of defendant's threat to 'blow a

hole through" a victim); *United States v. Mahon*, No. 2010 WL 4038763, at *11 (D. Ariz. Oct.

14, 2010) (admitting evidence of the defendant's allegiance to violent white supremacist groups),

*aff'd*, 793 F.3d 1115 (9th Cir. 2011).

B.    Evidence of Young's Prior Transfer of Funds
        Overseas in Furtherance of Unlawful Conduct

Exhibit 11 consists of documents seized from Young's residence in August 2016 that

establish that, long before he met a government agent, he transmitted money overseas under fake

names or from a fake address. GX 10-802 is a Western Union receipt from October 21, 2005,

reflecting the transfer of $450 to Zdravko Stefanov Daskalov ("Zdravko") in Bulgaria, by

Nicholas Young. The Western Union document reflects that, on that occasion, Young specified

on the form his actual name and address.

GX 10-801 is another Western Union receipt, from October 30, 2008, reflecting the transfer of $380 by Young to Zdravko.  This document reflects that, this time, Young specified as his address as the fictional address of 11881 "Hellbreak" Avenue in Fairfax, Virginia.  GX 10-803 is a third Western Union receipt, from August 15, 2013, reflecting the transfer of $812 to Zdravko by "Simon Belmont."  GX 10-804 is an email, dated May 12, 2004, from Zdravko to "Rudolph Van Waldron," regarding a shipment of drugs for $134.

The relevance of these exhibits is not that they show that Young purchased illegal drugs (we make no claim about the legality of the purchases).  Their relevance, instead, is that, long before Young met any government agent, he used fake names and a fake address to transmit money overseas in the course of transactions about which he did not want the government to know.  Indeed, his transmittal of funds under fake names or from a fake address between 2008 and 2014 is admissible evidence of his predisposition to send money to ISIS through the Threema Application ("the Threema App") in 2016.  To the extent that this evidence is "prejudicial" because it involved the purchase of drugs, any risk of prejudice could be mitigated by a limiting instruction.

C.  <u>Evidence of Possession and Dissemination of ISIS and Al Qaeda Propaganda</u>

The videos and images of ISIS and al-Qaeda propaganda that Young possessed are central evidence of Young's predisposition to support ISIS.  In addition to evidence of videos and images seized from his residence and computer media, testimony at trial will establish that, in 2014, Young showed Mo an extremist video, and that in May 2015, Young linked a jihadi video ("Screw Infidels") to his Facebook page.  Such evidence is admissible to show Young's intent. *United States v. Hassan*, 742 F.3d 104, 142 (4th Cir. 2014) (in a terrorism prosecution

not involving entrapment, evidence posted by defendant Yaghi on Facebook promoting his radical and violent jihadist beliefs supported his conspiracy convictions).

As the Fourth Circuit wrote in *Hassan,* "Hassan's nefarious intentions were substantiated when, in January 2009, he instructed his paramour to remove his postings on his Facebook page as well as postings on 'Muslim Gangsta For Life,' which endorsed his radical ideology."  The "Screw Infidels" video that Young posted on his Facebook page is analogous to the "Muslim Gangsta for Life" posts that Hassan posted on his own Facebook page. *Id*. at 145.

Given Young's entrapment defense, the ISIS and al-Qaeda videos and images that he possessed are indisputably relevant. *See United States v. Mehanna*, 735 F.3d 32, 62 (1st Cir. 2013) ("[T]he government's case depended on proving that the defendant's actions emanated from views that, over time, had aligned with al-Qa'ida's.  The media that he consumed en route to forming those views is a salient part of the story."); *United States v. Siraj*, No. 07–0224–CR, 2008 WL 2675826, at *2 (2d Cir. July 9, 2008) ("testimony regarding a videotape Matin had given to the cooperating witness . . . was relevant to the question of inducement because it showed that Matin was already well acquainted with the type of violent and graphic material he claims the cooperating witness used to entrap him").  Young does not suggest otherwise, and claims solely that the videos and images are unduly prejudicial and that written descriptions suffice.  The law is to the contrary.

For example, in *United States v. Mohamud*, 843 F.3d 420, 434 (9th Cir. 2016), the Ninth Circuit agreed that, to rebut an entrapment defense, the government was entitled to introduce evidence that the defendant supported Osama Bin Laden and the September 11 attacks, and possessed a magazine aimed at American jihadists.  In *United States v. El-Mezain*, 664 F.3d 467, 509-11 (5th Cir. 2011), the Fifth Circuit agreed that, to rebut the defendants' denial that they

supported Hamas, the government was entitled to introduce evidence seized from the defendants'

offices, including images of violence and videos glorifying Hamas and depicting Hamas leaders.

*Id.* at 509–11.[14]

Similarly, in Young's case, evidence of ISIS videos serves a vital purpose: to rebut his

claim that he was not predisposed to support ISIS.  As the court in *El-Mezain* concluded, the

high probative value of this evidence outweighs the risk of undue prejudice to Young.[15]

Young cites *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 128 (D. Conn. 2008), as a

decision "excluding mujahideen fighting videos insofar as they contained extreme violence,

bloody bodies and mutilation."  Def. Memo at 43.  *Abu-Jihaad* is not an entrapment case, but

Young's characterization of it is misleading anyway.  There, the court *admitted* videos depicting

"fighting between the mujahideen and Russian troops, replete with numerous explosions,

shootings, and dead soldiers as well as Muslim fighters," and "glorify[ing] martyrdom and also

the killing of non-believers."  *Abu-Jihaad,* 553 F. Supp. 2d at 128.  While the court did direct the

government to edit the videos to remove some particularly gruesome images, it held that "it is

difficult—if not impossible—for the Government to give the jury an accurate sense of the nature

---

[14] Like Young, the defendants in El-Mezain engaged in terrorist *financing* but not terrorist
violence themselves.  "Although this case relates to terrorism, it does not involve charges of
specific terrorist acts.  Instead, it focuses on the defendants' financial support for terrorism and
terrorist ideology."  *El-Mezain,* 664 F.3d at 483.

[15]  In so holding, the El-Mezain court rejected the defendants' undue prejudice
objections, which relied on *United States v. Al–Moayad*, 545 F.3d 139 (2d Cir. 2008) - - a case
that Young also cites.  In *Al–Moayad*, the court held that testimony from a victim of a Hamas
bomb attack on a bus and images of the aftermath of the attack were not admissible under Rule
403.  The court reached that ruling because the government offered this evidence to show the
defendants' knowledge that Hamas engaged in terrorist activity, even though the defendants
never denied such knowledge.  545 F.3d at 160.  In Young's case, however, the issue in this case
is not whether he knew that ISIS engaged in terrorist activity - - because he indisputably did - -
but whether he *supported* such activity.

of these videos without playing for the jury some of the violent and graphic portions of the videos. Otherwise, the jury would have an inaccurate sense of their content." *Id.*

On appeal, the Second Circuit upheld the admission of the videos, holding that "[a]lthough these excerpts included depictions of violence, as was necessary not to distort the sense of the films as a whole, the depictions were limited and, as the district court accurately observed, less gruesome than many seen on nightly news dispatches from Baghdad." *United States v. Abu-Jihaad*, 630 F.3d 102, 133–34 (2d Cir. 2010) (also holding that extremist material from websites the defendant visited was properly admitted). *Accord United States v. Pugh,* 162 F. Supp. 3d 97, 117–18 (E.D.N.Y. 2016) (in a non-entrapment case, admitting edited videos of ISIS executioners, because the "nature and content" of the videos spoke strongly to the defendant's "state of mind"). Given this precedent and the fact that Young has elected to pursue an entrapment defense, the ISIS and al-Qaeda videos and images are properly admitted to show Young's predisposition.

  D. <u>Evidence of Young's Possession of Islamic Nasheeds and White-Power Music</u>

Young argues that the government should be precluded from playing his music on grounds of relevance and prejudice. He suggests that, at most, the relevance of the music would lie in the fact that he possessed it. Young's Br. at 24. We plan to introduce evidence that Young possessed certain music, but do not seek to play any. Exhibit 12 contains GX 10-304, a photo of Young's iPod, which reflects that, among Young's music selections, were "ISIS Techno Remix" and "Jihad Nasheed." That evidence surely is probative of his predisposition. *See* , *e.g.*, *United States v. Magleby*, 241 F.3d 1306, 1319 (10th Cir. 2001) (finding that probative value of racist song lyrics on white supremacist CD owned by the defendant outweighed prejudicial effect and were properly admitted in civil rights case because defendant's state of mind was at issue).

E.  Young's Statement of Desire to Join ISIS in Order to Obtain a Slave

Young seeks to bar evidence of his desire to acquire a slave.  That evidence is admissible because, troubling as it may be, the prospect of obtaining a slave was one of Young's motivations for supporting ISIS.  *See United States v. Mostafa*, 16 F.Supp.3d 236, 258, 268 (S.D.N.Y. 2014) (evidence that the defendant justified enslaving captives was admissible even in a case *not* involving entrapment).  As the court found in *Mostafa*, Young's own statement is admissible because it is "no more prejudicial than that with which he has already been charged." *Id.* at 258.  By claiming entrapment, Young placed his intent at issue, and his own statements are admissible to prove his intent.

In addition to showing Young's predisposition, the evidence of Young's desire to acquire a slave is admissible because it is inextricably intertwined with evidence of other communications that Young had with Mo.[16]  As the Fourth Circuit has explained, "evidence of uncharged other acts is intrinsic and not subject to Rule 404 if the acts arose out of the same series of transactions as the charged offense or if the evidence of the uncharged conduct is necessary to complete the story of the crime on trial." *United States v. Day*, 700 F.3d 713 (4th Cir. 2012).  Such evidence is *direct* evidence of a crime.

Much of the evidence to which Young objects is inextricably intertwined with the evidence of the offenses charged against him.  For example, Exhibit 13 reflects that Young used the Threema App on July 30, 2016, to tell Mo about Young's desire to acquire a slave[17] - - and

---

[16]  More precisely, the evidence of Young's desire to acquire a slave is admissible because it is inextricably linked with evidence of other communications that Young had with the accounts that were controlled by the FBI - - but which Young *thought* were controlled by Mo.

[17]  "To be honest, I would like to buy a slave. . seriously, lol, but I heard the supply is low. . inshallah a large crop of Alawi women will fall into the hands of the mujahideen."

then immediately wrote that the local mosques were "corrupt" because they preached that "the jihad is within ourselves, jihad of the pen, blah blah blah, the usual emotional stuff, zero evidence." Young's derogation of the local mosques as "corrupt" because they did not interpret "jihad" necessarily to entail violence surely is probative of his predisposition to support ISIS - - but that derogation exists on the same screen shot that contains the statements that he made about desiring a slave in the same message. Further, as seen in Exhibit 10, GX 8-504, under the identity of "Dusselkamp," Young posted on Liveleak in December 2014, his agreement that mujahideen were authorized to take "wives" from among their captives. Regardless of how disturbing they are, Young's relevant statements about slaves simply cannot be disentangled from his other relevant statements, and are intrinsic to the case against him.

F.   Young's Statement of Desire to Kidnap and Torture an FBI Agent

Young challenges the admission of his statements to Khalil that he wanted to kidnap and sexually torture a female FBI special agent who previously interviewed him. These statements evidence his intent and are probative of predisposition.

In addition to proving Young's predisposition, this evidence is relevant for several related reasons. First, Young asserts that this prosecution is the continuation of an unfair focus on him that started in 2011 - - but Khalil's report to the FBI regarding Young's stated desire to kidnap an FBI agent was (not surprisingly) a factor in triggering that focus; to the extent that Young argues that the focus on him was unfair, we must be permitted to provide the context for that focus.

Second, in light of Young's claim of entrapment, Khalil's credibility is at stake. Khalil's credibility is enhanced, however, by the fact that the FBI found on Young's computer a photograph of the agent that (Khalil reported that) Young said that he wanted to kidnap. Third,

Young's musings about kidnapping and sexually torturing the agent is akin to his musings about attacking FBI generally, and corroborates other testimony on that point.

Statements of defendants' desire to attack law enforcement are routinely admitted to prove their predisposition. *See*, *e.g.*, *United States v. Cromitie*, 727 F.3d 194, 212-13 (2d Cir. 2013) (holding that defendant's statement, "I would actually like to put a fucking bomb in the back of a cop car while he's sitting in the motherfucker and watch him just explode, I would be the most happiest person in the world," was properly admitted to prove predisposition in case where defendant claimed entrapment. *See also United States v. Hassan*, 742 F.3d 104, 143 (4th Cir. 2014) (in a terrorism prosecution not involving entrapment, discussions regarding the kidnapping of a Marine officer supported the defendant's terrorism conspiracy conviction); *Mostafa*, 16 F. Supp. 3d at 267, admitting defendant's statements evincing a desire to kidnap non-Muslims). Because Young's statements to Khalil about kidnapping an FBI agent has significant probative value, it should admitted to establish predisposition.

G.    Evidence of Prior Statements About Attacking Law Enforcement, Violence Against Informants, Firearms Training, and Counter-Surveillance Measures

Young also moves to exclude several instances of his statements and conduct which are relevant and should be admitted to prove his predisposition. These include:

a) Suggesting that he and Khalil pour gasoline on FBI cars and light them;

b) Recounting to Khalil how Young aimed a rifle out of the window of his residence while scanning for law enforcement;

c) Telling Khalil that someone with Young's skills could attack the FBI; and

d) Describing to Khalil a method by which Young could smuggle weapons into the Alexandria Federal Courthouse so that they could be passed to confederates undetected.

All properly should be admitted as evidence of predisposition.  *Cromitie*, 727 F.3d at 212-13 (statements of desire to bomb police car, airport, and synagogue were proper evidence of predisposition); *United States v. Hassan*, 742 F.3d 104, 143 (4th Cir. 2014) (in a terrorism prosecution not involving entrapment, discussions regarding how a person could easily gain entry into an American military facility as a truck driver supported defendant's conviction).

Prior threats of violence - - such as Young's statement to Khalil that, if he ever were betrayed by someone, that person's life expectancy would be greatly diminished - - also properly should be admitted to show predisposition.  *See*, *e.g.*, *United States v. Higham*, 98 F.3d 285, 291 (7th Cir. 1996) (upholding admission of evidence of defendant "putting gun in the side of a man and threatening to 'blow a hole through [him]'" to prove predisposition in prosecution of defendant for hiring someone to commit murder for him).

Finally, Young's consciousness of government surveillance - - such as Young's statement that he was wary of government surveillance, his aiming an AK-47 style rifle out of the window of his residence while scanning for law enforcement, and his possession of disposable cell phones - - also is properly admissible to show his predisposition.  *See*, *e.g.*, *United States v. Ham*, 944 F.2d 902 *2 (4th Cir. 1991) (Table) (upholding admission of evidence to prove predisposition that defendant's residence was found stocked with attack dogs, five firearms, and a surveillance camera); *United States v. Gonzalez*, 19 F.3d 1169, 1173 (7th Cir. 1994) (citing, as evidence of predisposition, defendant's detection of government surveillance).[18]

---

[18] With respect to additional items listed by Young in his motion, animal abuse and a traffic ticket were part of conversations that Young had with Khalil.  To refute allegations that Khalil entrapped him, Khalil should be able to testify as to all of their conversations.  That being said, we do not plan to introduce the ticket itself in our case-in-chief.  With respect to sexual preference, we do not plan to present evidence on that topic (aside from possibly presenting testimony on other subjects from witnesses who were Young's ex-girlfriends).

Conclusion

"[I]if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue.  If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense."  *Sorrells v. United States,* 287 U.S. 435, 451 (1932), *quoted in United States v. McLaurin*, 764 F.3d 372, 381 (4th Cir. 2014).  Evidence of Young's predisposition to support terrorism is, therefore, admissible to rebut his own claim that his desire to support ISIS was implanted in him by the government.

For the foregoing reasons, Young's motion in limine should be denied.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:   _____/s/_____
Evan N. Turgeon
Special Assistant United States Attorney

Gordon D. Kromberg
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: gordon.kromberg@usdoj.gov

Certificate of Service

I hereby certify that on October 10, I electronically filed the foregoing

GOVERNMENT'S OPPOSITION TO OMNIBUS MOTION IN LIMINE with the Clerk of

Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel

of record.

_____/s/_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA    .    Criminal No. 1:16cr265
                            .
     vs.                    .    Alexandria, Virginia
                            .    October 27, 2017
NICHOLAS YOUNG,             .    9:26 a.m.
                            .
            Defendant.      .
                            .
.  .  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:          JOHN T. GIBBS, AUSA
                             GORDON D. KROMBERG, AUSA
                             EVAN N. TURGEON, SAUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314

FOR THE DEFENDANT:           NICHOLAS D. SMITH, ESQ.
                             David B. Smith, PLLC
                             108 North Alfred Street
                             Alexandria, VA 22314
                               and
                             LINDA MORENO, ESQ.
                             Linda Moreno P.A.
                             511 Avenue of the Americas
                             No. 2
                             New York, NY 10011

ALSO PRESENT:                SA NICHOLAS CASLEN

OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595


                    (Pages 1 - 24)

         COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

P R O C E E D I N G S

(Defendant present.)

THE CLERK:  Criminal Case 16-265, United States of

America v. Nicholas Young.  Would counsel please note their

appearances for the record.

MR. KROMBERG:  Good morning, Your Honor.  Gordon

Kromberg, John Gibbs, and Evan Turgeon for the United States.

With us at counsel table is Special Agent Caslen.

MR. SMITH:  Good morning, Your Honor.  Nicholas Smith

for Nicholas Young, and with me is counsel Linda Moreno.

MS. MORENO:  Good morning, Your Honor.

THE COURT:  Ms. Moreno, I've never met you in court,

but you and I had the *Al-Arian* case in common, and so your name

is well known to the Court.

MS. MORENO:  All those years ago, thank you.

THE COURT:  Welcome to the Court.

MS. MORENO:  Thank you.

THE COURT:  All right.  Now, we have before us today

the omnibus motion in limine, and I've looked at the

government's response, and I'm going to go ahead and just rule.

I don't need to hear argument, but I wanted to do it in open

court because sometimes on motions in limine, there's this --

it's a fluid -- it's a flexible kind of ruling, and that is,

normally my rulings on a motion in limine are always with a

caveat that if something changes during the course of the

3

1   trial, the decision may be reversed, so it's a, sort of a

2   preliminary ruling on certain issues.

3           And again, much of the government's response to the

4   motion in limine is based on the government's understanding

5   that there will be an entrapment defense.  Now, if there were

6   not an entrapment defense, a great deal of this evidence, in my

7   view, would be overly prejudicial, and it would not be properly

8   admissible, but as I understand it, and I will ask defense

9   counsel to correct me if my understanding is wrong, there will

10  be an entrapment defense in argument both that the defendant

11  was not predisposed and that the government induced him into

12  this conduct, and if that is the case, then that has opened the

13  door to a great deal of this type of evidence.

14          So I don't know who's going to be the main

15  spokesperson on this motion, whether it's you, Mr. Smith, or

16  Ms. Moreno, but somebody respond to that.

17          MR. SMITH:  Your Honor, I'll take the first stab at

18  it.  I think in response to the point Your Honor just raised,

19  the defense has never argued that in an entrapment case,

20  character evidence is never admissible wholesale as a general

21  principle.  Instead, we've just argued that the three

22  categories of evidence that we've highlighted in our motion

23  in limine do not go to predisposition or inducement in an

24  Islamic -- Islamist, militant Islamist terrorism case, so we're

25  not making that point that character evidence cannot come in.

4

1    We just would argue that common sense would suggest that in a

2    militant Islam terrorist case, white supremacist and Nazi

3    memorabilia is not relevant; and not only is it not relevant;

4    it doesn't come close to satisfying 403 balancing.

5          If I may, before the Court rules, I'd just like to

6    make one point and introduce one document, which is marked

7    Defense Exhibit 1.  We'd like to move it into the record, and

8    what it is is it's entitled the "Final Report:  Empirical

9    Assessment of Domestic Radicalization."  It's by two authors,

10   Michael Jensen and Gary LaFree, two Ph.D.'s.  This study was

11   funded by the Department of Justice, and, Your Honor, this is a

12   document that -- this is a study that is highly significant to

13   the defense's motion in limine.

14         The government has filed an expert opinion by an

15   expert called Dr. Gartenstein-Ross.  We received no notice of

16   that, by the way, so we're objecting to the use of that expert

17   opinion before certification in this hearing, but nevertheless,

18   if you pick through Dr. Gartenstein-Ross's report, which is the

19   only sort of factual basis for the Nazi-white supremacist

20   argument the government is making, you'll see that not only is

21   this study relied on by Gartenstein-Ross mis-cited; it runs

22   directly contrary to the only factual foundation offered by the

23   government to establish a connection between white supremacism,

24   Neo-Nazism, and ISIS.

25         The first page of the report establishes that -- the

5

1  Jensen-LaFree study establishes that these researchers have

2  built the largest known database on individual radicalization

3  in the United States.  It says the database includes 147

4  variables, covering demographic, background, group affiliation,

5  and ideological formation for 1,473 violent and nonviolent

6  extremists from across the ideological spectrum.

7          The report concludes in relevant part that extant

8  research has failed to establish -- rigorously compare

9  Islamist, far right, far left, and other extremist movements

10 despite "prima facie indications that there are important

11 differences in the radicalization causes and processes for

12 individuals who act across these milieus."  By "these milieus,"

13 it means far right, far left, militant Islam.

14         This is the study cited by their expert.  "The

15 research team for the Jensen-LaFree study knows of no empirical

16 effort the assess the comparability of Islamist, far right, far

17 left, or other radical ideologically driven movements in the

18 United States."

19         Then the report goes on to across a dozen metrics,

20 socioeconomic and geographic metrics undermine the notion that

21 there's any sort of possible data-driven comparison between the

22 far right and the far left, but, you know, the briefs get into

23 the weeds of this issue, get into the fact that the study that

24 this report that the government has submitted is anecdotal.  It

25 would -- the author of the report has never published in a

6

1    peer-reviewed academic paper on the connection between white

2    supremacism and militant Islam.  His opinion appears to be

3    largely repeating what -- an argument he made in a popular

4    press article in *The Weekly Standard*, but this is, this is

5    getting into the weeds.

6            I think the commonsense point here that an everyman

7    person would have about the argument the government is making

8    is not only is there no connection between white supremacism

9    and militant Islam; they're counter- -- they go -- the ideas

10   run contrary to each other.  They're mutually inconsistent.

11   They're antagonistic.

12           And if the Court is wondering why the government is

13   pushing a very extreme, perhaps risky trial argument about Nazi

14   evidence, the answer to that question is in the government's

15   brief.  The government says that the defense takes the position

16   under the *Jacobson* entrapment standard that the government is

17   is required to prove for predisposition purposes the defendant

18   had a predisposition to commit the charged crime before the

19   beginning of the investigation, before the first contact with

20   investigators.  That's in *Jacobson*, the Supreme Court decision.

21           The government says if that is true, if we are

22   required to prove under *Jacobson* a predisposition to materially

23   support radical Islam before the beginning of the

24   investigation, the government needs the Nazi-themed evidence

25   that was found in Mr. Young's house.

7

1          That statement is extraordinary because this is a
2   material support from militant Islam case.  Mr. Young was never
3   investigated for white supremacism, for hate crimes, for any of
4   these allegations.

5          How did they come up?  When Mr. Young's house was
6   searched after his arrest, these materials were found in his
7   home.  They were -- almost all of them were purchased in 2000,
8   16 years before the arrest.  Mr. Young was in a class on
9   European racism at George Mason University.  He was learning
10  about European racism at George Mason University.  He had a
11  collection of some pictures of Nazi materials in his house that
12  he largely acquired when he was in a European racism class at
13  George Mason University.

14         The FBI agents who were searching the home correctly
15  were not sure whether this material would be relevant to a
16  militant Islam case.  So what they did, and this is in the
17  record, is they called the prosecutor for the case and asked
18  him, correctly, whether these materials should be seized.  It
19  was authorized to seize these materials, but the point is that
20  was not the focus of the investigation.

21         It has no commonsense connection to militant Islam,
22  and you now have the government saying in a brief that they
23  cannot satisfy their previous position burden in this case
24  without Nazi and white supremacism evidence.

25         So the defense's position is that there is no

8

1   principal basis, as the EADR study I was just quoting from

2   shows, to draw a connection between Nazism and militant Islam,

3   and the only reason that is being offered in this case is to

4   satisfy a need for proof at trial.

5           If Your Honor would like to discuss the guns --

6           THE COURT:  Let me hear from Mr. Kromberg.

7           MR. KROMBERG:  Your Honor, our first witness in this

8   case is going to say that he was with Mr. Young at a Neo-Nazi

9   gathering and when they left the Neo-Nazi gathering, Mr. Young

10  says to the witness, "Don't discount the idea of an alliance

11  with the Muslims to combat the Jews."

12          Ten years later, Mr. Young -- the witness is going to

13  say that ten years later, Mr. Young gave him a copy of the

14  *Serpent's Walk* by the founder of the National Alliance, the

15  author of *The Turner Diaries*, a Neo-Nazi manifesto.  That ten

16  years later was in 2010.

17          The Court has seen that the defendant had the poster

18  of the Mufti of Jerusalem shaking hands with a generic-looking

19  Nazi, saying "Worldwide Association of Nazis and Islamists."

20          We're not saying that every case involving a

21  terrorist, Nazi material is probative of predisposition.  In

22  this case, when the defendant in this case used Hitler's

23  birthday as his own fake ID in setting up the communication

24  channel to communicate with the government undercover, in this

25  case, when the defendant said, "Don't discount the idea of an

9

1  alliance with the Muslims to combat the Jews," in this case, in

2  our exhibits, we showed, I think, Exhibit 5 --

3          THE COURT:  Well, let me stop you, Mr. Kromberg.

4  That statement that you cite, is that recorded, or will that --

5          MR. KROMBERG:  No.

6          THE COURT:  So that's just going to come in through

7  the testimony of a witness.

8          MR. KROMBERG:  Correct, not recorded.  This

9  happened -- this witness is a -- we spoke to the witness, and

10  he said, "Oh, yeah, years ago, I went to this Neo-Nazi

11  gathering with my friend, Mr. Young, and as we left that

12  gathering, we picked up all these materials from the National

13  Alliance, and he said to me, 'Don't discount the possibility of

14  an alliance with the Muslims to combat the Jews.'"

15          THE COURT:  Well, I mean, that kind of evidence makes

16  some of this -- some of this, not necessarily all of the Nazi

17  material -- relevant to this case, as prejudicial as it may be.

18          MR. KROMBERG:  Thank you, Judge.

19          You'll notice in the exhibits that we filed, Exhibit

20  5 is the bookmarks from Mr. Young's computer in 2011, and you

21  look at the, at the bookmarks, and there are some of them that

22  are Nazi, and some of them are Anwar al-Awlaki.

23          Mr. -- the defense counsel suggests that, oh, these

24  ideas are mutually inconsistent.  Maybe in some other case

25  they're mutually inconsistent.  In this case, this defendant

10

1    had them at the same time, and in this case, this defendant was

2    an adherent to both.  He used the name Stormtrooper Klaus

3    Dusselkamp when he was posting in favor of ISIS on Livelink.

4           This case is not -- we are not saying that every case

5    involving a terrorist and Islamist is related to Nazism, but

6    this case, it is.  This case, this defendant had on his phone

7    the picture with the smokestacks saying, "Together, we can

8    finish what Hitler started."  Well, what's that "together"?

9    Who are "we" that are doing this together?

10           We have the -- one of the amazing exhibits here, we

11    gave you a list of the prayer list that Mr. Young was praying

12    for when he was praying for Hitler and Mussolini and Sadam

13    Hussein and the Mufti of Jerusalem.  This is something modern.

14    This isn't ancient -- this isn't ancient history for Mr. Young.

15    This is what he believed as of now.  The people that he prayed

16    for were the Mufti of Jerusalem, Hitler, Sadam, his

17    grandparents, his family, the members of the umma, the

18    community, but this is, this is an unusual case.

19           And what, what Dr. Gartenstein-Ross said is not that

20    all Nazis and all Islamists are alike.  He said that the

21    mechanism of radicalization are similar in that they both have

22    dehumanized their enemies through hate speech and that it

23    contributes to the path that they take and the end point that

24    they reach.

25           He's not saying that every Nazi is the same as every

1    Islamist, but what he's saying is the dehumanization of your

2    enemy is a common trait between the two.

3            THE COURT:  And the virulent anti-Semitism.

4            MR. KROMBERG:  And the common enemy is hatred of

5    Jews.

6            We provided the picture of the door mat.  Mr. Young's

7    door mat was the Israeli flag.  No, that's not to say that

8    hatred of Israel is necessarily a hatred of Jews, but when you

9    also have on your phone, "Finish what Hitler started," the

10   defense in their pleading says, well, this just came to him

11   unsolicited on his phone.  The date that it came to him on his

12   phone was in January 2014.  I think that if you really didn't

13   like the picture, you might take it off your phone in the

14   two-and-a-half years before the government seizes the phone.

15           This case, Judge, is different than other cases.

16   It's a unique case, a unique defendant, and this case, the

17   predisposition evidence has to do with the convergence between

18   Nazis and Islamist terrorists, exemplified to some degree by

19   the Mufti of Jerusalem, Haj Amin Al-Husaini, who was in 2011 on

20   Mr. Young's Facebook page as a like.  He liked, he mentioned a

21   friend from his job, he mentioned John Wayne, and he mentioned

22   Haj Amin Al-Husaini.

23           This is an unusual case, and in this case, the

24   predisposition evidence has to do with Nazis.

25           THE COURT:  All right.

12

1           MR. SMITH:  Your Honor, if I may just very quickly

2    respond to some of these points?  If the Court is inclined to

3    include some of this evidence, which is highly cumulative, but

4    even if some of it were relevant, certainly not 50 pieces, that

5    would transform a militant Islamic terrorism case into a hate

6    crime case, but I would like to be clear with the Court what is

7    about to transpire.

8           The government has not cited a single terrorism case

9    with any Nazi memorabilia has ever been included.

10          THE COURT:  I don't think they have to.  Mr. Kromberg

11   has indicated there are specifics.  And again, if he's got --

12   if there are witnesses who are testifying to statements your

13   client made, this evidence obviously is relevant.

14          MR. SMITH:  I'm going to reach that, that point.  The

15   second is that in order to -- there is no factual argument to

16   link Nazism and the Islamic State in the government's briefs

17   except for the Gartenstein-Ross report.  The Gartenstein-Ross

18   report is an expert report.  Under Rule 702, an expert

19   report -- an opinion has to be based on sufficient data and

20   reliable principles.  The sole source of data from the

21   government's report is the Jensen and LaFree report I cited

22   earlier, which is directly contrary to Mr. Gartenstein-Ross's

23   opinion.

24          As for the chronological argument, which is

25   ultimately the final argument and sole argument the government

13

1   is making, the government argues that if Mr. Young had a

2   picture of himself in Nazi garb as a military reenactor at the

3   same time, in the same time period that he possessed -- that he

4   seemed to be interested in militant Islam, that renders the two

5   sort of subject matter in ideological context similar, but that

6   argument doesn't really work.

7          If -- there are many Neo-Nazi supporters and white

8   supremacist supporters in the world.  They do not include

9   Mr. Young, but because there are so many of them, there will

10  inevitably be a handful of Nazi and white supremacist

11  supporters who have any attribute, take acts.

12         There are many Neo-Nazi supporters who are Neo-Nazis

13  and carpenters.  You can find more than five of them.  There

14  are eight case studies cited in the Gartenstein-Ross report.

15  That doesn't establish an ideological connection between Nazism

16  and carpentry.

17         THE COURT:  Mr. Smith, you've made your argument.  I

18  understand it --

19         MR. SMITH:  As to the witness, we would dispute that

20  the comment was made.

21         THE COURT:  Excuse me.  I understand it in the

22  abstract, but Mr. Kromberg has properly focused this case on

23  the specifics of this case.

24         Now, whether Gartenstein can testify or not, file a

25  *Daubert* motion, and we'll look at whether or not this witness

14

1   can testify as an expert.  Under your discovery order, my

2   understanding is that the requirement is that the government

3   must disclose no later than ten business days before trial a

4   written summary of the testimony the government intends to use

5   under -- of an expert witness.

6           And so if either side is going to be providing expert

7   testimony in this case, but I think that might be a mistake

8   because the government is not, as I understand it, making some

9   general proposition that Nazism or white supremacist views

10  necessarily become pro-ISIS views.  What they're saying is in

11  this specific case, they have evidence that your client talked

12  with people about the two merging, and that is enough of a

13  link.  Plus the -- look, I'm ruling.

14          MR. SMITH:  Okay.

15          THE COURT:  Plus the common aim of both groups of

16  anti-Semitism.

17          In this case, now, I don't disagree with you that I

18  think there's too much, and I am going to require the

19  government to be -- to appropriately reduce the amount of

20  cumulative evidence.  You don't need to bludgeon this case with

21  this stuff because it is prejudicial, and it's my job to weigh

22  the relevance and the -- against the judicial impact -- the

23  prejudicial impact, and I'm going to have to do that.

24          I intend actually to look at this evidence before it

25  actually goes in.  We're not going to have a million sidebars

1   during this trial.  Juries hate it, and I hate it.

2          So I'm going to look at it the way I did in the

3   *Moussaoui* case, and I'll look at the videos if you're planning

4   to play any ISIS videos, and I'll tell you if you have to

5   redact it.  But the point is this evidence is coming in because

6   of the nature of the defense in this case.  If that defense

7   were different, that would change to a significant degree

8   probably most of this evidence.

9          I want to move on from the Nazi stuff.  Other than

10  putting the government on notice, as we get closer to the

11  trial, you have to give the Court and defense counsel a better

12  final list of what you're going to use, and we don't need ten

13  pictures or ten books or whatever.  That's not how it's going

14  to go in.

15          Now, the areas that I have great concern about,

16  though, is the government apparently is talking about

17  introducing all the weapons and the -- you can have a seat,

18  Mr. Smith -- all the weapons and the ammunition that was seized

19  at Mr. Young's residence.  I don't see the relevance of that to

20  this case, and I think there the prejudicial impact would be --

21  would outweigh any probative value.

22          There is no claim or charge of actual violence

23  against this defendant.  This is a material support case.  And

24  the type of material support this defendant is charged with is

25  aiding and abetting, you know, encouragement, perhaps obscuring

16

1   the movements of this person, and then sending the cards.

2   That's it.

3           There's no evidence that he was planning to do a

4   bombing.  There's no evidence which was the kind of evidence

5   that was in those cases you supported -- you cited to the

6   Court.

7           So I think, you know, it would be error to allow that

8   in unless as the case goes in, there is some argument by the

9   defense that Mr. Young was a completely pacific person that

10  never had any interest in promoting any acts of violence.  Then

11  it might properly open the door for some of that coming in.

12          MR. KROMBERG:  Judge, what is in this case is that in

13  2011, Mr. Young traveled to Libya to join the Abu Salim Martyrs

14  Brigade, and he went with body armor, and he returned with body

15  armor, and he has -- the testimony from the government

16  undercover will be that Mr. Young said he could sneak weapons

17  into this courthouse --

18          THE COURT:  And that's not coming in unless the door

19  is opened.  That is highly prejudicial.  The fact that he

20  traveled with the body armor is relevant to the issue of

21  connectivity with radical groups.  I don't have a problem with

22  that degree of connection, but just the fact -- I mean, the law

23  permits people to have weapons in their home.

24          MR. KROMBERG:  Oh, absolutely.

25          THE COURT:  And there's no evidence that any of these

17

1    weapons were illegally obtained, unless you have evidence to

2    that fact, and you haven't charged anything like that.  So that

3    in and of itself, just the cache of things that you found at

4    the house, are not coming in, but the evidence that he

5    traveled, that's certainly relevant.

6              MR. KROMBERG:  Judge, he had explosives there that

7    would do -- we understand from the FBI explosives expert and

8    we'll give notice of, that there's no lawful, legitimate use

9    for.  They're not illegal, but they're used for clearing land

10   in farm country perhaps, or they're used for destroying

11   buildings prior to clearing a building.

12             There was pieces of body armor to outfit a, outfit a

13   squad.  This was not personal use body armor.  This is --

14             THE COURT:  I understand, and it may be that there

15   was something else in the defendant's mind besides just

16   providing gift cards, but it's beyond the scope of the charges

17   in the indictment, and I think there the prejudicial impact

18   would outweigh the probative value.  You've got other evidence

19   in this case, so I'm not going to permit that, unless, as I

20   said, there's always a caveat unless something happens during

21   the trial that opens that door.  So listen carefully as the

22   case goes in.

23             MR. KROMBERG:  I will.

24             THE COURT:  All right?  So will I.

25             All right, I'm looking at the other categories of

18

1   evidence here.  That was the other, I thought, big category

2   that was the problem.  Oh, the other thing is these discussions

3   about sexual torture of a female agent or kidnapping an agent,

4   again in my view, the prejudicial impact of that outweighs any

5   probative value.

6         MR. KROMBERG:  I don't necessarily disagree with

7   that, Judge; however, we understand from recent discussions

8   with the defense that part of the defense is that the

9   government was focused too much on Mr. Young over the years,

10   should not have focused on Mr. Young.

11         We don't think that's relevant at all.  We think that

12   should not -- the defense should be precluded from arguing that

13   the -- arguing about the government's motivations in going

14   after --

15         THE COURT:  If they raise that argument, then you're

16   going to be able to come back and say, well, the FBI was

17   concerned about this man because he made these types of

18   comments.

19         MR. KROMBERG:  Exactly.

20         THE COURT:  That opens -- that's an example of

21   opening the door, all right?  So defense counsel need to be

22   judicious about how you decide to defend this case.  When a

23   door is opened, it allows the government to walk in.  If the

24   door is kept closed, they can't.  It's that simple.

25         But I would find that that evidence -- that kind of

19

 1    evidence, which would explain why the FBI continued to

 2    investigate this case as long as it did, would appropriately

 3    come in at that point, all right?  But unless it's opened up,

 4    it won't come up, all right?

 5             So the business about sneaking stuff into the

 6    courthouse, the thing about the kidnapping of the FBI agent or

 7    sexually assaulting or whatever, that doesn't come in, all

 8    right, unless it's opened, all right?

 9             MR. KROMBERG:  All right.

10             THE COURT:  I think that covered all the basic

11    things.  I mean, as I said, I'm going to go through the

12    evidence with you in advance, because I want to make sure it's

13    not going to be so ridiculously cumulative or so incendiary

14    that it can't go in.  I don't see any reason given the -- why

15    the -- never mind.  I won't go into that.

16             Ms. Moreno, you were going to say something?

17             MS. MORENO:  Your Honor, may I address the Court

18    briefly on a related matter?

19             THE COURT:  Yes.

20             MS. MORENO:  With respect to your previous order

21    denying the questionnaires, you had indicated in your order

22    that at the appropriate time, counsel would be able to propound

23    to the Court additional voir dire questions.

24             THE COURT:  Of course.

25             MS. MORENO:  Yes.  And not -- I'm not familiar with

20

1   Your Honor's rules and protocol.  Would the Court like that --

2   would that be appropriate at the bench during jury selection,

3   or would you like us to do it in writing?

4           THE COURT:  Again, you've got local counsel, who

5   should know how we operate here.

6           MS. MORENO:  I understand.

7           THE COURT:  But you have to file your proposed voir

8   dire ahead of time.  I think it's a week -- isn't it a week?

9   What's our standard rule?

10          MR. KROMBERG:  Yes, Your Honor.

11          THE COURT:  It's one week ahead of time.

12          MS. MORENO:  Thank you.

13          THE COURT:  As well as -- now I -- since we're

14  getting close to the trial date, in terms of jury instructions,

15  I don't want to have to read unnecessarily double sets of

16  instructions, so I expect both sides to try to work on a common

17  set of instructions if you can.  If there's a genuine

18  disagreement with an instruction, then you put that in writing,

19  and you have a proposed alternate instruction, and, of course,

20  I'll consider, you know, separate instructions if there are

21  individual ones that either side wants.

22          But with the voir dire, you propose all the -- all

23  the proposed voir dire comes to me a week ahead of time.  I

24  look at it.  All the voir dire is done by the Court.  Given

25  some of the issues in this case, I will have a larger pool of

21

1   jurors, obviously.

2          MS. MORENO:  Okay.

3          THE COURT:  And since we are getting close to the

4   case (sic) and it's going to take a while and it's going to be

5   in the holiday season and there are going to be a couple of

6   small interruptions given just the nature of that time period,

7   I'm going to seat 14 jurors, and my practice is that I don't

8   designate specific jurors as alternates.  I give each side one

9   additional peremptory, all right?  And that way, you know, you

10  can choose among --

11         MS. MORENO:  Yes.

12         THE COURT:  And then at the end of the trial,

13  assuming all 14 have made it through the whole trial, my

14  courtroom deputy with you-all present randomly pulls two names

15  out of the box, and those two become alternate No. 1 and

16  alternate No. 2.  That's how we proceed.

17         MS. MORENO:  Okay.

18         THE COURT:  I've never had an objection from counsel

19  proceeding that way.  If there is an objection, let me know

20  beforehand.  Okay?

21         MS. MORENO:  Thank you so much.

22         THE COURT:  All right.  And then what happens is so

23  after I've conducted the voir dire, I call counsel up to the

24  bench, and I will tell you who I'm going to strike for cause

25  unless there's an objection, and 99 percent of the time, the

22

1   lawyers agree with what I'm doing.  Then if there are any

2   additional jurors either side wants stricken for cause, I'll

3   hear it at that time.

4           Then the pool has been qualified, and we then draw

5   the jurors, and you'd better make sure you've consulted so you

6   know how we do -- there's no back-striking.

7           MS. MORENO:  There's no back-striking.

8           THE COURT:  Yeah, no back-striking.  All right?

9           MS. MORENO:  Thank you, Your Honor.

10          THE COURT:  All right.  Is there anything else we

11  need to address then?

12          MR. KROMBERG:  Not from the government, Judge.

13          THE COURT:  All right.  Mr. Smith?

14          MR. SMITH:  Your Honor, I'd just like to make one

15  point of clarification.  The Court has ruled on the Nazi

16  memorabilia, but there's essentially a breakdown of two buckets

17  of Nazi memorabilia.  There's one bucket where, you know,

18  there's photographs of historical Nazi-related memorabilia from

19  World War II, a photograph of reenactment garb, and then

20  there's a category where the government tries to make a visual

21  link between Nazism and militant Islam, for example, to this

22  figure of the Grand Mufti of Jerusalem who's shaking hands with

23  Hitler in a photograph.

24          So there's, there's one category where there is some

25  sort of visual link drawn, and there's a second where there's

23

1    no connection drawn.  That's -- the first bucket is sort of the

2    majority of it.  We would argue that's the cumulative part.

3              So is the Court ruling on --

4              THE COURT:  I'm letting --

5              MR. SMITH:  Did the Court want to view --

6              THE COURT:  I'm letting a little of both, but I want

7    to look at it.  Again, I expect Mr. Kromberg and Mr. Gibbs to

8    carefully go through it and cull out what would be cumulative,

9    because you don't need to bludgeon the jury with the fact.  And

10   let me see what his -- what the reduced list is like.  You'll

11   get a copy of that list as well.  And then I'll look at it and

12   see -- and I'll give you a determination as to whether I think,

13   you know, it can go in or not.

14             MR. SMITH:  So the Court is -- to be clear, the Court

15   is ruling on the historical, historical memorabilia?

16             THE COURT:  To some degree, if the government feels

17   it's necessary.  But again, I think you're correct that the

18   main emphasis ought to be on the evidence showing the

19   connection between the two.

20             MR. SMITH:  Thank you, Your Honor.

21             THE COURT:  All right.  Anything further?

22             MS. MORENO:  No, Your Honor, thank you.

23             THE COURT:  No?

24             MR. KROMBERG:  No, Your Honor, thank you.

25             THE COURT:  All right.  Then the defendant is

24

1  remanded.

2                        (Which were all the proceedings

3                         had at this time.)

4

5                  CERTIFICATE OF THE REPORTER

6      I certify that the foregoing is a correct transcript of

7  the record of proceedings in the above-entitled matter.

8

9

10  _____

                         /s/
                    Anneliese J. Thomson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) |
| | )    1:16-cr-265 (LMB) |
| | ) |
| NICHOLAS YOUNG, | ) |
| | ) |
| Defendant. | ) |

ORDER

For the reasons stated in open court, it is hereby

ORDERED that defendant's Omnibus Motion In Limine [Dkt. No. 117] be and is

GRANTED IN PART and DENIED IN PART.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 27 day of October, 2017.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 1:16 cr 265 |
| v. | ) | |
| | ) | |
| NICHOLAS YOUNG | ) | |

GOVERNMENT'S NOTICE OF EXPERT TESTIMONY

The United States provides this Notice of Expert Testimony pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) and Rules 702, 703, and 705 of the Federal Rules of Evidence. It is anticipated that the government will offer the expert testimony described below during its case-in-chief at trial.

1. Paul Lee, a special agent and computer forensic examiner with the Federal Bureau of Investigation.  In particular, Special Agent Lee will testify regarding his analysis of (a) the cell phone seized from the defendant on the date of his arrest; (b) the cell phone found on the bed of the truck carrying the defendant's client's vehicle on the date of his arrest; (c) the laptop, camera, and computer media found in the defendant's residence in August 2016.  His *curriculum vitae* is attached and his reports have been provided to the defendant in discovery.

2. Special Agent Alan Vanderplog,  a special agent and computer forensic examiner with the Federal Bureau of Investigation.  In particular, Special Agent Vanderplog will testify regarding his analysis of the iPod and a cell phone found in the defendant's residence in August 2016.  His *curriculum vitae* is attached and his reports have been provided to the defendant in discovery.

3.   Conroy V. Jett, a computer forensic examiner with the Federal Bureau of Investigation.  In particular, Mr. Jett will testify regarding his analysis of the computer media found in the defendant's residence in 2011.  His *curriculum vitae* is attached and his reports have been provided to the defendant in discovery.

5.   Daveed Gartenstein-Ross, a privately-employed scholar, practitioner, and author.  Dr. Gartenstein-Ross will testify as an expert regarding violent non-state actors, and the civil war in Libya.  He will testify regarding (a) the commonalities between radicalization mechanisms in militant Islamism and neo-Nazism; (b) the historical convergence between segments of the militant Islamist and Nazi or neo-Nazi movements; (c) the Abu Salim Martyrs' Brigade; and (d) the cultural significance of certain items seized from the defendant or found in his possession relating to militant Islam and Nazi or neo-Nazi movements.  His report is attached, and includes his *curriculum vitae*.

Stipulations reached by the parties may moot the need for the testimony of the computer forensic examiners listed above.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:   _____/s/_____
Gordon Kromberg
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Email: Gordon.kromberg@usdoj.gov

2

USCA4 Appeal: 18-4138    Doc: 24-1    Filed: 06/21/2018    Pg: 165 of 447

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of November 2017, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF, which will send a notification of such

filing (NEF) to counsels of record.

_____/s/_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov

3

-153-

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No.: 16cr265 (LMB) |
| NICHOLAS YOUNG, | ) |
| Defendant. | ) |

**DEFENDANT NICHOLAS YOUNG'S MEMORANDUM IN SUPPORT OF MOTION TO
EXCLUDE TWO EXPERT WITNESSES FROM TRIAL**

Defendant Nicholas Young, through his undersigned counsel, moves the Court to exclude

the testimony of two putative expert witnesses the government intends to introduce at trial: (1)

Dr. Daveed Gartenstein-Ross, who would opine that, in his expert opinion, white supremacism

and militant Islam are – contrary to received lay opinion –  the same phenomenon; and (2) Ian

Campbell, an Arlington County police officer, who appears to have created a short Power Point

presentation for trial, including such subjects as how a trained investigator may ferret out

narcotics through his or her sense of smell.

On November 17, 2017, the government filed a 102-page expert report authored by

Gartenstein-Ross (the "Nazi/ISIS Report").  (ECF 135-4.)  The Nazi/ISIS Report is an updated

version of the report the government filed in opposition to Mr. Young's motion *in limine*,

entitled "Report on the Relationship between Affinity for Nazism and Inclination to Support

Militant Islam Groups – United States v. Nicholas Young." (ECF 127-1.) Shorn of the abstract

noun-rich title, The Nazi/ISIS Report still suffers from the flaws of its antecedent:

- Gartenstein-Ross has no peer-reviewed publications concerning his (to say the least)
  improbable Nazi/ISIS thesis;

- He has never testified as an expert in any criminal trial, much less a terrorism one;

1

- The Nazi/ISIS Report is based on anecdote, not data;

- Conclusions do not follow premises;

- The methods are unsound: no effort is made to account for confounding variables;

- His analysis of the Nazism side of the equation rests on secondary sources which academics in the field have regarded as out of date since the 1960s or earlier;[1]

- The report omits to disclose, much less reconcile, the findings of key contrary evidence;

- The trier of fact will not require Gartenstein-Ross's brand of expertise in this trial.[2]

- Much of his proposed testimony is transparently a device to launder prejudicial hearsay into trial.

As for Mr. Campbell, the police officer, the government has not explained where his expertise lies, still less why the fact-finder requires it. To the contrary, the government has informed the defense Mr. Campbell is mostly a fact witness. Yet, Mr. Campbell will apparently also attempt to testify based on his understanding of "ideological indicators of extremism."

Both "experts" should be excluded from trial. Fed. R. Evid. 702.

## I.    THE PUTATIVE EXPERT WITNESSES

### A.    Dr. Daveed Gartenstein-Ross

Dr. Gartenstein-Ross reports he is the Chief Executive Officer of a for-profit company called Valens Global,[3] "a private commercial entity that focuses on the challenges posed by VNSAs." (Nazi/ISIS Report, p. 1.) By "VNSAs," Dr. Gartenstein-Ross means "violent non-state

---

[1] One example: Gartenstein-Ross refers to the journalist William Shirer as "one of the definitive historians of the Third Reich" and repeatedly cites him. (ECF 135-4, p. 62.) These are not the words of a Nazism expert. As Richard Evans, a preeminent contemporary scholar of Nazi Germany at Cambridge puts it, Shirer "is hopelessly out of date now." *See* goo.gl/ihfXPj.

[2] *See*, *e.g.*, Glenn Greenwald, The Sham "Terrorism Expert" Industry, Salon, available at: http://goo.gl/t8yA1d (discussing Gartenstein-Ross as an example of this lucrative inside-the-beltway cottage industry).

[3] The Valens Global website depicts Gartenstein-Ross and his employees, available at http://valensglobal.com/#team.

2

actors (VNSAs)," which he has "around twenty years of professional experience and educational study examining." *Id.*

Gartenstein-Ross cites four bullet-pointed examples of where he has been "court-certified to serve as an expert witness on terrorism and Islamist militant groups." (Nazi/ISIS Report, p. 4.) None includes certification as an expert witness at a criminal trial. Three of the matters are immigration-related.

The final matter is a federal civil case called *Foley v. Syrian Arab Republic* (D.D.C. 2017). (Nazi/ISIS Report, p. 4.) A PACER search for *Foley* turned up matter number 11-cv-699, and yielded one hit for a keyword search of Dr. Gartenstein-Ross's name: a minute entry indicating a liability hearing was held in November 2016, during which one of Plaintiff's witnesses is listed as Dr. Gartenstein-Ross. Undersigned counsel called an attorney for the *Foley* plaintiff and made inquiries. Plaintiff's counsel represented that the minute entry referencing Gartenstein-Ross's name was a default hearing: the opposing party was not present to contest Gartenstein-Ross's testimony on the subject of "terrorism and Islamist militant groups."

Dr. Gartenstein-Ross's CV includes hundreds of books, monographs, articles, and speeches on Islamist militancy. (Nazi/ISIS Report, pp. 4-7.) However, although the subject of the Report is the putative links between Nazism and militant Islam, Dr. Gartenstein-Ross's writings on the subject of the "militant white separatist and neo-Nazi movement" consist of two "technical publications," and two popular press articles, one an article in *The Weekly Standard* entitled "The Peculiar Alliance," dated 2005, the other a review of a "seminal book *The Enemy of my Enemy*" by an author called George Michael, published in 2006. (*Id.*, p. 7.) Gartenstein-Ross does not indicate where his book review was published, if anywhere. (*Id.*)

3

Much of the Report's Nazi/ISIS compare-and-contrast is an amalgam of Gartenstein-Ross's article from *The Weekly Standard* (2005), and analysis lifted from *The Enemy of my Enemy* book (2006), that is, of publications dated eight to nine years before the emergence of the FTO at issue in this case, ISIS.  For example, the following is the to-be-sure paragraph from Gartenstein-Ross's *Weekly Standard* article:

> Such an alliance seems unlikely on its face; after all, neo-Nazis view most Muslims as racially inferior, while Islamic extremists believe that neo-Nazis are just another flavor of infidel.

*See* The Peculiar Alliance, *The Weekly Standard*, available at goo.gl/p445wV.

And here is Gartenstein-Ross, nine years later, in the Nazi/ISIS report:

> It may seem counterintuitive or surprising that there would be areas of convergence between Nazism and Islamist militancy, or that both ideologies might appeal to the same person.  After all, a committed Nazi would view many Muslims as racially suspect, while Islamist militants tend to view 'infidels' as a whole as their adversaries.

(Nazi/ISIS Report, p. 18.)

In its original iteration, Gartenstein-Ross's Report contained three "conclusions": (1) "the mechanisms of radicalization that can attract an individual to neo-Nazism and to militant Islam are highly similar"; (2) "there are numerous salient case studies of convergence between Nazi or neo-Nazi ideology and militant Islamism in individuals that bear out the relationship between pro-Nazi beliefs and proclivity to support militant Islamists.  This convergence also has historical precedents"; (3) "when individuals have been attracted to or immersed in neo-Nazism, and then converted to Islam, they most frequently dive right into the extremist end of the diverse spectrum of Islamic practice, rather than showing interest in more moderate expressions of faith."  (ECF 127-1, p. 10.)

However, these "conclusions" were edited out and removed from the final Nazi/ISIS Report, likely because they represented an impermissible expert opinion on the legal conclusion

4

that ISIS and Nazism were similar enough to constitute relevant predisposition evidence in this case.  (*Compare* ECF 127-1, p. 10 *with* ECF 135-4, p. 10.)  Now, in the final version, the Report merely states it "examines what an examination of militant Islam and neo-Nazism [] can tell us about radicalization to violent extremism within these two ideological strains." (Nazi/ISIS Report, p. 10.)

Also added to the Nazi/ISIS Report is a new section "examin[ing] what an examination"[4] of various items seized from Mr. Young's home might say about the Nazi/ISIS "historical convergence" in this case.  (Nazi/ISIS Report, pp. 39-102.)  Dr. Gartenstein-Ross characterizes this expert "examination" as testing the "cultural significance" of the seized items.  (Nazi/ISIS Report, p. 10.)  The defense understands that, insofar as the Report analyzes the facts in this case, the "scientific, technical, or other specialized knowledge" offered by Gartenstein-Ross, Fed. R. Evid. 702(a), resides in his scientific/technical/specialized "examin[ing] of examination" of "cultural significance."

### B.    Ian Campbell, Arlington County Police Corporal

On November 17, 2017, the government informed the defense that a person called Ian Campbell, a police corporal with Arlington County, would testify as a fact witness because he allegedly attended a British National Party meeting with the defendant in 2000.  It added, however, that Campbell would also testify as an expert witness on the subject of "what he has learned about [] William Pierce, the National Alliance, *Hunter*, and the *Turner Diaries.*" He will also attempt to testify about, and display, a Power Point presentation he apparently created, entitled "Hidden in Plain Sight: Ideological Indicators of Extremism." (Attached hereto as Exh.

---

[4] Gartenstein-Ross declines to use the word "opinion" or "conclusion" throughout the final Nazi/ISIS Report. *Cf.* Rule 702 (expert may testify "in the form of an opinion . . . ."). Fed. R. Evid. 702.

5

1.)  The deck's relevance to this case is not immediately straightforward: the first slide, for

example states:

> The Trained Observer: Overt Signs of Criminal Activity
>
> - Guns – bulges in clothing, hand placement, magazines
>
> - Drugs – smells, spoons, needs, copper scouring pads

(Exh. 1.)

The government offered no CV for Ian Campbell. Nor did it indicate whether Mr.

Campbell has ever testified as an expert (or fact witness, for that matter).

## II.    ARGUMENT

### A.    Legal Standard

Rule 702 of the Federal Rules of Evidence provides that "a witness who is qualified as an

expert by knowledge, skill, experience, training or education may testify in the form of an

opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As for the "sufficient facts or data," upon which the expert's opinion must rest, anecdotal

case studies are insufficient.  *See*, *e.g.*, *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d

521, 527 (6th Cir. 2012) ("Red flags that caution against certifying an expert include reliance on

anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of

testing, and subjectivity."); *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1312 (11th Cir.

1999) (expert testimony should not be based solely on temporal proximity and anecdotal

6

evidence); *United States vs. Ira Stockton, et al.*, 13-cr-571, 2016 U.S. Dist. LEXIS 186465, *7

(D.N.M. May 2, 2016) (expert lacks sufficient facts and data where he relied on "anecdotal case

studies").

 To determine the reliability of the expert's methods, the court should consider testing,

peer review, error rates, and acceptability in the relevant expert community. *Daubert v. Merrell*

*Dow Pharms, Inc.*, 509 U.S. 579, 593-94 (1993); *United States v. McLean*, 695 Fed. App. 681,

684 (4th Cir. 2017) (same). Another elementary Rule 702 factor is falsifiability: whether a

theory can be proven false, or conversely, whether it is too subjective/value-laden to be

disproved. *See*, *e.g.*, *United States v. Wilson*, 484 F. 3d 267, 274 (4th Cir. 2007). Similarly, Rule

703 requires an expert to base his or her opinion on "facts or data," not "subjective impressions."

*Brown v. Burlington Northern Santa Fe Ry.*, 765 F.3d 765, 772 (7th Cir. 2014).

 A reliable expert method must account for, to the court's satisfaction, causes that might

explain the subject phenomena apart from the expert's thesis. *See*, *e.g.*, *Bickerstaff v. Vassar*

*College*, 196 F.3d 435, 450 (2d Cir. 1999) (holding that assumption that race bias tainted

professor's course evaluation scores is untenable without attempting to control for other causes

for low score); *Smith v. Xerox Corp.*, 196 F.3d 358, 370-71 (2d Cir. 1999) (holding that

plaintiff's statistical analysis failed on its own to support an inference of discriminatory treatment

sufficient to withstand a summary judgment motion because the analysis did not account for any

other causes or for the fact that older workers were more likely to be terminated); *Hollander v.*

*Am. Cyanamid Co.*, 172 F.3d 192, 203 (2d Cir. 1999) (holding that expert report is inadmissible

because its "inference of [age] discrimination solely on the basis of the raw numbers is

impermissible in the absence of any attempt to account for other causes of the . . . anomaly");

*Raskin v. Wyatt Co.*, 125 F.3d 55, 67-68 (2d Cir. 1997) (holding that expert report was

7

inadmissible in part because it "assume[d] any anomalies in the . . . data must be caused by age

discrimination, and [made] no attempt to account for other possible causes").

Finally, although an expert witness may in certain circumstances rely on hearsay

evidence as "data," the witness may not be used as a "conduit" to admit otherwise inadmissible

hearsay.  *See, e.g.*, *Gilmore v. Palestinian Interim Self-Government Auth.*, 53 F. Supp. 3d 191,

212 (D.D.C. 2014); *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (Although an expert

is entitled to rely on inadmissible evidence in forming his or her opinion, the expert "must form

his [or her] own opinions by applying his [or her] extensive experience and a reliable

methodology to the inadmissible materials"); *Estate of Parsons v. Palestinian Auth.*, 715 F.

Supp. 2d 27, 33 (D.D.C. 2010) ("Expert opinions may be based on hearsay, but they may not be

a conduit for the introduction of factual assertions that are not based on personal knowledge.");

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 445 (E.D.N.Y. 2013) (expert "testimony

cannot be used as an excuse to introduce and summarize straightforward factual evidence that

has not been admitted, such as a webpage that says 'Hamas carried out a suicide bombing'").

### B.   Gartenstein-Ross Has No "Scientific, Technical or Other Specialized Knowledge" Regarding His ISIS/Nazi Thesis – But He Does Tweet About It

To be certifiable, an expert must possess "scientific, technical or other specialized

knowledge," which will help the trier of fact understand the evidence or determine a fact in issue.

Fed. R. Evid. 702(a).  On the subject of his hypothesized ISIS/Nazi "convergence," Gartenstein-

Ross lacks these expert attributes.

Gartenstein-Ross has no peer-reviewed publications on the Nazi/ISIS "convergence." To

the contrary, his writings on the subject appear limited to *The Weekly Standard* and two

8

"technical journals." (Nazi/ISIS Report, p. 7.)[5]  In undersigned counsel's experience, counsel have never seen an expert certified with so few publications and such little experience on the very subject matter forming the basis of the expert opinion.  Nor has the government offered any peer-reviewed publications from any author on the Nazi/ISIS "convergence."

Gartenstein-Ross has never testified as an expert in a criminal case, much less on the subject of militant Islam.  Of course, he has also never testified as an expert on the ISIS/Nazi convergence in any case whatsoever.  Nor, of course, has the government offered any indication any expert has ever testified in a case on the ISIS/Nazi convergence (or offered any precedential support for the argument from any case, in any Circuit, at any time).

Gartenstein-Ross should not be certified on these facts alone.  *Newell Rubbermaid*, 676 F.3d at 527; *McGhan Med. Corp.,* 184 F.3d at 1312.

### C.    Gartenstein-Ross Relies on Anecdotal Evidence, Not Data, and Ignores the Key Study in the Field, the Jensen and LaFree Radicalization Study

The Nazi/ISIS Report's "convergence" argument rests, factually, on an analysis of "several individuals that illustrate the Nazi-militant Islamist connection." (Nazi/ISIS Report, pp. 23-32.)  This section, the sole element of factual analysis performed by Gartenstein-Ross before reaching items seized from Young's home, consists entirely of eight biographical vignettes.

Even if Gartenstein-Ross possessed "scientific, technical or other specialized knowledge" on the subject of the Nazi/ISIS "convergence," Fed. R. Evid. 702, which he most assuredly does not, his analysis is predicated on anecdotal evidence, not data.  It should be excluded for that reason alone.  *Newell Rubbermaid*, 676 F.3d at 527; *McGhan Med. Corp.,* 184 F.3d at 1312; *Ira Stockton, et al.*, 2016 U.S. Dist. LEXIS 186465, *7.  This chimes with common sense: because

---

[5] To be fair, Gartenstein-Ross occasionally tweets about subjects that seem to bring together Nazism and militant Islam.  *See, e.g.,* @DaveedGR, 23 Sep 2017: "So the story of the German jihadist who was also a BfV spy, porn star, and underwear maker isn't growing less weird."

9

there are so many examples of white supremacists/neo-Nazis in the world, finding eight white supremacist/neo-Nazis who *also* belong in category X (with X being any human characteristic) is not particularly challenging, much less "scientific, technical or specialized knowledge." This is particularly so where, like Gartenstein-Ross, one has selected such a motley crew of subjects: running the gamut from a Swiss born in 1927, to a contemporary American living in Pennsylvania, to a Catalan called Diego Jose Frias Alvarez. (Nazi/ISIS Report, pp. 23-32.)

Not only does Gartenstein-Ross have no data to support his Nazi/ISIS convergence, he ignores and fails to fully disclose the sole set of data on a possible Nazi/ISIS "convergence" – and which runs contrary to his argument. Gartenstein-Ross cites the following study: Jensen and LaFree, *Final Report: Empirical Assessment of Domestic Radicalization (EADR)* (College Park, Md.: University of Maryland, 2016) (the "EADR").[6] (Nazi/ISIS Report, p. 10 n. 7.) Among other findings Gartenstein-Ross omits from his Report are:

- "Extent research has failed to rigorously compare Islamist, far right, far left, and other extremist movements *despite prima facie indications that there are important differences in the radicalization causes and processes for individuals who act across these milieus*," EADR, at 15;

- "On average, individuals on the far right and those motivated by a single issue tend to be significantly older at their date of public exposure than their far left or Islamist counterparts," *id.*;

- "The education levels of extremists vary considerably when compared across ideological groups. [O]ur data show that individuals on the far right are less educated than other groups, with only 25.4% of valid cases holding a college degree or higher compared to the sample average of 43.3%.... Islamist extremists are near the average, with 41% holding a college degree or higher," *id.*, at 17;

---

[6] Available at http://www.ncjrs.gov/pdffiles1/nij/grants/250481.pdf. This is a study funded by the Department of Justice.

10

- "By a large margin, Islamist extremists had the highest numbers of first and second generation immigrants, making up 80% and 55% of all immigrants in the dataset in those categories, respectively. Individuals classified as far right have the lowest levels of first or second generation immigrant status, at 1.3% overall," *id.* at 18;

- "Far right extremists also show a relatively high rate of involvement in formal extremist groups at 58.6%, but were also often associated with informal extremist groups—a classification of organization with less leadership structure or defined roles, and includes groups often referred to as 'cells' and small, informal militias. Individuals described as Islamists and single issue had the lowest rate of group membership overall, with 23.1% and 18.2% acting without any known group affiliation, respectively," *id.* at 18;

Indeed, in a section of the EADR entitled "Implications for Criminal Justice Policy in the United States," Jensen and LaFree conclude that "The [EADR's] analyses of these questions show that there is no 'one-size-fits-all' model of radicalization." EADR, at 74.  The authors add: "Significant differences in background characteristics, group affiliations, and radicalization processes exist across ideological milieus." *Id.*  After all, among other differences, "[w]hile the radicalization of individuals on the far left and those motivated by Salafi jihadist ideologies tends to occur in early adulthood, individuals on the far right and those who are motivated by single-issues often radicalize later in life." *Id.*

Gartenstein-Ross fails to disclose these findings.  He fails to account for them.  He fails to distinguish them.  He fails to explain how they are incorrect.  Accordingly, the Nazi/ISIS Report should not be certified testimony for trial not only because it rests on no empirical support, but because it ignores the little empirical counter-evidence that exists.

### D.    Gartenstein-Ross's Method Is Unsound, and His Conclusions Do Not Follow

The Nazi/ISIS Report should be excluded because its opinions are not "the product of reliable principles and methods." Fed. R. Evid. 702. The Report's argument runs as follows.

11

*Radical ideology*. "Several studies" have shown that "radical ideology" is an "important vehicle driving extremist violence." (Nazi/ISIS Report, p. 11.)  Much of this discussion appears to concern "radical ideology" generally, as distinguished from the values and content giving substance to particular examples of radical ideologies.  (*Id.*)  Of the studies cited, only one appears to draw connections between militant Islam and "far-right ideologies" (such as Nazism), the previously cited Jensen and LaFree study (EADR).  As discussed, the EADR's conclusions run directly contrary to Gartenstein-Ross's.

*Political Grievance*.  This argument section appears to draw some sort of distinction between "radical ideology" and "political grievance," though the definitional boundaries remain unfocussed.  It appears the only part relating to ISIS/Nazis is the line that "both militant Islamist and neo-Nazi movements feature ideological true believers, as well as those whose involvement in the movement is driven more by individual or group experience." (Nazi/ISIS Report, p. 14.)  A little of both – for both groups? Don't many groups and institutions feature "ideological true believers"? Gartenstein-Ross's conclusion makes no effort to distinguish Nazi/ISIS adherents from many thousands of other ideological types.

*The Particular Role of Hate Speech*.  "Hateful messages are a staple of extremist ideologies." (Nazi/ISIS Report, p. 16.)   Again, as with such generic, value-emptied concepts as "radical ideology" and "political grievance," the concept of hateful speech and action does not draw ISIS and the Nazis any closer together than ISIS and PETA, or Nazis and the Weathermen.  Gartenstein-Ross sees "dehumanization" as the connecting tissue.  (*Id.* at 17.)  But dehumanization has been practiced historically not just by "VNSAs" and neo-Nazis, but also internationally recognized governments in times of war throughout history: World War II propaganda is one easy example.  Indeed, Gartenstein-Ross's premise reflects the outmoded

12

sociological focus on Nazism as the sole repository of dehumanization.  *See*, *e.g.*, Paul Bloom,

The New Yorker, The Root of All Cruelty, Nov. 27, 2017 ("Early psychological research on

dehumanization looked at what made the Nazis different from the rest of us. But psychologists

now talk about the ubiquity of dehumanization.").

     *The Convergence: Nazism and Islamist Militancy*.  Finally, the Report offers a specific

Nazi/ISIS linking argument to support its conclusions: both are "totalitarian"; "rigid"; "far-

reaching"; and divide the world into "good" and "evil." (Nazi/ISIS Report, p. 18.)

Unfortunately, these pat adjectives do nothing to separate Nazis and ISIS from Soviet

Communism, against which Nazism positioned itself in the interwar period, the Massachusetts

Bay Colony, Calvinism under Oliver Cromwell, Present day Democratic People's Republic of

Korea, and countless other historical examples.

     Similarly, the fact that ISIS and the Nazis share a "Jewish scapegoat" lends no support to

the Report's conclusions.  (Nazi/ISIS Report, p. 35.)  It is true that Nazis and militant Islamists

both suffer from an enduring and repulsive hatred of Jewish people.  Yet the Report fails to

grapple with the sad and more salient fact that even this commonality does not bring Nazis and

ISIS materially closer together relative to other groups and ideologies.  The Report

acknowledges that such an infamous propaganda work as the *Protocols of the Elders of Zion* was

"birthed in czarist Russia." (*Id.* at 37.)  It leaves out the unspoken implication: if anti-Semitism is

the linking factor, then an impartial, and not for-profit and litigation-driven, analysis would

consider whether the Nazi/ISIS comparison should sweep a little broader to include, for example,

by some estimates 74% of Middle East and North Africa, 34% of Eastern Europe, 24% of

Western Europe, and 19% of North America, which percentages harbor anti-Semitic attitudes

13

according to the Anti-Defamation League.[7] Anti-Semitism is a serious but also very widespread phenomenon not particularly localized in the groups at issue.

These sections of the Report constitute the premises of its (implicit) conclusion that Nazism is close enough to militant Islam to satisfy the government's need to use Nazi curio evidence in this militant Islam terrorism case. But they do not withstand basic scrutiny. The Report's methods are unsound and its conclusions do not follow from them.

### E.    Gartenstein-Ross's Methods Are Not Reliably Applied Here, and the Report Is Simply a Prejudicial Hearsay-Laundering Vehicle

Even if Gartenstein-Ross's methods were sound – which they are not – they are still not reliably applied to the facts in this case. Fed. R. Evid. 702(d). Often, the Report simply serves as a vehicle for the government to introduce evidence the Court has already indicated may be excluded from trial under Rules 401/403, as well as prejudicial hearsay evidence not even found in the defendant's possession. (Nazi/ISIS Report, pp. 39-102.) Even assuming Gartenstein-Ross's wandering musings on the "cultural significance" of various seized items constituted "scientific, technical or other specialized knowledge" (which of course they do not), much of the discussion has nothing to do with the Nazi/ISIS "convergence," but concerns instead the putative expert's seemingly random views on each item found in the defendant's possession, and even those that were not seized from Mr. Young.

Starting from the top, Gartenstein-Ross observes that "According to evidence provided to me by the U.S. Attorney's Office, the defendant possessed multiple issues of *Inspire*, an English-language online magazine published by al-Qaeda in the Arabian Peninsula (AQAP)." (Nazi/ISIS Report, p. 44.) Yet Gartenstein-Ross does not limit himself to *those* issues of *Inspire*. Instead, he repeatedly cites and quotes issues of the magazine – hearsay evidence – regardless of whether

---

[7] See Anti-Defamation League, ADL Global 100, available at http://global100.adl.org/#map.

14

it was possessed by the defendant.  (*Id.*)  This material is not only hearsay: it is highly prejudicial and inflammatory.  Although there is no charged violence in this case, Gartenstein-Ross proposes to discuss various bomb-making methods and other terrorist operations.  (*Id.* at 44-46.)  All of this would be excluded as hearsay evidence, if not also for failing Rule 403 undue prejudice balancing.  In addition, it has nothing to do with Gartenstein-Ross Nazi/ISIS convergence theory.

Gartenstein-Ross is the government's device for laundering hearsay evidence. *Palestinian Interim Self-Government Auth.*, 53 F. Supp. 3d at 212; *Mejia*, 545 F.3d at 197; *Palestinian Auth.*, 715 F. Supp. 2d at 33; *Strauss*, 925 F. Supp. 2d at 445 (expert "testimony cannot be used as an excuse to introduce and summarize straightforward factual evidence that has not been admitted, such as a webpage that says 'Hamas carried out a suicide bombing'").

Similarly, Gartenstein-Ross is used by the government as a vehicle to introduce prejudicial hearsay evidence when discussing the "Light series" videos.  (Nazi/ISIS Report, pp. 49-52.)  Much of this discussion has nothing to do with items found in the defendant's possession.  All of it is prejudicial and fails Rule 403 balancing.

Next, Gartenstein-Ross is used by the government as a vehicle to introduce prejudicial hearsay concerning biographical descriptions of individuals who are neither parties nor witnesses to the case.  (Nazi/ISIS Report, pp. 53-61.)  For example, Gartenstein-Ross is used to introduce hearsay evidence concerning a person named Abu Muhammad al-Maqdisi, who is "regarded as an extremely influential *saladi* jihadist." (*Id.* at 53.)  He is Palestinian.  (*Id.*)  Gartenstein-Ross is used to introduce hearsay evidence concerning Zach Chesser, who was charged in this district with terrorism. (*Id.* at 55.)  Gartenstein-Ross also offers hearsay testimony about Ali al-Timimi, who is not a witness or player in this case.  (*Id.* at 85-88.)  None of this hearsay would be

15

permitted in the case were it not for the pretense of including it as "data" relied upon by an expert. Accordingly, and because this hearsay has no connection to Gartenstein-Ross's Nazi/ISIS convergence thesis, this is another reason Gartenstein-Ross should not be permitted to testify at trial. *See Palestinian Interim Self-Government Auth.*, 53 F. Supp. 3d at 212; *Mejia*, 545 F.3d at 197; *Palestinian Auth.*, 715 F. Supp. 2d at 33; *Strauss*, 925 F. Supp. 2d at 445.

Likewise, Gartenstein-Ross's analysis of the "Abu Salim Martyr's Brigade" is a transparent excuse for otherwise-inadmissible hearsay. (Nazi/ISIS Report, pp. 59-61.) This section has nothing to do with the Nazi/ISIS connection, the putative basis of Gartenstein-Ross's expertise. What's more, the putative expert offers no analysis drawn from his expertise: he simply recites facts drawn from various sources of varying degrees of reliability, including amateur blogs. (*Id.*) A blog is not a credible source of information for an expert who would be certified under Rule 702. Fed. R. Evid. 703. All of this information is hearsay. This is not "expert testimony." It is a method by which the government may use proscribed evidence lacking in reliability. *See Palestinian Interim Self-Government Auth.*, 53 F. Supp. 3d at 212; *Mejia*, 545 F.3d at 197; *Palestinian Auth.*, 715 F. Supp. 2d at 33; *Strauss*, 925 F. Supp. 2d at 445.

Gartenstein-Ross then focuses his attention on the Nazi memorabilia found in Young's home. (Nazi/ISIS Report, pp. 61-80.) As shown *supra*, Gartenstein-Ross has no professional qualifications to conduct this "examin[ing] of examination" of "cultural significance," even assuming any expert does. He has no peer-reviewed publications on white supremacism or neo-Nazism. He is not specially educated in this field.

That may be why he cites the journalist William Shirer as "one of the definitive historians of the Third Reich" and repeatedly cites him. (ECF 135-4, p. 62.) For a self-described expert in Nazi Germany to make this statement is ludicrous. Shirer's *Rise and Fall of the Third Reich* was

16

a popular volume found on every college history student's shelf – many moons ago.  Today,

maybe one copy gathers dust in the back of Strand bookstore somewhere.  It is not, and never

was, academic historiography at all, much less the "definitive" treatment of the Third Reich.  As

Richard Evans, a preeminent contemporary scholar of Nazi Germany at Cambridge puts it,

Shirer "is hopelessly out of date now." *See* goo.gl/ihfXPj.

Beyond Gartenstein-Ross's manifest inability to testify expertly on this subject, he is also

used by the government to launder Nazi-themed hearsay, just as with militant Islam hearsay.

Even assuming Gartenstein-Ross was educated in, and expert in, such subjects as the SS (as

opposed to "VNSAs"), Nazi/ISIS Report, pp. 63-65, his proposed testimony merely regurgitates

swaths of prejudicial and irrelevant hearsay concerning the history of this praetorian guard.  This

is another reason not to certify Gartenstein-Ross.

The same goes for reams of hearsay information Gartenstein-Ross would be used to

introduce at trial concerning the so-called "National Alliance." (Nazi/ISIS Report, pp. 66-73.)

None of this prejudicial and inflammatory information was located in the defendant's possession.

Nor is there any evidence offered by the government indicating the defendant was aware of this

alleged history.  Gartenstein-Ross is unqualified to present "expert testimony" on this subject; it

is hearsay; it is unfairly prejudicial; it is irrelevant; it should be excluded.

Gartenstein-Ross proposes to read aloud from literature found in Young's home: the

*Serpent's Walk* and *Hunter*.  (Nazi/ISIS Report, pp. 73-80.)  Again, Gartenstein-Ross is not

qualified to discuss the neo-Nazism and white supremacism he sees in these volumes.  But even

if he were, he should not be permitted to read aloud, and at length, from these books: this is

prejudicial hearsay offered for no reason other than to inflame the jury.  Nor has the government

established enough of a connection between this literature and militant Islam to satisfy the basic

17

level of relevance required to use it.  In addition, Gartenstein-Ross acknowledges that *The Turner Diaries* were not found in the defendant's possession: Gartenstein-Ross's discussion of it is another backdoor attempt at introducing prejudicial hearsay evidence at trial.  (*Id.* at 78-80.)

Gartenstein-Ross proposes to introduce reams of prejudicial hearsay concerning the "cultural significance of evidence related to the Nazi/militant Islamist convergence." (*Id.* at 80-85.)  Once again, Gartenstein-Ross is not close to an expert in Nazism or World War II history. He is not qualified to opine on these subjects.  In addition, even if he were, Gartenstein-Ross does not limit himself to items seized from Defendant Young, but instead proposes to serve as a vehicle for a large amount of prejudicial hearsay about Nazism that was not found in Young's possession.  (*Id.* at 80-85.)  Indeed, Gartenstein-Ross bizarrely wanders into whatever subject piques his curiosity.  (*See*, *e.g.*, *id.* at 83.) ("Skorzeny also one of Hitler's favorite commandos, due to both his competency as a commando and the fact that both men hailed from Austria.") What any of this has to do with a US-based material support for terrorism case involving a Google Play gift card is mysterious.

Identically, in sections entitled "cultural significance of items found in defendant's internet activity"; "anti-semitic materials"; "9/11 conspiracy theories"; "jihadist materials"; "cultural significance of anti-semitic materials"; and "violent materials and militant posturing," Gartenstein-Ross wanders into various pieces of highly inflammatory and bizarre information and hearsay found nowhere in Young's possession. (Nazi/ISIS Report, pp. 88-102.)  This proposed testimony should be excluded for many reasons: First, this Court has already ruled that the charged conduct is nonviolent: Gartenstein-Ross's proposed "expert testimony" on "violent materials and militant posturing" not only fails Rule 702 analysis, it also contravenes the Court's relevance and Rule 403 rulings on this type of evidence.  Second, Gartenstein-Ross is again used

18

to launder a great deal of prejudicial hearsay that would not come in to trial but for the use of Gartenstein-Ross as an "expert." For all of the reasons cited in this brief, he should not be qualified under Rule 702, and the pretense of using him as an expert to introduce hearsay is just another basis to exclude his testimony.  Third, this case is not a hate-crime prosecution. Accordingly, Gartenstein-Ross's proposed testimony on the subject of "anti-semitic materials" is irrelevant in addition to being inflammatory, unfairly prejudicial and hearsay.

### F.    Ian Campbell, Arlington County Police Officer: Not an Expert Witness

The government has offered no basis upon which Ian Campbell, the Arlington County police officer, may qualify as an expert witness under Rule 702 on the subject of "what he has learned about [] William Pierce, the National Alliance, *Hunter*, and the *Turner Diaries.*" The government has provided no CV with his qualifications or experience.  As with most of Gartenstein-Ross's testimony, Mr. Campbell's is a backdoor attempt to introduce prejudicial hearsay.  The government has provided no indication Mr. Campbell has ever written, lectured, been educated in, or spoken about the subject of his proposed expert testimony.

## III.    CONCLUSION

For the foregoing reasons, Defendant Young moves to exclude from trial expert testimony offered by Dr. Daveed Gartenstein-Ross and Ian Campbell.

Dated: November 25, 2017                          Respectfully submitted.


                                                  */s/ Nicholas D. Smith*
                                                  Nicholas D. Smith (VA. Bar. 79745)
                                                  108 N. Alfred St.
                                                  Alexandria, VA 22314
                                                  Phone:(703)548-8911
                                                  Fax:(703)548-8935
                                                  nbs@davidbsmithpllc.com

                                                  Linda Moreno (admitted *pro hac vice*)
                                                  Linda Moreno P.A.

19

-172-

511 Avenue of the Americas
No. 312
New York, NY 10011
813-247-4500
lindamoreno.esquire@gmail.com

**Certificate of Service**

I hereby certify that on the 25th day of November, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> AUSA Gordon D. Kromberg
> AUSA John Gibbs
> U.S. Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> gordon.kromberg@usdoj.gov
> john.gibbs@usdoj.gov

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> */s/ Nicholas D. Smith*
> Nicholas D. Smith
> VA Bar No. 79745
> David B. Smith, PLLC
> 108 North Alfred Street
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> nds@davidbsmithpllc.com

21

Case 1:16-cr-00265-LMB   Document 1350-1   Filed 11/29/17   Page 1 of 102 PageID# 15943

# Expert Witness Testimony
## *United States v. Nicholas Young*

### Dr. Daveed Gartenstein-Ross
Chief Executive Officer, Valens Global
Senior Fellow, Foundation for Defense of Democracies

November 2017

My full name is Daveed Eliahu Ephraim Gartenstein-Ross. I am a scholar, practitioner, and author with around twenty years of professional experience and educational study examining violent non-state actors (VNSAs). My research has led me to consider VNSAs to be a coherent category of actors, where significant insight can be derived from comparing the organizational design, strategies, tactics, financing, recruitment, and ideologies of terrorist groups, insurgencies, cartels, gangs, and other kinds of VNSAs. Within this broad category of VNSAs, my work has focused in particular on the movement that self-identifies as *salafi jihadism*, as well as on U.S.-based militant white separatist groups.

I am the Chief Executive Officer of Valens Global, a private commercial entity that focuses on the challenges posed by VNSAs. I also hold appointments at think tanks in the United States and Europe. I have been a Senior Fellow at the Foundation for Defense of Democracies (FDD), a nonpartisan policy institute in Washington, D.C., for over a decade.[1] I am also an Associate Fellow at the International Centre for Counter-Terrorism – The Hague (ICCT). I have authored several studies for ICCT, some of which required international field research. Studies I wrote for ICCT include reports on the Tunisian jihadist group Ansar al-Sharia, a history of the Libyan civil war, and a review of how the Islamic State's (ISIS) propaganda plays a role in its strategy for global expansion.[2] I also recently served a term as a Fellow at Google's think tank Jigsaw, for which I led several major research projects examining extremists' use of online platforms, and what can be done to counter them.[3]

---

[1] For a sense of the work I have done for FDD, see the following books and studies that I authored for the institute, or for which I served as a volume editor: Daveed Gartenstein-Ross et al., *Islamic State 2021: Possible Futures in North and West Africa* (Washington, DC: FDD Press, 2017); Daveed Gartenstein-Ross et al., *China's Post-2014 Role in Afghanistan* (Washington, DC: FDD Press, 2014); Daveed Gartenstein-Ross & Jonathan Schanzer eds., *Allies, Adversaries and Enemies: America's Increasingly Complex Alliances* (Washington, DC: FDD Press, 2014); Daveed Gartenstein-Ross & Daniel Trombly, *The Tactical and Strategic Use of Small Arms by Terrorists and Terrorist Groups* (Washington, DC: FDD Press, 2012); Daveed Gartenstein-Ross & Linda Frum eds., *Terror in the Peaceable Kingdom: Understanding and Addressing Violent Extremism in Canada* (Washington, DC: FDD Press, 2012).

[2] See Daveed Gartenstein-Ross, *Ansar al-Sharia Tunisia's Long Game: Dawa, Hisba, and Jihad* (The Hague: ICCT – The Hague, 2013); Daveed Gartenstein-Ross, Bridget Moreng & Kathleen Soucy, *Raising the Stakes: Ansar al-Sharia in Tunisia's Shift to Jihad* (The Hague: ICCT – The Hague, 2014); Daveed Gartenstein-Ross & Nathaniel Barr, *Dignity and Dawn: Libya's Escalating Civil War* (The Hague: ICCT – The Hague, 2015); Daveed Gartenstein-Ross, Nathaniel Barr & Bridget Moreng, *The Islamic State's Global Propaganda Strategy* (The Hague: ICCT – The Hague, 2016).

[3] Much of the work I undertook for Jigsaw/Google is confidential, but one project, the Redirect Method, has been made public. See Andy Greenberg, "Google's Clever Plan to Stop Aspiring ISIS Recruits," *Wired*, September 7, 2016, at https://www.wired.com/2016/09/googles-clever-plan-stop-aspiring-isis-recruits/. As Greenberg explains, the program

1

I have experience teaching at the university level, in both graduate and undergraduate programs. From 2013-17, I held an appointment as an Adjunct Assistant Professor in Georgetown University's Security Studies Program, where I taught a course on Violent Non-State Actors. (I was invited to continue teaching in the 2017-18 school year, but declined because my family moved away from the D.C. area.) I previously served as a Lecturer for graduate and undergraduate classes at the Catholic University of America, where I taught courses on Violent Non-State Actors, and on Al-Qaeda and Its Affiliates. I have also taught classes for, or held faculty appointments at, the University of Southern California (teaching from 2013-present for the school's Executive Program in Counter-Terrorism), and the University of Maryland (Faculty Research Assistant in the Institute for Advanced Computer Studies, 2013-14).

I hold a Ph.D. in World Politics from the Catholic University of America, a J.D., *magna cum laude*, from the New York University School of Law, and a B.A. with Honors, *magna cum laude*, from Wake Forest University.

In addition to my education and professional work, I spent the better part of a year immersed in a charity organization that actively propagated salafi jihadist ideas, and was connected to the international salafi jihadist movement. As an idealistic young college student who was seeking deeper spiritual fulfillment, I converted to the Islamic faith in my early twenties. I was looking for employment between college and law school (a period stretching from December 1998 through August 1999), and applied for a position at an Islamic charity organization, the Al Haramain Islamic Foundation, located in my hometown of Ashland, Oregon. When I took the job, I did not realize that it was part of a broader salafi jihadist charitable front with offices throughout the globe, and multiple layers of connection to the al-Qaeda terrorist organization. Both Al Haramain's head office and also the branch that I worked for were designated terrorist organizations.[4] My time working for the charity and my inner struggles with the extremist ideas that Al Haramain was propagating internally are documented in my first book, *My Year Inside Radical Islam*.[5] Though I moved away from extremist Islam, and ultimately from the Islamic faith itself, this experience would do a great deal to shape my future passion for keeping America and its interests safe from

---

places advertising alongside results for any keywords and phrases that Jigsaw has determined people attracted to ISIS commonly search for. Those ads link to Arabic- and English-language YouTube channels that pull together preexisting videos Jigsaw believes can effectively undo ISIS's brainwashing—clips like testimonials from former extremists, imams denouncing ISIS's corruption of Islam, and surreptitiously filmed clips inside the group's dysfunctional caliphate in Northern Syria and Iraq.

The website that Jigsaw set up to explain the Redirect Method can be found at https://redirectmethod.org/. I led Valens Global's efforts to map the counter-extremist narrative space on YouTube for this project.

[4] See U.S. Department of the Treasury, press release, "Treasury Designates Al Haramain Islamic Foundation," June 19, 2008, https://www.treasury.gov/press-center/press-releases/Pages/hp1043.aspx (designation of the head office). In addition to being named a Specially Designated Global Terrorist, the branch that I worked for pled guilty to tax fraud related to a transfer of $150,000 to Chechnya. See U.S. Attorney's Office, District of Oregon, press release, "Specially Designated Global Terrorist Al-Haramain Islamic Foundation, Inc. Pleads Guilty to Tax Fraud," July 29, 2014, https://www.justice.gov/usao-or/pr/specially-designated-global-terrorist-al-haramain-islamic-foundation-inc-pleads-guilty.

[5] Daveed Gartenstein-Ross, *My Year Inside Radical Islam: A Memoir* (New York: Tarcher/Penguin, 2007).

the scourge of terrorism. The experience also provided me with a further, unique window into salafi jihadism and radicalization to violent extremist ideas.

I have three interlocking areas of competency that are relevant to the present case. The first area pertains to violent extremist movements claiming their inspiration from Islam (referred to herein as *Islamist militancy*, indicating these groups' goal of violently imposing their particular version of religious law, or *sharia*). Beginning around 1998, I have frequently traveled overseas to do professional work or conduct field research in multiple countries that are relevant to understanding transnational jihadism, including Iraq, Israel, Nigeria, Tunisia, Turkey, Qatar, and the United Arab Emirates. I have reviewed thousands of open-source documents about Islamist militancy, and I have served as a consultant and expert on terrorism and national security issues for the U.S., Canadian and Dutch governments, the European Union, NATO, and private organizations. In the course of this work, I have been certified by governmental bodies as a subject matter expert (SME) on terrorism and Islamist militant groups on multiple occasions, including for the following projects:

- serving as a co-principal investigator for a three-year, $1.5 million project for the Office of Naval Research, using a big-data approach to analyze relationships among Islamist militants to predict where splits are likely occur within these organizations;
- designing and delivering training for officials and analysts at U.S. Customs and Border Protection (CBP), for which I am currently the lead SME on a contract to deliver training services for CBP for a twelve-month period from 2016-17;
- separate from the training contract, serving as a SME on terrorism and VNSAs for CBP, a contract for which I began performance on May 1, 2017;
- serving as a Senior Advisor to the U.S. Department of Homeland Security's Office for Community Partnerships, which is a leading agency involved in domestic work related to countering violent extremism (CVE);
- designing and delivering training on global terrorism for the U.S. Army Corps of Engineers' Individual Terrorism Awareness Course (INTAC), for which I have been the lead instructor since June 2016;
- lecturing for U.S. Army units about to deploy to countries such as Djibouti, Egypt, Iraq, Jordan, Kuwait and Afghanistan—as well as for foreign militaries, including in Bulgaria, Croatia and Poland—through the Naval Postgraduate School's Leader Development and Education for Sustained Peace (LDESP) program, for which I taught on over 70 occasions from 2009-17;
- serving as a SME providing information and analysis to the Joint Improvised-Threat Defeat Organization (JIDO) on four different occasions, including projecting the aftermath of ISIS's advances in Iraq, and analyzing the future of the Libyan civil war;
- serving as a SME for the U.S. Department of State's Office of Anti-Terrorism Assistance, designing curriculum and leading instruction for that organization;
- leading training for the Anti-Terrorism Advisory Council (ATAC) on four separate occasions;
- organizing and facilitating a conference in Nigeria, as a European Union-appointed Strategic Communication Expert, helping civil society activists understand militant groups' use of social media (particularly that of Boko Haram) and forge a strategic action plan for countering it.

I have also been court-certified to serve as an expert witness on terrorism and Islamist militant groups in the following federal cases:

- *Foley v. Syrian Arab Republic* (D.D.C., 2017), where I served as an expert witness on Abu Musab al-Zarqawi's terrorist organization;
- *In the Matter of Abdul Qadir* (Arlington, Va. Immigration Court, 2015), where I served as an expert witness on Afghanistan's Taliban;
- *In the Matter of B.O. in Removal Proceedings* (Boston Immigration Court, 2012), where I served as an expert witness on al-Qaeda's activities and capabilities in Kenya; and
- *In the Matter of A.D.* (Memphis, Tenn. Immigration Court, 2012), *In the Matter of A.A.W.* (Bloomington, Minnesota Immigration Court, 2012), *In the Matter of A.A.I.* (Colorado Immigration Court, 2011), *In the Matter of the Application for Withholding of A.A.M.* (Boston Immigration Court, 2011), and *In the Matter of the Application for Asylum of M.A.A.* (N.J. Immigration Court, 2009), for all of which I served as an expert witness on the Somali group al-Shabaab.

In addition to the aforementioned work which required certification as an expert, other professional work I have undertaken related to VNSAs and Islamist militancy includes serving as a Subject Matter Consultant to the private security firm Corporate Risk International for a live hostage negotiation with the Iraqi militant group Asa'ib Ahl al-Haq; producing reports for firms in the oil and gas industry that need to make investment decisions related to VNSAs, or protect their facilities and personnel; and designing and leading strategic simulations exploring the competition between VNSAs and state actors for academic institutions like Johns Hopkins University. I have testified about my areas of core competency before the U.S. House and Senate more than a dozen times, as well as before the Canadian House of Commons.

Additionally, I am an author with specialized knowledge in the field of VNSAs and militant Islamism. I am the author or volume editor of twenty-two books and monographs, and I have written on these topics in peer-reviewed academic publications and the mainstream press. This work is outlined in my Curriculum Vitae, but some relevant selections include:

Books and Monographs
- *Islamic State 2021: Possible Futures in North and West Africa* (with J. Zenn and N. Barr), Foundation for Defense of Democracies, 2017.
- *The Islamic State's Global Propaganda Strategy* (with N. Barr and B. Moreng), ICCT – The Hague, 2016.
- *The War between the Islamic State and al-Qaeda: Strategic Dimensions of a Patricidal Conflict* (with J. Fritz, B. Moreng and N. Barr), Valens Global, report produced for U.S. Special Operations Command Central (SOCCENT), 2015.
- *The Crisis in North Africa: Implications for Europe and Options for EU Policymakers* (with N. Barr, G. Willcoxon, and N. Basuni), Netherlands Institute of International Relations Clingendael, 2015.
- *Ansar Bayt al-Maqdis's Oath of Allegiance to the Islamic State*, Wikistrat, 2015.
- *Bin Laden's Legacy*, New York: John Wiley & Sons, 2011.

Book Chapters

- "MENA Countries' Responses to the Foreign Fighter Phenomenon," in A. de Guttry et al. eds., *Foreign Fighters Under International Law and Beyond* (The Hague: T.M.C. Asser Press, 2016).
- "The Evolution of Post-Ben Ali Tunisian Jihadism," in A. Celso & R. Nalbandov eds., *The Crisis of the African State* (Quantico, Va.: Marine Corps University Press, 2016).
- "The Genesis, Rise, and Uncertain Future of al-Qaeda," in R. Law ed., *The Routledge History of Terrorism*, Routledge, 2015.
- "Violent Non-State Actors in the Afghanistan-Pakistan Relationship," in C. Fair & S. Watson eds., *Pakistan's Challenges*, University of Pennsylvania Press, 2015.
- "The Legacy of Osama bin Laden's Strategy," in David Kamien ed., *The McGraw-Hill Homeland Security Handbook*, McGraw-Hill, 2012.

Academic and Technical Publications

- "Violent Non-State Actors in the Age of Social Media: A Twenty-First Century Problem Requires a Twenty-First Century Toolkit," *Georgetown Security Studies Review*, special issue, February 2017.
- "How al-Qaeda Survived the Islamic State Challenge" (with N. Barr), *Current Trends in Islamist Ideology* (Hudson Institute), August 30, 2016.
- "Recent Attacks Illuminate the Islamic State's Europe Attack Network" (with N. Barr), *Jamestown Foundation*, April 27, 2016.
- "Tunisian Jihadism After the Sousse Massacre" (with B. Moreng), *CTC Sentinel*, October 2015.
- "The Role of Iraqi Tribes after the Islamic State's Ascendance" (with S. Jensen), *Military Review*, July-August 2015.
- "A Critical Link between Jabhat al-Nusra and al-Qaeda: Abu Humam al-Suri," *Militant Leadership Monitor* 6:5 (May 2015).
- "Al-Shabaab's Insurgency in Somalia: A Data-Based Snapshot" (with H. Appel), *Georgetown Journal of International Affairs*, April 3, 2014.
- "Perceptions of the 'Arab Spring' Within the Salafi Jihadi Movement" (with T. Vassefi), *Studies in Conflict & Terrorism* 35:12, November 2012.

Commentary, Op-Eds, and Policy Analysis

- "Terrorists Are Using Drones Now. And That's Not the Worst of It," *Fortune*, September 9, 2017.
- "The Manchester Attack Shows How Terrorists Learn," *The Atlantic*, May 23, 2017.
- "Lone Wolves No More," *Foreign Affairs*, March 27, 2017.
- "ISIL's Virtual Planners: A Critical Terrorist Innovation," *War on the Rocks*, January 4, 2017.
- "A Grim Anniversary: 15 Years after 9/11, the War against Radical Islamist Terrorism is not Looking Good," *New York Daily News*, September 11, 2016.
- "Rebranding Terror" (with T. Joscelyn), *Foreign Affairs*, August 28, 2016.
- "Bloody Ramadan: How the Islamic State Coordinated a Global Terrorist Campaign," *War on the Rocks*, July 20, 2016.
- "Boko Haram's Buyer's Remorse" (with J. Zenn), *Foreign Policy*, June 20, 2016.

- "Sunni Tribes Need Arms and Support to Fight ISIS," *New York Times*, June 1, 2015.
- "From Westgate to Garissa, Shabaab's Murderous Wave," *Foreign Policy*, April 10, 2015.
- "Zawahiri's Revenge," *Foreign Policy*, July 31, 2014.
- "The Jihadist Governance Dilemma" (with A. Magen), *Washington Post* (Monkey Cage blog), July 18, 2014.
- "Al-Qaeda in Iraq and the Abu Ghraib Prison Break," *Project Syndicate*, July 23, 2013.

I have also spoken at numerous events and conferences throughout the globe. Presentations and conference papers that I have delivered include:

- "Sixteen Years After 9/11: Assessing the Terrorist Threat" (panel), New America Foundation, Washington, D.C., September 11, 2017.
- "The Jihadist Landscape in South Asia," Near East South Asia Center, National Defense University, Washington, D.C., August 14, 2017.
- "Change or Continuity Since 2014: ISIS in Global Context" (panelist), The Evolving Terrorist Threat conference, The RAND Corporation, Arlington, Va., June 27, 2017.
- "Terrorism in 2020" (panelist), Department of Defense Combating Terrorism Intelligence Conference, Reston, Va., May 9, 2017.
- "What Next?: Regional Trends and Threats," Conference on What the New Administration Needs to Know About Terrorism & Counterterrorism, Georgetown University Center for Security Studies and St Andrews University Handa Centre for the Study of Terrorism and Political Violence, Washington, D.C., January 26, 2017.
- "How Does It All End?" workshop, panelist, National Counterterrorism Center (NCTC), McLean, Va., January 12-13, 2017.
- Keynote speech, After ISIL: Stability and Spillover, sponsored by U.S. Army Special Operations Command and the Laboratory for Unconventional Conflict & Simulation (LUCAS), Duke University, Durham, N.C., December 2, 2016.
- "The Future of Violent Extremism," Executive Program in Counter-Terrorism, CREATE center, University of Southern California, Los Angeles, August 3, 2016.
- "The Competition between the Islamic State and al-Qaeda," Kazakhstan Institute for Strategic Studies, Astana, Kazakhstan, March 2, 2016.
- "The Competition between the Islamic State and al-Qaeda: Implications for Regional States and the Future of the Jihadist Movement," NATO Advanced Research Workshop, Brussels, October 6, 2015.
- "The ISIS Campaign in Anbar," National Defense University, Washington, D.C., October 20, 2014.
- "Terrorism and the United Arab Emirates," National Defense College, Abu Dhabi, September 14, 2014.
- "Tunisia and Ansar al-Sharia: Foreign Fighters and the Evolution of a Jihadist Group," Combating Terrorism Working Group, Brussels, April 24, 2014.
- "Ansar al-Sharia's War with Tunisia," International Centre for Counter-Terrorism – The Hague, Netherlands, February 20, 2014.
- "Violent Non-State Actors: Strategies and Tactics in Addressing the Problem," Centre for Public Policy Research, Kochi, India, December 6, 2013.

- "Afghanistan After the United States Drawdown," O.P. Jindal Global University, Sonipat, India, December 4, 2013.
- "Ansar al-Sharia Tunisia's Long Game: Dawa, Hisba, and Jihad," Association for the Study of the Middle East and Africa Annual Conference, Arlington, Va., November 22, 2013.
- "Ansar al-Sharia Tunisia: *Dawa*, *Hisba*, and *Jihad*," International Centre for Counter-Terrorism – The Hague, Brussels, Belgium, April 19, 2013.
- "Dispatches from Mali," discussion sponsored by *Foreign Policy* and the Pulitzer Center on Crisis Reporting, Washington, D.C., January 30, 2013.
- "Why Are Consensus Views So Often Wrong in Regional Security Studies?," United States Naval Academy Africa Forum, Annapolis, Md., October 17, 2012.
- "The Arab Spring, Organizational Resiliency, and a New Operating Environment: Al-Qaeda's Outlook 2012," Defense Intelligence Agency Speaker Series, Washington, D.C., July 31, 2012.
- "Combating Olympic Terrorism: National and International Lessons," Potomac Institute for Policy Studies, Arlington, Va., July 25, 2012.
- "The Arab Awakening and the Future of al-Qaeda," Woodrow Wilson International Center for Scholars, Washington, D.C., May 10, 2012.
- "Al-Qaeda After bin Laden," School of Advanced International Studies, Johns Hopkins University, Washington, D.C., February 21, 2012.

A second relevant area of competency is my work on the militant white separatist and neo-Nazi movement. My writings on the subject include two technical publications written for the Foundation for Defense of Democracies ("Leadership vs. Leaderless Resistance" and "Assessing the Militant White Separatist Movement"), as well as popular press publications about the alliance between segments of the neo-Nazi and militant Islamist movements (including the article "The Peculiar Alliance" in the *Weekly Standard*, and a review of George Michael's seminal book *The Enemy of My Enemy*).

Work I have performed for government bodies as a certified expert has also covered white separatism and neo-Nazism. I have designed two training courses for the U.S. Department of State's Office of Anti-Terrorism Assistance—"Mitigating Prison Inmate Radicalization" and "Terrorism: Overview, Motives, and Methodologies"—that featured substantive discussion of the white separatist and neo-Nazi movement. And as previously noted, since June 2016 I have been the lead instructor for the U.S. Army Corps of Engineers' Individual Terrorism Awareness Course (INTAC). That course has featured a substantive discussion of white separatism in its unit on the U.S. Department of Defense's Northern Command geographic area (NORTHCOM).

A third relevant area of competency is the work I have undertaken on radicalization processes. My work on radicalization has focused in particular on the role played by the Internet and the online jihadist milieu—a focus that is relevant to the large number of Internet-focused pieces of evidence in the present case. My aforementioned work as a Senior Advisor to the U.S. Department of Homeland Security's Office for Community Partnerships (OCP) fundamentally related to the challenge of radicalization, as the purpose of CVE—which OCP is charged with advancing domestically—is reducing instances of radicalization and empowering communities to recognize

the danger signs. Furthermore, the projects I have undertaken for Jigsaw/Google involve providing technical expertise related to identifying and countering radicalization in the online sphere.

I was the lead author of a study that is frequently cited in the academic literature on the topic (*Homegrown Terrorists in the U.S. and U.K.: An Empirical Examination of the Radicalization Process*, 2009). Brian Michael Jenkins, a senior advisor to the president of the RAND Corporation and one of this country's preeminent scholars of terrorism, wrote about this study:

> Unless we can find ways to blunt the narrative of our terrorist foes, impede their recruiting, and discourage young men (and women) from destructive and self-destructive trajectories, terrorism will drain our resources, drag on our economy, and, yes, ultimately imperil our democracy. But in order to formulate intelligence and appropriate strategies to prevent this, we must understand better the process of radicalization and recruitment to terrorism. With this research, Gartenstein-Ross and Grossman significantly further that understanding.

I have testified before the U.S. House and Senate on the topic of radicalization three times, wrote an academic article (for the German journal *Der Bürger im Staat*) on radicalization in the U.S., and have published reviews of many the major academic works on the topic. Here are relevant publications of mine on radicalization, de-radicalization, and countering extremist ideologies:

- *Homegrown Terrorists in the U.S. and U.K.: An Empirical Examination of the Radicalization Process* (Washington, DC: FDD Press, 2009).
- "Lone Wolf Islamic Terrorism: Abdulhakim Mujahid Muhammad (Carlos Bledsoe) Case Study," *Terrorism and Political Violence* 26:110-28 (2014).
- "Islamistischer Terrorismus in den USA: 'Homegrown Terrorism' in den Vereinigten Staaten: Bedrohung, Ursachen und Prävention," *Der Bürger im Staat* (Germany), Winter 2011.
- "Save the Terrorism Prevention Toolkit" (with G. Selim), *War on the Rocks*, August 28, 2017.
- "Fixing How We Fight the Islamic State's Narrative" (with N. Barr), *War on the Rocks*, January 4, 2016.
- "Prominent European Islamic Terrorist Renounces Extremism," *The Atlantic*, October 19, 2010.
- "The Danger Signs of Terror," *National Post* (Canada), November 24, 2009.
- "How Do They Radicalize Others?," *Washington Times*, June 20, 2009.
- "Changing Minds," *Washington Times*, February 22, 2007.
- Book review, Ramón Spaaij, *Understanding Lone Wolf Terrorism*, in *War on the Rocks*, October 27, 2014.
- Book review, Clark McCauley & Sophia Moskelenko, *Friction*, in *Pragati*, November 2, 2012.
- Book review, Assaf Moghadam, *The Globalization of Martyrdom*, in *Association for the Study of the Middle East and Africa Book Notes*, October 15, 2010.
- Book review, Tore Bjørgo & John Horgan eds., *Leaving Terrorism Behind*, in *Association for the Study of the Middle East and Africa Book Notes*, April 14, 2010.
- Book review, Alan B. Krueger, *What Makes a Terrorist: Economics and the Roots of*

*Terrorism*, in *Association for the Study of the Middle East and Africa Book Notes*, 2009.

- Book review, Marc Sageman, *Leaderless Jihad*, in *Middle East Quarterly*, Summer 2009.
- Book review, Quintan Wiktorowicz, *Radical Islam Rising*, in *Middle East Quarterly*, Winter 2009.

Here is a selection of relevant presentations I have delivered on radicalization, deradicalization, and countering extremist ideologies:

- "Countering Violent Extremism," presenter and panelist, Homeland Security Training Institute, College of DuPage, Glen Ellyn, Ill., March 29, 2017.
- "Counterterrorism/Extremism and the Internet Challenge," respondent, Quad-Plus Dialogue, hosted at the Heritage Foundation, Washington, D.C., March 1, 2017.
- "The Growing Challenge," keynote address, Social Media Narratives and Extremism Workshop, sponsored by the Near East South Asia Center, National Defense University, Casablanca, Morocco, August 16-17, 2016.
- "As the Rest of the World Gets Online: Implications for Militant Groups, Stability, and Social Change," keynote speech, Transportation Security Administration (TSA) Intel Talk series, Arlington, Va., July 13, 2016.
- "Transnational Terrorism, Foreign Fighters and Youth Radicalization," Developing Strategies to Address Contemporary Security Challenges on Europe's Southern Flank, George C. Marshall European Center for Security Studies, Garmisch, Germany, May 10, 2016.
- "Cyber Technology Roles and Trends in Radicalization," keynote presentation, U.S. Army Special Operations Command Commander's Conference, West Point, N.Y., May 4, 2016.
- "Intellectual Frameworks for Counter-Messaging," U.S. Special Operations Command Central (SOCCENT), January 26, 2016.
- "On Tribalism, Jihadists, and Lone Wolf Political Violence," panel, Understanding the Extremist Threat workshop, Institute for National Strategic Studies, Washington, D.C., March 11, 2015.
- "Africa's Youth in the Age of Extremism," panelist, National Committee on American Foreign Policy, New York City, September 26, 2013.
- "Lone Wolf Islamic Terrorism: Abdulhakim Mujahid Muhammad (Carlos Bledsoe) Case Study," Lone Wolf and Autonomous Cell Terrorism, conference at Uppsala University, Uppsala, Sweden, September 25, 2012.
- "Islamist Radicalization," U.S. Marine Corps Command and Staff College, Quantico, Va., February 22, 2012.
- "Terrorist Use of the Internet," National Counterterrorism Center, Conference on al-Qaeda and the Global Threat, Warrenton, Va., July 28, 2011.
- "Ideas, Identity, and Terror," keynote speech, The Impact of Identity Politics on Violent Extremism: Regional Perspectives, Global Futures Forum, Monterey, Calif., April 7, 2011.
- "Countering Youth Radicalization," Preventing Youth Radicalization Conference, Ottawa Police Service, Ottawa, December 7, 2010.
- "Islamic Radicalization to 2025," Special Operations Command Europe (SOCEUR), Component Commander's Conference, Garmisch, Germany, November 16, 2010.

My research and scholarship in all three of these areas is consistent with best academic practices. I mainly rely on primary-source information, including statements and social media postings by extremist groups and their supporters, and internal documents intercepted by the United States or other governments. I cross-check all primary sources I read against other primary-source information, against information about events on the ground in relevant theaters, and against relevant secondary-source literature that allows me to determine whether my conclusions are consistent with those of other scholars and practitioners. I also check my analytic track record against unfolding events to determine if my anticipatory analysis is accurate, or if it requires some recalibration.[6]

In February 2017, the U.S. Attorney's Office in the Eastern District of Virginia asked me to review evidence gathered during the criminal investigation in the above-entitled case, *United States v. Nicholas Young*, including: digital media seized from the defendant's computer; various texts, documents, and items obtained from the defendant's belongings; records of Internet use by the defendant; photographs of the defendant seized from the defendant's computer; and weapons and combat gear possessed by the defendant. I was thereafter requested to produce a report, based on my expertise and experience, describing the cultural significance of the items seized from the defendant.

This report first examines what an examination of militant Islamism and neo-Nazism, as well as relevant academic research, can tell us about radicalization to violent extremism within these two ideological strains. It begins by explaining the commonalities between radicalization mechanisms in militant Islamism and neo-Nazism, then outlines how there has been a historical convergence between segments of the militant Islamist and Nazi or neo-Nazi movements. Following this exploration of radicalization dynamics, the report examines the cultural significance of evidence that the U.S. Attorney's Office in the Eastern District of Virginia has provided to me.

## I.     The Commonality Between Radicalization Mechanisms in Militant Islamism and Neo-Nazism

For decades, scholars of political and religious extremism have examined the reasons that some individuals who possess radical beliefs engage in terrorism and political violence to advance their cause. The academic literature has established several pathways that individuals follow from extremism to terrorist violence. Two major radicalization pathways are quite similar for militant Islamists and neo-Nazis. Some scholars emphasize the importance of *radical ideology*, or radical opinion, in driving people to illegally support militant groups.[7] And some scholars emphasize the

---

[6] For one framework on measuring forecasting, which I have adapted to measure my own work, see Philip E. Tetlock & Dan Gardner, *Superforecasting: The Art and Science of Prediction* (New York: Random House, 2015).

[7] See, for example, Michael Jensen & Gary LaFree, *Final Report: Empirical Assessment of Domestic Radicalization (EADR)* (College Park, MD: University of Maryland, 2016); Daveed Gartenstein-Ross & Laura Grossman, *Homegrown Terrorists in the U.S. and U.K.: An Empirical Examination of the Radicalization Process* (Washington, DC: Foundation for Defense of Democracies, 2009); Assaf Moghadam, *The Globalization of Martyrdom: Al Qaeda, Salafi Jihad, and the Diffusion of Suicide Attacks* (Baltimore: The Johns Hopkins University Press, 2008); Mitchell D. Silber & Arvin Bhatt, *Radicalization in the West: The Homegrown Threat* (New York: New York City Police Department Intelligence Division, 2007); Quintan Wiktorowicz, *Radical Islam Rising: Muslim Extremism in the West* (Oxford: Rowman & Littlefield, 2005).

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No.: 16cr265 (LMB) |
| NICHOLAS YOUNG, | ) |
| Defendant. | ) |

### DEFENDANT NICHOLAS YOUNG'S MOTION TO STRIKE WITNESSES DUE TO THE GOVERNMENT'S FAILURE TO COMPLY WITH *JENCKS* AND DISCOVERY ORDER

Defendant Nicholas Young, through his undersigned counsel, moves the Court to strike each witness for which the government has failed to comply with the Discovery Order deadlines in this case, as well as the Jencks Act, 18 U.S.C. § 3500.  *See* Discovery Order, ECF 62.

Consistent with the requirements of the Jencks Act, the Discovery Order in this case provides that *Jencks/Giglio* materials must be produced to the defense "no later than five calendar days before trial" for the witnesses who will testify in the government's case in chief. (ECF 62, p. 4.)  On November 30, 2017, at 6 p.m., the government informed the defense it was making a classified *Jencks* production.  Together with this information, the government served its twenty-seventh discovery letter in this case.  The letter stated that the classified *Jencks* information "look[s] voluminous" but that is "mostly because of a spreadsheet of evidence items printed out over hundreds of pages – with sometimes only one or even no items on a given page." When, on the evening of November 30, defense counsel picked up a separate *un*classified *Jencks* production from the government, a government attorney estimated that the classified *Jencks* materials would likely fill about three Redweld folders.

1

The government's production of classified *Jencks* five calendar days before trial is in defiance of the Discovery Order. The purpose of the five-calendar-day rule is to produce the *Jencks* materials to the defense in time to use them at trial, which is beginning December 5, 2017. Given that declassification of documents in this case has consumed months of time, the government's production cannot be deemed in compliance with the Discovery Order.

Nor is that all. The government not only failed to comply with the *Jencks* rule by serving last-minute classified materials, it failed to provide warning to the defense – or the Court – that these materials would be produced at the close of business five days before trial. Even assuming there is some excuse for this last minute classified production, there is no reason the defense should not have been warned of this problem reasonably in advance so it could take proper precautions, advise the Court of its ability to review the classified information, and make determinations as to whether the information should be declassified in good time before trial.

Ms. Moreno is now expected to review three Redwelds of classified materials before the opening of trial next Tuesday. The SCIF is not open over the weekend. On business days, the SCIF closes at 5 p.m. She cannot go into the SCIF *during* trial. Nor is it clear how the parties would resolve CIPA-related issues during trial in a manner expeditious enough to resolve any declassification issues as they arise.

Mr. Young moves to strike every government witness for whom a last-minute classified *Jencks* production has been made. Mr. Young cannot know the significance of the classified *Jencks* materials, but an adverse inference should be drawn against the government since it is unclear why it would have made this risky decision for immaterial witness statements.

Dated: November 30, 2017                    Respectfully submitted.


                                            */s/ Nicholas D. Smith*
                                            Nicholas D. Smith (VA. Bar. 79745)

2

108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
nbs@davidbsmithpllc.com

Linda Moreno (admitted *pro hac vice*)
Linda Moreno P.A.
511 Avenue of the Americas
No. 312
New York, NY 10011
813-247-4500
lindamoreno.esquire@gmail.com

3

**Certificate of Service**

I hereby certify that on the 30th day of November, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> AUSA Gordon D. Kromberg
> AUSA John Gibbs
> U.S. Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> gordon.kromberg@usdoj.gov
> john.gibbs@usdoj.gov

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> */s/ Nicholas D. Smith*
> Nicholas D. Smith
> VA Bar No. 79745
> David B. Smith, PLLC
> 108 North Alfred Street
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> nds@davidbsmithpllc.com

4

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA        .    Criminal No. 1:16cr265
                                .
     vs.                        .    Alexandria, Virginia
                                .    December 1, 2017
NICHOLAS YOUNG,                 .    9:51 a.m.
                                .
          Defendant.            .
                                .
. . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          JOHN T. GIBBS, AUSA
                             GORDON D. KROMBERG, AUSA
                             EVAN N. TURGEON, SAUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314

FOR THE DEFENDANT:           NICHOLAS D. SMITH, ESQ.
                             David B. Smith, PLLC
                             108 North Alfred Street
                             Alexandria, VA 22314
                               and
                             LINDA MORENO, ESQ.
                             Linda Moreno P.A.
                             511 Avenue of the Americas
                             No. 2
                             New York, NY 10011

ALSO PRESENT:                SA NICHOLAS CASLEN
                             W. SCOOTER SLADE

OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595

(Pages 1 - 31)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  Criminal Case 16-265, United States of
 3   America v. Nicholas Young.  Would counsel please note their
 4   appearances for the record.
 5            MR. KROMBERG:  Good morning, Your Honor.  Gordon
 6   Kromberg, John Gibbs, and Evan Turgeon for the United States.
 7   With us at the second table is FBI Special Agent Nicholas
 8   Caslen.
 9            THE COURT:  Good morning.
10            MS. MORENO:  Good morning, Your Honor.  Linda Moreno
11   and Nick Smith on behalf of Nicholas Young, who should be
12   coming out, I believe.
13            THE COURT:  All right.  Is the defendant up here?
14            THE COURT SECURITY OFFICER:  Yes, ma'am, he is.
15            THE COURT:  Let's get him in here.
16                       (Defendant present.)
17            THE COURT:  All right, the defendant is now in court.
18            All right, we have several motions on the Court's
19   calendar.  I want to address the one that was filed late last
20   night by the defendants.  Mr. Kromberg, you need to respond to
21   that motion because that motion creates a real issue for the
22   Court.
23            MR. KROMBERG:  First, I will say that I haven't read
24   it yet but I think I know what's in it, and it exhibits an
25   amazing misunderstanding of what's happened.  What was provided
```

3

1    yesterday --

2            THE COURT:  The question is the defense has argued

3    that around 6 p.m. last night, they received from your office

4    an indication that there was classified *Jencks* material, and

5    there was no notice to the Court that there was going to be any

6    kind of additional classified information that might need a

7    CIPA hearing.  Remember, we asked you-all to give us a notice

8    if there were any CIPA matters out there, and you filed a

9    status report a week or two ago indicating there were none.

10           MR. KROMBERG:  And, Your Honor, there has not been a

11   CIPA dispute in this case.  We've resolved them all, and we

12   will resolve these, too.  There will not be a CIPA dispute that

13   rises to this case.

14           Now, keep in mind that what, what was provided

15   yesterday was not the real *Jencks*.  The real *Jencks* was

16   provided 14 months ago.  Every single report in this case by

17   the agents, every single one except for the agent who

18   summarized the reports of another agent, and the summarizing

19   agent isn't even testifying anyway, but every single report was

20   provided 14 months ago.

21           What was provided yesterday, we did a canvass for

22   text messages and e-mails of all the government -- of the

23   testifying agents, and as the Court knows, years ago, that

24   wasn't even an issue.  The point of *Jencks* is we want the

25   defendant to have the agents' reports so he can cross-examine

4

1    the agents when they testify.  They've had that for over a

2    year.

3              What these are are the e-mails.  When I sent an

4    e-mail to Special Agent Caslen saying:  Do we have this piece

5    of evidence, he then sent an e-mail to Special Agent

6    Minichello, who said:  Let me look at my old report.  And he

7    sends it back to Caslen; Caslen sends it to me.

8              These are the types of things that were provided.

9    Now, because the FBI's e-mail system is classified and the text

10   messages are classified, these things were being generated

11   until now.  In fact, I just learned today that there was one --

12   there was another e-mail that we're going to have to deal with

13   that was generated yesterday.

14             So these are text messages among the agents and

15   they're e-mails among the agents, but every single report was

16   provided more than a year ago.  That's why up to now, the

17   defense attorneys have been saying there's so much stuff in the

18   SCIF, there's so much materials in this case.  It's because we

19   provided the reports in October 2016 that are all the reports

20   that are relevant to the case.  What we're talking about now

21   are the agents' e-mails about their reports.

22             Mr. Gibbs and I -- Mr. Turgeon spent an enormous

23   amount of time going over it.  Mr. Gibbs and I looked every one

24   of those documents that was provided yesterday, and I can tell

25   you that I went through 50 percent of them in an hour, and

5

1  Mr. Gibbs went through the other 50 percent in less than an

2  hour.

3          Now, it's true we had seen many of them before, so we

4  know what's in them, but there's nothing new in here.  These

5  are e-mail trains, trails, I guess, where six e-mails get

6  repeated and then someone writes someone new, it's another

7  e-mail for another agent.

8          THE COURT:  All right.

9          MR. KROMBERG:  This is what we're talking about.

10          THE COURT:  Are all these physically in the SCIF in

11  the courthouse right now?

12          MR. KROMBERG:  Maura Peterson said that her

13  associate, Scooter, whose last name I forgot --

14          THE COURT:  He's here.

15          MR. KROMBERG:  -- is here.

16          He's going to get them and bring them to Ms. Moreno

17  this morning.  By the way, there is one, one document that is

18  four lines long that is *Giglio*.  Everything else is *Jencks*, but

19  there is one document that was -- that is *Giglio*, and I told it

20  orally to Ms. Moreno this morning and told her if it needs to

21  be declassified, we will get it declassified in time for it to

22  be used at trial.

23          So I am telling Your Honor that there will not be a

24  CIPA issue in this case.

25          THE COURT:  All right.  Ms. Moreno?  Ms. Moreno, my

6

1  understanding is you are the attorney who has access to the

2  classified information, correct?

3      MS. MORENO:  That is correct, Your Honor.  I'm

4  cleared counsel.

5      THE COURT:  Right, all right.  And obviously, our

6  CISO is here this morning.  Do you have the information they're

7  talking about?

8      CISO SLADE:  (Shaking head.)

9      THE COURT:  You do not.

10     Well, the problem is Ms. Moreno is here from New

11 York.  She's the only attorney who has access to the classified

12 information, and her motion was a reasonable motion, and that

13 is, that the court -- the SCIF -- access to the SCIF is

14 limited.  She's -- her office is in New York.

15     But you are here this morning.

16     MS. MORENO:  Well, Your Honor, in all candor, I've

17 been here for the last week.  I'm here.  I live across the

18 street at the hotel.

19     THE COURT:  All right.  So if we get the information

20 to you midday today, you can go down to the SCIF and you can

21 look at it.

22     MS. MORENO:  But, Your Honor --

23     THE COURT:  Yes.

24     MS. MORENO:  Yes, and I intend to do that, but I am

25 not as optimistic as Mr. Kromberg that there will be absolutely

7

1   no CIPA litigation.  This Court knows that the CIPA discussions

2   which predate my entry in the case, the request and then the

3   ultimate declassifications and summaries that were provided

4   took several months.

5         Now, Mr. Kromberg is characterizing what he knows is

6   in the SCIF, but I, of course, have no idea, and just in

7   listening to him generically characterize text in e-mails, that

8   raises a few red flags for me, quite frankly, as someone who's

9   dealt with a lot of classified materials.

10        So we're very concerned that on Thursday, with jury

11  selection on Tuesday, they're disclosing these classified

12  materials that they've had for years probably and that we were

13  told and so represented to Your Honor that all CIPA litigation

14  was over.  In fact, I had a conversation with Maura Peterson,

15  when she asked me:  Linda, do you think I should be there on

16  Friday for this particular hearing?

17        I said:  No, I think we're done with the CIPA issues.

18        And then last night, I realized that I was wrong.  So

19  I think there should be some consequence to this, and, frankly,

20  I'm very concerned.  I don't know what I'm going to see or

21  find.

22        THE COURT:  All right.  Well, how soon can the

23  government get those three --

24        MR. KROMBERG:  Right now.  The question was when the

25  court -- classified information security officer could come

8

1  pick it up, and my exchange of e-mail with Maura Peterson this

2  morning led to it's available in the SCIF, and it can be -- we

3  can still be in court, but Pam Benson from our office is

4  available to turn it over.

5            THE COURT:  All right.  What I'm going to do then is

6  as soon as we finish, I'm going to direct Mr. Kromberg, his

7  office to get you this, the materials.  We have our CISO is

8  here.  You go down to the SCIF and look at it.

9            If it is as described by Mr. Kromberg, if it is

10 simply, you know, here's our 302 from January 3, if it's just

11 completely, you know, almost not statements, just

12 communications, you can easily tell the Court later this

13 afternoon there's nothing there.  In other words, I can reset

14 this case for a hearing this afternoon.

15           If there are issues within that material that you

16 feel are going to raise a matter, then we've got to take care

17 of it today.  I'm in trial all day Monday.

18           MS. MORENO:  I understand.

19           THE COURT:  I have no time to give this case on

20 Monday, and we have a large jury panel currently scheduled to

21 come in on Tuesday, all right?  So I think that's the best way

22 to handle it.

23           But if, in fact, there are substantive issues raised

24 in those three binders, as I'm told that's what it is, that are

25 going to require some kind of CIPA evaluation or that you feel

9

1  are more than just, you know, routine communications, we may

2  have to consider whether this case has to be continued, all

3  right?  There are some other issues that I'm concerned about as

4  well, but that's the first one, all right?

5          MS. MORENO:  And, Your Honor, how would you like me

6  to proceed in that regard?  Because --

7          THE COURT:  You'll go down and -- you'll go down and

8  look at this stuff in the SCIF.

9          MS. MORENO:  I will.

10         THE COURT:  If after you've looked at it you feel

11  that there needs to be a hearing of some kind, then you'll come

12  up to my chambers.  I'm on the bench until probably 1:30 today,

13  but I can hear you this afternoon, and the government will just

14  have to be on standby as to whether or not there's going to be

15  a hearing.

16         MS. MORENO:  Thanks.

17         MR. KROMBERG:  Your Honor, if I may, I would request

18  that before coming to you, Ms. Moreno contact us, because I've

19  been told by the FBI that they can get this stuff declassified

20  as necessary, because there are no -- these are not -- they're

21  secret because it was on a secret e-mail system or secret text

22  message system, but they're not secret in any other sense.

23         So I've been told, it's been represented to me that

24  the FBI can get, if -- to the extent that it's necessary, they

25  can get it done quickly.

10

1          THE COURT:  Well, we can have a CIPA hearing without

2    that having to be done.  All my folks are cleared, all right?

3    So that's not a problem.  The problem would be if Ms. Moreno

4    feels that she needs to use this information Tuesday or

5    Wednesday of next week --

6          MR. KROMBERG:  Then we will --

7          THE COURT:  -- you're telling me that it can be

8    declassified.

9          MR. KROMBERG:  I am told that, that it can be done in

10   time for it -- before any government witness who it applies to

11   is going to testify.

12         THE COURT:  Does this only apply to government

13   agents?

14         MR. KROMBERG:  Yes.  This is the e-mail system and

15   the text messages among the FBI agents and one guy who's no

16   longer in the FBI but was on the JTTF, now in the Air Force.

17         THE COURT:  All right.  Ms. Moreno, if you're going

18   to speak, you've got to be at the lectern.

19         MS. MORENO:  Again, I appreciate Mr. Kromberg's

20   representations.  I need to make my own evaluation.

21         THE COURT:  Of course.

22         MS. MORENO:  And I prefer to report back to the

23   Court, if it's the Court's pleasure.  If you would like me to

24   just engage with Mr. Kromberg, whatever is the Court's

25   pleasure, but I'm, I'm worried.

11

1              THE COURT:  I don't want to have to spend any more

2    time than needed, all right, so that if, in fact, there's a

3    question that you have that can be answered directly by

4    Mr. Kromberg, that's fine, but you will need to let my, my

5    secretary know one way or the other we're going to need a

6    hearing/we're not going to need a hearing, all right?

7              MS. MORENO:  I understand.

8              THE COURT:  All right?

9              MS. MORENO:  Thank you.

10             THE COURT:  All right.  Now, I am extremely concerned

11   about what I think is going to be a problem with pretrial

12   publicity in this case.  There was earlier this week on *The*

13   *Washington Post*, at least on their electronic version of the

14   paper, a fairly extensive article that reflected this interview

15   that should never have occurred, in my view, this summer,

16   before you were on the case, Ms. Moreno.

17             MS. MORENO:  Yes.

18             THE COURT:  But obviously, I'm sure you've seen it as

19   well; have you not?

20             MS. MORENO:  I have.

21             THE COURT:  And I understand -- I don't know whether

22   it's going to appear in print or not, but in any case, it was

23   certainly something that I had several people bring it to my

24   attention, so I'm assuming a fair number of Northern Virginia

25   jurors, potential jurors will have seen it.

12

1          I am concerned about how that may affect our ability

2     to get a jury, and that's why I've increased up to 125 the

3     number of jurors that we've called in.  There should have been

4     a supplemental list sent to counsel at this point, so you

5     should know who's on that list, and we're going to conduct the

6     voir dire up on the ninth floor in a larger courtroom solely

7     just to get the jury in place.

8          In my view, that should not have happened.  It's

9     unfortunate that it has because there would be enough other

10    issues in this case that are problematic.

11         I am extremely concerned that both sides are really

12    violating multiple local rules, and I'm actually going to

13    direct that, Mr. Kromberg, you and Mr. Smith, because you're

14    local counsel, both reread the local criminal rules over the

15    weekend.  For example, I don't have any proposed voir dire yet

16    from the United States.  The local rule says five business

17    days.

18         MR. KROMBERG:  We are not planning on submitting any

19    in this case, Judge.

20         THE COURT:  All right.

21         MR. KROMBERG:  Because the ones that the Court has

22    done in every other case that we've ever been in are fine with

23    us.

24         THE COURT:  Well, this is not like every other case.

25    There are a whole bunch of issues that I think are going to

13

1    have to be addressed to the jury, and I certainly am prepared

2    to do that, but I think as a courtesy, it would be nice to have

3    a one-line no voir dire is being requested.

4              MR. KROMBERG:  I understand.

5              THE COURT:  All right.  In terms of from the defense

6    standpoint, Mr. Smith, you clearly have not read the local

7    rules.  You sent us proposed jury instructions.  You didn't

8    follow the rule that requires there be a citation at the bottom

9    of each jury instruction indicating where the source of it is.

10   That's in the rules.  You should know that.

11             You submitted proposed voir dire that included a

12   significant number of questions that anybody who routinely

13   practices in this court would know are answered by the jury

14   lists that are given.  I mean, whether a juror is married or

15   not married, how many children they have, that's all

16   information you get.  I was surprised that local counsel would

17   not know that.

18             We're not getting courtesy copies.  Our divisional

19   rule is even though there's electronic filing, we're supposed

20   to get a hard copy within 24 hours of your filing any kind of

21   pleading of any length.

22             It goes on and on like that.  Mr. Smith, you're not

23   following local Rule 47 in terms of the font size of your

24   footnotes.

25             So I am very concerned that both sides are being

14

1  either lax or just don't know the rules, and I expect there to

2  be no problems with that next week.

3          We do have all the electronic issues resolved.  Each

4  side will be bringing one laptop into the courthouse for use at

5  the trial.  Any recording devices on those computers must be

6  unworkable at the time they're in the courthouse, and so I just

7  want to make sure we don't have any problems with that.

8          As I indicated earlier, or if I didn't, we're going

9  to seat fourteen jurors, two of whom will be alternates.  I

10 give each side one additional peremptory, so defense will have

11 eleven peremptories; the government will have seven.

12         At the end of the trial, if we have all fourteen

13 jurors here, we will randomly choose two to be the first and

14 second alternates, and then the remaining twelve will be the

15 group that will decide the case.

16         I think in terms of logistics, that takes care of all

17 the logistic issues.  Are there any other logistic issues,

18 Mr. Kromberg, the government feels may occur?

19         MR. KROMBERG:  I spoke with the Marshals Service

20 yesterday about the screen, and they were a bit unclear at --

21         THE COURT:  Don't worry about the screen.

22         MR. KROMBERG:  Okay.

23         THE COURT:  We're taking care of that.

24         But we are going to have to coordinate with you-all

25 down the road, and we may do that at a, at a bench conference,

15

1    the order of witnesses because it -- because of various

2    logistical things, I don't want long gaps between witnesses, so

3    those that need some special handling, you're going to have to

4    work with us about what order they're coming in, all right?

5              MR. KROMBERG:  Yes, ma'am.

6              THE COURT:  All right.

7              MR. KROMBERG:  So one, I don't know if it's a

8    logistical question or not, but because a couple of the

9    witnesses will be testifying under unusual circumstances, we --

10   it would be helpful to know what the Court is going to tell the

11   jury about that because for opening statements, I want to make

12   sure that I don't say something wrong.

13             My plan -- my hope would be that I could say that a

14   couple of our witnesses are going to be speaking from behind

15   the screen because of ongoing involvement in government work.

16             THE COURT:  Well, I'm not going to say "behind the

17   screen."  I'm going to say we're going to have a screen in the

18   courtroom that prevents the public from seeing certain

19   witnesses because they have sensitive roles, and would that

20   affect the jury's evaluation as to the case.  We did that in

21   *Sterling*, so, I mean, I've done that before.  That's not a

22   problem.

23             MR. KROMBERG:  Excuse me just one moment?

24             THE COURT:  Yes.

25             MR. KROMBERG:  May I defer to Mr. Gibbs on the next

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

-203-

16

1    question?

2              THE COURT:  Yes.

3              MR. GIBBS:  Judge, you were asking about logistics.

4    This sort of -- it goes back to a case I had before Your Honor

5    a couple of years ago, the *Amar Endris* case.  I think in terms

6    of the presentation, when the confidential human source

7    testifies, we do -- he did record the conversations, so we have

8    clips we would like to play in court, and then we would like to

9    project the transcript, which will just be an aid to the jury,

10   along with that.

11             THE COURT:  That's not a problem.

12             MR. GIBBS:  Okay.  The one little tweak to that is at

13   the end, the case agent will testify about the post-arrest

14   interview, which was videotaped, so we want to play the video,

15   and we would -- the transcripts are short.  They're a page

16   each.  We would propose to hand out paper copies because it's

17   hard to simultaneously have the video up and the transcript up.

18             THE COURT:  That kind of logistic is not a problem.

19   Just make sure you have enough copies of the transcript not

20   just for the jury but for the Court, for counsel, so there's no

21   issues with that.

22             And the practice in my court, if there are recorded

23   conversations for which we have transcripts, is I do not have

24   my court reporter taking down that -- the words that are being

25   spoken because we have transcripts.  Is there any objection,

17

1    Ms. Moreno, to proceeding that way?

2              MS. MORENO:  No, Your Honor.  Would then the

3    transcripts be admitted as exhibits?

4              THE COURT:  They're not usually because that would be

5    like having the witness's testimony in the jury room.  The jury

6    gets to hear them.  Now, if the jury wants to re-listen to

7    those, because they are exhibits, they can re-listen to them in

8    court.

9              MR. GIBBS:  And that was our understanding as well,

10   Judge.  The recording is the actual evidence.

11             THE COURT:  Right.

12             MR. GIBBS:  The transcript is simply an aid to the

13   jury.

14             THE COURT:  Right.  So that if the jury wanted to --

15   but it's a piece of evidence, so if they wanted to review that

16   piece of evidence, they would come back into court, and we'd

17   play it for them again.  They'd have the transcript.  They

18   don't take the transcripts back with them.

19             MS. MORENO:  May I address the Court?

20             THE COURT:  Yes, ma'am.

21             MS. MORENO:  With respect to the, the screen, we

22   would ask that the Court instruct the jury that, that the fact

23   that there is a screen and Your Honor's characterization of the

24   witnesses as being involved in sensitive investigations should

25   not impact their --

18

```
1              THE COURT:  Of course.
2              MS. MORENO:  -- ability to be fair, and really
3    inquire into that.
4              I mean, it is an unusual situation.  I've been in
5    that situation before, and, of course, the concern for the
6    defense is that it sends a message of security and safety that
7    unfortunately will inure to the detriment of Mr. Young, when it
8    shouldn't.
9              THE COURT:  Look, there are several very sensitive
10   issues in this case that I am going to clearly probe with the
11   jury.  One of them will be the screen.  The other one is, of
12   course, going to be the evidence as to the defendant's -- I'll
13   be careful how I say it -- possessing material, white
14   supremacist-Nazi material, all right?
15             Because I want to emphasize to the jury he can only
16   be convicted, if they're going to convict him, on the basis of
17   the specific charges the government has raised and not on any
18   other conduct.  So there are a lot of sensitive points.
19             But while we're talking about this, to try to get the
20   case as focused as possible, I am assuming -- if you don't want
21   to tell me, you don't have to, but from everything we've had
22   during the history of this case -- that the defense does plan
23   to raise an entrapment defense.  Is it appropriate to discuss
24   that early with the jury or not?
25             MS. MORENO:  May I have a very brief moment with my
```

19

1    cocounsel?

2              THE COURT:  Yes.

3              MS. MORENO:  Yes, Your Honor.

4              THE COURT:  All right.  We'll see how that works.

5              Now, the other thing is as long as we're getting the

6    logistics out, how long, Ms. Moreno, do you feel that you need

7    for an opening statement in this case?

8              MS. MORENO:  I was going to ask what is the Court's

9    protocol with that.

10             THE COURT:  The shorter the better.  So go ahead.  If

11   you make a reasonable request, you often get it granted.  If

12   it's unreasonable, it won't be.

13             MS. MORENO:  It won't be longer than 30 minutes.

14             THE COURT:  That's on the long side for an opening

15   statement.

16             MS. MORENO:  Twenty.

17             THE COURT:  Twenty.

18             All right, Mr. Kromberg, twenty for the government.

19             MR. KROMBERG:  Mine is going to be longer, Judge.  We

20   have to explain what the case is about before the --

21             THE COURT:  Yours is going to be 20 minutes, 20

22   minutes per side.  I have never seen an opening statement going

23   much more than that that was terribly effective.  So just make

24   it succinct.  All right.

25             MR. KROMBERG:  Judge, among the other logistical

20

1  issues are stipulations.  We supplied the defense with a number

2  of stipulations that Ms. Moreno has said that we should be able

3  to enter, and we would like to get them entered so that we can

4  cull down, make sure we can tell the witnesses, who are

5  otherwise custodial witnesses, that they do not need to come.

6          THE COURT:  It's to the benefit of both sides to let

7  the jury focus on the key issues in the case, and so I would

8  hope you can work that out, Ms. Moreno.

9          MS. MORENO:  Your Honor, several weeks ago, I

10  represented to the government and actually we communicated with

11  the government that we would stipulate to authenticity and

12  foundational issues to scores of their exhibits already so that

13  they don't have to bring in those custodians.  And I agree with

14  the Court, this case needs to be focused elsewhere.

15          THE COURT:  All right, great.

16          Now, while we're doing that, again, so that we can

17  again use all of our resources effectively, I don't understand

18  why there is any kind of a dispute or lack of agreement on the

19  jury instructions.  As I understand it from what was

20  represented to the Court, there was no objection by the defense

21  to any jury instruction up through 27, and then starting at 27,

22  as I understand, there's an objection, and then the defense

23  submitted a bunch of instructions which, as far as I can tell,

24  are, several of them are exactly the same as the government's.

25          I want to know why those are in dispute.  I mean, why

1   is Government Exhibit -- Instruction 28, the description of the

2   nature of the offense, why is that being objected to, and why

3   is there a Defense Instruction 27 offered in its stead?

4           MR. SMITH:  Your Honor, if I may, I can go through

5   each, each one of the proposed instructions.

6           THE COURT:  Well, I'm not going to do a charging

7   conference now.  I just want to know generically, why is there

8   a dispute?

9           MR. SMITH:  Generically, so we carefully reviewed the

10  government's proposed jury instructions, and with respect to 1

11  through 26, as Your Honor said, we found no -- we had no

12  quarrel with those, but we began examining the statutory

13  language in each of the charges, and, frankly, there were some

14  omissions in the statutory language that should have been

15  included.

16          I'll give Your Honor one example.  For 2339(b), one

17  factual pattern that allows a violation of the statute is to

18  provide advice or training to a foreign terrorist organization.

19  Now, that is the correct language from the statutory definition

20  in 2339(a).  However, there are two amendments to the statute

21  that were subsequently entered narrowly defining what

22  "training" and "advice" mean, to mean -- these two amendments,

23  I believe, were entered after the *Holder v. Humanitarian Law*

24  *Project* Supreme Court case on 2339(a) and the First Amendment.

25          "Training" is narrowly defined to mean, I don't have

22

1   the exact language in front of me, but sort of technical

2   training.  Those two narrowly defined elements of the statute

3   were left out of the government's instruction.  We're not sure

4   why they're defining the statute, so we put those in.

5         For the Section 1512 counts, the parties have a

6   dispute concerning what proof has to be adduced at trial to

7   achieve a guilty verdict, and so there is various different

8   formulations of the law based on Your Honor's decision in *Amri*

9   and some other decisions on, for example, what an official

10  proceeding is under Section 1512 and what facts have to be

11  proven to establish a violation of Section 1512(b)(3).

12        THE COURT:  Well, in the future, when you're

13  disputing jury instructions, you still have to put the

14  citation, all right?  And yours are without citation.

15        MR. SMITH:  And thanks for bringing that up, Your

16  Honor, because actually, we put a citation for every charge

17  where the government put a citation in its versions.  So if you

18  compare the two copies and look at 27 through I believe it's 43

19  in the government's jury charges and look at 27 through 43 in

20  ours, every time that the government's charge cites a citation,

21  we do as well.

22        THE COURT:  Well, both sides have to put citations

23  in.  That's the rule.

24        MR. SMITH:  But so I believe that Your Honor is

25  putting its finger on the issue here with Section 1512.  The

23

1   parties just have a dispute about what sort of proof has to be

2   adduced at trial.

3          THE COURT:  All right.  Now, the actual motions that

4   are pending before the Court on the docket right now are the

5   defendant's motion in limine concerning evidence produced on

6   November 7; the government's motion to amend or correct the

7   indictment, which involves Count 3 only of the indictment; and

8   the defendant's motion in limine to exclude the two expert

9   witnesses from trial.  I'm not going to hear much argument on

10  those motions because I've had enough time to look at them.

11         Mr. Kromberg, you're not going to like this ruling of

12  the Court, but on the government's motion to amend or correct

13  Count 3, I'm denying the motion, and I'm dismissing that count.

14  It completely, in my view, based on my *Amri* decision, I'm

15  satisfied that, in fact, that count can't go forward; plus, in

16  my view, it's duplicative of Count 2.  It's at the same time

17  periods, at basically the same -- it's a different gloss on the

18  case.

19         So I'm dismissing that count, all right?  And the

20  case will go forward on Counts 1, 2, and 4.

21         MR. KROMBERG:  Judge, when you say "all right," does

22  that --

23         THE COURT:  No, you don't have to say anything.  I'm

24  just telling you that's what I'm doing, all right?  There's no

25  sense in making the case any more complicated than it already

24

1   will be.

2            You can't possibly have an objection to that.

3            MR. SMITH:  No objection, Your Honor, of course.  No

4   objection.  I would just note that one reason we put this point

5   in our brief, we believe there's reason to believe the

6   government will file an interlocutory appeal on this issue.

7            THE COURT:  We'll worry about that when it happens,

8   all right?  But the point is I am dismissing that count right

9   now, all right?

10           Now, in terms of the experts, I am satisfied over the

11  defendant's objection that the first expert -- and hopefully, I

12  will some day learn how to pronounce this man's name

13  correctly -- Gartenstein-Ross or "Gartenstein"?  How is it,

14  -stein or "-stein"?

15           MR. KROMBERG:  I believe it is Gartenstein-Ross, Your

16  Honor.

17           THE COURT:  All right, Gartenstein-Ross.  I'm

18  allowing him to testify as an expert in all the areas in which

19  he's been designated.  I realize that he's a better expert in

20  some areas than others, but I think there's enough in his

21  background, the fact that the United States government uses him

22  for training in these areas is sufficient in my view, plus his

23  extensive academic credentials, and the fact, even though the

24  defense disputes this, he has been qualified as an expert.

25           And even in default cases, a judge still doesn't just

25

1   willy-nilly allow evidence into the record.  So I'm satisfied

2   that there's enough record that he may testify.

3           In terms of Ian Campbell, I think he is limited to

4   being a fact witness.  I don't see him as an expert, but to the

5   extent that he starts to put himself forward as an expert, he

6   can talk about what he as an officer has experienced himself as

7   a fact witness, what his interactions were with the defendant,

8   what he may have seen or heard the defendant say, and from his

9   experience on the street dealing in cases, if he has such

10  experience, he can testify to that.  That helps the jury.  The

11  average juror wouldn't necessarily understand this stuff.

12          But beyond that, his PowerPoint is not an appropriate

13  exhibit in this case, and I would not allow testimony along

14  those lines.  So that's my ruling on that.  So I guess that's

15  granted in part and denied in part.

16          And the last motion is the defendant's motion in

17  limine concerning evidence produced on November 7.  I am

18  concerned a bit about the hearsay element, so I want you to

19  respond to that, Mr. Kromberg.

20          MR. KROMBERG:  Your Honor, as I told the defense, we

21  never said or suggested we were going to use that evidence.

22  We've given the defense all of our exhibits.

23          THE COURT:  Ah.

24          MR. KROMBERG:  It was just presented to the defense

25  as one of the many things that we presented in discovery, in

26

1    part because Mr. Smith had represented to the Court that there

2    was no such thing as a terrorist asking for Google Play gift

3    cards, when, in fact, there was.

4          So we provided it, but we're not introducing that

5    unless they ask, and if they ask, then someone may, may answer

6    the question.

7          THE COURT:  All right.  At this point then, I'm not

8    going to actually rule on it.  As I said, the last time we had

9    a motion in limine, sometimes, you know, things change at

10    trial.  So my normal motto is, you know, if you open the door,

11    the government or vice versa, the other side can walk through

12    the door, and so you'll have to be sensitive as to what doors

13    are opened or not opened, all right?

14          I think that takes care of all the motions that were

15    formally on the docket.  Is there anything else, Mr. Smith?

16          MR. SMITH:  We understand Your Honor's ruling on

17    Gartenstein-Ross, but there was a second element to it, which

18    is that apart from certification, the expert's report indicates

19    that there's a large amount of hearsay evidence that he --

20          THE COURT:  I'm not letting his -- his report will

21    not be an exhibit, all right?

22          MR. SMITH:  Right.

23          THE COURT:  He will testify.  If he starts testifying

24    to something that you feel is based on hearsay or is hearsay,

25    you make the objection during the trial.

27

1          MR. SMITH:  Thank you.

2          THE COURT:  All right?  Then I have context.

3          MR. SMITH:  Thanks.

4          THE COURT:  Is there anything else either side needs

5     to bring to the Court's attention?

6          MR. KROMBERG:  No, Your Honor.

7          THE COURT:  No?  All right.  All right, so we're

8     going to wait to hear from Ms. Moreno.

9          MS. MORENO:  Yes, ma'am.

10         THE COURT:  And let us know as soon as you can.  As I

11    said, I can't do anything before 1:30.  After that, I would

12    like to not be here until seven or eight tonight; my staff

13    certainly doesn't want to be; so as soon as you can, let us

14    know what the situation is, all right?

15         MR. KROMBERG:  Your Honor, I did have one question.

16         THE COURT:  Yeah.

17         MR. KROMBERG:  For trial scheduling, do you plan to

18    hold the trial on Friday?

19         THE COURT:  Ah, all right.  We're going to start

20    Tuesday hopefully at ten o'clock, and I think out of an

21    abundance of caution, because I don't want to waste the jury's

22    time, I'm going to indicate that if there are any last-minute

23    pretrial issues, they must be noticed for 9:30 that morning up

24    on the ninth floor, which is where we're doing the voir dire,

25    so that we can take care of them before the jury comes in, all

28

1  right?

2          I run my trials until six o'clock at night.  We will

3  have court on Friday, probably not until 11:00-11:30 because I

4  have a docket that morning, all right?  And just if I didn't

5  already tell you, Monday the 11th, we will not start until two

6  in the afternoon, all right?  Other than that, we're going to

7  go -- and all other days start at 9:30 in the morning.  So we

8  go 9:30 to 6:00 Wednesday, Thursday.  Friday will be sort of a

9  half-day.  Monday will be a half-day.

10         And, Mr. Kromberg, I did need -- I noticed in your

11 request for electronic device, you indicated you thought the

12 trial would run through about the 15th.  Is that accurate?

13 Because I need to tell the jury, you know, an approximate time.

14         MR. KROMBERG:  I think our case is likely to take a

15 week, and whatever the defense case happens.

16         THE COURT:  So when you say a week, five trial days?

17         MR. KROMBERG:  Yes.

18         THE COURT:  All right.  And, Ms. Moreno, as far as

19 you can tell, what do you think the defense case might take?

20 Another day or two?

21         MS. MORENO:  If.  If that, yes.

22         THE COURT:  All right.  I will tell the jury to

23 expect two weeks, through the 15th, I think, is a fair

24 estimate, all right?  We're getting close to the holiday

25 season.  I know we have Hanukkah in that time frame.  We have

29

1    then the other -- the Christmas holiday coming up as well.  But

2    I think if we can get the case to the jury by the 15th, that

3    would be good, all right?  I mean, when I say "to the jury,"

4    get the whole case done by the 15th if we can.

5            All right, are there any -- yes, Mr. Smith?

6            MR. SMITH:  One, one final point.  I made an

7    incomplete statement to Your Honor's question before.  When the

8    Court inquired about the differences between the two

9    instructions, our entrapment instruction is taken directly --

10   almost directly from an instruction Your Honor issued in the

11   *Carranza* case, with some amendments to reflect what we think is

12   *Jacobson*'s -- the standard from the *Jacobson* decision on

13   entrapment.

14           However, the government included a series of

15   subsidiary instructions that we don't think are ever issued at

16   the trial level, instructions relating to friendship per se not

17   constituting entrapment.

18           THE COURT:  Well, all right, we'll address that issue

19   when we do the formal charging conference.  I was primarily

20   concerned, number one, with not wasting my time reading two

21   sets of instructions that are the same, and number two, that I

22   wasn't getting citations on the bottom.  Now, if you're telling

23   me you cited to *Carranza* and *Jacobson*, I'll re-look at the rest

24   of them.

25           But anyway, I just was putting both sides on notice

30

1    that I want the rules complied with as best possible.

2              MS. MORENO:  One more thing?

3              THE COURT:  All right, yes, ma'am.

4              MS. MORENO:  Would it be fair to say that we should

5    be prepared for opening statements Wednesday morning?  Do you

6    think we would be picking all day Tuesday?

7              THE COURT:  Not with me, no.  We'll have a jury --

8    no, you should be planning to open on Tuesday, and you may even

9    see a witness go on.

10             MS. MORENO:  On Tuesday.

11             THE COURT:  On Tuesday, oh, yeah, definitely.

12             MS. MORENO:  Thank you.

13             THE COURT:  Definitely.

14             All right, anything further on this case?

15             MR. KROMBERG:  So -- sorry.  Should we plan for

16   opening statements after lunch on Tuesday?

17             THE COURT:  Well, it depends how long it takes to get

18   the jury, all right?  I think given the number of jurors who

19   are going to be there, it may take a little bit longer, but be

20   prepared.  I mean, you may wind up, the government may have to

21   open before lunch.

22             MR. KROMBERG:  Okay.  Thank you.

23             THE COURT:  Lunch is normally around one o'clock, and

24   I take a mid-morning and a mid-afternoon break usually.  I do

25   let jurors take notes.  And I want to make sure, by the way,

31

1    that the defense is, in particular that you are completely

2    familiar with our no back-striking rule.

3              MS. MORENO:  Yes.

4              THE COURT:  And if you're not, my law clerk, you need

5    to get with him ahead of time so you understand how that's

6    done.

7              All right, anything further on this case?

8              MR. KROMBERG:  No, Your Honor.

9              THE COURT:  No?

10             MS. MORENO:  No, Your Honor.

11             THE COURT:  You're all free to go, and the defendant

12   is remanded.

13                              (Which were all the proceedings

14                               had at this time.)

15

16                   CERTIFICATE OF THE REPORTER

17     I certify that the foregoing is a correct transcript of

18   the record of proceedings in the above-entitled matter.

19

20

21   _____/s/_____

22                              Anneliese J. Thomson

23

24

25

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA           )
                                   )
                                   )
        v.                         )
                                   )      No. 1:16-cr-265 (LMB)
                                   )
NICHOLAS YOUNG,                    )
                                   )
        Defendant.                 )

## ORDER

For the reasons stated in open court, the United States of America's Motion to

Amend/Correct Indictment [Dkt. No. 138] is DENIED and defendant's Motion in Limine to

Exclude Two Expert Witness from Trial [Dkt. No. 142] is GRANTED IN PART AND DENIED

IN PART, and it is hereby

ORDERED that Count 3 of the Indictment [Dkt. No. 38] be and is DISMISSED.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this / ᵗᵗ day of December, 2017.

Alexandria, Virginia

                                        /s/
                                        _____
                                        Leonie M. Brinkema
                                        United States District Judge

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:16-cr-265 (LMB) |
| | ) | |
| NICHOLAS YOUNG, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

To avoid delaying voir dire, it is hereby

ORDERED that the government provide unredacted copies of all the materials at issue in defendant's Second Motion to Strike Witnesses [Dkt. No. 163] to the Court for an ex parte in camera review by noon today.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 4th day of December, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v.                                          )<br>) No. 1:16-cr-265 (LMB)<br>)<br>NICHOLAS YOUNG,                   )<br>)<br>Defendant.              ) | |

ORDER

In light of the last minute discovery issues in this case, see Dkt. Nos. 158, 163, which the

Court cannot resolve today because it has another criminal trial currently ongoing, and having

further considered the impact of the recent publicity on the Court's ability to ensure a fair trial,

the Court has instructed the Jury Clerk to cancel the calling of the jury pool for tomorrow.

Accordingly, it is hereby

ORDERED that the parties appear in Courtroom 600 at 10:00 a.m. tomorrow for a status

hearing.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 4th day of December, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

-222-

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .      Criminal No. 1:16cr265
                              .
      vs.                     .      Alexandria, Virginia
                              .      December 5, 2017
NICHOLAS YOUNG,               .      10:00 a.m.
                              .
              Defendant.      .
                              .
. . . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

FOR THE GOVERNMENT:          JOHN T. GIBBS, AUSA
                             GORDON D. KROMBERG, AUSA
                             EVAN N. TURGEON, SAUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314

FOR THE DEFENDANT:           NICHOLAS D. SMITH, ESQ.
                             David B. Smith, PLLC
                             108 North Alfred Street
                             Alexandria, VA 22314
                               and
                             LINDA MORENO, ESQ.
                             Linda Moreno P.A.
                             511 Avenue of the Americas
                             No. 2
                             New York, NY 10011

ALSO PRESENT:                SA NICHOLAS CASLEN

OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595

(Pages 1 - 54)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

                    P R O C E E D I N G S

1
2                       (Defendant present.)

3           THE CLERK:  Criminal Case 16-265, United States of

4   America v. Nicholas Young.  Would counsel please note their

5   appearances for the record.

6           MR. KROMBERG:  Good morning, Your Honor.  Gordon

7   Kromberg, John Gibbs, and Evan Turgeon for the United States.

8   With us at the next table is Special Agent Caslen.

9           THE COURT:  Good morning.

10          MR. SMITH:  Your Honor, Nicholas Smith for Nicholas

11  Young.  With me is Ms. Linda Moreno, and we also have here

12  today David Smith, who may be a fact witness on certain issues,

13  depending on what arises.

14          THE COURT:  All right, that's fine.

15          Well, as you know, what we had to do in light of sort

16  of the gathering perfect storm here, we had the problem with

17  this pretrial publicity with *The Washington Post* article,

18  extensive article, hitting the Sunday *Post*.  I'm having a copy

19  of that article made part of the record of this case.  I think

20  that's important.

21          So I was always concerned after the electronic

22  version came out that we might have a problem, which is why I

23  advised you last week that I'd asked for the jury section to

24  basically double the number of jurors that would have been

25  called in this morning.

3

1          Then Friday, we began having this problem with

2     late-supplied information from the government.  Ms. Moreno was

3     quite concerned about the extensive redactions.  The government

4     indicated, number one, that there really was no true *Jencks* and

5     certainly no *Brady* material within that late production.

6     However, defense counsel have a right to have as much access as

7     they can so they can make the determination as to whether any

8     of the information could be relevant to their defense.

9          Mr. Kromberg represented that he thought most if not

10    all of what was turned over could be declassified, and over the

11    weekend, apparently much of it was produced, although there's

12    still a significant amount that is, that is still redacted.

13    It's not clear whether it's truly classified or just redacted,

14    but in any case, counsel was still concerned about that, so

15    that on Monday, we got a motion to strike two of the

16    government's key witnesses because of that late production.

17          As you-all know, I was in trial on a separate

18    criminal case yesterday and could not get the time to look at

19    the information the government had provided.  We did that last

20    night.  And so we called off the jury because I was not going

21    to have 125 citizens sitting around all day unable to possibly

22    be called.

23          So the situation we now have is the problem of how we

24    reschedule this case.  I have looked at the information,

25    Ms. Moreno, and I can assure you that whatever was redacted --

4

1    and I couldn't always tell exactly because unfortunately, we

2    had -- and I'm not giving out anything that's classified at

3    this point -- I had two packages.  I call it the 27 package and

4    the 60 package.

5            The 27 package, I could do a page-by-page comparison

6    of what defense counsel got with its redactions and what the

7    government had given me unredacted.  There's nothing that was

8    redacted that is possibly *Jencks* or relevant to your case.

9    It's either questions by counsel, which are not *Jencks*

10   material, or it's telephone numbers or some of the what I call

11   classification gobbledygook, so there's nothing there in the 27

12   pages.

13           In the 60-page production, there is not a

14   page-by-page presentation.  In other words, what I got from

15   defense counsel as the redacted package with Bates stamp

16   numbers, if I looked at each of the classified pages, there was

17   not always a match, which made it basically not impossible but

18   extraordinarily difficult to tell, but I did go through every

19   page of the, of the classified stuff, and looking at just the

20   redactions that were in the classified production, again,

21   there's no *Jencks*.

22           There are questions of lawyers, which would not be

23   *Jencks*; there are telephone numbers within, like, the FBI

24   office, that's not relevant or appropriate for defense counsel;

25   and what I will again call the classification gobbledygook,

5

1    which has never been turned over and is completely irrelevant;

2    and there may be an occasional reference to an unrelated

3    matter, none of which would be appropriate.

4         So to that extent, whatever has been turned over to

5    date now I've looked at, and as a matter of law, there's

6    nothing there.  It will be kept as part of the permanent record

7    in the SCIF if down the road there's an issue, all right?

8         So that I've been able to resolve.

9         MR. SMITH:  Your Honor, may we, may we put just the

10   facts in the record as a part of the hearing?

11        THE COURT:  Go ahead.

12        MR. SMITH:  Okay.  Now, the documents that were

13   produced as *Jencks* material on November 30 at 6 p.m. were

14   originally classified, as Your Honor stated.  They were

15   declassified and produced on December 1 with the redactions, as

16   Your Honor stated.

17        On the same day, the defense sent an e-mail request

18   to the government requesting whether the information that was

19   still redacted in this production was classified or whether

20   there was a legal privilege that justified the redactions

21   remaining in the document.  The government didn't respond.

22        THE COURT:  Well, I'm letting you know I've looked at

23   them, and they are absolutely nothing that any defense attorney

24   would ever have a right to --

25        MR. SMITH:  Your Honor, if I may, I would just like

6

1   to put one fact in the record.  One of the documents that was

2   produced on November 30 has an e-mail.

3          THE COURT:  All right.  Let me -- is it in the 27 or

4   the 60 package?

5          MR. SMITH:  It's the package that begins -- I can --

6   I have a copy for the Court.

7          THE COURT:  Is it Bates stamped 1271?

8          MR. SMITH:  It's Bates stamped JKS2-001271.

9          THE COURT:  All right, hold on.

10          MR. SMITH:  This is the 27 page.  It begins

11   JKS2-001271.

12          THE COURT:  Oh, I have that one.

13          MR. SMITH:  Okay.  So if Your Honor turns to page

14   JKS2-001275, and there's an e-mail beginning at the bottom of

15   page --

16          THE COURT:  Wait a minute.  Let me have the package,

17   please, the 27.

18          No, I need the defense, I need the defense.

19          MR. SMITH:  Your Honor, I have a copy if you --

20          THE COURT:  All right, send it up.

21          THE COURT SECURITY OFFICER:  From the podium, sir.

22          MR. SMITH:  Oh.  So the page I'm asking to direct the

23   Court to is JK -- it's two-sided on the copy I've given you, so

24   it's back and front.  It's JKS2-001275.

25          THE COURT:  All right.

7

1          MR. SMITH:  And there's an e-mail that begins at the

2     bottom of that page.  001275.

3          THE COURT:  Yep, I got it.

4          MR. SMITH:  Okay.  So it's an e-mail -- if you look

5     to the bottom of the page, it's an e-mail from John Gibbs on

6     March 23, 2016, and it's to Nicholas Caslen, who's the case

7     agent here, and -- so that continues onto next page, so go to

8     JKS2-001276.  Do you see on the next page where it says, "Also,

9     guys, I have a question for you"?

10          THE COURT:  Yes.

11          MR. SMITH:  Okay.  It says, "Also, guys, I have a

12     question for you."

13          THE COURT:  Correct.

14          MR. SMITH:  This is John:  "Were all of the meetings

15     between Young and our current CHS recorded?  If not, do you

16     know which ones were not?"

17          So, and if you go back to JKS2-001275, you'll see the

18     e-mail in which Caslen is -- excuse me, Agent Caslen is

19     responding to Mr. Gibbs.  It's on -- that's on JKS2-001275.

20          THE COURT:  Yes.

21          MR. SMITH:  And Mr. Caslen says, "I think the first

22     one or two weren't recorded.  I will get in touch with Cam and

23     the former handler" -- he's referring to Mo's agent handler --

24     "to get the specifics on how many."

25          Does Your Honor see that?

8

1              THE COURT:  Yes.

2              MR. SMITH:  Okay.  Now, if Your Honor flips to page,

3    let's see, if Your Honor flips to page JKS2-001342, 1342?

4              THE COURT:  The problem is the government -- no, it's

5    difficult for me to match that because I don't have the Bates

6    stamps on what the government presented to the Court.

7              MR. SMITH:  This is what the government presented to

8    the Court.  So I don't need to -- Your Honor does not need to

9    review the redacted information.  This point is separate from

10   that.

11             If Your Honor looks at page 001342, I will complete

12   the point I was going to make.

13             THE COURT:  All right, go ahead.

14             MR. SMITH:  So if you look at -- there's a -- do you

15   see the e-mail from Agent Caslen to --

16             THE COURT:  Yes.

17             MR. SMITH:  Okay.  It's March 24, this one.  This is

18   one day after the e-mail we just reviewed, where Agent Caslen

19   said, "I think there are one or two meetings that have no

20   recordings."  This is the next day.

21             THE COURT:  All right.

22             MR. SMITH:  Mr. Caslen says, "There were four

23   meetings that weren't recorded," and he lists four dates.  Does

24   Your Honor see those dates?

25             THE COURT:  Yes.

9

1              MR. SMITH:  So the first -- on the first e-mail we

2     reviewed, there are one or two there are no dates listed.  Now

3     there are four dates for which there are no recordings.

4              If Your Honor finally on the last page flips to

5     JKS2-001273, near the front, 1273 --

6              THE COURT:  Go ahead.

7              MR. SMITH:  -- this is an e-mail on March 29.

8              So this is, I guess, five days after the last e-mail

9     we reviewed.  This is an e-mail from John Gibbs to Nicholas

10    Caslen, okay?  Apparently.  I mean, this is what it looks like.

11    And it says:  "Recordings were not conducted during the

12    meetings on 6-29-14 or 7-13-14."

13             Does Your Honor see that?

14             THE COURT:  Yes.

15             MR. SMITH:  Those are two additional dates.  So in a

16    matter of days, we have one of the case agents saying there's

17    one or two meetings that are not recorded.  Then there is four.

18    Then two additional ones are added, but these are not added by

19    the same agent.  These are added in an e-mail from Mr. Gibbs to

20    Mr. Caslen.

21             Now, Your Honor, I am not accusing the government --

22    the defense is not accusing any agent of any misconduct here at

23    all.  In fact, my hunch is that Mr. Caslen did not even know.

24    He was just correcting himself and fixing the record in these

25    e-mails, but the point is that without seeing the unredacted

10

1   information, we cannot know whether there was potentially a

2   recording on June 29, 2014, which is one of the new dates that

3   is added to this list.

4           And if -- Your Honor, if I may, I'd like to explain

5   to the Court why this is an important date and why that date is

6   significant and in a way that I don't think the Court has seen

7   yet.  This is a fact -- there's a document in the record that

8   is an FD-1036 memo, it's an FBI memo that's drafted by John

9   Minichello, who is the CHS, Mo's agent handler in the case, and

10  this is a memo that he drafted after debriefing Mo, the CHS Mo,

11  and on June 29, 2014, this is -- in the documents the

12  government has produced, this appears to be the first date in

13  which there was a record of Mo having spoken with the defendant

14  about ISIS.

15          Your Honor, may I, may I hand up a copy of this

16  document to the Court?

17          THE COURT:  Yes.  Mr. Kromberg or Mr. Gibbs, do you

18  know what, what Mr. Smith is talking about?

19          MR. SMITH:  This is --

20          MR. KROMBERG:  No, Judge, we don't.

21          MR. SMITH:  It's right here.

22          MR. KROMBERG:  Is this something just produced or a

23  year ago?

24          MR. SMITH:  You produced it as a part of the

25  production in discovery.  I can't remember the particular

11

1    discovery letter, but it's a part of the Mo production.

2              MR. KROMBERG:  So not this month.  Last year.

3              MR. SMITH:  Last year.  The significance of this

4    becomes apparent after discovery that was produced on five days

5    before trial.

6              THE COURT:  Let me, let me put this on hold for a

7    second, because the significant issue before the Court right

8    now and the imminent issue is the timing of the trial, all

9    right?  As you know, the problem we have is this case is

10   currently scheduled for an approximate one- to two-week trial,

11   and we're getting pushed up against the holiday season, which

12   becomes a problematic issue for getting jurors.

13             We're going to try this case.  The question is do we

14   try it in the next couple of days, or do we try it in January?

15   And I want to know whether you've given any thought to this.

16             I have concerns, as I said, about the taint of the

17   jury pool from *The Washington Post*, and I don't know if there

18   was other media coverage, but that *Post* article in particular

19   because of the timing and the fact that it was the Sunday *Post*,

20   which most people, if they don't read the paper during the

21   week, they catch up on the weekend, so we have that issue.

22             We still have the reality that I told the government

23   back in November, when we had one of our earlier hearings, that

24   I intended to make sure I had looked at any videos or reviewed

25   them, if there were any ISIS-type videos that the government

12

1  was going to be using, to make sure that they were not overly

2  prejudicial, not too long, etc., and also, that I wanted to

3  make sure I had a good picture of the Nazi-related materials

4  that the government planned to produce in their case-in-chief.

5  I don't have that yet, so I haven't had a chance to review

6  that.  We're still having these issues about the discovery.

7          So what I want to know right now before we get into

8  any of that is whether you-all talked between yourselves as to

9  how you want to proceed with the trial, and let me tell you

10  what the problems are.  There are three jury, criminal jury

11  trials scheduled to start tomorrow.  It is possible the excess

12  jurors that are not used when those three cases are put

13  together could be pulled in and we could try to get a jury

14  tomorrow afternoon.  I can't guarantee that we would be able to

15  get a jury tomorrow.  It is going to be very difficult to get

16  jurors in here Thursday or Friday.

17          Now, the other thing is the way our juries work is

18  people are called in for two-week sort of time periods, and

19  we're at the end of that current two-week period.  There's a

20  fresh group of 250 jurors on call for next Monday, but if we

21  decide to start the trial Monday, it can't be until the

22  afternoon, and we are pushing the case closer and closer to the

23  holiday season.

24          Now, the problem with that -- and I have no problem

25  trying cases on Christmas Eve, I've done it before, but it's

13

1    tough on juries, and I don't think either side wants a jury

2    that wants to rush to judgment, so that becomes an issue.

3           Therefore, what I -- and I've looked at my calendar,

4    and we would be available to start trying this case again, if

5    you don't want to try it this year, we could start the trial on

6    Monday, January 8, or if you didn't want it on a Monday,

7    Tuesday, January 9, and that January calendar is quite open.

8           So I think again, I want to hear what counsel's

9    position is on that.  Obviously, the defendant wants his case

10   tried as soon as possible, and the government, I suspect, has a

11   fair number of witnesses lined up and some logistical issues

12   that they want to have addressed.  Nevertheless, we want to

13   make sure the case is fairly tried.

14          Ms. Moreno, do you want to speak to that?

15          MR. SMITH:  Your Honor, may I --

16          THE COURT:  We'll get back to that in a minute.

17          MR. SMITH:  Okay.  Thanks.

18          MS. MORENO:  Yes, Your Honor.  I anticipated this

19   question in reading your order yesterday, and I did speak with,

20   with my cocounsel on this.  The problem I have in pushing this

21   case this month is the whole last week of December, I'm

22   committed.  I'm already committed.  And I can move things

23   around in January.  I certainly could begin the case the last

24   two weeks of January.

25          The only problem for me starting the case on the 8th

14

1   is that I'm currently scheduled to appear before Judge Byron in

2   the Middle District of Florida on the *Noor Salman* case on

3   January 17th, 18th, and 19th.  Now, I have cocounsel on that

4   case, and I could certainly arrange with him to handle those

5   matters, but if the Court is asking my preference, the last two

6   weeks of January.

7           That also would give us time to go over some of these

8   issues, which I think need some real consideration.  As the

9   Court knows, we got these materials two-three days before the

10  actual trial, and I would appreciate the, the extra time.

11          So my only calendar issues in January are these

12  hearings that are scheduled the 17th, 18th, and 19th, but if

13  the Court -- and I understand that this case from everyone, it

14  seems like it's going to go ten business days.  That would be a

15  fair estimate.

16          THE COURT:  So you'd want to start it on Monday,

17  January 22?

18          MS. MORENO:  I would.  I would ask for that, Your

19  Honor.

20          THE COURT:  We're clear.  Mr. Kromberg, let me hear

21  from the government.

22          MR. KROMBERG:  I have plans to be out of the

23  country -- actually, not -- to be far away inside the country

24  starting January 25, coming back February 8, and these plans

25  were made a long time ago.

15

1          THE COURT:  I'm not going to make you change your

2   plans.

3          MR. KROMBERG:  We thought that -- we provided 99.9

4   percent of the discovery in this case a year ago.  Yes, there

5   were some things that occurred five days before trial.  That

6   always happens.  We think that the case should start tomorrow.

7          Every -- there are many cases that this Court has

8   tried where there's plenty of pretrial publicity, and that can

9   be cured by asking the jurors:  Can you decide the evidence --

10  decide the verdict in this case on the basis of the evidence

11  before you and ignore what you've heard outside, if you've

12  heard anything?  And jurors can say whether they can or not.

13         THE COURT:  I understand that, when we have good

14  jurors.  Again, this is a -- we already have the problem that

15  we're getting close to a time period when I would be surprised

16  if we don't have an awful lot of jurors who will not be able or

17  willing to give us two weeks of their time right now, and every

18  day that goes on pushes us closer to that.

19         MR. KROMBERG:  And that's true.  And it's also true

20  that the defense, to their credit, has agreed to many

21  stipulations and --

22         THE COURT:  Well, has your case shortened now?

23         MR. KROMBERG:  I think it has, and I think we're a

24  one-week case.  Now, again, I don't know -- depending on how

25  the cross-examination goes and all, but we're down to about 14

16

1    or 15 witnesses.  Several of them are short, several of them

2    are going to be long, but I think it's possible to get it done

3    in a week, our case, in five trial days.  I don't know what the

4    defense case is.

5          So if it was our preference, we would say let's go

6    tomorrow and just ask the jurors can they put out of their mind

7    what, what they read in the paper.

8          THE COURT:  All right.  Well, we still have some

9    other issues, though.  Are you planning to use any of the ISIS

10   videos?

11         MR. KROMBERG:  No.  We have one video that we want --

12   that we plan to play that was, that Mr. Young posted on his

13   Facebook page.  If necessary, we could just describe that.  The

14   other videos in our exhibit list were going to be described and

15   not played.

16         THE COURT:  All right.

17         MR. SMITH:  May I respond to just a couple of the

18   points?

19         THE COURT:  All right.

20         MR. SMITH:  The documents that -- so there's a

21   five-day rule in this court, as the judge knows, for *Jencks*

22   materials.  The reason for the five-day rule is that, so that

23   defense can assess the significance of the *Jencks* statements in

24   advance of trial, and the 60-page document that the Court has

25   seen, there are still redactions that are incredibly important.

17

1          THE COURT:  I've just told you, I've reviewed those

2    60 pages.

3          MR. SMITH:  Apart from --

4          THE COURT:  There's no *Jencks* material.

5          MR. SMITH:  Your Honor, apart from, apart from the

6    redacted statements, there are dozens of documents in here, the

7    significance of yet the defense has not had an opportunity to

8    assess.  There are e-mails going back to several years in this.

9    We don't know why the statements were produced right now.  We

10   need to compare the statements against previous discovery

11   that's been given in this case to see whether there are any

12   differences that might be significant to the defense.

13          These statements relate to the solicitation of the

14   crime that is alleged in the case.  This goes to entrapment,

15   which is the central defense in the case, Your Honor.  So we

16   need time to assess these documents before going to trial.

17   They were given to us on the weekend before trial, and they

18   relate to our defense, so we need to, we need to run these

19   statements by hundreds of other documents that the government

20   has produced over the matter of -- over a year.

21          There have been 27 discovery letters in this case, an

22   extraordinary amount of discovery that we need to assess, and,

23   Your Honor, there's one more point I'd like to make.  I'd like

24   to hand up this document I wanted to show the Court earlier, an

25   FBI memo that shows why this June 29 date is very critical and

18

1   why these redactions, in the first document Your Honor looked

2   at, Your Honor may have to look at the document again to

3   understand the full significance of it.

4           THE COURT:  Let's take a look at it.

5           MR. SMITH:  So Your Honor is looking at a document

6   called the 1036 form.  You can see that on the upper left-hand

7   corner, 1036.

8           THE COURT:  Go ahead.

9           MR. SMITH:  And it's drafted by an Agent John

10  Minichello, who was the undercover informant's handler, which

11  means that he, after the agent -- after the informant would

12  meet with the defendant, he was either conducting a consensual

13  recording or he was trying to memorize what happened at the

14  meeting, and then he would go back to Minichello.  Minichello

15  would debrief him, and then -- so a 1036 form happens when

16  Minichello would debrief Mo and then summarize what Mo told him

17  after the meeting.

18          So this is a summary of what Mo told Minichello after

19  the meeting.  Your Honor can see it was drafted on July 14,

20  2017.

21          THE COURT:  2014.

22          MR. SMITH:  2014.  And if you flip -- if the Court

23  flips to the next page, it will see that that's a summary, that

24  is a summary of what transpired on June -- allegedly transpired

25  on June 29, 2014.  This is the only -- this is the first

19

1  document in discovery that we believe shows that Mr. Young had

2  a conversation about ISIS.  If the Court looks at the

3  highlighted language there, this is a conversation about ISIS.

4         Now, Your Honor will see that there's redactions

5  below that.  The government has never explained those

6  redactions.

7         Second, this date, June 29, is one of the dates, if

8  Your Honor will recall the earlier e-mails we were looking at

9  between the attorneys and Nicholas Caslen, originally

10  Mr. Caslen says on March 23 there's one or two dates that

11  aren't recorded.  That changes to, that changes to four dates.

12  That changes to four dates.  In a third e-mail, John Gibbs

13  responds that actually, June 29 is also not recorded.

14         This is June 29.  This is the memorandum of June 29.

15  This is apparently the first conversation that Mr. Young

16  allegedly had with Mo about the informant.

17         We need to know why there's a redaction in that

18  document, and we need to know, confirm through the use of these

19  redacted e-mails whether there was originally a recording of

20  this meeting.

21         THE COURT:  All right, now stop.  This document

22  you've handed up, this is the July 14, 2014 --

23         MR. SMITH:  That's when it was drafted, right.

24         THE COURT:  When did you get this?

25         MR. SMITH:  We got that in discovery -- Gordon is

20

1    correct -- a long time ago.

2              THE COURT:  And it had the redactions on it then.

3              MR. SMITH:  It had the redactions on it then, Your

4    Honor.

5              THE COURT:  Why did you not then in a more timely

6    manner ask what's been redacted?  I mean, this is the eve of

7    trial, and you're bringing this to the Court's attention at

8    this time.

9              MR. SMITH:  The reason -- so in the letter that

10   produced these memoranda, the discovery letter that produced

11   these memoranda, these were described as all of the documents

12   to which the defense is entitled after a declassification

13   process is complete.  That was the representation to the Court.

14             The Court is correct that we did not challenge the

15   representation in the discovery letter at the time, but, Your

16   Honor, the reason this is coming up now is because on

17   December 1, we had produced to us for the first time this

18   document indicating that this meeting had been recorded, Your

19   Honor.

20             So that's -- if your -- when we looked at that

21   memorandum originally --

22             THE COURT:  I understand.

23             MR. SMITH:  Yeah.

24             THE COURT:  Sit down.

25             Mr. Kromberg, was this --

21

1          MR. KROMBERG:  This document was provided in

2     classified form, redacted -- if it was redacted in classified

3     form -- and I don't remember what we did a year ago -- but this

4     document was provided to cleared counsel in classified form a

5     year ago, and if there was a redaction then, which I don't

6     remember, it would have been because it was reporting on other

7     individuals, but it was --

8          THE COURT:  Well, that's been, that's been the case,

9     so, look, the easiest thing is -- can -- first of all, though,

10    the question that Mr. Smith is raising, and it's a significant

11    question, is there appears to be, as I understand his argument,

12    an inconsistency as to whether or not this first -- or this

13    particular contact between Mo and the defendant was recorded.

14         MR. KROMBERG:  And Ms. Moreno asked me that this

15    weekend, and I sent her an e-mail back that said although most

16    of the mistakes in this case were made by me, Special Agent

17    Caslen made a mistake on his e-mail.  I told her that in an

18    e-mail.  We admitted that Special Agent Caslen was wrong when

19    he said -- in his e-mail when he talked about how many were

20    unrecorded.  So --

21         THE COURT:  I'm sorry, so this one is recorded or

22    not?

23         MR. KROMBERG:  No, it was not recorded.

24         THE COURT:  It was not recorded.  That's the answer,

25    all right?

22

1          Now, I will, however, just to make sure that the

2    record is clear on this, Mr. Kromberg, you need to give the

3    Court an unredacted version of whatever this is.

4          MR. KROMBERG:  Well, I need that because I don't have

5    it.  I don't know what it is.

6          THE COURT:  I know.  I'm going to give this back to

7    you, all right?

8          Give this to Mr. Kromberg, all right?

9          MR. KROMBERG:  And, Judge --

10         THE COURT:  Now, wait.  I want a copy -- I want a

11   copy of that and a copy of your unredacted version of that so

12   that I can --

13         MR. KROMBERG:  It's going to be classified -- it may

14   be classified.

15         THE COURT:  Well, give it to me in the SCIF.

16         MR. KROMBERG:  Okay.

17         THE COURT:  I mean, I will take a look at it and see.

18   My experience in having gone through this record, as I said

19   before, whatever they have redacted at this point of the things

20   I saw in the 27 and 60 packets are, as I've said, either not

21   *Jencks* because it's questions of lawyers or questions of

22   agents, and a question is not *Jencks* material, or it's the

23   gobbledygook back and forth, a lot of numbers that don't mean

24   anything, or it references other investigations or other

25   targets, which are not appropriate for this case.

23

1          MR. KROMBERG:  And, Judge, one other thing:  It may

2    well have been provided in unredacted form in classified

3    discovery a year ago, but I just don't remember now.

4          THE COURT:  I know.  That's the problem.  I actually

5    found inconsistencies and duplications even within the packets

6    that I looked at.  So that takes care of that issue at this

7    point.  You need to get that to me as quickly as possible.

8          MR. KROMBERG:  Yes, Your Honor.

9          THE COURT:  All right.  But that's an example of one

10   of the sort of still slightly unresolved issues.

11         Ms. Moreno?

12         MS. MORENO:  Thank you, Your Honor.  If I can just

13   readdress the calendaring issue?

14         THE COURT:  Yeah.

15         MS. MORENO:  While defense would have no objection to

16   trying the case without Mr. Kromberg, because we believe that

17   Mr. Gibbs can do the case very well without him, I understand

18   the problems with the June (sic) 22 date, I believe.  As I told

19   the Court, I do have cocounsel in that Middle District of

20   Florida case in the middle part of January, and I feel very

21   confident that my cocounsel can handle that, and so we're back

22   again, Your Honor, to that January 8 -- I believe it was

23   January 8 -- date that, that Your Honor first suggested.

24         We wouldn't -- we would request the additional time

25   to absorb, look, and compare the brand new produced materials

24

1    with the plethora of documents and also be able to discuss them

2    with our client.  As the Court knows, this is really -- it's

3    been a whirlwind, and so I would request also the January 8

4    date and leave it to me to make arrangements about my other

5    conflict in the Middle District of Florida.

6         THE COURT:  Is there any -- Mr. Kromberg, when do you

7    leave the area?

8         MR. KROMBERG:  25th.

9         THE COURT:  Of January?

10        MR. KROMBERG:  January.

11        THE COURT:  So a January 8 trial date would not be a

12   problem for you?

13        MR. KROMBERG:  I think that would work.  I will --

14        THE COURT:  Is it a problem for any of your key

15   witnesses?

16        MR. KROMBERG:  Well, yes, in fact.  One of our key

17   witnesses -- one of the witnesses we have the protective order

18   on is going -- I'm not sure how I can put this in this setting,

19   but we have a very serious problem with -- excuse me just a

20   minute.  May I confer?

21        (Discussion off the record.)

22        MR. KROMBERG:  We have a very serious problem with

23   one of our -- one of the witnesses covered under the protective

24   order, a key witness, and we may have a serious problem with

25   the other, because they are both involved in other things in

25

1    other, other geographic areas.

2          THE COURT:  And they couldn't be brought back during

3    that time period?

4          MR. KROMBERG:  I don't know.  I've been told that

5    it's going to be very difficult, if at all possible.

6          THE COURT:  Well, I think you need to let us know

7    that for certain.  I mean, again, I have --

8          MR. KROMBERG:  I can provide that information in

9    another --

10          THE COURT:  I don't need -- I don't need the details.

11   I just need you to find out for certain if that's a problem.  I

12   mean, again, the difficulty here is we do have basically, as I

13   read Ms. Moreno's position, almost a request by the defense for

14   a continuance of the trial.

15          MR. KROMBERG:  Well, that's true, but Ms. Moreno came

16   on the case, what, a month ago --

17          THE COURT:  Well, I know.

18          MR. KROMBERG:  -- two months ago, and that was the

19   choice of the defendant.

20          At that time, Your Honor said this trial date was

21   sticking.

22          THE COURT:  I understand, but we also didn't have the

23   issues that have arisen.

24          MR. KROMBERG:  The issues that have arisen come up --

25   it's true that the information -- some information was

1  classified, and within a day, 24 hours, that information was

2  provided in unclassified form.  Your Honor has seen that the

3  things that were redacted are not *Jencks*, so we've already had

4  one day delay.

5          So as it turns out, the defense will have their five

6  days to look at the 1 percent of information in this case that

7  was not provided a year ago, and the fact that they have an

8  issue now is because they're bringing up issues now for

9  documents they got a year ago, which, by the way, I think they

10 got in classified form, but since Mr. Smith can no longer look

11 at the classified information, he can't figure out whether he

12 got it in classified form with no redactions.  So he's bringing

13 up issues now which, well, I mean, they sound okay, but as a

14 practical matter, they should have been brought up a year ago

15 if there was an issue.

16         The outstanding issue now is a document we gave him a

17 year ago and why is there a redaction in it.  That should not

18 be a reason to postpone the trial more than a day.

19         THE COURT:  All right.

20         MR. SMITH:  Your Honor?

21         THE COURT:  Yes.

22         MR. SMITH:  Mr. Gordon just -- Mr. Kromberg just

23 represented that, that the documents that were produced to us

24 on November 30 at 6 p.m. were declassified the next day.  That

25 is correct.  He is, he is omitting to mention that there was a

27

1   second *Jencks* production at 8 p.m. on Saturday, after this

2   Court had already addressed the late production on the 30th.

3          This, this 60-page document produced on Saturday

4   night has lots of information, as we explained with the Court,

5   that needs to be checked and verified against a whole universe

6   of discovery that's already been produced in the case.

7          And, Your Honor, there's one more point about the

8   classified information and the review of that information.  On

9   September 25, the government filed -- a couple of weeks before

10  Ms. Moreno and I entered the case, the government filed a

11  motion to delete information from discovery.  We don't know --

12  I do not know what information that is referring to, but I do

13  know that when we asked the government for an explanation for

14  why there are certain redactions in the documents that were

15  produced in the past five days, they did not provide an

16  explanation, either a classification or legal privilege.

17         So, Your Honor, they filed this motion to delete

18  information from discovery on September 25.  On September 26,

19  the Court granted the order, the motion.

20         THE COURT:  And again, we granted it because what

21  they're asking is for what would be considered to be

22  extraneous, irrelevant, or improper information that doesn't go

23  to the defense.

24         MR. SMITH:  And, and that could easily be the case,

25  but, Your Honor, the motion was granted the next day, and then

28

1  we received the information that was deleted, that could have

2  been deleted.  So Ms. Moreno also needs an opportunity to go

3  into the SCIF to compare what we've received with the order

4  that was granted, the motion that prompted the order to be

5  granted on September 26.

6      THE COURT:  She won't be able to do that in all cases

7  because if it's been redacted, it's been redacted.

8      Look, I think perhaps the better compromise on this,

9  give the defense a few more days to get ready, is to start the

10  trial on Monday, when we have a fresh jury pool.  Otherwise, if

11  we do it this week, many of the jurors that we'd be looking at

12  have been through one or two other voir dires with other judges

13  and for some reason were excused from those other pools.

14      I can't bring in a fresh group of jurors this week.

15  The system just doesn't work that way.

16      So we can start the trial, it's going to be not until

17  two o'clock Monday afternoon.  That does mean if there were any

18  last-minute issues, we can address those Monday morning.  When

19  I say last-minute issues, I mean some small glitch about some

20  piece of discovery that's still not yet produced.

21      That does get us pushing the trial closer and closer

22  to the holiday.  What I'm planning to do, however, assuming we

23  are able to start on Monday, assuming we get a jury, is I'm

24  going to get rid of my Friday docket, so we will have a full

25  day of trial on Friday, so we can catch up a little bit there,

29

```
 1   all right?
 2           And I will try to see if we can perhaps start the
 3   trial at 9:00 rather than 9:30 so that we can pick up a little
 4   extra time that way.  So next week would be a very intense
 5   trial week, and then, you know, if the government can get its
 6   case in by close of that week, we'd almost be back on schedule,
 7   and then that leaves the second -- the last week of December
 8   before the holiday season, all right?
 9           MR. KROMBERG:  Yes, Your Honor.  I'm just trying to
10   work it out.  So starting on Monday with jury selection --
11           THE COURT:  Monday we would start jury selection
12   around two o'clock.
13           MR. KROMBERG:  And we would do jury selection,
14   perhaps opening statements.
15           THE COURT:  Correct.  Possibly even your first
16   witness, possibly.
17           MR. KROMBERG:  Okay.  Thank you.
18           THE COURT:  It depends how quickly things go, all
19   right?
20           And that does give just a few more days' distance
21   between The Washington Post article and the jury coming in as
22   well.  So that shouldn't change things too much, all right?
23           Now, just so we're all together so I can try to also
24   minimize the amount of delay we have during the trial, I want
25   to try to do the jury charge before we start the case.  Now, a
```

30

1  trial always has a few things that happen that might require

2  some mild modification of the charges, but where there appears

3  to be the dispute between you-all about the jury instructions,

4  we can get that resolved before the trial.  That saves time.

5          In terms of the voir dire, I can tell you, and I

6  actually can run this, if I have it here -- yeah.  Ms. Moreno,

7  you were concerned about how we would handle the witnesses who

8  were speaking behind a screen.

9          MS. MORENO:  Yes, Your Honor.

10          THE COURT:  All right.  And my intention was to do

11  the following:  First of all, I always tell the jury, just

12  because you haven't had a trial with me before, I always

13  explain to the jury what their role is as a juror.  I tell them

14  they're judges, I would like to give them black robes, so I

15  give them a preamble.

16          And then the question I would, I would tell them

17  first of all is that the credibility of each person who

18  testifies in a trial must be evaluated on its own merits, and

19  then I would ask them the law enforcement question:  Do you

20  believe that because a person is employed in law enforcement,

21  his or her testimony is worthy of more or less belief than that

22  of a non-law enforcement witness?

23          Then I would tell the jury:  Some of the government's

24  witnesses' identities must not be publicly disclosed.  Before

25  they testify, a screen will be used to prevent the public from

31

1  seeing these witnesses.  Of course, you and all the trial

2  participants will not have your view obstructed.  Do any of you

3  think that the use of the screen or the fact that certain

4  witnesses' identities cannot be disclosed would affect your

5  ability to judge this case impartially?

6          I think that handles it adequately.

7          MS. MORENO:  Yes.

8          THE COURT:  And then the other thing is there will be

9  evidence in this trial of Mr. Young's possessing white

10 supremacist and Nazi materials and having expressed anti-Israel

11 and anti-Semitic views.  This evidence is being submitted

12 solely to address the issue of the defendant's predisposition.

13 Mr. Young is not being prosecuted for possessing such materials

14 or holding such beliefs.

15         Would you have any difficulty in fairly evaluating

16 the case in light of such evidence?

17         I think that is sufficient to address that issue, all

18 right?  But that's how I intend to do that.

19         MS. MORENO:  And, Your Honor, just -- sorry.

20         I would, I would ask the Court that when, when during

21 the course of the trial these materials are being offered by

22 the government, we will ask for the Court to repeat an

23 instruction to the jury about those materials.

24         THE COURT:  A cautionary instruction?

25         MS. MORENO:  Um-hum.

32

1          THE COURT:  I think that might be appropriate.  We'll

2    have to see how it comes in.

3          Now, the only other thing is, since we're here, this

4    is how I intend to summarize the defense theory of the case,

5    all right?  You tell me if this is consistent with how you plan

6    to approach the case.

7          The defendant denies that he is guilty of these

8    charges and will argue that he lacked any predisposition to

9    commit the charged crimes and instead was induced by the

10   government to do what he did.  Specifically, he will argue that

11   Mo was at all times an agent of the federal government and that

12   but for Mo befriending him, none of the conduct for which he is

13   charged would have occurred.

14          MS. MORENO:  First of all, he was a paid agent.

15          THE COURT:  I'm sorry?

16          MS. MORENO:  Sorry.  First of all, he was a paid

17   agent.

18          THE COURT:  All right, I can add that.  That doesn't

19   bother me.

20          MS. MORENO:  We would ask that.  And with respect --

21   is the Court going to make a reference to the undercover agent,

22   Khalil, in 2010?

23          THE COURT:  I can add that.

24          MS. MORENO:  This would be important, Your Honor,

25   again with respect to the entrapment and the predisposition

33

 1   issue because the first contact is with Khalil in December, I

 2   think it's 23rd, at 2010.

 3             THE COURT:  All right.  I just, again, we're not

 4   going to summarize the whole case --

 5             MS. MORENO:  I understand.

 6             THE COURT:  -- but I want to make sure that my

 7   description of the defense is accurate so we don't have an

 8   objection the second I start the voir dire.

 9             MS. MORENO:  And, and would it be possible to get

10   these instructions in writing from Your Honor?

11             THE COURT:  We don't normally do that, but the three,

12   what I call the three sensitive ones I'll give you in writing,

13   yes.

14             MS. MORENO:  Thank you.

15             THE COURT:  It's not normally done, but I think that

16   will avoid any problems.

17             Mr. Kromberg?

18             MR. KROMBERG:  So there is an issue about what is the

19   legal point for predisposition in this case.  It is true that

20   there was a government undercover, Khalil, who met Young in

21   December 2010 and then never had any contact with him after

22   April 2012, and then Mo came into the picture in June 2014.

23             So we do not agree that the predisposition should be

24   measured at the time that Khalil, fortuitously or not, met

25   Young and became friendly with Young, but it is -- I know that

34

 1  that's what the defense is.

 2          THE COURT:  Well, you can argue that, but all I want

 3  to do right now is give the jury a snapshot as to what the

 4  essential issues in the case are.  I plan to summarize -- I'll

 5  give you that whole what I call preliminary explanation of the

 6  case.  I have to summarize briefly the government's three

 7  charges, what the theory is of the government's case, and then

 8  I always put on the defense theory of the case if I know it in

 9  advance, and I think that's sufficient.

10          I'm giving you more than I normally do, but because

11  of the sensitivity of some of the issues in this case, those

12  three particular instructions I will give you -- voir dire

13  questions I'll give you in advance.

14          In terms of the charging conference, what I think the

15  best thing would be is to do this this Friday.  We can do it in

16  the afternoon if that works on your calenders.  I can do it at

17  one o'clock to get you out of here on time if you'd like.

18          MR. KROMBERG:  That would be fine.

19          THE COURT:  One o'clock?  All right.

20          So Friday at one o'clock.  If there are any more

21  problems with discovery or anything else -- now, I'm going to

22  tell the government, stop e-mailing each other.  If you have

23  any more communications, you do it by phone, all right?

24          MR. KROMBERG:  I already told --

25          THE COURT:  So we're not creating any more *Jencks*

35

1   material.  And this is a case where I think the government bent

2   over backwards and gave every scintilla of arguable *Jencks*

3   material, and it's created more of a problem than is necessary.

4   You got more than you needed.

5          But good defense attorneys have to.  It's their

6   obligation to look through it, all right?  Because there's no

7   sense in having this case go to trial should the defendant be

8   convicted and then have all kinds of, you know, messy issues on

9   appeal.  It's better to take care of it now.  So that's the

10  problem.

11         No more e-mails, all right?  Nothing more in writing.

12  Do it verbally, all right?

13         I think --

14         MR. KROMBERG:  Your Honor, do you want -- for the

15  purposes of looking at the exhibits, the government exhibits,

16  do you want us to -- I mean, we filed them with the Clerk's

17  Office, but the clerk then signed them back to us because they

18  don't want to have them.

19         We can deliver them on paper to you.  The problem I

20  see is that when Your Honor looks at them, Your Honor won't

21  know the context of how they come up, and it might be that on

22  Friday at the same time as the charging conference, we can go

23  through exhibits, and we can -- you can ask those exhibits you

24  want to know about, and we can tell you how we think the

25  context is going to come up.

36

1          THE COURT:  Well, the only problem is that's done in

2     an open courtroom, and I don't want all this evidence also

3     getting, you know, spread out in detail, because again, I've

4     got to get a jury in here on Monday that doesn't know anything

5     more about the case than is necessary.  So --

6          MR. KROMBERG:  Well, but we could do that under

7     seal -- I mean, we could do that --

8          MR. SMITH:  Your Honor, we would object to any ex

9     parte hearing.

10          THE COURT:  Not ex parte.  Under seal.  It's just for

11    the attorneys at this point, again, to avoid the problem of

12    unnecessary pretrial publicity.

13          MR. KROMBERG:  But I don't, I don't understand how

14    the Court can actually know what's overly prejudicial without

15    knowing the context of how each, each exhibit would come in.

16          THE COURT:  Well, again, the problem was I didn't

17    want, you know -- we had talked about not having twenty

18    pictures of Nazi regalia or, you know, ten books of Nazi

19    materials.  I mean, again, the way it was coming to us a couple

20    of weeks ago was there was -- and again, I know the government

21    and defense often as well, you often list every possible

22    exhibit you think you might use, and then when push comes to

23    shove at trial, not every exhibit that's listed actually gets

24    used, but remember, I warned you back then that I didn't want

25    cumulative or what I would call overkill evidence.

37

1          This is for your case-in-chief.  Now, again, doors

2   may be opened, and I must have said a half a dozen times during

3   that hearing if the door is opened, you can walk through it.

4          The body armor was an issue that came up, I think,

5   last Friday, all right?  And I looked again at the transcript.

6   I have not barred that evidence from the case.  I have said if

7   the door is opened, it can be gone through.  Now, the door may

8   be opened during the closing -- during the opening statement.

9   It may be opened during the line of questioning of a witness,

10  all right?

11         If, for example, in the line of questioning, defense

12  counsel are probing the motivation of the FBI, why they were

13  interested in the defendant, which I suspect may be an issue,

14  that opens the door to the government putting in information

15  that they otherwise might not have needed to put in.

16         So it's a difficult case in that respect to make

17  pretrial these rulings other than to put the government on

18  notice to be conservative in your opening statement and to be

19  conservative as you put your direct case in until the door is

20  opened.  When you think the door has been opened, you're going

21  to run up and have a bench conference with me, and I'll decide

22  then whether or not you can get into some of that.

23         MR. KROMBERG:  So what I understand the Court to

24  direct is that we're not, we're not to bring in the issue about

25  the arsenal of weapons, but we can talk, when there's an

38

1   individual weapon that's involved in a particular incident,

2   that can be involved -- that can be raised, and that there

3   is -- the issue of the weapons does not encompass body armor.

4          Body armor is a separate thing because that is --

5   there is -- there's not nearly as many innocent explanations

6   for having so much body armor as there may be for having so

7   many guns.

8          THE COURT:  Well, the body armor, of course, on the

9   trips back from Libya does come in.  I think that -- I think I

10  ruled on that if I wasn't clear.  That certainly is

11  appropriate, I believe, because that goes right to some of the

12  connections with certain activities that are related to this

13  case and undercut possibly the predisposition argument.

14         MR. KROMBERG:  So the Khalil, we expect to testify

15  that Mr. -- that the defendant would say he hates the FBI, he

16  hates the FBI for a variety of reasons, and he has even scoped

17  out the JTTF, and he thought that he could attack them, and

18  he's never going to tell anybody what he -- when he does it.

19  He's not going to be like Amine El Khalifi, who was telling

20  everyone what he was going to do.

21         THE COURT:  Is that conversation in 2010?

22         MR. KROMBERG:  That was 2012 -- 2011 and 2012.  But

23  keep in mind, Judge, that the defense's theory is we have to

24  establish predisposition from before December 2010.

25         THE COURT:  Well, that's something defense counsel

39

1   may want to think about because if you start the predisposition

2   at a later date, then some of that Khalil business might not

3   come in.

4           I'm not going to get into your defense theory of the

5   case.  I'm just saying when the door is opened, all right, the

6   government can go through it appropriately, and I can't give

7   you, I'm not going to give you a line-by-line ruling on the

8   evidence out of context.  Context is always critical in these

9   cases, all right?

10          MR. KROMBERG:  So, Judge, I just want to put the

11  Court on notice that in my opening statement, I am planning to

12  talk about what the defendant said -- what Khalil says the

13  defendant said to him in 2011 and 2012 to establish

14  predisposition that he would support a terrorist group.

15          THE COURT:  All right.

16          MR. KROMBERG:  And that's going to include

17  attacking -- that's going to include attack -- talking about,

18  not -- he didn't say:  I'm going to.  He said:  I could do

19  this.  I could do that.  I could attack a federal building.  I

20  have a plan to do this, but I'm never going to tell anyone when

21  I'm going to do it.

22          And that, I believe, goes right into the fact that

23  what his plan was, he could help -- he could smuggle weapons

24  into a federal building and that -- and give it to other

25  people, and he had body armor for many people, and that's how I

40

1    was planning to go in the opening statement.

2            If the Court says I can't do that, I understand, but

3    I just wanted the Court to know that's the predisposition

4    evidence that we have from 2011 and 2012 that to the extent

5    that the defense says we have to show predisposition, long

6    before Mo ever came into the picture in 2014, that's the, sort

7    of the evidence we have.

8            MR. SMITH:  Your Honor, may I?  If the Court goes

9    back to the motion in limine we filed and reads the section on

10   the alleged violent comments in 2011, Your Honor will see that

11   that was a particular part of our motion.  We made an argument.

12   We cited legal cases.

13           If the Court pulls the transcript from the hearing,

14   you'll see that the Court explicitly ruled on these statements

15   that Mr. Kromberg was just referencing.  The Court ruled that

16   it was 403 inadmissible.

17           We had previously raised the entrapment defense.

18   That was on the table at the time of that ruling, and the Court

19   ruled on the record it was inadmissible for all of the reasons

20   stated in the defendant's motion.

21           The second point is Mr. Kromberg should not be

22   allowed to raise in his opening statement these comments about

23   the courthouse because in declassified documents that are now

24   open and public, the agent, the undercover agent who Mr. Young

25   allegedly made the comments to said these were not serious

41

 1  comments.  They were made in jest.

 2          THE COURT:  When, when did the agent make that

 3  statement?

 4          MR. SMITH:  The agent -- you mean when did he

 5  acknowledge they were in jest?

 6          THE COURT:  Yes.

 7          MR. SMITH:  I don't have the memo with me right now,

 8  but I believe it's dated 2013.

 9          MR. KROMBERG:  There is no memo from 2013.

10  Everything that happened was in 2010-2011.  The last time

11  Khalil ever saw or had any contact with the witness -- with the

12  defendant was 2012, and he did not say it was in jest.  What he

13  said was maybe a joke was the plan to kidnap and torture an FBI

14  agent.  That was in jest.

15          THE COURT:  Well, I --

16          MR. KROMBERG:  I'm sorry.  What Your Honor said was

17  barred by 403 was the plan to kidnap and torture the FBI agent

18  and the plan to smuggle guns into this courthouse, and that's

19  why I said that I've instructed the witness to not talk about

20  the courthouse but to talk about a federal building, because

21  it's central to what their conversation was, that Young

22  ought -- defendant Young hated the FBI and talked about

23  attacking the FBI.

24          He talked about shooting -- he talked about pointing

25  his guns out of his window of his house at the FBI agents he

42

1  thought were surveilling him, and that is, that is a comment --

2  a conversation that was repeated again and again with Khalil

3  over the course of months, and it was not in jest.

4          THE COURT:  All right, let me --

5          MR. SMITH:  Your Honor --

6          THE COURT:  Wait, wait, wait.  One attorney at a

7  time.

8          Ms. Moreno, you're on your feet.

9          MR. SMITH:  Just one last --

10          THE COURT:  No, Ms. Moreno is on her feet.  Just one

11  second.

12          MS. MORENO:  This is going to be a problem, Your

13  Honor.  You are correct that you have cautioned the defense

14  about opening the door that the government can roll through.

15  We are very sensitive and mindful to that, but I would ask the

16  Court to keep in mind not only how you ruled previously and

17  which is how we've been presuming the case would go and opening

18  statements would go, but Mr. Kromberg unfortunately -- and I

19  understand the rationale -- has this tendency to sort of ignore

20  the fine lines here.  Now he's going to talk about comments

21  made about attacking federal buildings.  It was my impression

22  that Your Honor thought that that was 403 evidence.

23          I'm very concerned about what the prosecution is

24  going to say in their opening statement.  I know that they are

25  packing their -- the weapons that were seized that I believe

43

1  Your Honor said were not coming into this case --

2            THE COURT:  Unless, unless the door is opened.

3            MS. MORENO:  Yes, yes, yes.

4            THE COURT:  But here's the problem:  You just told me

5  as I was -- about the opening statement and how I described to

6  the jury your theory of the case, entrapment defenses are very

7  difficult because, you know, they involve whether -- they're

8  going to involve, as I assume, an attack on the reasons why the

9  FBI was targeting Mr. Young, and again, if the government has

10 evidence that somebody is talking about, you know, blowing up

11 buildings, even if it looks like it might be in jest, in this

12 day and age, they have to investigate that.  That's a rational

13 explanation as to why a particular person might be targeted and

14 why a federal investigative agency would want to continue

15 investigating that person.

16            If a person, you know, hangs around with the wrong

17 people, which is possibly part of this case, if a person puts

18 out these days on, you know, on the Internet, on their Facebook

19 page, or they tweet and they have things in there about, boy,

20 I'd like to blow up the federal courthouse, that's enough to

21 get any responsible law enforcement agency looking at that

22 person.

23            And so to the extent that the issue about, you know,

24 the government was being so unfair in looking at this

25 individual, that opens a door to them coming back and saying:

44

1   Wait a minute.  We had this information.  This created all
2   kinds of concerns for us, and we went ahead and started probing
3   it.
4           So when you mention to me that you want to go back to
5   2010 and Khalil, that opens the door appropriately to stuff
6   about what was going on with Khalil, and that would then
7   further justify if stuff came out during that interaction the
8   government continuing to keep your client in their sights.
9           Now, that's a decision to some degree that you can
10  control.  We are going to come back on Friday afternoon at one
11  o'clock, and maybe some of these issues will have gone away or
12  been resolved, but at this point, in case there's a
13  misunderstanding, I thought I said clearly in that hearing that
14  motions in limine are very difficult to do in the abstract
15  unless there's something that clearly cannot come in because,
16  you know, it's an attorney-client privilege issue or something
17  like that, but I thought I put enough caveats, that's why I
18  said I put "unless the door is opened" throughout that
19  discussion, and in case that was not clear, I'm making it clear
20  now, there's practically nothing that's absolutely barred from
21  the government being able to use if the door is opened.
22          And again, there'll be, I guess, a fair number of
23  bench conferences if something like that happens, but the
24  cautious thing would be if, in fact, you are continuing with
25  the Khalil business, the government may get into a little of

45

1    that in their opening statement.

2           Now, I've given each side 20 minutes to keep you

3    somewhat out of trouble, all right?  So you have to use your

4    time wisely, but the government needs to think cautiously about

5    not putting anything in an opening statement that could create

6    reversible error.

7           MR. KROMBERG:  Yes.

8           THE COURT:  Mr. Kromberg has been around long enough

9    to know that.  But you'll need to be very careful about how you

10   proceed as defense.

11          MR. SMITH:  Your Honor, may I just include just a

12   couple of facts on the record?  So, Your Honor, Your Honor

13   mentioned that we would open the door to the guns and the

14   weapons, the comments that were allegedly made in 2011, if we

15   make the case about government -- why the government was

16   following a certain individual, but our argument is

17   predisposition is a mental state.

18          If you go back to the *Jacobson* decision, the question

19   is whether the government -- the defendant had the

20   predisposition, the mental predisposition to commit the charged

21   conduct before the first contact with the government agent.

22          And if Your Honor goes back to the Court's previous

23   ruling in the motion in limine, Your Honor stated on the record

24   in the hearing that those statements that were allegedly made

25   in 2011 would fail 403 balancing because the charged conduct

46

1    here is nonviolent.

2           THE COURT:  Well, the -- I understand what I said,

3    but I also said more than once that if the door is opened, they

4    can go through it, and it depends on -- we're going to stop

5    this -- it depends on how you're presenting your case.  I

6    mean -- and Ms. Moreno has been around long enough and has

7    tried enough cases to understand what the Court is saying -- in

8    a case involving entrapment defense, the issue of

9    predisposition is fairly broad.  Predisposition to commit acts

10   of violence, predisposition to be anti the U.S. government

11   because ISIS or ISIL is not considered to be a friend of the

12   United States government, those types of things are potentially

13   very relevant to the issue of predisposition.

14          So I'm not going to go any further in nuancing this

15   case.  Friday afternoon, after you've had a few more days to

16   look at the discovery and to think about how you want to

17   proceed, we can sort of wrap this up.  But I'm just saying

18   everybody is on caution, the government is on caution and

19   you-all are on caution as to how the case is to proceed.

20          MR. SMITH:  And one last point:  I referenced a

21   memorandum in which the undercover agent who Mr. Young

22   allegedly made the comments to about the courthouse, about the

23   guns, I referenced a memorandum where he indicated that this

24   was in jest.  Your Honor, may we please submit a briefing to

25   the Court?

47

1          THE COURT:  No.  I've had enough briefing in this

2     case, so I want -- and, Mr. Smith, when I've ruled, I'm not

3     going to be asked to re-rule a second or third time during --

4     once the trial gets started, if I sustain an objection, you sit

5     down, and that's the record, and, you know, down the road, if

6     there's an appeal, you can argue about it, but I don't want,

7     you know, a second and third round every time I do something

8     during the trial because it will never get done.

9          MR. SMITH:  Understood, Your Honor.  So Your Honor's

10     ruling is that if the door is opened, then the government may

11     then use that, may then use that in its opening statement.

12          THE COURT:  Well, the opening statement -- the

13     government speaks first, so they're going to speak in the

14     context of understanding what the defense is.  Right now,

15     you've told me you're going back to 2010 and Khalil.  I'm

16     suggesting the government be very judicious about what, if

17     anything, you want to do about that.

18          Khalil may come out of the case, may not; I don't

19     know.  That's it.  It's a surprise.  You normally don't know

20     what the government is going to say in its opening statement.

21          MR. SMITH:  And Your Honor just raised something very

22     important actually.  If we go back to the case law on

23     entrapment, you'll see that it's the government -- it's

24     sometimes colloquially referred to as an affirmative defense,

25     but that's, you know, you'll find that on the Internet if you

48

 1   research it.

 2           THE COURT:  I know.  You've raised it, but the

 3   government -- it's the burden on the government to prove --

 4           MR. SMITH:  The burden is on the government to prove

 5   predisposition, so to say that the defense is opening the door

 6   by pointing out 2010 is the government's burden, it's the

 7   government's burden under the case law to prove predisposition

 8   before 2010.  So it can't be the defendant opening the door by

 9   merely pointing out that the government has a burden.

10           THE COURT:  All right.  Well, then --

11           MR. SMITH:  That would be flipping the burden on the

12   defense.

13           THE COURT:  All right, that should make the case very

14   easy for the government now.  Mr. Kromberg, as long as it's

15   judicious, you can go into it.

16           MR. KROMBERG:  Thank you, Your Honor.

17           THE COURT:  All right, that's it.

18           MR. KROMBERG:  I have another point to bring up, a

19   different topic.

20           THE COURT:  All right.

21           MR. SMITH:  Your Honor, I just --

22           THE COURT:  Sit down, Mr. Smith.

23           MR. SMITH:  Okay.

24           MR. KROMBERG:  Your Honor, we raised in our pleading

25   that we filed yesterday a concern about the distribution of

49

1   *Jencks* -- publication of *Jencks* material publicly, that the

2   discovery order in the case says that the defense attorneys may

3   not provide the *Jencks* materials to the defendant.

4           In this case, the defense published -- filed

5   publicly, not under seal, the *Jencks* materials, and it has, I

6   am advised, gone over the Internet, and these are the e-mails

7   of the FBI and the discussions -- and the e-mails from

8   Mr. Gibbs and myself to the FBI, and we would like to have it

9   clear on the record that this cannot be.

10          If you're going to file anything in this case from

11  *Jencks*, that the discovery order entered in this case a year

12  ago says you can't do it.  You have to treat that carefully and

13  keep it closely held and not, not give it to the defendant and

14  not publish it, and then you have to return it to the

15  government at the end of the case.

16          THE COURT:  There is a protective order in the case.

17          MR. KROMBERG:  In fact, Judge, that's not even the

18  protective order.  That's just the original standard discovery

19  order issued in virtually every case.  The last paragraph says

20  *Jencks* materials may not be provided to the defendant, and they

21  have to be returned at the end of the case.

22          In this case, they were not only -- I mean, they were

23  publicly posted on ECF, and to their credit, the defense then

24  moved to have them put under seal after I pointed that out, but

25  I'd like the -- I hope that the Court can instruct the defense

50

1   that they cannot -- they can't violate the underlying discovery

2   order in this case.

3           THE COURT:  All right.

4           MR. SMITH:  Your Honor, what Mr. Kromberg just failed

5   to mention to you is that in his e-mail requesting that we move

6   the documents under seal, he acknowledged he forgot to stamp

7   the documents as sensitive, sensitive discovery materials.  The

8   protective order, as was pointed out to Mr. Kromberg, states

9   that the defense may file documents under seal when they are

10  marked sensitive discovery materials.

11          In the past, the government has marked documents

12  sensitive discovery materials.  In this case, they did not.

13          The defense looked at the local rules before making a

14  filing, which state that the defense is not even permitted to

15  make a filing under seal unless documents are marked -- unless

16  following the rules of the protective order that's entered in

17  the case.

18          THE COURT:  All right.  Well, they're under seal now,

19  and what's done is done, but obviously, both sides should be

20  sensitive to the requirements that information be handled that

21  way.  I was not aware of the fact that the government had to

22  actually stamp everything.  Those protective orders normally

23  cover that.

24          MR. KROMBERG:  Well, Mr. Smith has not responded to

25  what I said.  I'm reading from the, from the discovery order

51

1    entered on January 18, 2017:  "It is further ordered that, no

2    later than five calendar days before trial, the government

3    shall produce to the defendant the *Jencks* Act and *Giglio*

4    materials for the witnesses who will testify in the

5    government's case-in-chief.

6             "Counsel for the defendant may disclose the contents

7    of said *Jencks* Act and *Giglio* materials to his client, but may

8    not provide his client with said documents or reproductions

9    thereof.

10            "At the request of the government and consistent with

11   the ethical responsibilities of defense counsel, all *Jencks*

12   Act, *Giglio* materials, and reproductions thereof shall be

13   returned to the United States Attorney's Office forthwith at

14   the conclusion of the litigation of the case."

15            That's the standard discovery order.  That's not even

16   the protective order in this case.

17            THE COURT:  No, but that technically doesn't say that

18   if anything is filed, it must be filed under seal, but look,

19   I'm not going to spend any more time on this back-and-forth.

20   It is sensitive material.  If in doubt, you call the other side

21   and say:  Is this to be filed -- can I file this publicly, or

22   does it need to be filed under seal?

23            Fortunately, we only have a few more days before the

24   case gets started, and hopefully, neither side will get into

25   any further trouble so we don't have any long issues on Friday

52

1   afternoon.

2          But remember, I'm going to do a charging conference

3   on Friday.  I do not believe that the defense, in fact, did put

4   proper citations on all of the disputed instructions, and I

5   want to make sure that I get Word versions of both sets of jury

6   instructions so that we can manipulate them to the extent we

7   want to do that, but I would hope to be able to give you the

8   charge on Friday, and that will shorten things.

9          Now, again, charges always change a little bit.  I

10  don't know whether the defendant will testify or not testify,

11  there may be evidentiary issues that come up that need a

12  special instruction, but that would be the basic 95 percent of

13  the charge, and that should save us some time during the trial,

14  all right?

15          MR. KROMBERG:  Your Honor, I forgot -- I apologize,

16  and you probably answered this already, and I forgot:  Did you

17  want us to provide you with the exhibits, the government

18  exhibits to go through individually?

19          THE COURT:  At this point, I don't.

20          MR. KROMBERG:  Okay.

21          THE COURT:  Hopefully, you've listened to my warning

22  about, you know, not having thousands of exhibits, because I

23  was most concerned about a video.  If you're telling me that

24  the only video you plan to show is one that the defendant

25  himself had on his Web site --

53

1           MR. KROMBERG:  Correct.

2           THE COURT:  -- then I don't see how that is

3    objectionable as long as it's not too long.

4           I mean, I don't --

5           MR. KROMBERG:  It's about three minutes.

6           THE COURT:  All right, that's fine.  All right.

7           MS. MORENO:  Your Honor?

8           THE COURT:  Yes, Ms. Moreno.

9           MS. MORENO:  Thank you, Your Honor.  I thought it was

10   a good suggestion by the Court that perhaps these exhibits

11   could be discussed at our charging conference because I suspect

12   that they are going to want to admit a plethora of this

13   so-called Nazi memorabilia.

14          THE COURT:  Well, I would hope that you could talk,

15   and so the -- as I said, the government has probably listed in

16   an abundance of caution more exhibits than they're actually

17   going to use.  That's usually what attorneys do.

18          But, for example, in the *Moussaoui* case, we looked at

19   certain exhibits, and the defense had seen them and said, you

20   know, there are certain photographs that they just felt were

21   too prejudicial, there were certain audiotapes that were too

22   prejudicial.  I did look at that evidence in advance and gave

23   rulings on it, but again, if we're going to do that, you've got

24   to get it to me sooner than Friday.  Today is Tuesday.  Give me

25   time to really look at it.

54

1          So look at the exhibit list.  The first thing you

2    should do is call the government and make sure that they're

3    actually going to try to use that, and then to the extent that

4    there is an issue, let me take a look at it, all right?

5          MS. MORENO:  Thank you.

6          THE COURT:  Okay.  Anything further on this case?

7          MR. KROMBERG:  No, thank you, Your Honor.

8          THE COURT:  All right, then we'll recess it until one

9    o'clock Friday afternoon.

10                    (Which were all the proceedings

11                     had at this time.)

12

13              CERTIFICATE OF THE REPORTER

14     I certify that the foregoing is a correct transcript of

15    the record of proceedings in the above-entitled matter.

16

17

18    _____
                        /s/
19                 Anneliese J. Thomson

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA )
)
)
v. )
) No. 1:16-cr-265 (LMB)
)
NICHOLAS YOUNG, )
)
Defendant. )

ORDER

For the reasons stated in open court, defendant's Motion to Strike Each Witness as to

Whom the Government Has Failed to Comply with the Jencks Deadline [Dkt. No. 158] and

Second Motion to Strike Witnesses for Continued Failure to Produce Complete Jencks Materials

[Dkt. No. 163] are DENIED; and it is hereby

ORDERED that the parties appear in Courtroom 700 at 1:00 p.m. on Friday, December 8

for a status hearing; and it is further

ORDERED that the jury trial in this case be and is set to begin at 2:00 p.m. on Monday,

December 11 in Courtroom 700.

The Clerk is directed to forward copies of this Order to counsel of record and the United

States Marshals Service.

Entered this 5th day of December, 2017.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA          )
                                  )
                                  )
        v.                        )
                                  )        No. 1:16-cr-265 (LMB)
                                  )
NICHOLAS YOUNG,                   )
                                  )
            Defendant.            )

<u>ORDER</u>

In a hearing in open court on December 5, 2017, defendant raised an objection to the

redactions contained in an FBI Memorandum that the government has produced to defendant in

this case. The government has filed <u>ex parte</u> the classified, unredacted Memorandum [Dkt. No.

177] and the Court has reviewed it <u>in camera</u>. The Court finds that none of the redacted material

is relevant to the issues in this case, let alone exculpatory. Accordingly, it is hereby

ORDERED that defendant's oral objection to the redactions be and is OVERRULED.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this _6th_ day of December, 2017.

Alexandria, Virginia

_____/s/_____
Leonie M. Brinkema
United States District Judge

# The Washington Post

# METRO

SUNDAY, DECEMBER 3, 2017 · WASHINGTONPOST.COM/REGIONAL

    

8 a.m. 43°   Noon 54°   4 p.m. 55°   8 p.m. 46°

High today at approx. 2 p.m. **57** Precip 50% Wind SW 4-8 mph

**JOHN KELLY'S WASHINGTON**
Lingering on the topic of fish ponds, Answer Man sheds light on a historical lake in College Park. c3



**LOCAL OPINIONS**
Before he leaves office, Virginia Gov. Terry McAuliffe can do the right thing for Jens Soering. c4



**OBITUARIES**
Investigative reporter L Whitten's skills made h an enemy of President Richard M. Nixon. c9

## Man who patrolled D.C. Metro awaits terrorism trial

BY RACHEL WEINER

Nicholas Young is sure a jury will agree he's no radical Islamic terrorist.

First he might have to convince jurors he's not a neo-Nazi.

"I can't wait to go to trial," Young said in a phone interview from a Virginia jail. "Frankly, my case isn't like any other terrorism-related case that anyone's ever brought forward."

He's right. Young is the only U.S. police officer to ever face

---

First U.S. police officer to face such charges says he was entrapped by FBI

---

terrorism charges — a case brought after he was under FBI surveillance during six of the 13 years he patrolled the D.C. Metro system.

The 36-year-old Alexandria native is also a Muslim convert who

used to dress up as a Nazi officer in reenactments, according to court documents, and kept a prayer list that included Saddam Hussein and Adolf Hitler. And he's a Ron Paul supporter who used his vacation time to fight in a civil war on the other side of the world.

At a trial set for this week in Alexandria, federal prosecutors plan to pursue a novel argument. They will paint Young as a violent-minded believer in an alliance between Islamist and white



Nicholas Young

supremacist terrorism at a time when both are sowing fear across the country.

"It's a unique case; it's a unique defendant," Assistant U.S. Attorney Gordon Kromberg said in court last month. "The defendant was an adherent of both . . . The common

enemy is hatred of the Jews."

Young says his historical enthusiasms and dark sense of humor have been distorted to wrongly portray him as a man with long-standing terroristic proclivities. His only crime, he contends, was trying to help a friend who turned out to be an FBI informant. His defense team argues he was entrapped.

"They're really grasping at straws here, trying to take everything I said out of context and

YOUNG CONTINUED ON C5

---

-279-

SUNDAY, DECEMBER 3, 2017 · THE WASHINGTON POST     42   SU     C5

# Ex-Metro officer accused of terrorism says FBI trapped him

*"My brother doesn't have an aggressive bone in his body. He talks about violence only in a cartoonish, 'Quentin Tarantino-esque' way. . . . You would have to know him to know that. If you put it in print, it looks different."*

Ashley Young, Nicholas Young's sister





FAMILY PHOTO



U.S. ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF VIRGINIA





U.S. ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF VIRGINIA

CLOCKWISE FROM TOP LEFT: Nicholas Young with his father at his graduation from the police academy. He became a Metro Transit Police Department officer in 2003. Young is the only U.S. police officer to ever face terrorism charges. Young's tattoo of an SS unit logo is shown. The 36-year-old Alexandria native used to dress up as a Nazi officer in reenactments, according to court documents, and is also a Muslim convert. He kept a prayer list that included Saddam Hussein and Hitler.

**YOUNG** FROM C1

take it in the most sinister light," Young said. During an hours-long interview from the Northern Neck Regional Jail in Warsaw, Va., this summer, he discussed his interest in military history, his relationship with the FBI and his two trips to join rebel groups battling Moammar Gaddafi in Libya.

The alleged crime for which he was arrested in the summer of 2016 was nonviolent; he is accused of lying to the FBI about someone he thought had joined the Islamic State and sending that person $245 in mobile messaging cards. There was no threat to the Metro transit system, officials emphasized at the time.

But Young's words and interests, some of which a judge has ruled could be used against him at trial, were incendiary. He honored a pre-Nazi far-right German group on his license plate, tattooed the logo of an SS unit on his arm and used Hitler's birthday as an online password. Authorities say he joked with informants about wanting a female slave, smuggling weapons into federal court, and torturing and killing FBI agents.

## On the FBI's radar

Young was first contacted by the FBI in 2010 as authorities were investigating an acquaintance he knew through college and a local mosque. Court papers say Young told agents he was shocked by the allegations against Zachary Chesser, who would later be convicted of trying to join an al-Qaeda-linked terrorist group and threatening the creators of "South Park." Chesser, the defense says, later indicated he remembered Young as a conservative police officer "not interested in jihad."

In the years that followed, Young never left the FBI's radar. He said alarming things to an undercover officer, according to court papers, including vowing that anyone who betrayed him would end up at the bottom of a lake and bragging about his stockpile of weapons. The officer introduced him to Amine El Khalifi, who would later be convicted of plotting to bomb the Capitol.

While Young's violent comments kept him under scrutiny, for years his behavior never crossed a criminal line. Friends and family say he is no extremist or racist, just unusual. They point out that he had friends and girlfriends of various races and religions.

"My brother doesn't have an aggressive bone in his body," said his sister, Ashley Young. "He talks about violence only in a cartoonish, 'Quentin Tarantino-esque' way," she said. "He loves fantasy and anime."

"You would have to know him to know that," she said. "If you put it in print, it looks different. . . . The only thing extreme about my brother is his video-game playing."

The two had a happy and unremarkable childhood in the D.C. suburbs, raised by divorced parents who stayed on good terms. Nicholas Young considered joining the Army out of high school but did not want to upset his father, a teacher. So he enrolled at George Mason University and joined ROTC, where he learned following military orders was not for him.

Attention issues kept him from earning a degree. Though he was interested in getting a job with Fairfax police or the FBI, Young ended up leaving college to work in security. In 2003, he became a Metro Transit Police Department officer.

Young told his family about his new career by leaving invitations on their doorsteps to his academy graduation.

"He's very stubborn and independent, except if he's in a relationship — then it's whatever the girl he's with wants," Ashley Young said.

Raised Catholic, Young said he began studying Islam in college and decided to convert in 2006, the year his father died. He didn't like how Catholic doctrine would change, he said, and came to see Islam as a more constant faith.

"Religion shouldn't evolve as new prophets come around," he said.

As a transit officer, Young said he never used his gun, baton or pepper spray. In 2006, he earned a commendation from the D.C. U.S. Attorney's Office for apprehending — without using a weapon — a robber who had a large knife.

But he said he was once or twice reprimanded for not using enough tickets to turnstile-jumpers.

"I was a little soft on things," he said. "The person doing that doesn't have the money to pay; I'm not really doing them any favors by giving them a $6 ticket."

Fellow officers said Young was considered strange because of his penchant to prattle on about history and his passive approach to the job.

"Nick wasn't just your average police officer," former station manager Henry Marrow said. "He didn't like to push people over. . . . He didn't believe that people should be arrested for minor stuff."

But Facebook rants about the government and his known history as a Nazi reenactor also made many fellow Metro police officers wary, as did the long-beard Young began to grow. Around 2008, officials there took their concerns to the FBI, although the agency did not begin investigating Young for another two years.

If Young was concerned about his co-workers' opinions, he didn't show it. In 2011, he openly used his paid leave to help topple the Libyan government. By his telling, his first trip to the war-torn country was a decision born of impulse and a canceled vacation.

Young said he had made plans to go to a death metal concert in Japan, but the Fukushima nuclear disaster scared him off. With vacation time saved up, he needed something else to do.

Young had been following news of the unfolding civil war in Libya. Moved by the struggle of people there and excited by the idea of a revolution, he decided to join rebel groups. Later that year, he went a second time.

"During my entire time there, I never shot at anyone because I didn't need to; everyone shooting at me was too far away," he said.

He disputes that the men he fought with were extremists, though court papers say that in a text message later on he asked about members of an Islamist militia.

"Nothing was transmitted to me about sharia law or any other kind of political ambitions," he said. His comrades in arms, he added, wanted help from the American government, as well as Michael Jackson cassettes and Los Angeles Lakers paraphernalia — "they were just normal guys."

A co-worker warned Young that the FBI was looking into his travel, and he quickly returned home.

## A 'sympathetic figure'

When Young arrived back in the United States, he was met at the airport by two FBI agents.

Authorities debated whether they could arrest him then, court documents show, but the Justice Department ultimately declined. Instead, the agents suggested he become an undercover informant.

"They were very fake-friendly," Young said, offering financial and professional help.

He turned them down.

"I would have just been going after people, looking for their weaknesses, so they could tailor something to infiltrate their life," Young recalled.

Now he says the same thing happened to him, with informants repeatedly coming his way. In 2014, a shy 20-something named Mohammad stuck.

"They very cleverly created this character of a sympathetic figure," Young said. "When he was talking about going overseas, the reason was to fight [Syrian President Bashar al-] Assad. . . . It was totally humanitarian. . . . 'He's killing women and children, he's killing civilians, people are being buried alive.' And at no time did he show himself to be particularly religious."

A friend who asked not to be named to keep his family out of the public eye said he also met the informant. "You couldn't read the kid; he was very awkward, very weird — a putz," the friend said. "He pulled at Nick's heartstrings. . . . I told Nick, 'I think this guy is

an informant.' And Nick laughed."

The friend said he believes that to get Young to send the gift cards, Mohammad told "him some sob story about needing to reach his family."

According to the criminal complaint, however, the undercover operative made clear that the cards would be used to help Islamic State supporters join the terrorist group. Young would not comment on the details of the gift-card allegation.

Authorities in court papers say Mohammad exposed Young's radical inclinations, not his tenderheartedness. In recorded conversations, Young expressed disdain for mosques that preach "jihad of the pen" and argued that terrorist attacks were understandable reactions to Western aggression.

"At no time did I ever praise the attacks," Young maintained, "nor ever encourage any attacks against civilians." He once called the Islamic State a "gang of criminals," according to defense filings, and repeatedly told informants he would not break the law.

To make a case that he was entrapped by the FBI, Young will have to show he was not predisposed to support terrorism before he was first contacted by agents in 2010. That's why the Nazi evidence, which predates his known interest in radical Islam, is important to the government's case.

Young said much of the offensive material found in his home and on his computer was from a college class on European racism. And that, along with Nazi knives and pins, his collection included a Vietnam-era British flak vest, a Scottish breakaword, a Japanese samurai sword, Russian navy medals and a medieval coat of arms.

The World War II reenactments in which he dressed up as an SS officer were "just good fun," he said. "It's dead politics — it was a political movement that took place 60, 70 years ago."

But Young is unabashedly anti-Israel, agreeing with former congressman Ron Paul that American support for the country has only caused more problems in the Middle East. Evidence shows he used an Israeli flag as a doormat and drove with a bumper sticker reading "Boycott the terrorist state of Israel."

Nicholas Smith, a defense attorney for Young, said in court last month that the government was smearing his client in a way that defied "common sense." Smith added, "White supremacism and militant Islam are mutually inconsistent."

Kromberg disagreed, pointing to Young's own apparent interest in the historical connections between Hitler and Muslim leaders. One witness, Kromberg said in court, will testify that after going to a fascist rally in 2000, Young opined, 'Don't discount the idea of an alliance with the Muslims to combat the Jews.'"

Young went to that rally, held by the far-right British National Party, as part of his George Mason class, he says. He earned an A- in "History 387 — Myth of a Master Race."

Young, whose trial is set to begin Tuesday on charges of attempted material support for terrorism and obstruction of justice, is confident that such explanations will show he is neither a neo-Nazi nor a Islamist militant.

"I've been rotting away here in jail," he said. "I'm ready to restart my life."

*rachel.weiner@washpost.com*

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:16-cr-265 (LMB) |
| | ) | |
| NICHOLAS YOUNG, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is the government's Motion for Judicial Notice [Dkt. No. 187], in which the government asks the Court to take judicial notice "that the foreign terrorist organization at issue in this case, ISIL, also known as ISIS and the Islamic State, is currently a designated foreign terrorist organization ('FTO'), and has been so designated since October 15, 2004." Motion at 1. The Court has reviewed the Motion and the attached notices issued by the U.S. Secretary of State and published in the Federal Register and finds that it is appropriate for the Court to take judicial notice that ISIL is currently a designated FTO and has been a designated FTO since May 7, 2014. [Dkt. No. 187-3]. On that date, the Department of State published a notice in which the Secretary of State announced his conclusion "that there is a sufficient factual basis to find that al-Qa'ida in Iraq," which was already a designated FTO, "uses the additional alias Islamic State of Iraq and the Levant." Id. The government may put on evidence to show that before May 7, 2014, the group known as the Islamic State of Iraq and the Levant was an alias used by or a branch of the designated FTO al-Qa'ida in Iraq; however, the Court finds that it is not appropriate to take judicial notice that ISIL was a designated FTO as early as 2004 because the May 7, 2014 notice does not include the Secretary of State's determination of the initial date

USCA4 Appeal: 18-4138    Doc: 24-1      Filed: 06/21/2018    Pg: 294 of 447

that ISIL became an alias for or branch of al-Qa'ida in Iraq. Accordingly, it is hereby

ORDERED that the government's Motion for Judicial Notice [Dkt. No. 187] be and is

GRANTED IN PART AND DENIED IN PART.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this _11_ day of December, 2017.

Alexandria, Virginia

_____ /s/ _____

Leonie M. Brinkema
United States District Judge

2

-282-

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION


UNITED STATES OF AMERICA       .    Criminal No. 1:16cr265
                               .
     vs.                       .    Alexandria, Virginia
                               .    December 11, 2017
NICHOLAS YOUNG,                .    2:00 p.m.
                               .
            Defendant.         .
                               .
. . . . . . . . . . .


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME I


<u>APPEARANCES</u>:

FOR THE GOVERNMENT:          JOHN T. GIBBS, AUSA
                             GORDON D. KROMBERG, AUSA
                             EVAN N. TURGEON, SAUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314


FOR THE DEFENDANT:           NICHOLAS D. SMITH, ESQ.
                             David B. Smith, PLLC
                             108 North Alfred Street
                             Alexandria, VA 22314
                               and
                             LINDA MORENO, ESQ.
                             Linda Moreno P.A.
                             511 Avenue of the Americas
                             No. 2
                             New York, NY 10011


ALSO PRESENT:                SA NICHOLAS CASLEN
                             NICHOLAS ENNS
                             FABIAN VERA


(Pages 1 - 153)

2

<u>INDEX</u>

<u>OPENING STATEMENTS BY</u>:

  MR. KROMBERG                            121
  MS. MORENO                             135

<u>WITNESS</u>                    <u>EXAMINATION</u>    <u>PAGE</u>

<u>JURY PANEL QUESTIONING</u>:

  THE COURT                             3


<u>COURT'S PRELIMINARY INSTRUCTIONS</u>

  THE COURT                           106

3

1          NOTE:  The case is called to be heard in the presence

2   of the jury panel as follows:

3   JURY PANEL IN

4          THE CLERK:  Criminal case 16-265, the United States

5   of America versus Nicholas Young.  This case comes on for trial

6   by jury.

7          Will counsel please note their appearances for the

8   record.

9          MR. KROMBERG:  Good afternoon, Your Honor.  Gordon

10  Kromberg, John Gibbs, and Evan Turgeon for the United States.

11         With us at the second counsel table is FBI Special

12  Agent Nicholas Caslen and paralegal specialist Mr. Fabian Vera.

13         THE COURT:  Good afternoon.

14         MR. SMITH:  Good afternoon, Your Honor.  Nicholas

15  Smith for defendant Nicholas Young.  With me is Ms. Linda

16  Moreno as counsel.

17         MS. MORENO:  Good afternoon.

18         MR. SMITH:  And we also have a paralegal here, who is

19  another Nicholas, Nicholas Enns.  So we have four Nicholases in

20  this case.

21         MS. MORENO.  Thank you, Your Honor.

22         THE COURT:  Good afternoon.

23         MS. MORENO:  Good afternoon.

24         THE COURT:  And good afternoon, ladies and gentlemen.

25  Thank you very much for being at court this afternoon.

4

1          You are being considered for service on a jury that

2     is going to hear a criminal case brought by the United States

3     of America versus the defendant, Nicholas Young.

4          Now, this is the time of the trial called voir dire,

5     that's the technical legal term basically for jury selection.

6     We are going to choose 14 of you to act as the jury in this

7     case.

8          Now, if you are selected to be a juror, I want you to

9     think about yourself as if you were a judge, just like me.  I

10    can't give each of you a black robe to wear while you're

11    sitting in the jury box, but that is the role that you are

12    going to play because jurors are judges, specifically you are

13    judges of the facts of the case.

14         Now, you know yourself that if you had to be in court

15    in front of a judge, you would want to make sure that that

16    judge didn't have any preconceptions, any biases, or any ideas

17    about the case that might taint his or her decision making.

18    And that's the background that we have for asking the questions

19    that we're going to ask you today.

20         Now, I ask the questions, and I am going to use the

21    word "you" in the question, but as you think about the question

22    I want you to apply it not just to yourself individually, but

23    also to any of your immediate family members or close personal

24    friends.

25         Now, if you think that you do have an answer to the

5

1  question, the procedure will be for you to raise your hand, you

2  will need to stand and state your name, and then we will have a

3  discussion about the question and your answer.

4           If at any point there is something that you feel is

5  very personal and sensitive and you don't want to raise it in

6  front of everybody in the courtroom, the procedure is for you

7  to ask to approach the bench.  You will then come up on this

8  side, and the prosecutors will follow you.  My court reporter

9  has to get up here first.  So you have to wait for him or her,

10 I have two different court reporters working on this case, to

11 come up first.  And then we will have the juror come up, and

12 the prosecutors on the other side, the defense team comes up,

13 and we will have a private conversation with you.

14          Now, any time I am having what is called a bench

15 conference, because this is the bench, we put on that funny

16 white noise machine.  And that is meant to block your hearing

17 of what's going on up here, but it's also difficult for us to

18 hear over that machine.  So it's really important, whenever we

19 have a bench conference, whether it's during voir dire or

20 during the trial itself, you can stand up and stretch, move

21 around a little bit, but if you start to talk, it creates too

22 much other noise in the courtroom.

23          Now, our first order of business is going to be to

24 call attendance.  When you hear your name called, please stand

25 and say "here" or "present," and then you may have a seat.

6

1           NOTE:  The jury panel is called and sworn.

2           THE COURT:  All right, ladies and gentlemen, now I am

3     going to give you a very brief overview as to what the issues

4     are in this case.  And the first question I am going to be

5     asking you is whether you think you may have seen, read, heard,

6     or know anything at all about this case?

7           Nicholas Young, the defendant, is a former police

8     officer with the Washington Metro Transit Authority and has

9     been charged with three counts.  Count 1 alleges that between

10    December 3, 2015, and August 2, 2016, in Fairfax County, within

11    this district and elsewhere, that he knowingly and unlawfully

12    attempted to provide material support and resources to ISIL,

13    that is the Islamic State of Iraq and the Levant, a group

14    designated as a foreign terrorist organization, or FTO.

15          And more specifically, the Government alleges that

16    the defendant attempted to provide this support by providing

17    misleading information to the Federal Bureau of Investigation

18    about the location of a person known to him as Mo and whom

19    Young believed had traveled from the United States to Syria to

20    join ISIL.

21          In addition, the Government alleges that Young

22    provided gift cards and gift card codes to Mo, whom he believed

23    would use those gift cards and gift card codes to help ISIL

24    recruit members.

25          In Count 2 he is charged with obstruction of justice.

7

1   Specifically that between December 3 and 5 of 2015 in Fairfax

2   County, he knowingly, unlawfully, and corruptly attempted to

3   obstruct an official proceeding by attempting to deceive FBI

4   investigators as to the destination and purpose of a trip made

5   by Mo, who Young believed had traveled from the United States

6   to join Syria -- I'm sorry, had traveled from the United States

7   to Syria to join ISIL.

8          And in Count 3, he is charged with another count of

9   obstruction of justice, this time involving a text message that

10  he sent on November 20, 2014, to a cell phone he believed was

11  used by Mo in an attempt to make it falsely appear to the FBI

12  that Mo had left the United States for a vacation tour in

13  Turkey, whereas he believed that Mo had gone to Syria to join

14  and fight for ISIL.

15         The defendant denies that he is guilty of these

16  charges and will argue that he lacked any predisposition to

17  commit the charged crimes and instead was induced by the

18  Government to do what he did.  Specifically, he will argue that

19  Khalil, whom he met in 2010, and later Mo, were at all times

20  paid agents of the federal government.  And that but for Khalil

21  and Mo befriending him, none of the conduct for which he is

22  charged would have occurred.

23         Now, there has been some publicity about this case.

24  Last week there were publications both online and in the Sunday

25  portion of the Washington Post about this case.  There has also

8

1    I think been some other online information about it over the

2    past several months.

3            I want to know whether any of you believe you have

4    seen, heard, read, or in any respect think you might know

5    something about this case?

6            If you have such an answer, you need to raise your

7    hand.  And I am going to start -- I have to point to you, it is

8    very rude, but we do it this way.  And I am going to start on

9    the left.

10           So in the first row on the left, there is no -- yes,

11   sir, your name, please.

12           JUROR DIAZ:  Ariel Diaz, juror 18.

13           THE COURT:  Wait, you have to speak slowly so I can

14   hear you.  What's the last name?

15           JUROR DIAZ:  Diaz, number 18.  I just listened to the

16   news and I heard on the news about Nicholas Young.

17           THE COURT:  And that was recently?

18           JUROR DIAZ:  I'm sorry?

19           THE COURT:  Was that recent?

20           JUROR DIAZ:  I guess I listened to maybe within the

21   past week.

22           THE COURT:  Now, is there anything you heard in that

23   news broadcast that you think has tainted your mind?

24           In other words, do you feel you have made up your

25   mind about any of the issues in this case from what you heard

9

1    on the news?

2            JUROR DIAZ:  Only that --

3            THE COURT:  Well, I don't want to know what you

4    heard.  But I just want to know, do you think it might have

5    affected how you would think about this case?

6            JUROR DIAZ:  I don't know, actually.  I just heard it

7    and just knew he was on a sting operation.

8            THE COURT:  All right.  But again --

9            JUROR DIAZ:  I don't have -- yeah, I mean, without

10   seeing, hearing all the specifics, I can't really say.

11           THE COURT:  Have you made -- do you think you have

12   made up your mind about any issues?

13           JUROR DIAZ:  No.

14           THE COURT:  All right.  Thank you, Mr. Diaz.

15           Now, the lady behind you -- yes, ma'am, your name,

16   please.

17           JUROR BARRETTE:  Kristin Barrette.

18           THE COURT:  Hold on, we have to find you on the list.

19   All right.  How do you spell the last name?

20           JUROR BARRETTE:  Kristin Barrette, B-a-r-r-e-t-t-e.

21           THE COURT:  Number 4.  All right.  Yes, ma'am.

22           JUROR BARRETTE:  I am not entirely certain that this

23   is the same case, but there is actually a gentleman who was

24   arrested in my former neighborhood for something

25   extraordinarily similar.  And if that's the case --

10

```
1              THE COURT:  Do you live in Alexandria?

2              JUROR BARRETTE:  No.  I used to live in Fairfax.

3              THE COURT:  In the Alexandria section of Fairfax?

4              JUROR BARRETTE:  No, ma'am.

5              THE COURT:  All right.

6              JUROR BARRETTE:  It was on Heron Ridge Drive in

7    Fairfax.

8              THE COURT:  That's not this defendant.  But do you --

9    is it?  It is.  All right.

10             Do you feel that might affect your ability to judge

11   this case?

12             JUROR BARRETTE:  Well, uhmm --

13             THE COURT:  This is a very hard question to answer,

14   but you really do need to think about it very carefully.  If

15   you feel that, you know, there was neighborhood talk about it

16   or whatever -- I mean, if you think that could affect you, then

17   you need to tell us that, Ms. Barrette.

18             JUROR BARRETTE:  Given that I was familiar with this

19   man prior to this taking place, I think there is a chance that

20   might be the case.

21             THE COURT:  All right.  Thank you, Ms. Barrette.

22             Anybody else on the left side?  Yes, ma'am, in the

23   second row.  Your name, please.

24             JUROR CHOI:  Kyou-Bin Choi.  Last name Choi, C-h-o-i.

25             THE COURT:  All right.  You will just have to speak
```

11

1   as loud as you can because we have to hear you, Ms. Choi.  Yes,

2   ma'am.

3            JUROR CHOI:  I just heard the news about it, that's

4   why the name is familiar.

5            THE COURT:  Is there anything about what you heard in

6   the news article that you think could affect your ability to

7   judge this case fairly?

8            JUROR CHOI:  Probably not.  I didn't think much about

9   it.

10           THE COURT:  You didn't think much about it?  All

11  right.  Thank you, Ms. Choi.

12           There were other hands over here on the left.  Near

13  the wall -- yes, whoever's hand is near the wall.  Yes, sir.

14           JUROR DAVIS:  Yes, Ken Davis, juror 17.  Just vaguely

15  familiar with the case.

16           THE COURT:  I'm sorry, you're Mr. Davis?

17           JUROR DAVIS:  Yes.  I am just vaguely familiar with

18  the case from the newspaper.  Not so much with the details.  So

19  I don't think there is anything that would impair or influence

20  my judgment on the case.

21           THE COURT:  You haven't made up your mind about any

22  issue?

23           JUROR DAVIS:  No, ma'am.

24           THE COURT:  All right.  Thank you, Mr. Davis.

25           There are some more folks back there.  Yes, your

12

```
 1    name, sir.  Next to Mr. Davis.  Yeah.

 2            JUROR EVANS:  Betty Evans.  I read it in the

 3    Washington Post, but there was nothing in it that I think would

 4    really influence my judgment.

 5            THE COURT:  Was it the Sunday Post?

 6            JUROR EVANS:  Probably.

 7            THE COURT:  All right.  But again, nothing in the

 8    article particularly struck you such that you think you've made

 9    up your mind about anything?

10            JUROR EVANS:  No, because I thought trial had already

11    started --

12            THE COURT:  I'm sorry, you thought the trial had

13    already started?

14            JUROR EVANS:  The trial had already started, so I

15    didn't think much about it.

16            THE COURT:  All right.  Thank you, Ms. Evans.

17            There are some more folks.  Way in the back, yes,

18    sir, your name.  At the very back.

19            JUROR GHOSE:  Devajyoti Ghose.  I have heard of the

20    case in general terms, not this last piece, but earlier, I

21    believe.  At this time it's hard to say whether it could have

22    affected my judgment or not.

23            THE COURT:  Well, do you think it's possible that it

24    may have affected your judgment, that you might have pre-

25    decided any issues?
```

13

1          JUROR GHOSE:  Not pre-decided, no.

2          THE COURT:  Or have any feelings or beliefs about the

3    case?

4          JUROR GHOSE:  I generally do like to read about

5    things related to ISIL and so forth, but not relating to this

6    specific case.

7          THE COURT:  All right.  Thank you, Mr. Ghose.

8          There were some other folks.  Yes, sir, your name.

9          I'm sorry, I have to point to you.  Yes, ma'am.

10         JUROR FONTENETTE:  Shawn Fontenette, juror number 24.

11         THE COURT:  Yes, ma'am.

12         JUROR FONTENETTE:  I recently read about it in the

13   Washington Post, as well as heard about it on the news this

14   morning.  And I believe I read an article online from the

15   Washington Post.

16         THE COURT:  So you have had a fair amount of exposure

17   then, Ms. Fontenette?

18         JUROR FONTENETTE:  Yes.

19         THE COURT:  From what you've read or heard, do you

20   feel it would be difficult for you to be impartial as a juror

21   in this case?

22         JUROR FONTENETTE:  Yes.

23         THE COURT:  All right.  Thank you, Ms. Fontenette.

24         There is I think one other person.  Yes, your name,

25   please.

14

1          JUROR ELSBURY:  William Elsbury.

2          THE COURT:  The last name?

3          JUROR ELSBURY:  Elsbury, E-l-s-b-u-r-y.

4          THE COURT:  Yes, sir.

5          JUROR ELSBURY:  If this is the same officer that was

6   earlier, maybe last year or months ago was in the news.

7          THE COURT:  Yes.

8          JUROR ELSBURY:  Where he was fired from --

9          THE COURT:  Well, in any case, you've heard some --

10         JUROR ELSBURY:  I have heard, yes.  I heard a little

11  bit more recently as well.

12         THE COURT:  That is correct.  Is there anything that

13  you've heard or seen that you think could affect your ability

14  to judge this case impartially?

15         JUROR ELSBURY:  The only thing that really struck me,

16  it seemed like there was something about finding additional

17  weapons at his home or something like that.  I don't remember.

18         THE COURT:  You think that that would make it

19  difficult for you to be impartial in judging the case?

20         JUROR ELSBURY:  Perhaps, yeah.

21         THE COURT:  All right.  Thank you, Mr. Elsbury.

22         Anybody else on the left side?

23         All right, now in the center, let me start in the

24  first row.  On the aisle, yes, sir, your name, please.

25         JUROR McCRAVE:  Michael McCrave.  Probably when the

15

1   case --

2           THE COURT:  Wait, wait, just slow down one second.  I

3   have got to get your name.

4           JUROR McCRAVE:  McCrave.

5           THE COURT:  Yes, Mr. McCrave.

6           JUROR McCRAVE:  Probably when the case came out a

7   year or plus ago, read about it, heard about it.  But nothing

8   of it at this moment would influence my judgment.

9           THE COURT:  You haven't made your mind up about any

10  of the issues in the case?

11          JUROR McCRAVE:  No, ma'am.

12          THE COURT:  All right.  Thank you, Mr. McCrave.

13          And then there is a lady in the first row.  Yes,

14  ma'am, your name, please.

15          JUROR LAYTON:  Georgianna Layton.

16          THE COURT:  Yes, Ms. Layton.

17          JUROR LAYTON:  I'm not sure if this is even the case,

18  but this morning I heard on Channel 7 News, they were talking

19  about a police officer with ISIS, they think connection, and

20  that the jury selection was going on today.

21          THE COURT:  That's what this case is.

22          JUROR LAYTON:  Yeah.  I asked my husband, did you

23  hear the name?  And he goes, no.  And I said, I wonder if

24  that's me.

25          That's it, that's as far as --

16

1          THE COURT:  Ms. Layton, is there anything about that

2    situation that you feel might make it hard to be an impartial

3    juror?

4          JUROR LAYTON:  No, because I didn't even know his

5    name.

6          THE COURT:  All right.

7          JUROR LAYTON:  I just heard the situation.

8          THE COURT:  Thank you.  Now, folks, let me just say

9    for a second, we all just laughed, all right.  And I always

10   tell this to jurors so that you understand the context in which

11   humor may occur in a trial.  This is a very serious criminal

12   case, but even in the most serious things that we do in life,

13   there are times when, as human beings, something funny happens

14   and we all laugh.  It doesn't mean it's not a serious

15   enterprise.

16         And I always -- some of you, I am sure, go to the

17   theater.  If you have ever seen the play Hamlet, it's the most

18   serious tragedy in the English language, and right in the

19   middle of this deep, dark tragedy there is slapstick humor.

20   And Shakespeare did that to break up the tension.

21         So if from time to time we have a moment like this

22   where, as human beings, we all just laugh, it doesn't mean that

23   this is not a very serious trial.  And it doesn't mean that the

24   lawyers, or the judge, or the jury is not taking it seriously.

25   So I want you to understand the context of that.  All right?

17

1          Now, is there anybody else in the first row?

2          Now, in the second row, I see more hands going up.

3  Yes, your name, sir.

4          JUROR RENAUD:  My name is John Renaud, juror 67.

5          THE COURT:  Yes, sir.  Have you --

6          JUROR RENAUD:  I heard about this in generalities at

7  the time of the original arrest, but not in any of the

8  particulars.

9          THE COURT:  Was there anything about what you have

10  heard in the past that you feel would make it difficult for you

11  to be an impartial juror?

12          JUROR RENAUD:  No.

13          THE COURT:  Thank you, Mr. Renaud.

14          More people.  Yes, your name, sir.

15          JUROR LARSON:  Dave Larson.

16          THE COURT:  Yes, Mr. Larson.

17          JUROR LARSON:  Yeah, I read about it when the

18  gentleman was first arrested or apprehended.

19          THE COURT:  And not more recently than that?

20          JUROR LARSON:  No.

21          THE COURT:  Is there anything about what you did read

22  that you feel might affect your ability to be impartial?

23          JUROR LARSON:  No.

24          THE COURT:  No?  All right.  Thank you, Mr. Larson.

25          Yes, sir, you're name, please.

18

```
1              JUROR KAUFFMAN:  The last name is Kauffman, first
2    name is Thomas.
3              THE COURT:  Is it with a C or a K?
4              JUROR KAUFFMAN:  With a K.
5              THE COURT:  Got you.  Yes, sir.
6              JUROR KAUFFMAN:  Heard about the case several months
7    ago, not the particulars.  Just he was a police officer --
8              THE COURT:  And is there anything about what you read
9    that you think could affect your impartiality?
10             JUROR KAUFFMAN:  No.
11             THE COURT:  All right.  Thank you, Mr. Kauffman.
12             Are there more people who think they have been
13   exposed -- yes, sir, on the aisle, your name, please.
14             JUROR PONTICELLO:  Philip Ponticello.
15             THE COURT:  Can you spell the last name.
16             JUROR PONTICELLO:  P, as in Paul,
17   o-n-t-i-n-c-e-l-l-o.
18             THE COURT:  I have got you.  Number 65, right?
19             JUROR PONTICELLO:  Yes, ma'am.
20             THE COURT:  Yes, sir.
21             JUROR PONTICELLO:  Just saw on Channel 7 this morning
22   about it, and something on Google about it.  And I thought that
23   was maybe the trial, but they never said any more than what you
24   have said this morning about it.
25             THE COURT:  Is there anything about what you either
```

19

1    heard or saw on Google or this morning on the news that you

2    think could affect your impartiality?

3                JUROR PONTICELLO:  No.

4                THE COURT:  All right, thank you.

5                Anyone else in the center?  Yes, your name, please.

6                JUROR OBUCHOWSKI-BERMAN:  Susan Obuchowski-Berman.

7                THE COURT:  Yes, ma'am.

8                JUROR OBUCHOWSKI-BERMAN:  I remember hearing about

9    this case, it was probably within the past year.  Nothing very

10   recent.

11               THE COURT:  Is there anything about what you did hear

12   though that you feel could affect your impartiality?

13               JUROR OBUCHOWSKI-BERMAN:  No.

14               THE COURT:  Thank you, ma'am.

15               Anyone else in the center?

16               Now, on the far right, over here, is there anybody?

17               All right, way in the back, yes, sir.

18               JUROR WINER:  Jonathan Winer.

19               THE COURT:  Yes, sir.

20               JUROR WINER:  I saw it on the online Washington Post

21   the last few days.  There were details shared in that article

22   that the Court mentioned today that piqued my interest, points

23   of maybe personal introspections, but I guess it depends upon

24   how it is presented whether or not that would influence me.

25               THE COURT:  But you did read the online article this

20

1  past week?

2          JUROR WINER:  Yes, I did.  I don't know what the date

3  was, but it was the Washington Post online in the last few

4  days.

5          THE COURT:  And then, I'm sorry, did you say you then

6  did some research or further --

7          JUROR WINER:  No, it was information in that

8  article --

9          THE COURT:  All right.

10         JUROR WINER:  -- that piqued my interest.

11         THE COURT:  All right.  Thank you, sir.

12         And in the back, yes, your name, please.

13         JUROR WALDRON:  Cory Waldron, juror 87.  I am

14  familiar with the case to the point where I looked into it a

15  little bit when the defendant was first arrested, and am

16  familiar with the Government's accusations based on at least

17  that initial time frame.

18         THE COURT:  And do you feel that you have sort of

19  made up your mind about any issues?  Or do you feel that you

20  would have problems being impartial in judging the case?

21         JUROR WALDRON:  I believe I can remain impartial.

22         THE COURT:  But you have done some research on it?

23         JUROR WALDRON:  Nothing beyond the cursory, like of

24  the arrests.

25         THE COURT:  Well, when you said you did some

21

1    research, I mean, did you go online and follow --

2            JUROR WALDRON:  Just like Twitter and Web searches.

3    It was mainly an NBC News story.

4            THE COURT:  All right.  Thank you, sir.

5            Is there anybody else?

6            All right.  The next question, ladies and gentlemen,

7    I'm very aware of the fact that we are running into the holiday

8    season, Hanukkah starts this week and we are getting close to

9    Christmas.

10           There is a fair amount of evidence in this case.

11   There is some complicated issues, and it's going to take

12   several trial days.  We're going to work as hard as we can to

13   make this as efficient a trial as possible.

14           But let me give you an approximate idea of the time

15   commitment that this case will involve.  We're going to run

16   until approximately 6 o'clock this evening, and then hopefully

17   start tomorrow morning at 9 o'clock and run to approximately 6.

18           We have a one-hour lunch break around 1 o'clock, and

19   I always give jurors a mid-afternoon and a mid-morning break.

20   And sometimes if the trial is a very complicated trial,

21   sometimes we might even have two breaks in the morning and the

22   afternoon.  It sort of depends on how things are going.

23           We will certainly be in trial all of this week and

24   most likely through Wednesday of next week, it could even go

25   into Thursday.  I cannot imagine it will go past Friday.  But

22

1     we need jurors who can give us their full time and attention.

2          And that means that if you have any pre-purchased

3     flights or travel plans which can't be changed, you have child

4     care commitments, or work commitments, I know some of you are

5     teachers, that cannot be rearranged, we need to know that now.

6          So let me start again on the left side.  Is there

7     anybody, given that time commitment and the structure of the

8     day, that you feel you could not sit as a juror for this case?

9          Yes, sir, your name again, please.  You are Mr. Diaz?

10         JUROR DIAZ:  Yes, ma'am.  Sorry.  Juror 18.

11     Basically, I'm still in a 16-week supervisory course for my

12     work, and I have classes on the 13th and the 20th.

13         THE COURT:  And you can't miss the classes?

14         JUROR DIAZ:  No, no, especially the last two weeks.

15     And on the 21st it's going to be my son's graduation from

16     George Mason.

17         THE COURT:  All right.  Thank you, Mr. Diaz.

18         Yes, sir, your name, please.

19         JUROR ASIAMA:  Kwami Asiama, number 2.

20         THE COURT:  Yes, sir.

21         JUROR ASIAMA:  I do have travel plans sometime

22     Thursday this week through next week.  That is flexible though,

23     but just to let you know.

24         THE COURT:  When do you need to be leaving?

25         JUROR ASIAMA:  Thursday this week.

23

1          THE COURT:  I'm sorry?

2          JUROR ASIAMA:  Thursday this week.

3          THE COURT:  Thursday of this week?

4          JUROR ASIAMA:  Yes.

5          THE COURT:  But how flexible are those plans?

6          JUROR ASIAMA:  Very flexible.

7          THE COURT:  Can you postpone that trip for as long as

8  a week or seven or eight days?

9          JUROR ASIAMA:  Yes, it can be postponed.

10          THE COURT:  All right.  Thank you, Mr. Asiama.

11          Yes, your name, please.

12          JUROR CLELLAND:  Name is Mark Clelland.

13          THE COURT:  Can you spell the last name.

14          JUROR CLELLAND:  C-l-e-l-l-a-n-d.

15          THE COURT:  Number 14.

16          JUROR CLELLAND:  Yes, ma'am.  I am currently enrolled

17  in college, and I have finals for some of my classes that I

18  have already paid for later this week.

19          THE COURT:  When are your finals?  Are they in the

20  evening or during the day?

21          JUROR CLELLAND:  The first one is scheduled Thursday

22  at 10 a.m.

23          THE COURT:  All right.  Thank you, Mr. Clelland.

24          And, I'm sorry, do you have more than one exam

25  scheduled?

24

```
 1          JUROR CLELLAND:  No, just that one Thursday.
 2          THE COURT:  Is there -- is there a way of having that
 3   continued, or is that not possible in your university?
 4          JUROR CLELLAND:  I haven't inquired.  I am not sure
 5   about moving that.
 6          THE COURT:  Is this an online program, or is it like
 7   a George Mason or AU?
 8          JUROR CLELLAND:  It is Northern Virginia Community
 9   College.  It is an in-person class.
10          THE COURT:  And the semester ends December 22?
11          JUROR CLELLAND:  No.  The last final is this
12   Thursday, like three days from now.
13          THE COURT:  That's the last final?
14          JUROR CLELLAND:  Correct.
15          THE COURT:  Thank you.  All right.
16          Yes, ma'am, against the wall.  Your name, please.
17          JUROR DAOUST:  Andrea Daoust, D-a-o-u-s-t.
18          THE COURT:  Yes, ma'am.
19          JUROR DAOUST:  I recently -- I am a business owner, a
20   small business owner.  I recently changed my business to
21   virtual.  And I haven't worked out all the kinks in it yet.
22          And so, therefore, I am responsible for payroll and
23   everything that happens in terms of the mail, anything incoming
24   and outgoing.  And I have four employees that I'm responsible
25   for.
```

25

1           So could I manage it?  Yes, but it would be

2     difficult.

3           THE COURT:  All right.  Thank you, ma'am.

4           Yes, your name again, please.

5           JUROR BARRETTE:  Number 4, Kristin Barrette.

6           THE COURT:  Yes, Ms. Barrette.

7           JUROR BARRETTE:  May I approach the bench, Your

8     Honor?

9           THE COURT:  Actually, I don't think I need to have

10    you do that, but thank you.

11          Okay.  Yes, your name, please.

12          JUROR COTTERMAN:  Bruce Cotterman.

13          THE COURT:  Yes, Mr. Cotterman.

14          JUROR COTTERMAN:  Travel plans on December 22, and

15    they cannot be postponed.

16          THE COURT:  And are they in the morning or in the

17    afternoon?

18          JUROR COTTERMAN:  I think it's 8:30 in the morning.

19          THE COURT:  Okay.  Again, I'm not sure the case will

20    go that long, but we're trying out of an abundance of caution

21    to see how people's schedules are.  Thank you, Mr. Cotterman.

22          Yes, your name, please.

23          JUROR HONG:  Brian Hong.

24          THE COURT:  Spell the last name.

25          JUROR HONG:  H-o-n-g.

26

1          THE COURT:  Yes, Mr. Hong.

2          JUROR HONG:  So I am a manager in the hospitality

3   industry, and currently right now our specific location is

4   short staffed, so I am actually held responsible to help assist

5   and the rest of the region.

6          THE COURT:  Well, would it be an actual -- is there

7   no one who can take your spot for a week or ten days?

8          JUROR HONG:  No, everyone else is on vacation.

9          THE COURT:  So it would be a hardship for your

10  company?

11         JUROR HONG:  No one would be able to fill the spot.

12         THE COURT:  And this is a hospitality business?

13         JUROR HONG:  Yes.

14         THE COURT:  And this is your busy season?

15         JUROR HONG:  Yes.

16         THE COURT:  Thank you, Mr. Hong.

17         Anybody else on the left side?

18         How about in the center section, anybody in the first

19  row?

20         Yes, ma'am, your name again, please.

21         JUROR EILER:  My name is Ashley Eiler.  I'm a

22  teacher.  I could get a substitute teacher, but it's very

23  problematic for me because I have to drive back to Woodbridge,

24  and then I have to put all my lesson plans in for the next day.

25  So I am still responsible for my lessons even though I'm here.

27

1          THE COURT:  What grade do you teach?

2          JUROR EILER:  Middle school, 6, 7, and 8.

3          THE COURT:  So is this the end of the semester for

4    them too?

5          JUROR EILER:  Yeah.  Well, our quarter ends -- we

6    have to turn in grades on Wednesday.

7          THE COURT:  So in order for a substitute to take over

8    for you, how much prep time would you have to put in?

9          JUROR EILER:  At least an hour or two a day.

10         THE COURT:  Each day?

11         JUROR EILER:  Yeah, just to get the lesson plans

12   prepared and write it all down and leave it.  And then I'd have

13   do grades and things like that too?

14         THE COURT:  And you'd have to do that every single

15   day that you were here as a juror?

16         JUROR EILER:  I would probably have to group them

17   together a little bit, but yeah.

18         THE COURT:  All right.  Thank you, ma'am.

19         Who else in the first row?  Yes, your name, please.

20         JUROR GANTENBEIN:  Alice Gantenbein.  Juror number --

21   I don't know.

22         THE COURT:  27, does that sound right?

23         JUROR GANTENBEIN:  That sounds right.

24         THE COURT:  Good.

25         JUROR GANTENBEIN:  I'm also a teacher, seventh grade

28

1    life science.  I have a field trip with 38 students on Friday.

2    There is no one to take them if I don't go.  Not that I am

3    looking forward to going with 38 kids outside.

4              THE COURT:  All right.

5              JUROR GANTENBEIN:  I also am enrolled in two classes,

6    one of which meets at 4:30 tonight.

7              THE COURT:  All right.  Thank you, ma'am.

8              Yes, your name, please.

9              JUROR FRISCHKORN:  Yes, Susan Frischkorn.

10             THE COURT:  Yes, ma'am.

11             JUROR FRISCHKORN:  I'm a teacher also.  I'm the only

12   K-5 teacher, instructional technology teacher.  When I'm out,

13   they don't get a sub.  So I would have to cancel all my push-in

14   lessons and teacher meetings.

15             THE COURT:  All right.  Thank you, ma'am.

16             Anyone else?  Yes, ma'am.

17             JUROR GAYTON:  Cynthia Gayton.  I'm not sure what my

18   juror number is.

19             THE COURT:  28.

20             JUROR GAYTON:  I'm a professor, I teach.  Final exam

21   is on Friday, it's an oral presentation.  And a final paper due

22   on this Thursday.  I don't have -- there are no substitutes for

23   my program, it's only me.  And since it's an oral presentation,

24   I'm the only one who is going to be able to determine whether

25   they have passed, basically.

29

1          THE COURT:  And again, it's not something that could

2     be pushed off a week or too?

3          JUROR GAYTON:  It can't be because all of our exams

4     are scheduled and the rooms are scheduled, not without

5     affecting other professors and other students, and I have nine

6     students that this would affect.

7          THE COURT:  All right.  Thank you, ma'am.

8          All right.  Now in the second row -- third row.  Yes,

9     sir, your name, please.

10         JUROR RENAUD:  My name is John Renaud, number 67.

11         THE COURT:  Yes, sir.

12         JUROR RENAUD:  I am scheduled to be out of town

13    starting not this -- next Wednesday.  And I have sought and

14    gotten excused for the tail end of next week already.  I don't

15    know if that's a factor or not.

16         THE COURT:  So has the jury section already excused

17    you?

18         JUROR RENAUD:  Yes.

19         THE COURT:  All right.  Thank you, sir.

20         Anybody else in the --  yes, on the aisle, your name,

21    sir.

22         JUROR PONTICELLO:  Phil Ponticello.

23         THE COURT:  Yes, sir.

24         JUROR PONTICELLO:  I am the primary caregiver for my

25    wife, she has a doctor's appointment on Friday.  She is unable

30

1  to drive herself.  The doctor's appointment I can't reschedule,

2  and her doctor is in town only twice a month.

3          THE COURT:  Is there family member or friend who

4  could take her?

5          JUROR PONTICELLO:  No, ma'am.

6          THE COURT:  No?  All right, sir, thank you.

7          Anybody else in the back?  So everybody in the center

8  section has told me about any time commitment or scheduling

9  problems?

10          Yes, your name, please.

11          JUROR NINTEMAN:  I am James Ninteman,

12  N-i-n-t-e-m-a-n.

13          THE COURT:  I'm sorry?

14          JUROR NINTEMAN:  N-i-n-t-e-m-a-n.

15          THE COURT:  I have you, yes, you are 57.

16          JUROR NINTEMAN:  I am a regional manager.  We have

17  got two organization of parties' effort I am involved with.

18  One, I have got 45 people scheduled to be at our office on

19  Thursday afternoon at 4.  And then I am taking all of our

20  foremen out to dinner where we give bonuses out Friday at 5.

21  It's complicated, I really should be there.

22          That's all.

23          THE COURT:  All right.  Thank you, sir.

24          Anybody else in the center?  Yes, your name, please.

25          JUROR PIEDRAHITA:  Yes, Hector Piedrahita.

31

```
1              THE COURT:  Can you spell the last name.

2              JUROR PIEDRAHITA:  P-i-e-d-r-a-h-i-t-a.

3              THE COURT:  I have it, yes, sir.

4              JUROR PIEDRAHITA:  I have -- my wife has a very tough

5    schedule, and I have two boys.  So it might be -- I might have

6    to find some alternative babysitting if it requires that much

7    time.

8              THE COURT:  What time do you have to pick your

9    children -- are they in school?

10             JUROR PIEDRAHITA:  Yeah, they are in school, yes.

11             THE COURT:  What time do they normally get picked up?

12             JUROR PIEDRAHITA:  One gets picked up about 7:45 and

13   the next one 8:30.

14             THE COURT:  That's in the morning, that's the school

15   bus?

16             JUROR PIEDRAHITA:  Yes.  And then they are back by

17   3:30, 4 o'clock.

18             THE COURT:  So right now is it your wife who takes

19   care of them?

20             JUROR PIEDRAHITA:  No, my wife, she is a full-time

21   employee as well, and her job is a little bit more demanding

22   than mine, but I have got to be home for the kids.

23             THE COURT:  Do you have any regular babysitters or

24   family members --

25             JUROR PIEDRAHITA:  I don't.  I do have family
```

32

1    members, I've just got to check with them first before that

2    somebody is going to be there for the boys.

3              THE COURT:  So you don't know at this point?

4              JUROR PIEDRAHITA:  No, I do not.  I didn't know this

5    much commitment was going to be required.

6              THE COURT:  All right.  Thank you, sir.

7              Anybody else in the center?  In the center section?

8    Yes, your name.

9              JUROR PARKS:  Tim Parks, number 61.

10             THE COURT:  Yes, Mr. Parks.

11             JUROR PARKS:  Sure.  I work for a consulting company,

12   and we have a very short staff right now.  And it's going to be

13   very tough to replace what I'm doing for the next week or so.

14   We have a very large payroll process on Fridays.  They can

15   probably get through it, but no one has been ready or trained

16   for those processes at this point in time.

17             THE COURT:  Would the situation require you to take

18   time after jury service to be prepping people?

19             JUROR PARKS:  At night.

20             THE COURT:  I'm sorry?

21             JUROR PARKS:  At night, and in the morning before the

22   jury.

23             THE COURT:  All right.  Thank you, sir.

24             JUROR PARKS:  Thank you.

25             THE COURT:  There was another hand up.  Yes, way in

33

 1   the back.  Wait, let the young lady who is on the aisle -- yes,

 2   ma'am, your name.

 3            JUROR JHA:  I am Sandhya Jha.

 4            THE COURT:  Can you spell the last name.

 5            JUROR JHA:  J-h-a.

 6            THE COURT:  Are you number 41?

 7            JUROR JHA:  Yes.

 8            THE COURT:  Yes, ma'am.

 9            JUROR JHA:  I am a software engineer, and I have a

10   release due, like production, the goal will go to production on

11   this Sunday.  So it just requires trouble for me if I have to

12   stay here the whole day.

13            THE COURT:  How much work would you have to put in

14   each night?

15            JUROR JHA:  A few hours.

16            THE COURT:  A few hours.  All right.  Thank you,

17   ma'am.

18            Now, sir, in the back.

19            JUROR W. YEH:  Wen-Kuei Yeh.

20            THE COURT:  Hold on one second, we have two Mr. Yehs

21   on our jury list.

22            JUROR W. YEH:  First name is W-e-n.

23            THE COURT:  You are number 92?

24            JUROR W. YEH:  Yes.

25            THE COURT:  Yes, sir.

34

1          JUROR W. YEH:  I have three little kids, and my

2    parents are watching them for me, but I don't know what their

3    schedule is for the next two weeks.

4          And plus, I am managing a store.  So I don't know, I

5    mean, they won't be -- my two oldest will be out of school next

6    Monday.

7          THE COURT:  Starting Monday?

8          JUROR W. YEH:  Yes.  Yes, it's Loudoun County, so

9    they are out of school early.

10         THE COURT:  Wow, that's really early.

11         JUROR W. YEH:  So I need to make sure I can work with

12   their schedule and work with my schedule.

13         THE COURT:  And you don't have that schedule worked

14   out yet?

15         JUROR W. YEH:  I mean, I have my set schedule for the

16   store already, but I am basically working all next week and

17   this week.

18         THE COURT:  All right.  Thank you, sir.  Does that

19   take care of everybody in the center?

20         Now on the far right, over here.  Let's see, in the

21   first row.  Yes, ma'am, on the aisle, your name, please.

22         JUROR TU:  I don't know --

23         THE COURT:  I'm sorry, I need your name first.

24         JUROR TU:  The last name T-u.  I don't know my juror

25   number.

35

1           THE COURT:  I will get it, just one second.  You're

2   83.

3           JUROR TU:  83, thank you.

4           THE COURT:  Yes, ma'am.

5           JUROR TU:  I don't know right now what my schedule

6   is.  I come back and I am the one that work closely with

7   product manager, engineer, so I can secure all the funding for

8   the budgets.  And I work on the contracts.  So they don't know

9   right now I am going to be selected or not.  But if they really

10  need me, because they rely on me on all the budgets and finance

11  on the contracts, can I come back and ask the judge like, first

12  of all, can I be let go.  I don't know.

13          THE COURT:  Well, once we start the trial, we have to

14  go straight through with it.  So there is no flexibility in

15  that respect.

16          JUROR TU:  Yeah, that's what I know, because every

17  time someone asks --

18          THE COURT:  All right.  Thank you, ma'am.

19          JUROR TU:  Yes, they need me to work on projects and

20  everything for that.

21          THE COURT:  All right, thank you.

22          Anybody else in that row?

23          Now, in the second row, I see a hand.  Yes, your

24  name, please.  I can't see you.  Just stand up.  Yeah, your

25  name.

1          JUROR SUNKARA:  Venkatram Sunkara.

2          THE COURT:  You will have to spell the last name for

3     me.

4          JUROR SUNKARA:  Sunkara, S-u--

5          THE COURT:  Wait, wait.

6          JUROR SUNKARA:  S-u-n-k-a-r-a.  78, I guess.

7          THE COURT:  Yes, sir.

8          JUROR SUNKARA:  Yes.  I have my son's special needs

9     assessment tomorrow.  And on the 13th I have the hearing

10    meeting.  And because I live in Loudoun County, that means

11    December 15 the schools are closed for the rest of the year.

12         THE COURT:  All right.  So he needs his annual IEP

13    done right now?

14         JUROR SUNKARA:  His eligibility hearing is on the

15    13th.  And tomorrow we have to receive the assessment and

16    acknowledge the assessment so we can actually attend the

17    meeting on the 13th.

18         THE COURT:  All right.  Thank you, Mr. Sunkara.

19         On the aisle, yes, ma'am, your name, please.  Yes.

20         JUROR STEWART:  Mary Stewart.  I just have a one-hour

21    problem, I am a professor at Georgetown in the evenings, and I

22    am giving an oral examine on Tuesday at 6.

23         THE COURT:  That's tomorrow Tuesday?

24         JUROR STEWART:  It is.

25         THE COURT:  So you would have to leave by 5 o'clock

37

1      at the latest?

2              JUROR STEWART:  Yes.

3              THE COURT:  You couldn't push the exam until a little

4      bit later?

5              JUROR STEWART:  I will attempt with the university,

6      but there is another section that comes in right after us.

7              THE COURT:  How many students do you have?

8              JUROR STEWART:  I have five who are presenting

9      tomorrow.

10             THE COURT:  Five tomorrow?  Okay.  Thank you, ma'am.

11             Yes, your name, sir, the second row.

12             JUROR SPIEGEL:  Eric Spiegel.

13             THE COURT:  Yes, sir.

14             JUROR SPIEGEL:  I work in e-commerce, online sales.

15     And these two weeks are probably the busiest two weeks of the

16     entire year for me.  I would be happy to do something with a

17     shorter schedule, but I feel like the two weeks would be --

18             THE COURT:  Would it be a hardship for you?

19             JUROR SPIEGEL:  Yeah.  I am the only one in my

20     company that does the job too, so there is no one else that can

21     fill in.

22             THE COURT:  All right.  Thank you, sir.

23             In the middle, I have to just point to you.  I'm

24     sorry.  Go ahead, stand up, please.  Your name, please.

25             JUROR O'HARE:  Regina O'Hare.

38

1              THE COURT:  Yes, ma'am.

2              JUROR O'HARE:  I just have a problem with the going

3    until 6 o'clock.  I have a second job where I teach fitness

4    classes at night.  And it's actually really hard to find

5    someone to sub for those.  So I teach at 7 o'clock on Monday

6    and Wednesday.

7              THE COURT:  And where -- I don't need the street

8    name, but what town?

9              JUROR O'HARE:  It's in McLean.  But I'm worried about

10   getting from here to there and set up by that time.

11             THE COURT:  And it's Monday and Wednesday nights?

12             JUROR O'HARE:  Yes.

13             THE COURT:  Other than that, would you be available?

14             JUROR O'HARE:  Yes.

15             THE COURT:  All right.  Thank you, Ms. O'Hare.

16             Yes, next to Ms. O'Hare, yes.  Your name, please.

17             JUROR MARKER:  Rachael Marker, like what you write

18   with.

19             THE COURT:  Wait, hold on one second.  I am sorry,

20   Marker?

21             JUROR MARKER:  Yes.

22             THE COURT:  Yes, Ms. Marker.

23             JUROR MARKER:  I am a kindergarten special education

24   teacher.  Aside from -- I teach in Loudoun County, so I am off

25   and available all next week.  I am just concerned about getting

39

1   a substitute this week.  Nobody tends to pick up my sub jobs

2   because of my position.  And lesson planning aside, I can

3   handle all that.  I am just a little concerned day to day for

4   the sub.

5             THE COURT:  All right.  Thank you, Ms. Marker.

6             The gentleman against the wall.  Yes.

7             JUROR J. YEH:  Yeh, Y-e-h.

8             THE COURT:  Yes, Mr. Yeh.  I have got you.

9             JUROR J. YEH:  So my girlfriend has a scheduled

10  surgery on Friday.  I am the driver and a caretaker.  I would

11  talk to the doctors if I have to do scheduling.  I am not sure

12  if I should do --

13            THE COURT:  So you definitely have an appointment

14  with the doctor on Friday?

15            JUROR J. YEH:  Yes.

16            THE COURT:  And that can't be changed?

17            JUROR J. YEH:  Well, I don't know if there is a

18  penalty to change or not.  I would have to talk to her.  I

19  would to call the doctor's office.

20            THE COURT:  But you don't know?

21            JUROR J. YEH:  Right.

22            THE COURT:  Thank you.

23            Yes, in the back.  Your name, please.

24            JUROR SMITH:  Scott Smith, juror 75.

25            THE COURT:  Yes, sir.

40

1          JUROR SMITH:  I have a couple of things.  My boss is

2   out of country and I'm the manager in the office.  So we have

3   an interview coming on Wednesday that we can't move because of

4   the competitive environment.

5          THE COURT:  It's this coming Wednesday?

6          JUROR SMITH:  Yes.  We also -- I have a problem with

7   6 o'clock.  My autistic son, I am home by 5:15 in order to be

8   able to pick him up from the therapist to bring him home.

9          And then we actually have travel on the 22nd.

10          THE COURT:  All right.  Thank you, Mr. Smith.  That's

11   a trifecta, what you just gave me.

12          Is there anybody else?  On the aisle, yes, sir, your

13   name, please.

14          JUROR SMILEK:  Jan Smilek, I think number 74.

15          THE COURT:  Yes, sir.

16          JUROR SMILEK:  I previously informed the Court that I

17   will be traveling on this Wednesday, and Wednesday through

18   Friday, and received a temporary delay.

19          THE COURT:  All right.  So in other words, this

20   coming Wednesday and three days you're going to be gone?

21          JUROR SMILEK:  Yes.  I have already communicated with

22   the court that I am going to be out of state.

23          THE COURT:  All right.  Thank you, sir.

24          Yes, sir, your name.

25          JUROR VARGO:  Lane Vargo, with a V like Victor.

41

1          THE COURT:  Yes, Mr. Vargo.

2          JUROR VARGO:  I have business travel scheduled for

3    next Monday through Wednesday out of state.

4          THE COURT:  Is that at all changeable?

5          JUROR VARGO:  No.

6          THE COURT:  You can't change that?  No?  All right,

7    thank you, sir.

8          Yes, your name.

9          JUROR WINER:  Jonathan Winer.

10          THE COURT:  Yes, Mr. Winer.

11          JUROR WINER:  Yeah, I have already communicated to

12    the Court, at the end of next week I will be out of state on

13    personal travel, but it's Friday, we will be gone Friday.  So

14    if it goes that long, it doesn't impact me even then, but --

15          THE COURT:  All right.  Thank you, sir.

16          Now, is there anybody else?  Yes, in the back, your

17    name.

18          JUROR WALDRON:  Cory Waldron, juror 87.

19          THE COURT:  Yes, sir.

20          JUROR WALDRON:  Similar situation to Mr. Winer, I'm

21    out next Friday for personal travel.

22          THE COURT:  All right, thank you.

23          Now, is there anybody else for whom that trial

24    schedule is a problem?  Yes, ma'am, your name, please.

25          JUROR ISLAM:  Jawaher Islam, I-s-l-a-m.  I don't know

42

1  my juror number.

2          THE COURT:  Your number is 40.

3          JUROR ISLAM:  40, okay.  So I have to take care of my

4  family member, he is special needs also.  So my husband, he

5  can, but I think he is also busy season, he cannot take care

6  him some of the times that he is working.

7          So I don't know if I would be able to --

8          THE COURT:  Are there other family members or close

9  friends who have sometimes helped you take care of that child?

10          JUROR ISLAM:  I can look.

11          THE COURT:  Well, the trouble is we need to know.

12          JUROR ISLAM:  I don't know.

13          THE COURT:  You don't know.  All right.  Thank you,

14  ma'am.

15          I see another hand in the back.  Yes, ma'am.

16          JUROR EISENBERG:  Monica Eisenberg.

17          THE COURT:  What's your last name?

18          JUROR EISENBERG:  Eisenberg.

19          THE COURT:  Yes, Ms. Eisenberg.

20          JUROR EISENBERG:  I'm sick.

21          THE COURT:  You're sick?

22          JUROR EISENBERG:  Yes, I am sick.  And I don't know

23  if what I have is going to get worse the rest of the week.  I

24  would like to know if it's okay to call at the last minute if I

25  can't make it.  I don't know --

43

1          THE COURT:  I recognize that you actually made an

2   effort to come in here today, so I appreciate that.  Have a

3   seat, I think we can take care of the situation.

4          Is there anybody else?  Do I see any other hands up?

5   No.

6          All right, counsel, approach the bench.

7          NOTE:  A side-bar discussion is had between the Court

8   and counsel out of the hearing of the jury panel as follows:

9   AT SIDE BAR

10          THE COURT:  Now, first of all, does Mr. Young want to

11   be present at bench conferences?  He has a right to be here if

12   you want him.  If you don't want him, that's fine, but it's one

13   way other the other.  So you decide.

14          MS. MORENO:  And if he is up here, Your Honor, will

15   the Marshals also --

16          THE COURT:  They always follow him up.

17          MS. MORENO:  Can we just notify him of that?  Can we

18   take five seconds?

19          Can you do that for me?

20          I would rather him not come up.

21          THE COURT:  I understand why.  By I just have to give

22   you that option.

23          MS. MORENO:  Thank you, Your Honor.

24          THE COURT:  Not that many people read the Washington

25   Post.

44

1           MR. GIBBS:  That's surprising.

2           THE COURT:  I thought we would have a lot more,

3   that's interesting.

4           MS. MORENO:  If we were in New York, it would be a

5   different story, and if it was in the New York Times.

6           THE COURT:  Your client is waiving his appearance at

7   the bench conferences.

8           MR. SMITH:  Not all of them, just the ones --

9           THE COURT:  No, no, it can't be -- it's all or none,

10  we can't have it back and forth.

11          MR. SMITH:  Okay.  Can I tell him?

12          THE COURT:  Yes.  He is coming up.  So he will be at

13  all bench conferences.  All right.

14          MS. MORENO:  Okay.

15          MR. SMITH:  We changed our minds.

16          THE COURT:  All right.  Consistent, that's the point.

17          MR. SMITH:  Yes.

18          THE COURT:  Now, I plan to excuse, as I indicated to

19  you earlier, on the basis of these first two questions, I am

20  going to excuse any juror who I have concerns about for

21  pretrial publicity taint or they're not available for our

22  schedule.  So listen carefully as I excuse these.  Okay?

23          THE CLERK:  Judge, I have one more.

24          THE COURT:  Who is that?

25          THE CLERK:  Juror number 41.

45

1          THE COURT:  Don't worry about her.  I have already

2     got that.

3          Number 4, Barrette.  She is the one who knows the

4     defendant.  Number 14.  15.  16.  18.  19.  20.  21.  24.  25.

5     27.  28.  37.  40.  41.  49.

6          MR. SMITH:  Did Your Honor say 49?

7          THE COURT:  49.  That's the special ed. teacher.  57.

8     58.  61.  64.  65.  67.  74.

9          MR. SMITH:  Did Your Honor say 67?

10          THE COURT:  67.

11          MR. SMITH:  And that was because of the

12     unavailability next Wednesday?

13          THE COURT:  Yes.  74.  75.  76.  77.  78.  83.  86.

14     87.  89.  92.  93.

15          Now, is there any objection to those jurors being

16     stricken for cause based upon either some pretrial publicity

17     exposure or unable to meet this time schedule that we have set

18     for this trial?

19          MS. MORENO:  No objection from the defense, Your

20     Honor.

21          THE COURT:  No objection from the defense.

22          MR. GIBBS:  Nor from the government, Judge.

23          THE COURT:  Then I'm going to excuse those jurors

24     now.  I will read their names and numbers out.  That will be a

25     much smaller group with which we can work.  All right?

46

1          MS. MORENO:  Yes, I appreciate that.  Thank you, Your

2    Honor.

3          NOTE:  The side-bar discussion is concluded;

4    whereupon the case continues before the jury panel as follows:

5    BEFORE THE JURY PANEL

6          THE COURT:  The following jurors are going to be

7    excused.  Please leave quietly so the rest of the jurors can

8    hear as their names are being called.

9          Number 4, Ms. Barrette.  Number 14, Mr. Clelland.

10   Number 15, Mr. Cotterman.  16, Andrea Daoust.  18, Ariel Diaz.

11   19, Ashley Eiler.  20, Monica Eisenberg.  21, William Elsbury.

12   24, Shawn Fontenette.  25, Susan Frischkorn.  27, Alice

13   Gantenbein.  28, Cynthia Gayton.  37, Brian Hong.  40, Jawaher

14   Islam.  41, Sandhya Jha.  49, Rachael Marker.  57, James

15   Ninteman.  58, Regina O'Hare.  61, Timothy Parks.  64, Hector

16   Piedrahita.  65, Philip Ponticello.  67, John Renaud.  74, Jan

17   Smilek.  75, Scott Smith.  76, Eric Spiegel.  77, Mary Stewart.

18   78, Mr. Sunkara.  83, Ms. Tu.  86, Lane Vargo.  87, Cory

19   Waldron.  89, Jonathan Winer.  92, Wen-Kuei Yeh.  93, John Yeh.

20         NOTE:  The above-named jurors are excused and leave

21   the courtroom.

22         JUROR KWAK:  Your Honor --

23         THE COURT:  Yes, sir.

24         JUROR KWAK:  I'm sorry, my number is 44, Kwak, with a

25   K.

47

```
1                THE COURT:  Yes, Mr. Kwak.

2                JUROR KWAK:  Yes.  So you didn't excuse the other

3     reasons, my family.  I have some communication problem.

4                THE COURT:  Are you having trouble understanding

5     English?

6                JUROR KWAK:  Yes, please.  I already made request,

7     but they denied, the request was denied.  But I think my

8     English is not enough for jury service.  So how can I judge the

9     other people?

10               THE COURT:  All right.  We will get to you in a

11    minute.  All right, thank you.  Have a seat, please.

12               All right, ladies and gentlemen, I am going to have

13    other questions for you now, so please listen to these

14    questions carefully.

15               Remember the background for these questions.  That

16    is, we need to have 14 people.  We now know that you have the

17    time to give us, but it's also very important, given some of

18    the issues in this case, that you also listen carefully to my

19    questions and provide answers if you possibly can.

20               I want, first of all, for the prosecution team to

21    once again reintroduce themselves to the jury.  Also, identify

22    the agencies with which you are working.

23               Mr. Kromberg.

24               MR. KROMBERG:  I am Gordon Kromberg, I am an

25    Assistant United States Attorney here in the Eastern District
```

48

1   of Virginia, Alexandria Division.

2         MR. GIBBS:  John Gibbs.  I am also an Assistant U.S.

3   Attorney here in the Alexandria Division of the U.S. Attorney's

4   Office.

5         MR. TURGEON:  I am Evan Turgeon, I'm a Special

6   Assistant U.S. attorney here in the Alexandria Division of the

7   U.S. Attorney's Office.

8         MR. CASLEN:  Nicholas Caslen, I work for the Federal

9   Bureau of Investigation, special agent.

10         MR. VERA:  My name is Fabian Vera, I am a paralegal

11   with the U.S. Attorney's Office.

12         THE COURT:  Now, ladies and gentlemen, do any of you

13   think you might know in any personal or business capacity any

14   of the federal prosecutors, the case agent, or the paralegal?

15   Is there anybody?  All right.

16         Then, Mr. Smith, you can introduce your team.

17         MR. SMITH:  I am Nicholas Smith.  I am representing

18   the defendant, Nicholas Young.

19         THE COURT:  Mr. Smith, I am sorry, identify your law

20   firm and where it's located.

21         MR. SMITH:  The law firm I work for is called David

22   B. Smith, PLLC, and I am a partner with that law firm.

23         THE COURT:  And it's located in Alexandria.  All

24   right.

25         MS. MORENO:  Hello, my name is Linda Moreno, I am out

49

1    of New York.  And I am also defense counsel for Nicholas Young.

2            We also have Nicholas Enns, the fourth Nicholas.

3            MR. ENNS:  Yes, ma'am.  And I am a paralegal

4    contracted out to work for this case.

5            THE COURT:  All right.  Ladies and gentlemen, any of

6    you think you might know either of the defense counsel, the

7    paralegal, or the defendant, Mr. Young?  Is there anybody?

8            Ever had any business or personal relationships with

9    any of these folks?

10           To your knowledge, have any of you ever used the

11   services of the law firms involved here or been involved in

12   litigation with any of these firms?

13           All right, you may have a seat.  Thank you.

14           Now I'm going to ask each side to list the names of

15   any witnesses who you believe you may be calling during the

16   course of the trial.  We would like to know if any of the

17   jurors might recognize any of these witnesses.

18           Mr. Gibbs.

19           MR. GIBBS:  Thank you, Judge.  The Government intends

20   to call the following witness, we are going to call him an

21   Undercover Employee, who is going to testify under the name

22   Khalil Sullivan.  John Gervino with ICE.  John Minichello with

23   the FBI.

24           There will be a confidential human source testifying

25   under the name Mo.  Cameron Siegfried, who was a Task Force

50

1    agent with the FBI previously.  There will be an agent

2    testifying on behalf of the FBI as Special Agent Smith.  There

3    will be another FBI agent by the name of John Sikorski.  Paul

4    Lee is a forensic examiner with the FBI.  Ian Campbell is with

5    the Arlington County Police.  Kenneth Jamie McNulty is with the

6    Fairfax County Police.

7            We have a witness by the name of Brian Menzies, that

8    is spelled M-e-n-z-i-e-s.  There is going to be a witness by

9    the name of Daveed Gartenstein-Ross.  Special Agent Caslen, who

10   you just heard from, will testify.  And a witness by the name

11   of Joanne Dill who previously worked for WMATA.

12           And then it is possible, although we're not certain,

13   but there is another FBI employee by the name of Jamaal King.

14   And a second FBI employee by the name Mirian, M-i-r-i-a-n,

15   Fontanez.

16           THE COURT:  Ladies and gentlemen, do any of you think

17   you might recognize any of those names as people you might know

18   or have worked with?

19           Oh, I am surprised.  All right, very good.

20           Yes, ma'am, your name, please.

21           JUROR BROOKS:  Kira Brooks.

22           THE COURT:  Ms. Brooks, which name did you recognize?

23           JUROR BROOKS:  I don't recognize specific names, but

24   my company does a lot of work with Homeland Security and we

25   work with the FBI.  But I don't have any conflict with any of

51

1    people named here this morning.

2              THE COURT:  Ms. Brooks, what kind of work do you do?

3              JUROR BROOKS:  I own a management consulting company.

4    We do a lot of work with the Department of Homeland Security.

5              THE COURT:  If you can talk about it, what kind of

6    work does your --

7              JUROR BROOKS:  The particular contract is classified.

8              THE COURT:  Do you work on that contract yourself?

9              JUROR BROOKS:  I do consult to that client, yes.

10             THE COURT:  Well, given the nature of the issues in

11   this case -- as we said, it is an attempted support, material

12   support of ISIS, and obstruction of justice.  And given your

13   kind of work, do you feel you might have difficulty being an

14   impartial juror in this case?

15             JUROR BROOKS:  Yes.

16             THE COURT:  All right.  Thank you, Ms. Brooks.

17             All right.  Anybody else on the left side who thinks

18   you might recognize the names of any of these witnesses?

19             Now, in the center I saw some hands up.  Yes, your

20   name, sir.

21             JUROR EVANCHO:  Evancho, George.

22             THE COURT:  Yes, sir.

23             JUROR EVANCHO:  I am a retired federal employee.  My

24   last agency was Immigration and Customs Enforcement where I

25   served as the special security officer.  And John Gervino's

52

1    name is familiar to me.  I am not sure if I have met him, but I
2    am sure I have had some kind of dealings with him, I just can't
3    exactly pinpoint what those are.
4            THE COURT:  Do you feel that your prior work or the
5    nature of the issues in this case could make it difficult for
6    you to be impartial in judging this case?
7            JUROR EVANCHO:  No, Your Honor.
8            THE COURT:  All right.  And the relationship you had
9    with this person -- I mean, had you actually worked with this
10   person?
11           JUROR EVANCHO:  Not directly, Your Honor.  I was a
12   special security officer, I managed our SCIF.  And occasionally
13   we would have criminal investigators from the various agencies
14   come in, and I would assist them in doing whatever they needed
15   to do inside the SCIF.  No professional dealings otherwise, or
16   social for that matter.
17           THE COURT:  All right.  So that you recognize the
18   name, but you --
19           JUROR EVANCHO:  Yes.
20           THE COURT:  But did you ever have any face-to-face
21   contact with this person?
22           JUROR EVANCHO:  Your Honor, I honestly don't
23   remember.  That name is just very familiar to me.
24           THE COURT:  Because you've worked in that kind of an
25   agency, do you think you might tend to believe the testimony of

53

1    federal law enforcement people over that of an ordinary

2    civilian?

3              JUROR EVANCHO:  I'm sorry, Your Honor?

4              THE COURT:  Yes.  Because of your prior work, and

5    your work in a SCIF, and your work with intelligence matters,

6    do you feel that you might have more confidence in the

7    testimony of a federal agent, federal investigator than that of

8    a civilian?

9              JUROR EVANCHO:  No, Your Honor.

10             THE COURT:  All right.  Thank you, Mr. Evancho.

11             JUROR EVANCHO:  Yes, ma'am.

12             THE COURT:  Anybody else?  Yes, ma'am, in the back.

13             JUROR McKENZIE:  Yes, Patricia McKenzie.

14             THE COURT:  Yes, ma'am.

15             JUROR McKENZIE:  I didn't quite hear the first name

16   that you called, but I think you said Sullivan.

17             MR. GIBBS:  Well, actually he will be testifying

18   under a pseudonym.  So for purposes of his testimony, his name

19   that he will be using in court will be Khalil Sullivan.  That

20   is not his real name though.

21             JUROR McKENZIE:  Okay.  I just wanted to be sure

22   because my former boss' name is Cleovis Sullivan who works at

23   the Virginia Department of Transportation.  I just wanted you

24   to know.

25             MR. GIBBS:  It's not the same person.

54

```
1              THE COURT:  It's not the same person.  Thank you,
2   ma'am.  That is very careful listening, we appreciate that.
3              Is there anybody else in the center section?
4              How about on the right side, anybody who recognized
5   any of those names?
6              All right, I will ask Mr. Smith or Ms. Moreno, do you
7   have any witness names you want to run by the jury?
8              MS. MORENO:  Not at this time, Your Honor, no.
9              THE COURT:  All right.  Thank you.
10              Now, it's very important the jurors understand that
11   the credibility of each witness who testifies in a trial has to
12   be evaluated on its own merits.  And, therefore, I want to ask
13   the rest of the panel, do any of you hold the belief that
14   because a person is employed in law enforcement his or her
15   testimony is worthy of more or less belief than that of a
16   non-law enforcement witness?
17              Does anybody have that feeling or belief?  All right.
18              Some of the Government's witnesses' identities must
19   not be publicly disclosed.  And before these witnesses testify,
20   we are going to actually have a screen be pulled across the
21   courtroom to prevent the public from seeing these witnesses.
22   Of course, you, that is whoever is going to be in the jury, and
23   all of the trial participants will not have your views
24   obstructed.
25              Do any of you think that the use of the screen or the
```

55

1    fact that certain witnesses' identities cannot be disclosed

2    could affect your ability to judge this case impartially?

3            Do any of you feel that could be a problem for you?

4    No?  All right.

5            And do you feel you would have any difficulty in

6    evaluating that witness' testimony differently than that of an

7    ordinary civilian witness?  Is there anybody?

8            I want to know now whether any of you have any past

9    or present experience working in law enforcement?  And so,

10   specifically, although this is not limited to these agencies, I

11   want to know whether any of you have ever in the past or are in

12   the present employed by or doing business with the Department

13   of Justice?

14           Now, the Department of Justice is a large federal

15   agency.  It includes the Federal Bureau of Investigation, the

16   Drug Enforcement Administration, and up until about I guess now

17   ten years or so ago the Immigration and Naturalization Service.

18           But this would include also, expand this question to

19   the Central Intelligence Agency, the Department of Homeland

20   Security, which now includes the Immigration and Customs

21   Enforcement, or ICE agency, the Fairfax County Police

22   Department, the Arlington County Police Department, and the

23   Washington Metropolitan Transit Authority.

24           So do any of you have any current or past employment

25   or business dealings with any of those agencies or any other

56

 1   law enforcement experience?

 2          Let me start on the left side first.  Yes, ma'am,

 3   your name, please.

 4          JUROR BROOKS:  I'm Kira Brooks.

 5          THE COURT:  I'm sorry?

 6          JUROR BROOKS:  Kira Brooks.

 7          THE COURT:  Yes, Ms. Brooks.

 8          JUROR BROOKS:  Just what I said before, I have worked

 9   with --

10          THE COURT:  That's fine.  Thank you, Ms. Brooks.

11          Yes, against the wall, your name, sir.

12          JUROR BATT:  Yes, Stephan Batt.

13          THE COURT:  Yes, Mr. Batt, number 5.

14          JUROR BATT:  I worked at Homeland Security for about

15   seven years.  And I worked at Coast Guard headquarters, DHS

16   headquarters, and TSA headquarters.

17          THE COURT:  And you are currently at Homeland

18   Security?

19          JUROR BATT:  No, I left about a year-and-a-half ago.

20          THE COURT:  Are you now in civilian employment?

21          JUROR BATT:  No, I work at the U.S. PTO.

22          THE COURT:  All right.  Now, is there anything about

23   your past experience in the law enforcement agencies, including

24   the Coast Guard, that you feel could affect your impartiality

25   in this case?

57

1              JUROR BATT:  No, ma'am.

2              THE COURT:  In any respect, I am going to repeat the

3    question, do you think you might believe the testimony of a

4    Homeland Security agent more or less than that of a civilian

5    based upon your experience with the agency?

6              JUROR BATT:  No, ma'am.

7              THE COURT:  All right.  Thank you, Mr. Batt.

8              Yes, your name, sir.

9              JUROR CARPER:  Timothy Carper, number 10.

10             THE COURT:  I'm sorry, I can't hear you.

11             JUROR CARPER:  Timothy Carper, I'm number 10.

12             THE COURT:  Yes, Mr. Carper.

13             JUROR CARPER:  I am currently employed by the Drug

14   Enforcement Administration.

15             THE COURT:  In what capacity?

16             JUROR CARPER:  I am an IT staff, technical.

17             THE COURT:  So you do IT work?

18             JUROR CARPER:  Yes.

19             THE COURT:  Have you ever done any actual law

20   enforcement out-in-the-field kind of work?

21             JUROR CARPER:  No.

22             THE COURT:  No?  How long have you been with DEA?

23             JUROR CARPER:  Two-and-a-half years.

24             THE COURT:  And any other law enforcement agency

25   experience other than DEA?

58

1           JUROR CARPER:  No.

2           THE COURT:  So when you say IT, are you doing -- is

3    it personnel IT, or what kind of IT do you do?

4           JUROR CARPER:  IT security.  So intrusion detection,

5    vulnerability, I just protect the infrastructure.

6           THE COURT:  Is there anything about your work with

7    the DEA that you think could affect your ability to be

8    impartial in judging in this case?

9           JUROR CARPER:  No.

10          THE COURT:  This is not a DEA case, they are just

11   part of the Justice Department.  Have you had contact with

12   agents while you have been at --

13          JUROR CARPER:  No agents.

14          THE COURT:  Not at all?

15          JUROR CARPER:  No, I am not in that capacity.

16          THE COURT:  Thank you, Mr. Carper.

17          Yes, your name, sir.

18          JUROR DAVIS:  Yes, Kenneth Davis, juror 17.

19          THE COURT:  Yes, Mr. Davis.

20          JUROR DAVIS:  I work with a consulting firm that has

21   several clients, such as Homeland Security and intelligence

22   agencies.  And we are also on a contract vehicle with WMATA,

23   but I am not personally involved in any of those client

24   relationships.

25          THE COURT:  And can you tell us what kind of work you

59

1   do for your employer?

2          JUROR DAVIS:  Federal financial management

3   consultant.

4          THE COURT:  All right.  So your company does work

5   with these agencies, but you yourself don't?

6          JUROR DAVIS:  That's correct.  I am in executive

7   level leadership with the firm, but I don't serve directly

8   those clients currently.

9          THE COURT:  Is there anything about the issues in

10  this case and the kind of work that you do that you feel could

11  make it difficult for you to be impartial as a juror?

12         JUROR DAVIS:  No, Your Honor.

13         THE COURT:  All right.  Thank you, Mr. Davis.

14         Anybody else?  Yes, way in the back, your name, sir.

15         JUROR GOIDICH:  Thomas Goidich, G-o-i.

16         THE COURT:  Can you spell the last name again.

17         JUROR GOIDICH:  G-o-i --

18         THE COURT:  G-o-i.  Mr. Goidich, yes, sir.

19         JUROR GOIDICH:  I work for a CPA firm, and we have

20  work at DEA and U.S. Marshals on different contracts.

21         THE COURT:  Were any of those contracts involved with

22  specific law enforcement projects?

23         JUROR GOIDICH:  No.

24         THE COURT:  Is there anything about your work at

25  those agencies that you feel could make it difficult for you to

60

1    be impartial in judging this case?

2              JUROR GOIDICH:  No, ma'am.

3              THE COURT:  Thank you, sir.

4              Anybody else on the left side?

5              Now in the center?  Yes, your name, again, sir.

6              JUROR MCCRAVE:  Michael McCrave.  Retired Naval

7    officer.  Two years as a legal officer.  Also worked with the

8    DEA and NSA on other missions as part of being in the Navy.

9              THE COURT:  Given that -- now, how many years ago was

10   that?

11             JUROR McCRAVE:  That was 20 years ago as far as

12   active duty.  I am still currently employed working for the

13   Navy building ships currently.

14             THE COURT:  Is there anything about your past work in

15   law enforcement or intelligence work that you feel could affect

16   your impartiality to judge this case?

17             JUROR McCRAVE:  No, ma'am.

18             THE COURT:  Do you feel in any respect you might

19   believe the testimony of Government agents over that of

20   ordinary civilians because of your work in that area?

21             JUROR McCRAVE:  No, ma'am.

22             THE COURT:  All right.  Thank you, Mr. McCrave.

23             Yes, your name, sir.

24             JUROR EVANCHO:  Evancho, George.

25             THE COURT:  Yes, sir.

61

1              JUROR EVANCHO:  Previous work at the FBI in a

2    clerical capacity, 1976, 1977.  And Immigration and

3    Naturalization Service, also non-law enforcement position.  I

4    was a security specialist, personnel security specialist.  And

5    then Immigration and Customs Enforcement under DHS where I was

6    a security specialist, special security officer.

7              THE COURT:  Is there anything about all those jobs

8    that you feel might make it difficult for you to be impartial

9    in judging this case?

10              JUROR EVANCHO:  No, Your Honor.

11              THE COURT:  And again, do you feel in any respect you

12    would tend to believe the testimony of a federal law

13    enforcement officer, or a state law enforcement officer for

14    that matter, over that of a civilian?

15              JUROR EVANCHO:  No, Your Honor.

16              THE COURT:  All right.  Thank you, Mr. Evancho.

17              Anyone else in the first row?

18              Second row then.  Yes, sir, your name, please.

19              JUROR KAUFFMAN:  Last name is Kauffman, with a K,

20    Thomas.

21              THE COURT:  Yes, sir.

22              JUROR KAUFFMAN:  Between January of 1996 and December

23    of 2007 I served on the Fairfax County Board of Supervisors,

24    and in that capacity I represented Virginia on the Metro Board.

25              THE COURT:  Do you feel in any respect that that

62

```
1   relationship with that agency could affect your ability to be

2   impartial in judging this case?

3              JUROR KAUFFMAN:  No.  It has been a decade.

4              THE COURT:  All right.  Thank you, sir.

5              Anybody else in that row?  Yes, your name, please,

6   ma'am.

7              JUROR OBUCHOWSKI-BERMAN:  Susan Obuchowski-Berman.  I

8   have worked with the U.S. Department of Justice and the U.S.

9   Department of Homeland Security, and I am currently a federal

10  employee with the Department of State.

11             THE COURT:  And what are you doing at State right

12  now?

13             JUROR OBUCHOWSKI-BERMAN:  I'm an investigative

14  analyst with our counterintelligence division.

15             THE COURT:  All right.  Now, given the nature of the

16  issues in this case and your work, do you feel you would have

17  difficulty being impartial in judging this case?

18             JUROR OBUCHOWSKI-BERMAN:  I think it is likely.

19             THE COURT:  All right.  Thank you, ma'am.

20             Yes, sir, your name, please.

21             JUROR OLIVER:  Yes, ma'am, I am retired military --

22             THE COURT:  I'm sorry, I need your name first.

23             JUROR OLIVER:  I'm retired military, and I also --

24             THE COURT:  I need you're name.

25             JUROR OLIVER:  Oh, Oliver.  Juror number 60.
```

63

```
 1              THE COURT:  Yes, Mr. Oliver.

 2              JUROR OLIVER:  Yes.  I am retired military, and I

 3   currently work at the National Reconnaissance Office, armed

 4   security.  And I work with a lot of the Homeland Security and

 5   also Fairfax County.

 6              THE COURT:  All right.  Are you actually involved in

 7   active investigations?

 8              JUROR OLIVER:  Yes, ma'am.  I get full notices just

 9   like police officers do.

10              THE COURT:  Mr. Oliver, based upon that, do you feel

11   you might have difficulty in being impartial in judging this

12   case?

13              JUROR OLIVER:  No, ma'am.

14              THE COURT:  Given the nature of the issues in this

15   case, you don't think you might have some issues?

16              JUROR OLIVER:  I'll be okay.  I wouldn't have any.

17              THE COURT:  No preset ideas about the issues in this

18   case?

19              JUROR OLIVER:  No, ma'am.

20              THE COURT:  And you don't think you would favor the

21   testimony of a law enforcement officer against that of an

22   ordinary civilian?

23              JUROR OLIVER:  Oh, I would probably be a little

24   impartial in that part.

25              THE COURT:  I'm sorry?
```

64

1          JUROR OLIVER:  I would probably favor a police

2     officers with that one.

3          THE COURT:  All right.  Thank you, sir.

4          All right, anybody else?  Yes, way in the back.

5          JUROR YIANILOS:  Christopher Yianilos.

6          THE COURT:  Can you spell the last name.

7          JUROR YIANILOS:  Y-i-a-n-i-l-o-s.

8          THE COURT:  Yes, sir.

9          JUROR YIANILOS:  From 1999 until 2009 I worked with

10    the United States Senate and advised on many of the issues and

11    agencies that you mentioned, including WMATA.  I am a lawyer,

12    but not practicing, but I assisted a family friend with a case

13    of deportation that went before Immigration.

14          THE COURT:  All right.  Do you feel that any of those

15    experiences might make it difficult for you to be impartial in

16    judging this case?

17          JUROR YIANILOS:  No, Your Honor.

18          THE COURT:  In any respect, do you feel you might

19    believe the testimony of a federal law enforcement officer or

20    agent over that of an ordinary civilian?

21          JUROR YIANILOS:  No, Your Honor.

22          THE COURT:  All right.  Thank you, sir.

23          Anybody else in the center section?

24          How about on the far right then?  Yes, sir, your

25    name, please.

65

1          JUROR PHILLIPS:  Yes, Your Honor, Carter Phillips.

2          THE COURT:  Yes, Mr. Phillips.

3          JUROR PHILLIPS:  I was an assistant to the Solicitor

4    General from 1981 to 1984.

5          THE COURT:  All right.  Did you ever handle cases

6    involving these types of issues?

7          JUROR PHILLIPS:  I handled a wide range of criminal

8    cases while I was in the Justice Department.

9          THE COURT:  Mr. Phillips, do you feel in any respect

10   your past work in that area might make it difficult for you to

11   be impartial in judging this case?

12         JUROR PHILLIPS:  I don't think so, Your Honor, no.

13         THE COURT:  In any respect do you feel you might have

14   a pro prosecution bias, it's bad word, but I have to say it,

15   because of your past work?

16         JUROR PHILLIPS:  Too many years have passed, and I

17   have been on both sides of the aisle.

18         THE COURT:  And you are currently an attorney,

19   correct?

20         JUROR PHILLIPS:  I am currently an attorney.

21         THE COURT:  Have you done any criminal defense work?

22         JUROR PHILLIPS:  I have done a substantial amount of

23   criminal defense work.

24         THE COURT:  White collar?

25         JUROR PHILLIPS:  Yes, ma'am.

66

1            THE COURT:  All right.  Thank you, Mr. Phillips.

2            Anybody else?  Way in the back, yes, your name,

3    please.

4            JUROR WOLF:  My name is Garrett Wolf.

5    Approximately --

6            THE COURT:  Wait, wait, wait one second.  We have got

7    to find you on the papers.  Mr. Wolf, yes, sir.

8            JUROR WOLF:  Approximately 15 years ago I had a

9    year-long internship with the Department of Homeland Security.

10           THE COURT:  And what kind of things were you exposed

11   to there?

12           JUROR WOLF:  Just database administration.

13           THE COURT:  Database administration.  Is there

14   anything about that experience that you feel might make it

15   difficult for you to be impartial in judging this case?

16           JUROR WOLF:  No.

17           THE COURT:  All right.  Thank you, Mr. Wolf.

18           Now is there anybody else?  Anybody -- yes, your

19   name, please.

20           JUROR MEINKEN:  My name is Timothy Meinken.

21           THE COURT:  Yes, Mr. Meinken.

22           JUROR MEINKEN:  I'm not in law enforcement, but my

23   brother is an agent in the DEA.

24           THE COURT:  Is he around here?

25           JUROR MEINKEN:  No, he is not.

67

```
1              THE COURT:  All right.  Is there anything he may have
2    told you about his experiences as a DEA agent that you feel
3    could affect your ability to judge this case impartially?
4              JUROR MEINKEN:  No, I don't think so.
5              THE COURT:  In any respect do you think you might
6    believe the testimony of a federal law enforcement officer over
7    that of a civilian because your brother is a federal law
8    enforcement officer?
9              JUROR MEINKEN:  No, ma'am.
10             THE COURT:  All right.  Thank you, sir.
11             Anybody else?  Some of you have already answered this
12   question, so you don't need to repeat your answers.  But are
13   there any other jurors who have any specialized training or
14   experience, either in the areas of counterterrorism or
15   radicalization?  Is there anybody?
16             Have any members of the panel had any particularly
17   positive or negative experiences with persons of the Muslim
18   faith?  Is there anybody?
19             Yes, ma'am, your name, please.
20             JUROR MATTOS:  Kathy Mattos.
21             THE COURT:  Yes, Ms. Mattos.
22             JUROR MATTOS:  I teach English as a second language
23   to immigrants, and there are numerous people of the Muslim
24   faith.
25             THE COURT:  And it will probably -- you will hear
```

68

1    that the defendant is a convert to Islam.  In any respect would

2    your experience with members of that faith in your view make

3    any difference to you in terms of how you would judge this

4    case?

5              JUROR MATTOS:  I don't think so.

6              THE COURT:  All right.  Thank you, ma'am.

7              Is there anybody else?  Yes, in the back.

8              JUROR KASUN:  Regina Kasun.  I'm in health care, and

9    I work with many health care professionals that are Muslim.

10              THE COURT:  And, Ms. Kasun, is there any --

11              JUROR KASUN:  It's been positive.  I don't think it

12    would make any difference.

13              THE COURT:  In any respect would you feel that that

14    religion would in any way factor into your decision making in

15    this case?

16              JUROR KASUN:  No.

17              THE COURT:  All right.  Thank you, Ms. Kasun.

18              There were some other hands.  Yes, ma'am, your name,

19    please.

20              JUROR LAYTON:  Georgianna Layton.  I taught for

21    five years, so I have had a lot ESL students, ESL families.

22    And now for the last five years I mentor teachers.  So I work

23    with first- and second-year teachers, and I have ESL teachers

24    there, numbers of students, but there have been positive

25    interactions.

69

```
1              THE COURT:  So again, nothing about those
2    interactions that might affect your ability to be impartial in
3    judging the case?
4              JUROR LAYTON:  No, ma'am.
5              THE COURT:  All right.  Thank you.
6              Yes, I see another hand there.  Yes, ma'am.
7              JUROR HILLA:  Elizabeth Hilla.
8              THE COURT:  How do you spell your last name?
9              JUROR HILLA:  H-i-l-l-a.
10             THE COURT:  I have got you.  Yes, ma'am.
11             JUROR HILLA:  And same as these ladies, I teach
12   English as a second language as a volunteer position, so I meet
13   lots of people from Muslim countries.
14             THE COURT:  And you don't feel that in any respect
15   would affect your ability to be impartial in judging --
16             JUROR HILLA:  I don't think so.
17             THE COURT:  All right.  Thank you, Ms. Hilla.
18             Way in the back, yes, ma'am.
19             JUROR McKENZIE:  I think this might be repetitive,
20   but I --
21             THE COURT:  Are you Ms. Evans?
22             JUROR McKENZIE:  Ms. McKenzie.
23             THE COURT:  I am sorry, Ms. McKenzie.
24             JUROR McKENZIE:  What number am I?
25             THE COURT:  I will give it to you in a second here.
```

70

1   You are, if you are Patricia McKenzie, you are 53.

2           JUROR McKENZIE:  Thank you.  I'm an HR consultant

3   working with the Virginia Department of transportation, so I

4   work with a very diverse group of people in the community

5   allot.  So I would have no issues on this matter.

6           THE COURT:  Thank you, Ms. McKenzie.

7           On the far side, yes.

8           JUROR HOWARD:  Elizabeth Howard.

9           THE COURT:  Yes, Ms. Howard.

10          JUROR HOWARD:  Just in terms of positive experiences,

11  I have personal friends who are Muslim.

12          THE COURT:  And again, do you feel in any respect

13  that could affect your ability to judge this case impartially?

14          JUROR HOWARD:  No, I do not.

15          THE COURT:  All right.  Thank you, ma'am.

16          And in the back, yes, your name, please.

17          JUROR GOPAL RATNAM:  Ajitha Gopal Ratnam.

18          THE COURT:  You will have to spell the last name.

19          JUROR GOPAL RATNAM:  G-o-p-a-l --

20          THE COURT:  I have got you, Mr. Ratnam.

21          JUROR GOPAL RATNAM:  I have got friends who are

22  Muslim.  Nothing, I have just had positive --

23          THE COURT:  So again, you don't feel that would

24  affect you one way or the other?

25          JUROR GOPAL RATNAM:  No.

71

```
1              THE COURT:  All right.  Thank you, ma'am.

2              Anyone else on this side?

3              Center?

4              How about the far right?  Let me start at the front.

5    Yes, ma'am, your name, please.

6              JUROR TUCKER:  Elke Tucker.

7              THE COURT:  Can you spell the last name.

8              JUROR TUCKER:  T-u-c-k-e-r.

9              THE COURT:  Yes, Ms. Tucker.

10             JUROR TUCKER:  My stepson is Muslim, and the whole

11   family, but no negative experiences.

12             THE COURT:  So again, that would not in your view

13   make any difference to you?

14             JUROR TUCKER:  Probably not.

15             THE COURT:  I am sorry?

16             JUROR TUCKER:  Probably not.

17             THE COURT:  No.  All right.  Thank you, Ms. Tucker.

18             Way in the back in the corner.  Your name, sir.

19             JUROR WOLF:  Garrett Wolf.

20             THE COURT:  Yes, Mr. Wolf.

21             JUROR WOLF:  I am a Christian pastor, but I

22   participate in a lot of interfaith community dialogs with

23   people of various different faiths and backgrounds, but it's

24   all been positive experiences.

25             THE COURT:  All right.  So again, that wouldn't make
```

72

1    any difference to you one way or the other?

2              JUROR WOLF:  No.

3              THE COURT:  All right, thank you.

4              And in the corner.

5              JUROR WUKITSCH:  Thomas Wukitsch.

6              THE COURT:  Can you spell the last name again.

7              JUROR WUKITSCH:  W-u-k-i-t-s-c-h.

8              THE COURT:  Yes, sir.

9              JUROR WUKITSCH:  I have several personal friends who

10   are Muslim, including a college roommate who is still one of my

11   best friends.  I do not feel that would affect my ability to

12   judge this case fairly.

13             THE COURT:  All right.  Thank you, sir.

14             Anybody else?

15             JUROR ASIAMA:  I am a Christian, and my wife is --

16             THE COURT:  I am sorry, wait a second.  You are Mr.

17   Asiama, number 2.

18             JUROR ASIAMA:  Kwami Asiama.

19             THE COURT:  Yes, sir.

20             JUROR ASIAMA:  I grew up in Ghana where we have

21   Muslims and Christians living together in a positive way.  And

22   I am practicing Christian, and I tried to convert some of them,

23   and I am not successful, but that's who I am.

24             THE COURT:  And do you feel in any respect the fact

25   that the defendant is a convert to Islam, would that in any

73

1  respect affect your ability to judge this case fairly?

2          JUROR ASIAMA:  No.

3          THE COURT:  All right.  Thank you, sir.

4          Is there anyone else?

5          Now, there will be evidence in this case of Mr. Young

6  possessing white supremacist and Nazi materials and having

7  expressed anti-Israel and anti-Semitic views.  This evidence is

8  being submitted solely to address the issue of the defendant's

9  predisposition.  Mr. Young is not being prosecuted for

10 possessing such materials or holding such beliefs.

11         Would you have any difficulty in fairly evaluating

12 the case in light of such evidence?

13         Would that evidence give any of you difficulty in

14 evaluating this case?  All right.  There may also be -- yes,

15 ma'am.  And your name again.

16         JUROR TUCKER:  Elke Tucker.

17         THE COURT:  Yes, Ms. Tucker.

18         JUROR TUCKER:  In regards to Nazi material, I am from

19 Germany, and I am particularly sensitive in that regard to that

20 period of time.

21         THE COURT:  So you think that could affect how you

22 would judge the case, Ms. Tucker?

23         JUROR TUCKER:  I would have to listen to it.  I don't

24 know.

25         THE COURT:  But it might?

74

```
 1              JUROR TUCKER:  Could be.  I don't know.

 2              THE COURT:  All right.  Thank you, ma'am.

 3              Is there anybody else?  Yes, Mr. Asiama.

 4              JUROR ASIAMA:  As a former student of the University

 5   of Science and Technology in Ghana in Africa, in '87 I was a

 6   member of the Ghana Holyland Fellowship Association.  In that

 7   capacity, we visited Israel.  I just want to make sure I put

 8   that in the record.

 9              THE COURT:  But in any respect, would that make it

10   difficult for you to be impartial in judging this case?

11              JUROR ASIAMA:  No.

12              THE COURT:  No?  All right, sir.

13              Yes, ma'am.  And you are Ms. Brooks?

14              JUROR BROOKS:  Kira Brooks.  My husband and his

15   family are Jewish, and that would be hard for me to be

16   impartial.

17              THE COURT:  All right.  Thank you, Ms. Brooks.

18              Anybody else on the left side?

19              How about in the center?  Yes, ma'am, your name,

20   please.

21              JUROR OBUCHOWSKI-BERMAN:  Susan Obuchowski-Berman.

22              THE COURT:  Yes, ma'am.

23              THE OBUCHOWSKI-BERMAN:  My husband's side of the

24   family is Jewish.

25              THE COURT:  And do you feel that that kind of
```

75

1    evidence might make it difficult for you to be impartial?

2            JUROR OBUCHOWSKI-BERMAN:  Yes.

3            THE COURT:  All right.  Thank you, ma'am.

4            Is there anybody else?  Yes, your name, please.

5            JUROR PEISACH:  Brian Peisach.

6            THE COURT:  Can you spell the last name.

7            JUROR PEISACH:  P-e-i-s-a-c-h.

8            THE COURT:  Mr. Peisach, number 62.  Yes, sir.

9            JUROR PEISACH:  Well, I am Jewish, so I would be --

10           THE COURT:  Would that make it --

11           JUROR PEISACH:  I would be against anti-Semitism.

12   But in terms of the case, I don't think it would influence me.

13           THE COURT:  Do you feel though that if somebody had

14   that kind of literature in their possession or maybe espoused

15   anti-Israeli feelings, that that could make it difficult for

16   you to evaluate his case fairly?

17           JUROR PEISACH:  I think I could evaluate the case

18   fairly.

19           THE COURT:  All right.  Thank you, sir.

20           Anybody else?  All right.

21           There may be evidence in this case of Mr. Young

22   legally possessing multiple firearms.  Would any of you because

23   of things you have seen or heard about firearm possession in

24   United States, or because you are in advocacy groups either for

25   or against firearms, feel that that kind of evidence might make

76

1    it difficult for you to be fair in evaluating this case?  Is

2    there anybody?

3                Yes, ma'am, your name, please.

4                JUROR KASUN:  Regina Kasun.  I forget what number I

5    am.  I think I am 41.

6                THE COURT:  Yes, 42.

7                JUROR KASUN:  42.  I just have never been pro gun.  I

8    served in the military as an Army nurse way back, but just I

9    have never been pro gun personally.

10               THE COURT:  And so, if you had evidence of possession

11   of multiple firearms, that could be a problem for you?

12               JUROR KASUN:  It might sway my decision one way or

13   the other.  I am uncertain.

14               THE COURT:  All right.  Thank you, ma'am.

15               Yes, your name, please.

16               JUROR MATTOS:  Kathy Mattos.

17               THE COURT:  Yes, Ms. Mattos.

18               JUROR MATTOS:  Personal feelings against firearm

19   possession, especially multiples, make me wonder if I could be

20   really fair.

21               THE COURT:  Thank you, ma'am.

22               Yes, sir, your name, please.

23               JUROR McILVENNA:  Scott McIlvenna.  I am not sure of

24   my number.

25               THE COURT:  52.

77

1          JUROR McILVENNA:  52, okay.  I own a rifle for deer

2    hunting, so a state Virginia license.  But I would be impartial

3    to any information.

4          THE COURT:  And that's fine.  I mean, the Second

5    Amendment gives you a right to possess firearms, but some

6    people because of personal experiences, things they have read,

7    membership in the NRA, or membership in the Brady organization,

8    have strong views about firearm possession such that it could

9    affect an impartial evaluation of the case.

10          JUROR McILVENNA:  I don't have any memberships with

11    anything like that.

12          THE COURT:  So you don't have any problems with the

13    firearms?

14          JUROR McILVENNA:  No, ma'am.

15          THE COURT:  All right.  Thank you, sir.

16          Anyone else in the center?  How about way in the

17    back.  Yes, sir, your name, please.

18          JUROR GHOSE:  Devajyoti Ghose.  I don't have my juror

19    number.

20          THE COURT:  Wait, wait one second.  You are number

21    29.

22          JUROR GHOSE:  So I do have strong views about

23    firearms.  And I have some members of my family who had bad

24    experiences.

25          THE COURT:  So you feel that that evidence could make

78

1    a problem for you in being impartial?

2              JUROR GHOSE:  I am not sure.  It would depend upon

3    the type of weapons, but it is hard to make a broad judgment

4    about that.

5              THE COURT:  All right.  Thank you, sir.  Thank you.

6              Against the wall there, yes, sir.

7              JUROR DAVIS:  Yes, Ken Davis, juror 17.  I don't have

8    any affiliation with any firearms organizations, but I do have

9    strong personal feelings about ownership of multiple firearms.

10             THE COURT:  Do you feel that those feelings could

11   affect how you might judge this case?

12             JUROR DAVIS:  Potentially, depending upon the

13   quantity and the type of firearm.

14             THE COURT:  All right.  Thank you, sir.

15             Anybody else?  Yes, your name.

16             JUROR TUCKER:  Again, Elke Tucker.

17             THE COURT:  I'm sorry, your last name again?

18             JUROR TUCKER:  Tucker, T-u-c-k-e-r.

19             THE COURT:  Yes, Ms. Tucker.  The firearms give you

20   concern as well?

21             JUROR TUCKER:  Yes.  I am from Germany, we have

22   strict gun laws, guns aren't allowed.  And my personal belief

23   is they are too permissible with guns laws, so I would have a

24   problem.

25             THE COURT:  All right.  Thank you, ma'am.

79

1              Is there anybody else?  Yes, Mr. Asiama.

2              JUROR ASIAMA:  I think I would be really biased when

3    it comes to guns because I have a strong conviction about

4    firearms possession.

5              THE COURT:  Thank you, sir.

6              Is there anybody else?  All right.

7              Have any members of the panel themselves, or again,

8    remember, this applies to your immediate family members or

9    close personal friends, ever been the subject of a criminal

10   investigation or charged with violating a non-traffic criminal

11   law?

12             Anybody who has had that issue come up?  All right.

13             Have any members ever been the victim of a crime of

14   violence related to terrorism?

15             Yes, sir, your name again.

16             JUROR McCRAVE:  Michael McCrave.

17             THE COURT:  Yes, Mr. McCrave.

18             JUROR McCRAVE:  I had numerous friends at the

19   Pentagon on 9/11.

20             THE COURT:  All right.  Now, would that experience in

21   your view possibly affect how you might judge this case?

22             JUROR McCRAVE:  I would like to think not.

23             THE COURT:  I understand there is an ambivalence

24   there.  I mean, listen, it's very difficult to say, I'm not

25   sure I can be fair, but it's really important that you do that

80

1  kind of careful analysis.

2          JUROR McCRAVE:  Well, I have been thinking also on

3  the white supremacist literature and such, and that does

4  somewhat disturb me.

5          THE COURT:  All right.  Thank you, sir.

6          Yes.

7          JUROR PHILLIPS:  Carter Phillips, Your Honor.

8          THE COURT:  Yes, sir.

9          JUROR PHILLIPS:  I am the chair of Sidley Austin.

10  Sidley's offices were destroyed in 9/11.  I would have a hard

11  time putting that out of my mind.

12          THE COURT:  These are tough questions.  There are

13  serious issues in this case.  And I appreciate that, Mr.

14  Phillips.  Thank you.

15          JUROR PHILLIPS:  Thank you, Your Honor.

16          THE COURT:  Way in the back.  Yes, sir, your name,

17  please.

18          JUROR WUKITSCH:  Thomas Wukitsch.

19          THE COURT:  Yes, I am sorry, how do you spell your

20  last name?

21          JUROR WUKITSCH:  W-u-k-i-t-s-c-h.

22          THE COURT:  Yes, Mr. Wukitsch.

23          JUROR WUKITSCH:  Both of my parents were foreign

24  service officers serving in the Middle East.

25          THE COURT:  We are having trouble hearing you.  Can

81

1    you speak --

2            JUROR WUKITSCH:  Both of my parents were foreign

3    service officers serving in the Middle East.  Both of them,

4    particularly my father, were subject to various attempted

5    terrorist actions from time to time, people attempting to blow

6    him up in the course of his duties.  That never actually

7    occurred, thankfully.  And I do not think it would affect my

8    impartiality in this.

9            THE COURT:  You do not think that would affect you?

10            JUROR WUKITSCH:  No.  No, I do not.

11            THE COURT:  All right.  Thank you, sir.

12            Yes, your name, please.

13            JUROR YIANILOS:  Chris Yianilos.

14            THE COURT:  Yes, sir.

15            JUROR YIANILOS:  Your Honor, go back to your previous

16    question, I think it was whether you had a family member or

17    close personal friends that had been convicted of something

18    more than a minor traffic.

19            THE COURT:  Correct.

20            JUROR YIANILOS:  I have a close personal friend that

21    was convicted of a federal drug conspiracy.

22            THE COURT:  Was it in this court, if you know?

23            JUROR YIANILOS:  It was in this court back in the

24    late '80s.

25            THE COURT:  Do you know whether I might have been the

82

1   judge?

2          JUROR YIANILOS:  You were not.

3          THE COURT:  All right.  Is there anything about that

4   experience in your family or -- did you come to the trial at

5   all?

6          JUROR YIANILOS:  No.  And it was a friend, not a

7   family member.

8          THE COURT:  All right.  Is there anything about that

9   experience that you feel could affect your impartiality in

10  judging this case?

11         JUROR YIANILOS:  No, Your Honor.

12         THE COURT:  All right.  Thank you, sir.

13         Folks, I have asked you a lot of questions.  If there

14  is something that comes to mind as this is going on and you

15  realize that maybe you have an answer to a previous question,

16  it's perfectly appropriate for you to raise your hand.

17         All right.  I think the question we're asking though

18  right now was whether any of you have ever been the victim of a

19  crime of violence involving terrorism.

20         Yes, ma'am, your name, please.

21         JUROR LAYTON:  Georgianna Layton.  My sister and

22  cousin were in the Twin Towers, they both came out alive, but

23  very scary thought.

24         And going back, with gun control, my brother-in-law

25  just recently passed, was a New York City policeman, shot in

83

1   the line of duty.  His partner was shot and killed, and they

2   maimed him in the knees so he couldn't do anything to help him.

3           So gun control, I am against also.

4           THE COURT:  So do you feel those experiences might

5   make it difficult for you to be impartial in judging this case?

6   Some of those issues --

7           JUROR LAYTON:  Gun control I feel very strongly

8   about.

9           THE COURT:  All right.

10          JUROR LAYTON:  Because that was a police officer that

11  was attacked, both of them.

12          THE COURT:  Thank you, ma'am.  Thank you.

13          Anybody else?

14          I think we have had a few of you who told me you are

15  lawyers, but let me just ask this question.  Have any of you

16  received any training in the law?  That is, are you currently a

17  lawyer or have taken law courses?  Are you a paralegal or have

18  taken paralegal courses?  Are you a legal secretary?  Or do you

19  work in a law firm?

20          So I want to know now whether any of you have any

21  training or experience in the field of law?  Anybody on the

22  left side?  No?

23          How about in the center?  Mr. McCrave.

24          JUROR McCRAVE:  Yes, ma'am.  I was a Navy legal

25  officer for two years on the ship.

84

1              THE COURT:  All right.  Thank you, sir.

2              Anybody else in the center?  Yes, ma'am.  You are --

3              JUROR OBUCHOWSKI-BERMAN:  Susan Obuchowski-Berman.

4              THE COURT:  Yes.  And you have some legal training?

5              JUROR OBUCHOWSKI-BERMAN:  I do.  I have a Master's in

6  criminal justice investigation, so I did take some law courses

7  during that.  And I deal with law in my day-to-day work.

8              THE COURT:  All right.  Thank you, ma'am.

9              Yes, Mr. --

10              JUROR OLIVER:  Juror number 60.  I am currently

11  enrolled in university, criminal justice student.

12              THE COURT:  And you are Mr. Oliver?

13              JUROR OLIVER:  Yes, ma'am.

14              THE COURT:  All right.  You're taking courses.

15              All right.  Anybody else?  Yes.

16              JUROR YIANILOS:  Christopher Yianilos.  I'm an

17  inactive member of the Virginia Bar.  And I served as a federal

18  law clerk in the mid-'90s.

19              THE COURT:  Where did you clerk?

20              JUROR YIANILOS:  Southern District of West Virginia.

21              THE COURT:  Is there anything about your legal

22  training or experience that you feel could affect your

23  impartiality in this case?

24              JUROR YIANILOS:  No, Your Honor.

25              THE COURT:  Now, at the end of the trial I give the

85

1    jury the legal instructions.  Those are the principles of law

2    that have to be applied.

3            Should I explain a principle that is different from

4    what you might remember it being, or you disagree with how I

5    have phrased it, can you put aside your own view of the law and

6    just follow the law as given to you by the Court.

7            JUROR YIANILOS:  Yes, Your Honor.  I don't think I

8    have my own views of the law anymore, it has been so long.

9            THE COURT:  They might come back when you've heard

10   them.  But anyway -- All right.  Thank you, sir.

11           Is there anybody else?  All right, Mr. Phillips, I

12   know about you.

13           Yes, sir, your name again.

14           JUROR PEISACH:  Brian Peisach.

15           THE COURT:  Your name?

16           JUROR PEISACH:  Brian Peisach.

17           THE COURT:  Yes, Mr. Peisach.

18           JUROR PEISACH:  I have taken some courses in college

19   on criminology and business law.

20           THE COURT:  All right.  Thank you, sir.

21           Anybody else?

22           Do any members of the panel have any prior jury

23   experience either serving on a trial jury or a grand jury,

24   whether in state or federal court?

25           How about -- all right, we will start on the right

86

1    side this time.  Yes, the person on the aisle.

2              JUROR SHANHOLTZER:  Yeah, Mike Shanholtzer.  I think

3    I am 72.  I was on a criminal trial case in Leesburg.

4              THE COURT:  How long ago, do you remember?

5              JUROR SHANHOLTZER:  Probably ten years ago.

6              THE COURT:  And what was the issue in the case?

7              JUROR SHANHOLTZER:  It was assault and battery, and

8    some theft involved, felony theft.

9              THE COURT:  Do you remember what the jury did?

10             JUROR SHANHOLTZER:  It was a conviction.

11             THE COURT:  Was there anything about your experience

12   as a juror in that case that you feel could affect your

13   impartiality in judging this case?

14             JUROR SHANHOLTZER:  No, I don't think so.

15             THE COURT:  All right.  Thank you, sir.

16             How about anybody else on the right side?  Yes, your

17   name, please.

18             JUROR TUMP:  Neil Tump.

19             THE COURT:  What's the last name?

20             JUROR TUMP:  Tump, T-u-m-p.

21             THE COURT:  Tump, T-u-m-p, yes, sir.

22             JUROR TUMP:  Served on jury duty in the state of

23   Florida ten years ago in a criminal case.

24             THE COURT:  What was at issue, do you remember?

25             JUROR TUMP:  Drugs, drug dealing.

87

```
1              THE COURT:  What did the jury do?

2              JUROR TUMP:  Convicted.

3              THE COURT:  Was there anything about your experience

4    as a juror in that case that you feel could affect your

5    impartiality to be a juror in this case?

6              JUROR TUMP:  No, Your Honor.

7              THE COURT:  All right.  Thank you, Mr. Tump.

8              Anyone else on the right side?  Yes, ma'am.

9              JUROR TUCKER:  Yes, I was a juror in Manassas

10   12 years ago.

11             THE COURT:  Was there anything about that experience

12   that you feel could affect your impartiality?

13             JUROR TUCKER:  No.

14             THE COURT:  All right.  Thank you, ma'am.

15             And way in the back.  Yes, sir, your name, please.

16             JUROR GOLDSTEIN:  Ron Goldstein.

17             THE COURT:  Yes, Mr. Goldstein.

18             JUROR GOLDSTEIN:  I served on a municipal court jury

19   in Southern California.

20             THE COURT:  How long ago was that, if you can recall?

21             JUROR GOLDSTEIN:  About 30 years.

22             THE COURT:  What was at issue, do you remember?

23             JUROR GOLDSTEIN:  Prostitution, assault and battery,

24   and repossession of a home.

25             THE COURT:  And what did the jury do?
```

88

1          JUROR GOLDSTEIN:  Prostitution was a conviction.

2   Repossession of the home, he lost the home plus punitive

3   damages.  And the assault and battery was dismissed.

4          THE COURT:  Is there anything about those experiences

5   that you feel could affect your impartiality in judging this

6   case?

7          JUROR GOLDSTEIN:  No.

8          THE COURT:  All right.  Thank you, Mr. Goldstein.

9          How about in the center section?  Let's start in the

10  first row.  Again, your name, sir.

11         JUROR EVANCHO:  Evancho, George.  I served in a civil

12  case back in, oh, gosh, 1972 while I was a student at King's

13  College in Wilkes Barre, Luzerne County.  And a criminal case

14  in Prince William County sometime during the '90s, I don't

15  remember exactly.

16         THE COURT:  What was involved in the criminal case?

17         JUROR EVANCHO:  It was drugs.

18         THE COURT:  Drugs?

19         JUROR EVANCHO:  Yes.

20         THE COURT:  And what did the jury do?

21         JUROR EVANCHO:  It was pled several days into the

22  case.  There was a plea agreement.  And we don't know what

23  happened.

24         THE COURT:  Was there anything about those

25  experiences that you feel could affect your impartiality in

89

1    judging this case?

2              JUROR EVANCHO:  No, Your Honor.

3              THE COURT:  All right.  Thank you, sir.

4              Yes, ma'am.

5              JUROR LEWIS:  Michele Lewis.

6              THE COURT:  I am sorry, the last name?

7              JUROR LEWIS:  Lewis.  I am sorry.

8              THE COURT:  Yes, ma'am, Lewis.

9              JUROR LEWIS:  I served as a foreman of the grand jury

10   out in Prince William County about five years ago.  But no jury

11   duty.  I just served as the foreman.

12             THE COURT:  All right.  Now, you know that grand

13   juries are very different from trial juries?

14             JUROR LEWIS:  Right, right.  Oh, yeah.

15             THE COURT:  Ms. Lewis, was there anything about your

16   experience on a grand jury that you feel could affect your

17   impartiality in judging this case?

18             JUROR LEWIS:  No.

19             THE COURT:  Thank you, ma'am.

20             Yes, your name again, please.

21             JUROR McILVENNA:  McIlvenna, I think it's 52, if I

22   can remember correctly.

23             THE COURT:  It is.

24             JUROR McILVENNA:  Leesburg, probably about 12 years

25   ago, a DUI case.  The individual was convicted, kind of go

90

1    through a rehabilitation program.

2              THE COURT:  Was there anything about your experience

3    on that jury that you feel might make it difficult for you to

4    be an impartial juror in this case?

5              JUROR McILVENNA:  No, Your Honor.

6              THE COURT:  Thank you, sir.

7              Way in the back.  Yes, sir.

8              JUROR YIANILOS:  Last name Yianilos.

9              THE COURT:  Yes, sir.

10             JUROR YIANILOS:  Perhaps two or three years ago I was

11   in a jury in the city of Alexandria for a DUI case.

12             THE COURT:  Was there anything about that -- what did

13   the jury do in that case?

14             JUROR YIANILOS:  Convicted.

15             THE COURT:  Was there anything about that experience

16   that you feel could affect your impartiality as a juror in this

17   case?

18             JUROR YIANILOS:  No, Your Honor.

19             THE COURT:  All right.  Thank you, sir.

20             All right.  Yes, yes, ma'am.

21             JUROR KASUN:  Regina Kasun, 42.  I was just thinking

22   about the white supremacy issue.  And I think that that might

23   be difficult for me.

24             THE COURT:  Thank you, Ms. Kasun.

25             All right.  Way in the back.  Yes, you are Mr. --

91

1           JUROR OLIVER:  Juror number 60, Oliver.

2           THE COURT:  Mr. Oliver.

3           JUROR OLIVER:  What she just said, with the white

4    supremacy, that would be a problem for me.

5           THE COURT:  Thank you, Mr. Oliver.

6           On the left side, is there anybody -- do I have

7    everybody with jury experience now?  Anybody on the left side?

8           Do any members of the panel feel that they have a

9    problem understanding or speaking English?  Anybody?

10          All right.  Let me start with -- your name, please.

11          JUROR CAYLOR:  Caylor, Nubia.

12          THE COURT:  Can you spell the last name.

13          JUROR CAYLOR:  C-a-y-l-o-r.

14          THE COURT:  Ms. Caylor?

15          JUROR CAYLOR:  Yes.

16          THE COURT:  Have you had any trouble understanding

17   what I have said?

18          JUROR CAYLOR:  No.  But if I am required to do

19   writing, or sometimes understanding very sophisticated words, I

20   may have trouble.

21          THE COURT:  Ms. Caylor, jurors don't have to write

22   anything.

23          JUROR CAYLOR:  All right.

24          THE COURT:  But you have to be able to listen and

25   understand.  And there may be -- there may be evidence that you

92

1    need to read.  Do you have any trouble reading English?

2              JUROR CAYLOR:  No.  This is my first experience, so I

3    don't know what is involved.  So I don't want to be -- do

4    something that I am unable to do properly.

5              THE COURT:  I am able to understand you.  And if you

6    have been able to understand me, then I think your English is

7    fine.

8              JUROR CAYLOR:  All right.  Thank you.

9              THE COURT:  All right.  Thank you, Mr. Caylor.

10             Let's see.  Yes, your name, please.

11             JUROR CHOI:  Kyou-Bin Choi.  I think I'm number 12.

12             THE COURT:  Number 12.  Yes, Ms. Choi.

13             JUROR CHOI:  Yes.  Throughout the day I think I

14   understand most of the English, this is my second language, but

15   I kind of -- I think I'm missing some.

16             THE COURT:  Do you feel you haven't understood

17   everything I've said?

18             JUROR CHOI:  I guess some of them.

19             THE COURT:  All right.  Thank you, ma'am.

20             Way in the back.  Yes, sir, your name, please.

21             JUROR GREWAL:  Grewal, Rachpal.

22             THE COURT:  Can you spell -- can you spell the last

23   name.

24             JUROR GREWAL:  Grewal, G-r-e-w-a-l.

25             THE COURT:  G-

93

 1          JUROR GREWAL:  -- r-e-w-a-l.

 2          THE COURT:  Grewal.

 3          JUROR GREWAL:  Yes, ma'am.

 4          THE COURT:  Yes, sir.

 5          JUROR GREWAL:  I have like some difficulty about

 6   words I cannot understand.  So I don't want to make a wrong

 7   decision, that's what I am saying.

 8          THE COURT:  All right.  Thank you, sir.

 9          Yes, your name, please.  The gentleman on the aisle.

10          JUROR KWAK:  Yes, number 44, Tae Kwak.  I already

11   tell you, I'm sorry, I cannot understand some communication.

12          THE COURT:  All right, Mr. Kwak, thank you.

13          Anybody else for whom English is a problem?  Yes,

14   sir, your name, please.

15          JUROR SHIVAPURKAR:  Narayan Shivapurkar.  I have a

16   case --

17          THE COURT:  Wait, just one second, I have got to get

18   your name on my list here first.  How do you spell the last

19   name?

20          JUROR SHIVAPURKAR:  Shivapurkam.  S-h-i-v-a --

21          THE COURT:  You're number 73.

22          JUROR SHIVAPURKAR:  Yes.  Medically, I am taking some

23   medication, so I have temporary some hearing problems.

24   Hopefully it will be taken care of, but in the nearest future I

25   might have some problems, especially with your speaking from

94

```
 1    there.  I have some -- I have no problem with talking to him or

 2    something.

 3              THE COURT:  Well, we do have hearing -- we have

 4    earphones that we can give people who have --

 5              JUROR SHIVAPURKAR:  Yes, something like that would be

 6    needed.

 7              THE COURT:  And again, any juror who cannot

 8    understand something -- jurors are not allowed to ask

 9    questions, but if you couldn't hear, or if an English word was

10    not understandable, you can raise your hand as a juror and we

11    will correct that.

12              So if we are able to give you the headset, do you

13    feel that you understand English well enough?

14              JUROR SHIVAPURKAR:  Yes, ma'am.

15              THE COURT:  Very good.  Thank you, sir.

16              Anybody else?

17              Now, ladies and gentlemen, I have asked a far range

18    of questions, and you all know the background for this.  That

19    is, that we need to have jurors who can be completely impartial

20    as they evaluate this case and who have the time and the energy

21    to give this case.

22              So do any of you know of any other reason than you've

23    already given to me why you feel you could not sit as

24    completely attentive and fair juror?

25              All right, counsel, approach the bench.
```

95

1          NOTE:  A side-bar discussion is had between the Court

2     and counsel out of the hearing of the jury panel as follows:

3     AT SIDE BAR

4          THE COURT:  All right.  I am planning to, if our

5     numbers are right, we are going to be two short.  Which means

6     I'm taking the strikes from the Government.  I want to get this

7     case started.

8          First of all, are there any additional voir dire

9     questions the Government wants the Court to ask?

10          MR. GIBBS:  No.  We're good, Judge.

11          THE COURT:  You're satisfied.  All right.

12          Any additional voir dire that the defense wants the

13     Court do ask?

14          MS. MORENO:  We are satisfied.

15          THE COURT:  You're satisfied.  Here are the jurors I

16     am going to strike.  All right.  Number 2, Mr. Asiama.  Number

17     9, Kira Brooks.  Number 12, Choi.  17, Davis.  29, Ghose.  33,

18     Grewal.  42, Kasun, that was firearms and anti-Semitism.  44,

19     Kwak, that is English.  47, Layton.  50, Mattos.  51, McCrave.

20     59, Obuchowski-Berman, anti-Semitism was an issue there.  60,

21     Oliver, that was the white supremacy.  63 Phillips.  84,

22     Tucker, that was firearms and Nazi.

23          Are there any other jurors -- first of all, does the

24     Government have any objection to the jurors that I have struck?

25          MR. GIBBS:  No, Judge.

96

1          THE COURT:  Are there any additional jurors the

2    Government wants the Court to consider for cause?

3          MR. GIBBS:  No, we're good, Judge.  Thank you.

4          THE COURT:  Are there any -- first of all, is there

5    any objection to the jurors whom I have just struck?

6          MS. MORENO:  No, Your Honor.

7          THE COURT:  All right.  Are there any additionals you

8    would like stricken?

9          MS. MORENO:  Yes, Your Honor.  We would ask juror

10   number 11, Caylor, Nubia Janeth, to be struck on the basis of

11   language.  We believe that she does not -- she is not going to

12   be able to get through this case fairly.

13          And if the Court is conflicted about that, I would

14   ask the Court to ask her more deeply about that because she

15   volunteered that she had a problem.  When she spoke, it seemed

16   like she did.  This certainly was her second language.

17          So we would ask the Court to strike juror number 11,

18   I believe it is, for language issues.  That's the first one.

19          THE COURT:  Well, that's interesting.  She works --

20   her employer is Virginia Heart.  Let me find out what kind of

21   work she does do.  Hold on, you all just all step aside for a

22   second.

23          NOTE:  The side-bar discussion is concluded;

24   whereupon the case continues before the jury panel as follows:

25   BEFORE THE JURY PANEL

97

1           THE COURT:  Ms. Caylor, what kind of work do you do?

2           JUROR CAYLOR:  I work at INOVA Hospital.

3           THE COURT:  You work at a hospital?

4           JUROR CAYLOR:  INOVA.  And I do registration.

5           THE COURT:  Registration?

6           JUROR CAYLOR:  Yes.

7           THE COURT:  How long have you been in the United

8   States?

9           JUROR CAYLOR:  Like 19 years.

10          THE COURT:  19 years?

11          JUROR CAYLOR:  I can communicate fine and I write,

12  but I don't know what level for my English can be, like

13  superseded by what you guys require me to do.

14          THE COURT:  It sounds as though you are more confused

15  about what you do as a juror than English.

16          JUROR CAYLOR:  Yeah.

17          THE COURT:  But you say you do registration at one of

18  the Fairfax hospitals?

19          JUROR CAYLOR:  Yes.

20          THE COURT:  Okay.

21          NOTE:  A side-bar discussion is had between the Court

22  and counsel out of the hearing of the jury panel as follows:

23  AT SIDE BAR

24          THE COURT:  I think her biggest problem is that she

25  has a little difficulty expressing herself.  But if she has

98

1  been in the States for 19 years, she works registration at an

2  America hospital, she seemed to understand the question.

3          MS. MORENO:  Well, Your Honor, I would say that a

4  juror has to be able to express themselves very well in the

5  deliberating room.  And we would reassert our objection on the

6  basis of language for cause to that particular juror.

7          THE COURT:  I am going have to sit down and do the

8  math on this to see.  We are so close to having enough jurors,

9  we need to get this case going.  I will think about it.

10         Go ahead.

11         MS. MORENO:  May I ask Your Honor, did the Court

12  strike juror 17?

13         THE COURT:  Yes.

14         MS. MORENO:  Okay, thank you.  I'm so sorry.

15         THE COURT:  That was firearms, among other things.

16         MS. MORENO:  Your Honor, we would assert that juror

17  number 22, Mr. Evancho, should be stricken for cause.  He had

18  dealings with the SCIF.  He thinks he is familiar with Mr.

19  Gervino.  In fact, the quote is, he's sure he has had dealings

20  with Mr. Gervino, who is a witness for the prosecution.  He is

21  a retired federal employee.

22         We would ask the Court to find a cause challenge on

23  juror number 22.

24         THE COURT:  Yeah, I had double question marks about

25  him too.  If I had enough, I would be much more willing to.  We

99

1    have got to check the numbers.

2         MS. MORENO:  If I may, just 30 seconds, Your Honor.

3         Oh, juror number 73, Mr. Shivapurkar.  I do not

4    believe the Court struck juror number 73.  And you talked about

5    his hearing issues.  But I am convinced that language is an

6    issue for this particular juror.  And we don't believe that he

7    can -- that he is fit to serve, understanding the language and

8    expressing himself as a juror must do in deliberations.

9         So we would urge a cause strike on juror number 73.

10        I think that may be -- oh, sorry, there is one more.

11        THE COURT:  Well, believe it or not, he is on the

12   university faculty at Georgetown.  So let me -- if we're

13   talking about the same juror.

14        MS. MORENO:  Shivapurkar.

15        THE COURT:  Shivapurkar, number 73.  He is a

16   university professor.  So English will not be a problem.  I

17   will double-check that.  Let me do that right now.

18        MR. SMITH:  Could we provide him with a headset?

19        THE COURT:  Yes.

20        NOTE:  The side-bar discussion is concluded;

21   whereupon the case continues before the jury panel as follows:

22   BEFORE THE JURY PANEL

23        THE COURT:  Mr. Shivapurkar, where are you, sir?

24   Shivapurkar?

25        Did he go out?

100

1          Give him some headsets.

2          Mr. Shivapurkar, can you hear me now?

3          JUROR SHIVAPURKAR:  Yeah, yeah, no problem.

4          THE COURT:  Do I understand you are a university

5  professor at Georgetown?

6          JUROR SHIVAPURKAR:  I am, yes.

7          THE COURT:  What do you teach?

8          JUROR SHIVAPURKAR:  I am in oncology.

9          THE COURT:  Oncology?

10          JUROR SHIVAPURKAR:  Yes.

11          THE COURT:  So you are in medicine?

12          JUROR SHIVAPURKAR:  Medical school, yes.

13          THE COURT:  Do you have any problem with English at

14  all?

15          JUROR SHIVAPURKAR:  No, no.

16          THE COURT:  It's just the hearing?

17          JUROR SHIVAPURKAR:  Yeah, the hearing, anything you

18  say to me, it can be taken care of, but I am not sure whether

19  it can be taken care of within a week or so.

20          THE COURT:  If we have the earphones that we can give

21  you for the whole trial, will that --

22          JUROR SHIVAPURKAR:  Yes, that's fine.

23          THE COURT:  Thank you.

24          NOTE:  A side-bar discussion is had between the Court

25  and counsel out of the hearing of the jury panel as follows:

101

1  AT SIDE BAR

2          THE COURT:  Okay, he can hear.

3          MS. MORENO:  One last --

4          THE COURT:  Wait, wait, one second.  Go ahead.

5          MS. MORENO:  One last request, Your Honor.  Juror

6  number 62, Brian Peisach.

7          Your Honor, he identified -- he stood up when the

8  Court was inquiring about whether anyone would have any issues

9  or problems with the white supremacist literature and the Nazi

10  paraphernalia.  He immediately identified himself.  And he said

11  that he -- first, he said he would, and then he said he

12  wouldn't.

13          And I don't think the Court should take any chances

14  with a juror like that.  So we would urge a cause strike

15  against juror number 62.

16          MR. GIBBS:  Judge, I don't think that's a basis for

17  cause.  Again, you asked a very clear question.  He talked

18  about it, but the follow up was:  Can you be fair and

19  impartial --

20          THE COURT:  I'm not going to strike every Jewish

21  member of the panel.  He identified himself as Jewish, but he

22  did not indicate there would be a problem.

23          So you certainly have a bunch of peremptories, you

24  have got 11, so I am not taking any peremptories away from you,

25  but I am going to overrule that objection.  So he will still be

102

1    on the board.

2           And it's one attorney per issue.  So, Ms. Moreno,

3    you've got the voir dire.  But the same, when you have got a

4    witness, if you do the direct, you do all the objecting for

5    that witness.

6           MS. MORENO:  I understand.

7           MR. GIBBS:  Thank you, Judge.

8           THE COURT:  So the two I haven't resolved, Caylor I'm

9    satisfied, I am going to overrule your objection on Caylor

10   because 19 years in the United States and she is a registrar at

11   a local hospital.

12          Evancho is the only one, number 22.

13          MS. MORENO:  Your Honor --

14          THE COURT:  The problem we apparently have is that

15   the last juror, the professor, because he didn't let us know

16   that he wasn't able to hear, did not probably hear the whole

17   voir dire.  So I hate to have to do it all over again.

18          Is the Government sufficiently satisfied with the

19   basic pool that we have got that you're not going to squawk

20   about losing one or two peremptories?

21          MR. GIBBS:  We are not going to squawk about that.

22   That's fine if we lose some peremptories.

23          THE COURT:  All right.  Well, I am going to go ahead

24   and -- I am not going to over the whole -- we have been here

25   for two hours.  I am not going to --

103

1          MS. MORENO:  Your Honor, we are going to withdraw our

2   objection to juror number 73.  We will withdraw our

3   peremptory -- I mean, our challenge for cause to juror number

4   73.

5          THE COURT:  Then I will trade you, I will give you

6   Evancho.

7          MS. MORENO:  Thank you, Your Honor.

8          THE COURT:  All right.  So Evancho is out, 22 is out.

9   All right.  Caylor is staying in.  And Mr. Shivapurkar is

10  staying in.  Okay.

11         Are we all clear on that?  Ready?

12         MS. MORENO:  May I ask, Your Honor, just the next

13  protocol in terms of the striking, will we have just a couple

14  of minutes to confer about these names?

15         THE COURT:  You have got to do it quickly, but go

16  ahead.

17         MS. MORENO:  I understand.

18         THE COURT:  One more minute.  Up here though.  I

19  don't want you going back to your tables.

20         In terms -- I thought what the Court was going to do

21  was put 14 in the box now.

22         THE COURT:  Only of the ones that I have not stricken

23  from the -- yes.  The next thing that is going to happen is my

24  courtroom deputy will call 14 names.  They are going up there.

25  But the 14 she calls are going to be from the group that I have

104

1   not stricken for cause.

2           MS. MORENO:  Yes, Your Honor.

3           THE COURT:  You then start using your peremptories.

4           MS. MORENO:  Yes, yes.  But because we don't back

5   strike, we have to wait to see who the 14 are, am I correct in

6   that?

7           THE COURT:  Yes.

8           MS. MORENO:  Okay.  I just wanted to make sure.

9           THE COURT:  But once the 14 are there, you have got

10  14 in the box, the Government gets the board first.  If they

11  don't strike anybody --

12          MS. MORENO:  I understand.

13          THE COURT:  If they strike two, you have got 12 left.

14          MS. MORENO:  I understand.

15          THE COURT:  But anyone who you don't strike on that

16  first round is in.

17          MS. MORENO:  I understand.  No back-striking.

18          THE COURT:  Then we're set to go.

19          MS. MORENO:  I appreciate that.

20          THE COURT:  And I am finding the panel now to be

21  without any problems.  All right.  This panel is acceptable to

22  the Court.  I think we are going to go ahead and choose a jury.

23          NOTE:  The side-bar discussion is concluded;

24  whereupon the case continues before the jury panel as follows:

25  BEFORE THE JURY PANEL

1          THE CLERK:  If I call your name, please come forward

2     and have a seat in the jury box.

3          Juror number 26, Jo Ellen Frost.  Juror number 54,

4     Timothy Meinken.  Juror number 32, Ajitha Gopal Ratnam.  Juror

5     number 48, Michele Lewis.  Juror number 62, Brian Peisach.

6     Juror number 70, Justin Sculietti.  Juror number 72, Michael

7     Shanholtzer.  Juror number 91, Thomas Wukitsch.  Juror number

8     31, Ronald Goldstein.  Juror number 56, Scott Mueller, Sr.

9     Juror number 39, Robert Hull, Jr.  Juror number 85, Neil Tump.

10    Juror number 5, Stephan Batt.  Juror number 3, Lina Barkawi.

11         MS. MORENO:  She is not --

12         THE COURT:  No, she is not here.

13         THE CLERK:  Juror number 45, David Larson.

14         NOTE:  The lawyers exercise their strikes.

15         THE CLERK:  If I call your name, you may leave the

16    courtroom and exit the building.  Juror number 48, Michele

17    Lewis.  Juror number 72, Michael Shanholtzer.  Juror number 62,

18    Brian Peisach.  Juror number 26, Jo Ellen Frost.  Juror number

19    5, Stephan Batt.

20         NOTE:  The above-named jurors are excused and leave

21    the courtroom.

22         THE CLERK:  If I call your name, please come forward

23    and have a seat in the jury box.  Juror number 30, Thomas

24    Goidich.  Juror number 8, Arthur Briggs.  Juror number 94,

25    Christopher Yianilos.  Juror number 90, Garrett Wolf.  Juror

1  number 10, Timothy Carper, IV.

2           NOTE:  The lawyers exercise their strikes.

3           THE CLERK:  If I call your name, you may leave the

4  courtroom and exit the building.  Juror number 10, Timothy

5  Carper.

6           NOTE:  The above-named juror is excused and leaves

7  the courtroom.

8           THE CLERK:  If I call your name, please come forward

9  and have a seat in the jury box.

10           Juror number 1, Woogas Ali.

11           NOTE:  No furthers strikes are taken.

12           THE CLERK:  Ladies and gentlemen, will you please

13  stand and raise your right hand.

14           NOTE:  The jury for the case is sworn.

15           THE COURT:  I want to thank everybody who attended

16  court this afternoon, I know it has been a long time, but we

17  have now selected the 14 people who will be the jury in this

18  case.

19           So the rest of you are free to leave, or you may stay

20  and watch the proceedings.  But thank you for your attendance.

21           NOTE:  Those jurors not selected for jury duty are

22  excused and leave the courtroom.

23           THE COURT:  Now, ladies and gentlemen, I know you

24  want to take a break, and in about five minutes I am going to

25  let you take a break, but I want to give you some preliminary

107

1   instructions.

2          First of all, Mr. Goidich and Mr. -- I'm sorry, I

3   don't have your names correct, Mr. Wukitsch, I am terrible on

4   names, but the two of you who are sitting on the end, we are

5   going to give you notebooks and let you pass them down to each

6   other.  I am sorry, they are on the other end this time.  So

7   Mr. Larson and Mr. Wolf.

8          Many judges don't let jurors take notes, but it is my

9   practice to let jurors take notes if they want to.  And I just

10  want to give you a quick caution about that.

11         If you do decide to take notes, that's only for your

12  own personal memory aid.  You don't have to take notes.  It is

13  very important for jurors to make sure you're always watching

14  witnesses as they testify because facial expressions, how

15  people just walk around the courtroom, all that can tell you

16  something about them.  And so, we don't want you to have your

17  head buried in your lap trying to take notes.

18         The most important thing is to be listening carefully

19  because at the end of the case you will have to rely upon your

20  memory of the evidence when you make your decisions.

21         If note taking helps you keep focussed and helps you,

22  you're welcome to take notes.  But they are your own personal

23  memory aid.  They are not evidence in the case.  They are not

24  to be shown to the other jurors.

25         And you are all co-equal judges.  Each of your

108

1  individual memories and your opinions about the evidence is

2  worthy of consideration and respect by all the other jurors.

3        The fact that some of you may have taken a lot of

4  notes doesn't mean that that juror's memory or opinion is any

5  more worthy of consideration than that of a juror who takes

6  very few or none.

7        So with those understandings in mind, you're welcome

8  to take notes.  Whenever we're on a recess, just leave your

9  notebooks on your chairs, and we will get them back to you.

10  And of course, overnight we would keep them here as well.

11        Now, very quickly, I will give you an overview of

12  what you can expect in terms of the structure of the trial.

13  When you get back from your afternoon break, we're going to

14  have what is called opening statements.  I have given each side

15  approximately 20 minutes for making their opening statements.

16  This is the time when the lawyers will give you a brief

17  overview as to what the lawyers believe the case will look like

18  at the end.

19        If you know jig-saw puzzles, you know that the box

20  cover has the picture of the final puzzle.  You put all the

21  pieces together, and here is what you get.  And you're

22  basically going to get two different covers.  That's usually

23  what happens with opening statements.

24        Now, in a criminal case, the burden is upon the

25  Government, that is the prosecution, to prove its case.  And

109

1   that burden of proof is called proof beyond a reasonable doubt.

2           And because that is a heavy burden, the rules provide

3   that the Government gets to go first at each stage of the

4   proceedings.  That's why the Government, the prosecutors, will

5   make the first opening statement.  Then we turn to the defense.

6           Now, in our legal system, there is absolutely no

7   burden or obligation on a defendant to do anything at trial.

8   The defense doesn't have to make an opening statement, they

9   don't have to call any witnesses, they don't have to ask any

10  questions, because the burden of proof is on the Government.

11          A person who has been charged with criminal activity

12  walks into a courtroom with no evidence against him, a

13  completely clean slate.  That's called a presumption of

14  innocence.  And that presumption is only overcome if the

15  Government can prove guilt beyond a reasonable doubt.

16          But if the defense does want to make an opening

17  statement, then they would make it at that time.

18          After the opening statements are made, then we get

19  into the evidence portion of the trial.

20          Now, in this case there are different categories of

21  evidence.  The parties have stipulated to certain facts.  When

22  the parties stipulate to a fact, that means that they are not

23  going to present any evidence to prove that fact.  They are

24  satisfied that that fact is the case.

25          But you are the jury and the jury has the right to

110

1    disregard a stipulation because you are the fact finders.  But

2    I just want you to understand what a stipulation is.

3         The next type of evidence is the testimony of

4    witnesses.  All of the witnesses in this case will be in the

5    courtroom testifying from that witness box.

6         As I indicated earlier, there are a couple of

7    witnesses who, when they testify, the rest of the people in the

8    courtroom will not be able to see them.  You will be able to.

9         And there will be a couple of witnesses who will be

10   testifying under pseudonyms.  That is, not their true name.

11   And I have already explained that to you during the voir dire.

12        The Government will call its first witness, and that

13   line of questions is called the direct examination.  After the

14   direct examination is done, if the defense has issues they want

15   to raise, they can do what is called cross-examination.  After

16   the cross-examination, the Government is allowed another round

17   of questioning, which we call redirect, but that is limited to

18   the scope of the issues that are raised during cross.

19        And then the defense can ask one last round of

20   questions of that witness if there were things raised in the

21   redirect which the defense wants to clarify or address.

22        Then that witness is done and we call the next

23   witness until every witness has testified in the Government's

24   case.

25        The Government may also introduce evidence.  There

111

1  may be physical evidence such as there may be photographs,

2  there may be tape recordings, that's what we call physical or

3  hard evidence.

4       Then we will turn to see whether the defense plans to

5  put on any evidence.  Again, there is no burden on the defense

6  to put on any evidence whatsoever.

7       If, however, the defense does decide to put on

8  evidence, then when they call their witnesses, it would just be

9  the reverse order.  So the first defense witness would first be

10 questioned by defense counsel, that's called the direct exam.

11 Then the Government could do the cross.  And we would go that

12 way until the defense had put in any of their evidence.

13      In some cases the Government is allowed to make a

14 rebuttal case.  In which case they would then switch again and

15 the Government would call their witnesses first, and that would

16 be how that would work.

17      When all the evidence is in, then you will hear what

18 are called closing arguments.  Again, the Government gets to

19 make the first closing argument, and that's when the lawyers

20 are going to sum up all the issues and the evidence in the case

21 for you.  The defense then has the chance to make their closing

22 argument.  And because that heavy burden is on the Government,

23 the rules provide that the Government may make a rebuttal

24 argument.

25      Then it's my job as the presiding judge to give you

112

1    the specific legal instructions that you will need to apply as

2    you find the facts in the case.

3            Now, during the course of the trial a lawyer may

4    object to a question that is being asked or to a piece of

5    evidence that is coming in.  And it is a lawyer's job to object

6    when he or she believes that something is going on that

7    violates a rule of evidence, some prior ruling of the Court, or

8    some rule of criminal procedure.  And it's my job as the judge

9    to rule on an objection.  If I agree with the objection, I do

10   think that there is a problem, I will say either objection

11   granted or sustained.  And those words mean the same thing.

12           On the other hand, if I don't think the objection has

13   any merit, I will say objection overruled or denied.  And those

14   words mean the same thing.

15           It's very important that jurors not hold it against a

16   lawyer or the lawyer's client the fact that he or she has made

17   an objection.  Nor should you try to read anything into how I

18   rule on an objection.  The fact that I may grant an objection

19   doesn't mean I think that side should win the case.  Or if I

20   should deny an objection, that I feel that side should lose the

21   case.

22           It's the same way as an umpire or a referee in a

23   sporting event calls balls or strikes or fouls or whatever,

24   it's done to keep the enterprise going by the rules and not to

25   help one side or to hurt the other.

113

1          Now, it's extremely important that jurors not begin

2     making up their minds until they have heard all the evidence,

3     all the arguments of counsel, and received the instructions

4     from the Court.

5          So while this case is going on, and it's going to

6     take several days, it's really important to get to know each

7     other, you can talk about the weather, you can talk about the

8     holiday season, whatever you would like to talk about, but do

9     not start talking about what's going on in the courtroom, or a

10    particular witness, or a piece of evidence because that means

11    you're starting to deliberate, and that would be a violation of

12    your duty to sit and listen to everything and not make up your

13    minds until you have got all the information that you need.

14         The other very important principle of our justice

15    system is that cases have to be decided on what you see and

16    hear only in the courtroom.  That's why I spent so much time at

17    the beginning of the trial trying to find out if you had read

18    or heard anything about this in the news.

19         Now, I am not going to sequester you.  I am not

20    locking you up here at the courthouse for the next few days.

21    And you are allowed to watch television and go on the Internet,

22    but you are not allowed to conduct any investigation whatsoever

23    about this case.

24         You are also not allowed to listen to or consume any

25    media coverage about this case.  It's really important.  And

114

1   you must not discuss this case or in any way communicate about

2   it to any of your family members or friends or anyone else.  It

3   is all right to say, I'm in jury duty in federal court and I'm

4   going to be there the next couple of days.  But if they start

5   saying, what case are you hearing, you must say, the judge said

6   I can't talk about it.

7          And that's really important because Americans are

8   fascinated by trials, especially criminal trials.  I guarantee

9   you, if you start talking about the case, you will have

10  questions asked of you or free advice given to you about some

11  of the things you're talking about, and that means your thought

12  process would be tainted.

13         So it's really important -- and I will tell you, we

14  have a great track record here in Northern Virginia of our

15  juries really listening to these instructions.  There have been

16  some horrible stories in other courts where jurors have gone

17  home and gone on the Internet and looked things up and ruined

18  that trial.

19         So it's really important, and you can just blame me

20  if you are getting bothered by family members or business

21  associates or whatever, just say, the judge says I absolutely

22  can't talk about the case.  If you do that, we will have an

23  excellent trial.

24         It's going to be really important that you stay well

25  rested, not get sick.  I think the weather is going to

115

1     cooperate with us over the next few days.

2          And our nickname in this court is the Rocket Docket.

3     We are one of the fastest courts in the country.  I will be

4     very strict with the lawyers about time limits, trying not to

5     waste your time because we know it's very valuable time and

6     it's a difficult time period.  We will get this case to you as

7     quickly as we can.  But, obviously, it is a complex case and we

8     do need to give it the time that it needs.

9          So at this point I am going to let you all go, and I

10    am going to give you 20 minutes to stretch your legs.  I am

11    afraid the cafeteria is closed at this hour.  And I don't know

12    if we have coffee in there yet for you or not.  But just give

13    yourselves a chance to move around a little bit.

14         You are not frozen to the seats you are in.  You are

15    free to move around within the box, but I am going to stay in

16    session to talk to counsel for a couple minutes.  But the jury

17    may leave.

18         NOTE:  At this point the jury leaves the courtroom;

19    whereupon the case continues as follows:

20    JURY OUT

21         THE COURT:  All right.  First of all, any objection

22    to the preliminary charge to the jury?

23         MR. KROMBERG:  No, Your Honor.

24         MS. MORENO:  No, Your Honor.

25         THE COURT:  All right, very good.

116

1          I've given each side 20 minutes for their opening

2    statements.  I understand, via a phone call from Mr. Smith,

3    that there is issues about demonstratives.  I don't expect the

4    Government is going to use any demonstratives during its

5    opening statement.

6          If you are, let's get it cleared up right now.

7          MR. KROMBERG:  I gave the defense this morning the

8    list of the exhibits that they already have that I was going to

9    use.

10         THE COURT:  In your opening statement?

11         MR. KROMBERG:  Yeah.  And they are things that we

12   have already talked about.  There is the pictures of people

13   involved.  There is the pictures of the telephone being found

14   in the truck.  And the picture of the backpack where the

15   receipts are found.  And there is a picture of Young as a Nazi.

16   With six days later there is a picture of him as a Muslim with

17   a rifle.

18         THE COURT:  Wait.  All right.  You're on your feet,

19   Ms. Moreno, go ahead.

20         MS. MORENO:  So, Your Honor, we just got the -- we

21   had requested what demonstratives they wanted to use a couple

22   of days ago, and then today we got the list.  Which are,

23   frankly, most of them objectionable.

24         He wants to use a picture of the smokestack that --

25         MR. SMITH:  That someone texted to the defendant.

117

1          THE COURT:  All right.

2          MS. MORENO:  Nazi stuff.  He wants to use a picture

3   of Hitler.  He wants to use a picture of the Israeli flag.

4   Highly prejudicial.

5          THE COURT:  We're going to make it simple.  I'm going

6   to really be mean on both sides because this case has got to

7   get tried appropriately.

8          No demonstratives in the opening statements for

9   either side.  I know a picture is worth a thousand words.  I

10  will give you the thousand words.  If you need an extra couple

11  minutes or two, Mr. Kromberg or Mr. Gibbs, I'll give it to you.

12         Let's keep this case moving with as few objections as

13  possible.  All right, I've taken care of that issue.

14         MS. MORENO:  Yes, Your Honor.

15         THE COURT:  All right.  We have --

16         MR. KROMBERG:  Your Honor, may I just --

17         THE COURT:  Yeah.

18         MR. KROMBERG:  I understand.  What Ms. Moreno did not

19  mention, the pictures of the people involved, I wanted to

20  just -- some of these names are going to be coming up again and

21  again, and I wanted to have a picture of Saleh Albarmawi, a

22  picture of Amine El-Khalifi, and a picture of Liban Muhammad

23  who are going to be coming up.  And I wanted to put them on the

24  screen so there is some association between unusual names and

25  actual people.

118

1          THE COURT:  Those three pictures of three people is

2   not what defense counsel is worried about.  They are worried

3   about smokestacks and those highly incendiary kinds of issues.

4          Am I correct, Ms. Moreno?  Again, I want there to be

5   some common sense to this.  You need to be --

6          MS. MORENO:  I am getting used to things, I promise.

7          I think we should live with the Court's ruling.  I

8   don't think there should be any more discussion about it.  And

9   I think both sides -- I'm ready to proceed without any

10  demonstratives.

11         THE COURT:  When the witness starts to testify, then

12  the picture would be appropriate, it's within context.  We'll

13  keep it simple.  Just do it with old fashioned words, that's

14  fine.

15         In terms though of this afternoon, now we're going to

16  start up again about 5 o'clock, and we're going to take about

17  40 minutes for the opening statements.

18         The first witness on your list, is that still the

19  witness you plan to start this afternoon?

20         MR. KROMBERG:  It would be Khalil, Your Honor.

21         THE COURT:  And you can do him in 20 minutes?  Or you

22  just want to get it started?

23         MR. KROMBERG:  Well, that is our first witness,

24  that's who we --

25         THE COURT:  All right, that's fine.  So we need the

119

```
1    screen though; is that correct?
2              MR. KROMBERG:  We do.
3              THE COURT:  So we need to get the screen up before we
4    come back in.  All right?  And I assume that was worked out.
5              In any case, if not, you'll have to switch your
6    witness list around.
7              All right, we are recessing court --
8              MS. MORENO:  I am so sorry, Your Honor.
9              THE COURT:  Yes, ma'am.  You have to be at the
10   lectern.  I'm sorry, we can't hear you otherwise.
11             MS. MORENO:  In the 20 minutes that's allotted, does
12   the Court give a five-minute warning?  Because I would ask that
13   of the Court --
14             THE COURT:  I'll be watching.
15             MS. MORENO:  Thank you.
16             THE COURT:  You want a five-minute warning?
17             MS. MORENO:  Please, Your Honor.
18             THE COURT:  All right.
19             MS. MORENO:  Thank you so much.
20             MR. KROMBERG:  Your Honor, could we -- by the way,
21   could we talk about the rule on witnesses?
22             THE COURT:  Yes.  There has to be a rule on
23   witnesses.  Now, that means that anyone who is going to be
24   testifying in the case, other than the case agent, has to be
25   out of the courtroom.  That includes any experts.
```

120

1          And it also means that if it comes out that any

2     spectators or family members have talked to witnesses about

3     what's going on in the courtroom before that witness testifies,

4     that witness may be not able to testify, may be tainted.  All

5     right?

6          So I expect both sides -- and that works for the

7     Government as well.

8          MR. KROMBERG:  Yes, ma'am.

9          THE COURT:  All right.  Anything further before we

10     get started?

11          MS. MORENO:  No, Your Honor.

12          THE COURT:  All right.  Then I think we're probably

13     starting up again around 5 o'clock.  All right, we need to get

14     the screen up.  Recess court.

15          NOTE:  At this point a recess is taken; at the

16     conclusion of which the case continues as follows:

17     JURY OUT

18          THE COURT:  Before we pull the jury in, are there any

19     last minute issues?

20          MR. KROMBERG:  Not from the Government, Judge.

21          THE COURT:  No?  All right, let's bring the jury in.

22          NOTE:  At this point the jury returns to the

23     courtroom; whereupon the case continues as follows:

24     JURY IN

25          THE COURT:  There are a couple extra chairs.  Those

1  of you who have got your coats with you, you probably should

2  have put them in the jury room.  But if you want to just pass

3  them down to be make yourselves more comfortable, you can put

4  them there.

5           And, folks, I recognize -- counsel, have a seat.

6           I recognize the way this courtroom is set up, when

7  the lawyers are standing at the podium, it may block the view

8  for some of you from the witness box.  Move to another

9  position.

10           The only reason I don't have these last four seats

11  filled is I can't see you, and I like to watch my jury.  But

12  it's more important that you can see the witness.

13           So if any of you feel that your vision of the witness

14  is being blocked, please don't be shy about moving down to the

15  far end of the box.  All right.  And I think that way all of

16  you should be able to see.

17           All right, who is going to open for the Government?

18           MR. KROMBERG:  I am, Your Honor.

19           THE COURT:  All right, Mr. Kromberg.

20           MR. KROMBERG:  Good afternoon everybody.  As I was

21  already introduced, I am Gordon Kromberg.  I am an Assistant

22  United States Attorney here in Alexandria.

23           With my colleagues, Assistant United States Attorney

24  John Gibbs, Special Assistant United States Attorney Evan

25  Turgeon, we are representing the United States in this case.

122

1    Evan Turgeon is special, he is a Special Assistant United

2    States Attorney because he's on detail to us from the

3    Department of Justice.

4              Special Agent Nicholas Caslen from the FBI, he's the

5    case agent, he is the lead investigator.

6              Mr. Fabian Vera is a paralegal specialist in our

7    office, and he helps us keep track of the evidence, and he

8    works the technology, and we would be lost without him.

9              Together we're going to show you that between

10   December 2015 and August 2016 that man, Nicholas Young,

11   attempted to support, provide support to ISIS, the Islamic

12   State.

13             ISIS is an acronym, and you will hear it is the

14   Islamic State of Iraq and Syria, sometimes known as ISIL, the

15   Islamic State of Iraq and the Levant.  Sometimes known as, in

16   Arabic I think, Dawla.  We are going to show you that.

17             We are going to show you that he also attempted to

18   obstruct justice in order to prevent the authorities from

19   learning that he had helped someone that he knew go join the

20   Islamic State, leave the United States and go join the Islamic

21   State in Syria.

22             Now, what the judge is going to tell you, I believe,

23   because it's what she always says, what I say is not evidence.

24   What Mr. Gibbs says is not evidence.  What the defense

25   attorneys tell you is not evidence.  The evidence is what the

1   witness will tell you.

2          But I am going to tell you now what I think the

3   witnesses are going to say.  But if there is any conflict

4   between what any of the lawyers say and what any of the

5   witnesses say, it's what the witnesses say that goes.

6          So the first fact to know in this case is that

7   Nicholas Young was a police officer when this happened, sworn

8   to uphold the law.

9          The second fact to know is that this was a sting

10  case.  What a sting case means is when he was engaged in this

11  criminal activity, he thought he was dealing with someone that

12  he didn't know was in fact working for the Government.  The guy

13  who was in fact working for the Government in this case was

14  named Mo.

15         You will meet Mo.  You will hear that Young and Mo

16  met in May, June, the spring of 2014.  They became friendly.

17  You will hear parts of recordings where they talked about Mo's

18  plan to go join ISIS.  Mo was going to leave the United States

19  and go join the jihad in Syria.

20         Hearing that Mo was going to go leave the United

21  States to join the designated terrorist organization known as

22  ISIS, Officer Young didn't arrest him, didn't report him, but

23  said, hey, let me give you some advice on you can you get

24  through airport, get through Customs, get across the border.

25         You will hear how Officer Young said, hey, let's go

124

1   to a FedEx store because we'll set up e-mail accounts at the

2   FedEx store, we won't be using our own computers, we'll go to

3   the FedEx store and use the computers there, and we'll set up

4   new e-mail accounts that you will use only to talk to me and I

5   will use only to talk to you.  And then how could anyone ever

6   know that these accounts exist?

7         And you'll see that they went to the FedEx store and

8   they set up the accounts.  You will hear that Young, Officer

9   Young says, now, after you leave, I'm going to send you a text

10  message.  Don't reply.  Mo says, why not?

11         Officer Young says, because once the FBI figures out

12  that you have gone to join ISIS, they are come investigating,

13  and they are going to come look at everyone you knew to see if

14  anyone helped you, if anyone knew about this.  And they are

15  going to come talk to me, and they're going to look at me.  And

16  if there is this text message that I send to you that says, I

17  think you're going on a two-week vacation, it will be good for

18  me.  So whatever you do, don't respond to it.

19         So you'll hear how Mo left the country, left the

20  United States in October 2014.  And that was the last time

21  Officer Young ever saw Mo.  After that, all communications are

22  in writing.

23         You'll see that a couple weeks after Mo left, Officer

24  Young sent him a message, a text message.  And the text message

25  said:  Hope you had a good vacation.  If you want to have

1    lunch, hit me up.

2           That text was designed to mislead the authorities

3    into thinking that Officer Young didn't know that Mo had gone

4    to join ISIS.  That text was an attempt to obstruct justice.

5           You will see how from November 2014 to December 2015

6    Young and Mo exchanged e-mails.  They exchanged messages about

7    ISIS, about what Mo was doing at ISIS, about fighting,

8    terrorist attacks around the world.

9           Officer Young wrote:  Hey, be on the lookout for some

10   of my buddies from when I was in the jihad in Libya in 2011.

11          And you'll hear that Officer Young went to fight in

12   Libya in 2011 for an organization called the Abu Salim Martyrs

13   Brigade.  And Officer Young told Mo in the e-mail that these

14   guys that I was with, they are like-minded with your guys.

15   Like-minded with ISIS.

16          You'll see the e-mails where Officer Young says, hey,

17   I'm thinking of trying to get my money out of the United

18   States.  Could you ask your commanders if there is a good way

19   to get the money, get my money out of the United States without

20   the American authorities knowing about it.  Mo says, I'll ask,

21   but he never came up with any answers.

22          Now, keep in mind, it's not actually Mo on the other

23   end of the e-mails, it's the FBI.

24          You will hear from Special Agents Sikorski and

25   Siegfried how from October 2014 through August 2016 they

1    corresponded with Young while posing as Mo.

2           You will hear that in December 2015 the FBI comes to

3    talk to Officer Young.  And they say to him, hey, we're looking

4    for information about people in the area that may be supporting

5    ISIS.  Do you know anybody who has gone to join ISIS?  And

6    Officer Young says, I don't really know anything about that.

7           And they ask him, well, what about this guy Mo?  And

8    he says, yeah, I knew him a little.  I think, you know, he

9    might have gone over on vacation or something.  I haven't been

10   in contact with him.

11          Well, do you have an e-mail for him, they said.  He

12   says, nah, I had one, but I lost it, it was Mohammed something

13   or other.

14          The FBI leaves.  And Officer Young then recommences

15   his communication, his e-mail communication with Mo, saying,

16   hey, the FBI was coming to look for you.  And he sends it on

17   the e-mail that they had set up at the FedEx store, which was

18   called v4vendetta@mail.com.

19          So they go back to exchanging messages about ISIS,

20   about fighting, about terrorist attacks.  And then Mo sends

21   Officer Young a message.  He says, I just got this app for a

22   cell phone called a Threema, Threema.  It encrypts your text

23   messages.  If you go buy the Threema app, you can contact me on

24   this Threema account number and our text messages will be

25   encrypted.

1          Young goes and buys the Threema app and corresponds
2   with Mo on the encrypted Threema app.
3          On July 18, 2016, Mo sends -- I mean, really, the
4   FBI, but Mo sends a text message that says, you know, a lot of
5   our brothers, our fighters, our brothers are getting droned.
6   We need to bring more recruits here to help us.  Can you,
7   Young, can you help?  Can you help us by sending us Google gift
8   card codes?
9          It's a little bit complicated.  You'll hear about it.
10  But the point is that when you buy a gift card, on the back of
11  a gift card is a code.  That code is the equivalent of money.
12  And that ISIS wanted to use those Google gift card codes to buy
13  more Threema apps because the recruits that were going to come
14  to join ISIS needed to communicate with someone from ISIS, and
15  they were going to communicate through a Threema app, but ISIS
16  needed a different Threema account for every recruit in order
17  to keep operational security.
18         Young texts back on the encrypted Threema app,
19  inshallah, good willing, you will get it, you will get the
20  Google gift card codes.
21         And on July 28 the Google gift card codes arrive on
22  Mo 's encrypted Threema account.  And they came from a
23  different Threema account than the one that had been -- with
24  whom -- excuse me.  The one with which Mo had been
25  corresponding with Young.

128

1          But the FBI will tell you, you will hear, that Mo's

2     Threema account number was never given to anybody other than

3     Young.  So the only person who would be sending the gift card

4     codes to Mo on that Threema account was Young.

5          Shortly after that, Young is arrested.  And when he

6     is arrested, he has a bag with him.  In the bag are some

7     papers.  The papers have -- one of the scraps has Mo's Threema

8     account number, and Young's Threema account number, and Young's

9     e-mail address, the one that he set up at the FedEx store back

10    in October.

11         In the bag was also a receipt for the purchase of

12    gift cards at Best Buy.  And the FBI went all through Best Buy

13    and they got the video of Officer Young buying the gift cards.

14         Also in the bag was the packaging for a cell phone.

15    And that cell phone was later found -- it's a complicated

16    story, but you will see that it was found in connection with

17    the seizure of Officer Young's truck.  And that cell phone had

18    the Threema messages on it, not the ones sending the gift

19    cards, but just the corresponding with Mo part.  And it was the

20    same serial number on the phone that was on the packaging for

21    the cell phone that was in Young's possession when he was

22    arrested.

23         In short, the proof that Officer Young attempted to

24    support the Islamic State is pretty clear.  But we understand

25    that Officer Young isn't contesting that he did it, but he's

129

1    saying, I was entrapped into doing it.

2         As the judge will explain, for entrapment to exist,

3    there has to be something called inducement and in the absence

4    of something called predisposition.

5         As I expect the judge to explain to you later,

6    inducement for purposes of entrapment requires more than mere

7    solicitation by the Government.  It requires Government

8    overreaching and conduct sufficiently excessive to implant a

9    criminal design in the mind of an otherwise innocent party.  No

10   Government overreaching, can't be any entrapment.

11        You won't see any evidence of Government overreaching

12   here.  Indeed, no one even asked Officer Young to attempt to

13   protect Mo from the reach of the U.S. Government by lying to

14   the FBI or by sending the text message to try to deceive the

15   FBI.  There was no inducement.

16        But as the judge will explain for the entrapment to

17   exist, for the entrapment defense to exist, the defendant could

18   not have been predisposed to commit the crime.  That is to say,

19   there could be no entrapment if the defendant already had the

20   readiness and willingness to commit the crime when he was first

21   approached.

22        I expect the judge will also instruct you that

23   evidence of the defendant's ready response to the text message

24   saying, hey, can you send gift cards, can be used to prove that

25   he was predisposed to break the law.

130

1          I expect the judge will instruct you that

2     predisposition can be found based on behavior after the

3     investigators first contact the defendant.

4          As I said, you won't see any evidence of inducement,

5     but you will see evidence of predisposition.  That is to say,

6     that the defendant had the readiness and the willingness to

7     break the law long before he got caught up in the

8     investigation.

9          For example, you will see as early as 2007 he was

10    collecting speeches by Bin Laden, magazines, online magazines

11    put out by Al Qaeda.  Manuals on jihad.

12         You will see that under the name Dusselkamp he posted

13    support for ISIS online.  You will see that for years before

14    ISIS even existed, Officer Young was attracted to terrorists of

15    a different variety, Nazis.  Okay.  You will hear that he

16    sometimes posed as Stormtrooper Klaus Dusselkamp of the Nazi

17    SS.  You will hear that the SS specialized in terrorism, that's

18    what they did.  They were as vicious a terrorist group as ever

19    existed.

20         You will hear that Officer Young didn't merely play a

21    Nazi SS officer for social engagements or World War II

22    reenactments, he saw himself as that.  He has a big tattoo on

23    his shoulder, which you will see, which is an SS tattoo.  You

24    will see that he was attracted to SS terrorists and Islamic

25    terrorists at the same time.

1          You will see, for example, that he has a photo that
2     he has downloaded to his computer of him in his SS uniform.
3     And then six days later, and this was January 2006 and
4     February -- late January or early February 2006, he downloads a
5     picture of himself in Muslim garb carrying his rifle.
6          You will see that in his house in August 2016 when he
7     was arrested, he had a framed portrait of Adolf Hitler.
8          You'll wonder, how could one person be attracted to
9     both Nazis and Islamic terrorists?  You will hear that it's not
10    uncommon, and that one link that they have in common is that
11    they both hate Jews.
12         Young's friend from college, you will hear from him,
13    he's going to come in and say, well, as they left a neo-Nazi
14    gathering years ago Officer Young said -- well, not Officer
15    Young at the time, Nicholas Young says to him, hey, don't
16    discount the possibility of an alliance with the Muslims to
17    combat the Jews.
18         You will see that Young's hatred of Jews was quite
19    extraordinary.  When he was arrested, there was a graphic on
20    his phone showing some smokestacks and the logo Together We Can
21    Finish What Hitler Started.
22         You will see that in 2009 the doormat to his house
23    was an Israeli flag.
24         The first witness you are going to hear from will be
25    an undercover officer.  He is going to be known as Khalil.  He

132

1    was known to Officer Young as Khalil.  And Khalil will testify

2    that in his undercover capacity he was trying to get to know

3    someone else who had been suspected of radicalizing one of

4    Young's friends.  One of Young's friends by the name of Zachary

5    Chesser had been arrested for a terrorism offense in 2010 in

6    Northern Virginia.  And Khalil tries to get into the same

7    circles to find out if this guy Saleh Albarmawi was the guy who

8    radicalized this young convert by the name of Zachary Chesser.

9            And you will hear that Khalil says, so when I was

10   trying to get close to Albarmawi, I meet Nicholas Young.  And

11   Nicholas Young was close to Albarmawi, so I stayed close to

12   Nicholas Young so that I could get close to Albarmawi.

13           THE COURT:  Mr. Kromberg, you're almost up, your time

14   is up.

15           MR. KROMBERG:  I thought, Judge, you were going to

16   give me a little bit more time since --

17           THE COURT:  I will give you an extra minute or two.

18   Go ahead.

19           MR. KROMBERG:  Thank you, Your Honor.

20           You'll hear Khalil testify that when he was with

21   Young, Albarmawi regularly justified Islamic terrorism.

22           Khalifi -- you will also hear that one of the people

23   in the same circle, Amine El-Khalifi, later was arrested for

24   trying to blow himself up in the U.S. Capitol building.  And

25   that Khalifi at a dinner with Officer Young and Khalil talked

133

1  about how he was going to become a martyr.

2          And how Officer Young said, no one is ever going to

3  know what I'm going to do until after I do it.  But he talked

4  about how he could attack a federal building, how he could

5  attack the FBI building, and how he was going to go Postal some

6  day.

7          He talked about a plan on how he could smuggle

8  weapons into a federal building --

9          MS. MORENO:  Objection.

10         THE COURT:  Sustained.

11         MS. MORENO:  Move to strike.

12         THE COURT:  That's out of the case.  Let's go.

13         MR. KROMBERG:  Khalil is going to talk about how when

14 he and -- after Khalifi got arrested, Officer Young said, the

15 FBI is going to come talk to you, just like they came to talk

16 to me after Chesser was arrested.  You don't have to talk to

17 them.  And whatever you do, don't tell them about certain

18 things.

19         You will hear that Khalil also met another guy in the

20 same circle around Albarmawi and Young by the name of Liban

21 Mohammed.  And how Khalil ended up in a plot with Liban

22 Mohammed to join Al-Shabaab, a terrorist group in Somalia, and

23 that he did not recruit Nicholas Young to that plot because

24 that wasn't his goal.  His goal was Albarmawi and Liban

25 Mohammed.

134

1          You will also hear from Daveed Gartenstein-Ross, he

2     is what we call an expert witness, who will explain to you the

3     context of the various individuals and organizations that were

4     mentioned in the testimony.  He will explain to you parts of

5     the history of the Libyan civil war, the history and background

6     of ISIS, and the Abu Salim Martyrs Brigade.

7          Finally, Special Agent Caslen is going to testify.

8     He will be a summary witness.  He is going to try and tie the

9     various pieces of evidence together in this case.

10         There will be a lot of evidence in this case, and

11    we're going to try and make the best use of your time.  But at

12    the end of the case, the evidence is going to show that

13    Nicholas Young attempted to obstruct justice in November of

14    2014 when he sent that text message that he hoped the FBI would

15    find that would make it look like Nicholas Young didn't know

16    that Mo was going to join ISIS.

17         And it's going to show that he attempted to obstruct

18    justice in December of 2015 when he told the FBI, I don't know

19    how to contact the guy, I don't have an e-mail for him, I

20    thought he was just going on a tour.

21         It is going to show that he attempted to provide

22    material support to the Islamic State by trying to protect an

23    Islamic State fighter from being identified by the United

24    States of America.

25         And it's going to show that he attempted to support

135

1    the Islamic State by sending the Google Play gift card codes to

2    someone he thought was an Islamic State fighter.

3           At the close of the evidence Mr. Gibbs and I will

4    speak directly to you again and summarize the evidence that you

5    will have heard.  At that point I expect we're going to ask for

6    you to return a verdict of guilty.

7           Thank you.

8           THE COURT:  All right.  Ms. Moreno.

9           MS. MORENO:  Ladies and gentlemen, in this case

10   you're going to learn through the evidence that the FBI induced

11   Nick Young, a police officer who had served with distinction,

12   to commit a crime that they created where none would have

13   existed, and tried for six years to create a criminal when they

14   couldn't find one.  And that is the reason we're here today.

15          What is the crime here?  It's not anti-Semitism.  Mr.

16   Young isn't charged with any hate crimes here.  The charge is

17   an attempted material support of a designated foreign terrorist

18   organization.  And you must focus on those charges.

19          It's about a six-year investigation that started in

20   December 2010 with Khalil.  And what they have to show for it

21   are Google Play cards.  And that's why they're talking about

22   Hitler, and I'll address that in a minute.

23          Nothing here in this case is what it seems like on

24   the surface.  And you're going to learn that nobody in this

25   case, least of all Nick Young, was in ISIS.  And that Nick

136

1    Young never spoke to anybody in ISIS.  He never attempted to

2    contact anyone in ISIS.  And he never attempted to travel over

3    there to Syria, there is no evidence of that.

4              In fact, when we're talking about predisposition,

5    which I'll talk address in a minute, he rejected ISIS.

6              And as Mr. Kromberg talked about, there are a number

7    of undercover operatives here.  Khalil met Nick Young in

8    December of 2010, and he recorded and reported on Nick Young

9    until April of 2012, a two-year investigation.  And what

10   happened?  Nothing.

11             Two years later, Mo 1, because there are two Mos, Mo

12   1, the paid informant who was paid about $40,000 for his work,

13   he reported and recorded on Nick Young from May for about five

14   months.

15             And then we had Mo 2, another undercover agent, who

16   reported on Mr. Young for two years, from October 2014 until

17   his arrest in August of 2016.

18             Six years this investigation lasted.  And you're

19   going to learn that all these communications and these e-mails

20   and texts to Nick Young were carefully vetted and composed by

21   the FBI in order to get Nick Young to commit a crime.

22             Remember, what are the charges here?  There are three

23   of them, all non-violent.  None of them deal with Nazis or

24   anti-Semitism.  None of them are hate crimes.

25             The sole count, one, attempted material support of

137

1    ISIS where Nicholas Young sent $245 worth of Google Play gift

2    cards to an undercover agent who he believed was his friend for

3    two years.  This is not about whether the cards were sent.

4    This charge is about whether he materially supported ISIS and

5    whether he was entrapped into doing so.

6            Now, the two obstruction of justice charges, just to

7    summarize, and you'll get instructions from the Court, is

8    whether Mr. Young obstructed an official proceeding by

9    misleading the FBI on the destination and purpose of their own

10   agent that they were handling and managing, and who they knew

11   where he was all the time, and whether there was any official

12   proceeding in this case, which there wasn't.

13           So who is Nick Young?  He was born and raised here in

14   Virginia.  Described as a Libertarian.  He had an interest in

15   politics, and he talked about Mideast politics and geopolitics

16   in general.

17           You will learn that he converted from Catholicism to

18   Islam in late 2006 around the time his father passed away.

19           You will hear that he was described as a re-enactor,

20   one of those guys that gets together with others and pretends

21   to be fighters from the past.

22           And you will hear that he was a weapons collector.

23   All lawful, by the way.  There are no charges here that Nick

24   Young possessed any guns unlawfully or any weapons unlawfully.

25           And you're going to hear through the recordings and

138

1  the statements and the e-mails with the undercover operatives

2  that Nicholas Young wanted to make a life in this country,

3  wanted to retire from the police department here in America,

4  and that he would never have left America because he would miss

5  living here.  That's who he was personally.

6        What about his professional life?  He was a police

7  officer for the Washington D.C. Metro Transit Police, first and

8  foremost, for 13 years.  And he served with distinction.  He

9  was dedicated to protecting the passengers.

10       And by the way, during that 13-year period of time he

11  was never cited, disciplined for any discriminatory or racist

12  conduct to anyone.  Nothing.  He served with distinction.  In

13  fact, he was commended for his performance during that 13-year

14  period of time until he was arrested and his career was ended.

15       Let me talk about these Nazi materials.  You're going

16  to be instructed on what you're allowed to use some of this

17  stuff for.  Even if you want to consider it at all, the judge

18  is going to be specific, and she's going to tell you that you

19  can't use these photos, Hitler, and smokestacks, or the rest of

20  what Mr. Kromberg talked about in his opening statement, just

21  because they're offensive.

22       You'll be instructed also that the possession of this

23  stuff is protected by the Constitution, and that you can't

24  convict Nick Young on the possession of this stuff alone.

25       And the illogical, nonsensical link that the

1    Government wants you to make between white supremacists who are

2    somehow aligned with militant Islamists who are terrorists,

3    will not be borne out by the evidence or by your own common

4    sense.  You will conclude that, of course, Muslims do not

5    believe in white supremacy.

6            And what's not in dispute is that those materials,

7    those white supremacist materials, came to the Government's

8    attention after they arrested Nick Young, not before.  So they

9    brought these charges without knowing about these materials.

10   They arrested him.  And now they want to use these materials to

11   prove the charges.

12           And as I said, there is no evidence that he was ever

13   disciplined for any sort of discrimination or racist conduct on

14   the police force.

15           So how are they going to prove this link?  Well, Mr.

16   Kromberg talked about a Mr. Ross.  And there will only be one

17   witness, which should be no surprise, that will try to persuade

18   you that there is a connection between militant Islamic

19   terrorism and white supremacy.  And in the field of terrorism

20   studies, you're going to learn that Mr. Ross academically is

21   alone in his opinion.  He's the only member of that academic

22   club who believes that.  And that he is not a scholar and he is

23   in this for his own interests.

24           So let's talk about the relevant evidence in this

25   case.  The evidence is going to show you that the FBI

140

1    manufactured the crime.  This was their specific idea.  Their

2    agents, their timing, their methodology of what to do and how

3    to do it, and at their insistence.

4         And because of how the Government acted in this case,

5    Nick Young can assert the complete defense of entrapment to

6    Count 1.  And what is it?  Mr. Kromberg mentioned some of it.

7    Inducement and predisposition.

8         So what does the Government have to prove?  They have

9    to prove beyond a reasonable doubt, first, that Nick Young sent

10   these gift cards knowing that this guy Mo was in ISIS.  And if

11   and only if they show you that, then the entrapment would be a

12   complete defense to that charge.

13        If you so find that the Government induced Mr. Young

14   to sending the cards in the first place, it was their idea, and

15   that they failed to show you beyond a reasonable doubt that he

16   had no predisposition to do this before he was approached by

17   Government agents, which would have been December 2010.

18        So did they induce Nick Young into committing the

19   crime?  You bet.  And how do we know that?  Well, you're going

20   to hear over a six-year period of time all of these agents

21   making up stories, befriending Nick Young.  They prayed with

22   him.  They dined with him.  They shared war stories.  And they

23   talked about women, and their lives, and the past, and the

24   future.  All lies from their end.  And they came to him over

25   and over, elaborately weaving these fake stories.

141

1          And you're going to need to consider all those years,

2     this inducement of subtle pressure, not from someone hostile to

3     Nick Young, but someone he thought he was sharing a true

4     friendship with.  In this case, the fictitious Mos.

5          But it wasn't going fast enough for the agents over

6     this six-year period of time.  It wasn't going fast enough for

7     them.  So during this six-year period of time, which you will

8     learn that Nick Young in recordings and writings rejected ISIS,

9     they were frustrated.  They were frustrated with the slow pace

10    of Nick Young and the apparent unwillingness of him to engage

11    in criminal conduct.  And do you want what they named him?

12    They named him Slow Decline.

13         They ratcheted up the inducements, the narrative, the

14    ploy.  And in some of the last e-mails between Mo and Mr.

15    Young, he talked about how there were stories of bombs killing

16    children and destroying homes.  Stories of dead children.

17         And the Government, the FBI agents, talked about and

18    characterized those e-mails.  And do you know what they said?

19    They said, we hit the case with a defibrillator.  This is June

20    2016, six years after this all began.  We hid the case with a

21    defibrillator.  Why?  Because it wasn't going anywhere.

22         And when they were frustrated because he still wasn't

23    doing what they wanted him to do, they said -- and you will see

24    this.  They said, let's hope he goes one step further, one more

25    step, one giant leap for Slow Decline.  This is July 19, 2016,

142

1    two weeks before he's arrested.

2              So what about his predisposition for criminal

3    conduct?  There is none.  You will learn that Nick Young wasn't

4    predisposed, and that he rejected ISIS and its campaign.

5              And the first place you look is his performance as a

6    police officer, which he served with honor and distinction.

7    And there was no predisposition there, certainly.

8              So where else is the evidence of the lack of

9    predisposition?  Well, you're going to learn that Nick Young

10   was interviewed by the FBI eight times, eight times.  And all

11   eight times he consented, he talked to them without counsel

12   while he was a police officer.

13             This Libya trip that Mr. Kromberg mentioned, I want

14   to talk to you about that.  Mr. Young spoke to the Customs and

15   Border Patrol agents and talked about his trips to Libya.  This

16   is 2011.  And you'll hear that Mr. Young was inspired by the

17   Arab Spring.  Was outraged that Muammar Gaddafi, at the time an

18   enemy of the United States, was exterminating his people.  And

19   he went over to Libya.  He told CPB that.  He told the FBI.  He

20   told anyone who would listen.  You know why?  Because he was

21   proud of it.  And he didn't hide it.

22             And guess what happened to him when he came back.

23   And he declared the body armor, you will hear about this, from

24   his trips in Libya.  And do you know what happened to him?

25   Nothing, 2011, because he didn't do anything wrong.  Because

143

1   his conduct was not unlawful.  And because there is no evidence

2   that he joined any terrorist organization in 2011.  He told the

3   FBI that he thought it was his personal duty to report

4   terrorist attacks.

5          Now, you're going to hear about the back and forth

6   and the communications and the messages between Khalil, Mo No.

7   1, and Mo No. 2 with Nick Young.  And it's important for you to

8   pay attention to these because you're going to learn that Mr.

9   Young had extended conversations in September of 2014 before Mo

10  allegedly traveled to Syria.  And he told Mo, he told him, he

11  said, any American who attempts to join ISIS doesn't have any

12  wisdom.  He told Mo that he was against ISIS.  And he described

13  the head of ISIS in a mug shot, Mr. Baghdadi.  And he said,

14  that organization sounds like a bunch of criminals hungry for

15  power and money.

16         And why is this important?  He is talking to his

17  friend Mo in an unguarded way.  He thinks he is his friend, so

18  he is being honest about his opinions and what he thinks.  And

19  he told Mo that if he learned that someone was going to blow up

20  the subway, his help would be needed to stop them.  That's what

21  he said.

22         And then when Mo was making this fake noise about

23  going over there to join ISIS, Mr. Young said, you know, either

24  way, you're not at the end of a plank.  You have breathing

25  room.  It's a lot of responsibility there.  No one is holding a

1    gun to your head.  Because he was trying to dissuade Mo from

2    doing that, from going over there.

3            He told Mo that it was illegal to join a foreign

4    terrorist organization or to take up arms against the United

5    States.  And that makes sense, right, because when he came back

6    from Libya, what did -- which was lawful, Mr. Young told

7    everybody about that.

8            Now, what else did Nick Young say about ISIS?  And

9    this will be very important.  In November of 2015 -- Mr.

10   Kromberg has talked about accounts and e-mails back and forth.

11   But in November of 2015 -- and this is supposedly after Mo

12   travels to Syria.  This is very important.  Behind the

13   anonymous protections of the Internet, in a LiveLeak account

14   you will learn that Nick Young was scolding people who were

15   criticizing aspects of America.  And he wrote:  I live in the

16   U.S. because it's my country.  I don't support extremism.  I

17   live here because I was born here, and I feel welcome here.

18   And if you want to say something about this country, get in

19   line for citizenship.

20           And then he said:  I do not support ISIS in terms of

21   I don't wish for them to come out on top.

22           That's what he said in November of 2015.  All of

23   these statements are evidence of his lack of predisposition,

24   which you must consider.

25           And with respect to the obstruction charges, you will

145

1  get instructions from the Court on this, but they don't make

2  any sense.  There was no official proceeding and the Government

3  was not mislead.

4          Nick Young wrote to one of these fake friends:  You

5  can be a good Muslim and a good cop.

6          The Government's failure to provide you with any

7  evidence of integrity, which is what you should insist on,

8  beyond a reasonable doubt, the complete defense of entrapment,

9  will lead you to acquit Nick Young of all the charges.

10         Thank you.

11         THE COURT:  All right.  As I understand it, it is

12  going to take a few minutes to set the courtroom up for the

13  first witness.  And because of the hour, it makes no sense to

14  take that time right now.

15         So you all have been very patient, it was a long voir

16  dire, ladies and gentlemen, I am going to let you get out a few

17  minutes early tonight.  I am normally going to go until 6, but

18  I want to make sure you come back rested.

19         We will start tomorrow morning -- now, I know

20  Northern Virginia traffic is horrendous, and I don't know where

21  you all live, but is there anybody who feels you cannot get

22  here by 9 o'clock tomorrow morning?  Because we can't start

23  until you are all here.

24         So please make every effort you possibly can to be

25  here.  There shouldn't be any weather problems this week.

146

1          When you go home tonight, please remember my

2   cautions.  Do not -- and there has been some media coverage

3   about this case, I think it has been covered a bit today as

4   well.  Do not consume any information about this case.

5          Get a good night's sleep.  Get maybe some exercise.

6   Get your minds off the case, don't even think about it.  Go

7   home and just come back here rested tomorrow morning.

8          We will go as close to 6 o'clock tomorrow as

9   possible.  I want to get this case really moving so that we

10  don't push this any further toward the holiday season than we

11  have to.

12         So leave your notebooks here, and we'll see you

13  promptly at 9 o'clock tomorrow morning.  Thank you.

14         We'll stay in session.

15         NOTE:  At this point the jury leaves the courtroom;

16  whereupon the case continues as follows:

17  JURY OUT

18         THE COURT:  All right.  So what we'll do then, either

19  tonight or tomorrow morning before 9 o'clock, we'll set the

20  screen up.  All right.

21         MR. KROMBERG:  Yes, Judge.

22         THE COURT:  And then I am going to rely on the

23  support staff to make sure that the only people who will be

24  sitting over here are people who have the appropriate

25  clearances.  All right?

147

1           MR. KROMBERG:  Yes, Judge.

2           THE COURT:  All right.  The first witness, Mr.

3    Kromberg, how long do you anticipate the direct taking?

4           MR. KROMBERG:  It could easily take 45 minutes,

5    Judge.  I expect that the cross will be longer, but he's a

6    substantial witness, he is going to talk about a lot of things.

7           THE COURT:  I understand.  All right.  I just wanted

8    to get an idea about that.  All right.

9           Now, what is this issue about trying to put documents

10   on the electronic system with a -- I'm concerned about that.

11   And I will tell you why I'm concerned.

12           Look where the Government's screen is.  The

13   Government's screen is right here on the counsel table.  And I

14   think jurors would be able to see that.

15           MR. SMITH:  This screen, Your Honor?

16           THE COURT:  Yes, it worries me.

17           MR. SMITH:  Could we tilt it?  It might just be a --

18   the reason we proposed this idea of using the Elmo is twofold.

19   We think we can save over the course of the trial several hours

20   because if we're using documents for impeachment that are not

21   formally in evidence, we will have to be constantly handing up

22   documents.

23           And the reason we can't use a binder with tabs for

24   the witnesses is we don't know what shape that the direct

25   examination will take.  So we can't predict in advance which

148

1    particular documents we may need for cross-examination.

2           So if we use the screens, which I understand from

3    Lance Bachman we can do, we will save a lot of time in terms of

4    handing up impeachment documents.

5           But also, the witness can communicate with the lawyer

6    by using a kind of touch device to indicate particular places

7    on the document with his hand which only the lawyer, the

8    witness, the Government attorneys, and the Court will see.

9           THE COURT:  Well, I don't know how that is going to

10   make any sense to the jury.  Give me an example of what you're

11   going to do.  Put it on the system.

12          MR. SMITH:  Okay.  Your Honor, right now, obviously,

13   the whole court can see it, as well as the jurors.  But there

14   is a switch, I understand, that allows --

15          THE COURT:  I just hit it.

16          MR. SMITH:  Yes, you just hit it.

17          THE COURT:  Can you see, are the jurors able to see?

18          MS. MORENO:  No.

19          MR. SMITH:  And then, Your Honor, there is one more

20   thing you can do with it.  It will save a lot of time because

21   when the witness --

22          THE COURT:  You need to be at the lectern.

23          MR. SMITH:  Oh, sorry.  So when the witness is

24   sitting in the box, the witness can actually touch parts of the

25   document and indicate where the witness is referencing on the

1  document.  And that saves a lot of time itself because if the

2  attorneys have to stay at the lectern when they are speaking, I

3  can't exactly understand which part of a document the witness

4  is referring to.

5         And so, there is going to be a lot of waste and

6  inefficient time in complex documents with heavy redactions

7  about where -- and there is obviously unredacted, unclassified

8  portions.  So we're going to need to reference particular parts

9  of pages that are not obvious.

10        So I think we would save a tremendous amount of time

11 at trial by using the ELMO and switching it off only for

12 documents that are not in evidence, only for impeachment

13 documents.

14        THE COURT:  Well, we will see.  We're not going to

15 have a ton of sort of quiet secretive documents.  The jury will

16 grow crazy and it won't be that helpful.  So we will see how it

17 works.

18        MR. SMITH:  Okay.

19        THE COURT:  But you're planning to do that with

20 Khalil?

21        MR. SMITH:  With the witnesses for which we're using

22 impeachment, documents that are not part of the Government's

23 case in chief and that are not introduced, that are not in the

24 Government's exhibit list.

25        So if the document is in the Government's list, there

150

1  is no reason not to show the jury.  If a document is not in the

2  Government's exhibit list and it's not a defense evidence, and

3  we're not introducing it in evidence but only using it to

4  cross, then the jury shouldn't see it.

5            THE COURT:  We will have to see.  I mean, it sounds

6  to me as though that may start getting extraordinarily tedious

7  and not all that valuable.  We will wait and see how it looks

8  when it goes in.

9            But I see the screen that I need to hit is this one.

10            MR. SMITH:  And if the alternative is to do it the

11  analog way, the jury still is not going to understand what

12  document -- because if we hand a document up to the witness,

13  the jury is not going to know what document that is either.

14            THE COURT:  Yeah, but if these are not sworn

15  statements of the witness, how much of that is going to be

16  valuable, I don't know.  If these are recordings, you can use

17  the recordings.

18            MR. SMITH:  There is recordings as well, and we will

19  be using those.  But these -- we're not making any relevance

20  point with Your Honor right now.  We're simply saying, if Your

21  Honor thinks that these documents shouldn't be used, they

22  shouldn't be used.  But this would just speed up the process by

23  being able --

24            THE COURT:  We'll see, we'll see.  When we get to

25  that point, we'll see.

151

1          MR. SMITH:  Okay.

2          THE COURT:  I see the button to be pushed.  But I am

3   not convinced that that is going to be terribly effective.  All

4   right.  Anything further?

5          So we will have the courtroom ready to go with that

6   first witness, because it takes five minutes or so, as I

7   understand it, to set it all up.

8          MR. KROMBERG:  Your Honor, I hate to say it, but I

9   agree with Mr. Smith on how this could be helpful.  For

10  example, let's say I wanted to show a picture to -- a picture

11  of a person -- I want to show a picture of Ali Tamimi to the

12  witness.  So the witness needs to look at that picture.  The

13  defense needs to know what I'm talking about.  You need to know

14  what I'm talking about.  But the jury shouldn't see it until

15  it's introduced into evidence, at which point it can be

16  introduced into evidence.

17          THE COURT:  I understand that.  But I also have books

18  and they have books.  For photographs, that's one thing.  But,

19  I mean, with documents, many times the documents on these

20  screens are not all that --

21          MR. KROMBERG:  Right.  So I will say that for the

22  Government, we're not using much in the way of documents with

23  text on it.  That's more of the defense thing.  We have more

24  pictures that --

25          THE COURT:  And a lot of these pictures I don't

152

1    expect there is going to be an objection.  You know how we are.

2            MR. KROMBERG:  That's what I thought.

3            THE COURT:  I mean, is there any objection to Exhibit

4    14?  No, then it goes right out.

5            MR. KROMBERG:  I thought there was none, except it

6    turns out the opening statement drew objections on the

7    exhibits.  So I don't think we're going to have objections, but

8    we might.

9            THE COURT:  I'm not going to be terribly generous

10   with objections.  All right?  But again, if you walk over the

11   line, we'll do it.  All right.

12           MR. KROMBERG:  I am sorry for keeping you, but this

13   issue that did come up, Khalil is the witness, and I want to

14   make sure I have it straight.  There was an objection during my

15   opening about the smuggling guns in.  I had said, I think at

16   the hearing on Friday, that I understood Your Honor's ruling,

17   we're not allowed to saying anything about smuggling guns into

18   the courthouse, but I was going to say a federal building.

19           And that ties into the fact that there were 60 pieces

20   of body armor, that he could outfit a squad.  Because he said,

21   what Khalil is going to say, he talked about how he could

22   smuggle weapons in to people who had gotten through security on

23   their own and then there could really be some damage done.

24           So I thought, what I was planning to do was using

25   leading questions to Khalil on that issue --

153

1          THE COURT:  No, no, you can't lead.

2          MR. KROMBERG:  Okay.  Well, then --

3          THE COURT:  You will draw an objection.  No, don't

4     lead your witness.

5          MR. KROMBERG:  That's fine, but then I am going to

6     instruct him that he cannot say the word "courthouse," and

7     we're talking about a federal building, not a courthouse.

8          THE COURT:  That's right.  That's what we had talked

9     about.

10         MR. KROMBERG:  Thank you, Your Honor.

11         THE COURT:  All right.  All right, we will recess

12    court.  See you back here at 9 o'clock tomorrow morning.

13    -------------------------------------------------

14

15

16

17

18

19

20          I certify that the foregoing is a true and
         accurate transcription of my stenographic notes.
21

22

             /s/  Norman B. Linnell
23           Norman B. Linnell, RPR, CM, VCE, FCRR

24

25