RECORD NO. 18-4138

_In The_

# United States Court of Appeals

### For The Fourth Circuit

## UNITED STATES OF AMERICA,

_Plaintiff – Appellee,_

**v.**

## NICHOLAS YOUNG,

_Defendant – Appellant._

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA, No. 1:16-cr-265-LMB
HON. LEONIE M. BRINKEMA**

_____

**JOINT APPENDIX
VOLUME II OF V
(Pages 436 – 840)**

_____

Nicholas D. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, Virginia 22314
(703) 822-1086

Gordon D. Kromberg
Assistant U.S. Attorney
OFFICE OF THE U.S. ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 229-3721

_Counsel for Appellant_                    _Counsel for Appellee_

## TABLE OF CONTENTS
## VOLUME I OF V

**Appendix Page**

Docket Entries..................................................................................1

**Criminal Complaint**
    **filed August 2, 2016**............................................................. 31

**Affidavit in Support of Criminal Complaint**
    **filed August 2, 2016**............................................................. 32

**Indictment**
    **filed December 15, 2016**...................................................... 49

**Exhibit to Motion to Suppress**
    **filed February 15, 2017:**

    **Exhibit:**

    1.    **Search and Seizure Warrant**
        **dated August 2, 2016**............................................. 54

**Transcript of Motion Hearing before**
**The Honorable Leonie M. Brinkema**
    **on March 10, 2017** ................................................................ 67

**Order of**
**The Honorable Leonie M. Brinkema**
**Re: Denying Defendant's Motion to Suppress**
**Items Unconstitutionally Seized**
    **filed March 10, 2017** ............................................................ 92

**Government's Motion for Protective Order and to**
**Delete Certain Classified Information from Discovery**
    **filed September 25, 2017** ...................................................... 93

**Redacted Protective Order of**
**The Honorable Leonie M. Brinkema**
    **filed September 26, 2017** ...................................................... 94

Government's Opposition to Defendant's Omnibus Motion in Limine
    filed October 10, 2017 ................................................................97

Transcript of Motion Hearing before
The Honorable Leonie M. Brinkema
    on October 27, 2017 ................................................................ 126

Order of
The Honorable Leonie M. Brinkema
Re: Denying in Part Defendant's Omnibus Motion in Limine
    filed October 27, 2017 ............................................................ 150

Government's Notice of Expert Testimony
    filed November 17, 2017 ..........................................................151

Defendant's Memorandum in Support of Motion to Exclude
Two Expert Witnesses from Trial
    filed November 25, 2017 ........................................................ 154

Curriculum Vitae of Dr. Gartenstein-Ross
    filed November 29, 2017 ........................................................ 175

Defendant's Motion to Strike Witnesses Due to the Government's Failure to
Comply with *Jencks* and Discovery Order
    filed November 30, 2017 ........................................................ 185

Transcript of Motions Hearing before
The Honorable Leonie M. Brinkema
    on December 1, 2017 .............................................................. 189

Order of
The Honorable Leonie M. Brinkema
Re: Denying Defendant's Motion in *Limine* to Exclude
Two Expert Witnesses from Trial
    filed December 1, 2017 .......................................................... 220

Order of
The Honorable Leonie M. Brinkema
Re: Ordering Government to Provide Unredacted Copies of
Material at Issue in Defendant's Second Motion to Strike Witnesses
    filed December 4, 2017 .......................................................... 221

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Court's Ability to Ensure a Fair Trial**
            filed December 4, 2017 ...................................................... 222

**Transcript of Status Conference before**
**The Honorable Leonie M. Brinkema**
            on December 5, 2017 .......................................................... 223

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Denying Defendant's Motion to Strike Each Witness as to**
**Whom the Government has Failed to Comply With the *Jencks* Deadline**
**and Second Motion to Strike Witnesses for Continued Failure to Produce**
**Complete *Jencks* Material**
            filed December 5, 2017 ...................................................... 277

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Overruling Defendant's Oral Objections to *Jencks* Redactions**
            filed December 6, 2017 ...................................................... 278

**Washington Post Article "Man Who Patrolled D.C. Metro**
**Awaits Terrorism Trial"**
            filed December 8, 2017 ...................................................... 279

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Denying in Part Motion for Judicial Notice**
            filed December 11, 2017 ...................................................... 281

**Transcript of Jury Selection and Opening Statements**
**The Honorable Leonie M. Brinkema**
            on December 11, 2017 .......................................................... 283

# TABLE OF CONTENTS
## VOLUME II OF V

**Appendix Page**

**Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
on December 12, 2017** ..................................................................... **436**

### Testimony of "Khalil Sullivan":

**Direct Examination by Mr. Kromberg** .................................................. **450**
**Cross Examination by Ms. Moreno** ....................................................... **510**
**Redirect Examination by Mr. Kromberg** ............................................... **526**

### Testimony of John Gervino:

**Direct Examination by Mr. Turgeon** ..................................................... **529**
**Cross Examination by Ms. Moreno** ....................................................... **535**
**Redirect Examination by Mr. Turgeon** ................................................. **538**

### Testimony of SA John Richard Minichello:

**Direct Examination by Mr. Gibbs** ......................................................... **545**
**Cross Examination by Mr. Smith** ......................................................... **566**
**Redirect Examination by Mr. Gibbs** ..................................................... **624**
**Recross Examination by Mr. Smith** ...................................................... **621**

### Testimony of "Mo":

**Direct Examination by Mr. Gibbs** ......................................................... **629**
**Cross Examination by Mr. Smith** ......................................................... **663**

Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
    on December 13, 2017 ........................................................ 708

**Testimony of "Mo": (Resumed)**

Cross Examination by Mr. Smith ...................................... 713
Redirect Examination by Mr. Gibbs .................................. 731
Recross Examination by Mr. Smith.................................... 736

**Testimony of Agent Cameron Siegfried:**

Direct Examination by Mr. Gibbs ...................................... 740
Cross Examination by Mr. Smith ........................................ 784

**Testimony of "SA Smith":**

Direct Examination by Mr. Gibbs ...................................... 815
Cross Examination by Ms. Moreno...................................... 828

# TABLE OF CONTENTS
## VOLUME III OF V

**Appendix Page**

**Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
     on December 13, 2017, continued:**

### Testimony of SA John Sikorski:

Direct Examination by Mr. Gibbs ....................................................... 841
Cross Examination by Mr. Smith ....................................................... 896
Redirect Examination by Mr. Gibbs .................................................... 908

### Testimony of SA John Minichello: (Recalled)

Direct Examination by Mr. Gibbs ....................................................... 910
Cross Examination by Mr. Smith ....................................................... 924

### Testimony of Paul Lee:

Direct Examination by Mr. Turgeon ..................................................... 930
Cross Examination by Ms. Moreno ....................................................... 965
Redirect Examination by Mr. Turgeon .................................................. 967

### Testimony of Ian Paul Campbell:

Direct Examination by Mr. Kromberg .................................................... 970
Cross Examination by Mr. Smith ....................................................... 983

**Transcript of Jury Trial before**
**The Honorable Leonie M. Brinkema**
   **on December 14, 2017** ..............................................................**1021**

**Testimony of Kenneth James McNulty:**

**Direct Examination by Mr. Kromberg** ..................................**1026**
**Cross Examination by Mr. Smith** ...........................................**1037**
**Redirect Examination by Mr. Kromberg**.................................**1063**
**Recross Examination by Mr. Smith**.........................................**1067**

**Testimony of Brian Michael Menzies:**

**Direct Examination by Mr. Kromberg** ..................................**1069**
**Cross Examination by Ms. Moreno** ........................................**1084**

**Testimony of Joanne Dill:**

**Direct Examination by Mr. Kromberg** ..................................**1093**
**Cross Examination by Mr. Moreno** ........................................**1097**

**Testimony of Dr. Daveed Gartenstein-Ross:**

**Direct Examination by Mr. Kromberg** ..................................**1090**
**Cross Examination by Mr. Smith** .......................................... **1111**

**Testimony of SA Nicholas A. Caslen:**

**Direct Examination by Mr. Kromberg** ..................................**1277**

# TABLE OF CONTENTS
## VOLUME IV OF V

**Appendix Page**

**Transcript of Jury Trial before**
**The Honorable Leonie M. Brinkema**
    **on December 15, 2017** ....................................................................**1334**

    **Testimony of SA Nicholas A. Caslen: (Resumed)**

        **Direct Examination by Mr. Kromberg** ................................**1362**
        **Cross Examination by Mr. Smith** ......................................**1393**
        **Redirect Examination by Mr. Kromberg**...........................**1462**

        **Government's Closing Argument** .......................................**1524**
        **Defendant's Closing Argument** .........................................**1538**
        **Government's Rebuttal** ..................................................... **1565**

        **Court Instructs the Jury**...................................................**1575**

**Transcript of Jury Trial before**
**The Honorable Leonie M. Brinkema**
    **on December 18, 2017** ....................................................................**1619**

    **Jury Asks a Predisposition Question** ....................................**1621**

    **Government's Exhibits:**

    **1-201.  December 17, 2014 Email from Young** ......................**1631**

    **3-110.     Photograph** ..........................................................**1632**

    **4-203.     Photograph** ..........................................................**1633**

    **4-300.     Photograph** ..........................................................**1634**

<u>**Government's Exhibits,**</u> **continued:**

**10-231.**   **Photograph** ...................................................................1635

**10-241.**   **Photograph** ...................................................................1636

**10-252.**   **Photograph** ...................................................................1637

**10-700.**   **Photograph** ...................................................................1638

**10-701.**   **Photograph** ...................................................................1639

**10-706.**   **Photograph** ...................................................................1640

**10-863.**   **Photograph** ...................................................................1641

**10-903.**   **Photograph** ...................................................................1643

**11-401.**   **Photograph** ...................................................................1644

<u>**Defendant's Exhibits:**</u>

**2-8.**   **Photographs** ...................................................................1645

**14-24. Photographs** ...................................................................1652

**Redacted Verdict Form**
   **filed December 18, 2017** ...............................................1663

**Jury Instructions**
>        filed December 18, 2017 ................................................................1664

**Defendant's Sentencing Memorandum,**
**With Exhibits,**
>        filed February 16, 2018 ................................................................1712

>        <u>Exhibits</u>:

>        **A.     Character References**
>                various dates ................................................................1743


>        **B.     Psychological Evaluation**
>                dated December 5, 2016 ....................................................1796

**Letter to**
**The Honorable Leonie M. Brinkma from**
**Nicholas Young**
>        undated ................................................................1805

**Transcript of Sentencing Hearing before**
**The Honorable Leonie M. Brinkema**
>        on February 23, 2018 ................................................................1807

**Judgment in a Criminal Case**
>        filed February 23, 2018 ................................................................1832

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Denying Motions for a New Trial and Judgment of Acquittal**
>        filed February 23, 2018 ................................................................1837

**Defendant's Notice of Appeal**
>        filed February 28, 2018 ................................................................1838

# TABLE OF CONTENTS
## VOLUME V OF V – UNDER SEAL

**Appendix Page**

**Defendant's Second Motion to Strike Witnesses Due to
Refusal to Produce Complete *Jencks* Materials,
With Attachments,**
    **filed December 2, 2017** .........................................................................1840

**Presentence Investigation Report**
    **filed January 25, 2018** ..........................................................................1872

**Statement of Reasons**
    **filed February 23, 2018**.........................................................................1894

154

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .      Criminal No. 1:16cr265
                              .
     vs.                      .      Alexandria, Virginia
                              .      December 12, 2017
NICHOLAS YOUNG,               .      9:00 a.m.
                              .
            Defendant.        .
                              .
. . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME II

APPEARANCES:

FOR THE GOVERNMENT:          JOHN T. GIBBS, AUSA
                             GORDON D. KROMBERG, AUSA
                             EVAN N. TURGEON, SAUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314


FOR THE DEFENDANT:           NICHOLAS D. SMITH, ESQ.
                             David B. Smith, PLLC
                             108 North Alfred Street
                             Alexandria, VA 22314
                              and
                             LINDA MORENO, ESQ.
                             Linda Moreno P.A.
                             511 Avenue of the Americas
                             No. 2
                             New York, NY 10011


ALSO PRESENT:                SA NICHOLAS CASLEN
                             NICHOLAS ENNS
                             FABIAN VERA


(Pages 154 - 425)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

155

1  OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
                                   U.S. District Court, Fifth Floor
2                                  401 Courthouse Square
                                   Alexandria, VA 22314
3                                  (703)299-8595

156

<pre>
1                          I N D E X

2

                        DIRECT   CROSS   REDIRECT   RECROSS
3
   GOVERNMENT'S WITNESSES:
4
   Khalil Sullivan           168     221      244
5
   John Gervino              247     253      256
6
   SA John Richard Minichello  263   284      342       345
7
   Mo                        347     381
8

9

10                         EXHIBITS

11                              MARKED        RECEIVED

12 GOVERNMENT'S:

13 No. 1-101                                   274
       1-102                                   275
14     1-103                                   276
       1-200                                   271
15     6-101-2                                 351

16     6-102-2                                 354
       6-103-2                                 355
17     6-103-3                                 356
       6-103-5                                 357
18     6-103-6                                 358

19     6-104-2                                 361
       6-104-3                                 363
20     6-105-1                                 367
       6-106-4                                 370
21     6-107-1                                 371

22     6-108-1                                 372
       6-108-2                                 375
23     6-109-4                                 376
       6-109-5                                 378
24     6-109-6                                 379

25     6-110-1                                 365
       6-201                                   280
</pre>

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

157

<pre>
1                            EXHIBITS

2                                    MARKED        RECEIVED

3    GOVERNMENT'S:

4    No. 6-202                                     278
         6-203                                     282
5        7-201A                                    377
         7-201C                                    377
6        9-101                                     212

7        9-102                                     171
         9-103                                     181
8        9-104                                     185
         9-105                                     359
9        9-106                                     344

10       9-107                                     344
         9-108                                     172
11       11-202A                        203        203
         11-220                                    215
12       11-500                                    200

13       12-31                                     258
         12-32                                     259
14       12-33                                     262
         12-37                                     260
15       16-101 and 16-102                         259

16       16-103                                    260
         16-105                                    263
17       16-106, 16-401 and 16-402                 260

18

     DEFENDANT'S:
19
     No. 1                                         295
20       12                                        421

21

22

23

24

25
</pre>

158

```
 1                  P R O C E E D I N G S
 2                   (Defendant present, Jury out.)
 3          THE CLERK:  Criminal Case 16-265, United States of
 4   America v. Nicholas Young.  Would counsel please note their
 5   appearances for the record.
 6          MR. KROMBERG:  Good morning, Your Honor.  Gordon
 7   Kromberg, John Gibbs, and Evan Turgeon for the United States.
 8          THE COURT:  Good morning.
 9          MR. SMITH:  Good morning, Your Honor.  Nicholas Smith
10   for defendant Nicholas Young, as well as Linda Moreno and our
11   paralegal, Nicholas Enns.
12          THE COURT:  Good morning.
13          MS. MORENO:  Good morning.
14          THE COURT:  All right, we still are waiting on two
15   jurors.  I'll have my court security officer continue to
16   monitor that situation, but I understood there was a pretrial
17   matter?
18          MR. KROMBERG:  There is, Your Honor.  Based on the
19   opening statement from defense yesterday, where Ms. Moreno said
20   that the government -- the agents were frustrated that the case
21   was going slowly and that she, she was quoting from, I guess, a
22   text message about how the agents were hitting the case with a
23   defibrillator, it seems to me there's two issues there.
24          One, the issues in this case are inducement of
25   predisposition, and inducement is measured by what happened,
```

159

1   not what the agents thought should happen or thought of doing

2   but didn't do.  So if we go into what the agents were thinking

3   about but didn't do or why they did what they did, I think it's

4   irrelevant to the issue of whether the defendant was induced or

5   not.  Whether he was induced or not is measured by what

6   happened, what he saw, not what the agents said among

7   themselves.

8          The second -- related to that, though, is if they

9   want to talk, if the defense wants to get into why the agents

10  were frustrated, then it's only fair that the government gets

11  to answer why the agents were frustrated, and the agents were

12  frustrated, as you've heard, because of the things that were

13  said by the defendant that caused the agents to think that

14  Mr. Young was a very great danger.

15         So I think the best solution here is the defense

16  should -- the Court should rule it irrelevant to what the

17  government agents were thinking and what they were talking

18  about because that's irrelevant to whether he was induced or

19  not.  The inducement is every -- there's only text messages and

20  e-mails.  There's no verbal communications between the agents

21  and the defendant.  It was only text messages and e-mails,

22  which are all going to be in evidence.

23         THE COURT:  All right, who wants to address that?

24         MR. SMITH:  I'll address that, Your Honor.  So as the

25  Court knows, there are two elements to --

160

1          THE COURT:  Wait, wait, wait, wait.

2          All right, go ahead.

3          MR. SMITH:  The Court is familiar with the entrapment

4    standard, which contains two elements.  The first is

5    inducement, as Mr. Kromberg noted, and the second is

6    predisposition.

7          The inducement prong of entrapment is government

8    focused.  It focused on what the solicitation of the

9    defendant's crime consisted of, how was the crime -- how was

10   the crime solicited.

11         The text messages and e-mails that Mr. Kromberg is

12   referring to are actually the, contain the process by which the

13   agents were crafting the solicitation message to the defendant.

14   Now, there was an original -- there was one message, and then

15   it was fixed because that might --

16         THE COURT:  All right, anytime that door is open --

17         MR. SMITH:  Okay.

18         THE COURT:  -- it means the jury possibly could hear

19   what's in the courtroom, so we need to stop talking, all right?

20         MR. SMITH:  So Mr. Kromberg is correct that part of

21   the entrapment standard focuses on the defendant, the

22   defendant's mental state, what was the defendant's mental state

23   before he first encountered government agents in the

24   investigation, but when it comes to inducement, and we

25   understand from the government's opening statement that

161

1    inducement is a strong part of their case, they're going to be

2    pushing the argument that there was no inducement in this case,

3    these messages that Mr. Kromberg are referring to are critical

4    to establish what kind of solicitation there was, how long did

5    the solicitation exist, why were certain solicitation messages

6    used rather than others.

7              If it's the government's position that there was an

8    original solicitation of crime message that went too far, well,

9    why did it go too far?

10             THE COURT:  Well, wait.  The problem is, though, you

11   will be opening the door to permit the government to bring in

12   all of the thought process, all of the concerns that the agents

13   had, which means if they thought that your client had the

14   potential to blow up a federal courthouse or federal buildings,

15   that's going to open the door to that entire line, and I don't

16   really think you want to do that.  You should consult, I think,

17   with Ms. Moreno on this as well.

18             Right now, the government is correct that in terms of

19   inducement, it has to do with what specifically was presented

20   to your client.  All the background chatter, all the planning,

21   why we did this rather than that, is actually irrelevant to

22   that, but if you're going to go into that area, if you really

23   want to go in there, then it's going to open the door.  That's

24   the open door issue.

25             MR. SMITH:  And I will go speak with my cocounsel,

162

1   but I want to make one factual point first.  The messages and

2   the e-mails that Mr. Kromberg is referring to are from 2015 and

3   2016.  The opening door risk that the Court is referring to is

4   from six years before that, so we're only referring to

5   concerns -- the crafting of the solicitation message between

6   2015 and '16, Your Honor, so we're not launching a broadside on

7   the FBI's decision to investigate at any other point of the

8   investigation.  It's --

9           THE COURT:  It will reasonably open the door to the

10  government being able to explain why they were so concerned,

11  why they focused on your client and continued to focus on him

12  and were developing different strategies.

13          As I understand their position, they truly believed

14  up until probably the very end that your client really was a

15  very serious menace, and that would justify their frustration

16  in that they didn't get the smoking guns that they were

17  expecting to get.  They didn't get as much as they thought they

18  would get, but that's an issue you're going to open up.

19          MR. SMITH:  Okay.

20          THE COURT:  So you ought to consult about that.

21          MR. SMITH:  We, we will consult --

22          THE COURT:  All right.

23          MR. SMITH:  -- but I'll just note for the record once

24  that the concerns about -- that Mr. Kromberg referenced in

25  opening and to which we objected were from six years before the

163

1   messages that we're --

2           THE COURT:  I understand that.

3           MR. SMITH:  Okay.

4           MR. KROMBERG:  If I could correct the record, Judge,

5   first, they weren't six years before.  They were sent in 2011,

6   and these text messages --

7           THE COURT:  Just one second.  Any problem with

8   whoever just came in?

9           THE COURT SECURITY OFFICER:  No, ma'am.

10          MR. KROMBERG:  The text messages were 2014, 2015, and

11  2016.  And Special Agent Caslen, as the summary witness, will

12  testify if asked that he didn't sleep at nights because he was

13  concerned that that man was a danger because he had talked

14  about kidnapping an FBI agent and torturing her, and he had a

15  plan to smuggle weapons into this courthouse that the marshal

16  would say might well work.

17          THE COURT:  Well, we're not going to get into that no

18  matter what, or that will be definitely sealed.

19          All right, are we still waiting on a juror?

20          THE COURT SECURITY OFFICER:  One.

21          THE COURT:  All right, we have one juror who's not

22  here.

23          So have you-all decided?

24          MR. SMITH:  The witness hasn't -- the relevant

25  witness hasn't taken the stand yet, so, Your Honor, we have

164

1  heard the Court's message loud and clear, and we understand

2  that that is the risk, that door opening, but because the

3  witness has not testified yet, we can't exactly make a decision

4  about which direction we want to go in with cross-examination

5  yet, but we have received the Court's message and understand

6  that that would be --

7          THE COURT:  All right.

8          MR. SMITH:  Does Your Honor understand what I'm --

9          THE COURT:  Well, yes and no.  I mean, again, the

10  first witness who's testifying, this is irrelevant to that

11  witness.

12          MR. KROMBERG:  No.

13          THE COURT:  It's not?

14          MR. KROMBERG:  This is the witness -- excuse me.

15          This is the witness who would testify to those facts.

16  If, if we're going to get into why the FBI was so afraid of

17  this defendant, it's going to be on the basis of the statements

18  that the defendant made to this witness.

19          THE COURT:  Khalil.

20          MR. KROMBERG:  Correct.

21          THE COURT:  All right.  Then you need to decide now.

22  Now, we're waiting on a juror.  I'm going to recess until the

23  juror gets here.  You-all consult, and then when I come back

24  in, all you have to do is say, you know, we're going there or

25  we're not going there.

165

1          MR. SMITH:  Okay.

2          THE COURT:  That's all you have to tell me.  And

3  that's the cue.

4          MR. SMITH:  That's about five minutes, Your Honor?

5          THE COURT:  I don't know.  We can't do anything until

6  the last juror arrives, so we'll recess court.

7               (Recess from 9:09 a.m., until 9:17 a.m.)

8                         (Defendant present, Jury out.)

9          THE COURT:  All the jurors are here now, Ms. Moreno,

10  so we want to get started.  Yes.

11          MS. MORENO:  Yes, Your Honor.  As Mr. Smith said, we

12  understand the Court's message.  We understand the issue about

13  using the rationale why the agents were frustrated.  That would

14  open the door to why they felt that Mr. Young was a great

15  danger.

16          Understood.  Not going to go there, but I will remind

17  the Court that yesterday in his opening, in Mr. Kromberg's

18  opening, he talked about the federal courthouse or the federal

19  building, and I objected, and the Court sustained that.  So if

20  it's a tradeoff here that we're not going to go into certain

21  areas, we would ask the same of the government in not going

22  into not only the sexual torture comment apparently that

23  Mr. Young made, which the Court already ruled was out, but also

24  the stuff about going into the federal courthouse.

25          And I will also tell the Court that it's not a

166

1  comment that Mr. Young made that he was going to go into the

2  federal courthouse, which I think the Court might be under that

3  impression.  He said someone could do that.  So I don't, I

4  don't think that's proper.

5          THE COURT:  All right.  Well, I've already indicated,

6  I think at this point, let's get this case started.  Get your

7  direct in, and let's see how things go.

8          MR. KROMBERG:  Right.  I'm sorry, but I have to go

9  back to what I said in opening was I did not mention

10 courthouse; I said federal building.  Ms. Moreno objected, you

11 sustained it, but then after the openings, we talked again, and

12 I said that last week, I had said I was going to use court- --

13 I was going to use "federal building" instead of "courthouse,"

14 and as I said, I was going to lead the witness through it to

15 make sure he didn't say "courthouse," and Your Honor said,

16 "Don't lead."

17         THE COURT:  Yeah, but I assume you talked to the

18 witness --

19         MR. KROMBERG:  Yes.

20         THE COURT:  -- ahead of time and said, "Do not

21 mention 'courthouse.'"

22         MR. KROMBERG:  Yes.

23         THE COURT:  All right.

24         MR. KROMBERG:  We're going to talk federal building,

25 and that's all we're going to talk about.

167

1           THE COURT:  All right.  Well, that is appropriate.

2    That's how I parsed that particular issue.

3           MR. KROMBERG:  Thank you.

4           THE COURT:  All right, let's get the jury in.

5                    (Jury present.)

6           THE COURT:  Good morning, ladies and gentlemen.

7    Again, you-all have a seat.  If some of you feel that you can't

8    see the witness, please make sure that you move down to the

9    further seats because it is important to be able to see.  It

10   probably -- once there's attorneys standing at the podium, it

11   may make it more difficult for some of you, all right?  And

12   again, if you feel that you want to, just, you know, move on

13   down.

14          I want to thank you for being here this morning.

15   Again, I know sometimes -- there was some kind of a problem on

16   the beltway.  We can't start until all of you are here,

17   however, so if you can try to make an effort to be here by nine

18   o'clock?

19          But we're ready to go.  We're going to start with the

20   government's first witness.

21          MR. KROMBERG:  Your Honor, the government calls

22   Khalil.

23          THE COURT:  All right, Khalil.

24      KHALIL SULLIVAN, GOVERNMENT'S WITNESS, AFFIRMED

25          THE WITNESS:  Good morning.

Sullivan - Direct                                                    168

                              DIRECT EXAMINATION

1       BY MR. KROMBERG:

2       Q.   Good morning, Khalil.  For purposes of today, you're going

3       to be using the name "Khalil," and what was the last name that

4       you were known by when you knew the defendant?

5       A.   Khalil Sullivan.

6       Q.   Khalil Sullivan.  Spell "Sullivan" for the record, if you

7       would.

8       A.   S-u-l-l-i-v-a-n.

9       Q.   All right.  And between 2010 and 2012, were you acting as

10      an undercover officer for the FBI?

11      A.   Yes, sir.

12              THE COURT:  You need to move closer to the microphone

13      and speak up.

14              THE WITNESS:  Yes, ma'am.

15              Yes, sir.

16      BY MR. KROMBERG:

17      Q.   During your undercover work, what did you say Khalil

18      Sullivan was?  Or let me change that:  Who did you say Khalil

19      Sullivan was when people asked?

20      A.   I portrayed myself as an active duty U.S. Marine that was

21      a new convert to Islam.

22      Q.   And where did you say you were from?

23      A.   I was from Boston, Massachusetts.

24      Q.   And as Khalil Sullivan, did you know the defendant,

Sullivan - Direct                                                      169

1   Nicholas Young?

2   A.   Yes, sir.

3   Q.   Can you please point him out?

4   A.   He's in the middle of the table right there, sir

5   (indicating).

6           MR. KROMBERG:  And, Judge, the record will reflect

7   that the witness correctly identified the defendant?

8           THE COURT:  Wait.  Is there any objection to that?

9           MS. MORENO:  No objection.

10          THE COURT:  All right, the witness has identified the

11  defendant.

12  BY MR. KROMBERG:

13  Q.   So how did you meet Nicholas Young?

14  A.   I first met -- I first met Mr. Young at a party in

15  Alexandria, I believe.

16  Q.   A wedding?

17  A.   Yes, sir.

18  Q.   And was that in December of 2010?

19  A.   Yes, sir.

20  Q.   Now, do you have -- you have a book with you?

21  A.   Yes, sir.

22  Q.   Are those your notes?

23  A.   Yes, sir.  These are the notes as they pertain to

24  Mr. Young.

25  Q.   Okay.  And so you can refer to your notes at any time

Sullivan - Direct                                                        170

1   because we're going to be talking about things that happened

2   five -- four, five, and six years ago.

3   A.   Yes, sir.

4   Q.   Okay.  So at that wedding, December 2010, how did it come

5   about that you met Nicholas Young?

6   A.   I was invited to the party, and he, he happened to be at

7   the party also, and through the course of conversation that

8   night, we struck up a conversation with each other.

9   Q.   In your role as an undercover officer, why were you going

10  to that wedding?

11  A.   I was going there -- I was going to that party, my

12  objective was to meet Saleh Al-Barmawi.

13  Q.   Okay.  Can you please take a look at Government Exhibit

14  9-102, who the court security officer will --

15            THE COURT:  Now, do you have a set for the Court?

16            THE CLERK:  Yes, I have it.

17            THE COURT:  All right.

18            THE WITNESS:  Yes, sir.

19  BY MR. KROMBERG:

20  Q.   Okay.  Do you recognize that photo?

21  A.   Yes, sir.

22  Q.   And who is that?

23  A.   This is Saleh Al-Barmawi.

24            MR. KROMBERG:  Judge, we'd like to move into evidence

25  and publish to the jury the photo of Saleh Al-Barmawi that is

Sullivan - Direct                                              171

1   Government Exhibit 9-102.

2           THE COURT:  Any objection?

3           MS. MORENO:  No objection.

4           THE COURT:  All right, it's in.

5           (Government's Exhibit No. 9-102 was received in

6   evidence.)

7           THE COURT:  I think we should spell that name, too.

8   BY MR. KROMBERG:

9   Q.   Can you spell Al-Barmawi's name?

10  A.   Probably not.

11  Q.   Well, for purposes of the record, it will be Saleh,

12  S-a-l-e-h, last name Al-Barmawi, A-l-B-a-r-m-a-w-i?

13  A.   Sounds good to me.

14  Q.   Okay.  Now, when you're at the wedding and you meet

15  Mr. Young, what were the topics of your conversation with

16  Mr. Young at that wedding?

17  A.   My topics of conversation, we started off, we had similar

18  backgrounds as far as both coming from a Christian background.

19  We talked about my job, his job as a police officer.

20          Later on, we discussed Islam, discussed Islam in

21  America.  Mr. Young felt that there was a -- he talked about,

22  he felt -- he believed that there was a conspiracy against,

23  against Muslims in the United States.

24          Portraying myself as a newer Muslim, he talked about

25  some of the mosques in the area.  He talked about the Adams

Sullivan - Direct                                                    172

1   Center, and -- he talked about the Adams Center in Loudoun

2   County, Virginia.  He cautioned me against going there because

3   of the Sufis that were there.  He didn't really --

4   Q.   Before you go any farther --

5   A.   Sorry.

6   Q.   -- what did you -- can you explain not in detail, we're

7   not asking you to be an expert on Sufis, but just what do you

8   mean when you say Sufis?  Is it a sect of Islam?

9   A.   Yes.  Sufism is a --

10  Q.   A different sect than what Mr. Young was?

11  A.   At that point, I didn't know what sect he was, but the

12  targets of the investigation were not Sufis.

13  Q.   Was there any discussion about Farooque Ahmed?  Was there?

14  A.   Yes, sir.

15  Q.   Okay.  Now, before we talk about that, I'd like you to

16  take a look at Government Exhibit 9-108.

17           THE COURT:  Any objection?

18           MS. MORENO:  No objection.

19           THE COURT:  All right, it's in.

20           (Government's Exhibit No. 9-108 was received in

21  evidence.)

22           MR. KROMBERG:  Can you publish 9-108?

23  Q.   And who is Farooque Ahmed?  Who is that?

24  A.   Farooque Ahmed, he's an individual that was arrested for,

25  I believe, conspiring with al Qaeda for a plot against the

Sullivan - Direct                                                    173

1   Metro system.

2   Q.    Right.   And what was your conversation with Metro Police

3   Officer Young about Farooque Ahmed the first day you met him?

4   A.    When I, when I spoke to him, he mentioned -- he talked

5   about -- he didn't name Farooque by name, but he talked about

6   his case, that individual was recently arrested, and he talked

7   about him having a conversation with another Muslim who was

8   condemning Farooque Ahmed for his actions.

9        Mr. Young's response to that was that we should, we

10  should support the -- we should support the Muslim until he's

11  judged, then even after he's judged, he talked about just

12  providing support for him, you know, for him and his, his

13  family.   That's sort of the -- he didn't get into the details

14  of supporting his actions or anything like that.   He was just

15  talking about more just supporting him and just supporting his

16  family through this.

17  Q.    So did you end up obtaining Mr. Young's phone number that

18  day?

19  A.    Yes, sir.

20  Q.    How did that come about?

21  A.    Saleh directed -- I believe Saleh directed Mr. Young to

22  give me his phone number.

23  Q.    Saleh Al-Barmawi?

24  A.    Saleh Al-Barmawi, yes, sir.

25  Q.    So how -- by the way, do you recall that phone -- what

Sullivan - Direct                                                          174

1   that phone number was?

2   A.   No, I do not.

3   Q.   How did your relationship with Mr. Young develop after

4   that time?

5   A.   It developed -- it just developed into, like, a social,

6   friendly relationship after that.  It just -- we would go to,

7   occasionally go to prayer services together, go out to eat.

8   Later on, we went to some movies together, and just developed

9   into a social, friendly relationship.

10  Q.   What -- who else traveled in the same circles that you

11  would meet together with Mr. Young?

12  A.   Are you talking initially or over the course of the entire

13  case?

14  Q.   Just starting out, starting out.

15  A.   Starting out, it was mostly myself -- it was mostly

16  myself, Saleh Al-Barmawi, and there were other, other

17  individuals at that time, because we would -- there would be

18  sort of circles of people that would go to sort of the same,

19  you know, the same mosques.  We'd attend classes together.  I

20  can't recall all the people initially that were, that were

21  involved.

22  Q.   What could you see of Mr. Young's relationship with Saleh

23  Al-Barmawi, with Saleh Al-Barmawi?

24  A.   My observations and the statements that were made to me,

25  that they had a very close relationship with each other.  The

Sullivan - Direct                                                         175

1    first night that I met, Saleh and Mr. Young were talking about

2    traveling to Jordan together, traveling to hajj together, which

3    is significant in Islam.

4    Q.    That's a trip to Mecca?

5              MS. MORENO:  Objection.

6              THE COURT:  And what's the basis for the objection,

7    Ms. Moreno?

8              MS. MORENO:  Expert testimony, foundation.

9              THE COURT:  Oh, I think a member of that religion can

10   talk about what the hajj is.  Overruled.

11   BY MR. KROMBERG:

12   Q.   What, what did Saleh Al-Barmawi say about jihad while you

13   and Nick Young were together?

14   A.    Saleh talked about jihad as --

15             MS. MORENO:  Objection.  Hearsay.

16             MR. KROMBERG:  Judge --

17             THE COURT:  Is it being offered for the truth of its

18   contents?

19             MR. KROMBERG:  No.  We're putting in the fact that

20   Saleh Al-Barmawi is the person who radicalized, if anyone --

21             MS. MORENO:  Objection.

22             MR. KROMBERG:  -- not him.

23             THE COURT:  I'm going to overrule the objection.  Go

24   ahead.

25   BY MR. KROMBERG:

Sullivan - Direct                                                    176

1   Q.   What did Saleh Al-Barmawi say about jihad in the presence

2   of Nick Young?

3   A.   There were numerous conversations about jihad.  Saleh,

4   Saleh advocated -- he first said that jihad is, you know,

5   martyrdom is the highest level.  He talked about martyrdom,

6   becoming a shaheed, which is martyr in Islam, about getting to

7   the highest level of paradise.  He talked about that jihad is

8   an individual responsibility.

9   Q.   Now, when you say "individual responsibility," as opposed

10  to what?

11  A.   As opposed to it's up to the individual to engage in

12  jihad, not necessarily wait for, like, a leader or somebody to

13  tell you to go do it.

14  Q.   Okay.

15  A.   He also talked about that where jihad is, jihad against

16  the Israelis, jihad -- he used the word that Israel and

17  Americans are his enemy.

18        He also talked about scholars that profess violent

19  jihad against the United States.

20  Q.   Did he talk about sheikhs that did not tell people to

21  fight?

22  A.   Yeah.  He said that there are certain sheikhs that don't

23  tell people to engage in jihad, and he said that those people

24  are wrong.

25  Q.   What did he say about Usama Bin Laden?

Sullivan - Direct                                                    177

1              MS. MORENO:  Objection.

2              THE COURT:  Again, I'm going to overrule that given

3    the nature of the issues in the case.

4              THE WITNESS:  He, he discussed Usama Bin Laden.  He

5    said that he wished that he could have got more fatwas from

6    him.  And a fatwa is just an Islamic ruling from a scholar.  So

7    he mentioned that he would have liked to got more rulings from

8    Usama Bin Laden, and he -- when he talked about Usama Bin

9    Laden, he used the word that he made many beautiful statements.

10             He did not elaborate much on that, but he also said,

11   talking about Usama Bin Laden, he said there were some things

12   that he didn't necessarily agree with Usama Bin Laden said, but

13   he kind of smirked and didn't elaborate on those facts.

14   Q.  So did, did -- who, if any, leaders -- Islamic leaders did

15   Saleh Al-Barmawi say that he himself looked up to?

16   A.  He --

17   Q.  And again, I'm only talking about conversations that when

18   you were with Mr. Young.

19   A.  Yes.  There's one particular sheikh that Saleh Al-Barmawi

20   said that he looked up to was Mohammad Al-Maqdisi, and he said

21   that he's a Jordanian, one of the greatest scholars.  He said

22   that Maqdisi is on America's hit list because he openly

23   professes jihad.

24   Q.  What did Saleh Al-Barmawi say about Anwar Awlaki?

25             MS. MORENO:  Objection.

Sullivan - Direct                                                        178

1              THE COURT:  Overruled.

2              THE WITNESS:  I can't recall what he said about Anwar

3    Awlaki.

4    Q.   How about Ali Al-Timimi?

5              MS. MORENO:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  I don't believe that conversation on

8    Al-Timimi was in the presence of Mr. Young.

9    BY MR. KROMBERG:

10   Q.   Okay.  We'll leave it then.

11             So what did Saleh Al-Barmawi say in the presence of

12   Nicholas Young about American soldiers or people who worked

13   with Coalition Forces?

14   A.   Yeah, because we had a conversation but not in the

15   presence of Mr. Young, but there was one particular --

16             THE COURT:  Wait, wait, wait, I'm sorry.  These are

17   only conversations that you recall were made in the presence of

18   Mr. Young.

19             THE WITNESS:  Yes, ma'am.  I was just clarifying that

20   when he asked about the soldiers, that conversation was not in

21   the presence of Mr. Young, but there was a conversation about a

22   particular woman that worked for, worked for U.S. Forces.

23   BY MR. KROMBERG:

24   Q.   That was in the presence of Mr. Young?

25   A.   Yes.

Sullivan - Direct                                                    179

1   Q.   Yeah.  And what was that conversation?

2   A.   Saleh was saying that he, he expressed disgust for a woman

3   working with Coalition Forces, and he made the statement that

4   her working for Coalition Forces would be reason enough just to

5   shoot her.

6   Q.   What did Saleh Al-Barmawi do about the possibility that

7   the FBI might be investigating him?

8   A.   We would -- he would talk in codes sometimes.  He would

9   lower his voice, but he would also -- if he wanted to talk

10  about certain, certain topics, we would actually leave and go

11  for walks.

12  Q.   When you say "we," would it be we, you, Nicholas Young,

13  and Saleh Al-Barmawi?

14          MS. MORENO:  Objection.  Leading.

15          THE COURT:  That's leading.  Sustained.

16  BY MR. KROMBERG:

17  Q.   Okay.  Did you happen to go on walks around a golf course

18  with Saleh Al-Barmawi?

19  A.   Yes.

20  Q.   Who was with you when you did that?

21  A.   Mr. Young.

22  Q.   Okay.  And what topics were -- what type of topics were

23  discussed when you'd go walking around the golf course?

24  A.   I don't recall what topics were discussed at that time.

25  If I, if I could refer to my notes?

Sullivan - Direct                                                    180

1   Q.   You can refer to your notes at any time here.

2   A.   Okay.  I can't recall what, in the interests of time --

3   Q.   We'll get back to that.

4   A.   Okay.

5   Q.   But the point is feel free to refer to your notes and --

6   so those notes are -- well, tell the jury about how those notes

7   got compiled.  How did they get compiled?

8   A.   These notes -- these are my reporting.  Pretty much the

9   way the process would be is I would go out and I would have a

10  meeting, and then once the undercover meeting was completed, I

11  would come back and type my notes as soon as possible while the

12  event was still fresh in my, in my memory, and then those

13  reports were, were turned over to the FBI.

14  Q.   Okay.  And were those notes in front of you, are they

15  categorized by date?

16  A.   Yes, sir.

17  Q.   Take a look, if you would, at Government Exhibit 9-103.

18  A.   Yes, sir.

19  Q.   Do you recognize that photo?

20  A.   Yes, sir.  This is --

21  Q.   In the future, when you look at the picture, you look at

22  it, don't show the jury the picture.  You're just going to look

23  at the picture until the judge says the jury can see the

24  picture.

25  A.   Okay.  Sorry.

Sullivan - Direct                                                          181

1   Q.   Do you recognize that?

2   A.   Yes, sir, I do.

3   Q.   And who that?

4   A.   It's Amine El-Khalifi.

5           THE COURT:  There's no objection?

6           MS. MORENO:  No.

7           THE COURT:  It's in.

8           (Government's Exhibit No. 9-103 was received in

9   evidence.)

10  BY MR. KROMBERG:

11  Q.   Who is Amine El-Khalifi?

12  A.   Amine El-Khalifi was an individual that I associated with

13  that was later arrested for attempting to commit a suicide

14  bombing at the U.S. Capitol.

15  Q.   So did Mr. Khalifi know Mr. Young?

16  A.   They -- I would say they were not friends, they were not

17  close, but they knew of each other, yes.

18  Q.   Were there occasions when you dined together, the three of

19  you?

20  A.   Yes, sir.

21  Q.   And how did that come about?

22  A.   That came about, we were going to a lecture.  Well, the

23  first time, it was just sort of groups of circles that we would

24  just go out to eat, like, after classes, after prayer services.

25  We would just go out to eat with each other, and that's how

Sullivan - Direct                                                  182

1   sort of like the circles came together.

2   Q.    So what topics did Khalifi tend to talk about when you and

3   he and Mr. Young were together?

4   A.    There was, there was only a couple times that myself,

5   Khalifi, and Mr. Young were all together, but during those

6   times, Khalifi talked about -- he talked about martyrdom.  He

7   talked about the highest level of paradise to become a shaheed

8   is to become a martyr, and he talked about that you would have

9   to die in battle to become a shaheed.  He talked about his

10  Facebook account being shut down because he posted radical

11  mujahideen propaganda.

12         He talked about marksmanship.  He asked me to teach

13  him how to -- he asked me to teach him about marksmanship, and

14  we also had a conversation --

15  Q.    What was Mr. Young's involvement, if any, in the

16  discussion about marksmanship?

17  A.    I don't recall the specifics about it.  We would just --

18  him and I also, I believe, just talked about some basics of

19  marksmanship.

20  Q.    When you say "him and I" both, were you referring to

21  Mr. Young and you or Khalifi and you?

22  A.    Oh, Mr. Young and I.

23  Q.    We're talking about marksmanship with Khalifi?

24  A.    Yes.  But it wasn't, it wasn't like a class or a lesson or

25  anything.  We were just talking about marksmanship.

Sullivan - Direct                                                        183

1   Q.    Okay.  Do you recall a dinner with Mr. Young and Khalifi

2   at Chili's restaurant in April 2011?

3   A.    Yes, sir, I do.

4   Q.    And what, if anything, do you recall that Mr. Khalifi said

5   about martyrdom in Mr. Young's presence?

6   A.    That's when he spoke about martyrdom, basically obtaining

7   the highest level of paradise.

8   Q.    What, if anything, do you recall him saying about life,

9   about this life?

10  A.    About this life is just a test.  He also, Mr. Khalifi

11  believed that God had a test or a task for me that was unknown

12  at this time, and we talked about -- we talked about martyrdom.

13  I believe he was talking about the different, you know, types

14  of martyrdom.

15        And at that time, Mr. Young mentioned that, something

16  to the effect that one of the greatest shaheeds, one of the --

17  I'd have to refer to my notes.

18  Q.    Please do.  That would be your notes from, that would have

19  been April 2011?

20        April 1, 2011.

21  A.    Mr. Young just talked about one of the greatest shaheeds

22  is the man who initially fights the Muslim, becomes a Muslim,

23  and then fights the kufir as a Muslim, which a kufir is a

24  disbeliever.

25  Q.    Was there a time when you said you were distancing

Sullivan - Direct                                                    184

1   yourself from Mr. Khalifi, when you told Mr. Young that you

2   were distancing yourself from Mr. Khalifi?

3   A.   Yes, sir.

4   Q.   And how did that come about?

5   A.   I would have to go -- it was a conversation where -- I

6   don't recall how exactly the conversation of Khalifi came up.

7   I talked about him posting radical, radical material on the

8   Internet, that I was distancing myself from that.  Mr. Young

9   talked about that I should recommend that he goes to, he goes

10  to Syria.

11  Q.   That you should recommend to who, that who goes to Syria?

12  A.   Amine Khalifi.

13  Q.   Mr. Young said that you should tell Khalifi to go to

14  Syria?

15  A.   Yes.

16  Q.   Go to Syria to do what?

17  A.   He didn't, he didn't specify.

18  Q.   Okay.  And this was approximately when?  2011?

19  A.   Yeah, 2011.  And he said it -- we -- I mean, we had a lot

20  of hypothetical conversations, and, I mean, there were times we

21  were joking, there was times we were not joking, and it's --

22  these types of conversations we had, he never had a

23  conversation where he said, like, you know, this is the plan,

24  this is what you have to do, lay it out.  It was just sort of a

25  statement, a statement that he made.

Sullivan - Direct                                                          185

1  Q.   What, if anything, did he say about your firearms?

2  A.   My firearms?  We talked about firearms a lot, just casual

3  conversations, but after Amine was arrested, I recall a

4  conversation where Mr. Young and I both legally possessed

5  firearms, and I made the -- I talked about possibly selling my

6  firearms so that if anybody thought that I was involved with

7  Amine or that I had anything to do with him, that maybe that

8  might lower suspicions.

9          And he mentioned -- when I mentioned that, he

10 mentioned that he necessarily wasn't going to sell his, but he

11 talked about the possibility of stashing his weapons, burying

12 his weapons and having, like, a topographical map to locate

13 them.

14 Q.   Could you take a look at Government Exhibit 9-104?  And

15 tell us if you recognize that person.

16 A.   Yes, sir.

17          MS. MORENO:  No objection.

18          MR. KROMBERG:  All right.

19          (Government's Exhibit No. 9-104 was received in

20 evidence.)

21          MR. KROMBERG:  Please publish 9-104.

22 Q.   And who is that?

23 A.   That is Liban Mohamed.

24 Q.   Who was Liban Mohamed?

25 A.   Liban Mohamed is an individual that over the course of

Sullivan - Direct                                                    186

1   time radicalized and recruited me to go fight for Al-Shabaab.

2   Q.   Well, let's start even before that.  Where was Liban

3   Mohamed living when you met him?

4   A.   In Alexandria, Virginia.

5   Q.   Okay.  And was there any relationship between Liban

6   Mohamed and Nicholas Young?

7   A.   I -- from the first time when we met, it was my

8   understanding that Mr., Mr. Young and Liban were not friends

9   but knew each other because of -- we talked about the circles

10  before -- because of an individual named Zachary Chesser.  So

11  it's my understanding that they physically saw each other

12  before but never really engaged in any kind of conversations.

13  Q.   What was, could you tell, was the relationship between

14  Liban Mohamed and Saleh Al-Barmawi?

15  A.   They knew each other well.  There was a little bit of

16  animosity, animosity there.

17  Q.   And what did that appear to be based on?

18  A.   Well, the conversation that I had, now, this was a

19  conversation that I had with Saleh that was not in the presence

20  of Mr. Young.

21          MS. MORENO:  Objection.

22          THE COURT:  Well, in this -- this is a different kind

23  of question.  This is asking the relationship between --

24          MR. KROMBERG:  -- Al-Barmawi and Liban Mohamed.

25          THE COURT:  So I'm going to overrule the objection.

Sullivan - Direct                                                          187

1          THE WITNESS:  Okay.  Saleh Al-Barmawi and Liban

2   Mohamed both openly professed violent jihad to me, and what

3   Saleh Al-Barmawi was doing, he was upset about is that Liban

4   was too outspoken and sort of reckless, and he didn't give

5   specifics, but he felt that Liban in his -- how blatant he was

6   and how reckless he was, may have contributed to Zachary

7   Chesser being arrested.

8   Q.   Okay.  So now you were saying that you were involved with

9   Liban Mohamed in a plot, correct?

10  A.   Yes, sir.

11  Q.   In your undercover capacity?

12  A.   Yes, sir.

13  Q.   Please tell us about that.

14          MS. MORENO:  Objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  Over the course of my relationship with

17  Mr. Mohamed, he vetted me, provided me with extremist

18  propaganda.  He provided me with extremist reading materials,

19  and slowly over time, he began to educate me, and he

20  radicalized me, to the point where once he felt comfortable

21  with me, he expressed a desire for me to travel to Somalia,

22  where I would, where I would train and fight with Al-Shabaab.

23          During that time, we actually went, we actually made

24  a plan to go overseas.  We started collecting equipment,

25  material, and there were several people that were supposed to

Sullivan - Direct                                                    188

1   go with us over to Somalia.

2   Q.    And these several people, where were they from?

3   A.    Still the Northern Virginia, the Northern Virginia area.

4   Actually, the Northern Virginia area and also Minnesota.

5   Q.    And what time -- what time frame was this happening?

6   A.    My relationship with Liban or, like, the planning phase?

7   Q.    Both.

8   A.    Okay.  My relationship, I don't remember the exact time.

9   I met Liban in 2011, but the actual operational phase when

10  Liban and I were, were putting together a plan -- well, when

11  Liban was and I was just sort of part of that plan, was the

12  spring and summer of 2012.

13  Q.    So what role did Mr. Young have in the plan for the young

14  men from Northern Virginia to go to fight in Somalia?

15  A.    None.

16  Q.    Why didn't you solicit Mr. Young to join that plan?

17  A.    Because that, I mean, twofold.  One, that just wasn't my

18  role.  I wasn't a recruiter.  I wasn't a radicalizer.  That was

19  Liban's role.  That was the first, but the second part, I

20  was -- he wasn't -- Liban felt that he was -- he told me at

21  times that he was suspicious of Mr. Young.

22          But Mr. Young just, he just wasn't naturally involved

23  in the plan like that.  He never, he never expressed a desire

24  to me to, you know, to be involved in that, that type of

25  planning.

Sullivan - Direct                                                    189

1              And also, as an undercover, I'm just an investigative

2      technique.  I do what my case agents tell me to do, and I was

3      told specifically at that point to stay away from Mr. Young and

4      don't try to involve him in anything like that.

5      Q.    So turning back to your activities with Mr. -- your

6      relationship with Mr. Young, what types of things would you

7      talk about just in, in your relationship with him from when you

8      met him in December 2010 to, to when you stopped seeing him in,

9      I think, April 2012?

10     A.    I believe so, yes, sir.

11     Q.    Yes.  So what types of things did you talk about?  What

12     types of things did you do?

13     A.    Well, it would depend, where is Mr. Young and I alone, or

14     was Mr. Young and I with other people?

15     Q.    Well, let's start with other people.

16     A.    Okay.  Other people, if we were with Saleh Al-Barmawi, the

17     conversations would be a lot of time Islamically based, a

18     little more, I would say, sort of conservative.  We didn't talk

19     about a lot of -- there wasn't a lot of joking.  I mean, you

20     know, if there were jokes, it was normally about the Jews, but

21     there wasn't a lot of joking.  There wasn't a lot of

22     conversation outside of -- there was a lot of conversation sort

23     of outside of Islam just because that, you know, Saleh

24     Al-Barmawi, he was the one that was -- I mean, he was my main

25     target, so I would play off whatever conversations that, that

Sullivan - Direct                                                          190

1    he was, that he was engaged in.

2    Q.    You mentioned joking about the Jews.  What do you mean,

3    joking about the Jews?

4              MS. MORENO:  Objection.

5              MR. SMITH:  Objection.

6              THE COURT:  Only one attorney per witness, all right?

7    And it's Ms. Moreno's witness.  All right.

8              I'm going to overrule the objection.

9    BY MR. KROMBERG:

10   Q.    What do you mean -- what do you mean, joking about the

11   Jews?

12   A.    There seemed to be a common thread between Mr. Young,

13   Saleh, and pretty much almost all of the, I won't say all but

14   the people that were targets of the investigation or just

15   involved in it.  It was an overall hatred of Jews, where there

16   would be, it would be jokes.

17             Like, as of one time, I remember Saleh was telling a

18   joke in the presence of Mr. Young where the punch line was that

19   one -- people would be more upset at the death of one

20   non-Jewish bicycle maker than the death of 15 million Jews.

21             There was always conversations about the hatred of

22   Jews, you know, talking about how, wishing that Iran would

23   attack Israel, referring to the Jews as pigs.

24   Q.    So you were talking about what you did when you were with

25   Saleh Al-Barmawi and Young.  What types of things did you do

Sullivan - Direct                                                   191

1   when you were just with Mr. Young, just the two of you?

2   A.   We would just have just normal conversations.  We'd talk

3   about politics, talk about work, I mean, talk about women

4   sometimes.  We would just go to restaurants.  A couple times,

5   we just went to movie theaters and didn't really talk that much

6   about Islam that much at all.

7   Q.   What, if anything, was said about steroids?

8             MS. MORENO:  Objection.

9             THE COURT:  About what?

10            MR. KROMBERG:  Steroids.  Steroids.

11            THE COURT:  I'm going to sustain that objection.

12  BY MR. KROMBERG:

13  Q.   Okay.  What attitude did he exhibit -- attitude Mr. Young

14  exhibit towards the FBI?

15  A.   Overall distrust of the FBI and also some animosity

16  towards the FBI for the way that they handled questioning him

17  after Zachary Chesser was arrested for attempting to provide

18  material support to Al-Shabaab and threatening the South Park

19  rioters.

20  Q.   What did he believe was the status of any investigation of

21  him?

22  A.   He believed that both he and Saleh were currently under

23  investigation by the FBI.

24  Q.   What did he say about having received classified

25  information to that effect?

Sullivan - Direct                                                      192

1    A.    There was a conversation one time where I don't recall how

2    it came to be, but Mr. Young told me that there was a woman

3    that, didn't specify where she worked, but that she, she sort

4    of tipped him off that he was under investigation.   What

5    Mr. Young said is that this woman saw a piece of paper with his

6    name on it, and there were some other details, but relayed that

7    information to him.

8              He said that the woman first asked him:   Are you a

9    member of some, like, organized crime ring, or something to

10   that effect, but that she relayed information to him that she

11   saw a paper that showed that he was under investigation.

12   Q.    What did he say about the FBI listening to his

13   conversations?

14   A.    He believed that, that his phones were wiretapped, which

15   means that the government was actively listening to his calls.

16   Q.    What did he do to thwart the FBI listening to him?

17   A.    I would observe him at times, he would take out his

18   battery, he'd take out his battery, but he told me that he

19   would change up phones.

20   Q.    Well, did the term "burner phone" come up?

21   A.    Yes, sir.

22   Q.    What is a burner phone?

23   A.    A burner phone is just a prepaid phone that's really

24   not -- that you can just -- it's not attached to a person.   You

25   just -- it's not attached to you.   It's just like a throw-away

Sullivan - Direct                                                    193

1    phone, a prepaid phone.

2    Q.   What did he say would happen if the FBI came to his house?

3    A.   He -- there was times that we talked about that, and

4    again, like, there were times where we would, we would be

5    joking, we would be talking serious.  He would just mention

6    that how, that he did have weapons and that he would be within

7    his rights to shoot somebody that was on his property.

8    Q.   What did he say about the use of ballistic vests were for?

9    A.   We talked -- again, he said not that this was his plan,

10   but he talked about that, configuring, like, sort of medieval

11   armor, configuring medieval armor that would not be for an

12   assault but more of like to fortify a position, and that

13   mentioned something about if somebody tried to raid his home,

14   that's what, like, I believe he said that assault rifles and

15   amphetamines are for.

16   Q.   What did he say about looking for surveillance outside his

17   house?

18   A.   He told me that, that there was a time where he believed

19   he spotted surveillance, and he was looking for surveillance

20   with a, I believe he said an AK-47 or some sort of rifle with a

21   light attachment.

22   Q.   What did he say, if anything, about missing a doorknob on

23   his front door?

24   A.   There was a time when his doorknob was missing, and he

25   made a comment, but he was laughing when he made this comment,

Sullivan - Direct                                                      194

1   that he'd be able to stick, like, a shotgun out the doorknob so

2   it was like a, as a gun port.

3              Later on, though, I observed that that doorknob was

4   fixed.

5   Q.    What attitude did Mr. Young exhibit towards informants?

6   A.    He -- when we talked about informants, both Saleh and

7   Liban, we were all having a conversation about informants, and

8   it was the consensus that we should, we should try to uncover

9   who actually the informants are, right.

10  Q.    That would be you, right?

11  A.    That would be me, which is -- that would be correct.

12  Q.    What did he say -- what did Mr. Young say would happen to

13  anyone that he found would betray him?

14  A.    He made statements that, you know, their life expectancy

15  would be quickly diminished, and he also talked about, I

16  believe, I can't recall if he said head or feet being in cinder

17  blocks and thrown into Lake Braddock.

18  Q.    Did Young -- what, if anything, did he say about why he

19  was unlike Amine Al-Khalifi?

20             And could you put Khalifi on?  That's the guy who was

21  arrested for the suicide bomb attack attempt at the Capitol.

22  A.    There was a time when he was mentioning that Amine was

23  very, very outspoken, and I believe that he said something to

24  the effect that if I was going to do something, like, nobody

25  would know about it, kind of like he wouldn't talk about it.  I

Sullivan - Direct                                                      195

1  believe that was sort of the crux of the conversation.

2  Q.   What, if anything, did he say about going postal?

3  A.   He just talked, you know, just through conversations

4  sometimes, he talked about -- we both had conversations where

5  it was just, you know, he said that, you know, if I went

6  postal, that, you know, that he had a large amount of firearms.

7  Q.   What, if anything, did he say about bulletproof vests and

8  going postal?

9  A.   We talked about bulletproof vests.  A lot of times, he

10 mentioned that he had bulletproof vests.  There were times

11 where he asked me about bulletproof vests, what types I had.

12          I believe there was a conversation where he asked me

13 if I had ever known of anybody that was, like, shot with a

14 bulletproof vest, and he -- the conversations were just

15 basically around that, about different levels of bulletproof

16 vests.

17 Q.   What, if anything, did he say about the possibility of

18 attacking an FBI establishment?

19 A.   That, that a couple -- I believe that a couple

20 well-trained people would be able to attack the FBI

21 establishment.

22 Q.   So what, what, if anything, did he say about someone with

23 his skills?

24 A.   What -- do you recall what date that was?

25 Q.   Hang on.  I will get it for you.

Sullivan - Direct                                                        196

1              March 12, 2011, if I can refer you to your notes.

2    A.   2011, you said?

3    Q.   Yeah, March 12.

4    A.   Oh, sorry.  I thought you said 2012.

5    Q.   March 12, 2011.

6    A.   Give me one second, sir.

7              Okay.  And the question was --

8    Q.   What, if anything, did he say about someone with his

9    skills?

10   A.   He didn't, he didn't necessarily specify what his

11   skills --

12   Q.   Would you go to page 4 of your notes, if you would, for

13   that date?

14   A.   Yes, sir.  I'm looking at that.

15             He just mentioned that somebody with his skills could

16   attack an FBI establishment.  He didn't specify what his skills

17   were.

18   Q.   Did he say -- what, if anything, did he say about where

19   the FBI building was, the JTTF?  Joint Terrorism --

20   A.   Yeah, the JTTF.  He said that it's in D.C., but he does

21   not know exactly what floor it is, but he could find out what

22   floor the JTTF is on.  He also stated that if one person

23   attacked the JTTF, it would be suicide, but if more than one

24   person did it jointly, the untrained FBI would be in trouble.

25   Q.   Okay.  Is it correct that he talked about a plan by which

Sullivan - Direct                                              197

1   he could use his police credentials to smuggle weapons past

2   security?

3              MS. MORENO:  Objection.

4              THE COURT:  Sustained.  That's leading.

5   BY MR. KROMBERG:

6   Q.   What, if anything, did he say about using police

7   credentials to smuggle weapons past security in a federal

8   building?

9   A.   Okay.  He mentioned that --

10  Q.   You're not going to talk about what --

11  A.   Yes, I understand.  He mentioned one time that he entered

12  a federal building and he was able to just show his police

13  credentials and that he could have -- that he discovered that

14  he could probably get easily four or five guns into that

15  establishment and that if he chose to do so, he would be able

16  to hand them out to other people.

17  Q.   So how often were you seeing Mr. Young in early 2011?  And

18  you can refer to your notes if it's helpful.

19  A.   Early 2011, I mean, I was seeing him -- I was not seeing

20  him every single day, but again, he was not the, the target in

21  the investigation.  So I would be seeing him but not on a, on a

22  daily basis and not -- nowhere near as frequently as other

23  individuals.

24  Q.   So did there come a time -- or when did there come a time

25  when you stopped seeing him pretty regularly?

Sullivan - Direct                                                    198

1   A.   Yes, sir.

2   Q.   And when was that?

3   A.   When the focus of the investigation shifted from Mr. Saleh

4   Al-Barmawi to Liban Mohamed.

5   Q.   Well, even, even before that, look at your notes for

6   April 4 --

7   A.   Yes, sir, yes.

8   Q.   April 4, 2011.

9   A.   Yes, sir.

10  Q.   Was there a time -- how long was it did it go between when

11  you saw him on April 4 and the next time you saw him?

12  A.   Between, like, April and May, there was a -- it was a -- I

13  didn't see him, I didn't hear from him, and a lot of other

14  people didn't hear from him or see from him.

15  Q.   Did he tell you that he was going somewhere on April 4?

16  A.   No, he did not.

17  Q.   When you next saw him in May, late May, did he tell you

18  where he had been?

19  A.   No, sir.

20  Q.   Okay.  Did you ask him where he had gone?

21  A.   No, I did not.

22  Q.   Why not?

23  A.   Because if he wanted me to know, he would have told me.

24  Q.   Okay.  What, if anything, did he say about having been in

25  combat?

Sullivan - Direct                                            199

1   A.    I talked about my, my combat experience as a Marine over

2   in Iraq previously with him, and we would just have casual

3   conversations about combat, and I remember on one particular

4   occasion, he made a comment that, you know, people, people

5   here, they just don't know what it's like to be in combat.

6          He didn't necessarily say he was in combat, but

7   that's -- he was saying it -- he didn't say that he was in

8   combat, but he said in a manner that somebody who was in

9   combat, just saying, you know, that people around here, you

10  know, people just don't know what it's like.

11  Q.    How did he describe -- talking about his job as a police

12  officer, how did he describe his performance as a cop?

13  A.    We didn't talk about his performance as a police officer

14  that much.  I mean, the couple times we did talk about it, I

15  remember, vaguely remember one conversation where I think he

16  said that he, he hasn't written many tickets in the year, maybe

17  one ticket, but, I mean, I could be wrong on that.

18         But there was another time -- the only other time we

19  really talked about his, his job that -- he said that he felt

20  that his job was out to get him, that there was a conspiracy

21  against him.

22         And then he mentioned one incident one time when I

23  believe it was in the City of Fairfax that he was stopped for a

24  moving violation, and he did not identify himself as a police

25  officer, and he told me that because of the anti-Semitic bumper

Sullivan - Direct                                                          200

1   stickers on his car, like, he didn't really know how the cop

2   would react to that.  I believe he also said that he was

3   supposed to be on duty then anyway, so he didn't want to -- he

4   didn't want his job to find out.

5   Q.   And how would his job find out?

6   A.   Actually, I retract that.  He didn't tell me -- he didn't

7   tell me that he didn't want his job to find out.  He just told

8   me that he was supposed to be on duty at the time.

9             MR. KROMBERG:  Your Honor, at this point, I'd like to

10  read into evidence Stipulation No. 27 between the parties.

11            THE COURT:  All right.

12            MR. KROMBERG:  That the United States and the

13  defendant hereby stipulate and agree that Government Exhibit

14  11-500 is an authentic copy of the traffic ticket received by

15  defendant Nicholas Young on March 28, 2011.

16            And we'd like to move into evidence Government

17  Exhibit 11-500, which is the traffic ticket from March 28,

18  2011.

19            THE COURT:  Any objection?

20            MS. MORENO:  No objection.

21            MR. SMITH:  No.

22            THE COURT:  All right, it's in.

23            MR. KROMBERG:  Thank you, Your Honor.

24            (Government's Exhibit No. 11-500 was received in

25  evidence.)

Sullivan - Direct                                                      201

1        THE COURT:  Are you publishing that or not?

2        MR. KROMBERG:  No.

3        THE COURT:  All right.

4        MR. KROMBERG:  The jury can look at it.  It's just

5   the traffic ticket.  People have seen traffic tickets.

6        If I could have just one moment?

7   Q.  So if I can direct your attention to your notes from

8   April 1, 2011?  I'm referring to the incident about the traffic

9   ticket.

10  A.  Yes, sir.

11  Q.  Did you see in the notes where you talked -- where you

12  wrote down that he was worried that the police officer who

13  pulled him over would call his police department?  In the

14  notes, it's in the part about after the meal at Chili's

15  concluded.

16  A.  Yes, sir.  April 1, you said, sir?

17  Q.  April 1.

18  A.  Okay.

19  Q.  Do you see the part about the meal at Chili's?

20  A.  Yes, sir.

21  Q.  Okay.  And then your reference to the police officer

22  pulled him over?

23  A.  Yes, sir.

24  Q.  Okay.  Was there -- did Mr. Young express a concern --

25  what, if any, concern did Mr. Young express about him -- the

Sullivan - Direct                                                          202

1  police officer calling Metro to find out if he, he was really a

2  police officer?

3  A.   I don't remember the details.  It just said that Mr. Young

4  was worried that --

5           MS. MORENO:  Objection, Your Honor.  Improper.  Is

6  his recollection refreshed?  He's reading from his notes?

7           THE COURT:  Yeah, I mean, again, if the witness

8  cannot remember and has to look at the notes -- do the notes

9  refresh your memory as to what happened?

10          THE WITNESS:  I don't remember talking about that.

11          THE COURT:  All right.

12 BY MR. KROMBERG:

13 Q.   Okay.  Well, then -- so just looking at your notes from

14 that particular page, were these the notes that you wrote at

15 the time that you did remember?

16 A.   Yes, sir.

17          MR. KROMBERG:  Okay.  Well, then in that case, Judge,

18 we're going to move this page in as the past recollection

19 recorded.

20          MS. MORENO:  Objection.  There are a number of items

21 on this page, Your Honor.

22          THE COURT:  That's the problem.  I'll have you redact

23 the page so just this relevant answer can be there.  Why don't

24 you read that answer then in right now for the record so the

25 jury has context.

Sullivan - Direct                                                        203

1            MR. KROMBERG:  Okay.

2            THE COURT:  And what exhibit number are you putting

3    on that then?

4            MR. KROMBERG:  This is 11-202.  Let's make it 11-202A

5    because 11-202 is the notes as a whole.

6            THE COURT:  Well, the notes as a whole will not be

7    going in.

8            MR. KROMBERG:  Right.  So 11-202A.

9            THE COURT:  All right.  You will need to make sure

10   that's done at lunchtime --

11           MR. KROMBERG:  Yes, ma'am.

12           THE COURT:  -- so we can get it in the record, all

13   right?

14           MR. KROMBERG:  Yes, ma'am.

15           THE COURT:  That will be allowed in.

16           (Government's Exhibit No. 11-202A was marked and

17   received in evidence.)

18           MR. KROMBERG:  And if I may read that portion of the

19   notes --

20           THE COURT:  No, let the witness do it.

21           MR. KROMBERG:  Okay.

22           THE WITNESS:  I wrote that SD, that is, Mr. Young,

23   was worried that the police officer who pulled him, SD,

24   Mr. Young, over will call his police department.

25   BY MR. KROMBERG:

Sullivan - Direct                                                      204

1    Q.   Keep going.

2    A.   "SD stated that some officers are required to report to,

3    quote, roll call, where others are supposed to report directly

4    to the Metro station.  SD stated that on the day he was

5    supposed to report directly to a Metro station, SD stated that

6    he was late and had already reported over his radio that he,

7    SD, was on duty at the Metro station.  SD was concerned that if

8    he, SD, told the police officer that he too was an officer,

9    his, SD, police department would find out and make an inquiry

10   as to why SD had reported for duty yet he, SD, was stopped on a

11   traffic stop in his POV, not in uniform, and had lied about his

12   duty status."

13   Q.   That's it.  Now, POV, privately owned vehicle?

14   A.   Yes, sir.

15        MR. KROMBERG:  If I may just a moment?

16        Thank you, Your Honor.

17   Q.   Okay.  Directing your attention to August 27, 2011, did

18   you have occasion to meet Mr. Young at the Islamic Heritage

19   Center?

20   A.   August 27?  Let me get back to that, sir.

21        You said August 27, sir?

22   Q.   Correct.  Well, let me do it this way:  Was there a time

23   that he talked about going on -- that Mr. Young talked about

24   going on leave for an extended period?

25   A.   Yes, sir.

Sullivan - Direct                                                    205

1   Q.   Okay.  And can you tell us what you recall of that and

2   approximately when that occurred?

3   A.   In August time frame.  He, he did not give me many

4   details.  He just had a conversation that, that he was going to

5   be going away again, and I believe that he talked about some

6   sort of a problem he was having with his police department over

7   leave, but he told me he was going to go away again and --

8   Q.   Did he tell you where he was going?

9   A.   No, he did not.

10  Q.   Did you ask him where he was going?

11  A.   No, I did not.

12  Q.   Why not?

13  A.   If he wanted me to know, he would have told me.

14  Q.   So after that time, August 27, 2011, do you know -- do you

15  recall the next time you saw him?  And if you can refer to your

16  notes, refer to your notes.

17  A.   August 2011?

18  Q.   In fact, let me ask you, do you -- can you take a look at

19  Government Exhibit 11-101?  Now, 11-101 is a DVD.  Is the DVD

20  in front of you?

21  A.   Yes, sir.

22  Q.   Okay.  Are there your initials or your Khalil initials on

23  the DVD?

24  A.   Yes, sir.

25  Q.   And you listened to what's on that DVD?

Sullivan - Direct                                                    206

1   A.   Yes, sir.

2   Q.   Can you tell us what's on that DVD?

3   A.   It says recording of my interactions on that day.

4   Q.   On January 26, 2012?

5   A.   Yes, sir.

6   Q.   Okay.  How did it happen that you came to be recording him

7   on this day, January 26, 2012?

8   A.   This is the point in the investigation where I was

9   directed by the case agents to start recording my interactions.

10  Q.   Your interactions with who?

11  A.   With mostly Liban Mohamed.  With anybody at that point.

12  Liban Mohamed.  We were moving into sort of the criminal phase.

13  Q.   The criminal phase with respect to who?

14  A.   Liban Mohamed.

15  Q.   And that would -- tell us again what the criminal case

16  against Liban Mohamed was.

17  A.   This was the point where Mr. Mohamed was actively

18  recruiting me to collect weapons -- I'm sorry, collect

19  equipment to go over and fight and train Al-Shabaab in Somalia.

20  Q.   Okay.  So is Government Exhibit 11-101 an accurate

21  depiction of what happened at that meeting on January 26, 2012,

22  with Mr. Young, Mr. Al-Barmawi, and Liban Mohamed?

23  A.   Yes, sir.

24          MR. KROMBERG:  The government moves into evidence

25  11-101.  We do not plan to play it, Judge, but if the jury

Sullivan - Direct                                                       207

1  wants to listen to it later --

2          THE COURT:  I don't do it that way.  If, if you're

3  putting in an audiotape, it gets played during the trial.

4          MR. KROMBERG:  Okay.  These are long.  These are --

5  they're long, and the point of this is nothing happened, Judge.

6  That's what we're trying to get across.  There's nothing there.

7          MS. MORENO:  Judge --

8          THE COURT:  Wait a minute, wait a minute, wait a

9  minute.  I don't think it's correct to pile a ton of stuff on a

10 jury without it having been adequately discussed, explained,

11 and played for them in open court.

12         MR. KROMBERG:  Okay.

13         THE COURT:  All right?  So if it has no value, then

14 there's no sense putting it in the record.

15         MR. KROMBERG:  Okay.

16         THE COURT:  All right?  So 101 is not in at this

17 point.

18 BY MR. KROMBERG:

19 Q.   Take a look at 11-102.

20 A.   Yes, sir.

21 Q.   Is that a recording that you put your initials on?

22 A.   Yes, sir.

23 Q.   When was that meeting?

24 A.   That was on February 11, 2012.

25 Q.   And was that when you went to see the movie *The Grey*?

Sullivan - Direct                                                    208

1    A.   Let me get to that date, sir.  I believe so, though.

2         February 11, yes, sir, we saw *The Grey*.

3    Q.   Did you listen to what was on there?

4    A.   Yes, sir.

5    Q.   Is it an accurate depiction of what happened on that

6    meeting?

7    A.   Yes, sir.

8         MR. KROMBERG:  We're going to leave it not moved into

9    evidence again, but it exists if the defense wants to use it.

10        THE COURT:  All right.

11   BY MR. KROMBERG:

12   Q.   Take a look at Government Exhibit 11-103.

13   A.   Yes, sir.

14   Q.   What is that?

15   A.   This is also a recording --

16        MS. MORENO:  Excuse me, may we approach?

17        THE COURT:  Yes.

18        (Bench conference on the record.)

19        THE COURT:  All right, what's the point of talking

20   about tapes if they don't have anything in them?

21        MR. KROMBERG:  So my -- when I said there's nothing

22   in them, I meant nothing about entrapment, nothing about

23   inducement.  They're just two people talking about normal

24   things.

25        If the defense is going to say that Khalil

Sullivan - Direct                                                    209

1   radicalized this guy, here we have five tapes of their

2   meetings.  We don't have any other tapes, but these are the

3   five we have, and there's nothing in them about radicalization,

4   about entrapment, but it's the -- we're trying to prove

5   something that did not happen, and here are tapes that show

6   that at least these five meetings, which are the only tapes we

7   have, nothing happened.

8            MS. MORENO:  I'm utterly confused, Your Honor.  It's

9   never been the defense position that Khalil radicalized our

10  client.  What is he talking about?

11           THE COURT:  Well --

12           MS. MORENO:  These tapes, these recordings are

13  several hours long, a number of them.

14           MR. SMITH:  Each.

15           MS. MORENO:  Each.  So what are we doing here?  I'm

16  just lost, Judge.

17           THE COURT:  All right, I think this line of

18  questioning isn't helping in any respect.  It's only going to

19  have the jury scratching their heads, wondering what's going on

20  here.  Let's move on.

21           MR. KROMBERG:  That's fine.

22           THE COURT:  If in the defendant's case they get

23  closer to this kind of issue, it may have to be revisited in

24  the rebuttal situation.

25           MR. KROMBERG:  That's fine.  I'm surprised to hear

Sullivan - Direct                                                    210

1   what Ms. Moreno said, that they're not saying --

2           THE COURT:  I'm really surprised, too, because I

3   recall when I was giving the jury the summary of the

4   defendant's theory of the case, you-all asked me to add Khalil,

5   so there was that sentence in my opening description of the

6   case, but it didn't use the word "radicalized."

7           MS. MORENO:  Radicalized --

8           THE COURT:  All right.

9           MS. MORENO:  -- which is a different theory, Your

10  Honor.

11          THE COURT:  Well, the inducement is somewhat there.

12  All right, at this point, it's not an issue.

13          MS. MORENO:  Okay.

14          MR. KROMBERG:  Thank you.

15          THE COURT:  Thank you.

16          MS. MORENO:  Thank you.

17          (End of bench conference.)

18  BY MR. KROMBERG:

19  Q.   So I'd like to turn your attention now to the next meeting

20  you had with Mr. Young, which was on February 26, 2012?

21  A.   Yes, sir.

22  Q.   And you were wearing a recording on that meeting as well,

23  correct?

24  A.   Yes, sir.

25  Q.   During that meeting, where were you, do you recall?

Sullivan - Direct                                                    211

1    A.   That time, we were at the Bonefish Grill in Greenbriar

2    Shopping Center.

3    Q.   And you went to see a movie as well?

4    A.   Yes, sir.

5    Q.   *Act of Valor*?

6    A.   Yes, sir.

7    Q.   Okay.  So what conversation, if any, during that meeting

8    was there about Amine El-Khalifi?

9    A.   This was after Amine was arrested.  He was arrested for,

10   for going to the Capitol with a suicide vest.

11          We talked about his arrest.  During this time, I

12   brought up the -- you know, based on, you know, previous

13   conversations, I brought up the topic for us about trying to

14   uncover who the informant was, you know, trying to figure out

15   who exactly set Mr. Khalifi up.  I was the one that initiated

16   that conversation.

17          We talked about.

18   Q.   Why did you do that?

19   A.   Well, based on previous conversations that I had with

20   numerous people, that seems to be a common thread of like

21   that's what people would want to do during this conversation,

22   and I was trying to redirect the attention from myself.  It's

23   almost like, you know, if you bring it up, then maybe people

24   won't look at you.

25   Q.   Well, in fact, you weren't the informant on the Khalifi

Sullivan - Direct                                                         212

1    case, were you?

2    A.    Not really.

3    Q.    Well, you weren't the person who was involved with the

4    plot?

5    A.    No.

6    Q.    All right.  So what did Nick Young tell you would likely

7    happen to you as a result of your involvement with Mr. Khalifi?

8    A.    We talked about, both talked about that the FBI would

9    mostly likely come talk to me based on my, based on my

10   communications and my interactions with Amine.  He told me

11   that -- he just gave me some advice that, you know, when I'm

12   talking to them, to keep it short, simple, and sweet; and he

13   also told me that I really wouldn't have to answer questions, I

14   don't have to answer questions, opinion-based questions or

15   lifestyle questions, but --

16   Q.    What did Mr. Young -- what did Mr. Young say that was a

17   basis for why he believed this would happen to you now?

18   A.    I believe it's because he said that this is what happened

19   to him when Zachary Chesser was arrested.

20   Q.    Could you take a look at Government Exhibit 9-101, which

21   is a photo?

22            THE COURT:  Any objection to 101?

23            MS. MORENO:  No objection.

24            THE COURT:  All right, it's in.

25            (Government's Exhibit No. 9-101 was received in

Sullivan - Direct                                                          213

1    evidence.)

2    BY MR. KROMBERG:

3    Q.    Zachary Chesser, correct?

4    A.    Yes, sir.

5    Q.    And that's who Mr. Young was talking about?

6    A.    Let me refresh my recollection, sir.  He -- I remember he

7    had, he had these conversations.  He talked to me numerous

8    times about being interviewed because of his interaction with

9    Zachary Chesser.  I have to see if it was on this particular

10   date.

11   Q.    Well, okay.  It doesn't even matter for our purposes here.

12   A.    Okay.

13   Q.    So he gave you advice about speaking to the FBI.  That's

14   fine.  Was that meeting recorded?

15   A.    Yes, sir, it was.

16   Q.    Okay.  Did you have any other meetings with him?  April

17   27, 2012?

18   A.    Yes.  But also for that meeting, sir --

19   Q.    Please.

20   A.    On that particular meeting, you asked about other

21   conversations we had.  We did, we did talk about the

22   circumstances of which Mr. Khalifi, which Amine was arrested.

23   During that time -- because we talked about him being a police

24   officer and me being in the military, and I, I told him that it

25   was my opinion that if Amine was not truly set up, if he wasn't

Sullivan - Direct                                                      214

1   truly set up, if he actually did some of those things, then I

2   think what Amine did was wrong.

3            So I, I denounced what Amine did, and I gave -- and I

4   said because, you know, if he went through with that, if he

5   went through with that plot, then he wouldn't have killed any

6   politicians or anything like that.  He would have ended up

7   killing, like, a police officer like him that's just sitting

8   there or some tourist or something like that.

9            So I, you know, I denounced -- and I said if he

10  wasn't set up, if he actually did it, then I -- then what he

11  did was wrong.

12  Q.   And what did Mr. Young say in response?

13  A.   I don't, I don't remember exactly what his response was,

14  but Mr. Young never verbally supported what Amine did.

15  Q.   Okay.  So the next time you saw him was April 27, 2012?

16  Take a look at Government Exhibit 11-105, the DVD.

17  A.   Yes.  Yes, sir, April 27.

18  Q.   So you -- this, this was the point where you were

19  recording all meetings?

20  A.   Yes.

21  Q.   So that was -- so you know that was your last meeting with

22  him?

23  A.   Yes.

24  Q.   Okay.  Did you ever see him again after April 27, 2012?

25  A.   I don't, I don't recall seeing him.

Sullivan - Direct                                                    215

1   Q.   Please look at Government Exhibit 11-220.

2            THE COURT:  What is that, Mr. Kromberg?

3            MR. KROMBERG:  That's a text message, or it's an

4   e-mail containing a text message.

5            THE COURT:  Is there any objection to that?

6            MS. MORENO:  No objection.

7            THE COURT:  All right, 11-220 is in.

8            (Government's Exhibit No. 11-220 was received in

9   evidence.)

10  BY MR. KROMBERG:

11  Q.   You can look at it on the screen if it's easier.

12  A.   Yes, sir.

13  Q.   Do you recognize that?

14  A.   Yes, sir.

15  Q.   So what, what is that?

16  A.   That is a, that is a message that was, that was sent to me

17  from, from Nick that I forwarded on to the FBI, and at this

18  particular -- he just -- it's just reaching out to me because

19  he hasn't talked to me in a while, to --

20  Q.   Can you read that?  I don't think that the jury can really

21  read that.

22  A.   Okay.  It said, "Salam Alikom akhí," which is, that's a

23  traditional Islam greeting.  "Its your brother in Islam Nick.

24  I hope everything is going okay.  You dropped off the grid,

25  haven't seen you forever.  I'll admit I have done the same

Sullivan - Direct                                                      216

1  thing a few times, about a year ago there was a 3 or 4 month

2  period when the only time I left the house was for jumma" --

3  that's prayer services -- "but I was in a bad place then.  Hope

4  you are well.  Listen man, I got weekends off nowadays.  Whats

5  the good word?  Hit me up.  My phone fried a number of months

6  back but I still have the same number.  571-236-8195.  Lost

7  everyones number.  Don't be a stranger.  Lets meet up soon.

8  Nick."

9  Q.    And what did you do in response to receiving that message?

10  A.    I don't believe I responded to him.

11  Q.    Now, this -- what's on the screen, that is not -- correct

12  me if I'm wrong.  That's what you sent to the FBI after you got

13  the text message?  That's cut and pasted, or was that to you

14  directly?

15  A.    I think it was a -- no, this was an e-mail.  It wasn't a

16  text message.

17  Q.    Okay.  Now, why did you have so little contact with

18  Mr. Young after April 2012?

19  A.    Because I was engaged heavily with Liban Mohamed and I

20  believe there was like six or seven other individuals that were

21  supposed to be traveling with us, so at that point --

22  Q.    Traveling to Somalia?

23  A.    Yes, to join Al-Shabaab.

24        Mr. Young was not part of that.  We were not trying

25  to make him part of that, and I was directed by, by the FBI to

Sullivan - Direct                                                    217

1   not have contact with Mr. Young.

2   Q.    Okay.  So in the course of your relationship with -- when

3   you knew him, between December 2010-April 2012, what books or

4   written materials did you give Mr. Young about Islam?

5   A.    I don't recall giving him anything.

6   Q.    What videos or music did you give him about Islam?

7   A.    I don't recall -- I don't recall giving him anything, and

8   I certainly wouldn't have given him anything inflammatory.

9   Q.    What criminal activity did you ever ask him to engage in?

10  A.    None.  I actually refrained from trying to engage him in

11  any kind of criminal activity.

12  Q.    Between you and Mr. Young -- between your role of Khalil

13  Sullivan and Mr. Young, who was supposed to know more about

14  Islam?

15  A.    I can't speak to the exact knowledge of Islam that

16  Mr. Young had, but I will say that Mr. Young was a Muslim much

17  longer than I and has already -- and, and there was one point

18  that Saleh told me that he's impressed with the dedication, you

19  know, of Nick as a Muslim even though he doesn't have a lot of

20  time.

21  Q.    Saleh Al-Barmawi?

22  A.    Yes, sir.  Yes, sir.  But I can't, I can't really speak to

23  his, Mr. Young's level of education as far as Islam, but he

24  said he wasn't Muslim much longer than, than I.

25  Q.    What, if anything, did you ever tell him to do differently

Sullivan - Direct                                                  218

1    to be a better Muslim?

2    A.    I can't recall having any conversations like that.

3    Q.    Of all the people in the circle, the circles around

4    Mr. Young, who was the leader in all things relating to Islam?

5    A.    There were -- the circles overlapped.  You had sort of

6    Liban Mohamed's circle and then Saleh Al-Barmawi's, but in the

7    Saleh Al-Barmawi's circle, which Mr. Young was more rooted in,

8    Saleh Al-Barmawi was, was the leader.  In fact --

9    Q.    And how did -- how was he treated by others when you saw

10   that -- him there with Mr. Young?

11   A.    He was treated with respect.  I mean, there were times

12   when I've been with people where they actually called Saleh

13   "sheikh."  Saleh would give classes to people.  He would always

14   be the one that sort of -- when I was around, people would go

15   to him for advice.  People would go to him.

16        There was one particular time that Saleh actually

17   gave me what's called a fatwa to get out of the military.

18   Again, fatwa is an Islamic ruling.

19        Saleh frequently taught classes to people.  He would

20   have study sessions where he would always be the one that is

21   the leader, and people looked up to him.  And there was one

22   time that -- and Saleh would also correct people.  I remember

23   there was one occasion where we were just talking around, we

24   were talking about Hitler, and Mr. Young, you know, we were

25   talking about Hitler and talking about other Jews.

Sullivan - Direct                                                          219

1           MS. MORENO:  Objection.

2           THE COURT:  Overruled.

3           THE WITNESS:  Okay.  And where Mr. Young mentioned

4  something.  As I said, he said this -- he was sort of laughing

5  when he said it, but he mentioned that he was going to pray for

6  the soul of Hitler.  That's when Saleh came down and said:  No,

7  you can't pray for the soul of somebody who's a disbeliever.

8           So he, Saleh would correct you.  I mean, there were

9  times that Saleh would correct me on the proper hand to eat

10  with.  So he was definitely the leader of that, the people.

11  BY MR. KROMBERG:

12  Q.  Do you remember a movie at Saleh Al-Barmawi's house, *Lion*

13  *of the Desert*?

14  A.  Yes, sir.

15  Q.  So can you tell the jurors about what happened at that --

16  what that evening was?

17  A.  That was a movie of the *Lion of the Desert*.  It was at

18  Saleh Al-Barmawi's house, where Saleh invited a bunch of people

19  over.  The movie was about, I believe it was about the Libyan

20  jihad against the Italians.

21  Q.  In the 1920s and '30s?

22  A.  Yes.  The 1920s --

23           MS. MORENO:  Objection.

24           THE COURT:  What's the basis for the objection?

25           MS. MORENO:  Mr. Kromberg is testifying.

Sullivan - Direct                                                      220

1            THE COURT:  Sustained.

2            THE WITNESS:  Okay.

3    BY MR. KROMBERG:

4    Q.   When was the Italian jihad against -- was the Libyan jihad

5    against the Italians?

6    A.   It was based on, like, the early 1900s.

7    Q.   Okay.

8    A.   Early 1900s, that's what I could recall about the movie.

9    I believe it was the Libyans versus the Italians.

10            During the course of the movie, as I said, it was at

11   Saleh's house.  He was the one that invited people over.  Saleh

12   Al-Barmawi at times throughout the movie will point out

13   significant, significant events that happened in the movie.

14   Like, there was a couple times where somebody was talking about

15   jihad, about his obligation.  Saleh actually got up and

16   cheered.  There was one point in the movie where a woman's

17   husband was killed as a martyr, and I don't remember who in the

18   audience asked, but they turned to Saleh and said:  Why, you

19   know, why is she crying?  Because her husband is now a martyr.

20            Saleh said:  Well, she's still missing -- you know,

21   she's still missing her husband.

22            Because previously in conversations, I believe, I

23   believe Mr. Young was there on that, where talking about jihad,

24   Saleh mentioned that jihad would solve a lot of our problems.

25            MR. KROMBERG:  Okay.  Thank you.  Nothing further for

Sullivan - Cross                                                      221

1   the witness at this time.

2            THE COURT:  All right.

3            MR. KROMBERG:  Please answer defense's questions.

4            THE WITNESS:  Yes, sir.  Thank you.

5                       CROSS-EXAMINATION

6   BY MS. MORENO:

7   Q.   Good morning, Mr. Sullivan.

8   A.   Good morning, ma'am.

9   Q.   Excuse me, I've had terrible luck; I broke my glasses.

10  A.   No problem.

11  Q.   Sometimes they'll fall.  Pardon me.

12            Now, Mr. Sullivan, you met Nick Young in December of

13  2010?

14  A.   Yes, ma'am.

15  Q.   And your first report on Nick Young was in December 2010?

16  A.   Yes, ma'am.

17  Q.   And you met with Nick Young from December 2010 through

18  April 2012?

19  A.   On and off, yes, I believe that --

20  Q.   And the times that you met with him, you sometimes just

21  reported on him?  You issued reports, correct?

22  A.   I would, I would report on whoever, whoever that I really

23  met.

24  Q.   And that would include Nick Young?

25  A.   Yes.

Sullivan - Cross                                                      222

1   Q.   Right.  And so that big binder of notes that you have in

2   front of you --

3   A.   Yes, ma'am.

4   Q.   -- are notes and your reports about Nick Young?

5   A.   Yes, ma'am.

6   Q.   And I think it's the last four or five meetings with --

7   where you met with Nick Young, you recorded those meetings?

8   A.   Yes, ma'am.

9   Q.   Okay.  Now, so is it fair to say that you met with him

10  about 20 times during that period of time?

11  A.   That sounds about right.  That sounds about right.

12  Q.   And in those meetings, you and Mr. Young, I'm not talking

13  about all these other people you've been talking about --

14  A.   Okay.

15  Q.   -- just your discussions with Mr. Young --

16  A.   Yes, ma'am.

17  Q.   -- you talked about many things, right?

18  A.   Yes, ma'am.

19  Q.   And you talked about many things.  You were in an

20  undercover capacity.

21  A.   Yes, ma'am.

22  Q.   Right.  And the entire time, the entire relationship with

23  Mr. Young, he didn't know your true name, right?

24  A.   No, he did not, ma'am.

25  Q.   He didn't know who you were, correct?

Sullivan - Cross                                                     223

1   A.   Know who fake me is or real me?

2   Q.   Who you really were.

3   A.   Oh, no, he did not.

4   Q.   Right.  And so all those various times that he was talking

5   about surveillance of Muslims and mosques, he had some of those

6   conversations with you, correct?

7   A.   Yes, yes.

8   Q.   You were actually surveilling Muslims and mosques,

9   correct?

10  A.   No.  I was not surveilling Muslims and mosques.  I was

11  going in tasked with obtaining information on very specific

12  people that had already been predicated themselves to be prone

13  to violence.

14  Q.   You were praying in mosques with some of the subjects of

15  your investigation, correct?

16  A.   Yes, yes.

17  Q.   You attended prayers with those people, correct?

18  A.   Yes.

19  Q.   And you attended prayers with Mr. Young.

20  A.   Yes, ma'am.

21  Q.   Right?  And all the time you were doing that, you were

22  working in an undercover capacity?

23  A.   Yes, ma'am.

24  Q.   And while you were -- when you were outside of the mosque,

25  you had sort of a social relationship with Mr. Young, correct?

Sullivan - Cross                                                    224

1   A.    Yes, ma'am.

2   Q.    And throughout that social relationship, you, of course,

3   were deceiving Mr. Young on who you were, correct?

4   A.    Yes, ma'am.

5   Q.    And what your purpose was, in fact, in talking to

6   Mr. Young, right?

7   A.    Yes, ma'am.

8   Q.    Because after you would meet with Mr. Young and others,

9   you would go back to your car or your office and type up the

10  notes of the conversations, correct?

11  A.    Yes.

12  Q.    All right.  And you had, you had -- you talked a little

13  bit about this, but you talked about many things with

14  Mr. Young, right?  And when you would, when you would make

15  these reports -- this is before the recording.

16  A.    Yes, ma'am.

17  Q.    You would be in touch, of course, with -- you would be in

18  touch, of course, with your superiors, correct, after these

19  meetings?

20  A.    You mean would I establish -- would I have contact with

21  them?

22  Q.    Right.

23  A.    Yes.

24  Q.    Yes.  And you would share your reports with your

25  superiors, correct?

Sullivan - Cross                                                    225

1   A.    Are you talking immediately afterwards?

2   Q.    At any time.

3   A.    The process in which, how it normally happened, I would

4   have --

5           THE COURT:   Mr. Sullivan, stay closer to the

6   microphone and speak up, please.

7           THE WITNESS:   Sorry.   The process in which it

8   normally happened is I would have my meeting with whoever.

9   Afterwards, sometimes, sometimes I would physically meet with

10  somebody, but a lot of times, it was just phone conversation

11  with just a, hey, I'm okay, done for the day.

12          There was a -- it wasn't really sharing -- like, if

13  there was anything significant that happened during those

14  times, then, then I would relay that information, like,

15  verbally, right then and there if there was something

16  significant, but they wouldn't -- then I would just go write my

17  report, and I would give it to them when I finished my report.

18  That's the process in which, which it happened.

19  Q.    I understand.   You would also get direction from your

20  superiors, correct, in how you were conducting your

21  investigation?

22  A.    Yes.   Yeah, they -- yeah.   They're the ones that dictated

23  the targets are who we went after.   Yes, they dictated

24  everything.   I was just an investigative technique.

25  Q.    Did you -- you talked about this person, Amine Khalifi.

Sullivan - Cross                                                           226

1    A.   Yes, ma'am.

2    Q.   Yes.  And you, you said that Mr. Young was not friends and

3    not close to Mr. Khalifi in direct.

4    A.   Yes, yes.

5    Q.   Okay.  And, in fact, you introduced Mr. Khalifi to Nick

6    Young.

7    A.   It wasn't set up me to introduce Nick to Amine Khalifi.

8    It just happened by chance.  He said:  We have these circles.

9    And even the first time that we met was after a class and

10   prayer services, where there was just a group of people that

11   went out to the restaurant afterwards.

12   Q.   And you introduced Mr. Khalifi to Nick Young?

13   A.   I don't believe I was the one that physically introduced

14   him.  I mean, he was, he was with me, and I went out to eat

15   with somebody who was with Amine Khalifi, and then we sort of

16   met each other that way.  I mean, I don't think I was the one

17   that went up and said:  Hey, Amine, this is, you know, this is

18   Nick, you guys meet each other.

19        I don't -- like I said, I don't know exactly how that

20   meeting went, but yes, he was with me, and I was the one that

21   said we're going to go to this location right here, and that's

22   where Amine was, but it wasn't the intention or my direction to

23   get these two together.

24   Q.   But you understood that Mr. Young didn't know Mr. Khalifi

25   before that?

Sullivan - Cross                                                         227

1    A.    It was my -- I don't think that he -- he definitely wasn't

2    friends with him, but I don't know if he's ever physically seen

3    him before, anything like that.  I can't recall that.  I don't

4    believe so.

5    Q.    You also spoke about Liban Mohamed was suspicious of

6    Mr. Young.

7    A.    Yes.

8    Q.    Right?  And you talked about this whole Somalia --

9    A.    Yes, ma'am.

10   Q.    -- issue.

11          And Mr. Young didn't have anything to do with that,

12   right?

13   A.    No, nothing.

14   Q.    You talked about, you talked about -- just a moment,

15   please.

16          Now, in, in the relationships and the discussions

17   that you had with Nick Young --

18   A.    Yes, ma'am.

19   Q.    -- you told him many things that weren't true, right?

20   A.    Yes.

21   Q.    Right.  And you told him that you kept from the Marine

22   Corps that you were a Muslim because it would endanger your Top

23   Secret clearance.

24   A.    Yes.

25   Q.    Right.  And that wasn't true, right?

Sullivan - Cross                                              228

1   A.   No.

2   Q.   You also told him when they talked about Israel and

3   Palestine, you brought up that you hated the British --

4   A.   Yes.

5   Q.   -- because of what they did to Ireland.

6   A.   Yes.

7   Q.   Right.  You compared that situation with Israel and

8   Palestine in that, in that conversation, right?

9   A.   I don't recall doing that, but if it's written in my

10  reports, then it happened.

11  Q.   Now, in December of 2010, right from the very beginning,

12  you started talking to -- you indicated in your reports that

13  you were speaking to Nick Young as old friends because you had

14  bonded almost immediately; isn't that right?

15  A.   Yes.  And that actually was not by design at all.  It

16  just -- him and I just -- he wasn't even the target that I was

17  going there to meet.  It's just him and I generally just seemed

18  to have good conversations and get along.

19  Q.   You bonded and spoke like old friends from the very

20  beginning, right?

21  A.   Yeah.  We were very comfortable.

22  Q.   And that's because you were talking to him about the

23  military, right?

24  A.   Yes.

25  Q.   And talking to him about subjects that were of interest to

Sullivan - Cross                                                    229

1   him and that were common to him, correct?

2   A.   Well, it was -- I don't know what, what topics you're

3   referring to.

4   Q.   Well, the topics that I mentioned, the military, right?

5   A.   Yes, yes.  The military, yes.

6   Q.   And about Islam, about the faith, right?  You guys talked

7   about religion some?

8   A.   Yeah, some.  I mean, everybody in the room was Muslim, so

9   that was, I mean, that was just a common, a common bond with

10  everybody in that room.

11  Q.   Including you, sir?  Are you a Muslim?

12  A.   Am I --

13            MR. KROMBERG:  Objection, Judge.

14            THE COURT:  Wait, wait, wait.  Only the persona can

15  be discussed.

16            MS. MORENO:  Well, may we approach, Your Honor?

17            THE COURT:  Yes.

18            (Bench conference on the record.)

19            THE COURT:  Where's your client?

20            MR. SMITH:  I just don't know if it's sensitive to

21  the government to discuss this right here with him there.  I

22  didn't know if that's right.

23            THE COURT:  All right, we'll waive this one time.

24  Wait, switch positions.

25            MS. MORENO:  I'm sorry.

Sullivan - Cross                                                        230

1          THE COURT:  All right.

2          MS. MORENO:  Your Honor?

3          THE COURT:  Yes.

4          MS. MORENO:  In direct, I objected with the way

5    Mr. Kromberg was examining the witness about some issues

6    regarding Islam, and you overruled my objection, and you

7    indicated as a member of the religion, referring to

8    Mr. Sullivan, he could properly talk about that.

9          MR. KROMBERG:  That was with regards to the hajj,

10   what the hajj was.

11         MS. MORENO:  Yeah, right.  But the impression that

12   the jury has is that he's a Muslim, and I don't think that's

13   appropriate unless he is.

14         THE COURT:  No, no, no.  I think he can clearly, he

15   can clearly testify to the persona that he was presenting.

16   Obviously, he's presented a persona of being a Muslim.

17         Anybody who knows anything about Islam knows what

18   hajj is.  I mean, you can ask him how he knows about hajj,

19   whether the agents talked to him or he's done research, but you

20   cannot ask him anything about his personal actual identity,

21   which would include where he went to school, where he's really

22   from, although he's clearly got a Boston accent, or his

23   religion.

24         MS. MORENO:  Okay.

25         MR. KROMBERG:  Thank you, Your Honor.

Sullivan - Cross                                                    231

1          (End of bench conference.)

2   BY MS. MORENO:

3   Q.   By the way, you spoke about Zachary Chesser in direct.

4   A.   Yes, ma'am.

5   Q.   Yes.  And you know that Mr. Young didn't really know

6   Zachary Chesser, correct?

7   A.   Yeah.  I think he told me that he might have had, like,

8   one phone contact -- one, one phone call with him.  He said he

9   wasn't very, very close to him.  He just afterwards, just

10  showing support at court proceedings and support for his wife.

11  But again, he didn't say that he supported, you know, his

12  action.

13          THE COURT:  Mr. Sullivan, keep your voice up again.

14          THE WITNESS:  He said that, from what I gather from

15  that, he spoke to him, I believe he said one time, so he didn't

16  have much of an interaction with him.  It was more so just

17  showing support for him post-arrest.

18  BY MS. MORENO:

19  Q.   And his family.

20  A.   Yes, post-arrest.

21  Q.   Now, you talked about the Serbian Kosovo conflict.

22  A.   Yes.

23  Q.   And you indicated that Kosovo was such a clear-cut cause

24  for jihad.  That was something you brought up, correct?

25  A.   Yes.

Sullivan - Cross                                                    232

1   Q.   In conversations.

2   A.   Yes.

3   Q.   Mr. Young -- you, you talked about the Marine Corps.

4   A.   Yes.

5   Q.   And your issues with the Marine Corps with Mr. Young,

6   correct?

7   A.   Yes.

8   Q.   And Mr. Young actually tried to persuade you to stay in

9   the Marine Corps at times?

10  A.   I don't recall that.  I recall him more trying to persuade

11  me to get out and apply to some police departments, if my --

12  Q.   He also told you about -- he tried to encourage you to

13  join law enforcement, right?

14  A.   Yeah.  That's -- yeah.  I don't, I don't recall him trying

15  to persuade me to stay in the Marine Corps.  I thought it was

16  that I should apply to some police departments when I got out.

17  Q.   You had political discussions about Egypt and the Arab

18  Spring.  Do you recall those?

19  A.   Yes, sir -- yes, ma'am, sorry.

20  Q.   And Mr. Young spoke negatively about President Mubarak,

21  correct?

22  A.   Yes, he did.

23  Q.   Mubarak who was ultimately ousted from power, right?

24  A.   Yes.

25  Q.   You told Mr. Young that you wanted to get out of the

Sullivan - Cross                                                    233

1  Marine Corps because Barack Obama was your commander in chief.

2  A.   Yes.

3  Q.   Do you remember telling him that?

4  A.   Yes.

5  Q.   Was that said in Mr. Young's presence?

6  A.   That what?

7  Q.   That you wanted to get out of the Marine Corps because

8  Barack Obama was the commander-in-chief?

9  A.   If you, if you can point me to what day you're talking

10 about?  That statement, do you want to know the context behind

11 it or just yes or no?

12 Q.   February 28, 2011, I believe.

13 A.   Okay.

14 Q.   It will be around page 4.

15 A.   February 28?

16 Q.   2/28/11?

17 A.   I don't have that.

18       Okay.  You said page 4, ma'am?

19 Q.   I think it's page 6 actually.  We can move on, sir.

20 A.   Okay.  I see that.  Yes, that's -- we, we had that

21 conversation.  It was myself, Nick, and Saleh Al-Barmawi.

22 That -- that's when Al-Barmawi stated that I should get out of

23 the military and when -- that's when Nick agreed that Obama --

24 made a statement that Obama was a kufir, which is a

25 disbeliever.

Sullivan - Cross                                                        234

1   Q.   You had a conversation with Nick Young about issues with

2   enforcing unjust laws.  Do you remember that?

3   A.   Yes.  I, I think I, I asked him if there was any kind of

4   conflict with his job as a police officer and sharia law, which

5   he said he hasn't run into any conflicts, and I believe that's

6   the time when he talked about me joining maybe the DEA or

7   something like that because that would be little -- that would

8   be less conflicting with sharia law.

9   Q.   Mr. Kromberg focused you on this discussion about

10  attacking an FBI establishment, right?

11  A.   Yes.

12  Q.   Do you remember that?

13  A.   Yes, ma'am.

14  Q.   But in your notes, you, you didn't write that Nick Young

15  said that he wanted to do that.

16  A.   No, he -- it's --

17  Q.   Hold on.  He didn't, he didn't say that, right?

18  A.   No.  He mentioned --

19  Q.   That he wanted to do that.

20  A.   No.  He said that -- a lot of these conversations, I mean,

21  I will say that some of the conversations we had were

22  hypothetical.  If, if he said that he wanted to, he was going

23  to, then he would have then been the target of investigation.

24       These are just conversations that just came up, which

25  is why I would engage sometimes, we would have to see if those

Sullivan - Cross                                                    235

1   words are hypothetical or if those truly are plans.

2   Q.   Right.  And you didn't perceive them to be any kind of

3   plans?

4   A.   I didn't, I didn't take -- the way he said it, we would

5   have hypothetical conversations like that.  The way he said it,

6   I didn't take it as a plan, but what was a little alarming is

7   that he kind of went into a little bit of details of, like, how

8   he would do it if he was going to do it.  I mean --

9   Q.   He didn't say how he would do it.  He talked

10  hypothetically about how someone could do it; isn't that right?

11  A.   No.  I mean, the one part when he talked about somebody

12  with his skills.

13  Q.   No.  So I refer you to your notes.

14  A.   What date, what date is this?

15  Q.   Okay.  March 8, 2011.

16  A.   March 8, okay.

17  Q.   About four pages.

18       Now, you wrote these reports, right?

19  A.   Yes, I did.

20  Q.   And in these reports, you wanted to be accurate, correct?

21  A.   Yes.

22  Q.   Because that was --

23  A.   I'm sorry.

24  Q.   Excuse me.  Because that was important, right?

25  A.   Yes, absolutely.

Sullivan - Cross                                                          236

1    Q.   To have accurate information?

2    A.   Yes, ma'am.

3    Q.   And, of course, as an, as an FBI agent, you wanted to make

4    sure that if there was --

5             MR. KROMBERG:  Objection, Judge.

6             THE COURT:  Yes.  He's not an FBI agent.  He was

7    working for the FBI.

8             MS. MORENO:  I'm sorry; my apologies.

9    Q.   But you wanted to make sure that the information was

10   accurate, right?

11   A.   Absolutely, yes.

12   Q.   Because, because others were reviewing this information.

13   A.   Yes.

14   Q.   Right.  And so it would have been important if, in fact,

15   Mr. Young said, "I'm going to attack a courthouse or an FBI

16   establishment."  That would have been important?

17   A.   He, he --

18   Q.   That would have been important.

19            MR. KROMBERG:  Objection, Judge.  She should let the

20   witness answer the question.

21            THE COURT:  The question is quite simple, and the

22   question is was it important, and the answer would be yes or

23   no.

24            THE WITNESS:  Yes, it was important.

25   BY MS. MORENO:

Sullivan - Cross                                                      237

1   Q.   Right.  And, in fact, in some of these reports, sometimes

2   you actually quote Mr. Young, correct?  You put quotes around

3   what he said.

4   A.   Yes.

5   Q.   And in a lot of -- but most of it are your recollection of

6   what he had said, correct?

7   A.   Yes.

8   Q.   And you -- and in recalling what he had said, you really

9   wanted to make sure you got it right.

10  A.   Yes.

11  Q.   Yes.  Okay.  And so when you wrote this report --

12  A.   You said March 8, ma'am?

13  Q.   Excuse me, sir.

14            Sorry, I'm so sorry.  It is March 12.

15  A.   12th, okay.

16  Q.   Four pages in.

17  A.   Okay.  Okay.

18  Q.   And you wrote that --

19  A.   Sorry.

20  Q.   Let me finish.

21  A.   Sorry.  Sorry about that.

22  Q.   I'm sorry.  "SD" is who?

23  A.   Mr. Young.

24  Q.   And that stands for, do you know?

25  A.   That was his, the reporting code name.

Sullivan - Cross                                                    238

1  Q.   Stated that he despises the FBI and that someone with

2  skills could attack an FBI establishment.  That's what you

3  wrote, right?

4  A.   Yes.  Yes, ma'am.

5  Q.   And in that sentence, you didn't write that he said that,

6  correct, that he could do that?

7  A.   Well, he did because he said that, that he could find out

8  where the JTTF was, so he did, he did implicate himself in

9  that.  That's where he said, when he was talking about overall

10 his different skills, so if you're talking about somebody

11 attacking the JTTF and somebody doing this, yes, there were --

12 and sort of the general somebody with skills, somebody with

13 this, but he implicated himself.  He said, "I could find" --

14 that he could find out what floor the JTTF was on.

15 Q.   And he didn't tell you that he was going to be the one to

16 attack an establishment.

17 A.   No, and I didn't say -- no, and I didn't take this as a

18 plan.  This was more, like, hypothetically.  This wasn't, I

19 mean, I didn't --

20 Q.   Right.

21 A.   I didn't gather from that that he was actively planning on

22 attacking the JTTF.

23 Q.   And, in fact, Nick Young told you that while he distrusted

24 the FBI, that he respected the professionalism the agents

25 showed when they spoke to him?  He told you that?

Sullivan - Cross                                                          239

1   A.   He -- yes.  He was, he was able --

2   Q.   Did he tell you that?

3   A.   Yes.  He was able to separate at times.

4   Q.   And -- now, in March 28, 2011, you had known Mr. Young

5   about four months; is that right?  About four?

6   A.   About that, yes.

7   Q.   And you were friendly with him.

8   A.   Yes.

9   Q.   Right?  It's fair to say that he considered you a friend,

10  correct?

11  A.   Yes.

12  Q.   And his comments to you and his conversations to you would

13  have been unguarded, correct?

14  A.   Yes.

15  Q.   All right.

16  A.   Yes.

17  Q.   And he told you in March 28 of 2011 in a conversation that

18  he wanted to help Muslims as much as he could without doing

19  anything criminal and losing his job.  He told you that.

20  A.   Yes, he did.

21  Q.   And in a private conversation, right?

22  A.   I remember him saying that.  I don't know if it was

23  private.  I don't know if there was other people present.

24  Q.   But he told that to you.

25  A.   Yes, he did, ma'am.

Sullivan - Cross                                                    240

1              MS. MORENO:  May I have a moment, Your Honor?

2              THE COURT:  Yes, ma'am.

3    BY MS. MORENO:

4    Q.   You talked about gays in the police department.  Do you

5    remember that?

6    A.   I remember talking about homosexuals in the military.  I

7    don't remember talking about it in the police department.

8    Q.   And he said he didn't think it was going to be a big deal

9    to have --

10   A.   No, he did not.

11   Q.   -- gay people in the military, right?

12   A.   No, he did not.  No.

13              Yeah, that's what he said.

14   Q.   I'm sorry?

15   A.   No, I just -- yes, I remember that.  I remember that

16   conversation, yes.

17   Q.   He talked about -- he talked about politicians with you,

18   correct?  Politics and politicians?

19   A.   Yeah, we talked about politics a lot.

20   Q.   And he told you that Democrats and Republicans are equally

21   as bad but you find good politicians in both parties?  He told

22   you that?

23   A.   Yes.  I think he was more of a Ron Paul guy.

24              THE COURT:  Again, Mr. Sullivan, if you mumble, we

25   can't hear you.

Sullivan - Cross                                                    241

1           THE WITNESS:  Okay.  Yeah, he was talking about that,

2    that there was some good.  I think he -- I remember him saying

3    that he, he was more in favor of Ron Paul.

4    BY MS. MORENO:

5    Q.   Of Ron Paul, meaning the Libertarian politician?

6    A.   I believe him, him saying -- making positive comments.  I

7    can't recall exactly what, but I remember positive comments

8    about that.

9    Q.   In 2012, February 11, 2012, he talked to you about

10   retiring from the police department.  Do you remember that?

11   A.   February 11?

12   Q.   2012, sir.  You had a conversation with him about

13   Mr. Young retiring from the police force, right?

14   A.   Okay.  Yes.

15   Q.   Right?  Do you remember that?

16   A.   I remember having conversations with him about him

17   retiring.  If it was -- if you're saying it was on that day,

18   then it was on that day.

19   Q.   And he told you that he wanted to retire in the United

20   States, right?

21   A.   Are you getting this from my notes or recording?

22           THE COURT:  Well, you can't ask questions.

23           THE WITNESS:  I'm sorry; I'm sorry.  I don't, I

24   don't, I don't recall that.  I'm trying to look it up right

25   here.  I don't recall.  I don't recall that conversation.

Sullivan - Cross                                                          242

1           THE COURT:  You can lead.  Go ahead and lead so we

2   get right to it.

3           MS. MORENO:  Thank you.

4   Q.  In February 11 -- I'm sorry, February 26, 2012.

5   A.  Okay.  I was looking at February 11.  I didn't see that.

6   Q.  Nick Young told you that he envisioned retiring in the

7   United States and owning property in a Muslim country.  He told

8   you that, right?

9   A.  Yes.  I vaguely recall that conversation, yes.

10  Q.  Is that right, sir?  I'm sorry, I didn't hear you.

11  A.  What page?  Is that the second page?

12  Q.  The very first page, February 22, 2012.

13  A.  Yes, okay.  Yes, ma'am.  He said --

14  Q.  This is after you guys went to another movie, the *Act of*

15  *Valor*, right?

16  A.  Yes.

17  Q.  You went to movies together?

18  A.  Yes.

19  Q.  All right.  And he told you that he wanted to retire in

20  the United States, right?

21  A.  Yes, ma'am.

22  Q.  And he told you about his conversations with FBI agents at

23  times when they would interview him, correct?

24  A.  Yes.

25  Q.  Right.  And he told you that the U.S. government had asked

Sullivan - Cross                                                        243

1    him if he would commit an act of violence in America.

2    A.   Yes.

3    Q.   And he said not if he was in his right mind.

4    A.   Yes.

5    Q.   Right?

6    A.   Yes, ma'am.

7    Q.   He told you that.

8            And the last communication you had with Nick Young

9    was April 27, 2012, correct?

10   A.   Is that when that e-mail was that --

11   Q.   I believe so.

12   A.   Yes.  If that was the e-mail, that was the last

13   communication, I believe.

14   Q.   And after April 27, 2012 -- and you know that this was

15   also after he came back from Libya, correct?

16   A.   Yes, ma'am.

17   Q.   You know that.

18   A.   Yes, I knew about that.

19   Q.   And -- so Mr. Young, though, was not arrested in April of

20   2012, right?

21   A.   No.

22   Q.   No.  He wasn't arrested.

23   A.   No.

24           MS. MORENO:  May I have a brief moment, Your Honor?

25           THE COURT:  Yes, ma'am.

Sullivan - Redirect                                                    244

1              MS. MORENO:  Nothing further.

2              MR. KROMBERG:  Your Honor, I'm sorry, but we need to

3    approach on a matter.

4              THE COURT:  All right.

5              (Bench conference on the record.)

6              THE COURT:  Again, your client is not here.  We have

7    to have a consistency with this.

8              MR. SMITH:  We just wanted to make sure there wasn't

9    a security issue.

10             THE COURT:  This issue is Ms. Moreno.

11             All right, Mr. Kromberg?

12             MR. KROMBERG:  Your Honor, Ms. Moreno asked the

13   question, "You wrote that he respected the FBI agents who came

14   to interview him."

15             I'm passing the Court the notes from that.  The last

16   line says he respected the agents.  The line immediately before

17   that is talking about torturing the FBI agent who came to

18   interview him.  That's not respecting them.

19             We should be able to ask what did he really say about

20   the FBI agents who came to interview him.

21             THE COURT:  No, let it be.

22             MR. KROMBERG:  Okay.

23             (End of bench conference.)

24                      REDIRECT EXAMINATION

25   BY MR. KROMBERG:

Sullivan - Redirect                                                      245

1   Q.   Very briefly, Mr. Sullivan --

2              THE COURT:  Wait, wait.

3              MR. KROMBERG:  Oh, sorry.

4              THE COURT:  Always wait for my court reporter.

5   BY MR. KROMBERG:

6   Q.   Very briefly, Mr. Sullivan, Ms. Moreno asked you about

7   conversations about Mr. Mubarak and the Arab Spring.

8   A.   Yes, sir.

9   Q.   Directing your attention to February 7, 2011 --

10  A.   Yes, sir.

11  Q.   -- when you and he were talking about that, what did

12  Mr. Young say about peaceful protests?

13  A.   February 7?

14  Q.   February 7.

15  A.   Mr. Young talked about how that protesting, whether the

16  protesting really wasn't accomplishing anything, and that

17  peaceful protests, you need to seize places by force.

18  Q.   Thank you.

19  A.   If you want something, you need to take it by force.

20             MR. KROMBERG:  Thank you.  Nothing further, Judge.

21             THE COURT:  Any recross?

22             MS. MORENO:  No.

23             THE COURT:  All right, thank you.  I am assuming

24  Mr. Sullivan will not be called again, or is that a

25  possibility?

246

```
 1              MR. KROMBERG:  Depending on what might happen in the

 2    future, he might be called again.

 3              THE COURT:  All right.  Then, Mr. Sullivan, you're

 4    still under court control, so to speak, for your subpoena.

 5    You're not to discuss your testimony or anything you've seen or

 6    heard in court with any witness who has not yet testified.

 7              Do you understand?

 8              THE WITNESS:  Yes, ma'am.

 9              THE COURT:  All right, you're free to go at this

10    point.

11              THE WITNESS:  Thank you.

12                         (Witness stood down.)

13              THE COURT:  And I think this makes sense to have our

14    morning recess because we have to take the screen down.  Again,

15    as much of the trial as possible will be public, and this gives

16    the jury a chance to have your mid-morning break.  I'm going to

17    give you-all 15 minutes, so we'll reconvene at 20 after.  Thank

18    you.

19          (Recess from 11:04 a.m., until 11:22 a.m.)

20                    (Defendant present, Jury out.)

21          THE COURT:  Any issues before we bring the jury in?

22                         (No response.)

23          THE COURT:  No?  All right, let's bring them in,

24    please.

25                         (Jury present.)
```

Gervino - Direct                                                    247

 1              THE COURT:  All right, ladies and gentlemen, I just

 2    want to remind you you cannot be in the courtroom unless we

 3    have brought you in, so if you have anything that you need, you

 4    need to send a note to us, but we sometimes are discussing --

 5    have a seat, please.  We're sometimes discussing matters,

 6    logistics or other issues, and it's not appropriate for the

 7    jury to hear, and so it's really important that you follow our

 8    instructions on that.

 9              So when you come in the morning, you go directly to

10    the jury room, and during the recesses or when you come back

11    from lunch, you go directly, you know, to the jury room, all

12    right?  Thank you.

13              All right, call your next witness.

14              MR. TURGEON:  The government calls John Gervino to

15    the stand.

16          JOHN GERVINO, GOVERNMENT'S WITNESS, AFFIRMED

17                     DIRECT EXAMINATION

18    BY MR. TURGEON:

19    Q.   Will you please state your name and spell it for the

20    record.

21    A.   It's John Gervino, G-e-r-v-i-n-o.

22    Q.   How are you employed?

23    A.   I'm a private consultant currently.

24    Q.   In May of 2011, how were you employed then?

25    A.   I worked for Homeland Security Investigations, and I was

Gervino - Direct                                                      248

 1  assigned to the Washington Field Office, Federal Bureau of

 2  Investigation's Joint Terrorism Task Force.

 3  Q.    And what was your specific position?

 4  A.    I was assigned to the task force, and as an agent, and at

 5  the time, I would assist whatever case activity needed

 6  assistance.

 7  Q.    On May 20, 2011, did you have occasion to interview a

 8  traveler entering the United States?

 9  A.    Yes, I did.

10  Q.    And who was that traveler?

11  A.    Nicholas Young.

12  Q.    How do you remember what happened so long ago?

13  A.    Well, I've reviewed my notes.

14  Q.    Do you have those notes with you in court today?

15  A.    I do.  They're right here.

16  Q.    Do you recognize the defendant?

17  A.    He's right here in the middle, with the blue suit, blue

18  tie, yes.

19              THE COURT:  Any objection to the identification?

20              MS. MORENO:  No objection.

21              THE COURT:  All right, the witness identified the

22  defendant.

23  BY MR. TURGEON:

24  Q.    How did you happen to encounter the defendant on May 20,

25  2011?

Gervino - Direct                                          249

1   A.   I was at Dulles International Airport, and the defendant

2   was returning from abroad.

3   Q.   From which country did his flight originate, if you

4   remember?

5   A.   I believe his flight originated in France.  Prior to that,

6   he was in Egypt.  Prior to that, he was in Libya.

7   Q.   How long did you speak with him?

8   A.   I want to say approximately an hour.

9   Q.   And what did the defendant say about his employment?

10  A.   He was a police officer with Metro Transit Police.

11  Q.   Do you recall the defendant having any tattoo at that

12  time?

13  A.   I do.

14  Q.   What, if anything, do you recall about that tattoo?

15  A.   When I recall the tattoo, I believe it was on the upper

16  left area of his neck.

17  Q.   And what did you think about that?

18          MS. MORENO:  Objection.

19          THE COURT:  Sustained.  His view, his opinion, unless

20  you have something more specific, is not relevant to the case.

21  BY MR. TURGEON:

22  Q.   What, if anything, did the defendant tell you about where

23  he had been before returning to the U.S.?

24  A.   The defendant told me that he was in Libya, in Benghazi,

25  Libya, and Misrata, Libya.

Gervino - Direct                                                  250

1   Q.   And what, if anything, did he tell you about his time in

2   Misrata?

3   A.   During his time in Misrata, I believe he spent about three

4   weeks at various locations, and he told me he was providing

5   medical aid to wounded rebels.

6   Q.   And who did he tell you that he stayed with during that

7   time?

8   A.   He never mentioned a specific individual.  He just

9   mentioned that he stayed in various locations in Misrata.

10          THE COURT:  Can you spell that, please, as best you

11  can?

12          THE WITNESS:  Yes.  It's M-i-s-r-a-t-a.

13          THE COURT:  And what is that, Misrata?

14          THE WITNESS:  It's a province or a location in Libya.

15          THE COURT:  All right.

16  BY MR. TURGEON:

17  Q.   And what, if anything, did he tell you about the people

18  with whom he stayed while he was there?

19  A.   I believe he stayed with humanitarian workers, migrants,

20  and fighters in the house.  He stayed with fighters.

21  Q.   What, if anything, did you ask him about weapons?

22  A.   I asked him if he ever handled or fired a weapon while he

23  was in Libya.

24  Q.   And what did he tell you?

25  A.   He said he did not fire one, although he wanted to.  He

Gervino - Direct                                                    251

1   did, however, handle an AK-47.

2   Q.   Do you recall him telling you anything about vehicles in

3   which he rode?

4   A.   Yes.  He told me he handled an AK-47.  He stood on top of

5   a Jeep or gun truck with -- that had a mounted rocket

6   propeller -- rocket-propelled device on top of the vehicle.

7   Q.   What did he tell you about his involvement in fighting in

8   Libya?

9   A.   He told me -- let me just review my notes, if I may.

10  Q.   Sure.  Just look up at me when you've finished reviewing

11  your notes.

12  A.   Will do.

13       He told me he was shot at on a couple of occasions

14  in, in Libya, in Misrata, and ricochets came very close to him,

15  to him.

16  Q.   What did he tell you that he wore while he was in Libya?

17  A.   He wore a ballistic vest, which he painted a red crescent

18  symbol on the back of the vest.

19  Q.   On what date did he say that he left Libya?

20  A.   I believe on or about May 20 of 2011.

21  Q.   And on what date was his reservation for leaving Libya?

22  A.   For May 30.

23  Q.   What did you ask him about the ten-day difference between

24  the day that he left and the day that he was supposed to leave?

25  A.   I asked him his reason for leaving early since his

Gervino - Direct                                                    252

1   reservations were booked ten days -- there was a ten-day

2   difference.  He said he wanted to save vacation time and save

3   his life.

4   Q.   What did he tell you about the level of danger in Misrata?

5   A.   It was becoming more -- Misrata was becoming more and more

6   dangerous.  There were more mortar rounds landing and -- let me

7   just review my notes, if I may.

8            And larger mortar rounds.

9   Q.   What did you ask him about, about people he met over

10  there?

11  A.   Throughout the interview, on a number of occasions, I

12  asked him to provide names, descriptions, anything of who he

13  met, and he did not provide any descriptions or names.

14  Q.   Well, why did you ask him that question, though?

15  A.   Because the U.S. government is very interested in people

16  who, you know, were over there at that particular time.

17  Q.   And about how many times did you ask him that?

18  A.   There's four occasions throughout our encounter that I

19  asked him for descriptors of people he met.

20  Q.   How did he respond?

21  A.   He did not recall any details.

22  Q.   What did he tell you about how he felt about your

23  interview with him?

24  A.   Towards the end of the interview, he said he was angry,

25  and he felt like he was being interrogated.

Gervino - Cross                                                    253

1    Q.   What did he tell you about his treatment since 2008?

2    A.   He specifically mentioned that -- he said to me, "What

3    gives?  I've been getting the stink eye since 2008."

4             To me, that meant he felt he was being surveilled.

5    Q.   Did you see his luggage?

6    A.   I saw his luggage.

7    Q.   And was all of that luggage returned to him?

8    A.   I believe Customs and Border Protection kept part of his

9    luggage -- part of his belongings.

10   Q.   Did he provide any contacts or telephone numbers?

11   A.   Yes, he did.

12   Q.   And what was that number?

13   A.   One second.  571-236-8195.

14             MR. TURGEON:  The Court's indulgence for a moment?

15             THE COURT:  Yes, sir.

16             MR. TURGEON:  No further questions, Your Honor.

17             THE COURT:  All right.  Cross-examination?

18                       CROSS-EXAMINATION

19   BY MS. MORENO:

20   Q.   Mr. Gervino, now, you indicated -- you made a report in

21   this case, correct?

22   A.   That's correct.

23   Q.   And that's the report that you are reviewing from the

24   witness stand?

25   A.   That's correct.

Gervino - Cross                                                      254

1   Q.   Right?

2   A.   That's correct.

3   Q.   And you characterized Mr. Young during this interview that

4   you had with him in May 2011, you characterized him as being

5   cooperative throughout the interview, correct?

6   A.   I did.

7   Q.   Okay.  And that's because he told you in detail where he

8   was going and what he did, right?

9   A.   I would not agree to that.

10  Q.   Okay.  So he told you about when he left, correct?

11  A.   Yes, he did.

12  Q.   All right.  And he told you how long he stayed, correct?

13  A.   Yes, he did.  Yes.

14  Q.   And he told you the ways in which he traveled, correct?

15  A.   Yes.

16  Q.   He told you the places that he stayed, correct?

17  A.   Yes.

18  Q.   Right?  Like hotels, right?

19  A.   Yes.

20  Q.   And he told you about people that he stayed with, right?

21  A.   No, that's not correct.

22  Q.   He told you that -- he described people in Misrata that he

23  had seen, correct?

24  A.   Let me -- may I look at my notes again, please?

25  Q.   If you can't recall.

Gervino - Cross                                                    255

1          THE COURT:  Agent, can you recall without looking at

2   your notes?

3          THE WITNESS:  Yes.  He, he told me he stayed with

4   migrant workers, rebels, and humanitarian aid people.

5   BY MS. MORENO:

6   Q.   Right.  And he told you the reasons why he went over

7   there, right?

8   A.   Yes.

9   Q.   And he told you that he had seen reports that Gaddafi was

10  exterminating his people, right?

11  A.   That's correct.

12  Q.   And that he wanted to do something that was not for him,

13  correct?

14  A.   Correct.

15  Q.   And that he intended to write different senators about the

16  situation.  Do you remember that?

17  A.   Correct, yes.

18  Q.   Right?  He was going to write John McCain and Joseph

19  Lieberman, correct?

20  A.   I do remember that.

21  Q.   Complaining about Gaddafi, right?

22  A.   Yes.

23  Q.   Exterminating his people, correct?

24  A.   Correct.

25  Q.   And he then detailed some of the equipment that he had

Gervino - Redirect                                          256

1  with him, correct?  Some of his luggage?

2  A.   Can you, can you rephrase that?

3  Q.   His ballistic equipment.

4  A.   Yes.

5  Q.   He discussed that, right?

6  A.   Yes.

7  Q.   And, in fact, that equipment was returned to him.  You

8  know that, right?

9  A.   I do not know that.

10 Q.   Okay.  Did you have an occasion to speak with the other

11 agents who returned his equipment?

12 A.   I don't recall any conversation.

13        MS. MORENO:  Okay.  Nothing further.

14        THE COURT:  Any redirect?

15        MR. TURGEON:  Yes, ma'am.

16                   REDIRECT EXAMINATION

17 BY MR. TURGEON:

18 Q.   What, if anything, did the defendant tell you about his

19 travel to the Libyan border?

20 A.   The defendant mentioned that while in Alexandria, Egypt,

21 he secured a transport to the Libyan border which took

22 approximately seven hours by vehicle.

23 Q.   And did you ask him with whom he traveled?

24 A.   I did.

25 Q.   And what names did he provide you?

Gervino - Redirect                                                    257

1   A.   He did not provide names.

2   Q.   How many times did you ask him for names of individuals

3   with whom he'd stayed or whom he met overseas?

4            MS. MORENO:  Objection.  Asked and answered.

5            THE COURT:  Sustained.

6   BY MR. TURGEON:

7   Q.   What names, if any, did the defendant provide you about

8   individuals he stayed with overseas?

9            MS. MORENO:  Objection.

10            THE COURT:  Sustained.  It's been asked and answered.

11            MR. TURGEON:  No further questions, Your Honor.

12            THE COURT:  Any recross?

13            MS. MORENO:  No.

14            THE COURT:  Is anybody going to call Agent Gervino

15   again in the course of the trial?

16            MR. TURGEON:  No, Your Honor.

17            THE COURT:  What about the defense?  Are you going to

18   recall this witness in any respect?

19            MS. MORENO:  No, Your Honor.

20            THE COURT:  All right.  Then, sir, you're now excused

21   as a witness.  You can stay in court and watch the proceedings,

22   or you may leave, but you're not to discuss your testimony or

23   anything you see or hear in court with any witness who has not

24   yet testified.

25            THE WITNESS:  Thank you.

258

1                        (Witness excused.)

2            THE COURT:  Your next witness?

3            MR. GIBBS:  We will call Special Agent Minichello,

4   Judge.  Actually, Judge, we have some stipulations before that.

5   I apologize.

6            THE COURT:  All right.

7            MR. TURGEON:  Yes, I have some signed stipulations

8   that the government would like to enter into evidence.  First,

9   Your Honor, the government moves to offer a signed stipulation

10  marked Government Exhibit 12-31 into evidence and to read that

11  stipulation to the jury.

12           THE COURT:  All right, go ahead.

13           (Government's Exhibit No. 12-31 was received in

14  evidence.)

15           MR. TURGEON:  The stipulation reads:  The United

16  States and the defendant hereby stipulate and agree that

17  Government Exhibits 16-100 through 16-102 are photographs taken

18  by the FBI and/or U.S. Customs and Border Protection officials

19  of belongings of defendant Nicholas Young upon his arrival at

20  the Washington Dulles International Airport on May 24, 2011.

21           And based on that stipulation, Your Honor, the

22  government offers Government Exhibits 16-101 and 16-102 into

23  evidence and seeks to publish those to the jury.

24           THE COURT:  I'm sorry, just 101 and 102?  I thought

25  you said the stipulation was 100 through 102.

259

1          MR. TURGEON:  That's correct, Your Honor.  We're

2    offering 16-101 and 16-102 only.

3          THE COURT:  Any objection to those two going into

4    evidence?

5          MS. MORENO:  No objection.

6          THE COURT:  All right, they're in.

7          (Government's Exhibit Nos. 16-101 and 16-102 were

8    received in evidence.)

9          THE COURT:  Do you want to publish them to the jury?

10          MR. TURGEON:  Yes, Your Honor.  Could I have 16-101,

11    please?  This is a photograph of what appears to be body armor.

12          And 16-102, it's a photograph of the defendant's U.S.

13    passport.

14          THE COURT:  All right.

15          MR. TURGEON:  The government moves to offer a signed

16    stipulation marked Government Exhibit 12-32 into evidence and

17    to read that stipulation to the jury.

18          THE COURT:  Go ahead.

19          (Government's Exhibit No. 12-32 was received in

20    evidence.)

21          MR. TURGEON:  The stipulation reads:  The United

22    States and the defendant hereby stipulate and agree that

23    Government Exhibit 16-103 is an accurate copy of an e-mail from

24    defendant Nicholas Young to his superiors at the Metro Transit

25    Police Department in August 2011.

260

1          The government also moves to offer a second

2    stipulation marked Government Exhibit 12-37 into evidence and

3    to read that to the jury.

4          THE COURT:  Go ahead.

5          (Government's Exhibit No. 12-37 was received in

6    evidence.)

7          MR. TURGEON:  That stipulation reads:  The United

8    States and the defendant hereby stipulate and agree that

9    Government Exhibits 16-103, 16-106, -401, and -402 are

10   authentic business records of the Washington Metropolitan Area

11   Transit Authority.

12         And based on those stipulations, the government

13   offers Government Exhibit 16 -- excuse me, Exhibits 16-103,

14   106, 401, and 402 into evidence.

15         THE COURT:  Any objection?

16         MS. MORENO:  So stipulated.

17         THE COURT:  All right, they're in.

18         (Government's Exhibit Nos. 16-103, 16-106, 16-401,

19   and 16-402 were received in evidence.)

20         THE COURT:  Are you going to publish any of those or

21   not?

22         MR. TURGEON:  Excuse me, Your Honor?

23         THE COURT:  Are you going to publish any of those or

24   not?

25         MR. TURGEON:  Yes, all of them, please.

261

1          THE COURT:  All right.

2          MR. TURGEON:  16-106.  That is a Metro Transit Police

3   oath of office that appears to be signed by the defendant.

4          16-401 is a certificate of completion and training

5   slides for a counterterrorism course held on May 25, 2006.

6          16-402 is another certificate of completion and

7   training slides for a counterterrorism course held on June 27

8   and 28 in 2012.

9          MR. SMITH:  Your Honor, we object on relevance

10  grounds.

11         THE COURT:  Is this your witness?

12         MR. SMITH:  Our objection is that there's no relevant

13  witness --

14         THE COURT:  On your feet, please.  On your feet.

15         MR. SMITH:  The objection is these documents don't

16  seem to pertain to the last witness who was testifying.

17         THE COURT:  Well, they don't have to.  They're

18  stipulations.  The government can put them in at any point.

19         MR. SMITH:  They're stipulations as to authenticity,

20  which we agreed to, but the relevance of the documents --

21         THE COURT:  Well, there was no objection to their

22  being entered into evidence, so they're in evidence.  There was

23  no objection when I asked if there was any objection, so

24  they're in.  Overruled.

25              Let's move on.

262

1           MR. TURGEON:  So that's 16-402.  And Government

2    Exhibit 16-103, the second e-mail in that e-mail chain is an

3    e-mail from the defendant to his superior at the Metro Transit

4    Police Department, which appears to include travel confirmation

5    for a trip from Washington to Cairo, departing on August 31,

6    2011.

7           THE COURT:  Call your next witness.

8           MR. TURGEON:  Excuse me, Your Honor.  There's one

9    more.

10          THE COURT:  All right.

11          MR. TURGEON:  The government moves to offer

12   stipulation marked Government Exhibit 12-33 into evidence and

13   to read that stipulation to the jury.

14          THE COURT:  Go ahead.

15          (Government's Exhibit No. 12-33 was received in

16   evidence.)

17          MR. TURGEON:  That stipulation reads:  The United

18   States and the defendant hereby stipulate and agree that

19   Government Exhibit 16-105 is a photograph that accurately

20   depicts the Metro Transit Police Department's Code of Honor

21   document that was found by the FBI and/or U.S. Customs and

22   Border Protection officials among the belongings of the

23   defendant, Nicholas Young, at Hartsfield Jackson Atlanta

24   International Airport, in Atlanta, Georgia, on May 10, 2012.

25          Based on that stipulation, the government offers

Minichello - Direct                                                263

1    16-105 into evidence.

2            THE COURT:  Any objection?

3            MS. MORENO:  Not to that exhibit, Your Honor.

4            THE COURT:  All right, it's in.

5            (Government's Exhibit No. 16-105 was received in

6    evidence.)

7            MR. TURGEON:  And I'd like to publish that to the

8    jury as well.

9            THE COURT:  Go ahead.

10           MR. TURGEON:  16-105 is a photograph of what appears

11   to be a signed version of the Metro Transit Police Code of

12   Honor.  Thank you.

13           THE COURT:  All right, your next witness?

14           MR. GIBBS:  Judge, at this time, we'd call Special

15   Agent John Minichello to the stand.

16           THE COURT:  All right.

17     SA JOHN RICHARD MINICHELLO, GOVERNMENT'S WITNESS, AFFIRMED

18                      DIRECT EXAMINATION

19   BY MR. GIBBS:

20   Q.   Good morning, sir.

21   A.   Good morning.

22   Q.   Sir, would you please state your name for the record and

23   also spell your last name.

24   A.   Yes.  My name is John Richard Minichello.  My last name is

25   spelled M-i-n-i-c-h-e-l-l-o.

Minichello - Direct                                              264

1   Q.   And who do you work for?

2   A.   I work for the Federal Bureau of Investigation, or the

3   FBI.

4   Q.   And how long have you worked for the FBI?

5   A.   At this point, approximately eight years.

6   Q.   And where were you assigned in mid-2013?

7   A.   I was assigned to the Washington Field Office of the FBI.

8   Q.   And that's here in Washington, D.C.?

9   A.   That's correct, yes.

10  Q.   And at that time in mid-2013, were you working on any

11  investigations that eventually made you aware of the defendant,

12  Nicholas Young?

13  A.   I was, yes.

14  Q.   Was any other agent assigned to that investigation with

15  you as a co-case agent?

16  A.   They were.

17  Q.   And who was that?

18  A.   My co-case was Agent Cameron Siegfried.

19  Q.   And would you know how to spell his last name?

20  A.   I'll make sure.  Yeah, it should be S-i-e-g-f-r-i-e-d.

21  Q.   And, Special Agent Minichello, are you familiar with

22  what's known as a confidential human source, or a CHS?

23  A.   I am, yes.

24  Q.   What is that?

25  A.   A confidential human source is an individual that the FBI

Minichello - Direct                                              265

1   uses to collect information or evidence related to an

2   investigation.

3   Q.   And was a confidential human source introduced into this

4   investigation that you were just testifying about?

5   A.   They were, yes.

6   Q.   Who was that?

7   A.   That was Mo.

8   Q.   And was Mo paid in his role as a confidential human

9   source?

10  A.   He was, yes.

11  Q.   How much was he paid?

12  A.   Approximately $34,000.

13  Q.   And what did that roughly $34,000 include?

14  A.   It included both payments for services for activities

15  related to our investigation, and it also covered expenses

16  related to travel and other incidental expenses that came up

17  that he had to pay during the investigation.

18  Q.   And is paying a CHS something that the FBI routinely does?

19  A.   Yes, that's routine.

20  Q.   Now, Special Agent Minichello, what is a handling agent?

21  A.   A handling agent is the FBI agent or individual that

22  interacts with the human source and provides them with taskings

23  of what to do and also receives information they've collected

24  to put into reports about their investigation.

25  Q.   And in this investigation, who were Mo's handling agents?

Minichello - Direct                                                    266

1   A.    Mo's handling agent was both myself and Agent Siegfried

2   that I mentioned earlier.

3   Q.    And what did being Mo's handling agent entail?

4   A.    Generally, it entailed meeting with the human source, Mo,

5   on a regular basis, receiving information and data collected

6   related to our taskings, and providing them with new taskings

7   about what information we need to collect and how to go about

8   doing that.

9   Q.    And, Special Agent, can you explain what a legend or a

10  back story is?

11  A.    Sure.  When working with a confidential human source,

12  we'll often work out a, what we call a legend or a back story

13  for that source, and what that is, it is a back story that the

14  source can provide to subjects or other individuals that

15  they're interacting with that isn't their real personal

16  history.

17        The reason for that is that the human source risks

18  exposure to them and their families with the subjects if those

19  subjects would be aware of who they actually were, and so we

20  give them this back story.  It also allows the human source to

21  provide a reason for being where they are and for interacting

22  with the subjects.

23  Q.    And what was Mo's legend or back story?

24  A.    Mo's back story was that he was of Palestinian descent and

25  that he had previously been with the United States military.

Minichello - Direct                                                267

1   Q.   And when Mo started working for the FBI as a confidential

2   human source, what, if anything, was he told about keeping his

3   relationship with the FBI secret?

4   A.   Mo was advised that for his own safety, he should not tell

5   other people that he was working with the FBI.

6   Q.   But at some point in the investigation, did you learn that

7   Mo had, in fact, told somebody about his relationship with the

8   FBI?

9   A.   We did, yes.

10  Q.   All right.  Can you describe what happened?

11  A.   Yeah.  Briefly, we received an e-mail -- I received an

12  e-mail from an individual who was clearly not Mo, and that

13  e-mail intimated that that individual was aware that Mo was

14  working with the FBI.

15  Q.   And as a result of getting that e-mail that was clearly

16  not from Mo, what did you do?

17  A.   We were concerned about the safety of the human source,

18  Mo, and so we looked carefully to identify who was the sender

19  of that e-mail and then to deal with the source, to figure out

20  who else the source might have informed that he was working

21  with the FBI.

22  Q.   And can you describe what you did to try to get to the

23  bottom of this event?

24  A.   Yeah.  We did a number of different actions after we got

25  that e-mail.  Those included discussing the matter with the

Minichello - Direct                                              268

1  human source, and also conducted research on our own pertaining

2  to the e-mail as well as the individual we later identified to

3  be the sender of that e-mail.

4  Q.   And who did you determine that Mo had actually told about

5  his relationship with the FBI?

6  A.   Initially, we determined that an individual named

7  Stephanie and as well as an individual named Keith were

8  individuals that Mo had told about his working relationship

9  with the FBI, and then later, we also determined that there was

10 another individual named David.

11 Q.   And who did you determine Stephanie was?

12 A.   Stephanie was Mo's girlfriend at the time.

13 Q.   And who did you determine David and Keith were?

14 A.   David and Keith were both individuals that were involved

15 in the same line of work that Mo was.

16        THE COURT:  I'm sorry, what do you mean by same line

17 of work?

18        THE WITNESS:  Do you want me to clarify?

19        THE COURT:  Well, do you mean they were other

20 undercover people or they had --

21        THE WITNESS:  No, I apologize, in the same line of

22 work that Mo is involved in now.

23        THE COURT:  All right.

24        MR. GIBBS:  Thank you, Judge.

25 Q.   Now, Special Agent Minichello, when did this occur?

Minichello - Direct                                                    269

1  A.   In roughly April of 2014.

2  Q.   And had Mo been introduced to the defendant by that point?

3  A.   He had not, no.

4  Q.   And when was Mo eventually introduced to the defendant?

5  A.   Mo was introduced to the defendant in May of 2014.

6  Q.   Now, you testified that in April 2014, Mo was not

7  reporting on the defendant and hadn't met the defendant at that

8  point, correct?

9  A.   At the time of the incident you're talking about, yes,

10 that is correct.

11 Q.   Yes.  But at some point, did Mo start to provide

12 information about the defendant?

13 A.   Yes.

14 Q.   And did the FBI ultimately task Mo to start recording his

15 interactions with the defendant using the FBI's equipment?

16 A.   We did, yes.

17 Q.   And when was that?

18 A.   The first recordings were in July of 2014.

19 Q.   And from that point forward in July of 2014, was Mo always

20 recording his interactions with the defendant?

21 A.   Mo was, yes.

22 Q.   Now, what was the procedure to get these recordings back

23 from Mo once they were done?

24 A.   Mo was issued an FBI recording device, which he kept on

25 his person and could activate and deactivate prior to his

Minichello - Direct                                        270

1  meetings with the subject, Nick Young.  Once that had occurred,

2  we would meet with Mo at the soon as practical time that didn't

3  put him in danger, retrieve that device, and then we would be

4  able to access the information on that device after retrieval.

5  Q.   And, Special Agent Minichello, did there come a point in

6  time that Mo was removed from the investigation of the

7  defendant?

8  A.   He was, yes.

9  Q.   Why was that?

10 A.   We mentioned before the concept of a story arc or a

11 legend.  The legend that had been developed with Mo naturally

12 culminated with his supposed travel to join ISIS, the terrorist

13 group, and that is what we engineered into the structured story

14 with Nicholas Young.  It therefore made sense for the source's

15 credibility to culminate that story arc with the source

16 departing and actually traveling to join ISIS, and that's the

17 point at which we removed him.

18 Q.   And, Special Agent Minichello, before Mo reportedly left

19 this area, did he and the defendant set up e-mail accounts?

20 A.   They did, yes.

21 Q.   Okay.  And whose idea was it to set up those e-mail

22 accounts?

23 A.   That was Nicholas Young's idea.

24         THE COURT:  I'm sorry?  That was whose idea?

25 BY MR. GIBBS:

Minichello - Direct                                                    271

1    Q.    Whose idea was that?

2    A.    Yeah, the subject's.

3          MR. GIBBS:  Okay.  Your Honor, we have a stipulation,

4    it's Stipulation No. 1, I'd like to read into the record.

5          THE COURT:  All right.

6          MR. GIBBS:  The United States and the defendant

7    hereby stipulate and agree that Government Exhibits 1-101

8    through 1-222 are authentic business records of 1&1 Mail &

9    Media, Incorporated.

10         And, Your Honor, at this time, I'd like to have the

11   witness look at one of those exhibits that was just referenced,

12   and that would be Government Exhibit 1-200.

13         THE COURT:  Is there any objection to 1-200?

14         MR. SMITH:  No.

15         (Government's Exhibit No. 1-200 was received in

16   evidence.)

17   BY MR. GIBBS:

18   Q.    And, Special Agent, what is 1-200?

19   A.    This exhibit is -- it's subscriber information for an

20   e-mail account.

21   Q.    And do you know whose e-mail account this is?

22   A.    Yes.

23   Q.    And whose e-mail account is this?

24   A.    The e-mail account essakobayashi@mail.com was used by

25   Nicholas Young.

Minichello - Direct                                                    272

1          MR. GIBBS:  And if we could publish that?

2          And if we could go to the second page?

3   Q.  Special Agent Minichello, looking at the bottom of the

4   second page, what was the first date listed for this Essa

5   Kobayashi account?

6   A.  Do you want the very last date listed or the --

7   Q.  Yeah, the -- yeah, the last date.  It begins at the

8   bottom.

9   A.  October 25, 2014.

10  Q.  Thank you.  And, Special Agent Minichello, when did Mo

11  supposedly leave the country?

12  A.  Mo supposedly left the country and did actually leave the

13  country in October of 2014.

14          THE COURT:  I'm sorry, your voice trails off.  You

15  need to stay near the microphone and keep it up.

16          THE WITNESS:  I apologize, Your Honor.

17          THE COURT:  All right.  And that answer again,

18  please?

19          THE WITNESS:  Of course.  October of 2014.

20  BY MR. GIBBS:

21  Q.  And where did Mo tell the defendant he was going to first?

22  A.  Mo indicated that he was going to first travel to Turkey.

23  Q.  And you said Mo did travel overseas, in fact, and did Mo,

24  in fact, go to Turkey?

25  A.  He did, yes.

Minichello - Direct                                                    273

1   Q.   Who went with him?

2   A.   I did.

3   Q.   Now, what was the reason for actually traveling abroad

4   with Mo?

5   A.   There were a couple reasons, but the primary reason was

6   that by traveling to Turkey -- by Mo actually traveling to

7   Turkey, it created a record of his travel in government

8   systems, and there was concern at the time that Nicholas Young

9   might have access to government records and be able to check

10  whether Mo had actually traveled to Turkey.

11  Q.   And what did you and Mo do in Turkey to backstop his

12  travel story?

13  A.   While we were in Turkey, we traveled primarily in Istanbul

14  and took photographs and other -- collected other information

15  that we could send back to verify that Mo was actually in

16  Turkey at that time.

17  Q.   And at this time, sir, I'd like to have you take a look at

18  Government Exhibit 1-101.  Do you have that?

19  A.   I do.

20  Q.   And what is this exhibit?

21  A.   This is an e-mail message sent from an account, V x

22  Vendetta, V4Vendetta, to account essakobayashi@mail.com.

23  Q.   And what's the date on that e-mail?

24  A.   The e-mail is dated October 27, 2014.

25          MR. GIBBS:  Your Honor, at this time, we would move

Minichello - Direct                                               274

1   in Government Exhibit 1-101.

2            THE COURT:  Any objection?

3            MR. SMITH:  No.

4            THE COURT:  All right, it's in.

5            (Government's Exhibit No. 1-101 was received in

6   evidence.)

7            MR. GIBBS:  And if we could publish that, please?

8            THE COURT:  Go ahead.  Blow it up.  The jury can't

9   see that.

10           MR. GIBBS:  We'll zoom in on that, Judge.

11  Q.   Special Agent Minichello, who wrote this e-mail?

12  A.   This e-mail was a collaborative effort between myself and

13  Mo.

14  Q.   And which one -- can you identify which e-mail address is

15  Mo's?

16  A.   Yes.  Mo's e-mail address is the first one there, that

17  V4Vendetta@mail.com.

18  Q.   And which one is Young's?

19  A.   Essakobayashi@mail.com.

20  Q.   And you testified a few minutes earlier that before Mo

21  left, the defendant and he set up e-mail accounts so they could

22  communicate?

23  A.   That's correct.

24  Q.   Are these the e-mails they set up?

25  A.   That is also correct, yes.

Minichello - Direct                                                 275

1    Q.   Okay.  And the e-mail indicates that there's an

2    attachment.  What's attached to this e-mail?

3    A.   There's a photograph attached to that e-mail, and it's a

4    photograph of the Libyan consulate in Istanbul.

5                MR. GIBBS:  So if we could pull that up?

6    Q.   And, Special Agent Minichello, what was Young's connection

7    to Libya?

8    A.   Young had traveled to Libya prior to this and had

9    discussed that with the source, Mo.

10   Q.   Next, if I could have you take a look at Government

11   Exhibit 1-102?

12               THE COURT:  Any objection?

13               MR. SMITH:  No.

14               THE COURT:  All right, it's in.

15               (Government's Exhibit No. 1-102 was received in

16   evidence.)

17               MR. GIBBS:  Thank you.  We'll move it in.  Publish

18   it, please.  And if we could zoom in on that?

19   Q.   And just briefly, what is this e-mail?

20   A.   This is a second e-mail from the V4Vendetta account used

21   by Mo to Essa Kobayashi, which was used by Nicholas Young.

22   Q.   And if you look at that e-mail, towards the end, it says,

23   quote -- it talks about Mo meeting someone raising money for

24   the mujahideen, and then it reads, "He is helping me get to my

25   next step, he knows some of the guys we talked about down

Minichello - Direct                                          276

south."

　　　　　　Now, the "guys we talked about down south," what did
you intend to convey using that term?

A.　That term is a reference to ISIS based on the source and
Nicholas Young's previous conversations.

Q.　And what did you intend to convey in that e-mail by using
the term "mujahideen"?

A.　Again, this is supposed to be a reference to ISIS.

Q.　Thank you.

　　　　　　Next, if I could have you take a look at Government
Exhibit 1-103?

　　　　　　And we would ask to move that one into evidence.

　　　　　　THE COURT:　Any objection?

　　　　　　MR. SMITH:　No, Your Honor.

　　　　　　THE COURT:　All right, it's in.

　　　　　　(Government's Exhibit No. 1-103 was received in
evidence.)

　　　　　　MR. GIBBS:　If we could publish it?

　　　　　　THE COURT:　You may publish it.

BY MR. GIBBS:

Q.　And while we're zooming in, Special Agent Minichello, what
is Government Exhibit 1-103?

A.　This is a third e-mail from the V4Vendetta account to the
Essa Kobayashi account we discussed.

Q.　And what was the date of this third e-mail?

Minichello - Direct                                                    277

1   A.   It was dated October 30, 2014.

2   Q.   Now, did you include any photographs with this e-mail?

3   A.   I did, yes.  There are three.

4   Q.   And if you could -- we'll go through each of the three

5   photographs.  If you could indicate just what they are briefly?

6   A.   Of course.  The one marked U.S. 00150 is a photograph of

7   the Blue Mosque.  A similar photograph of the Blue Mosque is

8   for 151.

9   Q.   And let's get caught up.

10           That's the Blue Mosque in Istanbul?

11  A.   That's correct.

12  Q.   And then what's the third photograph?

13  A.   The third photograph is a picture of green birds in a tree

14  that we took while in Istanbul.

15  Q.   And what's the significance of a photograph of green

16  birds?

17  A.   Based on my experience, the reference to green birds is a

18  reference that individuals involved with extremist groups are

19  aware of, as green birds are believed to carry the souls of

20  martyrs to heaven.

21  Q.   Now, in that e-mail, you wrote, "Im leaving the city

22  tomorrow and headed south."  What was "south" a reference to?

23  A.   "South" was a reference to traveling to Syria, which was

24  south of where he was currently.

25  Q.   And how much longer did you and Mo remain in Turkey after

Minichello - Direct                                            278

1   that e-mail?

2   A.   Within the next 24 hours, we departed from Turkey.

3   Q.   And where did you and Mo go after leaving Turkey?

4   A.   Mo and I returned to the United States.

5   Q.   And, Special Agent Minichello, at some point after

6   returning to the United States, did the FBI obtain the

7   defendant's telephone records?

8   A.   We did, yes.

9   Q.   If you could, take a look at Government Exhibit 6-202.

10             THE COURT:  Is there any objection to 6-202?

11             MR. SMITH:  One moment, Your Honor.

12             No.

13             THE COURT:  It's in.

14             (Government's Exhibit No. 6-202 was received in

15   evidence.)

16             MR. GIBBS:  We will move it in.

17   Q.   What is 6-202, Special Agent?

18   A.   6-202 is a court order ordering a telephone provider, in

19   this case Verizon Wireless, to provide telephone records to the

20   FBI.

21   Q.   And what's the date of this court order?

22   A.   The order is dated --

23   Q.   It should be on the last page.

24   A.   Yes.  Sorry, I'm flipping back.

25             It's dated November 7, 2014.

Minichello - Direct                                              279

1           MR. GIBBS:  Could we pull up the first page of that,

2     please?

3     Q.   In the first paragraph there is the number, the

4     571-236-8195.  Is that the defendant's telephone number?

5     A.   That's correct, yes.

6     Q.   Now, what was the reason for getting the defendant's

7     telephone records when you did?

8     A.   We wanted to have an active order in place that provided

9     us with telephone records because we were aware that based on

10    discussions between Mo and the defendant, the defendant would

11    likely send a text communication to Mo as part of their plan.

12    Q.   And was Mo told that you had gotten the defendant's

13    telephone records?

14    A.   No.

15    Q.   What was Mo told about whether he should keep the same

16    telephone that he and the defendant had been communicating on?

17    A.   Mo was clearly instructed to keep that telephone number

18    active in case the defendant contacted him.

19    Q.   And what was Mo instructed to do if he received any

20    communications from the defendant?

21    A.   Mo was instructed to immediately contact myself if he

22    received such communication.

23    Q.   And did you, in fact, receive a phone call from Mo about

24    Nick Young?

25    A.   I did, yes.

Minichello - Direct                                              280

1   Q.   And what did you two discuss in that telephone call?

2   A.   I directed Mo to send me the text message that he received

3   from Nicholas Young.

4   Q.   And if you would, please take a look at Government Exhibit

5   6-201.

6            THE COURT:  Any objection?

7            MR. SMITH:  No objection.

8            THE COURT:  It's in.

9            (Government's Exhibit No. 6-201 was received in

10  evidence.)

11           MR. GIBBS:  And if we could publish that?

12           THE COURT:  Go ahead.

13  BY MR. GIBBS:

14  Q.   And, Special Agent Minichello, what is Government Exhibit

15  6-201?

16  A.   This is a record of a text message that was forwarded to

17  me by Mo after that discussion we mentioned.

18  Q.   And there are a few places at the top of that document

19  that are redacted.  Do you see that?

20  A.   I do, yes.

21  Q.   Do you know what those redactions are of?

22  A.   Yes.  They're redactions of the source's telephone number.

23  Q.   Mo's telephone number?

24  A.   Correct.

25  Q.   And did you have an opportunity to see this document

Minichello - Direct                                              281

1   before the redactions were there?

2   A.   I did, yes.

3   Q.   And did you recognize Mo's telephone number?

4   A.   I did, yes.

5   Q.   Now, what is the date that this text message was forwarded

6   to you from Mo?

7   A.   On November 20, 2014.

8   Q.   And what is the time?

9   A.   The time listed there you can see is 11:06 p.m.

10  Q.   And who is, who is it sent to?

11  A.   It was sent to, you can see there the

12  echotranslation2011@gmail.com, which is an e-mail account that

13  I controlled.  It was tied to a telephone number that Mo

14  forwarded that text to me.

15  Q.   So echotranslation was your account?

16  A.   Correct.

17  Q.   Now, as a result of getting the court order for the

18  defendant's telephone number that you testified about a few

19  moments ago, was the FBI able to determine if the defendant

20  had sent a text message to Mo's phone at around eleven o'clock

21  on November 20, 2014?

22  A.   Yes, we had.

23  Q.   I'd like you to take a look at Government Exhibit 6-203.

24          THE COURT:  Any objection?

25          MR. SMITH:  No.

Minichello - Direct                                                    282

1            THE COURT:  It's in.

2            (Government's Exhibit No. 6-203 was received in

3    evidence.)

4            MR. GIBBS:  Thank you.  If we could publish that?

5    Q.   Once it's up, if you could explain to the jury what this

6    document is?

7    A.   Absolutely.  The image you see here is an image taken from

8    our system, system record with the FBI that allows us to view

9    telephone records that have been provided to us by a telephone

10   provider.  So a telephone provider gives us the records, and

11   our system allows us to look at those records in a clear and

12   concise manner.  This is the image of what we see when we look

13   up those records that were provided to us.

14           MR. GIBBS:  Is there any way to enlarge that at all,

15   or are we stuck with what we've got?

16   Q.   And, Special Agent Minichello, what is listed as the

17   target number here?

18   A.   The target number, that's 1-571-236-8195.

19   Q.   And whose record is that?

20   A.   Nicholas Young's.

21   Q.   Now, the destination number is blacked out.  Do you see

22   that redaction there?

23   A.   I do, yes.

24   Q.   Were you able to look at this before it was blacked out?

25   A.   I was, yes.

Minichello - Direct                                                      283

1   Q.   And whose number was under the blacked-out portion?

2   A.   That was Mo's number.

3   Q.   And finally, how does the date and time on this document

4   from the Verizon record compare with the date and time listed

5   on the previous exhibit?

6   A.   The date is identical.  The time is approximately four to

7   five minutes prior to the previous exhibit.

8   Q.   And had Mo been instructed that if he got any text

9   messages or communications from the defendant, it was important

10  to immediately notify you?

11  A.   He was, yes.

12  Q.   And, Special Agent Minichello, how much longer did you

13  remain on the investigation after Mo supposedly left to go join

14  ISIS?

15  A.   I remained involved in the investigation until end of

16  November-early December 2015, when I transferred to a different

17  field office with the FBI.

18  Q.   Okay.  And finally, if we go back just briefly to

19  Government Exhibit 6-201, to the last page there?

20  A.   Okay.

21  Q.   Now, you testified that this was the text message

22  forwarded to you by Mo, correct?

23  A.   That's correct.

24  Q.   And is the text -- or the words in that text message

25  included at the end of that document?

Minichello - Cross                                          284

1   A.   They are, yes.

2   Q.   And what does that say?

3   A.   The forwarded text message reads:  "Salam.  Hope you had a

4   good vacation.  If you want to grab lunch after jumma, hit me

5   up."

6           MR. GIBBS:  Thank you.  That's all I've got.  I

7   believe the defense will have some questions with you.  Thank

8   you.

9           MR. SMITH:  Yes.

10          THE COURT:  All right, Mr. Smith?

11                      CROSS-EXAMINATION

12  BY MR. SMITH:

13  Q.   Good afternoon, Agent Minichello.

14  A.   Good morning.  How are you?

15  Q.   Well.  How are you?

16  A.   Doing well.

17  Q.   So, Mr. Minichello, you've testified that you were the

18  handler agent for Mo, the CHS, the confidential human source in

19  this case?

20  A.   I was one of the handlers.

21  Q.   One of the handlers.  And Agent Siegfried was the other,

22  the co-handler?

23  A.   Correct.

24  Q.   Now, you've testified that the -- that you would work with

25  the confidential human source to create a legend that would

Minichello - Cross                                                    285

1   allow the confidential human source to report on certain

2   targeted individuals; is that right?

3   A.   Correct.

4   Q.   And the purpose of creating this legend was to establish

5   trust between the confidential human source and the target,

6   correct?

7   A.   That was a part of it, yes.

8   Q.   And the purpose was to establish a personal connection

9   between the informant and the, and the target, correct?

10  A.   In some ways, yes, to establish some personal connection

11  as well as to obfuscate some personal connection that the

12  defendant --

13  Q.   So the legend you helped create for Mo, among other

14  things, was that he was Palestinian, correct?

15  A.   Correct.

16  Q.   That he had a grandmother in Palestine in the West Bank,

17  correct?

18  A.   Yes.

19  Q.   That she was under fire in the West Bank, correct?

20  A.   I don't recall that aspect of that.

21  Q.   We'll get to that.

22           That she had a sister in the West Bank, correct?

23  A.   I believe so, yes.

24  Q.   He had a strained relationship with his father, correct?

25  A.   Yes.

Minichello - Cross                                                     286

1  Q.   Yes.  He went to George Mason University, correct?

2  A.   I don't recall.

3  Q.   We'll get to that, but --

4         THE COURT:  Well, you don't need to say, "We'll get

5  to that."  Let's just ask the question.

6         MR. SMITH:  Okay.

7  Q.   So there were occasions when, when you worked with Mo, the

8  informant, that he would be recorded, he'd be wearing a wire,

9  correct?

10 A.   That is correct, yes.

11 Q.   There were also occasions when he wasn't wearing a wire,

12 correct?

13 A.   That's correct, yes.

14 Q.   When he's reporting on Nicholas Young?

15 A.   Correct.

16 Q.   And you testified that Nicholas Young met Mo, the

17 informant, in May of 2014, correct?

18 A.   Correct.

19 Q.   That he wasn't wired, right?

20 A.   At the time that he met Nick Young, is that what you're

21 asking?

22 Q.   Yes.

23 A.   Correct.

24 Q.   Now, you've testified that Mo had lied to the FBI in April

25 of 2014, correct?

Minichello - Cross                                          287

1   A.   Right.

2   Q.   So you're relying on Mo, the liar, to report on Nicholas

3   Young unrecorded, correct?

4   A.   No.  I was relying on Mo, who had told a lie but is not a

5   liar.

6   Q.   Okay.  So he meets Nicholas Young -- the informant meets

7   Nick on what date, do you remember?

8   A.   I don't recall.

9   Q.   It was May 22, right?

10  A.   I don't recall but somewhere around there, yes.

11            MR. SMITH:  A document.

12            THE COURT:  Wait, wait, you stay right there.

13            THE WITNESS:  Thank you.

14            THE COURT:  Is there a question?

15  BY MR. SMITH:

16  Q.   The question is did you draft -- do you see a memo in

17  front of you right now?

18  A.   Yes.

19  Q.   It's an FBI memo, right?  It's called a 1036 memo?

20  A.   Okay.

21  Q.   What is a 1036 memo?

22  A.   Well, in this case, it's a report of a -- basically a

23  report of a report of information that I collected from a

24  source.

25  Q.   Okay.  And you were collecting information from the source

Minichello - Cross                                              288

1    in that particular memo on Nicholas Young meeting with the

2    informant, correct?

3    A.   Yes, that's correct.

4    Q.   You didn't record -- you didn't instruct Mo to wear a wire

5    on that occasion, correct?

6    A.   Not that I recall.

7    Q.   Why didn't you?

8    A.   We often don't have sources record every conversation they

9    have with individuals.

10   Q.   When you review your notes, your summary of that meeting

11   on May 22 between the informant and Nicholas, did you record

12   that Nicholas discussed ISIS with Mo?

13   A.   Did I record as in conduct a recording, or did I write --

14   Q.   Did you reflect in your memorandum dated May 22, 2014 --

15   A.   Understood.  I'm sorry, what was it you were asking about

16   then?

17   Q.   Did you reflect --

18           THE COURT:  Wait, stop one second.  You both have to

19   slow down.  You have to speak more slowly and louder.  Stop

20   rustling papers.  It gets picked up on the microphone,

21   Mr. Smith, all right?

22           MR. SMITH:  Sorry, sorry.

23           THE COURT:  All right, let's start over.  Ask the

24   question, please.

25   BY MR. SMITH:

Minichello - Cross                                              289

1   Q.   The memorandum you're holding right now was drafted by

2   you, correct?

3   A.   The information in there was, yes.

4   Q.   Okay.  It's dated May 22, correct?  The meeting that

5   allegedly occurred between the informant and --

6   A.   May 22, that is correct.

7   Q.   Okay.

8   A.   The memorandum is not.

9   Q.   Now, your summary of that meeting as reported to you by

10  the informant, who is not wired, on May 22, does your summary

11  include any discussion between Nicholas Young and the informant

12  on the subject of ISIS?

13  A.   Does not appear to in this particular report.

14  Q.   You've testified today that this meeting was not recorded,

15  correct?

16  A.   That is correct.

17  Q.   Isn't it true that the case agent in this case originally

18  believed this meeting was recorded?

19  A.   I don't recall.

20  Q.   Okay.  I'm handing up some documents.

21          THE COURT:  Mr. Young -- I'm sorry, Mr. Smith, there

22  is a microphone there.  Every time you hit the microphone --

23          MR. SMITH:  I apologize, Your Honor.  I apologize.

24          THE COURT:  All right.

25          MR. SMITH:  I'll try to be quiet.

Minichello - Cross                                                          290

```
 1              THE COURT:  All right, this is taking too long.
 2   Ladies and gentlemen, I'm going to give you a five-minute
 3   break.  I'm going to get this better organized.
 4              MR. SMITH:  It's organized right now, Your Honor.  I
 5   can --
 6              THE COURT:  All right.  No more of these long delays.
 7   Now, what is the question?
 8   BY MR. SMITH:
 9   Q.   The question is do you see the e-mail from March 23 from
10   the case agent in this case, Nicholas Caslen, indicating the
11   number of meetings between the informant and Nicholas that were
12   not recorded?
13              THE COURT:  March 23 --
14              MR. SMITH:  March 23 e-mail from Nicholas Caslen.
15              THE COURT:  Of what year?
16              MR. SMITH:  2016.
17              THE WITNESS:  I mean, that's not what it says.  It
18   says, "I think."  It's implying that it's unclear.
19   BY MR. SMITH:
20   Q.   Do you see the e-mail in which the case agent says, "I
21   think there are one or two unrecorded e-mails"?  The e-mail is
22   dated March 23, 2016.  Do you see --
23   A.   The e-mail that I see reads, "I think the first one or two
24   weren't recorded.  I will get in touch with Cam and a former
25   handler to get the specifics."
```

Minichello - Cross                                              291

1   Q.   When Mr. Caslen says, "I will get in touch with Cam and

2   the former handler," who was he referring to?

3   A.   Both with myself and Cameron Siegfried, the agent we

4   discussed earlier.

5   Q.   Now, did Mr. Caslen get in touch with you as indicated in

6   that e-mail of March 23, 2016?

7   A.   I don't recall specifics of the discussions, but yes, we

8   had discussions of him about which means were recorded.

9            THE COURT:  Agent, you've still got to speak up.

10           THE WITNESS:  I'm sorry, Your Honor.

11           THE COURT:  You're fading away.

12           THE WITNESS:  I apologize.

13  BY MR. SMITH:

14  Q.   Now, can you turn your attention to the March 24, 2016,

15  e-mail in front of you?

16  A.   Okay.  I see it.

17  Q.   Is that an e-mail from Special Agent Nicholas Caslen?

18  A.   Yes, it is.

19  Q.   What does it say?

20  A.   It says, "It looks like there were four meets that weren't

21  recorded," and it lists dates.

22  Q.   What are those dates?

23  A.   The first date is May 31, 2014; the second date is June 5,

24  2014; a third date is June 9, 2014; and the fourth and last

25  date is July 12, 2014.

Minichello - Cross                                              292

1   Q.   Did Mr. Caslen, as referenced in the March 23, 2016,

2   e-mail we just reviewed, speak to you about the number of

3   unrecorded dates before he wrote the e-mail on March 24, 2016?

4   A.   I can't recall.

5   Q.   You cannot recall.

6        You've testified that the first time Mr. Young met

7   with the informant was May 22, 2016, correct, as reflected in

8   your --

9   A.   I testified it was in May, yes.  I believe you said the

10  date from the report.

11           THE COURT:   2014.

12           MR. SMITH:   2014, correct.

13  Q.   So this meeting was not recorded, but the case agent

14  originally believed it may have been, and you're stating he was

15  incorrect?

16  A.   I was stating that he did not know based on that e-mail,

17  yes.

18  Q.   He said that he was going to reach out to you, but he did

19  not, you're testifying?

20  A.   Did not reach out to me?  No.

21  Q.   Reach out to you about the number of unrecorded --

22  A.   I'm saying I can't recall the number of conversations I

23  had with Nick Caslen about that.  I'm also saying that he

24  appeared unsure based on the e-mail whether or not those

25  meetings were recorded.

Minichello - Cross                                              293

1   Q.   I understand.  You've testified today that the first

2   recording between the undercover informant and Nicholas Young

3   was made in July 2014, correct?

4   A.   The first recording that Mo made during -- that I have on

5   record recorded was in July of 2014.

6            MR. SMITH:  Can you put on the May 29 tape?

7            MR. ENNS:  May 29?

8            MR. SMITH:  May 29, 2014.

9            This was produced -- this is a record that was

10  produced to us in discovery, Your Honor.

11           THE COURT:  Is there an objection to this?

12           MR. GIBBS:  No, Judge.

13           THE COURT:  All right.

14           MR. SMITH:  Just go to 14 minutes, 40 seconds.

15           THE COURT:  I don't think it's happening.  Let's go.

16           MR. SMITH:  Can you turn to May 29?  Okay.  We'll get

17  back to that.

18           May 29, 2014.

19           THE COURT:  He says it's not -- Mr. Smith, back at

20  the lectern.  Move on.  You don't have it.

21           MR. SMITH:  Okay.

22  Q.   Do you recall the first occasion in which Mr. Young

23  allegedly discusses ISIS with the CHS, the informant?

24  A.   I don't recall the exact date, but I know we recorded it.

25  Q.   Okay.

Minichello - Cross                                                      294

 1  A.   Made a record of it, sorry.

 2  Q.   You did make a record?

 3  A.   Of the recording, yes.

 4  Q.   Do you see the memorandum in front of you?

 5  A.   I do.

 6  Q.   Did you draft it?

 7  A.   Yes.

 8  Q.   It's dated -- what's the date of the meeting on the

 9  memorandum you drafted between the informant and Nicholas

10  Young?

11  A.   The date of the meeting is on 29 June 2014 -- no, I'm

12  sorry, that's reporting it.  It's not the date of the actual

13  meeting.

14  Q.   Correct.  And you report, you write, you transcribe there

15  that Mr. -- the informant informed you that Nicholas Young and

16  the informant discussed ISIS on that occasion, on June 29,

17  2014, right?

18  A.   Yes, that's correct.

19  Q.   Mo was not wearing a wire on this occasion, correct?

20  A.   That is correct.

21  Q.   Okay.  Now, let's take a step back.  You testified earlier

22  that the first recorded meeting between Nicholas Young and the

23  informant was from July of 2014, correct?

24  A.   Recorded or reported?  I'm sorry.

25  Q.   Recorded meeting.  The first meeting in which the CHS, Mo,

Minichello - Cross                                                    295

1   was wearing a wire with Nicholas Young was in July 2014,

2   correct?

3   A.   That's correct.

4            MR. SMITH:  Okay.  We're playing a recording that was

5   marked May 29 -- May 31, 2014.

6            THE COURT:  Does this have an exhibit number so we

7   have it for the record?

8            MR. SMITH:  We're going to mark it as Defense

9   Exhibit 1.

10           THE COURT:  Is there any objection to Defense

11  Exhibit 1?

12           MR. GIBBS:  No, Judge.

13           THE COURT:  All right, it's in.

14           (Defendant's Exhibit No. 1 was received in evidence.)

15           MR. SMITH:  14:40.

16           THE COURT:  This is taking too long.  Move on to

17  something else.

18           MR. SMITH:  You'll let me know when you've got it,

19  right?

20  Q.   So we're about to discuss a May 29 meeting that was

21  recorded by your informant, Mo.  During this May -- after this

22  May 29 meeting, you drafted this memo.

23           THE COURT:  Mr. van Roekel?

24  BY MR. SMITH:

25  Q.   You see it doesn't have a date on it, does it?  It's

Minichello - Cross                                                    296

1   redacted, right?

2   A.   I'm checking, please.

3           MR. SMITH:  Have you got it?

4           MR. ENNS:  14:40.

5           MR. SMITH:  Okay.  Just hold on to it for a second,

6   okay?

7           THE WITNESS:  Yeah, this document does not have a

8   date.

9   BY MR. SMITH:

10  Q.   It does not have a date on it, does it?

11  A.   That's right.

12  Q.   The date, if you look at the top section of the memo,

13  there's a redacted box, correct?

14  A.   There is a redacted box, yes.

15  Q.   Where a date might be to indicate when the meeting was

16  held, right?

17  A.   It's blacked out.  I can't tell.

18  Q.   If you turn the memorandum over, you'll see a highlighted

19  passage about the Soviet invasion of Afghanistan.  Do you see

20  that?

21  A.   I see the highlighted passage.  Let me read it real quick.

22          MR. SMITH:  This is a section --

23          (Defendant's Exhibit No. 1 excerpt was played.)

24  BY MR. SMITH:

25  Q.   Do you recognize that voice that said, "Were they

Minichello - Cross                                               297

1   legitimate jihadis, or were they criminals?"  Do you recognize

2   that voice?

3   A.   I'd have to listen to it again, I'm sorry.

4   Q.   Excuse me?

5   A.   I'd have to listen to it again, I'm sorry.

6           MR. SMITH:  Play it again.

7           (Defendant's Exhibit No. 1 excerpt was played.)

8           MR. SMITH:  Pause it.

9   Q.   Did you hear the phrase, "Was that a jihad, or were they

10  criminals?"  Did you hear that phrase?

11  A.   I believe so, yes.

12  Q.   Whose voice is that?

13  A.   The primary voice speaking there, and actually now I can't

14  remember, I'd have to go back and listen to it again --

15  Q.   I'm referring to the last --

16  A.   The primary voice speaking as you hear it is, it sounds

17  like Mo.

18  Q.   Yes.  And the last voice, did you hear the phrase:  "Were

19  they rebels or were they -- were they legitimate jihadis or

20  were they criminals?"  Did you hear the phrase in the clip we

21  just played?

22  A.   I'd have to hear it again, I'm sorry.  I'll listen --

23          THE COURT:  No, we're not hearing it again.

24  BY MR. SMITH:

25  Q.   Okay.  That voice, is that voice not Nicholas Young?

Minichello - Cross                                                298

1    A.   I can't tell.

2    Q.   You can't tell.

3         There's a highlighted passage on your memorandum.

4    Can you read that for me, please?  What does it say?

5    A.   Yes, absolutely.  It said, "Nick appeared to agree with

6    Peshwaz and stated that the Soviet invasion" --

7         THE COURT:  Agent, you've got to speak louder and

8    more slowly.

9         THE WITNESS:  Of course.  "Nick appeared to agree

10   with Peshwaz and stated that the Soviet invasion of Afghanistan

11   was a legitimate jihad.  Nick argued that" --

12   BY MR. SMITH:

13   Q.   So if I understand you correctly, you've reflected in that

14   memorandum that Nick agreed, Nicholas Young, the defendant,

15   agreed with Peshwaz that the Soviet invasion -- that there was

16   a legitimate jihad against the Soviet invasion of Afghanistan,

17   correct?

18   A.   The Soviet invasion of Afghanistan, yes, that's correct.

19   Q.   You testified earlier today the first recorded meeting

20   between Mo and the defendant was in July 2014, correct?

21   A.   I testified the first meeting that I tasked Mo to record

22   that Mo recorded was in July.

23   Q.   Now, did you -- we just played a recording.  Does it

24   reflect the conversation you've written down in that

25   memorandum?

Minichello - Cross                                                    299

1    A.    Not necessarily.  The information, though, is similar from

2    what they sound on the recording.

3    Q.    What's the date of your memorandum?

4    A.    On this memorandum?

5    Q.    Yes.

6    A.    The one we discussed that didn't have a date?

7              THE COURT:  Did you become aware that at some point,

8    Mo was recording conversations that you or the FBI had not

9    directed him to record?

10             THE WITNESS:  There was a point that that happened,

11   yes, Your Honor.

12             THE COURT:  When did that happen?

13             THE WITNESS:  That was before this time frame.  I

14   can't remember the exact date that it occurred, though, I'm

15   sorry.

16             THE COURT:  I'm sorry, when did you find out that

17   that had happened?

18             THE WITNESS:  I can't recall.  It was before --

19   during April of 2014, I believe.

20             THE COURT:  In April of 2014, you found out that Mo

21   had made some recordings?

22             THE WITNESS:  I knew of one recording that Mo made

23   that he was not directed to make, but it was not of the subject

24   Nicholas Young.

25             MR. SMITH:  Your Honor, if I may, may I continue the

Minichello - Cross                                                    300

1   cross-examination?

2           THE COURT:  We'll see.  Go ahead.  Let's move this

3   along.

4           MR. SMITH:  Now, please play 14:40 again.

5           (Defendant's Exhibit No. 1 excerpt was played.)

6           MR. SMITH:  Your Honor, this disc we're playing was

7   marked as the 5/31 meeting.  It was a recording that the

8   government produced to us as reflecting a recorded meeting that

9   Mo conducted in May of 2014.  That's what we're playing from.

10  Q.   The highlighted passage from your memorandum,

11  Mr. Minichello, what does it read?

12  A.   It reads, "Nick appeared to agree with Peshwaz and stated

13  that the Soviet invasion of Afghanistan was a legitimate

14  jihad."

15  Q.   Now, the date of your memorandum is on the second document

16  I gave you, correct?  The date you drafted the memorandum, as

17  opposed to when the meeting occurred.

18  A.   Yes.  Assuming these are the same, which they appear to

19  be, then the date drafted would have been 6 June 2014.

20  Q.   That's before July 2014, correct?

21  A.   It is, yes.

22  Q.   Okay.  So there were recordings.  Mo did make recordings

23  before July 2014.  Your testimony was incorrect, right?

24  A.   Not necessarily.  I don't recall that --

25          THE COURT:  Mr. Smith, you've got to stop turning

Minichello - Cross                                                     301

1   pages.  We cannot hear you.  We can't hear the witness, all

2   right?

3           Now, what was your answer to that question?

4           THE WITNESS:  My answer to that question was I do not

5   recall a recording by Mo of the subject prior to that, though

6   this information does appear similar.

7   BY MR. SMITH:

8   Q.   Is that a memorandum drafted by you, Mr. Minichello?

9   A.   Yes, it is.

10  Q.   What's the date you drafted the memorandum on?

11  A.   The date listed here is June 9, 2014.

12  Q.   And the meeting that the memorandum reflects between the

13  undercover informant and Nicholas is when?

14  A.   It's June 5, 2014.

15  Q.   Was this meeting recorded?

16  A.   Not that I recall, no.

17  Q.   The case agent originally believed it was recorded,

18  correct?

19  A.   I do not know.

20  Q.   Go to the *Jencks* statement that's in front of you,

21  JKS2-001342.  It's the e-mail from March 24, 2016, from Agent

22  Caslen stating the total number of unrecorded meetings?

23  A.   Oh, that one.  Well, no, it says, "it looks like."

24  Q.   "It looks like."

25           And on the March 23, 2016, e-mail you have in front

Minichello - Cross                                                        302

1   of you from Agent Caslen, he states that he was going to speak

2   to you about the number of unrecorded meetings, correct?

3   A.    In the March 23 e-mail, it does.

4   Q.    Yes.  And then on March 24, Mr. Caslen says there are four

5   unrecorded meetings, correct?

6   A.    No.  Mr. Caslen says it looks like there were four.

7   Q.    It looks like there are four.  Is one of those four

8   June 5, 2014?

9   A.    Yes, it is.

10  Q.    Now, Mr. Minichello, you've testified that it was

11  Mr. Young's idea to set up an e-mail account with the

12  undercover informant, Mo, to speak once the undercover

13  informant, Mo, pretended to go to Syria, correct?

14  A.    I did, yes.

15          MR. SMITH:  Can you give me October 10, 2016?

16          And go to 1 hour, 17 minutes -- excuse me, go to 58

17  minutes.

18          (Excerpt of audio was played.)

19          MR. SMITH:  You were supposed to go to 10-16-2014, 58

20  minutes.  10-16-2014, 58 minutes.  Thank you.

21          (Excerpt of audio was played.)

22          THE COURT:  All right, we're stopping this.

23          Ladies and gentlemen, I'm going to let you get your

24  lunch break early today, all right?  We're going to be on

25  break.  I'd like you back here promptly at -- it's now 12:30.

Minichello - Cross                                                    303

1   I want you back here at 1:30, please, for lunch, all right?

2   We'll stay in session.

3                        (Jury out.)

4            THE COURT:  Now, there are three problems with what

5   is happening right now.  The point you're trying to make is a

6   legitimate point, but it's not being made well, and I do not

7   want -- it's confusing the jury to put on this kind of

8   evidence.

9            First of all, with tapes, there's normally a

10  transcript which helps the jury in listening to them.  These

11  are almost indecipherable; that's number one.

12           Number two, I have told you, Mr. Smith, these are

13  very sensitive microphones.  What you've got is a strip

14  microphone on the lectern.  Every time you move your papers, it

15  is picked up.  It is making it -- I'm sure my court reporter is

16  going crazy -- almost impossible to hear.  So you're

17  undercutting your own presentation by continuing to rattle your

18  papers.

19           Number three, your paralegal is not getting these

20  tapes properly timed or coordinated such that we're getting

21  right to it.  We will not -- I will not permit this kind of

22  long delay or listening to static or conversations that are

23  indecipherable.  You've got to work it out.  That's why we're

24  breaking now for lunch, all right?  Get it worked out.

25           But you cannot continue to rattle your papers at the

Minichello - Cross                                                      304

1    podium, all right?

2           MR. SMITH:  Your Honor, I apologize for rattling the

3    papers, but I'd just like to address the timing issue.

4           THE COURT:  No, you don't need to.  We're recessing

5    court.  We'll see you back here after the lunch break.

6               (Recess from 12:37 p.m., until 1:30 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Minichello - Cross                                                    305

```
 1              A F T E R N O O N   S E S S I O N

 2                   (Defendant present, Jury out.)

 3         THE COURT:  All right, Mr. Smith, how much longer do

 4  you think your cross is going to take?

 5         MR. SMITH:  I think about --

 6         THE COURT:  On your feet, please, at the lectern.

 7         MR. SMITH:  Your Honor, I think it will be about 15

 8  to 20 minutes, but it's going to be sped up because we're going

 9  to -- we've marked a bunch of exhibits so that Mr. Minichello

10  can go through them in order chronologically.

11         THE COURT:  All right.

12         MR. SMITH:  And then the remaining documents we're

13  going to show Mr. Minichello are marked with Bates stamps so

14  that we can quickly go to the correct page.

15         THE COURT:  All right.  For all future witnesses

16  starting tomorrow, you need to make sure you've got your

17  documents in a binder.  You give them to the witness at one

18  time, and that way we don't have this back-and-forth.

19         MR. SMITH:  I understand.  And if I may, I'd like to

20  make one point about the recordings, and this will hold through

21  for the rest of trial probably.  There are -- produced to the

22  defense in discovery were hundreds and hundreds of hours of

23  recorded conversations, maybe multiplying that is not correct.

24  Hundreds of hours of conversations.  And sometimes the

25  undercover informant was wearing a wire for the entire day, so
```

Minichello - Cross                                               306

1   it will be five-six hours.

2           So the defense has had to, to find arguably *Brady*

3   material, pick through hours and hours and hours of

4   conversations, and try to isolate select moments that are

5   relevant to the defense in this case.

6           The defense has spent countless hours trying to

7   isolate specific moments in which the defendant can be heard

8   speaking to the informant.  The recordings are faint.  It's

9   occasionally very difficult to understand the defendant unless

10  the listener is wearing headphones.  So we would just ask the

11  Court's patience in -- when we play certain recordings, it

12  might not be the exact moment at which the relevant comment is

13  made, but it will be made within a matter of moments.

14          THE COURT:  For purposes of the record, you have to

15  have the specific excerpts that you're going to use on one

16  disc.  We're not going to send down to the Court of Appeals,

17  should this case go that way, the entire disc.

18          And the second problem you've got with doing it this

19  way is without transcripts, it's almost impossible to hear

20  them.  Now, we're not going to play them four or five times for

21  the jury.  This was, you know -- both sides' obligation is to

22  produce the evidence in a format that the jury will be able to

23  without too much difficulty understand.

24          So we've got to get this case moving.  We are under a

25  tough time period, but anyway --

Minichello - Cross                                                    307

1            MR. SMITH:  And just, Your Honor, for the record, so

2    on the transcripts point, which is an excellent point, the

3    problem with the transcripts of the recordings that were

4    produced by the government is twofold.  They don't themselves,

5    the memoranda that summarize the recordings don't purport to be

6    exhaustive, so the agents will accurately represent that they

7    listened to this recording, but they're not purporting to

8    represent every single minute in the conversations.

9            So one problem is the transcripts don't cover all of

10   the relevant what we think is *Brady* material.

11           THE COURT:  You do that on cross.  But anyway, the

12   government will have transcripts for the tapes you're going to

13   play?

14           MR. GIBBS:  That's correct, Judge.

15           THE COURT:  All right.  And you have them in one

16   book, the way is our normal practice here?

17           MR. GIBBS:  I believe we do.  I think what we'll

18   do -- and, in fact, Judge, I want to let the Court know Mo is

19   the next witness.  He would have a number of clips, so we

20   would -- our thinking was to provide all the discs to him to

21   identify, move into evidence, and then play them sequentially,

22   and so I believe when you say they're all in the same book, I

23   think Mr. Vera is actually going to pull all the clips -- all

24   the discs out and have them all there on the witness stand so

25   we can go through them one by one.

Minichello - Cross                                                   308

1          THE COURT:  But in terms of listening to them, do you

2    have the transcripts for each one of those clips available?

3          MR. GIBBS:  We do, Judge.

4          THE COURT:  And they should be in one book.  What we

5    tell the jurors is, you know, turn now to tab 4, tab 7, or

6    tab 9.

7          MR. GIBBS:  Correct, Judge.  So we -- all the discs

8    are numbered, and the transcripts are that same number with the

9    -T on it.

10         THE COURT:  All right.  All right, let's bring the

11   jury in.

12         MR. SMITH:  Just one --

13                    (Jury present.)

14         THE COURT:  All right, folks, I hope you had a good

15   lunch.  We're going to try to make sure that things get moving

16   a little bit faster now, all right?

17         Mr. Smith?

18         MR. SMITH:  Your Honor, I've marked several exhibits

19   as Defense Exhibit 2, Defense Exhibit 3, Defense Exhibit 4,

20   Defense Exhibit 5, Defense Exhibit 6 and 7.  Some of these

21   documents are documents that I was reviewing with Agent

22   Minichello before we took a break, but now they are marked and

23   in chronological order so that we can discuss them with Agent

24   Minichello in order.

25   BY MR. SMITH:

Minichello - Cross                                              309

1  Q.   Good afternoon, Agent Minichello.

2  A.   Good afternoon, sir.

3  Q.   There is a document in front of you marked Defense

4  Exhibit 2.  Do you see that document?  There's a yellow sticky

5  note on the front that says DX-2.

6  A.   Oh, I see, DX-2.  It's got a little 1 underneath it?

7  Q.   Yes.

8  A.   Okay.

9  Q.   Is that a memorandum that's drafted by you?

10 A.   Yes.

11 Q.   What is the date of your memorandum draft?

12 A.   It's dated 6 June 2014.

13 Q.   Okay.  And does it reflect a meeting that the undercover

14 informant alleged he had with Mr. Young on a certain date in

15 May?  If you look near the top of the memorandum, there should

16 be a date in May.

17 A.   Yep.  I'm sorry, I see it.  Just let me look through it

18 real quickly.

19        Yes, that is correct.

20 Q.   And which date is that on the memorandum?

21 A.   The date listed there is May 22, 2014.

22 Q.   Now, you're testifying today that there was no recording

23 of the undercover informant Mo's alleged meeting with Nicholas

24 on May 22, 2014; is that correct?

25 A.   I testified that Mo did not make a recording of that

Minichello - Cross                                                    310

1    meeting on May 22, 2014.

2    Q.   Right.  And you testified that Mo to the best of your

3    knowledge did not make any recordings in his meetings with

4    Nicholas Young until July 2014; is that correct?

5    A.   That is correct.

6    Q.   Okay.  So there is no recording for this meeting on

7    May 22, which is reflected in the memorandum DX-2 in front of

8    you?

9    A.   I can testify that to my knowledge, Mo did not make a

10   recording of that, correct.

11   Q.   Now, in your memo, do you reflect that Mo had a

12   conversation with Nicholas Young about ISIS in DX No. 2 in the

13   memo in front of you?

14   A.   I do not see a mention of ISIS in this report.

15   Q.   You do not see a mention --

16        THE COURT:  This is the last time we're going to do

17   this.  If you're asking him to read reports and say something

18   that is or isn't in it, it just can't go like this.

19        All right, he said there was -- your answer was no.

20        THE WITNESS:  Correct.

21        MR. SMITH:  Your Honor, this is going to go quickly.

22   Q.   Do you see a document marked DX-3 in front of you?

23   A.   I do, yes.

24   Q.   Now, does -- what's the date of the memorandum?

25   A.   That memorandum is dated 6 June 2014.

Minichello - Cross                                                    311

1   Q.   Okay.  Did you draft that memorandum?

2   A.   Yes.

3   Q.   Now, there's no date of the alleged meeting that this

4   memorandum reflects between Nicholas Young and Mo in that

5   memorandum, correct?  The memorandum purports to summarize a

6   meeting between Nicholas Young and the undercover informant,

7   Mo, but there is no date of the meeting in that memorandum,

8   correct?

9   A.   Let me check.  That's correct.

10  Q.   Now, there's a paragraph that we were reading in the

11  earlier session about the Soviet invasion of Afghanistan.  Can

12  you find that paragraph?  I think it's on the second page of

13  DX-3.

14  A.   Let me look.

15  Q.   It begins, "Nicholas appeared to agree that the Soviet

16  invasion of Afghanistan was a legitimate jihad."

17  A.   Here we go.  Third page, I have it.

18  Q.   Can you read that sentence, please?

19  A.   Yes.  "Nick appeared to agree with Peshwaz, who stated

20  that the Soviet invasion of Afghanistan was a legitimate

21  jihad."

22          MR. SMITH:  Okay.  Please play the recording, please,

23  at 3 minutes, 40 seconds.

24          (Audio excerpt was played.)

25          MR. SMITH:  Stop it.

Minichello - Cross                                             312

1   Q.   Is that voice not Mr. Young saying that the rebels against

2   the Afghanistan government are not jihad; they are criminals?

3   Did you, did you understand that from the recording?

4   A.   I can't recall that specific bit.

5   Q.   Yeah.  Do you think that that conversation, that clip we

6   just played is the same clip that you're -- is the same portion

7   of conversation you're purporting to summarize in the June 6

8   memo marked DX-3?

9   A.   No.  I mean, the information is similar.  It talks about

10  the Soviet invasion of Afghanistan.

11  Q.   So you are agreeing that you are purporting to reflect the

12  conversation we just listened to on the recording in the

13  memorandum in front of you marked DX-3?

14  A.   No.  I'm saying that they have the same information in

15  them.

16  Q.   Okay.  Can you turn to DX-4, please?

17       Now, you've testified today that the first recorded

18  conversation between the informant and Nicholas Young was in

19  July 2014, correct?

20  A.   The first recording that Mo made of this subject, Nicholas

21  Young, defendant now, was in July.

22  Q.   And so you're testifying that what we just heard was not a

23  recording between Nicholas Young and the undercover informant

24  in May 2014; is that correct?

25  A.   I'm testifying that I did not task the, Mo to make a

Minichello - Cross                                                      313

1    recording of that conversation.

2    Q.   I'm not asking whether you tasked him.  I'm asking --

3          THE COURT:  You need to let the witness finish.

4    You're cutting him off.

5    BY MR. SMITH:

6    Q.   Mr. Minichello, I'm not asking whether you tasked Mo with

7    recording a conversation between Young and himself in May 2014.

8    I'm asking whether the clip we just listened to, as reflected

9    in your memorandum dated June 6 and marked DX-3, is a

10   conversation between Mr. Young and Mo in May of 2014.

11   A.   And I can't speak to the veracity of that, whether or not

12   it is, in fact, that conversation.

13   Q.   Were you the handler agent for Mo in this case?

14   A.   At that time?  Yes.

15   Q.   Yes.  Because you drafted a memo dated June 6, 2014,

16   correct?

17   A.   That's correct, yes.

18   Q.   Yes.  So are you representing today that you do not

19   recognize Mo's voice?

20   A.   I -- as I testified earlier, that does sound like Mo in

21   that recording.

22   Q.   Are you -- now, as Mo's handler, would you often hear

23   Nicholas Young's voice on recordings that Mo made?

24   A.   Yes.

25   Q.   Do you recognize Nicholas Young's voice?

Minichello - Cross                                              314

1   A.   It does sound similar to Nicholas Young, yes.  I'm not

2   trying to evade that.  I just can't --

3   Q.   Right.  The clip we just listened to sounds like Mo

4   speaking to Nicholas Young, correct?

5   A.   It sounds very similar, yes.

6   Q.   And it sounds like the conversation you were recording in

7   a memorandum dated June 6, 2014, correct?

8   A.   The information that is in that memorandum sounds very

9   similar to that conversation that we heard in that recording,

10  yes.

11  Q.   So when you testified earlier that the first recording

12  that was made between the informant and Nicholas Young was July

13  2014, that was probably incorrect, correct?

14  A.   No, that is incorrect.  I testified that the recording

15  that -- the first time that I tasked Mo to make a recording of

16  Nicholas Young, the first recorded conversations that I tasked

17  Mo to make were in July.

18        THE COURT:  Excuse me, what you're saying then is

19  apparently Mo made one or two unauthorized recordings?  Isn't

20  that what you're saying?  You start the official request from

21  the FBI to record in July.

22        THE WITNESS:  Yes, although I'm not -- I'm also not

23  testifying this particular recording is made by Mo of the

24  subject.  It does sound like it is a conversation between the

25  two, yes, in May.

1          THE COURT:  All right, that's the answer.  We've been

2    over this several times.

3          THE WITNESS:  So I don't mean to be obfuscating.  It

4    just --

5    BY MR. SMITH:

6    Q.   Okay.  Please turn to DX-5, please.  Is this a memorandum

7    you drafted?

8    A.   Yes, it is.

9    Q.   Does it have a date that purports to reflect a meeting

10   between Mo and Nicholas Young, Mo the informant and Nicholas

11   Young?

12          It's near the top.  Does it say June 29, 2014?

13   A.   I see the date.  I'm just making sure that --

14   Q.   Okay.

15   A.   -- what you're asking for is what's in the reporting.

16          Yes, it looks like on June 29, 2014, he had a meeting

17   with Nick --

18   Q.   Does it appear that the -- does the -- did Mo represent to

19   you that he had a conversation with Nicholas Young on June 29

20   about ISIS?

21   A.   Let me check.

22          Yes.

23   Q.   Do we have any reason to believe that this is not the

24   first occasion in which you recorded in a memorandum that

25   Mr. Young had a conversation about ISIS with the informant, Mo?

Minichello - Cross                                            316

1   A.   I'm sorry, could you restate the question?

2   Q.   Do you have any reason to believe that this memorandum

3   you're holding marked DX-5 is not the first occasion in which

4   you drafted a memorandum representing that the informant, Mo,

5   told you he had a conversation with Mr. Young about ISIS?

6   A.   Not that I can recall, no.

7   Q.   You have no reason to believe that this is not the first

8   alleged occasion in which Mo discusses ISIS with Nicholas

9   Young, correct?

10  A.   I'm sorry, I -- could you rephrase the question?

11  Q.   You're the case agent -- the agent handler for Mo, the

12  informant, correct?

13  A.   Yes, absolutely.

14  Q.   So you are familiar with the recorded history of

15  conversations between Mo and Nicholas Young, correct?

16  A.   Yes.

17  Q.   Do you have any reason to believe based on your knowledge

18  as agent handler for Mo that there was any recorded

19  conversation or memorialization of Mo's alleged conversations

20  with Nicholas about ISIS before this date, June 29?

21  A.   I have no reason to believe that Mo recorded any

22  conversations with Nicholas Young about ISIS before this date.

23  Q.   Thank you.  This meeting is not recorded, correct?

24  A.   Not to my knowledge.

25  Q.   Go to DX -- look down in DX-5.  There's a second date,

Minichello - Cross                                                    317

1  July 6, below the June 29 date.

2         Do you see July 6?  It's in the same exhibit marked

3  DX-5.

4  A.   Yep, I'm just going through it.  I don't see a date.

5  Stand by.

6  Q.   It's about midway, you have to go down the page.

7  A.   6 July?

8  Q.   Yes.

9  A.   Sorry.

10 Q.   So this purports to be a memorialization of a meeting

11 between the informant, Mo, and Nicholas, correct?

12 A.   Yes.

13 Q.   On July 6?

14 A.   It does.

15 Q.   Okay.  Now, does it say whether Mo alleged he had a

16 conversation with Nicholas Young about ISIS?  It does, doesn't

17 it?

18 A.   I have to read it, I'm sorry.

19 Q.   Okay.

20 A.   Please stand by.

21 Q.   I'm not asking you for content.  If you just find the word

22 "ISIS" and see that it alleges that Mr., Mr. Young had a

23 conversation with Mo about ISIS, that's all you need to

24 confirm.

25 A.   Well, I see the comment -- I see the term "ISIS" --

1   Q.   Yes.

2   A.   -- but as it reads, it doesn't necessarily say they had a

3   conversation about it in the first section.

4   Q.   What does it say?

5   A.   Do you want me to read the paragraph?

6   Q.   Please.

7   A.   Okay.  "CHS attended prayer" --

8            THE COURT:  Slow down and louder, please.

9            THE WITNESS:  Sorry, Your Honor.  "CHS attended

10  prayer at Sully Adams on 6 July 2014.  CHS met with Young and

11  T.J. in line for food prepared for breaking the day's FSA.

12  Young asked what they thought" -- it's a misspelling -- "about

13  the recent developments with ISIS.  T.J." --

14  BY MR. SMITH:

15  Q.   Stop.  You just read that Young asked about the recent

16  developments with ISIS, correct?

17  A.   Yes.

18  Q.   So this memorandum purports to reflect that the undercover

19  informant, Mo, had a conversation with Nicholas Young about

20  ISIS on July 6, correct?

21  A.   Well, no.  It says that Young asked their opinion on it.

22  It does not talk --

23  Q.   They had a conversation about ISIS according to Mo,

24  correct?

25  A.   Well, I hadn't gotten that far yet.  It says that Young

Minichello - Cross                                                    319

1   asked him about it.  I don't know whether they had the

2   discussion or not.

3   Q.   It says that Young asked about ISIS on July 6, correct?

4   A.   Yes, correct.

5   Q.   This meeting is not recorded, correct?

6   A.   Not to my knowledge, no.

7   Q.   Okay.  So we've -- so in DX-5, we have June 29 and July 6.

8   On both of those dates, you memorialize that Mo represented to

9   you he had a meeting with Nicholas Young and discussed ISIS on

10  both of those dates, correct?

11  A.   That he met with Nicholas Young and in a second meeting,

12  yes, Young asked him about the recent developments --

13  Q.   And you're testifying you have no reason to believe these

14  are not the first memorializations by you of alleged

15  conversations between Mo and Nicholas Young about ISIS,

16  correct?

17  A.   I don't recall previous memorializations to that effect.

18  Q.   Okay.  They're both not recorded, right?

19            THE COURT:  That's been asked and answered.  Let's

20  move on.

21  BY MR. SMITH:

22  Q.   Please go to DX-6, please.  Do you see this memorandum was

23  drafted by you, correct?

24  A.   Yes, that's correct.

25  Q.   What date does it purport to reflect in a meeting between

Minichello - Cross                                                    320

1    the informant, Mo, and Nicholas Young?

2    A.    The day of the meeting?

3    Q.    Yes.

4    A.    The first section is unclear.

5    Q.    Do you see July 13 --

6    A.    Then there's a second section --

7    Q.    Do you see July 13, the day July 13 in the document marked

8    DX-6?

9    A.    I see that date listed, yes.

10   Q.    And does this purport -- did you draft this memorandum?

11   A.    Yes.

12   Q.    Does it purport to represent that Mr. Young had a

13   conversation with Mo about ISIS?

14   A.    Let me see.

15   Q.    You just need to look for the word "ISIS," and then you

16   can let me know what it says.

17   A.    Okay.  Sorry, it wasn't highlighted.  I'm going to read

18   through to make sure I don't miss something.

19   Q.    Okay.

20         THE COURT:  No, we're not taking time for people to

21   read.

22         MR. SMITH:  This is the last step, Your Honor.

23         THE COURT:  This has got to be the last one.  This is

24   taking too much time.

25         MR. SMITH:  There is one more document after this.

Minichello - Cross                                                    321

1          THE COURT:  No, there will not be another one like

2    this.  It's taking too long.

3          MR. SMITH:  Your Honor, it's not like this.

4          THE COURT:  Let's move this.

5          THE WITNESS:  Sorry, Your Honor.

6          THE COURT:  Ask the question; let's get the answer.

7          MR. SMITH:  I'm just waiting for the --

8          THE COURT:  We want the answer, Agent.

9    BY MR. SMITH:

10   Q.   I asked the agent whether on July 13, Mo represented to

11   you that he had a conversation about ISIS with Nicholas Young.

12   A.   Yes.  Mo represented that he had a meeting with Nicholas

13   Young on July 13, and then the second paragraph, it says that

14   Young said that at this point, with the khalifa being declared

15   by ISIS -- IS is Islamic State -- if another person tries to

16   declare khalifa, they should kill him.

17   Q.   Okay.  So we've just discussed DX-5 and DX-6.  DX-5

18   includes dates June 29, 2014 --

19          THE COURT:  That's repetitive.  Let's move on.

20          MR. SMITH:  Your Honor -- okay.

21   Q.   Please turn to the document marked DX-7.  This is the

22   final document we're reviewing on this subject.  It's a series

23   of e-mails in March 2016.  Do you see DX-7?

24   A.   I do.

25   Q.   Can you please turn to -- there's *Jencks* Bates stamps at

Minichello - Cross                                                    322

1   the bottom of the page that begins JKS.  Do you see those JKS

2   letters?

3   A.   I do, yes.

4   Q.   Do you see JKS, the last digits are 001275?  1275.

5   A.   Here it is.

6   Q.   Do you see the e-mail on March 23, 2016, from Agent

7   Caslen?

8   A.   I do, yes.

9   Q.   He says -- read it to me, please.

10  A.   Just the body?

11  Q.   Just the body of the e-mail.

12  A.   It says, "I think the first one or two were (sic)

13  recorded.  I will get in touch with Cam and a former handler to

14  get the specifics of how many."

15  Q.   Now, you can't testify to what Mr. Caslen was thinking,

16  but this e-mail represents that he reached out to you about the

17  "one or two" that's referenced in the e-mail, correct?  "I

18  think the first one or two weren't recorded"; is that what you

19  said?

20  A.   That's what that read, and it indicates that he may have

21  had the intention of reaching out to both Cam and myself.

22  Q.   Okay.  Please turn to *Jencks* page No. 001342.

23  A.   Sorry.

24  Q.   001342.

25  A.   Yep.  Sorry.  I'm just making -- okay.  I have it here.

Minichello - Cross                                                    323

1   Q.   Do you see the e-mail on March 24, 2016, from Caslen?

2   A.   Yes.

3   Q.   So this e-mail is after the first e-mail we reviewed on

4   March 23, 2016, correct?

5   A.   That would make sense, yes.

6   Q.   Okay.  And what does the March 24, 2016, e-mail from Agent

7   Caslen say?

8   A.   The body reads, "It looks like there were four meets that

9   weren't recorded," then it lists the dates, which are May 31,

10  2014; June 5, 2014; June 9, 2014; and July 12, 2014.

11  Q.   Okay.  So two new dates have been added to the, to the

12  e-mail we reviewed on March 23, correct?  Mr. Caslen first says

13  one or two meetings are not recorded on March 23.  He says he's

14  going to speak to the former handler about it.  That's you,

15  right?

16  A.   Correct, yes.

17  Q.   Then on March 24, Mr. Caslen says there are four meetings

18  that are not recorded?

19  A.   That's correct.

20  Q.   Now, finally turn to *Jencks* 001273.

21  A.   127, I'm sorry, what was the last number?

22  Q.   001273.

23  A.   1273.

24  Q.   Yeah.

25  A.   Okay.

Minichello - Cross                                              324

1   Q.   Do you see an e-mail from -- it begins on the, maybe the

2   page before, 001272.  It's an e-mail dated March 29, 2016.

3   There's a whole bunch of redactions in it, continuing to the

4   next page, but on page *Jencks* No. 001273, do you see a line

5   that says, that adds two more unrecorded dates, unrecorded

6   meetings between -- alleged unrecorded meetings between

7   Mr. Young and the informant, Mo?

8              You'll see a date, June 29, about midway through the

9   page?

10  A.   Okay.  I see where you're talking about.

11  Q.   Okay.  So what does that unredacted line say?

12  A.   It said, "Recordings were not conducted during the

13  meetings on June 29, 2014, or July 13, 2014."

14  Q.   Okay.  So we started on March 23, the e-mail from

15  Mr. Caslen we just reviewed saying there are one or two

16  meetings that are not recorded.  He says he's going to speak to

17  you.  The next e-mail is dated March 24.  He says there are

18  four unrecorded meetings.  Then the final e-mail on March 29

19  says there are two additional unrecorded meetings.  This is

20  within the span of five days, correct?

21  A.   Part of that's correct, yes.

22  Q.   Okay.

23  A.   It doesn't say there were two additional dates, but it

24  does list two additional dates.

25  Q.   Now, on March 29, 2016, one of the additional dates that

Minichello - Cross                                                    325

1    was added was June 29, 2014, correct?

2    A.    That e-mail indicates that there was no meeting during the

3    meeting on June 29, 2014.

4    Q.    That e-mail indicates there was no recorded -- there was

5    no record -- there was no recorded wire of the meeting on June

6    29?

7    A.    It says recordings were not conducted.

8    Q.    Recordings were not conducted.

9          Now, you recall that you agree that June 29, 2014, to

10   the best of your knowledge, is the first recorded time,

11   instance in which the informant, Mo, allegedly had a

12   conversation with ISIS about Mr. Young, correct?

13   A.    No.

14   Q.    You testified earlier that --

15   A.    I don't believe so.  Say that again.  Maybe I missed it.

16   Q.    You testified earlier that June 29, 2014, there was a

17   meeting between Mr. Young and the undercover informant,

18   correct?  That's DX No. 5?

19   A.    I thought you said recording.  I apologize, go ahead.

20   Q.    There was a meeting -- you say there was a meeting on

21   June 29, 2014.  That's DX-5?

22   A.    Yep.

23   Q.    And you agreed that to the best of your knowledge, as

24   agent handler in this case, you're aware of no previous

25   memorializations of Mr. Young allegedly having a conversation

Minichello - Cross                                                    326

1   about ISIS with Mo, correct?

2   A.   Before the June 29 date.

3   Q.   Before the June 29 date.

4   A.   I don't recall any, no.

5   Q.   You testified earlier that you have no reason to believe,

6   there were no earlier memorializations earlier than June 29,

7   2014, reflecting an alleged conversation about ISIS between

8   Nicholas Young and Mo?

9          MR. GIBBS:  Judge, if he testified to that before,

10  it's asked and answered.

11         THE COURT:  Sustained.

12         MR. GIBBS:  Thank you.

13  BY MR. SMITH:

14  Q.   Mr. Minichello, I'd like to talk to you about compensation

15  of the informant, Mo.  So you've testified he was paid over

16  $30,000 to report on Nicholas, correct?

17  A.   Yes, that's correct.

18  Q.   And he was compensated, Mo, for results, correct?

19  A.   He was compensated for a number of things.  Usually we pay

20  sources, as we did in the case of Mo, for expenses incurred, if

21  they have any during the course of their operations, as well as

22  for the services rendered, their time spent, activities that

23  they conduct in our behalf.  We compensate them for that.

24  Q.   So was the compensation tied to performance evaluation in

25  any respect?

Minichello - Cross                                                          327

1   A.   No, not necessarily.  We will discontinue sources if we

2   feel that they are not performing.

3   Q.   You instructed Mo that he would be paid for results in

4   discussing ISIS with Nicholas, correct?

5   A.   No, I don't recall that.

6   Q.   No?  You instructed Mo to raise the subject of ISIS with

7   Nicholas?

8   A.   I don't recall the exact task we related to that.  We, I'm

9   sure, would have instructed him that if the subject came up, it

10  would be of interest to us.

11  Q.   If the subject came up, it would be of interest to you,

12  but did you instruct Mo to raise the subject of ISIS with

13  Nicholas?

14  A.   I can't remember the exact time I would have done that.

15  It's possible, though.

16  Q.   It's possible.

17       You testified earlier that Mo began recording

18  conversations without you instructing him to.  When was that?

19  A.   Prior to his being tasked to engage Mr. Young, he had

20  conducted a recording untasked by us of a meeting with some

21  other subjects.

22  Q.   And did you investigate?

23  A.   I'm sorry, I don't understand.

24  Q.   When did you find out that Mo was recording conversations

25  without your instructing him to?

Minichello - Cross                                                    328

1   A.   There's only one instance, and I can't remember the exact

2   date, but it was before he was tasked as Mr. Young.

3   Q.   So when you found out that he was recording conversations

4   without instructing him to, did you investigate why Mo was

5   doing that?

6   A.   Well, there wasn't any need to investigate it.  Mo told us

7   that he had conducted a recording.  It's not illegal to do that

8   by any means.  We prefer that sources use FBI devices for

9   recording purposes because they are controlled, we can attest

10  to their veracity after the fact, but it's by no means criminal

11  for him to have done so.

12          So after we determined that it occurred, after the

13  source told us, "Hey, I made a recording," we instructed him

14  not to do that in the future and to only do task recordings for

15  us.

16  Q.   So you testified that Nicholas first met Mo in May 2014,

17  correct, to the best of your knowledge?

18  A.   Yes.

19  Q.   But he was -- Nicholas Young was a subject of interest to

20  the Counterterrorism Division of which you are a part before

21  May 2014, correct?

22  A.   Yes, he was.

23  Q.   Mr. Young met the undercover agent, Khalil, in December

24  2010, correct?

25  A.   I don't recall.

Minichello - Cross                                          329

1   Q.   A counterterrorism investigation into Nicholas was opened

2   in September 2010, correct?

3   A.   I can't remember the exact date.

4   Q.   In 2010, it was opened?

5   A.   I can't recall.  I believe that's accurate, but I can't

6   recall the exact date.

7   Q.   Okay.  Before Mr. Young met the undercover informant, Mo,

8   he had traveled to Libya in 2011, correct?

9   A.   I know that Mr. Young had traveled to Libya.  I do not

10  know the dates of that.

11  Q.   But the Bureau understood, the counterterrorism section

12  understood that Mr. Young had traveled to Libya in 2011,

13  correct, before he met Mo?

14  A.   I can't attest to the dates, but yes, he had traveled to

15  Libya.  I was aware of that.

16  Q.   The Bureau understood that Mr. Young carried a firearm

17  routinely as a part of his work with Metro Transit Police,

18  correct?

19  A.   I believe that's accurate, yes.

20  Q.   They understood these facts between 2011 and May 2014,

21  when Mo first met Nicholas, correct?

22  A.   Yes.

23  Q.   Did you instruct Mo to meet Nicholas, encounter Nicholas,

24  and report on Nicholas at any point before May 2014?

25  A.   I don't recall.  I don't believe so.  That meeting

Minichello - Cross                                              330

1   occurred not at our direction, as I recall.  I don't believe I

2   tasked him to meet with --

3   Q.   Well, you testified to the best of your knowledge, the

4   first time Mr. Young met the informant, Mo, was in May of 2014,

5   correct?

6   A.   Correct.  I can't see why I would have tasked him to do

7   that.

8   Q.   You did not -- you did not task Mo to report on Nicholas

9   at any point between 2010, when the investigation opened, and

10  2014, correct?

11  A.   I do not recall, no.

12  Q.   Now, the Bureau understood that Mr. Young made a second

13  trip to Libya in September 2011, correct?  There was one trip

14  in May of 2011.  There was a second trip in September of 2011,

15  correct?

16  A.   I'm sorry, I cannot attest to those dates.

17  Q.   After Mr. Young returned from Libya, the Bureau attempted

18  to recruit Nicholas as an undercover informant, correct?

19  A.   I can't attest to that either.

20  Q.   You don't know whether Mr. Young was recruited as an

21  undercover informant?

22  A.   I'm sorry?

23  Q.   You don't know whether Mr. Young was recruited by the

24  Counterterrorism Section as an undercover informant?

25  A.   To my knowledge, he was not recruited as a CHS.

1   Q.   He was not?

2   A.   Correct.

3   Q.   Okay.

4        THE COURT:  Ladies and gentlemen, I do want you to be

5   aware that when the lawyers make a statement of fact in a

6   question, if the witness says, "I don't remember," "I can't

7   recall," or "I don't know," the lawyer's question is never

8   evidence.  It's only the answer that a witness provides that's

9   the evidence, so be very careful in understanding the

10  difference between that.

11       MR. SMITH:  I'm keeping the papers off the lectern

12  here so I don't -- okay.

13  Q.   I'm handing up a document that we will mark as Defense

14  Exhibit 8.

15  A.   Thank you, sir.

16  Q.   Now, that's a, what you call a 302 memo, right?

17  A.   It is, yes.

18  Q.   What's a 302 memo?

19  A.   It is a document that reports factual information to the

20  best of our knowledge that we've recorded through an interview

21  or other means -- other investigative activities we conduct in

22  the FBI.

23  Q.   Okay.  So before you review this document, you've

24  testified, to be clear, that you were unaware that the

25  Counterterrorism Section has attempted to recruit Mr. Young as

Minichello - Cross                                                      332

1   an informant?

2   A.    Correct.

3   Q.    Okay.  What is the date on that 302?

4   A.    It is dated September 29, 2011.

5   Q.    Okay.  Can you turn to the last page of the memorandum?

6   Excuse me, first tell me, what agent was interviewing Mr. Young

7   on September -- well, what is the agent's name at trial?

8   A.    I'm sorry, I don't understand the question.

9         THE COURT:  Wait, wait, wait, wait, wait.

10        MR. GIBBS:  Can we approach?

11        THE COURT:  Yes.

12        (Bench conference on the record.)

13        MR. GIBBS:  Judge, I believe that the answer is going

14  to be one of the FBI witnesses whose identity is protected, but

15  I'm not -- I mean, I think at a minimum, he needs to be asked

16  as a leading question, but this is a document from 2011 that he

17  didn't author.  I'm not quite sure where we're getting with

18  the --

19        THE COURT:  You need to ask him has he ever seen that

20  document before.  He's already testified he doesn't know.  His

21  involvement appears to be from 2014 on.  You cannot let this

22  name get revealed, so I think this line of questioning should

23  stop.  You should be able to get this from another witness.

24        MR. SMITH:  Okay.  Well, it might depend, Your Honor,

25  depending on -- we don't know exactly who's going to testify

Minichello - Cross                                                    333

1    for the government.  We have never received a witness list.

2             THE COURT:  You've got a list right here.

3             MR. SMITH:  The government actually refuses to give

4    us an exhibit list.

5             MR. KROMBERG:  I provided the names directly to

6    Ms. Moreno, and I announced it in open court yesterday for all

7    the world to hear.

8             THE COURT:  All right, let's move this along.  This

9    agent is not going to help you on this point.

10            MR. SMITH:  Okay, okay.  Fine.

11            THE COURT:  By the way, you've got to let the witness

12   finish the answer.  You're keeping him -- this transcript is

13   going to be a complete piece of garbage.  You have to wait

14   until the witness finishes answering.

15            MR. SMITH:  Sometimes I can't hear him, Your Honor.

16            THE COURT:  I'm sorry?

17            MR. SMITH:  Sometimes I can't hear him.

18            THE COURT:  Well, then tell him to speak up.  I've

19   been having problems, too, all right?

20            (End of bench conference.)

21   BY MR. SMITH:

22   Q.   Mr. Minichello, you were Mo's agent handler, so you were

23   following the conversations that the informant, Mo, alleged he

24   had with Nicholas throughout the course of the investigation

25   while you were the agent handler for Mo, correct?

Minichello - Cross                                              334

1   A.   That's correct, yes.

2   Q.   Were you aware -- did you review any alleged

3   communications between Mr. Young and Mo in which Mo represented

4   that Nicholas had ever actually spoken to anyone in ISIS?

5   A.   I'm sorry, could you repeat the question?

6   Q.   In reviewing Mr. Young's alleged conversations with Mo

7   through recordings or through debriefings, did you ever come to

8   learn that Nicholas Young had ever spoken to anyone actually in

9   ISIS, any members of ISIS?

10  A.   Sorry, I'm thinking.  Give me a second.

11       I can't recall having any statements where he said he

12  had contacted somebody directly in ISIS.

13       THE COURT:  Ladies and gentlemen, are any of you

14  having trouble hearing the witness?

15                      (Jurors nodding heads.)

16       THE COURT:  You are.

17       THE WITNESS:  I'm sorry.

18       THE COURT:  You've got to speak up.  I don't know how

19  many times I have to say that, all right?

20       THE WITNESS:  I keep trailing off.  I apologize.

21  BY MR. SMITH:

22  Q.   So you're unaware of the defendant ever actually speaking

23  to ISIS during the course of your investigation with Mo between

24  May of 2014 and August of 2016; is that correct?

25  A.   That's correct.

Minichello - Cross                                                    335

1    Q.   So you continued to instruct Mo to discuss ISIS with

2    Nicholas Young when you had no information that he was speaking

3    to anyone in ISIS, correct?

4    A.   That's correct.

5    Q.   Now, you've testified about some e-mails that were sent

6    from someone pretending to be Mo in Turkey but who was not

7    actually Mo.  It was an agent, correct?

8    A.   No, incorrect.  Those e-mail communications were a

9    collaborative effort between myself and Mo.

10              THE COURT:  Agent, speak up.

11              THE WITNESS:  That is incorrect.  Those e-mail

12   communications were a collaborative effort between myself and

13   Mo, so to say that they were not from Mo is inaccurate.

14   BY MR. SMITH:

15   Q.   Okay.  So the first -- you've represented that the first

16   e-mail that was a collaborative effort between you and Mo to

17   Nicholas Young after Mo pretended to leave the United States on

18   October 25, 2014, was an e-mail dated October 27, 2014,

19   correct?

20   A.   No.  Mo did leave the country.  We both traveled to

21   Turkey.

22   Q.   No, no, I'm saying -- my question is you were representing

23   that the first communication for Mo to Nicholas Young after Mo

24   left the country -- after the person pretending to be Mo left

25   the country was dated October 27, 2014, correct?

Minichello - Cross                                                    336

1    A.    Okay.  To be clear, Mo left the country, not pretending to

2    be Mo.  Mo left the country, as did I, and --

3    Q.    Well, his name is not actually Mo.

4    A.    Understood.  So just to be clear, yes, the person we're

5    talking about as Mo left the country with me, and then from

6    Turkey, we sent that first e-mail.  The collaborative effort

7    that was that e-mail, we sent it back to Nicholas Young.

8    Q.    Did Nicholas respond to that e-mail?

9    A.    To the series of e-mails, yes, but there was a delay in

10   the time between that e-mail was sent and the time that he

11   replied.

12   Q.    How long was the delay?

13   A.    How long was the delay?

14   Q.    Yes.

15   A.    You know, I don't remember the exact date that he replied,

16   but I believe it was in December of 2014.

17   Q.    So you wrote him an e-mail in October, after Mo left the

18   country, and he doesn't respond to it for three months, right?

19   A.    Not three months, but there is a delay, yes, as I

20   discussed.

21   Q.    Okay.  So the process -- the process by which you created

22   these e-mails, you said initially it was collaborative between

23   yourself and the undercover informant, Mo.  It was

24   collaborative for that October 27 e-mail from Turkey, right?

25   A.    There were three e-mails that were done collaboratively

Minichello - Cross                                            337

1   with the source, the ones I discussed earlier.

2   Q.   Right.  But actually, the agents were all communicating

3   with each other by e-mail how to solicit Nicholas Young to

4   discuss ISIS, correct?

5   A.   There were communications about how to solicit -- how to

6   deal with messages to Nicholas Young, as I recall, yes.

7   Q.   And those solicitation communications were about the same

8   time that -- about the same time that you're e-mailing

9   Mr. Young about Mo being in ISIS, correct?

10  A.   I don't recall which ones you're referring to, but if you

11  can point me to one?

12  Q.   I will.

13  A.   Thank you.

14          MR. SMITH:  Here it is.  All right.

15          I'm handing up a document marked Defense Exhibit --

16  the last one was 9, correct?

17          THE COURT:  The last one was 8.

18          MR. SMITH:  The last one was 8?  So this will be

19  Defense Exhibit 9.

20          MR. GIBBS:  Nick, can I take a look at it?

21          MR. SMITH:  Do you want to take a look at it?

22          MR. GIBBS:  Yeah.

23          Your Honor, we object to this line of questioning.

24  This goes back to the objection we had earlier about the

25  process of creating some of these e-mails.  This appears to be

Minichello - Cross                                                    338

1  a --

2          THE COURT:  Is this agent-to-agent discussions?

3          MR. GIBBS:  They are, but it's after Agent Minichello

4  left the squad, and he is not included in those communications.

5          THE COURT:  I'll sustain the objection.

6          MR. GIBBS:  Thank you.

7          THE COURT:  Move on.

8          MR. SMITH:  So if the defense understands correctly,

9  there will be an additional witness on the subject matter of

10  communications --

11          THE COURT:  Let's move on.  We're not asking

12  questions about the trial.  Do you have any more questions for

13  this witness?

14          MR. SMITH:  I do have one final list of questions

15  here.

16  Q.   Now, Mr. Minichello, you learned from Mo on several

17  occasions that Nicholas Young was pushing back against Mo's

18  conversations about ISIS, correct?

19  A.   No, but can you point me to a particular discussion that

20  you're referring to?

21          THE COURT:  I'm sorry, this has to stop.  You're

22  rattling your papers.  You did it while you were asking the

23  question, which made it hard to hear, and you're doing it while

24  the witness is answering, all right?  All right, ask the

25  question again.

Minichello - Cross                                                  339

1   BY MR. SMITH:

2   Q.   Mr. Minichello, there came a time when you learned from Mo

3   that Nicholas Young was pushing back against Mo's efforts to

4   discuss ISIS, correct?

5   A.   I don't recall that, but if you can point me to a

6   particular document, I can --

7   Q.   I will.

8   A.   -- talk about it.

9   Q.   I will.  Didn't Mo tell you --

10             THE COURT:  Jurors can't hear you again, Agent.

11             THE WITNESS:  I apologize.

12             THE COURT:  I don't know what to say.

13             THE WITNESS:  I'm losing my voice.  Sorry.

14             THE COURT:  Lean right into that microphone, and

15   speak up.

16             THE WITNESS:  Yes, ma'am.

17   BY MR. SMITH:

18   Q.   On September 11, 2014, didn't you reflect that Nicholas

19   Young told Mo, "I saw Baghdadi's mug shot on the news, and I

20   was like, oh, they sound like a bunch of criminals who are

21   hungry for power and money"?

22   A.   I don't recall.

23   Q.   You don't recall ever hearing that comment?  That doesn't

24   stick out in your mind?

25   A.   It doesn't stick out in my mind.  I'm not saying it didn't

Minichello - Cross                                                    340

1  happen.  I just don't recall to put it to a date.

2  Q.    Specifically or you don't recall it ever having been said?

3  A.    I don't recall.  I'm sorry, I don't remember exactly that

4  comment, but I would have probably documented something like

5  that.

6  Q.    So I'm going to hand up a document marked Defense

7  Exhibit -- is this 10?

8          THE COURT:  Does the government need to see this

9  exhibit, or are you all right with it?

10          MR. GIBBS:  Let me take a quick look.  Is this the

11  transcript?

12          MR. SMITH:  This is the transcript.

13          MR. GIBBS:  Thank you, Judge.

14          THE COURT:  All right.

15  BY MR. SMITH:

16  Q.    That's a memorandum called the 1057 memorandum, correct?

17  A.    That's correct, yes.

18  Q.    And can you turn to page 12 of that memorandum?  Well,

19  first, tell me, this is a reflection of a recording that was

20  made on September 11, 2014, correct?

21  A.    Stand by.  Let me take a look.

22  Q.    Okay.

23  A.    Sorry.  If you know where I'm looking for that, feel

24  freely to steer me in the --

25  Q.    Looking at page 12, there's a sticky note there that says

Minichello - Cross                                                341

1    "Baghdadi."

2    A.    There are separate -- there are separate 1057s up here.

3    Which one are you referring to?

4    Q.    The September 11, 2014, 1057, and it's on page 12 of that

5    document.

6    A.    On the entire pile?

7    Q.    Well, yeah.  If you look at the bottom of the page, there

8    are page numbers, and it says page 12.

9    A.    But there are duplicative page numbers, that's all.  I'll

10   find it.  Sorry.

11        Okay.  Here's a page 12, and, I'm sorry, your

12   question was?

13   Q.    Do you see where -- do you recall Mo informing you that

14   Mr. Young said on September 11, 2014, "I saw Baghdadi's mug

15   shot on the news, and I was like, oh, they sound like a bunch

16   of criminals who are hungry for power and money"?  Do you

17   remember reviewing that, that recording?

18   A.    Not in particular, but I'm sure it would have been

19   recorded and have a transcript done for it.

20   Q.    Do you recall Mo telling you or listening to a recording

21   reflecting that Nicholas told Mo on September 11, 2014, if he

22   ever heard someone was going to blow up the subway, you need

23   Nicholas's help to stop them?  Do you remember learning that?

24   A.    No, I don't recall those particular events.  Not that they

25   weren't recorded.  I just don't recall them offhand.

Minichello - Redirect                                                342

1   Q.   Did there come a time that you learned that Mo was having

2   a conversation with Nicholas on September 11, 2014, and when Mo

3   said he wanted to help militant Islam, Nick said, "Why now?"

4   A.   I'm sorry, do you want me to reference the transcript and

5   tell you what was recorded or what I recall?

6   Q.   Do you have any reason to believe --

7   A.   I do not -- I want to be clear.  I don't recall --

8            THE COURT:  Stop.  This is not proper.  You're trying

9   to read the transcript in.  We've got the recordings.  Play the

10  recordings, but asking this witness what he remembers or

11  doesn't remember is not proper.  We're stopping the cross

12  unless you have something new to go into.

13           Anything else?

14           MR. SMITH:  We're finished, Your Honor.

15           THE COURT:  All right.  Any redirect?

16           MR. GIBBS:  Briefly.  I want to redirect on the

17  transcript.

18           Can I take a look at it?

19           THE COURT:  Do you need the exhibit?

20           MR. GIBBS:  I do.  I need the exhibit that has that

21  Baghdadi comment on it.

22                       REDIRECT EXAMINATION

23  BY MR. GIBBS:

24  Q.   All right, Special Agent Minichello, I'd like to hand this

25  document back up to you.

Minichello - Redirect                                      343

1    A.    Thanks.

2    Q.    Sir, this is the document you just testified about related

3    to al-Baghdadi.

4              MR. SMITH:  Your Honor, objection.  The Court just

5    ruled that this testimony --

6              THE COURT:  If we have this conversation recorded,

7    the best evidence is for the jury to hear it.

8              MR. SMITH:  Correct.

9              THE COURT:  So I'm going to do the same to the

10   government that I did to defense.  Let's move on.  This is --

11             MR. GIBBS:  Judge, I don't have it cued up.  I just

12   want him to read about three lines from that.

13             THE COURT:  No, I've sustained the objection.

14   BY MR. GIBBS:

15   Q.    Special Agent Minichello, you were asked on cross about

16   some of the reporting of Mo, and there were some names that

17   came up there.  Do you recall the name Peshwaz?

18   A.    I do.

19   Q.    And who is Peshwaz?

20   A.    Peshwaz Waise is who that's referring to, and he's a -- he

21   was another investigative subject of the FBI.  I really do

22   apologize; I'm losing my voice.  Peshwaz Waise is who I was

23   referring to, and he was another investigative subject --

24   counterterrorism subject of the FBI at that time.

25   Q.    All right, if you can take a look at Government Exhibit

Minichello - Redirect                                           344

1   9-106?

2   A.   I'm sorry, is it in that folder?

3            THE COURT:  9-106?

4            MR. GIBBS:  Correct, Judge.

5            THE COURT:  Do we have the exhibit folder?

6            MR. GIBBS:  And also, while we're up, 9-107, the

7   second one.

8            And, Judge, if there's no objection to the pictures

9   of Peshwaz and also T.J. Singh, who is the other person?

10           THE COURT:  All right, any objection to 106 or 107?

11           MR. SMITH:  No, Your Honor.

12           THE COURT:  All right.

13           MR. GIBBS:  We would publish 9-106, please.

14           THE COURT:  They're both in.

15           (Government's Exhibit Nos. 9-106 and 9-107 were

16  received in evidence.)

17  BY MR. GIBBS:

18  Q.   And who -- you were testifying about Peshwaz.  Who is, who

19  is on the screen?

20  A.   9-106 is Peshwaz Waise.

21  Q.   And what was his relationship with the defendant, Nick

22  Young?

23  A.   Peshwaz Waise was a friend and appeared to be a confidante

24  of Nicholas Young.

25  Q.   And then if we can go to 9-107?  Who is that?

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

Minichello - Redirect                                          345

1   A.   9-107 is Tejpal Singh.

2   Q.   Who is he?

3   A.   He is another friend of both Peshwaz and Nicholas Young,

4   and we quite often referred to him as T.J.

5   Q.   Okay.  And what's his relationship with Nicholas Young?

6   A.   Again, he appears to be a friend and confidante of

7   Nicholas Young.

8            MR. GIBBS:  All right.  Thank you, Judge.  That's all

9   I've got.

10           THE COURT:  All right.  Any recross, Mr. Smith?

11                    RECROSS EXAMINATION

12  BY MR. SMITH:

13  Q.   Mr. Minichello, you just testified about Peshwaz.  You

14  testified that he was a confidante of Mr. Young's, correct?

15  A.   Yes.

16  Q.   Do you know whether Peshwaz had Mr. Young's phone number?

17  A.   I don't recall if he did or not.

18  Q.   He didn't have?  Peshwaz did not have Mr. Young's phone

19  number, did he?  You have Mr. Young's cell phone, correct?

20  A.   I don't personally.  I don't recall if we have that number

21  or not.

22  Q.   It was seized as part of the seizure raid of Mr. Young's

23  home in October -- August 2016?

24           MR. GIBBS:  Judge, the witness has already said he

25  doesn't know the answer to this question.

Minichello - Redirect                                              346

 1              THE COURT:  Sustained.

 2              MR. SMITH:  That's it, Your Honor.

 3              THE COURT:  All right, thank you.

 4         Now, it's not the Court's practice to have witnesses

 5    recalled in the direct examination.  I see that this witness's

 6    name appears again on the list.  Are you really planning to

 7    recall him?

 8              MR. GIBBS:  We are, Judge.  This witness comes up at

 9    the end on the day of the arrest, and he's involved in the

10    post-arrest interview, so for purposes of the chronology of the

11    case, we've done it that way.

12              THE COURT:  All right.  Then, Agent Minichello, you

13    are not excused as a witness.  That means you cannot be in

14    court, and you're not to discuss your testimony with anyone,

15    but the next time you're in court, you'd better have a better

16    voice, all right?

17              THE WITNESS:  I understand, Your Honor.

18                        (Witness stood down.)

19              THE COURT:  All right.  Ladies and gentlemen, we need

20    to take a five-minute recess because we have to put the screen

21    back up, so you'll get a chance to stretch your legs for just a

22    couple of minutes, but don't leave the jury room because we're

23    going to get you right back in here.

24         We'll recess court.

25                   (Recess from 2:28 p.m., until 2:37 p.m.)

Mo - Direct                                                                347

1                           (Defendant and Jury present.)

2              THE COURT:  Call your next witness.

3              MR. GIBBS:  We call Mo, Your Honor.

4                  MO, GOVERNMENT'S WITNESS, AFFIRMED

5                          DIRECT EXAMINATION

6    BY MR. GIBBS:

7    Q.   Good afternoon, sir.

8    A.   Hello.

9    Q.   Sir, the name that you are testifying under today is Mo,

10   correct?

11   A.   That is correct.

12   Q.   And that's the name that the defendant knew you as?

13   A.   That is correct.

14   Q.   Now, sir, in 2013, did you begin working as an FBI source

15   here in Northern Virginia?

16   A.   Yes.

17   Q.   And what time of year was that?

18   A.   I started back in August 2013.

19   Q.   Were you living in Northern Virginia at that time?

20   A.   Correct.

21   Q.   And were you paid in your role as an FBI source?

22   A.   Yes.

23   Q.   Now, when you started working as a source, were there

24   particular FBI agents that you worked with?

25   A.   Yes.

```
Mo - Direct                                                      348
```

1   Q.   And who were they?

2   A.   Agent John Minichello and Cameron.

3   Q.   Do you know Cameron's last name?

4   A.   I don't recall.

5   Q.   Now, did there come a point in time during your work as an

6   FBI source that you met the defendant, Nicholas Young?

7   A.   Yes.

8   Q.   And when did you and the defendant first meet?

9   A.   May of 2014.

10  Q.   Is the defendant here in court today?

11  A.   Yes.

12  Q.   All right, can you just point him out and indicate what

13  he's wearing?

14  A.   He's wearing a blue navy suit.

15          THE COURT:   Any objection to the identification?

16          MS. MORENO:   No objection.

17          THE COURT:   All right, the witness has identified the

18  defendant.

19  BY MR. GIBBS:

20  Q.   Now, Mo, did you ever learn where the defendant lived?

21  A.   I've never been to his house, no.

22  Q.   But did you know where he lived?

23  A.   Yes.

24  Q.   And where did he live?

25  A.   In the Fairfax area.

Mo - Direct                                                              349

1   Q.   And you said you never went to his house?

2   A.   No, sir.

3   Q.   And did he ever come to your house?

4   A.   No.

5   Q.   Now, at some point after working with the FBI as a source

6   for a period of time, did the FBI get you to start recording

7   your meetings with the defendant?

8   A.   Yes.

9   Q.   And did they provide you with FBI equipment in order to do

10  that?

11  A.   Correct.

12  Q.   And when was that?

13  A.   July of 2014.

14  Q.   And from the point when the FBI provided you with the

15  recording equipment to record your meetings with the defendant,

16  did you always record your meetings with him?

17  A.   Yes.

18  Q.   And, sir, I believe there are some discs on the stand up

19  there with you.  Do you see those?

20  A.   Yes.

21         MR. GIBBS:  All right.  And, Your Honor, at this

22  time, I'd like to have the witness identify the first one.  I

23  believe it's Exhibit 6-101-2T, dated July 27, 2014.

24  Q.   Do you see that?

25  A.   6-101-2?

Mo - Direct                                                          350

1   Q.   Yep.

2   A.   Yes.

3   Q.   And do you recognize that disc?

4   A.   I do.  It's got my initial on it.

5   Q.   Is that how you recognize it?

6   A.   Yes.

7   Q.   And prior to coming to court today, did you listen to a

8   number of discs and initial them with, with putting your

9   initials on it?

10  A.   I have.

11  Q.   And did you also compare what's on the recording with the

12  transcript for accuracy?

13  A.   Yes, I have.

14  Q.   And when you did that, did you have an opportunity to make

15  any corrections on the transcript that you caught?

16  A.   I did.

17          MR. GIBBS:  All right.  Your Honor, at this time, we

18  would move in Government Exhibit 6-101-2.  We would ask --

19          THE COURT:  Any objection?  Any objection?

20          MR. SMITH:  One moment, please.

21          No objection.

22          THE COURT:  Whose witness is this?

23          MR. SMITH:  This is my witness, Your Honor.  No

24  objection.

25          THE COURT:  All right, it's in.

Mo - Direct                                                        351

1              (Government's Exhibit No. 6-101-2 was received in

2     evidence.)

3              MR. GIBBS:  And, Your Honor, we would ask to play

4     that disc along with the transcript, which is 6-101-2T.

5              THE COURT:  All right, go ahead.

6              (Government's Exhibit No. 6-101-2 was played.)

7     BY MR. GIBBS:

8     Q.   Now, Mo, in that clip, the defendant said, "People don't

9     look favorably towards, like, the Islamic State."  Now, had you

10    and the defendant already been talking about the Islamic State

11    by July 27 of 2014?

12    A.   Yes.

13    Q.   And also in that clip, the defendant used the term "the

14    new Caliphate."  What is "the new Caliphate"?

15    A.   He's referring to the Islamic State.

16    Q.   Is that also what's known as ISIS?

17    A.   Yes.

18    Q.   And then at page 2 of the transcript, when the defendant

19    brought up Abu Bakr, did you know who that was?

20    A.   Yes.

21    Q.   And who is Abu Bakr?

22    A.   He's the ruler of ISIS.

23    Q.   And what role, if any, did Abu Bakr have in declaring that

24    ISIS was the new Caliphate?

25              MR. SMITH:  Objection, Your Honor.

Mo - Direct                                                          352

1          THE COURT:  If you know.  Overruled.  Only if you

2    know.

3          THE WITNESS:  Can you state the question?

4    BY MR. GIBBS:

5    Q.   Sure.  What role, if any, did Abu Bakr have in declaring

6    that ISIS was the new Caliphate?

7    A.   He went on stand and declared in front of thousands of

8    people that he's the new ruler.

9    Q.   And when did he declare the new Caliphate?

10   A.   It was during Ramadan of 2014.

11   Q.   And what time of year does Ramadan generally fall in?

12   A.   It was around June.

13   Q.   All right.  So not too far before this particular

14   recording?

15   A.   No.

16   Q.   All right.  Next if you could take a look at the disc at

17   6-102-2?

18   A.   Okay.

19   Q.   Do you recognize that?

20   A.   Yes.

21          MR. GIBBS:  And we would ask to move that in and play

22   the transcript that accompanies this, which is 6-102-2T.

23          THE COURT:  Any objection?

24          MR. SMITH:  Your Honor, no objection to the disc.  We

25   object to the government's summaries of the audio recordings,

Mo - Direct                                                              353

1  which were never produced to the defense and reflect the

2  government's --

3          THE COURT:  We're just cueing up the transcript of

4  the tape right now; is that correct?

5          MR. GIBBS:  Correct.

6          MR. SMITH:  It's the government's understanding of

7  the --

8          THE COURT:  Excuse me, you need to be on your feet

9  when you're speaking.

10          MR. SMITH:  Your Honor, we believe it's the

11  government's understanding of the transcript rather than an

12  agent's summary of the transcript.  This is a summary that the

13  government's attorneys have drafted.

14          THE COURT:  Ladies and gentlemen, let me just tell

15  you what the real evidence is in a case that involves any type

16  of recording.  It's what you are able to hear on the recording,

17  the actual voices speaking.  That's the evidence.

18          Transcripts are prepared solely as an aid to help you

19  listen, but if you, if you detect any difference between the

20  transcript and what you're hearing, you have to go with what

21  you hear, and if the transcript says something and you don't

22  hear that on the tape, then you have to disregard the

23  transcript, all right?

24          Let's play it.

25          MR. GIBBS:  Thank you, Judge.

Mo - Direct                                                          354

1              (Government's Exhibit No. 6-102-2 was received in

2       evidence and played.)

3       BY MR. GIBBS:

4       Q.    Sir, in that recording, the defendant talked to you about

5       being careful, and he said, "I look at tons of stuff on the

6       Internet."  We'll get back to this in a bit, but did the

7       defendant ever show you some ISIS videos at some point?

8       A.    Yes.

9       Q.    And later in that recording, the defendant suggested to

10      you about going on a tour group and having a printed itinerary.

11             MR. SMITH:   Objection, Your Honor.   Leading.

12             THE COURT:   Sustained.

13      BY MR. GIBBS:

14      Q.    Who came up with the idea in that recording of going with

15      a tour group and having a printed itinerary?

16             MR. SMITH:   Objection.   Best evidence.

17             THE COURT:   No, overruled.

18      BY MR. GIBBS:

19      Q.    Whose idea was that to go with a tour group and have a

20      printed itinerary?

21      A.    Nick.

22      Q.    And at the end of that recording, he told you that you

23      can't carry more than $10,000.   Who was the first person to

24      tell you about this $10,000 currency limit?

25      A.    Nick did.

Mo - Direct                                                              355

1  Q.   The defendant?

2  A.   Correct.

3          MR. GIBBS:  Your Honor, if we could turn to -- and,

4  sir, if you could take a look at 6-103-2?  And we would offer

5  that into evidence and ask to play it along with 6-103-2T.

6          MR. SMITH:  No objection.

7          THE COURT:  All right, it's in.

8          (Government's Exhibit No. 6-103-2 was received in

9  evidence and played.)

10 BY MR. GIBBS:

11 Q.   Now, sir, at the beginning of that clip, the defendant

12 told you to lose the phone and take the battery out.  Did you

13 know what he meant by that?

14 A.   To put my phone away.

15 Q.   And how frequently would the defendant tell you to do

16 things like that?

17 A.   A few times.

18 Q.   And later, the defendant told you about a brother who

19 moved down here who was in the Marines.  Who first told you

20 about that brother in the Marines?

21 A.   The defendant.

22 Q.   And how about the Moroccan guy he said who got arrested on

23 terrorism charges?  Who first told you about him?

24 A.   The defendant.

25 Q.   And at one point, the defendant said that he had been

Mo - Direct                                                    356

1  interviewed by the feds a few times.  When was the first time

2  the defendant told you that?

3  A.   That was the first time.

4  Q.   In that recording we just heard?

5  A.   Correct.

6  Q.   And he also told you that they try to get you with, like,

7  financial stuff.  In your dealings with the defendant, how

8  often did you offer him financial stuff?

9  A.   None.

10  Q.   How often did the FBI task you to offer him financial

11  stuff?

12  A.   Never.

13        MR. GIBBS:  Your Honor, if we could turn to 6-103-3?

14  Q.   Do you see that there, sir?

15        THE COURT:  Any objection?

16        MR. SMITH:  No objection.

17        THE COURT:  All right, it's in.

18        (Government's Exhibit No. 6-103-3 was received in

19  evidence.)

20        MR. GIBBS:  We'll ask to move that in and play that

21  with the transcript, please.

22        THE WITNESS:  I see that.

23        (Government's Exhibit No. 6-103-3 was played.)

24  BY MR. GIBBS:

25  Q.   Now, sir, in the recording we just heard, the defendant

Mo - Direct                                                          357

1    said, "If you go to Morocco, how are you going to get to Syria

2    or Iraq?"  At this point in September of 2014, where was ISIS's

3    territory located?

4                MR. SMITH:  Objection.

5                THE COURT:  If you know.

6                THE WITNESS:  Iraq and Syria.

7    BY MR. GIBBS:

8    Q.   And do you recall in that recording the defendant

9    mentioning to you that you should get an Associated Press job

10   or a journalist-type badge?

11   A.   Correct.

12   Q.   Who came up with the idea of getting an Associated Press

13   job or a journalist-type badge?

14   A.   The defendant.

15               MR. GIBBS:  Next if we could turn to 6-103-5 and 5T?

16   It's another disc dated September 11, 2014.  If we could play

17   that?

18               THE COURT:  Any objection?

19               MR. SMITH:  No objection, Your Honor.

20               THE COURT:  All right, it's in.

21               (Government's Exhibit No. 6-103-5 was received in

22   evidence and played.)

23               MR. GIBBS:  Now, if we can go straight to the next

24   clip, which is also on that date, 6-103-6?

25               THE COURT:  Any objection?

Mo - Direct                                                          358

1              MR. SMITH:  No objection.

2              THE COURT:  All right, it's in.

3              (Government's Exhibit No. 6-103-6 was received in

4   evidence and played.)

5   BY MR. GIBBS:

6   Q.   Now, sir, in the first clip we heard, the defendant asked

7   if you had watched the latest Light Revival and Light Reloaded

8   videos, and then he said, "That's why I brought this, so I'll

9   show you it."  What did the defendant actually bring you to

10  show?

11  A.   The ISIS-produced video.

12  Q.   And what did he bring to play it on?

13             MR. SMITH:  Objection.

14             THE COURT:  What's the basis for the objection?  On

15  your feet, please.

16             MR. SMITH:  The basis is personal knowledge of how

17  the video was created and by whom the video --

18             THE COURT:  That wasn't the question, I don't

19  believe.

20             MR. GIBBS:  No, the question was what did he bring to

21  play it on.

22             THE COURT:  What was the device upon which it was

23  going to be played.

24             MR. SMITH:  It was the question before that about --

25             THE COURT:  Well, you objected to this question.

1    Overruled.

2    BY MR. GIBBS:

3    Q.   And what did the defendant bring to play the video on?

4    A.   I can't recall.

5    Q.   But did you actually watch some videos with the defendant

6    that day?

7    A.   Yes.

8    Q.   And in the second clip, the defendant said, "Hicham and

9    T.J., like, watch these a lot."  Who is Hicham?

10   A.   Hicham is a friend of the defendant.

11   Q.   Do you know his -- well, Your Honor, at this time, I'd

12   like to read Stipulation No. 19 into the record.

13            THE COURT:  All right.

14            MR. GIBBS:  The United States and the defendant

15   hereby stipulate and agree that Government Exhibit 9-105 is a

16   photograph that accurately depicts Hicham Hall.

17            And we would ask to publish that photograph, which is

18   Exhibit 9-105.

19            THE COURT:  Any objection?

20            MR. SMITH:  No objection.

21            THE COURT:  All right, it's in.

22            (Government's Exhibit No. 9-105 was received in

23   evidence.)

24   BY MR. GIBBS:

25   Q.   And do you recognize that individual, sir?

Mo - Direct                                                         360

1   A.   I do.

2   Q.   And who is he?

3   A.   That's Hicham, the defendant's friend.

4   Q.   And he also -- you mentioned Hicham and T.J.  Who is T.J.?

5   A.   T.J. is another friend of the friend and a friend of

6   Hicham.

7            MR. GIBBS:  And if we could pull up 9-107, which is

8   already in evidence?

9            THE COURT:  All right.

10  BY MR. GIBBS:

11  Q.   And who is that?

12  A.   T.J.

13  Q.   That's the person you just testified about?

14  A.   Correct.

15  Q.   Now, a moment ago, you said that the defendant played some

16  videos for you.  Where were the two of you when, when you

17  watched those videos?

18  A.   Do you want me to tell you exactly where?

19  Q.   Well, I mean, just generally.

20  A.   We're at the Afghani restaurant in Fairfax.

21  Q.   And is that someplace you often went and had meals

22  together?

23  A.   Yes.

24  Q.   And in the second clip that we heard, you asked the

25  defendant if you should be sitting like that.  Why did you ask

Mo - Direct                                                          361

1   him that question?

2   A.   Because we were in -- we were in the open.

3   Q.   And then in response, the defendant said, "I watch this

4   one when I'm at lunch at work."  Who did the defendant work

5   for?

6   A.   D.C., D.C. Metro Police, or Transit.

7   Q.   And, and what was the topic of these videos you watched in

8   the Afghani restaurant?

9   A.   The topic of the video?

10  Q.   Yes.

11  A.   I can't recall.

12  Q.   What were they about, though?

13  A.   They were ISIS propaganda, recruiting videos, talking

14  about jihad and several other topics.

15  Q.   And there at the end of that second clip that we heard,

16  the defendant asked if you had talked to Hicham about anything,

17  because he said he's, quote, very against.  What was Hicham

18  against at that point?

19  A.   Joining ISIS or supporting ISIS.

20           MR. GIBBS:  Thank you, sir.

21           If we can next go to Exhibit 6-104-2?

22           MR. SMITH:  No objection.

23           MR. GIBBS:  Thank you.

24           THE COURT:  It's in.

25           (Government's Exhibit No. 6-104-2 was received in

Mo - Direct                                                           362

1   evidence.)

2          MR. GIBBS:  We'd ask to play that along with the

3   transcript, and this is a clip dated October 2, 2014.

4          (Government's Exhibit No. 6-104-2 was played.)

5   BY MR. GIBBS:

6   Q.   Now, sir, at the beginning of that clip we just listened

7   to, the defendant said he watched videos of guys running around

8   in sandals and, quote, even, like, fighting.

9          How did the defendant's reference to fighting compare

10  to what you were saying was the purpose of your trip?

11  A.   Say that again?

12  Q.   How did the defendant's reference to fighting in that clip

13  compare with what you were telling him you were planning to do

14  with your trip?

15  A.   He was referring to ISIS fighters fighting in the videos

16  he showed me.

17          MR. SMITH:  Objection.

18          THE COURT:  What's the basis for the objection?

19          MR. SMITH:  The witness should not be testifying

20  about the defendant's personal mental state of which he has no

21  personal knowledge.

22          THE COURT:  I'll sustain that objection.

23  BY MR. GIBBS:

24  Q.   And what were you telling the defendant your plans were?

25  A.   To travel overseas.

Mo - Direct                                                          363

1   Q.   To do what?

2   A.   To join our fight.

3   Q.   And when the defendant was giving you advice about what

4   you should pack for that trip, he mentioned digital video

5   cameras and digital zooms.  Who first brought up those topics

6   in your discussions?

7   A.   The defendant.

8   Q.   And he also said that he heard that these guys are on,

9   like, social media, like, lesser known things like Kik.  Who

10  first brought up social media things like Kik in your

11  discussions?

12  A.   The defendant.

13  Q.   And after he brought up Kik, the defendant said to you you

14  can actually get in contact with these people over that.

15           MR. SMITH:  Objection.  Best evidence.

16           THE COURT:  Overruled.

17  BY MR. GIBBS:

18  Q.   And what did you understand "these people" to refer to?

19  A.   Fighters overseas or recruiters.

20           MR. GIBBS:  Thank you.

21           Your Honor, if we can next turn to Exhibit 6-104-3?

22           THE COURT:  Any objection?

23           MR. SMITH:  No.

24           THE COURT:  It's in.

25           (Government's Exhibit No. 6-104-3 was received in

Mo - Direct                                                         364

1   evidence and played.)

2   BY MR. GIBBS:

3   Q.   All right.  Now, sir, in the clip we just listened to, the

4   defendant told you that there's a chance you'll get asked,

5   like, a lot of questions, and then you brought up T.J.  Remind

6   us again who T.J. is.

7   A.   T.J. is the second picture that was shown.

8   Q.   And who is he?

9   A.   The defendant's friend.

10  Q.   And that's Tejpal Singh?

11  A.   Yes.

12  Q.   And at that point, you said to the defendant that, quote,

13  you were there at the Little Italian when he was explaining

14  about his flight.  What was that a reference to?

15  A.   An experience he had.  He was pulled aside for extra

16  questioning.

17  Q.   And he told that story to you and the defendant?

18  A.   Yes.

19  Q.   And was anyone else there?

20  A.   Yes.

21  Q.   Who else was there?

22  A.   A guy named Peshwaz was there, and I don't recall if

23  Hicham was there or not.

24  Q.   Okay.  But those are -- and who are Peshwaz and Hicham?

25  A.   It's another person in the group of -- in the circle of

```
Mo - Direct                                                    365
```

 1    friends of the defendant.

 2              MR. GIBBS:  All right, thank you, sir.

 3              Next if we could turn to Government Exhibit 6-110-1,

 4    which is a clip dated October 9, 2014?

 5              THE COURT:  Any objection?

 6              MR. SMITH:  What was the exhibit number again?

 7              THE COURT:  110, 6-110.

 8              MR. SMITH:  No objection.

 9              THE COURT:  It's in.

10              (Government's Exhibit No. 6-110-1 was received in

11    evidence.)

12              MR. GIBBS:  And we would ask to play that, Your

13    Honor.  Thank you.

14              THE COURT:  Yes, sir.

15              (Government's Exhibit No. 6-110-1 excerpt was

16    played.)

17              MR. SMITH:  Objection.  Relevance.  Your Honor, we

18    object to the relevance.  The government is playing a

19    ten-minute clip that has no relevance to this case.

20              THE COURT:  I think this has been long enough.

21              MR. GIBBS:  And that's the end of it, Judge.  Thank

22    you.

23    Q.   So, sir, who was doing most of the talking there in that

24    clip?

25    A.   Hicham.

Mo - Direct                                                              366

1              MR. GIBBS:  And if we could pull up Government

2    Exhibit 9-105?

3              THE COURT:  Any objection to -- oh, that's the

4    photograph.

5              MR. GIBBS:  It's in evidence.

6              MR. SMITH:  No objection.

7    BY MR. GIBBS:

8    Q.   And who is this again?

9    A.   That's Hicham.

10   Q.   All right.  So he was the one doing most of the talking in

11   the clip we just listened to, correct?

12   A.   Correct.

13   Q.   All right.  And can you just set this up?  First of all,

14   where were you when this clip was recorded?

15   A.   We were at Hicham's house.

16   Q.   What was going on at Hicham's house?

17   A.   He was inviting us over for dinner.

18   Q.   And when you say "we were there," who else besides

19   yourself and Hicham were there?

20   A.   T.J. and the defendant.

21   Q.   And just describe for us sort of how -- what stage of the

22   night was it when this -- or of the dinner was it when this

23   clip was recorded?

24   A.   It was past dinnertime.  Almost everyone left, and myself,

25   the defendant, and Hicham were talking.

Mo - Direct                                                          367

1   Q.   And where did this conversation take place?

2   A.   At Hicham's basement or lower bedroom, I guess.

3   Q.   And so at the time that the recording was made, who was

4   there?  Was it just the three of you?

5   A.   Correct.

6   Q.   And at this point in time, was Hicham aware of what your

7   plans were?

8   A.   Prior to this?

9   Q.   Yes.

10  A.   He had the indications, but it was solidified and then

11  this clip.

12  Q.   And what did you do while all this was going on?  What was

13  your response?

14  A.   I was just listening to what he was saying.

15  Q.   And was Nick Young there for the entire conversation?

16  A.   Yes.

17          MR. GIBBS:  Thank you.

18          Your Honor, next we would move to Government Exhibit

19  6-105-1, which is a clip dated actually the next day,

20  October 10, 2014.

21          THE COURT:  Any objection?

22          MR. SMITH:  No objection.

23          THE COURT:  It's in.

24          (Government's Exhibit No. 6-105-1 was received in

25  evidence.)

Mo - Direct                                                          368

1              MR. GIBBS:  Thank you.  We'd ask to play that along

2      with the transcript.

3              THE COURT:  Yes.

4              (Government's Exhibit No. 6-105-1 excerpt was

5      played.)

6              MR. SMITH:  Objection.  Relevance.

7              THE COURT:  This is not a drug case, so you need to

8      keep that out, all right?

9              MR. GIBBS:  Okay.

10             THE COURT:  Sustained.

11             MR. GIBBS:  Can we pick it up there, Your Honor?

12             THE COURT:  Get past that.

13             (Government's Exhibit No. 6-105-1 excerpt was

14     played.)

15             MR. SMITH:  Objection.  Objection.

16             THE COURT:  Wait, wait, wait.  Take it off.  Take it

17     off.

18             MR. GIBBS:  Your Honor, this was completely

19     unsolicited.  The defendant offered this as an example of why

20     he is so paranoid and how even somebody trying to sell him cut

21     rate steroids is somebody he's suspicious of at the gym.  So it

22     certainly goes to his state of mind.  He was not prompted by

23     the source.

24             MR. SMITH:  Your Honor, the defendant's state of mind

25     about drugs is irrelevant to this case.

Mo - Direct                                                            369

1            THE COURT:  It is, and I've told the jury that, and

2   we have 14 very attentive people who understand the difference.

3            This is not a drug case, folks, all right?  So any

4   reference or discussion about drugs, there's no indication that

5   the defendant is using or selling drugs.

6            Let's just move on.  Overruled.

7            MR. GIBBS:  Let's finish it.

8            (Government's Exhibit No. 6-105-1 excerpt was

9   played.)

10  BY MR. GIBBS:

11  Q.   Now, sir, in the clip we just heard, the defendant talked

12  about being suspicious of everyone and trying not to deal with

13  people in mosques.  How often would he say things like that to

14  you?

15  A.   Often.

16  Q.   And at the end of the clip, the defendant talked about

17  Nabil saying certain things last night and your reaction to

18  what he said.  Can you explain what had happened with Nabil the

19  night before?

20  A.   Yes.  We were talking about ISIS and whether it's

21  legitimate to legitimize their cause, and the defendant was

22  suspicious of me up until he saw me defending my side of the

23  story.

24  Q.   And what was your side of the story?

25  A.   That ISIS is legitimate.

Mo - Direct                                                                370

1   Q.   And when he talked about that occurring the night before,

2   was the night before the dinner at Hicham's place you already

3   testified about?

4   A.   It was that night.

5   Q.   And in terms of Hicham, I didn't ask you this before, but

6   you testified about who Hicham is.  Did, did Nick Young know

7   Hicham before you did?

8   A.   Yes.

9   Q.   All right.  So how did you meet, first meet Hicham?

10  A.   I met Hicham going to Adams Sully.

11  Q.   What is that?

12  A.   It's a mosque at Sully, and I forgot the name of the town.

13           MR. GIBBS:  That's all right.  Thank you.

14           Judge, next we would ask to play Government Exhibit

15  6-106-4, and the transcript is 4T.

16           THE COURT:  Any objection?

17           MR. SMITH:  No objection.

18           THE COURT:  All right, it's in.

19           (Government's Exhibit No. 6-106-4 was received in

20  evidence and played.)

21  BY MR. GIBBS:

22  Q.   Now, sir, in the clip we just listened to, at one point,

23  the defendant told you to stick with the medical story until

24  you get to wherever you're trying to reach.  What was the

25  medical story?

Mo - Direct                                                           371

1   A.   The medical back- -- so with my medical background and

2   with the story of joining an organization, going along with

3   that, when I get to ISIS territory, that I can tell them my

4   medical background before I mention my military background.

5   Q.   And the defendant also made a comment at the end of that

6   clip about, he said, thousands of people getting buried alive.

7   What was that a reference to?

8              MR. SMITH:  Objection.

9              THE COURT:  If you understand.  Do you know from the

10  context what that was about?

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  All right, go ahead.  Overruled.

13             THE WITNESS:  From the videos that were shown of

14  thousands of people being buried by ISIS.

15             MR. GIBBS:  Thank you.

16             Your Honor, next we would turn to Government Exhibit

17  6-107-1.  It's a clip dated October 17, 2014.

18             MR. SMITH:  No objection.

19             MR. GIBBS:  We'd ask to play that.

20             THE COURT:  All right, it's in.

21             (Government's Exhibit No. 6-107-1 was received in

22  evidence and excerpt was played.)

23             MR. SMITH:  Objection, Your Honor.  Relevance.  This

24  conversation is just dragging on and on.

25             THE COURT:  I agree with that.  I'll sustain the

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

```
Mo - Direct                                                        372
```

 1    objection.

 2              MR. GIBBS:  That's fine, Judge.

 3    Q.   Before we move to the next clip, at the beginning of that

 4    particular clip, the defendant told you that if you get a

 5    boarding pass with four S's on it, it means you've been

 6    selected for additional screening.  Who first told you that

 7    piece of information?

 8    A.   The defendant.

 9              MR. GIBBS:  Thank you.

10              Next, Your Honor, I'd like to move to Government

11    Exhibit 6-108-1 and 1T.

12              MR. SMITH:  No objection.

13              THE COURT:  It's in.

14              (Government's Exhibit No. 6-108-1 was received in

15    evidence and excerpt was played.)

16              MR. SMITH:  Objection, Your Honor.  Relevance.  This

17    is --

18              MR. GIBBS:  Judge, this is the last clip we have of

19    any length, and this is actually the one where the defendant

20    proposes the text message that he's going to --

21              THE COURT:  I'm going to overrule the objection.

22              MR. GIBBS:  Thank you.

23              (Government's Exhibit No. 6-108-1 excerpt was

24    played.)

25              THE COURT:  All right, I think the jury has been

Mo - Direct                                                              373

1  sitting now for over two hours.  It's a good time to take a

2  break, and I'll give everybody 15 minutes.  We'll start up at

3  25 of.

4              MR. GIBBS:  Thank you, Judge.

5                   (Recess from 4:21 p.m., until 4:37 p.m.)

6                        (Defendant present, Jury out.)

7              THE COURT:  How much longer do you have with this

8  witness?

9              MR. GIBBS:  I was looking, Judge.  I don't think much

10 longer.  I've got one clip that's about four minutes and then a

11 couple others that are less than a minute each, and I've got

12 just a couple of exhibits to show and just a couple of

13 pictures, so I anticipate ten minutes maybe, maybe fifteen, but

14 quickly.

15             THE COURT:  All right.  He went on around 2:40 today.

16 I want to make sure this case doesn't drag, so I'm alerting the

17 defense that you're going to get no more than about the same

18 time for direct.  So if you're expecting a four- or five-hour

19 cross, it's not going to happen.

20             MR. GIBBS:  I understand.

21             THE COURT:  All right, let's bring the jury in.  And

22 the witness can come in.

23                        (Jury present.)

24             THE COURT:  As I said before, folks, you're not

25 frozen to any particular seat, so make sure that you feel

Mo - Direct                                                      374

1  comfortable moving around in the box.  I know some of you have

2  moved down, which is just fine.  Especially the people who have

3  been in the back row for all today, you know, you have to

4  either look at the big screen or the ones on the front row, so

5  maybe tomorrow you may want to switch position, okay?  You

6  don't have to.  It's up to you-all.

7         All right, Mr. Gibbs, the witness is back on the

8  stand.

9         MR. GIBBS:  All right, thank you.

10 Q.  All right, sir, at the end of that last clip, the

11 defendant made a statement how he said that, quote, I'm going

12 to text your phone, like, today or after that or something,

13 because it will be good for me.

14         Do you recall that?

15 A.  I do.

16 Q.  And what were you expected to do from the FBI if you got a

17 text message like that from the defendant?

18 A.  To immediately notify them and send over the text.

19 Q.  And did you, in fact, get a text message like that from

20 the defendant?

21 A.  I did.

22 Q.  And what did you do with it?

23 A.  I forwarded it to Agent John Minichello.

24         MR. GIBBS:  And if we could just pull up Exhibit

25 6-201, which is already in evidence?

Mo - Direct                                                          375

1   Q.   And, sir, do you recognize this?

2   A.   I do.  I've seen it before.

3   Q.   I'm sorry, what is this?

4   A.   This is, yeah, a text message that the defendant sent to

5   my phone.

6            MR. GIBBS:  If we could just blow up the message at

7   the end of that?  And then I'll move on.

8            THE COURT:  It's there.  It's already there.

9            MR. GIBBS:  Okay.  Thank you.

10  Q.   And is that the text message he sent to you on that day?

11  A.   Yes.

12           MR. GIBBS:  Thank you.

13           Your Honor, next if we could, I would offer into

14  evidence 6-108-2, which is another clip.

15           MR. SMITH:  No objection.

16           THE COURT:  All right, it's in.

17           (Government's Exhibit No. 6-108-2 was received in

18  evidence.)

19           MR. GIBBS:  If we could play that, Mr. Vera?  Thank

20  you.

21           (Government Exhibit No. 6-108-2 was played.)

22  BY MR. GIBBS:

23  Q.   Sir, in that clip, the defendant told you that it's only

24  illegal to take up arms against a U.S. ally or to join a

25  terrorist organization, and then he described what could happen

Mo - Direct                                                          376

1   if you lied to a federal agent.  Who was the first one to bring

2   up the consequences of lying to a federal agent?

3   A.   Yeah, the defendant.

4          MR. GIBBS:  All right.  Next if we could move to

5   Government Exhibit 6-109-4?

6          THE COURT:  Any objection?

7          MR. SMITH:  No objection.

8          THE COURT:  All right, it's in.

9          (Government's Exhibit No. 6-109-4 was received in

10  evidence.)

11         MR. GIBBS:  We'd ask to play that.

12         (Government's Exhibit No. 6-109-4 was played.)

13  BY MR. GIBBS:

14  Q.   Now, sir, where did you and the defendant go after this

15  conversation on October 25, 2014?

16  A.   The Kinko's in Sterling.

17  Q.   And how did you get there?

18  A.   By vehicle.

19  Q.   And whose vehicle was it?

20  A.   My vehicle.  It was a rental.

21         MR. GIBBS:  And, Your Honor, at this time, I would

22  read another stipulation into evidence.

23         THE COURT:  All right.

24         MR. GIBBS:  It's Stipulation No. 15, which states

25  that the United States and the defendant hereby stipulate and

Mo - Direct                                                              377

1   agree that Government Exhibits 7-200 through 7-215 are

2   authentic business records of FedEx Office & Print Services,

3   Inc., and at this time, I would offer into evidence two of

4   those exhibits, which is 7-201A and 7-201C.

5              THE COURT:  Any objection?

6              MR. SMITH:  No objection.

7              THE COURT:  All right, they're both in.

8              (Government's Exhibit Nos. 7-201A and 7-201C were

9   received in evidence.)

10             MR. GIBBS:  If we could publish -- let's do 7-201A.

11  Q.   And, sir, can you describe what this is a photograph of?

12  A.   It's a photograph of myself and the defendant.  I'm in the

13  pink shirt, and we've -- that's a picture of us entering the

14  Kinko's.

15  Q.   And he's the one in the dark shirt; is that correct?

16  A.   Correct.

17  Q.   And what did you two do at the store on October 25 of

18  2014?

19  A.   We paid for a FedEx card with cash to log on to a computer

20  so that it doesn't trace back to us.

21  Q.   And what were you actually purchasing in the FedEx store?

22  A.   Computer time -- or a card that allows to log in to a

23  computer to use the computer.

24  Q.   Okay.  And so let's -- Your Honor, at this time, we would

25  ask to play another short clip, which is Government Exhibit

```
Mo - Direct                                                    378
```

1    6-109-5.

2            THE COURT:  Any objection?

3            MR. SMITH:  No objection.

4            THE COURT:  All right, it's in.

5            (Government's Exhibit No. 6-109-5 was received in

6    evidence and excerpt was played.)

7            MR. SMITH:  Objection, Your Honor.

8            THE COURT:  Wait a minute, wait a minute.

9            MR. SMITH:  We weren't told which clip this would be

10   so --

11           THE COURT:  It's 6-109-5.

12           MR. SMITH:  Your Honor will see from the exhibit list

13   in this case that the government has not provided minutes for

14   the recordings that it intends to play in court, so the defense

15   is unaware of which particular minutes the government wants to

16   play from a given recording.  We object to this.

17           MR. GIBBS:  Your Honor, these were all provided to

18   the defense.

19           THE COURT:  As long as you've had the entire exhibit,

20   the fact that the government is not playing the whole thing is

21   not in my view a violation of the rules.  So the objection is

22   overruled.

23           Let's go.  You may play it.

24           Did you lose it?

25           MR. VERA:  I did.  One second.

Mo - Direct                                                          379

1            (Government Exhibit No. 6-109-5 was played.)

2  BY MR. GIBBS:

3  Q.   And, sir, what was going on in this clip?

4  A.   We were setting up our accounts, communication accounts,

5  e-mail accounts.

6  Q.   Okay.  And you were setting up your e-mail accounts, and

7  as part of that, did you have to provide a, a birth date?

8  A.   Yes.

9  Q.   And what birthday did the defendant provide?

10 A.   Hitler's birthday.

11 Q.   And did you know what Hitler's birthday was at that point?

12 A.   Not at the time, no.

13         MR. GIBBS:  All right.  And, Your Honor, we have one

14 last clip I'd like to play, which is 6-109-6.

15         THE COURT:  Any objection?

16         MR. SMITH:  No objection.

17         THE COURT:  All right, it's in.

18         (Government's Exhibit No. 6-109-6 was received in

19 evidence and played.)

20 BY MR. GIBBS:

21 Q.   So, sir, what was going on in that clip?

22 A.   We were still filling out data and -- while we were

23 creating accounts, we were filling out data and actually

24 creating the user name of the account, of each e-mail account.

25 Q.   And what was the defendant's e-mail account that he set up

Mo - Direct                                                        380

1   on October 25, 2014, with you?

2   A.   Essa Kobayashi, the one that was shown.

3   Q.   And was that the last day that you saw the defendant

4   before this trial started?

5   A.   I can't recall.  Either we met again one last time before

6   that, or that was the last time.

7   Q.   Okay.  But was this towards the end of your last in-person

8   meetings with the defendant?

9   A.   Yes.

10  Q.   And what happened after the two of you parted ways?

11  A.   Basically, he gave me a, gave me a hug and told me --

12  wished me luck.

13  Q.   And where did you go at that point?

14  A.   From there?

15  Q.   Well, did you -- you know, a few days after this, where

16  did you go?

17  A.   I left to Turkey.

18  Q.   With?

19  A.   With Agent John Minichello.

20  Q.   All right, thank you.

21         And at any of the time while you were still in touch

22  with the defendant or with the defendant, at any point, did you

23  ever ask the defendant to lie if he was approached by the FBI

24  about you?

25  A.   No.

Mo - Cross                                                         381

 1              MR. GIBBS:  Thank you.

 2              Your Honor, that's all I have, Judge.

 3              THE COURT:  All right.  Cross-examination?

 4                       CROSS-EXAMINATION

 5    BY MR. SMITH:

 6    Q.   So, Mo, I'm Nicholas Smith.  I'm representing Nicholas

 7    Young.  I'm going to cross-examine you with some questions.

 8    A.   Hello.

 9    Q.   So you're testifying here today under a pseudonym,

10    correct?

11    A.   That's correct.

12    Q.   You are -- your role in this case was as a paid informant

13    for the FBI?

14    A.   Yes.

15    Q.   You're not an agent of the FBI.  You are sort of a

16    contractor for the FBI.  They pay you to, to report on a

17    target?

18    A.   I'm not a contractor.

19    Q.   You're not an agent of the FBI, correct?

20    A.   No, and I'm not an agent.

21    Q.   You were paid over $34,000 to report on Nicholas Young,

22    correct?

23    A.   Specifically for Nicholas Young?  I was paid 34,000, yes.

24    Q.   In connection with this investigation into Nicholas Young?

25    A.   Yes.

Mo - Cross                                                          382

1   Q.   How did your payment work?  Were you paid for results?

2   A.   I don't understand the question.

3   Q.   Were you paid regardless of whether you performed poorly

4   by the FBI in connection with your investigation into Nicholas

5   Young?

6   A.   The payment wasn't just for Nicholas Young.  I started

7   working before that.

8   Q.   When did the -- when did the government agree to make a

9   payment to you of $34,000?

10  A.   It wasn't a sum payment.  It was --

11  Q.   How was it -- how did the payment work?

12  A.   I started back in August 2013, and they would pay me for

13  information.

14  Q.   What kind of information did they pay you for?

15  A.   I don't seem to understand.

16  Q.   What kind of information did the FBI pay you for?

17  A.   Any information that they needed help with.

18  Q.   Such as?  What's an example of the information they needed

19  help with?

20  A.   I don't, I don't understand what you're saying.

21  Q.   They told you they needed information, and they agreed to

22  pay you in exchange, correct?

23  A.   That's not how it worked.

24  Q.   How does it work?

25  A.   They would, they would help -- they would ask me to do

Mo - Cross                                                          383

1  something, and I would --

2  Q.   What would they ask you to do?

3  A.   Before Nicholas Young?  Are we talking about --

4  Q.   I'm asking you what they paid you to do.  What did they

5  pay you the $34,000 to do?

6  A.   They paid me to gather information.

7  Q.   What kind of information?

8  A.   Any information that would hurt, like, hurt U.S. citizens,

9  U.S. interests.

10 Q.   Any information that would hurt U.S. citizens or U.S.

11 interests?

12 A.   Correct.

13 Q.   They also instructed you to engage in conversations with

14 ISIS about the targets you're reporting on, correct?  You were

15 instructed to raise the subject of ISIS with the targets of the

16 investigations?

17 A.   Of Nicholas?

18 Q.   Yes.

19 A.   No.

20 Q.   You were not instructed to do that?

21 A.   No.

22 Q.   So you created a legend with your agent handler, correct?

23 A.   I don't seem to understand.  A legend?

24 Q.   Are you familiar with the term "legend"?

25 A.   No.

Mo - Cross                                                               384

1   Q.   You created a fake personality with the agent handler who

2   you worked with, correct?  And you would assume that

3   personality while you're reporting on an individual?

4   A.   I wouldn't say a fake, no, but I was planning on

5   traveling, yes.

6   Q.   So you assumed a fake identity in order to report on

7   Nicholas Young, correct?

8   A.   A fake identity?  No.

9   Q.   It wasn't fake?

10  A.   No.

11  Q.   So you are testifying here today you were not under a

12  pseudonym when you met Nick and gave him your background?  That

13  was true information, correct?

14  A.   The, the pseudonym is short for my, for my real name.

15  It's not fake.

16  Q.   When you introduced yourself to Nicholas Young, you

17  explained where you were from, correct?

18  A.   Yes.

19  Q.   And that you had family members, correct?

20  A.   Yes.

21  Q.   And was that information true or false?

22  A.   It's true.

23  Q.   All of it was true?

24           MR. GIBBS:  Judge, may we approach on this?

25           THE COURT:  Yes.

Mo - Cross                                                          385

```
 1              (Bench conference on the record.)
 2          MR. GIBBS:  Judge, I think the witness is a little
 3   bit confused as to I hope we're not bringing out true
 4   information, but obviously, anything that relates to who he
 5   truly is is protected by the protective order.
 6          MR. SMITH:  Your Honor, we've got several documents
 7   in discovery from the government stating that the information
 8   he told Nicholas Young was false.  If he's now testifying it's
 9   true, that's a credibility issue.  It's impeachment.
10          MR. GIBBS:  No, I think he's confused by the
11   question.  I think he's just --
12          THE COURT:  Well, the problem is you cannot reveal
13   his true identity or any information that could lead somebody
14   to figure out who he is, and that's part of the sensitivity of
15   this case.  That's the whole reason why we have the screen up.
16   So you need to stay away from that.
17          MR. SMITH:  Your Honor, I'm not asking him about his
18   true identity.  I'm asking whether the information that he gave
19   the defendant about his background was true or false.
20          THE COURT:  That's the same thing.  He's of
21   Palestinian origin.  You've already got him verifying his true
22   first name is Mohammad.  I mean, I'm concerned.  I thought
23   you-all would be on your feet sooner.
24          All right, stay away from it.
25          MR. SMITH:  Stay away from it?
```

Mo - Cross                                                          386

1              THE COURT:  Stay away from it.

2              (End of bench conference.)

3    BY MR. SMITH:

4    Q.   Now, when did you meet Nicholas Young?

5    A.   I met him back in May of 2014.

6    Q.   And where did you meet him?

7    A.   At the Sully Mosque.

8    Q.   And were you at the Sully Mosque to meet Nicholas Young

9    that day?

10   A.   That specific day?

11   Q.   The first time you met him, were you going to the Sully

12   Adams Mosque in order to meet Nicholas Young, or did you happen

13   to chance on him there?

14   A.   No, I just -- it was a chance.

15   Q.   So at what point were you directed by your agent handler

16   to report on Nicholas Young?

17   A.   It wasn't until later.

18   Q.   It was not until later.

19   A.   Yes.

20   Q.   Your agent handler instructed you on how to describe

21   yourself to Nicholas Young in order to develop a relationship

22   with him, correct?

23   A.   Can you elaborate?

24   Q.   You were directed by your agent handler to develop a

25   relationship with Nicholas Young, correct?

```
Mo - Cross                                                        387
```

 1  A.    Yes.

 2  Q.    And how did he instruct you to develop a relationship with

 3  Nicholas Young?

 4  A.    He asked me to report any conversations that I had with

 5  Nicholas Young.

 6  Q.    Right.  But before you had sensitive conversations with

 7  Nicholas Young, you were directed to develop a connection with

 8  him first, correct?

 9  A.    He was in the same group of friends of Hicham and T.J., so

10  by default, he was part of the -- by the association, it fell

11  naturally.

12  Q.    Your agent handler directed you to become friends with

13  Nicholas Young, to report on him, correct?

14  A.    Yes.

15  Q.    And how did he tell you -- how did your agent handler

16  direct you to develop a friendship with Nicholas Young?

17  A.    I don't seem to understand.  How did he -- how did he ask

18  me to do that?

19  Q.    You just testified that he -- that your agent handler

20  directed you to become friends with Nicholas Young, correct?

21  A.    Yes.

22  Q.    And how did your agent handler instruct you to go about

23  becoming friends with Nicholas Young?

24  A.    Simply to strike a relationship and listen.

25  Q.    Strike a relationship.  And how would you -- how did you

Mo - Cross                                                          388

1   strike the relationship?

2   A.    Two guys going to the masjid and praying and, and meeting

3   afterwards for dinner or something like that.

4   Q.    So you told Nicholas Young you went to George Mason

5   University, correct?

6   A.    Correct.

7   Q.    Nicholas Young went to George Mason University, correct?

8   A.    Yes.

9   Q.    You told him you were in the military reserves, correct?

10  A.    Correct.

11  Q.    You told him that you had a religious conflict at work

12  with the military reserves that might cause you to leave,

13  correct?

14  A.    Yes.

15  Q.    You knew that Nicholas Young told you that he had a

16  religious conflict at work with the police department, correct?

17  A.    I don't recall.

18  Q.    So you had a -- you met Nicholas Young in 2014, and your

19  relationship under this pseudonym lasted until about August of

20  2016, correct?

21  A.    Me personally physically?

22  Q.    The character called Mo had a relationship between -- with

23  Nicholas Young between May 2014 and August 2016, including

24  e-mails, correct?

25  A.    Yes.

```
Mo - Cross                                                    389
```

1  Q.   You met with Nicholas Young over 23 times, correct?

2  A.   I don't recall the exact times, but that sounds about

3  right.

4  Q.   You met with Nicholas Young on many more occasions than on

5  the occasions for which we played clips during your direct

6  testimony, correct?

7  A.   Past my trip to Turkey?  Is that what you're saying?

8  Q.   Including all of the times you've met with the defendant,

9  Nicholas Young, there were a number of occasions you met with

10 Nicholas Young in addition to the dates for which we played

11 clips, audio clips during your direct testimony, correct?

12 A.   Past my trip to Turkey, I did not meet with Nicholas

13 Young.

14 Q.   There was a number of times which you met with Nicholas

15 Young, correct?  Over 20 times, right?

16 A.   I don't recall.

17 Q.   You met with Nicholas Young on occasions which you did not

18 play in a recording during your direct testimony, correct?

19 A.   Again, I don't recall how many times.

20 Q.   I'm not asking you how many times.

21 A.   Okay.  I haven't met him after my trip to Turkey.

22          THE COURT:  No, no, that's not, that's not the

23 question.  The question is were all of your conversations that

24 you had, you in person had with him played in court today?

25          THE WITNESS:  Not all of them.

Mo - Cross                                                          390

1   BY MR. SMITH:

2   Q.   Not all of them.  So there were times when you met with

3   Nicholas Young there was no recording which was played in court

4   today, correct?

5   A.   All of them were recorded, but not all of them were

6   played.

7   Q.   All of your meetings with Nicholas Young were recorded?

8   A.   Yes.

9   Q.   Okay.  You testified on direct today that the first

10  recording you made of Nicholas Young was in July 2014, correct?

11  A.   Audio recording, yes.

12  Q.   No, you said all -- you just testified, sir, that all of

13  your meetings with Nicholas Young were recorded, correct?

14  A.   Yes, audio recording.

15  Q.   And you also testified that the first recorded meeting was

16  July 2014, correct?

17  A.   Yes.

18        MR. SMITH:  This is Defense Exhibits 2 through 6.

19  Q.   Do you see the sticky note that says DX-2 on it?

20  A.   Yes.

21  Q.   This is an FBI memorandum called a 1036 form.  Do you

22  recognize the author of the memorandum?

23  A.   Yeah -- yes.

24  Q.   What does it say?

25  A.   John Minichello.

Mo - Cross                                                          391

1    Q.   Who is John Minichello?

2    A.   He's the FBI agent I was in contact with.

3    Q.   He's your agent handler, right?

4    A.   Yes.

5    Q.   This memorandum reflects your meeting --

6              MR. GIBBS:  Judge, he can -- if he's using it to

7    refresh, he needs to be able to have a chance to read it and

8    hear a question instead of having it, the sort of leading

9    questions right here.

10             MR. SMITH:  This is cross-examination.

11             THE COURT:  Number one, on cross-examination, the

12   other side can lead, as you know.  Number two, though, I don't

13   want a whole lot of repetition, and so to the extent that this

14   is going over what was rehashed with the agent, we're not going

15   to hear it a second time.

16             MR. SMITH:  Your Honor, the witness just testified --

17             THE COURT:  Mr. Smith, when I'm speaking, you don't

18   speak over the Court.  The court reporter cannot get two people

19   at the same time.  Let me finish.

20             I'm going to permit a little bit of this as long as

21   it's not repeating everything that's been going on, all right?

22             MR. SMITH:  Okay.

23             MR. GIBBS:  Thank you, Judge.

24   BY MR. SMITH:

25   Q.   Do you see the date May 22 in the document marked DX-2?

Mo - Cross                                                          392

1    A.   Yes.

2    Q.   Does that May 22 date reflect a meeting you had with

3    Nicholas Young?

4    A.   Yes.  That's -- this is in part of information I provided

5    in an e-mail to John.

6    Q.   So, so that May 22 date is May 22, 2014, correct?

7    A.   Yes.

8    Q.   So you just testified here today that you have had no

9    meetings with Nicholas Young that were not recorded, correct?

10   A.   I said the audio recordings start in July.

11   Q.   Right.  Okay.  Can you turn to DX No. --

12           THE COURT:  Well, wait.  You're saying audio

13   recordings.  Are there some other kind of recordings going on

14   here?

15           THE WITNESS:  No, ma'am.  I met the defendant in May;

16   however, in July is when the audio recordings started.

17           THE COURT:  So you did not -- were not involved in

18   any recordings with the defendant in May or June?

19           THE WITNESS:  Well, I would pass any information to

20   the agent, though.

21           THE COURT:  No, no, that's not the question.

22           THE WITNESS:  Yes.

23           THE COURT:  The question is were you involved, either

24   yourself on your own -- at your own initiative or at the

25   direction of the FBI, were you recording conversations you had

Mo - Cross                                                         393

 1  with Mr. Young in May and June?

 2           THE WITNESS:  No.

 3  BY MR. SMITH:

 4  Q.   You testified earlier today that you never met with

 5  Mr. Young on an occasion in which you did not record the

 6  conversation, correct?

 7  A.   Correct.

 8  Q.   And you acknowledged that the memorandum in front of you

 9  on May 22, 2014, reflects a meeting you had with Mr. Young,

10  correct?

11  A.   Correct.

12  Q.   And you've testified earlier that July 2014 was the first

13  time that you recorded a meeting with Nicholas Young, correct?

14  A.   Yes.

15  Q.   Thank you.

16           Turn to DX-4, please.  Do you see the date on that

17  memorandum?  Excuse me, do you recognize the author of the

18  memorandum?

19  A.   I do.

20  Q.   Who is it?

21  A.   John Minichello.

22  Q.   He's your agent handler, right?

23  A.   Yes.

24  Q.   Do you see the June 5 date in the body of the memorandum,

25  June 5, 2014?

Mo - Cross                                                          394

1   A.   I see a -- I see a June 9.

2   Q.   It's DX-4.

3   A.   I am looking at DX-4.

4             I see it in the body now.

5   Q.   Do you see it?

6             Does this reflect a meeting between you and Nicholas

7   Young on June 5, 2014?

8   A.   Yes.  It was a group of friends.  We were all there at a

9   little, little Italian restaurant.

10  Q.   Right.  And every time you met with Nicholas Young, there

11  was an audio recording, right?

12  A.   With this group of friends?  That was prior to the

13  recording starting.  This one you're referring to --

14  Q.   Nicholas Young is mentioned in that memorandum on June 5,

15  2014, correct?

16  A.   Correct.

17  Q.   And you've testified today that the first -- you never had

18  a meeting with Nicholas Young without recording it, correct?

19            MR. GIBBS:  Judge, that's been asked and answered.

20            THE COURT:  Sustained.  Let's move this along.

21  BY MR. SMITH:

22  Q.   Can you turn to DX-5, please?

23  A.   Okay.

24  Q.   Do you see the author of that memo?  It's John Minichello,

25  right?

```
Mo - Cross                                                          395
```

1    A.    Yes.

2    Q.    He's your agent handler, right?

3    A.    Correct.

4    Q.    Do you see the June 29 date?

5    A.    I see it.

6    Q.    Does this reflect a meeting you had with Nicholas Young on

7    June 29, 2014?

8    A.    Yes, Nicholas was present.

9    Q.    Was this meeting recorded?

10   A.    No.

11   Q.    Did you discuss ISIS with Nicholas Young on June 29, 2014?

12   A.    Can I read this?

13   Q.    Well, first you have to try -- do you remember?  Do you

14   recall discussing ISIS?  Sir --

15   A.    I don't recall.  I would have to --

16   Q.    You can't recall, okay.

17          Did your agent handler ever instruct you not to

18   record a meeting with Nicholas Young?

19   A.    Did he not --

20   Q.    Did he instruct you to go on certain meetings --

21   A.    No.

22   Q.    -- with Nicholas Young and not record?

23   A.    And not record?

24   Q.    Yes.

25   A.    No.  I don't seem to understand --

Mo - Cross                                                          396

1   Q.  So you're acknowledging that this June 29 date, meeting

2   between you and Nicholas Young that you allege was not

3   recorded, correct?

4   A.  No, it was -- it wasn't recorded by audio; however, I

5   would --

6   Q.  It wasn't -- excuse me, what did you say?

7   A.  It wasn't recorded through audio, but I would, I would

8   pass on information to him, yes.  This entire time, I would

9   pass on information every time.

10  Q.  And why were you not wearing a wire on this occasion?

11  A.  I'm not familiar how FBI does, like, how they acquire it.

12  Q.  Who makes the decision whether you wear a wire when you

13  meet with Nicholas Young?

14  A.  I do not know.

15  Q.  You don't know?

16  A.  Are you asking me who in the FBI makes that decision?

17  Q.  Yes.  When you would go out and meet with Nicholas Young

18  as a paid informant, would your agent handler direct you to

19  wear a wire?

20  A.  Yes, my agent, my agent would direct me.

21  Q.  And there were occasions when he directed you not to,

22  correct?

23  A.  Not to, not to wear a wire?

24  Q.  Wear a wire in a meeting with Nicholas Young, correct?

25          MR. GIBBS:  Judge, objection.  The witness already

 1  testified that starting in July, he was recording all of his

 2  meetings.  This is a rehash.

 3              THE COURT:  This is a slightly different question,

 4  though.  The question is whether anybody at the FBI ever told

 5  Mo not to wear a wire when he was communicating with Mr. Young.

 6  That's the question.

 7              Do you understand the question?

 8              THE WITNESS:  No one told me that.

 9  BY MR. SMITH:

10  Q.   No one told you that.  So on this occasion on June 29,

11  reflected in DX No. 5, the document in front of you --

12  A.   Yes.

13  Q.   -- you have testified you were not wearing a wire,

14  correct?

15  A.   Correct.

16  Q.   And why were you not wearing a wire on this occasion?

17  A.   Because it was prior to when the FBI told me to wear a

18  wire.

19  Q.   So the decision of whether to wear a wire is up to the

20  agent handler, not you, correct?

21  A.   Correct.

22  Q.   There were occasions when you wore a wire when you did not

23  tell the agent handler, correct?

24  A.   That is not correct.

25  Q.   It isn't?

1  A.   No.

2  Q.   Thank you.

3         Can you turn to DX-6, please?  Excuse me, in the same

4  document, DX-5, please find the date July 6.  It's below the

5  June 29 date.

6         Do you see July 6?

7  A.   Is it on the first page?

8  Q.   Mo, have you ever lied to the FBI?

9  A.   Yes.

10  Q.   You have.  How many times?

11  A.   Once.

12  Q.   Once?  When was that?

13  A.   I can't recall the date, but I did.

14  Q.   Do you see the July 6 date in that memo, DX-5?

15         THE COURT:  You can lead him.  Just get him right to

16  the page.

17         MR. SMITH:  It's on the page.  It's on that one page.

18         THE COURT:  All right, ask the question.

19         THE WITNESS:  Yes, I see July 6.

20  BY MR. SMITH:

21  Q.   Does that reflect a meeting you had with Nicholas Young on

22  July 6, 2014?

23  A.   That looks correct.

24  Q.   Right.  Did you have that meeting with Nicholas Young on

25  July 6, 2014?

Mo - Cross                                                          399

1   A.    Yes.

2   Q.    Do you remember it?

3   A.    Not entirely, but yes.

4   Q.    Okay.  Do you see where it says you discussed ISIS with

5   Nicholas Young, July 6?  Look for the word "ISIS" on that memo.

6   A.    I see.  I see where you're saying.

7   Q.    Do you remember that conversation?

8   A.    Not entirely, but yes.

9   Q.    Not entirely, but yes?

10  A.    As in, like, the scope of the conversation, yes, but I

11  haven't looked at this reporting.

12  Q.    Please go to DX-6, please.  It reflects a meeting on

13  July 13, 2014.

14  A.    I'm looking at it.

15  Q.    Was this meeting recorded between you and Nicholas Young?

16  I'm just -- no?  Was it recorded?

17  A.    When you say "recorded," like, did I report it?

18  Q.    Record it.  Were you wearing a wire during that meeting?

19  No, I'm asking you if you wore a wire, not what the --

20  A.    May I look at the --

21  Q.    The memo doesn't say.  I'm asking you whether you recall

22  wearing a wire.

23  A.    I need, like -- I need to read the information to

24  understand so I can refresh my memory.

25  Q.    I'm saying did you wear a wire on July 13, 2014?

Mo - Cross                                                          400

1   A.   Yes.  I wore a wire starting in July, yes.

2   Q.   Okay.  Okay.  Mo, you've testified today about some of

3   these clips from meetings you were wearing a wire on with

4   Nicholas Young during your meetings.

5   A.   Yes.

6   Q.   And this began in July 2014, correct?

7   A.   Yes.

8   Q.   Those clips we played from July 27 -- July 27, August 10,

9   September 11, October 2, October 10, October 16, October 17,

10  October 23, October 24, and October 25, those did not -- those

11  were clips from the meetings, correct, selections from your

12  entire conversation with Nicholas Young, correct?

13  A.   Yes.

14  Q.   Those clips were not the entire conversation you had with

15  Mr. Young on those given days, correct?

16  A.   They were --

17  Q.   There was conversation that was recorded on those days I

18  just listed but was not played in court, correct?

19  A.   Correct.

20        MR. SMITH:  Let me pull up September 11, 2014, and

21  start at 42 minutes, 54 seconds.  Don't start it yet.

22        MR. ENNS:  What is the time?

23        MR. SMITH:  The time is 42 minutes, 54 seconds, but

24  don't play it yet.

25  Q.   So, Mo, on -- you testified about September 11, 2014,

Mo - Cross                                                              401

1   correct?

2   A.   Yes.

3   Q.   Didn't you tell Nicholas that you wanted to help out in

4   Syria and Nicholas responded, "Why now?"

5   A.   Yes.

6   Q.   And didn't Nicholas argue that no one restricts us from

7   practicing our religion here?  By "here," he meant the United

8   States?

9   A.   Can, can you --

10  Q.   Didn't Nicholas argue on September 11, 2014, one of the

11  dates you testified about today, that no one restricts us from

12  practicing our religion here, meaning you had brought up the

13  subject of ISIS on this date, and Nicholas responds, "Why now?

14  No one restricts us from practicing our religion here."

15           Do you remember that?

16  A.   I recall.

17  Q.   You recall it?

18  A.   Yes.

19  Q.   Do you recall it specifically?

20  A.   It was part of the conversation.

21           MR. SMITH:  Right.  Please play 42, 42 minutes, 54

22  seconds.  Can you turn it up?

23           You're on September 11, 2014.

24           (Audio excerpt was played.)

25  BY MR. SMITH:

Mo - Cross                                                          402

1   Q.   Mo, did you -- it's kind of hard to hear the conversation.

2   We are marking that audio clip on September 11, 2014, between

3   the minutes 42 minutes, 54 seconds, and 46 minutes, 45 seconds,

4   as Defense Exhibit, I believe it's 10 now.  It's kind of hard

5   to hear the audio on that clip, but did you hear Mr. Young

6   referencing Abdullah?

7   A.   Yes.

8   Q.   Who is Abdullah?

9   A.   I'm not familiar with who Abdullah is at the moment.

10  Q.   But you heard Mr. Young referencing an Abdullah who had

11  something to say about a concept of not rebelling against the

12  legitimate government, correct?  Did you, did you catch that?

13  A.   Yes.

14  Q.   And you've heard Mr. Young make that statement, right?

15  A.   Yes.

16  Q.   So what Mr. Young was saying right here when you were

17  telling him, "Wouldn't it be more free, wouldn't it be more

18  liberating to move abroad and overseas?" is Mr. Young was

19  telling you about Abdullah, who is citing this Islamic concept

20  that you can't overthrow a legitimate government, correct?

21  A.   What Mr. Young was saying?  Correct.

22  Q.   Mr. Young had told you this before, right, before

23  September 11, 2014?  He had told you about this concept that

24  it's un-Islamic to overthrow the legitimate government,

25  correct?  He had told you this before?

Mo - Cross                                                              403

1    A.    Yes.

2    Q.    When did he tell you that?

3    A.    I don't recall.

4    Q.    But you remember him saying that to you on multiple

5    occasions, right?

6    A.    Everything that I've -- I reported, I reported to either

7    in the recording or in audio, but yes.

8    Q.    Your first audio recording was on -- with Mr. Young was on

9    July -- in July 2014, right?

10   A.    Audio recording, correct.

11         MR. SMITH:  Right.  Play the May 31 recording, 14

12   minutes, 40 seconds.

13         (Audio excerpt was played.)

14         MR. SMITH:  Now, pause it.

15   Q.    Whose voice is that?

16   A.    It sounds like my voice.

17         MR. SMITH:  Right.

18         Keep playing.

19         (Audio excerpt was played.)

20         MR. SMITH:  Pause it.

21   Q.    Whose voice is the second voice, the one who's responding

22   to you?

23   A.    The defendant.

24         MR. SMITH:  Okay.  Keep playing.

25         (Audio excerpt was played.)

Mo - Cross                                                              404

1          MR. SMITH:  Pause it.

2   Q.   Did you hear what Mr. Young said on the recording?

3   A.   It doesn't sound clear.

4   Q.   Didn't Mr. Young tell you when you -- you raised the

5   subject of the Soviet invasion of Afghanistan in that clip,

6   right?

7   A.   Yes.

8   Q.   And doesn't Mr. Young say -- question you and say, "Are

9   they rebels?  Are they mujahideen?" which is something noble,

10  right, according to you in that comment?  I mean, he says, "Are

11  they mujahideen, or are they criminals because they've rebelled

12  against the legitimate government?"

13          Did you hear that?

14  A.   Yes.

15  Q.   And Mr. Young makes a similar comment on September 11,

16  2014, correct?

17  A.   Yes.

18  Q.   Now, turn quickly, really quickly back to DX-3 in front of

19  you, sticky note DX-3.  Do you see, do you see it's a

20  memorandum by John Minichello?

21  A.   Yes.

22  Q.   Do -- so flip to the second page, and do you see where it

23  says:  Mr. Young appears to agree that -- with Peshwaz that the

24  Soviet invasion of Afghanistan, there was a legitimate jihad?

25  Do you see that paragraph?

Mo - Cross                                                          405

1    A.    Yes.

2    Q.    That's reflecting the conversation we just listened to,

3    right?

4    A.    This conversation?

5    Q.    Yeah, the conversation we were just listening to on the

6    audio recording.  That's -- this memorandum you're looking at

7    is reflecting a -- just read the memorandum, that paragraph.

8    A.    Read it out loud?

9    Q.    Sure.

10   A.    "Nick appeared to agree with Peshwaz and stated that the

11   Soviet invasion of Afghanistan was a legitimate jihad.  Nick

12   argued that there is currently no khalifa, so Muslims cannot

13   rely on the government to declare jihad.  T.J. stated that

14   jihad was declared in Egypt, and Hall responded saying that

15   nobody mobilized.  Nick stated that the situation in Egypt

16   showed that relying on governance to declare jihad does not

17   work.  He also said that if an individual could help defend

18   fellow Muslims, they should do so."

19   Q.    That's the recording -- the memorandum you're reading

20   right now reflects a summary of the recording we were just

21   listening to, correct?

22   A.    Yes.

23   Q.    Thank you.

24         That was on May 31, 2017, correct?

25   A.    That recording?

Mo - Cross                                                                406

1   Q.   That, what you were just reading.  You see it's drafted on

2   June 6, 2014.  Do you see that, DX-3?

3   A.   Yes.

4   Q.   And so -- and if you flip to the next page, the Soviet

5   invasion of Afghanistan, that reflects the May 31 meeting you

6   had with Mr. Young, right?  And that's the clip we were just

7   listening to?  Yes?

8   A.   Yes.

9   Q.   Thanks.

10        On September 11, Nicholas told you he had been

11  against ISIS because of all the bad stuff he was hearing about

12  them, right?

13  A.   Yes.

14  Q.   He told you on the same day that when he saw Baghdadi's

15  mug shot on the news, he thought they sounded like a bunch of

16  criminals who were hungry for power and money, right?

17  A.   I don't recall.

18  Q.   You don't recall?  It's on -- do you see that memorandum

19  in front of you is dated, reflects the meeting you had with

20  Mr. Young on September 11, 2014?

21  A.   Yes.

22  Q.   So you flip to page 12.  The page numbers are at the

23  bottom.  It's up near the top of the page.

24        Didn't Nicholas tell you that when he saw Baghdadi's

25  mug shot on the news, he thought they sounded like a bunch of

Mo - Cross                                                          407

1    criminals who are hungry for power and money?

2    A.   Yes.

3    Q.   On September 11, didn't you tell Nicholas, "I've kind of

4    made up my mind to go to Syria," to which Nicholas responds,

5    "It's kind of nice in the U.S., isn't it?  Good opportunities"?

6    A.   Yes.

7              MR. SMITH:  Let's play that.  Can you go to

8    September 11, 2014, 1 hour, 51 minutes, 42 seconds?

9              (Audio excerpt was played.)

10             MR. SMITH:  We're moving into evidence as Defense

11   Exhibit 11 a September 11, 2014, audio at 1 hour, 51 minutes,

12   42 seconds, to 1 hour, 54 minutes, 45 seconds.

13             MR. GIBBS:  No objection, Judge.

14             THE COURT:  We'll have to see how that goes in, but

15   all right.

16   BY MR. SMITH:

17   Q.   Mo, on September 11, 2014, Nicholas told you that Muslims

18   are not allowed to spy on each other, right?

19   A.   Correct.

20   Q.   And he told you that if somebody -- that there's a

21   difference, there's something -- he said there's an exception,

22   right?  Do you remember what his exception was?

23   A.   Not exactly, but yes.

24   Q.   Didn't he tell you that spying on other Muslims would be

25   legitimate if there's violence involved, in any potential

Mo - Cross                                                          408

1  violence?

2  A.    Correct.

3           MR. SMITH:  Can you play, can you play 9/11/2014,

4  2 hours, 19 minutes, 14 seconds?

5           THE COURT:  Mr. Smith, I have to tell you that unless

6  the jurors have much better hearing than I do, I don't think

7  other than traffic, we're getting anything out of these tapes.

8  It's not helping.

9           MR. SMITH:  Your Honor, we're going to move each

10  selection into evidence and then allow the jury to listen to

11  the recordings with headphones and then also move in the

12  transcript of the recording.  The reason we're doing it both

13  ways is because the government often did not reflect the entire

14  conversation in the transcript.

15           THE COURT:  We should have the transcripts now and

16  not at some later time because there's no way of being able to

17  compare what we're seeing the way we did with the government.

18  We could look at the transcript and we could be hearing.  We're

19  not going to be doing this case piecemeal like that.  You

20  should have the evidence ready at this point if you're going to

21  be playing it.

22           MR. SMITH:  Your Honor, this is all of the evidence

23  that the government presented to it, and we're also going to

24  introduce into evidence every transcript that the government

25  gave us.

Mo - Cross                                                              409

1              THE COURT:  Well, whether I'll permit it is another

2      question.  Let's continue this.  But I'm just thinking -- raise

3      your hands, folks.  Are you able to hear anything reasonably on

4      this?

5              A JUROR:  A little.

6              THE COURT:  Just a little?  A very small amount.

7      It's terribly difficult to put a case on like this.

8              So ask your questions of the witness, all right, but

9      in terms of just sitting here and listening to a lot of

10     tapes --

11             MR. SMITH:  Your Honor, I will ask the questions, and

12     if the witness does not recall Mr. Young's comment to him, I

13     will play the recording and introduce it into evidence.

14             THE COURT:  Well, we'll see.  Let's ask the question.

15     BY MR. SMITH:

16     Q.   On September 11, 2014, Nicholas told you that if someone

17     was going to blow up a subway, you should notify him because he

18     would stop it, correct?

19     A.   Correct.

20     Q.   On September 11, 2014, Nicholas told you he wanted to make

21     someone's life better in response to your comment that you were

22     young and restless, correct?

23     A.   I do not recall.

24             MR. SMITH:  This is a short clip, Your Honor,

25     September 11, 2014, 1 hour, 2 minutes, 42 seconds.

Mo - Cross                                                                410

1              (Audio excerpt was played.)

2    BY MR. SMITH:

3    Q.   When you mentioned on September 11, 2014, that you wanted

4    to go abroad and you had made up your mind, didn't Nicholas

5    push back and say he sees younger guys like you talking

6    radically, right?

7    A.   Yes.

8    Q.   And he said he didn't mean to insult you, but he said,

9    "I'm older than you," right, and, "I'm a little bit less

10   radical than you," right?

11   A.   I don't recall.

12              MR. SMITH:   September 11, 2014, 1 hour, 9 minutes, 22

13   seconds.   1 hour, 9 minutes, 22 seconds.

14              (Audio excerpt was played.)

15              MR. SMITH:   Stop it.

16              We're introducing that clip as Defense Exhibit 12,

17   which is September 11, 2014, 1 hour, 9 minutes, 22 seconds, to

18   1 hour, 13 minutes.

19   Q.   Mo, in that clip, Mr. Young said he was thinking about

20   younger brothers who went overseas, right?

21   A.   Yes.

22   Q.   And Mr. Young said:  Why this narrow criteria they've set

23   for themselves?  Why do they have this narrow criteria they set

24   for themselves, right?

25   A.   Yes.

Mo - Cross                                                                411

1    Q.    And by "narrow criteria," Mr. Young meant why do they

2    believe they have to go overseas to fight, right?

3    A.    Yes.

4    Q.    On September 11, 2014, you told Nicholas that the dictator

5    of Syria was burying innocents up to their necks, torturing

6    them, and that was a reason to support ISIS, didn't you?

7    A.    Yes.

8    Q.    You would frequently have conversations about Dictator

9    Assad of Syria and how he was butchering civilians, correct?

10   A.    Yes.

11   Q.    You were instructed by your agent handler to use the

12   subject of Syria and Assad in discussions with ISIS about

13   Nicholas -- with Nicholas about ISIS because you knew Nicholas

14   had an interest in geopolitics, correct?

15   A.    Yes.

16   Q.    You played on Nicholas Young's interest in geopolitics to

17   get him to talk about ISIS, correct?

18   A.    Yes.

19   Q.    In response to your comment that the dictator of Syria was

20   burying innocents up to their necks and torturing them,

21   Nicholas told you he was against ISIS months before that,

22   correct?

23   A.    Yes.

24   Q.    You testified about your conversations with Nicholas on

25   October 2, 2014, today, correct?

Mo - Cross                                                                412

1    A.   Yes.

2    Q.   When you told Nicholas that you had firmed up your

3    decision to go to Syria, to go abroad to Turkey, Nicholas told

4    you to find another job in the same field in America, correct?

5    A.   In the same field?

6    Q.   He told you to get -- you told him you'd lost your job,

7    right?

8    A.   Correct.

9    Q.   Why did you tell him you'd lost your job?

10   A.   Because I actually did lose my job.

11   Q.   You were being paid by the FBI to inform on Nicholas,

12   correct?

13   A.   Yes, during that time.

14   Q.   Is that paid work?

15   A.   From that period when I met, yeah, Nicholas Young.

16   Q.   So when you -- you told Nicholas Young you had lost your

17   job on October 2, 2014, correct?

18           MR. GIBBS:  Objection, Judge.  Asked and answered.

19           MR. SMITH:  Okay.

20           THE COURT:  Sustained.

21   BY MR. SMITH:

22   Q.   On October 2, 2014, Nicholas told you to find another job

23   in America, right?

24   A.   Yes.

25   Q.   Now, you've testified today about a conversation you had

Mo - Cross                                                          413

1   at Hicham Hall's house on October 9, 2014.  Do you remember

2   that?

3   A.    I do.

4   Q.    And there was a clip played from that meeting on

5   October 9, 2014, where Hicham is kind of ranting at you, right?

6   A.    Yes.

7   Q.    That conversation you had with Hicham was when you were

8   inside Hicham's house that evening after dinner with Hicham's

9   family, correct?

10  A.    Correct.

11  Q.    But then you walk out of the house with Nicholas and

12  Hicham, and then Hicham confronts you after that conversation,

13  correct?

14  A.    Correct.

15  Q.    Hicham says essentially:  All of this ISIS conversation

16  you're talking about, you need to be careful, and, you know, if

17  I ever see you again, I might inflict physical harm on you.

18          Do you remember that?

19  A.    I do.

20  Q.    That happened after the conversation that you had with

21  Hicham that was played today, correct?

22  A.    You mean, like, after the recording?

23  Q.    There was a clip that we played today from your meeting

24  with Hicham and Nicholas Young on October 9, 2014, correct?

25  A.    Correct.

Mo - Cross                                                          414

1   Q.   And that conversation from the clip took place in Hicham

2   Hall's house that evening, on October 9, correct?

3   A.   Correct.

4   Q.   But when you left his house that evening after that

5   conversation for which we played the clip, Hicham Hall

6   confronted you about your interest in ISIS, correct?

7   A.   Yes.

8   Q.   He said, "If I ever see you again, I might inflict

9   physical harm on you because of your interest in ISIS,"

10  correct?

11  A.   I can't recall if he said exactly that, but --

12  Q.   Essentially?

13  A.   Yes, essentially.

14  Q.   And that happened after Hicham's conversation with you,

15  right?

16  A.   Yes.

17  Q.   Didn't one day -- you testified about October 10, 2014,

18  correct?  That's one day after the meeting at Hicham's house?

19  A.   Yes.

20  Q.   You testified today about your meeting with Nick on

21  October 10, 2014.  We played a clip from it, correct?

22  A.   Correct.

23  Q.   Didn't Nicholas Young tell you on October 10, one day

24  after the meeting at Hicham's house, that Hicham was speaking

25  from his heart and that Nicholas Young understood where he was

Mo - Cross                                                          415

1   coming from?

2   A.   I don't recall that.

3            MR. SMITH:  October 10, 2014, 2 hours, 34 minutes.

4   October 10.

5            MR. ENNS:  2 hours, 34 minutes?

6            MR. SMITH:  2 hours, 34 minutes.  This is only one

7   minute long.  2 hours, 34 minutes.

8            (Audio excerpt was played.)

9            MR. SMITH:  Tap me when you've got it, okay?

10            (Audio excerpt was played.)

11  BY MR. SMITH:

12  Q.   So didn't Nicholas tell you the next day, on October 10,

13  2014, that he understood where Hicham was coming from?

14  A.   Yes.

15  Q.   And -- but when he said that, "I understand where Hicham

16  is coming from," he was referring to when Hicham confronted you

17  the evening before, correct?

18  A.   Yes.

19  Q.   So when the prosecutor in your direct testimony asked you

20  whether -- suggested Nicholas was agreeing with Hicham's

21  comments to you inside the house, that's not what Nicholas

22  Young was referring to on October 10, was it?

23  A.   He's referring to what Hicham has stated.

24  Q.   When Mr. Young told you on October 10, 2014, that he

25  understood where Hicham was coming from, Mr. Young was

```
Mo - Cross                                                        416
```

1   referring to when Hicham confronted you about ISIS the night

2   before, correct?

3            MR. GIBBS:  Judge, he can't say what Mr. Young was

4   thinking.

5            THE COURT:  Sustained.

6   BY MR. SMITH:

7   Q.   Didn't -- on October 10, 2014, the same day we're talking

8   about, didn't Nicholas tell you to constantly purify your

9   intentions?

10  A.   He did.

11  Q.   Didn't he tell you you should always follow your

12  conscience?

13  A.   Yes.

14  Q.   Didn't he suggest that this idea you have of going

15  overseas might be an opinion you have that you're sticking to

16  out of pride?

17  A.   I don't recall that.

18           MR. SMITH:  This is 30 seconds, Your Honor.

19  October 10, 2014, 38 minutes, 39 seconds.

20           You let me know when you get those, okay?

21           MR. ENNS:  38 minutes, 39 seconds.

22           MR. SMITH:  Yeah.

23           THE COURT:  Let's move this along.  Come on, ask your

24  next question.

25  BY MR. SMITH:

Mo - Cross                                                                417

1   Q.   So you agree that on October 10, he told you to purify

2   your intentions?

3          MR. GIBBS:  He just testified, Your Honor, he

4   couldn't remember.

5          THE COURT:  Sustained.

6   BY MR. SMITH:

7   Q.   On October 10, 2014, didn't Nicholas tell you, "You're

8   going to get grilled if you go to Syria and come back"?

9   A.   Yes.

10  Q.   He told you this a lot, right?

11  A.   Yes.

12  Q.   He told you on multiple occasions right around the time

13  you left for Syria on October 25, 2014, correct?

14  A.   Correct.

15  Q.   Didn't he tell you he personally would be afraid to do

16  that because you're going to get caught?

17  A.   Yes.

18  Q.   At the end of your meeting on October 10, 2014, didn't

19  Nicholas suggest to you that you might be feeling pressured and

20  not to change your mind about Syria at the end of the meeting?

21  A.   I don't recall.

22          MR. SMITH:  The paralegal now explains that he's

23  good.

24          Please play October 10, 2014, 56 minutes, 54 seconds,

25  to the end.

Mo - Cross                                                              418

1           MR. ENNS:  One more time?

2           MR. SMITH:  October 10, 2014, 56 minutes, 54 seconds.

3           (Audio excerpt was played.)

4           MR. SMITH:  Is this October 10?

5           (Audio excerpt was played.)

6           MR. SMITH:  Stop it.  Stop it.

7    Q.   You testified about your meeting with Nicholas Young on

8    October 16, 2014, correct?

9    A.   Correct.

10   Q.   During that meeting, you attempted to have Nicholas offer

11   to purchase your vehicle, your Jeep, right?

12   A.   Did I offer him to buy?

13   Q.   Your agent handler instructed you before this meeting to

14   see whether Nick might be willing to buy your Jeep before you

15   went overseas, right?

16   A.   I don't recall.

17   Q.   Do you recall trying to sell your Jeep before you went

18   abroad?

19   A.   I do recall trying to sell it, but I don't recall trying

20   to sell it to him.

21   Q.   You tried to sell it to him, and he didn't agree to buy

22   your Jeep, did he?

23   A.   I don't recall.

24   Q.   Now, in your direct testimony, you testified that on

25   October 16, 2014, it was Nicholas Young's idea to create a Kik

Mo - Cross                                                          419

1    account, right?

2    A.   Yes.

3    Q.   It was actually your idea, wasn't it?

4    A.   To create a Kik account?

5    Q.   Yeah.  It was your idea.  You came up with the idea of Kik

6    because Nicholas told you that he's not familiar -- he's not

7    tech savvy, he doesn't know about Kik, correct?

8    A.   No, that's not true.

9    Q.   It was your idea to come up with Kik, wasn't it?

10             MR. GIBBS:  He just answered the question.  Asked and

11   answered.

12             THE COURT:  Sustained.  Sustained.

13   BY MR. SMITH:

14   Q.   On October 10, 2014, during your conversation with Nick

15   about e-mails when you travel abroad, you told Nick you'd have

16   your sister and mom's contact information in your phone,

17   correct?

18   A.   I don't recall.

19   Q.   During this meeting on October 10, 2014, you said that the

20   whole purpose of your booking of the tour in Turkey was to have

21   a good story, and Nicholas said, "You should actually take the

22   tour," didn't he?

23   A.   Yes.

24   Q.   During this meeting, Nicholas asked you whether you might

25   go from Turkey to Palestine instead of Syria, correct?

```
Mo - Cross                                                      420
```

1   A.   Yes.

2   Q.   You didn't correct him, did you?

3   A.   I'm sorry?

4   Q.   You didn't say, "No, I'm not going to Palestine," did you?

5   A.   No.

6   Q.   During this meeting on October 10, 2014, Nicholas

7   cautioned you that it's tough to leave something you know for

8   something you don't, didn't he?

9   A.   I don't recall.

10  Q.   During this meeting, Nicholas -- you asked Nicholas if he

11  wanted to go to Syria, and he said, "No, I'd rather go to

12  Libya, where I have friends," right?

13  A.   Say that again?

14  Q.   During the meeting on October 10, 2014, you asked Nicholas

15  if he wanted to go to Syria, right?

16  A.   Correct.

17  Q.   And he said, "No, I'd rather go to Libya.  I have friends

18  there."  Right?

19  A.   Yes.

20  Q.   At some point during your meeting on October 10, 2014,

21  Nicholas told you why he decided to stay in the U.S. and not go

22  back to Libya again, right?

23  A.   I don't recall.

24  Q.   He told you it was his girlfriend, his Canadian

25  girlfriend, right?

Mo - Cross                                                              421

1    A.   I don't recall.

2         MR. SMITH:  Your Honor, we have to play October 16,

3    2014, 2 hours, 22 minutes, 30 seconds.  This is October 16,

4    2014, and it's at 2 hours, 22 minutes, 30 seconds.

5         October 16, 2014, 2 hours, 22 minutes, 30 seconds.

6         (Audio excerpt was played.)

7         MR. SMITH:  Stop it.

8         Your Honor, we move into evidence that clip from

9    October 16, 2011.  It's going to be Defense Exhibit 12.

10        MR. GIBBS:  No objection, Judge.

11        THE COURT:  All right.

12        (Defendant's Exhibit No. 12 was received in

13   evidence.)

14        MR. SMITH:  That's December (sic) 16, 2 hours, 22

15   minutes, 30 seconds, to 2 hours, 23 minutes, 36 seconds.

16   Q.   You met with Nicholas Young on October 17, 2014, correct?

17   That's one of the clips you played today.

18   A.   Yes.

19   Q.   During that meeting, you asked Nicholas Young whom you

20   could trust if you went to Syria, correct?  Who could you

21   trust?  You're asking Nicholas that question.

22   A.   Correct.

23   Q.   And he said unlike Libya, the situation there is more

24   complicated, right?

25   A.   Yes.

Mo - Cross                                                                422

1   Q.   He said in Libya, it was either you're for a dictator, and

2   he was referring to Gaddafi, or you're against a dictator.

3   That was the situation in Libya, right?

4   A.   Yes.

5   Q.   And he said the situation in Syria is different because

6   there's all kinds of groups and players involved in the war

7   there, right?

8   A.   Yes.

9        THE COURT:  All right, it's six o'clock.  We're going

10  to close it up for today.

11       MR. SMITH:  One last comment, Your Honor.

12       THE COURT:  No, we're finishing at six o'clock.

13       Ladies and gentlemen, you've been very patient.  This

14  evidence, I know, is tough.  I want to make sure that everybody

15  gets a good night's sleep.  And again, please make sure you

16  avoid any media coverage about this case or anything else

17  related to ISIS or any kind of terrorist issues that might be

18  floating around right now.

19       Again, please make sure that you follow all of my

20  directions about not trying to make up your mind about any

21  issue or communicating about this case.  I am going to be

22  putting both sides on a time limit tomorrow so we start moving

23  this case more efficiently.

24       And if you can all try to be here by nine o'clock

25  tomorrow morning, we'd appreciate that, but we'll let you go.

Mo - Cross                                                            423

1   I'm staying in session with counsel for a few minutes.

2                         (Jury out.)

3               THE COURT:  And the witness may leave.

4                         (Witness stood down.)

5               THE COURT:  All right, I don't know how in the world

6   this record is going to be put together.  The defense

7   absolutely must properly produce this evidence.  You're going

8   to need to put your specific clips on one tape.  We're not

9   going to have this so that somebody has to go through the tape

10  with a counter.  And there has to be a transcript to go with

11  this.  It's absolutely incomprehensible.  It's gobbledygook,

12  and I've never seen a record quite this bad.  I mean, the

13  government's wasn't all that much better.

14              These are terrible tapes.  I don't understand why the

15  FBI can't figure out a better way of cleaning up their tapes.

16  I mean, there's obviously important information for both sides

17  which the trier of fact is not going to be able to get in any

18  kind of reliable manner because the tapes are so bad.

19              Now, you mentioned headphones.  If you have a

20  headset, is it any easier to hear this stuff?  I mean, some of

21  you have been listening to this.

22              MR. SMITH:  It is, Your Honor.  It's far easier, Your

23  Honor.

24              THE COURT:  Well, what I'm going to do then is before

25  the jury comes in, not tomorrow but maybe Thursday, I'm going

424

1   to come in early and put on a set of headphones, and I want to

2   listen to one of your tapes again, because we should have done

3   that with the jury.  You should have given us a heads up on

4   that.  We have enough headsets.

5          But in any case, this case has to start moving.

6   We've been extremely slow.  There are repetitive questions.

7          Now, you're an excellent -- both sides are doing

8   this, but you're doing it more than anyone else, Mr. Smith:

9   You're repeating answers and making questions longer than they

10  have to be.  The prosecution sometimes does that, too.  It's a

11  great trick of trial advocacy.  I'm not going to permit it now.

12         Questions have to be shorter and more specific.  They

13  can't be repeated.  We're not going to go over things a second

14  and third time, and I said I'm putting you-all on a time limit.

15  You've got one hour to finish your cross-examination of this

16  witness.  So do triage, get your best points out, but that's

17  how we're going to get this case moving.

18         All right, we'll see you-all tomorrow morning at nine

19  o'clock.

20         MR. GIBBS:  Thank you, Judge.

21   (Recess from 6:05 p.m., until 9:00 a.m., December 13, 2017.)

22

23

24

25

425

1                    CERTIFICATE OF THE REPORTER

2        I certify that the foregoing is a correct transcript of

3   the record of proceedings in the above-entitled matter.

4

5

6                              _____
                                              /s/
7                                    Anneliese J. Thomson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

426

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA     .     Criminal No. 1:16cr265
                            .
     vs.                  .     Alexandria, Virginia
                            .     December 13, 2017
NICHOLAS YOUNG,           .     9:00 a.m.
                            .
         Defendant.      .
                            .
.   .   .   .   .   .   .   .   .   .   .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>VOLUME III</u>

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:         JOHN T. GIBBS, AUSA
                          GORDON D. KROMBERG, AUSA
                          EVAN N. TURGEON, SAUSA
                          United States Attorney's Office
                          2100 Jamieson Avenue
                          Alexandria, VA 22314

FOR THE DEFENDANT:          NICHOLAS D. SMITH, ESQ.
                          David B. Smith, PLLC
                          108 North Alfred Street
                          Alexandria, VA 22314
                           and
                          LINDA MORENO, ESQ.
                          Linda Moreno P.A.
                          511 Avenue of the Americas
                          No. 2
                          New York, NY 10011

ALSO PRESENT:               SA NICHOLAS CASLEN
                          NICHOLAS ENNS
                          FABIAN VERA

(Pages 426 - 737)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

427

```
OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                U.S. District Court, Fifth Floor
                                401 Courthouse Square
                                Alexandria, VA 22314
                                (703)299-8595
```

428

I N D E X

|                                    | DIRECT | CROSS | REDIRECT | RECROSS |
|------------------------------------|--------|-------|----------|---------|

WITNESS ON BEHALF OF
THE GOVERNMENT:

| Mo (Resumed)                       |        | 431   | 449      | 454     |
| Agent Cameron Siegfried            | 458    | 502   |          |         |
| SA Smith                           | 533    | 546   |          |         |
| SA John Sikorski                   | 559    | 614   | 626      |         |
| SA John Minichello (Recalled)      | 628    | 642   |          |         |
| Paul Lee                           | 648    | 683   | 684      |         |
| Ian Paul Campbell                  | 688    | 701   |          |         |

EXHIBITS

|                                                      | MARKED | RECEIVED |
|------------------------------------------------------|--------|----------|

GOVERNMENT'S:

| Nos. 1-101 thru 1-116                                |        | 461      |
| 1-210A                                               |        | 479      |
| 1-201 thru 1-219                                     |        | 461      |
| 1-221 and 1-222                                      |        | 561      |
| 1-220                                                |        | 528      |
| 1-701 and 1-702                                      |        | 663      |
| 2-101 thru 2-112                                     |        | 563      |
| 2-116, 2-118 thru 2-123                              |        | 563      |
| 2-125 thru 2-130                                     |        | 563      |
| 3-100                                                |        | 594      |
| 3-101                                                |        | 595      |
| 3-102 and 3-103                                      |        | 597      |
| 3-104 thru 3-114, 3-117 thru 3-121,                  |        | 603      |
| 3-115                                                |        | 594      |

429

```
 1                            EXHIBITS

 2                                   MARKED        RECEIVED

 3   GOVERNMENT'S:

 4   Nos. 3-117A                                     605
           3-118A thru 3-120A                        608
 5         3-125                                      603
           3-200, 3-202 thru 3-226                    599
 6         3-300 and 3-302                            608

 7         4-101, 4-102, 4-104, 4-105                 609
           4-106                                      613
 8         4-107 thru 4-109                           609
           4-200                                      609
 9         4-300                                      629

10         5-101-4                                    541
           5-102                                      545
11         5-301-1 thru 5-301-3                       639
           6-103-7                                    454
12         7-101                                      612

13         7-102                                      610
           7-103                                      612
14         7-202A thru 7-216A                         463
           10-100                                     674
15         10-101A                                    677

16         10-861                                     699
           11-400                                     695
17         12-34                                      662
           12-36                                      665
18         18-100                                     688

19

20

21

22

23

24

25
```

430

1                    P R O C E E D I N G S

2                    (Defendant present, Jury out.)

3          THE CLERK:  Criminal Case 16-265, United States of

4    America v. Nicholas Young.  Would counsel please note their

5    appearances for the record.

6          MR. GIBBS:  Good morning, Your Honor.  John Gibbs,

7    Gordon Kromberg, Evan Turgeon on behalf of the United States,

8    along with Special Agent Nicholas Caslen and Paralegal

9    Specialist Fabian Vera.

10         THE COURT:  Good morning.

11         MR. SMITH:  Good morning, Your Honor.  Nicholas Smith

12   for defendant Nicholas Young, and with me is counsel Linda

13   Moreno.

14         THE COURT:  All right.  Good morning, counsel.

15         MS. MORENO:  Good morning.

16         THE COURT:  The jury is here, so we'll get them in to

17   get started.  And remember, you have an hour to finish up the

18   cross-examination.

19                    (Jury present.)

20         THE COURT:  Oh, good, you're changing positions.  Do

21   you want to come down?  I'm not sure -- you're short.  You may

22   not be able to see from where you are.  I just won't be able to

23   watch you today, all right.  You-all have a seat.  You can sit

24   as soon as you're in the box.

25         Well, good morning, ladies and gentlemen.  I always

1   tell lawyers that when I have a jury that gets to court on

2   time, I know I have a very serious jury, and I want to thank

3   you.  Again, I recognize how traffic is, and it was cold out

4   there this morning, and I guess all of your engines started, so

5   that's great.

6           We're going to -- I just want you to know that I have

7   decided to give the lawyers time periods to keep this case on

8   schedule.  You know, everything in life has limits.  Even our

9   lives have limits.  There's no reason why trials shouldn't,

10  either, so people have to put their best evidence on within the

11  time I'm giving them, but I want to get this case to you as

12  quickly as we can.

13          So we're going to proceed, and, Mr. Smith, you're in

14  the middle of your cross-examination.

15          MR. SMITH:  Thank you, Your Honor.

16      MO, GOVERNMENT'S WITNESS, PREVIOUSLY AFFIRMED, RESUMED

17              CROSS-EXAMINATION (Cont'd.)

18  BY MR. SMITH:

19  Q.   Good morning, Mo.

20  A.   Good morning.

21  Q.   Mo, I'd like to pick up on where we left off yesterday

22  when the cross-examination was recessed for the evening

23  yesterday.

24  A.   Yes.

25  Q.   Yesterday, you testified that your agent handler

Mo - Cross                                                          432

 1  instructed you to discuss geopolitics with Mr. Young in order

 2  to encourage conversation about ISIS.  Correct?

 3  A.   I do not recall.

 4  Q.   Do you recall mentioning that you would raise the subject

 5  of the dictator of Syria, Basher Assad, with Mr. Young in order

 6  to discuss ISIS with Mr. Young?

 7  A.   I do not recall.

 8  Q.   Did you discuss the Syrian war with Mr. Young in

 9  connection with ISIS?

10  A.   Yes.

11  Q.   And did Mr. Young take an interest in the Syrian war

12  because of the Syrian government's butchery of civilians in

13  that war?

14  A.   Yes.

15  Q.   And did you continue those conversations with Mr. Young

16  about the war and about how civilians were dying in Syria?

17  A.   Yes.

18  Q.   I'd like to talk about some of the other ways in which you

19  developed a personal connection with Mr. Young, okay?

20  Mr. Young would go out with you to eat at restaurants, correct?

21  A.   Yes.

22  Q.   He would buy you meals, correct?

23  A.   Yes.

24  Q.   You would have many conversations at these restaurants and

25  in social occasions which had nothing to do with terrorism,

Mo - Cross                                                          433

1   correct?

2   A.    That happened.

3   Q.    It happens on multiple occasions, correct?

4   A.    Yes.

5   Q.    You would buy him gifts, correct?

6   A.    I don't recall.

7   Q.    You bought him a Palestinian scarf.  Do you remember that?

8   A.    Yes.

9   Q.    So you do recall.

10          You would share stories about your families, correct?

11  A.    Yes.

12  Q.    You told him about your grandmother in the West Bank,

13  correct?

14  A.    Yes.

15  Q.    And that your grandma in the West Bank was not very

16  wealthy and was struggling to get by there, correct?

17  A.    I don't recall.

18  Q.    And Mr. Young told you about his father, correct?

19  A.    Yes.

20  Q.    He told you about how, his regrets about how he wished he

21  had gotten to know his father better, correct?

22  A.    Yes.

23  Q.    And you had multiple conversations about this, correct?

24  A.    Correct.

25  Q.    Mr. Young told you about his ex-girlfriends and his

Mo - Cross                                                                434

1   romantic relationships in the past, correct?

2   A.   Yes.

3   Q.   You would have long conversations about girls and dating,

4   correct?

5   A.   Yes.

6   Q.   Mr. Young told you that one of the reasons why he never

7   went back to Libya after 2011 was that he developed a strong

8   relationship with one girlfriend from Canada, correct?

9   A.   Yes.

10  Q.   And he discussed with you how after this girlfriend broke

11  up with him, he was very devastated, and you had a long

12  conversation about that, correct?

13  A.   Yes.

14  Q.   That was in the same week that you decided to go to --

15  pretend to go to Syria, correct?

16  A.   I don't recall.

17  Q.   Okay.  Let's go back to the meetings we were discussing

18  yesterday which you testified about.

19  A.   Yes.

20  Q.   So you testified about a meeting on September 11, 2014,

21  with Mr. Young, correct?

22  A.   I did.

23  Q.   And then after that meeting, the next meeting you

24  testified about was not until October, correct?

25  A.   Correct.

Mo - Cross                                                           435

1   Q.   Okay.  But you had some meetings with Mr. Young between

2   that September 11 meeting and the meetings in October, correct?

3   A.   All meetings were recorded.

4   Q.   I understand.  I'm just asking you to confirm that there

5   were some meetings between the September 11, 2014, meeting with

6   Mr. Young and the October 2014 meetings which you testified

7   about yesterday.

8   A.   I don't recall.

9   Q.   I'd like to hand up a document dated September 23, 2014.

10  It's an FBI summary.

11           THE COURT:  When you say all of your meetings with

12  Mr. Young were recorded, what do you mean by that?

13           THE WITNESS:  I mean by I was wearing a wire.

14           THE COURT:  So they were all -- in your view, they

15  were all audio recorded?

16           THE WITNESS:  Yes, ma'am.

17           THE COURT:  All right.

18  BY MR. SMITH:

19  Q.   So, Mo, if you take a look at that document, do you see

20  that if you -- it's an FBI memorandum reflecting a CHS

21  recording?

22  A.   Yes.

23  Q.   And can you see on the second page the date of the meeting

24  that it reflects between you and the defendant, Nicholas Young?

25  A.   Yes.

Mo - Cross                                                              436

1    Q.    Did you testify about that meeting yesterday?

2    A.    The little Italian cafe?  Yes.

3    Q.    You testified about that meeting yesterday, on

4    September 12.  You testified yesterday about September 11,

5    2014.  I'm asking you if you also testified about September 12,

6    2014, which is -- September 12 is reflected in that FBI

7    memorandum in front of you?

8    A.    Yes.  I only testified about September 11.

9    Q.    Okay.  Do you recall your conversation on September 12,

10   2014, with Mr. Young?  I'm not asking you to read the document.

11   I'm just asking whether you recall.

12   A.    No, I don't.

13   Q.    Okay.  So you don't recall what happened on that date?

14   A.    No.

15   Q.    If I asked you to review that document in front of you and

16   refresh your recollection, would you be able to?

17   A.    No.

18   Q.    Why not?

19   A.    Most of it is redacted.

20   Q.    Thank you.

21          Now, you testified yesterday about your meeting on

22   October 16, 2014, with Mr. Young, correct?

23   A.    Yes.

24   Q.    And during that -- do you recall that meeting?  Do you

25   recall that meeting?  I think it's the little Italian cafe.

Mo - Cross                                                                437

1   That's what you were thinking about on October 16?

2   A.   I don't recall the exact location, but --

3   Q.   You testified yesterday about your meeting on October 16,

4   2014, right?

5   A.   Yes.

6   Q.   Who is Shuaib?

7   A.   Shuaib is the imam -- or one of the imams at the Sully

8   Mosque.

9   Q.   And did Shuaib ever have a conversation with you about

10  your thoughts about going to Syria or overseas?

11  A.   Yes.

12  Q.   What did Shuaib think about you going to Syria?

13  A.   He discouraged it.

14  Q.   What did he say to you?

15  A.   I don't recall the exact wordings, but --

16  Q.   Strongly discouraged it, correct?

17  A.   Yes, he discouraged it.

18  Q.   And what mosque is Shuaib an imam at?

19  A.   The Sully Mosque.

20  Q.   That's the mosque that you and Nicholas went to, right?

21  A.   Occasionally, he would go there.

22  Q.   That's where you met Nicholas, right, Sully Adams?

23  A.   The first time?  Yes.

24  Q.   Okay.  So do you recall that on your October 16 meeting

25  with Nicholas Young which you testified about, that Nicholas

Mo - Cross                                                        438

1    Young told you -- he said to you Shuaib would have convincing

2    arguments for not going to Syria.  Do you remember that?

3    A.   I don't recall.

4    Q.   Do you recall that Mr. Young said Shuaib would have very

5    convincing arguments for not going to Syria and that maybe

6    perhaps you should listen to them?

7    A.   I do not recall.

8              THE COURT:  Again, ladies and gentlemen, this is an

9    example of whatever the lawyer said in that question you cannot

10   accept as evidence if the witness says he doesn't recall it,

11   all right?  I just want you to keep that clear.

12             MR. SMITH:  Your Honor, I just need one moment.

13   Q.   I'm handing up a document that's an FBI memorandum that's

14   a consensual recording on October 16, 2014.

15             Excuse me, I'm looking for -- I'm looking for

16   October 17.  Can you give me October 17?

17             Here it is.

18             October 17.  There you go.

19             MR. GIBBS:  Your Honor, obviously, he can try to

20   refresh the witness with this, but it's not marked at this

21   point, and it's not a transcript.  It's a summary of a

22   conversation.

23             THE COURT:  Well, it's simply being used to see if it

24   could refresh the memory of the witness.  That's all right, but

25   if the witness looks at it and it doesn't refresh anything,

Mo - Cross                                                                    439

1    that's it.  It doesn't come into evidence.

2            MR. GIBBS:  Understood, Judge, but just for the

3    record, it needs to be marked as something so we at least have

4    a record of what was shown to the witness.

5            THE COURT:  You have that problem extensively.  What

6    number do you want to put on that?

7            MR. SMITH:  Let's call this Defense Exhibit 12.

8            THE COURT:  I think we have a thousand Exhibit 12s.

9    It's going to make no sense in this record.

10           MR. SMITH:  Your Honor, if I may, I'd like to first

11   describe the document to the court reporter, describe the date,

12   the author, hand it to the witness, and then after the witness

13   reviews it, I will explain the -- I will mark the document

14   after I cross-examine the witness.

15           THE COURT:  I'm not going to guarantee that this

16   record will ever be accurate.

17           MR. SMITH:  Thank you, Your Honor.

18           THE COURT:  This is not the way it should be done.

19           MR. SMITH:  I'm handing up a document dated

20   October 17, 2014.  It's an FBI memorandum drafted by Cameron

21   Siegfried.

22   Q.   Mo, let me know when you see the October 17, 2014, date.

23   A.   I see it.

24   Q.   Okay.  Does this memorandum reflect a summary of your

25   recording on October 17, 2014?

Mo - Cross                                                        440

1           THE COURT:  The proper question is looking at that,

2    does that refresh your memory?

3           MR. SMITH:  I have to ask the question that I'm

4    asking -- it's a very long memorandum, so I asked him -- the

5    question for the witness was do you recall a conversation with

6    Shuaib -- a conversation about Shuaib with Nicholas Young on

7    October 17, 2014?

8           THE WITNESS:  I don't recall exactly the date that I

9    had a meeting with Shuaib.

10   BY MR. SMITH:

11   Q.   I'm not asking you about your meeting with Shuaib and the

12   date.  I'm asking you whether on October 17, 2014, you had a

13   conversation with Nicholas Young about Shuaib.

14   A.   I honestly can't recall.

15   Q.   Can you turn to page 11, please?

16   A.   Okay.

17   Q.   Can you review the middle of the page and see if Shuaib is

18   referenced, please?

19   A.   I see Shuaib.

20   Q.   What does it say there?  Does that refresh your

21   recollection --

22           THE COURT:  No, no, no.

23   BY MR. SMITH:

24   Q.   Does that refresh your recollection, Mo?

25   A.   I spoke to Shuaib many times.  I can't say that on that

```
Mo - Cross                                                          441
```

1    day specifically.

2    Q.    I'm not asking you about when you spoke to Shuaib.  I'm

3    asking you about whether Nicholas Young said to you on

4    October 17, 2014, that Shuaib would have convincing arguments

5    for not going to Syria and maybe you should not block it out of

6    your mind because he's probably more knowledgeable than you.

7    A.    I honestly don't recall.

8    Q.    And your, your recollection is not refreshed reviewing the

9    document in front of you?  You could just review that page

10   you're looking at, page 11.

11   A.    Yes.

12   Q.    So your recollection is refreshed?

13   A.    Yes.

14   Q.    So you do recall that Mr. Young said -- suggested to you

15   on October 17, 2014, that Shuaib would have convincing

16   arguments for not going to Syria?

17   A.    Yes.

18   Q.    And that maybe you should not block that out of your mind?

19   A.    Yes.

20   Q.    And that he's -- Shuaib is probably more knowledgeable

21   about you on the subject of whether you should go to Syria?

22   A.    Yes.

23   Q.    Thank you.

24         You testified yesterday about meetings you had with

25   Mr. Young on October 23 and October 25, 2014, correct?

Mo - Cross                                                           442

1    A.   Correct.

2    Q.   And you testified a little bit about a meeting you had on

3    October 24, 2014, correct?

4    A.   I can't recall exactly.

5    Q.   So, so you left the United States and the fictitious

6    identity you've created on October 25, 2014, correct?

7    A.   I can't recall, honestly, the exact date.

8    Q.   Do you recall the evidence yesterday showing you and

9    Mr. Young in a FedEx store?

10   A.   Yes.

11   Q.   And, and that was a FedEx -- that was an occasion in which

12   you created e-mails to chat when you left the country?

13   A.   Correct.

14   Q.   And that was October 25, 2014, correct?

15   A.   I would have to refresh my memory.

16   Q.   Okay.  You had a meeting the day before you left Syria

17   with Mr. Young, correct?

18   A.   Yes.

19   Q.   And during that meeting, Mr. Young said to you a few

20   things that should have cautioned you about going to Syria,

21   correct?

22   A.   I can't recall.

23   Q.   Mr. Young said to you, "It's only illegal to take up arms

24   against a U.S. ally," correct?

25   A.   Yes.

Mo - Cross                                                          443

1    Q.    He said to you, "It's illegal to join a terrorist

2    organization," correct?

3    A.    Yes.

4    Q.    This is a day before you left for Syria, correct -- or

5    Turkey, rather, correct?

6    A.    Yes.

7    Q.    He said to you, "There are other groups in Syria that are

8    not illegal terrorist organizations," correct?

9    A.    Correct.

10   Q.    He said, "If you have an itch to travel to Syria, you

11   might join a group that's not a terrorist group," correct?

12   A.    I can't recall.

13   Q.    And you asked him, "If Customs stops me and asks me

14   whether -- where I'm going, do I have to tell them?"

15         And Mr. Young said, "Yeah," correct?

16   A.    I can't recall.

17         MR. SMITH:  So this is a summary, an FBI summary of

18   Mo's consensual recording on October 24, 2014.  I'm handing it

19   up to the witness.

20         MR. GIBBS:  Judge, we have the same issue.  First of

21   all, it's not a marked document.  Second, this is a summary of

22   a recording that we played yesterday here in court.  The

23   statements that were just referenced we just heard on the

24   consensual audio yesterday.

25         THE COURT:  It's normally not wise cross-examination

Mo - Cross                                                        444

1   to simply repeat what went on in the government's case.  The

2   jury did as best they could hear this yesterday.

3           MR. SMITH:  Your Honor, there were selective clips

4   from this meeting played yesterday.  It wasn't the entirety of

5   the conversation, so we are only eliciting parts of the

6   conversation that were not included.

7           Now, this one question about whether Mo would have to

8   tell CBP about coming back to Syria, that was included in the

9   clip played yesterday, but the clip was selective.  There were

10  seconds cut out, and, Your Honor, the government has presented

11  what it describes as a transcript of that recording.  We would

12  object to that description as a transcript.  It is only a

13  selective portion of the recording from that date.

14          THE COURT:  Well, we're not going to fight about what

15  is or is not a transcript, but at this point, if there's

16  something in addition to what was played yesterday, that is not

17  inappropriate.

18          MR. SMITH:  Thank you.

19          THE COURT:  So the objection is overruled.

20          MR. SMITH:  Thank you, Your Honor.

21          MR. GIBBS:  And, Judge, if I may, it's still an

22  unmarked document.

23          THE COURT:  We still have this problem.  I'm not sure

24  how it will ever get linked up, but at this point, let's get

25  this moving because of our time limit.

Mo - Cross                                                          445

1    BY MR. SMITH:

2    Q.    Do you see the document in front of you dated --

3    reflecting a meeting on October 24, 2014?

4    A.    Yes.

5    Q.    And this is a summary of your -- of the recording you

6    created during your meeting with Nicholas Young on October 24,

7    2014, correct?

8    A.    Yes.

9    Q.    Can you turn to page 5, please?  And can you review the

10   last line, the last comment on the page that begins with "SD"?

11   "SD" is for Slow Decline, so that is supposed to reflect a

12   summary of Mr. Young's comment.

13   A.    I'm looking at it.

14   Q.    Okay.  Can you review that comment and then review the top

15   of page 6 to about six lines down?  You can just let me know

16   when you're finished.  Six lines down on page 6 from the top.

17   You don't have to read it.  You can just let me know if that

18   refreshes your recollection.

19   A.    By reading it, it refreshes my recollection.

20   Q.    Okay.  So do you recall then on October 24, 2017, this is

21   the day before you left for Turkey, Mr. Young said, "They will

22   put you through the ringer if you go overseas and try to come

23   back"?

24              Do you remember that?

25   A.    Yes.

Mo - Cross                                                             446

1    Q.    Mr. Young told you, "They will want to know what cities

2    you're in, this and that," right?

3    A.    Yes.

4    Q.    And you asked him, "Do I have to tell them?  Do I have to

5    tell them that?"  Right?  Meaning do I have to tell them,

6    Customs, where I was going if I go overseas?  You asked him

7    that, correct?

8    A.    I don't recall.

9    Q.    Is your recollection refreshed on reviewing what I just

10   asked you to review, the memorandum in front of you on page 6,

11   the top of the page?

12   A.    Not entirely.

13   Q.    Not entirely, but he said something to the effect of --

14   you asked him, "I mean, am I going to get in trouble if I try

15   to come back from Turkey or Syria?"

16   A.    I don't recall.

17   Q.    And didn't Mr. Young say, "Yeah, you're going to go

18   through the ringer"?

19   A.    Yes, he did say that.

20   Q.    Okay.  Now, on the same day, October 24, 2014, the day

21   before you leave for Turkey, Mr. Young admonishes you about

22   something you have to keep in mind if you do go to Syria or if

23   you go to Turkey or anywhere overseas.  He gives you a word of

24   advice, correct?

25   A.    I don't recall.

Mo - Cross                                                          447

1   Q.   He says to you, "You can change your mind," and, "Some

2   people decide not to change their mind out of pride."

3          Do you remember that?

4   A.   I do not recall.

5   Q.   Can you turn to page 11, and can you review the last

6   comment on page 11, which begins "SD," for Slow Decline?

7   A.   That last paragraph, you said?

8   Q.   Yeah.  Can you review that?  And just -- you don't need to

9   read it.  Just tell me if that refreshes your recollection.

10  A.   Yes, I remember that.

11  Q.   So this appears to be in this memorandum, the last comment

12  Mr. Young made to you on October 24, 2014, the day before you

13  went to Turkey, correct?

14  A.   Correct.

15  Q.   And doesn't Mr. Young tell you that, you know, it's okay

16  if you change your mind about going?  Correct?

17  A.   Correct.

18  Q.   And doesn't he say that what you should basically do is

19  follow your conscience, correct?

20  A.   Yes.

21  Q.   Hadn't Mr. Young said this to you on a number of occasions

22  in this period of time in September and October 2014:  "The

23  most important thing is to follow your conscience"?

24  A.   Yes.

25  Q.   Mo, your relationship with Nicholas Young lasted between

Mo - Cross                                                          448

1    May 2014 and, if we include the e-mails that you and the agent

2    handler sent from Syria and Turkey, it includes up to August

3    2016, July of 2016, correct?

4              MR. GIBBS:  Judge, that's incorrect.

5              THE COURT:  Well, more than that, this witness has

6    already said that he's basically out of the situation after he

7    goes to Turkey, so he can't answer that question, so I'm

8    sustaining the objection.

9              MR. SMITH:  Okay.  I'll just note that yesterday,

10   Mr. --

11             THE COURT:  I sustained the objection.  You just ask

12   a new question.

13   BY MR. SMITH:

14   Q.   So your relationship with Mr. Young then lasted from May

15   2014 to October of 2014, correct?

16   A.   Correct.

17   Q.   And did you at any point ever see Mr. Young speak with

18   someone who was actually in ISIS, a member of ISIS?

19   A.   I can't recall.  I can't say whether or not.

20   Q.   You don't remember?  You don't know, right?

21   A.   I don't know.

22   Q.   Did you ever witness over these dozens of occasions in

23   which you were having conversations with Mr. Young about these

24   subjects that were in the recordings yesterday, did you ever

25   witness Mr. Young ever try to give material support to ISIS,

Mo - Redirect                                                        449

1    give something material to ISIS?

2    A.    Did I witness?

3    Q.    Yeah.

4    A.    No.

5    Q.    So ISIS's involvement in your part of this investigation

6    was fictitious, correct?

7    A.    My part?

8    Q.    During the time you were with, you were reporting on

9    Nicholas Young -- your agent handler instructed you to report

10   on Nicholas Young between May 2014 and October of 2014,

11   correct?

12   A.    Yes.

13   Q.    And you testified that you had conversations about ISIS

14   with Mr. Young in that period, correct?

15   A.    Correct.

16   Q.    But ISIS was never actually involved in any of these

17   conversations or plans or anything of any nature, correct?

18   A.    Yes.

19   Q.    You never communicated with ISIS, did you?

20   A.    No.

21             MR. SMITH:  Thank you, Your Honor.  That's it.

22             THE COURT:  All right.

23             MR. GIBBS:  Thank you, Judge.

24                       REDIRECT EXAMINATION

25   BY MR. GIBBS:

Mo - Redirect                                                        450

1   Q.   Good morning, Mo.

2   A.   Good morning, John.

3   Q.   You were testifying a few moments ago about Shuaib, the

4   iman at Sully Mosque, Shuaib, I can't remember his last time.

5   Do you recall that?

6   A.   Yes.

7   Q.   And you were asked some questions about Shuaib saying

8   things to discourage you from going to join ISIS.  Do you

9   recall that?

10  A.   Yes.

11  Q.   And by this point, had you made it clear that that was

12  your interest?

13  A.   Yes.

14  Q.   Now, when you were asked earlier about these e-mails you

15  set up right before you left the country, whose idea was it to

16  go set up those e-mails?

17  A.   It was the defendant.

18  Q.   And who went when you went to the store to set up those

19  e-mails?

20  A.   The defendant.

21  Q.   All right.  Was Shuaib there with you?

22  A.   No.

23  Q.   Was he invited to go with you?

24  A.   No.

25  Q.   Did anyone else go with you besides the defendant?

Mo - Redirect                                                        451

1    A.    No.

2    Q.    And what was the purpose of setting up those e-mails?

3    A.    To maintain communication and to update him about my trip.

4    Q.    And your trip to go do what?

5    A.    To join ISIS.

6    Q.    And at any point when you were setting up those e-mails,

7    did the defendant do anything or say anything to discourage you

8    from going to join ISIS?

9    A.    No.

10   Q.    Now, you were asked yesterday and today about some of the

11   recordings you made at the instruction of the FBI beginning in

12   July 2014.  Do you recall that?

13   A.    Yes.

14   Q.    And these were consensual recordings of the defendant,

15   right?

16   A.    Yes.

17   Q.    And yesterday on cross-examination, the defense asked you

18   about one recording that was made earlier, in May of 2014.

19   A.    Yes.

20   Q.    Do you recall that?

21         And that was a couple of months before the FBI

22   instructed you to start recording?

23   A.    Correct.

24   Q.    And do you remember yesterday the defense actually played

25   a portion of that recording?

Mo - Redirect                                                          452

1   A.   Yes.

2   Q.   Now, Mo, what, if any, recordings did you make with your

3   phone before the FBI instructed you to start recording the

4   defendant in July?

5   A.   The one in May.

6   Q.   And can you explain what happened with that one recording

7   on your phone?

8   A.   The defendant wasn't the subject.  The -- it was another

9   person.  It was Peshwaz, and he made a significant comment that

10  I felt needed to be passed on to Agent John Minichello, so I

11  took it upon myself to record and pass that to John.

12  Q.   All right.  And you mentioned Peshwaz.

13       Can we pull up 9-106, which is in evidence?

14       Who is this?

15  A.   That's Peshwaz.

16  Q.   All right.  And you testified a moment ago that the reason

17  you made that recording on your phone was that you believe

18  Peshwaz was making a significant statement?

19  A.   Correct.

20  Q.   And what was Peshwaz talking about?

21  A.   Jihad in Afghanistan.

22  Q.   And you testified a moment ago that once he made that

23  recording on your phone, you passed it to Special Agent John

24  Minichello, correct?

25  A.   Yes.

Mo - Redirect                                                          453

1   Q.   All right.  What did he tell you about making any

2   recordings without being instructed to do so by the FBI?

3   A.   To never do that again.

4   Q.   And did you follow that instruction?

5   A.   Yes.

6   Q.   And finally, one of the recordings you did make at the

7   instruction of the FBI that we heard yesterday was dated

8   September 11, 2014, and the defense asked you about that one.

9   They played a portion that related to Al Baghdadi.  Do you

10  recall that?

11  A.   Yes.

12  Q.   Who is Al Baghdadi?

13  A.   Al Baghdadi is the leader of ISIS.

14  Q.   And in the portion we heard yesterday the defense played,

15  the defendant made some comments about Al Baghdadi, his

16  pictures looking like a thug or looking like a criminal.  Do

17  you recall that?

18  A.   Yes.

19  Q.   And in that recording you made back in September of 2014,

20  do you remember what the defendant said about a minute and a

21  half after that in that recording?

22  A.   I do not recall.

23        MR. GIBBS:  Your Honor, we would ask to play, it's a

24  very short clip, I think it's 17 seconds long, it's cued up and

25  ready to go, and this is a portion from Exhibit 6-103-7, and we

Mo - Recross                                                       454

1   do have a transcript ready to go as well.

2            MR. SMITH:  No objection.

3            THE COURT:  All right, it's in.

4            (Government's Exhibit No. 6-103-7 was received in

5   evidence.)

6            MR. GIBBS:  Thank you.

7            THE COURT:  Do we have the audio?

8            MR. VERA:  Yes.

9            (Government's Exhibit No. 6-103-7 excerpt was

10  played.)

11           MR. GIBBS:  Thank you.

12           MR. SMITH:  Your Honor, three questions.

13           THE COURT:  Just one second.  He's not finished.

14           Are you done?

15           MR. GIBBS:  I am done.  Mo, thank you.

16           THE COURT:  All right.  Go ahead, Mr. Smith.

17                    RECROSS EXAMINATION

18  BY MR. SMITH:

19  Q.   Mo, after your testimony concluded yesterday on

20  cross-examination when the court recessed, did you discuss your

21  testimony yesterday with the attorneys after the hearing?

22  A.   No.

23  Q.   You did not, okay.

24           Yesterday you testified that the first time you made

25  a recording of Mr. Young in a meeting with him was July 2014,

Mo - Recross                                                                                                                  455

1  correct?

2  A.    Correct.

3  Q.    And I asked you whether there was any recordings that you

4  had of meetings with Mr. Young before that point, correct?

5  A.    Yes.

6  Q.    You stated there were none, correct?

7  A.    Yes.

8  Q.    So your testimony yesterday was false, correct?

9  A.    The May recording was not about the defendant.

10  Q.    I'm not asking about a May recording.  Yesterday, I asked

11  you whether there were any recorded meetings that you had with

12  Mr. Young before July 2014, correct?

13  A.    All the audio recordings that were consensual were made in

14  July.

15  Q.    No, no, it's a yes or no.

16         MR. GIBBS:  Judge, he's attempting to answer the

17  question.

18         THE COURT:  Sustained.

19  BY MR. SMITH:

20  Q.    I asked you yesterday whether July 2014 -- there were any

21  meetings you had with Mr. Young that were recorded before July

22  of 2014, correct?

23  A.    Yeah.  You asked me if I had any meetings with the

24  defendant, so it sounded like the defendant alone.  That's why

25  I said July.

Mo - Recross                                                      456

1   Q.    I asked you yesterday whether you had ever recorded a

2   meeting with a target without the permission of your agent

3   handler, correct?

4   A.    I don't recall.

5   Q.    You said yesterday that you have never recorded a meeting

6   without the permission of your agent handler, correct?

7   A.    Correct.

8   Q.    Today you are -- it is your testimony that you have

9   recorded a meeting without the permission of your agent

10  handler, correct?

11  A.    Yes.  In May, yes.

12  Q.    So your testimony yesterday was incorrect, right?

13  A.    I was saying that the May -- or the recording that was

14  made in May, I did not have his permission to record that

15  meeting.

16  Q.    That is your testimony today, correct?

17  A.    Yes.

18  Q.    Yesterday when I asked you whether you had ever recorded a

19  meeting without the permission of your handler agent, you said

20  no, correct?

21            MR. GIBBS:  Judge, that's asked and answered.

22            THE COURT:  Sustained.

23            MR. SMITH:  Thank you.

24            THE COURT:  All right, does anybody anticipate

25  calling this witness again?

Mo - Recross                                                        457

1          MR. GIBBS:  Not from the government, Judge.

2          THE COURT:  How about from the defense?

3          MR. SMITH:  No.

4          THE COURT:  No?  All right.

5          Then thank you for your testimony.  You're free to go

6    at this time.  Do not discuss your testimony with any witness

7    who has not yet testified.

8                         (Witness excused.)

9          THE COURT:  All right.  Your next witness?

10         MR. GIBBS:  Cameron Siegfried, Your Honor.

11         THE COURT:  All right, Agent Siegfried.

12         MR. GIBBS:  And he does not need the screen to be up

13   while he's testifying.

14         THE COURT:  All right.  Ladies and gentlemen, because

15   it takes a couple of minutes to reset the courtroom, you're

16   getting a very short -- this is not your long morning coffee

17   break.  If you'd just leave the courtroom for a minute, we'll

18   recess for five minutes to reset.

19              (Recess from 9:39 a.m., until 9:44 a.m.)

20                    (Defendant present, Jury out.)

21         THE COURT:  All right, let's bring the jury in.  And

22   we want Agent Siegfried in here.

23                    (Jury present.)

24         THE COURT:  The agent should come around this way.

25       SA CAMERON SIEGFRIED, GOVERNMENT'S WITNESS, AFFIRMED

1                        DIRECT EXAMINATION

2    BY MR. GIBBS:

3    Q.   Good morning, sir.

4    A.   Good morning.

5    Q.   Sir, can you please state and spell your name for the

6    record.

7    A.   Yeah.  It's Cameron Siegfried, C-a-m-e-r-o-n, last name

8    Siegfried, S-i-e-g-f-r-i-e-d.

9    Q.   All right.  And, sir, your voice is a little soft-spoken,

10   and so sound doesn't always carry that well in here, so make

11   sure to lean forward so the mic can pick you up, if you will,

12   and try to keep your voice up, if you would.

13   A.   Sure.

14   Q.   And who do you work for?

15   A.   The Air Force Office of Special Investigations.

16   Q.   And how long have you been in that position?

17   A.   About 12 years.

18   Q.   And during your time with Air Force Office of Special

19   Investigations, were you assigned to work as a task force

20   officer with the FBI at any point?

21   A.   Yes, I was.

22   Q.   When was that?

23   A.   That was from December 2011 to April of 2016.

24   Q.   And where was that that you were assigned to work as a

25   task force officer?

Siegfried - Direct                                                          459

1   A.   The FBI Washington Field Office.

2   Q.   And as part of your duties as a task force officer, did

3   you participate in an investigation here in Northern Virginia

4   as co-case agent with Special Agent John Minichello?

5   A.   Yes, I did.

6   Q.   And were you assigned to that investigation during the

7   time when the CHS Mo supposedly left to go join ISIS?

8   A.   Yes, I was.

9   Q.   And when was that?

10  A.   Initially started around May of 2014.

11  Q.   And when did Mo supposedly leave to go join ISIS?

12  A.   That was towards the end of October of 2014.

13  Q.   And at that time, towards the end of October in 2014, did

14  John Minichello and Mo actually leave the country and travel to

15  Turkey?

16  A.   Yes, they did.

17  Q.   And did they send several e-mails, I believe it was three

18  in total, to the defendant from Mo's V4Vendetta mail account?

19  A.   Yes, that's correct.

20  Q.   And after the e-mails that were sent from Turkey, who

21  actually controlled that V4Vendetta e-mail account?

22  A.   It was myself and Agent Minichello.

23  Q.   And did you and Agent Minichello impersonate Mo when you

24  would send e-mails from that account to the defendant?

25  A.   Yes.

Siegfried - Direct                                                    460

1    Q.   Did you receive e-mail from the defendant from his

2    essakobayashi e-mail account?

3    A.   Yes.

4              MR. GIBBS:  Your Honor, at this point, just in the

5    interests of sort of time and efficiency, if I could, and if

6    there's no objection, we'd like to move in all of the

7    essakobayashi e-mail accounts, which is Exhibits 1-201 through

8    1-219, and we'd like to move in all the V4Vendetta e-mails,

9    which is 1-101 through 1-116, and then I would just go through

10   them with the agent a little more quickly.

11             THE COURT:  Any objection?

12             MR. SMITH:  To virtually all of the e-mails, we have

13   no objection.  We --

14             THE COURT:  On your feet, Mr. Smith.  On your feet.

15             MR. SMITH:  We have an objection to one particular

16   exchange, but for the rest of the e-mails, we have no quarrel.

17             THE COURT:  Which one do you have an objection about?

18             MR. SMITH:  Can we approach the bench?

19             THE COURT:  Just tell me which one so I can see it.

20             MR. SMITH:  Your Honor, the, the e-mails are produced

21   in a way where there's long chains, so if we could explain it

22   at the bench --

23             THE COURT:  Wait, just give me the number, please.

24   They're all marked.

25             MR. SMITH:  Your Honor, they were not produced to the

Siegfried - Direct                                              461

1   defense Bates stamped.

2           THE COURT:  Am I missing something?  How has the

3   government produced these exhibits?  I mean, you said --

4           MR. GIBBS:  With our exhibit numbers on them, Judge.

5   That's what -- the numbers I just referenced.

6           THE COURT:  So 1-201, for example -- it's very

7   specific.  It's a two-sentence exhibit.  You should be able to

8   tell me of this group which is the one you have a problem with.

9   Just give me the number; I'll look at it.

10          MR. SMITH:  Your Honor, we would need five minutes to

11  do that.  In the interests of speeding --

12          THE COURT:  All right, they're all in.  They're all

13  in at this point.  Let's go.

14          (Government's Exhibit Nos. 1-101 through 1-116 and

15  1-201 thru 1-219 were received in evidence.)

16          MR. GIBBS:  Thank you, Judge.

17          If we could pull up Exhibit 1-104?

18  Q.   Now, what is this?

19  A.   This is, this is an e-mail from the e-mail account that,

20  that we took over, Mo's e-mail account, to the defendant's

21  e-mail account on November 20 of 2014.

22  Q.   And so just to set the stage then, this is one of the

23  e-mails that you and Special Agent Minichello drafted and sent

24  to the defendant?

25  A.   That's correct.

Siegfried - Direct                                                    462

1  Q.   And in the first line of that e-mail, you wrote, "I made

2  it to dawlah!"  What does "dawlah" refer to?

3  A.   "Dawlah" is an Arabic term for state.  It's typically used

4  among ISIS supporters and other travelers and, you know, common

5  among ISIS facilitators, recruiters, to describe the Islamic

6  State.

7  Q.   And so why didn't you just simply say, "Hey, I made it to

8  ISIS," instead of saying, "I made it to dawlah"?

9  A.   It's not, it's not common vernacular for how these

10 individuals talk, and it wasn't consistent with, with the

11 legend and the security protocols that they had set up prior

12 to, to Mo initially traveling.

13 Q.   And then if you look about four lines down in that e-mail,

14 you said, "The brothers look like they are making progress in

15 Derna."

16          Where is Derna?

17 A.   Derna is a, a town in northeastern Libya.

18 Q.   And what was the defendant's connection to Libya?

19 A.   He had attempted to travel there -- or traveled there at

20 least once and then attempted a second time.

21 Q.   And, Special Agent, in the course of the investigation,

22 was the FBI able to determine where Young went when he sent

23 e-mails to Mo?

24 A.   Yes.

25 Q.   And how did you learn that?

Siegfried - Direct                                                    463

1   A.   We took the IP address off the e-mail header, took the

2   date and time stamp and did a subpoena to -- well, we took the

3   IP address, identified it resolved to a FedEx corporate office

4   in Texas, and then from there subpoenaed FedEx about an hour or

5   two time frame before and after the e-mail was sent to get

6   video from the FedEx store.

7   Q.   And how did you know which FedEx store to subpoena or to

8   seek those video records from?

9   A.   At the time, we didn't.  We assumed he likely used the

10  closest FedEx store to his, to his residence.

11  Q.   And were you correct in that?

12  A.   Yes.

13          MR. GIBBS:  If we could pull up -- actually, these

14  are not in yet, but we have a number of still photos from the

15  FedEx surveillance videos, and we would ask, again in the

16  interests of speed and efficiency, if we could, to move in

17  Exhibit 7-202A through 7-216A.  These are all FedEx stills.

18          MR. SMITH:  No objection.

19          THE COURT:  All right, they're all in.

20          (Government's Exhibit Nos. 7-202A through 7-216A were

21  received in evidence.)

22  BY MR. GIBBS:

23  Q.   And before we get to that, I just -- one question I had on

24  the previous exhibit, 1 -104, when you talked in that e-mail

25  about the brothers look like they are making progress in Derna,

Siegfried - Direct                                              464

1  who are the brothers you were referring to making progress in

2  Derna?

3  A.   "The brothers" was just a reference to other members of

4  the Islamic State.

5  Q.   In Libya?

6  A.   Yes.

7  Q.   Thank you.

8        All right, now if we can pull up the first still,

9  it's 7-202A.

10       And what is this?

11  A.   This is a still image of the defendant entering the FedEx,

12  FedEx office store.

13  Q.   All right, it's not real clear.  Are you able to make out

14  the date there at all?

15  A.   It appears to be December 12 of 2014.

16  Q.   Well, hold that thought.  If we can go to Exhibit 1-201,

17  see if that helps you at all with the date?

18  A.   Sorry.  It appears to be December 17 of 2014.

19       MR. GIBBS:  All right.  And if we could pull up

20  1-201?

21       THE COURT:  You've got to blow that up.  The jury

22  can't read that.

23       MR. GIBBS:  If we can enlarge the top section of

24  that?

25  Q.   How long after receiving the e-mail saying that Mo had

Siegfried - Direct                                                    465

1   made it to dawlah and that the brothers were making progress in

2   Derna did the defendant respond?

3   A.    It was approximately three weeks to a month.

4          MR. GIBBS:  All right.  In the first paragraph there

5   at the top, Mr. Vera, if we can highlight the sentence six

6   lines down where the defendant wrote, "I have been following

7   the news of the region"?

8   Q.    Now, Special Agent, in the course of your correspondence

9   with the defendant, how common was it for him to say that he

10  was following the news related to where Mo was located?

11  A.    It was fairly common.

12         MR. GIBBS:  And then if we could next move to

13  Government Exhibit 1-202?

14         MR. SMITH:  No objection.

15         THE COURT:  It's in.

16         MR. GIBBS:  And if we can blow up the top there?

17  Q.    What is this e-mail?

18  A.    This is an e-mail from the defendant to Mo's e-mail

19  account controlled by us on December 17, 2014.

20  Q.    So the same date as the last e-mail?

21  A.    Yes, it is.

22  Q.    And what did the defendant say in the second e-mail about

23  any pics that confirm that he had read the previous e-mails

24  that were sent from Turkey?

25  A.    He, he discussed the Blue Mosque and a -- the Libyan

Siegfried - Direct                                                    466

1  consulate that we had sent pictures of -- or actually, that

2  Agent Minichello had sent pictures of in previous e-mail.

3  Q.   Thank you.

4         All right, next if we can go to 1-203?

5         MR. SMITH:  No objection.

6         THE COURT:  These are all in already.

7  BY MR. GIBBS:

8  Q.   Yeah.  What is, what is this e-mail?

9  A.   This is an e-mail from the defendant to Mo's e-mail

10  account controlled by us on December 26, 2014.

11         MR. GIBBS:  And can we highlight that first sentence

12  that begins with the words, "Your brother"?

13  Q.   Based on a review of this e-mail, could you determine

14  which brother the defendant was referring to in that first

15  sentence?

16  A.   Yes.

17  Q.   Who was that?

18  A.   That was Hisham Hall.

19  Q.   How can you tell that was Hisham Hall?

20  A.   The description was consistent with, with Hisham's

21  consistent travel back and forth to school at the time.  He

22  was, he was attending school on the West Coast, and he came

23  into town in Northern Virginia a few weeks before, before Mo

24  had notionally left, and it was -- again, it was just

25  consistent with the description of Hisham Hall.

1  Q.   And that was based on your experience working on this

2  investigation?

3  A.   That's correct.

4  Q.   Thank you.

5       Next, if we can go to Exhibit 1-105?  And if we can

6  zoom in on the e-mail -- yeah, you've got it.

7       So what is this?

8  A.   This is an e-mail from Mo's e-mail account controlled by

9  us to the defendant on January 7, 2015.

10      MR. GIBBS:  And if we could, can we highlight the

11 portion in that e-mail from Mo's account, it's ten lines down,

12 that begins with the line, "People are big on Kik and twitter"?

13 And if we can highlight all the way down to where it says,

14 "talk to you sometime"?

15 Q.   Now, Special Agent, you put a reference in there, in your

16 e-mail to the defendant to the Jordan pilot.  What was that a

17 reference to?

18 A.   The Jordan pilot was a reference to a Jordanian pilot that

19 was participating in, in bombings of basically ISIS positions

20 in Syria and had ejected and was, was captured by ISIS in late

21 December of 2014.

22 Q.   And what does the word "we" refer to where you wrote,

23 "since we picked up the Jordan pilot"?

24 A.   "We" was just a reference to ISIS, the group that Mo was

25 with.

Siegfried - Direct                                                        468

1    Q.   And in your e-mails to the defendant, did you frequently

2    reference events that were reported in the media?

3    A.   Yes, we did.

4    Q.   And was this an example of that?

5    A.   It was.

6            MR. GIBBS:  All right, if we could turn to Exhibit

7    1-204?  And if we can blow up the top portion?

8    Q.   What is this exhibit?

9    A.   This is an e-mail from the defendant to Mo's e-mail

10   account on January 8, 2015.

11   Q.   And keeping January 8, 2015, in mind, if we can go quickly

12   to Exhibit 7-204A?  So what is 7-204A?

13   A.   This is a still image of the defendant in the FedEx office

14   store on January 8 of 2015.

15   Q.   And that's the store that you subpoenaed the surveillance

16   records from?

17   A.   Yes, that's correct.

18           MR. GIBBS:  All right, let's go back to the e-mail

19   from January 8, if we could.

20           Mr. Vera, if you can zoom up on the top, and if you

21   can then highlight -- sorry, it's 1-204.  And if you can zoom

22   in on the first -- the second and third lines, beginning

23   with, "If you are unable to write or get injured"?

24   Q.   Now, how did the defendant's use of the word "commander"

25   in this e-mail fit into what you were telling him that Mo was

Siegfried - Direct                                                      469

1   doing overseas?

2   A.   Yeah, it appeared to be a reference that he, he understood

3   Mo to be with ISIS and, obviously, under a commander was the

4   way I read it.

5            MR. GIBBS:  And then if we can go down seven lines,

6   if we can highlight the sentence that begins, "Ha, yep, heard

7   about the rat pilot"?

8   Q.   Special Agent, what was the status of the Jordanian pilot

9   at this point?

10  A.   At this point, the, the status at least reported in the

11  media was unknown.

12  Q.   But was anyone widely reported to be holding the Jordanian

13  pilot?

14  A.   Yes.  He -- at that point, the ISIS was widely reported to

15  have captured that pilot.

16  Q.   And at some point after January 8 of 2015, what did ISIS

17  ultimately do to the Jordanian pilot?

18  A.   There were videos, obviously, published, I believe, in

19  early February of 2015.  The pilot was put in a cage and burned

20  alive.

21  Q.   And was that event widely reported?

22  A.   Yes, it was.

23  Q.   And then if possible, can we go down, I'd like to

24  highlight the portion -- the section that starts nine lines

25  down, where the defendant, it begins, "Not sure if you got the

Siegfried - Direct                                                    470

1   news there yet," and goes down about five lines all the way

2   to, "according to people in the building."

3           Do you see that?

4   A.  Yes, I do.

5   Q.  All right.  And did you recognize what that was a

6   reference to?

7   A.   Yes.  It appeared to be a reference of the attack on the

8   *Charlie Hebdo* newspaper in Paris.

9   Q.  And can you describe that attack a little bit, exactly

10  what, what occurred?

11  A.   Yes.  I believe a couple individuals --

12          MR. SMITH:  Objection, Your Honor.  I believe the

13  witness is reading from a document on the witness stand.

14          THE COURT:  You do need to recall from your own

15  memory, without looking at anything.

16          THE WITNESS:  Yeah.

17          THE COURT:  All right.

18          THE WITNESS:  Yeah.  I believe a couple individuals

19  opened fire on a French newspaper, resulted in, you know, maybe

20  a dozen deaths.

21  BY MR. GIBBS:

22  Q.  All right, thank you.

23          Next if we can go to Government Exhibit 1-106 and

24  pull that up?  And can we highlight the sentence 13 lines down

25  that begins, "I heard about france"?

Siegfried - Direct                                              471

1           And while we're pulling that up, can you explain what

2    that e-mail is, who it's from and who it's to?

3    A.   Yes.  This is an e-mail from Mo's e-mail account to the

4    defendant on January 29, 2015.

5    Q.   And so this is one that you and Special Agent Minichello

6    drafted and sent to the defendant?

7    A.   Yes, that's correct.

8    Q.   And in the highlighted portion there, when, when you said

9    that there are many brothers from there over here who seem so

10   happy -- well, actually, let me -- yeah.  So you talked about

11   France, said there are many brothers from over here who seem so

12   happy.  When you used the term "over here," what did you mean

13   for that to refer to?

14   A.   "Over here" was just a reference to Syria, Iraq, any

15   territory controlled by ISIS.

16   Q.   Thank you.

17           Next if we could pull up Government Exhibit 1-205?

18   What is 1-205?

19   A.   This is an e-mail from the defendant to Mo's e-mail

20   account on February 3, 2015.

21   Q.   All right.  Keeping that February 3 date in mind, if we

22   can pull up first 7-205A and then 7-205B?

23           Which, which exhibit is this?

24   A.   This is a still image of the defendant in the FedEx office

25   store, in his police uniform, on February 3, 2015.

Siegfried - Direct                                              472

1   Q.   And that's 7-205A, correct?

2   A.   Yes, that's correct.

3   Q.   And then let's look at 7-205B.  And what is 7-205B?

4   A.   This is a second still image of the defendant in his

5   police uniform on February 3, 2015, in the FedEx office store.

6   Q.   And you said it's a photograph of the defendant in his

7   police uniform.  Who did he work for at that time?

8   A.   He worked for the Washington Metro Transit Authority.

9   Q.   Thank you.

10           Now, if we can move to Government Exhibit 1-206?

11  What is this document?

12  A.   This is an e-mail from the defendant to Mo's e-mail

13  account on February 18, 2015.

14  Q.   All right.  And again, with that February 18, 2015, date

15  in mind, if we could pull up 7-207A and then 7-207B?

16           What is 7-207A?

17  A.   This is a still image of the defendant entering the FedEx

18  office on February 18, 2015.

19  Q.   And how about 7-207B?

20  A.   This is a second image of the defendant leaving the FedEx

21  office store on February 18, 2015.

22  Q.   And that's the date that the previous e-mail we had on the

23  screen was sent, correct?

24  A.   That's correct.

25  Q.   Now, if we could go to Government Exhibit 1-107?  If we

Siegfried - Direct                                              473

1   can blow -- yeah, thank you.

2           Now, what is 1-107?

3   A.  It's an e-mail from Mo's e-mail account to the defendant

4   on March 2, 2015.

5           MR. GIBBS:  Mr. Vera, if we could highlight the

6   sentence eight lines down that begins with the words, "When we

7   are in Raqqah"?

8   Q.  Now, Special Agent, where is Raqqah?

9   A.  Raqqah is in Syria.

10  Q.  And what's the significance of Raqqah as it relates to

11  ISIS?

12  A.  At the time, that was basically considered their, their de

13  facto headquarters.

14  Q.  So essentially, the capital of the Islamic State?

15  A.  That's correct.

16  Q.  And as part of this e-mail that was sent to the defendant

17  on March 2, 2015, was a photograph also included with the

18  e-mail?

19  A.  Yes.

20          MR. GIBBS:  Can we pull that up?

21  Q.  And what is this a photograph of?

22  A.  It's a photograph of a neighborhood in Raqqah.

23  Q.  All right.  And what was, what was the reason of including

24  it with the e-mail?

25  A.  More or less just the reason was to provide additional

Siegfried - Direct                                                    474

1   information to the defendant that, that showed that Mo was in,

2   in Raqqah.

3   Q.    Thank you.

4         And next if we can turn to Government Exhibit 1-207?

5   If we could pull up the e-mail at the top, please?  Okay.

6         And what is 1-207?

7   A.    This is an e-mail from the defendant to Mo's e-mail

8   account on April 10, 2015.

9         MR. GIBBS:  All right.  And, Fabian, if we can

10  highlight the entire last paragraph of that e-mail?

11  Q.    Now, do you see in that last paragraph where the defendant

12  said, "If you come across anymore libyan brothers"?

13  A.    Yes, I do.

14  Q.    All right.  Based on what you were telling the defendant,

15  where would Mo be located if he came across any more Libyan

16  brothers?

17  A.    In Syria and Raqqah specifically.

18  Q.    All right, thank you.

19        Next if we can go to Government Exhibit 1-208?  And

20  if we can zoom in on the top of that, what is 1-208?

21  A.    That is an e-mail from the defendant to Mo's e-mail

22  account on April 25, 2015.

23        MR. GIBBS:  All right.  And next if we can turn to,

24  quickly to Government Exhibit 7-209 A and 7-209B?

25        What is 7-209A?

1   A.   This is a still image of the defendant entering the FedEx

2   office on April 25, 2015.

3   Q.   And then can we go to 7-209B?  What is this exhibit?

4   A.   And that is another still image of the defendant leaving

5   the FedEx office on April 25, 2015.

6   Q.   And that's the same day as the previous e-mail we just

7   looked at?

8   A.   That's correct.

9          MR. GIBBS:  Next if we could turn to Government

10  Exhibit 1-209?

11  Q.   What is 1-209?

12  A.   That is an e-mail from the defendant to Mo's e-mail

13  account on May 8, 2015.

14  Q.   All right.  And that's short enough, I'm not going to ask

15  you any questions beyond that.  We'll move on to the next one.

16          Can we go to Exhibit 1-108?  If we could zoom in on

17  the -- as much as possible on that e-mail?

18          What is 1-108?

19  A.   That is an e-mail from Mo's e-mail account to the

20  defendant on May 10, 2015.

21          MR. GIBBS:  And, Fabian, if it's possible, can we

22  zoom in on the first paragraph to start with?  And can we --

23  yeah, that's good.

24  Q.   And, Special Agent, do you see the section about four

25  lines from the bottom that starts with, "We were back in the

Siegfried - Direct                                                476

1   city helping to train some of the new brothers"?  Do you see

2   where it goes all the way down to the end of that paragraph?

3   A.    Yes.

4   Q.    Now, when you talked about when we were back in the city,

5   what city did you intend for that to refer to?

6   A.    That was a, again, a reference to Raqqah.

7   Q.    And in May of 2015, who controlled Raqqah?

8   A.    ISIS did.

9   Q.    And when you wrote in that paragraph that -- when you

10  talked about getting places for food and to relax and you said

11  that is harder now that we went east, what is going east a

12  reference to?

13  A.    Going east was a, was a reference to Iraq, and

14  specifically later in Anbar province.

15  Q.    And is that a province in Iraq?

16  A.    Yes.

17  Q.    And what was the reason about including the reference

18  going to east?

19  A.    It was consistent with what ISIS was, was doing at the

20  time.  They were, they were attempting to, you know, keep and

21  gain additional territory in the Anbar province.

22  Q.    And was the push into Anbar province, was that an event

23  that was widely reported in the media?

24  A.    Yes, it was.

25              MR. GIBBS:  And next if we can pull up in the -- can

Siegfried - Direct                                                    477

1   you zoom in on the second paragraph, Fabian?  And if possible,

2   can we highlight the first four sentences of that second

3   paragraph, ending with "shahid"?

4   Q.   Now, Special Agent, this was included in the e-mail, and

5   it talked about the brothers in Texas.  What was that a

6   reference to?

7   A.   The brothers in Texas was a reference to an attack on a

8   Prophet Muhammad cartoon contest in Garland, Texas.

9   Q.   And in your e-mail to the defendant, you wrote that we

10  cheered when we heard the brothers became shahid.  Who did you

11  intend for "we" to refer to when you said that we cheered?

12  A.   "We" was a reference to ISIS.

13  Q.   What does it mean to become shahid?

14  A.   "Shahid" is a common term for a martyr.

15  Q.   Thank you.

16          Now, if we can next turn to Government Exhibit 1-210?

17  And what is Government Exhibit 1-210?

18  A.   This is an e-mail from the defendant to Mo's e-mail

19  account on May 13, 2015.

20  Q.   May 13, 2015.  So can we pull up Exhibits, let's start

21  with Exhibit 7-211A.  What is 7-211A?

22  A.   That's a still image of the defendant entering the FedEx

23  office on May 13, 2015.

24  Q.   And then can we turn to 211B, please?

25  A.   And that's a second still image of the defendant entering

Siegfried - Direct                                                478

1    the FedEx -- or actually appears to be leaving the FedEx office

2    on May 13, 2015.

3    Q.   All right, thank you.

4         And you testified earlier that when you checked the

5    IP information on the e-mails from the defendant, they came

6    back to that FedEx store?

7    A.   It actually returned to FedEx office corporate store, but

8    there was no way to actually determine the specific store.  The

9    only way we were able to do that was to get video surveillance

10   of the time frame of when he actually sent the e-mails.

11   Q.   Okay.  And this was a FedEx store near his house?

12   A.   Yes, it was.

13        MR. GIBBS:  All right, let's go back to the e-mail,

14   if we could, 1-210.  And if we can zoom in on that e-mail at

15   the top, please?

16   Q.   And what did the defendant's reference in his e-mail to

17   Mo's account, saying -- talking about the "Texas thing"

18   indicate to you as far as whether he had read your prior

19   e-mail?

20   A.   He appeared to be referencing the, you know, the reference

21   to the attack that we had discussed in the previous e-mail.

22        MR. GIBBS:  And can we highlight next that entire

23   second paragraph in there?

24   Q.   Now, with regards to the defendant's reference there to

25   news in *The Post* about a U.S.-trained army and a Saudi-funded

Siegfried - Direct                                              479

1   umbrella group getting aimed towards the brothers soon, were

2   you able to review any news stories that were consistent with

3   what the defendant's described there?

4   A.   Yes, I was.

5   Q.   All right.  I'm not going to pull this up yet, but I'd

6   like you to take a look at Government Exhibit 1-210A.  Do you

7   have that before you?

8   A.   Yes, I do.

9   Q.   All right, what is 1-210A?

10  A.   It is a *Washington Post* article.

11  Q.   And just generally, what is it about?

12  A.   Yeah, it basically discusses the U.S. efforts to train

13  Syrian rebels to counter ISIS.

14         MR. GIBBS:  All right.  And, Judge, we would move for

15  the admission of 1-210A at this point.

16         MR. SMITH:  Objection.  Hearsay.

17         MR. GIBBS:  Judge, we're not offering it for the

18  truth of the matter asserted.  It's what the defendant is

19  reading about.

20         THE COURT:  Overruled.  It's in.

21         (Government's Exhibit No. 1-210A was received in

22  evidence.)

23         MR. GIBBS:  Thank you.

24         So if we could publish that to the jury, please?

25  Q.   And in the previous e-mail the defendant wrote, he talked

Siegfried - Direct                                                    480

1   about the news in *The Post*.  Who actually published this

2   article?

3   A.   *The Washington Post*.

4   Q.   And what is the date on this article, at least -- yeah,

5   the date on this one?

6   A.   It's May 7, 2015.

7   Q.   So six days before the defendant's e-mail?

8   A.   Yes.

9   Q.   All right.  And in the third paragraph of that news story,

10  who does it say that this program is aimed at countering?

11  A.   ISIS or ISIL.

12  Q.   Thank you.

13          Next if we could turn to Government Exhibit 1-211?

14  Maybe we can -- can you just highlight the top portion?

15          What is 1-211?

16  A.   It's an e-mail from the defendant to Mo's e-mail account

17  on June 13, 2015.

18  Q.   What is the subject of the e-mail from the defendant to

19  Mo's e-mail account?

20  A.   Subject was "Need advice."

21          MR. GIBBS:  All right.  And if we could briefly pull

22  up Exhibits, let's start with 7-212A?

23  Q.   What is 7-212A?

24  A.   It's a still image of the defendant in the FedEx office

25  store on June 13, 2015.

Siegfried - Direct                                                    481

1   Q.   And then how about 7-212B?

2   A.   It's a still image of the defendant leaving the FedEx

3   office on June 13, 2015.

4   Q.   Thank you.  Now, if we can go back to Exhibit 1-211?

5   That's the e-mail with the subject "Need advice."

6           And can we -- Mr. Vera, can we zoom in on the second

7   paragraph there?  And can you then highlight the last four

8   lines, beginning with, "Okay, now as to my question"?

9           Do you see that, Special Agent?

10  A.   Yes.

11          MR. GIBBS:  If we can go to, zoom in on the last

12  paragraph?  We have to sort of do this step by step.  And can

13  we then highlight the, the sentence three lines down in that

14  paragraph that begins, "Unfortunately I have enough flags on my

15  name"?

16          Now, in the e-mails that the defendant sent to you,

17  Special Agent, how would you describe his level of security

18  consciousness?

19  A.   He seemed to be fairly security conscious and cognizant

20  of, careful of what he sent.

21          MR. GIBBS:  And then staying with the e-mail, can we

22  highlight the sentence nine lines down that starts, "If not,

23  could you ask your commanders"?

24  Q.   Special Agent, what was the significance of the defendant

25  using the word "commanders" in his e-mail to you?

Siegfried - Direct                                                    482

 1            MR. SMITH:  Objection.

 2            THE COURT:  We've already had that issue come up once

 3      before.  He's already answered what "commanders" means, so I'm

 4      sustaining the objection.  It's cumulative.

 5            MR. GIBBS:  That's fine, Judge.

 6            And next, if we can go farther down in that

 7      paragraph, I want you to highlight the section 13 lines down

 8      that begins, "I wanted to go to the one country I was in

 9      before," and ends with, "the guys that you were with that have

10      a presence there."  So it's about five lines.

11      Q.   Now, when the defendant talked about "the one country I

12      was in before," did you know what that was a reference to?

13      A.   It appeared to be a reference to Libya.

14      Q.   And when he said that some issues arose with them, "unless

15      they pledged to your guys since I saw them last," based on what

16      you were telling the defendant, who were Mo's guys?

17      A.   Mo's guys were ISIS.

18      Q.   All right, next if we could turn to Government Exhibit

19      1-109?  What is 1-109?

20      A.   It's an e-mail from the -- from Mo's e-mail account to the

21      defendant on June 21, 2015.

22            MR. GIBBS:  And can we zoom in on the third

23      paragraph, Fabian?  And can you highlight the two sentences

24      four lines down that begin, "If you decide to leave, be

25      careful," and ends with, "it was for my tour"?

Siegfried - Direct                                              483

1  Q.   Now, Special Agent, in the earlier e-mail, the defendant

2  had asked about getting advice from Mo's commanders about

3  possibly moving money overseas.  Do you recall that?

4  A.   Yes.

5  Q.   And here is the response that, that was drafted and sent

6  to him.  Why didn't you encourage the defendant about moving

7  his money overseas with the help of Mo's commanders?

8  A.   You know, we just didn't think it was consistent with the

9  legend that had been built around Mo.  We hadn't asked for

10 anything up to that point, and we thought pushing him, you

11 know, to send money, you know, at that point didn't make any

12 sense and, you know, wanted to let him know sending money via

13 Western Union or a straight wire or anything like that was

14 probably a bad idea.

15 Q.   All right, thank you.

16         Next if we could go to Exhibit 1-110?  What is 1-110?

17 A.   That's an e-mail from Mo's e-mail account to the defendant

18 on July 14, 2015.

19 Q.   Right.  And if you drop down from there, it's sort of a

20 little tricky to read, if you drop down, if we could go to the

21 next header there, the one dated Sunday, June 21, 2015, that's

22 the one I want to ask you about.  What is that?

23 A.   That is an e-mail from Mo's e-mail account to the

24 defendant on June 21, 2015.

25 Q.   All right.  And so June 21, 2015, when you take a look at

Siegfried - Direct                                                    484

1    7-213A, what is 7-213A?

2    A.   This is a still image of the defendant in the FedEx office

3    on June 21, 2015.

4    Q.   And then what is 7-213B?

5    A.   That's a still image of the defendant leaving the FedEx

6    office on June 21, 2015.

7    Q.   All right, thank you.

8          Now if we could go back to the June 21 e-mail, which

9    is Exhibit 1-110?  And, Fabian, can we zoom in on that first

10   paragraph that starts, "V, thanks for the advice"?  And then

11   can we highlight the sentence two lines down that begins, "And

12   if there is a way to leave my email address"?

13         Special Agent, do you see in that e-mail where the

14   defendant said:  If there is a way to leave my e-mail address

15   with a trusted commander so I may be alerted if something

16   happens to you?  Do you see that?

17   A.   Yes.

18   Q.   All right.  Besides this "trusted commander," how many

19   other people did the defendant authorize Mo to share his e-mail

20   account with?

21   A.   No one.

22   Q.   Thank you.

23         If we can go to Exhibit 1-213?  If we could just zoom

24   in on the whole e-mail?  It's not very long.

25         What is 1-213?

Siegfried - Direct                                                485

1   A.   It's an e-mail from the defendant to Mo's e-mail account
2   on July 1, 2015.
3   Q.   All right, we'll come back to it in just a second, but if
4   we could pull up 7-214A?  And what is 7-214A?
5   A.   It's a still image of the defendant in the FedEx office
6   store on July 1, 2015.
7   Q.   Thank you.
8          Now, let's go back to the 1-213, and stay zoomed in
9   on it, if we can.  And can we highlight the last couple of
10  sentences at the bottom, starting with, "If you come across any
11  brothers from that city," and take it all the way to the end?
12         Now, in the defendant's e-mail to Mo's account, he
13  said that people from the Abo Salem Suhada Brig. is who I was
14  with mostly.  Who first brought up the Abo Salem Suhada Brig.
15  in your e-mails to the defendant?
16  A.   The defendant did.
17  Q.   Thank you.  Next if we can go to Government Exhibit 1-214?
18  And what is 1-214?
19  A.   That is an e-mail from the defendant to Mo's e-mail
20  account on July 20, 2015.
21  Q.   Thank you.
22         And, Fabian, if we can zoom in on the third paragraph
23  of that July 20 e-mail, the one that starts with, "Yeah, been
24  well over a month"?
25         And then four lines down, the defendant

Siegfried - Direct                                                      486

1  writes, "Yeah, I'm not sure who they are with now but assume it

2  is the same and they have a different leadership the brothers

3  where you are."

4          Where were you consistent in your e-mails in

5  indicating that Mo was?

6  A.   With ISIS, in ISIS-controlled territory in either Syria or

7  Iraq.

8          MR. GIBBS:  And then below -- let's see.  Then below

9  that, if we can pull up the part that begins, "Inshallah the

10 divisions will be solved," and ends with, "like minded"?

11 Q.   Now, in the e-mail -- in the defendant's e-mail to Mo's

12 account where he wrote about how he remembered these as being

13 the best of brothers and "like-minded" and how he wanted to see

14 the "divisions solved and the brothers united," what was your

15 understanding of which brothers this referred to?

16 A.   Seemed to be a reference to resolving the divisions

17 between ISIS and, you know, the group he's referencing.

18 Q.   And what group was that that he was referencing?

19 A.   The brothers he was with.

20 Q.   In where?

21 A.   In Libya.

22 Q.   Thank you.

23         Next if we can pull up Government Exhibit 1-112?  And

24 if we can zoom in on the top of that e-mail?

25         And if you can just indicate what Government Exhibit

Siegfried - Direct                                                    487

1  1-112 is?

2  A.   It's an e-mail from Mo's e-mail account to the defendant

3  on October 1, 2015.

4          MR. GIBB:  Fabian, can we highlight the first

5  sentence of that second paragraph that begins, "Things here are

6  ok but everyone is talking about Russia"?

7  Q.   Special Agent, what was that in reference to?

8  A.   That was a reference to Russia's involvement in carrying

9  out air strikes supporting the Assad regime.

10  Q.   And was that event widely reported in the media?

11  A.   Yes, it was.

12          MR. GIBBS:  And then further down, five lines down,

13  can we highlight the sentence that begins, "My Canadian friend

14  told me"?

15  Q.   Now, when you wrote in that e-mail about a deal being

16  struck to split up Sham, can you explain what "Sham" means?

17  A.   Yes.  "Sham" was just a general reference to Syria.

18  Q.   All right, thank you.

19          Next if we can turn to Government Exhibit 1-216?  And

20  if we can zoom in on that e-mail at the top?

21          What is 1-216?

22  A.   Sorry, I'm just --

23  Q.   That's okay.  I jumped ahead on you a little bit.

24          Special Agent, it is on -- we will pull it up on the

25  screen as well if that's easier for you.

Siegfried - Direct                                                    488

1   A.   Okay.

2   Q.   I know you have to sort of toggle back and forth, but that

3   may be the best way to do it.

4   A.   Yeah, it's an e-mail from the defendant to Mo's e-mail

5   account on October 13, 2015.

6           MR. GIBBS:  And if we could highlight that first full

7   paragraph that starts, "Yes, it seems like the west"?

8   Q.   In the defendant's e-mail to Mo's account, when he talked

9   about, "everyone needs to join under one banner to repel them,"

10  what was your interpretation of what that meant?

11  A.   That seemed to be a reference to, my interpretation was,

12  the other groups fighting the Assad regime, including, you

13  know, al-Nusra Front and the Syrian rebels.

14  Q.   Thank you.

15          Next if we can turn to Government Exhibit 1-218?

16  That will be up on your screen in a moment.  If we can zoom in

17  on that?

18          Special Agent, would you -- could you tell what

19  brother the defendant was referring to in this particular

20  e-mail?

21  A.   Yes.  It appeared to be another reference to Hisham Hall.

22  Q.   And how could you tell this was a reference to Hisham

23  Hall?

24  A.   The references to him studying and, you know, I think the

25  defendant had referenced at one point that he was going back to

Siegfried - Direct                                              489

1   his home country, not explicitly saying Morocco, but that he

2   had been studying and kind of moving back and forth, and it was

3   consistent with, with Hisham Hall.

4   Q.   And is Hisham Hall from Morocco?

5   A.   Yes.

6   Q.   Okay.  All right, thank you.

7        Next if we could turn to Government Exhibit 1-113?

8   And if we can zoom in on the top just so it's a little more

9   easy to make out?

10       What is 1-113?

11  A.   That's an e-mail from Mo's e-mail account to the defendant

12  on November 15, 2015.

13       MR. GIBBS:  All right.  And, Fabian, if you could

14  highlight the entire second paragraph, zoom in on it?

15  Q.   Now, in the second paragraph of that e-mail to the

16  defendant, you talked about the news in Paris.  What was that a

17  reference to?

18  A.   That was a reference to the multiple attacks that went on

19  in Paris, I believe it was a few days prior to that.

20  Q.   And who claimed responsibility for those Paris attacks?

21  A.   ISIS did.

22  Q.   All right, thank you.

23       Now, Special Agent Siegfried, by this point in

24  November of 2015, the FBI and, you know, specifically you and

25  John Minichello had been using the V4Vendetta e-mail account to

Siegfried - Direct                                                    490

1   pose as Mo and to communicate with the defendant as though Mo

2   was with ISIS, correct?

3   A.    That's correct.

4   Q.    And around this point in the investigation, did the FBI

5   make a decision to approach the defendant directly?

6   A.    Yes.

7   Q.    And when was that?

8   A.    That was in, I believe December 3 was the first, first

9   time.

10  Q.    You said the first time.  How many interviews did the FBI

11  conduct with the defendant?

12  A.    At that point, it was December 3, and I believe December 5

13  he was interviewed a second time.

14  Q.    And who, who were the agents who conducted the interviews

15  with the defendant?  And keep in mind, one of the agents will

16  be referred to -- well, is not to be referred to in his real

17  name.  Do you know what his pseudonym is?

18  A.    Yes.

19  Q.    Okay.  Who were the agents who conducted those two

20  interviews?

21  A.    Agent Caslen and Agent Smith.

22          MR. GIBBS:  Thank you, sir.

23          Judge, at this point, this agent is one we did want

24  to break up as well because we'd like to present evidence of

25  the interviews at this point, but he will have a little bit of

Siegfried - Direct                                                  491

1   testimony after that related to some additional e-mails, but

2   with the Court's indulgence, we'd like to finish our questions

3   now, we can either go into cross now or the defense can do

4   their entire cross once he's completed all of his testimony,

5   but the next witness we would call would be Special Agent

6   Smith, who will need to testify behind the screen about the

7   December 2015 interviews.

8           THE COURT:  I think it's -- the jury can, can parse

9   this together.  I think when a witness is on the stand, we

10  should try to get all of the testimony out.  Let's finish with

11  this witness.

12          MR. GIBBS:  That's fine, Judge.

13  Q.   All right.  So, Special Agent, in terms of the interviews

14  conducted by the FBI in December of 2015, after those two

15  interviews occurred in early December, what did that do to the

16  defendant's e-mail communications to Mo's account?

17  A.   The, the communication dropped for about, about a month,

18  month or so, maybe two.  I'd have to look.

19  Q.   Okay.  And after a certain amount of time passed without

20  getting any e-mails from the defendant, what did you do?

21  A.   We sent another e-mail.

22          MR. GIBBS:  And if we could pull up Government

23  Exhibit 1 -219?  And let's blow up the e-mail at the bottom, if

24  we could.

25  Q.   And what was the date of the e-mail at the bottom?

Siegfried - Direct                                              492

1  A.    This was an e-mail from Mo's e-mail account to the

2  defendant on January 16 of 2016.

3  Q.    Is it January 16 or January 14?

4  A.    Sorry, January 14, 2016.

5  Q.    Okay.  And what was the subject line of your e-mail to the

6  defendant?

7  A.    There is no subject.

8          MR. GIBBS:  And, Fabian, can we highlight the last

9  three sentences of that e-mail, starting with, "I think the

10  kuffar know I have made it somehow"?

11  Q.    Now, what did you intend to convey to the defendant by

12  using the term "kuffar"?

13  A.    "Kuffar" mean disbelievers, the government, FBI.

14  Q.    And did the defendant respond to this e-mail?

15  A.    Yes, he did.

16          MR. GIBBS:  All right.  And before we jump up to the

17  top of that, if we could pull up Government Exhibit 7-216A?

18  Q.    What is 7-216A?

19  A.    It's a still image of the defendant in the FedEx office on

20  February 16, 2016.

21          MR. GIBBS:  Okay.  And let's go back to the previous

22  exhibit, which is 1-219.  And can we zoom in on the top of that

23  now?  Actually, the "From" and "To" information, if we could

24  start with that?

25  Q.    All right, you testified a moment ago that your e-mail on

Siegfried - Direct                                                      493

1    January 14 had no subject.  What was the subject of the

2    defendant's e-mail to you on February 16, 2016?

3    A.    "Yeah, they were asking about you."

4    Q.    And approximately how long after your e-mail to the

5    defendant did he wait to respond?

6    A.    It was approximately a month.

7            MR. GIBBS:  And, Fabian, next could we zoom in on the

8    first paragraph of the defendant's e-mail?  And can we

9    highlight the first three lines of that first paragraph?  Yeah.

10   The first three sentences, I guess.

11           And then, Fabian, farther down in that same

12   paragraph, can you highlight the last four lines of that

13   paragraph, beginning with, "So again I was being careful"?

14   Q.    Now, in that first paragraph, the defendant talks about

15   Tor and some of these other apps to communicate on.  Who first

16   brought up the idea of these other devices such as Tor and

17   different apps that in the defendant's word would be "secure"?

18   A.    The defendant.

19   Q.    And you testified a moment ago that the subject line of

20   this particular e-mail was, "Yeah, they were asking about you."

21           Can we next zoom in on the second paragraph, Fabian?

22   And if we could, could we highlight the first seven lines of

23   that paragraph that end with, "at least 6 goons in teams of two

24   that were going around"?

25           Special Agent, is this where the defendant described

Siegfried - Direct                                                494

1   in his e-mail being questioned by the FBI?

2   A.    Yes.

3   Q.    And when the defendant said in that e-mail that they

4   wanted your phone, e-mail, Facebook info, were those the sorts

5   of questions he was asked, actually asked by the FBI in

6   February of 2015?

7   A.    Yes, he was.

8   Q.    And when the defendant told the person he believed was Mo

9   that he had said that Mo had gone on vacation and to visit

10  family, how did that compare with the story that the defendant

11  and Mo had come up to explain Mo's trip before he left?

12  A.    It was -- it's fairly consistent.

13          MR. GIBBS:   And then, Fabian, if we could -- at the

14  end of that paragraph, if we could highlight the last three

15  lines -- the last sentence, I guess, but it begins, "I read in

16  the papers"?

17  Q.    Now, in that last line, when the defendant used the

18  term "the state," did you recognize that reference?

19  A.    Yes, a common reference to Islamic State.

20  Q.    And with regards to the defendant saying that he read in

21  the papers about the state being able to make new passports and

22  then saying, "inshallah they could furnish you with necessary

23  documents in another name to travel regionally," were you able

24  to review any news reports prior to February 16, 2016, that

25  were consistent with what the defendant described?

Siegfried - Direct                                                    495

1   A.   Yes, I was.

2   Q.   All right.  I'd like you to take a look at Government

3   Exhibit 1-219A, and we're not going to pull it up.  I think, I

4   think it should be there in your stack because that's not in

5   evidence yet.

6   A.   I don't believe it is.

7   Q.   I think it should be attached to --

8           THE COURT:  It's not in the Court's book, either.

9   219A is not.

10          MR. GIBBS:  Oh, it's not?  All right, we may, we may

11  just come back and clean that up later, Judge.

12  Q.   All right, Special Agent, if you could turn to Government

13  Exhibit 1-220?  And we can pull that up on the screen, so you

14  maybe able to see it quicker that way.

15          And can you just highlight the top for us?

16          All right.  So you testified a moment ago about

17  getting an e-mail from the defendant dated February 16, 2016,

18  with the subject, "They were asking about you."  Did the

19  defendant then send a second e-mail about 20 minutes later on

20  that same date?

21  A.   Yes.

22  Q.   And that one is "Subject:  "Re:  Salam," correct?

23  A.   Yes.

24          MR. GIBBS:  Fabian, can we zoom in on the third

25  paragraph?  All right, thank you.  And can we highlight the

Siegfried - Direct                                               496

1  section that begins a couple lines down, begins, "But yeah...I

2  have heard," and goes all the way down to, "group you are with

3  not divided"?

4  Q.   Now, in this e-mail, when the defendant said, "the only

5  way forward now is with the group you are with not divided,"

6  what group were you consistent in indicating Mo was with?

7  A.   ISIS.

8  Q.   And then next, Special Agent, if we could turn to

9  Government Exhibit 1-115?

10          THE COURT:  1-115?

11          MR. GIBBS:  Yes.  1-115, I'm sorry.  Pull it up, and

12  let's highlight the top portion.

13  Q.   And what is Government Exhibit 1-115?

14  A.   That is an e-mail from Mo's e-mail account to the

15  defendant on March 5, 2016.

16          MR. GIBBS:  All right.  And, Fabian, if we can zoom

17  in on that second paragraph of the e-mail at the top?  And then

18  if you can highlight the section, it starts three lines in

19  with, "The brothers that I have been helping," and then take it

20  all the way down to the end of that paragraph?

21  Q.   Now, Special Agent, did you tell the defendant in this

22  e-mail about another way or a new way that the two of you could

23  communicate?

24  A.   Yes.

25  Q.   And what was the new method you could use to communicate?

1  A.   We had, we had basically described an encrypted messaging

2  application called Threema that was widely being adopted by

3  ISIS.

4  Q.   And is that the reason you suggested it to the defendant?

5  A.   Yes, one of the reasons.

6  Q.   All right, thank you.

7        Next if we can go to Government Exhibit 1-116?  And

8  if we could just sort of zoom in on the entire paragraph, I

9  think we should be able to bring it up.

10        What is 1-116?

11  A.   That's an e-mail from Mo's e-mail account to the defendant

12  on April 18, 2016.

13        MR. GIBBS:  And, Fabian, can we zoom in on the entire

14  second paragraph, and then can we highlight the first three

15  lines that start with, "Although Allah," and ends with, "make

16  hijrah to Khilafah now"?

17        Now, what did you intend to convey to the defendant

18  by telling him, "I am blessed to be living in dawlah"?

19  A.   Just a reference to living under the Islamic State.

20        MR GIBBS:  And then, let's see, below that, can we

21  highlight the sentence two lines down that begins, "I mentioned

22  in last email," and ends with, "because more secure"?

23  Q.   Now, what did you intend to convey in that sentence by

24  using the term "hijrah"?

25  A.   I was basically kind of conveying that Mo was in the

Siegfried - Direct                                          498

1  process of helping other facilitators move Westerners,

2  potential recruits into ISIS, and "hijrah" is just another word

3  for, you know, traveling.  It's common among ISIS supporters.

4  Q.   Right.  And you talked about helping facilitators recruit

5  people to ISIS, and in the e-mail message, you talked about how

6  the Threema app would help brothers make hijrah.

7  A.   Sure.

8  Q.   How was it that this Threema app would help brothers make

9  hijrah?

10 A.   It was a -- it was a secure way to communicate with, with

11 potential recruits, being able to set up one account and solely

12 communicate with that one person in order to facilitate the

13 travel to the Islamic city.

14 Q.   Right.  So was the idea that you would have a secure way

15 for one recruiter to talk to one potential fighter that

16 wouldn't be compromised?

17 A.   Yes.

18 Q.   And then after saying that and telling the defendant he

19 should text you on the Threema app because it's more secure,

20 you gave him an ID.  What was that ID?

21           Can we highlight that?

22 A.   Yeah.  That was UNTDSKA7.

23 Q.   And what does that Threema ID allow a user to do?

24 A.   Typically, the, the user or the recipient, if I sent that

25 user ID to somebody else, I mean, they typically would have to

Siegfried - Direct                                          499

1   know that ID in order to communicate with me.  It's a very

2   specific -- it's not tied to an e-mail or a phone number or

3   anything else.

4   Q.    And just as they would have to know that ID to communicate

5   with you, would you have to know their ID to communicate with

6   them?

7   A.    Yes.

8   Q.    Okay.  Now, Special Agent Siegfried, at the beginning of

9   your testimony, you testified about being detailed to the FBI

10  as a task force agent, and I believe your testimony was your

11  time as a task force agent ended in April 2016, correct?

12  A.    That's correct.

13  Q.    And this e-mail is dated April 18, 2016?

14  A.    Yes, it is.

15  Q.    So was this the end of your time with the FBI?

16  A.    Yes, it was.

17  Q.    And did you go back to the Air Force soon that after that?

18  A.    Yes, I did.

19          MR. GIBBS:  Okay.  Just a moment.

20          Yeah, there's one -- if I can just go back very

21  briefly to one exhibit, it's 1-220.  If you could pull that up,

22  Fabian?  And if you could zoom in on the third paragraph that

23  starts, "Yeah, saw Paris"?

24          Now, this was the e-mail dated February 16, 2016, the

25  "Re:  Salam" e-mail from defendant's e-mail address.  Do you

Siegfried - Direct                                                    500

1    see that.

2    A.   Yes.

3    Q.   All right.  When defendant talked about yeah, saw Paris,

4    and he gave a description of what happened, how did that relate

5    to something you had referenced in an earlier e-mail?

6    A.   I believe in a -- I'd have to look at it, but in an

7    earlier e-mail, I believe there was a reference to the

8    *Charlie* -- well, I'm sorry, give me one second.

9             This was a reference to the attacks in Paris in

10   November.

11            MR. GIBBS:  Okay.  Thank you.

12            And, Judge, there was one exhibit that we didn't have

13   a paper copy of, but I do have a -- I have it on the machine,

14   and -- well, actually, let me do this:  Can I just hand this up

15   to the witness and then authenticate it and move it in?

16            THE COURT:  Is it a newspaper article?

17            MR. GIBBS:  It is.

18            THE COURT:  All right.  Defense have seen it?

19            MR. GIBBS:  Yep.

20   Q.   All right, what's that exhibit number, Special Agent?

21   1-219A?

22   A.   Yes, that's correct.

23   Q.   All right, what is that exhibit?

24   A.   It is a Reuters news article.  The title is "Islamic State

25   Can Make Fake Syrian Passports."

Siegfried - Direct                                                    501

1   Q.   All right.  And a few moments ago, you testified about an

2   e-mail from the defendant where he said, "I read in the papers

3   that the state has the ability to make new passports."  Was

4   that at least one article that was consistent with what the

5   defendant described?

6   A.   Yes.

7             MR. GIBBS:  Your Honor, if we could move that into

8   evidence and publish it, please?

9             MR. SMITH:  We object to it to the extent that it's

10  being used to establish -- we object to the evidence to the

11  extent it's being used to establish the truth of the contents

12  in the article but --

13            THE COURT:  Well, the right objection and the one

14  I'll sustain is there's no evidence that an American-based

15  person would have read a British news article.  The other one

16  was *Washington Post*.  The defendant is from this area; that's

17  not an unreasonable assumption.

18            MR. SMITH:  That's correct, Your Honor.

19            THE COURT:  So I will sustain that objection.  The

20  exhibit is not in.

21            MR. SMITH:  Okay.

22            MR. GIBBS:  Thank you, Judge.  I think that's all

23  we've got.

24            Thank you, sir.  I believe the defense will have some

25  questions for you.

Siegfried - Cross                                                    502

1          THE COURT:  All right.  Cross-examination?

2                      CROSS-EXAMINATION

3   BY MR. SMITH:

4   Q.   Good afternoon, Agent Siegfried.

5   A.   Good afternoon.

6   Q.   So you've testified today that you began e-mailing the

7   defendant with some of your colleagues from, allegedly from

8   Syria but not actually in Syria around October 2014, correct?

9   A.   I began around November of 2014.

10  Q.   Oh, you began around November 2014, but the, the

11  individual, the agent pretending to be Mo began e-mailing

12  Nicholas Young allegedly from Syria or Turkey in October of

13  2014, correct?

14  A.   Yes.  I believe they, they sent those together.

15  Q.   And the first e-mail that was sent from Turkey from the

16  character pretending to be Mo was in October -- on October 27,

17  2014, correct?

18  A.   I don't have that in front of me but --

19  Q.   That's Government Exhibit 1-101.

20          Can we put that up?

21  A.   Yes, this appears to be the first e-mail.

22  Q.   Okay.  Do you recall whether the individual, the agent

23  pretending to be Mo asked Nicholas Young -- do you recall

24  whether the agent pretending to be Mo indicated in this e-mail

25  on October 27, 2014, that Mo was heading to Syria?

Siegfried - Cross                                                        503

1    A.    I'm sorry, I don't understand the question.

2    Q.    Can you refresh your recollection by looking at this

3    document, this e-mail dated October 27, 2014?

4             MR. GIBBS:   Judge, just to be clear, this is not one

5    of the exhibits he authored or testified about.

6             THE COURT:   I would think you have a better witness

7    to ask this of, Mr. Smith.   Again, your time is somewhat

8    limited.

9             MR. SMITH:   Your Honor, Mr. Siegfried just testified

10   about the e-mails on October 27 and October 29.   They're

11   Government Exhibits 1-101 and 1-102.   He was a witness for

12   these --

13            THE COURT:   Look, if you want to ask it, I'm going to

14   allow you to do it, but this is probably not your best witness

15   since he said he was not in on the project at that point.   You

16   have another agent who's coming back here.

17            MR. SMITH:   Your Honor, that's not clear to us yet at

18   this point from the government's explanations to us, but we

19   will proceed quickly.

20            THE COURT:   All right.

21   BY MR. SMITH:

22   Q.    So in this e-mail on October 27, 2014, the agent

23   pretending to be Mo does not indicate that he would be

24   traveling to Syria, correct?

25            MR. GIBBS:   Judge, first of all, that misstates the

Siegfried - Cross                                                      504

1    evidence because Special Agent Minichello testified he and Mo

2    drafted the e-mail, and the exhibit speaks for itself.

3              THE COURT:  You've reserved Minichello to come back.

4              MR. GIBBS:  Correct.

5              THE COURT:  Whether you call him or the defense calls

6    him, it's up to whoever you want -- however you want to do it,

7    but the point is he is the better witness rather than having

8    somebody who didn't author the article try to talk about what

9    it means.  So I'm going to sustain --

10             MR. SMITH:  We can --

11             THE COURT:  I'm sustaining the objection.  Move on,

12   sir.

13   BY MR. SMITH:

14   Q.   Agent Siegfried, the agent pretending to be Mo had

15   e-mailed Nicholas Young three times in a row in October and

16   November, before Nicholas Young responded to those e-mails, to

17   the agent pretending to be Mo, correct?

18   A.   I believe it was three times.

19   Q.   And the first time that the agent pretending to be Mo

20   e-mailed Nicholas Young was October 27, 2014, correct?

21   A.   Yes.

22   Q.   And Mr. Young did not respond until December 17, 2014,

23   correct?

24   A.   That's correct.

25   Q.   Now, Agent Siegfried, you testified about an e-mail which

Siegfried - Cross                                                    505

1    is Government Exhibit 1-204, dated January 8, 2015, correct?

2    That's Government Exhibit 1-204, and it referenced a Jordanian

3    pilot?

4    A.   Yes.

5    Q.   And it's your testimony that this e-mail indicated

6    Mr. Young's support for -- or interest in ISIS, as indicated by

7    the fact that he was referencing a Jordanian pilot burning in

8    this e-mail, correct?

9    A.   My understanding from, from reading the e-mails, he was

10   referring to the Jordanian pilot that we had referenced in a

11   previous e-mail.

12   Q.   At this point in time on January 8, 2015, there came a

13   time when the FBI investigated an account called a LiveLeak

14   account.  Are you familiar with that LiveLeak account?

15   A.   No.

16        MR. SMITH:  Okay.  This is a government -- this is a

17   document for the witness dated June 4, 2015.

18        MR. GIBBS:  Can we take a look?

19        MR. SMITH:  Sure.

20        THE COURT:  Has the government seen it?

21        MR. SMITH:  They produced it to us, Your Honor.

22        MR. GIBBS:  Your Honor, there's a couple issues with

23   this.  One, again, it's not a marked exhibit, but more

24   importantly, the question was whether he was familiar with the

25   defendant's LiveLeak account.  The defendant -- the witness

Siegfried - Cross                                                          506

1   said no.  Now, this appears to be an attempt to refresh him on

2   that, which since the answer is he doesn't know anything about

3   the LiveLeak account --

4                THE COURT:  Well, let him look at it and see if it

5   refreshes his recollection.

6   BY MR. SMITH:

7   Q.   I can -- actually, Agent Siegfried, are you familiar with

8   SSA Bryan Vorndran?

9   A.   Yes.

10  Q.   And who is he?

11  A.   He's the -- he was at the time the squad supervisor.

12  Q.   And what was his role in this case?

13  A.   Managing cases.  That's his job.

14  Q.   So did you work -- is it accurate to say you worked under

15  SSA Vorndran on this Slow Decline investigation?

16  A.   Yes.

17  Q.   And were you familiar with other aspects of the Slow

18  Decline investigation?

19  A.   On the peripherals.  I mean, I knew generally about the

20  general gist of the investigation.

21  Q.   So there's a memo in front of you, and it's dated June 14,

22  2015, correct?

23  A.   Yes.

24  Q.   And is that an FBI memorandum?

25  A.   Yes, it is.

Siegfried - Cross                                                     507

1   Q.   And is it a memorandum that is purporting to summarize

2   Mr. Young's comments on at Web site called LiveLeak?

3            MR. GIBBS:  Judge, it's either going to refresh his

4   recollection or it's not.

5            THE COURT:  Right, right, right.

6            Have you ever seen that before?

7            THE WITNESS:  I don't recall seeing this specific

8   memorandum, but seeing the Düsselkamp, I vaguely remember that

9   as an account, but I don't recall the contents of the LiveLeak

10  account.

11           THE COURT:  All right.

12  BY MR. SMITH:

13  Q.   Do you recall whether the counterterrorism section

14  conducted an analysis of Mr. Young's LiveLeak comments?

15  A.   They may have.  I -- to my recollection, I don't know.

16  Q.   Okay.  I'm handing up a former government exhibit marked

17  8-508, which the government removed right before trial from its

18  exhibit list.

19           THE COURT:  Show it first to counsel.

20           MR. GIBBS:  Judge, again, we object.  This is a

21  witness who's testified he's not familiar with the LiveLeak

22  information.  This is, appears to be a screen shot related to

23  that.  We are calling witnesses later in this case who have

24  personal knowledge of that.  This witness clearly does not.

25           THE COURT:  You're using up your time, Mr. Smith, on

1    stuff that doesn't appear to be --

2            MR. SMITH:  Your Honor, this is, this is impeachment

3    evidence because it concerns --

4            THE COURT:  Well, just show it to the witness then --

5            MR. SMITH:  Okay.  Thank you.

6            THE COURT:  -- and ask your question.

7            MR. SMITH:  Thank you.

8    Q.   This is a document that was formerly marked Government

9    Exhibit 8-508.

10           THE COURT:  Now, what is the question?

11   BY MR. SMITH:

12   Q.   Now, the question is do you see -- do you see this as a

13   screen shot from the Web site LiveLeak?

14           MR. GIBBS:  Objection.

15           THE COURT:  That's it.  That's all you're going to

16   ask.

17           MR. SMITH:  No, I'm just --

18           THE COURT:  But what happens is even though I tell

19   the jury and I know they're going to try very hard to put out

20   of their minds statements that counsel is making, now you're

21   practically testifying, because this is a witness who has said

22   he had a short-term involvement in this investigation.  He has

23   said that he does not know these other peripheral issues.

24           Agent, in looking at that document, do you know

25   anything about that?

Siegfried - Cross                                                    509

1          THE WITNESS:  I personally do not recall.  I -- now

2    that I've seen the memorandum, I do recall there was a LiveLeak

3    account, but I don't recognize the screen shots, no.

4          THE COURT:  All right.  Then I'm sustaining the

5    objection.  Move on to some other topic.

6    BY MR. SMITH:

7    Q.   So, Agent Siegfried, is it accurate to say that between

8    October 2014 and until about June 2016, agents pretending to be

9    Mo were e-mailing Mr. Young continuously during that period

10   from the alias of Mo?

11   A.   Yes, that's correct.

12   Q.   So these agents continued to have conversations with

13   Mr. Young under the Mo alias throughout this period, but they

14   never arrested him, correct?

15   A.   That's correct.

16   Q.   Mr. Young remained on the police force during all of these

17   communications, correct, in Washington, D.C.?

18   A.   That's correct.

19   Q.   You have not testified that any of the comments in these

20   exchanges are in any way criminal, correct?

21          MR. GIBBS:  Judge, there's no basis for that.

22          THE COURT:  Sustained.

23          MR. GIBBS:  Thank you.

24   BY MR. SMITH:

25   Q.   You testified about a May 10, 2015, e-mail which was

Siegfried - Cross                                                    510

 1  marked Government Exhibit 1-108, correct?  And it referenced

 2  going east.  The alias pretending to be Mo said he was going

 3  east.  Do you recall that?

 4  A.   That's correct.

 5  Q.   Do you know whether Mr. Young knew what the alias Mo was

 6  referring to when he said "going east"?

 7           MR. GIBBS:  Judge, calls for speculation.

 8           THE COURT:  Sustained.

 9  BY MR. SMITH:

10  Q.   In the same e-mail, you reference -- Mo, the alias Mo,

11  references a Texas attack in the May 10, 2015, e-mail.  Do you

12  recall that?

13  A.   Yes.

14  Q.   Do you have any -- do you have any personal knowledge that

15  the defendant understood what you were referring to in that

16  e-mail?

17           MR. GIBBS:  Same objection, Judge.

18           THE COURT:  Sustained.

19  BY MR. SMITH:

20  Q.   Agent Siegfried, do you have any knowledge of whether the

21  defendant speaks Arabic?

22  A.   I believe he may speak limited Arabic.  I'm not sure.

23  Q.   You're not sure.  You don't know.  Okay.

24           You reference a *Washington Post* article dated May 7,

25  2015, in connection with that later e-mail from Mr. Young on

Siegfried - Cross                                                    511

1   May 10, 2015.  Do you recall that *Washington Post* article?

2   A.   Yes.

3   Q.   Do you have any evidence that Mr. Young reviewed that

4   article?

5              MR. GIBBS:  Judge, again, calls for speculation.

6              THE COURT:  Sustained.

7   BY MR. SMITH:

8   Q.   Now, you testified about a December 17, 2014, e-mail

9   marked GX-1-202, and it was an e-mail from an agent pretending

10  to be the Mo alias from Turkey which attached some photographs

11  of the mosque in Turkey.  Do you recall that?

12  A.   Yes.

13  Q.   Why did you send those, those mosque photos to Mr. --

14             MR. GIBBS:  Judge, this witness, the testimony is

15  that he did not send that.  It goes to the --

16  BY MR. SMITH:

17  Q.   Why did the agent pretending to be Mo send the pictures of

18  Turkey to Mr. Young?

19             THE COURT:  Wait, wait, wait.  We've already heard

20  that previously, all right?

21             MR. GIBBS:  It's cumulative.

22             MR. SMITH:  It's actually -- Your Honor, if I may?

23             THE COURT:  What is -- do you have an understanding

24  as to why that was done?  Either you do or you don't.

25             THE WITNESS:  Yes.

Siegfried - Cross                                                512

1          THE COURT:  All right.  I believe he can testify as

2    to what his understanding is, all right?

3          MR. SMITH:  Thank you, Your Honor.

4          THE COURT:  What is your understanding as to why

5    those photographs were sent?

6          THE WITNESS:  My understanding was to show exactly

7    what they had discussed previously before Mo had left, that he

8    would travel to Turkey under the guise of a tour, and he would

9    take photos while he was there to support that he was actually

10   there.

11   BY MR. SMITH:

12   Q.   Didn't your Mo -- you're informant Mo's agent handler,

13   correct?

14   A.   Yes.

15   Q.   Okay.  Didn't Nicholas once tell Mo that he downloaded a

16   picture of the Blue Mosque at work and he liked looking at it?

17   A.   I, I don't recall that.

18   Q.   Okay.  You testified that there was a June 21, 2015,

19   e-mail marked Government Exhibit 1-109, and Mr. Gibbs asked

20   you, "Why didn't you ask him to send Mo money in June 2015?"

21   Do you remember that question from Mr. Gibbs?

22   A.   Yes.

23   Q.   And your response was, "It would have been inconsistent

24   with the legend that Mo had created," correct?

25   A.   Yes.

Siegfried - Cross                                                    513

1  Q.    And that was in June 2015, correct?

2  A.    Yes, I believe so.

3  Q.    Isn't it true that you had decided the investigation was

4  dragging at that point?  Isn't it true that the case agents

5  pretending to be Mo in June 2016 had said this case

6  investigation is slow, and Slow Decline --

7              MR. GIBBS:  Objection, Judge.  This is our prior

8  standing objection to the motivation of other agents, not this

9  agent, and information that was not contained in the e-mails.

10  If it didn't make it into the e-mails, it's not relevant.

11              MR. SMITH:  Your Honor, the relevance of these

12  communications is the purpose of the testimony elicited from

13  Cameron Siegfried is to show that the defendant had a

14  predisposition to support ISIS.  If there are documents from

15  the government's own agents indicating that things are slow

16  because they are not finding the predisposition they want, this

17  is relevant testimony.

18              MR. GIBBS:  Judge, first of all, this is the -- this

19  is the issue we discussed at the bench previously.

20              THE COURT:  Well, we should be at the bench now.

21              MR. GIBBS:  Thank you.

22              (Bench conference on the record.)

23              MR. GIBBS:  So, Judge, this -- I believe on the first

24  day of the trial, we discussed the issue about opening doors,

25  and this is the issue.  If they want to get into this whole

Siegfried - Cross                                                514

1   idea of why the government was very concerned here --

2        THE COURT:  Wait a minute.  I'm hearing noise in the

3   courtroom.  What's going on?

4        The clerk is speaking to the jurors.  Hold on a

5   second.

6        Is there a problem with the jurors?

7        THE CLERK:  No.  Just need to check in.

8        THE COURT:  Okay.  Go ahead.

9        MR. GIBBS:  Okay.  So this is that issue related to

10  opening the door.  If they want to open the door to the idea of

11  why the agents were very concerned and why they did certain

12  things, then, you know, those doors are going to be opened.

13       The problem here, too, is this is not -- as I

14  understand it, these are not communications by this witness, so

15  it doesn't go to his motivation, so --

16       MR. SMITH:  Your Honor, we believe his name is

17  redacted --

18       THE COURT:  Just a second.  I keep hearing the --

19  what is the jury talking about?

20       All right, go ahead.

21       MR. SMITH:  May I explain the relevance of the

22  documents?

23       THE COURT:  Go ahead.

24       MR. SMITH:  Okay.  So, Your Honor, Mr. Siegfried

25  testified that the reason he did not ask Nicholas Young to send

Siegfried - Cross                                                    515

1   money to Syria was because it would have been inconsistent with

2   the legend, and I believe that -- I understand the purpose of

3   Mr. Gibbs' testimony, and I, and I think it's relevant because

4   it shows that we didn't -- the reason the government did not

5   ask him to commit the crime that they later asked him to commit

6   is not because he didn't have the predisposition, but it would

7   have been inconsistent with the legend that Mo had created for

8   his background, but if Your Honor looks at these

9   communications, you'll see that even internally, the agents

10  believed that -- they said they needed to hit the case with a

11  defibrillator to get it going.

12          This is not about the government's mindset.  This is

13  about one party is taking the position that the defendant had a

14  predisposition to support terrorism at this point.  If the

15  government takes the same, an internally inconsistent position,

16  we're allowed to raise the fact that the party making this

17  argument has argued internally the opposite.

18          Your Honor, if I may, there's one more comment that,

19  that is *Brady* in this case.  There's a July 2016 e-mail to the

20  lead case agent saying, "All, maybe Slow Decline is being

21  overly cautious," in response to their request that he send

22  more e-mails to Mo in Syria.

23          So we're not introducing this evidence to show what

24  the government thought, but if an opposing party is taking a

25  position with respect to the defense's predisposition at a

Siegfried - Cross                                                    516

1   certain point and it has issued inconsistent statements on that

2   predisposition, we're entitled to inquire.

3           THE COURT:  Well, first of all, I'm not at all

4   convinced that that is correct, but the second problem you have

5   is the door being opened now to almost all of the concerns that

6   the FBI had about your client because there's so many -- so

7   much smoke in this case, and we're trying to keep as much of

8   that out, but I think it just opens the door completely to

9   everything, because they were concerned about the white

10  supremacist stuff, concerned about radical, other radical

11  issues, they found ammunition.  These are all things that it

12  opens up.

13          So I'm going to go ahead and continue my earlier

14  ruling that this is not relevant to the core issues in this

15  case.  The motivation of the government in this case and the

16  fact that they were frustrated, if they were, and they weren't

17  getting enough, is not relevant to the issues.  So I've made my

18  ruling.  You'll have to live with it.  Thank you.

19          (End of bench conference.)

20          THE COURT:  We're going to have our break in five

21  minutes, folks, because that's about the normal time to take

22  our mid-morning break.

23          Go ahead, Mr. Smith.

24  BY MR. SMITH:

25  Q.   Mr. Siegfried, you testified about an e-mail from the

Siegfried - Cross                                                    517

1    alias Mo to Mr. Young on July 1, 2014.  It was marked

2    Government Exhibit 1-213, and it concerned the Abu Salim

3    Martyrs Brigade.

4            Do you remember that e-mail?

5    A.   Is that the 2015 e-mail?

6    Q.   It's 7/1/2015, Government Exhibit 1-213.  It references

7    Abu Salim Martyrs Brigade.

8    A.   Yes.

9    Q.   This e-mail was sent after Mr. Young returned from Libya,

10   not before, correct?

11   A.   Yes.

12   Q.   In fact, at this time, you had concluded there was no

13   evidence Mr. Young had joined the terrorist group in Libya,

14   correct?

15           MR. GIBBS:  Objection, Judge.

16           THE COURT:  What's the basis of the objection?

17           MR. SMITH:  And more --

18           THE COURT:  Wait a minute.  I'm trying to hear from

19   Mr. Gibbs.

20           MR. SMITH:  Not the documents that Your Honor just

21   ruled on.  There are distinct documents indicating that at the

22   time --

23           THE COURT:  Wait, wait, wait.

24           MR. GIBBS:  Wait.  The question was the witness had

25   concluded.

Siegfried - Cross                                                    518

```
1              THE COURT:  Just stop.
2              Folks, start your break now, all right?  And I'll
3    have you back here, please, at 11:30, all right?  Thank you.
4                        (Jury out.)
5              THE COURT:  All right.  Now, let me hear the question
6    you want to ask the witness.
7              MR. SMITH:  So, Your Honor, there was a government
8    exhibit marked 1-213, and it was an e-mail.
9              THE COURT:  I have it in front of me, all right.
10             MR. SMITH:  July 2015.  And in that e-mail, Mr. Gibbs
11   elicited from the witness his opinion that this was
12   referencing, this Abu Salim Martyrs Brigade comment was
13   referencing a terrorist group in Libya, and, Your Honor, at the
14   point that this e-mail was sent, we have some evidence produced
15   in discovery indicating that the counterterrorism section
16   investigation into Mr. Young had no evidence that this Abu
17   Salim Martyrs Brigade was a terrorist group, was active in the
18   area of Libya where Mr. Young was.
19             So -- and why is this relevant?  Because the
20   government is eliciting this -- these conversations about Abu
21   Salim Martyrs Brigade to establish the point that Mr. Young had
22   a predisposition to support terrorism at this point, but there
23   was no evidence at this time that, that this group had anything
24   to do with terrorism, and, in fact, the government acknowledged
25   as much internally.
```

Siegfried - Cross                                                    519

1          Mr. Siegfried was a part of this investigation.

2          MR. GIBBS:  And, Judge, if I could respond quickly?

3          THE COURT:  Yes.

4          MR. GIBBS:  Because the testimony was misstated.  The

5    e-mail was from the defendant saying, "The group I was with was

6    Abu Salim Martyrs Brig.," B-r-i-g-period.  My only question to

7    the agent was, "Who first brought up the Abu Salim Martyrs

8    Brigade?"

9          And he said, "The defendant," and I moved on from

10   that.

11         So I didn't ask him anything about the nature of the

12   group or what the FBI believed about the group, which isn't

13   relevant anyway.

14         The e-mail speaks for itself.  It's the defendant's

15   statement.  He volunteered that information to the person he

16   believed was Mo.  I didn't touch it beyond just pointing out

17   that the agent and the FBI didn't bring that up at all.  The

18   defendant brought it up himself, and that's the extent of the

19   testimony.

20         THE COURT:  That's how I recall the testimony.

21         MR. SMITH:  And, Your Honor, the only -- the

22   relevance of eliciting that comment at all is to establish

23   Mr. Young's predisposition to materially support terrorism.

24         THE COURT:  But it's your client who put the

25   statement in the e-mail.  The government didn't.  That's the

Siegfried - Cross                                                    520

1   whole point.  Your client in his words includes the

2   statement, "People from the Abo Salem Suhada Brig. is who I was

3   with mostly.  I know there has been some problems there where

4   they are, but they are good brothers."

5           That's it.

6           MR. SMITH:  Would Your Honor agree that if it were --

7   if the Court could take judicial notice of the fact that Abu

8   Salim Martyrs Brigade is not a terrorist group hypothetically,

9   would Your Honor find that testimony relevant in this case

10  about Mr. Young commenting about the Abu Salim Martyrs Brigade?

11          THE COURT:  Oh, I, I think it's clearly relevant to

12  this case.  It shows among other things that your client has

13  been in a part of the world where groups of radical activity

14  are working.  I'm not going to get into taking judicial notice

15  of something like that.  I don't have any information before me

16  one way or the other, but I think this is a line of questioning

17  for this witness in particular that's not going anywhere.

18          So as I said, I'm going to sustain that objection.

19          MR. GIBBS:  Right.  I should just note for the

20  record, Judge, we will call a witness, our expert, who will be

21  able to testify about Abu Salim Martyrs Brigade.  This witness

22  just doesn't have the basis to do that.

23          THE COURT:  All right.

24          MR. GIBBS:  So thank you.

25          MR. SMITH:  And one final question, Your Honor?

Siegfried - Cross                                              521

1              THE COURT:  Yes.

2              MR. SMITH:  Would Your Honor find it relevant to

3    examine the witness on the FBI -- we have an internal document

4    here indicating that the FBI understood in March 14, 2016, that

5    Mr. Young told the informant that his contacts overseas had

6    views opposing ISIS.

7              MR. GIBBS:  Judge, again, the issue we're having, and

8    we had this discussion at the bench, sort of these internal

9    deliberations with the FBI are not relevant.  It does open the

10   door to why the FBI was so concerned and, you know, put these

11   resources on this case, but, you know, again, asking this

12   witness about internal deliberations that he was likely not a

13   part of and that never resulted in communications with the

14   defendant is just not relevant.  It has no -- you know, I think

15   Your Honor used the words "there's a lot of smoke here," and

16   you're trying to avoid the smoke.  That's a huge amount of

17   smoke here.

18             THE COURT:  I'm sustaining the objection.  All right,

19   we're on recess until 11:30.

20             (Recess from 11:18 a.m., until 11:31 a.m.)

21                    (Jury present.)

22             THE COURT:  All right, Mr. Smith.

23   BY MR. SMITH:

24   Q.   Agent Siegfried, you testified that on -- there was an

25   e-mail sent by Mr. Young on February 16, 2016, it was marked

Siegfried - Cross                                                    522

1   GX-1-219, and it referenced the Tor secure app.  Do you

2   remember that e-mail?

3   A.   Yes, I do.

4   Q.   Did you testify that it was Mr. Young who first raised the

5   subject of communicating on a secure app with the informant?

6   A.   Yes.

7   Q.   You also testified about an e-mail that Mo, the alias Mo

8   sent to Mr. Young on June 14, 2016, correct, in which the alias

9   Mo attempts to solicit the defendant on texting on a more

10  secure app?  This was Government Exhibit 1-221.  It's an e-mail

11  sent from the alias Mo on June 14, 2016?

12          MR. GIBBS:  Judge, I don't believe that was one of

13  his exhibits.  He had left by April.

14          THE COURT:  That's correct.

15          MR. SMITH:  It's -- Your Honor, I'd like to hand up

16  an e-mail dated April 18, 2016, from the informant Mo to the

17  defendant.

18  Q.   Have you ever seen --

19          MR. GIBBS:  Judge, before he starts testifying again,

20  that is just a piece of paper.  It's not marked again.

21          THE COURT:  Well, these are not exhibits.  They're

22  not going into evidence.

23          MR. SMITH:  They're impeachment documents.

24          THE COURT:  They're a piece of paper that's just

25  being used to not impeach but to refresh this man's memory.

Siegfried - Cross                                                      523

1    That's all right.

2              MR. GIBBS:  Okay.

3              THE COURT:  It's not going in the record.

4              MR. SMITH:  Thank you, Your Honor.

5    Q.   What is that e-mail that you're looking at?

6    A.   It's an e-mail from Mo's e-mail account to the defendant.

7    Q.   And have you ever seen that e-mail before?

8    A.   Yes.

9    Q.   Okay.  And is it true that in that e-mail, the alias Mo

10   attempts to solicit a conversation with the defendant on a

11   secure app?

12   A.   Yes.

13   Q.   And do you know when the defendant responded to that

14   e-mail dated April 18, 2016?

15   A.   I wasn't around when he responded.

16   Q.   One of, one of your exhibits was Government Exhibit 1-221.

17   It was dated June 14, 2016, and it was from the defendant to

18   the alias Mo.  Do you recall --

19             MR. GIBBS:  Objection again, Judge.  He left in April

20   2016.  We didn't offer that exhibit through this witness.

21             THE COURT:  I'm going to sustain the objection.  Get

22   it from the correct witness.  There will be another witness.

23   BY MR. SMITH:

24   Q.   Isn't it true -- you are the -- you are a case agent on

25   this case.  You are a case agent.  You read this e-mail on

Siegfried - Cross                                                    524

1   April 18, 2016.  You've reviewed it before, correct?

2   A.   Yes.

3   Q.   Isn't it the case that when the defendant responded to

4   that e-mail, he indicated, "I really don't trust electronic or

5   e-mail communications.  Don't feel comfortable on this"?

6            MR. GIBBS:  Objection, Judge.  That's the June --

7            MR. SMITH:  "I don't really do the" --

8            THE COURT:  Wait, wait, wait.  When there's an

9   objection, you have to stop so we can hear the objection.

10            MR. GIBBS:  Objection.  I believe that's the text

11   from the June e-mail that was just ruled that the defendant

12   (sic) didn't have a basis to testify to because he had left the

13   FBI by that time.

14            THE COURT:  What are you reading from?

15            MR. SMITH:  This is not a text.  This is an e-mail

16   produced to the defense in discovery.

17            THE COURT:  It doesn't make any difference.  What's

18   the date of the e-mail?

19            MR. SMITH:  The date of the e-mail is June 14, 2016.

20            THE COURT:  Fine.  It's after this witness is no

21   longer involved, so I'm sustaining the objection.  You need to

22   move on to another line of questioning.

23   BY MR. SMITH:

24   Q.   So, Agent Siegfried, at several points during the e-mail

25   exchange, during the e-mail exchange in which you were drafting

Siegfried - Cross                                              525

1  e-mails with the alias Mo, the defendant, what was the

2  investigative purpose of having the alias write to Young about

3  Syrian butchery?

4  A.    I'm not sure what you're referring to.

5  Q.    Are you familiar with the fact that there are e-mails

6  between the defendant and the alias Mo between October 2014 and

7  June -- and April 2016 concerning the Syrian government's

8  butchery of its civilians?  Are you familiar with those

9  e-mails?  The alias Mo would write to Mr. Young in e-mails in

10 this period concerning the Syrian government's slaughter of its

11 people, correct?

12 A.    I believe --

13        MR. GIBBS:  Judge, again, we entered all the e-mails.

14 If he wants to show him one, I think that would be the best way

15 to approach this witness.

16        MR. SMITH:  Your Honor, I'm entitled to ask --

17        THE COURT:  I'm overruling the objection.  This is

18 cross-examination, and this is one of the two agents who was

19 handling Mo and handling this aspect of the investigation.  So

20 I'm overruling that objection.

21        MR. SMITH:  Thank you, Your Honor.  And I believe the

22 witness just said yes, but he was about to explain.

23        THE WITNESS:  Yeah.  I believe there may have been

24 reference to that at one point.  I don't recall exactly which

25 e-mail.

1  BY MR. SMITH:

2  Q.   So do you understand as the handler agent for Mo what the

3  investigative purpose would have been to write about the Syrian

4  butcheries in Syria in the e-mail communications with

5  Mr. Young?

6            MR. GIBBS:  Judge, again, this goes back to the FBI

7  deliberations.

8            THE COURT:  Yes.  You continue to go on that theme,

9  which I have said is outside of the proper way of defending

10  this case.  I've made the ruling.  You need to go on now,

11  Mr. Smith.

12            MR. SMITH:  Your Honor, this is a slightly different

13  point.  If I may, may we approach the bench?

14            THE COURT:  You keep asking about strategy.  Strategy

15  is not really relevant to this case.

16            MR. SMITH:  This concerns the defendant's mindset,

17  Your Honor.

18            THE COURT:  No.  I'm sustaining the objection.  Let's

19  move on.

20  BY MR. SMITH:

21  Q.   In this time period between October 2014 and June 2016,

22  the alias Mo would write e-mails to the defendant about the

23  alias Mo's mother, correct?

24  A.   I believe we reference it on at least one occasion.

25  Q.   And was the reference to Mr. Young's -- Mr. -- the

Siegfried - Cross                                                      527

1  undercover informant Mo's mother, was that in connection

2  with -- was that designed to investigate Mr. Young's potential

3  material support for terrorism?

4           MR. GIBBS:  Objection, Your Honor.

5           THE COURT:  Sustained.

6  BY MR. SMITH:

7  Q.  So we just talked about these e-mail -- this e-mail

8  exchange between the informant Mo, the alias of the informant

9  Mo on April 18, 2014 -- 2016, and June 14, 2016, correct?

10          THE COURT:  I'm not sure the dates are correct.  Try

11 that again.

12          MR. SMITH:  I just examined the witness about an

13 e-mail dated April 18, 2016, that was marked Government Exhibit

14 1-116.  It's 2016.

15          THE COURT:  116, do you have it there?  It should be

16 in the book.

17          MR. SMITH:  This is the solicitation e-mail we just

18 discussed.

19 Q.  You reviewed this e-mail on April 18, 2016, in which the

20 undercover informant solicits a communication on the undercover

21 app with the defendant?

22 A.  Yes.

23 Q.  It's true that the defendant did not respond to this

24 communication for two months, correct?

25          MR. GIBBS:  Judge, again, we've established this

528

1    witness left at the end of April.  He didn't --

2              THE COURT:  Sustained.

3              MR. GIBBS:  Thank you.

4              MR. SMITH:  That's it, Your Honor.  Thank you.

5              THE COURT:  All right.  Is there any redirect?

6              MR. GIBBS:  The only thing I need to do, Judge, is

7    clean up one thing.  I believe we offered Government Exhibit

8    1-220, and when I read the list of exhibits we were offering in

9    order to speed things up, I don't think I mentioned that one.

10   That was the second February 16, 2016, e-mail.  We would ask to

11   move that into evidence as well.

12             THE COURT:  Any objection?

13             MR. SMITH:  No objection.

14             THE COURT:  All right, it's in.

15             (Government's Exhibit No. 1-220 was received in

16   evidence.)

17             THE COURT:  All right, does anybody have any further

18   questions for this witness?

19             MR. GIBBS:  I don't, Judge.  Thank you.

20             THE COURT:  He will not be recalled in the

21   government's case.

22             MR. GIBBS:  No, because we took him all the way to

23   the end.

24             THE COURT:  All right.  Does the defense expect to

25   call this witness again, Mr. Smith?

529

1            MR. SMITH:  Your Honor, whether we call this witness

2    will depend on how the government presents certain

3    communications later.

4            THE COURT:  That's fine.  That's the answer.

5            MR. SMITH:  Okay.

6            THE COURT:  So, Agent, you're not excused as a

7    witness.  You don't have to be here the rest of today, I can

8    guarantee you that, but you're not to discuss your testimony or

9    anything you've seen or heard in court with any witness who has

10   not yet testified, all right?

11           THE WITNESS:  Yes, ma'am.

12           THE COURT:  All right, thank you.

13                        (Witness stood down.)

14           THE COURT:  Call your next witness.

15           MR. GIBBS:  Judge, this is Special Agent Smith, and

16   this will require the screen.

17           THE COURT:  All right.  Folks, you're getting your

18   exercise this morning.  It only takes a couple of minutes.  I'm

19   actually going to stay in session, but you-all go out and just

20   stretch your legs, and we'll get you right back in here.

21                        (Jury out.)

22           THE COURT:  We need to get the screen up.

23           MR. SMITH:  Your Honor, may I address just one point

24   that has been concerning to Your Honor over the course of these

25   cross-examinations, which is which particular government agent

530

1  should be questioned about certain documents, is it this agent

2  or the next, and the reason, Your Honor, the defense is

3  attempting to question certain agents about time periods that

4  might not exactly coincide with their time in the investigation

5  is the government has not informed us which agents it will be

6  using to present which evidence.

7          Now, there was a team, there was a whole team of

8  agents who were on this case, and we have no information about

9  which agent will present which evidence.  So there's a risk if

10  we don't attempt to introduce certain evidence with Witness 1,

11  we'll lose that opportunity if Witness 2 does not present on

12  the subject matter we're trying to inquire into.

13          THE COURT:  Well, I mean, part of that, I think,

14  could have been worked out ahead of time.

15          Would the government have objected -- I mean,

16  obviously, they don't have to tell you exactly what every

17  witness is going to testify to.  This case has gone on for some

18  period of time, and there are obviously multiple agents who

19  have worked on it.

20          Has Minichello been on this case from the very

21  beginning?

22          MR. GIBBS:  I don't think so.  He left in 2015.

23          MR. KROMBERG:  May I address that, Judge?

24          THE COURT:  Yes, go ahead, Mr. Kromberg.  Up at the

25  lectern.

531

1          MR. KROMBERG:  Agent Minichello was not the agent

2    from the beginning.  Agent Jones was the agent from the

3    beginning.  Agent Jones is not being called to testify because

4    he left when -- quite a while ago.  Agent Minichello replaced

5    Agent Jones, and Agent Caslen replaced Agent Minichello.

6          THE COURT:  All right.

7          MR. KROMBERG:  But to answer, to answer Mr. Smith's

8    question, if he focused on the exhibits that we're introducing,

9    he would have the right witness, but he's asking questions

10    about the exhibits that haven't yet been introduced.

11          THE COURT:  All right.

12          MR. KROMBERG:  It's also true that if he wants to

13    call anyone in the defense case, he can call them, too.

14          THE COURT:  All right, to make things easier, to keep

15    this case moving, I will ask the government just to do a

16    timeline.  That's all that's needed.

17          MR. SMITH:  Thank you, Your Honor.

18          MR. KROMBERG:  In fact, thank you.  When I submitted

19    a timeline to the defense, they objected to it, but we want to

20    present a timeline to Special Agent Caslen's testimony as a

21    government exhibit to set forth just the concrete facts of what

22    happened when, and we're going to present that, as I hope will

23    be admitted, as a summary chart to go to the jury to help when

24    things happened.

25          THE COURT:  Here's what we'll do:  You take your

532

1    timeline and just put agents on it.  In other words, Agent

2    So-and-so and Agent So-and-so were here to here on the

3    timeline.  There may be overlap, Agent So-and-so and Agent

4    So-and-so were here.

5            That should give the defense what they need, all

6    right?

7            MR. KROMBERG:  That will be fine.

8            THE COURT:  Fine.  Let's move on then.  We're ready

9    to bring the jury back in.

10           MR. GIBBS:  Your Honor, just one note.  With Special

11   Agent Smith, he's testifying to the December interviews with

12   the defendant.

13           THE COURT:  Hold on one second before we bring the

14   jury in.

15           MR. GIBBS:  Both of the December 3 and December 5

16   interviews were recorded.  We're going to play the entirety of

17   the last one because it's short.  We're going to play clips, a

18   few clips of the first interview.  I think the sound quality is

19   better than it was yesterday, but Your Honor had mentioned

20   headphones.  If we have them available, certainly I think it

21   would be helpful.

22           THE COURT:  Well, we don't have 14.  I mean, you-all

23   need to make some commonsense approaches to the Court about

24   logistics.  I would expect that an interview ought to have been

25   well recorded.  So it better be because the tapes have been, I

Smith - Direct                                                          533

1   think, really very, very unfair to the jury to have to listen

2   to that kind of evidence from both sides, all right?

3            MR. GIBBS:  Understood.

4            THE COURT:  All right, let's get the jury in here.

5   Is the witness available?  We can bring him in while they're

6   coming in.

7                      (Jury present.)

8            THE COURT:  All right, folks, you can all have a

9   seat.

10           All right, Mr. Gibbs?

11            SA SMITH, GOVERNMENT'S WITNESS, AFFIRMED

12                     DIRECT EXAMINATION

13  BY MR. GIBBS:

14  Q.   Good morning, sir.

15  A.   Good morning.

16  Q.   Sir, for purposes of this proceeding, you will be

17  testifying as Special Agent Smith, correct?

18  A.   Yes, sir.

19  Q.   And were you working as a task force officer for the FBI

20  beginning in 2010?

21  A.   Yes, sir.

22  Q.   And at some point during your time with the FBI, did you

23  participate in an investigation of the defendant, Nicholas

24  Young, as well as a number of other people?

25  A.   Yes, I did.

Smith - Direct                                                      534

1   Q.   All right.  Is Nicholas Young here in court?

2   A.   Yes, sir.

3   Q.   Can you point him out and identify what he's wearing?

4   A.   He's in the -- sitting between his defense counsel at the

5   defendant's table.

6              THE COURT:  Any objection to the identification?

7              MS. MORENO:  No objection.

8              THE COURT:  All right.  The witness has identified

9   the defendant.

10             MR. GIBBS:  Thank you, Judge.

11  Q.   Special Agent Smith, over the course of the investigation,

12  was a CHS known as Mo introduced to the defendant?

13  A.   Yes, sir.

14  Q.   And at some point in time, did Mo supposedly leave the

15  country?

16  A.   Yes, sir.

17  Q.   And prior to supposedly leaving the country, what did Mo

18  and the defendant do so that they would be able to communicate?

19  A.   They established a -- e-mail accounts for both of them,

20  respectively.

21  Q.   And once Mo supposedly left the country, who was actually

22  controlling Mo's e-mail account?

23  A.   A combination of two colleagues on the same task force.

24  Q.   So these were FBI agents?

25  A.   One FBI agent and one task force officer.

Smith - Direct                                                      535

1   Q.   Okay.  And by December of 2015, how long had the defendant

2   been corresponding with Mo's e-mail account?

3   A.   Over a year.

4   Q.   And by December of 2015, was the decision made to

5   interview the defendant?

6   A.   Yes, sir.

7   Q.   And where did that interview take place?

8   A.   The first interview occurred at the Panera in Fairfax.

9   Q.   And that's in Northern Virginia?

10  A.   Yes, sir.

11  Q.   And you said that's in Fairfax County?

12  A.   Yes, sir.

13       MR. GIBBS:  Your Honor, we would just ask for

14  judicial notice that that occurred in the Eastern District of

15  Virginia.

16       THE COURT:  I'll take such notice.

17       MR. GIBBS:  Thank you.

18  Q.   And you said the date of that interview was December 3,

19  2015?

20  A.   That's correct.

21  Q.   All right.  And how did you contact the defendant to be

22  able to interview him at that Panera bread in Fairfax?

23  A.   We called him.

24  Q.   All right.  And who specifically called him?

25  A.   I did.

Smith - Direct                                                          536

1   Q.   And what did you say to him?

2   A.   We called -- I don't remember the exact words I used, but

3   I -- we asked if he could help with a matter and meet with us.

4   Q.   Did you give him any more details than that?

5   A.   No.

6   Q.   And describe what happened.  Who got to the Panera first?

7   A.   Myself and Special Agent Caslen.

8   Q.   All right.  And was he the other person in the interview?

9   A.   Yes, sir.

10  Q.   And how long did it take the defendant to arrive?

11  A.   I can't remember, maybe 30 minutes or so.  We were there

12  maybe 20-30 minutes earlier.

13  Q.   And once the defendant arrived, is that when the first

14  interview took place?

15  A.   Yes, sir.

16  Q.   And was that interview recorded?

17  A.   Yes, sir.

18  Q.   And did the defendant know that?

19  A.   I -- no, he did not.  We did not advise the defendant that

20  we were recording the interview.

21  Q.   And when that interview first began, what were you asking

22  the defendant about initially?

23  A.   We interviewed him initially, asked him about an associate

24  of his that -- named Peshwaz Waise, another Northern Virginia

25  resident.

Smith - Direct                                                        537

1                MR. GIBBS:  And if we can just pull up 9-106 briefly?

2    Q.   Do you recognize that individual?

3    A.   I do.

4    Q.   And who is that?

5    A.   That is Peshwaz Waise.

6    Q.   So that's the person you were asking the defendant about?

7    A.   Correct.

8    Q.   All right.  And next if you could take a look, Special

9    Agent, at Government Exhibit 5-101-1?  I believe there -- on

10   the lectern, there should be discs up there, right?  Yep.

11   A.   Okay.

12   Q.   Do you recognize that?

13   A.   I do.

14   Q.   And that's a disc, right?

15   A.   Actually, it's a transcript.

16   Q.   Okay.  Is there a disc with it?

17   A.   No, sir.

18               MR. GIBBS:  If I could indulge the court security

19   officer, we're going to be -- well, let's start with 5-101-1.

20   We'll ultimately enter all the ones in that series.

21               THE COURT SECURITY OFFICER:  5-101-1?

22               MR. GIBBS:  Yes, sir, 5-101-1.

23               THE COURT:  It's again just a piece of paper.

24   Where's your CD?

25               MR. GIBBS:  I believe it's in the bin, correct?

Smith - Direct                                                          538

1              THE COURT SECURITY OFFICER:  There's no disc in here.

2              THE COURT:  Are there any discs over there at all?

3              THE COURT SECURITY OFFICER:  There are some that were

4    previously reviewed, Your Honor.

5              MR. GIBBS:  Judge, we actually have it.  I can hand

6    it up.  I apologize for that.

7              THE COURT:  All right.  We have one over here.

8    Mr. van Roekel?

9              Does that have the label on it?

10             MR. GIBBS:  It does, Your Honor.

11             THE COURT:  All right.  5-101-1, is that correct?

12             MR. GIBBS:  It is.  And actually, we put all the

13   clips on there, so I believe it's 101-1 through 101-7.

14   Q.   Is that correct?

15   A.   Yes, sir.

16   Q.   Okay.  And you reviewed that prior to your testimony here

17   today?

18   A.   I did.

19             MR. GIBBS:  Judge, we would move in the disc and ask

20   to play the first clip along with the transcript that

21   accompanies it.

22             THE COURT:  Any objection?

23             MS. MORENO:  No objection, Your Honor, as long as

24   it's described as clips, individual clips from the interviews.

25             MR. GIBBS:  Correct.

Smith - Direct                                                           539

1           THE COURT:  Clips would be an excerpt.  It's not the

2    entire interview, all right.  But we'll have to talk about how

3    it all goes back to the jury, all right?  You're only playing

4    one clip, one portion of that.

5           MR. GIBBS:  Right.  And I can maybe clarify that a

6    bit.

7    Q.   So, Special Agent Smith, when you conducted the interview

8    with the defendant, with Special Agent Caslen present, how

9    long -- again, just roughly ballpark, how long were you at the

10   Panera there with the defendant?

11   A.   I would say approximately two hours, two-and-a-half hours

12   approximately.

13   Q.   Okay.  And obviously, the clips we're going to play do not

14   amount to anywhere near that time, correct?

15   A.   No, sir.

16   Q.   Okay.  So these are, these are excerpted from the longer

17   interview itself, right?

18   A.   Yes, sir.

19           MR. GIBBS:  All right, thank you.

20           And if we can start with 101-1 and 101-1T?

21           THE COURT:  T being the transcript?

22           MR. GIBBS:  Correct.

23           (Government's Exhibit No. 5-101-1 was played.)

24   BY MR. GIBBS:

25   Q.   Now, Special Agent, in that recording, the defendant said

Smith - Direct                                                    540

1   when he was asked about Mo that Mo had left a year ago on

2   vacation and that he went to Turkey.  Now, by this point in the

3   investigation, what had the FBI agent who was posing as Mo led

4   the defendant to believe that Mo was doing?

5   A.   He was a fighter for the Islamic State.

6   Q.   And when Mo was still in this area here in Northern

7   Virginia, who helped him come up with the story that he was

8   going to Turkey for a vacation?

9   A.   The defendant, Mr. Young.

10          MR. GIBBS:  Next if we could turn to Government

11  Exhibit 5-101-2, which again is a clip of the December 3, 2015,

12  interview?  We'd ask to publish that along with the transcript.

13          THE COURT:  All right.

14          (Government's Exhibit No. 5-101-2 was played.)

15          MR. GIBBS:  All right, next I'd like to turn to clip

16  3, which is 5-101-3T, and ask to publish that by playing it

17  along with the transcript.

18          THE COURT:  All right.

19          (Government's Exhibit No. 5-101-3 was played.)

20  BY MR. GIBBS:

21  Q.   Now, Special Agent, in that clip, the defendant said at

22  one point that ISIS declared the Caliphate in the summer of

23  2014.  Do you recall that?

24  A.   I do.

25  Q.   And was that your understanding as well?

Smith - Direct                                                          541

1   A.   Yes, it is.

2   Q.   And at one point, the defendant brought up Peshwaz, and he

3   sort of compared him to Mo and said that Peshwaz was always

4   talking about religion and Mo wasn't.  Who was Peshwaz again?

5              MS. MORENO:  First of all, objection.  Leading.

6   Misstates the evidence.

7              THE COURT:  It is leading, so I'm sustaining the

8   objection.

9   BY MR. GIBBS:

10  Q.   Who is Peshwaz?

11  A.   Peshwaz is a Northern Virginia resident, also a subject of

12  the FBI.

13  Q.   And that was the person whose photograph you identified

14  earlier?

15  A.   Yes, sir.

16             MR. GIBBS:  Thank you.

17             And, Your Honor, we would next move into evidence and

18  play Exhibit 5-101-4.  That's another clip from the December 3

19  interview.

20             THE COURT:  All right, it's in.

21             (Government's Exhibit No. 5-101-4 was received in

22  evidence and was played.)

23  BY MR. GIBBS:

24  Q.   Special Agent Smith, in that quote when the defendant was

25  asked about where Mo was, he said, "Maybe he was going to

Smith - Direct                                                    542

1   Turkey."

2           Where had Mo actually led the defendant to believe

3   that he was going?

4   A.   To the Islamic State's capital of Raqqah, in Syria.

5   Q.   And what was the story that the defendant and Mo came up

6   with to explain what he would be doing overseas?

7   A.   That he would be taking a tour in Turkey.

8   Q.   And towards the end of that clip, Special Agent Caslen in

9   talking to the defendant said, "You're a cop."  Where did the

10  defendant work at that time?

11  A.   He was a Metro Transit Police officer.

12          MR. GIBBS:  Your Honor, if we could play Exhibit

13  5-101-5?  That's another clip from the December 3 interview.

14          THE COURT:  All right.

15          (Government's Exhibit No. 5-101-5 was played.)

16          MR. GIBBS:  Your Honor, that was a short clip.  We'll

17  just go straight to the next one, which is 5-101-6T.

18          THE COURT:  All right.

19          (Government's Exhibit No. 5-101-6 was played.)

20          MR. GIBBS:  And then let's go to the last clip of the

21  December 3, 2015, interview, which is clip 7.  It's 5-101-7T.

22  If we could play that along with the recording?

23          THE COURT:  All right.

24          (Government's Exhibit No. 5-101-7 was played.)

25  BY MR. GIBBS:

Smith - Direct                                                      543

1  Q.   All right.  Special Agent Smith, at the beginning of that

2  last clip, the defendant said he hadn't had any contact with Mo

3  since October 2014.  Do you recall that?

4  A.   Yes, sir.

5  Q.   All right.  As of December of 2015, what sort of

6  communicating was the defendant doing with the person he

7  believed was Mo?

8  A.   They were exchanging e-mail correspondence.

9  Q.   And, in fact, later in that clip, he said that he used to

10  have an e-mail address for Mo, and he thought it was something

11  like mmohammad.  In fact, what was the e-mail address that the

12  defendant was using to communicate with the person he believed

13  was Mo?

14  A.   The e-mail address that the defendant was using was

15  essakobayashi@mail.com.

16  Q.   And the essakobayashi, that was the defendant's e-mail

17  address?

18  A.   Yes, sir.

19  Q.   And what was Mo's e-mail address?

20  A.   Mo utilized V4Vendetta@mail.com.

21  Q.   Thank you.

22        Now, Special Agent Smith, was a second interview with

23  the defendant conducted?

24  A.   Yes, sir.

25  Q.   How long after that first interview was the second one?

Smith - Direct                                                          544

1    A.    Approximately two days.

2    Q.    And who conducted the second interview?

3    A.    Myself and Special Agent Caslen.

4    Q.    And where did that take place?

5    A.    That occurred outside his residence, also in Fairfax

6    County.

7              MR. GIBBS:    Again, Judge, we would ask that the Court

8    take judicial notice of the fact that it occurred in the

9    Eastern District of Virginia.

10             THE COURT:    Yes, we'll take such notice.

11             MR. GIBBS:    Thank you, Judge.

12   Q.    Was the defendant expecting you and Special Agent Caslen

13   when you arrived?

14   A.    No, sir.

15   Q.    And you said the interview took place outside of his

16   house?

17   A.    Well, the defendant stood inside his house, and myself and

18   Special Agent Caslen stood outside on his front step.

19   Q.    And was the second interview also recorded?

20   A.    Yes, it was.

21             MR. GIBBS:    And if we could, Your Honor, I would ask

22   to play that interview, and if I could hand up the disc?

23             THE COURT:    What exhibit number?

24             MR. GIBBS:    It's 5-102.

25             THE COURT:    Is there any objection to that?

Smith - Direct                                                      545

 1              MS. MORENO:  No objection.

 2              THE COURT:  No?  It's in.

 3              (Government's Exhibit No. 5-102 was received in

 4    evidence.)

 5    BY MR. GIBBS:

 6    Q.   First of all, do you recognize that?

 7    A.   I do.

 8    Q.   Do you see your initials on there or your name?

 9    A.   I wrote "Smith" on there and the date.

10    Q.   You reviewed this prior to your testimony today?

11    A.   I did.

12              MR. GIBBS:  All right, we would ask to play 5-102 and

13    project the transcript along with it.

14              THE COURT:  All right, go ahead.

15              (Government's Exhibit No. 5-102 was played.)

16    BY MR. GIBBS:

17    Q.   Now, Special Agent Smith, toward the beginning of that

18    clip, the defendant had said Mo had, quote, talked about going

19    with, like, a tour group or something.  Prior to leaving, what

20    had Mo actually led the defendant to believe was the purpose of

21    his trip?

22    A.   To join the Islamic State.

23    Q.   And later in that clip, the defendant was asked about Mo's

24    e-mail, and he said it was probably in a car he had recently

25    sold.  During this time, what was the defendant using to

Smith - Cross                                                          546

 1  communicate with the person he believed was Mo?

 2  A.    E-mail addresses that they set up together.

 3  Q.    And what was the particular e-mail address he had for Mo?

 4  A.    V4Vendetta@mail.com.

 5  Q.    And later in that clip, the defendant denied knowing

 6  anyone who gave Mo guidance or advice on his travel.  Before Mo

 7  left for his trip, who was the person who gave him a great deal

 8  of guidance or advice for his travel?

 9  A.    Nicholas Young.

10          MR. GIBBS:  Thank you, sir.  I believe the defense

11  will have some questions for you.

12          THE COURT:  Okay.  Cross?

13                    CROSS-EXAMINATION

14  BY MS. MORENO:

15  Q.    Agent Smith, now, when you went to see Nick Young on

16  December 3, you were with Special Agent Caslen, correct?

17  A.    Yes, ma'am.

18  Q.    And that particular interview was about two hours, right?

19  A.    Yes, ma'am.

20  Q.    Two-and-a-half hours?

21  A.    Approximately, yes.

22  Q.    And not only did you have a recording, but you generated

23  what's called a 302 report on the basis of that first

24  interview, correct?

25  A.    Yes, ma'am.

Smith - Cross                                                          547

1   Q.   And you've reviewed that particular report before

2   testifying here today, right?

3   A.   Yes, ma'am.

4   Q.   And the same is true of the second interview on

5   December 5, two days later.  We heard the clip on that just

6   now, right?

7   A.   Yes, ma'am.

8   Q.   And you also generated another 302 on that, correct?

9   A.   Yes, ma'am.

10  Q.   And that's just a report summarizing the interviews,

11  right?

12  A.   Yes, ma'am.

13  Q.   And you've also reviewed that one as well?

14  A.   Yes, ma'am.

15  Q.   Okay.  Because I'm going to ask you some questions about

16  that.

17           But first of all, when you called Nick Young, you had

18  asked him to meet you gentlemen at the Panera; is that right?

19  A.   That's my recollection.  I know that's where we ended up

20  in doing the interview.  I believe we, we suggested that

21  location.  I don't recall precisely where we said to meet.  It

22  just, that's where we ended up meeting.

23  Q.   Now, if -- Nick Young knew that he was meeting with you in

24  your capacity as an FBI agent, correct?

25  A.   Yes, ma'am, but I'm not an FBI.  I'm a task force officer.

Smith - Cross                                                        548

1   Q.   Sorry.  But he did -- he was advised that Special Agent

2   Caslen over here was going to meet with him, correct?

3   A.   I don't remember if I said over the phone who he'd be

4   meeting with, but I, I thought I mentioned that I was going to

5   be in the interview as well.

6   Q.   Here's my question:  He knew he was meeting with federal

7   law enforcement officers, correct?

8   A.   Yes, ma'am.  Yes, ma'am.

9   Q.   All right.  And when he went to see you, did he bring a

10  lawyer?

11  A.   No, ma'am.

12  Q.   Okay.  And this interview that lasted two-and-a-half

13  hours, at any time, he could have gotten up and left, correct?

14  A.   Yes, ma'am.

15  Q.   And at any time, he could have asked for a lawyer, right?

16  A.   Yes, ma'am.

17  Q.   But he continued to talk to you, correct?

18  A.   Yes, he did.

19  Q.   That entire interview.  And, in fact, two days later, he

20  spoke to you?

21  A.   Yes, he did.

22  Q.   And at no time did he want counsel with him?

23  A.   He never said anything like that.

24  Q.   Right.  Now, he -- so in that first interview, which is

25  the long interview, December 3, I want to focus your attention

Smith - Cross                                                          549

1    on that, you talked about a variety of -- you talked about a

2    few people.  You talked about Peshwaz.

3    A.    Yes, ma'am.

4    Q.    Okay.  And you know that Mr. Young hadn't seen this

5    gentleman, Peshwaz, for a couple of years, right?

6    A.    That's what he told us.

7    Q.    Okay.  And you then asked him a number of different

8    questions about Mo, correct?

9    A.    Yes, ma'am.

10   Q.    And he had told you -- you had asked him where, if he

11   had -- if this gentleman, Mo, had family overseas, right?

12   A.    Yes, ma'am.

13   Q.    And he told you that he thought that he had some family in

14   Palestine, correct?

15   A.    Yes, ma'am.

16   Q.    By the way, there was a -- in one of the clips, there was

17   something about Mr. Young didn't speak the language or Arabic,

18   and I think it was cut off.  You have no evidence that

19   Mr. Young speaks Arabic, do you?

20   A.    I have none.

21   Q.    Okay.  I mean, you've never heard him on any tapes or

22   anything or in conversations speaking Arabic, right?

23   A.    No, ma'am.

24   Q.    You don't know that to be the case, correct?

25   A.    I do not believe -- I do not know him to speak Arabic.

Smith - Cross                                                        550

1   Q.   Okay.  Now, it was kind of -- and forgive me for

2   characterizing it, but with you and Mr. Caslen, the both of you

3   were asking Nick Young questions, right?

4   A.   Yes, ma'am.

5   Q.   And it was kind of like a tag team between the two of you,

6   correct?

7   A.   Yes, ma'am.

8   Q.   Right.  Because you, you were -- and a lot of the

9   conversations, you were also trying to, shall we say, build

10  some sort of rapport with Mr. Young, correct?

11  A.   Yes, ma'am.

12  Q.   Okay.  Because sometimes either you or Special Agent

13  Caslen were talking about how -- talking about how perhaps ISIS

14  had been overexaggerated in the news, right?

15  A.   Yes.

16  Q.   You remember some of those comments.

17          But, of course, that's not how you really felt,

18  right?

19  A.   No, ma'am, I do not -- did not.

20  Q.   Now, you asked specifically about Mo and Mo's opinions

21  about the Islamic State a number of times in a number of ways,

22  fair?

23  A.   Yes, ma'am.

24  Q.   Okay.  And what you said was -- what Mr. Young would say

25  at various times, he would say yes, that Mo had a generally

Smith - Cross                                                            551

1   favorable opinion of Islamic State.  He told you that, right?

2   A.   Yes, ma'am.

3   Q.   Okay.  And, in fact, Mr. Young had admitted to you that Mo

4   could have gone to fight with the Islamic State, right?

5   A.   Yes, something to that effect.

6   Q.   Right.  You remember him saying that, correct?

7   A.   He said -- I believe it was, it could have been inferred,

8   it's a possibility that he could have gone, I think, was as far

9   as an affirmative statement that he had joined the Islamic

10  State that he stated on that interview.  He did not say, to my

11  recollection, that he went to join the Islamic State or that he

12  had joined the Islamic State.

13  Q.   Mr. Young told you that Mo, or Mohammad -- when "Mohammad"

14  is used in your reports, that would be Mo, the Mo we're talking

15  about, correct?

16  A.   Yes, ma'am.

17  Q.   All right.  And he told you that Mohammad could be either

18  in the Islamic State or Palestine or with his sister somewhere

19  in the U.S.  He told you that, right?

20  A.   Yes, ma'am.  I don't have that exact part of the

21  transcript in front of me, but that sounds correct.

22  Q.   Okay.  Would you like to see your report?

23  A.   Sure, yes.

24          THE COURT:  He said it sounds correct.  He's not

25  disputing that.

Smith - Cross                                                          552

1              MS. MORENO:  Okay.  Thank you, Your Honor.

2    Q.   And he told you -- in fact, he told you the correct date

3    that the last time that he had spoken to Mo -- excuse me, the

4    last -- the time that he thought Mo had left the country was

5    October 2014, right?

6    A.   Yes.  Mr. Young did say that he believed that Mo had

7    departed the United States before Halloween in 2015.

8    Q.   '14?

9    A.   '14, sorry.

10   Q.   Okay.  And, in fact, in one of the clips that we heard,

11   one of you gentlemen was talking about, well, he could have

12   gone between July and the fall or something, and Mr. Young

13   corrected you and said, "I think he left in October of 2014,"

14   right?

15   A.   Yes, ma'am, he did.

16   Q.   Okay.  And, in fact, Mo never -- Mo was always in the

17   country, right, except for that short trip with, with another

18   agent to Turkey?

19   A.   Yes, ma'am.

20   Q.   There was discussions about Syria between Mr. Young and

21   yourself, right?

22   A.   Yes, ma'am.

23   Q.   And when I say "yourself," I'm also including Agent

24   Caslen, correct?

25   A.   Correct.

Smith - Cross                                                    553

1    Q.   And, and there was discussions about the confusing

2    situation in Syria, right?  We heard that in one of the, the

3    clips just now?

4    A.   Yes.

5    Q.   And, and the different, the different factions that were

6    over in Syria made it a confusing situation, correct?  Correct?

7    A.   Yes, correct.

8    Q.   In one of the conversations, I think Government's Exhibit

9    5-101-4, there was some discussions about Mo, and Mr. Young

10   said, "Yes, it could be inferred that he was going to ISIS."

11   A.   Yes.

12   Q.   He told you that, right?

13          But that he couldn't, he couldn't get really good

14   information because it was a difficult situation over there,

15   correct?

16   A.   Yes, ma'am.

17   Q.   In one of the clips played, 5-101-5, the question was

18   asked of Mr. Young if anyone in the community would have told

19   Mo to go over there.  Do you remember that discussion?

20   A.   I don't recall the question being that -- it was more of

21   would you have gone for guidance?  More open-ended than

22   suggesting that someone would tell him to go.

23   Q.   And Mr. Young replied that no one in the community would

24   actually tell him to go and fight, right?

25   A.   I wouldn't characterize that as -- respectfully, ma'am, it

Smith - Cross                                                    554

1   was just more open-ended.  I mean, I don't dispute what's in

2   the transcript, but I don't recall him saying exactly that.

3   Q.   You don't dispute what's in the transcript.

4   A.   Right.  I mean, I don't want to misspeak.  My recollection

5   is he said he didn't know of anyone he would go to the

6   community for for guidance and left it at that.

7   Q.   But again, there were a number of times when Mr. Young

8   said that it was a confusing situation over there --

9   A.   Yes, ma'am.

10  Q.   -- to you, right?

11        In fact, at one point when there were a number of

12  questions being asked and Mr. Young was hesitant about

13  answering specifically, Mr. Caslen said that Mr. Young wasn't

14  putting words in other people's mouths.  Do you remember that

15  comment on the clip that was played?

16  A.   I do.

17  Q.   Now, this entire time that you're asking questions about

18  Mo, you already knew the answers to these questions that you

19  were asking Mr. Young, right?

20  A.   Yes, ma'am.

21  Q.   And there wasn't any real FBI investigation into Mo,

22  correct?

23  A.   No, ma'am.

24  Q.   There was no grand jury investigation into Mo, right?

25  A.   No, ma'am.

Smith - Cross                                                        555

1   Q.   During this -- during these two interviews, you did not

2   say to Mr. Young that he himself was under investigation, did

3   you?

4   A.   No, ma'am.

5   Q.   At one point, focusing back on December 3, the first

6   interview, the long interview, there was a discussion, you were

7   asking him about Peshwaz, and I think either yourself or

8   Special Agent Caslen brought up the attacks on civilians in

9   California.  Do you remember that?

10  A.   Yes.

11  Q.   And, in fact, Mr. Young told you that one would not find

12  anything in the Koran that would encourage attacks on

13  civilians.  He told you that; do you remember that?

14  A.   Yes, ma'am.

15  Q.   And that's in your report, correct?

16  A.   Yes.

17         MS. MORENO:  May have a moment, Your Honor?

18         I have nothing further, Your Honor.

19         THE COURT:  All right.  Any redirect?

20         MR. GIBBS:  Nothing for this witness, Judge.  Thank

21  you.

22         THE COURT:  Superb timing since it's just about

23  lunchtime.  We can take the screen down and not have to waste

24  everybody's time doing that, all right.

25         No one's going to call Agent Smith again; is that

556

1  correct?

2          MR. GIBBS:  We are not, Judge.

3          MS. MORENO:  We are not.

4          THE COURT:  All right.  Then, sir, you're excused as

5  a witness.  You may leave at this time.  Do not discuss your

6  testimony with any witness who has not yet testified, all

7  right?

8          THE WITNESS:  Thank you, Your Honor.

9                      (Witness excused.)

10          THE COURT:  All right.  Then, ladies and gentlemen,

11  I'm going to give you one hour, so please be back here at 5 of

12  two, and we'll start the next witness at that time.

13              (Recess from 12:58 p.m., until 1:55 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

557

```
 1              A F T E R N O O N   S E S S I O N
 2                    (Defendant present, Jury out.)
 3              THE COURT:  All right, the jury is ready.  I just
 4   want to find out, Mr. Gibbs or Mr. Kromberg, what's your time
 5   estimate now?  We have, I think, eight witnesses left on your
 6   list.
 7              MR. GIBBS:  I know this afternoon I've got two FBI
 8   witnesses, and I don't think they're going to take a
 9   tremendously long amount of time.  The first one is longer than
10   the other.  We will certainly finish with those two this
11   afternoon.
12              Then we've got Paul Lee, right?
13              MR. KROMBERG:  May I?
14              THE COURT:  Yes.
15              MR. KROMBERG:  So we have two FBI witnesses, a CART
16   examiner who should be short.  Then we have three or four
17   relatively short civilian witnesses that are here.  We want to
18   put them on.
19              Our expert witness we didn't tell to come until
20   tomorrow morning, but we could if necessary, if we get that
21   far, we can just go to our summary witness, Special Agent
22   Caslen.  So we could in theory finish tomorrow morning -- well,
23   again, it's tough to say, but --
24              THE COURT:  Right.
25              MR. KROMBERG:  -- we should expect to be done, our
```

558

 1   case, tomorrow.

 2           THE COURT:  That's my estimate.  I would suspect

 3   probably midday tomorrow or so.

 4           So that's just notice to the defense, if you're going

 5   to have any witnesses, you need to have them on deck for

 6   tomorrow.

 7           MS. MORENO:  Yes, Your Honor.

 8           THE COURT:  All right.  Now, what I do plan to do

 9   is -- we'll get the jury in here in a second -- if we complete

10   all of the evidence by close of business tomorrow, which is

11   Thursday, even if it's not six o'clock, I'm going to send the

12   jury home a little early if we get done, like, at four or five,

13   because I think it's better if we can to have closing arguments

14   and instructions back to back and then let the jury start

15   deliberation.

16           I only have one criminal matter on the docket for

17   Friday morning.  That's at 9:00, so we can start Friday at

18   9:30, so that may be how we handle things.  We'll see how it

19   goes.

20           All right, let's bring the jury in.

21           And this is going to be Agent Sikorski?  That's the

22   next witness?

23           MR. GIBBS:  That's correct, Judge.

24           THE COURT:  All right.  Do you have somebody to get

25   him in here?