**RECORD NO. 18-4138**

In The
# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

## NICHOLAS YOUNG,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA, No. 1:16-cr-265-LMB
HON. LEONIE M. BRINKEMA**

———————

**JOINT APPENDIX
VOLUME III OF V
(Pages 841 – 1333)**

———————

Nicholas D. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, Virginia 22314
(703) 822-1086

Gordon D. Kromberg
Assistant U.S. Attorney
OFFICE OF THE U.S. ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 229-3721

*Counsel for Appellant*

*Counsel for Appellee*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS
## VOLUME I OF V

**Appendix Page**

Docket Entries........................................................................1

**Criminal Complaint**
    **filed August 2, 2016**.........................................**31**

**Affidavit in Support of Criminal Complaint**
    **filed August 2, 2016**.........................................**32**

**Indictment**
    **filed December 15, 2016**...................................**49**

**Exhibit to Motion to Suppress**
    **filed February 15, 2017:**

    **Exhibit:**

    1.    **Search and Seizure Warrant**
            **dated August 2, 2016**...............................**54**

**Transcript of Motion Hearing before**
**The Honorable Leonie M. Brinkema**
    **on March 10, 2017** ......................................**67**

**Order of**
**The Honorable Leonie M. Brinkema**
**Re: Denying Defendant's Motion to Suppress**
**Items Unconstitutionally Seized**
    **filed March 10, 2017** ...................................**92**

**Government's Motion for Protective Order and to**
**Delete Certain Classified Information from Discovery**
    **filed September 25, 2017** ...........................**93**

**Redacted Protective Order of**
**The Honorable Leonie M. Brinkema**
    **filed September 26, 2017** ...........................**94**

**Government's Opposition to Defendant's Omnibus Motion in Limine**
filed October 10, 2017 ...................................................................97

**Transcript of Motion Hearing before**
**The Honorable Leonie M. Brinkema**
on October 27, 2017 ................................................................ 126

**Order of**
**The Honorable Leonie M. Brinkema**
**Re: Denying in Part Defendant's Omnibus Motion in Limine**
filed October 27, 2017 ............................................................. 150

**Government's Notice of Expert Testimony**
filed November 17, 2017 ..........................................................151

**Defendant's Memorandum in Support of Motion to Exclude**
**Two Expert Witnesses from Trial**
filed November 25, 2017 .......................................................... 154

**Curriculum Vitae of Dr. Gartenstein-Ross**
filed November 29, 2017 .......................................................... 175

**Defendant's Motion to Strike Witnesses Due to the Government's Failure to**
**Comply with *Jencks* and Discovery Order**
filed November 30, 2017 .......................................................... 185

**Transcript of Motions Hearing before**
**The Honorable Leonie M. Brinkema**
on December 1, 2017 ................................................................ 189

**Order of**
**The Honorable Leonie M. Brinkema**
**Re: Denying Defendant's Motion in *Limine* to Exclude**
**Two Expert Witnesses from Trial**
filed December 1, 2017 ............................................................. 220

**Order of**
**The Honorable Leonie M. Brinkema**
**Re: Ordering Government to Provide Unredacted Copies of**
**Material at Issue in Defendant's Second Motion to Strike Witnesses**
filed December 4, 2017 ............................................................. 221

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Court's Ability to Ensure a Fair Trial**
     **filed December 4, 2017** ............................................................... 222

**Transcript of Status Conference before**
**The Honorable Leonie M. Brinkema**
     **on December 5, 2017** ................................................................. 223

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Denying Defendant's Motion to Strike Each Witness as to**
**Whom the Government has Failed to Comply With the *Jencks* Deadline**
**and Second Motion to Strike Witnesses for Continued Failure to Produce**
**Complete *Jencks* Material**
     **filed December 5, 2017** ............................................................... 277

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Overruling Defendant's Oral Objections to *Jencks* Redactions**
     **filed December 6, 2017** ............................................................... 278

**Washington Post Article "Man Who Patrolled D.C. Metro**
**Awaits Terrorism Trial"**
     **filed December 8, 2017** ............................................................... 279

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Denying in Part Motion for Judicial Notice**
     **filed December 11, 2017** ............................................................. 281

**Transcript of Jury Selection and Opening Statements**
**The Honorable Leonie M. Brinkema**
     **on December 11, 2017** ............................................................... 283

## <u>TABLE OF CONTENTS</u>
### **VOLUME II OF V**

<u>**Appendix Page**</u>

**Transcript of Jury Trial before**
**The Honorable Leonie M. Brinkema**
      **on December 12, 2017** ...................................................................**436**

**<u>Testimony of "Khalil Sullivan":</u>**

**Direct Examination by Mr. Kromberg** ....................................**450**
**Cross Examination by Ms. Moreno** .......................................**510**
**Redirect Examination by Mr. Kromberg**...............................**526**

**<u>Testimony of John Gervino:</u>**

**Direct Examination by Mr. Turgeon**......................................**529**
**Cross Examination by Ms. Moreno**........................................**535**
**Redirect Examination by Mr. Turgeon** .................................**538**

**<u>Testimony of SA John Richard Minichello:</u>**

**Direct Examination by Mr. Gibbs** ..........................................**545**
**Cross Examination by Mr. Smith** ...........................................**566**
**Redirect Examination by Mr. Gibbs** ......................................**624**
**Recross Examination by Mr. Smith**.........................................**621**

**<u>Testimony of "Mo":</u>**

**Direct Examination by Mr. Gibbs** ..........................................**629**
**Cross Examination by Mr. Smith** ............................................**663**

Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
   on December 13, 2017 ................................................................ 708

**Testimony of "Mo": (Resumed)**

Cross Examination by Mr. Smith ........................................... 713
Redirect Examination by Mr. Gibbs ..................................... 731
Recross Examination by Mr. Smith....................................... 736

**Testimony of Agent Cameron Siegfried:**

Direct Examination by Mr. Gibbs .......................................... 740
Cross Examination by Mr. Smith ........................................... 784

**Testimony of "SA Smith":**

Direct Examination by Mr. Gibbs .......................................... 815
Cross Examination by Ms. Moreno......................................... 828

## <u>TABLE OF CONTENTS</u>
### VOLUME III OF V

<u>**Appendix Page**</u>

**Transcript of Jury Trial before
The Honorable Leonie M. Brinkema**
      **on December 13, 2017, continued:**

    <u>**Testimony of SA John Sikorski:**</u>

    **Direct Examination by Mr. Gibbs** ................................. 841
    **Cross Examination by Mr. Smith** ................................ 896
    **Redirect Examination by Mr. Gibbs** .................................. 908

    <u>**Testimony of SA John Minichello: (Recalled)**</u>

    **Direct Examination by Mr. Gibbs** .............................. 910
    **Cross Examination by Mr. Smith** ............................... 924

    <u>**Testimony of Paul Lee:**</u>

    **Direct Examination by Mr. Turgeon** .............................. 930
    **Cross Examination by Ms. Moreno** ........................... 965
    **Redirect Examination by Mr. Turgeon** ................................ 967

    <u>**Testimony of Ian Paul Campbell:**</u>

    **Direct Examination by Mr. Kromberg** ............................... 970
    **Cross Examination by Mr. Smith** ........................... 983

Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
    on December 14, 2017 ..................................................................1021

<u>Testimony of Kenneth James McNulty</u>:

Direct Examination by Mr. Kromberg ..................................................1026
Cross Examination by Mr. Smith ........................................................1037
Redirect Examination by Mr. Kromberg..............................................1063
Recross Examination by Mr. Smith......................................................1067

<u>Testimony of Brian Michael Menzies</u>:

Direct Examination by Mr. Kromberg ..................................................1069
Cross Examination by Ms. Moreno ......................................................1084

<u>Testimony of Joanne Dill</u>:

Direct Examination by Mr. Kromberg ..................................................1093
Cross Examination by Mr. Moreno ......................................................1097

<u>Testimony of Dr. Daveed Gartenstein-Ross</u>:

Direct Examination by Mr. Kromberg ..................................................1090
Cross Examination by Mr. Smith ........................................................ 1111

<u>Testimony of SA Nicholas A. Caslen</u>:

Direct Examination by Mr. Kromberg ..................................................1277

# TABLE OF CONTENTS
## VOLUME IV OF V

**Appendix Page**

**Transcript of Jury Trial before**
**The Honorable Leonie M. Brinkema**
     on December 15, 2017 ................................................................1334

     **Testimony of SA Nicholas A. Caslen: (Resumed)**

     **Direct Examination by Mr. Kromberg** ................................1362
     **Cross Examination by Mr. Smith** ......................................1393
     **Redirect Examination by Mr. Kromberg**............................1462

     **Government's Closing Argument** .......................................1524
     **Defendant's Closing Argument** ........................................1538
     **Government's Rebuttal** ..................................................... 1565

     **Court Instructs the Jury**....................................................1575

**Transcript of Jury Trial before**
**The Honorable Leonie M. Brinkema**
     on December 18, 2017 ................................................................1619

     **Jury Asks a Predisposition Question** .....................................1621

     **Government's Exhibits:**

     **1-201.  December 17, 2014 Email from Young** .......................1631

     **3-110.**     **Photograph** ..........................................................1632

     **4-203.**     **Photograph** ..........................................................1633

     **4-300.**     **Photograph** ..........................................................1634

**Government's Exhibits, continued:**

10-231.   Photograph .................................................................1635

10-241.   Photograph .................................................................1636

10-252.   Photograph .................................................................1637

10-700.   Photograph .................................................................1638

10-701.   Photograph .................................................................1639

10-706.   Photograph .................................................................1640

10-863.   Photograph .................................................................1641

10-903.   Photograph .................................................................1643

11-401.   Photograph .................................................................1644

**Defendant's Exhibits:**

2-8.   Photographs ..................................................................1645

14-24. Photographs ..................................................................1652

Redacted Verdict Form
    filed December 18, 2017 ....................................................1663

**Jury Instructions**
　　filed December 18, 2017 ...................................................................1664

**Defendant's Sentencing Memorandum,**
**With Exhibits,**
　　filed February 16, 2018 ...................................................................1712

　　　**Exhibits:**

　　**A.**　**Character References**
　　　　various dates ...................................................................1743


　　**B.**　**Psychological Evaluation**
　　　　dated December 5, 2016 ...................................................1796

**Letter to**
**The Honorable Leonie M. Brinkma from**
**Nicholas Young**
　　undated ...................................................................................1805

**Transcript of Sentencing Hearing before**
**The Honorable Leonie M. Brinkema**
　　on February 23, 2018 ...................................................................1807

**Judgment in a Criminal Case**
　　filed February 23, 2018 ...................................................................1832

**Order of**
**The Honorable Leonie M. Brinkema**
**Re: Denying Motions for a New Trial and Judgment of Acquittal**
　　filed February 23, 2018 ...................................................................1837

**Defendant's Notice of Appeal**
　　filed February 28, 2018 ...................................................................1838

# <u>TABLE OF CONTENTS</u>
## VOLUME V OF V – UNDER SEAL

<u>Appendix Page</u>

**Defendant's Second Motion to Strike Witnesses Due to
Refusal to Produce Complete *Jencks* Materials,
With Attachments,**
    **filed December 2, 2017** ..........................................................................1840

**Presentence Investigation Report**
    **filed January 25, 2018** ..........................................................................1872

**Statement of Reasons**
    **filed February 23, 2018** ..........................................................................1894

Sikorski - Direct                                                        559

1              MR. GIBBS:  He's here.

2              THE COURT:  Oh, all right.  Agent, come up here and

3    stand by the witness box.

4                        (Jury present.)

5              THE COURT:  All right, ladies and gentlemen, I thank

6    you for being right here on time.  We're taking the next

7    witness.

8          SA JOHN SIKORSKI, GOVERNMENT'S WITNESS, AFFIRMED

9                      DIRECT EXAMINATION

10   BY MR. GIBBS:

11   Q.   Good afternoon, sir.

12   A.   Good afternoon.

13   Q.   Sir, would you please state your name for the record and

14   spell your last name.

15   A.   Sure.  My name is Jonathan Sikorski.  My last name is

16   spelled S-i-k-o-r-s-k-i.

17   Q.   And who are you employed by?

18   A.   I'm employed by the Department of Justice, FBI.

19   Q.   How long have you been with the FBI?

20   A.   I've been with the FBI since February of 2010, so a little

21   over seven-and-a-half years.

22   Q.   Now, sir, in the summer of 2016, were you assigned to

23   assist in the Nicholas Young investigation?

24   A.   Yes, I was.

25   Q.   And as part of that assignment, were you assigned to

Sikorski - Direct                                                       560

1   impersonate a confidential human source named Mo in order to

2   communicate with the defendant?

3   A.    Yes, I was.

4   Q.    Now, prior to your communications with the defendant, had

5   he been communicating with anyone else at the FBI?

6   A.    Yes.  He had been communicating with other individuals

7   employed by the FBI online in a similar manner that I was going

8   to be.

9   Q.    And if you could -- we could -- let's see.  I'd like to

10  have you take a look at, let's just pull up Government Exhibit

11  1-221, which is already in evidence.  Do you -- yeah.

12          Special Agent Sikorski, what is this?

13  A.    This is an e-mail that I received on June 14, 2016, from

14  the Essa Kobayashi account to the V4Vendetta account.

15  Q.    And who is the Essa Kobayashi account from?

16  A.    That is the defendant.

17  Q.    And who was, who was handling the V4Vendetta account at

18  that point?

19  A.    At this point, it was the government operating --

20  impersonating the confidential human source known as Mo, but we

21  were -- the government was operating that account at that time.

22          MR. GIBBS:  All right, thank you.

23          And, Fabian, if we could highlight the portion that

24  begins, "I don't really do the tech thing," and ends with "but

25  inshallah that app will be okay"?

Sikorski - Direct                                                    561

1  Q.   Special Agent Sikorski, when did the defendant say that he

2  would message you on the app?

3  A.   He said he would message me on the app within the week.

4          MR. GIBBS:  And then if we could bring up Government

5  Exhibit 1-222?  If we could blow that up?

6          THE COURT:  221 is not in yet.

7          MR. GIBBS:  Oh, it's not?

8          MR. SMITH:  It is in.

9          THE COURT:  Well, it's not showing on our list.

10         MR. GIBBS:  Okay.  And I trust your list.  This

11  morning, I intended to enter all the e-mails.  I would ask to

12  enter the last two Essa Kobayashi e-mails, which are 1-221 and

13  1-222.

14         THE COURT:  Is there any objection to those?

15         MR. SMITH:  No objection.

16         THE COURT:  All right, they're in.

17         (Government's Exhibit Nos. 1-221 and 1-222 were

18  received in evidence.)

19  BY MR. GIBBS:

20  Q.   And then as to that exhibit, 1-222, what is that, sir?

21  A.   This is an e-mail again from the Essa Kobayashi account to

22  the V4Vendetta account that was sent on Thursday, July 14,

23  2016.

24  Q.   And what did he say in that message?

25  A.   "Salam alikom brother, I messaged you on the app..."

Sikorski - Direct                                                        562

1   Q.   Now, you testified a moment ago that in his June 14

2   e-mail, the defendant said he would message you on the app

3   within a week.  How long did it actually take him?

4   A.   It was a full month.

5   Q.   And how many times did the FBI contact the defendant

6   between June 14 and July 14 to try to convince him to send a

7   message using the app?

8   A.   None.

9   Q.   Now, what was this app?

10  A.   The app we were referring to is an app called Threema,

11  T-h-r-e-e-m-a.

12  Q.   And can you explain what Threema is?

13  A.   Threema is a social media messaging app.  It's an

14  encrypted messaging app that is run on individuals' phones or

15  mobile devices or even could be run on a laptop.  That app

16  offers encrypted messaging from one end to the other.

17  Q.   And what is the -- what does the fact that it's encrypted,

18  what does that mean?

19  A.   It means that only the two users, so the two end users,

20  are able to view that message.  Therefore, the actual

21  communication that's going across the airways, whether it be a

22  cell phone signal or a WiFi network, is encrypted, and the two

23  end users are the people who can actually see what the message

24  says.

25  Q.   And beginning in mid-July of 2016, did you, in fact, begin

Sikorski - Direct                                                        563

1   to communicate with the defendant using this Threema app?

2   A.   Yes, I did.

3            MR. GIBBS:  And, Your Honor, at this time, again for

4   the sake of a little bit of speed and efficiency, I'm going to

5   have the agent testify to a number of the Threema

6   communications, and if I could just offer into evidence, if

7   there's no objection, Exhibits 2-101 through 2-112, 2-116,

8   2-118 through 2-123, and 2-125 through 2-130?

9            THE COURT:  Any objection?

10           MR. SMITH:  No.  Your Honor, we have no objection,

11  but we don't know why we're not just admitting all of the

12  Threema messages.

13           THE COURT:  Because there's no sense in putting more

14  into the jury -- for the jury's consideration if we don't need

15  them all.  I don't want a lot of cumulative evidence, so it's

16  an appropriate use of an economical approach to things.  If

17  there are additional exhibits you want to use in your cross, of

18  course, you may.

19           MR. SMITH:  Okay.  Thank you.

20           THE COURT:  They're all in.

21           (Government's Exhibit Nos. 2-101 thru 2-112, 2-116,

22  2-118 thru 2-123, and 2-125 thru 2-130 were received in

23  evidence.)

24           MR. GIBBS:  Thank you, Judge.

25  Q.   So if we could, let's pull up 2-102.  Do you see that on

Sikorski - Direct                                               564

1   the screen?

2   A.   Yes, I do.

3   Q.   And what is that?

4   A.   This is a picture of a Threema account.  The Threema

5   account is, has the user ID HWM5PPKH, and that is the user

6   account that sent me a message on the Threema account --

7   Threema account, sorry.

8   Q.   And whose Threema account is this?

9   A.   That's the defendant's, sir.

10  Q.   And next if we could pull up Exhibit 2-101?  What is

11  2-101?

12  A.   2-101 is again a picture of the phone I was utilizing to

13  use the Threema app.  In this case, it's a picture of the

14  message that the defendant sent me on Thursday, July 14, 2016.

15  Q.   And you talked about receiving it.  Did you actually

16  receive this message on a cell phone?

17  A.   Yes.  It's -- the actual photo that is behind that

18  zoomed-in picture, yes, that photo right there, that is a photo

19  of the actual cell phone I was using to send and receive the

20  messages.

21  Q.   And we're going to look at a number of Threema messages

22  here this afternoon.  Is that the way you captured all of the

23  defendant's Threema messages, by taking a photograph of it?

24  A.   Yes.  I used another phone and took a photograph of the

25  actual phone I was using.

Sikorski - Direct                                                    565

1   Q.   And was there a reason that you did that?

2   A.   Yes.

3   Q.   And what was the reason?

4   A.   Many of the online encrypted messaging apps have a

5   security feature installed within them.  If I was to conduct a

6   screen capture of that actual message, it would send the other

7   user a notification that that screen capture was just taken,

8   and we did not, obviously, want that to happen.

9   Q.   And in the message that we have here before us, 2-101, the

10  defendant says:  "Salam alicom V."  Did you understand the

11  reference to V?

12  A.   Yes.  V is a reference to the e-mail account, the

13  V4Vendetta account that had previously been utilized by the FBI

14  and the confidential human source, Mo.

15  Q.   And the letters and numbers at the top, the HWM5PPKH,

16  again, what, what is that?

17  A.   That is the Threema user account that was being utilized

18  by the defendant's Threema account.  I believe it is assigned

19  by Threema.  I do not believe it is picked, but I can't

20  definitively say if that was a specific picked series of

21  letters and numbers.

22  Q.   All right.  And next if we could go to Exhibit 2-103?

23  A.   Yes.

24  Q.   Now, how long after the defendant's July 14 message did

25  you respond?

Sikorski - Direct                                                566

1   A.   We waited about four days, and I responded on Monday,

2   July 18, 2016, and my response is indicated in the green bubble

3   that you can see in the lower half of that picture of the cell

4   phone.

5   Q.   All right, thank you.  You read my mind.

6            And in your message to the defendant, when you

7   said, "I was out on ribat over the past week," what does

8   "ribat" mean?

9   A.   "Ribat" is a term used by Islamic fighters as an operation

10  or fighting.  It's a term just used to abbreviate that.

11  Q.   All right, thank you.

12           Next if we can go to Exhibit 2-104?

13  A.   Yes.  This is again a picture of the phone I was utilized

14  to communicate on Threema, and there is a new message here, the

15  bottom bubble, that begins with, "I don't pay attention."  You

16  can see that I sent that message at 4:38 p.m., indicated by the

17  time stamp on the lower left.

18  Q.   And in that bubble at the bottom that we have just zoomed

19  in on, it said, "Lots more drones than there were b4 and a lot

20  of good brothers have earn shahadah."  What did you intend to

21  convey by using the term "shahadah"?

22  A.   "Shahadah" is an Islamic term used for individuals dying

23  on behalf of Allah sometimes on the battlefield, sometimes in

24  other ways, but it's a term utilized in that manner.

25  Q.   And then right after that, you talked about we lose a lot

Sikorski - Direct                                                           567

1   and try to replace quick need to do it faster.

2         Was that the end of that message?

3   A.   Yes, it was.

4   Q.   Thank you.

5         Next if we could pull up Exhibit 2-105?

6   A.   Again, this is a continuation.  This is another picture of

7   the cell phone that I was utilizing, utilizing to communicate

8   on Threema.  The newest message is the message that I sent on

9   the bottom, indicated in the lower green bubble, that I sent at

10  4:41 p.m.

11  Q.   And in that lower message, you told the defendant, "I know

12  u mention u would loookfor that email account that u dont have

13  to sign up for and let us know about it."  What was that in

14  reference to?

15  A.   That was a reference to a previous conversation that the

16  individual, the other FBI employee had with the defendant on

17  the e-mail accounts.  That was referenced previously to my

18  involvement referencing making an e-mail account that was

19  secure to communicate back and forth.

20  Q.   And then below that, you said, "We dont use emails to talk

21  to the brothers in the west who make hijrah we stick to this."

22  What does "hijrah" refer to?

23  A.   "Hijrah" refers to a migration.  It's a term used for

24  migration of an individual from a non-Muslim country to a

25  country who is Muslim and is Islamic.

Sikorski - Direct                                                    568

1  Q.   And when you said in that message we stick to this to

2  communicate with brothers in the west who make hijrah, what did

3  you mean by "this"?

4  A.   I was referring to the Threema account that we were

5  utilizing here to communicate.

6  Q.   And what was your reason for including that detail?

7  A.   I wanted to convey to the defendant that we utilized the

8  encrypted messaging app to talk to individuals in the West

9  because of how security conscious the defendant had been in the

10 past with us, so I wanted to communicate that this was an

11 encrypted messaging app and this is how we communicate to

12 individuals in the West on this encrypted app.

13 Q.   And next if we could pull up Government Exhibit 2-106?

14 A.   Yes.  This is again a screen capture of messages that I

15 sent to the defendant using the Threema app.  The new message

16 is the lower green bubble again, indicated by the 4:46 p.m.

17 time stamp.

18 Q.   And in that message, you told the defendant, "The group of

19 brothers im' helping that get people to dawlah have 2 very

20 trusted brothers in Uk who buy us Google gift cards and send us

21 the codes on the back so we can by accounts on threema."

22        When you talked about the brothers that get people to

23 dawlah, first of all, what does "dawlah" refer to?

24 A.   "Dawlah" is a term used to refer to the Islamic State.  It

25 could be the Islamic State in Syria; it could be the Islamic

Sikorski - Direct                                                    569

1   State in Iraq.

2   Q.   And what did you mean when you talked about brothers that

3   get people to dawlah?

4   A.   Brothers, I was referring to ourselves, so brothers

5   meaning other individuals affiliated with ISIS getting

6   individuals to dawlah.

7   Q.   And so if they get them to dawlah, would these essentially

8   be recruiters for ISIS?

9   A.   Correct, yes.

10  Q.   And you used the term "U.K." in there.  What does "U.K."

11  stand for?

12  A.   The United Kingdom, England.

13  Q.   All right.  And, Special Agent Sikorski, next I'd like to

14  pull up Government Exhibit 2-107.  And what is, what is 2-107?

15  A.   Again, it is a picture of the cell phone that I was

16  utilizing to communicate on Threema.  Again, the newest message

17  is the one that you can see highlighted now at the bottom,

18  indicated -- there's a glare there, the flash on the camera,

19  but it says 4:51 p.m., the time stamp on which I sent the

20  message.

21  Q.   And is this a continuation of your July 18 Threema message

22  to the defendant?

23  A.   Yes, it is.

24  Q.   And in that message, what does the "blessed operation in

25  Belgium" refer to?

Sikorski - Direct                                                    570

1    A.    I was referring to the ISIS-related attacks that occurred

2    in Belgium in and around the summer of 2016 in which an airport

3    and another location were attacked.

4    Q.    And then also in that message, what does the "operation in

5    Nice" refer to?

6    A.    I was referring to the ISIS operation that occurred in

7    Nice, France.  Nice is a city in France in which ISIS conducted

8    an attack on civilians.

9    Q.    And what did you tell the defendant about how those two

10   operations in Europe impacted ISIS's ability to get more Google

11   codes?

12   A.    I specifically told him that we only had a few codes left

13   and they won't be able to start again after those operations.

14   So the operations were impacting due to security increases the

15   amount of codes that we could receive.

16   Q.    Next if we could turn to Government Exhibit 2-108?  And

17   what is 2-108?

18   A.    2-108 is again a picture of the cell phone that I was

19   using to communicate on Threema.  Again, the newest message is

20   the one that you can see highlighted here that was sent at 4:56

21   p.m.

22   Q.    And what did you tell the defendant that your group needed

23   in lieu of the e-mail accounts that the defendant had talked

24   about previously?

25   A.    We, we told the defendant we needed more of the Google

Sikorski - Direct                                                        571

1   codes.

2   Q.   And how, how can someone obtain these Google codes?

3   A.   Google codes are similar to a gift card, so Google codes

4   can be purchased by going to any type of a store, you know,

5   Walmart, your Target, your Best Buys, and purchasing what's

6   known as a Google Play card.  On the back of that card is a

7   code just like a gift card.  That code is then redeemable

8   online to purchase things like Threema accounts, to purchase

9   things from the Google Play store, whether it be apps, games,

10  but it's very similar to buying a gift card, taking the code

11  off the back of the gift card, and utilizing that code as

12  monetary value to buy something.

13  Q.   And in that message on 4:56 p.m., when you told the

14  defendant, "We have a few brothers waiting for a while now

15  until we can get them our contact info and cannot creat any new

16  accounts," what brothers were you referring to there?

17  A.   I was referring to the brothers that we had previously

18  talked about who we talked about with the defendant who we were

19  looking to bring over to dawlah in order to fight on behalf of

20  ISIS.

21  Q.   And in the last sentence of that message, you told the

22  defendant, "These brothers are being pushed to wilayat sirte in

23  Libya."  What is "wilayat sirte"?

24  A.   "Wilayat Sirte" refers to, "Wilayat" means province.

25  "Sirte" is a city or region of Libya.  So "Wilayat Sirte" is

Sikorski - Direct                                                      572

1   basically the province or area in and around Sirte, Libya.

2   Q.   So based on your messages to the defendant, what impact

3   would getting additional Google codes have on getting ISIS

4   fighters into Libya?

5   A.   Those Google codes would allow us in dawlah, meeting Mo in

6   dawlah, to facilitate the travel of ISIS fighters into the

7   Wilayat Sirte area in Libya.

8   Q.   And next if we could turn to Government Exhibit 2-109?

9   And, Special Agent Sikorski, what is this exhibit?

10  A.   Again, this is a picture of the phone that I was

11  utilizing.  The newest message is the lower green box that was

12  just zoomed in on here, and you can see this is a message that

13  I sent at 5 p.m.

14  Q.   And in the second sentence of your message, you said that

15  if the defendant can only send a couple codes, that would be

16  okay.  What codes were you referring to again there?

17  A.   The Google Play card codes that we had just talked about.

18  Q.   And what -- can you just read what you said in the first

19  sentence to the defendant?

20  A.   "Their desire to fight for their religion is a inspiration

21  to us all."

22  Q.   And what was the reason for including that detail in your

23  message?

24  A.   We wanted to make it clear to the defendant that we --

25  these Google Play cards were going to be used to facilitate

Sikorski - Direct                                                   573

1  individuals into Libya who wanted to fight.

2  Q.    And if we could next turn to Government Exhibit 2-110?

3  And what is Government Exhibit 2-110?

4  A.    This is a picture of the phone again that I was utilizing.

5  You can see there's a, a variation in this picture.  You can

6  see my messages were in green.  The messages from the

7  defendant, so his responses, are the messages that appear in

8  the white bubbles to the left, and you can see that those

9  messages were sent on Thursday, July 21, 2016.

10 Q.    Thank you.  And yeah, we've zoomed in on that -- the first

11 message there that begins, "I see your messages were from the

12 18th."  And after talking about how long it took your message

13 to arrive, the defendant described a failed military coup in

14 Turkey.  Did you know what he was talking about there?

15 A.    Yes.  In and around July of 2016, there was a highly

16 publicized on national news and covered live on a lot of news

17 organizations a military coup attempt in Turkey to overthrow

18 the government, and that ultimately failed around the same day,

19 if not the -- that night.

20 Q.    Thank you.  Next if we could go to Government Exhibit

21 2-111?

22 A.    Yes.  Again, this is a screen capture of the phone that I

23 was utilizing to communicate on Threema.  In this instance,

24 these are all messages sent by the defendant to my Threema

25 account.

Sikorski - Direct                                                        574

1            MR. GIBBS:  Can we zoom in on the first large message

2    at the top there?

3    Q.   After the defendant in that message to you talks about a

4    base in Djibouti, special soldiers, and frequenting bars, he

5    then says that base likely affects east and north Africa and

6    maybe Yemen, as opposed to, quote, where you are, though.

7            In your Threema communications with the defendant and

8    the earlier e-mail communications with the defendant, where did

9    the FBI always lead him to believe that Mo was located?

10   A.   We always told the defendant or led him to believe that we

11   were in ISIS-controlled territory in Iraq or Syria and had

12   specifically mentioned that we were in Raqqah, Syria, at one

13   point.

14           MR. GIBBS:  Next if we can zoom in on the next two

15   messages together?

16   Q.   And in the message there at the top, what question did the

17   defendant ask about the cards?

18   A.   He specifically asked, "Why were the brothers in UK told

19   to stop though?"  Basically, it's just an abbreviation.  He

20   asked why were they told to stop sending the cards.

21   Q.   And then below that, the defendant said, "Inshallah more

22   codes will come your way."  What does "inshallah" mean?

23   A.   It's just an Islamic term for God willing.

24   Q.   Okay.  Next if we can go to Government Exhibit 2-112?

25   A.   Yes.  This is again a picture of the phone that I was

Sikorski - Direct                                                        575

1   utilizing to communicate with the defendant on Threema, and

2   again you see in green the message that I sent back to the

3   defendant.  In this case, I sent it on Thursday, July 28, 2016,

4   at 1:54 a.m.

5              MR. GIBBS:  And can we zoom in on -- yeah, thank you.

6   Q.   Now, in the first sentence, you wrote, "The brothers in UK

7   stop getting codes to save for hijrah they have amazing comp

8   skills needed here and bec of Allah's will we were able to help

9   with there hijrah to khilafah."

10             First of all, what are "comp skills"?

11  A.   I was referring to computer skills.  I just abbreviated

12  "computer" to "comp" just for less characters.

13  Q.   And when you wrote about saving for hijrah and helping

14  with their hijrah, what does "hijrah" mean?

15  A.   Again, "hijrah" is a reference to individuals making a, a

16  move from a non-Islamic country to an Islamic country.

17  Q.   And when you wrote about their hijrah to khilafah, what

18  does "khilafah" mean?

19  A.   "Khilafah" is a reference to the Islamic State.

20  Q.   And towards the end of that Threema message to the

21  defendant, you wrote, "any codes u can get will helpful and

22  allow us to help many make hijrah.  Only need a few right now."

23             What did you mean when you said the codes would help

24  many make hijrah?

25  A.   I meant by us obtaining the Google codes off of the Google

Sikorski - Direct                                              576

1  Play cards, we would be able to facilitate the travel and talk

2  to those individuals on Threema, as I had previously mentioned

3  to the defendant, which would help us facilitate their travel

4  into Libya and ISIS-controlled territory.

5  Q.  Next if we could take a look at Government Exhibit 2-116?

6  A.  Yes.  This is again a picture of the cell phone that I was

7  utilizing to communicate with the defendant, and there's a

8  series of new messages here indicated by the time stamps on the

9  left at 2:04 a.m., 2:11 a.m., and 2, I believe that says 18,

10  but again, this picture would have to be zoomed in for me to

11  verify that bottom one.

12          MR. GIBBS:  All right.  So let's zoom in on the

13  bottom one, 2:18 a.m.

14          THE WITNESS:  Yes, it does say 2:18.

15  BY MR. GIBBS:

16  Q.  And in this message, you started off talking about

17  Djibouti and how, quote, kufar have these drone in Djibouti.

18  What was that statement in response to?

19  A.  That statement was in response to the defendant's message

20  previously indicating in talking about the base in Djibouti.

21  Q.  And you end that message by saying, "they know khilafah

22  cont to expand in Libya and we have many ppl there even if

23  media won't report."

24          Who is the "they" you're referring to when you wrote

25  "they know khilafah continue to expand in Libya"?

Sikorski - Direct                                                        577

1   A.    I was referring to the west, western governments, the U.S.

2   government and U.S. authorities.

3   Q.    And who was the "we" you were referring to when you told

4   the defendant that we have many people in Libya?

5   A.    ISIS.

6   Q.    Next if we could turn to Government Exhibit 2-118?  And

7   what is this?

8   A.    This is again a picture of the cell phone that I was

9   utilizing to communicate with the defendant.  In this case,

10  this is a message that the defendant sent me.  Again, this is

11  similar -- the messages from the defendant are in the white on

12  the left-hand side of the message screen.

13  Q.    Okay.  And this one actually is a little blurry, and I

14  think we tried to zoom, and it's not legible, so I think we

15  have to keep it at this resolution, but, Special Agent

16  Sikorski, at the beginning of that message, where the defendant

17  said, "Yea, I'm careful.  Disturbing to know they were somehow

18  watching my house like 4 years back," in your communications

19  with the defendant, did he frequently portray himself as

20  security conscious?

21  A.    Yes.

22  Q.    And how did that impact the way that you communicated with

23  him?

24  A.    We had to make sure we were being security conscious with

25  the defendant, too.  Obviously, we couldn't state things in the

Sikorski - Direct                                                    578

1  obvious that we would state with maybe other people we were

2  talking to because the defendant was security conscious and

3  indicated that to us in these three messages in previous

4  communications.

5              MR. GIBBS:  And can we highlight that one sentence

6  that starts, "Last year I was in a flight," pull it up in

7  yellow?

8  Q.   And the sentence we've highlighted that says, "Last year I

9  was in a flight and I'm nearly positive 2 agents were watching

10 me," is that an example of what you just testified to about the

11 defendant being security conscious?

12 A.   Yes, I was.

13 Q.   All right, if we can go to Exhibit 2-119?

14 A.   Yes.  Again, this is a picture of the phone I was

15 utilizing, and these are messages sent from the defendant to me

16 on the Threema account.

17             MR. GIBBS:  And can we highlight the message in the

18 middle that begins, "Yeah, the bases they have are strong"?

19 Q.   Can you just read that, if you're able to make it out?

20 A.   Yes.  The highlighted portion says, "Yeah, the bases they

21 have are strong.  But the people in them leave a lot for

22 recreation."

23 Q.   And did you understand what that was a reference to?

24 A.   Yes.  I understood that to be a reference to the fact that

25 the bases that individual is on that he had previously

Sikorski - Direct                                                      579

1    mentioned, the bases themselves are very strong, but the

2    individuals who work on those bases or are assigned to those

3    bases leave for recreation.  So they leave to go to the

4    restaurants, to the stores, and things like that.

5    Q.   Next, if we could pull up Government Exhibit 2-120?

6            And what is this exhibit?

7    A.   Again, this is a continuation of the message.  The exhibit

8    is a picture of the cell phone I was utilizing to communicate

9    with the defendant on Threema, and this is a continuation of

10   the messages that the defendant sent me on the application.

11           MR. GIBBS:  And if we can just highlight the message

12   at the bottom?

13   Q.   And if you could just read that?  If you can make it out?

14   A.   It says, "oh, and YOU are the smart one.  Allah blessed

15   you with the intelligence and wisdom to stay off their radar

16   until you reached your objective."

17   Q.   And when the defendant talked in that message about

18   staying off their radar, what was your interpretation of who

19   "their" was referring to?

20   A.   The U.S. government, the FBI, U.S. authorities.

21   Q.   And next, if we could go to Government Exhibit 2-127?  And

22   what is 2-127?

23   A.   2-127 is a picture of the cell phone that I was utilizing

24   to communicate with the defendant.  This picture is of a new

25   Threema account.

Sikorski - Direct                                                    580

1   Q.   All right.  So there's something different about this

2   account than the ones you previously testified about?

3   A.   Yes, there is.

4   Q.   And what is different about this Threema account?

5   A.   This Threema account is new.  You can see at the top it no

6   longer says that HWM account.  It has a, what I refer to as a

7   tilde, the little ~ symbol, and the capital letter L, as you

8   can see highlighted in yellow there.  This is not the previous

9   account that I was communicating with the defendant on.

10  Q.   And just for the record, all the Threema messages up to

11  this point we've been -- you testified about were from the

12  defendant's previous Threema account?

13  A.   Yes, they were.

14  Q.   And other than the defendant, did you give your Threema

15  account information to anyone else?

16  A.   No, I did not.

17  Q.   And was the message in this, we'll call this the ~ Threema

18  account, was this consistent with what you and the defendant

19  had been communicating about for the last two weeks?

20  A.   Yes, it was.  This Threema account began sending me Google

21  Play Card codes.

22  Q.   And actually, if we can just go back real quickly to I

23  believe it's the last exhibit, 2-120?  Or 126, I apologize.

24  A.   Yes.

25  Q.   Do you see the third message up from the bottom, the one

Sikorski - Direct                                                    581

1   about Inshallah, the brother got arrested?  Is that it?

2              THE COURT:  I don't think that's the right exhibit.

3   BY MR. GIBBS:

4   Q.   Yes, let's go to 2-120.

5   A.   Yes, I do.  The third message from the bottom now

6   highlighted in yellow begins, "Inshallah the brother that got

7   arrested."

8   Q.   And this is a message from the defendant to your Threema

9   account, correct?

10  A.   Yes, it is.

11  Q.   Do you know what brother he was referring to there?

12  A.   Yes, I do.

13  Q.   And who was that?

14  A.   It was an individual -- do you want me to name him?

15  Q.   Yes.

16             MR. SMITH:  Objection, Your Honor.

17             THE COURT:  Wait.  What's the basis for the

18  objection?

19             MR. SMITH:  The objection is it's speculation who was

20  the defendant referring to.

21             MR. GIBBS:  Well, I think -- I can rephrase the

22  question.

23             THE COURT:  All right.

24  BY MR. GIBBS:

25  Q.   When the defendant referred to the brother that got

Sikorski - Direct                                                    582

1    arrested making dawah will be okay, do you understand who that

2    was a reference to?

3    A.   Yes, I did.  It was a reference to an individual that the

4    defendant and I had previously talked about on Threema that

5    stuck his foot around the corner.  That individual was an

6    individual by the name of Peshwaz Waise.

7    Q.   And that's an individual here in the Eastern District of

8    Virginia, correct?

9    A.   Yes.  He's in the Northern Virginia area and known to the

10   defendant.

11   Q.   All right, thank you.

12            And while we're on this, so, you know, we were

13   talking about that ~ account.  This particular message had the

14   HWM55PPKH at the top, correct?

15   A.   Yes, it did.

16   Q.   All right.  So let's go back to the ~ account, which is

17   2-127.

18   A.   Yes.

19   Q.   In total, during the time you were impersonating Mo on

20   these -- on this Threema account, how many different Threema

21   accounts did the defendant use to communicate with you?

22   A.   Two total.

23   Q.   And what did -- well, first of all, let's go ahead and

24   highlight the message at the top there.  It's not extremely

25   easy to see, so if you could just read that, I would appreciate

Sikorski - Direct                                                      583

1   it.

2   A.    It says, "Respond to verify receipt...may not answer

3   depending on when as this device will be destroyed after all

4   are sent to prevent the data being possibly seen on this end in

5   the case of something unfortunate."

6   Q.    And who came up with that idea of destroying the device?

7   A.    The defendant.

8   Q.    And down below where the defendant said, "after all are

9   sent," what did he actually send in the third bubble down below

10  there?

11  A.    In the third bubble below are Google Play codes or Google

12  codes.   Each of those codes is valued at $10.

13  Q.    And who came up with the idea of actually sending the

14  Google Play codes to you on a second Threema account?

15  A.    The defendant.

16  Q.    And you said that those codes at the bottom, those are

17  Google codes?

18  A.    Yes, they are.

19  Q.    And then turning to Exhibit 2-128, if we can just bring

20  that up for a moment?   And then if we can go to 2-129?

21        Are both of those exhibits, are they both a

22  continuation of those Google codes from the defendant?

23  A.    Yes, they were.

24  Q.    And where were you when you received these gift card

25  codes?

Sikorski - Direct                                                    584

1  A.    I believe I was specifically in -- at the time I received

2  them, on the phone.

3  Q.    Well --

4  A.    I believe I was in Washington, D.C., or at my house in

5  Northern Virginia.  I don't remember exactly the first time

6  that I noticed that these were actually received.

7  Q.    And what did you ultimately do with the gift card codes

8  that the defendant sent you?

9  A.    I took those codes and created a separate Google account

10 at the Washington Field Office in Washington, D.C., and

11 redeemed each of those codes for the dollar amount indicated.

12 Some of the codes were redeemed for $10, and some of them were

13 indicated for -- redeemed for $15.  Each of the values matched

14 what were sent, either value 15 or value 10, as indicated in

15 those messages.

16 Q.    And was there a reason that you cashed those codes right

17 away?

18 A.    Yes.  We wanted to make sure that the defendant, if he was

19 able to track if the codes were redeemed, that he saw that the

20 codes were redeemed immediately because we needed to use them

21 immediately, as we had indicated, to facilitate the brothers

22 over to ISIS-controlled territory.

23 Q.    And what was the total value of the gift card codes that

24 the defendant sent you?

25 A.    The total value was $245.

Sikorski - Direct                                                          585

1  Q.   And in the last message on Exhibit 2-129, can you read

2  what you said to the defendant in that green bubble after he

3  sent the last of the gift card codes?

4  A.   "MashaAllah may Allah reward you for your efforts.  This

5  will help the brothers from Sudan seeking to fight in path of

6  Allah in khilafah."

7  Q.   And based on what you were telling the defendant, where

8  would those brothers be fighting in the path of Allah?

9  A.   We told them they were being sent to that Wilayat Sirte

10  area of Libya.

11  Q.   And what date did you send that Threema message to the

12  defendant?

13  A.   I sent that on July 29, 2016.

14  Q.   And then if we can turn to Government Exhibit 2-130?

15         Now, the previous message you just testified about

16  that you sent, was that sent to the defendant's original

17  Threema account or to his second one?

18  A.   That was that second account, indicated by the ~L account.

19         MR. GIBBS:  And so in Exhibit 2-130 -- can we

20  highlight the -- yeah, you got the bottom two?  Thank you.

21  Q.   What does the -- on that green message from you, there's a

22  little symbol next to that of an eye, it looks like?

23  A.   Yes.  We haven't previously talked about this, but the

24  Threema application has a built-in feature that allows the

25  individual to see when the other end user reads the message.

Sikorski - Direct                                                    586

1   So in this case, you can see the message indicated by the

2   actual eye indicates that the message was read at 10:41 a.m.,

3   and if you go to the previous, you can see the envelope that I

4   described previously means when I sent it.

5   Q.   And then after reading that or, you know, after the symbol

6   of the eye was on there, the message at the bottom in gray, who

7   was that from?

8   A.   That was from the defendant, the response to what I had

9   said in the green bubble.

10  Q.   And can you just read what the defendant said in that

11  message to you?

12  A.   Yes.  There's an emoji with a single index finger being

13  pointed up, and then it says, "glad it came through.  Getting

14  rid of device now..fo real.  Gonna eat the Sim card.  Have a

15  good day."

16  Q.   And who brought up this idea of getting rid of the device?

17  A.   That was the defendant.

18  Q.   And who brought up this idea of eating the SIM card?

19  A.   That is the defendant.

20  Q.   What is a SIM card?

21  A.   The SIM card is the little card that's in the back of your

22  phone.  It is a plastic-metallic chip that controls the IMEI

23  number, the IMSI number and things like that, or just the IMSI

24  number.  I may be mistaken there.  But it's basically the

25  control card for the phone that allows the phone to communicate

```
Sikorski - Direct                                           587
```

1    with the cell towers and things.

2    Q.   And was this last message from the ~ Threema account?

3    A.   Yes, it was.

4    Q.   So if we could go to Government Exhibit 2-121?  What is

5    2-121?

6    A.   Again, this is a picture of the phone that I was utilizing

7    to communicate with the defendant.  In this case, we are back

8    to the original defendant's HWM Threema account.

9    Q.   And can you read what you said in the first sentence of

10   that message to the defendant about the brothers in Sudan?

11   A.   Yes.  It says, "Salaam akhi.  The brothers in Sudan will

12   be grateful for your help."

13   Q.   And then further down in that message, you said,

14   "Sometimes ops last for few days or week depend on rafidi moves

15   when were out."  What were you referring to when you talked

16   about ops lasting for a few days?

17   A.   I was referring to the operations in which Mo, who I was

18   impersonating, was going out and fighting on behalf of ISIS.

19   Q.   And what does "rafidi" mean?

20   A.   "Rafidi" is a term used, it's a -- I think the literal

21   definition is something like rejectionist, but it's a term used

22   to describe Shia Muslims.

23   Q.   At the end, you said, "Your message gives strength and I

24   let brother know we have more codes bec of trusted brothers in

25   dar al kufar."  What does "dar al kufar" refer to?

Sikorski - Direct                                                588

1   A.    Just land of a non-Believer.  Literal translation could be

2   the West, the U.S. and Europe.

3   Q.    And which trusted brothers in Dar al-Kufr were you

4   referring to in that message?

5   A.    The defendant.

6   Q.    Now, if we could next go to Government Exhibit 2-122?  And

7   what is 2-122?

8   A.    2-122 is again a picture of the phone I was utilizing to

9   communicate with the defendant on, and again, this is the

10  original HWM account, and you can see that the new message here

11  is the message the defendant sent me in the lower gray box.

12  Q.    Can you just read what the defendant said in the message

13  in that gray box?

14  A.    It says, "Rafida rats.  Allah bless you.  Stay safe.

15  Waalikom salam."

16  Q.    Next, if we could turn to Government Exhibit 2-123?

17  A.    Yes.  Again, this is a picture of the phone I was

18  utilizing to communicate with the defendant on Threema with.

19  There are two new messages indicated in the green boxes here

20  that I sent to the defendant.

21       MR. GIBBS:  And I believe we have the first message

22  highlighted on the screen at the moment.  If we can zoom in on

23  the second one next?

24  Q.    Now, in that message, after writing about the coup attempt

25  in Turkey, you told the defendant, "Border with Sham just to

Sikorski - Direct                                              589

1   large for them to lose thousands at once."  What does "Sham"

2   refer to?

3   A.    "Sham" refers to the Islamic State in Syria, basically the

4   actual territory.

5   Q.    And then towards the bottom of that message, you talked

6   about the Khilafah needs brave brothers and sisters, and then

7   you said, "We needed more brothers for fights so we move them

8   before sister."

9          What fight was that a reference to?

10  A.    Just the general fight that ISIS was fighting with the

11  Iraqi government, the U.S.-backed coalition, and the Syrian

12  government.

13  Q.    And then if we could turn to Government Exhibit 2-125?

14  What is 2-125?

15  A.    Again, it's a picture of the phone that I was

16  communicating with the defendant utilizing Threema, and the new

17  messages here sent on Thursday, August 2, 2016, are messages

18  the defendant sent me, as indicated in the gray bubbles to the

19  left.

20          MR. GIBBS:  All right.  And if we could pull up that

21  first gray bubble that starts, "Glad you weren't on ops for

22  long"?

23  Q.    Special Agent Sikorski, in that first message to you, what

24  did the -- what explanation did the defendant give for why the

25  Turkish border was harder to get through now?

Sikorski - Direct                                                    590

1   A.   Because they had bent to Zionist pressure.

2        MR. GIBBS:  And then if we could blow up the second

3   bubble?

4   Q.   Now, about halfway down, the defendant said, "To be honest

5   I would like to buy a slave..seriously, lol, but I heard the

6   supply is low..inshallah a large crop of Alawi women will fall

7   into the hands of the mujahedeen."

8        What does "mujahideen" mean?

9   A.   It's a term used for an Islamic fighter.

10  Q.   And what does "Alawi" mean?

11  A.   "Alawi" refers to a group or sect of Muslims in Syria and

12  others parts of the Middle East.

13  Q.   And did you understand the defendant's reference to hoping

14  a large crop of Alawi women would fall into the hands of

15  mujahideen?

16  A.   Yes.  I --

17       MR. SMITH:  Objection as to speculation as to

18  defendant's mindset.

19       THE COURT:  I'm going to sustain the objection.

20  BY MR. GIBBS:

21  Q.   And, Special Agent Sikorski, in your communications with

22  the defendant, who was the only one to bring up an interest in

23  buying an Alawi slave?

24       MR. SMITH:  Objection.  Leading.

25       THE COURT:  Well, more than that, I think we're

Sikorski - Direct                                                591

1   getting beyond the scope of what's at issue in this case, so

2   I'll sustain the objection.

3   BY MR. GIBBS:

4   Q.   And, Special Agent Sikorski, if you can turn to Government

5   Exhibit 2-126?

6            And if we can -- first of all, what is 2-126?

7   A.   Again, it is a picture of the cell phone that I was

8   utilizing to communicate with the defendant via Threema on.

9            MR. GIBBS:   And if we can zoom in on the second

10  message from the bottom?

11  Q.   Now, in that second message, the defendant said, "Please

12  let me know if you find any brothers from Derna or Abu Salem

13  martyrs brigade."

14           First of all, where is Derna located?

15  A.   It's a city within Libya.

16  Q.   And in your Threema communications with the defendant, who

17  was the only one to bring up the Abu Salim Martyrs Brigade?

18           MR. SMITH:   Objection.  Leading.

19           THE COURT:   No, no.

20           MR. GIBBS:   That's not leading.

21           THE COURT:   That's not leading.  Overruled.

22           THE WITNESS:   It was the defendant.

23  BY MR. GIBBS:

24  Q.   And in terms of the defendant's request to tell him if you

25  found any brothers from either Derna or the Abu Salim Martyrs

Sikorski - Direct                                                          592

1    Brigade, when you corresponded with him, where did you always

2    lead him to believe that Mo was located?

3    A.    In ISIS-controlled territory in Syria or Iraq.

4    Q.    And then if we could -- we can take that one down.

5              If we can go to the message just above that?  And in

6    the message above that, the defendant talked -- well, can you

7    read after the first sentence, the one that begins, "I was

8    talking to a very smart sister"?

9              MR. SMITH:  Objection.  Relevance.  Relevance.

10             MR. GIBBS:  I'm going to ask a question about that.

11             THE COURT:  You need to tie it up.  All right,

12   overruled.

13             THE WITNESS:  "I was talking to a very smart sister

14   from north Africa, she didnt have a good view of the khalifa,

15   or any mujahideen really...."

16   Q.    And then what does it say after the dot-dot-dot?

17   A.    "But that isnt suprising due to the brainwashing in those

18   corrupt mosques..(the jihad is within our selves, jihad of the

19   pen, blah, blah, the usually emotional stuff, zero evidence.)"

20   Q.    And was this the first time the defendant had brought up

21   this really smart sister from north Africa?

22   A.    Yes.

23   Q.    And when he used the term "khalifa," again, what does the

24   term "khalifa" mean?

25   A.    The Islamic State.

Sikorski - Direct                                                        593

1    Q.   And he said, "a good view of the khalifa or any mujahideen

2    really."  Again, remind us what "mujahideen" means.

3    A.   "Mujahideen" is a term used for an Islamic fighter.

4    Q.   All right, thank you.

5         Now, Special Agent Sikorski, what was the date of the

6    defendant's last Threema message to you?  You may have to go

7    back.  Let's go --

8    A.   I have to look back, but I believe it was on August 2, but

9    I'd have to verify through the exhibit.

10   Q.   Right.  Let's go back to 2-125.  That will make it a

11   little easier.

12   A.   Yes.  It was there Tuesday, August 2, 2016.

13   Q.   And when was the defendant arrested?

14   A.   The next day.

15   Q.   So August 3, 2016?

16   A.   Yes.

17   Q.   And what was your role on August 3, 2016?

18   A.   My role on August 3, 2016, was to respond to the Metro

19   transit facility located in Springfield, Virginia, to secure

20   the defendant's vehicle and locker simultaneously to the

21   defendant's arrest.

22        MR. GIBBS:  And, Your Honor, at this time, I have a

23   stipulation to read into the record.

24        THE COURT:  All right.

25        MR. GIBBS:  Stipulation No. 6.  The United States and

Sikorski - Direct                                                    594

1   the defendant hereby stipulate and agree that Government

2   Exhibit 3-100 is a photograph that accurately depicts defendant

3   Nicholas Young's truck on August 3, 2016, before it was

4   searched by the FBI."

5           And we would ask to move in Government Exhibit 3-100

6   at this time.

7           MR. SMITH:  No objection.

8           THE COURT:  All right, it's in.

9           (Government's Exhibit No. 3-100 was received in

10  evidence.)

11          MR. GIBBS:  And if we could just pull that up?

12  Q.   What is this, sir?

13  A.   That is a photo taken of the defendant's truck on the

14  morning of August 3 in Springfield, Virginia.

15  Q.   And then I have another stipulation to read, which is

16  Stipulation No. 9, where the United States and the defendant

17  hereby stipulate and agree that Government Exhibit 3-115 is a

18  photograph that accurately depicts a bumper sticker on

19  defendant Nicholas Young's truck on August 3, 2016, before it

20  was searched by the FBI.

21          And we have would ask to move in Government Exhibit

22  3-115.

23          MR. SMITH:  No objection.

24          THE COURT:  All right, it's in.

25          (Government's Exhibit No. 3-115 was received in

Sikorski - Direct                                                    595

1    evidence.)

2            MR. GIBBS:  If we could publish that?

3    Q.   And, Special Agent Sikorski, you testified about your role

4    in the -- on the day of the arrest of the defendant.  What

5    role, if any, did you have in transporting the defendant's

6    truck on August 3, 2016?

7    A.   My role in transporting the defendant's truck was myself

8    and another special agent from the FBI watched that vehicle be

9    loaded onto a flatbed tow truck.  That tow truck then drove

10   with us behind it all the way from Springfield, Virginia, to a

11   location in Washington, D.C., where the vehicle was going to be

12   secured pending the issuance of a search warrant.

13   Q.   All right.  And I'd like to read into the record

14   Stipulation No. 7, which says, "The United States and the

15   defendant hereby stipulate and agree that Government Exhibit

16   3-101 is a photograph that accurately depicts the mode of

17   transport of defendant Nicholas Young's truck to an FBI

18   facility after it was seized on August 3, 2016.

19           And we would ask to move in Government Exhibit 3-101.

20           MR. SMITH:  No objection.

21           THE COURT:  All right, it's in.

22           (Government's Exhibit No. 3-101 was received in

23   evidence.)

24           MR. GIBBS:  And if we could publish that?

25   Q.   So you just testified a moment ago about the flatbed that

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

-877-

Sikorski - Direct                                                     596

1    the truck was transported on.  Is this what it looked like that

2    day?

3    A.   Yes.  This is an exact depiction of what it looked like

4    when it arrived at the facility in Washington, D.C.

5    Q.   And who was in charge of making sure the truck stayed

6    secured until it could be transported?

7    A.   I was.

8    Q.   And where -- you said -- and what were you doing during

9    the time the truck was being moved?

10   A.   Myself and another special agent were traveling in my

11   FBI-issued bureau car directly behind this flatbed tow truck

12   with that truck on the back of it, following it to this

13   facility in D.C.

14   Q.   And what happened -- when you got to D.C., what happened

15   before the truck was taken off of the trailer?

16   A.   Myself and the other agent were waiting on the side of

17   this ramp.  As you can see, that goes up into the open door.

18   We were alerted by the tow truck driver that as he began to

19   undo the straps of the vehicle, the tow truck driver alerted us

20   that there was a cell phone lying on the flatbed of the tow

21   truck in between the two rear wheels.

22        MR. GIBBS:  And, Your Honor, at this time, we would

23   offer into evidence Exhibits 3-102 and 3-103, which are

24   photographs of that phone.

25        THE COURT:  Any objection?

Sikorski - Direct                                                      597

1               MR. SMITH:  No objection.

2               THE COURT:  They're in.

3               (Government's Exhibit Nos. 3-102 and 3-103 were

4     received in evidence.)

5               MR. GIBBS:  Let's pull up 3-102 first.

6     Q.    Now, Special Agent Sikorski, who took this photo of the

7     phone?

8     A.    It was either myself or Special Agent Miriam Fontanez.  We

9     were both present.  I don't specifically remember which one of

10    us actually took the picture, but we were both present when we

11    were taking this evidence.

12    Q.    And you testified a moment ago about seeing the phone on

13    the flatbed on that day.  Is this the way it looked when it was

14    pointed out to you?

15    A.    Yes.  That is an exact -- that is the exact location that

16    I first observed it.  This is an unmoved photo.

17    Q.    And yeah, if we can look at Government Exhibit 3-103, that

18    might give you a better view.  What is this?

19    A.    Again, this is a zoomed-in picture of that cell phone

20    lying on the bed of the flatbed tow truck.

21    Q.    And what kind of phone was this?

22    A.    It was a ZTE phone.

23    Q.    And the color is?

24    A.    It was a, a black phone.  It had a clear, large screen on

25    the front side of it.  This is a picture of the back side, as

Sikorski - Direct                                                    598

1   it was laying on the flatbed when we saw it.

2   Q.    And was there anything unusual on the phone itself?

3   A.    Yes.  On the front of the phone, where you would normally

4   see the front-facing camera, there was pieces of Scotch Tape,

5   clear Scotch Tape covering the front-facing camera.

6   Q.    And so what happened to the phone after you and Mirian

7   Fontanez found it on the trailer?

8   A.    We took possession of it as FBI evidence at that location.

9   From that location, we responded directly to the Washington

10  Field Office in Washington, D.C., and entered that phone into

11  FBI evidence.

12  Q.    And is that standard procedure on how you handle evidence

13  when you seize it at the FBI?

14  A.    Yes.

15  Q.    And this was you and Special Agent Fontanez that took the

16  phone back to the Washington Field Office?

17  A.    Yes, it was.

18        MR. GIBBS:  Your Honor, at this time, I would like to

19  read Stipulation No. 10, which says that the United States and

20  the defendant hereby stipulate and agree that Government

21  Exhibits 3-302 through 3-226 are messages found by the FBI on

22  the cellular telephone marked as Government Exhibit 3-200.

23        THE COURT:  All right, is there any objection to

24  those exhibits going in, that is, 3-202 through 226 and also

25  3-200?

Sikorski - Direct                                                      599

1              MR. SMITH:  No objection.

2              THE COURT:  All right, they're all in.

3              (Government's Exhibit Nos. 3-200 and 3-202 thru 3-226

4    were received in evidence.)

5              MR. GIBBS:  Thank you.

6    Q.   Special Agent Sikorski, prior to your testimony today, did

7    you look at 3-202 through 3-226 from this phone?

8    A.   Yes, I did.

9    Q.   And what were those exhibits?

10   A.   Those exhibits were the forensic examination of the phone

11   that I found on the bed of that tow truck, and they are the

12   other end of the Threema communications that I was

13   communicating with my phone.  These exhibits are the other end

14   of that that were found on that phone that was lying on the bed

15   of the tow truck.

16   Q.   And so if we could -- I'm not going to display all of them

17   or even very many of them because you said these are the other

18   end of the messages.  So the defendant's messages you testified

19   about earlier were on this phone?

20   A.   Correct.  Both the defendant's messages to me and my

21   messages to the defendant were found on that phone that was

22   recovered from the bed of that flatbed tow truck.

23             MR. GIBBS:  Okay.  So I just want to pull up a couple

24   of these, but if I could pull up 3-202?  And if it's possible

25   to zoom in a little bit?

Sikorski - Direct                                              600

1   Q.   Now, Special Agent Sikorski, can you explain what this is?

2   A.   That is a picture of the phone that I found on the bed of

3   the flatbed tow truck.  You can see that clear Scotch Tape that

4   I indicated previously in the upper right-hand corner, and then

5   this specific HWM account is a -- is the Threema account that I

6   was communicating on with that other phone that you saw the

7   previous Threema messages from.

8   Q.   Right.  And we talked about the Threema account.  This was

9   the first Threema account that you were communicating with the

10  defendant, correct?

11  A.   Yes, it was.

12  Q.   Not the one that was used to send the codes?

13  A.   Correct.  This is the HWM account, not that account with

14  the ~L that I previously described.

15  Q.   And then if we can go to 3-203, what is 3-203?

16  A.   3-203 is a picture of that ZTE phone, and again, this is a

17  picture of the Threema accounts and messages on that phone.

18  Q.   And do you recognize any of the accounts in the middle of

19  that -- or on that phone anywhere?

20  A.   Yes.  I only recognize the lower account that's indicated

21  with a UNTDSKA7.  That is my Threema account that I was

22  utilizing to communicate with the defendant.

23  Q.   And off to the side of that account you were using to

24  communicate with the defendant, do you see a letter there?

25  A.   Yes.  Highlighted in yellow, this is again that same

Sikorski - Direct                                               601

1  symbol that I referred to as a tilde.  You see the ~V, with a

2  capital V.

3  Q.   And do you recognize the reference to the V?

4  A.   Yes.  That's a reference to the V4Vendetta and to the V

5  that the defendant had initially called me when he initially

6  said, "Salam alicom V" to the first Threema message he had sent

7  me.

8           MR. GIBBS:  And then just one more on this phone from

9  the truck flatbed.  If we could pull up 3-224?  If we can zoom

10 in on that a bit?

11 Q.   Now, did you recognize this message on the phone from the

12 flatbed as one that you had received previously?

13 A.   Yes.  This is one of --

14           MR. SMITH:  Objection, Your Honor.  Relevance.

15           THE COURT:  No.  It's connecting the dots, which the

16 government has the obligation to do.  Overruled.

17           THE WITNESS:  Yes.  This is the message that the

18 defendant sent me on my phone that I received from my Threema

19 account.  This is the actual message on that phone that he sent

20 me.

21 BY MR. GIBBS:

22 Q.   And, in fact, at the top of the phone, you can actually

23 see "ZTE."  That refers to the type of the phone?

24 A.   Yes.  That is the, I believe the brand of that particular

25 phone.

Sikorski - Direct                                                602

1   Q.   Now, you testified earlier, Special Agent Sikorski,

2   that -- well, first of all, you testified that you looked at

3   all the messages on this black ZTE phone from the flatbed

4   truck, correct?

5   A.   I looked at the exhibits from the Threema messages on that

6   phone.

7   Q.   Right.  And you testified earlier that the codes that the

8   defendant actually sent you were from a second tilde account.

9   Do you recall that?

10  A.   Yes, I do.

11  Q.   And in the last message the defendant sent, he said he was

12  getting rid of the device and he was eating the SIM card.  Do

13  you recall that message?

14  A.   Yes, I do.

15  Q.   So were any of those tilde messages found on this black

16  ZTE gophone?

17  A.   No, not to my knowledge.

18          MR. GIBBS:  Your Honor, at this time, I've got

19  another stipulation to read into the record.  It's Stipulation

20  No. 8.

21          The United States and the defendant hereby stipulate

22  and agree that Government Exhibits 3-104 through 3-114,

23  Government Exhibits 3-117 through 3-121, Government Exhibit

24  3-125, and Government Exhibit 3-300 are items that were found

25  by the FBI in defendant Nicholas Young's truck after his

Sikorski - Direct                                                    603

1    arrest.

2            THE COURT:  All right.  Do you want to move all of

3    those in at this point or not?

4            MR. GIBBS:  I would like to, Judge, and I'll have the

5    agent talk about some of those right now.

6            THE COURT:  Any objection?

7            MR. SMITH:  Your Honor, only to 3-300.  It's a Sony

8    Cyber-Shot camera seized from the truck.  We don't know what

9    the government intends to do with the camera, whether it

10   intends to just present the camera.

11           THE COURT:  All right.  That's the last one in the

12   series, so let's wait and see.

13           So at this point, 104 through 114, 117 to 121, 125

14   are in, correct?

15           MR. GIBBS:  Correct.

16           THE COURT:  All right.  300 is not yet in.

17           (Government's Exhibit Nos. 3-104 thru 3-114, 3-117

18   thru 3-121, and 3-125 were received in evidence.)

19           MR. GIBBS:  And then at this time, Judge, I would

20   like to have the, Special Agent Sikorski take a look at Exhibit

21   3-117.  Let's just pull that up.

22   Q.    Special Agent Sikorski, what is 3-117?

23   A.    3-117 is a picture of a FedEx office user card or stored

24   value card.

25   Q.    Okay.  And, in fact, there were a number of these FedEx

Sikorski - Direct                                                    604

1   stored value cards found in the defendant's truck on the day of

2   the arrest, correct?

3   A.    I know of two.

4   Q.    Okay.  And in the investigation, we have a number of

5   e-mails that the defendant sent from the Essa Kobayashi e-mail

6   account that are in evidence, and we have a number of still

7   photos of the defendant in the FedEx.  Now, were you able to

8   look at the date and times of some of those e-mails and the

9   FedEx photos and compare that with the transaction detail

10  history we got from FedEx to confirm if, in fact, there were

11  transactions on those dates?

12  A.    Yes, I was.

13  Q.    All right.  And sort of a long, complex question, but

14  let's see if we can walk through this.

15          So 3-117, could we look at the back of that card,

16  Fabian?

17          And so there is a number on that.  Do you see that?

18  A.    Yes, I do.  It's highlighted in yellow.  It's RU402068209.

19  Q.    And if we can pull up 3-117A, which is the transaction

20  detail history for that particular FedEx value card?

21          THE COURT:  All right.  Now, the subsections A or B,

22  whatever you've got, were not formally moved in, so is there an

23  A for each of these exhibits?

24          MR. GIBBS:  I'm sorry, is there a page for?

25          THE COURT:  Yeah.  117A is a separate exhibit from

Sikorski - Direct                                                    605

1    117.  When you did that mass moving in, we didn't talk about

2    subgroupings of As or Bs.  Is that expected to have happened?

3            MR. GIBBS:  Well, I'd like to have the agent take a

4    look at 117A, and I would like to have it moved in at this

5    time.

6            THE COURT:  What I'm saying is it's not in yet.

7            MR. GIBBS:  Okay.

8            THE COURT:  Okay.  Is there any objection to 117A?

9    I'm assuming defense counsel have it.  Mr. Smith, is there an

10   objection to 117A?

11           MR. GIBBS:  Judge, I would note we have a

12   certification for this.  This is a FedEx business record.

13           THE COURT:  I understand that, but let's --

14           MR. SMITH:  No objection.

15           THE COURT:  All right.  It's now in, and you may

16   publish it.

17           (Government's Exhibit No. 3-117A was received in

18   evidence.)

19           MR. GIBBS:  All right.  First of all, let's do it

20   this way:  Can we pull up Exhibit 1-219 to start with?  If you

21   could zoom in on the top of that?  This is an e-mail that's

22   already in evidence.

23   Q.   And, Special Agent Sikorski, do you see the date on that

24   e-mail in 1-219?

25   A.   Yes, I do.

Sikorski - Direct                                                    606

1   Q.   And what is the date?

2   A.   It is February 16, 2016.

3            MR. GIBBS:  And then if we can pull up a second

4   exhibit, which is also already in evidence, it's 7-216A?

5   Q.   And this is a -- do you recognize this exhibit?

6   A.   Yes, I do.  It's a photo of a FedEx facility and the

7   defendant on February 16, 2016.

8   Q.   All right.  So the same date as the prior e-mail?

9   A.   Yes.

10           MR. GIBBS:  All right.  So let's go to the

11  transaction detail history 3-117A, if we can display that.

12  We'll have to blow that up.

13           Now, let's start at the top.  Is there a way to

14  enhance the actual number of the FedEx card?  And is there a

15  way to pull the other card, do them side by side?

16           THE COURT:  Let's move this along.  The jury, I

17  think, has the picture.

18           MR. GIBBS:  Okay.  And so let's just stick with the,

19  the exhibit on the right, which is the FedEx detail history.

20  And if we can bring that up by itself and blow it up a little

21  bit?

22  Q.   And, Special Agent Sikorski, the date we were asking about

23  was February 16, 2016.  For that particular FedEx card from the

24  defendant's truck, were you able to find any transactions where

25  that card was used at a FedEx on February 16, 2016?

Sikorski - Direct                                                              607

1  A.    Yes.  There are three transactions indicated in lines

2  No. 27, 28, and 29 that occurred on February 16, 2016.

3  Q.    And were you able to make similar connections for other

4  transactions on those FedEx cards in preparation for your

5  testimony today?

6  A.    Yes.  I was able to connect at least three other

7  transactions in this same manner, linking the pictures with the

8  transaction dates and times from the FedEx transaction history.

9           MR. GIBBS:  All right.  And I won't make you go

10  through that again.  Thank you, though.

11           And then, Judge, we have -- I have another

12  stipulation, and this relates to Government Exhibit 3-300.  The

13  defendant -- the defense did not agree to that exhibit, which

14  was the camera from the truck.

15           Stipulation No. 11 says that the United States and

16  defendant hereby stipulate and agree that Government Exhibit

17  3-302 is a photograph that was found by the FBI on defendant

18  Nicholas Young's camera marked as Government Exhibit 3-300.

19           So we would ask to admit 3-302 and 3-300 into

20  evidence.

21           MR. SMITH:  Your Honor, we stipulated to the

22  authenticity of the document, not relevance.  We object to the

23  relevance of the document.  If Your Honor looks at --

24           THE COURT:  Let me take a look at it.

25           MR. SMITH:  The defense objects to the relevance in

Sikorski - Direct                                                    608

1    connection with this particular witness.

2              THE COURT:  I'll permit it.  Overruled.

3              (Government's Exhibit Nos. 3-300 and 3-302 were

4    received in evidence.)

5              MR. GIBBS:  Thank you, Your Honor.  And if we could

6    publish 3-302?

7              And before I go to the next stipulation, I've just

8    got a couple more, Your Honor, I did not move in the other

9    FedEx transaction detail history, so 3-118A, 119A, and 120A are

10   three additional documents like the ones in 3-117A.  We'd ask

11   to move those three in as well.

12             THE COURT:  Any objection --

13             MR. SMITH:  Well --

14             THE COURT:  -- to 118A, 119A, and 120A?

15             MR. SMITH:  No objection.

16             THE COURT:  All right, all three are in.

17             (Government's Exhibit Nos. 3-118A thru 3-120A were

18   received in evidence.)

19             MR. GIBBS:  And I'd like to read into the record

20   Stipulation No. 12:  The United States and the defendant hereby

21   stipulate and agree that Government Exhibits 4-101, 102, 104,

22   105, 107 --

23             THE COURT:  Whoa, whoa, slow down.  101, 102, 104,

24   105, 107, what?

25             MR. GIBBS:  108.

Sikorski - Direct                                                609

1           THE COURT:  Go ahead.

2           MR. GIBBS:  109, and 4-200 were found by the FBI in

3   the course of arresting defendant Nicholas Young on August 3,

4   2016.

5           MR. SMITH:  No objection.

6           THE COURT:  All right, they're all in.

7           (Government's Exhibit Nos. 4-101, 4-102, 4-104,

8   4-105, 4-107 thru 4-109, and 4-200 were received in evidence.)

9           MR. GIBBS:  And if I could, there are two other

10  exhibits I'd like to show the agent.  If we could pull up

11  Exhibit 4-102?

12  Q.   Have you seen this document before, Special Agent?

13  A.   Yes, I have.

14  Q.   Do you recognize any of the markings on this document?

15  A.   Yes.  This document is actually upside down.  If you were

16  to rotate it 180 degrees like was just done there, the top

17  UNTDSKA7, that is my Threema account that I was utilizing to

18  communicate with the defendant.  You can see the word "Threema"

19  written there, which is the messaging app we were communicating

20  on, and the HWM5PPKH account is the defendant's account that

21  was communicating with me on the Threema application.

22  Q.   All right.  And then -- I've already rotated, unless you

23  could tell, but the other writing on there, do you recognize

24  that?

25  A.   No.

Sikorski - Direct                                              610

1    Q.   Okay.  That will be for a different witness.

2              Then if we can go to Government Exhibit 4-104?  And

3    we're going to have to zoom in on the top of this exhibit, but

4    had you reviewed this previously, Special Agent Sikorski?

5    A.   Yes, I had.

6    Q.   And what is this?

7    A.   It appears to be an advertisement or -- for a local

8    business, roti, with some words written on it.

9    Q.   And as far as the words written on it, did you recognize

10   any of those words?

11   A.   I did recognize at the very, very top, you can see

12   above "Keep your," now highlighted in yellow, it says "Essa

13   Kobayashi."  That is the e-mail account of the defendant that

14   was communicating with the account being perceived to be Mo and

15   the V4Vendetta e-mail account.

16   Q.   Thank you.

17             And then if we could, if I could have you take a look

18   at Government Exhibit 4-107, or if we can pull that up?

19             If I could indulge the CSO, I'd also like to have the

20   agent take a look at Exhibit 7-102, which is a paper document.

21             MR. SMITH:  No objection.

22             THE COURT:  All right, it's in.  7-102 is in.

23             (Government's Exhibit No. 7-102 was received in

24   evidence.)

25   BY MR. GIBBS:

Sikorski - Direct                                                        611

1   Q.    All right.  Do you have that there in front of you?

2   A.    Yes, I have both 4-107 exhibit and 7-102.

3   Q.    Okay.  And were you able to compare those two?

4   A.    Yes, I was.

5   Q.    Okay.  And 4-107 is a Best Buy receipt that was found in

6   the course of arresting the defendant, correct?

7   A.    Yes, it is.

8   Q.    And what is 7-102?

9   A.    7-102 is a Best Buy records, I'll refer to here as a

10  duplicate copy of records that the FBI obtained from Best Buy.

11  These two transactions are identical.

12  Q.    Thank you.

13        And then, Special Agent Sikorski -- I've just got a

14  couple more stipulations, and I think we'll be done.

15        THE COURT:  Well, give the jury some context.  What

16  was bought?  What does the receipt refer to?

17  BY MR. GIBBS:

18  Q.    Yeah, can you go ahead and --

19  A.    The receipt is from Best Buy, Best Buy in Fairfax,

20  Virginia, and there are $100 worth, so ten $10 Google Play

21  cards purchased from Best Buy from these receipts.

22        MR. GIBBS:  And I believe 4-107, it's not upside

23  down, yeah, if we could enhance that a little bit?

24        And then finally while we're still on Best Buy, I'd

25  like to read into evidence Stipulation No. 14, which is:  The

Sikorski - Direct                                                    612

1    United States and the defendant hereby stipulate and agree that

2    Government Exhibits 7-101, 7-102, 7-103, and 7-102 are

3    authentic business records of Best Buy, Inc.

4              THE COURT:  101, 102, and 103.

5              MR. GIBBS:  Correct.

6              THE COURT:  All right.

7              MR. SMITH:  Your Honor, the defense objects on the

8    basis of cumulative evidence.  This is unnecessary.  These are

9    videotapes showing that the defendant walked into Best Buy.

10             MR. GIBBS:  And I would make an offer of proof,

11   Judge, that is the evidence that he actually went in and bought

12   the receipt -- or bought the Google Play gift cards, or at

13   least some of them, and saved the receipts.  The videos are

14   very short.

15             THE COURT:  I'm going to overrule the objection.

16   They're in.

17             (Government's Exhibit Nos. 7-101 and 7-103 were

18   received in evidence.)

19             MR. GIBBS:  All right, thank you.

20             And if we could play beginning with the first video

21   and just roll right through them?

22             And for the record, we'll start with 7-101-1 and then

23   play 7-101-2 and 7-101-3, which are three Best Buy surveillance

24   videos.

25             (Government's Exhibit Nos. 7-101-1 and 7-101-2 were

Sikorski - Direct                                                    613

1   played.)

2            THE COURT:  How much longer is it like this?  This is

3   not adding much.

4            MR. GIBBS:  Yeah, go to the next one.

5            (Government's Exhibit No. 7-101-3 was played.)

6            MR. GIBBS:  And finally, Judge, I've just got two

7   more stipulations.  Stipulation 13:  The United States and the

8   defendant hereby stipulate and agree that Government Exhibit

9   4-106 is a photograph that accurately depicts the backpack of

10  defendant Nicholas Young after his arrest on August 3, 2016.

11           We would ask to move in that exhibit.

12           MR. SMITH:  No objection.

13           THE COURT:  All right, it's in.

14           (Government's Exhibit No. 4-106 was received in

15  evidence.)

16           MR. GIBBS:  If we could just publish it briefly?

17           And I'll read the last exhibit -- or last

18  stipulation, rather:  The United States and the defendant

19  hereby stipulate in Stipulation No. 29, they stipulate and

20  agree that metadata displayed on photographs from electronic

21  media among the government exhibits is metadata that was found

22  by the FBI forensic examiners who examined the electronic

23  media.

24           THE COURT:  Anything further?

25           MR. GIBBS:  No, Judge.  Thank you.

Sikorski - Cross                                                      614

1              THE COURT:  All right.  Mr. Smith?

2              MR. GIBBS:  Thank you, Special Agent Sikorski.

3              THE WITNESS:  Thank you.

4              MR. SMITH:  Your Honor, we're going to be brief with

5    this witness.

6                         CROSS-EXAMINATION

7    BY MR. SMITH:

8    Q.   Good afternoon, Agent Sikorski.

9    A.   Good afternoon.

10   Q.   You testified when you began taking control of the alias

11   Mo's e-mail account, correct?

12   A.   Yes.

13   Q.   And approximately when was that?  When did you take

14   control of that e-mail account?

15   A.   It was in July of 2016.  I never sent any messages on that

16   e-mail account.  I only was in the receive mode.

17             MR. SMITH:  So -- and could we put up GX, Government

18   Exhibit 1-221?  This was -- I think -- can you blow it up?

19   Q.   This is the first e-mail that you testified about this

20   afternoon, correct?  It's from June 14, 2016?

21   A.   Correct.

22   Q.   You -- did you draft that e-mail, or was that drafted by

23   someone prior to you?

24   A.   This was an e-mail sent by the defendant to --

25   Q.   Excuse me, excuse me.  Did you receive that e-mail once

Sikorski - Cross                                                      615

1    you had taken control of Mo's account?

2    A.    No.   I was not in control of this account when this was

3    received.

4    Q.    Okay.

5    A.    I later viewed it, but this was not -- I did not have

6    control of this account until July of 2016.

7    Q.    When you took control of the account in July 2016, did you

8    review the previous communications between the defendant and

9    the alias Mo's e-mail account to familiarize yourself with the

10   communications?

11   A.    Yes, absolutely.

12   Q.    And in order to properly communicate with Young as the

13   alias Mo from that point forward?

14   A.    Yes, that's correct.

15         MR. SMITH:   Okay.   So -- and can you put Government

16   Exhibit 1-221 back up and blow it up?

17   Q.    So Mr. Young's e-mail on this date was in response to a

18   prior communication from, from the alias Mo, correct?

19   A.    Yes, that's correct.

20   Q.    And, in fact, there were two prior communications that

21   this e-mail on June 14 was in response to, correct?

22   A.    I would have to review to know that there was specifically

23   two, but this is definitely a response to previous messages.

24         MR. SMITH:   Can we put up Government Exhibit 1-115?

25   And blow up the, blow up the first e-mail.   The top, March 5.

Sikorski - Cross                                                          616

1   Q.   Have you seen the March 5 e-mail from the alias Mo account

2   to Nicholas Young?

3   A.   Yes, I have.

4   Q.   And in that e-mail, does the alias Young -- or the alias

5   Mo ask -- broach the subject of communicating on a

6   surreptitious app in this exchange?

7   A.   Yes.

8   Q.   To the best of your knowledge, is this the first time that

9   the alias Mo raises the subject of using a secure app to

10  communicate with Young?

11  A.   Yes.  Right now, to the best of my knowledge, yes, it is.

12  Q.   And to the best of your knowledge, is this the first

13  communication between Mr. Young and Mo from either party

14  indicating that there would be further communications on the

15  secure app?

16  A.   Yes.

17          MR. SMITH:   Thank you.

18          Can you put up Government Exhibit 1-116?  Can you

19  blow up the -- yeah.

20  Q.   Have you seen this e-mail before from the alias Mo account

21  to Mr. Young?

22  A.   Yes, I reviewed it before.

23  Q.   And what is the date on that e-mail?

24  A.   It's April 18, 2016.

25  Q.   And this is an e-mail from the alias Mo to Nicholas Young

Sikorski - Cross                                                  617

1  that was following up on the previous e-mail we looked at,

2  Government Exhibit 1-115?

3          Let me rephrase that.  Do you -- are you aware of any

4  e-mails exchanged between the alias Mo account and Nicholas

5  Young between March 5, 2016, which we just looked at, and the

6  e-mail in front of you, Government Exhibit 1-116?

7  A.   Again, I would have to look at all of the communications

8  to confirm because I was not in control of these e-mail

9  accounts at the time, so I'm unable to specifically -- in

10  between those dates, I just don't remember unless I was shown

11  the actual full communication.

12  Q.   So who was in control?  Which agent was in control of the

13  alias Mo's e-mail account at this point?

14  A.   I believe it was the Agent Cameron Siegfried.

15          MR. SMITH:  Siegfried.

16          Your Honor, we move these two e-mails into evidence

17  as complete statements.  The witness --

18          THE COURT:  Wait, wait, wait.  Aren't they already

19  in?  I thought we've seen both of these.

20          MR. GIBBS:  They are, Judge.  I don't think -- I

21  think these are our exhibits.

22          MR. SMITH:  We're moving them in, Your Honor, because

23  the government has not put a witness on to testify about these

24  exhibits.

25          THE COURT:  Wait, wait, wait, wait.  The exhibit

Sikorski - Cross                                                          618

1   numbers again are what?  Government Exhibit --

2              MR. SMITH:  Government Exhibit 1-115.

3              THE COURT:  115.

4              MR. SMITH:  And Government Exhibit 1-116.

5              THE COURT:  All right, they're both in evidence.

6              MR. SMITH:  All right.

7              THE COURT:  All right.  In case they weren't.  I

8   think they already are.  They are.

9   BY MR. SMITH:

10  Q.   The second e-mail on April 18, 2016, indicates that the

11  alias Mo e-mail account again requests that the defendant

12  Nicholas Young and the alias Mo communicate through a secure

13  app, correct?

14  A.   Yes.

15  Q.   And then if we go back to Government Exhibit 1-221, it's

16  dated June 14, 2016, correct?

17  A.   It is.

18  Q.   And it's from Nicholas Young to the alias Mo's account?

19  A.   Yes, it is.

20  Q.   Is this the first response that the defendant made to the

21  two e-mails we just looked at from March 2016 and April 2016?

22  A.   Again, to the best of my knowledge right now, yes, it is.

23  Q.   Thank you.

24              And does the defendant say in the e-mail in front of

25  you, Government Exhibit 1-221, "I don't really do the tech

Sikorski - Cross                                                    619

1  thing...but I will inshallah message you on that app within the

2  week, likely before you read this message.  I really don't

3  trust any electronic or email communication...don't feel

4  comfortable even on this...but inshallah that app will be

5  okay."  Correct?

6  A.   Yes, that's a direct quote from the e-mail.

7  Q.   Did you testify earlier today that Mr. Young was the first

8  communicant between himself and the alias Mo to suggest

9  communicating on a secure app?

10  A.   I do not believe so.

11  Q.   So your testimony is it was the undercover informant, it

12  was the alias Mo that first suggested communicating on Threema?

13  A.   Yes, that's my recollection.

14  Q.   Okay.  Agent Sikorski, you testified that it was the

15  defendant Young who came up with the idea of sending codes on a

16  second account, a second Threema account, correct?

17  A.   Yes, I did.

18  Q.   But it was you who came up with the idea of sending the

19  codes in the first place, correct?

20  A.   We asked the defendant to send us Google Play codes, yes.

21  Q.   And the defendant had not offered to send Google Play

22  codes at any point before that, correct?

23  A.   Not to my knowledge.

24  Q.   But the government in the alias Mo role had suggested that

25  Mr. Young send Google Play cards before that, correct?

Sikorski - Cross                                              620

1   A.   Before, before what?

2   Q.   Before the -- so your message soliciting the Google Play

3   cards was dated July 18, 2016?  That's Government Exhibit

4   2-106.

5   A.   Yes.  That's my first response to the defendant on the

6   Threema app.

7   Q.   But prior to July 18, 2016, the alias Mo e-mail account

8   had suggested that Mr. Young send -- communicate through the

9   secure app through the use of Google Play gift cards, correct?

10  A.   Correct.  We had discussed how to purchase the app with

11  the, with the play card code.

12  Q.   That was Government Exhibit 1-221, dated June 14, 2016?

13  A.   I'd have to look.

14       MR. SMITH:  Can you put Government Exhibit 1-221 back

15  up?

16  Q.   This is an e-mail from the defendant's account to the

17  alias Mo's account dated June -- wait.  Excuse me.

18       Government Exhibit 1-115.  Government Exhibit 1-115

19  is a March 5, 2016, e-mail from the, from the government's

20  alias Mo account to the defendant's e-mail account.  The second

21  paragraph, within the second paragraph, do you see the line

22  that reads, "We think that the kuffar had spy or hacked

23  there," and it's, I believe it says -- what does it say?

24  ". . . Telegram and some other apps.  The brothers that I have

25  been helping with translations that were guiding people here

Sikorski - Cross                                                    621

1   are starting to use an app," and it says "Threema," right?  "We

2   were been trying to mess around with the Threema app and a few

3   of the brothers with technology backgrounds think its safer

4   than the other apps.  These brothers are so smart to hear them

5   talk about this its amazing that Allah has brought them to us.

6   One problem is that it takes time to set up though since we

7   have to use gift cards to get the app."

8           This is an e-mail from the alias Mo account to the

9   defendant on March 5, 2016, correct?

10  A.   Yes, it is.

11  Q.   The defendant did not respond to this e-mail with a

12  suggestion that he could send those gift cards, did he?

13  A.   No, he did not.

14  Q.   Okay.  So if we go back to the solicitation of the gift

15  card charge on July 18, 2016, that's Government Exhibit 2-106,

16  the defendant did not respond to this message by sending gift

17  cards; is that correct?

18  A.   No, he did.  He did send gift cards.

19  Q.   I'm asking you about the message on July 18, Government

20  Exhibit 2-106.  In response to this message, did the defendant

21  send gift cards?

22  A.   Yes.  I believe in response to the messages that I was

23  sending him on Threema, he sent gift cards.

24  Q.   I'm referring to the July 18, 2016, message that's

25  Government Exhibit 2-106.  On the screen, do you see that it

Sikorski - Cross                                                    622

1   reads -- this is your message, correct?

2   A.   Yes.

3   Q.   It says, "The group of brothers im' helping to get people

4   dawlah have 2 very trusted brothers in Uk who buy us Google

5   gift cards and send us the codes" back on accounts.  "Theyve

6   been sending codes for a while . . .."

7            Next message says -- let's see here -- the response

8   to this text message on July 18 is Government Exhibit 2-109,

9   correct?  We've got 2-109?  Which begins, "Congratulations on

10  your child."

11           THE COURT:  That's not there.

12  BY MR. SMITH:

13  Q.   2-110?

14  A.   Yes, those messages are from the defendant to me on

15  July 21, 2016.

16  Q.   July 21.  Did the defendant send gift cards on July 21,

17  2016, to --

18  A.   No, he did not.

19  Q.   Okay.  So, so the defendant did not respond to the first

20  solicitation request for Google Play gift cards on July 18,

21  2016, correct?

22  A.   He did not respond with Google Play cards on July 21, no.

23  Q.   And then you sent a second message, correct, on July 28,

24  2016?  That's Government Exhibit 2-212?

25  A.   Yes, I did.

Sikorski - Cross                                                    623

1   Q.   And in this message, Government Exhibit 2-212, it's the

2   July 28, 2016, message from the V4Vendetta account, "The

3   brothers in UK stopped getting codes to save for hijrah . . .."

4        Do you see that one?

5   A.   I'm flipping through my paper here.  Sorry.

6   Q.   It's 2-112?

7   A.   Yes.  Yes.  I now see in front of me Government Exhibit

8   2-112.

9   Q.   This is a message on July 28, 2016, correct?

10  A.   Yes, it is.

11  Q.   And this is in response to defendant's message of July 21,

12  2016, correct?

13  A.   Yes, it is.

14  Q.   So in this message, you are asking Mr. Young this a second

15  time, to send gift cards, correct?

16  A.   Yes, that's correct.

17  Q.   But it's actually a third time, though, right?

18  A.   The first time was the first time we just talked about on

19  the first messages that I sent, and this would be the second

20  time.  I'm not sure where the third time comes in.

21  Q.   Did you agree a few moments ago when we looked at

22  Government Exhibit 1-115 on March 5, 2016, that the V4Vendetta,

23  the Mo alias account had solicited gift cards from --

24            MR. GIBBS:  I'd object to the form of the question.

25            THE COURT:  I think that misstates that.  I'll

Sikorski - Cross                                                    624

 1   sustain the objection.

 2            MR. GIBBS:  Thank you.

 3            THE COURT:  Mentioning something and soliciting are

 4   two different things.  You need more specifics.

 5   BY MR. SMITH:

 6   Q.   I think if we go back to Government Exhibit 1-115, which

 7   is an e-mail dated March 5, 2016, do you agree, Agent Sikorski,

 8   that this e-mail from yourself reads, "We think that the kuffar

 9   had spy or hacked there telegram and some other apps.  The

10   brothers that I have been helping with translations that were

11   guiding people here are starting to use an app called Threema.

12   We were been trying to mess around with the Threema app and a

13   few of the brothers with technology backgrounds think its safer

14   than the other apps.  Only problem is that it takes time to set

15   up though since we have to use the gift cards to get the app."

16            Is that what it says?

17   A.   That's what it says, yes.

18   Q.   Did Mr. Young respond to this communication positively by

19   suggesting that you and the alias Mo should communicate through

20   the secure app?

21   A.   No.

22   Q.   He did not respond to that, that request until June 2016,

23   correct?

24   A.   Yes, I believe that's correct, the next response.

25   Q.   And in that response, Government Exhibit 1-221, he said,

Sikorski - Cross                                                    625

1   "I really don't trust any electronic or email communication...

2   don't feel comfortable even on this."  Correct?

3   A.   Yes.  Without it directly in front of me -- it's in front

4   of me.  That was a paraphrase, but yes.

5   Q.   So finally, in Government Exhibit 2-112, that's July 28,

6   2016, and your message says, "Only need a few right now,"

7   meaning gift cards.  Just send a few, right?

8   A.   Yeah.  I said we only need a few.

9   Q.   You testified earlier today that you were in Washington,

10  D.C., when you received these messages on July 28, 2016,

11  correct?

12  A.   I believe I said I didn't remember if I was because some

13  of the messages I was home when I received them in Alexandria,

14  Virginia, and some of the time I was in D.C.  I don't

15  specifically remember when I actually received those messages.

16  I just don't remember, I'm sorry.

17  Q.   And is that true for all of the Threema messages that

18  were, that were discussed in your direct testimony?  Do you not

19  recall for any given message on Threema that you discussed in

20  your direct when you received -- whether you received it in

21  Alexandria or Washington, D.C.?

22  A.   Some of them I can -- some of them I can specifically tell

23  because the pictures that I took of them, you can tell, like,

24  one of them is my kitchen, the background is my kitchen

25  counter.  You can tell on some of them where I was based on

Sikorski - Redirect                                                626

1   what the background of the picture is.

2   Q.   You don't remember for July 28?

3   A.   So if I looked at it at home and then actually took the

4   picture at the office, I just don't recall.

5   Q.   I'm just asking you today.  Today, as you testify today,

6   you do not recall?

7   A.   No, I don't recall if I was in D.C. or Virginia when I

8   actually received them.

9   Q.   Do you know where the messages were sent, the Threema

10  messages were sent from the defendant's side?

11  A.   No, I do not.

12  Q.   They were sent in Southwest, D.C., in L'Enfant Plaza,

13  correct?

14          MR. GIBBS:  Judge, the agent just testified he didn't

15  know.

16          THE COURT:  That's testifying.  Again, I would advise

17  the jury again, disregard that.  There's no evidence of that

18  unless the witness says yes, that's where it happened.

19          MR. SMITH:  That's all, Your Honor.

20          THE COURT:  All right.  Any redirect?

21                    REDIRECT EXAMINATION

22  BY MR. GIBBS:

23  Q.   One thing I -- you were asked on cross, it made me realize

24  I needed to bring it out earlier, was the Best Buy receipts you

25  testified about earlier?

Sikorski - Redirect                                              627

1   A.   Yes.

2   Q.   And the Best Buy video?

3   A.   Yes.

4   Q.   Where was that Best Buy located?

5   A.   It was in Fairfax, Virginia.

6         MR. GIBBS:  That's all I have, Judge.  Thank you.

7         THE COURT:  Is anybody going to call -- any recross?

8   That's one question.

9         MR. SMITH:  (Shaking head.)

10        THE COURT:  No?  All right.

11        Is anybody going to call Agent Sikorski again?

12        MR. GIBBS:  The government is not, Judge.

13        THE COURT:  How about the defense?  Is the defense

14  planning to call this witness again?

15        MR. SMITH:  No, Your Honor.

16        THE COURT:  All right.  Then, Agent, you're excused

17  as a witness.  You can stay in court and watch the proceedings

18  or leave, but do not discuss your testimony or anything you see

19  or hear in court with any witness who has not yet testified.

20        THE WITNESS:  Yes, Your Honor.

21        THE COURT:  All right?

22                    (Witness excused.)

23        THE COURT:  All right, call your next witness.

24        MR. GIBBS:  John Minichello.

25        THE COURT:  All right.  Agent Minichello, you're

Minichello - Direct                                          628

1   still under your affirmation to tell the truth from yesterday,

2   and I hope your voice is stronger.  All right?

3              THE WITNESS:  Yes, Your Honor.

4              THE COURT:  All right.

5              SA JOHN MINICHELLO, GOVERNMENT'S WITNESS,

6                  PREVIOUSLY AFFIRMED, RECALLED

7                      DIRECT EXAMINATION

8   BY MR. GIBBS:

9   Q.   Good afternoon, Special Agent Minichello.

10  A.   Good afternoon, sir.

11  Q.   In August 2016, when the defendant was arrested, did you

12  come back to this area to participate in processing the

13  defendant?

14  A.   Yes, I did.

15  Q.   And do you know what the defendant looked like?

16  A.   I do.

17  Q.   Is he here in the courtroom?

18  A.   He is.

19  Q.   Could you point to him and identify what he's wearing?

20  A.   He's there at the defense table.  He's wearing a purple

21  tie -- blue.

22             THE COURT:  Any objection?

23             MR. SMITH:  No objection.

24             THE COURT:  All right, he's identified.

25  BY MR. GIBBS:

Minichello - Direct                                               629

1   Q.   Now, you said you were involved in processing the

2   defendant.  What was that role exactly?

3   A.   After his arrest, we brought defendant Nicholas Young to

4   the FBI office, the Washington Field Office, and took down his

5   biographical information, took photographs of the defendant.

6   Q.   And let's start with photographs of the defendant.  I

7   believe you have a folder there in front of you and should have

8   Exhibit 4-300 in there.

9          MR. SMITH:  One moment, Your Honor.  We object to

10  relevance, 403.

11         THE COURT:  All right, let me take a look.

12         Based on pretrial rulings that we've had, I'm going

13  to find that this can come in.  It is relevant given the issues

14  in the case, so the objection is overruled.

15         MR. GIBBS:  Thank you, Judge.  And if we could move

16  4-300 into evidence and publish it to the jury?

17         THE COURT:  It's in.

18         (Government's Exhibit No. 4-300 was received in

19  evidence.)

20  BY MR. GIBBS:

21  Q.   Now, what is 4-300?

22  A.   That's a tattoo we observed on Nicholas Young's left arm.

23  Q.   And was the defendant interviewed that day?

24  A.   He was, yes.

25  Q.   And did you interview him?

Minichello - Direct                                                630

1   A.   I was one of two agents that interviewed him, yes.

2   Q.   All right.  And was the other agent who interviewed him

3   someone we will call Special Agent Jones?

4   A.   He is, yes.

5   Q.   And did the defendant sign an advice of rights form before

6   being interviewed?

7   A.   Yes, he did.

8   Q.   If you could take a look at Exhibit 5-302?

9         THE COURT:  Is there any issue about the way in which

10  the statements were taken from the defendant?

11        MR. SMITH:  (Shaking head.)

12        THE COURT:  No?

13        MR. SMITH:  No, Your Honor.

14        THE COURT:  They were voluntary?  You're satisfied

15  from *Miranda* warnings and all of that?

16        MR. SMITH:  Your Honor, this issue has never come up

17  before.

18        THE COURT:  Well, I know, so you get a chance to

19  raise it now.  Is there any issue about the voluntariness of

20  any statements made by your client?

21        MR. SMITH:  Would the Court allow us to speak with

22  our client before responding?

23        THE COURT:  Do it promptly, yes.

24        (Discussion between Mr. Smith and the defendant off

25  the record.)

Minichello - Direct                                                    631

 1              MR. SMITH:  Your Honor, we have no objection.

 2              THE COURT:  All right.

 3              MR. GIBBS:  So we'd move 5-302 into evidence.

 4              THE COURT:  5-302?

 5              MR. GIBBS:  And if we could publish that?

 6              THE COURT:  Hold on a second.

 7              You really don't need it.  There's no issue.

 8              MR. GIBBS:  That's fine.  We'll move on.  I'm going

 9   to save a little time.

10   Q.   Special Agent Minichello, when you and Special Agent Jones

11   interviewed the defendant, was that interview videotaped?

12   A.   Yes, it was.

13   Q.   And prior to your testimony today, did you look at clips

14   from that interview and compare them with transcripts of those

15   clips for accuracy?

16   A.   I did, yes.

17   Q.   And did you initial the -- I think it's just one clip.

18   Did you initial that?

19   A.   I initialed a disc with those clips on it, yes.

20              MR. GIBBS:  All right.  If I could hand this up to

21   the defendant, have him authenticate it?

22              THE COURT:  You're handing it to the witness.

23              MR. GIBBS:  Yes, thank you.

24   Q.   And do you recognize that?

25   A.   I do.  And I recognize my initials on that disc.

Minichello - Direct                                                632

1           MR. GIBBS:  All right.  Judge, at this time, what I'd

2    like to do is move in the disc which is 5-301, I believe it's

3    all three numbers:  5-301-1, -2, and -3.  All three clips are

4    contained on the one disc.  I'd like to move that into

5    evidence.

6           And this is the interview I was telling the Court

7    about that was actually videotaped.  So we have paper

8    transcripts.  These are short clips, but I'd like to pass those

9    out as well.

10          THE COURT:  All right, I think this is a good time

11   actually to take the afternoon break because you have to hand

12   out papers.

13          MR. GIBBS:  Sure.

14          THE COURT:  We can get -- we'll have the transcripts

15   on the chairs for the jurors when they come back in.  We'll be

16   in recess until four o'clock.

17          (Recess from 3:44 p.m., until 4:00 p.m.)

18                              (Defendant present, Jury out.)

19          THE COURT:  All right, I understand there's one or

20   two matters defense wants the Court to consider?

21          MR. SMITH:  Your Honor, I think we understand from

22   the government that the next witness, Agent Minichello, will be

23   testifying about his interview with the defendant on August 3,

24   2016.  This isn't charged conduct.  This is just a conversation

25   that the defendant had on the day of his arrest.  It doesn't --

Minichello - Direct                                                    633

1          THE COURT:  All right, let me find out, what's the

2     relevance of anything that's going to be said?

3          MR. GIBBS:  Judge, because it's charged conduct.  In

4     Count 1, he's charged from December to August 3, 2016, for

5     making a false statement about the destination and purpose of

6     Mo's trip and why he went over there.  They asked him about Mo

7     in the August 3 interview, and he lied about -- in answering

8     questions about Mo.  So it is part of Count 1.

9          THE COURT:  It's relevant.

10         MR. GIBBS:  Thank you.

11         THE COURT:  Overruled.

12         I thought there was another issue.

13         MS. MORENO:  Thank you, Your Honor.

14         THE COURT:  All right.

15         MS. MORENO:  I'm not sure exactly which witness is

16    going -- the government is going to try to get a number of

17    items in.  These are all these Hitler, smokestack --

18         THE COURT:  All right.

19         MS. MORENO:  -- Jewish cartoon stuff, and I'm not

20    sure who's going to do it.  I've asked.

21         We have stipulated to the places that it was found,

22    but we have not stipulated to relevance or the 403 issue, which

23    is very important to us.  So I certainly don't want any of

24    these published, and I don't want the government to tell the

25    jury that the defense has stipulated to it, and I'd like the

Minichello - Direct                                            634

1   Court to look at each and every one of those -- that category

2   of items in -- that we feel are very prejudicial.

3          THE COURT:  I had previously told the government that

4   I wanted to take a look at what you were planning to introduce,

5   this type of evidence, to make sure that it was not cumulative

6   and that it was reasonable, all right?  And you still haven't

7   given it to the Court.  We're not just wholesale allowing, you

8   know, 25 or 30 exhibits.

9          You'll get, you know, I'm allowing you to go into

10  this somewhat because again, the predisposition issue is an

11  element the government's got to meet, all right?  And you've

12  made a strong argument that your client did not have any

13  disposition to get involved in this kind of activity until the

14  government got involved with him.  We've talked about this

15  before.  And I have made the decision based upon what has been

16  presented to me pretrial that there is enough evidence of some

17  connection between being part of a white supremacist,

18  anti-Semitic, or having those sympathies, and going into the

19  more radical form of, you know, militant Islam, and so it's

20  part of this case.

21         That's because of the way the case is being

22  litigated, but I'm not going to allow the government, I hope,

23  to overstep the bounds on the 403.

24         I did, if you recall in the initial voir dire to the

25  jury, tell them that's not what your client is being charged

Minichello - Direct                                                    635

1    for, and I will repeat a similar type of instruction to the

2    jury and explain to them the reason why this was permitted in,

3    it is relevance to the issue of predisposition.

4              MS. MORENO:  Your Honor, I, I don't want to frustrate

5    the Court's protocol at all or be disrespectful, but I believe

6    that each and every item that they're talking about we either

7    need to go to the bench or the Court needs to take a look at it

8    beforehand, because there are 30 or 40 of these exhibits

9    that -- cartoons, it's just -- it's beyond the pale.

10             And while the defense respectfully does not agree

11   with the Court's interpretation of predisposition and the

12   connection between militant Islam and white supremacy, we honor

13   the Court's decision, but still there's got to be a 403

14   gatekeeping aspect to this.

15             THE COURT:  Which witness is going to be testifying

16   to this?

17             MR. KROMBERG:  Your Honor, most of these items the

18   defense has stipulated to the authenticity of.

19             THE COURT:  That's not the issue.

20             MR. KROMBERG:  I understand.  So as a result -- and

21   that they were, they were seized at a particular place in

22   Mr. Young's home or from his computer media.  So we do not

23   think we needed to have a witness testify as to yes, these were

24   seized from Mr. Young's house.

25             That we -- for example, *Inspire* magazines put out by

Minichello - Direct                                              636

 1  al Qaeda, they were seized from the house, and the defense has

 2  stipulated they were on the computer media.  I don't think that

 3  we need a witness to say this was seized from the defendant's

 4  house on his computer media.

 5           We could -- now, it is true that I would ask

 6  Mr. Daveed Gartenstein-Ross to talk about those items, but I

 7  think that they can be admitted even before he gets here so we

 8  don't have to go through the, okay, we move to admit -- "Do you

 9  recognize this?  What is it?"

10           "It's an *Inspire* magazine.  There is an Usama Bin

11  Laden speech.  There is" --

12           THE COURT:  Now, wait, wait.  That is directly

13  related to the issues in this case.  That's not going to be the

14  problem.

15           MR. KROMBERG:  Right.

16           THE COURT:  The problem is the Nazi and white

17  supremacist exhibits.

18           MR. KROMBERG:  Right.

19           THE COURT:  How many of those are you planning to

20  introduce?

21           MR. KROMBERG:  There are approximately six

22  photographs of Mr. Young, and I may be off, it may be seven,

23  but six or so.  There is a framed portrait of Hitler.  There is

24  a poster of Hitler.

25           There is the series of photographs that Your Honor --

Minichello - Direct                                                637

1    not photographs -- well, photographs that Your Honor has seen

2    involving the Mufti of Jerusalem during World War II and the

3    graphic of the Worldwide Association of Islamists and Nazis.

4    There's a picture of Otto Skorzeny, who is on the defendant's

5    prayer list along with Hitler, and Dr. Gartenstein-Ross is

6    going to speak about Skorzeny.

7            There are -- excuse me just a moment.  Let me take a

8    look.

9            MR. SMITH:  Your Honor, if I may just --

10           THE COURT:  No, this is not your issue.

11           MR. KROMBERG:  Your Honor, to the extent that Your

12   Honor wants to follow along, these are the series of exhibits

13   in No. 10, which are the things that were seized during the

14   2016 search.

15           THE COURT:  Look, actually what I don't want to do is

16   hold up a very conscientious jury.  Let's finish with this

17   witness because he's not related to this issue.

18           MR. KROMBERG:  And what I -- I actually do not

19   disagree with what Ms. Moreno said.  It may be appropriate

20   after this witness and the next witness also is talking about a

21   seized item that apparently we don't have a stipulation to, but

22   after that, then it's just predisposition witnesses.

23           THE COURT:  All right.

24           MR. KROMBERG:  And it may be appropriate to let the

25   jury go at that point and then talk about individual exhibits.

Minichello - Direct                                           638

1                THE COURT:  Let's get, let's get the jury in.

2                MR. SMITH:  Your Honor, there's one critical point we

3       have to discuss.  Mr. Gibbs just made a representation to the

4       Court about the relevance of the next witness, and it's

5       factually inaccurate.

6                THE COURT:  He has this witness on the stand.  I want

7       to get this witness --

8                MR. SMITH:  Your Honor, this is -- I just need to

9       make an offer of proof.  It's absolutely essential, Your Honor.

10      This is essential.

11               Mr. Gibbs just represented that this next witness

12      would testify on Mr. Young's statements in the August 3, 2016,

13      interview, the arrest day.  Mr. Gibbs represented that this is

14      charged conduct.

15               If Your Honor just reviews the indictment, you'll see

16      that August 3, 2016, is not a date included in any of the

17      charges.  So this is not charged conduct, Your Honor.

18               MR. GIBBS:  Judge, I believe -- well, I don't --

19               MR. SMITH:  We have the indictment right here.

20               THE COURT:  I have the indictment.

21               MR. SMITH:  If Your Honor looks at Count 1, in

22      paragraph 3, it says, "between December 3, 2015, and August 2."

23               MR. GIBBS:  It says, "on or about August 2."

24               THE COURT:  And this is August 3?

25               MR. GIBBS:  Correct, Judge.

Minichello - Direct                                                    639

1          THE COURT:  Overruled.  Let's go.

2                    (Jury present.)

3          THE COURT:  All right, everybody set?

4          All right, Mr. Gibbs?

5          MR. GIBBS:  Thank you.

6   Q.  Special Agent Minichello, you testified a moment ago that

7   you were one of the two FBI agents who participated in the

8   interview of the defendant after he was arrested in August of

9   2016, correct?

10  A.  That is correct, yes.

11  Q.  All right.  And if we could play the first clip of the

12  videotape -- well, and the interview was videotaped?

13  A.  Yes, it was.

14  Q.  All right.  If we could play that first clip?  And I

15  believe we have transcripts for that.

16          THE COURT:  All right.  So 5-301-1, that's what this

17  is?

18          MR. GIBBS:  It's 5-301-1, correct, Judge.

19          THE COURT:  All right.  And then 2 and 3 are also in.

20  They're all in.

21          (Government's Exhibit Nos. 5-301-1 thru 5-301-3 were

22  received in evidence.)

23          (Government's Exhibit No. 5-301-1 was played.)

24  BY MR. GIBBS:

25  Q.  All right.  Now, in that first clip, Special Agent

Minichello - Direct                                                    640

1   Minichello, when you asked about the person in this picture

2   right here, whose picture did you show the defendant?

3   A.   It was a picture of Mo, the confidential human source we

4   talked about in my earlier testimony.

5   Q.   And when the defendant said at the end of that clip that

6   you-all are going to check phone records, was he right about

7   that?  Did the FBI, in fact, get his phone records?

8   A.   We did.

9   Q.   And was that the pen/trap order that allowed you to obtain

10  his Verizon records that we -- you testified about yesterday in

11  Exhibit 6-202?

12  A.   Correct.  That order as well as others from previous

13  intercepts of his telephone, yes.

14          MR. GIBBS:  All right.  And I'm not going to bring

15  that up, but if we can go to the second clip, which is 5-301-2?

16          (Government's Exhibit No. 5-301-2 was played.)

17  BY MR. GIBBS:

18  Q.   Now, Special Agent Minichello, at the end of that clip,

19  when the defendant said he never hung out at Mo's house and Mo

20  never hung out at his, was he accurate about that?

21  A.   To the best of my knowledge, yes.

22          MR. GIBBS:  And finally, if we could display Exhibit

23  5-301-3?

24          (Government's Exhibit No. 5-301-3 was played.)

25          MR. GIBBS:  All right.  And finally, Special Agent

Minichello - Direct                                                      641

1   Minichello -- can we pull up Exhibit 6-201 and go to the second

2   page?

3             THE COURT:  Is that already in?

4             MR. GIBBS:  It is already in, Judge.

5             THE COURT:  All right.

6             MR. GIBBS:  Can you blow up the message on the second

7   page?

8   Q.   All right, Special Agent Minichello, at the end of the

9   clip that we just played, the defendant said at the end, "I

10  thought he would be back, but he didn't come back."

11            Do you recall that?

12  A.   I do, yes.

13  Q.   And in an earlier clip, he talked about how you-all,

14  meaning the FBI, are going to check phone records.  Do you

15  recall that?

16  A.   I do, yes.

17  Q.   All right.  Now, the exhibit on the screen now, this is an

18  exhibit you testified about yesterday.  This is a text message

19  from the defendant's phone to Mo's phone in November of 2014.

20  Do you recall that?

21  A.   I do, yes.

22  Q.   Okay.  And how does the message that he sent to Mo's phone

23  back in November of 2014 compare with what he told you and

24  Special Agent Jones about how you were going to check phone

25  records and he thought he would be back?

Minichello - Cross                                                        642

1    A.    The two correlate in the sense that we did send -- we did

2    intercept a message from the defendant to Mo, and it was

3    retained in the telephone records.

4           MR. GIBBS:  Okay.  Thank you.  That's all I have,

5    Judge.

6           THE COURT:  All right.  Mr. Smith, any cross?

7           MR. SMITH:  Yes.

8                         CROSS-EXAMINATION

9    BY MR. SMITH:

10   Q.    Good afternoon, Agent Minichello

11   A.    Good afternoon, sir.

12   Q.    This interview was conducted on August 3, 2016, in the

13   clip we just viewed, correct?

14   A.    As I recall, yes, sir.

15   Q.    This was after Mr. Young was arrested?

16   A.    That's correct.

17   Q.    Okay.  At all times during this interview, there was no

18   FBI investigation into the informant, Mo, correct?  At the time

19   of this interview, there was no FBI investigation into your own

20   informant, Mo, correct?

21   A.    Mo was a not a target in the FBI investigation at that

22   time, no.

23   Q.    Has he ever been the target of an FBI investigation?

24   A.    Not by me nor to my knowledge.

25   Q.    Not to your knowledge.

Minichello - Cross                                                    643

1          There's never been at any point a grand jury

2    investigation into this informant, Mo, has there?

3    A.    I'm unaware of one.

4    Q.    You asked Nicholas Young in the interview:  Where did Mo

5    go, right?  You said:  Do you have any knowledge of where he

6    went?  I'm paraphrasing now.

7    A.    Let me find the clip here real click.  Which line are you

8    referring to of the transcript?

9    Q.    I'm sorry, I'm paraphrasing.

10   A.    Okay.

11   Q.    You said something to the effect of do you know where Mo

12   went?  Do you know why he's no longer in the Northern Virginia

13   area?

14   A.    I don't think we exactly said that, but --

15   Q.    Well --

16   A.    I'm not trying to parse words.  I just want --

17   Q.    Do you recall inquiring of the defendant on August 3,

18   2016, where -- whether he knew where Mo went?

19   A.    Generally, yes.  Absolutely.

20   Q.    Yes.  And what was Mr. Young's response, do you recall?

21   A.    I believe he said, "I don't know," but it's recorded here.

22   Q.    Or couldn't say?  He said, "I couldn't say"?

23          Was that false?

24   A.    Yes.

25   Q.    Why?

Minichello - Cross                                                    644

1   A.    Why was it false?

2   Q.    Yeah.

3   A.    I think based on the defendant's knowledge and previous

4   conversations with Mo, he had a very good idea of where he was

5   and that he was able to say that.  So saying that he couldn't

6   say that wasn't accurate.

7   Q.    Did the informant actually travel to Syria?

8   A.    No.

9   Q.    So if Mr. Young had said the informant had actually

10  traveled to Syria, that would be false, correct?

11  A.    No.

12  Q.    Why?

13  A.    Mr. Young could easily have said the informant --

14  Q.    I'm not asking you what Mr. Young could have said.  I'm

15  asking you whether it would have been false.

16          MR. GIBBS:  Objection, Judge.  The witness should be

17  allowed to answer the question.

18          THE COURT:  No, overruled.

19  BY MR. SMITH:

20  Q.    I'm asking you whether it would have been false if

21  Mr. Young had said he had gone to Syria.

22  A.    It would have been inaccurate, but it would not have been

23  out of line with --

24  Q.    It would have been inaccurate, correct?

25          THE COURT:  Wait.

Minichello - Cross                                                    645

1           THE WITNESS:  It would have been inaccurate at the

2    time, but to what the defendant would have suspected or

3    believed based on his foreknowledge where Mo was, he wouldn't

4    have been telling the truth at that point if he said he went to

5    Syria.

6    BY MR. SMITH:

7    Q.   So I'm not asking about what Nick knew.  I'm asking

8    whether it would have been as a matter of fact objectively true

9    or false for Mr. Young to say Mo had traveled to Syria.

10          MR. GIBBS:  Judge, I'd object on relevance grounds at

11   this point.

12          THE COURT:  Overruled.

13   BY MR. SMITH:

14   Q.   Would -- if Mr. Young had told you Mo had gone to Syria,

15   he told you that in the interview on the arrest day of

16   August 3, 2016, would that have been true or false?

17   A.   It would have been factually inaccurate; that is correct.

18   Q.   Thanks.  At all times during the interview on August 3,

19   2016, you knew where Mo had allegedly gone, right?

20   A.   Yes.

21   Q.   So you knew the answer to your own question you asked

22   Mr. Young on August 3, 2016, before you asked it, correct?

23   A.   Which question in particular, if you could read?

24   Q.   Did you know where Mo went in October of 2014?  We just

25   discussed how you said --

Minichello - Cross                                              646

1    A.   Yes, absolutely.

2    Q.   So before you asked the question, you knew the answer,

3    right?

4    A.   Yes.

5    Q.   I think you also asked a question about whether you had --

6    how many communications have you had with Mr. -- with the

7    informant, Mo, since he left in October of 2014?  You asked

8    Nicholas that on August 3, 2016, correct?

9    A.   To the best of my knowledge, yes.  I believe we had a good

10   grasp of those communications.

11   Q.   You already knew the answer to exactly how many

12   communications he had had, correct?

13   A.   That's what I said.

14   Q.   You also asked him how many times had he met the

15   informant, Mo, right, on August 3, 2016?

16   A.   Something to that effect.  Would you like me to read the

17   exact line or --

18   Q.   No.

19   A.   Okay.

20   Q.   You already knew the answer, right?

21   A.   Yes.

22   Q.   Did you ask Mr. Young in this interview any questions that

23   you did not already have the answers to?

24   A.   I can look back.  I can't recall.  Would you like me to

25   review?

Minichello - Cross                                                    647

1   Q.   Okay.  Concerning Mo.

2   A.   Yes.  There are questions in there that relate to the

3   defendant's intentions, which I couldn't say though I could

4   speculate to.

5   Q.   I didn't ask you whether any of your questions concerning

6   Mo are questions for which you were seeking factual information

7   that could have corrected your understanding of what Mo had

8   done or said.

9   A.   Okay.  So could you restate your question?

10  Q.   I'm asking you whether there were any questions you asked

11  the defendant, Nicholas Young, on August 3, 2016, that would

12  have corrected your understanding of what the informant, Mo,

13  had done or said in the past.

14  A.   No.

15          MR. SMITH:  Thanks.  That's all I have.

16          THE COURT:  Any redirect?

17          MR. GIBBS:  No, Judge.  Thank you.

18          Thank you, sir.

19          THE COURT:  I'm assuming this agent now can step

20  down?  There's no one who's going to call him for a third time?

21          MR. GIBBS:  We have no intention of calling him for a

22  third time, Judge, thank you.

23          THE COURT:  How about the defense?  Do you plan to

24  call this witness again?

25          MR. SMITH:  No, not now, Your Honor.

Lee - Direct                                                          648

1          THE COURT:  Well --

2          MR. SMITH:  We have no intention of calling this

3    witness again.

4          THE COURT:  All right.  Then, Agent, you may step

5    down.  You're now excused as a witness.  You can stay in court

6    and watch the proceedings or leave, but do not discuss your

7    testimony or anything you hear in court with any witness who

8    has not yet testified.  Thank you.

9          THE WITNESS:  Thank you, Your Honor.

10                        (Witness excused.)

11         THE COURT:  All right, your next witness?

12         MR. TURGEON:  The government calls Paul Lee to the

13   stand.

14         THE COURT:  Yeah, I'll ask the jury to turn in the

15   transcripts, please, so that you're not bothered by them.

16            PAUL LEE, GOVERNMENT'S WITNESS, AFFIRMED

17                     DIRECT EXAMINATION

18   BY MR. TURGEON:

19   Q.   Could you please state your name and spell it for the

20   record.

21   A.   Yeah.  My name is Paul Lee.  It's spelled P-a-u-l L-e-e.

22   Q.   How are you employed?

23   A.   I am a computer forensic examiner for the FBI.

24   Q.   How long have you been a computer forensic examiner?

25   A.   I've been doing computer forensic examining for over 12

Lee - Direct                                                          649

1    years.  I've been employed with the FBI for 18 years.

2    Q.    Sir, could you please tell the jury what a computer

3    forensic examiner does?

4    A.    Basically, we recover data from evidence, digital

5    evidence, to include computer hard drives, servers, magnetic

6    medias, optical medias like CDs, electronic medias like thumb

7    drives, and also electronic devices like cell phones and

8    tablets.

9    Q.    What experience do you have in computer forensic

10   examinations?

11   A.    I've conducted basically data recovery for digital

12   evidence in, both in the Windows forensics, in Linux forensics,

13   in mobile devices.

14   Q.    Approximately how many computer forensic examinations have

15   you conducted in your career?

16   A.    I've done over, well over 600, and involving 1,500

17   devices, pieces of evidence.

18   Q.    And what sort of training do you have in computer forensic

19   examinations?

20   A.    I have --

21              THE COURT:  Is there any, any debate about the

22   qualification of this witness?

23              MR. SMITH:  No, Your Honor.

24              MS. MORENO:  No, Your Honor.

25              THE COURT:  Are you having him designated as an

Lee - Direct                                                          650

1   expert?

2            MR. TURGEON:  Yes, Your Honor.  The government moves

3   to certify the witness as an expert in computer forensic

4   examinations.

5            MS. MORENO:  No objection.

6            THE COURT:  All right, he's so qualified.  Let's move

7   this along.

8   BY MR. TURGEON:

9   Q.   Mr. Lee, what is the role of a search warrant in the

10  computer forensic process?

11  A.   Basically, a search warrant for -- from a computer

12  forensic standpoint, it allows me to give me the legal

13  authority to proceed with the examination.

14  Q.   And when in the process do you review the search warrant?

15  A.   I review it just before I conduct any examination, and I

16  have to confirm the search warrant.

17  Q.   Okay.  Let's talk about hard drives.  What's the first

18  step in conducting a computer forensic examination of a hard

19  drive?

20  A.   The key element is to preserve the evidence.  You do that

21  by obtaining an image of the hard drive, and then you work off

22  the image.

23  Q.   Could you please explain how that image is obtained?

24  A.   Basically, you, you can take the hard drive, remove it

25  from the computer.  You connect it to a computer, and you use a

Lee - Direct                                                              651

1   software that is tested and approved by FBI Headquarters, and

2   that software basically does a bit-by-bit copy of the content

3   of the hard drive, of the evidence, and creates it in a file,

4   which we call an image, a forensic image.

5   Q.   What role does write-block play in preserving that

6   evidence?

7   A.   Write-block prevents data from writing into the original

8   evidence, but it allows the software or the hardware to see the

9   data within the evidence.  So it's a one-way data flow.

10  Q.   And then after you've made a copy, how do you determine --

11  after you've made an image, rather, how do you determine

12  whether that image is the same as the original?

13  A.   We use a -- by way of using a hash, it's called the MD5

14  hash, and what happens is that when we conduct the image of a

15  hard drive, we calculate the hash as we create the hard drive.

16  So the hash represents the original data, and then we calculate

17  it again on the copy image, and they should compare the same.

18  They pretty much represent like a fingerprint.

19  Q.   And so what happens to that MD5 hash value if there's one

20  change made to the imaged copy, like one period or one dot

21  added or subtracted?

22  A.   That hash would be dramatically different.

23  Q.   Sir, after you make an image of a seized hard drive, what

24  do you do with the original hard drive?

25  A.   The original hard dive is reassembled at a computer and

Lee - Direct                                                          652

1  returned to Evidence Control, and I document it in the chain of

2  custody.

3  Q.   And then how do you proceed with the examination of the

4  image that you made?

5  A.   Basically, I take the image and run it against an approved

6  tool that we have to recover the data and sort it to a point

7  where I can present it to the investigator for review.

8  Q.   And after that recovery and analysis, what steps are taken

9  in the post-examination verification process?

10  A.   I take that image that I did the processing on, the data

11  recovery, and I run that hash again on that image, and it

12  should compare to the original.

13  Q.   And after that verification, what do you do with any files

14  or other evidence that you found?

15  A.   The files and the data that are recovered from, from the

16  analysis is posted for the case agents and the investigators

17  for review.

18  Q.   And were the steps you just described followed in this

19  case?

20  A.   Yes, sir.

21  Q.   So let me ask you about cell phones now.  What processes

22  are available for conducting a computer forensic examination of

23  a cell phone?

24  A.   A cell phone is a little different than computer hard

25  drive in the sense that cell phone, you're conducting the, not

Lee - Direct                                                        653

1  just the memory chip but also the device, and typically, it is

2  conducted live.

3  Q.   Are there any other types of examinations that you can

4  conduct?

5  A.   Yeah.   There's, there's essentially two categories.   You

6  can do a logical extraction or a physical extraction, and

7  there's something in between as well but --

8  Q.   And how do you determine whether to conduct a logical or a

9  physical extraction?

10  A.   That is purely dependent on the make and model of the

11  phone; the condition of the phone, for example, if the phone

12  was soaked in water, it can drive how you have to extract that

13  data; and also dependent on the software version and also the

14  security that's applied to that phone, whether it's PIN lock or

15  gesture lock or so forth.

16  Q.   So could you please describe the process for conducting a

17  logical extraction, briefly?

18  A.   Yeah.   Basically, in a logical extraction, it's like

19  taking data from a live device because unlike a computer and a

20  hard drive, where a hard drive is just four screws and a couple

21  of connectors, you can pull it out, in a phone, the memory chip

22  is soldered into the circuit board, and you're not going to be

23  able to pull that, so you're going to have to conduct that exam

24  with the phone on and operating, and that would be typical of

25  logical examinations, and sometimes you do that with a physical

Lee - Direct                                                              654

1   examination as well, with that technique, using certain tools.

2   Q.    So other than what you just mentioned, could you please

3   describe the process for conducting a physical examination of a

4   cell phone?

5   A.    Okay.  A physical examination, again, it could be done

6   live and also could be done as, basically turned off, where the

7   phone is not operating, but you're still live because you're

8   adding power to the phone, and you're extracting the data

9   directly from the circuit board.

10  Q.    So after you extract data from a cell phone using either

11  method, what is done with the original phone?

12  A.    The original phone is returned to evidence control.  If --

13  unless there's additional analysis that needs -- that's

14  required after a physical extraction.

15  Q.    How do you examine any data that you've extracted through

16  either means?

17  A.    The data extracted is processed and sorted just like

18  similar to an image, and it's presented to a form where it can

19  be easily reviewed by the investigators.

20  Q.    And then what do you do with any files or evidence that

21  you, that you found?

22  A.    I post that -- I archive that on a read-only DVD or CD or

23  optimal media, and I present that to the case squad, and I put

24  a similar copy up at the server so they can see it -- so

25  multiple people can see it at the same time.

Lee - Direct                                                        655

1    Q.   And were those steps followed with regard to the cell

2    phone extractions you did in this case?

3    A.   Yes, sir.

4    Q.   When did you first become involved in this case?

5    A.   If I can look at my notes here?

6            I was assigned to this case on August 17, 2016.

7    Q.   What was your first assignment?

8    A.   My first assignment was to analyze four items, one being a

9    Toshiba laptop, one being a ZTE phone, and another item being a

10   Verizon flip phone, and then one more item, which is the Amazon

11   tablet.

12   Q.   Okay.  With the help of the court security officer, I'm

13   going to show you what's been marked as Government Exhibit

14   3-200.  I believe it's a physical phone already in evidence, I

15   believe.

16            MR. SMITH:  No objection.

17            THE COURT:  All right, it's in.

18   BY MR. TURGEON:

19   Q.   What is that, Mr. Lee?

20   A.   That is the ZTE phone that I analyzed.

21   Q.   So you've seen it before?

22   A.   It's a smartphone, yeah.

23   Q.   How can you identify it as such?

24   A.   The unique -- I notice in my photograph I have here in my

25   notes the uniqueness of the tape, the translucent tape that was

Lee - Direct                                                      656

1  on there as found when I pulled it out of evidence.

2  Q.   And where on the phone is that tape?

3  A.   That is right over the camera, on the front, front camera.

4  Q.   Is that exhibit in substantially the same condition today

5  as when you finished conducting your examination of it?

6  A.   Yes.

7          MR. TURGEON:  Your Honor, at this time, the

8  government would like to read Stipulation No. 42 into evidence.

9          THE COURT:  All right.

10         MR. TURGEON:  It states:  The United States and the

11 defendant hereby stipulate and agree that Government Exhibit

12 3-200 is the cellular telephone depicted in Government Exhibit

13 3-103.

14         And can we pull up 3-103, please?

15         THE COURT:  Well, we've seen that already.  It's

16 already in evidence.

17         MR. TURGEON:  That is in evidence, Your Honor, yes.

18         THE COURT:  All right.

19 BY MR. TURGEON:

20 Q.   Mr. Lee, before beginning your examination of the phone,

21 did you review any search warrants?

22 A.   Yes, I did.

23 Q.   And based on that review, what, if anything, did you

24 determine?

25 A.   The search warrant allowed me the legal authority to

Lee - Direct                                                        657

1    proceed with my examination.

2    Q.    Mr. Lee, with regard to the tape on the camera that you

3    mentioned, was that tape already on the camera, or did you put

4    any additional or other tape on there?

5    A.    No, I did not put tape on it.  I typically do, but that

6    tape was already in place.

7    Q.    Okay.  Mr. Lee, what is an international mobile equipment

8    identity, IMEI number?

9    A.    The IMEI is an equipment, it's a hardware identifier that

10   basically -- it's a number that, that allows you to use the

11   network.  It's what the network uses to identify your equipment

12   in the tower, so if you're with AT&T, and they would look for

13   that IMEI and say, yeah, that is your equipment.

14   Q.    And is that a number that's unique to a phone?

15   A.    That's absolutely yes.

16   Q.    Were you able to determine the IMEI number of this phone?

17   A.    Yes, I did.

18   Q.    How did you do that?

19   A.    That was etched in the back of the -- if you open the back

20   on the battery, that's etched right there on the label.

21   Q.    And what was that IMEI number?

22   A.    That's a 15-digit number.  I'll have to look at my -- that

23   IMEI number is 869578020680874.

24   Q.    Mr. Lee, you're looking at notes right now?

25   A.    Yes.

Lee - Direct                                                          658

1   Q.   Are those notes that you made when that information was

2   fresh in your mind?

3   A.   Yes.

4   Q.   From the examination?

5   A.   Yeah.  There's actually photographs, too, of the photos I

6   took.

7   Q.   I'm going to ask with the help of the court security

8   officer to show you what's been marked as Government Exhibit

9   4-109, which is, I believe, already in evidence, and that's

10  cell phone packaging found in the defendant's backpack.

11               THE COURT:  It's already in.

12               MR. TURGEON:  Excuse me, Your Honor?

13               THE COURT:  That exhibit is in.

14               MR. TURGEON:  Yes.  I'd like to have it presented to

15  the witness so he can testify about it.

16               THE COURT:  All right.

17               MR. TURGEON:  4-109, please.

18  Q.   Mr. Lee, is there an IMEI number listed on that packaging?

19  A.   Yes, it is.

20  Q.   And how does that number on the packaging compare to the

21  IMEI number that you found etched into the battery chamber of

22  that phone?

23  A.   That number is identical.

24  Q.   Okay.  Mr. Lee, what is the SIM card?

25  A.   A SIM card is a subscriber identity module, SIM, and what

Lee - Direct                                                              659

1   that is, it's a small plastic card that the inserted into the

2   phone, and that card is provided by your service provider,

3   like, say, Verizon or AT&T, and in that card contains the

4   necessary subscriber numbers to handshake with the network when

5   you use that service.

6          If you use a phone without the SIM card, you don't --

7   you're not going to be able to make calls or receive texts.

8   Q.   And by what sort of serial number, if any, is the SIM card

9   identifiable?

10  A.   The SIM card is identified with a, with a number they call

11  ICCID.  It stands for integrated circuit card identifier.

12  Q.   And is that a number that's unique to a SIM card?

13  A.   That's correct.

14  Q.   And did Government Exhibit 3-200 have a SIM card?

15  A.   The phone, yes, it did.

16  Q.   And were you able to determine that SIM card ICCID number?

17  A.   Yes.

18  Q.   How did you do that?

19  A.   It's two ways.  First of all, it's printed on the outside

20  of the card, so -- in clear view, and then also when you do the

21  extraction of the data, that data also shows the identical

22  number.  I usually match them both, make sure that there was

23  not a mistake in printing.

24  Q.   And did you match them both in this case?

25  A.   Yeah -- yes.

Lee - Direct                                                    660

1   Q.   What was the ICCID number?

2   A.   The ICCID number for that card is a 20-digit number.

3   Sometime they're 21, sometime they're 20.  This is

4   89014103278807244994.

5   Q.   Could you please look at the cell phone packaging again,

6   Government Exhibit 4-109?

7   A.   Okay.

8   Q.   And how does the ICC- -- excuse me, do you see an ICCID

9   number on that packaging?

10  A.   Yes, I do.

11  Q.   And how does that ICCID number compare to the SIM card

12  that you were just testifying about from the cell phone?

13  A.   This number is the same.

14  Q.   Okay.  What analysis, if any, did you perform on the SIM

15  card?

16  A.   I do a logical extraction of the data to reveal the

17  numbers that are stored in that SIM card.

18  Q.   Were you able to determine that phone's telephone number?

19  A.   Yes.  That's stored in the SIM card as well.

20  Q.   What was that telephone number?

21  A.   That telephone number is 703-338-2313.

22  Q.   What type of analysis -- or extraction, rather, did you

23  conduct on that cell phone's handset?

24  A.   Initially, I tried to turn it on to see the condition, and

25  it was pattern locked, so not knowing the pattern, I wasn't

Lee - Direct                                                        661

1  going to be able to get into it.  The tools that I use weren't

2  able to bypass that law.

3           So what I had to do was basically, and I'm certified

4  to do so, it's using advanced extraction, which is

5  disassembling the phone, installing the wires to the circuit

6  board, and communicate directly to the memory and download the

7  entire memory.  And it's 8-gigabyte size, or roughly 8

8  gigabytes.

9           THE COURT:  Eight gigabytes?

10          THE WITNESS:  Eight gigabytes.  Yeah, that phone is

11 8-gigabyte, but when you download the memory, it's slightly

12 smaller than that.

13          MR. TURGEON:  Your Honor, for the jury's reference,

14 I'd like to publish Exhibit 4-109, which is the cell phone

15 packaging.

16          THE COURT:  Any objection?

17          MR. SMITH:  No objection.

18          THE COURT:  All right, it's in.

19 BY MR. TURGEON:

20 Q.   Mr. Lee, is this the packaging you were just discussing?

21 A.   Yes.  Yes, sir.

22 Q.   So what were the results of the process you just

23 described?

24 A.   Basically, I was able to acquire a, a copy of the memory

25 data from the cell phone without having to remove the chip and

Lee - Direct                                                            662

1  all, just basically just tapped into the circuit board and read

2  it, and then I was able to process that, that data.

3  Q.   And processing that data, what sort of information did you

4  recover?

5  A.   Media files, e-mails, and call logs, contacts, those kind

6  of things, and also apps that were, that were installed as a

7  third party.

8  Q.   Were you able to determine that phone's Google account

9  number?

10 A.   Yes.

11 Q.   Excuse me, Google account name?

12 A.   Yes, name and e-mail.

13 Q.   What Google account was registered to the phone?

14 A.   That Google account was in <u>argeltal777@gmail.com</u>.  I think

15 it's -- I think it's pronounced "argeltal777," I guess.

16 Q.   And what apps, if any, did you determine were installed on

17 that phone?

18 A.   There were not many third-party apps.  There was one that

19 was prominent.  It was Threema.

20          MR. TURGEON:  Okay.  I have here a signed stipulation

21 which is labeled Government Exhibit 12-34 which I'd like to

22 move into evidence and read to the jury.

23          THE COURT:  Go ahead.

24          (Government's Exhibit No. 12-34 was received in

25 evidence.)

Lee - Direct                                                      663

1          MR. TURGEON:  The United States and the defendant

2    hereby stipulate and agree that Government Exhibits 1-700

3    through 1-702 are authentic business records of Google, Inc.

4          THE COURT:  All right.  You're moving those exhibits

5    in now, 700, 701, and 702?

6          MR. TURGEON:  Just 701 and 702, Your Honor.

7          THE COURT:  All right, 1-701 and 702 are in.  Any

8    objection?

9          MR. SMITH:  No objection.

10         MS. MORENO:  No objection.

11         THE COURT:  All right.

12         (Government's Exhibit Nos. 1-701 and 1-702 were

13   received in evidence.)

14         MR. TURGEON:  At this time, Your Honor, I'd like to

15   publish Government Exhibit 4-102.

16         THE COURT:  That's already in, I believe.

17         MR. TURGEON:  That's already in evidence, Your Honor.

18         THE COURT:  All right, go ahead.

19         MR. TURGEON:  That's a scrap of paper seized from the

20   defendant's truck.

21         THE COURT:  Yes.

22         MR. TURGEON:  Actually, Your Honor, there's a

23   correction.  That was seized from the defendant's person at the

24   time of his arrest.

25   Q.   Mr. Lee, could you look at that exhibit, 4-102, on the

Lee - Direct                                                      664

1   screen?

2   A.   Yes.

3   Q.   Do you see on that screen anything that, that resembles

4   the Google account associated with that cell phone?

5   A.   Yeah.  It's the, it's the argeltal777@.  That's the part

6   that I, that I see there.

7           MR. TURGEON:  Okay.  I'd like to publish to the jury

8   and show to Mr. Lee Government Exhibit 1-701.

9           THE COURT:  All right.

10  BY MR. TURGEON:

11  Q.   Mr. Lee, what is this?  I believe it's on your screen,

12  Government Exhibit 1-701.

13  A.   This appears to be a Google return on a, maybe a

14  subpoenaed data of the Google account information that was

15  returned to the government, a typical return that I've come

16  across.

17          THE COURT:  I'm sorry, you were trailing off,

18  Mr. Lee.  You have to speak up.

19          THE WITNESS:  Oh, I'm sorry.  My apologies.  This

20  appears to be a Google return, data return from a request of

21  subscriber information.

22  BY MR. TURGEON:

23  Q.   Okay.  What e-mail address is associated with that

24  subscriber information?

25  A.   The e-mail address that's being returned, the data for

Lee - Direct                                                          665

1    that e-mail address is argeltal777@gmail.com.

2    Q.   On what date was that Google account created, according to

3    the subscriber info?

4    A.   According to this document, the Google account was created

5    on July 12, 2016.

6    Q.   Okay.  I'd like to show you what's been marked as

7    Government Exhibit 1-702.  And what is this, Mr. Lee?

8    A.   That is a typical Google Play receipt.  When you purchase

9    an app online using the device, you would get that e-mail

10   return confirming that you purchased the app.

11   Q.   And from what e-mail address was that purchase of Threema

12   made?

13   A.   Yeah, that e-mail address on here is also argeltal,

14   argeltal777@gmail.com.

15   Q.   And according to that exhibit, on what date was that

16   purchased?

17   A.   That date on that exhibit shows July 12, 2016.

18           MR. TURGEON:  Your Honor, I have here another

19   stipulation labeled Government Exhibit 12-36, which I'd like to

20   move into evidence and read to the jury.

21           THE COURT:  Go ahead.

22           (Government's Exhibit No. 12-36 was received in

23   evidence.)

24           MR. TURGEON:  That stipulation reads:  The United

25   States and the defendant hereby stipulate and agree that the

Lee - Direct                                                            666

1    Threema encrypted messaging application was installed on the

2    cellular telephone marked as Government Exhibit 3-200 and was

3    registered to e-mail address argeltal777@gmail.com.

4            THE COURT:  All right.

5    BY MR. TURGEON:

6    Q.   Mr. Lee, after you finished work with that seized cellular

7    telephone, what did you do with the phone?

8    A.   I processed the data first because we still have a phone

9    that's locked, so I processed the data, and during the process,

10   it recovered the pattern, the lock pattern.  So now I have the

11   lock pattern of 1478 basically, and I tried that on the phone,

12   and I reassemble the phone, bring it back up, and that unlocked

13   the phone.

14   Q.   It turned it on?

15   A.   Yep.  It turned on, and it unlocked the phone using the

16   pattern.

17   Q.   And did you examine the contents of the phone?

18   A.   Yeah.  I had to look at the content because in the

19   request, they were looking for a certain app, so I was looking

20   for that app, and it was there.

21   Q.   And could I show you what's been marked as Government

22   Exhibit 3-202?  It's already in evidence.

23           Mr. Lee, do you recognize that photograph?

24   A.   Yes, I do.  I took it.

25   Q.   And what does that photograph depict?

Lee - Direct                                                           667

1   A.    That photograph is a picture of the account, Threema

2   account as it appears on the phone.

3   Q.    And can I just -- can I pull up 3-203, please?

4         And did you take that photo as well?

5   A.    Yes, I did.

6   Q.    And 3-204?  And you took that as well?

7   A.    Yes, I did.

8   Q.    Okay.  And did you take several other photographs of

9   the messaging app?

10  A.    Yeah, I took a series of photographs on the contents of

11  that app.

12  Q.    Sir, after you finished examining the phone, what did you

13  do with it?

14  A.    I returned the phone to the evidence control and

15  documented it on chain of custody.

16  Q.    All right.  With the help of the court security officer,

17  I'd like to show you what's been marked as Government Exhibit

18  4-200.  That should be another cell phone.

19         Mr. Lee, have you seen that phone before?

20  A.    Yes, I have.

21  Q.    How can you identify it?

22  A.    There, there is a unique green tint around the screws on

23  this Verizon phone.  By the brand name, also.

24  Q.    And is that exhibit substantially in the same condition

25  today as when you first examined it?

Lee - Direct                                                          668

1   A.   Yes, it is.

2             MR. TURGEON:   The government moves to admit Exhibit

3   4-200 into evidence, Your Honor.

4             THE COURT:   Any objection?

5             MS. MORENO:   No objection.

6             THE COURT:   It's in.

7   BY MR. TURGEON:

8   Q.   Mr. Lee, before beginning your examination of that phone,

9   did you review any search warrants?

10  A.   Yes, I did.

11  Q.   And based on that review, what, if anything, did you

12  determine?

13  A.   The search warrant on the backpack where this phone was

14  seized basically allowed me to proceed with the forensic

15  examination.   It gives me the legal authority.

16  Q.   And what type of analysis, if any, did you perform on that

17  phone?

18  A.   This phone, because of the make and model, the only

19  analysis I could do was a logical extraction.

20  Q.   And through your examination of that phone, were you able

21  to determine the phone's telephone number?

22  A.   Yes, I did.

23  Q.   What was that?

24  A.   That telephone number is, my refreshed notes here, is

25  571-236-8195.

Lee - Direct                                                            669

1   Q.   And what, if anything, did you find in your analysis of

2   that phone?

3   A.   In the, in the analysis using extraction with two

4   different tools, I've got the contacts, call lots, SMS, MMS,

5   and also a bunch of media files.

6   Q.   Okay.  And, Mr. Lee, I'm going to direct your attention in

7   that -- I believe in the folder right there should be something

8   marked Government Exhibit 4-203.

9           MR. SMITH:  Objection, Your Honor.  Objection.

10          THE COURT:  Wait a minute.  Whose witness is this?

11          MS. MORENO:  It's my witness.

12          THE COURT:  All right.

13          MS. MORENO:  And I'm sorry.

14          THE COURT:  Are you objecting?

15          MS. MORENO:  Yes, Your Honor.

16          THE COURT:  All right.  Is this related to what we

17  had a discussion of?

18          MS. MORENO:  Yes.

19          THE COURT:  Do I have a copy of 203 in my book?

20          MR. TURGEON:  Yes, you do, Your Honor, 4-203.

21          THE COURT:  Let me take a look at it.

22          MS. MORENO:  May we approach, Your Honor?

23          THE COURT:  Let me take a look at it first.

24          This was actually referenced in the opening

25  statement.

Lee - Direct                                                          670

1          MR. TURGEON:  That is true, Your Honor, yes.

2          THE COURT:  Approach the bench, but we're going to

3    move this.

4          (Bench conference on the record.)

5          THE COURT:  Mr. Kromberg in his opening statement

6    mentioned this, the smokestack.  This is --

7          MS. MORENO:  Judge, with respect, so the opening

8    statements, I mentioned this in my opening statement, that it

9    may not be properly before the jury at the end of the case.

10   Opening statement isn't evidence.  This is not properly the

11   subject matter testimony of the CART expert.  This is just

12   another way to get this stuff in.

13         Your Honor, there are 42 separate exhibits in this

14   white supremacy-Nazi category.  I strongly object.  It's

15   irrelevant, and it's highly prejudicial.

16         THE COURT:  Well, it's not going to make sense right

17   now until Gartenstein testifies, which is tomorrow.

18         MR. KROMBERG:  In fact, Judge, the next witness, if

19   we get to it, is going to be Ian Campbell, who I had originally

20   told you last week was going to be the first witness, but he

21   couldn't be the first witness.

22         THE COURT:  He's the one who --

23         MR. KROMBERG:  He's the one who's going to say that

24   Mr. Young said, "Don't discount the idea of an alliance with

25   the Muslims to combat the Jews."  So we're going to get into

Lee - Direct                                                          671

1   this with the next witness, but we, we have to admit this

2   evidence because the defense, although they have stipulated to

3   many things, and we're very grateful for that, they did not

4   stipulate that this was an authentic document found on that

5   phone.

6           THE COURT:  Well, if they have stipulated that all of

7   these exhibits were found on one of the devices of the

8   defendant --

9           MR. TURGEON:  They did not stipulate to that fact,

10  Your Honor.

11          MS. MORENO:  No, we didn't.

12          THE COURT:  Are you doing it on the record now?

13          MR. SMITH:  Yes, we've stipulated to authenticity.

14  It was a text message to someone sent.  This was sent as a text

15  message to the defendant.  The government knows that.

16          THE COURT:  So all right.  So what I'm hearing on the

17  record is that the defense is not contesting that these

18  exhibits, these problematic exhibits all were retrieved from

19  some device belonging to the defendant.

20          MS. MORENO:  That is correct, Your Honor.

21          THE COURT:  All right.  Then we don't need this

22  witness for any of that, all right?

23          MR. KROMBERG:  Sure.

24          THE COURT:  Whether the exhibits actually come in

25  will depend upon the proper foundation that you lay with the

Lee - Direct                                                          672

1   future witnesses who testify, all right?

2            MS. MORENO:  Thank you.

3            MR. TURGEON:  Your Honor, with regard to this

4   particular exhibit, Mr. Lee will testify about the date that it

5   was created, the metadata, as well as what he was able to

6   determine as to how that image made its way onto the phone.

7            MS. MORENO:  It's irrelevant.  We're not contesting

8   that it was found on his device.

9            THE COURT:  No, but I think the government wants

10  something else.  They apparently want how long it's been

11  sitting on the device?

12           MR. TURGEON:  Both how long it has been sitting on

13  the device but we also know that the defense plans to argue

14  that this was sent to Mr. Young in an unsolicited text message,

15  and Mr. Lee is going to testify as to whether or not his

16  examination revealed that to be true.

17           MR. SMITH:  Okay.  Then we don't contest that.  We

18  don't contest it.  We're not going to raise that issue at

19  trial.

20           THE COURT:  Hold on to Lee as a possible rebuttal

21  witness if for some reason there's slippage.

22           MR. TURGEON:  Okay.

23           THE COURT:  Let's move this along, all right?

24           MS. MORENO:  Thank you.

25           (End of bench conference.)

Lee - Direct                                                          673

1           MR. TURGEON:  I'd like to publish Government Exhibit

2    11-220 to the jury, and that's already in evidence.

3           THE COURT:  All right.

4           MR. TURGEON:  11-220, please.  Can we zoom in on

5    that, please?

6    Q.   Mr. Lee, I'm directing your attention to Government

7    Exhibit 11-220.  Does that exhibit reflect the telephone

8    number -- a telephone number?

9    A.   Yeah, there's a telephone number in there.

10   Q.   And is that the same telephone number as the telephone

11   number in Nicholas Young's device that you're currently

12   discussing?

13   A.   That is the same number.

14   Q.   It's the same number.

15          Mr. Lee, after you completed working with that seized

16   telephone number, what did you do with that phone -- excuse me,

17   with that seized cellular telephone, what did you do with the

18   phone?

19   A.   I returned the phone to evidence control and documented it

20   on chain of custody.

21   Q.   Okay.  With the help of the court security officer, I'm

22   going to show you what's been marked as Government Exhibit

23   10-100.  And that's in this box.

24          THE COURT:  It's over here, Mr. van Roekel.

25   BY MR. TURGEON:

Lee - Direct                                                        674

1   Q.   Mr. Lee, could you hold that up very briefly?  And could

2   you identify what that is?

3   A.   This is a Toshiba laptop.

4   Q.   Have you seen that laptop before?

5   A.   Yes, I have.

6   Q.   And how can you identify it?

7   A.   I can identify it by looking at the label, make, and model

8   down here as well, and also in this particular laptop, there's

9   a unique dent on the lower left corner, right here.

10  Q.   And have you conducted an examination of that laptop?

11  A.   Yes, I did.

12          MR. TURGEON:  You can bring it down.

13  Q.   Is that laptop in substantially the same condition today

14  as when you examined it?

15  A.   Yes, it is.

16          MR. TURGEON:  Your Honor, the government moves to

17  admit Exhibit 10-100 into evidence.

18          THE COURT:  Any objection?

19          MS. MORENO:  No objection.

20          THE COURT:  All right, it's in.

21          (Government's Exhibit No. 10-100 was received in

22  evidence.)

23  BY MR. TURGEON:

24  Q.   And, Mr. Lee, did you review a search warrant before

25  examining that laptop?

Lee - Direct                                                              675

1   A.   Yes, I did.

2   Q.   And what did you determine from that?

3   A.   The search warrant for the house in which the laptop was

4   seized gives me the legal authority to proceed with the

5   examination.

6   Q.   What steps did you take to preserve the evidence on that

7   laptop?

8   A.   I initially removed the hard drives from the laptop

9   without turning on the laptop and then produced an image of

10  that hard drive.

11  Q.   Okay.

12  A.   And then in the process, creating the MD5 hash as well.

13  Q.   And were you able to obtain an image from that hard drive?

14  A.   Yes, I have.

15  Q.   And how did you know that image was identical to the

16  original?

17  A.   I then run the MD5 hash calculation again on the copy

18  image and compare it to the original MD5 hash, and they match

19  identical.

20  Q.   So after making that image and comparing the hash values,

21  what did you do with the original laptop?

22  A.   The original laptop was reassembled and returned to

23  evidence control.

24  Q.   And then what, if anything, did you do with the copy that

25  you had made of the image?

Lee - Direct                                                          676

1   A.   The copy of the -- the image copy was used to conduct the

2   analysis to recover the files, the contents in that hard drive,

3   in the image, and then it's sorted and presented to the case

4   agent, so the reviewers.

5   Q.   And what -- using that software, what, if anything, did

6   you find?

7   A.   Basically, on that -- I've got audio files, photos, things

8   that were on the original requests, focusing on things that

9   contained words like --

10           THE COURT:   Well, wait, we don't need -- we don't

11  need that at this time.

12           MS. MORENO:   Objection.

13           THE WITNESS:   Okay.

14  BY MR. TURGEON:

15  Q.   And after you completed your review of that copy, did you

16  obtain another hash value?

17  A.   Yes, I did.

18  Q.   And what was the result of that?

19  A.   That the hash matches the original.

20  Q.   So what does that mean?

21  A.   That means that, that image was not altered during the

22  entire process of recovery, data recovery.

23  Q.   Okay.   I'm going to direct your attention --

24  A.   And it matches the original.

25  Q.   Directing your attention to what's been marked as

Lee - Direct                                                         677

1   Government Exhibit 10-101-A, I believe that should also be in

2   the folder in front of you.  It may be the very last document

3   or the next-to-last document.  10-101A, yes.

4           Do you recognize the information on that document?

5   A.   Yes, I do.

6   Q.   Have you reviewed that document previously?

7   A.   Yes, I have.

8   Q.   And what information, if any, is contained on that

9   document?

10  A.   This is a summary of -- a subset of what's called a

11  Favorites, which is basically bookmarks from the Internet

12  Explorer browser.  So this is a subset of the, the bookmarks

13  that were found on the Internet Explorer browser which is

14  called Favorites.

15  Q.   And does that exhibit fairly and accurately depict

16  bookmarks that you found during your examination of that

17  laptop's hard drive?

18  A.   Yes, it does.

19          MR. TURGEON:  The government moves to admit Exhibit

20  10-101A into evidence, Your Honor.

21          MS. MORENO:  I think there will be an objection to

22  that.

23          THE COURT:  Oh, I think this is relevant.  I'm

24  overruling that objection.  This is in.

25          (Government's Exhibit No. 10-101A was received in

Lee - Direct                                                        678

evidence.)

              MR. TURGEON:  And the government moves to publish

that to the jury as well.

              THE COURT:  Go ahead.

BY MR. TURGEON:

Q.   Mr. Lee, what is the, the fifth bookmark listed on that

exhibit?

A.   "Watch New ISIS Video Shows Child Soldier Executing

'Spies' heavy.com.url."

Q.   What's the next one?

A.   The next one down is "Islamic State propaganda video

features Karl" -- the name is spelled S-t-e-f-a-n-o-v-i-c.  I

will not attempt to pronounce that.

Q.   And what's the one after that?

A.   The one after that is "ISIS Documentary 2015 - Selling

Girls - YouTube.url."

Q.   And what's the one after that, just briefly?

A.   Http-shoebat.com."  It says "watch-video-isis-savages-

beheading-twenty-one-copticchristians-saw-martyrs-beheaded-

name-jesus-fulfilled-.url."

Q.   And then finally, what's the bookmark after that?

A.   "Watch New ISIS Mass Execution Video Features French

Executioner Heavy.com.url."

              MR. TURGEON:  The Court's indulgence, Your Honor?

              THE COURT:  What does "date modified" mean?

Lee - Direct                                                          679

 1            THE WITNESS:  That was the last time that that date
 2   was updated, modified.
 3            THE COURT:  What does that really mean?
 4            THE WITNESS:  Okay.  So if, if there was an update to
 5   that, to that URL, then that URL is modified.
 6            THE COURT:  Okay.
 7            THE WITNESS:  So unlike created date, created date
 8   may stay the same, and later on, if the Web site updates that
 9   URL for whatever reasons, it would bump the modified date.
10            THE COURT:  All right.
11            MR. TURGEON:  The government has no further questions
12   for Mr. Lee.
13            THE COURT:  All right.  Ms. Moreno?
14            MR. SMITH:  Your Honor, we have one question.
15            THE COURT:  No, no.  This is not your witness.  Is
16   this your witness or not?
17            MR. SMITH:  There was one cross-examination question.
18   It was a follow-on question to what Your Honor just asked.
19            THE COURT:  This is not your witness, though.  Who's
20   taking responsibility for this witness?
21            MR. SMITH:  Oh, you mean mine personally.
22            THE COURT:  Which attorney has this case -- this
23   witness?  I thought it was yours.
24            MR. TURGEON:  Your Honor, I actually have one more
25   question, one or two more questions for Mr. Lee, if I may.

Lee - Direct                                                          680

1          THE COURT:  Go ahead.

2    BY MR. TURGEON:

3    Q.   Mr. Lee, with regard to that exhibit we were just talking

4    about, the date modified, how, if at all, does a date modified

5    change when someone visits a bookmark?

6    A.   Well, the bookmark items, sometimes the bookmark is

7    updated by content, you know, if the page is updated.  If

8    there's a change on the link, they will update that link as

9    well.

10   Q.   So --

11   A.   It's changed by the provider, by the page provider, I

12   believe.

13   Q.   Are you able to say based on this date modified that

14   someone using the computer visited the bookmark on that date?

15   A.   Yeah.  I think, I think the modify would trigger an

16   update.  When you visit that link, it would check the content,

17   maybe the cache content on the hard drive, compare it to the

18   data that is presenting.  If they're the same, they're not

19   going to update it, but if they're different, they're going to

20   update it.

21   Q.   So based on these bookmarks, are you able to tell when the

22   user of a computer visited the Web site listed?

23   A.   I don't think I can conclusively say that, as to when they

24   visited, but, but last update was, was there because if it

25   wasn't -- if the content was the same, you wouldn't have a

1   modified update.  So if you were to visit it later on, the

2   modified date may not change if the data is not, you know, it's

3   the same.

4   Q.   Are you able to say whether someone visited these Web

5   sites on these dates?

6             MR. SMITH:  Objection.  Asked and answered.

7             THE COURT:  All right, what I need to know is which

8   attorney -- I thought, Ms. Moreno, you started out with this

9   witness, didn't you?

10            MS. MORENO:  I am, Your Honor.

11            THE COURT:  Yes.  So the rule is the same attorney

12  stays with the witness, so only you can object.  Do you have an

13  objection?

14            MS. MORENO:  I do.

15            THE COURT:  What's the -- stand up, please.  What is

16  the objection?

17            MS. MORENO:  Asked and answered, Your Honor.  He did

18  ask him that question, and he said he couldn't tell him the

19  answer.

20            THE COURT:  Sustained.

21            MS. MORENO:  And he's gone back to it again.

22            THE COURT:  Sustained.

23  BY MR. TURGEON:

24  Q.   Mr. Lee, what relationship, if any, is there between the

25  date of the bookmark and the use of the computer to visit that

Lee - Direct                                                            682

1   page?

2   A.    Usually when you visit a page, it's tracked in the cookies

3   basically.  It's not in the URL.  So that's typically how, how

4   that's worked.  If they drop a cookie on your computer, it will

5   show you, you know, when you visited that day.

6              THE COURT:  Mr. Lee, keep your voice up, please.

7              THE WITNESS:  I'm sorry.  When you, when you visit a

8   site last, they try to track your habits by updating that

9   cookie.  So, so usually it's last visit.  You would find, if

10  you could decipher the cookie, sometimes the codes are not as

11  easily decipherable.

12  BY MR. TURGEON:

13  Q.    Was the date that the page was bookmarked necessarily on

14  or before or after the date modified, or are you not able to

15  tell?

16  A.    Well, this is definitely -- the dates here definitely says

17  a visit had, was performed during those dates.  Whether that

18  was the latest one or not is --

19  Q.    What do you mean, performed during that?

20  A.    Well, you don't -- the bookmarks aren't added

21  automatically.  You have to do it.  It's a manual process.  So

22  if, if I have a page that I like to visit often, I'm going to

23  bookmark that page.  So I will, I will manually, me, not the

24  computer, add that bookmark on that -- on your favorites.

25  Q.    And --

Lee - Cross                                                          683

1   A.    So, so the user will -- this is all manually added by the

2   user.

3   Q.    And for each bookmark, when is that added?

4   A.    The first one is --

5              MS. MORENO:  Objection.  Asked and answered.

6              THE COURT:  No, I think this is slightly different.

7   Overruled.

8              THE WITNESS:  The first one is October 25.

9   BY MR. TURGEON:

10  Q.    So let's talk about the first one.

11  A.    Yeah.

12  Q.    On what date was that book-, was that bookmark added; are

13  you able to tell?

14  A.    It was, it was last updated on October 25, 2015.

15  Q.    And does that mean that someone using the computer visited

16  it on that date or not?

17  A.    Definitely on that date, yeah.

18             MR. TURGEON:  Okay.  Thank you.

19             THE WITNESS:  At some point that date, yeah, but it

20  may not be the latest date that he visited.

21             MR. TURGEON:  Thank you.

22             THE COURT:  All right, cross-examination?

23             MS. MORENO:  Just one or two questions.

24                           CROSS-EXAMINATION

25  BY MS. MORENO:

Lee - Cross                                                        684

1  Q.   I'm confused, Mr. Lee.

2            THE COURT:  All right, come up.

3  BY MS. MORENO:

4  Q.   Date modified, I thought you said that it was those dates

5  reflected updates by the URL.  I thought you had said that --

6  A.   Yeah.

7  Q.   -- initially.

8  A.   Yeah.

9  Q.   Well, so do you have any sense of when the user of the

10 computer last visited any of those Web sites?  You can't tell

11 from that sheet.

12 A.   No, not last visited, but the question wasn't did the

13 person visit it that day.  The question was when was the last

14 visit.  Yeah, that would require cookies.

15 Q.   That would require cookies, and that's --

16 A.   If it's the last visited --

17 Q.   Let me just --

18 A.   I'm sorry.

19 Q.   And that's not reflected on this, on this sheet, right?

20 That information, the cookie information is not reflected on

21 this sheet?

22 A.   No, the cookie is not here.

23           MS. MORENO:  Right.  Okay.  Thank you.  Nothing

24 further.

25           THE COURT:  All right, anything further?

Lee - Redirect                                                        685

1            One question, so you don't have much leeway.

2                        REDIRECT EXAMINATION

3    BY MR. TURGEON:

4    Q.    Mr. Lee, if not the last visit, what date is represented

5    by those bookmark dates?

6    A.    The first bookmark is October 25, 2015.

7    Q.    And what does that mean?

8    A.    That means at that, that time, somebody at least

9    updated the -- modified that bookmark.

10   Q.    Thank you.

11   A.    It's usually going to be the user of that computer that

12   adds that bookmark in there.

13            MR. TURGEON:  Thank you.

14            THE COURT:  Any recross?

15            MS. MORENO:  No, Your Honor.

16            THE COURT:  All right.  Then I believe this witness

17   has completed his testimony, correct?

18            MR. TURGEON:  Yes, Your Honor.

19            THE COURT:  All right.  Thank you, Mr. Lee.

20            Is anyone going to call Mr. Lee again?  No?

21            MS. MORENO:  No, Your Honor.

22            THE COURT:  All right.  Then, sir, you're excused, so

23   you may stay in court now and watch the proceedings, or you may

24   leave, but don't discuss your testimony or anything you see or

25   hear with any witness who has not yet testified.

686

```
1              THE WITNESS:  Yes, Your Honor.

2              THE COURT:  Thank you.

3                       (Witness excused.)

4              THE COURT:  All right, your next witness?

5              MR. TURGEON:  Your Honor, I have one exhibit to

6   offer, and it's a self-authenticating exhibit.

7              THE COURT:  All right.

8              MR. TURGEON:  It's marked Government Exhibit 18-100.

9              THE COURT:  Is there any objection to 18-100?

10             MR. SMITH:  Yes, we do object, Your Honor, because

11  the Court has already ruled on this issue.

12             THE COURT:  Wait a minute.  Let me take a look at it.

13             MR. TURGEON:  Your Honor, if I may, the Court did

14  rule on an issue having to do with this; however, the Court's

15  ruling did not -- expressly did not prevent the government from

16  introducing additional evidence on this point.

17             THE COURT:  All right, let me see it.

18             MR. TURGEON:  I have a copy for Your Honor.

19             THE COURT:  All right, hand it up, please.

20             MR. TURGEON:  I'll hand it to the court security

21  officer.  Thank you.

22             Your Honor, there are two documents there.  The first

23  is the government's exhibit.  The second is the original Web

24  page for Your Honor's reference.

25             And with regard to the relevance, Your Honor, I'll
```

687

1   point Your Honor to about three-quarters of the way down the

2   second page.

3               THE COURT:  Approach the bench.

4               (Bench conference on the record.)

5               THE COURT:  All right, an element of the government's

6   case is that they have to establish there's an event here,

7   involved here within the proper time period, and we had this

8   issue come up.  This appears to be a document from the

9   Department of State that lists ISIS on their designated

10  counterterrorist organizations effective 2004.

11              If you're going to dispute this issue, we'll put

12  evidence in -- we'll put evidence on.  If you're not disputing

13  it, we don't need all of this.

14              MR. SMITH:  It's in dispute.

15              THE COURT:  I'm sorry?

16              MR. SMITH:  It is in dispute.

17              THE COURT:  All right.

18              MR. SMITH:  I think their expert will, will discuss

19  this, will cover this issue.

20              THE COURT:  Well, then this exhibit goes in then.

21              MR. TURGEON:  Yes.

22              MR. SMITH:  Oh, okay.  We misunderstood.  We thought

23  the government was attempting to relitigate this issue of an

24  instruction.

25              THE COURT:  No, no, no.  What they want to do now is

Campbell - Direct                                                    688

1   since we have this issue that's come up is they've got to put

2   on evidence of it.  This is a document that they want in.

3            No objection?  All right, it's in.

4            MR. TURGEON:  Thank you, Your Honor.

5            (End of bench conference.)

6            THE COURT:  No, no, that, I think, is the only

7   exhibit we've got.

8            All right, I have officially allowed 18-100 to be

9   admitted into evidence.

10           MR. TURGEON:  Thank you, Your Honor.

11           (Government's Exhibit No. 18-100 was received in

12  evidence.)

13           THE COURT:  All right, your next witness?

14           MR. KROMBERG:  The government calls Ian Campbell.

15           THE COURT:  All right.

16        IAN PAUL CAMPBELL, GOVERNMENT'S WITNESS, AFFIRMED

17                      DIRECT EXAMINATION

18  BY MR. KROMBERG:

19  Q.   Mr. Campbell, please state your full name and spell your

20  last name for the record, and be aware that you need to lean

21  forward a little bit so that your voice gets into the

22  microphone.

23  A.   Ian Paul Campbell, C-a-m-p-b-e-l-l.

24  Q.   I don't know if that's loud enough.

25           THE COURT:  Could you speak louder, sir?

Campbell - Direct                                                        689

1             THE WITNESS:  Ian Paul Campbell, C-a-m-p-b-e-l-l.

2    BY MR. KROMBERG:

3    Q.   All right.  So when you, when you answer from now on,

4    please keep up that timbre of voice and also that leaning

5    forward.

6             Mr. Campbell, how are you employed?

7    A.   I'm a detective with the Arlington County Police

8    Department.

9    Q.   And how long have you been so employed?

10   A.   Since 2006.

11   Q.   You're not here in the capacity of a detective in

12   Arlington County, correct?

13   A.   Correct.

14   Q.   You've been subpoenaed?

15   A.   I have.

16   Q.   Okay.  Do you know the defendant in this case?

17   A.   I do.

18   Q.   Okay.  Can you please point him out and describe what he's

19   wearing?

20   A.   The blue suit with the blue tie.

21             THE COURT:  Any issue about the identification?

22             MR. SMITH:  No.

23             THE COURT:  All right.

24   BY MR. KROMBERG:

25   Q.   And how do you know the defendant in this case?

Campbell - Direct                                                      690

1    A.    We went to college together.

2    Q.    And where was that?

3    A.    George Mason University.

4    Q.    Okay.  And when was that?

5    A.    1998 until around 2002.

6    Q.    Okay.  So please look at Government Exhibits 13-101, 102,

7    103, and 104; and after you've had a chance to look at them,

8    I'm going to ask you if you recognize them.

9    A.    I recognize all these exhibits.

10   Q.    And those are your items that you provided to the

11   government for use in this case, correct?

12   A.    They are.

13   Q.    Okay.  And where did you get those items?

14   A.    I got them at a meeting between the National Alliance -- a

15   group called the National Alliance and a group called the

16   American Friends of the British National Party.

17   Q.    And when was that?

18   A.    I believe spring of 2001.

19   Q.    Was Mr. Young involved in that at all?

20   A.    He was.

21   Q.    How did that come about?

22   A.    We were both involved in a class called European Racism.

23   As part of that class, we found out that they were having a

24   meeting of these two groups to be held in Arlington County.  We

25   approached the professor of this class and asked if we could

Campbell - Direct                                                    691

1   interview the person that is head of this group called the

2   American Friends of the British National Party for this class.

3   Q.    What was the reason for interviewing the head of the

4   American Friends of British National Party for the course on

5   European racism?

6   A.    It was part of a class project.

7   Q.    Excuse me, why this particular person as opposed to any

8   other person?

9   A.    The opportunity presented itself for -- to have a

10  firsthand knowledge, what we call a primary source, where I

11  could actually go and talk to the head of these groups that we

12  were studying and interview them and ask them what their views

13  on certain subjects were.

14  Q.    So what were the views of the British National Party that

15  made them relevant to the course on European racism as you

16  understood it at the time?

17  A.    The British National Party, as I understood at the time,

18  was a xenophobic political party.  They were more of like a

19  Britain for the British, very -- it was a racist group

20  essentially.

21  Q.    And how did you get the opportunity to go meet the, was it

22  Mark Cotteril?

23  A.    I believe that was his name, yes.

24  Q.    How did you get the opportunity to interview Mark

25  Cotteril?

Campbell - Direct                                                    692

1   A.    I can't remember off the top of my head.  It was arranged,

2   I think, through a friend or through the professor himself

3   where we could approach this guy.  We talked to him.  We gave

4   him a list of questions beforehand.  He agreed to do it, and we

5   met him at the rally in Arlington.

6   Q.    So it was a -- you mentioned the National Alliance.  What

7   was the National Alliance?  That was different from the

8   American Friends of the British National Party, right?

9   A.    It is.

10  Q.    Okay.  What is a National Alliance?

11  A.    The National Alliance is another, it's a neo-Nazi group.

12  It's an organization.

13  Q.    And you mentioned a rally, so where was this rally, and

14  what happened there?

15  A.    It was basically a meeting.  I don't remember exactly what

16  the topic of the meeting was.  It was held at a Thai restaurant

17  in Arlington, Virginia.

18        As part of this meeting, the group then went to the,

19  I believe it was either the German or the Austrian Embassy.  At

20  the time, the Country of Austria elected a far, essentially a

21  racist guy as either prime minister or some sort of -- he held

22  some sort of political office, and the government wasn't

23  allowing him to hold that political office, so this group went

24  to protest the embassy to show their dissatisfaction for that

25  decision.

Campbell - Direct                                                      693

1   Q.   How many people do you recall were at that

2   meeting/gathering/rally, whatever you're going to term it as,

3   in Arlington, at the Thai restaurant?

4   A.   I would say maybe 25 at most.

5   Q.   So why would you -- why do you characterize them as

6   neo-Nazis?

7   A.   Based on the publications that they put out, based on the

8   information that I know about them through research, through my

9   knowledge of them, through studying them.

10  Q.   Okay.  Well, let me turn your attention to a slightly

11  different topic.  Over the years after college, did you

12  continue to socialize with the defendant?

13  A.   After college, it was on and off maybe, not that much.

14  Q.   Did you know him to use any other names or any other

15  identities?

16  A.   I knew him to use the name Klaus.

17  Q.   Was there a last name that went with Klaus?

18  A.   I can't remember off the top of my head.

19  Q.   Did you -- have you heard the name Düsselkamp?

20  A.   Yes.

21  Q.   Was it Klaus Düsselkamp?

22  A.   From what I remember, yes.

23  Q.   And what was -- who was Klaus Düsselkamp in connection

24  with the defendant?

25  A.   From what I remember, it was sort of like a pseudonym.  I

Campbell - Direct                                                      694

1  know he was involved in a reenactment group, and from what I

2  remember, he would use that name for his reenactment group.

3  Q.    A World War II reenactment group?

4  A.    Yes.

5  Q.    And Storm Trooper Klaus Düsselkamp, what side was he on in

6  World War II?  Was he on the American side or the other side?

7  A.    It was German.

8  Q.    Okay.  When was -- before today, when was the last time

9  that you saw the defendant?

10  A.    I want to say early in 2010.

11  Q.    And what was the occasion in 2010?

12  A.    I'd run into him at work.  Me being a police officer in

13  Arlington and him with his profession, he was also in

14  Arlington.  We would run across each other, and in 2010, I was

15  celebrating my 30th birthday and invited him to Washington,

16  D.C., as part of that.

17  Q.    I'd like you to take a look at an exhibit, it should be --

18  the court security officer should be able to provide it to

19  you -- 11-400.

20           MR. SMITH:  Your Honor, we object on 403 grounds.

21  This is a running objection for all the pieces of this

22  testimony.

23           THE COURT:  All right, let me, let me just see what

24  this is.

25           All right, the objection is overruled.

Campbell - Direct                                                    695

1   BY MR. KROMBERG:

2   Q.    Mr. Campbell, do you recognize that photo?

3   A.    I don't recognize the photo, but I recognize the license

4   plate.

5   Q.    Do you recognize the truck?

6   A.    I don't recognize the truck itself, no.

7   Q.    But you recognize the license plate?

8   A.    I do.

9   Q.    Okay.  And what do you recognize the license plate as?

10  Belonging to anyone you know?

11  A.    It did belong to the defendant.

12        MR. KROMBERG:  Okay.  The government moves in

13  Government Exhibit 11-400, and we can publish it to the jury,

14  but we're going to get to it later, Judge.  I think let's just

15  publish it now for a moment.

16        THE COURT:  Yeah, I'm letting it in over the defense

17  objection.

18        (Government's Exhibit No. 11-400 was received in

19  evidence.)

20        MR. KROMBERG:  And if you can zoom in on the license

21  plate?  FRI KRP?  Okay, thank you.

22  Q.    So, Mr. Campbell, at your birthday party, did, did you

23  receive a gift from Mr. Young?

24  A.    I did.

25  Q.    The court security officer is going to give you what's

Campbell - Direct                                                      696

1    been marked Government Exhibit 13-105, which is a, a book.

2              Do you recognize that?

3    A.    I do.

4    Q.    And what is that?

5    A.    It is a book called *Serpent's Walk*.

6    Q.    And who, who owns that book?  I mean, whose book is that?

7    A.    Well, it was given to me as a gift.

8    Q.    Okay.  By, by Mr. Young?

9    A.    Correct.

10   Q.    All right.  What is that book about?

11   A.    I'm not quite sure.  I didn't read it.

12   Q.    Who is the author?

13   A.    A man named Randolph Calverhall.

14   Q.    I'm going to show you what's been marked Government

15   Exhibit 10-860, which is -- 10-860, and I'm going to ask if you

16   recognize that other book.

17              I'd also like to read a stipulation, Judge.

18              THE COURT:  Well, let's do one thing at a time,

19   Mr. Kromberg.

20              MR. KROMBERG:  Right, but the stipulation applies to

21   this particular book.

22              THE COURT:  All right, hold on one second.

23              All right, go ahead.

24              MR. KROMBERG:  So the stipulation is Government

25   Exhibit 12-22:  The United States and the defendant hereby

Campbell - Direct                                                  697

1    stipulate and agree that Government Exhibits 10-400 through

2    10-532, Government Exhibits 10-533 through 10-621, Government

3    Exhibits 10-650 through 10-825, and Government Exhibits 10-850

4    through 10-900 were found by the FBI in the course of searching

5    the residence of the defendant, Nicholas Young, in August 2016.

6              THE COURT:  It doesn't mean they're all going to be

7    entered into evidence.

8              MR. SMITH:  Your Honor, we stipulate to authenticity.

9    We have a running objection to every piece of evidence in

10   this --

11             THE COURT:  Ladies and gentlemen, I want to caution

12   you on this evidence that's coming in tonight and tomorrow, and

13   I think I mentioned it when we did the voir dire, and you-all

14   told me that you could evaluate the evidence in the proper

15   context in which it's being offered.

16             Because this case involves the defense of entrapment,

17   as everybody has explained to you at the beginning, the issue

18   about the mindset of the defendant is important.

19             I'm allowing some but not all of this type of

20   evidence about the defendant's involvement or interest in what

21   were considered to be anti-Semitic groups in evidence because

22   the government has to link some of that to whether or not he

23   was induced by government action to get engaged in all the

24   activities you've been hearing about or whether or not, you

25   know, he was absolutely innocent and it was all the government

Campbell - Direct                                                        698

1  that overwhelmed his free will and got him incited into doing

2  this.

3         So I want you to understand he is not being charged

4  and you cannot find him guilty for possessing Nazi or

5  anti-Semitic literature.  He's not being charged with that, he

6  cannot be convicted for that, but the evidence is being allowed

7  in to be considered, that's all, as whether or not it helps or

8  doesn't help to establish the predisposition issue, all right?

9  So let's go along with this now.

10        And the defense has a running objection to all of

11 this.

12        MR. KROMBERG:  Right.  And although I think this one

13 would be odd because 10-861 -- 10-861, if you can --

14        THE COURT:  Well, you're talking about 10-860 right

15 now.

16        MR. KROMBERG:  Let me, let me just switch it back to

17 861.  That will be easier.  861 we could do with a photo if

18 necessary.  Yes, basically a photo.

19 Q.   Is that a photo of the book *Serpent's Walk*?

20 A.   It is.

21        MR. KROMBERG:  Right.  I will represent to the Court

22 that that is just the photo.  We actually have the book, so

23 that -- Mr. Campbell, is that the same book -- excuse me, is

24 that a copy of the same book that the defendant gifted you in

25 about 2010 for your birthday?

Campbell - Direct                                                    699

1           THE WITNESS:  So this photo is the same book as the

2    book --

3    BY MR. KROMBERG:

4    Q.   Is it a copy of the same book?  Because that, that piece

5    of paper is supposed to represent the book that was seized from

6    the defendant's house in August 2016, so I'm asking if that is

7    the copy of the same book.

8           THE COURT:  No, is that the cover of the book?

9           THE WITNESS:  It appears so, yes.

10          THE COURT:  All right, that's a picture of the cover

11   of the book.

12          MR. KROMBERG:  Okay.

13          THE COURT:  Are you moving 861 in?

14          MR. KROMBERG:  Yes, Judge.

15          THE COURT:  All right.  Over the defense objection,

16   it's in.

17          (Government's Exhibit No. 10-861 was received in

18   evidence.)

19   BY MR. KROMBERG:

20   Q.   Now, 860 is before you as well, correct?  That's a cover

21   of another book.

22   A.   Correct.

23   Q.   Do you know what that book is?

24   A.   I do.

25   Q.   Okay.

Campbell - Direct                                              700

 1          MR. SMITH:  Objection, Your Honor.  This is the

 2   expert testimony that Your Honor excluded.  One of these books

 3   was not gifted to Mr. Campbell, and he is purporting to testify

 4   about it as an expert.

 5          THE COURT:  Well, wait a minute.  Not as -- have you

 6   seen this book before?

 7          THE WITNESS:  I have.

 8          THE COURT:  Have you read it?

 9          THE WITNESS:  No.

10          THE COURT:  You've only seen it?

11          THE WITNESS:  Yes.

12          THE COURT:  In what context did you see it?

13          THE WITNESS:  I provide training for the police

14   department, and I've put that in.

15          THE COURT:  But that's all -- you've not actually

16   read the book itself?

17          THE WITNESS:  No, I have not.

18          THE COURT:  I'll sustain the objection.

19          MR. KROMBERG:  Well, Judge, I actually didn't want to

20   ask what the book was about.  I wanted to ask who the book is

21   by.

22          THE COURT:  Well, how can you know what the book is

23   about if you haven't read it?

24          MR. KROMBERG:  I was going to talk about the cover of

25   the book and who is it by and who is it published by.

1          MR. SMITH:  Your Honor, objection.  This is exactly

2     what the Court ruled on before trial.

3          THE COURT:  Yeah, I'm going to -- I'm going to at

4     this point sustain the objection.  861 is in; 860 is not in.

5     BY MR. KROMBERG:

6     Q.   Okay.  Going back to the meeting you went to with

7     Mr. Young in connection with your college course, in the course

8     of your discussions with Mr. Young about that meeting, did the

9     subject of Muslims come up?

10    A.   It was not a discussion with him, no.

11    Q.   If it was not a discussion with him, did the subject of

12    Muslims come up when you were leaving that meeting?

13    A.   It did.

14    Q.   Okay.  And what did Mr. Young say at that point?

15    A.   At the time, the participants of the meeting, including

16    the person I was interviewing, was having a discussion with

17    another person there.  I don't know if it was about Israel or

18    about Muslims in general or about Jewish people, I can't

19    recall, but in the course of that conversation, Mr. Young

20    interjected something to the effect of, "Don't discount the

21    Muslims' ability to fight against the Jews."

22         MR. KROMBERG:  Okay.  Thank you.  Thank you,

23    Mr. Campbell.  The defense may have questions for you.

24                      CROSS-EXAMINATION

25    BY MR. SMITH:

Campbell - Cross                                                    702

 1   Q.   Good evening, Mr. Campbell.  Did you say you were

 2   subpoenaed to appear here today?

 3   A.   I was.

 4   Q.   So you're not coming here freely, right?

 5   A.   Correct.

 6   Q.   So you're coming here to testify today in an attempted

 7   material support for terrorism case in 2017 --

 8           MR. KROMBERG:  Objection, Judge.  That's totally

 9   irrelevant to anything that this witness can answer.

10           THE COURT:  Now, wait a minute.  It's also a long

11   speaking question, which I advised everybody to try to reduce.

12   Just ask your question directly.

13   BY MR. SMITH:

14   Q.   You understand that you're here to testify today in this

15   material support case --

16           MR. KROMBERG:  Objection, Judge.  It's irrelevant

17   what --

18           MR. SMITH:  I haven't finished my question, Your

19   Honor.

20           MR. KROMBERG:  It's irrelevant.

21           THE COURT:  Mr. Kromberg, have a seat.

22           Do you understand why you're here today?

23           THE WITNESS:  I do, Your Honor.

24           THE COURT:  What's your understanding of why you're

25   here today?

Campbell - Cross                                                      703

1          THE WITNESS:  The accused is -- or the defendant is

2    accused of material support.

3          THE COURT:  And the government asked you to testify?

4          THE WITNESS:  They did.

5          THE COURT:  That's fine.  Ask your next question.

6    BY MR. SMITH:

7    Q.   So it's your testimony that you had a project in a George

8    Mason University class?

9    A.   Correct.

10   Q.   In 2000?

11   A.   I don't -- I think it was 2001.

12   Q.   2000-2001 approximately.  You couldn't remember when you

13   first spoke to the government about that?

14   A.   It was a spring class, yeah.  No, I couldn't remember.

15   Q.   Okay.  And then it's your testimony that ten years later,

16   the defendant gave you a book, and that book is not the subject

17   of Muslims or Islam, correct?

18   A.   I haven't read the book.  No, I don't know.

19   Q.   So you haven't read the book that Nicholas gave you, and

20   you're coming here to testify today that he gave you --

21          MR. KROMBERG:  Objection, Judge.

22          THE COURT:  Have a seat.

23          That's argumentative.  Sustained.

24   BY MR. SMITH:

25   Q.   So at some point before your testimony here today, the

Campbell - Cross                                                      704

1    FBI -- or the government called you in for an interview, right?

2    A.    Correct.

3    Q.    When was that?

4    A.    I don't recall off the top of my head.

5    Q.    Was it this year or --

6    A.    Yes, I believe so.

7    Q.    In January of 2017?

8    A.    I don't remember.

9    Q.    Okay.  Where was that meeting?

10   A.    There was a meeting here.

11   Q.    What is "here"?

12   A.    At the U.S. Attorney's Office.

13   Q.    So did they call you and tell you to come to the U.S.

14   Attorney's Office?

15   A.    I don't remember the exact way I came in to be called

16   here, yeah.  No.

17   Q.    But they reached out to you, not vice versa, right?

18   A.    Correct.

19   Q.    And in the meeting, who was at the meeting?

20   A.    I believe Mr. Kromberg and the agent next to him.

21   Q.    And did they tell you what the purpose of that meeting

22   was?

23   A.    To talk about the defendant.

24   Q.    And what sort of questions did they ask you?

25   A.    Basically about the testimony that I just gave, about my

Campbell - Cross                                                    705

1    interactions with him over the years, the statement that he

2    made at this rally.

3    Q.   So did they ever ask you about militant Islam?

4    A.   Not that I remember off the top of my head.

5    Q.   So is it fair to say that the purpose of the meeting was

6    to ask you about your experience with Mr. Young in 2000 as a

7    college roommate?

8            MR. KROMBERG:   Objection, Judge.   To characterize the

9    purpose of the meeting, the purpose of the meeting from the

10   government's side is irrelevant.   The purpose of the meeting

11   from the, from the witness's side is that he was asked to come

12   in.

13           THE COURT:   I don't know why you're objecting,

14   Mr. Kromberg.   It's late in the day, and this is not anything

15   that's harmful to the government's case.   Let's move on.

16   BY MR. SMITH:

17   Q.   So, Mr. Campbell, you were an old friend of Mr. Young from

18   the ROTC, correct?

19   A.   Correct.

20   Q.   You were his roommate in 2000 at George Mason, correct?

21   A.   I don't remember which year it was but --

22   Q.   You were his roommate in your senior year at George Mason?

23   A.   It was not my senior year, I believe.

24   Q.   Which year was it in college?

25   A.   I want to say it was maybe sophomore or junior.   I had

Campbell - Cross                                                        706

1   another roommate that moved out to live off campus, and he

2   basically came in and stayed in his room.

3   Q.   Was Mr. Young a Muslim when you were a roommate with him?

4   A.   No, he was not.

5   Q.   Was he a Catholic?

6   A.   I don't believe so, no.

7   Q.   You don't, okay.

8          So when you spoke to the government earlier this

9   year, could you remember when you took this European racism

10  class?

11  A.   I believe it was spring 2001.  It was around that time.

12  Q.   When the government asked you about it, you didn't

13  remember what time the class -- what year the class was, right?

14  A.   Correct.

15  Q.   Okay.  And then at some point in your meeting with the

16  government in -- earlier this year, in January 2017, you

17  realized the government was collecting information about white

18  supremacism for this about Nicholas Young, correct?

19  A.   I believe so, yes.

20  Q.   And then you told the government attorneys that Nicholas

21  and yourself had been in a project in a European racism class,

22  right?

23  A.   Correct.

24  Q.   And you didn't remember the date of the, the year in which

25  you took this class initially with the government?

Campbell - Cross                                                          707

1    A.   Correct.

2    Q.   But you did remember that you had a class project in which

3    you went to a British National Party meeting, correct?

4    A.   It was American Friends of the British National Party.

5    Q.   At a Thai restaurant, correct?

6    A.   Correct.

7    Q.   Where 50 people attended?

8    A.   I don't think it was that many.

9    Q.   And that there was an individual named Mark who was going

10   to be interviewed?

11   A.   Correct.

12   Q.   And he spoke with a reverend?

13   A.   Yes.

14   Q.   And this reverend was speaking about Muslims?

15   A.   I don't know if it was the reverend who was speaking about

16   Muslims or who was speaking about Muslims or if they were

17   speaking about Israel or Jewish people.  I don't remember.

18   Q.   You remembered all of those details?  You remembered all

19   of those details in your conversation with the government in

20   January of 2017?

21   A.   I don't remember, no.

22   Q.   Do you remember what other classes you took at Mason in

23   2000?

24   A.   Not off the top of my head, no.

25   Q.   Do you remember the names of any of your professors?

Campbell - Cross                                                    708

1   A.    The professor in that class was Gillette.  I've -- I mean,

2   I can rattle off names of my professors.  I don't know if it

3   was that particular year.

4   Q.    So you said that you don't remember basically which

5   classes you took?

6   A.    At that time?

7   Q.    Yeah.

8   A.    I mean, I remember which classes I took.  I couldn't give

9   you a chronological order of which classes I took when.

10  Q.    Do you remember any other projects you worked on besides

11  the British National Party meeting project?

12  A.    No.

13  Q.    Okay.  So you told the government's attorneys in January

14  of 2017 that you invited Nicholas to your 30th birthday party?

15            MR. KROMBERG:  Objection, Judge.  That's misstating

16  what the witness has said.  The witness said he spoke to me and

17  to Special Agent Caslen.  He didn't say government attorneys.

18            THE COURT:  But you are a government attorney,

19  Mr. Kromberg.  We don't need this kind of an objection.

20  Overruled.

21  BY MR. SMITH:

22  Q.    So the question was when you were speaking with

23  Mr. Kromberg and Agent Caslen, you told them that you invited

24  Nicholas to your 30th birthday party?

25  A.    Correct.

Campbell - Cross                                                        709

1   Q.   That was in 2009?

2   A.   That was 2010.

3   Q.   2010.  And that this party was -- did you tell

4   Mr. Kromberg and Agent Caslen who was invited to your birthday

5   party?

6   A.   I don't believe I said anything specific, no.

7           MR. SMITH:  I've got a 302 dated January 17, 2017.

8   It's an interview of Ian Campbell.

9           MR. KROMBERG:  Your Honor, we've had a long time of

10  improper cross-examination.  If the question is if it refreshes

11  his memory, that's the only question that is appropriate here.

12          THE COURT:  That is correct.  Take a look at the 302,

13  Officer Campbell, and see --

14  BY MR. SMITH:

15  Q.   If you turn to the second page, there's a paragraph in

16  which you're talking about, you seem to be talking about --

17          MR. KROMBERG:  Objection.

18          MR. SMITH:  I'm helping --

19          MR. KROMBERG:  Not Mr. --

20          THE COURT:  Just say:  Look at page 2.

21          MR. KROMBERG:  Does it refresh your recollection?

22  That's the appropriate question.

23          THE COURT:  Do you see -- you're looking at page 2?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Does that refresh your memory?

Campbell - Cross                                                          710

BY MR. SMITH:

Q.    About the 30th birthday party.

A.    Yes.

Q.    So did you -- do you recall telling the -- Mr. Kromberg

and Agent Caslen whether you invited any of your friends -- any

other friends to the party?

A.    I don't recall telling them, but I do remember there

obviously being more people at my 30th birthday that I -- I

didn't name them --

Q.    Did you tell Mr. Kromberg that you had invited --

          MR. KROMBERG:  Objection.

BY MR. SMITH:

Q.    -- your liberal Jewish friends?

          THE COURT:  Wait.  Mr. Smith, you are again talking

over the witness.  You need to listen to him.  Let him finish.

          MR. SMITH:  He had --

          THE COURT:  No.  He started to object because you

were talking while the witness was talking.

          All right, go ahead and finish your statement, sir.

          THE WITNESS:  I had friends there that -- yeah, my

friends, they come from all different walks of life, and some

of them happen to be liberal, some of them happen to be Jewish.

BY MR. SMITH:

Q.    And so you told the government, Mr. Kromberg and Agent

Caslen, that Mr. Young gave you a copy of *Serpent's Walk* for

Campbell - Cross                                                          711

1   your birthday, right?

2   A.    Correct.

3   Q.    Do you remember that exchange at your birthday when

4   Mr. Young gave you the book?

5   A.    Vaguely.  I remember receiving the book from him and

6   seeing it.

7   Q.    Do you remember your reaction?

8   A.    I thought it was kind of odd.  I may have just put it in

9   my bag.

10  Q.    Did you, did you think it was funny?

11  A.    I thought it was odd.  I may have, I may have kind of like

12  laughed it off, as I normally would in a situation like that,

13  yes.

14  Q.    Did you have an interest in history at the time on your

15  30th birthday?

16  A.    I do.

17  Q.    Like, what kind of history?

18  A.    All sorts of history.  My dad was a historian.  He's an

19  author so --

20  Q.    World War II history as well, right?

21  A.    As well, yes.

22  Q.    Okay.  So, so after you have a meeting with the

23  government's attorney, Mr. Kromberg, and the case agent, Agent

24  Caslen, did you take some sort of action after you met them to

25  assist them in this case?

Campbell - Cross                                                    712

1   A.   I don't understand your question.

2   Q.   So after your -- so you had a meeting sometime this year,

3   earlier this year --

4   A.   Okay.

5   Q.   -- when you met with Mr. Kromberg sitting next to me and

6   Agent Caslen, correct?

7   A.   Correct.

8   Q.   And did you take some sort of action after your meeting to

9   assist in the prosecution of the case?

10  A.   What would this action be?  I don't understand what you

11  mean.

12  Q.   You don't recall next steps after you met with the

13  government to sort of help out, help uncover some of the

14  evidence that would be used in this case?

15  A.   I retrieved the book from my storage unit.

16  Q.   Okay.  Did, did you reach out to one of your professors

17  about this European --

18  A.   I did.

19  Q.   Okay.  Do you recall e-mailing him and telling him about

20  this case and inquiring whether the professor might have some

21  materials that would be useful to this case?

22  A.   I do.

23  Q.   And what did you -- and did the government ask you to do

24  that?

25  A.   I don't remember.

Campbell - Cross                                                        713

1  Q.   Do you think you would have done it on your own

2  initiative?

3  A.   Yes, probably.

4  Q.   Do you remember what you asked your professor?

5  A.   As part of that class, it was an interview, and it was

6  videotaped on a VHS, I believe it was.  It could have been a

7  smaller tape.  Either way, it was videotaped, and the videotape

8  was submitted to the professor.

9         There was an issue with the audio on the videotape,

10 so the interview was kind of pointless because the microphone

11 wasn't working, and that was the last I remember of the

12 videotape, so I thought that maybe he still had it somewhere.

13 Q.   So when you reached out to this professor from the

14 European racism class, did you sort of explain to the professor

15 in what capacity you were seeking this information?

16 A.   I did.

17 Q.   And what did you tell him?

18 A.   I don't remember off the top of my head, but I said

19 something about the investigation.

20 Q.   Can you just flip to the last page on the -- in the

21 document I gave you?  It's an e-mail from you to the professor

22 dated January 19, 2017.  It's the second paragraph?

23 A.   Yep.

24 Q.   Does that refresh your recollection?

25 A.   It does.

Campbell - Cross                                                        714

1    Q.   And what did you -- and what did you tell your professor

2    that -- in what capacity did you tell the professor you were

3    writing to him?

4    A.   It was in an investigative capacity.

5    Q.   You told him that you were working with the FBI in this

6    case, right?

7    A.   I did.

8    Q.   What did you mean by that?

9    A.   The FBI was obviously investigating the defendant and

10   asked me these questions, and I recalled these things, and I

11   asked the -- I told the professor basically why I was reaching

12   out for.

13   Q.   So did you not understand that they were interviewing you

14   as a potential witness?  Did you understand that the government

15   was interviewing you to work with the FBI in this

16   investigation?

17   A.   I did.

18   Q.   Or as a witness?

19   A.   As a witness.

20   Q.   That's what you meant here by "working with the FBI"?

21   A.   Correct.

22   Q.   Okay.  So at some point during your meeting in January of

23   2017 with, with the government attorney and the, and the case

24   agent, do you recall whether you told them about how often you

25   were still seeing Nicholas Young after college?

Campbell - Cross                                                          715

1   A.   I don't recall exactly, but it was on and off.  It was

2   intermittent.

3   Q.   How often would you say?

4   A.   In which period?  I mean --

5   Q.   I mean, so you were roommates in 2000.  2000, correct?

6   A.   I don't -- around that time, yes.

7   Q.   So how often would you say you met -- you saw Nicholas

8   Young between 2000 and 2010?

9   A.   Not very often.

10  Q.   Wasn't it like a couple times a year to get drinks?

11  A.   Yeah, maybe.

12  Q.   Okay.

13  A.   And that was more towards the end of college, and then

14  after that period, it was probably like a four- or five-year

15  period where, you know, we really didn't see each other.  I

16  really didn't know what he was doing until I saw him at work at

17  one point.

18  Q.   So is it fair to say when you lived with Mr. Young, he was

19  not a -- didn't give indications of militant radical Islamism?

20  A.   No, he did not.

21  Q.   Okay.  Just a few more questions.  So when you were in

22  college together, what would you and Young -- Nicholas Young do

23  together?  Did you hang out?

24  A.   Yeah, we would go to concerts together.

25  Q.   Like rock shows?

Campbell - Cross                                                    716

1    A.    That's pretty much the extent of it.

2    Q.    Clubs, right?

3    A.    Yeah.

4              MR. SMITH:  That's all, Your Honor.

5              THE COURT:  All right.  Mr. Kromberg, is there any

6    redirect?

7              MR. KROMBERG:  No, Your Honor.

8              THE COURT:  All right.  I assume that no one's going

9    to call Officer Campbell again?

10             MR. KROMBERG:  The government is not.

11             THE COURT:  How about the defense?

12             MR. SMITH:  No.

13             THE COURT:  No?

14             All right, sir, then you're excused as a witness.

15   Actually, we're going to be shutting things down.  So just

16   don't discuss your testimony with any witness who has not yet

17   testified.

18             THE WITNESS:  Thank you, Your Honor.

19                         (Witness excused.)

20             THE COURT:  All right, ladies and gentlemen, we're

21   actually moving quite well.  I can give you tomorrow a much

22   better time estimate, but we are moving faster.  I will need

23   you back here at nine o'clock, however, tomorrow morning, but

24   you're getting 15 minutes early released tonight, all right?

25             Again, please remember my cautions.  Do not try to

717

1   conduct any investigations.  Stay away from, you know, don't

2   start researching URLs and all that kind of stuff, all right?

3          It's really important again you get a good night's

4   sleep, keep following my instructions, and we'll see you-all

5   back here promptly at nine o'clock tomorrow morning.

6          All right, we're going to stay in session for a

7   minute or two.

8                        (Jury out.)

9          THE COURT:  Now, again, I don't think it's ever wise

10  for any attorney to object if the objection isn't really -- if

11  the question is not hurting the issue, and, Mr. Kromberg, I

12  think you must be tired because I don't think some of your

13  objections were necessary.

14         MR. KROMBERG:  I'm sure you're right, Judge, but it

15  is also true that ineffective assistance of counsel comes back

16  to bite the government, not the defense.  When he's handing

17  up -- when Mr. Smith is handing up exhibits to a --

18         MS. MORENO:  I'm sorry, that's so insulting.

19         THE COURT:  Wait, wait.  Have a seat.

20         MR. KROMBERG:  After he's been repeatedly told to

21  mark the exhibits, give it to the witness, and he doesn't do

22  it, our record, as the Court has said, is going to be a mess.

23         THE COURT:  But remember, these are not going into

24  evidence.  These 302s are not in the evidence.  They've not

25  been moved into evidence.  All this discussion about all these

718

1    documents, they're not in evidence.

2              MR. KROMBERG:  Okay.

3              THE COURT:  I haven't heard very many times --

4              MR. SMITH:  Your Honor, we just object to that

5    statement, which is kind of extraordinary, insulting,

6    unprofessional.

7              THE COURT:  Excuse me, it's late in the day, and

8    we're not going to have this type of back-snapping at each

9    other.  Look, this case has to stay on track.  You've done a

10   pretty decent job.

11             I think tomorrow, I want to make sure that we don't

12   have any extraneous problems tomorrow.  So the order of

13   witnesses for tomorrow, Mr. Kromberg, is who, Officer McNulty?

14   I'm looking at the list you gave me.

15             MR. KROMBERG:  Right.  If -- we have to find out if

16   Mr. -- I think it is true that it would be Mr. McNulty,

17   Mr. Menzies --

18             THE COURT:  I'm sorry, what is the purpose of the

19   Fairfax County officer?

20             MR. KROMBERG:  He was a roommate of, of Mr. Young

21   from approximately 2004 to 2007.  He is going to talk about --

22             THE COURT:  A little bit like this testimony?

23             MR. KROMBERG:  Correct.

24             THE COURT:  All right.

25             MR. KROMBERG:  Purely predisposition issues.  And

719

1    then Mr. Menzies replaced Mr. McNulty as the roommate from

2    approximately 2007 to 2010.

3            I think then we would go to Professor

4    Gartenstein-Ross, then the summary -- then Officer Dill from

5    the Metropolitan Washington Police Department, and then the

6    summary witness, Agent Caslen.

7            THE COURT:  All right.  So you're reversing the order

8    slightly.  Agent Caslen is your last witness?

9            MR. KROMBERG:  Correct.

10           THE COURT:  All right, that's fine.

11           MR. KROMBERG:  Correct.  I believe that Ms. Dill is

12   going to be very, very short.  I think Mr. McNulty is going to

13   be pretty short, although there is an issue that I think we do

14   need to talk about before we get to Mr. McNulty.

15           THE COURT:  All right.

16           MR. KROMBERG:  And that is that he's going to say

17   when he lived there, there were packages being -- I'm going to

18   ask, "What other names did you know the defendant to use?"

19           And he's going to say, "Oh, Rudolph Von Waldron."

20           And I'll say, "What did he use the name Rudolph Von

21   Waldron from?"

22           "Oh, he received packages from Bulgaria."

23           Now, what the packages from Bulgaria are, that he was

24   buying -- we have e-mail traffic to show he was buying illegal

25   steroids.  Now, I realize the Court has said this is not a drug

720

1   case, but these are international financial transactions.

2            THE COURT:  I'm not letting that in.  Forget it.

3            MR. KROMBERG:  And that may be, Judge, but when the

4   defense says, oh, this is purely a financial case, and it has

5   nothing to do with terrorism, we are put in the position of

6   saying, oh, here we have a financial transaction, financial

7   transactions under fake names to going -- to commit unlawful

8   activity.

9            THE COURT:  Mr. Kromberg, you're inviting reversible

10  error.  I will not let that evidence in.  Make sure your

11  witnesses know not to get into it.  Do not open that door.  I

12  will not permit it.  All right?

13           MR. KROMBERG:  Can we use the fact that he was using

14  fake names to get packages internationally, without going into

15  what was in the packages?

16           THE COURT:  No, that's too far back.  No, no.  All

17  right.

18           All right, is there anything else?  What are the

19  exhibit numbers that you're going to be tendering that have the

20  Nazi stuff in it?  And I assume they're all in my book?

21           MR. KROMBERG:  They are, Judge.

22           THE COURT:  All right.

23           MR. KROMBERG:  So you've already seen the one from

24  the phone.  That is the smokestack one that that CART examiner

25  was talking about.

721

```
 1              THE COURT:  All right.

 2              MR. KROMBERG:  The -- in the 8 series of exhibits,

 3   there are LiveLeak -- we're going to -- we're going to prove

 4   that the defendant had a LiveLeak account under the name of

 5   Düsselkamp.

 6              THE COURT:  All right.  The 8 series?

 7              MR. KROMBERG:  Correct, 8-500 to 8-510.

 8              THE COURT:  Hold on.

 9              MR. KROMBERG:  And, Your Honor, they're actually not

10   about Nazi stuff other than it's the account in the name of

11   Düsselkamp, and --

12              THE COURT:  I'm permitting that in.

13              MR. KROMBERG:  Okay.  So that's the 8 series.  Then

14   the next would be --

15              THE COURT:  Well, when you say the 8 series --

16              MR. KROMBERG:  So it's 8-500, 8-501, 502.  Let's see,

17   503, 504, 505, 507, and 510.

18              THE COURT:  Well, the reason why this will be

19   relevant to the case, I'm skimming them very fast, but, I mean,

20   there are references to Islamic types of issues.

21              MR. KROMBERG:  Right.  These are all the ISIS ones.

22              THE COURT:  Yeah.

23              MR. KROMBERG:  The only connection to Nazism is the

24   name Düsselkamp.

25              THE COURT:  Yep, that certainly is relevant.  That
```

722

1   comes in.

2           MR. KROMBERG:  So after that, there would be 10-230,

3   and the exhibits --

4           THE COURT:  All right, hold on a second.  I'm sorry,

5   10-230?

6           MR. KROMBERG:  230.  These are -- the series of

7   Exhibits 10-230 through 10-252 are items that were found on the

8   defendant's computer media in 2016, and the first 10 or first

9   11 all have to do with the Mufti of Jerusalem, and the Mufti is

10  meeting Hitler and the Mufti recruiting Muslim troops for the

11  SS.  I think the Court has seen those before.

12          MR. SMITH:  Your Honor, we'd like to object to these

13  on the record.

14          THE COURT:  Because of the nature of this case and

15  the argument that there is this crossover between the interest

16  in the white supremacy and Nazism and radical Islam, I'm

17  permitting it over your objection.

18          MR. SMITH:  Your Honor, just to be clear, there's two

19  categories in here.  The first category, which is 10-30 through

20  10-36, relates to the Mufti, which is this figure that

21  Gartenstein-Ross will try to establish as the missing link

22  between militant Islam and white supremacism.  That's 10-230 to

23  10-236.

24          But then if Your Honor looks at, at 10-250 to 10-252,

25  cartoon Jew directing U.S. tank, cartoon Jew directing Colin

723

1  Powell, Jewish swine, that, Your Honor, is -- there's no

2  argument for relevance in this case and --

3        THE COURT:  Well, the linkage is the rabid

4  anti-Semitism.  That's definitely a linkage.  I'm going to

5  permit it.  It's not pretty stuff, and I've warned the jury

6  once and I'll warn them again that they have to use it in the

7  proper way, which is whether or not there was this

8  predisposition to engage in radical Islamic activity,

9  supporting them anyway, so I'm allowing it in.

10        MR. SMITH:  I'm not suggesting the Court should look

11 at these images, because they're horrible, but if the Court did

12 look at the images, it would see that there's no -- there's

13 nothing in these about Islam at all.  I mean, there's not even

14 a visual connection, whereas if the Court looks at these Mufti

15 pictures, Mufti and Hitler, then there's this visual connection

16 between the Mufti of Jerusalem, who, by the way, is a figure

17 from the 1930s, so how that's related to contemporary militant

18 Islamist is not explained, but at least there's, to put it

19 bluntly, a Muslim in that picture, right?

20        But when it comes to these Jewish swine and cartoon

21 Jew pictures, there's no visual connection whatsoever.  It's

22 pure prejudice.  If a, if a team of scientists came together to

23 create the most prejudicial Rule 403 image possible in a

24 criminal case, it would be these images:  10-250, 10-251,

25 10-252.  It is the purest kind of unfair prejudice you can

724

1   imagine.

2          THE COURT:  I recognize it's tough stuff, but that's

3   the nature of this case, so I'm letting it in.  All right.

4          MR. KROMBERG:  So, Your Honor, I was going to

5   continue.  So that was -- I had mentioned 10-230 through

6   10-240.  10-241 is apparently Muslim women holding a sign that

7   says "God Bless Hitler."

8          10-242 is this individual, Nicholas Skorzeny, who was

9   an SS officer who apparently later converted to Islam when he

10  escaped British jail after World War II is my understanding.

11  250, 251, and 252 are what Mr., Mr. Smith just talked about.

12          After that, please go to 10-700.  These are physical

13  items that were found during the search.

14          THE COURT:  Hold on.  They're not in my book.

15          MR. KROMBERG:  10-700 is not there?

16          THE COURT:  Well, not in this book.

17          MR. KROMBERG:  Oh.

18          THE COURT:  Do you have 10-700 there?

19          THE CLERK:  No.

20          THE COURT:  All right, 10-700.

21          MR. KROMBERG:  10-700, 701, 702.

22          THE COURT:  Well, 700 is the picture of Adolf Hitler

23  in a frame.

24          MR. KROMBERG:  701 is a book that says the SS was

25  Hitler's instrument -- I mean, the title: *The SS:  Hitler's*

1  *Instrument of Terror.*  702 are other SS books.  We were not

2  going to use 703, the tie tack.  We're not going to use 710,

3  the belt buckle.

4       706 is the roster for the Düsselkamp group.  711 is a

5  poster that says, "When I come back" -- Hitler:  "When I come

6  back...no more Mr. Nice guy."

7       714 is a flag, not a swastika flag.  As I understand

8  it, it was used by neo-Nazis when they weren't using the

9  swastika, but that's the flag that we understand was, I think

10  Mr. McNulty is going to say was hanging in the workout room.

11       THE COURT:  Is he going to understand what this flag

12  is?

13       MR. KROMBERG:  No, no, no.  He's just going to say it

14  was -- Dr. Gartenstein-Ross is going to explain what the flag

15  is, but Mr. McNulty is going to say, "Yes, this is what was

16  hanging there."

17       10-15 is a picture of the locker that just says

18  "Düsselkamp" on it.  10-814 is a prayer list that included

19  Hitler and Skorzeny and the Mufti on it.  10-600 is the book

20  *Hunter.*  10-861 is the book *Serpent's Walk.*  10-862 --

21       THE COURT:  Wait, wait.  The *Hunter* book I've already

22  said is not coming in.

23       MR. SMITH:  Right.

24       THE COURT:  All right.

25       MR. KROMBERG:  It wasn't coming in through Campbell,

726

1   but it was found in his house, and Gartenstein-Ross is going to

2   talk about how this is part of the National Alliance neo-Nazi

3   publications.  So I understand that Officer Campbell couldn't

4   talk about it, it wasn't his, but -- in any event, "Who Rules

5   America?" is a photo, only we don't actually have the document.

6   And 10-863 is that white power music that Your Honor has seen

7   before.

8           Then there are -- we're going to try to use five of

9   the photos from the DVD that's marked 10-900.  And --

10          THE COURT:  These are reenactments?

11          MR. KROMBERG:  Well, no, they're parties, and they

12  are party scenes, but we don't seem to have any -- we're not

13  using any photos of reenactments.  The photos of other

14  gatherings but not reenactments.

15          11-401 is the Israeli flag door mat.

16          MR. SMITH:  Your Honor, we object.  We don't --

17          THE COURT:  I'm sorry?

18          MR. SMITH:  The Israeli flag, this is a -- this is a

19  U.S. terrorism prosecution case.  Why is an Israeli -- it's

20  just --

21          THE COURT:  Because again, the issue of anti-Semitism

22  is the link -- part of the linkage that makes any kind of

23  linkage make any sense between the Nazis and radical Islam.

24          MR. SMITH:  But, Your Honor, that's a national flag.

25  This is --

727

1          THE COURT:  I disagree with you on that.  I'm going

2     to allow it.

3          Yeah.

4          MR. KROMBERG:  And, Judge, the others, the 14 series,

5     there will be --

6          THE COURT:  Hold on.  Go ahead.

7          MR. KROMBERG:  -- three more photos of Young dressed

8     as a Nazi.

9          Those are the ones that were dated January 28, 2006.

10         THE COURT:  Which 14?  I mean, my --

11         MR. KROMBERG:  I'm sorry, 14-112, 113, and 114.

12         THE COURT:  Wait a minute, wait a minute.  This one

13    only goes up to 105.

14         MR. KROMBERG:  I'm sorry?

15         THE COURT:  Is there another 14 book?

16         THE CLERK:  No.

17         THE COURT:  14- what?

18         MR. KROMBERG:  Mr. Vera asked me to pass on that it's

19    volume 7.  It's 14-112, 113, and 114.

20         I would note, Judge, that 114 --

21         THE COURT:  Yeah.

22         MR. KROMBERG:  -- is not a picture of Young, but it

23    was Young's picture of other people at that gathering giving a

24    Heil Hitler salute.

25         THE COURT:  Yeah, that's starting to be cumulative

728

1  and overkill.  You don't need both 112 and 113.  You're making

2  your point.  You don't need to make it ten times.  So I'll let

3  you use some discretion, but you can't get these all in, all

4  right?

5          MR. KROMBERG:  Okay.

6          THE COURT:  They're repetitive.

7          MR. KROMBERG:  Then there's 14-134 and 135.

8          THE COURT:  All right, hold on.

9          MR. KROMBERG:  And these were items that were found

10  on his, the defendant's computer in 2011.

11          MR. SMITH:  Again, Your Honor, with respect to 14-10

12  to 135, we object to the insinuation that every anti-Israel

13  object in this case is evidence of predisposition to materially

14  support terrorism.  That's an extraordinary statement and

15  theory, Your Honor.

16          THE COURT:  Well, I agree that an isolated --

17          MR. SMITH:  That is coming close to prosecuting

18  political speech.

19          THE COURT:  And you can make that argument to the

20  jury, but I'm going to let -- again, I don't want all of these

21  in.  You have to use some discretion.  I'm saying this could

22  come in, but we're not going to have --

23          MR. KROMBERG:  Right.  Well, keep in mind, Judge,

24  that what you heard before was 45 exhibits.  Well, it's not 45

25  exhibits.  It's about seven photographs and ten graphics, and

729

 1   then there's the stuff about the Mufti, which is ten right

 2   there.

 3        So yes, there are -- anyway, I also left out from the

 4   Facebook, there's a link that Mr. Young linked to the

 5   prosecution of another Muslim who was arrested on terrorism

 6   charges who had been a Nazi.  That guy's name was Emerson

 7   Begolly.

 8        THE COURT:  There's no issue there, no problems with

 9   that kind of thing.

10        MR. KROMBERG:  I think that is all.  If I may ask my

11   colleagues?

12        Anything else?

13        Anyway, Judge, I believe that is it.  If not the

14   entire universe, it's virtually the entire universe.

15        THE COURT:  As I said, some of it's a bit cumulative,

16   so I'll expect you to pare it down a bit, but the basic subject

17   areas I am permitting in over the defense objection.

18        MR. KROMBERG:  Thank you, Your Honor.

19        THE COURT:  All right.  All right, so we're starting

20   up at nine tomorrow morning.  So, Mr. Kromberg, what's your

21   estimate?  You will finish tomorrow?

22        MR. KROMBERG:  Oh, yes.  So as I say, the -- well,

23   one thing that I have not said is there are a number of items

24   that were found during the search that we are going to want to

25   publish, not only these but, but the more Islamic terrorism

730

1  things like *Inspire* magazine and the *Book of Jihad*.

2        THE COURT:  All of that's clearly relevant.

3        MR. KROMBERG:  So that's going to take some time to

4  just -- the defense has agreed generally speaking that they are

5  authentic, that they were the ones -- they were items that were

6  found at the house at the time of the search.  So it's still

7  going to take some time to do that --

8        THE COURT:  All right.

9        MR. KROMBERG:  -- but as far as witnesses go,

10  Mr. McNulty is going to be very short; Mr. Menzies is going to

11  be short, maybe equivalent to Mr. Campbell; and I believe that

12  Dr. Gartenstein-Ross is going to take some time because I want

13  to ask him what does this mean and what does that mean and what

14  is the -- in the context, what does this mean?  So that might

15  take a couple hours.

16        Special Agent Caslen's summary testimony I don't

17  think is going to be as long because I believe that most

18  everything will have already been talked about.

19        THE COURT:  Are all the summary exhibits, to the

20  extent you have any, have those been shared with the defense?

21        MR. KROMBERG:  We filed the timeline -- we gave the

22  defense a timeline.  It is -- I'm sure there will be changes to

23  it because we don't want to reference things that weren't

24  admitted, but they have the timeline that's more inclusive, and

25  we're going to have to take some things out of it to make sure

731

1    that we're not referencing anything that was not admitted, but

2    the defense has that.

3                THE COURT:  All right.

4                MR. SMITH:  One response to the militant Islam

5    documents:  If Your Honor looks at the 14 series, 14-101 to

6    14-104, Mr. Kromberg said that -- I believe he's made some

7    statement about all of these documents were -- all of this

8    literature was collected from Mr. Young's home.

9                In fact, I think three of these are not collected

10   from -- three of these *Inspire* magazines were not taken from

11   his home.

12               THE COURT:  Well, were they from his backpack or his

13   locker?

14               MR. KROMBERG:  They were all from the computer at his

15   home, Judge.  There was an additional paper copy that was found

16   during the search in August 2016, but all five issues of

17   *Inspire* magazine came from the computer that was searched in

18   September 2011.

19               MR. SMITH:  So the issue here, Your Honor, is whether

20   Gartenstein-Ross is testifying on any issues of this magazine

21   that were not found in Mr. Young's possession.  If they were

22   found in Mr. Young's possession, we have no objection.  The

23   question is in reviewing his expert report, it seemed that he,

24   he was proposing testimony on issues that were not even found

25   in the defendant's possession, and we would object to that type

732

 1   of document.

 2           THE COURT:  Well, to the extent he's testifying about

 3   *Inspire*, I'm assuming you've shown him the ones that you seized

 4   from the defendant's home?

 5           MR. KROMBERG:  Well, yes.

 6           THE COURT:  All right.

 7           MR. KROMBERG:  Those are the ones we showed him, and

 8   those are the ones we're going to ask him about.

 9           THE COURT:  Then I don't think there should be an

10   issue there.

11           MR. SMITH:  And we'd just like to clarify that we're

12   not using any music at trial, that, you know, we're not playing

13   any music.

14           MR. KROMBERG:  I said before that we wanted to play

15   one video that Mr. Young posted on his Facebook page, and that

16   is the only one --

17           THE COURT:  Is it in English or Arabic?

18           MR. KROMBERG:  English -- excuse me, I'm sorry.

19           MR. SMITH:  Your Honor, we have no objection to that

20   video.

21           THE COURT:  Well, wait, there's no objection now.  Is

22   it in English or Arabic?

23           MR. KROMBERG:  Okay.  I think it's got English

24   subtitles.  But it's also -- we have, we have a number of

25   videos that were in an earlier version of the exhibit list that

733

1   we have taken off the exhibit list, and either

2   Dr. Gartenstein-Ross or Special Agent Caslen will describe

3   them, but we're not looking to play any others other than the

4   one that was posted on the Facebook page, and that's a music

5   video.  It's about two minutes long, maybe two-and-a-half.

6           I'm passed a note that says, "The Marshals Service

7   wants to know if any weapons are coming in tomorrow."

8           THE COURT:  No.

9           MR. KROMBERG:  No.

10          THE COURT:  That makes it easy, all right?  No.  All

11  right?

12          All right.  We could get this case to the jury on

13  Friday unless, again, I don't know what the defense case is

14  going to look like, if there is one, but -- so I don't want a

15  long holdup for the jury.  So one of the things that the

16  government needs to start doing is putting together an index of

17  the exhibits that have been admitted, all right?  Because I

18  have found that trials where there's a lot of evidence and the

19  jury has had a couple of days, one of the first questions we

20  get is could we have an index to the exhibits that have been

21  entered?

22          Now, I am very concerned about the defense case

23  because of the strange way in which evidence has been

24  discussed, and here is the problem:  You did play video clips.

25  We are not sending to the jury entire tapes and telling the

734

1    jury:  Go to counter hour 2, minute 30, second whatever.

2          MR. SMITH:  Your Honor means audio clips, right?

3          THE COURT:  The audio clips you have to make sure you

4    have on an easily retrievable disc, the way the government has

5    done it, because it's all sort of clips, and we have to make

6    sure that they match up with what was going on in trial, but

7    otherwise, it can't go to the jury because I'm not having them

8    wandering through these tapes that you've got.

9          So sometimes juries don't want to hear things

10   replayed for them, but I've just -- I've put you on notice that

11   it's got to be done better than it was done during the trial.

12         MR. SMITH:  Your Honor, we can put it all on one

13   easily accessible disc, and we can actually provide headphones

14   if necessary for the jury to listen to back there, but as far

15   as the exhibits are concerned, Your Honor has clarified that

16   when we're impeaching the witness with documents, we needn't

17   mark the exhibits if we don't intend to introduce them into

18   evidence.

19         THE COURT:  Right.  They're not --

20         MR. SMITH:  The only reason we had been marking them

21   before was because I think Your Honor said that we should be

22   marking them because the Court was under the impression we

23   intended to introduce the documents.

24         THE COURT:  All right.  But you're not.

25         MR. SMITH:  But we're not, so there's not going to be

735

 1   a confused exhibit scenario.  We may have exhibits, but they're

 2   not necessarily the documents we were using to impeach.  We

 3   will provide an exhibit list to the government in due time.

 4   So --

 5            THE COURT:  All right.

 6            MR. SMITH:  For each impeachment document we intend

 7   to introduce as an exhibit.

 8            THE COURT:  Well, impeachment -- all right.  All I'm

 9   saying is you'd better get them labeled correctly, and you'd

10   better have a list for the Court and for the government if

11   you're putting on a case where you're putting on exhibits, but

12   I'm mostly concerned about the audio clips because there were

13   not any transcripts for them, and the way they were being

14   retrieved during the trial, as we all know, was difficult

15   because you're giving, you know, a time on a long tape, and

16   your paralegal was having some trouble retrieving them, but

17   that's not the way we ever do it for a jury.

18            So, I mean, they have to be, as the government did

19   it, you know, a nice, easily identifiable this is Exhibit 102,

20   102 is this two-minute clip from a conversation on a particular

21   date.

22            MR. SMITH:  We can put it together, Your Honor.

23            THE COURT:  All right, that needs to be done.  So I

24   don't want to waste -- both sides need to think about, as I

25   said, the exhibit list.

736

1          And what I require, because I've had this issue come

2     up before in other trials, the exhibit number and a

3     nonargumentative but helpful description of what the exhibit

4     is, all right?  And the other side -- each side has to exchange

5     their lists, and I want both sides to sign off on them.  In

6     other words, I don't want the defense arguing, oh, the

7     government in describing Government Exhibit 13 was

8     editorializing or trying to argue their case.  It has to be a

9     nice, clear description:  e-mail conversation, blank date,

10     that's fine.

11          Because again, we want the jury to be able to get to

12     the case without, you know, being here for five days trying to

13     muck through the evidence, because if they get frustrated, they

14     just, you know, will rush to judgment.  We don't want that, all

15     right?

16          Are there any other matters we have to take up before

17     tomorrow?

18          MR. KROMBERG:  Not from the government.

19          THE COURT:  So again, just make sure, counsel, that

20     if you do have witnesses, they're here, all right?

21          All right, we'll recess court until nine tomorrow.

22     (Recess from 6:11 p.m., until 9:00 a.m., December 14, 2017.)

23

24

25

737

1                    CERTIFICATE OF THE REPORTER

2         I certify that the foregoing is a correct transcript of

3     the record of proceedings in the above-entitled matter.

4                              _____/s/_____

5                                   Anneliese J. Thomson

| **From:** | Essa Kobayashi <Essakobayashi@mail.com> |
| **Sent:** | Wednesday, December 17, 2014 4:18 PM |
| **To:** | Vx Vendetta <V4Vendetta@mail.com> |
| **Subject:** | Re: Safe |

V-

WaAlikom Salam! Glad to hear it brother. I hope things were not too difficult on you getting to where you needed to be. My sincere apologies for not responding/checking earlier. I was dreading seeing you in some news story :-/ or something here the last couple months and probably was waiting for something like that or to get a text from you saying that you were back. In the end, I have no excuse though and am sorry for not checking up on you earlier. Rest assured you have been on my mind and in my prayers. Some brothers were asking where you are and if I have heard from you ect. So, you have been missed by your brothers here. I have been following the news of the region closely as usual. Glad to hear that the trip didn't take too long. I was expecting that you would have been in a holding pattern, sitting in some town for a good number of weeks at least.

Yes, have seen the news from that part of north africa, I'm not sure such a developement there is timed the best as it will give more of an excuse for oppression and return to the rule of the Taghut...but even before that the brothers there have been getting pressed, anyway, enough of politics...so I trust in God's plan and pray things work out for the people the best.

I'm curious, the internet there...are people able to get on via smartphones or is just over desktops/laptops?

How is the weather there? I have heard there is fuel oil shortages. I hope the winter will not be too hard on you.

-Essa

> **Sent:** Thursday, November 20, 2014 at 6:55 PM
> **From:** "Vx Vendetta" <V4Vendetta@mail.com>
> **To:** essakobayashi@mail.com
> **Subject:** Safe
>
> Essa,
>
> Salaam Alaykum. I made it to dawlah! Mashallah words cant explain! The trip was easier then I thought but it was really nervous when i got closer. The internet is spotty but im able to get on sometimes. Things are hard hear but the brothers have good hearts. The brothers look like they are making progress in Derna mashallah. I do not know when I might write again but make duaa for me brother.
>
> -V

GOVERNMENT
EXHIBIT
**1-201**
1:16-cr-265

-1020-

738

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA        .        Criminal No. 1:16cr265
                                .
      vs.                       .        Alexandria, Virginia
                                .        December 14, 2017
NICHOLAS YOUNG,                 .        9:00 a.m.
                                .
              Defendant.        .
                                .
. . . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME IV

APPEARANCES:

FOR THE GOVERNMENT:             JOHN T. GIBBS, AUSA
                                GORDON D. KROMBERG, AUSA
                                EVAN N. TURGEON, SAUSA
                                United States Attorney's Office
                                2100 Jamieson Avenue
                                Alexandria, VA 22314

FOR THE DEFENDANT:              NICHOLAS D. SMITH, ESQ.
                                David B. Smith, PLLC
                                108 North Alfred Street
                                Alexandria, VA 22314
                                  and
                                LINDA MORENO, ESQ.
                                Linda Moreno P.A.
                                511 Avenue of the Americas
                                No. 2
                                New York, NY 10011

ALSO PRESENT:                   SA NICHOLAS CASLEN
                                NICHOLAS ENNS
                                FABIAN VERA

(Pages 738 - 1071)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

739

1  OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
                                 U.S. District Court, Fifth Floor
2                                401 Courthouse Square
                                 Alexandria, VA 22314
3                                (703)299-8595

740

1                            I N D E X

2

                       DIRECT  CROSS  REDIRECT  RECROSS

3    WITNESSES ON BEHALF OF
4    THE GOVERNMENT:

5    Kenneth James McNulty      743    754    780     784

6    Brian Michael Menzies      786    801

7    Joanne Dill                810    814

8    Dr. Daveed Gartenstein-Ross  828  932

9    SA Nicholas A. Caslen      994

10

11

                            EXHIBITS

12
                            MARKED        RECEIVED

13   GOVERNMENT'S:
14
     No. 1-100                              817
15       1-301 thru 1-308                   818
         1-401 thru 1-408, 1-410           819
16       1-600                              820
         3-125                              821
17
         4-203                              821
18       8-101 thru 8-104                   822
         8-106                              1033
19       8-107                              824
         8-108                              823
20
         8-109                              1031
21       8-112 thru 8-115                   823
         8-500                              1038
22       10-000                             745
         10-103                             824
23
         10-105                             824
24       10-202T                            912
         10-203                             925
25       10-204                             907
         10-205                             916

741

1                        EXHIBITS (Cont'd.)

2                                    MARKED        RECEIVED

3      GOVERNMENT'S:

4      No. 10-208                                    908
           10-220, pages 1 and 2                    1026
5          10-230                                    881
           10-231                                    882
6          10-232, 10-236 thru 10-238, 10-240       884

7          10-241                                    886
           10-303 thru 10-305                        826
8          10-305-T                                 1054
           10-700                                    781
9          10-706, redacted                         1035

10         10-714                                    749
           10-807                                   1020
11         10-814                                   1049
           10-850                                    903
12         10-860                                    892

13         10-863                                    749
           10-818 and 10-822                         895
14         11-401                                    799
           12-13                                     822
15         13-101 thru 13-104                        893

16         13-105                                    894
           14-100                                    894
17         14-101 thru 14-105                        897
           14-119                                   1043
18         14-140                                   1057

19         14-141                                   1058
           14-180                                    879
20         15-201                                   1029

21

       DEFENDANT'S:
22
       No. 4                                         981
23         5                                         980
           6                                         982
24         7                                         980

25

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

742

1                    P R O C E E D I N G S

2                   (Defendant and Jury present.)

3          THE CLERK:  Criminal Case 16-265, United States of

4    America v. Nicholas Young.  Would counsel please note their

5    appearances for the record.

6          MR. KROMBERG:  Good morning, Your Honor.  Gordon

7    Kromberg, John Gibbs, and Evan Turgeon for the United States.

8    With us at the counsel tables are FBI Special Agent Caslen and

9    paralegal specialist Fabian Vera.

10         THE COURT:  Good morning.

11         MR. SMITH:  Good morning, Your Honor.  Nicholas Smith

12   for defendant Nicholas Young, and with me is Ms. Linda Moreno.

13         MS. MORENO:  Good morning.

14         THE COURT:  Good morning.

15         And, ladies and gentlemen, I think you get the award

16   for being the most prompt jury.  I'm very, very pleased that

17   you could all get here on time.  Again, we're going to move

18   this case as quickly as we can.

19         Any problems last night for any of you?  Did you bump

20   into anything that you need to tell me about?  No?

21         Great, then we'll get started.  Call your next

22   witness.

23         MR. KROMBERG:  Good morning, Your Honor.  The

24   government calls Jamie McNulty.

25         THE COURT:  All right.

McNulty - Direct                                                    743

1          KENNETH JAMES McNULTY, GOVERNMENT'S WITNESS, AFFIRMED

2                         DIRECT EXAMINATION

3   BY MR. KROMBERG:

4   Q.    Good morning, Mr. McNulty.

5   A.    Good morning.

6   Q.    Now, the first thing is you have to remember to speak up

7   because I don't know if the amplifier works the way we -- it's

8   not ideal, so you need to keep your voice up, and it might help

9   to lean forward a little bit because that bar is what is

10  amplifying your voice.

11          So could you state your full name and spell your last

12  name for the record.

13  A.    Full name is Kenneth James McNulty.  Last name is

14  M-c-N-u-l-t-y.

15          THE COURT:  You have to speak up, Mr. McNulty, or we

16  can't hear you.

17          THE WITNESS:  Okay.

18          THE COURT:  Much louder.

19          THE WITNESS:  Kenneth James McNulty, M-c-N-u-l-t-y.

20  BY MR. KROMBERG:

21  Q.    And, Mr. McNulty, how are you employed?

22  A.    I work for the Fairfax County Police Department.

23  Q.    Now, are you here today because of your work in the

24  Fairfax County Police Department?

25  A.    No.

McNulty - Direct                                                744

1  Q.   Okay.  Do you know the defendant, Mr. Nicholas Young?

2  A.   Yes.

3  Q.   And how do you know him?

4  A.   We grew up together, went to school together, lived

5  together.

6  Q.   How about what contact did you have with him after

7  college?

8  A.   After college.  So after college, I consider when I

9  graduated college in 2007, occasional --

10  Q.   Okay.  Let me strike that.

11         How about, why don't we start from the time you were,

12  say, 22, after, say, maybe 2002.

13  A.   Okay.

14  Q.   What contact did you have after you guys were how old at

15  that point?

16  A.   In 2002, I would have been 22.

17  Q.   Okay.  So after that point, what contact did you have with

18  him?

19  A.   After 2002, I believe it was in 2003, I moved in with him.

20  Q.   So you were roommates?

21  A.   Yeah.

22  Q.   Were you paying rent or --

23  A.   Yeah.

24  Q.   Okay.  In his house?

25  A.   Yes.  Well, at the time, it was his dad's.

McNulty - Direct                                                    745

1   Q.   And what was the address, do you remember?

2        THE COURT:  Well, we don't need that.  Just the

3   street address is fine.

4   BY MR. KROMBERG:

5   Q.   Heron Ridge Drive?

6   A.   Yes.

7   Q.   Okay.  I'm going to show you a photograph that's

8   Government Exhibit 10-000, and I will ask you if you recognize

9   that photograph.  The court security officer is going to give

10  that to you.

11       THE COURT:  Is there any objection to that?

12       MR. SMITH:  No objection.

13       THE COURT:  All right, it's in.  You can put it on

14  the screen.

15       (Government's Exhibit No. 10-000 was received in

16  evidence.)

17       MR. KROMBERG:  Would you please put on 10-000?

18  Q.   Mr. McNulty, you can just look at the screen over there.

19  A.   Yes, that looks like the house.

20  Q.   Okay.  And you -- how long did you live there?

21  A.   I lived there until about 2007.

22  Q.   Okay.

23       THE COURT:  So that's five years?

24       THE WITNESS:  Just under five years.

25       THE COURT:  All right.

McNulty - Direct                                                            746

1    BY MR. KROMBERG:

2    Q.   Do you recall his e-mail addresses that you've, that

3    you've known him to use?

4    A.   There was one that I spoke with him on, it was his

5    initials, NY and then 1203, I believe, @, it was like an AOL

6    account.

7    Q.   All right.  And was there a Flying Dutchman?

8              MR. SMITH:  Objection.  Leading, Your Honor.

9              THE COURT:  Sustained.

10   BY MR. KROMBERG:

11   Q.   Do you remember any other e-mail accounts that you knew

12   him to use?

13   A.   I would just talk to him on the AOL.

14   Q.   Okay.  I'm going to ask you to -- the court security

15   officer is going to show you a flag that's been marked

16   Government Exhibit 10-714.  This has been authenticated

17   pursuant to a stipulation as having been seized from the

18   defendant's house in August 2016.

19             MR. SMITH:  One moment, Your Honor.

20             What was the exhibit number again?

21             MR. KROMBERG:  10-714.

22   Q.   Could you take a look at that flag?

23   A.   I can touch it?

24             MR. SMITH:  Objection, Your Honor.

25             THE COURT:  The objection is overruled.

McNulty - Direct                                                    747

BY MR. KROMBERG:

Q.   Can you take a look at the flag?  Yes, you can touch it.
You can open it and look at it and see if you recognize it.

A.   Yeah, I recognize it.

Q.   Okay.  And how do you recognize it?

A.   I believe it was hung in the basement of the house.

Q.   When you were living there?

A.   Yes.

Q.   Can you -- do you see the eagle symbol on that flag?

A.   Yes.

Q.   What, if any, connection did that eagle symbol have to a
tattoo that Mr. Young had?

          MR. SMITH:  Objection.  Leading.

          THE COURT:  I don't think so.  I'll overrule the
objection.

          THE WITNESS:  Okay.  You want me to answer it?
Sorry.

BY MR. KROMBERG:

Q.   If the judge says you can answer, you can answer.

A.   Okay.  So it resembles a tattoo that he has on his neck.

Q.   Or at least he had on his neck when you knew him?

A.   Yes.

Q.   Okay.  So, so this flag was hanging downstairs.  What,
what was -- what kind of room was it where it was hanging?

A.   It was, like, a workout area.

McNulty - Direct                                                    748

1   Q.   So did he have workout equipment in there?

2   A.   Yes.

3   Q.   Treadmill?

4   A.   No treadmill.

5   Q.   Weights?

6   A.   Yeah.

7   Q.   Okay.  Did you have occasion while you lived there to see

8   the defendant working out in the workout room?

9   A.   Yes.

10  Q.   Okay.  Do you recall what sort of music that he listened

11  to when he was working out?

12          MR. SMITH:  Objection.  Leading.

13          THE COURT:  No, overruled.

14          THE WITNESS:  Okay.  So, you know, it would sound

15  like punk music when working out.

16  BY MR. KROMBERG:

17  Q.   And what kind of rhetoric did you hear in that music?

18  A.   There was occasion where there was some songs that had

19  some racially derogatory terms in them.

20  Q.   Okay.  Well, we're not going to -- we don't need to go

21  into the racially derogatory terms.

22          THE COURT:  Are you moving 10-714 into evidence at

23  this time or not?

24          MR. KROMBERG:  Yes, Your Honor.

25          THE COURT:  All right.  I know there's an objection,

McNulty - Direct                                                    749

 1  but it's overruled.

 2              MR. SMITH:  A relevance objection.

 3              THE COURT:  It's overruled.

 4              (Government's Exhibit No. 10-714 was received in

 5  evidence.)

 6              MR. KROMBERG:  At this time, Judge, we'd move in

 7  10-863, which was -- we have a stipulation that was seized from

 8  the residence on -- in August 2016.

 9              THE COURT:  When you say "the residence" --

10              MR. KROMBERG:  Mr. Young's residence.

11              THE COURT:  Is this the one that they just saw the

12  photograph of?

13              MR. KROMBERG:  Yes.

14              THE COURT:  All right.  Just to make it clear to the

15  jury.

16              MR. SMITH:  We object to 403, relevance.

17              THE COURT:  All right.  The objection is overruled.

18              (Government's Exhibit No. 10-863 was received in

19  evidence.)

20              MR. KROMBERG:  And could we just publish that to the

21  jury now, 10-863?

22              MR. SMITH:  We also object to the playing of any

23  music, if that's what the government intends to do.

24              THE COURT:  All right, the Court is overruling the

25  objection.

McNulty - Direct                                                    750

1           MR. KROMBERG:  We're not going to ask to play any

2    music, Judge.

3           Could you zoom in on that?  Okay.  That's fine.

4    We'll move on.

5    Q.   Mr. McNulty, what, if any, interest did you see Mr. Young

6    exhibit with respect to Nazis while you were living with him?

7    A.   He was into a reenactment group where, from my

8    understanding, he portrayed a Nazi character.

9    Q.   What, if anything, did Mr. Young ever tell you about his

10   parents' attitudes towards his own interest in Nazis?

11   A.   I know -- I can't remember when, but there was some

12   discussion of one of his parents approaching him about his

13   choice in the reenactment group.

14   Q.   Well, when you say approached him, approached him in the

15   sense of did the parent have a -- did Mr. Young say that his

16   parent approved or disapproved?

17   A.   Disapproved.

18   Q.   Did you know Mr. Young's father?

19   A.   Yes.

20   Q.   Were you aware of Mr. Young's father's death?

21   A.   Yes.

22   Q.   Do you recall when that was?

23   A.   Around 2006.

24   Q.   Did you observe a change in Mr. Young's personality after

25   his father's death?

McNulty - Direct                                                    751

1   A.    Yeah.  I mean, you know, I could tell there was some

2   depression.

3   Q.    Was -- what relationship temporally, what relationship in

4   time was there between his father's death and when he started

5   to turned to Islam?

6   A.    I'm not sure, but it seemed, it seemed around the time he

7   would watch some videos that would, I guess, comfort him with a

8   guy that would just talk about the Koran, and it seemed to help

9   him cope with things going on.

10  Q.    So were you living with him when he converted to Islam?

11  A.    I don't know.  He -- I don't know the specific date that

12  he did.

13  Q.    Was there any -- did you observe any physical changes

14  around this time in Mr. Young?  And I'm referring to his

15  physical appearance.

16  A.    Yeah.  You know, maybe he just kind of would be unshaven,

17  but, you know, nothing, nothing more than that.

18          MR. SMITH:  Objection.  Relevance.

19          THE COURT:  Are you going to tie that up?

20          MR. KROMBERG:  I hope so.

21          THE COURT:  All right.  At this point, I'll overrule

22  the objection.

23  BY MR. KROMBERG:

24  Q.    What personality changes did you observe at that same

25  time?

McNulty - Direct                                              752

1              MR. SMITH:  Objection.  Leading.

2              THE COURT:  Did you observe any personality changes?

3    That's not a leading question.

4    BY MR. KROMBERG:

5    Q.   Did you observe any personality changes?

6    A.   After the -- after his father's death?

7    Q.   At the time -- yes, but at the time that he's becoming

8    unshaven and watching videos.

9    A.   I mean, you know, there was some depression, you know, it

10   was up and down at times, but he, he kind of became a little

11   distant from me, you know, and I don't think it was the

12   father's death.  I think both of us just had different things

13   going on in our lives.

14   Q.   What, if any, changes did you see regarding who he

15   socialized with around that time?

16   A.   Well, I didn't know who he really socialized with.  I

17   didn't know that group of people, but, you know, he would talk

18   about he was hanging out with people.  I don't, I don't know

19   their names or anybody.

20   Q.   Did -- what, if anything, did you observe regarding the

21   videos he watched at that time?

22   A.   Well, you know, he would watch videos all the time.  He

23   was on YouTube all the time watching videos, like I mentioned

24   earlier, the guy talking about the Koran.  There was, there was

25   one occasion where there was a video that I can remember, and

McNulty - Direct                                                753

1   it was kind of like the humming that sounded like it was in

2   Arabic, and it was like a -- it was like a stereotypical, like,

3   terrorist camp video, but, you know, that, that was one time

4   that I saw that.

5   Q.    When you say that he was watching them all the time, what

6   do you mean by that?  Do you mean -- well, what do you mean by

7   "all the time"?  How many times a day was he watching them?

8   A.    Any time of day.  I mean, you know, I would wake up, leave

9   for work, and I could hear him in his room watching videos and

10  whatnot.  I don't, I don't know what it was of, but --

11  Q.    And what time would you leave for work?

12  A.    It varied.  At the time, I had a schedule where I'd work

13  one month of day work, one month of midnights, so it could have

14  been anywhere from five in the morning to five in the evening.

15  Q.    Did you know a Brian Menzies?

16  A.    The name sounds familiar.  I did not know him, though.  I

17  saw him in passing one time when I was moving out.

18  Q.    And what was he doing when you were moving out?

19  A.    He was moving in.

20  Q.    Okay.  Did you remain in contact with Mr. Young after you

21  moved out of the townhouse in 2007?

22  A.    Yes.

23  Q.    And how frequent was your contact?

24  A.    We would text on our birthdays "Happy Birthday."  We would

25  talk to each other maybe a couple times a year, not very often.

McNulty - Cross                                                    754

1          MR. KROMBERG:  Okay.  Thank you, Mr. McNulty.  I

2   expect the defense will have some questions for you.

3          THE COURT:  All right.  Cross-examination?

4                    CROSS-EXAMINATION

5   BY MR. SMITH:

6   Q.   Good morning, Mr. McNulty.

7   A.   Hi.

8   Q.   Were you subpoenaed to be here today?

9   A.   Yes.

10  Q.   You're not here voluntarily, correct?

11  A.   Correct.

12  Q.   So when you were living with Mr. Young between 2004 and

13  2007, you weren't just roommates, correct?

14  A.   Correct.

15  Q.   In fact, you were pretty close friends, correct?

16  A.   Yes.

17  Q.   And during the period you just testified about when you

18  said that Mr. Young was watching videos, you continued to be

19  friends with him throughout this period, correct?

20  A.   Correct.

21  Q.   In fact, you had a wedding during this period, right?

22  A.   Yes.

23  Q.   And you had a -- you married Fabiola, your girlfriend,

24  correct?

25  A.   Yes.

McNulty - Cross                                                    755

1  Q.   And she was a roommate with you and Nicholas, correct?

2  A.   Yes.

3  Q.   And Mr. Young had a good relationship with both of you,

4  correct?

5  A.   Correct.

6  Q.   During this whole period that you were describing with

7  Mr. Kromberg, correct?

8  A.   Correct.

9  Q.   In fact, Mr. Young was the best man at your wedding,

10  correct?

11  A.   Correct.

12  Q.   You also went to Nick's dad's funeral, correct?

13  A.   Correct.

14  Q.   So when were you first contacted by the government about

15  this case?

16  A.   I would say maybe six months ago.

17  Q.   Six months ago?  And who contacted you?

18  A.   I cannot recall the name of who contacted me.

19  Q.   Did you have a meeting with the government?

20  A.   Yeah.  They came to my house.

21  Q.   And what did they say?

22  A.   They just asked me some questions.

23  Q.   You said six months ago?

24  A.   It could have been different, but I'm just estimating

25  about six months ago.

McNulty - Cross                                                    756

1  Q.   And what sort of questions were they asking you?

2            THE COURT:  Keep your voice up a little bit louder,

3  please.

4            THE WITNESS:  Okay.  You know, just how I knew him,

5  how long I knew him, you know, anything observed.

6  BY MR. SMITH:

7  Q.   Were they asking you in particular whether you had seen

8  anything German-related in his house?

9  A.   Yeah.

10  Q.   That's where they were going with their questions towards

11  you?

12  A.   Well, I mean, they had asked about if I had recognized the

13  flag.

14  Q.   Which flag?

15  A.   The one right here.  Asked about music and videos.

16  Q.   So when you were living with Nick between 2004 and 2007,

17  you would all hang out together, you, Fabiola, and Nicholas,

18  right?

19  A.   Yes.

20  Q.   Fabiola liked Nicholas, right?

21  A.   Yes.

22  Q.   And Fabiola was -- what background is she?

23  A.   She's Hispanic.

24  Q.   And so were there many occasions in which you, Fabiola,

25  and Nicholas would have dinner together with Fabiola's family?

McNulty - Cross                                                      757

1    A.    Probably.

2    Q.    And her family is Hispanic, correct?

3    A.    Yes.

4    Q.    Did Fabiola's family like Nick?

5    A.    They did.

6    Q.    Why?

7    A.    I mean, you know, he's a likable guy.  He's nice.  He'll

8    talk to anybody.

9    Q.    And he is still a likable guy?

10   A.    Yeah.

11   Q.    So when you were living together between 2004 and 2007,

12   you, Fabiola, and Nick would do what together at the house?

13   Would you watch TV together?

14   A.    Yeah, we'd watch TV, movies.

15   Q.    Throughout this period you were talking about with

16   Mr. Kromberg, right?

17   A.    Yes.

18   Q.    So is it, is it accurate to say that when you say that you

19   heard Mr. Young watching video clips during this period, you

20   were not offended enough to stop hanging out with Nicholas,

21   correct?

22   A.    Correct.

23   Q.    Did there come a time when you met Nicholas's girlfriend

24   named Leesah?

25   A.    Leesah.

McNulty - Cross                                                    758

1   Q.   It might be spelled L-e-e-s-a-h.

2   A.   Yeah.  Yeah, it does sound familiar.

3   Q.   Do you recall her?

4   A.   Yeah.

5   Q.   Do you recall when Nicholas dated Leesah?

6   A.   I want to say it was, he started dating her before I moved

7   in, so maybe, like, between 2002.

8   Q.   Do you recall what -- was Nick close with Leesah?

9   A.   Yeah, he was close with her.

10  Q.   He would hang out with her a lot?

11  A.   Yeah.

12  Q.   And do you remember Leesah's background?

13  A.   I believe she was Asian.

14  Q.   And they had a close relationship, right?

15  A.   Yes.

16  Q.   Nick was spending a lot of time with her in this period?

17  A.   Yes.

18  Q.   Would you say that's about 2002 to 2004?

19  A.   Yes.

20  Q.   Now, your family had a relationship with Nicholas, too,

21  correct?

22  A.   Yes.

23  Q.   Your father and your mother both met Nicholas?

24  A.   Yes.

25  Q.   And what did they think of Nicholas?

McNulty - Cross                                                          759

1  A.    You know, once again, he was a likable guy.  They liked

2  him.

3  Q.    And when I said your mom, I meant your stepmom, right?

4  A.    Both my stepmom and my mom.

5  Q.    And your stepmom had, you know, she's met Nicholas, she's

6  had dinners with him, right?

7  A.    Yes.

8  Q.    During the period that you were discussing with

9  Mr. Kromberg?

10  A.    Yes.

11  Q.    And what's your stepmom's background?

12  A.    She's Asian.

13  Q.    She's Filipino?

14  A.    Yeah.

15  Q.    Now, Mr. McNulty, what does your father do?

16  A.    Right now, he works in government contracting.

17  Q.    Did there come a time when he served overseas?

18  A.    Yes.

19  Q.    And what did he do overseas, if it's not too sensitive to

20  mention?

21  A.    My understanding is that he did IT work on military bases.

22  Q.    Was he in Iraq at one point?

23  A.    Yes.

24  Q.    And did there come a time when he came back from Iraq

25  with, you know, objects that he had collected of interest and

McNulty - Cross                                                     760

1   gave them to you?

2   A.   Yes.

3   Q.   And do you remember what some of those were?

4   A.   One of the things he brought was, like, this leg

5   armor-type thing.  Something else he had brought was a, I don't

6   know the name for it, but it was like a, it was like a dress

7   that men wear.

8   Q.   What kind of men?

9   A.   Muslims.

10  Q.   And did he bring something else back, too?  Some people

11  call it a kufia?  It's a --

12  A.   Yes.  That was with, that was with the kind of dress.

13  Q.   And what color was that?

14  A.   It was white.

15  Q.   No, I mean the -- the dress was white, but what color was

16  the thing that you wear on your head -- that Muslims wear on

17  their heads?

18  A.   The one he brought, I thought it was white.

19  Q.   Was it red and checked?  Well, you remember that he

20  brought back sort of an Arab scarf that men wear over their

21  heads, right?

22  A.   Yeah.

23  Q.   When was that about?

24  A.   Well, he worked overseas from about 2004 until two

25  thousand --

McNulty - Cross                                                          761

1   Q.    '6?

2   A.    He was over there until about 2012, so he was on and off

3   over there for between those years.

4   Q.    So do you remember a time when your father came back from

5   Iraq and he brought back some of these traditional garbs, and

6   did you and Nick ever sort of put them on to have a laugh?

7   A.    I'm sure we did.

8   Q.    And you took pictures of that, right?

9   A.    I'm, I'm sure we did.

10  Q.    Do you recall an occasion when you took a picture of Nick

11  wearing a red check scarf and a white outfit and he might have

12  been holding -- sitting in front of a gun and looking very

13  scary?  Do you remember that occasion?

14  A.    It's kind of fuzzy, but I remember something like that.

15  Q.    So during that occasion when you took this gag picture of

16  Nick, were you -- do you think you were engaged in some sort

17  of, something terroristic?

18  A.    No.

19  Q.    It was supposed to be a joke, right?

20  A.    Yes.

21  Q.    Did you ever meet Janine?

22  A.    Yes.

23  Q.    Who was Janine?

24  A.    It was another girl that he was seeing.

25  Q.    And when was that about?

McNulty - Cross                                                        762

1   A.   This was probably 2005-2006.

2   Q.   Maybe about 2009?  You moved out from Nicholas's apartment

3   about 2007, right?

4   A.   Okay.  So maybe it was a little later.

5   Q.   But you continued to see him after -- you continued to

6   have a relationship with Nicholas --

7   A.   Yeah.

8   Q.   -- after you moved out, right?

9   A.   Yeah.

10  Q.   So you would have seen Nicholas and his girlfriend after

11  you moved out in 2007?

12  A.   Yeah.  I don't know if I saw them together after I moved

13  out.  I know I had talked to her one time.

14  Q.   And what was -- was Nicholas close to Janine?  Is that

15  fair to say?

16  A.   Yeah.

17  Q.   He had a good relationship with her, solid?

18  A.   Yeah.

19  Q.   What was Janine's background?

20  A.   I think she was, I can't remember what country

21  specifically, but Middle Eastern.

22  Q.   Was she, was she Pakistani?

23  A.   She could have been.

24  Q.   Did you know Zara?

25  A.   Zara?

McNulty - Cross                                                   763

1   Q.   Did you ever meet Zara?

2   A.   That name doesn't sound familiar.

3   Q.   You might have known her as Kristen or Kirsten?

4   A.   I'm not sure.

5   Q.   Do you recall that Nicholas had a girlfriend from Canada?

6   A.   Yes.

7   Q.   And when did you meet her?

8   A.   I don't think I ever met her.

9   Q.   You heard of her, though?

10  A.   I heard of her.

11  Q.   Did Nicholas ever tell you about her?

12  A.   Oh, yeah.  He would say --

13         MR. KROMBERG:  Objection, Judge, to what Nicholas

14  told this witness about his girlfriend.

15         THE COURT:  How is this relevant?

16         MR. SMITH:  This is -- the government is attempting

17  to establish a predisposition to commit crimes, and this

18  evidence shows that --

19         THE COURT:  You'd better approach the bench.

20         (Bench conference on the record.)

21         THE COURT:  Yes?

22         MR. SMITH:  Your Honor, this is relevant for a couple

23  of reasons.  One, she's Jewish, and he was dating her for

24  several years.  This is the Canadian girlfriend about whom

25  Mr. Mo testified earlier in the trial that Mr. Young told him

McNulty - Cross                                                      764

```
 1   that Mr. Young did not want to go back to Libya because of his
 2   girlfriend and his very close relationship with her.  If Mr. --
 3           THE COURT:  All right.
 4           MR. KROMBERG:  It's hearsay to have the defendant
 5   offer his own testimony through his own -- through another
 6   witness.  I can ask a question --
 7           MR. SMITH:  It's not offered for the truth.
 8           THE COURT:  Just a minute.
 9           MR. KROMBERG:  The fact that she's Jewish is
10   obviously offered for the purpose of proving that she was
11   Jewish, for the truth of the fact that she was Jewish.  So you
12   cannot, you cannot bring in that evidence.
13           THE COURT:  It is -- coming in this way, it's
14   hearsay.  I'm sustaining the objection.  Let's go back.
15           MR. SMITH:  May I ask questions about the girlfriend?
16           THE COURT:  No.
17           (End of bench conference.)
18           THE COURT:  Wait, wait, wait.  You need to wait.
19   Make sure the court reporter is ready.
20           Now she's ready.
21           MR. SMITH:  Are you ready?
22   Q.   So I was asking about a girlfriend, Zara, but I'm going to
23   back up and ask you a more general question.  Is it fair to say
24   that during the time period you knew Nicholas Young, you saw
25   him date several different people?
```

McNulty - Cross                                                        765

1    A.   Yes.

2    Q.   And did you observe any sort of racist behavior of

3    Mr. Young in his selection of who he decided to have

4    relationships with?

5    A.   No.

6    Q.   And was that true for his friends as well?  So that -- we

7    were talking about his girlfriends, but did you see any racist

8    kind of discrimination in his selection of friends?

9    A.   No.

10   Q.   And you actually had quite a few minority friends,

11   correct?

12   A.   Correct.

13   Q.   And did Mr. Young ever suggest to you that you should not

14   hang around them for racial reasons?

15   A.   No.

16   Q.   So you testified about Mr. Young's music interests,

17   correct?

18   A.   Yes.

19   Q.   And what did you say again, what in particular was

20   something scary?

21   A.   Oh, no, I just said it sounded like punk music.

22   Q.   Punk music?

23   A.   Yeah.

24   Q.   But Mr. Young listened to lots of different kinds of

25   music, right?

McNulty - Cross                                                    766

1   A.   Correct.

2   Q.   So that's just one small part of it, right?

3   A.   Yes.

4   Q.   So you testified about this German flag that you saw in

5   Mr. Young's home?

6   A.   Yes.

7   Q.   But isn't it true that that German flag was just one of

8   the kind of military objects in Mr. Young's home?

9   A.   Yes.

10  Q.   There's a whole slew of different kinds of military

11  objects in his home, right?

12  A.   Yes.

13  Q.   Like, do you remember what he had?

14  A.   A lot of things.

15  Q.   Like what?

16  A.   I mean, he was a big collector of Warhammer 40K.

17  Q.   What is Warhammer 40K?

18  A.   So it's like a type of board game, and you make little

19  figurines, and you can paint them, and it's a type of game that

20  you can play.

21  Q.   So did he have lots of books about history?

22  A.   Yes.

23  Q.   And was it just German history?

24  A.   No.

25  Q.   Was it, like, Civil War history?

McNulty - Cross                                                    767

1    A.    It was probably every kind of history.

2    Q.    So, so you did see some German objects within that

3    collection of military --

4    A.    Yes.

5    Q.    -- sort of paraphernalia in his house?

6              But that was just one portion of all of these

7    military objects in his home, correct?

8    A.    Yes.

9    Q.    You saw Vietnam era objects in his home?

10   A.    Yes.

11   Q.    World War I objects in his home?

12   A.    Yes.

13   Q.    Mr. Young's grandfather was in the Air Force, correct?

14   Did you know that?

15   A.    I mean, I knew he was in the military.  I didn't know

16   which branch.

17   Q.    He was, he was -- so that sort of -- that sparked his

18   interest in United States military objects, correct?

19   A.    I imagine that's what it would be from.

20   Q.    Do you remember seeing, like, Air Force jump boots in his

21   home?

22   A.    Yes.

23   Q.    Like, various different kinds of U.S. military objects,

24   like ammo boxes from the U.S. Army, GI boxes from World War II?

25   A.    Yes.

McNulty - Cross                                                      768

1   Q.   Did you ever view Mr. Young as, as -- what was his

2   political orientation?  Was he conservative?

3   A.   Conservative, yes.

4   Q.   And he had a particular interest in a certain Republican

5   politician, right?

6   A.   So I know after I had moved out, I know I had come by at a

7   time and seen some, like, Ron Paul signs.

8   Q.   Right.

9   A.   Yeah.

10  Q.   Mr. Young liked Ron Paul, right?

11  A.   Yes.

12  Q.   And what was your understanding of what kind of a

13  politician Ron Paul is?

14          MR. KROMBERG:  Objection, Your Honor.  I don't see

15  the relevance of what Mr. McNulty's --

16          THE COURT:  I'm going to -- I'll overrule the

17  objection.

18          THE WITNESS:  Okay.  So, you know, Ron Paul, the idea

19  that I got from him is, like, small federal government.

20  BY MR. SMITH:

21  Q.   He opposes wars overseas, right?

22  A.   Correct.

23  Q.   And that was a political point of view, a political point

24  of view that Mr. Young shared, correct?

25  A.   Correct.

McNulty - Cross                                                    769

1  Q.   He thought that wars overseas were a drain on U.S.

2  resources, correct?

3  A.   Correct.

4  Q.   And do you think that Mr. Young's interest in this sort of

5  antiwar position was related to animosity towards American

6  soldiers?

7  A.   No.  I think it was just a feeling that he had.

8  Q.   In fact, it might have been inspired -- according to your

9  conversations with Mr. Young, it might have been inspired by a

10  concern for the U.S. military, correct?

11  A.   Could have been.

12  Q.   When you were friends with Mr. Young and you saw all these

13  possessions in his house, U.S. Army artifacts and all the rest,

14  did you get the sense that Mr. Young hated American soldiers?

15  A.   No.

16  Q.   You never got that sense, did you?

17  A.   No.

18  Q.   And you were very close to Mr. Young, right?

19  A.   Yes.

20  Q.   And to the contrary, wasn't Mr. Young pretty patriotic

21  about the military?

22  A.   He was.

23  Q.   And that would make sense because his grandfather was in

24  the Air Force, correct?

25  A.   Yes.

McNulty - Cross                                                      770

1   Q.   So did there come a -- so you -- how did you meet

2   Mr. Young?

3   A.   It was around '92-'93 time frame, between middle school

4   and high school.

5   Q.   And was there some activity that you bonded in together, a

6   kind of --

7   A.   Yeah.  We were in -- so in high school, we were in Junior

8   ROTC, which is, you know, I guess, kind of like military-type

9   classes and school where they teach you leadership and history,

10  and then in college, we actually did, continued into ROTC.

11  Q.   And Mr. Young, he remained in the ROTC for a bit longer

12  than you.  Do you know Mr. Campbell, Ian Campbell?

13  A.   Yes.

14  Q.   He was in the ROTC with both of you, correct?

15  A.   Yes.

16  Q.   And Mr. Campbell dropped out before Mr. Young, right?

17  A.   I believe so.

18  Q.   So when you were in the ROTC together with Mr. Young, did

19  you get the sense that he was, supported kind of a violent

20  overthrow of the government?

21  A.   No.

22  Q.   Did there come a time when you learned that Mr. Young

23  joined the National Guard?

24  A.   Yes.

25  Q.   And when was that?

McNulty - Cross                                                  771

1   A.    Maybe '99 to 2000.

2   Q.    Well, you know, wasn't it after September 11?

3   A.    Okay.  Maybe it was, because we, we used to actually work

4   security together during 9/11, and I remember talking to him on

5   the phone during 9/11 and both of us being in shock, and so

6   maybe it was after that.

7   Q.    You said both of you were in shock.

8   A.    Yeah.

9   Q.    Can you, can you explain what you mean by that?

10  A.    At the time, my dad was working at National Airport, and I

11  had gotten a call from him.  I called Nick because he was

12  working at the security site that we both worked at together,

13  and told him what was going on, and, you know, he seemed

14  surprised, and I think he went to a restaurant in the shopping

15  center to watch the TV and just stayed there the whole time

16  watching the TV.

17  Q.    Would you say that he was happy about September 11?

18  A.    No.

19  Q.    What would you say his reaction was?  Shock? dismay?

20  A.    Yeah.

21  Q.    Do you remember anything he specifically told you about

22  September 11?  Did he say -- did he give you some comments?

23  A.    I don't recall.

24  Q.    Okay.  You said that you were at a security site with him

25  on that day.

McNulty - Cross                                                        772

1  A.    Not on -- I was just talking with him on the phone.  I was

2  off that day because it was actually during a time where I was

3  working full time, and on Tuesdays and Thursdays, I would take

4  classes at George Mason, and so it was either a Tuesday or a

5  Thursday that 9/11 happened.

6  Q.    And at that time, you were not a Fairfax County police

7  officer?

8  A.    Correct.

9  Q.    So did there come a time when you learned about this case,

10  when you learned that Nick had been arrested?

11  A.    Yes.

12  Q.    And is it safe to say that you were shocked?

13  A.    Yes.

14  Q.    Is it safe to say that -- is it accurate to say that given

15  what you knew about Nick when you lived with him, the fact that

16  he was arrested for attempted material support for terrorism

17  was extraordinary to you?

18  A.    That it was extraordinary?

19  Q.    It was shocking.

20  A.    Yes.

21  Q.    Would you have expected that when you lived with him in

22  2004 to '7?

23  A.    No.

24  Q.    Now, you said that after Mr. Young's father died in -- you

25  said 2006, but it's 2007.

McNulty - Cross                                                        773

1   A.   Okay.

2   Q.   You went to his father's funeral, right?

3   A.   Yes.

4   Q.   And you said that you noticed a behavioral change in

5   Mr. Young?

6   A.   Yes.

7   Q.   Do you think that was because his father died?

8   A.   Yeah.

9   Q.   And did you have the sense that Nick wanted to have

10  conversations with you about his father's death?  He needed

11  someone to talk to about it?

12  A.   Yes.

13  Q.   So what would you talk about with him?

14  A.   You know, just he would express to me feelings that,

15  things that he wished he could have done that he didn't.  So,

16  you know, I would try to comfort him and tell him the right

17  thing to make him feel better.

18  Q.   So you testified about the reenactments kind of thing, the

19  Nazi World War II reenactments.

20  A.   Yeah.

21  Q.   And you said that you saw Nick doing the reenactments when

22  you were living with him between 2004 and '7?

23  A.   Yeah.

24  Q.   And you said that someone told -- Nicholas told you that

25  his parents told him they disapproved, right?

McNulty - Cross                                                    774

1   A.   Yeah.

2   Q.   Did you ever at any point see Mr. Young engaged in

3   political advocacy for white supremacism?  And by political

4   advocacy, I mean, like, you're familiar with, you know, going

5   to a rally and chanting and carrying signs in public.  That's

6   what political advocacy, that's what I mean by that.

7   A.   Yeah.  No, I never saw, like, politics mixed in with the

8   reenacting that he would do.

9   Q.   So it was kind of your sense that this was sort of like

10  dress-up?

11  A.   Yeah.

12  Q.   Are you familiar with the term "cosplay"?

13  A.   Yeah.

14  Q.   What is cosplay?

15  A.   Kind of you dress up in a character.

16  Q.   But it's like -- it's not to be meant sincerely; is that

17  right?

18  A.   It sounds right.

19  Q.   It's like you dress up as something to pretend for a day

20  that you're this character, but that doesn't mean that you

21  share that character's political views, correct?

22  A.   Correct.

23  Q.   So was it your sense that Mr. Young's dressing up as a

24  Nazi was sort of like a cosplay-type thing?

25  A.   Yeah.

1          THE COURT:  You really should say "yes" or "no," not

2   "yeah."

3          THE WITNESS:  Okay.  Yes.

4   BY MR. SMITH:

5   Q.   So I was asking you about Zara earlier, but -- I'm not

6   going to ask you about her background, but isn't it true that

7   Mr. Young would talk about her a lot?

8   A.   Yes.

9   Q.   He was very -- he loved her very much, right?

10  A.   Yes.

11  Q.   And did there come a time when -- were you still friends

12  with Nick when Zara and Nicholas Young broke up?

13  A.   He had talked about it, yes.

14  Q.   Do you remember when that was about?

15  A.   Maybe 2011-'12 time frame.

16  Q.   Maybe 2013?

17  A.   Okay.

18  Q.   And you encouraged Nick to remain in a relationship with

19  her about that time, right?

20  A.   Well, yeah, because I remembered him talking about his

21  feelings for her, and I told him, you know -- I don't remember

22  specifically saying, but I told him, you know, if you have

23  feelings for her, don't break the law, but make sure she knows

24  how you feel.

25  Q.   Don't break the law?

McNulty - Cross                                                    776

1   A.   As far as, like, harassing her.

2   Q.   Well, yeah.

3        So you also went to high school with Mr. Young,

4   right?

5   A.   Yes.

6   Q.   You went to West Potomac?

7   A.   Yes.

8   Q.   When you met with the government before you testified here

9   today, did the government ask you any questions like this?  I'm

10  asking about, you know, whether Nick Young was racist towards

11  any of your friends, whether he was racist and discriminatory

12  in his dating habits.  Did they ask you any of those questions?

13  A.   I don't recall those.

14  Q.   You don't recall them?

15  A.   Right.

16  Q.   Their questions were more focused on all of the German

17  things Nick had in his house, right?

18  A.   It was kind of more of an overall picture of everything,

19  the history of me knowing him.

20  Q.   So there came a time when Nick was dating Zara when --

21  she's the Canadian one?

22  A.   Okay.

23  Q.   When she couldn't get back into the United States.  Do you

24  remember that?

25  A.   Yes.

McNulty - Cross                                                          777

1   Q.   And, and did Nick ever -- so what was your sense of why

2   she couldn't get back into the United States?

3   A.   Her immigration.

4            THE COURT:  Wait, wait, wait.

5            MR. KROMBERG:  What is the witness's sense of why an

6   ex-girlfriend --

7            THE COURT:  I think this is getting -- this is

8   clearly not relevant at this point.  I'm sustaining the

9   objection.  Move on.

10           MR. SMITH:  This isn't about why she couldn't get

11  back into the United States.  It's just one personal anecdote

12  about Mr. Young that has nothing to do with the law.

13           THE COURT:  Let me hear the next question.

14           MR. SMITH:  Okay.

15  Q.   Do you remember that Mr. Young drove for about 20 hours

16  round trip when they would not allow --

17           MR. KROMBERG:  Objection, Judge.

18           THE COURT:  Again, sustained.  It's not relevant.

19  BY MR. SMITH:

20  Q.   So you testified earlier that Mr. Young had a kind of

21  Libertarian political mindset, right?

22  A.   Yes.

23  Q.   And is it your understanding that that Libertarian

24  political mindset that Mr. Young had included a belief in civil

25  liberties?

1    A.    Yes.

2    Q.    Strict constitutionalism?

3    A.    Yes.

4    Q.    Nick might have said this to you on a couple of occasions,

5    that he believes in strict constitutionalism?

6    A.    I know he was, he was firm in his constitutional rights.

7    Q.    And that was true throughout the period when you knew him

8    between 2004 to '7?

9    A.    Yes.

10   Q.    When you were living with Nick Young between 2004 and '7,

11   did it ever occur to you that he might while he was a police

12   officer attack some people for political reasons?

13   A.    No.

14   Q.    Does that seem -- does that idea seem even plausible to

15   you?

16   A.    No.

17   Q.    You had mutual friends in common with Nicholas Young,

18   right?

19   A.    Yes.

20   Q.    Who were those people?

21   A.    Other people that we went to school with.  One of them

22   that I can think of is Thomas Tsui.

23   Q.    Who's Thomas Tsui?

24   A.    He's a friend that we went to high school with, went to

25   college with.

McNulty - Cross                                                      779

1   Q.   He's another police officer, right?

2   A.   He was a police officer, yes.

3   Q.   Where was he a police officer?

4   A.   Arlington County.

5   Q.   And what's, what's Thomas Tsui's background?

6   A.   He was in the military.  He may still be.

7   Q.   He's Korean, right?

8   A.   He's Chinese.

9   Q.   Chinese.

10       And Nick was very close with Tommy Tsui, right?

11  A.   Yes.

12  Q.   When was that?  When was Nick close with Tommy Tsui?

13  A.   All through high school, college.

14  Q.   And after college as well?

15  A.   Yeah.

16  Q.   So at the time you had your wedding to Fabiola, you had

17  mutual friends who were minorities, right?

18  A.   Yes.

19  Q.   And Nicholas would hang out with all of -- with those

20  minority friends as well?

21  A.   Yes.

22  Q.   Did those -- did any of your mutual friends stop hanging

23  out with Nicholas because he was radical?

24  A.   No.

25  Q.   So you're currently an officer with the Fairfax County

McNulty - Redirect                                                780

1   Police Force?

2   A.   Yes.

3   Q.   But you're nearing retirement, aren't you?

4   A.   No.

5   Q.   How close are you?

6   A.   Well, I used to work for the Sheriff's Office, and when I

7   left there, I gave up all my time and started over.

8   Q.   So how many years have you got left?

9   A.   So if I count the Sheriff's Office and the police time, it

10  will be almost 17 years.

11            MR. SMITH:  Okay.  Thanks.

12            Your Honor, I think that's everything.

13            THE COURT:  All right.  Any redirect?

14            MR. KROMBERG:  Yes, Your Honor.

15                      REDIRECT EXAMINATION

16  BY MR. KROMBERG:

17  Q.   Mr. McNulty, what flags were hanging in the house when you

18  were living there besides the flag you identified before?

19  A.   So there was that flag.  I can remember a Confederate

20  flag.  There may have been a United States of America flag.

21  Q.   Hanging in the house?

22  A.   There may have been.

23  Q.   You remember the Confederate flag and you remember the

24  German flag hanging in the workout room?

25  A.   Yeah.

McNulty - Redirect                                                  781

1          MR. KROMBERG:  So can you bring up Government Exhibit

2    10-700?

3          Judge, this is -- we have a stipulation that this was

4    seized from Mr. Young's residence in August 2016.

5          MR. SMITH:  Objection.  403.

6          THE COURT:  Let me take a look at it.

7          Overruled.

8          (Government's Exhibit No. 10-700 was received in

9    evidence.)

10         MR. KROMBERG:  Can you put up on the screen 10-700,

11   please?

12   Q.   Do you see that framed portrait of Adolf Hitler?

13   A.   Yes.

14   Q.   Do you recall seeing that when you were living with

15   Mr. Young?

16   A.   No, I don't.

17   Q.   Do you recall seeing any framed portraits of any political

18   leaders in the house when you were living with Mr. Young?

19   A.   Not that I can recall.

20         MR. KROMBERG:  Please put up 4-300, which is admitted

21   already.

22   Q.   Do you recall that tattoo of Mr. Young?

23   A.   Yes.

24   Q.   And did you know what that tattoo was of?

25   A.   I don't know the details behind it.  I think it had

McNulty - Redirect                                              782

1   something to do with the reenactment unit that he was in.

2   Q.   So was that in your view just -- what was the term you

3   used before about what, when you're acting in a reenactment

4   unit?  What, what term was that?

5   A.   Like a character?

6   Q.   That was cosplay to get a tattoo, do you think?

7   A.   Well, that's, that's, I guess, the term that he had used.

8   I mean, you know, it's -- but, I mean, if you're asking what

9   that is, it's from his unit that he was --

10  Q.   How about the tattoo of the eagle on his neck?  Was that

11  part of the cosplaying?

12  A.   I don't know.

13  Q.   So take a look, if you would, at Government Exhibit 9-102,

14  which is in evidence.

15          MR. SMITH:  Objection.

16          MR. KROMBERG:  It's in evidence, Judge.

17          THE COURT:  It's in evidence.  Overruled.

18  BY MR. KROMBERG:

19  Q.   Do you recognize -- you can put the name on it.  It's in

20  evidence.

21          Do you recognize Saleh Al-Barmawi, who's in that

22  picture?

23  A.   No.

24  Q.   Never saw him?

25  A.   No.

McNulty - Redirect                                                    783

1   Q.   So he wasn't one of the friends that you knew Nicholas

2   Young to have?

3   A.   So I, I knew the names that kind of sounded like Saleh,

4   but I never met him, never saw him.

5   Q.   How about 9-103?  Do you recognize this fellow, Amine El

6   Khalifi?

7   A.   No.

8   Q.   He was not one of the people you hung out with when you

9   hung out with Mr. Young?

10  A.   No.

11  Q.   How about 9-104?  Do you recognize Liban Mohamed?

12  A.   No.

13  Q.   So he was not one of the people you hung out with?

14  A.   No.

15  Q.   Okay.  How about 9-105?

16            MR. SMITH:  Objection.  Relevance.

17            THE COURT:  Overruled.

18  BY MR. KROMBERG:

19  Q.   Do you recognize Hicham Hall?

20  A.   No.

21  Q.   Not one of the people that you knew in common?

22  A.   Correct.

23  Q.   How about 9-106, Peshwaz Waise?  Do you recognize him?

24  A.   No.

25            MR. KROMBERG:  Okay.  Thank you, Judge.  I have

McNulty - Recross                                                        784

1    nothing further.

2              MR. SMITH:  Just a quick redirect, Your Honor.

3              THE COURT:  Yes, sir.

4                        RECROSS EXAMINATION

5    BY MR. SMITH:

6    Q.   So you testified that you didn't see the Hitler picture

7    that Mr. Kromberg just showed you in the home.

8    A.   Correct.

9    Q.   But you did see some German objects in the home --

10   A.   Correct.

11   Q.   -- when you lived with Nicholas.

12             Were those objects prominently -- were they hung up

13   on the walls?

14   A.   No.  I think most of the stuff he would keep in his closet

15   in his room.

16   Q.   Right.  It was all dumped in a drawer, right?

17             Do you know when Nicholas acquired those, all those

18   German artifacts?

19   A.   When he got into German reenacting.

20   Q.   He was in a European racism class -- do you remember

21   that? -- at George Mason?

22   A.   I can't remember, you know, specific classes he took.

23   Q.   Right.  But, like, when you were at the home, you know,

24   you were roommates together, was Nicholas trying to put Hitler

25   things up on the walls, you know, was he talking about Hitler a

1  lot?

2  A.  No.

3  Q.  Okay.  So, so it was all dumped in his closet is what

4  you're saying?

5  A.  Yeah.  Yes, sorry.

6  Q.  So do you know what Nick majored in?  Do you know what,

7  like, his focus of studies was at George Mason?

8          MR. KROMBERG:  Objection, Judge.  I think this is

9  beyond the scope of redirect.

10          THE COURT:  It's beyond the scope of the redirect.

11  BY MR. SMITH:

12  Q.  Okay.  So the government just showed you some pictures,

13  some scary photographs, right?

14  A.  Some photos of some guys.

15  Q.  Some photos, they looked like booking photos or something?

16  A.  It looked like some mug shots.

17  Q.  And the government asked you did you ever see, did you

18  ever see Nicholas with this person, right?

19  A.  Correct.

20  Q.  Did you ever know Nicholas to be an associate of Saleh,

21  and then he showed a picture of Saleh?

22  A.  Correct.

23  Q.  Right?  Did -- when you were living with Nick and when you

24  knew Nick, did you ever see Nick do anything dangerous with any

25  of these individuals?

Menzies - Direct                                                  786

1   A.    I never saw any of these individuals.  I never saw Nick do

2   anything dangerous.

3   Q.   Okay.  Did you see Nick sort of, like, sneaking around

4   with those sort of people who might look suspicious?

5   A.   No.

6              MR. SMITH:  Okay.  Thank you, Your Honor.

7              THE COURT:  All right, is anybody going to call this

8   witness again?

9              MR. KROMBERG:  No, Your Honor.

10             THE COURT:  What about the defense?  Mr. Smith?

11             MR. SMITH:  No, no.

12             THE COURT:  All right, thank you.

13             Then, Officer McNulty, you're excused as a witness.

14  You can stay in court and watch the proceedings or leave, but

15  you're not to discuss your testimony or anything you see or

16  hear in court with any witness who has not yet testified.

17             THE WITNESS:  Yes, Your Honor.  Thank you.

18                   (Witness excused.)

19             THE COURT:  Your next witness?

20             MR. KROMBERG:  Brian Menzies.

21             THE COURT:  Mr. Menzies.

22        BRIAN MICHAEL MENZIES, GOVERNMENT'S WITNESS, AFFIRMED

23                     DIRECT EXAMINATION

24  BY MR. KROMBERG:

25  Q.   Good morning, Mr. Menzies.  Please state your full name

Menzies - Direct                                                      787

1    and spell your last name for the record.  And before you do,

2    let me say you have to speak up and you have to lean forward a

3    little bit so that the jury can hear you.

4    A.   Okay.  Brian Michael Menzies.

5    Q.   Louder.

6    A.   Brian Michael Menzies.

7    Q.   And spell your last name, please.

8    A.   M-e-n-z-i-e-s.

9    Q.   Mr. Menzies, what city do you live in now?

10   A.   I live in South St. Paul, Minnesota.

11   Q.   And how are you employed?

12   A.   I currently work at Walmart as a department manager.

13   Q.   Are you studying to do something else?

14   A.   Yeah.  I'm studying to be an EMT and paramedic.

15   Q.   And you took a test on that this week?

16   A.   Yeah, I took a test on Tuesday.

17   Q.   Okay.  Do you know the defendant in this case, Mr. Young?

18   A.   Yes, sir.

19   Q.   Again, keep your voice up.

20   A.   All right.

21   Q.   How do you know him?

22   A.   I used to be his roommate.

23   Q.   And what time, what years were you his roommate?

24   A.   Around 2009-2010.

25   Q.   So did you move in -- do you recall the individual who was

Menzies - Direct                                                    788

1  the roommate before you moved in?

2  A.   Yeah.  I met him once or twice, Jamie.

3  Q.   And do you remember the last name?

4  A.   McNulty.

5  Q.   Okay.  So you moved in after Mr. McNulty moved out?

6  A.   Correct.

7  Q.   Okay.  Do you remember the address, Heron Ridge Road?

8  A.   Yeah.  I don't remember the exact, but Heron Ridge Drive,

9  Heron Ridge Road.

10 Q.   Okay.  When you were living together, did you socialize

11 much with Mr. Young?

12 A.   Me and Nick were on different schedules, so we'd see each

13 other a lot in passing and hung out a couple times.

14 Q.   Do you know -- who do you recall seeing that he did

15 socialize with?

16 A.   His, his girlfriend at the time was over a lot as well as

17 a man named Saleh.

18       MR. KROMBERG:  Can you put up 9-102, please, which is

19 in evidence?

20 Q.   Is that Saleh?  You can see it on your screen right next

21 to you, too.

22 A.   Yes, sir.

23 Q.   Okay.  Did you know Saleh Al-Barmawi?

24 A.   I never really hung out with him personally, but I would

25 interact with him, you know, at school events or when he was

Menzies - Direct                                                      789

1    over at the house.

2    Q.   What did you know him to do when he was at these school

3    events or when you would see him?

4    A.   He would talk a lot with, like, the younger students in

5    the MSA.

6    Q.   What is the MSA?

7    A.   What's that?

8    Q.   What is the MSA?

9    A.   Oh, sorry, the Muslim Student Association.

10   Q.   Right.  Please continue.  He would speak a lot with the

11   younger students at the MSA?

12   A.   Yeah.  We'd have, like, dinner nights, or we'd have

13   certain teachers or scholars come to the school, with MSA

14   hosting the event, and Saleh would be there and discuss things

15   with some of the students about Islam and whatnot.

16   Q.   Did he have a particular point of view he was known for?

17   A.   Yes.  Saleh was known to be very conservative and follow

18   the Salafi ideology.

19   Q.   And what is the Salafi ideology?

20             MS. MORENO:  Objection.

21             THE COURT:  Are you a member of that religion?

22             THE WITNESS:  I am Muslim, yes.

23             THE COURT:  All right.  Then as a Muslim, are you

24   aware of what that group is involved with?

25             THE WITNESS:  Yes.  I know a little bit about the

Menzies - Direct                                                        790

1    ideology of the Salafi.

2            THE COURT:  Well, then you can speak as a member of

3    the faith your understanding of that ideology.  Go ahead.

4    Overruled.

5    BY MR. KROMBERG:

6    Q.   Please talk about -- please explain to the jury what

7    Mr. Al-Barmawi's position, what he talked about.

8    A.   So --

9            MS. MORENO:  Objection.  Hearsay.

10           THE COURT:  No, it's not being offered for the truth

11   of its contents.  It's being offered for what he heard this

12   individual say, so overruled.

13   BY MR. KROMBERG:

14   Q.   Please go ahead.

15   A.   You know, the Salafi ideology from my understanding was

16   the teachings of a man named Muhammad Abdul Wahhab of Saudi

17   Arabia in the 19th Century who believed that the three

18   generations after Prophet Muhammad were the generations who

19   held to the truth and that anything after that time would be

20   considered a religious innovation known as bid'a.

21   Q.   Bid'a, you have to -- you're going to have to spell it

22   because we have to have everything written down here.

23   A.   B-i-d-apostrophe-a.

24   Q.   Okay.

25   A.   So Saleh was very adamant in that ideological perspective,

Menzies - Direct                                                         791

1    and so, for instance, he would tell people, you know,

2    celebrating the Prophet's birthday would be an innovation.

3    Interaction with the opposite sex would be considered something

4    that would be considered sinful.  Something like prayer beads

5    would be considered an innovation.  You shouldn't be using them

6    because it imitates, you know, the Christians, Hindus,

7    Buddhists, stuff like that.

8    Q.   So what was Mr. Young's relationship to Saleh Al-Barmawi?

9    A.   Nick and Saleh were friends.  They hung out a lot

10   together.

11           MR. KROMBERG:  Please show 9-101.

12   Q.   Do you recognize 9-101 on your screen?

13   A.   Yes, sir.

14   Q.   And who is that?

15   A.   That is Zack Chesser.

16   Q.   Did you know Zachary Chesser?

17   A.   I knew him through school, yes.

18   Q.   What was Saleh's -- Saleh Al-Barmawi's relationship with

19   Zachary Chesser?

20   A.   Saleh was also friends with Zack.

21   Q.   Did you encounter Saleh Al-Barmawi at, in a store called

22   Halalco?

23   A.   Yes.

24   Q.   Can you describe what Halalco is and what happened when

25   you'd see Saleh at that store?

Menzies - Direct                                                        792

1   A.    Sure.   So Halalco is kind of like a little supermarket for

2   the local Muslim community in Virginia.   You'd have like a

3   restaurant, books, produce, you know, pretty much a little bit

4   of everything; and I went a lot of times there to get my, my

5   produce and goods as well as books; and a couple of times, I

6   would see Saleh or one of the Salafi brothers in the book

7   section, notably in the section on what they considered an

8   innovative subject such as mysticism, and basically --

9          MS. MORENO:   Excuse me.   Your Honor, I'm going to

10  object to this answer.   It's irrelevant.

11         THE COURT:   I think given the way the case is going,

12  it's not irrelevant.   I'm going to overrule the objection.

13         MR. KROMBERG:   Thank you, Your Honor.

14  Q.    Can you please make sure you speak up, though?

15  A.    Okay.   And, you know, I saw Saleh a couple times there as

16  I looked at books, just telling people that, you know, these

17  books are a bid'a or an innovation and why are you bothering

18  reading this stuff when all you need is, you know, the Koran

19  and the example of the Prophet known as the sunnah.

20  Q.    What is the sunnah?

21  A.    The sunnah, s-u-n-n-a-h, it's basically the example that

22  the Prophet and the generations after him left behind that

23  Muslims look to for guidance and instruction.

24  Q.    Was Mr. Al-Barmawi associated with any particular Islamic

25  school or institute?

1    A.    I know he endorsed Al-Maghrib Institute at the time.

2    Q.    And you're going to have to spell that, please.

3    A.    Okay.  A-l-dash-M-a-g-h-r-i-b, I believe, or i-r-b.

4    Q.    And where is the Maghrib Institute?

5    A.    It is a -- I don't believe it has any, like, headquartered

6    building.  It's an institute that holds online classes as well

7    as areas like a D.C. area, Texas, Boston, and they have

8    instructors, like I said, online or in person that will hold

9    lectures.

10   Q.    And what are the -- what is the particular viewpoint of

11   the Al-Maghrib Institute?

12   A.    At the time I was living in --

13              MS. MORENO:  Objection.

14              THE COURT:  I'm going to overrule that.

15   BY MR. KROMBERG:

16   Q.    Please answer.

17   A.    At the time I was living in Virginia, Al-Maghrib espoused

18   a very Salafi ideological viewpoint.

19   Q.    Are you familiar with an individual named Maqdisi,

20   M-a-q-d-i-s-i?

21   A.    No, sir.

22   Q.    How about Anwar Awlaki?

23   A.    Yes, sir.

24   Q.    Okay.  What, if anything, did Mr. Young say about Anwar

25   Awlaki?

Menzies - Direct                                              794

1            MS. MORENO:  Objection.

2            THE COURT:  What's the basis for the objection?

3            MS. MORENO:  403, 401.

4            THE COURT:  Overruled.

5   BY MR. KROMBERG:

6   Q.   Please answer.

7   A.   What was the question?

8   Q.   I'm sorry.  What did Mr. Young say about Anwar Awlaki?

9   A.   A lot of the brothers I knew in Virginia were very

10  influenced by --

11           MS. MORENO:  Objection.

12           THE COURT:  I think now the answer is -- just listen

13  to the question and directly answer the question, please.

14  BY MR. KROMBERG:

15  Q.   What, if anything, did Mr. Young say about Awlaki?

16  A.   You know, Nick had some of his lectures and saw Anwar

17  Awlaki as someone who was a positive role model.

18  Q.   What did Saleh Al-Barmawi say about Awlaki?

19  A.   Saleh --

20           MS. MORENO:  Objection.

21           THE COURT:  Again, overruled.

22           THE WITNESS:  Saleh, too, was also very much

23  influenced by Anwar Awlaki's lectures and used him as kind of

24  like his main person that he would talk about as a good example

25  of a Muslim.

Menzies - Direct                                                      795

1    BY MR. KROMBERG:

2    Q.   What denomination of Islam were you when you lived with

3    Mr. Young?

4    A.   In the initial beginnings, I was Shia, and eventually I

5    became Sunni.

6    Q.   What reaction did Mr. Young and Mr. Al-Barmawi have to you

7    because of your status as a Shia?

8    A.   Nick never personally gave me any problems being Shia, but

9    Saleh was very adamant in his negative opinion of the Shia.

10   Q.   Is there a standard Islamic greeting that you exchange

11   when you meet another Muslim?

12   A.   Yes.  Traditionally when you greet another Muslim, you

13   say, As Salaamu Alaikum.

14   Q.   I think we're going to have to spell that.

15   A.   A-s S-a-l-a-a-m-u A-l-a-i-k-u-m.

16   Q.   When you saw Saleh Al-Barmawi and you gave him an Islamic

17   greeting, how would he respond to you when you were a Shia?

18   A.   He typically would not respond back and smirked at me.

19   Q.   What reaction did Zachary Chesser have to you as a Shia?

20   A.   The same thing as well, and sometimes as I would pray,

21   Zack would purposely step in front of me, which is considered

22   very rude in the Islamic faith to do so.

23   Q.   When you first met Mr. Young, how often did he interact

24   with other Muslims?

25   A.   When I first met Nick, we met at one of the MSA dinner

1  events, and Nick was very active with the brothers showing up

2  to all the MSA events.

3  Q.   How, how did you see Mr. Young's relationship with other

4  Muslims affected, if at all, by his relationship with Saleh

5  Al-Barmawi?

6  A.   You know, over time, I saw him strictly just kind of

7  hanging out with Saleh.

8  Q.   What, if any, discussion between Saleh Al-Barmawi and

9  Mr. Young do you recall hearing regarding the killing of U.S.

10 soldiers in Afghanistan?

11          MS. MORENO:  Objection.

12          THE COURT:  Overruled.

13          THE WITNESS:  As I recall, Saleh felt that it was

14 necessary, that, you know, the soldiers in Iraq or Afghanistan

15 were invaders, and that it was to be expected.

16 Q.   And what did Mr. Young say?

17 A.   At that time, Nick was in agreement.

18 Q.   Was there a particular curse that he used at that time

19 with respect to the American soldiers?

20 A.   Not that I can recall.

21 Q.   What attitude did Mr. Young express regarding government

22 surveillance of him?

23 A.   What was that?  Sorry, I coughed.

24 Q.   What attitude did Mr. Young express with regard to

25 government surveillance of him?

1   A.   I know at one point in time, Nick was aware of the

2   possibility of Internal Affairs looking into him, and so he was

3   telling me, you know, "Don't answer the door."

4   Q.   Keep your voice up, please.

5   A.   Sorry.  He was aware of internal investigations at his job

6   and told me, you know, "If anyone comes, don't answer a door.

7   I'll answer the door.  And if anyone comes looking for me, tell

8   them I'm not home," things like that.

9   Q.   What firearms did you see around the house?

10  A.   At the time I was living with Nick, I saw several.  I'm no

11  expert on firearms.

12          MS. MORENO:  Objection.

13          THE COURT:  I think now the door has been adequately

14  opened.  I'm allowing it in.  Overruled.

15          THE WITNESS:  I saw several handguns outside of his

16  gun that he carried for work.  I saw some type of assault

17  rifle.  I saw some type of gun set up on, like, kind of like a

18  tripod stand.  That's the ones I remember.

19  BY MR. KROMBERG:

20  Q.   What kind of gun was on -- as best you can describe, the

21  gun that was on the tripod, where was the tripod when you saw

22  it?

23  A.   The tripod was outside the -- in the dining room area, by

24  the balcony sliding door window area.

25  Q.   What, if anything, did Mr. Young say to you about his

Menzies - Direct                                                    798

```
 1  feelings towards Jews?

 2          MS. MORENO:  Objection.

 3          THE COURT:  Overruled.

 4          THE WITNESS:  Nick was very anti-Jewish while I lived

 5  with him and mentioned it several times to me as well as my

 6  sister.

 7  BY MR. KROMBERG:

 8  Q.   Please look at Government Exhibit 11-400.  I think the

 9  court security officer will provide it to you.

10          MS. MORENO:  There'll be an objection to this, Your

11  Honor.

12          THE COURT:  All right, overruled.

13          Is this a document, or is this an object?

14          MR. KROMBERG:  It should be a picture.

15          THE COURT:  All right, there it is.

16  BY MR. KROMBERG:

17  Q.   Do you recognize that?

18  A.   Yes, I do.

19  Q.   What, what is that?

20  A.   It is an image of Nick's truck.

21  Q.   Okay.  Wait a minute.  Then I must have the wrong one.

22  Ha.

23          11-401, I'm sorry.  I think 11-400 is already in

24  evidence.

25          THE COURT:  It is.
```

Menzies - Direct                                                      799

1          MS. MORENO:  Your Honor, there is an objection to

2    11-401.

3          THE COURT:  All right, hold on.  Let me take a look

4    at it.

5          11-401 is a photograph.

6          MR. KROMBERG:  Correct.

7          THE COURT:  I understand the objection, but it's

8    overruled.  We've had that discussion before.

9          Is it not there?  Here, take mine.

10   BY MR. KROMBERG:

11   Q.   Okay.  Do you recognize what's been marked 11-401?

12   A.   Yes, sir.

13   Q.   Okay.  And what is that?

14   A.   It is the front door area of Nick's house, with the

15   Israeli flag on the ground as the doormat.

16         MR. KROMBERG:  Okay.  We move it into evidence and

17   ask to publish to the jury 11-401.

18         THE COURT:  It's in over defense objection.

19         (Government's Exhibit No. 11-401 was received in

20   evidence.)

21         MR. KROMBERG:  Can you please publish 11-401?

22   Q.   And that was the front door of the house you lived in with

23   Mr. Young?

24   A.   Correct.

25   Q.   What was Mr. Young's attitude towards Nazism?

Menzies - Direct                                                    800

1   A.   Nick had an interest in the Nazi Third Reich.  He talked

2   about it adamantly.  He had World War II Nazi paraphernalia as

3   well.  He had discussions about Hitler with myself as well as

4   my sister one time while she visited.

5   Q.   So I want to direct your attention now to April 2011.

6   You're still living there, right?

7   A.   April 2011, I believe so.

8   Q.   Well, let me ask you what, if anything, did Mr. Young tell

9   you about a trip that he was going to embark upon?

10  A.   Yes.  So then I was still living with him at the time.  He

11  was going on a trip.  He told me he was going to Africa --

12  South Africa.

13  Q.   Okay.  And do you recall him also going on a trip in

14  August 2011?

15  A.   I know when I was living with Nick, he went on a few trips

16  while I was with him for vacation.

17  Q.   Did he tell you where he went during that second trip in

18  August?

19  A.   The only one that I can recall remembering was when he

20  told me he was going to South Africa.

21  Q.   Did he ever tell you that he was going to or had gone to

22  Libya?

23  A.   He did not.

24  Q.   So at some point, you moved out of his -- of the

25  residence.  After you moved out -- well, let me ask you this:

1   Where was Mr. Young when you moved out?

2   A.   He was on one of his trips when I moved out.

3   Q.   Okay.  And what contact did you have with him after that?

4   A.   I had contact with Nick after I moved out maybe once or

5   twice.  I apparently misread my checkbook, and I apparently

6   owed Nick still a month or two of rent, and so we figured that

7   out, and I sent him the check.

8              MR. KROMBERG:  Okay.  Thank you.  I have nothing

9   further for this witness.  I -- I'm sorry, hang on just one

10  moment.

11             Thank you.  I imagine defense will have questions for

12  you.

13             THE COURT:  Yes, ma'am, go ahead.

14             MS. MORENO:  Thank you.

15                       CROSS-EXAMINATION

16  BY MS. MORENO:

17  Q.   Good morning, Mr. Menzies.

18  A.   Good morning.

19  Q.   Now, you lived with Nick Young from actually it was 2007

20  through 2011, about four years, correct?

21  A.   End of 2007, correct.

22  Q.   Right?  It wasn't 2009 to 2010.

23  A.   Okay.

24  Q.   Right?  It was four years?

25  A.   Give or take.  I don't know the exact dates, but I

Menzies - Cross                                                          802

1    remember moving in around the end of 2007 because of the

2    semester.

3              THE COURT:  I'm sorry, let me stop.  Mr. Menzies,

4    keep your voice up.  We're having trouble hearing you.

5              THE WITNESS:  Sorry, sorry.  Yes, I moved in probably

6    the end of 2007, at the end of the winter semester.

7    BY MS. MORENO:

8    Q.   You moved in when Mr. McNulty moved out, right?

9    A.   Yes.

10   Q.   Okay.  Now, you -- actually, you have gone through

11   different variations of faith in Islam; isn't that right?

12   A.   Correct.

13   Q.   Right.  You -- I believe you began as a Sufi, correct?

14   A.   Yes.  I have always remained a Sufi, which is the mystical

15   interpretation of Islam.

16   Q.   And then you were Shia, correct?

17   A.   Correct.

18   Q.   And then you're Sunni now?

19   A.   Yes.  Sunni is the foundation for Sufism.

20   Q.   Now, you talked a little bit about these other gentlemen,

21   Mr. Saleh.  Now, Mr. Saleh, he came to the home only once or

22   twice, to Nick Young's home, correct?

23   A.   Yeah, I saw Saleh several times while I was there.

24   Q.   And you -- but you saw him at these MSA gatherings,

25   correct?

Menzies - Cross                                                          803

1    A.    Correct.

2    Q.    And you felt insulted by Mr. Saleh and the other

3    gentlemen, correct?

4    A.    Other gentlemen?

5    Q.    You felt insulted by Mr. Saleh because he wouldn't return

6    the particular Salaam Alaikum greeting to you, right?

7    A.    Once I saw how Saleh was towards me, I kind of just

8    avoided him at that point as much as I could, yes.

9    Q.    You, you disliked him, correct?  That's fair to say?

10   A.    I wouldn't say disliked, but we obviously -- we had

11   cordial relations as much as possible.

12   Q.    And you felt that you couldn't get closer to Nick Young

13   because of what you perceived were relationships with other

14   people, right?

15   A.    No, I would not say that.

16          MS. MORENO:  May I have a moment, Your Honor?

17   Q.    You felt that Mr. Saleh had something to do with the fact

18   that you and Mr. Young never connected and became friends,

19   right?

20   A.    You know, initially, I mean, Nick and I, you know, we got

21   along very well.  We had some similar interests in some

22   tabletop games, but over time, Nick was very isolated from

23   myself and some of the other brothers that he initially hung

24   out with and spent more time with Saleh.

25   Q.    Do you remember being interviewed in this -- in connection

Menzies - Cross                                                        804

1   with this case, sir?

2   A.    Yes.

3   Q.    And that was June 13 of this year?  Do you remember that?

4   A.    Yes, it was this year.

5   Q.    Okay.  Do you remember talking to Agent Caslen?

6   A.    Yes, ma'am.

7   Q.    And do you remember telling them that you never

8   connected -- you felt that you never connected with Mr. Young

9   and became friends because of Mr. Saleh?

10  A.    Like I said, initially I felt me and Nick were getting

11  along well, but once Saleh was more and more in Nick's life is

12  when he started to disconnect from people.

13  Q.    Okay.  Now, Mr. Young told you that he supported Ron Paul,

14  correct?

15  A.    Yes.

16  Q.    And you understood that Mr. Young was a Libertarian,

17  right?

18  A.    Yes.

19  Q.    But you have an opinion that Libertarians are

20  anti-Semitic, correct?

21  A.    I do not.

22  Q.    Okay.

23  A.    I voted for Gary Johnson this past election, so I am

24  somewhat a Libertarian myself.

25  Q.    Do you recall telling Agent Caslen that Libertarians have

Menzies - Cross                                                      805

 1  a history of being anti-Semitic?

 2  A.   I do not recall that.

 3          MS. MORENO:  Your Honor, I'd give this to the court

 4  security officer to refresh his recollection.  I'm not marking

 5  this.

 6          THE COURT:  I understand.

 7  BY MS. MORENO:

 8  Q.   Handing up the June 13 302 interview with Mr. Menzies, if

 9  you could look at page 189, the highlighted area?

10  A.   Yes, I read that.

11  Q.   And do you recall telling them that Libertarians,

12  according to you, have a history of being anti-Semitic?

13  A.   I do not recall that, no.

14  Q.   But that's what you told Mr. Caslen?

15          MR. KROMBERG:  Objection, Judge.  That is --

16          THE COURT:  No, you're testifying now.

17          You don't remember -- looking at that doesn't refresh

18  your memory?

19          THE WITNESS:  No, not that section.

20          THE COURT:  All right, that's the answer.  You can

21  return the document to counsel.

22  BY MS. MORENO:

23  Q.   By the way, these weapons that you talked about, you had

24  no knowledge that any of these weapons were unlawfully

25  possessed, correct?

Menzies - Cross                                                    806

1   A.   Yes, correct.

2   Q.   You had no knowledge that any of them were unlawful,

3   right?

4   A.   Yeah.  I mean, as him being a police officer and having

5   the weapons, I didn't think anything of it.  I was never a

6   firearms guy, so I just assumed.

7   Q.   You had no information that the possession of the guns was

8   unlawful?

9           MR. KROMBERG:  Objection.  Asked and answered.

10          MS. MORENO:  No.

11          THE COURT:  I think his answer is he had no such.

12  BY MS. MORENO:

13  Q.   Okay.  And by the way, during this period when you lived

14  with Mr. Young, you saw him to be a Ron Paul supporter,

15  correct?

16  A.   Yes.

17  Q.   And you saw that he had a garage full of posters and yard

18  signs, correct?

19  A.   Yes.

20  Q.   And those signs would go up around the house outside,

21  correct?

22  A.   Yeah.  Like when people put their support signs in the

23  front yard and stuff like that.

24  Q.   Now, you say that you overheard Mr. Young agree about this

25  comment regarding U.S. soldiers, right?

Menzies - Cross                                                     807

1    A.   Yes, yes.

2    Q.   Right?

3    A.   Yes.

4    Q.   Who else was there?

5    A.   Saleh.

6    Q.   And who else besides Mr. Saleh?

7    A.   That's the only two I remember.

8    Q.   Okay.  And when did that comment occur?

9    A.   It was either outside the house or it could have been at

10   George Mason.  I don't recall the exact location, but I

11   remember --

12   Q.   When?

13   A.   At some point when I was living there.

14   Q.   You don't, you don't know?

15   A.   I don't remember the exact date, no.

16   Q.   Did you tell anyone else about that comment?

17   A.   No.

18   Q.   Now, when you moved out, when you moved out, you did so

19   when Mr. Young was away, correct?

20   A.   Yes.

21   Q.   And, in fact, you owed him money, correct, when you moved

22   out?

23   A.   Yeah.  At the time, I was not aware.

24   Q.   And when you moved out, you didn't leave him the rent

25   money, right?

Menzies - Cross                                                         808

1   A.   When I moved out, I was not aware that I still owed him

2   rent.

3   Q.   But, but he got in touch with you after you moved out.  Do

4   you remember that?

5   A.   Yes.  He left me a voicemail, and I gave him a call back

6   the moment I got it, and we straightened it out.

7   Q.   In fact, he called you several times in order for you to

8   pay the back rent?

9   A.   That was because I was up in the mountains in New York and

10  I had no reception.

11  Q.   And you told him that you had to pay in installments,

12  right?

13  A.   At that time, yes.

14  Q.   And that's what you did, and that's what he accepted,

15  correct?

16  A.   Correct.

17  Q.   Now, Mr. Young never discussed Libya with you; isn't that

18  right?

19  A.   No.

20  Q.   And you never saw him watching any jihadi videos online,

21  correct?

22  A.   No.  I never watched TV or videos with him.

23  Q.   And you never heard him talk about al Qaeda, correct?

24  A.   Not at the time, no.

25  Q.   And this was during the four-year period that you lived

Menzies - Cross                                                              809

1    with him, right?

2    A.   Yes, at the time I lived with him.

3             MS. MORENO:  Thank you.

4             THE COURT:  No further questions?

5             MS. MORENO:  No further questions.

6             THE COURT:  Is there any redirect?

7             MR. KROMBERG:  No redirect, Judge.

8             THE COURT:  All right, is anybody going to call

9    Mr. Menzies again?

10            MR. KROMBERG:  Not the government, Judge.

11            THE COURT:  How about for the defendant?  Ms. Moreno?

12            MS. MORENO:  I'm sorry?

13            THE COURT:  Are you going to call the witness again?

14            MS. MORENO:  No.

15            THE COURT:  All right.  Then, sir, you're excused as

16   a witness.  You can stay in court and watch the proceedings, or

17   you may leave, but you're not to discuss your testimony or

18   anything you see or hear in court with any witness who has not

19   yet testified, all right?

20            THE WITNESS:  Yes, ma'am.

21                       (Witness excused.)

22            THE COURT:  All right.  And your next witness, is

23   that the expert?

24            MR. KROMBERG:  We could call -- we'll call Ms. Dill.

25            THE COURT:  All right.  This is a relatively short

```
Dill - Direct                                                  810
```

1    witness, as I understand?

2              MR. KROMBERG:  Yes.

3              THE COURT:  All right.

4              JOANNE DILL, GOVERNMENT'S WITNESS, AFFIRMED

5                     DIRECT EXAMINATION

6    BY MR. KROMBERG:

7    Q.   Good morning, Ms. Dill.

8    A.   Good morning.

9    Q.   Please state your full name and spell your last name for

10   the record, and also, it's important to keep your voice up

11   because the jurors need to hear you.

12   A.   Joanne Dill, D -- as in David -- i-l-l.

13   Q.   Ms. Dill, how are you employed?

14   A.   I work for Metro.

15   Q.   And in what capacity?

16   A.   I am a digital video evidence technician.

17   Q.   And how long have you been in that position?

18   A.   Since September.

19   Q.   And before that, how were you employed?

20   A.   I was a Metro Transit Police officer.

21   Q.   And how long had you been a Metro Transit Police officer?

22   A.   Twenty years.

23   Q.   Are you retired from Metro Transit Police?

24   A.   I retired May 1.

25   Q.   Congratulations.

```
Dill - Direct                                                    811
```

1   A.   Thank you.

2   Q.   What were your -- what are the responsibilities of a Metro

3   Transit Police officer?

4   A.   We patrol the Metro trains and buses.  I spent my whole

5   career except for one year where I patrolled buses, I patrolled

6   trains, riding the trains and walking through the stations.

7   Q.   Is the Metro system for purposes of the police department

8   divided into different districts?

9   A.   Yes, sir.  Right now, we have two districts, the District

10  1 and District 2.  We used to have a third district, which was

11  the revenue facility.

12  Q.   So I would like to direct your attention to the period of

13  2013 to 2014.  What district were you assigned?

14  A.   District 2.

15  Q.   And what district is that?

16  A.   At that time, it was based out of Franconia-Springfield, I

17  believe.  We moved from Huntington to Franconia, and it was the

18  Yellow Line and the Blue Line up through Metro Center and then

19  the Green Line down to Anacostia -- sorry, Branch Avenue.  And

20  at some point, we had Largo and New Carrollton, but that

21  switched.  So basically, south of Metro Center.

22  Q.   Do you know the defendant?

23  A.   Yes.

24  Q.   How do you know him?

25  A.   We worked together.  He was a police officer with me.

Dill - Direct                                                    812

1   Q.   Did you have occasion to speak with him while he was at

2   District 2?

3   A.   Yes.

4   Q.   And when would that have been?

5   A.   We had a number of different conversations over the course

6   of the years we worked together, but we had quite a few around

7   the summer of 2013.

8   Q.   Okay.

9            THE COURT:  Can you speak -- can you get a little

10  closer?  You'll have to bend slightly, I'm sorry.  That's the

11  microphone, that black strip.  All right.

12           THE WITNESS:  Is this better?

13           THE COURT:  Much better, thank you.

14  BY MR. KROMBERG:

15  Q.   In the course of your conversations with Mr. Young, did

16  the subject of religion come up?

17  A.   Yes.

18  Q.   Okay.  And did the subject of the Caliphate come up?

19  A.   Yes.

20  Q.   And what, if anything, was said about the Caliphate?

21  A.   I had been watching the news and seen the Caliphate

22  mentioned, and I was already suspicious of him, so I mentioned

23  it to him to see what he would say.

24  Q.   And what did he say?

25  A.   He said that he believed in it and he thought it was a

Dill - Direct                                                    813

1   good thing for that part of the world.

2   Q.   So to the best of your recollection, when did this

3   conversation occur?

4   A.   Probably six months to a year after the summer of 2013.

5   Q.   So am I hearing -- am I correct that it's late 2013 to the

6   middle of 2014?

7   A.   Approximately, yes.

8   Q.   And on a different note, when you're assigned to work in

9   the Metro Police -- in District 2, say, do you have to go

10  someplace first to clock in, or do you go to a station and

11  patrol where, a particular area?  I mean -- let me strike that.

12  Let me try that again.

13          Do you go some central place first, or do you go to

14  an assigned location where you're supposed to be first?

15  A.   You can do either.  For instance, I worked at the

16  Franconia district station.  They did what they called

17  decentralization, where if I live close to Branch Avenue, I can

18  check on at Branch Avenue, and that way I'm already patrolling

19  when my shift begins instead of going all the way to the

20  district.

21  Q.   How do you check in?  Excuse me, how did you check in?

22  A.   I did both.  I mean, if I --

23  Q.   No, no, I'm sorry.  How -- back when you checked in, how

24  did you check in?  What's the mechanics of it?

25  A.   Oh, if you decentralize?

Dill - Cross                                                          814

1    Q.    Yes.

2    A.    There is a phone, and you put it on speaker, and you call

3    into the district, and 20 years ago, when I started, you would

4    just talk to the sergeant.  Later on, they had this system

5    where there is a phone number where they would do a conference

6    call, and you would sort of be part of roll call from a

7    distance.  You would hear everything that went on in the roll

8    call room at the district from the conference call.

9    Q.    So who would be on the conference call from the district?

10   A.    The supervisor, the sergeant running the roll call, and

11   the other officers who were in the room, in the roll call room.

12   Q.    So how would the supervisor in the roll call room know

13   where you were when you called in?

14   A.    They wouldn't.  You could call in from your cell phone.

15   It was basically on the honor system.  You would call in from

16   that room.

17          MR. KROMBERG:  Okay.  Thank you.  Nothing further for

18   the witness.

19          Ms. Dill, I expect the defense will have some

20   questions for you.

21          THE COURT:  Ms. Moreno?

22                       CROSS-EXAMINATION

23   BY MS. MORENO:

24   Q.    Just a couple questions, Ms. Dill.  When did you meet with

25   the government in this case?

Dill - Cross                                                              815

1   A.   I met with the prosecuting attorney on Saturday.

2   Q.   This Saturday?

3   A.   Yeah.

4   Q.   That's the only time?

5   A.   That's the only time I've met with the attorney.

6   Q.   Okay.

7   A.   The -- there were a couple of FBI agents that interviewed

8   some of us.  It was before I retired, so probably the spring of

9   2017.  I don't know exactly when.

10  Q.   Let me just ask you this:  You worked with Mr. Young for a

11  number of years, I gather?

12  A.   Yes.

13  Q.   Okay.  And did you ever see Mr. Young discriminate,

14  racially treat any of the passengers?

15  A.   No.

16            MS. MORENO:  Nothing further.

17            THE COURT:  All right.  Any redirect?

18            MR. KROMBERG:  No, Your Honor.

19            THE COURT:  I assume that Ms. Dill does not need to

20  be recalled?

21            MR. KROMBERG:  She does not.

22            THE COURT:  All right, ma'am, then you're excused as

23  a witness, and that means that you can come in court and watch

24  the proceedings or leave, but you're not to discuss your

25  testimony or anything you see or hear in court until the case

816

 1    is over.  Do you understand that?

 2                THE DEFENDANT:  Yes, Your Honor.

 3                THE COURT:  All right.

 4                        (Witness excused.)

 5                THE COURT:  Is your next witness the expert?

 6                MR. KROMBERG:  Yes, but I propose to introduce some

 7    of the exhibits that would have come in with a witness, with a

 8    seizing agent, but we have stipulations for it, and that will

 9    take some time, so we can get the exhibits in for the expert to

10    talk about.

11                THE COURT:  All right.

12                MR. SMITH:  Your Honor, may we address each one of

13    these exhibits with the Court before they're published all at

14    once?

15                THE COURT:  Well, are they all the ones we discussed

16    last night, or are there additional ones?

17                MR. SMITH:  There's dozens, Your Honor, so we just

18    need to be able to make objections to each on the record before

19    they're published.

20                MR. KROMBERG:  They are most of the ones that we

21    talked about last night, although we withdrew some, and there

22    are additional ones that I don't expect are going to be

23    problems at all because they have to do strictly with the

24    Islamic terrorism side of the case and not the Nazi side of the

25    case.

817

1          THE COURT:  All right, which books are we going to be

2   looking at?

3          MR. KROMBERG:  Well, I was going to start from the

4   beginning.  There are a lot.

5          MR. SMITH:  Before they're published, Your Honor, may

6   we have a conference so that we can put our objections --

7          THE COURT:  Let's just get it started so we're not in

8   the hypothetical.  Let's see what the problems are.

9          MR. SMITH:  All right.

10          MR. KROMBERG:  Judge, Exhibit 1-100 is subscriber

11   information from 1&1mail.com.  We have a certification from

12   1&1mail.com.  That is 1-000.  So I think that 1-100 comes in as

13   a business record of 1&1mail.com.

14          THE COURT:  Is there any objection?

15          MR. SMITH:  No.

16          THE COURT:  All right, that's in.

17          (Government's Exhibit No. 1-100 was received in

18   evidence.)

19          MR. KROMBERG:  Government Exhibits 1-301, 1-302, and

20   all the way through 1-308 are e-mails from the

21   MALIKtheAmerican@mail.com, which we have a stipulation No. 2

22   which I'd like to read into the record.  Stipulation No. 2,

23   which is Government Exhibit 12-2:  The United States and the

24   defendant hereby stipulate and agree that Government Exhibits

25   1-300 through 1-308 are authentic business records of 1&1 Mail

818

1    & Media, Inc.

2            We moved exhibits in, Judge, but we are going to wait

3    to publish them for when Special Agent Caslen testifies.

4            MR. SMITH:  No objection.

5            THE COURT:  All right.  So 301 and 302 through 308

6    are in.

7            MR. KROMBERG:  Thank you.

8            (Government's Exhibit Nos. 1-301 through 1-308 were

9    received in evidence.)

10            THE COURT:  All right.

11            MR. KROMBERG:  Now, Government Exhibits 1-401 through

12    1-410, same situation.  We don't need to publish them now.

13    We're going to speak about them later with Special Agent

14    Caslen, but we have the stipulation, Government Exhibit 12-3:

15    The United States and the defendant hereby stipulate and agree

16    that Government Exhibits 1-400 through 1-407 are authentic

17    business records of Yahoo!

18            And then stipulation No. 4, Government Exhibit 12-4:

19    The United States and the defendant hereby stipulate and agree

20    that Government Exhibit 1-408 is an accurate reproduction of

21    the e-mails that defendant Nicholas Young exchanged with the

22    address mohamed_2060@yahoo.com.

23            THE COURT:  Wait.

24            MR. KROMBERG:  Government Exhibit 12-5 --

25            THE COURT:  Wait, wait, wait, wait.  You wanted 401

819

1  through --

2          MR. KROMBERG:  Right.  Well, it's covered by three

3  separate stipulations, which I'm just going through the third

4  stipulation now.

5          THE COURT:  All right.

6          MR. KROMBERG:  And by the way, everybody should know

7  that the defense saved a lot of people, time, and effort by

8  entering into these stipulations, and we're grateful for that.

9          THE COURT:  All right.

10          MR. KROMBERG:  Stipulation No. 5, Government Exhibit

11  12-5:  The United States and the defendant hereby stipulate and

12  agree that Government Exhibit 1-410 is a true copy of an

13  affidavit of the defendant, Nicholas Young.

14          And, Judge, as a result of those stipulations, we

15  move in Government Exhibits 1-401 through 1-410, and we'll

16  publish them later.

17          THE COURT:  I don't, I don't think you mentioned 409.

18          MR. KROMBERG:  Correct.  You're exactly right, no

19  409.  401, 402, 403 --

20          THE COURT:  401 through 8 and then 10, but not 9.

21          MR. KROMBERG:  Exactly.

22          THE COURT:  All right, no 9.  They're in.

23          (Government's Exhibit Nos. 1-401 thru 1-408 and 1-410

24  were received in evidence.)

25          MR. KROMBERG:  Government Exhibit 1-600, we have a

820

1    stipulation No. 35 for that.  That is a Microsoft record, and

2    stipulation 35 says:  The United States and the defendant

3    hereby stipulate and agree that Government Exhibit 1-600 is an

4    authentic business record of Microsoft Corporation.

5            And once again, we're not going to publish that until

6    Special Agent Caslen testifies.  And therefore, we move in

7    1-600.

8            THE COURT:  Is there any objection?

9            MR. SMITH:  No objection.

10           THE COURT:  All right, it's in.

11           (Government's Exhibit No. 1-600 was received in

12   evidence.)

13           MR. KROMBERG:  Government Exhibit 3-125 is a Virgin

14   Mobile record, and it's covered by stipulation No. 8, I think.

15   That's what my notes say.  Is that right?

16           But I don't have -- I'm going to have to come back to

17   that because I don't have that stipulation right here, which I

18   thought I would.

19           THE COURT:  All right.

20           MR. KROMBERG:  Do we have a stipulation of that?

21   Okay.  Mr. Turgeon is stepping in for me, as usual.  Thank you.

22           Stipulation No. 8:  The United States and the

23   defendant hereby stipulate and agree that Government Exhibits

24   3-104 -- and, in fact, stipulation No. 12-8, is that already in

25   evidence?

821

```
 1              SA CASLEN:  It is.

 2              MR. KROMBERG:  Oh, okay.  In that case, sorry, we're

 3    just moving into evidence Government Exhibit 3-125, and we will

 4    publish it later when Special Agent Caslen testifies.

 5              THE COURT:  Any objection?

 6              MR. SMITH:  No objection.

 7              THE COURT:  All right, it's in.

 8              (Government's Exhibit No. 3-125 was received in

 9    evidence.)

10              MR. KROMBERG:  Now, Government Exhibit 4-03, Judge,

11    is what the CART examiner testified about yesterday.

12              THE COURT:  All right, hold on.

13              MR. KROMBERG:  4-203, Judge.

14              THE COURT:  I need the book.  Just a second.

15              Yes.

16              MR. KROMBERG:  And that's what Mr. Lee testified

17    about, and it was not admitted when he testified, but we move

18    it in now, and Mr. Gartenstein-Ross will -- I expect will

19    testify about it.

20              THE COURT:  All right, I know there's a defense

21    objection under 403 to that.

22              MR. SMITH:  That's correct.

23              THE COURT:  And it's overruled.

24              (Government's Exhibit No. 4-203 was received in

25    evidence.)
```

822

1          MR. KROMBERG:  Now, I know that Government Exhibit

2    4-106 was admitted yesterday.  However, the stipulation that

3    covers it, I believe, was not admitted, and that's Government

4    Exhibit 12-13, which explains where that exhibit came from.  So

5    I'd like to read Government Exhibit 12-13, which says:  The

6    United States and defendant hereby stipulate and agree that

7    Government Exhibit 4-106 is a photograph that accurately

8    depicts the backpack of defendant Nicholas Young after his

9    arrest on August 3, 2006 (sic).  But the underlying Exhibit

10   4-106 is already in evidence.

11          THE COURT:  All right.

12          (Government Exhibit No. 12-13 was received in

13   evidence.)

14          MR. KROMBERG:  We're on Government Exhibits 8-01

15   through 8-04.

16          THE COURT:  Hold on.

17          MR. SMITH:  8-01?

18          MR. KROMBERG:  I'm sorry, 8-101.  8-101 through

19   8-104.

20          MR. SMITH:  So, Your Honor, we object to these on 401

21   and 403 grounds.

22          THE COURT:  All right, hold on.

23          I'm overruling the objection.  They're in.

24          (Government's Exhibit Nos. 8-101 thru 8-104 were

25   received in evidence.)

823

1          MR. KROMBERG:  So 8-101 through 104.

2          8-108 and Government Exhibits 8-112 through 8-115 are

3    authentic business records of Facebook, Inc.  That's

4    stipulation No. 17.  So we would move in not only 8-101 through

5    8-104 but also Government Exhibit 8-108 and Government Exhibits

6    8-112 through 8-115, which I expect Mr. Gartenstein-Ross to

7    talk about as well.

8          THE COURT:  I'm sorry, go over those again.

9          MR. KROMBERG:  8-101 through 8-104.

10         THE COURT:  Those are already in.

11         MR. KROMBERG:  8-108 and 8-112 through 8-115.

12         MR. SMITH:  And, Your Honor, I believe Your Honor

13   ruled on 8-108 yesterday, so we're not objecting to that, but

14   we object to the balance of the exhibits the government just

15   cited on 401 and 403 grounds.

16         THE COURT:  I'm permitting them in.  Overruled.

17         (Government's Exhibit Nos. 8-108 and 8-112 thru 8-115

18   were received in evidence.)

19         MR. KROMBERG:  8-107, Judge, the government -- there

20   was a stipulation, Government Exhibit 12-18:  The United States

21   and the defendant hereby stipulate and agree that Government

22   Exhibit 8-107 is an accurate screenshot of a Facebook account

23   taken by an FBI agent in 2011.  And we'd move in Government

24   Exhibit 8-107.

25         MR. SMITH:  We have no objection to that.

824

1          THE COURT:  It's in then.

2          (Government's Exhibit No. 8-107 was received in

3   evidence.)

4          MR. KROMBERG:  Now, I believe that stipulation 20 is

5   already in; is that correct?  No?  Okay.

6          Government Exhibit 12-20 says:  The United States and

7   the defendant hereby stipulate and agree that Government

8   Exhibits 10-103 through 10-109, Government Exhibit 10-202, and

9   Government Exhibits 10-203 through 253 were found by the FBI in

10  computer media found in the course of searching the residence

11  of defendant Nicholas Young in August 2016.

12         So at this point, we would like to move in many but

13  not all of the exhibits covered by that stipulation, and I'd

14  like to list the exhibits we'd want to move in.  If the Court

15  has the book starting at 10-103?

16         THE COURT:  All right.  Well, 103 is fine.  That's

17  in.

18         (Government's Exhibit No. 10-103 was received in

19  evidence.)

20         MR. KROMBERG:  And 105?

21         THE COURT:  Yes, that's in.

22         (Government's Exhibit No. 10-105 was received in

23  evidence.)

24         MR. KROMBERG:  106?

25         THE COURT:  I don't really see what relevance that

825

 1  has.  Let's not overload the jury with stuff.

 2          MR. KROMBERG:  If we could put that aside, we'd like

 3  to explain it outside the presence of the jury, if I could.

 4          109?

 5          THE COURT:  I mean, you're going to have to have some

 6  context for these.

 7          MR. KROMBERG:  And that's -- the point is that

 8  Mr. Gartenstein-Ross is -- I'm not publishing them now, Judge.

 9  I'm going to publish them, and Mr. Gartenstein-Ross is going

10  to -- my hope is he's going to explain the context of these

11  things.

12          THE COURT:  I think it would be better then to do it

13  in the context of his testimony.  This is -- it's too abstract

14  at this point.

15          MR. SMITH:  Your Honor, the challenge is that

16  sometimes if it's in the context of the testimony, that an

17  exhibit would be published without --

18          THE COURT:  No, it can't be published until -- in

19  other words, the exhibit would be shown to the witness.  If the

20  witness recognizes or can he discuss it somehow, I think it's

21  better.  I mean, these --

22          MR. SMITH:  And then we'll go through the process

23  during the testimony?

24          THE COURT:  We'll see.  I mean, I know you have a

25  running objection.  If it's all 403, all you have to just do is

826

```
 1    object --
 2              MR. SMITH:  With some of the exhibits that
 3    Mr. Kromberg is citing right now, we actually don't dispute
 4    relevance.  I mean, that would be --
 5              THE COURT:  Well, then you do it in the context of
 6    the testimony.  This is too abstract this way.
 7              MR. SMITH:  Okay.
 8              THE COURT:  All right?
 9              MR. KROMBERG:  Okay.  So there are --
10              THE COURT:  And this particular picture is too
11    abstract.
12              MR. KROMBERG:  That's fine.  So I can go to a
13    different series, a different stipulation, or if we can move to
14    10-303 --
15              THE COURT:  Hold on, I need another book.
16              MR. SMITH:  Just so Your Honor is clear, if you're at
17    the exhibit list 10-20 through --
18              THE COURT:  I'm at 10-303 right now.  That's what he
19    just mentioned.  So don't, don't keep throwing numbers at me.
20              MR. SMITH:  Okay.
21              THE COURT:  All right, 10-303.
22              MR. KROMBERG:  10-303, 304, and 305, the stipulation
23    21, Government Exhibit 12-21:  The United States and the
24    defendant hereby stipulate and agree that Government Exhibits
25    10-303 through 10-305 were found by the FBI on an iPod found in
```

827

1  the course of searching the residence of defendant Nicholas

2  Young in August 2016.

3           MR. SMITH:  And, Your Honor, we don't challenge the

4  relevance of that.

5           THE COURT:  All right, then 303 to 305 are in.

6           (Government's Exhibit Nos. 10-303 thru 10-305 were

7  received in evidence.)

8           MR. SMITH:  If I may, Mr. Kromberg just skipped right

9  over 10-20 -- 10-220 to 10-252.  These are, these are the

10 exhibits we were discussing after trial yesterday, and we

11 object to all of those on 401 and --

12          THE COURT:  He hasn't mentioned those yet.

13          MR. KROMBERG:  I would have mentioned them, but I

14 thought Your Honor didn't want me to mention them now.

15          THE COURT:  In the context of the witness.  This is

16 really tedious for a jury.  It makes no sense to spend our time

17 doing this right now, all right?  So let's get -- let's take

18 our morning break, which will be until eleven o'clock, and then

19 get your witness in, and we'll see how it goes then, all right?

20 All right.

21          (Recess from 10:42 a.m., until 11:05 a.m.)

22                      (Defendant and Jury present.)

23          THE COURT:  Mr. Kromberg, call your next witness.

24          MR. KROMBERG:  The government calls Mr. Daveed

25 Gartenstein-Ross.

Gartenstein-Ross - Direct                                      828

1      DR. DAVEED GARTENSTEIN-ROSS, GOVERNMENT'S WITNESS, AFFIRMED

2                        DIRECT EXAMINATION

3   BY MR. KROMBERG:

4   Q.    Good morning.  Can you please state your full name, and

5   spell your last name for the record.

6   A.    Sure.  My name is Daveed Gartenstein-Ross.

7   Q.    Let me stop you right there.  You need to speak up because

8   the audience is across the room.  So please keep your voice up.

9   If necessary, lean forward into the strip microphone in front

10  of you.

11  A.    Sure.  Sorry about that.  My name is Daveed

12  Gartenstein-Ross, and the last name is spelled

13  G-a-r-t-e-n-s-t-e-i-n-hyphen-R-o-s-s.

14  Q.    Now, forgive my ignorance on a very basic question.  How

15  should I be -- how do you prefer to be addressed:  Mr. Ross?

16  Professor Ross? Dr. Ross?

17  A.    Dr. Gartenstein-Ross.

18  Q.    Dr. Gartenstein-Ross, that's what we'll do.

19          Okay.  Dr. Gartenstein-Ross, can you tell the jurors,

20  how are you employed?

21  A.    I am a senior fellow at a think tank called the Foundation

22  for Defense of Democracies, which focuses --

23  Q.    Keep your voice up.

24          THE COURT:  You need to keep your voice up.

25          THE WITNESS:  Sure.  Sorry about that.  I'm a senior

Gartenstein-Ross - Direct                                          829

1  fellow at a think tank called the Foundation for Defense of

2  Democracies, which focuses on national security issues, and I'm

3  also the chief executive officer of a private firm called

4  Valens Global, which is focused on the problem set of violent

5  non-state actors.

6  BY MR. KROMBERG:

7  Q.    What is your educational background?

8  A.    I have a bachelor's degree from Wake Forest University; I

9  have a Juris Doctor degree from the New York University School

10 of Law; and I have both a Master's Degree and a Ph.D. from the

11 Catholic University of America in World Politics.

12 Q.    How were you employed after college?

13 A.    After college, I was employed by an organization called

14 the Al-Haramain Islamic Foundation, which is a specially

15 designated global terrorist entity today.  As an idealistic

16 young college student, I converted to the Islamic faith and was

17 looking for something to do between college and law school and

18 worked for this organization that was espousing Salafi jihadist

19 ideals and had connections to the al Qaeda network.  Obviously,

20 when I took the job, I didn't know about those connections.

21 Q.    We're going to get later, I hope, to talking -- to

22 defining some of the terms you just used, but did you write a

23 book about your experience?

24 A.    Yes, I did.

25 Q.    And what book was that?

1   A.   It was called *My Year Inside Radical Islam*.

2   Q.   So after your year inside radical Islam, how have you been

3   employed?

4   A.   Well, that experience helped to shape my interest in

5   keeping the country safe.  I moved away both from Islamic

6   radicalism and also ultimately from the Islamic faith, and I

7   was in New York going to law school when the September 11

8   attacks occurred.  That was very transformational for me, and

9   since then, after a brief stint of first clerking on the D.C.

10  Circuit Court of Appeals and then practicing law for a short

11  time, I've been working in the national security sphere from

12  2004 onward.

13  Q.   What have you done in the national security field since

14  2004 in your capacity as a fellow at the Foundation for Defense

15  of Democracies and the Valens Global?

16  A.   A number of different things.  Some of it involves doing

17  work both for private and public entities who need to know more

18  about the threats of terrorism to try to keep both their

19  interests and also the interests of the nation safe.  Some of

20  it is involved doing academic work and writing technical and

21  popular press articles to help to explain the threats that our

22  country faces, including commentary in the media and elsewhere.

23          This has included work for U.S. Customs and Border

24  Protection, for whom I provide strategic analysis of sub-state

25  threats.  I work as a senior advisor through the end of October

Gartenstein-Ross - Direct                                          831

1    of this year.

2            For DHS, the Department of Homeland Security's Office

3    of Community Partnerships, which was at the forefront of

4    countering violent extremism efforts in the United States,

5    which is trying to counter radicalization, training work, work

6    analyzing the threat of sub-state violence in the Horn of

7    Africa for oil and gas clients who need to understand the

8    future shape of insurgencies and --

9    Q.   Let me, let me stop you and ask you about the ICCT.

10   A.   Yeah.

11   Q.   What is the ICCT?

12   A.   The ICCT is the International Centre for Counter-Terrorism

13   at the Hague.  It's a think tank which is partially funded by

14   the Dutch government, and I was a visiting fellow there in the

15   Hague in early 2013, and I've been an associate fellow with

16   that organization since.

17   Q.   What did you do for the ICCT in the Hague in your capacity

18   there?

19   A.   When I was there, I wrote a study on a group called Ansar

20   al-Sharia in Tunisia.  It's a Tunisian jihadist organization.

21   I went to Tunisia and did field research there and subsequently

22   wrote a monograph that was peer reviewed and published by ICCT.

23   Q.   What is Jigsaw?

24   A.   Jigsaw is a think tank associated with the company Google.

25   They think about how Google's applications relate to different

Gartenstein-Ross - Direct                                    832

1    complex problems we face.  The first -- I was a fellow there

2    for a spell, for about a year, and the first work I did for

3    them looked at the extremist group ISIS, the Islamic State's

4    use of the YouTube platform, helping them to think through an

5    interesting pilot program that could be used to counter ISIS's

6    spell for people who were seeking out ISIS propaganda material

7    online.

8    Q.   Have you taught at the university level?

9    A.   Yes, I have.

10   Q.   Where and what?

11   A.   I've taught at Georgetown University in the Security

12   Studies Program, which is a graduate program.  I taught a class

13   called Violent Non-State Actors from 2013 through 2016.

14   Q.   You taught the class, not the violent non-state actors,

15   between 2013 and 2015?

16   A.   Right.  I taught the class about violent non-state actors.

17   I taught the same class at the Catholic University of America

18   at the graduate level.  I taught an undergraduate class also at

19   the Catholic University of America called al Qaeda and Its

20   Affiliates.  That was an undergraduate class.

21        And I also teach in the University of Southern

22   California's Summer Executive Program in Counterterrorism.

23   It's a professional education program, and I've taught there

24   every summer since 2011.

25   Q.   Anything at the University of Maryland?

Gartenstein-Ross - Direct                                        833

1   A.    Yeah.  I was a faculty research assistant at the

2   University of Maryland.  That wasn't a teaching position.  It

3   was for a research project that I was undertaking with other

4   people who were on faculty there.

5   Q.    Where have you lectured on the topics that you have

6   studied?

7   A.    I've lectured a lot of places.  Some of the recent places

8   I've lectured include the Institute of World Politics, which is

9   a graduate program here in Washington, D.C.; at the UCLA Center

10  for Middle East Development's program in Doha, that's in Qatar,

11  I was just there earlier this month; at the George C. Marshall

12  Center at Garmisch, Germany; at Universitat Tüebingen, which is

13  a German university in the City of Tüebingen.

14  Q.    Can we stop you just for a second --

15  A.    Sure.

16  Q.    -- so you can spell what you just said?

17        Because the court reporter probably needs that.

18  A.    Universitat is U-n-i-v-e-r-s-i-t-a-t, and Tüebingen is

19  T-ü-e-b-i-n-g-e-n.

20        And at Uppsala University, which is U-p-p-s-a-l-a, in

21  Uppsala, Sweden; at Georgetown University, at the Center for

22  American Progress, which is a think tank in D.C.; at the Rand

23  Corporation, which is also a partially government-funded think

24  tank based in D.C.; and the like.  There are dozens of others,

25  National Defense College in Abu Dhabi, which is in United Arab

Gartenstein-Ross - Direct                                          834

1    Emirates.

2    Q.    What work have you done regarding the Libyan Civil War?

3    A.    I wrote a peer-reviewed study for the International Centre

4    for Counter-terrorism at the Hague, which was published in

5    early 2015, which provided a history of the Libyan Civil War to

6    that point.

7    Q.    And for whom have you consulted with respect to the Libyan

8    Civil War?

9    A.    With four -- the Joint Improvised-Threat Defeat

10   Organization, JITDO, which is an arm of the U.S. Department of

11   Defense which is trying to anticipate the kind of threats that

12   American service members may face abroad; and also for the

13   Dutch Ministry of Foreign Affairs.  They commissioned a study

14   which I wrote about the crisis we're facing in North Africa,

15   including the Libyan Civil War, and I gave a briefing to the

16   Dutch Ministry of Foreign Affairs, including some follow-on

17   advice about how European policymakers should position

18   themselves.

19   Q.    Where have you taught with respect to the topic of the

20   Libyan Civil War?

21   A.    Where have I taught about the Libyan Civil War?

22   Q.    Where?  Have you taught classes about it?

23   A.    I haven't taught classes about it, no.

24   Q.    Have you provided testimony before Congress on this topic?

25   A.    Yes.  I testified, I believe, on May 1 of 2015 before the

Gartenstein-Ross - Direct                                               835

1   U.S. House of Representatives about the Libyan Civil War.

2   Q.    What work have you done regarding violent extremist

3   movements claiming inspiration from Islam?

4   A.    I've done a lot of work on that.  Some of it is what I've

5   previously mentioned with respect to the work I've done for

6   U.S. Customs and Border Protection.  For that, I've done both

7   strategic analysis and also undertaken training work for U.S.

8   Customs and Border Protection.  The work that I did for Jigsaw

9   also fell into that category, looking at several ways that

10  violent non-state actors claiming inspiration from Islam use

11  Google's various platforms.

12        I've done work for oil and gas companies, including

13  for TULA Oil and Statoil, looking at the growth of jihadist

14  movements or violent Islamist movements in North Africa.

15        I've led training for the U.S. Naval Postgraduate

16  School's LDESP program, Leader Development and Education for

17  Sustained Peace, that's what the acronym stands for, which is

18  preparing troops for deployments abroad.

19        I served as the lead instructor and currently do for

20  the U.S. Army Corps of Engineers' Individual Terrorism

21  Awareness course.  That course is designed to provide people

22  with training, giving them an appreciation of threats they may

23  confront when they go overseas.

24        I have served as a subject matter expert for the U.S.

25  State Department's Antiterrorism Assistance Office.  I designed

Gartenstein-Ross - Direct                                    836

1   and -- four different courses for them, the courses could last

2   for as much as a week or two weeks, and have also delivered

3   some training for that entity.  And I --

4   Q.   What about the Office of -- anything in the Department of

5   Defense?

6   A.   Yeah.  A number of those which I named were Department of

7   Defense.

8   Q.   Right.

9   A.   The U.S. Army Corps of Engineers was --

10  Q.   Office of Naval Research?

11          THE COURT:  Mr. Kromberg, don't cut the witness off.

12          MR. KROMBERG:  Sorry.

13          THE WITNESS:  Yeah.  So I'm a coprincipal

14  investigator for a three-year project for the Office of Naval

15  Research, which is using a big data approach to understand

16  where splits are likely to occur within a variety of militant

17  organizations that are self-described jihadist organizations.

18          And one final thing I'll mention in this category is

19  I worked for the European Union as a strategic communications

20  expert.  I worked in Nigeria helping the Nigerian civil society

21  activists to understand extremist groups' use of online

22  platforms and the role that they could play in countering it.

23  Q.   Have you conducted field work in this area?

24  A.   Yes, I have.

25  Q.   And what, what would that consist of?

Gartenstein-Ross - Direct                                          837

1   A.   So for, for either field research or else professional

2   work, I've been to Iraq, Nigeria, Israel, Tunisia, Turkey,

3   Qatar, and the United Arab Emirates, all of which have either

4   involved interviewing people or going to areas where jihadist

5   groups recruit or interfacing with officials and understanding

6   at either a street level or an official level how that entity

7   is looking at the problem jihadism as it relates to their own

8   interests.

9   Q.   For whom have you consulted on this topic, or is that --

10  have you covered that?

11  A.   Yeah, I think I've covered most of the entities who I've

12  consulted for on that topic.  I mean, there are, there are

13  others as well.

14  Q.   NATO?

15  A.   Yeah, NATO is one which I've done a couple of projects for

16  both, both, you know, both, number one, for NATO, putting

17  together a new way that they can undertake monitoring and

18  evaluation of counterterrorism capacity building and more

19  recently developing software for them which relates to that

20  mission.

21  Q.   Oh, sorry.  Have you provided testimony before Congress on

22  this topic?

23  A.   Yes.  I've testified before the U.S. Congress about a

24  dozen times on this topic.

25  Q.   Have you testified before in court as an expert on this

Gartenstein-Ross - Direct                                      838

1    topic?

2    A.    I have.

3    Q.    Okay.  And where was that?

4    A.    I testified late last year in the District Court of the

5    District of Columbia on the *Foley v. Syrian Arab Republic* case.

6    That was a civil lawsuit where the plaintiffs were suing the

7    Syrian government for its sponsorship of what I call the

8    Zarqawi network, which is the network that would develop into

9    the group known as ISIS.

10             And I've testified as well in a number of different

11   immigration/asylum cases as an expert witness on militant

12   groups or country conditions.  I've testified on the Taliban in

13   Afghanistan, on al Qaeda's presence in Kenya; and finally, I've

14   testified in five different asylum cases on the Somali militant

15   group Al-Shabaab, which is a part of the al Qaeda network.

16   Q.    Have you -- what, if any, books or monographs have you

17   authored on this topic?

18   A.    I've authored -- I've been the author or editor of 22

19   different books and monographs.  Recent ones I wrote include

20   *Islamic State 2021:  Possible Futures in North and West Africa*,

21   which is a monograph published by the Foundation for Defense of

22   Democracies; *The Islamic State's Global Propaganda Strategy*,

23   which was published in 2016 by ICCT, the Hague; *The War Between*

24   *the Islamic State and Al Qaeda*, which was originally written

25   for U.S. Special Operations Command Central and was then

1    republished by the New America Foundation, which is a

2    D.C.-based think tank; *The Crisis in North Africa*, which I had

3    mentioned before.  That was funded by the Dutch Ministry of

4    Foreign Affairs and then was published by a Dutch institute

5    called the Clingendael Institute.  *Ansar Bayt al-Maqdis's Oath*

6    *of Allegiance to the Islamic State*, it's about how an Egyptian

7    jihadist group ended up taking an oath of allegiance to ISIS.

8    That was published in 2015 by Wikistrat.  *Bin Laden's Legacy*,

9    which was published in 2011 by John Wiley & Sons.

10           That's a relevant selection of some of the monographs

11   I've authored.

12   Q.   What work have you done regarding white and the neo-Nazi

13   movement?

14   A.   I've done a bit of work relevant to that.  I've written a

15   couple of technical publications, "Leadership v. Leaderless

16   Resistance" and "Assessing the Militant White Separatist

17   Movement."  I've written on that in the popular press, and some

18   of my professional work has covered this.  This is -- it has

19   been part of the class I taught at Georgetown at the graduate

20   level.  It's been part of the, two of the courses that I

21   designed for the State Department's Office of Antiterrorism

22   Assistance, including one that looked at prison inmate

23   radicalization, and it's been part of the U.S. Army Corps of

24   Engineers' Individual Terrorism Awareness course, where I

25   looked at this threat for the NORTHCOM, or North America

1   Combatant Command area of operations.

2   Q.    Directing your attention to your work regarding

3   radicalization, can you tell us what you have authored on this

4   topic on radicalization processes?

5   A.    The main thing I authored is an empirical study published

6   in 2009 called *Homegrown Terrorists in the U.S. and U.K.*, which

7   looks at 119 different cases of radicalization in the jihadist

8   context.   I published a case study on this on a man named

9   Carlos Bledsoe, who attacked an Army-Navy Recruiting Center in

10  Little Rock, Arizona, which involved extensive field research

11  and interviews.   It was published in the peer-reviewed journal

12  *Terrorism and Political Violence*.

13          I wrote a piece that appeared in the German journal

14  Der Bürger im Staat, which looks at -- sorry, it's spelled

15  D-e-r B-ü-r-g-e-r i-m, and the last word is Staat, S-t-a-a-t --

16  which looks at homegrown terrorism and radicalization in the

17  context of the United States.

18          I've written --

19  Q.    I'm sorry, was that in German?

20  A.    Yeah, it appeared in German.   I, you know, I don't speak

21  German.   They translated it.   I learned enough to kind of see

22  where there were mistranslations, but it appeared in German.

23          Then a number of different reviews, book reviews of

24  major works in this area, including for technical journals like

25  the *Journal of the Association for the Study of the Middle East*

Gartenstein-Ross - Direct                                              841

1    *and Africa Book Notes*, and for *Middle East Quarterly.*

2    Q.   Have you testified before Congress on this topic?

3    A.   Yes, I did.

4    Q.   Do you recall how many times?

5    A.   Only once.

6    Q.   Have you --

7    A.   No, I'm sorry, that's inaccurate; I apologize.  I

8    testified on this topic on three different occasions before the

9    U.S. Congress but --

10            MR. SMITH:  Your Honor, I object to the witness

11   reading documents.

12            THE COURT:  Is that your CV that you're looking at?

13            THE WITNESS:  Yeah, it's the CV.

14            THE COURT:  All right.  You should not be looking at

15   it unless you absolutely cannot remember, and then ask for

16   permission to take a chance to refresh your memory.

17            THE WITNESS:  Sure.  I apologize.

18            THE COURT:  All right.

19   BY MR. KROMBERG:

20   Q.   Dr. Gartenstein-Ross, how do you conduct your research?

21   A.   I conduct my research through a comparative method,

22   primarily looking at primary sources related to the

23   organization in question.  I read as much as I can from various

24   primary sources, including statements they've put out,

25   communiques that have been captured, and information made

Gartenstein-Ross - Direct                                        842

1   available in government and other investigations.

2           Secondly, I'll compare that against secondary source

3   material to see whether my conclusions square with those of

4   others in the field; and then I also track my analytic record,

5   that is, anticipatory analysis and other areas through a

6   tracking system to see if what I'm anticipating matches events

7   on the ground.

8   Q.    How in your field does one evaluate competency?

9   A.    I think there's a few ways to evaluate competency.  One

10  way to evaluate competency is based on technical detail,

11  whether someone understands the movements that they're looking

12  at.  Secondly, there's competency that relates to specific

13  projects.  So for the Office of Naval Research, for example,

14  which we've mentioned before, it's a big data project, and

15  competency relates to both accurately coding information

16  related to militant organizations and also understanding the

17  way in which that relates to a big data-based analysis for it.

18          A third way one can evaluate competency is

19  particularly in the area of anticipatory analysis, which is

20  basically a predictive record, looking at when someone predicts

21  that a militant group will grow or shrink or looking at when

22  someone predicts certain actions within an organization, that

23  it will split or that it will join ISIS or that it won't,

24  whether someone's predictions are actually mapping with how

25  events on the ground develop.

1          I think those are all relevant ways to judge

2   competency.

3          MR. KROMBERG:  Your Honor, at this point, I'd ask

4   that Dr. Gartenstein-Ross be designated an expert on violent

5   extremist movements claiming inspiration from Islam, white

6   separatists and the neo-Nazi movement, radicalization

7   processes, and the Libyan Civil War.

8          THE COURT:  All right.  Any objection?

9          MR. SMITH:  We do object, Your Honor, but I think it

10  would be more efficient to conduct voir dire and

11  cross-examination at the same time so we don't split up the

12  testimony.

13         THE COURT:  Well, I'm finding this is sufficient that

14  I'm going to deem him to be an expert.  And what that means,

15  ladies and gentlemen -- and certainly you can cross-examine

16  him -- we normally don't let witnesses testify as to their

17  opinion about any particular issue in a trial, but we make an

18  exception for those persons who either through education or

19  experience have developed a certain amount of expertise in an

20  area that the jury might not normally have much information

21  about.

22         You, however, are the triers of fact.  It's totally

23  up to a jury to decide how much, if any, of any expert's

24  testimony you want to accept.  In other words, you are free to

25  reject any bit of an expert's testimony if you find it's not

Gartenstein-Ross - Direct                                    844

1    adequately supported by facts or if it's contradicted by other

2    evidence in the case.

3            So with that understanding, we allow -- we will allow

4    this witness to testify as to his opinions within the relevant

5    areas for which he's been certified, and I do find all four

6    areas, there's adequate expertise.

7            MR. KROMBERG:  Thank you, Your Honor.

8    Q.   Dr. Gartenstein-Ross, when you were describing your

9    personal history, you mentioned the term "Salafi" in the

10   context of the Al-Haramain Foundation.

11   A.   Yes.

12   Q.   Can you talk about that again, but this time describe what

13   you -- what the term "Salafi" means so that the jurors have

14   some sense of what -- who it was you were working for?

15           THE COURT:  Let's spell it, too.  Spell the term,

16   please.

17           THE WITNESS:  Sure.  "Salafi" is spelled S-a-l-a-f-i.

18           THE COURT:  All right.

19           THE WITNESS:  And "Salafi" refers to an austere

20   Islamic religious movement.  This is the term they use to refer

21   to themselves.  It refers to the first three generations of

22   Muslims.  The term "Salaf us Salih," S-a-l-i-h is the second

23   word there, refers to the pious predecessors.  Salafis believe

24   that that --

25           MR. SMITH:  Objection.  Relevance.

Gartenstein-Ross - Direct                                      845

1              THE COURT:  Overruled.

2              THE WITNESS:  Salafis believe that Islam has been in

3     a state of decline since the first three generations, and so

4     they seek to return to a religious practice that to them

5     comports with those first three generations.  It tends to be in

6     general variant rules based on outlook, and there are multiple

7     streams of Salafism.

8     BY MR. KROMBERG:

9     Q.   What relationship is there between Salafism and the modern

10    Islamic terrorism?

11    A.   Most of the current Islamic terrorist groups fall under a

12    particular strain of Salafism called Salafi jihadism.  There's

13    other ways to understand Salafism.  Not all Salafis are

14    jihadist, but the jihadist strain of Salafism believes that the

15    world situation is so dire for a variety of reasons, including

16    political reasons and reasons related to, you know, falling

17    from the right practice of religion and needing to install

18    religious governance, that they believe that, that violence is

19    justified.  That is what they -- that is what they call jihad.

20    Q.   But is it correct -- you just said that not all people who

21    follow Salafism believe in violence today.

22    A.   That's absolutely correct.  Not all of them do.

23    Q.   Okay.  So can we please tell the jurors what ISIS is and

24    explain the background of how it came to be and where it is

25    now?

Gartenstein-Ross - Direct                                        846

1   A.    Sure.  ISIS, it's a term that stands for the Islamic State

2   of Iraq and al-Sham, a-l-hyphen-S-h-a-m.  It's a group that

3   split from al Qaeda to become its own separate organization.

4            When we look at the history of what ISIS is, the kind

5   of founding figure within ISIS is a man named Abu Musab

6   al-Sarqawi.  Do you need me to spell that?

7   Q.    Please.

8   A.    Sure.  A-b-u, second name M-u-s-a-b, last name

9   a-l-hyphen-S-a-r-q-a-w-i.

10           Abu Musab al-Sarqawi was a long-time militant going

11  back to the 1990s.  He's of Jordanian origin.  He had been in

12  Afghanistan at a time when Afghanistan was mired -- well, as it

13  still is today -- in civil war.  After training with militants

14  in Afghanistan, he returned to Jordan and was jailed for some

15  time.

16           He established his militant organization, which he

17  called Jamaat a-l-hyphen-T-a-w-h-i-d.  Jamaat al-Tawhid, it was

18  an organization that was originally in jail.  After he was

19  released, he then, you know, he was released around the time

20  the 9/11 attacks occurred.  He looked to establish a jihad, an

21  organization that would take part in the Iraq War.

22           The organization in Iraq came to be known as al Qaeda

23  in Iraq.  Both of those organizations were designated by the

24  U.S. government --

25  Q.    When you say "both of those organizations," which are you

Gartenstein-Ross - Direct                                              847

1    referring to?

2    A.    So Jamaat al-Tawhid and al Qaeda in Iraq, you know,

3    they're arguably the same organization, but once we got to the

4    point -- but there were some changes, right?  When it became al

5    Qaeda in Iraq, there were other insurgent movements after the

6    U.S. invasion that joined and became a part, and this

7    amalgamation was known as al Qaeda in Iraq.

8          So, you know, there's some debate about which one --

9    where the designation began, and U.S. government documents kind

10   of name them differently, but they're only a few months apart.

11   Both of those organizations were separately designated.

12         After that --

13   Q.    When you say "designated," what do you mean by

14   "designated"?

15   A.    So a designation is when the U.S. government -- and the

16   entities responsible are the State Department, Department of

17   the Treasury, and the U.S. Department of Justice -- based on

18   the best information available, determine that an organization

19   is a foreign terrorist organization.  At that point, it is

20   illegal for U.S. citizens to contribute to that organization or

21   materially support it.

22   Q.    Can I interrupt you for a moment?  Is that different from

23   what Al-Haramain was designated as when you were working --

24         MR. SMITH:  Object to the expert defining the law.

25   An issue and legal opinion --

Gartenstein-Ross - Direct                                          848

1           THE COURT:  Overruled.  He's an expert.  He has a law

2    degree.  He can do that.

3           MR. SMITH:  We object to any expert --

4           THE COURT:  The objection is overruled.

5    BY MR. KROMBERG:

6    Q.   Can you explain, when you were talking about the

7    designation, is that the same designation that Al-Haramain,

8    where you worked, was?

9    A.   Yeah, largely.  And there's two different designations.

10   One of them is a foreign terrorist organization for an entity

11   that's entirely foreign.  The other is a specially designated

12   global terrorist.

13           Al Qaeda in Iraq was designated as both, and so it

14   was designated in 2004.  Thereafter, at one point, al Qaeda in

15   Iraq became the dominant military force in Iraq's Anbar

16   Province.  Ultimately, it engaged in very awful forms of

17   torture.  It imposed a version of sharia, or Islamic law, which

18   didn't comport with what Anbari citizens had known.

19           There was a resulting uprising against them known as

20   the Sahwa, S-a-h-w-a, and both this uprising by Sunni Muslims

21   along with a surge in U.S. troops and the U.S.'s turning

22   towards population-centered counter-insurgency, which was a

23   technique of trying to win over the population, helped to cut

24   al Qaeda in Iraq down to size.

25           By 2009, it was a former shell of its former self,

Gartenstein-Ross - Direct                                          849

1    but then it ended up getting revived based on a few different

2    factors.

3              Based on the -- so al Qaeda in Iraq is a Sunni

4    organization.  The government of Iraq is dominated by Shias,

5    which is a different Islamic sect.  The Shia government never

6    succeeded in really incorporating Sunnis into the new structure

7    in government in Iraq.  This isolated the Sunni community.

8              Further, you had a civil war break out in Syria which

9    helped to breathe new life into this al Qaeda in Iraq

10   organization.

11             It took on a number of different names from 2006

12   onward, but fundamentally, it remained the same organization,

13   and this is actually shown in the designations.  Rather than

14   redesignating ISIS, which is the name that the group took on

15   prior to taking on just the name the Islamic State, rather than

16   designating these as new organizations, the U.S. government

17   updated the designation to show that al Qaeda in Iraq was now

18   operating under a new name; in other words, there was

19   organizational continuity.

20             In 2014, in February, ISIS, which had previously been

21   a part of al Qaeda, was expelled from the al Qaeda organization

22   by al Qaeda's leadership after going through a number of

23   arguments with them which amounted to turf wars.  Then in June

24   2014, it undertook this massive offensive from Syria, where it

25   was based at the time around a city called Raqqa into Iraq.

Gartenstein-Ross - Direct                                          850

1   Q.   Let me stop you.  So Raqqa is R-a-q-q-a?

2   A.   That's correct.

3   Q.   Okay.  I'm sorry for interrupting you.  Please go ahead.

4   A.    It captured major cities including Mosul most

5   significantly, controlled territory around the size of Great

6   Britain, and by the end of June of 2014, ISIS, which obviously,

7   based on how much it was able to capture, was very militarily

8   powerful, announced that it had reestablished the Caliphate.

9   Q.   Okay.  Now you've hit on a term we need to -- you need to

10  explain.  What is the Caliphate?

11  A.    So the Caliphate, the term "caliph," it means successor.

12  A Caliphate was established after the death of the Prophet

13  Muhammad, the Prophet Muhammad being the key religious figure

14  within the Islamic faith.

15       And, you know, thereafter, there were often competing

16  Caliphates over the course of the 1,400 years that followed,

17  but what everyone agrees upon, and this is particularly of

18  resonance to jihadists, is that the Caliphate ended in the

19  1920s, when the Ottoman Empire collapsed, and is replaced with

20  the modern Republic of Turkey, which is a secular state.

21       This is referred to numerous times by various

22  jihadist figures, including Usama Bin Laden and others, as

23  being one of the greatest crimes.  And so jihadists for a long

24  time have sought to reestablish the Caliphate.

25       When one looks at things like al Qaeda's 20-year

Gartenstein-Ross - Direct                                          851

1   battle plan against the West, one of the key steps in that

2   plan, which is a plan fashioned by a high-level al Qaeda leader

3   named Saif al-Adl, S-a-i-f, last name a-l-hyphen-A-d-l, you

4   know, it -- one of the key steps there is reestablishment of

5   the Caliphate, which to them means that you'd have a single

6   body, not a state but a single body ruling over the vast

7   majority of the world's Muslims.

8            That to them is what the Caliphate is, not just a

9   political body but a political, a political/religious body,

10  where it incorporates their very strict version of Islamic law

11  and imposes that on the population under its control.

12  Q.   So what relationship does the -- would the Caliphate have

13  to existing nation states?

14  A.   It would -- it's supposed to supplant all existing nation

15  states.

16  Q.   All right.  So when was the Caliphate declared?  You

17  were --

18  A.   At the end of June 2014.

19  Q.   Okay.  And who declared it?

20  A.   It was declared in an announcement by Abu Mohammad

21  al-Adnani, A-d-n-a-n-i, who was the spokesman for ISIS, and Abu

22  Bakr al-Baghdadi also echoed that announcement.  Abu Bakr

23  al-Baghdadi is the, according to ISIS, is the caliph or the

24  leader of the newly established Caliphate.

25  Q.   How noteworthy an event in the Muslim world was the

Gartenstein-Ross - Direct                                     852

1  declaration of the Caliphate?

2  A.   Well, it was highly noteworthy but not in the sense that

3  people saw it as legitimate.  It was noteworthy in the sense

4  that, number one, ISIS had come to control an extraordinary

5  amount of territory by this time.  Number two, from the very

6  outset, it was committing the kind of atrocities that were

7  rarely seen, raging from beheadings to sex slavery to literal

8  cases of genocide.

9          Number three, in declaring the Caliphate, they had

10  declared all other entities, including nation states and

11  jihadist groups, to be rendered illegal.  To them, because only

12  the Caliphate had legitimate religious legitimacy, every other

13  entity was not legitimate and was, in fact, an enemy to be

14  conquered.

15          It was significant because throughout the region,

16  people understood that this meant that not only would the

17  Caliphate -- the self-proclaimed Caliphate seek to expand, but

18  also it was going to try to recruit among citizens of various

19  countries to try to get them to carry out terrorist attacks,

20  which ultimately, you know, we've seen a significant increase

21  in terrorism not just in the Middle East but in Europe and here

22  in the U.S. linked to ISIS's rise and declaration of a

23  Caliphate.

24  Q.   So what were the arguments in favor of the Caliphate among

25  Muslims -- and let me focus on Muslims in the United States, to

Gartenstein-Ross - Direct                                            853

1   the extent that you could generalize that way.

2   A.    So the arguments in favor of the Caliphate were, number

3   one, that it controlled sufficient territory; number two --

4   Q.    Sufficient territory to mean it's legitimate?

5   A.    Yeah.  Sufficient territory to be a legitimate political

6   entity.

7           Number two, there's requirements for who a caliph can

8   be.  One of them involves the ancestry of the caliph.  He has

9   to be from the Quraishi Tribe.  It's Q-u-r-a-i-s-h-i.

10          MR. SMITH:  Objection.  Relevance.

11          THE COURT:  Well, I think at this point, you know --

12          MR. SMITH:  Quraishi Tribe.

13          THE COURT:  Just a second.  Although it's very

14  interesting, I think we have to keep this focused on the issues

15  relevant to this case, all right?  So I'm going to sustain that

16  objection.

17  BY MR. KROMBERG:

18  Q.    All right.  Dr. Gartenstein-Ross, how fast -- focusing on

19  2014-2015, how did the, how did the size, the geographical size

20  of ISIS change?

21  A.    It expanded from 2014 -- it expanded during the course of

22  2014.  As 2015 began, it was a bit rudderless for a little

23  while.  Then in May of 2015, it -- this is in Iraq-Syria.  In

24  May of 2015, it engaged in an offensive which captured three

25  major geographic areas.  Two of the significant ones were the

Gartenstein-Ross - Direct                                         854

1  City of Ramadi in Iraq and Palmyra in Syria.

2          At the same time, it was also expanding outside of

3  Iraq and Syria.

4  Q.   Such as where?

5  A.   One place is Nigeria, where the jihadist group Boko Haram

6  pledged allegiance to them, and also in Libya, where you had a

7  major group in the City of Derna called the Islamic Youth Shura

8  Council, which pled allegiance to them.

9  Q.   And if I can interrupt, stop you for a second, so what

10 impact did the growth of the Islamic State have on the

11 attractiveness of the, of the Islamic State to Muslims who were

12 wondering whether it was appropriate to support the Islamic

13 State or not?

14 A.   It made it very attractive for a certain subset who were

15 inclined to support jihadism.

16 Q.   And why was that?

17 A.   ISIS really rested a lot of its legitimacy on what you

18 could call a winner's message.  It wanted to show that it was

19 strong, that it was constantly taking territory.  It would --

20 even some of the atrocities that it broadcast to the world,

21 when it beheaded people, when it set people on fire, when it

22 melted them in acid, these were all indications that the

23 organization was strong, which could be seen on the one hand as

24 sticking up against the enemies of Islam.  On the other hand,

25 within kind of a debate within the jihadist movement, they

Gartenstein-Ross - Direct                                          855

1  wanted to show that they had clearly displaced al Qaeda, the

2  organization which they grew out of.

3  Q.   Let's turn our attention, if we could -- in fact, before

4  we step away, what are the other names that ISIS is known by?

5  A.   It's known by a number of names.  Daesh is, is one of

6  them.  It's thought of as a derogatory term.

7  Q.   D-a-e-s?

8  A.   D-a-e-s-h, which is based on an acronym that relates to

9  another term it's known by.  It's known by many as Dawla,

10 D-a-w-l-a, which in Arabic means state.  They call themselves

11 the Islamic State.

12 Q.   How about ISIL?

13 A.   Yeah, that's another term they're known by, which stands

14 for the Islamic State of Iraq and the Levant.

15 Q.   Okay.  Let me turn your attention to the Libyan Civil War.

16 Can you sketch out the history of the, of the war in Libya that

17 was in existence in 2011 and until it -- until today, if that's

18 what it is?

19 A.   Sir, what's the question?

20 Q.   Could you sketch out the history of the war in Libya that

21 was occurring in 2011?

22 A.   So in 2011, early on, you had anti-Gaddafi protests.

23 Q.   Gaddafi was the dictator?

24 A.   Yeah.  Muammar Gaddafi was the Libyan dictator.

25          There were protests which fairly soon escalated into

1  military action against the regime.  There were multiple fronts

2  on which, on which fighting occurred.  Some of the major

3  battles occurred around Misrata.  Benghazi was another city in

4  which Gaddafi was trying to mount a crackdown.  And the U.S.

5  and NATO intervened in this conflict beginning in March of

6  2011, which helped to turn the tide of the conflict.

7          By the end of the year, Gaddafi had been found by a

8  mob and killed, and a new democratic government was being put

9  in place.  That government, however, was never really able to

10 extend its writ across the country, and there was an ongoing

11 civil war which really kicked up in 2013, in part in response

12 to Islamist groups killing civilians around Benghazi.

13 Q.   When you, when you refer to Islamist groups, what do you

14 mean?

15 A.   By Islamist, I refer to groups that seek to forcibly

16 impose Islamic law.

17 Q.   So what were the various factions on the rebel side

18 against Gaddafi in 2011?

19 A.   There were a few different factions -- actually a number

20 of them.  One faction was the Misratan faction, which was

21 centered around the City of Misrata.  They were seen as the

22 truly revolutionary faction.

23          Another major faction was focused around the City of

24 Zintan, Z-i-n-t-a-n.  That was sometimes referred to as

25 counterrevolutionary.  They were anti-Gaddafi, but there were a

Gartenstein-Ross - Direct                                    857

1    lot of remnants of the Gaddafi regime.

2            There were jihadist factions that were a part of this

3    conflict from the very outset.

4    Q.   When you say jihadist factions, what do you mean?

5    A.   I mean factions that ascribe to Salafi jihadism, as

6    previously defined.  In particular around Derna, there was a

7    group called the Derna Brigade which was involved in much of

8    the earlier action, which was a clearly jihadist organization,

9    and then you had some tribal action as well especially in the

10   south of the country.

11   Q.   What was the Abu Salim Martyrs Brigade?

12   A.   The, the Abu Salim Martyrs Brigade is a group that grew

13   out of the afore-mentioned Derna Brigade.  It referred to a

14   slaughter by Gaddafi in the 1990s of over a thousand prisoners

15   at the notorious Gaddafi prison called the Abu Salim prison.

16           The Abu Salim Martyrs Brigade was founded by

17   individuals with connections both to the Taliban and also al

18   Qaeda.  Individuals who were early commanders in it had played

19   a role in sending fighters up to Iraq during the course of the

20   Iraq War to become a part of al Qaeda in Iraq.  Ultimately, the

21   Abu Salim Martyrs Brigade became a part of the umbrella

22   organization called the Derna Mujahideen Shura Council.

23   When --

24   Q.   And when was that, can you say?

25   A.   The Derna Mujahideen Shura Council was founded in, I

Gartenstein-Ross - Direct                                          858

1    believe, late 2014.  It is the 2014-2015 period.

2            But within, you know, within the world of jihadism in

3    this time, you had this intense competition playing out between

4    ISIS and al Qaeda.  ISIS was trying to usurp the al Qaeda

5    network, and al Qaeda was trying to play defense to make sure

6    that ISIS did not become the new dominant jihadist

7    organization.

8            The Derna Mujahideen Shura Council and the Abu Salim

9    Martyrs Brigade ultimately fought against ISIS in Derna and, by

10   the middle of -- by the middle of 2015, were able to largely

11   drive ISIS out of Derna.

12   Q.   So when you were talking before about jihadist groups, how

13   would you characterize Abu Salim Martyrs Brigade on the

14   spectrum of the revolutionary, the counterrevolutionary, the

15   jihadist?  Where, where do they fall?

16   A.   Clearly jihadist.  You know, not only do you have

17   leadership and founders that were affiliated with al Qaeda and

18   the Taliban, but it was also endorsed by al Qaeda in the

19   Islamic Maghreb on more than one occasion, and, you know, al

20   Qaeda organizations, which are -- you know, al Qaeda prior to

21   ISIS was the preeminent jihadist organization, and it doesn't

22   randomly endorse other groups.  It has an expansion strategy

23   where sometimes it expands kind of covertly under other brands,

24   but regardless of whether Abu Salim Martyrs Brigade is a part

25   of al Qaeda, which a number of analysts believe that it is, it

Gartenstein-Ross - Direct                                      859

1   certainly is endorsed by al Qaeda because it fits the Salafi

2   jihadist mood that al Qaeda wishes to promote.

3   Q.   So is the Abu Salim Martyrs Brigade an enemy of ISIS?

4   A.   Ultimately, yes.  It went to war with ISIS.  ISIS in June

5   of 2015 assassinated the head of the Abu Salim Martyrs Brigade,

6   who is also the head of the Derna Mujahideen Shura Council, a

7   man named Salim Darby, S-a-l-i-m D-a-r-b-y, and after they

8   assassinated Salem Darby, the Abu Salim Martyrs Brigade as well

9   as the broader Derna Mujahideen Shura Council coalition that

10  they were a part of went to war with ISIS in Derna and

11  ultimately won that battle with ISIS.  They were able to expel

12  ISIS from the city.

13  Q.   So they were fighting each other.  How do their ideologies

14  differ, if at all?

15  A.   The ideologies are largely the same.  The big point -- the

16  big point of disagreement between them is whether ISIS

17  legitimately established the Caliphate.  Al-Qaeda argues that

18  it did not; ISIS argues that it did.

19        There are some strategic differences between the two,

20  with ISIS being more overtly brutal.  Al Qaeda is also a very

21  brutal organization, but it doesn't advertise its brutality in

22  the same way that ISIS did.  This was a longstanding dispute

23  between the two, going back to Abu Musab al-Zarqawi, as I

24  mentioned before.  When he controlled Anbar Province, al Qaeda

25  leadership warned him about his beheadings and his torture,

Gartenstein-Ross - Direct                                              860

1  asking, "Couldn't you just shoot your captives rather than

2  beheading them?  You would accomplish the same thing without

3  drawing so much public distaste."  So it's a strategic

4  difference.

5            And then you have a lot of personality and

6  organizational differences between them, but both of them

7  believe in establishing sharia law by force, and both of them

8  ultimately believe in reestablishing the Caliphate, though al

9  Qaeda believes that the time hasn't come yet for a Caliphate to

10 be declared.

11 Q.   So I'd like to turn your attention to a particular

12 incident that has come up in the evidence regarding the Jordan

13 pilot.  What would -- what's the reference to the Jordan pilot

14 in 2015 having to do with ISIS?

15 A.   Yeah.  The Jordanian pilot, whose name was Moaz

16 Kasasbeh -- do you need me to spell that?

17 Q.   Please.

18            THE COURT:  Go ahead.

19            THE WITNESS:  M-o-a-z is the first name, and Kasasbeh

20 is K-a-s-a-s-b-e-h.

21            He was a Jordanian pilot who was shot down over ISIS

22 territory.  He was captured by ISIS, and then, you know, as

23 they tend to like to do, they execute their captives on camera.

24 In this case, they executed Kasasbeh by burning him alive.

25 Q.   So I'd like you to take a look at what's been introduced

Gartenstein-Ross - Direct                                          861

1   into evidence as Government Exhibit 1-106.

2           Can we put that on the screen?

3           And there's a, there's a reference -- you should have

4   a screen right next to you, and it should be appearing shortly.

5   And what it's going to reference is what happened in France in

6   January 2015.  Do you see the reference to what just happened

7   in France?

8   A.  No.

9           THE COURT:  No, I don't think you have the right

10  exhibit.

11          MR. KROMBERG:  Let's move on then until we can find

12  the right one.

13  Q.  There was a reference we've heard multiple times about

14  Raqqa, so who controlled Raqqa in 2015?

15  A.  The Islamic State, ISIS.

16  Q.  Now, there was also a reference in the evidence to an

17  attack in Texas in 2015.  Could you describe that?

18  A.  Yes.  This was --

19          MR. SMITH:  Objection to the asking the witness to

20  describe what's in evidence.  I don't -- it appears the

21  government just asked the witness to describe what's in

22  evidence.

23          THE COURT:  Wait.  Are you aware of an incident in

24  Texas related to your study of radical jihadists?

25          THE WITNESS:  Yes, Your Honor.

Gartenstein-Ross - Direct                                            862

1          THE COURT:  All right.  I think that's relevant.

2    Overruled.

3          THE WITNESS:  So in May of 2015, there was an event

4    in Garland, Texas.  It was a rather provocative event, which

5    was a Muhammad art exhibition.  You know, within traditional

6    Islamic beliefs, the person of the Prophet Muhammad should not

7    be displayed in art or otherwise.

8          And so a couple of individuals who self-identified as

9    jihadists named Elton Simpson and Nadir Soofi drove from

10   Phoenix, Arizona, down to Garland, Texas.  They got out of --

11   they had been in touch with a major ISIS recruiter named Junaid

12   Hussain, who spent a lot of time online trying to encourage

13   people to carry out attacks.

14         They drove up to the art exhibition.  It was well

15   protected.  They hopped out of their car with smiles on their

16   faces and started firing their guns.  They shot a security

17   guard in the ankle, but ultimately, both of them were shot and

18   killed soon after they had opened fire.

19         MR. KROMBERG:  So I've been given the correct exhibit

20   number, 1-219.  If you could put it up on the screen?

21   Q.   It refers to something that happened in Paris.  And this

22   is an e-mail on February 16, 2016.

23         MR. SMITH:  Your Honor, we're objecting to --

24         THE COURT:  Wait, wait, wait.  One person speaks at a

25   time, all right?  Now, what is the objection?

Gartenstein-Ross - Direct                                          863

1          MR. SMITH:  The objection is this witness is an

2    expert who may testify about what happened in Texas, but he

3    cannot be asked to interpret the evidence in this case and try

4    to divine the defendant's words and try to figure out what the

5    defendant meant or didn't mean in certain exhibits.

6          THE COURT:  Well, certainly he can explain his

7    understanding of the reference, but whether or not it's the

8    same as what your client understood, I agree, he cannot testify

9    to that.

10         Go ahead.  Overruled.

11   BY MR. KROMBERG:

12   Q.   Did something involving ISIS occur in Paris shortly before

13   February 16, 2016?

14   A.   Yeah.  This appears to be --

15         THE COURT:  No, the question -- you don't need to

16   read the e-mail.  The question is did something happen in Paris

17   slightly before February of 2016 --

18         THE WITNESS:  Yes.

19         THE COURT:  -- related to the issues in this case?

20         THE WITNESS:  Okay.  Thank you, Your Honor.

21         Yes.  A few months before, in November 2015, there

22   was a major urban warfare-style attack in Paris in which about

23   nine different attackers, including suicide bombers and

24   jihadists with guns, made war on the city and succeeded in

25   killing about 130 people in one evening.

Gartenstein-Ross - Direct                                          864

1    BY MR. KROMBERG:

2    Q.    Let's take a look at 6-110-1, which is in evidence.    And

3    there's a reference to Khorasan and De Mahdi.    Can you explain

4    who De Mahdi is and what the Khorasan refers to?

5    A.    Sure.

6              MR. SMITH:   Objection to asking the witness to

7    explain what another witness, a fact witness in this case meant

8    by a certain statement.

9              THE COURT:   Are these, are these terms of art, or do

10   they name people?   What are these, just generically?

11             THE WITNESS:   Yes, they're terms of art.   They're

12   terms of art that derive, Your Honor, from the jihadist

13   movement --

14             THE COURT:   All right.

15             THE WITNESS:   -- and has specific meanings within it.

16             THE COURT:   This expert, he can testify as to what

17   terms mean in that particular movement.

18             MR. SMITH:   He can testify about it, and the proper

19   inquiry would be from Mr. Kromberg:   Are you familiar with

20   the Khorasan?   What is it?   It would not be to pull up an

21   exhibit -- a witness exhibit in this case --

22             THE COURT:   All right, all right.

23             MR. SMITH:   -- and then ask the expert to read off of

24   it.

25             THE COURT:   All right, I agree on that, Mr. Kromberg.

Gartenstein-Ross - Direct                                            865

1    You can argue your case at the end, all right?  But at this

2    point, if there are technical terms you want explained, you can

3    ask it that way.

4              MR. KROMBERG:  That's fine.

5    Q.   Can you explain the term "De Mahdi"?

6    A.   Yes.  De Mahdi, or -- which is a reference to a

7    Messiah-like figure who will come at the end of times and lead

8    the Islamic world in battle, it has different meanings to

9    different Muslims.

10             THE COURT:  How do you spell the word?

11             THE WITNESS:  It's M-a-h-d-i, Your Honor.

12             So it has different meanings to different Muslims.

13   Within the context of Salafi jihadism, it's referring to a

14   figure who will help to usher in significant conquests, and

15   it's tied to the notion of the Apocalypse, the notion of the

16   end times for the world.  It will be a military leader.

17   BY MR. KROMBERG:

18   Q.   How about the Khorasan?

19   A.   Khorasan, which is K-h-o-r-a-s-a-n, is referring to the

20   territory we know as Afghanistan, you know, approximately.

21   It's a figure that -- it's a term that also figures in end

22   times theology for jihadist groups.  There's a reference in the

23   Hadees, the al-Hadees, which are the sayings of the Prophet

24   Muhammad, that at the end times, there will be black banners

25   coming out of Khorasan, and both within al Qaeda and also

Gartenstein-Ross - Direct                                          866

1   within ISIS, there's a belief that this is a reference to

2   jihadist flags.  They believe that they are fulfilling this

3   prophecy.

4   Q.   Let's talk about, if we could switch a little bit to

5   radicalization.  What do you refer to when you say

6   radicalization?

7   A.   By radicalization, I refer to the process by which one

8   comes to accept a militant ideology, one that countenances

9   violence in order to impose what that ideology is.  That and,

10  I'd say, also the process of actually seeing violence as

11  something that is acceptable to undertake in service of the

12  ideology.

13  Q.   What factors have you found are important to whether

14  someone radicalizes?

15  A.   There are a number of different factors.  Two of the major

16  factors which I look at and other scholars look at are

17  ideology, that is, being radicalized into an ideology that

18  itself countenances violence, and political grievance, that is,

19  seeing that the world has done wrong to you or a group that you

20  associated with -- associate with, ending violence is justified

21  in response.

22         There are other trajectories as well.  Sense of

23  adventure has been one.  Money is sometimes an ideology

24  correlating with radicalization, and in some cases, mental

25  illness.

Gartenstein-Ross - Direct                                                867

1   Q.    Are the factors consistent regardless of the ideology to

2   which someone is radicalized?

3             MR. SMITH:  Objection.  Leading.

4             THE COURT:  No.  Overruled.

5             THE WITNESS:  There's, there's debate about that.

6   Generally speaking, within the academic literature on

7   radicalization, a lot of experts try to look for a universal

8   theory of radicalization, one which can explain radicalization

9   to a variety of different ideologies.  I think some of the more

10  recent empirical citizenship suggest that not all ideologies

11  are equal.

12            For some extremist ideologies and in particular

13  there's a study from the University of Maryland which finds

14  that for neo-Nazism and for jihadism, there's more of a

15  proclivity to violence against innocence based on ideology than

16  you'd find, for example, in eco-terrorism or in other kinds of

17  political terrorism.

18  BY MR. KROMBERG:

19  Q.    What ideology have you found is relevant to radicalization

20  to Islamic violence?

21  A.    Well, I find that, that acceptance of neo-Nazi ideology is

22  relevant to acceptance of jihadist violence.

23            MR. SMITH:  Objection.  Relevance.

24            THE COURT:  Overruled.

25  BY MR. KROMBERG:

Gartenstein-Ross - Direct                                          868

1   Q.   Well, before we even get to the neo-Nazi part of it,

2   though, there are -- what other, what other ideologies are

3   relevant to why someone radicalizes to particularly Islamic

4   violence?

5   A.   What other ideologies are relevant?  Oh, do you mean like

6   within the framework of Islamic beliefs?

7   Q.   Yes.

8   A.   So Salafi jihadist ideology is relevant to radicalization

9   violence.

10  Q.   And how so?

11  A.   In that the major groups -- al Qaeda, ISIS -- that want to

12  carry out violence purportedly in service of the Islamic faith

13  define themselves as Salafi jihadists, and looking at, you

14  know, the span of homegrown terrorism cases when I examined

15  them in 2009, I found throughout the sample that evidence of

16  Salafi ideology came up significantly within the people who

17  radicalized to violence or other illegal action in service of

18  the cause.

19  Q.   How is political grievance relevant to radicalization to

20  Islamic violence?

21  A.   Political grievance is relevant in that people aren't

22  always ideologically motivated.  Sometimes they're motivated

23  more by feeling that the world has been unfair.  They might act

24  in service of a cause even if they don't ascribe to the

25  ideology, but sometimes, as scholarship in this field has

Gartenstein-Ross - Direct                                          869

1    found, political grievance and ideology can meld together.

2           In other words, you may feel that the world has been

3    unfair, unjust, and ideology can give shape both to defining

4    who your relevant in-group is, that is, in whose service you're

5    trying to act, to find your relevant out-group, that is, to

6    find who it is is responsible for this terrible state of

7    affairs, and then to find a program of action.  So in that way,

8    political grievance and ideology can work together to motivate

9    one towards violence.

10   Q.   Is the same true with respect to Nazi violence?

11   A.   Yes.

12   Q.   A political grievance -- I'm sorry, is it -- when you just

13   talked about what was relevant to radicalization to -- excuse

14   me, you just talked about how political grievance is relevant

15   to Islamic violence.  Is the same thing true --

16           MR. SMITH:  Objection.  Misstating the testimony.

17           THE COURT:  Why don't you let him finish the

18   question?

19           MR. KROMBERG:  I'll just change the question, Judge.

20   Q.   How is political grievance relevant to Nazi violence, if

21   at all?

22   A.   Political grievance is also relevant to Nazi violence.

23   Q.   What, what significance does hate speech have in

24   radicalization?

25   A.   Hate speech is significant in that it helps to clearly

Gartenstein-Ross - Direct                                          870

1  define who the out-group is against whom violence is justified,

2  and hate speech through dehumanization and marginalization of

3  the out-group can both serve to increase hostility towards that

4  out-group while at the same time lowering the threshold for

5  violence.

6           In other words, we all have somewhat of a natural

7  disinclination to want to do violence to other human beings.

8  Hate speech can help to reduce that disinclination and make one

9  think that violence is either justified or perhaps even a

10 heroic act.

11 Q.   Well, I've got to caution you to not talk too much like a

12 professor, but when you talked about marginalization, what do

13 you mean by marginalization?

14 A.   What I mean by marginalization is in this context,

15 marginalizing a group as unworthy of compassion.  As I said,

16 generally speaking, people have some natural disinclination to

17 want to do violence to other people.

18          When we see them -- when we see another group as evil

19 or sub-human, that could make violence neutral.  You know, if

20 you see another group as being kind of the equivalent of

21 vermin, if you have vermin in your house, you'll exterminate

22 them, and you won't think much about it, and if you've really

23 dehumanized another individual, you may see killing them as a

24 heroic act just based on the group to which they belong.

25 Q.   What impact does one's willingness to support violence in

Gartenstein-Ross - Direct                                                871

1   support of one type of extremism have on one's willingness to

2   support violence in support of another type of extremism?

3   A.   My conclusion is that it has an impact, that if one has

4   ascribed to an extremist ideology, then it's easier to do two

5   things.  One, it's easier to see another extremist ideology as

6   persuasive.  Your threshold for accepting extreme ideas that

7   may even cause harm to others is lowered.  And secondly,

8   especially if you've already seen violence in service of the

9   first as acceptable, it means your threshold for seeing

10  violence as something you'll undertake or support is, is

11  lowered.

12          In both cases, you're more inclined to, having

13  already accepted an extremist ideology, to accept another and

14  maybe even act in service of it.

15  Q.   What -- maybe this is a basic question:  What is Nazism?

16  A.   Nazism, or National Socialism, is a movement associated in

17  particular with Adolf Hitler, who was the founder of this

18  movement, and it was -- it acted in Nazi Germany starting in

19  the 1930s.  Hitler became chancellor in January of 1933.

20  Shortly thereafter, there was a major fire at the Reichstag, or

21  the parliament building, which created a number of emergency

22  decrees.

23          Nazi Germany was an authoritarian state, a

24  totalitarian state, with secret police, clamp-downs on the

25  press.  Its ideology was based upon Aryan racial supremacy.

Gartenstein-Ross - Direct                                                      872

1    They saw the, the German and Nordic peoples as at the top of

2    the racial hierarchy.  They saw other races as inferior.

3            They wanted living space for the Germanic people.

4    This caused invasions of a number of different neighboring

5    countries, you know, Poland, Austria, and others.

6    Q.    And that was World War II.

7    A.    That was World War II.  And ultimately, it was also an

8    anti-Semitic ideology which favored the extermination of the

9    Jewish people, which is another program that Nazi Germany

10   attempted to put into effect and managed to kill millions of

11   Jews.

12   Q.    Did Nazism die when, when Hitler's regime fell?

13   A.    The idea of Nazism did not die.  I mean, today we refer to

14   people who still adhere to that ideology as neo-Nazis.  There

15   are -- there is still a movement that believes in Hitler's

16   ideals and believes that at some point, Nazism as a system of

17   governance can be reenacted.

18   Q.    Is adherence to Nazism inconsistent -- excuse me, is

19   adherence to neo-Nazism inconsistent with adherence to militant

20   Islamism?

21            MR. SMITH:  Objection.  Relevance.

22            THE COURT:  Overruled.

23            THE WITNESS:  So the answer is, is no.  In some ways,

24   it is.  You know, there are, there are certainly very clear

25   surface-level inconsistencies, ranging from Nazis, generally

Gartenstein-Ross - Direct                                      873

1  speaking, will see many Muslims as racially inferior, and on

2  the militant Islamic side, those who don't adhere to the

3  Islamic faith are seen as suspect and ultimately as enemies,

4  but, in fact, there is an enemy-of-my-enemy convergence between

5  the two.

6  Q.   When you say the enemy-of-my-enemy convergence, is that

7  the same as the enemy of my enemy is a friend?

8  A.   Yes, that's correct.  It's a famous statement which

9  justifies people with inconsistent ideas or those who

10 ultimately are enemies temporarily aligning to advance a

11 certain goal.

12 Q.   Is adherence to neo-Nazism consistent with all parts of

13 the Islamic spectrum?

14 A.   Absolutely not.  The Islamic spectrum -- the Islamic faith

15 is a diverse faith, and, you know, the vast majority of Muslims

16 reject neo-Nazism.

17 Q.   Who is -- are you familiar with David Myatt, M-y-a-t-t?

18 A.   Yes.  David Myatt was a leader of a neo-Nazi group called

19 Combat 18.  Neo-Nazis often have letters that congregate with

20 numbers, so 18 there stands for A, which is the first letter of

21 the alphabet, and H, which is the eighth letter.  It's

22 reference to Adolf Hitler.  It's a British neo-Nazi

23 organization which would engage in various acts of

24 terrorization of minority communities.

25         David Myatt ended up converting to militant Islam and

Gartenstein-Ross - Direct                                            874

1   arguing basically for the convergence of the two.  He served as

2   a theoretician for a time, arguing that neo-Nazis, those who

3   ascribe to neo-Nazi ideas --

4           MR. SMITH:  Objection to all of this hearsay.

5           THE COURT:  Overruled.

6           THE WITNESS:  -- should embrace the Islamic faith,

7   because he argued that Muslims would be the best weapons

8   against what he called the Zionists, Jews who in his view were

9   conspiring to, to slyly rule the world.

10  Q.   Who is Steven Smyrek, S-m-y-r-e-k?

11  A.   Steven Smyrek was a neo-Nazi who converted to the Islamic

12  faith, actually to the Shia branch of Islam.  He was arrested

13  in Israel in 1997 for trying to carry out a suicide bombing on

14  behalf of a militant organization known as Hezbollah.

15          He was released in a prisoner exchange.  He allegedly

16  renounced violence, but upon coming back to Europe, he gave

17  interviews in which he talked about how he would gladly be a

18  suicide bomber or die for his cause.

19  Q.   Who is Ahmed, A-h-m-e-d, Huber, H-u-b-e-r?

20  A.   Ahmed Huber was a Swiss journalist.  He was born in the

21  1920s.  He's now dead.  He converted to Islam relatively

22  somewhat late in life, in his thirties, after encountering a

23  number of Algerians who were a part of the Algerian Civil War,

24  an anticolonial war against France.

25          He went then to Egypt to meet with its then

Gartenstein-Ross - Direct                                          875

1    president, Gamal Abdel due Nasser, G-a-m-a-l, last name

2    N-a-s-s-e-r.  At the time, Nasser's Egypt was a haven for a

3    number of ex-Nazis.  Some of them served in the Egyptian

4    government apparatus, and some of the -- some of them helped to

5    train the Egyptian Armed Forces and to train some sub-state

6    groups which were fighting for Arab nationalist causes.

7           According to Huber, Nasser told him some things about

8    Adolf Hitler that led Huber to eventually become an enormous

9    fan of Adolf Hitler.  Huber would propagandize from his home

10   about the need for Nazis and jihadists to work together.  He

11   was a fan not only of Hitler but of Usama Bin Laden.  He saw

12   the 9/11 attacks as, as he put it, an act of counterterrorism;

13   in other words, he saw them as fully justified.

14          And he also was part of a bank called Al-Taqwa,

15   T-a-q-w-a, which was involved in financing terrorism,

16   supporting terrorist groups, and was designated by the U.S.

17   government for these acts.

18   Q.   How about Sascha, S-a-s-c-h-a, Lemansky, L-e-m-a-n-s-k-y?

19   A.   Yeah.  Sascha Lemansky was a former neo-Nazi who ended up

20   taking part in a German-speaking -- can I refer to my notes for

21   a second just to make sure I'm not mixing up two people?

22   Q.   Please.  If you need to refer to your notes, refer to your

23   notes.

24   A.   My apologies.

25          Oh, sorry, yeah.  As I suspected, I was getting my

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

-1158-

1   wires crossed.  Soscha Lemansky was a -- was based in Germany.

2   He had been a neo-Nazi and had, had released videos talking

3   about fighting against immigrants.  He released a YouTube video

4   called "Tips for Fighting Against the Cockroaches."

5           He later converted to Islam in 2014.  He was arrested

6   by Germany for releasing ISIS propaganda videos and admitted

7   that he had planned attacks where he wanted to kill German

8   police officers on ISIS's behalf.

9   Q.  How about Devon, D-e-v-o-n, Arthurs, A-r-t-h-u-r-s?

10  A.  Devon Arthurs was a former Nazi, by his own admission, who

11  earlier this year held up a Green Planet Smoke Shop in Tampa,

12  Florida.  Arthurs held three people hostage for a time and said

13  that this was in retaliation for U.S. foreign policy in Muslim

14  countries.

15          When the authorities arrested him, he admitted to

16  them that he had just carried out a couple of murders.  He told

17  authorities where it had taken place.

18          When authorities went there, the bodies were there.

19  These were former friends of his who were also neo-Nazis who

20  wouldn't respect his new Islamic faith, so he killed them prior

21  to taking hostages at the smoke shop.

22  Q.  How about Thomas Usztics, U-s-z-t-i-c-s?

23  A.  Thomas Usztics was a former neo-Nazi who became a part of

24  a group called Deutsch Taliban Mujahideen.  This was a

25  Germanic-speaking group in Afghanistan that was a jihadist

Gartenstein-Ross - Direct                                              877

1   organization.  He would -- he appeared in a couple of videos

2   for them.  They were associated with a well-known transnational

3   jihadist group called the Islamic Jihad Union.

4           He appeared in a couple of videos propagandizing for

5   them and reached back to German citizens to try to encourage

6   them to materially support this organization.

7   Q.   How about Diego Alvarez?

8   A.   Diego Alvarez is a neo-Nazi based in the Catalan area of

9   Spain, Catalonia.  He worked with a local jihadist cell.  He

10  was not Muslim, but he found based on the idea that the enemy

11  of my enemy is my friend, he found an area to cooperate with

12  them.

13          He helped to arm this cell.  He helped it to select

14  possible targets.  They planned to attack government buildings,

15  police stations, synagogues, a Jewish bookstore.  The plot was

16  broken up before it could be launched by the Catalan Police.

17  Q.   Let me ask you to take a look at an exhibit that's in

18  evidence, Government Exhibit 8-108.  It's a Facebook record

19  with a reference to Emerson Begolly, to a news article about

20  Emerson Begolly.  Are you familiar with Emerson Begolly?

21  A.   Yes.

22  Q.   Are you familiar with -- I don't know if you can tell from

23  that Facebook page where the link is to Emerson Begolly, but

24  tell us about Emerson Begolly.

25          MR. SMITH:  Objection again to asking -- there's no

Gartenstein-Ross - Direct                                    878

1   reason why the expert needs to be asked about the evidence in

2   this case.  He can be simply asked about Emerson Begolly.

3           THE COURT:  I'm going to overrule the objection.

4   Let's go.

5   BY MR. KROMBERG:

6   Q.   Can you -- are you familiar with Emerson Begolly?

7   A.   Yes.

8   Q.   Okay.  Who is Emerson Begolly?

9   A.   Emerson Begolly was a young man in Pennsylvania who had

10  been inculcated into neo-Nazi ideology as a young man.  He

11  converted to Islam and was active on a number of different

12  jihadist forums.  On these forums, you know, even for very --

13  for him tended to be fairly anti-Semitic.  He was really known

14  for his Jew hatred, putting together a few nasheeds,

15  n-a-s-h-e-e-d, or songs talking about killing Jews.

16          He took on a, he took on a nom de guerre, and that

17  was his nom de guerre, al-Shishani, which means The Chechen.

18  He would write under that name in jihadist forums.

19  Q.   And then he was arrested on a terrorism offense?

20  A.   Yeah, he was arrested on a terrorism offense in part for

21  trying to encourage attacks, something he would frequently do

22  on the forums that he was a part of, and ended up biting an FBI

23  agent as he was being arrested.

24          MR. KROMBERG:  So at this point, I'd like to read

25  into evidence Government Exhibit 12-28, which is a stipulation:

Gartenstein-Ross - Direct                                        879

1   The United States and the defendant hereby stipulate and agree

2   that Government Exhibits 14-100 through 14-140 and Government

3   Exhibit 14-180 were found by the FBI on computer media found

4   and searched by the FBI in September 2011 at the residence of

5   defendant Nicholas Young.

6           And we'd like to move into evidence, Judge,

7   Government Exhibit 14-180, and I'd like to ask the witness

8   about an individual referenced on 14-180.

9           THE COURT:  All right, hold on one second.

10          MR. SMITH:  We object to the extent this is a list of

11  Web sites that includes information that is not relevant to the

12  expert's testimony.

13          THE COURT:  Let me take a look at it.

14          Overruled.

15          (Government's Exhibit No. 14-180 was received in

16  evidence.)

17  BY MR. KROMBERG:

18  Q.   So take a look, if you would, at the screen.  You should

19  be able to see 14-180.  And do you see a reference there to

20  Alois Brunner?  A-l-o-i-s Brunner, B-r-u-n-n-e-r.

21  A.   Yes.

22  Q.   Who was Alois Brunner?

23  A.   Alois Brunner was a figure in Nazi Germany.  He was close

24  to Adolf Eichmann, who ended up going to Syria.

25  Q.   After the war?

Gartenstein-Ross - Direct                                          880

1    A.    After the war.  This is when a number of Nazi war

2    criminals -- and he was considered to be a war criminal --

3    ended up fleeing the area.  He cooperated with the Syrian

4    regime.  According to journalists who visited Syria like Robert

5    Fisk, he'd taken part in establishing some torture devices for

6    them, and he had been a convert to Islam.

7    Q.    How about are you familiar with Johann von Leers,

8    J-o-h-a-n-n, von, v-o-n, Leers, L-e-e-r-s?

9    A.    Yeah, Johann von Leers.

10   Q.    Who is that?

11   A.    He was a propagandist for Hitler during Nazi Germany who

12   then took up residence in Egypt after he fled.  He converted to

13   Islam, taking on a Muslim name -- or an Arabic name, and helped

14   to propagandize for the Nasser regime.

15          There was at the time, you know, significant tension

16   ranging on the state of outright warfare between the State of

17   Egypt and the State of Israel, so a lot of the anti-Semitic

18   propaganda which he had produced as a part of the Nazi Germany

19   regime he was able to repurpose and expand upon for Egypt.

20          MR. KROMBERG:  Your Honor, at this time, we'd like to

21   show the witness -- move into evidence Government Exhibit

22   10-230, which has been covered by a stipulation already in

23   evidence that it was found in the computer media of the -- at

24   the defendant's residence in August 2016.  I think Your Honor

25   has seen this before.

Gartenstein-Ross - Direct                                          881

1              MR. SMITH:  Objection.

2              THE COURT:  I think now it's relevant.  I'll overrule

3    the objection.

4              MR. KROMBERG:  Can you please show 10-230?

5              THE COURT:  So it's in.

6              (Government's Exhibit No. 10-230 was received in

7    evidence.)

8    BY MR. KROMBERG:

9    Q.   Do you see that poster -- or that graphic, 10-230?

10   A.   Yes.

11   Q.   And do you recognize the individual on the left side of

12   the screen?

13   A.   Yes.

14   Q.   And do you know who that is?

15   A.   It's a cartoon depiction of Haj Mohammad Amin al-Husayni,

16   who had been the Grand Mufti of Jerusalem, a figure who took up

17   refuge in Nazi Germany and propagandized on the part of the

18   Nazi regime, including helping to recruit for the SS, which was

19   its elite intelligence unit.

20   Q.   What was Haj Amin al-Husayni's relationship with Hitler?

21   A.   Haj Amin al-Husayni had met with Hitler when he came to

22   Germany.

23   Q.   Hold on, let me try and -- Government Exhibit 10-231,

24   Judge, is covered by that same stipulation, and we'd move it

25   in.

Gartenstein-Ross - Direct                                              882

1          MR. SMITH:  Please don't put it up yet.  Object.

2    403, 401.

3          THE COURT:  Well, now it's relevant, so the objection

4    is now overruled.  231 is in.

5          (Government's Exhibit No. 10-231 was received in

6    evidence.)

7    BY MR. KROMBERG:

8    Q.   So take a look at 231.  Do you recognize that photo?

9    A.   Yes.

10   Q.   And what is that photo?

11   A.   That's -- that photo is, it depicts Adolf Hitler's meeting

12   with Haj Amin al-Husayni.

13   Q.   What did Husayni say that he wanted out of his

14   relationship with Hitler?

15   A.   There were several things that he wanted.  Some of them

16   involved political leadership roles, but the main area of

17   agreement was that he also wanted the extermination of the

18   Jewish people.

19   Q.   What was Haj Amin al-Husayni's relationship to the SS?

20   You just mentioned the SS.

21   A.   He helped to recruit a predominantly Bosnian Muslim

22   division of the SS which aided in Nazi Germany's efforts.  He

23   also wrote a propaganda booklet for -- which went to them

24   called "Islam und Judentum," or "Islam and Judaism," which was

25   a highly anti-Semitic tract encouraging violence against the

Gartenstein-Ross - Direct                                          883

1   Jewish people.

2          MR. KROMBERG:  Your Honor, at this time, we'd like to

3   move into evidence additional photos found on the defendant's

4   computer media in August 2016.  They are Government Exhibit

5   10-232, 236, 237, 238, and 240.

6          MR. SMITH:  Now, Your Honor, we object on 401, 403,

7   and cumulative basis.

8          MR. KROMBERG:  And I hope Your Honor will notice I

9   deleted several of the items that we talked about in this

10  series, that we talked about before.

11         THE COURT:  The exhibits you're trying to enter have

12  not only photographs but printing.

13         MR. KROMBERG:  Right.  And we -- there's additional

14  stipulation about that, about the metadata, Judge, and I

15  believe we've entered that one, but that's -- the stipulation

16  is that the government and the defense agree that the printing

17  on the bottom of those photos is metadata from those pictures

18  that were found on the computer of the defendant at his

19  residence.

20         MR. SMITH:  Again, Your Honor, Mr. Kromberg continues

21  to insinuate that stipulations have anything to do with

22  relevance in this case.

23         THE COURT:  I understand that, but what I want to

24  make sure of is, in other words, where there is a name given

25  and there's a name and then there's a, you know, the JPG --

Gartenstein-Ross - Direct                                          884

 1            MR. KROMBERG:  Name of the file.  That was the name
 2   of the file on -- that is the metadata for that picture.
 3            THE COURT:  All right.  I'm going to permit those in
 4   because the government has cut back on it, so they're all in.
 5            (Government's Exhibit Nos. 10-232, 10-236 thru
 6   10-238, and 10-240 were received in evidence.)
 7            MR. KROMBERG:  Judge, could we publish to the jury --
 8   what one did we just do?  231?  Okay.  Please put up 10-232.
 9   Q.   Do you recognize that picture.
10   A.   Yes.
11   Q.   And what is that?  What is depicted in that photo?
12   A.   That is Haj Amin al-Husayni inspecting the Bosnian Muslim
13   division of the SS.
14   Q.   And please bring up 10-236.
15            And what is that?
16   A.   That's a photo of Haj Amin al-Husayni.
17   Q.   And how about 10-237?
18   A.   That's a photo of Bosnian Muslim members of the, of the
19   Waffen-SS who had been recruited by Husayni, which he recruited
20   for.  They're reading his booklet, "Islam und Judentum," which
21   is "Islam and Judaism."  I had mentioned that before.
22   Q.   When you say Waffen-SS, what is Waffen?
23   A.   The Waffen-SS was units that are part of the battle of
24   World War II.
25   Q.   Was there any significance between Waffen-SS and just SS?

Gartenstein-Ross - Direct                                             885

1   A.   Well, you had different units that were -- you had

2   different units throughout the course of the conflict.  Some of

3   them would be more intelligence units.  Some of them would

4   be battle units.

5              MR. SMITH:  Objection.  Relevance.

6              THE COURT:  I think now we're beyond the field of

7   what we need.  I'll sustain the objection.

8              MR. KROMBERG:  That's fine.

9              So please turn to -- bring up 10-238.

10  Q.   Do you recognize that?

11  A.   Yes.  Those are also Bosnian Muslim members of the SS.

12  Q.   Keep your voice up.

13  A.   Those are also Bosnian Muslim members of the SS.

14  Q.   And 10-240, please.

15  A.   That is a Nazi German propaganda poster depicting,

16  depicting the Mufti with Bosnian Muslim members of the SS.

17  Q.   Okay.  So what is the -- go back to, if we could, 10-230.

18  Can you bring up 10-230?

19              It's on the screen.  What is the point of

20  agreement -- can you tell us what that, what that poster says

21  in German?

22  A.   So "Die Allianz" means the Alliance.

23  Q.   Between?

24  A.   Yeah, from 1939 to 2004.  I don't think there's

25  significance of 2004 other than that may have been the year

Gartenstein-Ross - Direct                                      886

1   that it was put together, but it's indicating the convergence

2   that we had talked about, the idea that between men like Haj

3   Mohammad Amin al-Husayni and the Nazis, here this is taken from

4   a previous Hitler Youth poster which had been used during the

5   World War II era, this is obviously put together much later,

6   but the argument that it's making is that this is an alliance

7   based on the idea of the enemy of my enemy is my friend.

8   Q.   And who is the enemy?

9   A.   The enemy is the Jews.  That's the common -- I mean, the

10  Jews but more broadly the West, democratic societies.  The Jews

11  are a point of hatred, a point of dehumanization, but

12  ultimately, the enemy goes far beyond that.

13         MR. KROMBERG:  Your Honor, at this point, we'd like

14  to bring up and move into evidence 10-241, covered by the same

15  stipulation, that it was, it was found on the defendant's

16  computer at his home in August of 2016.  We are not suggesting

17  that we've agreement that it's relevant, but we --

18         MR. SMITH:  No, Your Honor.  At this point, it's far

19  past cumulative.  It's plain 403 evidence, and we object.

20         THE COURT:  I'm -- I understand, again, the problem

21  here, but I am permitting it in.  Overruled.

22         (Government's Exhibit No. 10-241 was received in

23  evidence.)

24         MR. KROMBERG:  Can you publish 241, please?

25  Q.   Now, Dr. Gartenstein-Ross, can you tell from the, the head

Gartenstein-Ross - Direct                                          887

1  gear of the people in that poster what religion they are?

2  A.    Yes.

3  Q.    And what can you tell us from what they're dressed?

4  A.    They're wearing burkas.   They're Muslim.

5  Q.    What is a burka?

6  A.    A burka is gear that a woman would wear that is meant to,

7  to cover certain parts of the body.   In this case, it's

8  covering everything except for the eyes and probably the hands

9  and the feet.   It's the garment that is over their face -- over

10 their face and head.

11 Q.    Dr. Gartenstein-Ross, what is -- what -- when someone

12 refers to the Zionist conspiracy, what are they referring to?

13 A.    It's a belief that there is a Jewish conspiracy to

14 secretly control the world.

15 Q.    I'd like you to take a look, if you could, at Government

16 Exhibit 10-862, which is not in evidence, but it's covered by

17 the stipulation that it was found at the defendant's house in

18 August --

19         THE COURT:   Don't show it, don't show it yet.

20         MR. SMITH:   Objection.   403, 401.   Your Honor, the

21 point has been made that Mr. Gartenstein-Ross is trying to

22 establish.

23         THE COURT:   I'm going to sustain that objection.   I

24 think at this point, this is getting cumulative and repetitive.

25         MR. KROMBERG:   Okay.

Gartenstein-Ross - Direct                                          888

1              THE COURT:  It's out.

2    BY MR. KROMBERG:

3    Q.   So who is William Pierce?

4    A.   William Pierce is the late leader of an American neo-Nazi

5    group called the National Alliance.

6    Q.   And what -- and what is William Pierce within the National

7    Alliance known for?

8    A.   He's known for a number of things.  In addition to leading

9    the group, he's known for writing a number of fictional novels

10   which depict a domestic race war in extraordinarily violent and

11   gory detail.

12   Q.   What are those books?

13   A.   The books include *Serpent's Walk*, *Hunter*, and *The Turner*

14   *Diaries*.

15              MR. SMITH:  Objection.  Relevance, Your Honor,

16   because there is no document in evidence that is authored by

17   William Pierce.

18              MR. KROMBERG:  Your Honor, we have already in

19   evidence two copies of *Serpent's Walk*, and we've offered

20   *Hunter*, which the defense objected to as irrelevant the last

21   time we did that, and Your Honor said --

22              MR. SMITH:  Mr. Kromberg appears not to know that the

23   books were written under pseudonyms.

24              MR. KROMBERG:  Oh, are you testifying?

25              THE COURT:  This is improper, all right?  Counsel --

Gartenstein-Ross - Direct                                         889

1   again, jury, disregard this conversation between the lawyers,

2   all right?

3           We have seen pictures of what appear to be covers

4   that have those titles on them, but whether they're the actual

5   book or not, I don't think we have that evidence here yet.

6           MR. KROMBERG:  Your Honor, Mr. Campbell testified

7   that he was given a gift of the *Serpent's Walk* and he had it

8   at -- he said this book was the book that was given to him by

9   Mr. Young, and then we introduced the cover of the book that

10  had been seized at the house.  That was the *Serpent's Walk*.

11          And then we gave Mr. Campbell a copy of the cover of

12  *Hunter*, which had been seized at Mr. --

13          THE COURT:  Do you have the books themselves in

14  court?

15          MR. KROMBERG:  Certainly *Serpent's Walk* is here.  I

16  do not know --

17          THE COURT:  All right, what's the exhibit number?

18          MR. KROMBERG:  10-860 and 10-861, Judge.

19          THE COURT:  All right.  Mr. van Roekel, see if you

20  can find the actual book.  I don't want the photograph; I want

21  the book.

22          MR. KROMBERG:  Your Honor, could --

23          THE COURT:  Is it not there?

24          MR. KROMBERG:  It's on the desk.  Right, there we go.

25          THE COURT:  All right.  Hand the book -- I don't want

Gartenstein-Ross - Direct                                          890

1    the picture -- the book to the witness.

2              Have you ever seen that before?

3              THE WITNESS:  Yes.

4              THE COURT:  And how have you seen it?

5              THE WITNESS:  So you mean the physical copy or the

6    book itself?

7              THE COURT:  Have you seen the book itself?

8              THE WITNESS:  This book itself, not this particular

9    copy, no.

10             THE COURT:  Have you seen other copies that look like

11   that?

12             THE WITNESS:  Yes, I have.

13             THE COURT:  Have you read them?

14             THE WITNESS:  Yes.

15             THE COURT:  All right.  You can ask about that.

16             MR. SMITH:  Your Honor, the objection is that the

17   author, William Pierce, is nowhere found on that book.

18             THE COURT:  Do you know who the author of that book

19   is?

20             THE WITNESS:  Yes.  The author is William Pierce.

21             THE COURT:  And how do you --

22             MR. SMITH:  The testimony is prejudicial.

23             THE COURT:  How do you know that?

24             THE WITNESS:  Because it's what -- everyone,

25   including the National Alliance, accepts that William Pierce

1   wrote the book.  It's universally accepted even by his

2   organization.  He wrote all of his books under pseudonyms.

3   Andrew MacDonald is *The Turner Diaries,* here it's Randolph

4   Calverhall, but the National Alliance makes no secret of the

5   fact that he was the author of these books.

6           MR. SMITH:  Your Honor, our objection is based on

7   that there appears to be no evidence that Mr. Young understood

8   who the pseudonymous author of this novel is.  Now the expert

9   is proposing to testify on the background of William Pierce.

10  There's no evidence in this case indicating that Mr. Young knew

11  who William Pierce is.

12          THE COURT:  I'm not so sure it's important whether

13  one knows who the author of a book is or not.  I mean, the

14  question is what is the book and what are its contents.  That's

15  what's relevant to the case, not who wrote it.

16          MR. SMITH:  I believe Mr. Gartenstein-Ross was about

17  to talk about the background and belief that William Pierce was

18  the pseudonymous author of a book.

19          THE COURT:  Yeah, I think we're going beyond the

20  scope.  The book itself speaks for itself.

21          MR. KROMBERG:  Your Honor, well, here are the books

22  by the way.  So there's the one copy from Mr. Campbell, and

23  here are the two copies of *Hunter* and *Serpent's Walk* that were

24  seized.  We have the books.  And what I was going to ask is who

25  published the book, and that would be the National Alliance.

Gartenstein-Ross - Direct                                          892

1   National Alliance is what Mr. Campbell talked about as the

2   neo-Nazi group in America --

3           THE COURT:  You need to stop testifying as well.

4           Do you know who the publisher is of these two books?

5           THE WITNESS:  Yes.

6           THE COURT:  Who is the publisher?

7           THE WITNESS:  The publisher is National Vanguard

8   Books, which is the publishing arm of the National Alliance,

9   William Pierce's organization.

10          THE COURT:  All right.  And these two books were

11  found in the defendant's residence or his backpack?  Where were

12  they found?

13          MR. KROMBERG:  Residence.

14          THE COURT:  All right.  Then the books are in.

15          MR. SMITH:  The books are in.

16          (Government's Exhibit No. 10-860 was received in

17  evidence.)

18          THE COURT:  That's fine.

19          MR. SMITH:  The only objection we're making is that

20  the name "William Pierce" is nowhere found on the document.

21          THE COURT:  I understand.  All right, let's move on.

22  William Pierce is not that important to this case.

23          MR. KROMBERG:  Could I -- do you want me to hold

24  them?

25          THE COURT:  No, you should give it to the court

Gartenstein-Ross - Direct                                          893

1   security officer.  They're part of the record of the case now,

2   and the jury will have access to them.  The jury can open up

3   the folder and look at the books if they want to.

4              MR. KROMBERG:  Okay.  Also at this point, Judge, we

5   move in the exhibits that Mr. Campbell testified that he

6   brought from the meeting he went to with Mr. Young that are

7   13-10 -- excuse me -- 13-101, 102, 103, and 104.

8              MR. SMITH:  And here, Your Honor, the relevance

9   objection is that Mr. Campbell testified that these documents

10  were procured during an academic exercise.

11             THE COURT:  That's fine.  And you can get into that

12  on cross-examination.

13             MR. SMITH:  Thank you.

14             THE COURT:  But 101 through 104 -- did you include

15  105?

16             MR. KROMBERG:  No.  105 is already in, Judge.

17             THE COURT:  All right, 101 through 104 are now in.

18             (Government's Exhibit Nos. 13-101 thru 13-104 were

19  received in evidence.)

20             MR. KROMBERG:  If 105 is not in, it should be, but I

21  think it is.

22             THE COURT:  It's not.

23             MR. KROMBERG:  Okay.  Well, then I move 105 in.

24  Mr. Campbell said that he received it as a gift from the

25  defendant.

Gartenstein-Ross - Direct                                    894

1              THE COURT:  Yes, it's in.

2              (Government's Exhibit No. 13-105 was received in

3     evidence.)

4              MR. KROMBERG:  Thank you, Your Honor.

5     Q.   Now, we're now going to get into a series of exhibits

6     that, that are not in, and I'd like, I'd like to ask the

7     witness about the Government Exhibit 14-100.  We have a

8     stipulation already read in that this is a document that was

9     found on the defendant's computer media during a search.

10             MR. SMITH:  No objection to 14-100.

11             THE COURT:  I'm sorry, 14-what?

12             MR. KROMBERG:  100.

13             (Government's Exhibit No. 14-100 was received in

14     evidence.)

15             MR. KROMBERG:  Could you please bring up 14-100?

16    Q.   Do you know what the *Book of Jihad* is?

17    A.   Yes.

18    Q.   What is the *Book of Jihad*?

19    A.   The *Book of Jihad* is a book by a man writing under the

20    name Ibn Nuhaas, and it's here N-u-h-a-a-s, which outlines

21    selective verses from the Koran counseling warfare against

22    Unbelievers.  This is a book that has been endorsed by both

23    al Qaeda and ISIS in their propaganda.  ISIS at one point said

24    that just as Muslim women living in kafir lands or the lands of

25    infidels read their children *Cinderella* and *Robinhood*, we

Gartenstein-Ross - Direct                                        895

1   should read our children Ibn Nuhaas's *Book of Jihad.*

2           MR. KROMBERG:  I'd like to show the witness, Your

3   Honor, Government Exhibits 10-18 and 10-220 -- excuse me, 10-18

4   and 10-822, which have been stipulated as having been seized

5   from the defendant's residence in August 2016.

6           MR. SMITH:  There is no 10-18.

7           MR. KROMBERG:  10-818.  I'm sorry, 10-818 and 10-822.

8           MR. SMITH:  No objection to 10-818.  The next one was

9   what?

10          MR. KROMBERG:  10-822.

11          MR. SMITH:  No objection to 10-822.

12          THE COURT:  All right, they're both in.

13          (Government's Exhibit Nos. 10-818 and 10-822 were

14  received in evidence.)

15          MR. KROMBERG:  Can you bring up on the screen 10-818,

16  please?

17  Q.   Do you recognize Anwar Awlaki's *Hereafter* series?

18  A.   Yes.

19  Q.   But first, can you please tell us who Anwar Awlaki was?

20  A.   Anwar Awlaki was a leader within al Qaeda in the Arabian

21  Peninsula who had for a time taught and lived in the United

22  States.  He has kind of this career trajectory where when he

23  was in the U.S., he was often thought of as being a moderate.

24  His work received very wide distribution.  It was Salafi in

25  nature.  It was legalistic.

Gartenstein-Ross - Direct                                        896

1          And when he went to Yemen and became a part of

2     al Qaeda overtly, it became much more violent.  It called for

3     terrorist attacks against the United States.  He at one point

4     personally sanctioned one terrorist attack, which was to be a

5     Christmas Day bombing of an airplane.

6          The *Hereafter* is a somewhat important work in that it

7     serves as a bridge between his more moderate phase and his

8     later phase of calling for open warfare.  In the *Hereafter*,

9     Awlaki outlines the end times, and the overarching argument

10    that he makes is that the end times will feature a war between

11    the Muslims and Rome, which he characterizes as the United

12    States and Europe.

13         And so this is where he starts to make that bridge

14    where as part of salvation, part of what one needs to do is to

15    make warfare against non-Believers, especially the West.

16    Q.   Now, I'd like to turn your attention -- well, I first have

17    to get it into evidence -- 14-101 -- Judge, 14-101, 102, 103,

18    104, and 105, I believe, are -- they should be treated

19    together.  There's a stipulation that they were found on the

20    defendant's computer, and we move them into evidence at this

21    time.

22         MR. SMITH:  Object to 101, 102, 103, 104 as

23    cumulative.

24         Oh, did you say 14 or 13?

25         MR. KROMBERG:  14.

Gartenstein-Ross - Direct                                              897

1          MR. SMITH:  14-101, 2, 3, 4?

2          MR. KROMBERG:  14-101, 102, 103, 104, 105.

3          MR. SMITH:  No objection.

4          THE COURT:  All right, 14-101 through 105 are in.

5          (Government's Exhibit Nos. 14-101 thru 14-105 were

6   received in evidence.)

7   BY MR. KROMBERG:

8   Q.   Okay.  So please take a look at 14-101.

9          Oh, there are hard copies of these exhibits, and if

10  we could give them to the witness, I think it would be easier.

11         And are you familiar with *Inspire* magazine?

12  A.   Yes.

13  Q.   Okay.  Can you tell the jury what *Inspire* magazine is or

14  was?

15  A.   *Inspire* is a publication that was published by al Qaeda in

16  the Arabian Peninsula.  Anwar al-Awlaki, who was just

17  mentioned, was one of the two major figures responsible for

18  producing it along with another American named Samir Khan.  As

19  the name somewhat implies, one of the purposes of *Inspire* is to

20  inspire people to carry out terrorist attacks on their own.

21         One of the big sections is called "Open Source

22  Jihad," which had instructions for how people can make bombs,

23  run over people with vehicles that would puncture their skin,

24  methods that seem to have subsequently been used in actual

25  attacks.

Gartenstein-Ross - Direct                                          898

1    Q.   So take a look, if you would, at Government Exhibit

2    14-101, which is the Summer 2010 issue of *Inspire*.   And

3    directing you to page 8, this may be an obvious one, but who is

4    Bin Laden?

5    A.   Usama Bin Laden is the, one of the founding figures in the

6    al Qaeda terrorist organization.

7    Q.   I don't think we have to go more into that.   Let's go to

8    page 11, if you could, and is who is Zawahiri?

9    A.   Ayman al-Zawahiri was at the time this was published the

10   deputy leader of al Qaeda.   Since then, he's been elevated to

11   being the emir following Usama Bin Laden's death.

12   Q.   And page 13, who is Abu Basir?

13   A.   Abu Basir was the head of al Qaeda in the Arabian

14   Peninsula at the time.

15   Q.   Page 26, a prayer from Bin Laden referring to an underwear

16   bomber, who was the underwear bomber?

17   A.   The underwear bomber is a young Nigerian man named Umar

18   Farouk Abdulmutallub.   He had tried to carry out a terrorist

19   attack on Christmas Day of 2009, trying to destroy a plane that

20   had taken a trans-Atlantic flight and was landing in Detroit.

21   He'd hidden liquid explosives in his underpants basically to

22   avoid metal detection.   He was able to get them on board the

23   plane.

24           Fortunately, when he got out a syringe to puncture

25   the liquid explosives, it didn't detonate.   It was obviously

Gartenstein-Ross - Direct                                      899

1   quite painful to him, but passengers were able to wrestle him

2   to a stop.

3           Now --

4   Q.   Okay.  Well, I think we can -- that's probably enough on

5   that.

6           Let's go to page 31.  What is "Open Source Jihad"?

7   A.   Open source jihad is, it's a play on open source coding.

8   Open source coding is when people who, you know, code computer

9   programs put the code out there so that anyone can use it and

10  duplicate it.

11          Just like people do open source coding, al Qaeda's

12  open source jihad was taking the way that they build bombs, the

13  way that they would kill people, and making it available for

14  anyone to use.  In other words, consistent with the name

15  *Inspire*, it was meant to inspire people to make the open source

16  jihad instructions their own.

17  Q.   So the article "Make a bomb in the kitchen of your Mom,"

18  page 33, are you familiar with that article?

19  A.   Yes.

20  Q.   Has that article been effective in inspiring people to

21  make bombs?

22  A.   Yes, it has.

23  Q.   How about page 34, the article "What to Bring When You're

24  Going on Jihad"?

25          MR. SMITH:  Objection.  Cumulative.  Relevance.

Gartenstein-Ross - Direct                                              900

1           THE COURT:  I think there's enough there.

2           MR. KROMBERG:  Okay.

3           THE COURT:  Move on.

4    BY MR. KROMBERG:

5    Q.   Let's go to 14-102, and would it be fair to say that it's

6    similar articles in 14-102, the *Inspire* magazine from Fall

7    2010?

8    A.   Yes.  There are definitely similar articles throughout the

9    run of the magazine.

10   Q.   And go to page 53, if you would.  What is that ultimate

11   mowing machine reference?

12          MR. SMITH:  Objection.  Relevance, 403, cumulative.

13          THE COURT:  Yeah, I think that's -- I'm going to

14   sustain the objection.

15   BY MR. KROMBERG:

16   Q.   Okay.  How about page --

17          THE COURT:  You've made your point with the magazine.

18   Let's move on to something else.

19          MR. KROMBERG:  All right.

20          THE COURT:  Where do you buy those?  Can you go to

21   the local newsstand and buy one?

22          THE WITNESS:  No, they're not available in the local

23   newsstand.  They're -- al Qaeda posted them to the Internet,

24   and so --

25          THE COURT:  Do you download them?

Gartenstein-Ross - Direct                                                901

1           THE WITNESS:  Yes.  They're, they're published

2    electronically.

3           MR. KROMBERG:  And, Your Honor, the stipulation in

4    this case is that they were on Mr. Young's computer.

5           MR. SMITH:  The stipulation was they were acquired

6    from a device that was in the possession of Mr. Young.  That

7    was the stipulation.

8           THE COURT:  Well, more than that, just so the jury is

9    clear and so I'm clear, we have physical exhibits that you were

10   showing to the witness.  I mean, again, I can't see exactly

11   what shape they're in, but he's looking at paper.

12          MR. KROMBERG:  So we printed them out to make it

13   easier for him to look through it.

14          THE COURT:  All right, so I want that clear for the

15   jury.  In other words, the manner in which the government

16   seized them was not the manner in which they're in court, that

17   is, as a paper magazine, like, you know, *Time* magazine.  They

18   were always on -- in electronic format?

19          MR. KROMBERG:  I'm sorry to confuse things, but we

20   did seize one copy that was printed out.  So we have one copy,

21   that is, Government Exhibit 10-8- -- I'll have that number in a

22   moment, but the point is we did seize one copy in hard copy, in

23   paper, and the other -- five copies electronically and one copy

24   in paper.

25          THE COURT:  All right.

1          MR. SMITH:  Your Honor --

2          THE COURT:  I think the jury should understand the

3    difference because what we have on the witness stand are what

4    look like, as I said, a *Time* magazine, a physical piece of,

5    series of pages.

6          MR. SMITH:  And, Your Honor, the defense specifically

7    carved out of the stipulation that the presentation of the

8    evidence that was found on devices in Mr. Young's possession

9    wouldn't accurately reflect how it was seen on Mr. Young's

10   device.  That was not a part of the stipulation.

11         THE COURT:  All right.

12         MR. KROMBERG:  And the paper copy that was seized for

13   which we have a stipulation is 10-850, and we would move that

14   into evidence at this time as well.

15         THE COURT:  There's no objection to that, correct?

16         MR. SMITH:  No objection.

17         THE COURT:  All right.  And do you have 10-850 there?

18   I want to make sure we have it.

19         MR. KROMBERG:  I'm told, Your Honor, that it's

20   outside, and we can bring it in.  We didn't bring all the --

21         THE COURT:  All right.  Well, 850 is -- needs to be

22   here if it's going to be part of the record.

23         THE COURT SECURITY OFFICER:  We have it, Your Honor.

24         THE COURT:  Oh, it's right here.  It's right here.

25         Just, again, so that the jury is clear, what is in my

Gartenstein-Ross - Direct                                        903

1   court security officer's hand, that is 850?

2          MR. KROMBERG:  That is a photograph of the pile of

3   documents.

4          THE COURT:  All right.  No, I don't want that.  I

5   want this.

6          That's the correct evidence.  Substitute that for

7   what is -- yeah.  Give back those papers.

8          I don't think it's correct for the jury to be seeing

9   *Inspire* in this different format, all right?  So -- but 850 is

10  an accurate depiction of how *Inspire* existed physically, not

11  electronically, physically.

12         MR. KROMBERG:  With a black-and-white printer as

13  opposed to a color printer.

14         MR. SMITH:  There is no stipulation or evidence in

15  this case that the electronic versions that were just shown

16  were ever viewed by Mr. Young.

17         THE COURT:  All right, I understand that, and that's

18  a legitimate argument that you can make.

19         MR. SMITH:  Okay.

20         THE COURT:  All right, that's fine.

21         (Government's Exhibit No. 10-850 was received in

22  evidence.)

23  BY MR. KROMBERG:

24  Q.   I would like to turn your attention to 14-104, which is

25  the special edition of *Inspire*.

Gartenstein-Ross - Direct                                        904

1              THE COURT:  All right, so 14-104, we have to give

2    that back to the witness.

3              MR. SMITH:  And, Your Honor, again, we object on the

4    best evidence rule.  This is not a hard copy.  This is a

5    photograph.

6              THE WITNESS:  I'm familiar with that.  I can give it

7    back.

8    BY MR. KROMBERG:

9    Q.   That's fine.  The electronic evidence -- the special

10   edition of *Inspire* magazine, what was that about?

11   A.   It was about a specific plot which had taken place in late

12   2010.  Al Qaeda in the Arabian Peninsula was able to place

13   bombs onboard parcel shipments.

14             MR. SMITH:  Objection.  Relevance, 401, 403.  There

15   is no charged violence in this case.

16             THE COURT:  The case involves, however, an entrapment

17   defense, where predisposition of the defendant is a critical

18   element the government has to establish, and so they're allowed

19   to put on evidence of that predisposition existing before any

20   government agent got involved, and unfortunately, that leaves

21   the door open to this type of evidence.

22             But the defendant is not charged with a crime of

23   violence, ladies and gentlemen, and as I've told you many times

24   before, you'll have to be very careful how you evaluate the

25   relevance of this evidence to the issues in this case.

Gartenstein-Ross - Direct                                          905

1          MR. KROMBERG:  Thank you, Your Honor.

2          THE COURT:  I'm overruling the objection.

3  BY MR. KROMBERG:

4  Q.   The headline is "$4,200."  What is that a reference to?

5  A.   It's a reference to how much this plot cost them to

6  undertake.

7  Q.   And how much did *Inspire* claim, did al Qaeda in the

8  Arabian Peninsula claim that it cost the western world to

9  respond to this $4,200 plot?

10  A.   Millions of dollars or more.  Because they had succeeded

11  in disguising bombs as printer cartridges, which are very

12  difficult to detect, and beyond that, when we send parcels via

13  UPS or FedEx, which these bombs made their way onboard UPS and

14  FedEx planes, not all the parcels are, are screened ahead of

15  time.  It would be far too expensive.

16          So the argument that they made in this issue was that

17  on the one hand, the West can spend millions upon millions of

18  dollars and bleed itself into bankruptcy to try to defend

19  against plots like this.

20          MR. SMITH:  Objection.  Relevance.

21          THE COURT:  I think now it's gone too far, and it's

22  also lunchtime, so we're recessing until two o'clock.  Thank

23  you.

24          MR. KROMBERG:  Thank you, Your Honor.

25          (Recess from 1:06 p.m., until 2:00 p.m.)

1              A F T E R N O O N   S E S S I O N

2                      (Defendant and Jury present.)

3              THE COURT:  All right, Mr. Kromberg.

4              MR. KROMBERG:  Thank you, Your Honor.

5                      DIRECT EXAMINATION (Cont'd.)

6    BY MR. KROMBERG:

7    Q.   Good afternoon, Dr. Gartenstein-Ross.  Have you -- do you

8    know who the individual referred to as Maqdisi is?

9    A.   Yes.

10   Q.   Who is that?

11   A.   Abu Muhammad al-Maqdisi is a well-known jihadist ideologue

12   associated with al Qaeda, someone who has long had connections

13   with the organization and has been -- he originally, though,

14   actually founded the Jama'at al-Tawhid organization.

15   Q.   Let me -- I don't know that it's necessary to go into -- I

16   mean, you could go into more detail, but I'm thinking that we

17   don't need to.

18   A.   That makes sense.  To keep what I was saying brief, he

19   founded the organization that would later become ISIS, though

20   he's allied with al Qaeda.

21   Q.   Okay.  I'd like you to turn to the *Inspire* -- I have one

22   more question for you on *Inspire* magazine, 14-105.  I'd like

23   you to turn to page 36.

24              What is the Clown of the Tawaghit?

25   A.   So "tawaghit" refers to tyrants, and he's referring to

Gartenstein-Ross - Direct                                          907

1  Muammar Gaddafi.  It's a notice -- an inspiration to people to

2  join in the fight against Gaddafi's regime.  This was at a time

3  when the revolution was kicking up and Gaddafi was still in

4  power but losing ground.

5  Q.   Okay.  And that was, that was the Spring 2011 issue?

6  A.   Yes.

7  Q.   We are done with the *Inspire* magazines.

8         Is -- can you take a look at -- yes.  So, Judge, we

9  want to ask the witness to look at 10-204.

10         MR. SMITH:  No objection.

11         THE COURT:  All right, 10-204 is in.

12         (Government's Exhibit No. 10-204 was received in

13  evidence.)

14  BY MR. KROMBERG:

15  Q.   You can take a look at it on the screen.

16         Could you interpret -- can you explain what the

17  significance or the meaning or context of this, of this

18  document that was -- graphic that was found on the defendant's

19  computer, computer media in August 2016?

20  A.   Sure.  It's a pro-jihadist and pro-Caliphate statement.

21  At the top, you have what's called al-raya, a-l-hyphen-r-a-y-a,

22  which to jihadists, with the black background and the white

23  lettering, it's a battle flag, and that's meant to symbolize

24  the struggle of replacing all the nation states whose flags are

25  at the bottom with one flag, one people, one cause, in other

Gartenstein-Ross - Direct                                                908

1   words, replacing all the current nation states with a

2   Caliphate.

3            MR. KROMBERG:  So let's turn to 10-208 again.  Don't

4   put it on the screen until the judge has had a chance to --

5            MR. SMITH:  No objection, Your Honor.

6            THE COURT:  All right, it's in.

7            (Government's Exhibit No. 10-208 was received in

8   evidence.)

9            MR. KROMBERG:  Okay.  Please put 10-208 on the

10  screen.

11  Q.    Can you explain the context of 10-208?

12  A.    Yes.  This is also a pro-jihadist and pro-Caliphate

13  statement.  What the Arabic says is "Coming soon, God willing,

14  the Caliphate."  At the very bottom, it says "al-Khilafah," the

15  Caliphate in Arabic, and it shows in an hour glass the various

16  flags and nation states melting away and being replaced with

17  two things.

18           One is al-raya, which is the battle flag of jihad,

19  another is a flag called al-liwa, l-i-w-a.  That's the white

20  background with the black lettering, which is a flag that can

21  be used in places that are conquered where sharia or Islamic

22  law is being applied.  This is the way jihadists make use of

23  the raya and the liwa.

24  Q.    Okay.  If you could look at Government Exhibit 10-202,

25  which, I believe, is a video, but I don't -- I think it's --

Gartenstein-Ross - Direct                                            909

1   well, is there going to be an objection to it?

2           MR. SMITH:  Yes, there is an objection to playing the

3   video.

4           MR. KROMBERG:  Okay.  I don't want to play the video.

5   I want to ask the witness to describe the video.  Is there an

6   objection to admitting it for the purpose of letting the

7   witness describe it?

8           MR. SMITH:  No, Your Honor, we object to the extent

9   that the expert witness is going to be commenting on a video

10  that the government --

11          THE COURT:  Well, the question is whether or not the

12  witness has seen this video.

13          MR. KROMBERG:  This was -- well, I think the answer

14  is going to be --

15          THE COURT:  Lay a foundation first.

16  BY MR. KROMBERG:

17  Q.   Are you familiar with a statement that --

18          THE COURT:  No, no.  Do you have an exhibit here or a

19  copy of it?

20          MR. KROMBERG:  It is a -- I have a translation of it

21  that I could show him to say -- so that --

22          THE COURT:  No.  Is it -- where is it in my book?

23          MR. KROMBERG:  10-202T is the English part of it.

24  The actual video has the English scrolling along the bottom,

25  but we don't have to play the thing.

Gartenstein-Ross - Direct                                       910

1          THE COURT:  No, I understand that.  Hold on a second.

2          All right, so all it is as I look at it, right now

3   I'm seeing just a disc, all right.  All I have in my book --

4          MR. KROMBERG:  Go to the next one, 10-202T, Judge.

5   Do you have it?

6          THE COURT:  It's not in my book.

7          MR. KROMBERG:  Could we pass one up?

8          MR. SMITH:  Your Honor, we object on cumulative

9   grounds as well.

10          THE COURT:  Well, it's a, it's a different medium at

11   this point, so I'm going to allow it if it's all right, but let

12   me take a look at it, please.

13          MR. KROMBERG:  While Mr. Vera looks for that, we'll

14   move on to something else.

15   Q.   What is a nasheed?

16   A.   A nasheed is an a cappella song.

17   Q.   Excuse me, what?

18   A.   It's an a cappella song, an Islamic song.  There are a

19   variety of nasheeds.  It's something -- they've been around for

20   centuries.  Around the 1970s, there started to become

21   increasingly politicized forms of nasheeds.  Nasheeds are

22   something that ISIS in particular has made use to propagandize

23   for its cause.

24          The reason it's a cappella is because in their view,

25   musical instruments are haram, so this is the way that they

Gartenstein-Ross - Direct                                      911

1   allow music to be lawful under their interpretation of Islam.

2   Q.    When you say "haram," h-a-r-a-m, "haram" means what?

3   A.    It means unlawful under Islamic law.

4   Q.    Let me ask, the term has come up, "istishhadi,"

5   i-s-t-i-s-s-h-a-d-i.  Can you tell us what "istishhadi" is?

6   A.    I need to see a context.

7              MR. KROMBERG:  So if we can bring up 10-101A?  And

8   also at the same time, I'd pass up to the Court 10-202T.

9              MR. SMITH:  Your Honor, we object to these because

10  there's no evidence in the record that the defendant speaks

11  Arabic, so an English translation performed by the government

12  is irrelevant.

13             MR. KROMBERG:  Right.  And that's as I mentioned,

14  Judge, if you play the video, the English translation scrolls

15  along the bottom as Bin Laden is speaking in the video.

16             MR. SMITH:  There's no evidence in the record, Your

17  Honor, that Mr. -- the defendant watched this video.

18             THE COURT:  I understand that, and that's certainly a

19  relevant issue in cross, but all right.  If that's what this

20  is, then -- again, do you know what we're talking about in this

21  video?

22             THE WITNESS:  Yes.

23             THE COURT:  Have you seen the video yourself?

24             THE WITNESS:  Yes, I have.

25             THE COURT:  All right, I'm going to overrule the

1    objection, so 10-202 and 202T --

2              MR. KROMBERG:  We don't even need to move in the --

3    let's only move in 202T, Judge, and the fact is that the jury

4    will understand that it's an English translation of the video

5    that was found on the defendant's computer pursuant to, as we

6    stipulated.

7              THE COURT:  All right, it's in.

8              (Government's Exhibit No. 10-202T was received in

9    evidence.)

10   BY MR. KROMBERG:

11   Q.   Okay.  Can you explain what that video was?

12   A.   Are you talking about the Bin Laden video?

13   Q.   Yes.

14   A.   So this was a video of Usama Bin Laden addressing

15   essentially a western or American audience.  He was arguing in

16   favor of his cause, arguing that the cause he is fighting for,

17   establishing an Islamic State, will provide the solutions to

18   the various ills of society.

19   Q.   Okay.  Thank you.

20              I think I need to go back to the question I asked you

21   before of what is "istishhadi"?  And I'd like you to look at

22   10-101A, which already is in evidence.

23   A.   I don't know what it's referring to in this context.

24   Q.   Okay.  What is The Light series of lectures?

25   A.   The Light series of lectures is a series of lectures

Gartenstein-Ross - Direct                                                913

1  undertaken by a production company that initially was

2  pro-jihadist and later is ISIS, broke out from al Qaeda, became

3  very explicitly pro-ISIS.  It talked about the ills of society,

4  moved on to how the Caliphate has allegedly idyllic life,

5  showing videos of life under the Caliphate, with children being

6  educated, things like that, showed speeches of Abu Bakr

7  al-Baghdadi, ISIS's caliph, and argued against what are called

8  media lies against ISIS.

9  Q.   Let me show you what I believe has been admitted as

10  Government's Exhibits 8-13, 8-14, and 8-15, which we'll take

11  one at a time.  8-13 --

12            MR. SMITH:  Which series is that?

13            MR. KROMBERG:  8-113, 114, and 115, which are the

14  Facebook records.

15            MR. SMITH:  Objection, Your Honor.  401, 403,

16  cumulative.

17            THE COURT:  Well, they're already in.

18            MR. SMITH:  We're objecting to the expert witness

19  looking at evidence from this case and commenting on the

20  evidence.  He's here as an expert witness.

21            THE COURT:  To the extent that they reference

22  Islamic-type things, he's an expert in that area.

23            MR. SMITH:  The defense's position is that he can be

24  asked about those things without having, showing him the

25  evidence and having him comment on it.

Gartenstein-Ross - Direct                                        914

1          THE COURT:  Well, it has to make some connection to

2   the case, so I'm overruling the objection.

3          MR. KROMBERG:  Could you put 8-113 on?

4          THE COURT:  You need to blow that up so people can

5   see it.

6   BY MR. KROMBERG:

7   Q.   Do you see a reference in that Facebook record to Light

8   series?

9          MR. SMITH:  Objection to all of the commentary in

10  this, in this piece of evidence that has nothing to do with The

11  Light series, and it's being posted to prejudice the defendant.

12         MR. KROMBERG:  The commentary, Judge, this is his

13  Facebook page.

14         THE COURT:  I'm overruling the objection.

15  BY MR. KROMBERG:

16  Q.   Dr. Gartenstein-Ross, do you see a reference to The Light

17  series?

18  A.   Yes, I do.

19  Q.   Okay.  And can you tell us, do you know about that,

20  what -- okay.  What reference do you see in there?

21  A.   The reference is to The Light, Part 40.  It gives the

22  title of this episode of The Light series.  It's over 50

23  episodes of The Light series, with different titles.  In this

24  case, the title is "Satanic Leaders Run the World," which is

25  part of the grievances being expressed in The Light series of

Gartenstein-Ross - Direct                                          915

1   videos.

2   Q.   Okay.  Let's go to 8-114.

3           MR. SMITH:  Objection, Your Honor.  Relevance.

4           THE COURT:  Overruled.

5           MR. SMITH:  There are statements in the exhibit that

6   have nothing to do with the testimony the expert is giving

7   right now.

8           THE COURT:  All right, overruled.

9           MR. SMITH:  403, cumulative.

10  BY MR. KROMBERG:

11  Q.   Do you see a reference to The Light series in 8-114?

12  A.   Yes.

13  Q.   And what is that reference?

14  A.   The reference is to Part 17, which is titled "The Face of

15  Zionism," and its summary aptly indicates what it's about,

16  various subjects from religion to conspiracy theories of the

17  Illuminati and the New World Order, which are both concepts

18  which are prevalent in several lines of conspiracy theories.

19          MR. SMITH:  Objection.  Relevance.

20          THE COURT:  Overruled.

21  BY MR. KROMBERG:

22  Q.   Please turn to 8-115.

23          Do you see what's going to be blown up in just a

24  moment, do you see the reference to The Light series?

25  A.   Yes.

Gartenstein-Ross - Direct                                      916

1    Q.    And what is that reference?

2    A.    The reference is to photos posted by The Light

3    revelations, and it's described as the vile and despicable

4    French committing atrocities in half-a-dozen nations.  One of

5    the themes of The Light is also injustices committed by western

6    nations and some of the grievances that tie into their overall

7    argument for ISIS.

8             MR. KROMBERG:  Okay.  Now, Judge, we're going to look

9    at exhibits that have been stipulated as having come from the

10   defendant's computer but have not yet been admitted:  10-204

11   and 205.

12            I'm sorry, we just talked about -- I apologize, we

13   talked about 10-204.  10-205.

14            MR. SMITH:  Objection.  403, cumulative.

15            THE COURT:  All right, I do think you're adding more

16   than is necessary here, Mr. Kromberg, so let's start moving

17   this along, all right?

18            MR. KROMBERG:  I have just three more like that.

19   We're going to then move on to another, slightly different

20   subject.

21            THE COURT:  All right, 10-205 is in.

22            (Government's Exhibit No. 10-205 was received in

23   evidence.)

24   BY MR. KROMBERG:

25   Q.    Can you explain what, what that is?

1              MR. SMITH:  Objection.  403, relevance.

2              THE COURT:  Overruled.

3              THE WITNESS:  As the photograph indicates, it's Hamas

4    suicide bombers who are marching in formation.

5    BY MR. KROMBERG:

6    Q.   And take a look at --

7              MR. SMITH:  Your Honor, we'd like to explain the

8    basis of our objection to all of --

9              THE COURT:  No, we don't need to have speeches in

10   court.  We've already had it off the record so --

11             MR. SMITH:  This isn't an offer of proof.  This is

12   separate from the previous objections.  Your Honor --

13             THE COURT:  Wait a minute, wait a minute.  Approach

14   the bench.

15             (Bench conference on the record.)

16             THE COURT:  Yes, Mr. Smith.

17             MR. SMITH:  Now, the reason we're objecting to

18   instead of asking the expert questions about particular

19   subjects and showing him the evidence is the government is

20   leading the jury to believe that these images are collected

21   over time.  In fact, the evidence shows in this case that all

22   of these images were downloaded the same day, one day, and they

23   might have been downloaded collectively.

24             By presenting it seriatim image after image after

25   image and representing that it's on Mr. Young's computer,

Gartenstein-Ross - Direct                                    918

1   they're creating an impression to the jury that this is a span

2   in time.  In fact, as they know, all of these images were

3   downloaded in one single day.  So to parade them in front of

4   the jury --

5           THE COURT:  But they maintain they were downloaded.

6   This one, 207 on it --

7           MR. SMITH:  Agent Caslen created a timeline which

8   shows when most of these images were created, Your Honor, and

9   most of them were created in one day.  So to parade them in

10  front of the Court like this is creating a deeply misleading

11  impression.

12          THE COURT:  You can make that argument to the jury

13  either when you cross-examine this witness or when Agent Caslen

14  testifies, all right?  So I understand the argument.  It's an

15  interesting one; nevertheless, it's overruled.  Let's go on.

16          MR. SMITH:  Thank you.

17          (End of bench conference.)

18  BY MR. KROMBERG:

19  Q.   We just -- you just spoke about 10-205, correct?

20  A.   The Hamas suicide bombers one.

21          MR. KROMBERG:  Okay.  Let's look at 10-105, Judge.

22  This has not been -- it's been stipulated to but not been

23  admitted, stipulated to the authenticity of it as coming from

24  the defendant's computer media.

25          MR. SMITH:  One moment, Your Honor.

Gartenstein-Ross - Direct                                        919

1          THE COURT:  Oh, I think we have enough of these.

2    Let's move on.  105 is not in.

3    BY MR. KROMBERG:

4    Q.   Take a look at 10-704, which has been admitted.  That is a

5    flag.  Can you take a look at that flag -- that's been admitted

6    into evidence -- and tell the jury what that flag is?

7    A.   Yeah.  This is the Reichskriegsflagge.  It's a flag that

8    was used by Imperial Germany prior to the end of World War I,

9    from about 1903 to 1919.  It's a flag that then was replaced

10   with the beginning of the Weimar Republic, which was

11   established after the end of the first World War.

12          This is a flag that was used by a kind of non-state

13   group in Germany called the Freikorps.  They used a number of

14   different flags, but this is one version of the

15   Reichskriegsflagge that they used.  The Freikorps engaged in a

16   lot of violence during that period, especially against Jews and

17   often against women.

18          And it's a flag that today in Germany, where Nazi

19   flags are banned, some neo-Nazis use this flag.

20   Q.   Could you take a look, please, at Government Exhibit

21   11-400, which is in evidence, which is a license plate?

22          MR. SMITH:  Objection.  The expert does not need to

23   comment on a license plate.

24          THE COURT:  Overruled.

25          MR. KROMBERG:  Can you blow that up so we can see the

Gartenstein-Ross - Direct                                          920

1   license plate?  Okay.  We can see it.

2   Q.   Does that appear to be a reference to the organization you

3   just mentioned?

4            MR. SMITH:  Objection.  This is not expert testimony.

5            THE COURT:  That was leading actually.

6   BY MR. KROMBERG:

7   Q.   Okay.  What reference do you draw from looking at that

8   license?

9            MR. SMITH:  Objection.  Not expert testimony.

10           THE COURT:  Overruled.

11           THE WITNESS:  It appears to be a reference to the

12  Freikorps, the group that I mentioned.  The Freikorps was

13  largely a group of returned World War I veterans.  They

14  returned to a state which was in somewhat of a -- somewhat of

15  chaos.  The Freikorps had existed for a while, but during this

16  period, there were various groups fighting for control of

17  places in Germany.  There were Communist groups.  The Freikorps

18  tended more towards the nationalist and racialist side of the

19  division.

20  BY MR. KROMBERG:

21  Q.   Take a look, if you would, at Government Exhibit 4-300,

22  which is an exhibit which is in evidence.  It is a tattoo on

23  the defendant's arm.

24           MR. SMITH:  Objection, Your Honor.  This is not

25  expert testimony.

Gartenstein-Ross - Direct                                              921

1              THE COURT:  Overruled.  And it's expert because this

2     witness has been proffered as an expert in the area of, among

3     other things, radical groups, including the neo-Nazis, and the

4     symbols used by neo-Nazis would be within his area of

5     expertise.

6              All right, let's go on.

7     BY MR. KROMBERG:

8     Q.   Do you recognize that symbol on the defendant's arm?

9     A.   Yes.

10    Q.   What is that a symbol of?

11    A.   It's a symbol of a division of the SS called the

12    Hohenstaufen.

13    Q.   Take a look, please, at Government Exhibit 3-110, which is

14    in evidence.

15             So if we can bring up 3-110?

16             Can you see that?

17    A.   Yes.

18    Q.   What is that?

19    A.   That is an SS insignia, referring to the German

20    intelligence and fighting units that were both important to

21    Nazi Germany's totalitarian control and later to the Final

22    Solution.

23             MR. SMITH:  Your Honor, we object because just

24    yesterday, the government announced in court that it would not

25    be using this piece of evidence.

Gartenstein-Ross - Direct                                        922

1          THE COURT:  Yeah, I think you did actually.

2          MR. KROMBERG:  I'm not using the tie tack box.

3          THE COURT:  That's true.  That's true.

4          MR. KROMBERG:  This was already in evidence.  This

5    was admitted already.

6          THE COURT:  All right.

7          MR. SMITH:  Cumulative.

8          THE COURT:  All right.  Overruled.

9    BY MR. KROMBERG:

10   Q.   Take a look, if you would, at Government Exhibit 10-907.

11          Please do not put it up on the screen until the judge

12   has a chance to look at it.

13          MR. SMITH:  Objection.  401, 403, cumulative.

14          THE COURT:  Yeah, I think that's cumulative.  I'll

15   sustain that objection.

16   BY MR. KROMBERG:

17   Q.   Take a look, if you would, at 10-242.

18          MR. SMITH:  Wait.

19          MR. KROMBERG:  Don't put it on the screen until the

20   judge has a chance to look at it.

21          MR. SMITH:  Objection.  401, 403, cumulative.

22   10-242.

23          THE COURT:  This is getting cumulative now,

24   Mr. Kromberg.  We're going to --

25          MR. KROMBERG:  We haven't spoken about this person.

Gartenstein-Ross - Direct                                    923

1              MR. SMITH:  Your Honor --

2              THE COURT:  We don't get to speak about every one,

3     Mr. Kromberg.  I've given you some leeway on this, but let's

4     not overdo it.

5              MR. KROMBERG:  Oh, okay.

6     Q.   Take a look at 10-250, 251, and 252.

7              MR. SMITH:  Your Honor, we object.  401, 403,

8     cumulative, and probably leading to a mistrial.

9              THE COURT:  You can put one of those in.  Choose,

10    choose the one you want.

11             MR. KROMBERG:  10-252.

12    Q.   What does that -- what does that mean to you in your

13    field, Dr. Gartenstein-Ross?

14    A.   It's an anti-Semitic cartoon, with a caricature of a

15    Jewish person indicated as Jewish swine.

16    Q.   Who is Nicholas Skorzeny?

17             MR. SMITH:  Your Honor just ruled on this point.

18    Objection.  Your Honor just ruled on 10- --

19             THE COURT:  I'm sustaining the objection.  Let's move

20    this along.  Come on.

21             MR. SMITH:  Your Honor, we move for a mistrial.

22             THE COURT:  Would you please --

23             MR. SMITH:  We move for a mistrial.

24             THE COURT:  It's denied.  Let's go.

25    BY MR. KROMBERG:

Gartenstein-Ross - Direct                                              924

1    Q.   Turn to 14-134 -- no, sorry, let's go back to 4-203.

2    4-203 is something that Mr., Mr. Lee was testifying about and

3    was not admitted at that time.

4            MR. SMITH:  Objection, Your Honor.  Cumulative, 401,

5    403.

6            MR. KROMBERG:  I mentioned this in opening statement,

7    and I -- it's time that the jury saw it.

8            THE COURT:  I need Book 4 up here.

9            I'm allowing it in.  Overruled.

10           MR. KROMBERG:  Please publish 4-203.

11   Q.   Can you, can you read that to the jury?

12   A.   Sure.  "The time has come that we, as a nation of earth,

13   as a people, must rise up and take responsibility" --

14           MR. SMITH:  Objection.  An expert witness does not

15   read testimony in a case.

16           THE COURT:  All right, I don't think the -- I don't

17   think the words have to be read.  If you have a question about

18   anything else on that, you can ask him.

19           MR. KROMBERG:  Okay.

20   Q.   This document which was found on, as we have stipulated,

21   it was -- no, excuse me, there is testimony it was found on

22   defendant's phone.  What's the context for this statement?

23           MR. SMITH:  Objection.  He's asking the witness to

24   testify about factual context.  He's an expert witness.

25           THE COURT:  Do you recognize any of the depictions on

Gartenstein-Ross - Direct                                        925

1   that as having any significance based upon your studies?

2              THE WITNESS:  Yes.

3              THE COURT:  What is that?

4              THE WITNESS:  Yes.  So the smokestacks here are a

5   reference to the crematoria, when Jewish people were

6   annihilated in World War II.  When it says that together we --

7              THE COURT:  That's all right.  We don't need the

8   words.  All right, that's fine.

9   BY MR. KROMBERG:

10  Q.   Take a look, if you would, at 10-203.  This has not yet

11  been admitted, but it's been stipulated that it was found on

12  the defendant's computer media in August 2016.

13             THE COURT:  We've already had some testimony about

14  that but --

15             MR. SMITH:  Objection.  Cumulative, 401, 403.

16             MR. KROMBERG:  I don't think we had testimony on this

17  one, Judge.  We had a different manual.

18             THE COURT:  All right.  Oh, I see.  All right.

19             MR. SMITH:  We also object to the sequence of the

20  evidence in this case.

21             THE COURT:  Well, that's -- the government can put

22  the evidence on in any order they want.  You can raise that

23  issue in cross-examination if you think it's relevant, but

24  10-203 is in.

25             (Government's Exhibit No. 10-203 was received in

Gartenstein-Ross - Direct                                    926

1    evidence.)

2    BY MR. KROMBERG:

3    Q.   Can you take a look at 10-203 and explain what that is?

4           And if you can turn to the next page?

5    A.   Yes.  What -- this newsletter re-published was an al Qaeda

6    handbook.  It was a handbook about how to create and sustain a

7    terrorist organization, how to survive interrogation, things of

8    this sort that would be helpful to a group that wants to make

9    warfare in al Qaeda's cause.

10   Q.   Turn, if you would, to Mr. Young's -- excuse me, to

11   Government Exhibit 8-103, which is in evidence.  I'd like you

12   to look at the profile picture on the Facebook page.

13          MR. SMITH:  Objection.  401, 403, cumulative.

14          THE COURT:  Overruled.

15          MR. SMITH:  Letting the government put up the

16   evidence before an objection can be placed.

17          THE COURT:  Overruled.

18   BY MR. KROMBERG:

19   Q.   Can you explain what this photo -- not what it's doing on

20   the profile page of the Facebook account, but what is that

21   photo of?

22   A.   It's a photo of a man named Abu Musab.  He is a jihadist

23   leader based in Syria.  There are different accounts of who he

24   is.  Some put him with ISIS, some put him with the Nusra front,

25   but he's universally recognized as being a jihadist figure on

Gartenstein-Ross - Direct                                    927

1    the battlefield fighting in Syria.

2    Q.    And what is written on his head gear?

3    A.    That's the shahada.  This makes it a, you know, similar to

4    al-raya.  This is what -- so the shahada, s-h-a-h-a-d-a, is the

5    Islamic declaration of faith.  The declaration of faith is, of

6    course, itself innocuous, but put on a black background in --

7    with white lettering, especially when used by a jihadist

8    figure, it takes on specific significance as a symbol of jihad

9    and warfare.

10   Q.    Now, is it correct -- am I correct that you mistakenly

11   thought this was someone else when you first saw it?

12   A.    Yes.

13   Q.    And who --

14            MR. SMITH:  Objection.  Objection.  This is not a

15   fact witness.

16            THE COURT:  Overruled.

17   BY MR. KROMBERG:

18   Q.    Who did you think it was?

19   A.    I thought that it was the defendant initially.

20   Q.    What is the significance of green birds in the Salafi

21   jihadist world?

22   A.    Green birds is a reference to martyrs.  There's a verse in

23   the Koran talking about how in Jannah, in Paradise, the martyrs

24   will be in the hearts of green birds, at the foot of Allah's

25   throne, of God's throne, and they can go anywhere they want in

Gartenstein-Ross - Direct                                          928

1   Paradise.

2           And so green birds are referenced a lot within

3   jihadist material as being representative of martyrdom,

4   martyrdom being thought by jihadists to be an automatic entry

5   into Paradise.

6   Q.   What, what controversy exists in parts of the Muslim

7   community about whether ISIS are Muslims or not?

8   A.   Many Muslims argue that ISIS is not, in fact, Muslim

9   because its actions, ranging from the atrocities that they

10  commit, beheadings and the like, to genocide, to slavery, are

11  not representative of Islam, and cast them out as mere outlaws

12  rather than as Muslims.

13  Q.   And the opposing side?

14  A.   The opposing side is that they haven't committed

15  nullifiers of Islam, that they are actually a part of the

16  Islamic faith.

17  Q.   What are nullifiers?

18  A.   It's traditionally thought that there are ten nullifiers

19  of Islam, things like associating partners with God.  Islam is

20  a monotheistic faith, which would cast somebody out of being a

21  part of that faith.

22  Q.   What is a kafir?

23  A.   A kafir or k-a-f-i-r, is a derogatory term for a

24  non-Muslim.  It's often translated as infidel or unbeliever.

25  Q.   What are Alawites?

Gartenstein-Ross - Direct                                    929

1  A.   The Alawites are a sect that's associated with the Assad

2  government, which rules in Syria.  Their status as Muslims is

3  somewhat controversial, though the Iranian clergy has given

4  them some legitimacy within the faith.

5  Q.   The phrase "a large crop of Alawite women" --

6           MR. SMITH:  Objection.  Objection.  Relevance, 403.

7  This is expert testimony, not a recitation of the facts in the

8  record.

9           THE COURT:  I think we don't need to go into that.

10 He's explained what "Alawite" means.  The jury can parse that

11 into what they have there.

12 BY MR. KROMBERG:

13 Q.   Is there a controversy within the Muslim religion among

14 some Muslims who say that others don't think that religion

15 applies to anything in the modern day?

16 A.   Yes.

17 Q.   And what controversy is that?

18 A.   So there's a controversy about liberal Muslims, those who

19 don't -- who according to some people who are of a more

20 conservative bent, think don't actually want to apply the

21 religion.  The argument being made against those Muslims is

22 that God's law supersedes man's law, and so you can't

23 compromise it in order to fit in in countries like the U.S. or

24 western countries.

25 Q.   For those Muslims who say that -- whose position is that

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

-1212-

1    you're not -- excuse me, for those Muslims who are not liberal

2    Muslims, for those Muslims who are against liberal Muslims,

3    what is their position on whether they are authorized to take

4    women as slaves or booty after battle?

5              MR. SMITH:  Objection.  Relevance, 403, cumulative.

6              THE COURT:  Yeah, I think now it's getting

7    cumulative.  I'm going to sustain the objection.

8    BY MR. KROMBERG:

9    Q.   What does the term mean "jihad is within ourselves"?

10             MR. SMITH:  Objection.  Your Honor, without notifying

11   the Court, the government is attempting to sneak in

12   testimony from --

13             THE COURT:  You need to be on your feet, Mr. Smith.

14   I don't want to have to say it again.

15             MR. SMITH:  Objection.  Mr. Kromberg is attempting to

16   cite testimony from this case to the expert witness and have

17   the expert witness comment on fact witness testimony in the

18   case.

19             THE COURT:  That's a -- no, I think that that is a

20   term that would, the average juror would not understand, and

21   it's related to this whole area, so I'm overruling the

22   objection.  Go ahead.

23   BY MR. KROMBERG:

24   Q.   Can you describe what the issue is about "the jihad is

25   within ourselves"?

Gartenstein-Ross - Direct                                        931

1    A.    Yes.  So "jihad" is a term that means struggle, and so

2    there is a controversy among Muslims as to what "jihad" means.

3    To some, jihad is a struggle against our own inner demons or

4    proclivity to sin.  That's what the term "jihad is within

5    ourselves" refers to.  It refers to more liberal

6    interpretations of jihad, fairly derisively refers to more

7    liberal interpretations which nullify the warfare-like meanings

8    behind the term.

9    Q.    What is "jihad of the pen"?

10   A.    Jihad of the pen is the idea that rather than undertaking

11   military action against the enemies of the Muslims, one can

12   write about injustice or write against the thing that they

13   oppose.

14   Q.    What is the position of Salafi jihadists regarding jihad

15   of the pen?

16   A.    That it's ridiculous, that one can only define "jihad" as

17   being warfare, that that is the best, truest interpretation of

18   this concept.

19              MR. KROMBERG:  Judge, if I may have a moment to go

20   over my very muddled notes now --

21              THE COURT:  All right.

22              MR. KROMBERG:  -- to make sure that the things that

23   you're allowing me to go into I'm going into?

24              Judge, that's all for this witness.

25              Thank you, Dr. Gartenstein-Ross.  I expect the

Gartenstein-Ross - Cross                                          932

1    defense will have some questions for you.

2             THE COURT:  All right.  Mr. Smith?

3                        CROSS-EXAMINATION

4    BY MR. SMITH:

5    Q.   Good afternoon, Mr. Gartenstein-Ross.  Okay.  So you're

6    here to testify today in part that your expert opinion is that

7    white supremacism is comparable in some sense to militant

8    Islam, correct?

9    A.   In some sense, yes.

10   Q.   And in the sense in which you mean it is that white

11   supremacism and militant Islam share similar mechanisms of

12   radicalization; is that correct?

13   A.   That's correct.

14   Q.   White supremacists are by their nature racist, correct?

15   A.   Yes.

16   Q.   And hundreds of millions of Muslims around the world are

17   ethnic minorities and non-whites, correct?

18   A.   Yes.

19   Q.   By their definition, by their nature, by their ideology,

20   white supremacists deplore racial minorities, correct?

21   A.   Not universally, no.

22   Q.   What is a white supremacist, Mr. Gartenstein-Ross?

23   A.   A white supremacist is someone who believes that the white

24   race is superior to other races.

25   Q.   So that it is your testimony that their ideology is that

Gartenstein-Ross - Cross                                          933

1   non-whites are inferior and should not be treated on the same

2   plane as whites, correct?

3   A.    That's correct.

4   Q.    And there are hundreds -- would you agree with this

5   factual matter, as a factual matter, that most Muslims in the

6   world are not white?

7   A.    That's correct.

8   Q.    But that difference is not enough to outweigh the areas

9   they share in common, in your view, correct?

10  A.    There's also another area of compatibility, which is that

11  all not all white supremacy believes that there should be

12  mixing of the races.  So for Nazis during the 1950s, when they

13  were looking at the Arab world --

14  Q.    Dr. Gartenstein-Ross, that wasn't -- you're not answering

15  my question.  Have you ever testified as an expert in any case

16  on this connection between white supremacism and militant

17  Islam?

18  A.    No.

19  Q.    Have you ever testified in a criminal case?

20  A.    No.

21  Q.    Do you have any peer review publications on your thesis

22  that there's a connection between white supremacism and

23  militant Islam?

24  A.    No.

25  Q.    Have you ever had any peer review on that subject at all?

Gartenstein-Ross - Cross                                          934

1    A.   Depends on what you mean by peer review, but I have not

2    authorized a peer-reviewed article on it.  I have talked to

3    other academics about the topic.

4    Q.   Your writings on this subject consist of two popular press

5    articles, correct?

6    A.   That is not correct.

7    Q.   How many articles are there?

8    A.   There are four articles I've written on this topic.

9             THE COURT:  Can you move closer to the microphone?

10   BY MR. SMITH:

11   Q.   I asked you about popular press articles.

12   A.   Oh, yes, there are two popular press articles, but there

13   are other --

14   Q.   So you wrote an article --

15            THE COURT:  Wait, wait, wait.  You have got to slow

16   down and let the witness finish testifying, all right?

17            THE WITNESS:  But there are other articles as well.

18   BY MR. SMITH:

19   Q.   So you wrote an article in *The Weekly Standard,* correct,

20   about this subject?

21   A.   That is correct.

22   Q.   And when was that?

23   A.   2006, I believe.

24   Q.   Was that before the terrorist group in this case emerged?

25   A.   No.

Gartenstein-Ross - Cross                                        935

1   Q.   It was not?

2   A.   The Zarqawi network existed long before that.  ISIS is a

3   descendant of al Qaeda in Iraq.  As we talked about when I

4   reviewed the various designations, al Qaeda in Iraq was

5   designated in 2004, and rather than designating ISIS later on

6   as a different entity, the designation was just updated to show

7   that it was using a different name.

8   Q.   When was your --

9   A.   ISIS had already existed by 2006.

10  Q.   Thank you, sir.

11          When was your testimony that the Caliphate was

12  declared?

13  A.   The Caliphate was declared in 2014, June.

14  Q.   Thanks.  Now, you testified about your work on the white

15  supremacist and neo-Nazi movement, correct?

16  A.   Correct.

17  Q.   And your CV indicates this is limited to two technical

18  publications, correct?

19  A.   In terms of writing, yes.

20  Q.   Yes.  And who are those two technical publications?

21  A.   Both written for the Foundation for Defense of Democracies

22  and --

23  Q.   That's an organization you work for, correct?

24  A.   Correct.  One of them is on assessing --

25  Q.   Sir, I didn't ask you about assessing.

Gartenstein-Ross - Cross                                      936

1          MR. KROMBERG:  Objection.

2          THE COURT:  You need to, sir --

3   BY MR. SMITH:

4   Q.   It's a yes-or-no question.

5   A.   I'm sorry, I thought you asked what.  I apologize.

6   Q.   So those two technical publications, they were not subject

7   to any peer review, correct?

8   A.   They were not peer-reviewed before they were published,

9   no.

10  Q.   What -- you're an academic, right?

11  A.   Among other things.  I don't primarily --

12  Q.   You testified you teach at Georgetown University?

13         MR. KROMBERG:  Objection.

14         THE COURT:  If you cannot stop talking while the

15  witness is answering the question, I'm going to stop this.

16         MR. SMITH:  Thanks.

17         THE WITNESS:  I have.  I don't teach there now.  I

18  taught there up through the fall of 2016 term.

19  BY MR. SMITH:

20  Q.   What is peer review?

21  A.   Peer review is when other academics or other practitioners

22  review a publication prior to it appearing in print.

23  Q.   And why is peer review important in the field of academia

24  in establishing a thesis?

25  A.   It's important in that it shows that a thesis -- well, two

Gartenstein-Ross - Cross                                            937

1   things:  Number one is that it's important in that it shows

2   that other academics think it comports with the standards that

3   are being used; but secondly, peer review is not essential for

4   legitimacy of an argument.

5   Q.   That's your position.  Are you aware of any other expert

6   who has testified on the connection between white supremacism

7   and militant Islam in a, in a case?

8   A.   No.

9   Q.   Are you familiar with Evan Kohlmann?

10  A.   Yes.

11  Q.   Who is Evan Kohlmann?

12  A.   He is a, an individual who studies terrorism and testifies

13  in some terrorism trials.

14  Q.   Is it fair to say he testifies frequently in terrorism

15  trials?  He's one of the primary terrorism --

16  A.   Yes.

17  Q.   -- experts relied on in terrorism prosecutions in this

18  country, correct?

19  A.   Correct.

20  Q.   And are you familiar with Matthew Levitt?

21  A.   Yes.

22  Q.   Who is he?

23  A.   He's a scholar at the Washington Institute for Near East

24  Policy.

25  Q.   And is, is it fair to say that Matthew Levitt frequently

Gartenstein-Ross - Cross                                          938

1   testifies on behalf of the government in terrorism

2   prosecutions?

3   A.   I don't know if he testifies frequently.  I know that he

4   has.

5   Q.   On multiple occasions?

6   A.   More than once.  I don't know how often.

7   Q.   Now, are you aware of Evan -- would you say that Evan

8   Kohlmann and Matthew Levitt are qualified to testify about

9   terrorism subjects in cases?

10  A.   Yes.

11  Q.   Are you aware of Evan Kohlmann or Matthew Levitt ever

12  testifying on the subject of a white supremacist and militant

13  Islam connection?

14  A.   No, I am not.

15  Q.   When did the government approach you to testify in this

16  case?

17  A.   February of 2017.

18  Q.   And when you met with them, did they tell you what they

19  wanted you to testify about here?

20  A.   Yes.

21  Q.   What, what did they -- what did they ask you about?  What

22  was the subject of testimony that they inquired about?

23  A.   The subject of testimony involved radicalization processes

24  and items of cultural significance to both jihadists and also

25  to the neo-Nazi movement.

Gartenstein-Ross - Cross                                        939

1   Q.   Did they indicate to you that they would like to see a

2   connection made, drawn between white supremacism and militant

3   Islam?

4   A.   No.  They indicated that they wanted me to look at whether

5   there was a connection.

6   Q.   Which items did they want you to look at?

7   A.   Do you mean the items of cultural significance?

8   Q.   Yes.  We'll get to the cultural significance in a minute,

9   but did they show you any documents or pictures during your

10  first meeting with them?

11  A.   During the first meeting, I don't remember if they showed

12  me any initially, but yeah, I've seen items and pictures

13  related to this case throughout.

14  Q.   So the government showed you these items and pictures, and

15  they indicated to you that what?  What were you supposed to do

16  with these items, with these pictures of -- these Nazi pictures

17  they showed you?

18  A.   What was I supposed to do with them?

19  Q.   Did they indicate -- when they showed you these documents,

20  did they indicate what sort of analysis they wanted you to

21  perform?

22  A.   No one could tell me what kind of analysis to perform.

23  They can tell me what to analyze.

24  Q.   I'm not suggesting they told you what your conclusion

25  should be, but when they handed you documents and pictures with

Gartenstein-Ross - Cross                                        940

1   the Nazi evidence we just looked at, did they indicate what

2   type of analysis or method -- methodology you would use to

3   analyze those materials?

4   A.   Sure.  They indicated what kind of topics I was interested

5   in.  I'm not -- perhaps I don't understand your question.

6   Q.   Okay.  So you had a meeting with the government before you

7   testified here today, correct?

8   A.   Yes.

9   Q.   And at some point, they showed you the pictures that you

10  just testified about, correct?

11  A.   Correct.

12  Q.   And when they showed you those pictures, did they explain

13  what sort of analysis they wanted you to perform as an expert

14  in connection with those pictures?

15  A.   Yes.

16  Q.   And what sort of analysis did they ask you to perform?

17  A.   They asked me to indicate what the cultural significance

18  was of the items that we saw, in other words, what do they mean

19  to someone who's involved with these movements.

20  Q.   And they asked you what the cultural significance of these

21  items were in connection with a material support for terrorism

22  case?  So in other words, when they showed you these --

23  A.   Cultural significance doesn't change based on whether or

24  not you're involved in a material support for terrorism case.

25  Q.   Did you understand when they showed you the Nazi pictures

Gartenstein-Ross - Cross                                              941

1  that this was a cultural significance analysis for a terrorism

2  case?

3  A.   I didn't hear -- I didn't hear the full question that you

4  asked.

5  Q.   You had a meeting with the government before your

6  testimony today in which they showed you the pictures which you

7  just testified about, correct?

8  A.   Yes.

9  Q.   And when they showed you those pictures, did they explain

10 to you that the expert analysis they wanted you to perform was

11 in connection with a material support for terrorism case?

12 A.   Yes, of course.

13 Q.   And what was your response?

14 A.   My -- I agreed to testify.

15 Q.   But you had never performed that analysis before that

16 point, correct?

17 A.   I had performed the analysis of cultural significance on

18 multiple occasions.  It's part of what I do day-to-day --

19 Q.   But you never performed --

20        MR. KROMBERG:  Objection, Judge.

21        THE COURT:  You have to stop cutting off the witness.

22 BY MR. SMITH:

23 Q.   My question is whether you had ever drafted a report, an

24 expert opinion on the connection between militant Islam and a

25 white supremacism before you were approached by the government

Gartenstein-Ross - Cross                                            942

1   in this case.

2   A.   Had I ever drafted a report on that connection?  No.

3   Q.   Thanks.  How much were you paid for your services in this

4   case?

5   A.   Well, the money doesn't go to me personally, it goes to my

6   firm, but I believe $16,000.

7   Q.   16,000.

8          And at what point were you paid for your services?

9   A.   The invoices are monthly based on hours per month.

10  Q.   Dr. Gartenstein-Ross, you've testified today that you've

11  served as an expert witness in a federal case, correct?

12  A.   That's correct.

13  Q.   Is it one case that you've testified in as an expert,

14  federal case?

15  A.   One -- well, all the immigration cases I've testified in

16  are federal, so that's eight cases.

17  Q.   But you cited as an example the Foley against the Syrian

18  Arab Republic case?

19  A.   Correct.

20  Q.   You were certified as an expert witness in that case?

21  A.   That's correct.

22  Q.   But there was no opposition to your service as an expert

23  in that case, right?

24  A.   Correct.

25  Q.   It was a default hearing?

Gartenstein-Ross - Cross                                          943

1    A.   Yes.

2    Q.   Okay.  That's, that's not a criminal case, is it?

3    A.   No.  It's a civil case, as I specified.

4    Q.   Okay.  So in your, in your testimony today, you referenced

5    a report, University of Maryland report, empirical assessment

6    of domestic radicalization from 2016, correct?

7    A.   Correct.

8    Q.   Your expert report submitted in this case cites that

9    radicalization report, correct?

10   A.   Correct.

11   Q.   It cites it a couple of times, right, your expert report?

12   A.   I think so.

13            MR. SMITH:  Okay.  I'm going to cross-examine the

14   witness and refresh his recollection with this document.  It is

15   not being admitted into evidence.

16            THE COURT:  Well, he hasn't failed to remember

17   anything yet, so why don't you ask the question first.

18            MR. SMITH:  Okay.  Well, that's fair.

19   Q.   Have you reviewed the -- are you familiar with the report,

20   final report, Empirical Assessment of Domestic Radicalization?

21   A.   Of course.

22   Q.   Okay.  So did you review that report before drafting your

23   expert testimony in this case?

24   A.   Yes.

25   Q.   And do you recall that -- so what is the EADR?  I'm going

Gartenstein-Ross - Cross                                      944

1    to call it the EADR, but this is the Empirical Assessment of

2    Domestic Radicalization, a 2016 study by two scholars at

3    Maryland.  What is the -- what is that report analyzing?

4    A.    It's a mixed method study.

5              THE COURT:  Can you speak up a little louder, please?

6              THE WITNESS:  Sure.  It's a mixed method study,

7    particularly looking at quantitative factors, which is looking

8    at basically the universe of known domestic terrorists across

9    ideology types, and it looks at a large number of factors to

10   try to understand commonalities and differences in

11   radicalization among these different ideological types.

12   BY MR. SMITH:

13   Q.    Okay.  The EADR study which we're referencing built the

14   largest known database on individual radicalization in the

15   U.S., correct?

16   A.    That's what, what it says.  I believe that's correct.

17   Q.    You have no reason to believe it's not?

18   A.    No, I don't.

19   Q.    Okay.  And radicalization, the mechanisms of

20   radicalization is the basis of your testimony today.  You're

21   drawing a connection between white supremacism and militant

22   Islam based on shared radicalization mechanisms, correct?

23   A.    That's not the entirety of it, no.

24   Q.    That's a part of it, correct?

25   A.    It is a part, yes.

Gartenstein-Ross - Cross                                      945

1  Q.    So this EADR study we just referenced and which is cited

2  selectively in your report says that this database that was

3  built by these scholars at the University of Maryland included

4  147 variables covering demographic, background, group

5  affiliation, and ideological information for 1,473 violent and

6  nonviolent extremists from across the ideological spectrum.

7          Do you remember that from your review of the EADR

8  report?

9  A.    Of course.

10  Q.    Okay.  This is an empirical study of radicalization,

11  correct?

12  A.    Yes.

13  Q.    This study found that extant research has failed to

14  rigorously compare Islamist far right, far left, and other

15  extremist movements, right?

16  A.    Yes, in terms of a quantitative look at them.

17  Q.    Do you recall that the report said that extant research

18  has failed to rigorously compare Islamist --

19          MR. KROMBERG:  Objection, Judge.  Asked and answered.

20          MR. SMITH:  Your Honor, the witness said

21  quantitative, so I'm just trying to --

22          THE COURT:  This is a different question.  Overruled.

23  BY MR. SMITH:

24  Q.    This is a different question.  So I'm just trying to

25  clarify whether you recall that the report found that extant

Gartenstein-Ross - Cross                                              946

1   research of any stripe has failed to rigorously compare

2   Islamist, far right, far left, and other extremist movements.

3   A.    Yes, but what is --

4   Q.    Sir, do you recall that this report found that initial --

5   that there were initial indications that there are, quote,

6   important differences in the radicalization causes and

7   processes for individuals who act across these ideological

8   milieus?

9   A.    Yes.

10  Q.    This study was funded by the Justice Department, right?

11  A.    Correct.

12  Q.    Did the authors of this -- do you have any reason to

13  believe that the methodology supporting this study is flawed?

14  A.    That the methodology supporting the study is flawed.  As a

15  whole, no.

16  Q.    Were the authors of this study unaware of your writing in

17  this subject area?

18  A.    My writing didn't seek to compare -- my writing didn't

19  seek to compare, if you're talking about the radicalization

20  writing that I've done.  You're mixing apples and oranges with

21  the question.

22          They're not saying that everything that's been

23  written is terrible.  They're looking at radicalization

24  trajectories.  Both of the articles that you referenced which I

25  had written were not about radicalization trajectories.

Gartenstein-Ross - Cross                                        947

1    Q.    They weren't peer-reviewed publications, right?

2              MR. KROMBERG:   Objection, Judge.

3              THE WITNESS:   That's correct.

4    BY MR. SMITH:

5    Q.    Okay.

6    A.    It's not -- that statement that you're quoting is not a

7    criticism either of my study on radicalization or of the work

8    that I had done looking at the two movements.

9    Q.    I didn't suggest it was a criticism of your study because

10   your study was created for this case, whereas this report, the

11   EADR, was published in 2016.

12   A.    When I said my study, I'm referring to my 2009

13   radicalization study.

14   Q.    Oh, did the 2009 radicalization study concern the link

15   between militant Islam and white supremacism?

16   A.    No, we've already established that.

17   Q.    Okay.  So this report from the EADR, Final Report

18   Empirical Assessment of Domestic Radicalization, we've

19   established this is an empirical study, a study based on data,

20   correct?

21   A.    Yes, we have.

22   Q.    Your expert testimony today is based on -- your expert

23   testimony today on the subject of shared radicalization

24   mechanisms between white supremacism and militant Islam is

25   based on a case study, correct?

Gartenstein-Ross - Cross                                          948

1    A.    That's not fully correct, no.

2    Q.    Does your -- is your report based on a case study of eight

3    individuals who seem to share an interest in both militant

4    Islam and white supremacism?

5    A.    It includes that.  It's not based on that.

6    Q.    And how many individuals are included within that case

7    study?

8    A.    You mean within the eight case studies?

9    Q.    Yes.

10   A.    There are eight individuals.

11   Q.    Eight individuals, right.

12         So we just discussed how the EADR developed a

13   database of 1,473 violent and nonviolent extremists across the

14   ideological spectrum, correct?

15   A.    Yes.

16   Q.    That is the database -- that is the universe of subjects

17   examined in that 2016 study?

18   A.    Correct.

19   Q.    And the universe of individuals covered in your study in

20   this case is eight people, correct?

21   A.    Yes, but the --

22   Q.    Sir, I'm not -- it's a yes-or-no question.

23         So the EADR study, you reviewed this one, correct?

24   A.    Yes, we've established that.

25   Q.    Do you recall that the EADR study identified a number of

Gartenstein-Ross - Cross                                              949

1   metrics across which Islamist extremists differ from far right

2   extremists?

3   A.    Yes, of course.

4   Q.    What were some of those metrics along which far right,

5   such as white supremacists and neo-Nazi extremists, differ from

6   militant Islamic extremists?

7   A.    Two metrics off the top of my head are age and education.

8   Q.    And how do those -- what are those metrics -- what are the

9   differences in those metrics between militant Islam extremists

10  and far right extremists?

11  A.    I'd want to check.  You know, my testimony is not that the

12  two trajectories are exactly the same.  I believe off the top

13  of my head that right wing extremists tended to radicalize

14  older, and they tended to have less education, but I could be

15  misremembering.

16  Q.    Those are two factors.  I think the EADR study which

17  you've reviewed found that Islamist extremists are near the

18  average, with 41 percent holding college degrees, correct?  And

19  individuals on the far right are less educated than other

20  groups, correct?

21  A.    Yes.

22  Q.    Do you recall that the EADR study found that far right

23  extremists also show a relatively high rate of involvement in

24  formal extremist groups at 58 percent, but that Islamists

25  are -- Islamists were at 21 percent and 18 percent, acting

Gartenstein-Ross - Cross                                          950

1   without any known group affiliation, correct?

2   A.    Correct.

3   Q.    Are you aware of any other study that's -- any other

4   empirical study that tests radicalization across ideological

5   milieus based on data apart from this EADR study?

6            I'll rephrase that.  Are you aware of any other

7   study, empirical study that tests radicalization across

8   ideological milieus in a country separate from this report

9   we're discussing, the EADR report?  Are you aware of any other

10  empirical studies on this, on this subject?

11  A.    No, not that, not that does the cross-comparison across

12  milieus.  There are a number of studies that look at them

13  within single milieus, though.

14  Q.    Well, you would characterize your thesis as a, as a

15  cross-milieux study, correct?  You are comparing militant Islam

16  and white supremacism across those ideological milieus?

17  A.    Part of it is, part of it isn't, right?  The fundamental

18  argument is simply that having been radicalized into Nazism, it

19  can be a pathway into militant jihadism, that once you succumb

20  to one of those ideologies, it makes succumbing to the latter

21  more easy, and that there's a number of cases that bear that

22  out.

23  Q.    As a, as a former academic, would you say that if -- in

24  order to increase the reliability of the results of the

25  conclusion, would one prefer to have more data or less data in,

Gartenstein-Ross - Cross                                            951

1   in arriving at a theory, a conclusion?

2   A.   One always wants more data.

3   Q.   One always wants more data.

4        Now, you've testified that there are several areas in

5   which militant Islam can be compared to white supremacism, and

6   one of them -- one of these criteria is radical ideology,

7   correct?

8   A.   Yes.

9   Q.   And you have -- your argument is based on this idea that

10  because both white supremacists and militant Islam supporters

11  have radical ideologies, a supporter of white supremacism might

12  be inclined to support militant Islam as well?  Is that, is

13  that your testimony?

14  A.   No.

15  Q.   No.  So what is the purpose of radical ideology in

16  compiling your argument in this case?

17  A.   Radical ideology -- sorry, could you rephrase your

18  question?  I want to make sure I'm answering your --

19  Q.   So there are several areas in which you identify

20  commonality between white supremacism and militant Islam.

21  A.   Yes.

22  Q.   And one of those areas is what you characterize as radical

23  ideology; is that correct?

24  A.   That's correct.

25  Q.   And how does radical ideology connect white supremacism

Gartenstein-Ross - Cross                                          952

1   and militant Islam?

2   A.   In both cases, radical ideology tends to define very well

3   an in-group.  It tends to point to a variety of out-groups in

4   both cases and define a program of action.  In both cases and

5   for all of the eight cases which we discussed in my direct

6   examination, individuals who gravitated from neo-Nazism to

7   militant Islam connected the two in most cases explicitly in

8   their own words through hatred of the Jews.  They talked about

9   how militant Islam was a great way to combat global Zionism.

10  Q.   We haven't reached the hatred of the Jews point yet.  I'm

11  just focused on radical ideology itself.

12  A.   Right.  I'm answering that question.

13  Q.   Okay.  So doesn't -- so in order to compare two political

14  groups based on radical ideology alone, you have to empty the

15  two political groups' ideologies of their content to compare

16  them that way, correct?  So if you say that there is -- there

17  are Communists, right, and there are Nazis and there are both,

18  would you agree that both of those political movements feature

19  radical ideologies?

20  A.   Yes.

21  Q.   Now, your point is that because both groups have radical

22  ideologies, one may therefore conclude as the next step that if

23  one is a Communist, one is more likely to be a Nazi; is that

24  correct?

25  A.   You'd have to study that.  You know, if, if I were to try

1  to see if there was a pathway from Communism to Nazism, what I

2  would want to look at is, number one, have we seen people

3  following that trajectory; and number two, if people have

4  followed the Communism to Nazism trajectory, what do they say

5  about the linkage between the two?

6          Do they say:  I was a radical Communist, and then I

7  realized that my ideals were being fulfilled in Nazism, such

8  that they see them as connected, or do they see them as

9  distinct?  That what would give you some indication as to

10 whether this was a pathway.

11 Q.   Okay.  So if I understand you correctly, what you're

12 suggesting is that radical ideology per se does not link two

13 different political groups with different content in their

14 radical ideologies.  What you're suggesting is that further

15 nuance is required in assessing the two different political

16 groups and that radical ideology itself as divorced from the

17 underlying content of the ideology is not enough to link the

18 two groups.  Is that your testimony?

19 A.   That -- yes, my testimony is that the fact that someone

20 has ascribed to a radical ideology isn't necessarily a

21 predictor of a jump to the next ideology.  You'd have to look

22 below that to similarities in ideology or the world view being

23 formed, the sets of enemies, and look at whether we've actually

24 seen movement from one to the other.

25 Q.   So, so if I understand you correctly, so radical ideology

Gartenstein-Ross - Cross                                        954

1    itself is not enough.  We need more nuance is your point.  Is

2    that -- am I fairly summarizing your point?

3    A.   Yeah.  I mean, I don't have -- on the first point, I don't

4    have a judgment as to whether radical ideology alone is enough.

5    It may or it may not be, but I'm not testifying one way or the

6    other as to whether radical ideology is enough.

7         I am testifying to when you have other nuances, like

8    shared dehumanization, shared enemies, a shared kind of world

9    view in terms of in-group and out-group, that it is easier to

10   transition from one to the other.

11   Q.   In other words, you're suggesting that we need to consider

12   and move on in your testimony, consider some of the other

13   factors in addition to radical ideology.  In order to make this

14   final link between the shared conversions between militant

15   Islam and white supremacism, we need to move on in your

16   testimony.

17        You also testified about hate speech, correct?

18        THE COURT:  Now you're giving a speech.  You need to

19   ask a question.

20   BY MR. SMITH:

21   Q.   Did you also testify how hate speech links militant Islam

22   and white supremacism?

23   A.   Yes.

24   Q.   And you've testified that it is a shared proclivity for

25   hate speech that renders white supremacists who ordinarily hate

Gartenstein-Ross - Cross                                        955

1    minorities and militant Islam similar.  That's one of the

2    factors, hate speech, that renders them similar?

3    A.    I don't agree with the way that you phrased that.  It's

4    one of the -- it's one of the similarities that has allowed

5    people to make a transition from one to the other.  It's a

6    similarity that the subjects themselves, people have gone from

7    being Nazis to being jihadists, or vice versa in the case of

8    Ahmed Huber, have pointed to as being significant.

9    Q.    So is hate speech limited to militant Islam supporters and

10   white supremacists?

11   A.    Of course not.

12   Q.    Why do you say of course not?

13   A.    Because we all know that hate speech can come from a

14   variety of corners.

15   Q.    So there's nothing special about hate speech itself that

16   links militant Islam and white supremacism, correct?

17   A.    Well, I haven't made the argument that these two have to

18   be seen as the only things that have hate speech.

19   Q.    We're going to keep moving on.  But you would agree that

20   hate speech itself is not enough to establish the connection

21   you want, which is the basis of your thesis, right?

22   A.    I disagree with your statement, no.  I mean, I'm not

23   saying -- I'm not drawing a connection that these two are

24   unique and that there is nothing like them.  I'm not saying

25   that only these two use hate speech.  Rather, the argument I'm

Gartenstein-Ross - Cross                                          956

1  making is that one can transition from being a neo-Nazi to

2  being a jihadist, that we've seen it happen.

3            I'm not saying that it's the only route in or the

4  only area where one would succumb to hate speech that would

5  make them more likely to be a jihadist.  So no, the connection

6  I'm making is not that these two are absolutely unique and that

7  there is nothing in the world like them.

8  Q.    I don't think I suggested that in my question to you, but

9  you would agree that if, for example, focusing on hate speech,

10 if we were to take an easy example, we have a political

11 spectrum in this country with Democrats and Republicans, and if

12 Democrats and Republicans both engaged in hate speech, would

13 you be able to conclude from the hate speech of a Democrat that

14 they are more inclined to become a Republican because

15 Republicans also engage in hate speech?

16           You would not agree with that statement, right?  Take

17 an example of the political spectrum in this country.

18 A.    No, I heard your question.  I agree that I would not agree

19 with the statement that the fact that they both engage in hate

20 speech would make a Democrat more likely to be a Republican.

21 Q.    You also single out dehumanization as a factor that links

22 white supremacism and militant Islam, correct?

23 A.    That's correct.

24 Q.    Is dehumanization a concept that is limited to militant

25 Islam terrorist supporters?

Gartenstein-Ross - Cross                                          957

1   A.   No.

2   Q.   Is it limited to white supremacists?

3   A.   No.

4   Q.   Would you agree that governments throughout history have

5   practiced dehumanization in propaganda?

6   A.   Yes.  In fact, you know, the case studies that are, have

7   been done on this and the academic work that has been done on

8   this looks at dehumanization across a variety of contexts,

9   ranging from Nazi Germany to the Rwandan genocide and others,

10  and finds that hate speech has been used in a variety of places

11  and has the impact of dehumanizing in many cases future victims

12  of genocide.

13  Q.   So you would agree that the psychology professor has sort

14  of left the old notion that dehumanization is purely a Nazi

15  phenomenon?

16  A.   I'm not sure that that accurately characterizes the old

17  notions of it.  In looking at hate speech and dehumanization

18  early on, a lot of the early work focused on Nazi Germany.  I

19  don't think that there are that many academics who are so

20  narrow as to think that only Nazi Germany dehumanized its foes.

21  Q.   One of the areas of convergence you identified between

22  white supremacists and militant Islam supporters is that both

23  are "rigid," correct?

24  A.   That is one area, yes.

25  Q.   Is that adjective limited to white supremacists and

Gartenstein-Ross - Cross                                          958

1  militant Islam supporters?

2  A.   No.

3  Q.   Your report finds that both groups have far-reaching

4  ideologies, correct?

5  A.   That's correct.

6  Q.   Is that factor limited to these two groups, white

7  supremacists and militant Islam supporters?

8  A.   No.

9  Q.   Your report finds that both groups have all-consuming

10 outlooks, correct?

11 A.   That's correct.

12 Q.   Is that limited to militant Islam supporters and white

13 supremacists?

14 A.   No.

15 Q.   So if I understand your testimony correctly, there really

16 is one linking factor, right?  There is -- well, I can quote

17 you.  So does your report indicate that Jews, quote, lie at the

18 center of literally every Nazi-jihadist-defining affinity?

19 Your report says, "Jews lie at the center of literally every

20 Nazi-jihadist affinity."

21         Is that what your report concludes?

22 A.   Yeah.  What it should have said is every case of

23 Nazi-jihadist affinity.

24 Q.   So would you agree that the connection you're trying to

25 establish between a proclivity to support white supremacists

Gartenstein-Ross - Cross                                    959

1   and militant Islam supporters centers around a hatred of Jews?

2   A.   That's an important factor.  It's not the only one.

3   Q.   So when you wrote it lies at the center, you mean it's

4   central, but it's not the only central factor?

5   A.   Yeah.  It's been center to the -- it's central to the

6   eight cases which I've identified, where in all of those cases,

7   the people identified hatred of Jews as being an important

8   aspect of how they were able to move in most cases from Nazism

9   to jihadism or in one case were able to cooperate with

10  jihadists despite being a Nazi.

11          There are other commonalities between the two, but

12  hatred of the Jew looms extraordinarily large across these two

13  ideologies.

14  Q.   That's how I understood your testimony to be.

15          So, so it's hatred of the Jews.  Is hatred of the

16  Jews and anti-Semitism limited to these two groups, white

17  supremacists and militant Islam supporters?

18  A.   No.

19  Q.   It infects groups across the ideological spectrum,

20  correct?

21  A.   Sure.

22  Q.   Left-wing politics, anti-Semitism is prevalent?

23  A.   So I would say there is a core difference, though.

24  Q.   Sir, I'm asking the question.  So would you agree that

25  anti-Semitism is prevalent on the left wing in politics in this

Gartenstein-Ross - Cross                                          960

1   country?

2   A.   I --

3   Q.   Far left wing?

4   A.   I have -- I don't have a basis for agreeing or disagreeing

5   with that statement.

6   Q.   Would you agree that anti-Semitism is prevalent on the

7   right wing in this country?

8   A.   Would I agree that it's prevalent on the right wing, on

9   the right wing of this country?  No.  I mean, that's making a

10   fairly large judgment about an entire political, political

11   spectrum.  If your argument --

12   Q.   Are you familiar with the John Birch Society?

13   A.   What?

14   Q.   Are you familiar with the John Birch Society?

15   A.   Yes.  It --

16   Q.   What is the John Birch Society?

17   A.   The John Birch Society was an anti-Communist movement that

18   existed during the Cold War era.

19   Q.   Was it anti-Semitic?

20   A.   Yeah, in many of its -- so if your question is does it

21   exist on the right wing, yes, I agree with it.  I don't agree

22   with it as phrased, which seems to be talking about prevalence

23   across the entire right wing.  I'm not going to talk about the

24   prevalence across an entire part of the political movement, but

25   if you're talking about on the fringe, has it existed for the

Gartenstein-Ross - Cross                                              961

1   John Birch Society, for example, yes, of course.

2   Q.    I think it's sufficient just for you to say that you agree

3   that there's anti-Semitism across the political spectrum.

4   A.    Sure, I'm happy to agree with that.  I don't want to agree

5   with questions that seem to make broad generalizations.

6   Q.    So in order to draw your conclusion that there is some

7   sort of connection between militant Islam and white supremacism

8   based on hatred of the Jews, you have to identify some sort of

9   hatred that's unique from all of the hatred that exists across

10  the political spectrum, correct?

11  A.    No, that's not correct.

12  Q.    Why?

13  A.    So number one, most theories of radicalization actually

14  look for a generalized theory of radicalization.  They don't

15  look for something that's unique.

16         So in general, if one is saying that X is a pathway

17  into, say, militant Islamism, if they say ideology is a path to

18  militant Islamism, then most academics are looking for ideology

19  to be a path into multiple kinds of radical ideologies.

20         So if I'm talking about how hatred of the Jews could

21  lead people from Nazism to militant Islamism, I don't -- the

22  argument is not necessary that they're unique in this regard.

23  There can be plenty of other places where hatred of the Jews

24  exists.  It's possible that some of these other places are

25  pathways in as well.

1          But what's not necessary is to have a theory that

2    uniquely connects the two where nothing else can be connected.

3    It's possible that there are other things that could connect as

4    well.  Here all we're looking at is the connection between the

5    two.

6    Q.   The connection between the two, as you've just stated, is

7    based -- what lies at the center of the connection you're

8    arguing is anti-Semitism, correct?

9    A.   Anti-Semitism is, yes, very important.

10   Q.   And you also agree that anti-Semitism is prevalent across

11   ideological groups, correct?

12   A.   Yes.

13   Q.   So it is your position that you can link militant Islam

14   and white supremacism with anti-Semitism even though you agree

15   anti-Semitism exists across ideological spectrums, correct?

16   A.   That's correct, but as I said --

17   Q.   Is that not a logical flaw?

18          MR. KROMBERG:  Objection.

19          THE WITNESS:  No, that is not a logical flaw.

20          THE COURT:  Wait, wait, wait.  Just a second.

21          THE WITNESS:  Sure.

22          THE COURT:  One person speaks at a time, all right?

23   Of course, the transcript of this proceeding is going to be a

24   piece of just, you know, garbled, all right?

25   BY MR. SMITH:

Gartenstein-Ross - Cross                                              963

1   Q.   You're attempting to establish a connection between a

2   proclivity for supporting white supremacism and a proclivity

3   for supporting militant Islam based on a shared hatred of the

4   Jews, correct?

5   A.   That is correct.

6   Q.   And you agree that a hatred of the Jews is prevalent

7   across the political spectrum, correct?

8   A.   It -- well, you keep using the word "prevalent."

9   Q.   It exists across --

10  A.   It exists.

11  Q.   Across the political spectrum, correct?

12  A.   Correct.

13  Q.   So in order to make an argument that a proclivity for

14  supporting white supremacism indicates a proclivity for

15  supporting militant Islam, as opposed to any other part, piece

16  of the political spectrum, you would have to establish that the

17  anti-Semitism linking the two groups you want to establish is

18  something distinct from the anti-Semitism you agree exists

19  across the spectrum, correct?

20  A.   You'd have to establish that it's unique?  No, you

21  wouldn't.

22  Q.   It's a premise of your argument, correct?

23  A.   No, that's not correct.  As we talked about, first of all,

24  you don't need to show, like, we need not believe that the two

25  are absolutely unique about radical ideologies.  There could be

Gartenstein-Ross - Cross                                                964

1  another radical ideology that also is a pathway into militant

2  Islamism based on anti-Semitic beliefs.  That wouldn't nullify

3  neo-Nazism being a way in.

4          In fact, generally speaking, academics try to look

5  for generalized explanations, not unique explanations which

6  limit it down to two ideologies.  And secondly, not all

7  anti-Semitism is equal.  You know the genocidal anti-Semitism

8  of neo-Nazism is not the same as, say, someone who just has

9  some anti-Semitic beliefs.  Exterminationists' discrimination

10 is not the same as, you know, standard stereotypes or perhaps

11 bigotry.

12 Q.   So if I understand your testimony correctly, you have

13 identified something that is distinguishable about the

14 anti-Semitism of white supremacists and militant Islam

15 supporters that's different from the sort of casual

16 anti-Semitism you might identify across the political spectrum.

17 You -- I believe you just testified that it's more virulent,

18 that the anti-Semitism between -- in militant Islam supporters

19 and in white supremacists is more virulent than the

20 anti-Semitism across the political spectrum?

21 A.   That's correct, but your question before was whether --

22 Q.   Sir, I'm asking -- I'm just asking you a yes-or-no

23 question.

24 A.   Yes.

25 Q.   Okay.

Gartenstein-Ross - Cross                                              965

1    A.   Certain --

2    Q.   Do you have any studies -- do you have any data and

3    empirical studies backing up your assessment that there is a

4    more virulent anti-Semitism motivating militant Islam

5    supporters and white supremacism than the anti-Semitism that

6    exists in other parts of the political spectrum?

7    A.   Do I have any studies?  Well --

8    Q.   Did you rely on any data --

9    A.   Yes.

10   Q.   -- in arriving at that premise of your argument?

11   A.   I relied upon statements of neo-Nazis and major jihadist

12   figures who identify Jews as the center -- the central enemy

13   that they see.

14   Q.   What statements?

15   A.   The statements of, of Hitler; of Goebbels; of Zaid

16   Khattab, who is the forefather of the Islamic movement.  You

17   know, as you said, it does tend to be more virulent; I agree

18   with that; and looking at statements from these movements, I

19   think the virulence of their hatred comes across very well.

20   Q.   You've identified your method as one -- your method in

21   comparing militant Islam and white supremacism as one of

22   testing the cultural significance of various items that were

23   found in the defendant's home, correct?  That is the test, one

24   of what is the cultural significance of these items, correct?

25   A.   I don't understand your question.

Gartenstein-Ross - Cross                                                  966

1   Q.   So you are testifying here today, as your report

2   indicates, about the cultural significance of various items

3   that were seized from the defendant's home?

4   A.   Yes, I have.

5   Q.   That's how you characterize your, your method, is one of

6   assessing the cultural significance of the items?

7   A.   No.   I mean, you're mixing up two different things, right?

8   Looking at the cultural significance of the items is saying

9   what does this mean?   That's a method.   In terms of looking at

10  Nazism and militant Islamism, the method was, number one,

11  looking at mechanisms of radicalization that bind the two, and

12  number two --

13  Q.   Dr. Gartenstein-Ross, I was only asking --

14            MR. KROMBERG:   Objection, Judge.

15  BY MR. SMITH:

16  Q.   I was only asking about the cultural significance element.

17            THE COURT:   Now, you're doing the same thing,

18  Mr. Kromberg, all right?   One person at a time.

19            MR. KROMBERG:   Objection, Judge.   He asked the

20  question.   The witness was in the middle of the answer, number

21  one, and number two, he was cut off.

22            THE COURT:   All right, I'll sustain the objection.

23  Let's keep it calm.

24  BY MR. SMITH:

25  Q.   Are you familiar with the concept of falsifiability?

Gartenstein-Ross - Cross                                           967

1    A.    Yes.

2    Q.    What is falsifiability?

3    A.    Falsifiability means that you can falsify something if you

4    test it.  You can determine whether something is false by

5    looking at, say, a data set or running some sort of test to

6    determine the truth or falsehood of a matter.

7    Q.    So you would agree that's a part of scientific method is,

8    it's part of arriving at an empirical conclusion of

9    falsifiability is an important aspect of that?

10   A.    Sometimes, yes.

11   Q.    So would you agree that your cultural significance test of

12   items is not falsifiable?  We can't prove it right or wrong?

13            MR. KROMBERG:  Objection, Judge.  The witness has

14   testified that Mr. Smith is mixing apples and oranges.

15   Cultural significance is one thing he was hired to do, to

16   assess the cultural significance of certain items.

17            That's not, as the witness has testified, that's not

18   his method of studying radicalization.

19            MR. SMITH:  Your Honor, I haven't asked the witness

20   about falsifiability in connection with cultural, his cultural

21   significance test yet.  I'm just trying to elicit one answer on

22   this question, which is --

23            THE COURT:  Why don't you-all approach the bench.

24            (Bench conference on the record.)

25            THE COURT:  I'm giving you some leeway on this, but I

Gartenstein-Ross - Cross                                        968

1  don't know if it's really helping your situation that much.

2  Number one, I think the jury is getting a little bit tired of

3  this.  Number two, this is a social science area, and as you

4  know, social sciences are not the same as hard sciences.  If

5  you go too far down this road, you're going to be misleading

6  the jury in that respect.

7           MR. SMITH:  Well --

8           THE COURT:  So I'm just giving you that warning, all

9  right?  But -- and I do think you're mixing things up as you

10  put these questions in.  The questions are way too long.  So

11  that's what I want on the record.

12          MR. SMITH:  We can move on, Your Honor.

13          THE COURT:  What?

14          MR. SMITH:  We can just move on.  I'll move on.

15          THE COURT:  All right, that's fine.

16          (End of bench conference.)

17  BY MR. SMITH:

18  Q.   Now, part of your thesis of the connection of white

19  supremacists to military Islam is based on these eight case

20  studies in your report, correct?

21  A.   Correct.

22  Q.   And these individuals who have an interest in both

23  militant Islam and white supremacism, these individuals were,

24  were engaged in actual support for militant Islam, correct, in

25  the sense that they were either arrested for engaging in

Gartenstein-Ross - Cross                                          969

1   violence in support of militant Islam, they, they all attempted

2   violence in some way, correct?

3   A.   Yeah, that's correct.  The, the one exception is David

4   Myatt, who just -- who theorized as to violence, but the

5   others, it's correct.

6   Q.   So Steven Smyrek tried to conduct a terrorist attack,

7   right?

8   A.   Yes.

9   Q.   Ahmed Huber was named by the Treasury Department as a key

10  terrorist financier?

11  A.   Yes.

12  Q.   Lemansky was arrested planning a -- for planning a

13  terrorist attack?

14  A.   Correct.

15  Q.   Devon Arthurs was arrested for holding (inaudible) at

16  gunpoint, and the rest were all involved in violence -- in acts

17  of violence and arrested.  None of these figures in your case

18  study convergence thesis were involved in government sting

19  operations, correct?

20  A.   None of them were caught in sting operations.  I think --

21  you know, I think that's correct, yes.

22  Q.   So none of these -- none of these case studies you're

23  citing involves an example where the government is soliciting

24  the terror crime that was committed, correct?

25  A.   Correct.

Gartenstein-Ross - Cross                                          970

1  Q.   And all of these case studies except for the Myatt example
2  you cited involve violent, not nonviolent, support for militant
3  Islam, correct?
4  A.   Well, one case was, as you had said, for Ahmed Huber, he
5  was a financier, not actually directly the one carrying out
6  violence but funding those who were carrying out violence.
7  Q.   So, so we were discussing the difference between empirical
8  study and a case study.  So you've selected eight examples that
9  you believe establish your conclusion that there is some sort
10 of comparison between militant Islam and white supremacism that
11 might lead one supporter of one group to be inclined to the
12 other.
13       Isn't the problem with choosing eight examples and
14 trying to establish a conclusion based on those eight examples
15 that there are many other factors that might lead these
16 individuals to support both militant Islam and white
17 supremacism that has nothing to do with hatred for the Jews?
18 A.   No, that's not a -- that's not a problem in selecting
19 those eight in that in those eight -- if I understand your
20 question correctly, in those eight, they specify this front and
21 center as having been an important point of connection.  There
22 may as well -- there may be other variables as well.
23       Usually radicalization tends to be a complex thing,
24 where it doesn't boil down to a single factor, but they have
25 listed that factor as one important reason that they are able

Gartenstein-Ross - Cross                                              971

1  to merge white supremacy neo-Nazi with jihadism.

2  Q.   So you would agree that there are many neo-Nazis in the

3  world, hundreds of thousands, if not more?  Neo-Nazis or white

4  supremacists?

5  A.   Yes.

6  Q.   There are hundreds of thousands of examples?

7  A.   Right.

8  Q.   So if we wanted to, we could find eight neo-Nazis who are

9  also eight carpenters, correct?

10 A.   Yes, but it --

11 Q.   But we could also find eight neo-Nazis who are plumbers?

12 A.   Yes.

13 Q.   And we could find eight neo-Nazis who are also violinists,

14 correct?

15 A.   I have no information on whether there are eight neo-Nazis

16 who are violinists.

17 Q.   Given the statistics, given the big numbers, we could

18 probably find eight neo-Nazis who are also each one of these

19 categories, right?

20 A.   That's correct.

21 Q.   On that basis alone, would you establish a convergence

22 between violinists and neo-Nazism?

23 A.   Not unless they said:  I'm a plumber, and that was

24 absolutely essential to me becoming a neo-Nazi.

25 Q.   Right.  But if only eight individuals who are neo-Nazis

Gartenstein-Ross - Cross                                          972

1   and anti-Semites say they are anti-Semites, that's not

2   establishing the point beyond those eight individuals, correct?

3   A.    Could you repeat your question, please?

4   Q.    So you said that you could not craft your convergence

5   thesis about a neo-Nazi-violinist connection unless those eight

6   neo-Nazi-violinists said they supported neo-Nazi and violin and

7   they were violinists because they were anti-Semitic; is that

8   right?

9   A.    Yeah.  I mean, ideally as well, there'd be a history of

10  neo-Nazi war criminals finding shelter with violinists,

11  violinists coming over and playing the violin to try to

12  encourage Nazis to kill the Jews, and recruiting violinist

13  units into the SS to take part in the genocide.

14  Q.    I know you just used a lot of explosive terms right there,

15  but I don't think you've answered my question.

16  A.    No, I've answered your question.

17  Q.    You've also testified about Libya.  You've testified that

18  you have published some articles about the Libyan Civil War.

19  A.    I published some articles in a peer-reviewed study, yes.

20  Q.    Okay.  You haven't published any peer-reviewed studies

21  about this group called the Abu Salim Martyrs Brigade, have

22  you?

23  A.    I have not.

24  Q.    Okay.  You have no personal knowledge of the Abu Salim

25  Martyrs Brigade, do you?

Gartenstein-Ross - Cross                                        973

1   A.   What do you mean by personal knowledge?

2   Q.   By personal knowledge, I mean if you were a witness in

3   Libya to -- if you had, knew someone in the Abu Salim Martyrs

4   Brigade, if you had spoken to someone who had spoken to someone

5   in the Abu Salim Martyrs Brigade, if you had traveled to Libya

6   and witnessed the Abu Salim Martyrs Brigade, you would have

7   personal knowledge of that group.

8   A.   So under one of those, which is kind of the indirect

9   connection, yeah, but I've read primary source information of

10  the group.  I've studied the group's connections.  I haven't

11  traveled over to Libya and met with them.  I think I wouldn't

12  get along with them very well.

13  Q.   One of your sources for your testimony on the Abu Salim

14  Martyrs Brigade is *Time* magazine, right?

15  A.   Yes.

16  Q.   One of your sources is a blog, right?

17  A.   No.

18  Q.   What is the Long War Journal?

19  A.   The Long War Journal is an online journal written by

20  professionals which looks at, it's titled "*The New York Times*

21  and Elsewhere," which delves very deeply to connections --

22            THE COURT:  Wait a minute.

23            THE WITNESS:  Sorry.  The Long War Journal is an

24  online journal written by professionals in this field which

25  looks very closely at jihadist groups and the connections

Gartenstein-Ross - Cross                                          974

1    between them and their leadership structure and propaganda.

2    BY MR. SMITH:

3    Q.   So I'm going to show you some pictures that are, are going

4    to be newly marked as defense exhibits.

5              And, Your Honor, we'll discuss with you the defense

6    exhibit numbers.

7              THE COURT:  I think we need a break, so I'm going to

8    give you 15 minutes, and we'll reconvene at quarter of.

9              MR. SMITH:  Okay.

10             (Recess from 3:30 p.m., until 3:47 p.m.)

11                       (Defendant present, Jury out.)

12             THE COURT:  Ms. Moreno, as you know, I did the recess

13   because I was getting signals from you.  I don't believe -- I

14   watch the jurors.  I can't see these three, but I did not see

15   the gentleman whom I think you're concerned about actually

16   dozing off.  I think from time to time, he's one of those folks

17   who looks down, but anyway, this should have awakened him, but

18   as I said, the cross was getting tedious, and it's late in the

19   day, and that starts to happen so --

20             MS. MORENO:  Yes, Your Honor.  I would appreciate it,

21   however, if the Court keeps an eye, because I actually have

22   seen him sleeping, and he doesn't assume a, you know, a

23   crouched position.

24             THE COURT:  All right, I'll keep my eye on him.

25             MS. MORENO:  We appreciate it.

Gartenstein-Ross - Cross                                              975

1          MR. SMITH:  Your Honor?

2          THE COURT:  For scheduling purposes, Mr. Smith, how

3   much longer do you think you're going to be with your cross?

4   I'm not trying to rush you because I'm giving you equal time

5   with the government.  I want to know whether you think you're

6   going to use all of that.

7          MR. SMITH:  I think approximately 30 minutes, maybe

8   20 minutes.

9          THE COURT:  All right.  All right, that's fine.

10         And then the government has one more witness for

11  today.

12         MR. KROMBERG:  That is correct, Judge.

13         THE COURT:  And how long do you think your witness is

14  going to take?

15         MR. KROMBERG:  It could be an hour and a half.

16         THE COURT:  All right.  That tells me -- we've given

17  you the proposed verdict form, so overnight you can take a look

18  at that and see if there's any objections to it, all right?

19         MR. KROMBERG:  Yes.

20         THE COURT:  Let's bring the jury in.

21                    (Jury present.)

22         THE COURT:  One of our jurors just sent us a note

23  that he's wondering for planning purposes what time I think we

24  might conclude tomorrow, that he has to pick someone up at

25  Dulles on a Friday night, and I think to get to Dulles on a

Gartenstein-Ross - Cross                                          976

1    Friday, to be safe, you'd have to leave here by 4:30, and I

2    really don't think we want to end that early.  I'm not going to

3    keep you here until six on a Friday because we're actually

4    ahead of schedule, but I think by five o'clock, I would still

5    like to be able to run the case.

6            So if alternate plans can be made, I'd appreciate

7    that.  If you think it's going to be a disaster, let us know.

8            Which juror?

9            A JUROR:  I'll make alternate plans.

10           THE COURT:  You can do that?  All right.  But I will

11   get you out of here by five tomorrow, all right?

12           A JUROR:  Okay.

13           THE COURT:  All right.

14   BY MR. SMITH:

15   Q.   Dr. Ross, you've testified that you relied primarily on

16   primary sources, correct?

17   A.   Yes.

18   Q.   And what is a primary source?

19   A.   A primary source is a statement from a jihadist group

20   that --

21           THE COURT:  Can you speak up, sir?

22           THE WITNESS:  Sure.  A primary source is a statement

23   from a jihadist group, a document that has been intercepted,

24   you know, a missive that was written, even if a jihadist has an

25   online blog, for example, looking at their online blog.

Gartenstein-Ross - Cross                                          977

1   Q.   Okay.  And that's opposed to a secondary source, correct?

2   A.   Right.

3   Q.   And a secondary source is what?

4   A.   A secondary source is a newspaper article, a book, another

5   source which provides a scholar's conclusion about a particular

6   topic.

7   Q.   So an analyst -- an analyst's assessment of a primary

8   source would be a secondary source?

9   A.   Correct.

10  Q.   Okay.  So going back to Abu Salim Martyrs Brigade, you've

11  testified that your understanding of Abu Salim Martyrs Brigade

12  is based in part on *Time* magazine, correct?

13  A.   Yes, in a small part.

14  Q.   Is *Time* magazine a primary source?

15  A.   It is a secondary source.

16  Q.   You've testified that you've relied on something called

17  the Long War Journal in testifying about the Abu Salim Martyrs

18  Brigade, correct?

19  A.   That is correct.

20  Q.   Is the Long War Journal a primary source?

21  A.   It is a secondary source.

22  Q.   Okay.  So you've testified that you prefer to rely on

23  primary sources because they're more reliable, but in

24  connection with the Abu Salim Martyrs Brigade, you are not

25  relying on primary sources, correct?

Gartenstein-Ross - Cross                                                978

1    A.    That's incorrect.  In, in the report which you're pointing

2    to, I primarily -- I put secondary sources down there.  The Abu

3    Salim Martyrs Brigade was a late addition to the case, but I've

4    read plenty of primary sources related to the Abu Salim Martyrs

5    Brigade, and in particular their fight against ISIS in Derna.

6    I've done original reporting on that which is based on primary

7    sources, and one can easily find that on the Internet.

8    Q.    You just said it was a late addition to the case.  What

9    did you mean by that?

10   A.    It was added, I think, a couple of weeks before into my

11   report.

12   Q.    And when is that?  A couple of weeks before your report,

13   what time are you referencing?

14   A.    I don't -- sometime in November, I was asked to add it and

15   did.

16   Q.    So the government asked you to add a little section on Abu

17   Salim Martyrs Brigade in November of 2016 -- 2017?

18   A.    That's correct.

19   Q.    And you had never discussed with them up to that point Abu

20   Salim Martyrs Brigade?

21   A.    No, I discussed it before.  I just wasn't going to include

22   a discussion of Abu Salim Martyrs Brigade in my report

23   previously.

24   Q.    Why not?

25   A.    I don't know.  I mean, it all, it all refers -- it all

Gartenstein-Ross - Cross                                             979

1   relates to, I assume, admissibility of evidence in the case,

2   what evidence is likely to have been presented.  I simply

3   provided analysis of those items that I was asked to analyze.

4   Q.   Did they ask you not to include the -- did the government

5   attorneys ask you not to include Abu Salim Martyrs Brigade

6   before because you had insufficient information to expertly

7   testify?

8   A.   No, that's not at all correct.

9           MR. SMITH:  Okay.  Let's put up, this is now marked

10  Defense Exhibit 5.  This is a photograph from a camera that was

11  seized by the FBI from the defendant's home after his arrest in

12  August 2016.

13          THE COURT:  I assume there's no objection from the

14  government?

15          MR. KROMBERG:  I don't know what we're talking about

16  yet.

17          THE COURT:  All right, you need to present your

18  exhibits to the government.

19          MR. SMITH:  We have, Your Honor.  That's not entirely

20  accurate.  We gave them an exhibit list this morning.  I showed

21  the pictures to Mr. Kromberg, and he said, "We have no issue

22  with them."

23          MR. KROMBERG:  If that's the picture that we're

24  talking about, we have no issue with it, but I don't --

25          MR. SMITH:  I can understand the, the basis of the

Gartenstein-Ross - Cross                                          980

1   testimony in just a minute if we put the picture up here,

2   Defense Exhibit No. 5.

3           THE COURT:  Is there any objection, Mr. Kromberg?

4           MR. KROMBERG:  None.

5           THE COURT:  All right, it's in.

6           (Defendant's Exhibit No. 5 was received in evidence.)

7           MR. SMITH:  So can you blow that up?

8   Q.  So I think you can see the defendant with a backwards hat

9   there giving a peace sign.  This is from a camera that the

10  government seized from Mr. Young's home when he was in Libya.

11  I'm just -- I'd ask you to look at that picture.

12          You're testifying today as an expert on the Abu Salim

13  Martyrs Brigade, correct?

14  A.  Yes.

15  Q.  Do you -- can you identify in that picture for me the

16  indicators of the Abu Salem in that picture?

17  A.  For that picture, one cannot say whether, like, I looking

18  at that don't know whether those individuals are in the Abu

19  Salim Martyrs Brigade or not.

20          MR. SMITH:  Okay.  Let's go to Defense Exhibit 7.

21          THE COURT:  Any objection to 7?

22          MR. KROMBERG:  No.

23          THE COURT:  All right, it's in.

24          (Defendant's Exhibit No. 7 was received in evidence.)

25  BY MR. SMITH:

Gartenstein-Ross - Cross                                          981

1  Q.   Do you -- so this is another photograph taken from

2  Mr. Young's camera when he was in Libya during this, this trip

3  that the government's been referencing in May of 2011.  Do you,

4  do you see any indication in that photo of the Abu Salim

5  Martyrs Brigade or terrorist --

6  A.   Yeah, I would assume that individual is not a part of the

7  Abu Salim Martyrs Brigade --

8  Q.   Okay.

9  A.   -- both because of his age and a few other reasons.

10         MR. SMITH:  Can you go to No. 4, please, Defense

11  Exhibit 4?

12         THE COURT:  Any objection to 4?

13         MR. KROMBERG:  No.

14         THE COURT:  All right, it's in.

15         (Defendant's Exhibit No. 4 was received in evidence.)

16  BY MR. SMITH:

17  Q.   Any indication here?

18  A.   No indication one way or the other.

19  Q.   Would you call -- now, would you call documentary evidence

20  like this a primary source?

21  A.   Yes.

22         MR. SMITH:  Okay.  Can you go to Defense Exhibit 6,

23  please?

24         THE COURT:  Any objection?

25         MR. KROMBERG:  No objection.

Gartenstein-Ross - Cross                                              982

1          THE COURT:  All right, it's in.

2          (Defendant's Exhibit No. 6 was received in evidence.)

3          MR. SMITH:  Can you rotate it?

4    Q.   Any evidence here?

5    A.   That they're part of the Abu Salim Martyrs Brigade?

6    Q.   On the beach.

7    A.   Yeah, there is not evidence here that says that they are.

8          THE COURT REPORTER:  Please repeat that.

9          THE WITNESS:  Sure.  My answer to him was that yes,

10   there's not evidence there that the individuals in this picture

11   are a part of the Abu Salim Martyrs Brigade.

12   BY MR. SMITH:

13   Q.   Thanks.  So you've, you've testified today about these

14   eight case studies that establish the connection between Nazism

15   and -- neo-Nazism and militant Islam.  Would you say that your

16   analysis of those case studies would depend on how seriously

17   the subject matter of the case study took his views of Nazism?

18   A.   I don't understand what you mean by that my analysis of

19   them would depend upon them.

20   Q.   So, so your testimony today about the connection between

21   militant Islam and white supremacism is in part based on your

22   case study of eight individuals?

23   A.   Correct.

24   Q.   And these eight individuals exemplify how a person might

25   have an affinity for white supremacism and militant Islam,

Gartenstein-Ross - Cross                                                983

1   correct?

2   A.   Yes.

3   Q.   So would it affect your analysis of those eight

4   individuals if one of the individuals did not take Nazism

5   seriously, but, rather, thought of it as a gag, a joke?

6   A.   If one of them thought of it as a gag, would it affect

7   my --

8   Q.   Do you see some distinction between a political interest

9   in Nazism and sort of, for example, an interest in World War II

10  reenactment?

11  A.   Yes, there is a difference between the two.

12  Q.   What's the difference?

13  A.   On the one hand, someone who has a political interest

14  ascribes to the ideology.  Someone who is a reenactor doesn't

15  necessarily ascribe to the ideology.  They may.

16  Q.   So would you say that in the eight case studies upon which

17  your opinion is based, were those individuals politically

18  interested in Nazism and white supremacism?

19  A.   Yes.

20  Q.   They were not reenactors, correct?

21  A.   They were not -- none of them were solely reenactors.

22  Q.   Solely.  Were any of them World War II reenactors?

23  A.   I don't have information on that.  It's not impossible

24  that one would be.

25  Q.   It's not impossible?

Gartenstein-Ross - Cross                                              984

1    A.   But I have no information indicating that they would.

2    Q.   No information upon which you based your report?

3    A.   Correct.

4    Q.   Okay.  So you're testifying that it would affect your

5    analysis of these eight individuals if, for example, it turned

6    out that one of those individuals did not politically support

7    Nazism but, rather, dressed up on the weekends as a Nazi

8    reenactor?

9    A.   Would it change my view if one of them only dressed up as

10   a Nazi on the weekends and didn't support it?  If there was no

11   support at all for that ideology, yes, but it depends on kind

12   of at what point in time we're looking at that.

13   Q.   Okay.

14   A.   It's possible -- so yes, it would, it would affect the way

15   you would view that case.

16   Q.   Okay.  So before you performed your, your cultural

17   significance test on Mr. -- the items seized from Mr. Young's

18   house, did the government inform you that nearly all of these

19   objects were dumped in a closet in his home?

20        MR. KROMBERG:  Objection, Judge.  There is no

21   evidence that that is true in the first place.

22        THE COURT:  Sustained.  Sustained.

23   BY MR. SMITH:

24   Q.   Now, you've testified about Salafism.  That was one of the

25   first areas of inquiry that you addressed.

Gartenstein-Ross - Cross                                          985

1    A.    "Salafism."

2    Q.    "Salafism."  Did you testify there are several different

3    kinds of Salafism?

4    A.    Yes.

5    Q.    What were the kinds again?

6    A.    So I only named Salafi jihadism, but in addition to Salafi

7    jihadism, two others I would name are, number one, political

8    Salafism, where one tries to bring about more of an

9    incorporation of Islamic law into the law of the state through

10   political means.

11          A second one I would point to is Salafi quietism,

12   which eschews involvement in the political system.  But there

13   are a number of kinds of Salafism.  Those are three strains

14   that academics tend to look to.

15   Q.    You've testified today about one of the objects you

16   examined for the cultural significance test was a flag.

17   A.    Yes.

18   Q.    A nation state flag that was on the ground, correct?

19   A.    Correct.

20   Q.    Which flag was that?

21   A.    Are you talking about the Reichskriegsflagge?

22   Q.    There was a flag -- you testified about a picture of a

23   flag that was allegedly used as a doormat in front of the

24   defendant's --

25   A.    I actually did not.

1              MR. KROMBERG:  That did not occur.

2              THE WITNESS:  I did not testify about that, sir.

3              THE COURT:  Different witness.  It's been a long day.

4     It came in through a different witness.  It came in with one of

5     the roommates.

6     BY MR. SMITH:

7     Q.   You testified about --

8              THE COURT:  Why don't you show him the picture?  Do

9     you want him to look at the picture?

10             MR. SMITH:  No, I don't want to show him the picture

11    if he hasn't testified about the subject area.

12             THE COURT:  All right.

13    BY MR. SMITH:

14    Q.   So during the course of your testimony, you looked at the

15    various objects you were tasked with assessing the cultural

16    significance of on the computer screen in front of you,

17    correct?

18    A.   Yes.

19    Q.   And when those were first provided to you, the government

20    did not tell you how the defendant interacted with those items,

21    correct?

22    A.   Correct.

23    Q.   So it was not a basis of your testimony -- in formulating

24    your opinion about the cultural significance of the items

25    seized from the defendant's home, you did not know anything

Gartenstein-Ross - Cross                                        987

1   about how the defendant used those items?

2   A.   Well, I would disagree with the word "anything," but that

3   wasn't the focus of the testimony.  The focus of the testimony

4   and the focus of the assessment was not on passing judgment

5   upon the defendant.  It was simply looking at the items and

6   giving an assessment of what the items meant.

7   Q.   Right.  So your testimony would be different, for example,

8   about the application of your ISIS-Nazi connection in this case

9   if you learned, for example, that these items were rarely used

10  by the defendant that you testified about?

11  A.   No, that's not correct.  So you're mixing up two different

12  things.

13  Q.   What am I mixing up?

14  A.   On the one hand, I would absolutely say that Nazism can be

15  a funnel into militant Islamism, into jihadism.  What your

16  question is is would that affect the application if, for

17  example, someone were --

18        THE COURT:  Mr. Smith, I don't know if you can hear

19  it or not.  When you do that --

20        MR. SMITH:  You're right, Your Honor; I apologize.

21        THE WITNESS:  And so your question is about the

22  application.  You know, yes, if an individual were not a Nazi,

23  if they were solely a reenactor, for example, the

24  application -- there would be a different application.  It

25  wouldn't fit that framework.

Gartenstein-Ross - Cross                                          988

1              But as to the framework itself, that Nazism can be a

2       funnel into militant Islamism, into jihadism, that wouldn't

3       change; that is, only the potential application might change.

4       BY MR. SMITH:

5       Q.   I see.  So you're relying primarily on primary sources,

6       maybe not in connection with Abu Salim Martyrs Brigade, but

7       aspirationally you rely on primary sources.  Do you recall the

8       primary sources you've used in your testimony about the Abu

9       Musab portion of the -- of your testimony?

10      A.   The Abu Musab portion?

11      Q.   Yes.

12      A.   For Abu Musab, it wasn't a primary source portion.  What I

13      was looking at was what does Abu Musab mean to people who've

14      looked at that photograph.

15      Q.   I see.

16      A.   And so I looked at multiple, probably about 12 different

17      people who were interpreting the photo, all of whom believe him

18      to be a jihadist.  The reason why I said that I'm not sure if

19      Abu Musab is associated with Nusra or ISIS is precisely the

20      lack of the underlying primary source.  What I can say, though,

21      is that by everyone, including ISIS, in a primary source, there

22      is one primary source there, which was an ISIS propaganda piece

23      which lists a number of individuals by their nationality, and

24      it lists Abu Musab as a Chechen, as Shishani.

25      Q.   I'm more curious about the way you use blog sources.  So

Gartenstein-Ross - Cross                                              989

1  you use a couple of blogs to support --

2  A.   Correct.

3  Q.   -- your testimony about Abu Musab, correct?

4  A.   To support the testimony that he is seen by all observers

5  as a jihadist.

6  Q.   Some of these blogs are in, are in Cyrillic, right?

7  A.   Yes.

8  Q.   Do you read Cyrillic?

9  A.   No.

10 Q.   Do you have a copy of your report in front of you?

11 A.   Yes.

12 Q.   Can you turn to the Abu Musab portion, please?

13 A.   Could you give me the page, sir?

14 Q.   Yes.  It's -- I'm looking at the November 17 copy, and I'm

15 looking at page 90, footnote 387.

16 A.   Yes.

17 Q.   Do you see footnote 387?

18 A.   Yes.

19 Q.   So that, that appears to be a blog that you're using to

20 support some of your testimony, but do you see the initial

21 title of the blog is quoted -- is Cyrillic writing?  Do you see

22 that?

23 A.   Right.

24 Q.   Do you know whether that's Russian or Ukrainian?

25 A.   Not off the top of my head, but --

Gartenstein-Ross - Cross                                          990

1   Q.   Can you tell -- wait, sir.  Can you tell me how you

2   reviewed the blog?

3   A.   Through -- what I did was a Google image search to see

4   everybody who was looking at it.  Then I used a translation

5   service for that.  The translation service indicated that they

6   saw him as a jihadist as well.

7          The -- none of the purpose of reviewing this was to

8   get at the truth of the matter as to who he is, but to see how

9   he is perceived by everyone who looked at that photograph, and

10  I gave a comprehensive review of people who talked about the

11  photograph.  I included the Cyrillic sources for the purpose of

12  completeness.

13  Q.   You said you had these, you had these blog posts

14  translated by what, now?

15  A.   Google Translator.

16  Q.   Google Translator.  Did you, did you indicate that in your

17  report?

18  A.   No.

19  Q.   Why not?

20  A.   I mean, I'm not sure there was a need to, but --

21  Q.   Okay.

22  A.   -- I mean --

23  Q.   How many times did you use blogs in formulating your

24  testimony?

25  A.   I think only for that section.  That particular section

Gartenstein-Ross - Cross                                              991

1  rested on looking at who do people think that Abu Musab is, so

2  I looked as comprehensively as I could about people who were

3  commenting on that particular photograph.

4  Q.    Some of your testimony on the Nazism side of the

5  equation --

6              THE COURT:  Ah, get away from that microphone.

7              MR. SMITH:  All right.

8  Q.    Some of your testimony on the Nazism piece of this theory

9  is, is predicated on a book called *The Rise and Fall of the*

10 *Third Reich*, correct?

11 A.    Yes.

12 Q.    Is that a primary source?

13 A.    No.  It's a history.

14 Q.    It's a history.  Is it an academic history?

15 A.    It's a history written by a nonacademic that was taught in

16 academia and just had a 50th anniversary edition published.

17 Q.    You called it one of the definitive histories of Nazism,

18 correct?

19 A.    Absolutely.

20 Q.    That's not right, right?

21 A.    No, it's correct.

22 Q.    Okay.

23 A.    It sold over a million copies.  The Smithsonian in their

24 public -- in their magazine had an article commemorating the

25 50th anniversary.  It's not, you know, necessarily the perfect

Gartenstein-Ross - Cross                                    992

1    source out there, but it certainly is seen as definitive in

2    terms of defining the way a generation of Americans understood

3    Nazi Germany.

4            MR. SMITH:  Thank you.

5            That's all our questions, Your Honor.

6            THE COURT:  All right.  Any redirect?

7            MR. KROMBERG:  Judge, before we do, I'd like to

8    approach.

9            THE COURT:  All right.

10           (Bench conference on the record.)

11           THE COURT:  I'm watching the juror.  He's awake.

12           MR. KROMBERG:  Judge, in the cross-examination,

13   Mr. Smith made a point that Mr. Young was just a reenactor or

14   suggested that he was just a reenactor and wouldn't it make a

15   difference to the analysis if he was just a reenactor.

16           Well, we have seven photographs of Mr. Young in his

17   Nazi uniform, none of which have anything to do with

18   reenactments.

19           MR. SMITH:  We dispute that.

20           MR. KROMBERG:  And Your Honor has not allowed any of

21   the photographs of him in a Nazi uniform in today.  I'm

22   guessing that Your Honor thought we had done some yesterday,

23   but you have not, so I would like to move those in today to

24   show that he, A, he's in a Nazi uniform, and B, it has nothing

25   to do with reenactments.

993

1          THE COURT:  We have no context, Mr. Kromberg, in

2    understanding that.  He might have dressed like that before he

3    went off to the reenactment.

4          MR. KROMBERG:  Judge, the guy has a flower in his

5    lapel, and they're somewhere, they're drinking and they're in

6    dress uniforms.  You don't go to a reenactment in your dress

7    uniform.

8          THE COURT:  I'm sorry, I'm going to sustain the

9    objection.

10          MR. KROMBERG:  Not one picture of him in a Nazi

11    uniform?

12          THE COURT:  Not one picture.  Thank you.

13          (End of bench conference.)

14          MR. KROMBERG:  Nothing further, Judge.

15          THE COURT:  No redirect?  All right.  Well, then

16    thank you for your testimony, sir.

17          I assume nobody's going to call the professor again?

18          MR. KROMBERG:  Not from the government.

19          THE COURT:  How about from the defense?

20          MR. SMITH:  No, Your Honor.

21          THE COURT:  All right.  Then, sir, you're excused.

22    You may stay in court and watch the proceedings or leave, but

23    don't discuss your testimony or anything you see or hear in

24    court until the case is over.  Thank you.

25                         (Witness excused.)

Caslen - Direct                                                        994

1             THE COURT:  All right, your next witness?

2             MR. KROMBERG:  Special Agent Caslen.

3        SA NICHOLAS ANGELO CASLEN, GOVERNMENT'S WITNESS, AFFIRMED

4                         DIRECT EXAMINATION

5    BY MR. KROMBERG:

6    Q.    Good afternoon, Special Agent Caslen.

7    A.    Good afternoon, Gordon.

8    Q.    Please state your full name and spell your last name for

9    the record.

10   A.    Nicholas Angelo Caslen.  Last name is Caslen, C-a-s-l-e-n.

11   Q.    And even though you were sitting here all this time and

12   hearing that the witnesses had to speak up, you probably don't

13   recognize that you still need to speak up even more.

14   A.    Noted.

15   Q.    Okay.  Have you been the case agent, the lead investigator

16   in this case for -- since 2015?

17   A.    Since October of 2015, when I transferred to the

18   Washington Field Office, I was assigned this case amongst

19   others.

20   Q.    I'd like you to take a look at Government Exhibit 3-100,

21   which is in evidence.

22             And can we get a close-up on the bumper stickers,

23   please?

24             Agent Caslen, do you recall the bumper stickers on

25   the back of the truck?

Caslen - Direct                                                    995

1  A.   I do.

2  Q.   What are they?

3  A.   So the one on the right-hand side says "Boycott the

4  Terrorist State of Israel."  The one in the middle is similar

5  to another exhibit that we saw earlier that states "Libyan

6  Civil War Vet, Siege of Misrata, April-May 2011"; and the one

7  on the left states "Save our Troops.  Let Israel Fight Its Own

8  Wars."

9  Q.   Okay.  Let's go to 4-101, which is also in evidence.  That

10 was a truck registration that we have a stipulation was found

11 on the defendant's -- in the defendant's bag when he was

12 arrested?

13 A.   Correct.

14 Q.   And who was owner of that truck according to that

15 registration?

16 A.   Nicholas Young.

17 Q.   Okay.  Let's go to 4-105.  Nicholas Young's driver's

18 license, we have a stipulation that that was found upon --

19 seized upon his arrest.  What was his address?  Can you see

20 that?

21 A.   I can.  It is 12737 Heron Ridge Drive, in Fairfax County,

22 Virginia 22030.

23 Q.   I'd like you to turn to 4-104, which is in evidence.  That

24 was a document seized at the time of the arrest.

25         Can we get to the -- so that's the roti falafel

Caslen - Direct                                                    996

1  document that has the "Essa Kobayashi" on that side?

2  A.    Correct.

3          MR. KROMBERG:  Can you get to the back side,

4  Mr. Vera?  Can you blow that up?

5  Q.    Did you see anything of significance on the back side of

6  that document?

7  A.    I did.

8  Q.    What was that?

9  A.    At the bottom here, it says "Omar Said Al Britani."

10 Q.    Who is Omar Saeed al-Britani?

11 A.    So I researched online who Omar Saeed al-Britani is, and

12 it was a kunya, which is also known as a name an individual

13 might adopt when they go overseas to fight, of an individual

14 from Britain, hence the name Al Britani.

15 Q.    Okay.

16 A.    And he was chastised -- he had joined ISIS and was

17 chastised by ISIS for pushing recruits to Libya rather than

18 pushing them to Syria or Iraq.

19 Q.    Okay.  Take a look, if you would, at Government Exhibit

20 3-104, which was found in the truck, that's already in

21 evidence.  And if you can compare that, please, to Government

22 Exhibit 1-106, which is an e-mail that came from 1&1 Mail &

23 Media records?  And I'd ask you, how does the message in

24 Government Exhibit 3-104 from the truck compare to the e-mail

25 message that you've seen?

Caslen - Direct                                                    997

1    A.   If I could get this one zoomed in on, please?

2              So this is the content of the body of an e-mail that

3    was sent --

4              MR. SMITH:  Objection, Your Honor.  We can't really

5    see what that message says.  Is there a clearer version?

6              THE COURT:  Well, you have a paper set, don't you?

7              MR. SMITH:  Your Honor, this is just -- the version

8    we have was produced in the same format here, but we can't read

9    this on the screen.

10             THE COURT:  All right, this is -- these are hard to

11   read.  This is 3-104?  Is this 101 -- which one is this?

12   Mr. Kromberg, the one on the screen, is that 104 or 106?

13             MR. KROMBERG:  104.

14             THE COURT:  All right, 3-104.  Let me see what it

15   looks like in my book.

16             MR. KROMBERG:  Could we ask the court security

17   officer to pull the original document, 3-104?

18             THE COURT:  Yeah, for the witness.

19             THE COURT SECURITY OFFICER:  Not in here.

20             THE COURT:  Well, the one that's in my book is worse

21   than that one that's on the screen, so you have to do better

22   than that.

23   BY MR. KROMBERG:

24   Q.   Anyway, can you answer -- can you -- are you able to make

25   it out, Agent Caslen?

Caslen - Direct                                                      998

1   A.   I can make it out.

2   Q.   Okay.  What is the relationship between that piece of

3   paper that had been found in the truck with Government Exhibit

4   1-106, which was the e-mail from 1&1 Mail & Media?

5   A.   So this is the -- what you're seeing here in this exhibit

6   is the body of an e-mail that -- and if I could see the other

7   exhibit, I believe it's --

8               MR. SMITH:  Objection.

9               MR. KROMBERG:  Government Exhibit 1-106 is --

10              MR. SMITH:  That's not --

11              THE COURT:  Wait a minute.  He's talking.  Just a

12  minute.

13              MR. KROMBERG:  I've been handed, Judge, what I hope

14  is the actual exhibit.

15              THE COURT:  Show it first to defense counsel.

16              MR. SMITH:  This is not the same thing on the screen.

17              MR. KROMBERG:  It's a band.  You have to open it.

18  Can I --

19              THE COURT:  Do you need scissors?

20              MR. KROMBERG:  I don't know.

21              THE COURT:  I don't know if I should send scissors

22  over there.

23              MR. SMITH:  Your Honor, this isn't the same thing

24  that's on the screen.

25              THE COURT:  Mr. Kromberg, is it or isn't it?

Caslen - Direct                                                         999

1              MR. KROMBERG:  It is not the same thing that is on

2    the screen.

3              THE COURT:  All right, let's move on to something

4    else, please.  It's too late in the day to be doing this.

5              MR. SMITH:  Your Honor, I think we should inquire why

6    the document that was just on the screen --

7              THE COURT:  Relax.  Don't ask for any more evidence,

8    Mr. Smith.  Come on.

9    BY MR. KROMBERG:

10   Q.   Okay.  Please take a look at Government Exhibit 4-108,

11   which is in evidence.  4-108.

12              Okay.  What, what is that?

13   A.   This is a Verizon prepaid card found in the defendant's

14   backpack on the day of his arrest.

15   Q.   And what is that -- what was the significance of that card

16   to you?  What did you understand it to be?

17   A.   The defendant had had two cellular phones that he used to

18   communicate on the Threema app.  We never found the second

19   phone that had the tilde L account number on it that sent the

20   codes to the undercover agent who was receiving them.  So it

21   was my assumption that this was a card that may have been used

22   to register a second cell phone.

23   Q.   Well, why would that card not have been used for the, for

24   the phone that -- the phones that the government did find?

25   A.   The phone that the government did find was an AT&T prepaid

Caslen - Direct                                                      1000

1    cell phone, not a Verizon cell phone.

2    Q.   And what about Mr. Young's personal phone?

3    A.   That was not a prepaid phone.

4    Q.   Okay.  Now, let's take a look at 3-105, which is in

5    evidence from the truck.  Do you see that?

6    A.   I do.

7         MR. SMITH:  Your Honor, we can't see this.

8    Objection.

9         THE COURT:  Do you have a cleaner copy?

10        MR. SMITH:  Just generally, the government -- we

11   object on any non- -- the government using these images when

12   they have the actual documents themselves.

13        MR. KROMBERG:  So we're going to pass up 3-104 and

14   3-105, the actual documents seized from the truck, not the

15   pictures.

16        MR. SMITH:  So this is the first document that was

17   blurry?  Is that --

18        MR. KROMBERG:  That is correct.

19        MR. SMITH:  It's not blurry in this document.

20        MR. KROMBERG:  No, it is not.

21        THE COURT:  Don't complain then.  Let's put it in --

22   let's get that -- that should have the correct sticker on it,

23   though.  That should be our 3-104.

24        MR. KROMBERG:  That is correct, Judge.

25        THE COURT:  All right.

Caslen - Direct                                                    1001

 1            MR. SMITH:  Your Honor, we can't stipulate to the

 2    authenticity of this document.

 3            MR. KROMBERG:  You already did.

 4            THE COURT:  Oh, we'll have this fight outside the

 5    presence --

 6            MR. SMITH:  Your Honor, we were only -- we were only

 7    given an electronic version of this document.  If Your Honor

 8    compares this document to the one on the screen, it's not the

 9    same.

10            THE COURT:  All right, let's go.  Hand it up here.

11            (Bench conference on the record.)

12            THE COURT:  I began reading it.  This "Salaam alaykum

13    brother" is the first three words of the one on the screen.

14    This looks to be the same.  I'm not going to sit here and do a

15    word-by-word parse of it.  This looks to be exactly the same.

16    We had one of these messages before.  It talks about the

17    brother in Canada.

18            MR. KROMBERG:  Right.  And so the significance of

19    this, Judge, is that it was found in, in either -- it was found

20    in the truck, and since it was the message with a header cut

21    off, that's proof that Mr. Young was the person who was sending

22    that message, because the body of the message was found in his

23    truck.

24            THE COURT:  So this physical item, this is the actual

25    item that was found in the truck?

Caslen - Direct                                                    1002

1           MR. KROMBERG:  Right.  And that's what the parties

2    stipulated was found in the truck.

3           MR. SMITH:  No, Your Honor.  We were never provided

4    the physical copy, Your Honor.

5           THE COURT:  Well, are you disputing that this was

6    found in the truck?

7           MR. SMITH:  We don't -- we've never seen that

8    document.

9           THE COURT:  You see it now.  Are you disputing it?

10           MR. SMITH:  How can I know without speaking to my

11    client?

12           THE COURT:  You have to lay a foundation.

13           MR. KROMBERG:  So first of all, Judge, we have

14    provided access to all seized exhibits in August of 2016, and

15    they were all available all that time, and we sent a copy of

16    that electronically, saying, "Would you stipulate to it?"

17           And they said, "Yes," and they signed the

18    stipulation.

19           That's all we can do with any case.  We made it

20    available in original form, and then we sent a copy of it and

21    asked for the stipulation.

22           THE COURT:  It's been stipulated to.  It's in.

23           MR. KROMBERG:  Thank you.

24           (End of bench conference.)

25           THE COURT:  All right, Mr. Van Roekel, if you'll pick

Caslen - Direct                                                1003

1   up that item and put that in the sleeve for Exhibit 3-104?  So

2   that is the official document.  And then you can show it to the

3   witness so he can read it.

4         All right.  So then you can give him the original,

5   yeah.  Just make sure it gets in the right jacket.

6   BY MR. KROMBERG:

7   Q.   Now, Special Agent Caslen, can you compare 3-104 found in

8   the seized truck to the e-mail message from 1&1 Mail & Media

9   that's already in evidence, Government Exhibit 1-106, from

10  January 29, 2015?

11  A.   So the exhibit in my hand --

12  Q.   Call it by its number.

13  A.   Exhibit 3-104, 3-104 was a piece of paper found in the

14  defendant's center console of his truck the day we searched his

15  vehicle, which I was present for, and it is the body of this

16  e-mail that was sent to the defendant by the, we'll call him

17  the fake Mo or the notional Mo, who was the FBI undercover

18  agent, on January 29.  However, this page that we found in the

19  defendant's center console of his truck had the header

20  information cut off of it, and it was just the body of the

21  e-mail.

22  Q.   Okay.  Now, I'd like to hand you the original of

23  Government Exhibit 3-105, which has been admitted into evidence

24  as having been seized from the truck, and I ask you how does

25  that message seized from the truck compare to other messages

Caslen - Direct                                                    1004

1  you have seen?

2  A.    So this is another -- Exhibit 3-105 was also found in the

3  same center console of the defendant's pickup truck the day we

4  searched his vehicle, and it is an e-mail from an individual

5  named -- or an individual named Mohamed, and I don't know how

6  to pronounce the last name, so I'll spell it:  A-l-m-n-s-o-r-y,

7  with the e-mail address mohamed_2060@yahoo.com to an e-mail

8  account, freedomforlibya777@yahoo.com, dated Saturday, 11 June

9  2011, and in the body of the e-mail, it's addressed to "Dear

10 Malik," and "Malik" is an alias we know the defendant to have

11 used in Libya.

12 Q.    Well, let's stop there for just a moment.  So could you

13 compare that to Government Exhibit 1-401 that has been -- that

14 was admitted earlier this afternoon?  We did not publish it,

15 but we talked about it was the basis of a stipulation that it

16 was going to be admitted and we were going to publish it when

17 we got to you.

18        So, Mr. Vera, could you publish Government Exhibit

19 1-401?

20        MR. SMITH:  One moment, please.

21        1 dash what?

22        MR. KROMBERG:  1-401.

23        THE COURT:  If it's in evidence, you can publish it.

24 BY MR. KROMBERG:

25 Q.    So, Special Agent Caslen, what's the relationship between

Caslen - Direct                                                      1005

1   the message -- the document found in the center console of the

2   truck to the document obtained from the Internet service

3   provider?

4   A.   They were the same message.

5   Q.   Okay.  Now, the document found in the truck has

6   handwriting on it, correct?

7   A.   Yes, it does.

8   Q.   And what --

9           MR. SMITH:  Objection.  Which document?

10  BY MR. KROMBERG:

11  Q.   The document seized from the truck, Government Exhibit

12  3-105, has handwriting on it, correct?

13  A.   It does.

14  Q.   And what is handwritten on Government Exhibit 3-105, the

15  document seized from the truck?

16  A.   On the first page, it is -- right here, it says "Malik the

17  American."  Down here says "4/20/89."

18          THE COURT:  Agent, what you can do is you can take

19  your finger -- you should be able to take a finger on that

20  screen and circle what you're talking about so the jury can see

21  it.

22          THE WITNESS:  Yes, Your Honor.  Right here --

23          THE COURT:  Not working?

24  BY MR. KROMBERG:

25  Q.   Okay.  So that's the "Malik the American" that's

Caslen - Direct                                                    1006

1   handwritten, and is there something else handwritten on there?

2   A.    There is.   Just a little bit lower and to the left is the

3   date "4/20/89."

4   Q.    Okay.  Now, what is Government Exhibit 1-200, which is

5   already in evidence?

6   A.    This was subscriber information we obtained for the

7   defendant's e-mail account, Essa Kobayashi.

8   Q.    The one that was set up at the FedEx store on October 25,

9   2014?

10  A.    Correct.

11  Q.    Okay.  And what is the birth date of Essa Kobayashi on

12  Government Exhibit 1-200?

13  A.    4/20/1989.

14  Q.    Okay.  Let's look at Government Exhibit 1-300, which I

15  believe is in evidence, and what is Government Exhibit 1-300?

16  A.    Government Exhibit 1-300 is subscriber information for an

17  e-mail account, MALIKtheAmerican@mail.com.

18  Q.    And what is the birth date for the individual who

19  registered MALIKtheAmerican?

20  A.    4/20/1989.

21          MR. SMITH:  Objection to the characterization of that

22  as the birth date of the subscriber.  I believe it's the

23  password but not necessarily --

24          THE COURT:  You need to be on your feet in this

25  court.

Caslen - Direct                                                    1007

1           MR. SMITH:  I apologize, Your Honor.  We object to

2    the characterization of this statement as the birth date of the

3    subscriber rather than the password for this subscriber.

4           MR. KROMBERG:  Your Honor, if that's -- to solve that

5    problem, we can go back and play Government Exhibit 6-109-5, in

6    which Mr. Young -- which the jury already heard, where

7    Mr. Young said he was going to use Hitler's birthday, 4/29/89,

8    as the birth date for the account.

9           THE COURT:  It says "Date of birth" on it.  I mean,

10   that's not a solid objection.  I'm overruling it.

11   BY MR. KROMBERG:

12   Q.   What is the significance of 4/20/89?

13   A.   April 20 was the birth date.  I'm unsure of the exact

14   year.

15          THE COURT:  Well, it wasn't 1989, I'm sure.

16          THE WITNESS:  That's correct, Your Honor.

17   BY MR. KROMBERG:

18   Q.   Okay.  Now, looking at Government Exhibit 1-300, how do

19   the login IP addresses from Government Exhibit 1-300, the

20   MALIKtheAmerican subscriber information, compare with the IP

21   addresses from the Essa Kobayashi records?

22   A.   All the IP addresses result back to the same FedEx

23   company, similar to the testimony of the undercover agent who

24   was handling the e-mail account V4Vendetta.

25   Q.   Now, I want to look at the dates on that subscriber

Caslen - Direct                                              1008

1    information for the MALIKtheAmerican account, 1-300, and how

2    they compare with the dates of Mr. Young's correspondence with

3    Mo about his colleagues from Libya.  So first I'd like to get

4    you to look at 1-211, which is in evidence, which is, I

5    believe, from June 13, 2015, in which Essa Kobayashi said, "I'm

6    going to try to get ahold of him this week."

7              And then if you'd look at 1-301, and what was the

8    date of the e-mail on 1-301?

9    A.   The date on this e-mail was June 15, 2015.

10   Q.   Okay.  And could we -- can you, can you read 1-301?

11   A.   I brought a copy of it up here.  May I read from here?

12   Q.   If you can't -- if you cannot read it from the screen,

13   then read 1-301 from what you brought up.

14             THE COURT:  Well, you don't want him to read the

15   whole thing.

16             MR. KROMBERG:  Okay.  Thank you, Your Honor.

17   Q.   Can you characterize what the e-mail is of 1-301?

18   A.   I can.  This is an e-mail from MALIKtheAmerican to the

19   same individual, mohamed_2060@yahoo.com, that was -- that an

20   e-mail was from in Government Exhibit 3-105, and in this e-mail

21   dated June 15, 2015, Malik is asking for updates on individuals

22   that he was with in Libya and mentions the second line down,

23   the Shuhada Brigade, also in the second paragraph mentions

24   specific names of individuals that they were with when they

25   were in Libya.

Caslen - Direct                                                      1009

1  Q.   Okay.  So take a look now at Government Exhibit 1-302, and
2  I'd ask you the same question, to characterize 1-302 rather
3  than reading the whole thing.
4  A.   This is an e-mail from MALIKtheAmerican to
5  EMAD_lias@yahoo.com, and I would characterize this as Malik
6  reaching out to this individual to see how things were going.
7  Q.   Now, is it correct that Government Exhibits 1-303 and 305
8  are substantially the same but to different e-mail addresses?
9          Can you bring up 303 and 305?
10 A.   That's correct.  This is a -- two more e-mails from
11 MALIKtheAmerican to additional e-mails, essentially asking the
12 same thing.
13 Q.   Okay.  Now let's turn to Government Exhibit 1-304.  That
14 came from the records of the Internet service provider.  What
15 is that?
16 A.   It appeared to be a message back to MALIKtheAmerican
17 informing the user that e-mail address ifaga79@yahoo.com was
18 not a good address, so the e-mail was returned.
19 Q.   Okay.  Turn to Government Exhibit 1-213, which is in
20 evidence, and is it fair to characterize that as an e-mail from
21 Essa Kobayashi to V4Vendetta on July 1, 2015, stating:  I tried
22 reaching out to them but have not received a reply?
23 A.   Yes.
24 Q.   How about Government Exhibit 1-215, also previously in
25 evidence?  Is that from September 7, 2015?

Caslen - Direct                                                    1010

1   A.   It is.

2   Q.   And it said, "still haven't heard from those brothers."

3   A.   That is correct.

4   Q.   Okay.  So go to --

5            MR. SMITH:  Your Honor, I object.  The government is

6   not giving the parties enough time to review these e-mails in

7   establishing these points.  The government -- Mr. Kromberg is

8   asking Agent Caslen to summarize these reports within a matter

9   of seconds before they can be reviewed.

10           THE COURT:  In this court, known as the Rocket

11  Docket, speed is never a problem.  So overruled.

12           MR. SMITH:  I object.

13  BY MR. KROMBERG:

14  Q.   Special Agent Caslen, did you compile a timeline in this

15  case?

16  A.   I did.

17  Q.   Okay.  Can you take a look at Government Exhibit 16-000?

18  And I -- do you have it with you by any chance?

19  A.   I brought a copy of mine up here.

20  Q.   There you go.

21           THE COURT:  That's been shared with defense counsel?

22           MR. KROMBERG:  It has.

23           MR. SMITH:  It has, but we object to it as

24  inadmissible evidence.  It was created as a timeline for this

25  case by the summary agent.  This kind of evidence is not

Caslen - Direct                                          1011

1   normally admitted.

2          THE COURT:  Well, in this court, it is, as long as

3   it's accurate.  So overruled.

4          MR. KROMBERG:  Judge, I will say, let me just state

5   for the record that it's not a work that's final because it has

6   not incorporated the things that happened up to this moment.

7   It was final as of last night, but we didn't include the

8   evidence that hadn't been -- excuse me, we may have included

9   evidence that we thought was going to be admitted but hasn't

10  been admitted, so we have to tailor it before it can be

11  admitted to make sure that it's not referring to anything that

12  we thought would be admitted but wasn't admitted.

13         THE COURT:  All right.

14         MR. SMITH:  Your Honor, that doesn't make sense to

15  the defense, and we object to the introduction of this.

16         THE COURT:  Well, it does make sense because there

17  are exhibits that the government obviously had in it where I

18  granted your objection and so they're not in the case, and so

19  we're going to -- summary exhibits are certainly permissible in

20  a complex case where there's a lot of data.  Whether or not the

21  jury is satisfied that it's an accurate summary is going to be

22  an issue for the jury, and they'll get an instruction on that.

23         But since it's not -- it can't go in in the format in

24  which it is currently, you'll need to have the agent talk

25  around --

Caslen - Direct                                                    1012

1              MR. KROMBERG:  Right.

2              THE COURT:  All right.

3              MR. KROMBERG:  Absolutely.

4              THE COURT:  All right.

5    BY MR. KROMBERG:

6    Q.   So you have it in front of you now?

7    A.   Correct.

8    Q.   Okay.  So just to go through it, through some of the

9    points that I hope might be helpful at this moment, so can you

10   talk about the --

11             THE COURT:  Explain first how you went about making

12   this timeline.

13             MR. KROMBERG:  Thank you, Your Honor.

14             THE WITNESS:  Your Honor, I took the proposed

15   government's exhibit list and put them in chronologic order

16   based on the date.  So, for example, if the defendant had a

17   meeting with Khalil, I made a line item for a date where he had

18   a meeting with Khalil.  If a graphic or a nasheed was on the

19   defendant's electronic media, based on the CART report, I would

20   place when that item was on, placed onto the computer or the

21   iPod or whatever electronic media onto there.  Same thing with

22   meetings with Mo.  Same things with e-mails that were sent back

23   and forth between the defendant and Mo and the defendant and

24   individuals in Libya.

25             THE COURT:  Thank you.

Caslen - Direct                                                    1013

1  BY MR. KROMBERG:

2  Q.   When you say the CART reports, the CART reports are not in

3  evidence, but the metadata from the CART reports are, correct?

4  A.   Correct.  They would be the metadata strips at the bottom

5  of all the exhibits that had been entered into evidence.  For

6  example, like, with the graphics, you have the picture.  Then

7  underneath the graphic, you have the metadata.

8  Q.   Now, can you turn to -- I think perhaps the most confusing

9  part is 2011, starting in early 2011 to cover the trip to

10 Libya.  So that's fairly -- on my -- it's page, page 5.  Can

11 you start at 4 --

12          MR. SMITH:  Your Honor, the copy that the government

13 provided to us does not have page numbers.  We're not sure if

14 this is even -- this might explain Mr. Kromberg's explanation

15 for the changing exhibit list.  The copy we were provided

16 doesn't have them.

17          THE COURT:  All right.  Now, hold on a second.  Do I

18 have a copy?

19          MR. KROMBERG:  You have a copy, Judge.

20 Q.   Why don't you turn to 4/6/2011.  "4/6/2011, Young enters

21 Egypt."

22          THE COURT:  This is 16-000?

23          MR. KROMBERG:  Correct.

24          THE COURT:  All right.  And you said page 5?

25          MR. KROMBERG:  My page 5, but it's -- "4/6/2011" is

Caslen - Direct                                                    1014

1    the entry.

2              THE COURT:  The very last one on that page?

3              MR. KROMBERG:  I think that your version may be

4    different than mine, but since I'm going to be talking

5    around --

6              THE COURT:  It's the only one for 4/6.  I see it,

7    okay.

8    BY MR. KROMBERG:

9    Q.   Okay.  So the entry "Young enters Egypt," where did you

10   get the information for "Young enters Egypt"?

11   A.   From a stamp in the defendant's passport.

12   Q.   Okay.  So -- and then "Young enters Libya" on 4/10/2011,

13   where did you get that one?

14   A.   Again, from a stamp in defendant's passport.

15   Q.   And then, "5/17/2011, Young returns to Egypt from Libya,"

16   from the passport?

17   A.   Again, from the passport.

18   Q.   And then he returns to the United States 5/20/2011, from

19   the passport?

20   A.   From the passport as well as Government Exhibit 3-109.

21   Q.   And 3-109 is -- that was the CBP form that -- Customs and

22   Border Protection register form 6059B, May 2011, France, Egypt,

23   Libya, that has been admitted into evidence, correct?

24   A.   Correct.

25   Q.   Okay.  So -- then you have, "Special Agent Gervino

Caslen - Direct                                                      1015

1   interviews Young about his trip to Libya that same day"?

2   A.   That is correct.

3            MR. KROMBERG:  Okay.  So, Judge, we're not going to

4   go through the timeline.  I just wanted to go through that part

5   of it so that the jury understands what this timeline is, and

6   we will get a version of the timeline revised to comport with

7   the evidence that has been admitted and not reflect evidence

8   that has not been admitted.

9            THE COURT:  All right.

10           MR. SMITH:  Your Honor, the defense wants to request

11  that we get this up, the final version, in time to

12  cross-examine the, the relevant summary witness.

13           THE COURT:  We'll see.

14           Go ahead, Mr. Kromberg.

15  BY MR. KROMBERG:

16  Q.   Okay.  Can you look, please, at Government Exhibit 6-201,

17  the text message that was sent to Mo's cell phone?  Do you

18  recognize that?

19  A.   I do.

20  Q.   Okay.  Now, look at 6-203, which is the Verizon records.

21  Do you see that?

22  A.   I do.

23  Q.   What does that record reflect regarding the time of the

24  text message?

25  A.   The raw time stamp on the message is November 20, 2014, at

Caslen - Direct                                                    1016

1    23 hours, 1 minute, 22 seconds.

2    Q.   And what does the record reflect regarding the location of

3    the sender's phone?

4    A.   If we could zoom out?

5         The latitude-longitude in this data reflect 39

6    degrees .0388 latitude and -77.5247 degrees longitude.

7    Q.   And where is that?

8    A.   Where it says "SRC_Global_Cell_ID" data.

9    Q.   No, I'm sorry, where is that latitude and longitude?

10   A.   Oh, I apologize.  If you place those coordinates into

11   Google Maps, it drops you right onto the Dulles Greenway,

12   literally right onto a cell phone tower.

13   Q.   Okay.  I'd like you to turn to 1-410, which has been

14   admitted.  That is a declaration of the defendant that it was

15   his -- he was controlling the freedomforlibya e-mail account?

16   A.   That is correct.

17   Q.   Okay.  Did you look through those freedomforlibya e-mail

18   exhibits, Government Exhibits 1-401 through 1-408?

19   A.   I did.

20   Q.   Okay.  Could you take us through what was the sequence of

21   events involving those freedomforlibya e-mails, starting from

22   Government Exhibit 1-401 and the date of that one?

23   A.   I'm sorry, could you repeat the question?

24   Q.   Start with Government Exhibit 1-401, and what was the date

25   of that e-mail on freedomforlibya -- the freedomforlibya e-mail

Caslen - Direct                                                1017

1    account?

2    A.    Okay.   The date of this first e-mail is June 11, 2011, and

3    this is a, this is a scene from a copy that the service

4    provider gave us, and this is the one that's equivalent to

5    Government Exhibit 3-105 that was found in defendant's pickup

6    truck, and this is an e-mail to the defendant from Mohamed

7    using mohamed_2060@yahoo.com.   This is a different Mohamed

8    other than the, the one that testified earlier.

9    Q.    Right.

10   A.    And this is an e-mail where Mohamed is asking the

11   defendant, using the name Malik, for different pieces of night

12   vision rifle scopes, specifically --

13             MR. SMITH:   Objection.   Hearsay.

14             THE COURT:   Look, is it being offered for the truth

15   of its contents or just to explain the types of communications

16   that are going on with the defendant?   What are you offering it

17   for?

18             MR. KROMBERG:   It's not offered for the truth that

19   Malik -- excuse me, that Mohamed wanted rifle scopes.   It's

20   we're going to set the stage for what the defendant did in

21   response to what he perceived to be a request for rifle scopes.

22             THE COURT:   All right, I'm going to overrule the

23   objection.   But again, this Mohamed is not Mo?

24             THE WITNESS:   No, Your Honor.

25             THE COURT:   All right.

Caslen - Direct                                                    1018

1   BY MR. KROMBERG:

2   Q.   So on Government Exhibit 1-401 -- in fact, let's -- would

3   it be easier to go to 1-4- -- do we have a summary of all these

4   that are laid out in a more clear form?

5           MR. SMITH:  Objection.  Best evidence.

6           MR. KROMBERG:  Okay.

7           THE COURT:  Just take him through the exhibits.

8           MR. KROMBERG:  Okay.  Although the defense did

9   stipulate that Government Exhibit 1-408 was a cleaned-up

10  version of it all?

11          THE COURT:  Mr. Kromberg, just --

12          MR. KROMBERG:  But we'll just go through it.

13  Q.   Okay.  1-401, you're looking at it.  And what Mohamed --

14  let's call him mohamed_2060, okay?  Okay.  He's asking for

15  equipment, correct?

16  A.   Correct.

17          MR. SMITH:  Objection.  Leading.

18          THE COURT:  Sustained.

19  BY MR. KROMBERG:

20  Q.   Okay.  Let's look at Government Exhibit 1-402.  What's

21  that one?

22  A.   So this is an e-mail from mohamed_2060 back to

23  freedomforlibya777, which is the defendant, on June 13, just a

24  few days later, stating that he needs two of each type.

25  Q.   Okay.  And go to Government Exhibit 1-403.

Caslen - Direct                                                    1019

1   A.    So this is an e-mail from the defendant using the

2   freedomforlibya777@yahoo account back to mohamed_2060 on June

3   15, that states that he needs to check export regulations and

4   see what they say, and if it's okay, that he would purchase

5   $1,500 worth.

6   Q.    And go to Government Exhibit 1-404.  What's that one?

7   A.    This was an e-mail from mohamed_2060 to the defendant on

8   the defendant's freedomforlibya777@yahoo.com account, with a

9   subject line only.

10  Q.    405?  1-405, excuse me.

11  A.    So this is an e-mail from the defendant back to

12  mohamed_2060 on July 22, stating -- telling mohamed_2060 that

13  he hasn't been able to buy anything because his old roommate,

14  who he refers to as a freaking Sufi, owed him money, but he's

15  been avoiding him for the last couple months.

16  Q.    Were you here in court earlier, I think it was today, when

17  the former roommate, the Sufi, Brian Menzies, testified?

18  A.    I was.

19  Q.    Okay.  Now, 406, 1-406?

20  A.    So this is an e-mail from the defendant using his

21  freedomforlibya777@yahoo.com account back to mohamed_2060,

22  asking for contact information for some of the brothers in

23  Misrata, which is a city in Libya.  He, he told mohamed_2060

24  that he's not going to be able to send him the stuff that he

25  asked for because it was illegal to send and it would be seized

Caslen - Direct                                                        1020

1   by U.S. Customs, and he stated that he hadn't gotten paid back

2   the money from his roommate; however -- or, excuse me, but he

3   was able to borrow money from a family member.

4           And so if there was something that he could purchase

5   for mohamed_2060 in Egypt, he would bring it, or he stated he

6   would just bring him the cash.

7           Then he proceeded to give mohamed_2060 a new phone

8   number with a 571 area code, asking Mohamed to call him back on

9   that, saying he couldn't talk on his other phone, and that he

10  would be back in two weeks.

11  Q.  Now, how does the date -- take a look at 10-807, which is

12  in evidence, I believe.  If it's not, I'm moving it in because

13  we stipulated that it --

14          MR. SMITH:  Which number was it?

15          MR. KROMBERG:  10-807.

16          THE COURT:  It's not in.

17          MR. KROMBERG:  Okay.  We have a -- we already read

18  the stipulation that said this exhibit was seized during the

19  search of the defendant's residence in August 2016, and we're

20  moving it into evidence.

21          MR. SMITH:  No objection.

22          THE COURT:  All right, it's in.

23          (Government's Exhibit No. 10-807 was received in

24  evidence.)

25          MR. KROMBERG:  Can we publish that to the jury,

Caslen - Direct                                                    1021

1  please?

2            THE COURT:  I'm sorry, is there an objection?

3            MR. SMITH:  Well, we would request the original copy.

4            Your Honor, a lot of these digital versions are,

5  we've noticed this throughout the government's exhibit list,

6  they're zoomed out, and they're blurred where you can't even

7  read them.

8            THE COURT:  Well, you don't get them; they'll be for

9  the jury; but we should have the originals.  There's no reason

10 we don't have them except that they were in these nice

11 envelopes, right?  So for the jury to be able to look at them,

12 they have to open up each envelope, which is one of the reasons

13 why I assume we have these electronic copies.

14           MR. SMITH:  And, Your Honor, just so you know, the

15 defense has e-mailed the government several times asking for

16 higher-quality images that they've sent, and they don't

17 respond, Your Honor.

18           THE COURT:  Well, the point is -- but if you had

19 access to the actual original documents, then the government

20 fulfilled its obligation of giving the defendants access to the

21 information.  Let's not have this discussion now.

22 BY MR. KROMBERG:

23 Q.   Do you have 10-807 in there?

24 A.   I have it.

25 Q.   Okay.  Can you tell us what Government Exhibit 10-807 is?

Caslen - Direct                                                    1022

1  A.   This is a letter from the United States Department of

2  State to the defendant, with the subject line:  "Request to

3  approve the importation of personal protective equipment."

4           MR. SMITH:  Your Honor, hearsay.  What's this being

5  offered for?

6           MR. KROMBERG:  Okay.  One, it shows that Mr. Young

7  was in Libya and brought body armor to Libya and it got seized

8  on the way back; two, that he had just received information

9  from the State Department that body armor was being seized when

10 he wrote to Malik -- when he wrote to mohamed_2060 that I can't

11 send this to you, what you're asking for, because it will be

12 seized.

13          MR. SMITH:  Your Honor, that's offered for its truth

14 in other words.  It's hearsay.

15          THE COURT:  It's an official government document, a

16 communication.  I'm going to overrule the objection.  It's in.

17 BY MR. KROMBERG:

18 Q.   Okay.  So, Special Agent Caslen, what's the -- on the

19 timeline, what, what -- when did the State Department write

20 that letter to Mr. Young talking about the equipment that was

21 seized from him in relation to when he told mohamed_2060 that

22 the equipment that mohamed_2060 requested would be seized?

23 A.   This letter from the U.S. Department of State was issued

24 on July 28, 2011, just a few days before the e-mail was sent to

25 mohamed_2060.

Caslen - Direct                                                    1023

1   Q.   Now, what, if anything, did -- on 1-406, what did the

2   defendant say to mohamed_2060 that he could do even if he could

3   not send the equipment from America?

4              MR. SMITH:  Objection.  Vague.

5              THE COURT:  Well, if he asks it as a leading

6   question, you'd be objecting.

7              MR. SMITH:  We're objecting.  We don't understand it.

8   Yeah, objection.  Leading.

9              THE COURT:  But actually, I want you-all to approach

10  the bench.

11             (Bench conference on the record.)

12             THE COURT:  I may have missed something, but the

13  e-mail from Mohamed is asking for rifle scopes, not body armor.

14             MR. KROMBERG:  Correct.  The point is that when Young

15  wrote back saying, "I can't send this to you because it would

16  be seized," and it was right after he had gotten notification

17  about the regulations on what would be seized, because, in

18  fact, his stuff had been seized.

19             THE COURT:  Yeah, but I don't think that letter

20  mentions rifle scopes.

21             MR. KROMBERG:  Right.

22             THE COURT:  It just mentions body armor, right?

23             MR. KROMBERG:  That's true.

24             THE COURT:  That's apples and oranges.  I don't think

25  that's appropriate.

1          MR. KROMBERG:  Okay.

2          THE COURT:  All right?

3          (End of bench conference.)

4   BY MR. KROMBERG:

5   Q.   Special Agent Caslen, what did, according to the e-mail

6   1-406, did Mr. Young offer to do instead of sending, sending

7   equipment to Libya?

8   A.   Defendant told mohamed_2060 that he had borrowed money

9   from a family member and could bring the money to mohamed_2060

10  in lieu of sending it, or if he could purchase something in

11  Egypt, he would bring it to him.

12  Q.   On 1-407, look at Government Exhibit 1-407.  What did

13  mohamed_2060 write?

14  A.   So this is an e-mail from mohamed_2060 to the defendant on

15  the defendant's e-mail account, freedomforlibya777@yahoo.com,

16  and mohamed_2060 replied to the defendant's e-mail that he

17  needed the amount of $3,000.

18  Q.   So I'd like you to take a look at Government Exhibit

19  10-220.  Now, let me check to see if that is in or not.

20          It is not, Judge.  We -- it is covered by the

21  stipulation that it was a document seized from the defendant's

22  computer.

23          MR. SMITH:  Which exhibit number is this?

24          MR. KROMBERG:  10-220.

25          MR. SMITH:  This is 10 -220.

Caslen - Direct                                                    1025

1          MR. KROMBERG:  Yes, that's 10-220.

2          MR. SMITH:  We object.

3          MR. KROMBERG:  10-220 is two slides, and we're

4    interested in the second -- one page, the second page of the

5    exhibit.

6          THE COURT:  Is that exactly what was seized, or is

7    there --

8          MR. KROMBERG:  I took out the other pages that I

9    thought were --

10         THE COURT:  Yeah, but this is exactly what was

11   seized?

12         MR. KROMBERG:  Yes.  This was a computer, electronic

13   file, and this is the printout of the electronic file.

14         MR. SMITH:  We object to the extent it's not the

15   complete record.

16         THE COURT:  You want the whole thing in?

17         MR. SMITH:  Yes.

18         THE COURT:  All right, the whole thing in.

19         MR. KROMBERG:  We're happy --

20         MR. SMITH:  No, no, no.  The point is the

21   government -- Gordon represented that the piece of evidence

22   he's about to introduce is not complete.

23         THE COURT:  Well, then the whole thing goes in.  He's

24   trying to make it easier for you.  He's trying to make it --

25   are you looking at the right exhibit?  Take a look at 220.  How

Caslen - Direct                                                      1026

1   many pages is there in --

2           MR. SMITH:  Your Honor, the objection is withdrawn.

3           THE COURT:  All right.  So just page 2 of 220.

4           MR. KROMBERG:  Well, page 1 and 2 to show what it is,

5   that it just is the -- that this is -- that in the -- the

6   defendant knew that he had a document saying that this was --

7           THE COURT:  Ah, I understand, yes.  Two pages go in.

8           (Government's Exhibit No. 10-220, pages 1 and 2, was

9   received in evidence.)

10          MR. KROMBERG:  We'd like to publish both pages of

11  10-220, please.

12          Okay.  And if you can go to the second page?

13  Q.   Special Agent Caslen, were there documents or items seized

14  from the house or the truck that had that thunderbolt design?

15  A.   There were items already offered into evidence, such as

16  the tie tack found in defendant's truck was the same SS

17  lightning bolts.

18  Q.   Okay.  Let's go on to 1-701, Government Exhibit 1-701,

19  which is already in evidence.

20          And can you zoom in on that, please?

21          And that's the Google subscriber information for

22  Argel Tal?  Did you try to find who Argel Tal is?

23  A.   I did.  I searched the Internet on Google for Argel Tal

24  and found it is a character referenced in the Warhammer series.

25  Q.   And the Warhammer series is a video game?

Caslen - Direct                                                    1027

1   A.    I'm not sure if it's a video game, but I do know there's

2   some books related to it.  It's a science fiction novel series.

3   Q.    Okay.  Did you find any reference to other Warhammer

4   characters in this investigation?

5   A.    The defendant's Facebook page was titled Ciaphas Cain.  I

6   don't know how it's pronounced.

7   Q.    C-i-a-p-h-a-s, Ciaphas Cain?

8   A.    Correct.

9   Q.    Did you find evidence that the Facebook account in the

10  name of Ciaphas Cain belonged to Nicholas Young?

11  A.    I did.

12  Q.    Okay.  I'd like you to take a look at and compare the

13  exhibits that have been admitted Government Exhibit 8-101 and

14  8-102 with government exhibits that have not yet been admitted

15  but are covered by a stipulation that they came from the

16  defendant's computer, computer media, 14-121 and 14-122.

17           MR. SMITH:  Objection, Your Honor.  Relevance, 403,

18  and cumulative.

19           THE COURT:  All right, let me look.

20           MR. KROMBERG:  May I respond to the relevance part?

21           THE COURT:  Let me look at them first so I can see

22  what we're talking about.

23           14-1?

24           MR. KROMBERG:  14-121 and 14-122.

25           THE COURT:  All right.  And you want that compared

Caslen - Direct                                                      1028

1  with 8-101 and 102?

2          MR. KROMBERG:  Right, because 8-101 and 102 are the

3  Facebook account of Ciaphas Cain, and 14-121 and 14-122 are

4  from computer media that we've stipulated was seized from

5  Mr. Young's residence.

6          MR. SMITH:  The defense objects.  The relevance of

7  the fact that these last items are seized from Mr. Young's

8  residence --

9          THE COURT:  I think these two are, that there are 403

10 problems.  I'm going to sustain the objection.

11         MR. SMITH:  Thank you.

12 BY MR. KROMBERG:

13 Q.  Did you find a profile photo of Nicholas Young on the

14 Ciaphas Cain site?

15 A.  I did.

16 Q.  Can you take a look at 8-107?  8-107.  It's in evidence.

17         THE COURT:  It's in evidence?

18         MR. KROMBERG:  Yes.

19         THE COURT:  All right.

20 BY MR. KROMBERG:

21 Q.  Was that the profile -- was that the Facebook page profile

22 photo of Nicholas Young?

23 A.  It was.

24 Q.  And that's in the name of Ciaphas Cain?

25 A.  Correct.

Caslen - Direct                                                          1029

1   Q.   Now, did you find -- was there another profile photo of

2   the Ciaphas Cain Facebook site that you found?  Could you take

3   a look at 15-201, which is not in evidence yet?

4             MR. SMITH:  Objection.  Relevance.

5             THE COURT:  This one I will permit in.  Overruled.

6             (Government's Exhibit No. 15-201 was received in

7   evidence.)

8             MR. KROMBERG:  So we move in 15-201, and can you

9   publish it to the jury?

10  Q.   Special Agent Caslen, is that the profile -- the profile

11  photo is the top photo; is that correct?

12  A.   Correct.  This was in the profile photos album of the

13  defendant's Facebook page, so at one point in time, the

14  defendant used it as a profile photo.

15            MR. KROMBERG:  And go down to the bottom photo, if

16  you would, Mr. Vera.

17  Q.   And that's the Abu Musab photo that Daveed

18  Gartenstein-Ross talked about earlier?

19  A.   Correct.  That's Abu Musab al-Shishani.

20  Q.   Turning to Government Exhibit 8-112, Facebook subscriber

21  information that's in evidence, can you please explain to the

22  jurors what information was used to register the Ciaphas Cain

23  account, what e-mail address?

24  A.   The defendant used the e-mail address

25  herebedragons777@gmail.com.

Caslen - Direct                                                    1030

1   Q.   And the name Ciaphas Cain?

2   A.   Correct.

3   Q.   Take a look, if you would, at Government Exhibit 8-108,

4   which is a Facebook record in evidence, 8-108.  Do you see a

5   link there to Emerson Begolly?

6   A.   I do.  It's on the very top.

7   Q.   Emerson Begolly was the individual who

8   Dr. Gartenstein-Ross talked about?

9   A.   That's correct.

10  Q.   Okay.  And did you -- so this was a link that the

11  defendant put on his Facebook account, correct?

12  A.   It appears to be a like for an item on the defendant's

13  Facebook account, yes.

14  Q.   And did you click on that link to see what that was, what

15  he was liking?

16  A.   We were able to follow this to a YouTube channel.

17  Q.   And is that YouTube, is that Government Exhibit 8-109?

18  Don't -- that has not yet been admitted.  Please take a look at

19  8-109.

20            MR. SMITH:  Objection.  Relevance, 403, cumulative.

21            THE COURT:  Well, are you planning to play this?

22            MR. KROMBERG:  No, no.  Just want to show him the

23  picture.

24            THE COURT:  You're just showing the picture of a

25  disc?  That's what I've got for 8-109.

Caslen - Direct                                                    1031

1           MR. KROMBERG:  Oh, I'm sorry, we wanted -- we were

2    going to play ten seconds of it to show it has a picture of

3    Emerson Begolly.  Well, ten seconds.

4           MR. SMITH:  Your Honor, if you look at the title of

5    the Exhibit 8-109, it's not Emerson Begolly.  It's something

6    else.

7           MR. KROMBERG:  And that's exactly why, Judge, that

8    we --

9           THE COURT:  I think given the context of the case,

10   that's all right.  It can go in.

11          (Government's Exhibit No. 8-109 was received in

12   evidence.)

13          MR. KROMBERG:  So can you display ten seconds of --

14          THE COURT:  8-109 is in.

15          MR. KROMBERG:  -- 8-109?

16          (Excerpt of Government's Exhibit No. 8-109 was

17   played.)

18          MR. KROMBERG:  That's it.

19   Q.   So was that Emerson Begolly in his Nazi uniform on the

20   right?

21   A.   It was.

22   Q.   Okay.  Thank you.

23          Now, look at 8-104, which is a Facebook post from --

24   Facebook record from the Ciaphas Cain account, 8-104.  And did

25   you find the link there to the "Screw Infidels" video?

Caslen - Direct                                                    1032

1   A.   I don't remember which YouTube URL it exactly was, but I

2   did find a link to a video titled "Screw Infidels" on the

3   Facebook page.

4   Q.   So what would you need to refresh your recollection on

5   which link it was?

6   A.   I took a screen shot of the YouTube channel that has the

7   URL.

8   Q.   Okay.  So can you look -- can the witness look at to

9   refresh his recollection, look at Government Exhibit 8-105,

10  which is a screen shot, to refresh his recollection of which is

11  the link?

12          MR. SMITH:  Objection.  The witness can refresh his

13  recollection without publishing it.

14          THE COURT:  We're not publishing it.  He's just going

15  to look at it.

16          THE WITNESS:  Okay.  I remember which one it is.

17  BY MR. KROMBERG:

18  Q.   Okay.  Which one is it?

19  A.   It's the -- this is the -- it's five up, dated May 14,

20  2015, with the URL ending in H-M.

21  Q.   Okay.  And did you go to that link?

22  A.   I did.

23  Q.   And did you watch that video?

24  A.   I did.

25  Q.   All right.

Caslen - Direct                                                         1033

1   A.   A couple times.

2          MR. KROMBERG:   The government -- this is the one

3   video we wish to play, Judge.  This is on the Ciaphas Cain

4   Facebook page, and this is Government Exhibit 8-106, and we

5   move it into evidence so that we can play it.

6          MR. SMITH:   Objection to playing the clip.

7          THE COURT:   I'm sorry, no objection?

8          MR. SMITH:   Objection.  403.

9          THE COURT:   All right, it's overruled.

10         (Government's Exhibit No. 8-106 was received in

11  evidence.)

12         MR. SMITH:   401.

13         MR. KROMBERG:   Okay.  Can you play it?

14         Mr. Vera tells me it's six minutes long, and I think

15  that even just playing two-and-a-half minutes of it will be

16  more than enough to understand what this is.

17         THE COURT:   Is there any objection?  I know there's

18  an objection to the exhibit, but is there an objection if it's

19  going to be played to only a portion of it being played, or do

20  you want the whole thing?

21         MR. SMITH:   We would prefer not to have any of it

22  played, Your Honor.  We think this is all cumulative.

23         THE COURT:   I understand, but I've said it's going

24  in, so the question is is there an objection to it not being

25  complete?

Caslen - Direct                                              1034

1          MR. SMITH:  No.  If it's going to be played, we have

2   no objection to the clip.

3          THE COURT:  All right, go ahead.

4          (Excerpt of Government's Exhibit No. 8-106 was

5   played.)

6          MR. SMITH:  I think that's over two minutes.

7          MR. KROMBERG:  That's fine, Judge.

8   Q.   Mr. -- Special Agent Caslen, turning to 8-110 from the

9   Ciaphas Cain Facebook page, did you find a photo of a dog on

10  that site, on 8-110?

11  A.   I did.  This is the photo of a dog.

12  Q.   Okay.  Did you find that same photo as the avatar for the

13  defendant posting on another Web site?

14  A.   We did, on the defendant's --

15  Q.   Look at 8 -- okay.  What other Web site?

16  A.   On the defendant's LiveLeak account.

17         THE COURT:  110 is not in evidence.

18         MR. KROMBERG:  Correct.

19  Q.   So I was just asking, what is the LiveLeak account?  Or

20  what is LiveLeak?

21  A.   LiveLeak is a, it's a Web site that folks can upload

22  videos to and people can watch videos.

23  Q.   And did you -- did you find from the -- that photo of the

24  dog was being used as an avatar for someone on that site?

25  A.   I did.

Caslen - Direct                                                      1035

1   Q.   And what was the name of the accountholder for that

2   account that used the dog as the avatar?

3   A.   Düsselkamp.

4   Q.   And what evidence that -- did you have in this case that

5   Young used the name Düsselkamp?

6   A.   On his Nazi reenactment group roster, his name on the

7   roster was Storm Trooper Klaus Düsselkamp.

8   Q.   Okay.  Take a look at 10-706.

9        It is not yet in evidence.  The government is going

10  to move it in evidence.

11       MR. SMITH:  We object on relevance and 403 grounds.

12       THE COURT:  I'm allowing this in, but I think since

13  there are other names here and other addresses, it needs to be

14  redacted.

15       MR. KROMBERG:  Right.  We have provided in the past

16  on our motions a redacted version, and we can substitute a

17  redacted version of it for this as well.

18       THE COURT:  For the record, 10-706 is in, but it will

19  have to go redacted.

20       (Government's Exhibit No. 10-706, redacted, was

21  received in evidence.)

22       MR. KROMBERG:  Can it be published to the jury in

23  unredacted form now?

24       THE COURT:  Yeah.

25       MR. KROMBERG:  Okay.  Please post 10-706, and also

Caslen - Direct                                                    1036

1    just zoom in, if you would, on the left-side column.  Or start

2    at the top.  How about just the heading at the top?

3             Okay.  And now go to the lower left.  That's it, all

4    right.

5    Q.   Okay.  So -- and also, did you find other evidence of --

6    that Young was Düsselkamp at the house?  And I direct your

7    attention to 10-715, which is not in evidence yet.

8             MR. SMITH:  Objection.  Relevance, 403, cumulative.

9             MR. KROMBERG:  10-715 is two photographs, Judge.

10            MR. SMITH:  Your Honor, the original explanation for

11   the government's relevance point on the Düsselkamp evidence was

12   to establish that the defendant opened a LiveLeak account.

13   That is not in dispute in this case, so the relevance point no

14   longer exists.

15            THE COURT:  Well, the first page, I can't even

16   decipher what in the world it's depicting, so I don't think

17   that adds anything to the case.  The second, however --

18            MR. KROMBERG:  Right.  I think that they're two views

19   of the same thing, Judge.

20            THE COURT:  Well, I'm looking at something different

21   then.  I don't see it.  But page 2, I think page 2 -- only the

22   second page of that exhibit should go in.

23            MR. KROMBERG:  That's fine.

24            Mr. Vera, can you move in the second page of page 2?

25   And then we'll delete that other page for when it goes into the

Caslen - Direct                                                    1037

1    exhibit binder.

2         That's -- okay.

3    Q.   Special Agent Caslen, not paying any attention to the book

4    that you see there, but what is underneath the book?

5    A.   So this is a photograph taken during the search of the

6    defendant's residence, and during examination of the photo,

7    there is a, appears to be, like, a foot locker with the name

8    Düsselkamp on the foot locker.

9    Q.   Okay.  Thank you.

10        Now, taking a look at -- did you go to the LiveLeak

11   site to try to find the history of the Düsselkamp posts on the

12   LiveLeak site?

13   A.   I did.

14   Q.   And what did you find?

15   A.   I found a profile for Düsselkamp that has dates of

16   registration, some stats on the account, such as, I believe,

17   videos that were uploaded, videos that were viewed, and a list

18   of comments that, made by the user of the profile.

19   Q.   On that profile page, did you also find any particular

20   insignia or decal identifying -- that helped identify Mr. Young

21   to -- link Mr. Young to that account?

22   A.   There were two.  There was the photograph of the dog that

23   we just saw as well as a, a morale patch that folks wear on

24   backpacks or Velcro patch that has a squirrel in it, and it

25   says "Secret."  We found the photograph of that.

Caslen - Direct                                                    1038

1          MR. SMITH:  Your Honor, we object on -- we've already

2   stipulated that the LiveLeak account was created by the

3   defendant.

4          THE COURT:  All right.

5          MR. SMITH:  We've now heard testimony for about 15

6   minutes on how the --

7          THE COURT:  All right, then we don't need this

8   evidence.  There's no issue about that.

9          MR. KROMBERG:  Well, we do need the evidence because

10  it has when he posted and --

11         THE COURT:  Well, then ask the when question.

12         MR. KROMBERG:  Well, at this point, we move in --

13  please take a look at Government Exhibit 8-500.

14         THE COURT:  All right.  So is there an objection to

15  8-500?

16         MR. SMITH:  No.

17         THE COURT:  All right, 8-500 is in.

18         (Government's Exhibit No. 8-500 was received in

19  evidence.)

20         MR. KROMBERG:  Okay.  So if you can now publish

21  8-500?

22  Q.  Now, Special Agent Caslen, can you explain what -- the

23  data that you can find about the length of time that Düsselkamp

24  was posting on LiveLeak account?

25         And I ask Mr. Vera to zoom in on the left side.

Caslen - Direct                                                1039

1  You're ahead of me as usual.

2  A.   The, the account information showed that Düsselkamp had

3  been a member of LiveLeak since June 26, 2017 (sic), had last

4  had activity on December 5 (sic) of 2016, and down below on the

5  next page --

6           THE COURT:  I'm sorry, go over that again for me,

7  please?  I didn't hear you.

8           THE WITNESS:  My apologies, Your Honor.  The

9  left-hand side of the account shows that the, the user had been

10  a member of LiveLeak since June 26, 2007, and last had activity

11  on the account on December 15, 2016.

12          THE COURT:  Thank you.

13          THE WITNESS:  And down at the bottom, you can see

14  that there were over 1,100 comments made.

15 BY MR. KROMBERG:

16 Q.   So I'd like to direct your attention to a comment on

17 8-502, and I'm then going to ask you about 8-501, which are not

18 yet in evidence, and we will move them in evidence once the

19 judge takes a look.

20          THE COURT:  All right, so you're moving 502 in at

21 this point?

22          MR. KROMBERG:  501 and 502.

23          MR. SMITH:  We object to the video -- well, we object

24 to both on 401, 403, and cumulative grounds.

25          MR. KROMBERG:  We're not moving in the video.  We

Caslen - Direct                                                  1040

1   want to get in a comment about the video, Judge.

2          MR. SMITH:  We still think it's cumulative, Your

3   Honor.

4          THE COURT:  Well, I'm not even sure I see what a

5   comment is on 501.

6          MR. KROMBERG:  Right, on 502.

7          THE COURT:  But on 502, there are comments.

8          MR. KROMBERG:  Right.  And what I expect the witness

9   to say is that the comments on 502 are about the videos

10  described in 501.  If it helps, I can ask the witness to

11  describe the relationship between 501 and 502.

12         THE COURT:  Let me look at these comments.

13         What's the date this was posted?  February of 2015,

14  is that right?

15         THE WITNESS:  That's correct, Your Honor.

16         MR. SMITH:  Also, Your Honor, we also object on the

17  ground that it's an incomplete statement.  The government is

18  submitting exhibits that splice and dice the relevant screens,

19  and so --

20         THE COURT:  Yeah, I'm sustaining the objection.

21  BY MR. KROMBERG:

22  Q.   Special Agent Caslen, when you looked at these, how did

23  you try to preserve them?  How did you try to preserve what you

24  saw?

25  A.   I was on a laptop and took a screen shot of the entire

Caslen - Direct                                                      1041

1   screen.  So are we talking these two specific exhibits?

2   Q.    Correct.

3   A.    So the first exhibit is, has --

4            THE COURT:  Well, I've ruled.  These are not going

5   in, so let's stop talking about them.

6   BY MR. KROMBERG:

7   Q.    Let's look at Government Exhibit 14-135.  That was found

8   on the -- we have stipulated it was found on defendant's

9   computer.

10           MR. SMITH:  Objection.  This is cumulative to the

11  rest of today's testimony, it fails 403, and it's irrelevant.

12           THE COURT:  Oh, yeah, this is getting very cumulative

13  now.  I'm sustaining the objection.

14  BY MR. KROMBERG:

15  Q.    What materials did you find relating to Mr. Young's

16  interest in weapons --

17           MR. SMITH:  Objection, Your Honor.

18           THE COURT:  Just let him finish the question.

19  BY MR. KROMBERG:

20  Q.    Interest in weapons in a particularly Islamic setting?

21  A.    I believe there was a photograph already placed into

22  evidence that showed the defendant dressed in traditional

23  Islamic attire, strapped with a shoulder holster weapon and a

24  long knife.

25  Q.    Right.  So that was Government Exhibit 3-302, which has

Caslen - Direct                                                      1042

1  already been in evidence.

2  A.   That's correct.

3  Q.   Okay.  So what others did you see?  Let me show -- take a

4  look at Government Exhibit 14-119.

5          MR. SMITH:  Wait, wait.

6          MR. KROMBERG:  We're not publishing it.  I'm just

7  asking the witness to look at it.

8          THE COURT SECURITY OFFICER:  14-119?

9          MR. KROMBERG:  Correct.  It's a computer item.  It's

10 not a -- it's a photo.

11         THE COURT:  It's a document.  I mean, it's just a

12 piece of paper.

13         THE COURT SECURITY OFFICER:  I don't have a 119.

14         THE COURT:  All right, do you have a copy for the

15 witness?  Here.

16         Wait a minute.  Make sure this is what you're talking

17 about, Mr. Kromberg.

18         MR. KROMBERG:  Yes, that is.

19 Q.   Do you recognize that?

20 A.   I do recognize this photo.

21 Q.   And that was found on the defendant's computer in, in his

22 house?

23 A.   It was found on the defendant's computer media -- or

24 electronic media.

25         MR. KROMBERG:  Your Honor, the government moves in

Caslen - Direct                                                1043

1  14-119.  One of the -- one of the particular relevances of it

2  is the metadata on that, which is six days different from

3  metadata on photos of him in a different outfit.

4           MR. SMITH:  Your Honor, metadata can be elicited from

5  the witness without publishing the photos.  The government

6  knows this is cumulative, 403.

7           THE COURT:  Well, I don't think it's cumulative if

8  the dates are different, but I think you have to get that from

9  the witness.

10           MR. KROMBERG:  That's fine.  Okay.

11  Q.   Special Agent Caslen --

12           THE COURT:  So it's in evidence if you want to post

13  it.

14           (Government's Exhibit No. 14-119 was received in

15  evidence.)

16           MR. KROMBERG:  Thank you.

17           So please publish 14-119.

18  Q.   Okay.  What's the -- according to the metadata that the

19  parties have stipulated is correct, what was the date that that

20  item was created or modified -- it was created on that

21  computer?

22  A.   February 2, 2006.

23  Q.   Okay.  Within -- did you find photos -- we're not moving

24  to introduce them now, we're just talking about photos, but did

25  you find photos that were created on that same computer within

Caslen - Direct                                              1044

1    six days of that date where, where the defendant was dressed in

2    a Nazi uniform?

3            MR. SMITH:  Objection.  Leading.

4            THE COURT:  Sustained.

5    BY MR. KROMBERG:

6    Q.   Okay.  What photos did you find of the defendant within

7    six -- that were created within six days of the photo that you

8    just -- that was, that was on the screen a moment ago but has

9    disappeared?

10   A.   We found a series of photographs depicting the defendant

11   and several other individuals dressed in SS uniforms, posing

12   for photographs.

13   Q.   Well, did it appear to be a reenactment?

14           MR. SMITH:  Objection.  Leading.

15           THE COURT:  Sustained.

16   BY MR. KROMBERG:

17   Q.   What did -- what was the setting of those photos?

18   A.   The setting was an indoor, I would call it a, like,

19   barracks.  They had some beds, tables.

20   Q.   What kind of uniforms were they wearing?  Were they, were

21   they uniforms designed for being outside in the mud or being at

22   a party?  Actually, let me strike that.

23           Dress uniforms or battle dress uniforms?

24   A.   To me, they appeared to be formal uniforms.

25   Q.   Was one of the gentlemen there wearing a flower in his

Caslen - Direct                                                      1045

1    lapel?

2    A.   Yes.

3    Q.   Now, looking at Government Exhibit 14-119, did you find

4    that firearm in Young's residence?  When I say "you," I don't

5    mean you personally, but was that firearm found in the

6    residence?

7            MR. SMITH:  Objection.  This issue has already been

8    ruled on, Your Honor.

9            THE COURT:  Sustained.

10   BY MR. KROMBERG:

11   Q.   All right.  Did you compare the paper issue of *Inspire*

12   magazine found in August 2016 at the defendant's house to the

13   issue that were found on his computer from 2011?

14   A.   I did.

15   Q.   And what did you find?

16   A.   The -- I believe it was the fall 2010 issue was printed

17   and seized at the defendant's residence during the search in

18   2016, and it was the same copy -- it was a copy of the digital

19   copy on his computer.

20           MR. SMITH:  Objection.  Best evidence.

21           THE COURT:  No.  Overruled.

22           MR. KROMBERG:  So we move in at this time, if it

23   hasn't already been moved in, the paper copy of Government

24   Exhibit 10-850.  We don't need to go through it again, but I

25   just want to move in that it was -- the paper copy was found.

Caslen - Direct                                                      1046

1           THE COURT:  It's already in.

2    BY MR. KROMBERG:

3    Q.   Okay.  So it might be easier to look at this in Government

4    Exhibit 14-102, the electronic version, which is already in.

5    Direct your attention to page 73, and did you find any

6    reference to someone personally known to the defendant?

7    A.   I did.  So this is a page within the magazine which is

8    common to be in *Inspire* magazine, where they list Muslim

9    prisoners that they request prayers for, and at the very

10   bottom, which is three -- three names up is the name of Zachary

11   Adam Chesser.

12   Q.   Now, did you -- take a look, if you would, at Government

13   Exhibit 10-814.

14           MR. SMITH:  Objection, Your Honor.  It's 401, 403,

15   best evidence, cumulative.

16           Your Honor, this is particularly difficult to read,

17   and that's why we would need to see a copy.

18           THE COURT:  Well, I have older eyes than you,

19   Mr. Smith, and I could read it by squinting a bit, so --

20           MR. SMITH:  We think --

21           THE COURT:  You've got a copy of it, right?

22           MR. SMITH:  We have not.

23           THE COURT:  Do you not have the electronic?

24           MR. SMITH:  We have the electronic version, but this

25   is 403 evidence, Your Honor.  If Your Honor is looking at

Caslen - Direct                                                    1047

10-814?

2          MR. KROMBERG:  Your Honor, this might be -- for me to
explain relevance, I think it's something that you would want
me to do at the bench.

5          THE COURT:  Yeah, come on up here.

6          (Bench conference on the record.)

7          THE COURT:  Yeah.

8          MR. KROMBERG:  Your Honor, this appears to be a
prayer list in which the defendant is praying for, among
others, his family, but of the only -- the only political
leaders that he prayed for were Hitler, Mussolini, Saddam, the
Mufti, and Ali Timimi, and we were then going to ask that --
Special Agent Caslen did Ali Timimi come up in the *Inspire*
magazine, and he was going to say yes, he's in that same list
of Muslim prisoners.

16          MR. SMITH:  Your Honor, the Timimi connection is just
a ruse to introduce highly prejudicial evidence.  I'm sorry to
say that, but this is exactly what the government is doing.
This is plainly 403 evidence.

20          And furthermore, we can- -- maybe my eyes are not as
good as yours, but I cannot read this from the electronic page.

22          MR. KROMBERG:  If you want to use scissors --

23          MR. SMITH:  This is also cumulative, Your Honor.

24          THE COURT:  No.

25          MR. KROMBERG:  This is not cumulative.

Caslen - Direct                                              1048

1          THE COURT:  This is different.  This is different

2     because it's a linkage between the two.

3          MR. KROMBERG:  Exactly.

4          THE COURT:  No, no, definitely relevant to the issues

5     in this case, all right?  So it's overruled.  If you actually

6     want to see the paper, you can see it.

7          MR. SMITH:  Well, we would request that the witness

8     refresh his recollection with that.  He's representing he can

9     read this.

10         THE COURT:  All right.  The problem, of course, is

11    these don't have stickers on them.

12         MR. KROMBERG:  Well, we can -- I can put one on as

13    soon as we get back to my desk.

14         THE COURT:  You can read it.

15         MR. SMITH:  Wait a second.  I don't think this is a

16    prayer to these individuals.  I don't see where it is.  Where

17    is it, Gordon?

18         THE COURT:  It says "The Dead" on the top.

19         MR. KROMBERG:  I'm sorry?

20         THE COURT:  It says "The Dead" on the top.

21         MR. KROMBERG:  It has "The Dead," "The Living," "The

22    Community."

23         MR. SMITH:  Where does it say this is a prayer?  "The

24    Dead."  We object to the characterization that this is a prayer

25    list.

Caslen - Direct                                                         1049

1              THE COURT:  All right.  Well, you can argue about

2    that, but it's going in.

3              MR. KROMBERG:  Thank you, Your Honor.

4              THE COURT:  All right.  What's the number on that?

5              MR. KROMBERG:  10-814.

6              (End of bench conference.)

7              THE COURT:  That should eventually go in the folder

8    for 10-814.  That is the original, and it's in evidence.

9              (Government's Exhibit No. 10-814 was received in

10   evidence.)

11   BY MR. KROMBERG:

12   Q.   Special Agent Caslen, what is Government Exhibit 10-814

13   that the parties have stipulated was seized from the

14   defendant's residence in August 2016?

15   A.   This is a list of people which the defendant would pray

16   for, hence, by the term "O Allah, protect my father," which

17   would indicate it was a prayer.

18   Q.   Of the -- not talking about his family members that he was

19   praying for, were there -- is there a list of political leaders

20   that he was praying for?

21   A.   There is.

22   Q.   And who were those people?

23             MR. SMITH:  Objection to the characterization in this

24   as a prayer.  He is speculating about the defendant's mindset.

25             THE COURT:  Overruled.

Caslen - Direct                                                      1050

1            THE WITNESS:  So the political leaders include

2     Hitler, Skorzeny, Haj Amin al-Hussaini, Mussolini, Saddam

3     Husein.

4     Q.    Does Ali Timimi appear anywhere on that list?

5     A.    On the back side, Ali al-Timimi as well as the name Saleh

6     does appear.

7     Q.    Okay.  Now, did you find reference to Ali al-Timimi in the

8     *Inspire* magazine that was, it's 14-101, which is already in

9     evidence?  And if I could direct your attention to page 64?

10    A.    I did.  He is the second name down.  He was also on the

11    last example of this that you showed from the other issue.

12    Q.    Okay.  Now, in the winter 2010 issue, 14-103, did you find

13    references to anyone else that Mr. Young has talked about

14    according to the testimony that we heard from Khalil earlier in

15    the trial?  And I'm directing your attention to page 66 on

16    Government Exhibit 14-103.

17    A.    There is.  At the very bottom of the, of the right-hand

18    side, you'll see the name Brother Farooque Ahmed.  As Khalil

19    testified on Day One of the trial --

20            MR. SMITH:  Objection.  Hearsay.

21            THE COURT:  Overruled.

22            THE WITNESS:  As Khalil testified on Day One of the

23    trial, the defendant -- on the day that the defendant met him,

24    the defendant and he talked about Farooque Ahmed, who was the

25    individual arrested by the FBI for attempting to plot to blow