RECORD NO. 18-4138

*In The*

# United States Court of Appeals

## For The Fourth Circuit

# UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

# NICHOLAS YOUNG,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA, No. 1:16-cr-265-LMB
HON. LEONIE M. BRINKEMA**

———

**JOINT APPENDIX
VOLUME IV OF V
(Pages 1334 – 1839)**

———

Nicholas D. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, Virginia 22314
(703) 822-1086

Gordon D. Kromberg
Assistant U.S. Attorney
OFFICE OF THE U.S. ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 229-3721

*Counsel for Appellant*

*Counsel for Appellee*

## TABLE OF CONTENTS
## VOLUME I OF V

**Appendix Page**

Docket Entries...................................................................................1

**Criminal Complaint**
    **filed August 2, 2016**................................................. 31

**Affidavit in Support of Criminal Complaint**
    **filed August 2, 2016**................................................. 32

**Indictment**
    **filed December 15, 2016**........................................... 49

**Exhibit to Motion to Suppress**
    **filed February 15, 2017:**

    **Exhibit:**

    1.    **Search and Seizure Warrant**
        **dated August 2, 2016**............................... 54

**Transcript of Motion Hearing before**
**The Honorable Leonie M. Brinkema**
    **on March 10, 2017** ................................................. 67

**Order of**
**The Honorable Leonie M. Brinkema**
**Re: Denying Defendant's Motion to Suppress**
**Items Unconstitutionally Seized**
    **filed March 10, 2017** .............................................. 92

**Government's Motion for Protective Order and to**
**Delete Certain Classified Information from Discovery**
    **filed September 25, 2017** ......................................... 93

**Redacted Protective Order of**
**The Honorable Leonie M. Brinkema**
    **filed September 26, 2017** ......................................... 94

**-i-**

**Government's Opposition to Defendant's Omnibus Motion in Limine**
  filed October 10, 2017 .................................................................. 97

**Transcript of Motion Hearing before**
**The Honorable Leonie M. Brinkema**
  on October 27, 2017 .................................................................... 126

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Denying in Part Defendant's Omnibus Motion in Limine**
  filed October 27, 2017 ................................................................. 150

**Government's Notice of Expert Testimony**
  filed November 17, 2017 ............................................................. 151

**Defendant's Memorandum in Support of Motion to Exclude**
**Two Expert Witnesses from Trial**
  filed November 25, 2017 ............................................................. 154

**Curriculum Vitae of Dr. Gartenstein-Ross**
  filed November 29, 2017 ............................................................. 175

**Defendant's Motion to Strike Witnesses Due to the Government's Failure to**
**Comply with *Jencks* and Discovery Order**
  filed November 30, 2017 ............................................................. 185

**Transcript of Motions Hearing before**
**The Honorable Leonie M. Brinkema**
  on December 1, 2017 ................................................................... 189

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Denying Defendant's Motion in *Limine* to Exclude**
**Two Expert Witnesses from Trial**
  filed December 1, 2017 ............................................................... 220

**Order of**
**The Honorable Leonie M. Brinkema**
**Re:  Ordering Government to Provide Unredacted Copies of**
**Material at Issue in Defendant's Second Motion to Strike Witnesses**
  filed December 4, 2017 ............................................................... 221

Order of
The Honorable Leonie M. Brinkema
Re:   Court's Ability to Ensure a Fair Trial
      filed December 4, 2017 ................................................................ 222

Transcript of Status Conference before
The Honorable Leonie M. Brinkema
      on December 5, 2017 ................................................................ 223

Order of
The Honorable Leonie M. Brinkema
Re:  Denying Defendant's Motion to Strike Each Witness as to
Whom the Government has Failed to Comply With the *Jencks* Deadline
and Second Motion to Strike Witnesses for Continued Failure to Produce
Complete *Jencks* Material
      filed December 5, 2017 ........................................................ 277

Order of
The Honorable Leonie M. Brinkema
Re:  Overruling Defendant's Oral Objections to *Jencks* Redactions
      filed December 6, 2017 ........................................................ 278

Washington Post Article "Man Who Patrolled D.C. Metro
Awaits Terrorism Trial"
      filed December 8, 2017 ........................................................ 279

Order of
The Honorable Leonie M. Brinkema
Re:  Denying in Part Motion for Judicial Notice
      filed December 11, 2017 ........................................................ 281

Transcript of Jury Selection and Opening Statements
The Honorable Leonie M. Brinkema
      on December 11, 2017 ............................................................ 283

# TABLE OF CONTENTS
## VOLUME II OF V

**Appendix Page**

**Transcript of Jury Trial before**
**The Honorable Leonie M. Brinkema**
  **on December 12, 2017** .................................................................. **436**

**Testimony of "Khalil Sullivan":**

**Direct Examination by Mr. Kromberg** .................................................. **450**
**Cross Examination by Ms. Moreno** ...................................................... **510**
**Redirect Examination by Mr. Kromberg** ............................................. **526**

**Testimony of John Gervino:**

**Direct Examination by Mr. Turgeon** .................................................... **529**
**Cross Examination by Ms. Moreno** ...................................................... **535**
**Redirect Examination by Mr. Turgeon** ................................................ **538**

**Testimony of SA John Richard Minichello:**

**Direct Examination by Mr. Gibbs** ........................................................ **545**
**Cross Examination by Mr. Smith** ......................................................... **566**
**Redirect Examination by Mr. Gibbs** .................................................... **624**
**Recross Examination by Mr. Smith** ..................................................... **621**

**Testimony of "Mo":**

**Direct Examination by Mr. Gibbs** ........................................................ **629**
**Cross Examination by Mr. Smith** ......................................................... **663**

Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
    on December 13, 2017 ................................................................ 708

<u>Testimony of "Mo": (Resumed)</u>

Cross Examination by Mr. Smith .......................................... 713
Redirect Examination by Mr. Gibbs ...................................... 731
Recross Examination by Mr. Smith........................................ 736

<u>Testimony of Agent Cameron Siegfried:</u>

Direct Examination by Mr. Gibbs .......................................... 740
Cross Examination by Mr. Smith .......................................... 784

<u>Testimony of "SA Smith":</u>

Direct Examination by Mr. Gibbs .......................................... 815
Cross Examination by Ms. Moreno ........................................ 828

## <u>TABLE OF CONTENTS</u>
**VOLUME III OF V**

<u>**Appendix Page**</u>

**Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
        on December 13, 2017, continued:**

<u>**Testimony of SA John Sikorski**</u>**:**

**Direct Examination by Mr. Gibbs** ..................................................... 841
**Cross Examination by Mr. Smith** ...................................................... 896
**Redirect Examination by Mr. Gibbs** ................................................ 908

<u>**Testimony of SA John Minichello**</u>**: (Recalled)**

**Direct Examination by Mr. Gibbs** ..................................................... 910
**Cross Examination by Mr. Smith** ...................................................... 924

<u>**Testimony of Paul Lee**</u>**:**

**Direct Examination by Mr. Turgeon** .................................................. 930
**Cross Examination by Ms. Moreno** .................................................... 965
**Redirect Examination by Mr. Turgeon** .............................................. 967

<u>**Testimony of Ian Paul Campbell**</u>**:**

**Direct Examination by Mr. Kromberg** ................................................ 970
**Cross Examination by Mr. Smith** ...................................................... 983

Transcript of Jury Trial before
The Honorable Leonie M. Brinkema
    on December 14, 2017 ...............................................................1021

<u>Testimony of Kenneth James McNulty</u>:

Direct Examination by Mr. Kromberg ..................................1026
Cross Examination by Mr. Smith ..........................................1037
Redirect Examination by Mr. Kromberg..............................1063
Recross Examination by Mr. Smith.......................................1067

<u>Testimony of Brian Michael Menzies</u>:

Direct Examination by Mr. Kromberg ..................................1069
Cross Examination by Ms. Moreno .......................................1084

<u>Testimony of Joanne Dill</u>:

Direct Examination by Mr. Kromberg ..................................1093
Cross Examination by Mr. Moreno .......................................1097

<u>Testimony of Dr. Daveed Gartenstein-Ross</u>:

Direct Examination by Mr. Kromberg ..................................1090
Cross Examination by Mr. Smith ......................................... 1111

<u>Testimony of SA Nicholas A. Caslen</u>:

Direct Examination by Mr. Kromberg ..................................1277

# TABLE OF CONTENTS
## VOLUME IV OF V

**Appendix Page**

**Transcript of Jury Trial before**
**The Honorable Leonie M. Brinkema**
    **on December 15, 2017** ............................................................1334

    **Testimony of SA Nicholas A. Caslen: (Resumed)**

        **Direct Examination by Mr. Kromberg** ................................1362
        **Cross Examination by Mr. Smith** ......................................1393
        **Redirect Examination by Mr. Kromberg**............................1462

        **Government's Closing Argument** ........................................1524
        **Defendant's Closing Argument** .........................................1538
        **Government's Rebuttal** ..................................................... 1565

        **Court Instructs the Jury**...................................................1575

**Transcript of Jury Trial before**
**The Honorable Leonie M. Brinkema**
    **on December 18, 2017** ............................................................1619

    **Jury Asks a Predisposition Question** ....................................1621

    **Government's Exhibits:**

    **1-201.  December 17, 2014 Email from Young** .......................1631

    **3-110.      Photograph** ..........................................................1632

    **4-203.      Photograph** ..........................................................1633

    **4-300.      Photograph** ..........................................................1634

<u>**Government's Exhibits,**</u> **continued:**

10-231.    Photograph ...................................................................1635

10-241.    Photograph ...................................................................1636

10-252.    Photograph ...................................................................1637

10-700.    Photograph ...................................................................1638

10-701.    Photograph ...................................................................1639

10-706.    Photograph ...................................................................1640

10-863.    Photograph ...................................................................1641

10-903.    Photograph ...................................................................1643

11-401.    Photograph ...................................................................1644

<u>**Defendant's Exhibits:**</u>

2-8.    Photographs ..................................................................1645

14-24. Photographs ..................................................................1652

Redacted Verdict Form
    filed December 18, 2017 ......................................................1663

**Jury Instructions**
     **filed December 18, 2017** ...................................................................**1664**

**Defendant's Sentencing Memorandum,**
**With Exhibits,**
     **filed February 16, 2018** .................................................................**1712**

     <u>**Exhibits**</u>**:**

     **A.**     **Character References**
            **various dates** ...................................................**1743**

     **B.**     **Psychological Evaluation**
            **dated December 5, 2016** ..................................**1796**

**Letter to**
**The Honorable Leonie M. Brinkma from**
**Nicholas Young**
     **undated** ...........................................................................**1805**

**Transcript of Sentencing Hearing before**
**The Honorable Leonie M. Brinkema**
     **on February 23, 2018** ....................................................................**1807**

**Judgment in a Criminal Case**
     **filed February 23, 2018** .................................................................**1832**

**Order of**
**The Honorable Leonie M. Brinkema**
**Re: Denying Motions for a New Trial and Judgment of Acquittal**
     **filed February 23, 2018** .................................................................**1837**

**Defendant's Notice of Appeal**
     **filed February 28, 2018** .................................................................**1838**

# TABLE OF CONTENTS
## VOLUME V OF V – UNDER SEAL

**Appendix Page**

**Defendant's Second Motion to Strike Witnesses Due to
Refusal to Produce Complete *Jencks* Materials,
With Attachments,
        filed December 2, 2017** .........................................................................1840

**Presentence Investigation Report
        filed January 25, 2018** .........................................................................1872

**Statement of Reasons
        filed February 23, 2018**.........................................................................1894

Caslen - Direct                                                    1051

1    up the D.C. subway system.

2            MR. KROMBERG:  Now, can you bring up 9-108, which is

3    in evidence?

4    Q.    And that would be the picture of Farooque Ahmed?

5    A.    Correct.

6    Q.    Okay.  Now, please take a look at Government Exhibit

7    14-180, which is a list of Web sites that were found on the

8    defendant's -- well, let me -- according to stipulation 28,

9    which I can read if I can find it, the United States and the

10   defendant hereby stipulate and agree that Government Exhibits

11   14-100 through 14-140 and Government Exhibit 14-180 were found

12   by the FBI on computer media found and searched by the FBI in

13   September 2011 at the residence of defendant Nicholas Young.

14           I think that 12-28 is already in, but I've lost

15   track.  In any event, 14-180, the government moves into

16   evidence as a list of bookmarks on that computer in -- as of

17   that time, which is slightly different than what Your Honor has

18   seen before, which was a list of bookmarks in 2016.

19           MR. SMITH:  Objection.  Cumulative, relevance, 403.

20           THE COURT:  Overruled.

21           MR. KROMBERG:  Could you publish, please, 14-180?  Is

22   it possible to blow that up so people can read it?  Okay.

23   Q.    Can you -- Special Agent Caslen, on that list of

24   bookmarks, do any of them involve Nazis or Hitler?  Appear to

25   involve, excuse me.

Caslen - Direct                                                  1052

1   A.   Yes.  The first bookmark is titled "YouTube - Are the BNP

2   Nazis."

3   Q.   And that is the British National Party that Mr. Campbell

4   testified about?

5   A.   Correct.

6   Q.   Okay.  Anything about Usama Bin Laden?

7   A.   The third -- the third bookmark down, "LiveLeak.com -

8   Sheikh Osama Bin Laden Speech to American Citizens After the

9   Iraq Invasion," the URL.

10  Q.   Anything about Anwar Awlaki?

11  A.   Yes.  Towards the middle, there is a LiveLeak.com

12  bookmark, "Anwar Al Awlaki Allah is Preparing Us For Victory."

13  Q.   And towards the bottom?

14  A.   There's two more down there towards the bottom.  They're

15  YouTube channels -- excuse me, YouTube videos.  "YouTube.com -

16  Anwar Al Awlaki Jihad Against All Arab Rulers" and "YouTube --

17  Anwar Al Awlaki The True Muslims Must See.

18  Q.   Now, do you see -- is there anything --

19  A.   I apologize, there's two more Anwar Al Awlaki URLs.

20  Q.   Now, you were here when Dr. Gartenstein-Ross talked about

21  Alois Brunner, correct?

22  A.   I was.

23  Q.   Is there a bookmark for Alois Brunner in here?  Near the

24  bottom.

25           MR. SMITH:  Your Honor, objection.  This is all

Caslen - Direct                                                    1053

1  cumulative evidence.  It's not building towards the point.

2  It's just repetitive, and it's been that way for an hour.

3           THE COURT:  Overruled.

4           THE WITNESS:  Right underneath the last YouTube video

5  for Anwar Al Awlaki is, I can't pronounce his name like you

6  did, but Mr. Brunner.

7  Q.   Okay.

8  A.   And I would point out that all these bookmarks were --

9  have a date on the right-hand side between 2009 and 2010, all

10 dates before he met Khalil.

11 Q.   Now, take a look, if you would, at Government Exhibits

12 10-303, 304, and 305.  They are -- I believe we introduced them

13 earlier today pursuant to stipulation 21.

14          THE COURT:  I know we've seen these.  They're in

15 evidence, I believe.

16          MR. KROMBERG:  Right.

17          THE COURT:  Yeah.

18          MR. KROMBERG:  Right.  Okay.  So I'd like -- we have

19 not published them.  I said we were going to publish them with

20 Special Agent Caslen.

21          THE COURT:  All right.

22          MR. KROMBERG:  Can you publish 303?  This was -- can

23 we blow it up just a little?

24          And that's 303.  Could you publish 304?

25          And can you publish 305?

Caslen - Direct                                                1054

1   Q.   Special Agent Caslen, were you able to -- did you listen

2   to these nasheeds?

3   A.   I did.

4   Q.   Were you able to understand any of them?

5   A.   One of them.

6   Q.   And which one was that?

7   A.   There was a nasheed, I believe, titled "Alhayat Media."

8   However, I'm not 100 percent sure that's the name of the, the

9   file, but it was a lengthier nasheed, but the first couple

10  minutes were in English.

11  Q.   Did you write down what the English language portion of

12  that nasheed was?

13  A.   I did.  I transcribed it.

14  Q.   And is that Government Exhibit 10-305T?  Can you take a

15  look at 10-305T?

16        Is that what you wrote?

17  A.   It is, and it has the file name on here.

18        MR. KROMBERG:  Okay.  Judge, we'd move into evidence

19  Government Exhibit 10-305-T.  We are not playing the video --

20  we're not playing the nasheed, but this is what the special

21  agent wrote down he heard in English on the nasheed.

22        THE COURT:  Is there any objection?

23        MR. SMITH:  No objection.

24        THE COURT:  All right, it's in.

25        (Government's Exhibit No. 10-305-T was received in

Caslen - Direct                                                        1055

1    evidence.)

2            MR. KROMBERG:  Can you publish 10-305-T?  And if you

3    could blow it up so that we can read it?  Thank you.

4    Q.   Special Agent Caslen, would you read at least the first

5    couple paragraphs of that aloud?

6    A.   So I will read the first paragraph, which is sort of a, I

7    would call it a refrain, and it's repeated after each other

8    paragraph.  So I'll read it first and then a couple of the

9    other verses.  The refrain -- and I'm --

10           MR. SMITH:  Objection.  Cumulative.

11           THE COURT:  He's explaining it.  Otherwise, we could

12   play it.  This is giving the jury as accurate a picture of it

13   without having to play it.

14           MR. SMITH:  My cumulative point is that we've seen

15   this kind of evidence for 45 minutes now, Your Honor.

16           THE COURT:  All right, I'm overruling the objection.

17           MR. SMITH:  I'm not exactly sure where this is going,

18   what we're doing right now.

19           THE WITNESS:  "For the sake of Allah, we will march

20   to the gates of the paradise where our maidens await.  We are

21   men that love death, just as you love your life.  We're the

22   soldiers that fight in the day and the night.  We're the

23   soldiers that fight in the day and the night."

24           That paragraph is repeated after each verse.  The

25   first paragraph says:

Caslen - Direct                                                    1056

1          "Going forth preparing to roar are the brothers of

2    light with kuffar in sight.  There rang so many and weapons are

3    heavy, but soldiers of Allah are more than ready, but soldiers

4    of Allah are more than ready."

5    BY MR. KROMBERG:

6    Q.   Okay.  You don't have to read it more.  The jurors can

7    read it more if they so choose later.

8          Take a look, if you would, at the Government Exhibit

9    14-140, which we have stipulated came from the computer in

10   2011.

11   A.   I recognize this.

12   Q.   Okay.  What is that?

13   A.   This is an e-mail sent from the e-mail address

14   herebedragons777@gmail.com to e-mail address

15   herebedragons777@gmail.com.   Herebedragons777@gmail.com was the

16   e-mail address that the defendant used to register his Facebook

17   account, so this is an e-mail he sent to himself.

18   Q.   Slow down, slow down.  That he used to register his

19   Facebook account, and that was Government Exhibit 8-112 that we

20   looked at previously?

21   A.   That is correct.

22   Q.   Okay.  So that's at herebedragons' account, but he

23   e-mailed it to himself?

24   A.   That is correct.

25   Q.   Okay.  Now, did you look at that YouTube channel -- oh,

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

Caslen - Direct                                                    1057

1    I'm sorry.  Judge, we'd move into evidence Government Exhibit

2    14-140.

3              THE COURT:  Is there any objection to this?

4              MR. SMITH:  Not the e-mail, Your Honor.

5              THE COURT:  All right, then it's in.

6              (Government's Exhibit No. 14-140 was received in

7    evidence.)

8              MR. KROMBERG:  Now, could we publish that e-mail?

9              THE COURT:  Go ahead.

10   BY MR. KROMBERG:

11   Q.   Okay.  Now, what is the content of that e-mail?

12   A.   The content of the e-mail was simply a URL to a YouTube

13   page.

14   Q.   And did you go to that YouTube page?

15   A.   I did.

16   Q.   And what did you find when you went to that YouTube page?

17   A.   I found a series of videos that were posted to that

18   YouTube page which contain images of folks with weapons,

19   speeches by Anwar Al Awlaki, photos -- excuse me, videos that

20   had folks like Usama Bin Laden in them.

21   Q.   And so can you take a look at what's been marked

22   Government Exhibit 14-141?  Are those the screen shots that you

23   took of the contents of that YouTube channel?

24             MR. SMITH:  Objection.  Relevance, cumulative, 403.

25             MR. KROMBERG:  Judge, we're not seeking to play any

Caslen - Direct                                                      1058

1    of them.

2              THE COURT:  I'm permitting this in.

3              (Government's Exhibit No. 14-141 was received in

4    evidence.)

5              MR. KROMBERG:  And you can publish that, please.

6    Q.   Now, Special Agent Caslen, can you explain why there are

7    several pages here of screen shots for this one channel?

8    A.   I can.  So I, I went to the YouTube channel, and I took

9    screen shots as I scrolled down, overlapping so you can see all

10   of the videos that were on this user's YouTube channel.

11   Q.   And so some of those -- is it correct that some of those

12   screen shots have portions of the channel that were already

13   included on another screen shot?

14   A.   That is correct.

15   Q.   Okay.  Now, did you try to find those videos and listen to

16   them?

17   A.   Yes, I did.  I listened to them, and I summarized them.

18   Q.   And would that be Government Exhibit -- take a look at

19   Government Exhibit 16-002.

20   A.   Yes, that's it.

21   Q.   Okay.  Those are the summaries that you made of the

22   videos -- the YouTube videos that you watched from that

23   channel?

24   A.   That is correct.

25              MR. KROMBERG:  Okay.  Judge, we move in Government

Caslen - Direct                                                    1059

1   Exhibit 16-002, Special Agent Caslen's summary of the videos

2   that he watched on that channel.

3          MR. SMITH:  Your Honor, may we approach the bench?  I

4   have an objection.

5          THE COURT:  Yes.

6          (Bench conference on the record.)

7          MR. SMITH:  So if the government is giving us a

8   Hobson's choice where they can say we can play a highly

9   prejudicial video or you can submit to our, our

10  characterization of what happens in the video, that's not fair.

11         THE COURT:  I agree.

12         MR. SMITH:  Okay.

13         THE COURT:  I agree, all right?

14         MR. SMITH:  That's cumulative.

15         THE COURT:  You're getting -- I think you have in

16  your direct case more than enough evidence.

17         MR. KROMBERG:  May I say, Judge, that the point of

18  this is that this was before he met Khalil.  The defense's

19  theory, as I understand it, is we have to prove predisposition

20  from before December 2010.

21         THE COURT:  But you got -- I've let you get the

22  screen shots in, so the jury can see a sampling of the types of

23  things that he is looking at without going into this much

24  detail.

25         MR. KROMBERG:  Okay.

1060

1    THE COURT:  So I'm going to sustain the objection,

2 all right?

3    MS. MORENO:  I have a scheduling question, Your

4 Honor.

5    THE COURT:  Yeah, I'm going to let the jury go home

6 now, all right?

7    MS. MORENO:  Thank you.

8    (End of bench conference.)

9    THE COURT:  Ladies and gentlemen, you've been a great

10 jury, and we're getting, really, we're moving very well.  I am

11 optimistic, unless we have a major glitch, I think the evidence

12 may close tomorrow, which means I can probably get this case to

13 you on Monday.  So it's not going nearly as late into next week

14 as I had been concerned about.

15    Now, again, stuff can happen, but we're really ahead

16 of where everybody thought we would be.  It may not seem that

17 way to you, but we really are.  So I'm letting you go home for

18 tonight.

19    Now, I actually have some other matters in court.

20 Friday is our normal motions day, unrelated to this case, and I

21 don't like to keep juries waiting.  We do value your time.  So

22 I think tomorrow morning, to play safe, I don't need you here

23 until 9:30.  It gives you a few extra minutes in the morning,

24 all right?

25    And as I said, I think you've been such a great jury

1061

1  in terms of being here on time that I'm going to close it down

2  at five o'clock tomorrow, so that you can for planning

3  purposes, all right, you get the extra hour before the weekend

4  starts, all right?

5          It is -- I'm quite sure you'll need to be back here

6  on Monday, so how far into next week we go, I don't know, but

7  the case is moving along quite well.

8          So remember my cautions about avoiding any media

9  coverage, discussing the case in any respect, and that

10  includes, you know, any kind of tweeting.  Stay off the

11  Internet.  In terms of trying to look at any of these URLs or

12  sites or Web sites that's been discussed, you must stay away

13  from anything related to this case.

14          I will see you tomorrow morning at 9:30.  We will

15  stay in session.

16                    (Jury out.)

17          THE COURT:  Mr. Kromberg, about how much longer do

18  you think -- Agent, you may go back to your seat.

19                    (Witness stood down.)

20          THE COURT:  How much longer do you think your case

21  is -- your questioning of the agent will be?

22          MR. KROMBERG:  Just one moment, Your Honor.

23          I would say another 45 minutes.

24          THE COURT:  All right.  Well, then there will be

25  cross-examination, but he is your last witness.

1062

```
 1              MR. KROMBERG:  That's correct.
 2              THE COURT:  Now, in the meantime, however, so we
 3   don't have any delay on this timeline, I expect you to have
 4   done a revised timeline so that -- and get it to the defense as
 5   early as you can.
 6              MR. KROMBERG:  Try and get it tonight.
 7              THE COURT:  All right, that's fine.  All right.
 8              And, Ms. Moreno, how long do you anticipate your case
 9   taking?
10              MS. MORENO:  May I have a moment, Your Honor?
11              THE COURT:  Yes, ma'am.
12              MS. MORENO:  Your Honor, if the government closes
13   tomorrow with their last witness, we, we feel confident that
14   the case can go to the jury -- I'm sorry, I should be over
15   here -- the case can go to the jury on Monday.
16              I had a question about the Court, the Court's wishes
17   with respect to how long you will allow the closing arguments
18   to be.
19              THE COURT:  What I always do to lawyers is I say you
20   tell me how much time you want.  If it's a reasonable request,
21   you often get it.  If it's unreasonable, you don't get it.
22   So --
23              MS. MORENO:  We think 45 minutes would be apt.
24              THE COURT:  That's just about right.
25              Government want 30 and 15?  What do you want,
```

1063

1    Mr. Kromberg or Mr. Gibbs?

2              MR. KROMBERG:  That will be fine, Judge.

3              THE COURT:  All right?  So 45 minutes per side, all

4    right.

5              MR. KROMBERG:  I have a question.

6              THE COURT:  Yes.

7              MR. KROMBERG:  I believe that I have the ability to

8    speak with my case agent even though he's in the middle of

9    testifying despite the rule on witnesses because he's the case

10   agent.

11             THE COURT:  Well, he sat through the whole trial,

12   too, so yeah, of course.

13             MR. KROMBERG:  Thank you, Your Honor.

14             THE COURT:  All right, we gave you the proposed

15   verdict form.  It's a little bit different from what either

16   side submitted, all right?  You don't have to tell me tonight,

17   but take a look at it.  If there are any things you want

18   changed or any typos, let us know.  And we're working on the

19   jury charge, which we may be able to get to you by midday

20   tomorrow.

21             So at some point on Monday, I do expect closing

22   arguments and instructions.  We'll get the case to the jury on

23   Monday, all right?  So we are a day or two ahead of schedule,

24   which is great.

25             MS. MORENO:  I forgot to ask you an important

1064

1    question about the Rule 29s, Your Honor.

2              THE COURT:   The government hasn't rested yet.

3              MS. MORENO:  When they do rest --

4              THE COURT:   When they do rest, I will tell you right

5    now you can make a perfunctory motion, but it will be denied

6    because all, all inferences get drawn in favor of the

7    government at this point, and I think at this point, the one

8    issue that I didn't think they were going to get in they're

9    going to get in.  So I think there's no problem.  We'll go

10   forward, all right?  I don't want a long delay in the trial for

11   that.

12             All right, anything further that we --

13             MS. MORENO:  Thank you.

14             THE COURT:   Oh, here's what I'm going to do tomorrow

15   morning:  Because I have a criminal matter, I'm going to make

16   the criminal folks sit at the back table, so it's only the back

17   table that needs to be cleaned up.  You can leave your stuff at

18   the front table, all right?

19             I mean, when we have another criminal matter, I can't

20   have all of your stuff there, so both sides will need to figure

21   out what you want to do with the stuff that's on those back

22   tables, but I think there's less stuff there than there is on

23   the front ones.  That's why we're starting at 9:30.  I mean, I

24   think my criminal matter is going to take five minutes, maybe

25   ten.

1065

1    So you-all should be here around nine tomorrow so you

2    can set the courtroom back up because you're going to have to

3    take it a little bit apart tonight, all right?

4    All right, does the government anticipate the

5    possibility of a rebuttal case?  That's the one thing I think

6    we should all know about.  I'm not going to require you to tell

7    me who but --

8    MR. KROMBERG:  Right.  We reserved particularly

9    Khalil, and we did not release him on the possibility that we

10   would be able to get into -- or we would be required to get

11   into issues that he did not get into before.  So it's possible,

12   depending on what happens.

13   THE COURT:  All right.  You didn't have to tell me

14   who it is.

15   MR. KROMBERG:  Right.

16   THE COURT:  It's just we will not need the screen,

17   though, for any rebuttal evidence; is that right?

18   MR. KROMBERG:  Well, if Khalil does testify, then we

19   would need a screen.

20   THE COURT:  Then you'll need to give us a heads up if

21   that looks like the case.

22   MR. KROMBERG:  So, Judge?

23   THE COURT:  Yeah.

24   MR. KROMBERG:  There is one other issue I think it

25   makes sense to go into now, and that is, as I was -- some of

1066

1  the remaining issues with Special Agent Caslen have to do with

2  other items that were seized from the house.

3       In her opening statement, Ms., Ms. Moreno said that

4  the defendant was a collector of weapons.  So we -- as I've

5  said, we don't need to put in the actual firearms, but I do

6  want to put in body armor because I don't think people have any

7  conception of the magnitude of the body armor that was found in

8  the house in this case.  So I was going to have it brought into

9  the courtroom while Special Agent Caslen is testifying so that

10 when we get to that point, he could reach into the boxes, pull

11 those things out, and it's going to be a pile, because we

12 estimate 60, six-zero, pieces of body armor, which in our view

13 is particularly relevant because one person does not need 60

14 pieces, but a person who talks about getting a team to attack

15 places might have a use for 60 pieces.

16       THE COURT:  But here's the problem:  This case is

17 charged as a material support case, where the material support,

18 although you do have that one set of e-mails about the rifle

19 scopes, but there's no evidence that that ever happened, and,

20 in fact, in the defendant's favor, you've got his statement

21 that he wanted to check to make sure it was legal, finds out

22 that it's not, and he doesn't do it.

23       I said earlier this is not a violent case in that

24 respect, and so I think you create the potential for reversible

25 error if you put that kind of evidence in, and so at this

1067

```
1   point, at this point, I don't think the door has been

2   adequately opened for that to come in.  All right?

3          MR. KROMBERG:  I will point out, Judge, that defense

4   has said that he's a collector of weapons, ammo cans, U.S. Army

5   equipment, and it just doesn't -- it leaves the wrong

6   impression that he was a collector when this was not

7   collecting.  This was -- I don't know what it is, but it's

8   something almost unfathomable that a normal person would have

9   this kind of equipment in his house that's again not firearms

10  which --

11         THE COURT:  But you can't leave this jury at this

12  point with the impression that Mr. Young was about to go out

13  and start blowing things up.  That's not this case.

14         MR. KROMBERG:  But it's also not the case that he's a

15  peaceful person --

16         THE COURT:  Well --

17         MR. KROMBERG:  -- because the evidence that Your

18  Honor has kept out is -- Ms. Moreno asked the witness, "Isn't

19  it true that he said that he had a respectful attitude towards

20  the FBI agents who interviewed him?" when as we showed Your

21  Honor, that eight lines above that, where the respectful

22  attitude was not respectful at all and had to do with violence.

23         So it's unfair to leave the jury with the impression

24  that Mr. Young has nothing to do, had no indications of going

25  in that direction.
```

1068

1      THE COURT:  At the present time, the way the case is
2  postured, I don't think enough of the door has been opened on
3  that, but again, it depends on what the evidence is in the
4  defense case.  I mean, again, as I've said, a couple of times,
5  I've used the word "pacific" several times.  If the impression
6  that is being made is that this is a completely benign, pacific
7  situation, then you can approach the bench and see whether or
8  not in rebuttal it's appropriate to bring that in.
9      MR. KROMBERG:  And that's --
10     THE COURT:  All right?
11     MR. KROMBERG:  And that's fine, Judge.
12     THE COURT:  So I'm saying it's not coming in in your
13 case-in-chief.
14     MR. KROMBERG:  And that's fine, but then we would ask
15 that the defense be barred from arguing in closing argument
16 that he exhibited a respectful attitude toward the FBI when he
17 spoke to them or that he was a peaceful man, because that is
18 the wrong impression.  It's unfair to the government to be able
19 to argue that only because the government was not able to bring
20 in this evidence.
21     THE COURT:  I think you have actually at this point
22 enough evidence already in your case-in-chief that if that
23 really came out, you can rebut it if you've thought carefully
24 about which evidence you've already got.  So I don't think you
25 need this extra stuff, as I just said, but it depends on the

1069

1    rebuttal, all right?

2           So, I mean, if it comes in for the first time in the

3    closing argument, in your rebuttal argument, just know what

4    your evidence is.  You've got it in your evidence already.

5           MR. KROMBERG:  Judge, one last question on a slightly

6    different note was the defense had said that they wanted

7    Mr. Cameron Siegfried to be retained, and we would ask if

8    that's still the case so that if he's not, he can go back to

9    where he's -- he doesn't live here, and he can go back to where

10   he's from.

11          THE COURT:  All right.

12          MR. SMITH:  Your Honor, if I may, I'd like to address

13   Gordon's first point.

14          THE COURT:  No, let's do the last one with the agent.

15   Do you need Siegfried again?

16          MR. SMITH:  I don't even recall saying we did need

17   Siegfried.

18          THE COURT:  Yes, you did.  I think you were not sure.

19   So when you're not sure, we hold on to them.

20          MR. SMITH:  Well, since Your Honor told the jury that

21   the case would probably be given to them by Monday, is there

22   any reason we need to decide --

23          THE COURT:  Yes, because they want -- he's an FBI

24   agent -- or Air Force.

25          MR. KROMBERG:  Air Force.

1070

```
 1              THE COURT:  They want to send him back to wherever

 2   he's from.  He shouldn't just have to sit around here waiting

 3   on whether you're going to call him or not.

 4              MR. SMITH:  That's fine, Your Honor.

 5              THE COURT:  You're releasing him?

 6              MR. SMITH:  Yes, we're releasing him.

 7              MR. KROMBERG:  Thank you.

 8              THE COURT:  All right.

 9              MR. SMITH:  But we'd like to address one point Gordon

10   just made.

11              THE COURT:  Yes.

12              MR. SMITH:  Gordon made a point about Ms. Moreno's

13   opening and the language she used.  I'd just note that the

14   language Ms. Moreno used was no broader than the Court's venire

15   question concerning ownership of firearms.  The Court

16   venired --

17              THE COURT:  I've ruled in your favor at this point.

18              MR. SMITH:  Right.  No, I'm just addressing Gordon's

19   point --

20              THE COURT:  You don't need to address it when you've

21   won.  Most good lawyers just sit down and don't let the judge

22   change her mind, all right?

23              Anything further on this case?

24              MR. KROMBERG:  No, thank you, Judge.

25              THE COURT:  All right, then we'll recess court until
```

1071

1    nine o'clock tomorrow morning.

2       (Recess from 6:07 p.m., until 9:00 a.m., December 15, 2017.)

3

4                    CERTIFICATE OF THE REPORTER

5        I certify that the foregoing is a correct transcript of

6    the record of proceedings in the above-entitled matter.

7

8

9                              _____
                                          /s/
10                               Anneliese J. Thomson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1072

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA    .    Criminal No. 1:16cr265
                        .
    vs.              .    Alexandria, Virginia
                        .    December 15, 2017
NICHOLAS YOUNG,        .    9:30 a.m.
                        .
          Defendant.    .
                        .

. . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME V

APPEARANCES:

FOR THE GOVERNMENT:        JOHN T. GIBBS, AUSA
                        GORDON D. KROMBERG, AUSA
                        EVAN N. TURGEON, SAUSA
                        United States Attorney's Office
                        2100 Jamieson Avenue
                        Alexandria, VA 22314

FOR THE DEFENDANT:         NICHOLAS D. SMITH, ESQ.
                        David B. Smith, PLLC
                        108 North Alfred Street
                        Alexandria, VA 22314
                         and
                        LINDA MORENO, ESQ.
                        Linda Moreno P.A.
                        511 Avenue of the Americas
                        No. 2
                        New York, NY 10011

ALSO PRESENT:             SA NICHOLAS CASLEN
                        NICHOLAS ENNS
                        FABIAN VERA

(Pages 1072 - 1335)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1073

1   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                    U.S. District Court, Fifth Floor
2                                   401 Courthouse Square
                                    Alexandria, VA 22314
3                                   (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1074

I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

WITNESS ON BEHALF OF
THE GOVERNMENT:

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SA Nicholas A. Caslen (Resumed) | 1079 | 1110 | 1179 | |

Closing Argument by Mr. Gibbs:                    Page 1241

Closing Argument by Mr. Smith:                    Page 1255

Rebuttal Argument by Mr. Kromberg:                Page 1282


EXHIBITS

|  | MARKED | RECEIVED |
|---|---|---|

GOVERNMENT'S:

| | MARKED | RECEIVED |
|---|---|---|
| Nos. 7-201B and 7-201D | | 1203 |
| 10-620 | | 1097 |
| 10-650 | | 1090 |
| 10-701 | | 1090 |
| 10-806 | | 1082 |
| 10-810 | | 1085 |
| 10-821 | | 1102 |
| 10-823 | | 1086 |
| 10-824 | | 1098 |
| 10-825 | | 1101 |
| 10-826 and 10-827 | | 1092 |
| 10-903 | | 1081 |
| 11-600 | | 1092 |
| 12-24 | | 1204 |
| 16-001 | | 1095 |

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

1075

EXHIBITS (Cont'd.)

|  | MARKED | RECEIVED |
|---|---|---|

DEFENDANT'S:

| No. 1 | | 1201 |
| 2, 3 and 8 | | 1133 |
| 14 thru 24 | | 1172 |
| 25 | | 1208 |

1076

```
 1                    P R O C E E D I N G S
 2                   (Defendant present, Jury out.)
 3           THE CLERK:  Criminal Case 16-265, United States of
 4    America v. Nicholas Young.  Would counsel please note their
 5    appearances for the record.
 6           MR. KROMBERG:  Good morning, Your Honor.  Gordon
 7    Kromberg, John Gibbs, and Evan Turgeon for the United States,
 8    and with us is Special Agent Caslen and Mr. Fabian Vera.
 9           THE COURT:  Good morning.
10           MR. SMITH:  Good morning, Your Honor.  Nicholas Smith
11    for defendant Nicholas Young, and with me is Ms. Linda Moreno.
12           MS. MORENO:  Good morning.
13           THE COURT:  All right, the jury is all here, so I
14    don't want to hold them up, but I had one quick question
15    because I just about have the charge -- or at least the draft
16    charge complete, which you're going to probably get around
17    lunchtime.  Is the defense making an entrapment defense as to
18    all three counts or only as to Count 1?  I need to know that
19    because it changes how we structure the language of that
20    instruction.
21           MR. SMITH:  Your Honor, we are only making the
22    entrapment defense with respect to Count 1.
23           THE COURT:  That's what I thought, all right.  So we
24    have to modify the instruction slightly to make that clear to
25    the jury.
```

1077

1          MR. SMITH:  Right.

2          THE COURT:  All right, thank you.

3          All right, let's bring the jury in.

4          MR. KROMBERG:  Sorry, Your Honor, on the special

5    verdict form, if I may, can I ask Mr. Turgeon to address the

6    Court?

7          THE COURT:  Yes.

8          MR. TURGEON:  Good morning, Your Honor.  The

9    government's reviewed Your Honor's proposed verdict form, and

10   it occurred to us yesterday that as to Count 1, which is

11   attempting to provide material support, there are actually two

12   ways based on the evidence currently in evidence in which that

13   could have happened.  The first is attempting to provide

14   material -- excuse me, attempting to provide misleading

15   information to the FBI in order to protect Mo's ability to

16   avoid capture and continue to serve ISIL, and that language is

17   right from the indictment, and the other theory is the gift

18   card theory, by attempting to provide material support by

19   providing gift card codes or gift cards to Mo, and that

20   language is from the indictment as well.

21          So the government would offer this special verdict

22   form that allows the jury to make an independent determination

23   as to each theory of guilt or innocence with regard to Count 1.

24   So I've broken that down.  I have a copy for Your Honor if Your

25   Honor would like to review that.

1078

```
1              THE COURT:  Well, have you given that to the opposing
2     counsel yet?
3              MR. SMITH:  No.
4              MR. TURGEON:  No, we haven't.
5              MR. SMITH:  And, Your Honor, we're able to object
6     right now to this proposal.
7              THE COURT:  Well, wait.  Let me take a look at it and
8     think about it.  I don't want to -- again, when a jury is on
9     time, I don't want them to be held up.  Let's get the jury in
10    here.  You have time to think about it.
11             MR. SMITH:  Okay.
12             THE COURT:  I'm not making up my mind.  I just want
13    to see it, and you can hand it up -- let's get the jury in
14    first.  Then hand it up.
15             MR. TURGEON:  Thank you, Your Honor.
16                         (Jury present.)
17             THE COURT:  Good morning, ladies and gentlemen.
18    Again, thank you for being here promptly.  We're going to get
19    the case started right away and move it as quickly as we can.
20    Unless the snow looks like it's going to be horrendous, I would
21    like us to stay in session then until five o'clock.  If
22    something changes, we start seeing a blizzard out there, I'll
23    let you go home earlier.
24             All right, Mr. Kromberg?
25             MR. KROMBERG:  Thank you, Your Honor.
```

Caslen - Direct                                                      1079

1           SA NICHOLAS ANGELO CASLEN, GOVERNMENT'S WITNESS,

2                   PREVIOUSLY AFFIRMED, RESUMED

3                   DIRECT EXAMINATION (Cont'd.)

4    BY MR. KROMBERG:

5    Q.   Special Agent --

6           THE COURT:  You're still under your affirmation to

7    tell the truth from yesterday.

8           THE WITNESS:  Yes, Your Honor.

9    BY MR. KROMBERG:

10   Q.   Special Agent Caslen, when did the FBI first learn that

11   the defendant's associates in Libya in April 2011 were at the

12   Abu Salim Martyrs Brigade?

13   A.   We first learned about his association with that group

14   through an e-mail that the defendant sent to alias Mo, who

15   was -- the e-mail address was being handled by one of the FBI

16   undercover agents.  I believe it was in July.

17   Q.   Well, hold on.  The evidence is already in evidence.

18           Mr. Vera, can you put up 1-213, please?

19           Is that the one you're referring to?

20   A.   It is.

21   Q.   And what's the date of that?

22   A.   The date is July 1, 2015.

23   Q.   And the reference to the organization was what in that

24   message?

25   A.   The second line from the bottom, "People from the Abo

Caslen - Direct                                                    1080

1  Salem Suhada Brig."

2  Q.    Okay.  Was a more complete name given in, in February 2016

3  in a text message?

4  A.    It was.

5  Q.    Okay.  Could we put on Government Exhibit 2-126?  And in

6  that message, is the more complete name in there?

7  A.    It is.  It's in the second message from the bottom.  It

8  states, "Please let me know if you find any brothers from derna

9  or Abu Salim martyrs brigade."

10 Q.    And before those two messages, who did -- what

11 organization did the FBI understand Mr. Young to have been

12 with?

13 A.    We did not know at the time.

14 Q.    Now, yesterday, you were talking about Government Exhibit

15 14-119.

16        Can you put on 14-119?

17        Now, you mentioned that six days -- you had seen

18 photos from six days earlier with Mr. Young dressed in a Nazi

19 uniform.  Did you see photos after this, chronologically after

20 this time of him dressed in a Nazi uniform?

21 A.    I did.  In 2007, there was -- we had seized the disc from

22 the defendant's residence that had photographs of the defendant

23 and some other folks at a, what appeared to be a dinner party

24 dressed in Nazi uniforms, with flags, with swastikas.

25 Q.    Was he holding a gun in one of those photographs?

Caslen - Direct                                                    1081

1    A.   He was.

2              MR. KROMBERG:  Judge, we would ask that you take a

3    look at 10-903.

4              MR. SMITH:  We object, Your Honor.  Relevance,

5    cumulative.

6              MR. KROMBERG:  And we're particularly interested in

7    the metadata on the bottom of 10-903.

8              THE COURT:  I'll permit that.  Overruled.

9              (Government's Exhibit No. 10-903 was received in

10   evidence.)

11             MR. KROMBERG:  Thank you.  Please publish 10-903.

12   Q.   And, Special Agent Caslen, what is the date that that

13   document was created?

14   A.   November 17, 2007.

15   Q.   Okay.  Let me turn your attention to Government Exhibit

16   which is not yet in evidence 10-1006.

17             I don't think you're going to have any issue with it.

18             MR. SMITH:  There is no 10-1006.

19             THE COURT:  10 what?

20             MR. KROMBERG:  10-806.

21             THE COURT:  806.

22             MR. KROMBERG:  And the next is 10-810.  I don't think

23   you care about that.

24             MR. SMITH:  No, no.  No objection.

25             THE COURT:  All right, it's in.

Caslen - Direct                                                    1082

1              (Government's Exhibit No. 10-806 was received in

2     evidence.)

3              MR. KROMBERG:  So 10-806, please publish.

4     Q.   And it's very difficult to read those, but, Special Agent

5     Caslen, can you tell us what those documents are?

6              MR. SMITH:  Objection.  This is another example of

7     documents where we cannot read the documents.  They're too far

8     zoomed out.  The originals aren't here.

9              MR. KROMBERG:  The originals are here if you want the

10    originals, but we can't put the originals on the screen in any

11    way other than this.

12             THE COURT:  Well, you actually can.  The

13    old-fashioned way is you put these on the Elmo and it projects,

14    but, I mean, I can't even read these in my book.

15             MR. KROMBERG:  We're going to blow them up.  Let me

16    ask the witness, if I may, Judge, what are these documents?

17             THE WITNESS:  I recognize the photo as being e-mails

18    that we seized from the defendant's residence on the date of

19    his arrest and search that are correspondence between his

20    employers about his trip.

21    BY MR. KROMBERG:

22    Q.   Regarding his, his request for leave?

23    A.   Correct.

24    Q.   Okay.  And they provided some dates that you were using to

25    put into the timeline that you were compiling, correct?

Caslen - Direct                                          1083

1   A.   That is correct.

2   Q.   Okay.  Can you --

3           THE COURT:  See, the normal way this would be done is

4   the originals, that is, what you've got in your hand would be

5   sitting over here and would be shown to the witness or -- and

6   then you'd have the electronic version which the jury could be

7   seeing, all right?  So we may have to spend some time before

8   the case goes to the jury with your substituting what you're

9   holding, and we will, we will use the scissors to open them all

10  up, and the only thing I'll ask the jury is be very careful

11  when you look at the document to put it back in the correct

12  folder.  Otherwise, we lose control because I don't think we've

13  put stickers -- you want scissors again?  Can we get scissors?

14          We're going to leave them there.  You just behave

15  yourselves with them, all right?

16          MR. KROMBERG:  Thank you, Your Honor.  And we did, in

17  fact, discuss this very issue this morning.  Mr. Vera is

18  working with the court security officer to substitute the

19  originals for the items -- for the copies, excuse me.

20          THE COURT:  All right.  So if defense counsel want to

21  look at them, go ahead.

22          While that's happening, so, Agent, these are

23  communications -- printouts, right, of e-mail communications

24  between the defendant and his employer?

25          THE WITNESS:  I believe it's between the defendant's

Caslen - Direct                                                    1084

1    employer and another employer.  I don't -- I do not recall if

2    it is the defendant e-mailing the employer.

3              THE COURT:  But they were in his possession?

4              THE WITNESS:  They were in the -- I'm sorry, Your

5    Honor?

6              THE COURT:  They were where?

7              THE WITNESS:  They were seized out of defendant's

8    residence.

9              THE COURT:  All right.

10             MR. SMITH:  No objection, Your Honor.

11             THE COURT:  All right.

12             MR. KROMBERG:  Thank you, Your Honor.

13             THE COURT:  Let's get them all pooled together and

14   give them to the witness.  These are what, five sheets of

15   paper?  Four sheets.  They should all have labels on them.

16   BY MR. KROMBERG:

17   Q.   Okay.  So the judge had asked, was the defendant a

18   recipient or copied on those e-mails?

19   A.   No.

20   Q.   And they were from Sergeant Washington, is it?

21   A.   They're from Sergeant Tiffany M. Washington to Julius Byrd

22   and Ronald Pavlik, who was the chief --

23   Q.   And they were regarding a request for leave by the

24   defendant?

25   A.   Yes.

Caslen - Direct                                                           1085

1   Q.   Okay.  We'll move on.  They're in evidence.

2         And is it correct that you used that information to

3   put on the timeline to try to reconstruct the events of what

4   happened in 2011?

5   A.   Correct.

6         MR. KROMBERG:  Okay.  We also move in Government

7   Exhibit 10-810, which is the passport that was found at the

8   defendant's house in August 2016.

9         THE COURT:  I assume there's no objection?

10        MR. SMITH:  No objection.

11        THE COURT:  No objection.  All right, it's in.  It's

12  in, Mr. Kromberg.

13        (Government's Exhibit No. 10-810 was received in

14  evidence.)

15        THE COURT:  All right, now don't get so aggressive

16  with the cutting that we're losing the stickers.

17        MR. KROMBERG:  In fact, I think we need to put the

18  sticker on that because the sticker was put on the bag.

19        THE COURT:  I know.  That's why I'm saying you're

20  getting too aggressive.  We're going to lose control of the

21  evidence.  We have one here.

22        Oh, you've got one?  All right.

23        Now, Mr. van Roekel, I'm sorry, that sticker needs to

24  be put on the passport.  Just put it on the back of the

25  passport.

Caslen - Direct                                                    1086

1   BY MR. KROMBERG:

2   Q.   Okay.  Special Agent Caslen, did you use this passport to

3   come up with events in the timeline?

4   A.   Yes, this passport was used.

5   Q.   Okay.  Take a look, if you would, at Government Exhibit

6   10-823, which is not yet in evidence.

7            MR. SMITH:  No objection, Your Honor.

8            THE COURT:  It's in.

9            (Government's Exhibit No. 10-823 was received in

10  evidence.)

11           MR. KROMBERG:  Okay.  Mr. Vera, can you publish

12  10-823?  We'll put the original in later, but for now just --

13  Q.   Special Agent Caslen, can you tell what that document is,

14  10-823?

15  A.   I recognize this document.  It was -- I requested that it

16  be translated by --

17  Q.   Well, before you even go into the translation, but just

18  Libyan customs -- a Libyan customs form?

19  A.   Correct.

20  Q.   And there's a date on it?

21  A.   There is.  It's September 8, 2011.

22  Q.   And it reflects body armor?

23  A.   Correct.

24  Q.   Okay.  And you used that for your timeline as well,

25  correct?

Caslen - Direct                                                    1087

1   A.   I did.

2   Q.   Now, take a look at 10-701, which is a book?

3             THE COURT:  Now, wait, hold on a second.  I want to

4   make sure that I understand the evidence.

5             MR. SMITH:  Objection.

6             THE COURT:  The evidence appears to be in both Arabic

7   and English.

8             THE WITNESS:  Correct.

9             THE COURT:  The English that's on this exhibit, was

10  that originally on the exhibit just like this?

11            THE WITNESS:  It was, Your Honor.

12            THE COURT:  All right.  So in other words, none of

13  this has been translated by anybody, I mean, anybody at the

14  FBI's direction?

15            THE WITNESS:  None of the writing placed onto the

16  exhibit, Your Honor, was placed on there by an FBI translator.

17  We requested a translator translate the Arabic portion, but

18  that is not reflected directly onto the exhibit.  The English

19  on there was written by, that's original to the exhibit.

20            THE COURT:  That's all I wanted to make sure.  So

21  that just so the jury understands, 10-823 is exactly what you

22  got from wherever you got it?

23            THE WITNESS:  From the defendant's residence, Your

24  Honor.

25            THE COURT:  All right, that's fine.

Caslen - Direct                                                    1088

1   BY MR. KROMBERG:

2   Q.   Okay.  10-701 is a book?

3            MR. SMITH:  And here, Your Honor, we object.  This is

4   again cumulative, 401, 403.

5            THE COURT:  All right, let me see.

6            MR. KROMBERG:  And, Judge, I believe this is the only

7   book that -- in the defendant's possession that its title

8   establishes a point we've been trying to make.

9            THE COURT:  All right, hold on.

10           Is that in a folder of some kind?

11           MR. KROMBERG:  I have the book here.

12           THE COURT:  All right.  I want to take a -- I assume

13  the defense has already seen it?

14           MR. KROMBERG:  It's been --

15           THE COURT:  Where are you going?

16           MR. SMITH:  I was going to hand it up.

17           THE COURT:  No, you never hand anything up.  You give

18  it to my court security officer, Mr. Smith.

19           MR. SMITH:  I just wanted to be careful.

20           THE COURT:  Okay.  So you have clips on it because

21  it's falling apart.  There's no binding.

22           I don't see what the purpose of this is given all the

23  other evidence that's in the case.

24           MR. KROMBERG:  Your Honor, we need to approach if you

25  want my response.

Caslen - Direct                                                    1089

1              THE COURT:  Yes, go ahead.

2              (Bench conference on the record.)

3              MR. KROMBERG:  Your Honor, the title of the book is

4    *The SS:  Hitler's Instrument of Terror*.  We want to show

5    that -- the symbol of the front, the parallel bolts, and that

6    the SS was a terror organization and that's what Mr. Young was

7    posing as, a member of a terror organization.

8              THE COURT:  No, I think only the cover can come in.

9              MR. KROMBERG:  Absolutely fine.

10             MR. SMITH:  Your Honor, this is the point of parity.

11   This is 403 evidence, pure 403 evidence, and the word "terror,"

12   "terror" can mean many things.  Terrorism, non-state act of

13   terrorism is not the same as the abstract word "terror."  This

14   argument is plainly silly and --

15             THE COURT:  It works into the entrapment issue, and

16   I'm allowing just the cover, all right?

17             MR. KROMBERG:  That's fine.

18             THE COURT:  So actually then, you don't need the book

19   701 as you've done it.

20             MR. KROMBERG:  That's fine.

21             THE COURT:  Take it back.

22             (End of bench conference.)

23             THE COURT:  Just for the record, I've determined just

24   the cover is all that's needed for 701, so 10-701 is in

25   evidence, but that exhibit will consist solely of the cover

Caslen - Direct                                                    1090

1    that we already have through a slide.

2             (Government's Exhibit No. 10-701 was received in

3    evidence.)

4             MR. KROMBERG:  Can you publish the cover of 701,

5    10-701?  Okay.

6    Q.   Now, Special Agent Caslen, how many cell phones were found

7    in the defendant's house at the search in August 2016?

8    A.   There were a lot of cell phones.

9    Q.   I'm handing you what's been marked --

10            THE COURT:  You don't have to open that.

11            MR. KROMBERG:  I wasn't.  I was just going to hand

12   him the bag, which has been marked 10-650.

13            THE COURT:  Is there any objection to 650?

14            MR. SMITH:  To the extent it's just the physical

15   phones themselves, no.

16            THE COURT:  Is there anything other than the phones

17   in there?

18            MR. KROMBERG:  No.  Just bags with phones in them.

19            THE COURT:  All right, 650 is in.

20            (Government's Exhibit No. 10-650 was received in

21   evidence.)

22   BY MR. KROMBERG:

23   Q.   Now, Special Agent Caslen, were you able to determine the

24   names in which all of these phones were registered in?

25   A.   Not all of the phones here we were able to determine the

Caslen - Direct                                                      1091

1   name, but we were able to determine the name that some of the

2   defendant's phones were registered in.

3   Q.   Okay.  Take a look, if you would, at Government Exhibit

4   3-125, which I believe has already been admitted.

5                THE COURT:  Wait until we confirm that.

6                It's in.  125 is in.

7                MR. KROMBERG:  It was seized from the truck, and we

8   stipulated that it was seized from the truck.

9                Okay.  Can you put 3-125 on the screen, please?  And

10  you're going to have to blow that up.  That's a bad term to use

11  here, but expand it.

12               MR. SMITH:  Objection.

13               THE COURT:  Sustained.

14               MR. KROMBERG:  And focus in on the top, if you would.

15  Q.   Now -- well, can you tell the jury what this document

16  was -- is?

17  A.   This is a document seized from the defendant's truck the

18  day we searched his vehicle, and it's a piece of paper with an

19  account summary for a Virgin Mobile cellular telephone.

20  Q.   And in what name was it in?

21  A.   I recognize the exhibit, and the name is an Otis

22  Driftwood.

23  Q.   Okay.  Did --

24               THE COURT:  I'm sorry, spell that.  Otis?

25               THE WITNESS:  Otis, O-t-i-s.  Driftwood,

Caslen - Direct                                                    1092

1    D-r-i-f-t-w-o-o-d.

2    BY MR. KROMBERG:

3    Q.    Can you take a look at Government Exhibit 11-600?

4              MR. SMITH:  No objection.

5              THE COURT:  All right, it's in.

6              (Government's Exhibit No. 11-600 was received in

7    evidence.)

8              MR. KROMBERG:  Can you publish 11-600, please?

9    Q.    And is that the Sprint subscriber information for Otis

10   Driftwood?

11   A.    It is.  This is a subscriber information for another

12   account on Sprint in the name of Otis Driftwood as well.

13   Q.    Were you able to find a 12939 Shadow Lane in Fairfax?

14   A.    There is a Shadow Lane in Fairfax, but there's not a

15   12939.

16   Q.    Take a look, if you would, at Government Exhibits 10-826

17   and 827.  Now, they are not in evidence yet; however, the

18   parties have stipulated in stipulation No. 40, which is

19   Government Exhibit 12-40, that's -- just one moment.

20             THE COURT:  Is there any objection to 26 or 27?

21             MR. SMITH:  No, Your Honor.

22             THE COURT:  No?  All right, they're both in.

23             (Government's Exhibit Nos. 10-826 and 10-827 were

24   received in evidence.)

25             MR. KROMBERG:  Okay.  Thank you.

Caslen - Direct                                                      1093

1              Can you publish, Mr. Vera, 10-826?  And you have to

2     expand that near the top.

3     Q.   Special Agent Caslen, can you tell what 10-826 is?

4     A.   This is a receipt for a Boost Mobile phone dated

5     December 2, 2011, and the customer name was Simon Belmont.

6     Q.   Take a look now at 10-827.  And can you tell what that

7     document is?

8     A.   This is a document for another Virgin Mobile phone.

9     Q.   In the name of?

10    A.   I believe that one was also in the name of Simon Belmont.

11    Q.   Now, were you able to locate Simon Belmont?

12    A.   We searched for -- we did a Google search for Simon

13    Belmont, and he's a character in a, I believe in a movie.

14    Q.   But you didn't find the person who was a subscriber who

15    had these phones, Simon Belmont?

16    A.   No.

17    Q.   Okay.  Now, Special Agent Caslen, what involvement did you

18    have -- sorry -- did you have with a grand jury investigation

19    involving the defendant, Nicholas Young?

20    A.   Over the course of the investigation, the FBI, myself

21    included, my colleagues, some who have testified earlier, have

22    requested federal grand jury subpoenas related to the defendant

23    for subscriber information, information such as Agent Cameron

24    Siegfried stated, introduced related to the FedEx surveillance

25    videos.  We received that information directly at times from

Caslen - Direct                                                    1094

1    the providers, from FedEx, for example.  There were federal

2    grand jury subpoenas that we ourselves issued and received the

3    response back from.

4    Q.    When you say you yourself issued, what do you mean?

5    A.    The agents assigned to the investigation and that were

6    doing the investigation.

7    Q.    Right, but did they write the grand jury subpoena or

8    obtain a grand jury subpoena and then serve it?

9    A.    We obtained the grand jury subpoena from the grand jury

10   and then served them directly to the providers or via the

11   portals that some of these online social media companies have

12   us serve them through.

13   Q.    And how was -- what was your involvement in the receipt of

14   information that were provided in response to grand jury

15   subpoenas?

16   A.    We would analyze the data.

17   Q.    No, I'm sorry, before you get there, how did, how did you

18   get the data to analyze?

19   A.    It would be sent directly to us.  Sometimes, for example,

20   Facebook or Google, for example.  We'll use Google as an

21   example in this case.  You serve the subpoena through an online

22   portal to Google.  Google notifies us, the agent, that your

23   results are ready.  You log on to your account in Google.  You

24   download the results, and then we upload them into our case

25   file.

Caslen - Direct                                                          1095

1   Q.   What district was the grand jury that was involved in the

2   investigation located?

3   A.   Eastern District of Virginia.

4   Q.   Okay.  Now, please take a look at Government Exhibit --

5            THE COURT:  I'm sorry, when did you start

6   getting grand -- as far as you know, when did you start, you

7   being the FBI, start getting grand jury subpoenas?  From what

8   year?

9            MR. KROMBERG:  If I may, Judge, the next -- what I

10  was asking the defendant -- the witness to look at --

11           THE COURT:  Are you going there?

12           MR. KROMBERG:  -- is a list.

13           THE COURT:  All right.

14  BY MR. KROMBERG:

15  Q.   Okay.  Can you please look at Government Exhibit 16-001?

16  It's not in evidence.

17           THE COURT:  All right.

18  BY MR. KROMBERG:

19  Q.   It should be 16-001.

20           MR. SMITH:  No objection.

21           MR. KROMBERG:  Oh, in that case --

22           THE COURT:  There's no objection?

23           MR. SMITH:  No.

24           THE COURT:  All right, it's in.

25           (Government's Exhibit No. 16-001 was received in

Caslen - Direct                                                          1096

1   evidence.)

2              MR. KROMBERG:  Please publish 16-001.

3   Q.   Special Agent Caslen, what is that document?

4   A.   This is a document that we put together showing examples

5   of grand jury subpoenas that were served in this investigation.

6   Q.   Was this all the subpoenas that were served in this

7   investigation?

8   A.   No, it was not.  This is just a sampling.

9   Q.   Were all of those subpoenas directed at Nicholas Young?

10  A.   Yes.

11  Q.   Were other subpoenas in this investigation directed at

12  individuals other than Nicholas Young?

13  A.   They were.

14  Q.   For example, were there -- were you looking for subscriber

15  information for other individuals?

16  A.   Yes.

17  Q.   Okay.  16-001 is in.  Then we can take it off -- I mean,

18  we can take it off the screen.

19              So, Special Agent Caslen, what techniques of

20  operational security did you observe or did you find the

21  defendant to have used?

22  A.   There were plenty.  For example, as we've heard in

23  testimony, the defendant would instruct Mo to take the battery

24  out of his cell phone when they would talk about derogatory

25  information.  The defendant would routinely use a FedEx store

Caslen - Direct                                                      1097

1   to disguise where he was e-mailing people from rather than

2   using his home computer.

3           The use of the bag of cell phones that we showed

4   earlier rather than simply using his phone to communicate with

5   other individuals.

6   Q.   Let me ask you to look at Government Exhibits 620 --

7   10-620 and 10-621.  They are things, 10-620 and 621.

8           THE COURT:  Any objection to 621 and 620?

9           MR. SMITH:  One moment, Your Honor.

10          Your Honor, we object on relevance grounds.  I don't

11  understand.

12          MR. KROMBERG:  I'm going to hand to the Court --

13          MR. SMITH:  Relevance and 403.

14          THE COURT:  Wait a minute.  620?

15          MR. KROMBERG:  In fact, we don't need -- it's

16  already, it's already marked.

17          Judge, I'm going to hand to the court security

18  officer to hand to the Court what is 10-620 so the Court can

19  see what it is.

20          THE COURT:  The objection to 620 is overruled.  Go

21  ahead.

22          (Government's Exhibit No. 10-620 was received in

23  evidence.)

24  BY MR. KROMBERG:

25  Q.   And where was this found, Special Agent Caslen?

Caslen - Direct                                                        1098

1   A.   This item is an RF bug detector, and it was found in the

2   defendant's residence on the day we searched his residence.

3           MR. SMITH:   Objection to the evidence, Your Honor.

4           THE COURT:   Overruled.  That's not looking for

5   cockroaches.  What is it looking for?  You said it's a bug

6   detector.

7           THE WITNESS:   This would search for devices that were

8   placed inside of a residence that were transmitting a signal.

9           THE COURT:   It's in.

10  BY MR. KROMBERG:

11  Q.   Take a look at the photo of Government Exhibit 10-824, but

12  it's not in evidence.

13          Could we get the photo of 10-824?

14          MR. SMITH:   No objection.

15          THE COURT:   All right, 824 is in.

16          (Government's Exhibit No. 10-824 was received in

17  evidence.)

18          MR. KROMBERG:   All right, can you publish 10-824?

19  Q.   And what is that?

20  A.   This is a receipt from PayPal for a pair of night vision

21  goggles that were purchased by Nicholas Young, with the

22  defendant's address and an e-mail address used by the

23  defendant, flyingdutchman1979@hotmail.com, with the defendant's

24  auction ID name, skraal777, and that is spelled

25  s-k-r-a-a-l-7-7-7.

Caslen - Direct                                                1099

1   Q.   Now, I'd like you to look at Government Exhibit 10-821,

2   which is a booklet which the parties have stipulated was seized

3   from the defendant's house, but the parties have not agreed on

4   its admission into evidence.

5          MR. SMITH:  And we object on 401 and 403 grounds and

6   cumulative grounds.

7          THE COURT:  Hold on a second.

8          MR. SMITH:  Your Honor, may we approach the bench

9   about this issue?  There's something we need to explain.

10         THE COURT:  All right, go ahead.

11         (Bench conference on the record.)

12         THE COURT:  Yes.

13         MR. SMITH:  This was apparently work-related

14  material.  I don't know what the government's relevance

15  argument is, but to the extent they're presenting this as some

16  sort of a --

17         THE COURT:  Well, it puts him on notice.  I mean,

18  this is evidence again of what was in this man's mind as to an

19  issue and what investigators look for in terms of indicia of

20  terrorist activities.  It goes to the entrapment issue, it

21  seems to me.

22         MR. KROMBERG:  Mr. Gibbs suggested it was a checklist

23  that the defendant was trying to follow, but I thought that was

24  being sarcastic.  But Your Honor is exactly right; it lists

25  various things that the government looks for, and that goes to

Caslen - Direct                                                    1100

1   the defendant's knowledge of what the government looks for.

2              THE COURT:  Yeah, I'm overruling the objection.

3              (End of bench conference.)

4              MR. KROMBERG:  I'm handing to the court security

5   officer Government Exhibit 10-821, and it's been admitted into

6   evidence.

7              Mr. Vera, can you put the first page of that on the

8   screen?  And blow it up so the jury can see it, please.

9   "Warnings Signs of Terrorist Events."

10  Q.   So, Special Agent Caslen, this was found in the

11  defendant's house in August 2016?

12  A.   Correct.

13  Q.   What is the point of -- what's the Bureau of Justice

14  Assistance's aim in distributing this document?

15  A.   This is to be a pocket guide for law enforcement officers,

16  state, local, tribal law enforcement officers, on how to spot

17  signs of terrorist events and explain to them what to do if you

18  see them.

19             MR. KROMBERG:  Can you turn to page 5, Mr. Vera?

20  Q.   And, Special Agent Caslen, what is a precursor, a possible

21  sign of terrorist activities that local offices should be on

22  the lookout for?

23             MR. SMITH:  Objection.  This is being used to prove

24  the truth of the --

25             THE COURT:  No.  At the bench conference, we

Caslen - Direct                                                      1101

1    explained why it's going into evidence.  Overruled.

2                THE WITNESS:  There are several things in here.  Just

3    to point out the relevant ones, modifications of vehicles,

4    which the defendant had gutted his truck, the interior of his

5    truck; possession of or attempts to acquire the following types

6    of items:  body armor, identifications.  An example, military

7    identifications.

8    Q.    What military identifications are you talking about?

9    A.    In the defendant's residence, there were two visitor's IDs

10   to DTRA, the Defense Threat Reduction Agency.

11   Q.    Can you take a look at Government Exhibit 10-825?  It's

12   not yet in evidence.

13               MR. SMITH:  No objection.

14               THE COURT:  All right, it's in.

15               (Government's Exhibit No. 10-825 was received in

16   evidence.)

17               MR. KROMBERG:  If you could put that on the screen,

18   please?  Okay.

19   Q.    So that was -- so please continue, Special Agent Caslen.

20   A.    I stand corrected.  I said they were visitor's badges.

21   They are temporary badges.  Those are the badges that were

22   found at the defendant's residence.

23   Q.    Okay.  Go back to 10-821.  Now, you said as a precursor,

24   there's body armor.  What body armor was found at the

25   defendant's house?

Caslen - Direct                                              1102

1              MR. SMITH:  Objection, Your Honor.  401, 403, law of

2    the case.

3              THE COURT:  Now that's become relevant.  I'm

4    permitting it in.

5              (Government's Exhibit No. 10-821 was received in

6    evidence.)

7    BY MR. KROMBERG:

8    Q.   What body armor was found?

9    A.   There was over 70 pieces of body armor found in the

10   defendant's residence of various types:  helmets, ballistic

11   helmets, a ballistic face mask, full length body armor, to

12   include legs.  I would say --

13   Q.   For how many people?

14   A.   Well, there were ten tactical vests that were, contained

15   ballistic panels as well as many other inserts that could be

16   placed into them.  There was neck guards.  There were ceramic

17   plates.

18   Q.   How many neck guards were there?

19   A.   I don't recall the exact amount, but there were several.

20             MR. KROMBERG:  So we have them, and, Judge, we can

21   move them into evidence, but they take up a lot of space

22   because of the volume and such, but we can move them in now,

23   and they are Government Exhibits 10-500 through 10-569.

24             MR. SMITH:  And before that, may we have one final

25   bench conference?

Caslen - Direct                                                    1103

1              THE COURT:  Now, you said the word "final."  If I

2    hold you --

3              MR. SMITH:  On this issue.

4              THE COURT:  All right.

5              MR. SMITH:  Thanks.

6              THE COURT:  Approach.

7              (Bench conference on the record.)

8              THE COURT:  Yeah.

9              MR. SMITH:  Okay.  So our position is that it is the

10   law of the case already that the body armor would be excluded

11   unless the defense opened the door.  We believe we have not

12   opened the door.  We believe that it's on the record that the

13   judge has already ruled that unless the government -- the

14   defense opened the door, the body armor would not be coming in,

15   so we're going to move for a mistrial on that ground.

16             THE COURT:  Stop.  We're not having a mistrial in

17   this case.

18             The jury does not need to see it.

19             MR. KROMBERG:  Okay.

20             THE COURT:  I think, however, because this timeline

21   is significant, I'm allowing -- you've got enough on that.

22             MR. KROMBERG:  Okay.

23             THE COURT:  So just go ahead.

24             (End of bench conference.)

25   BY MR. KROMBERG:

Caslen - Direct                                                    1104

1   Q.   Scratch that, Special Agent Caslen.  We are not going to

2   bring those -- bring the body armor in, but -- -

3              MR. SMITH:  Objection.

4              THE COURT:  Overruled.  Let's not just having

5   objections all the time.

6   BY MR. KROMBERG:

7   Q.   I'd like to show you Government Exhibit 10-532A.

8              MR. SMITH:  Objection, Your Honor.  401, 403.  It's

9   the same issue Your Honor just ruled on, and Gordon is ignoring

10  it.

11             THE COURT:  Let me see what we have here.  10-532?

12             MR. KROMBERG:  532 is a piece of body armor.  10-532A

13  is photographs.

14             MR. SMITH:  Objection to --

15             THE COURT:  Just a second.

16             No, we don't need that.  532 is not in.

17  BY MR. KROMBERG:

18  Q.   Okay.  When you mentioned the types of body armor that

19  you --

20             THE COURT:  No, let's get on to another topic.

21  BY MR. KROMBERG:

22  Q.   Okay.  Let's go back to 821, page 5.  Weapons or

23  ammunition, were there weapons and ammunition in the house?

24             MR. SMITH:  Objection.  This is law of the case, and

25  it's also 403.

Caslen - Direct                                                    1105

1              THE COURT:  Yeah.  Mr. Kromberg, I think we've been

2    through some of this pretrial, all right?  So move on to

3    another question.  Sustained.

4    BY MR. KROMBERG:

5    Q.   Okay.  Were there unusual chemicals or ingredients in the

6    house?

7              MR. SMITH:  Objection.  Law of the case, 401, and

8    403.

9              THE COURT:  I don't think that issue was addressed.

10             MR. KROMBERG:  I don't think it has, Your Honor.

11             THE COURT:  No.  Overruled.

12   BY MR. KROMBERG:

13   Q.   Were there unusual chemicals or ingredients in the house?

14   A.   Yes, there were.  There were smoke grenades --

15             MR. SMITH:  Objection.  We move for a mistrial.

16             THE COURT:  Overruled.

17             MR. SMITH:  This is the law of the case.

18             THE COURT:  Overruled and denied.

19             Go ahead.

20   BY MR. KROMBERG:

21   Q.   Go ahead.

22             MR. SMITH:  But to be clear, this was -- this is an

23   issue that Your Honor ruled on before trial.

24             MR. KROMBERG:  That is not correct, Judge, and it's

25   also correct that sometimes the Court changes its mind, but

Caslen - Direct                                                      1106

1   that did not happen in this case because that did not --

2   question did not come up before.

3              THE COURT:  I've made the ruling, but I do want to

4   move this along.

5              MR. KROMBERG:  Right.

6   Q.   So what are the chemicals?  What were the chemicals that

7   you saw that were found in the house?

8   A.   There was also a thermite grenade, which --

9              MR. SMITH:  Your Honor, objection.  This is exactly

10  what the Court just ruled on.

11             THE COURT:  All right.

12             MR. SMITH:  Mr. Kromberg tried to elicit the exact

13  same testimony right after Your Honor ruled on it.

14             THE COURT:  Mr. Kromberg, move on to identification

15  issues or other items that might be there on the list.

16             MR. KROMBERG:  We've talked about the prepaid cell

17  phones.  Can we go to the next page?

18             Can we go to the next page?

19  Q.   And, Special Agent Caslen, under "Contacts," what does

20  this, the document that the defendant had in his house say to

21  do if you see a threat or something that is suspicious in this

22  regard?  Step one says either arrest them or detain them or

23  report them?

24  A.   Okay.

25             MR. SMITH:  Objection.  Leading.

Caslen - Direct                                                    1107

1              THE COURT:  Sustained.

2              THE WITNESS:  Yes, that is correct.

3    BY MR. KROMBERG:

4    Q.   Okay.  And when the judge says "sustained," then you don't

5    answer -- don't answer the question.

6    A.   My apologies.

7              MR. KROMBERG:  Can we go to the next page?

8    Q.   Now, these are warning signs which, some of which appear

9    to be the same as the precursors we went over before, but were

10   there anti-government special interest tattoos involved in this

11   case?

12             MR. SMITH:  Objection.  Leading.

13             THE COURT:  Yeah, I think that's leading.  You've got

14   to do it in a non-leading manner.  Sustained.

15   BY MR. KROMBERG:

16   Q.   Okay.  Starting from the top with domestic terrorist

17   warning signs, were there any signs of domestic terrorism

18   warnings in the -- you've seen in this case?

19   A.   There were.  There were bumper stickers.  There were

20   anti-government special interest tattoos.  There -- am I

21   allowed to read?

22   Q.   Go ahead.

23   A.   Claims regarding government conspiracies.

24   Q.   And how about claims that law enforcement is illegitimate?

25   A.   That's correct.

Caslen - Direct                                                    1108

1          MR. KROMBERG:  Okay.  Let's go to the next page.  Is

2  that the end?  No, okay.

3  Q.   How about on the last page, under "Other Signs,"

4  "extremist religious literature and paraphernalia"?

5  A.   There were.  Already placed into evidence were the copies

6  of *Inspire* magazine, the Book of Jihad.

7  Q.   And the history of visiting suspicious Internet sites?

8  A.   Correct.

9  Q.   And the -- how about bomb-making manuals?

10          MR. SMITH:  Objection, Your Honor.  Your Honor has

11  already ruled on this.  Law of the case.

12          THE COURT:  I believe we've ruled on that -- all

13  right, I think we have enough on this, Mr. Kromberg.  Let's

14  move on.

15  BY MR. KROMBERG:

16  Q.   Okay.  And the last is a picture of a book by Andrew

17  Macdonald.  Was that book found in his, in his house?  No,

18  correct?

19  A.   No, *The Turner Diaries* was --

20          MR. SMITH:  Leading.

21          MR. KROMBERG:  Okay.  Strike that.  The answer is no.

22          THE COURT:  Let's move on.  Come on.

23  BY MR. KROMBERG:

24  Q.   What book was seized by the author Andrew Macdonald?

25          MR. SMITH:  Objection.  Cumulative.

Caslen - Direct                                                    1109

1             THE COURT:  You may ask the question.

2    BY MR. KROMBERG:

3    Q.   What book was seized from the defendant's house by Andrew

4    Macdonald?

5    A.   I believe the book *Hunter*, which was already placed into

6    evidence.

7             MR. KROMBERG:  And that was 10-860 in evidence?  I've

8    lost track.

9             MR. SMITH:  No.  The Court excluded that exhibit.

10            MR. KROMBERG:  Then now we're moving it into

11   evidence.

12            MR. SMITH:  Your Honor, it's already been excluded.

13            THE COURT:  Just a second.

14            I don't think we need to get into this.  I'll sustain

15   the objection.

16            MR. KROMBERG:  Okay.  Just one moment, please.

17            Judge, at some point, we're going to need to get with

18   the court reporter to make sure that the evidence that we think

19   is in is in --

20            THE COURT:  Yes.

21            MR. KROMBERG:  -- but we reserve -- this is all for

22   this witness, but we do reserve, I hope, the ability to move

23   things into evidence on the basis of, on the basis of testimony

24   already if we have somehow forgotten to move them in.

25            THE COURT:  My practice with cases involving an

Caslen - Cross                                                    1110

1   extensive amount of documentary evidence is that we don't waste

2   the jury's time with that.  We do it on the record at some

3   point when we're in recess, all right?

4            MR. KROMBERG:  And I will pass -- return the Court's

5   pair of scissors.

6            THE COURT:  All right.

7            MR. KROMBERG:  Thank you, Your Honor.

8            THE COURT:  Cross-examination, Mr. Smith?

9                          CROSS-EXAMINATION

10  BY MR. SMITH:

11  Q.   Good morning, Agent Caslen.

12  A.   Good morning, counselor.

13  Q.   So, Agent Caslen, you're here testifying as a summary

14  witness today, correct?

15  A.   Correct.

16  Q.   And that means you're testifying about the length of the

17  investigation into the defendant, about the course of the

18  investigation into the defendant?

19  A.   Towards the evidence that was put in, correct.

20  Q.   Towards the evidence that was put in.

21            And you are the case agent on this investigation,

22  correct?

23  A.   I currently am, yes.

24  Q.   What does that -- what does that mean, case agent?

25  A.   The agent in charge of managing the investigation, and

Caslen - Cross                                                        1111

1   have been so since October 2015.

2   Q.    So at some point since October 2015 and the present, have

3   you familiarized yourself with the case, the case file, so to

4   speak, into Nicholas Young?

5   A.    I have.

6   Q.    So you're familiar with the course of the investigation

7   into Mr. Young?

8   A.    Correct.

9   Q.    Okay.   Mr. Caslen, when did the counterterrorism

10  investigation into Nicholas begin?

11  A.    I believe it began in 2010.

12  Q.    And what prompted the investigation into Mr. Young?

13  A.    It was the defendant's connection to Zachary Chesser.

14  Q.    And can you explain what you mean by "connection"?

15  A.    I believe there were phone contacts that were, they were

16  attempting to verify.

17  Q.    And do you remember how many phone contacts there were?

18  A.    I do not recall.

19  Q.    It was about two, right?

20  A.    I would not know.

21        MR. SMITH:   Your Honor, I'm just not introducing an

22  exhibit.   I'm handing up a document, which is an FBI memorandum

23  dated September 9, 2010, just to refresh Agent Caslen's

24  recollection.

25  Q.    Have you ever seen that memorandum, Agent Caslen?

Caslen - Cross                                                          1112

1           MR. KROMBERG:  Objection, Judge.  The question is

2  does it refresh your recollection.

3           THE COURT:  Yeah.  That's the only proper question.

4  BY MR. SMITH:

5  Q.   Does it refresh your recollection?

6  A.   Is there a portion that you'd like me to read rather than

7  the whole thing in interests of time?

8  Q.   There is.  The second page.  There's a reference to

9  Zachary Chesser on the --

10 A.   By second page, do you mean the back of the first page or

11 the second --

12 Q.   The second document.  The first page of the second

13 document.

14          There's a reference to Zachary Chesser about halfway

15 down the page, three-quarters of the way down the page.

16          THE COURT:  And the question, Agent, is whether after

17 you read that, does that jog your memory so that you can answer

18 the question?

19          THE WITNESS:  Might I also ask what the question is

20 that you're asking to jog my memory about?

21 BY MR. SMITH:

22 Q.   When you were the case agent familiarizing yourself with

23 the case file of Nicholas Young, do you recall learning that

24 Mr. Young's cell phone had only two communications with Zac

25 Chesser on it?

Caslen - Cross                                                    1113

1   A.   I do not know how many it had.

2   Q.   And you do not recall after reviewing the document in

3   front of you?

4   A.   I do not.

5   Q.   So, Agent Caslen, do you -- after your review of the case

6   file, do you recall what prompted the FBI investigation

7   besides -- into Mr. Young besides Zachary Chesser's

8   communications with Mr. Young?  Were there any other factors?

9   A.   Are you sure you want me to answer that question?

10  Q.   No, I -- sir, I'm only asking you about Mr. Young's

11  involvement at work.  Was there a work-related issue with

12  Mr. Young at the Metro Transit Police Department that prompted

13  the investigation to begin?

14  A.   I believe there was information that came from his

15  department regarding a room that the defendant had set up.

16  Q.   That's what I'm referring to.  What was that incident?

17  What was that?

18  A.   So I'm not familiar with all the details of that because I

19  was not here back then, but there was a room that the defendant

20  had set up that had some books and some things in it that the

21  Metro Transit Police Department had informed us about.

22  Q.   And would you -- do you recall whether that book was a

23  Koran?

24  A.   I don't recall exactly which books they were.

25  Q.   Okay.  Do you recall whether there were just newspaper

Caslen - Cross                                                    1114

1   articles --

2   A.   Again, I wasn't here when all that happened, so I don't

3   recall exactly what was there.  I attempted to find the

4   information and was not able to find exactly what they were,

5   but I do recall a mention of newspaper articles.

6   Q.   Do you recall that there was -- the investigation began

7   partly because Mr. Young was having a beard dispute with his

8   police department he was working for?

9   A.   Did you say "beer" or "beard"?

10  Q.   Beard, beard dispute.

11  A.   I recall the defendant mentioning on his Facebook account

12  that he was having a dispute with his department over his

13  beard.

14  Q.   But you don't recall whether that had anything to do with

15  the beginning of the investigation?

16  A.   I do not.

17  Q.   So at some point after the investigation began in

18  September 2010, Zac Chesser was arrested on terrorism charges,

19  correct?

20  A.   I don't think that's correct.

21  Q.   At some point -- I mean, at some point after the

22  investigation into Mr. Young began --

23       MR. KROMBERG:  Objection, Judge.  The witness (sic)

24  is misstating the evidence that has already come in.  What the

25  witness said was the investigation started after Zachary

Caslen - Cross                                                    1115

1  Chesser was arrested.

2  BY MR. SMITH:

3  Q.   Is that correct, what Mr. Kromberg said?

4  A.   The investigation into Mr. Young started after Zachary

5  Chesser was arrested.

6  Q.   Correct.

7  A.   Yes.

8  Q.   But Mr. Chesser had been a subject of a counterterrorism

9  investigation before Mr. Young was arrested, correct?

10  A.   That is correct.

11  Q.   Okay.  Now, there would come a time after the

12  counterterrorism investigation into Mr. Young began that you

13  would interview Mr. Young about Zachary Chesser, right?

14  A.   I did not interview the defendant about Zachary Chesser,

15  no.

16  Q.   Do you recall learning about Mr. Young's interview about

17  Zac Chesser when you reviewed the case file when you came into

18  this case?

19  A.   Yes.  The defendant was interviewed by the initial case

20  agents.

21  Q.   And do you recall what Mr. Young told the case agents on

22  that occasion?

23  A.   I do not recall exactly what he said.

24  Q.   Well, do you recall that he said that he was shocked by

25  Mr. Chesser's arrest and that it would be his religious duty to

Caslen - Cross                                                      1116

1   inform on Chesser if he ever learned that he was committing any

2   acts of terrorism?

3   A.   The interview wasn't recorded, so I was never able to

4   listen to the defendant say that, so I do not recall exactly

5   what he said.

6            MR. SMITH:  Your Honor, I'm just handing up a

7   document to refresh Mr. Caslen's recollection to see whether he

8   recalls this from the case file.  This is an important document

9   because it's dated September 13, 2010.  This is an important

10  date for the entrapment defense.

11           THE COURT:  All right.

12           MR. SMITH:  So I'm handing up a document dated

13  9/13/2010.  It's an FBI 302 memorandum.  This should have been

14  in Nicholas Young's case file.

15           THE COURT:  All right, hand it up.

16  BY MR. SMITH:

17  Q.   Are you familiar with that document, Agent Caslen?

18  A.   I recognize the document.

19  Q.   And does it refresh your recollection about what Mr. Young

20  may have told the interviewing agents on -- in September 2010?

21  A.   In the interests of time, would you point me to exactly

22  where in here that you want me to read?

23  Q.   Does it refresh your recollection that Mr. Young told the

24  interviewing agents --

25           THE COURT:  Well, wait.  He's asking you to point him

Caslen - Cross                                                    1117

1   to the paragraph.  Where?  On the first part of the page or the

2   back?  Where are you looking at?

3           MR. SMITH:  Your Honor, it's on the second page.

4   There's a conversation.  It's only a one-page document, Your

5   Honor, and Chesser's name is capitalized, so all of Mr. Young's

6   comments in the 302 are clearly recognizable.

7           MR. KROMBERG:  Your Honor, I would -- I object on the

8   grounds of hearsay.  It's improper to elicit the defendant's

9   statements from the government witness, and when the government

10  does it, it's an admission from a party opponent, but when the

11  defendant is asking to get what the defendant already said to a

12  government agent, that is not an admission from a party

13  opponent.

14          THE COURT:  He can ask, however, what, if anything,

15  was the agent's understanding.

16          MR. SMITH:  And state of mind, Your Honor, which

17  is --

18          THE COURT:  Wait, no.  The agent's state of mind has

19  nothing to do with this at this point.

20          MR. SMITH:  Mr. Young's state of mind, Your Honor.

21          THE COURT:  He cannot possibly go into the state of

22  mind of somebody else.  All you can say is what does that

23  reflect the defendant having said to whoever was investigating

24  him.

25          THE WITNESS:  Yes, Your Honor.

Caslen - Cross                                                    1118

1              THE COURT:  All right?

2              THE WITNESS:  So I don't doubt the words by the

3    interviewing agents that are on here, but again, I never heard

4    the defendant say any of these things.

5    BY MR. SMITH:

6    Q.   Thank you.

7              Now, Agent Caslen, I'm going to continue on the theme

8    of Zac Chesser, because you've been in court during the

9    testimony of this case, correct?

10   A.   Correct.

11   Q.   So it's correct that Zachary Chesser's image was published

12   on the screens, and there was testimony from prior witnesses in

13   this case concerning Zac Chesser and his possible relationship

14   with Nicholas Young, correct?

15   A.   Correct.

16   Q.   Now, did there come a time when you learned that Zac

17   Chesser himself said --

18             MR. KROMBERG:  Objection, Judge.  This is hearsay,

19   but the defendant -- but the witness is being asked to say what

20   Zachary Chesser said.

21             MR. SMITH:  Your Honor, it's not being offered to

22   prove the truth of the matter asserted.

23             THE COURT:  Well, approach the bench.

24             (Bench conference on the record.)

25             MR. SMITH:  There's two reasons we would use this.

1    The first is impeachment testimony.  Agent Caslen has indicated

2    that he has reviewed the entire case file, he's familiar with

3    the investigative history of this case, and Mr. Chesser has

4    indicated that he did not have extensive contacts with Nicholas

5    Young.  If Agent Caslen testifies that he did, this would be an

6    impeachment statement not offered for its truth.

7            Second, the very fact that an individual made this

8    statement is not being offered to prove the truth of the matter

9    asserted.  It is merely to -- it is a statement that has been

10   made.  The very fact that it's been made is significant and

11   relevant, regardless of whether the truth is, the underlying

12   truth is accurate.

13           The government can on redirect question the --

14   whether this letter is, is authentic.  They know it's authentic

15   because they produced it to us.

16           Those, those are perfectly legitimate uses of this

17   document to cross-examine a witness, and, Your Honor, since the

18   government has made a big deal out of connecting Mr. Young to

19   Chesser in its opening, I think it would be highly unfair to

20   not allow the defense to cross-examine the case agent, who

21   we've allowed to go onto the stand without objecting to his

22   summary testimony when we could have.

23           So this is --

24           THE COURT:  All right.  Mr. Kromberg?

25           MR. KROMBERG:  Judge, what Mr. Smith is referring to

Caslen - Cross                                                    1120

1    is a letter that Zachary Chesser from jail wrote.  If they

2    wanted Zachary Chesser's testimony, they should have subpoenaed

3    him, but to present his testimony through a letter is wrong.

4         And if we go that route, then I'm going to ask the

5    agent, "What did Zachary Chesser say publicly on the Internet?"

6    The answer is going to be, "I lied about everything I ever said

7    to the government."

8         MR. SMITH:  That's fine.

9         THE COURT:  I'm going to allow it.  I'm going to let

10   the defense do it, and it opens the door.

11        MR. KROMBERG:  Okay.

12        (End of bench conference.)

13   BY MR. SMITH:

14   Q.  So when you were reviewing the case file into Mr. Young's

15   investigation, did you learn that Mr. Young had a relationship

16   with Zac Chesser?

17   A.  I knew there was phone contact between the two.

18   Q.  Was there anything more than that?

19   A.  I believe based off of -- I believe both of them were

20   members of the Muslim Student Association at George Mason.

21   Q.  At George Mason.

22        Was it more extensive than that?

23   A.  I don't, I don't recall finding anything else that led to

24   believe it was more extensive.

25   Q.  Did you learn the opposite, that Zac Chesser may have been

Caslen - Cross                                                      1121

1    suspicious of Nick Young?

2    A.   I actually do not recall that.

3    Q.   Now, I'm going to hand you up a document to refresh your

4    recollection.  It's not being admitted into evidence.  It's not

5    being admitted for its truth.  It is a letter from Zachary

6    Chesser, which the date on the letter is an FBI stamp dated

7    1/24/2017, but I think the actual underlying letter was drafted

8    on August 9, 2016, and I'm going to direct your attention to

9    page 3 and page 4.

10           So after you review the first page, just let me know

11   if you've ever seen that document before.

12   A.   I have seen this.

13   Q.   And do you recall this -- that in this letter, Mr. Chesser

14   said that when he was at George Mason, Mr. Young never said

15   anything supporting jihad?

16   A.   And that's on page 3, you said?

17   Q.   3 or 4.

18   A.   Could you repeat the question?

19   Q.   Do you recall in this investigation learning that

20   Mr. Chesser said that Mr. Young at George Mason never said

21   anything supporting jihad?

22   A.   This letter does not specifically reference George Mason,

23   but it does say that Nick had -- essentially, Nick had nothing

24   to do with jihad.

25   Q.   Thank you.

Caslen - Cross                                                        1122

1        Do you recall learning that Zac Chesser said that

2   Mr. Young wasn't particularly knowledgeable about Islamic law

3   and would not have known that being any kind of cop was

4   forbidden?

5   A.   Yes.  It says at that time, he wasn't particularly

6   knowledgeable of Islamic law.

7   Q.   I'm just asking whether it refreshes your recollection.

8   You don't have to read it.

9   A.   Oh.

10  Q.   Do you recall learning that Mr. Chesser said, "Nick was a

11  transit cop, and none of us were even willing to reveal to him

12  that we supported jihad"?

13  A.   Yeah.

14  Q.   And do you recall that an agent we're calling Jones at

15  this trial would later acknowledge that Young had few contacts

16  with Chesser?

17  A.   I don't recall that specifically.

18        MR. SMITH:  Okay.  We can move on.  Thank you.

19  Q.   Now, another individual of interest in connection with

20  these interlocking investigations that we discussed during the

21  government's case-in-chief was Hisham Hall.  Are you familiar

22  with Hisham Hall?

23  A.   I am.

24  Q.   And what is the nature of Hisham Hall's relationship with

25  Mr. Young according to your investigation?

Caslen - Cross                                                    1123

1   A.   I understand the two to be friends.

2   Q.   Has -- did you see the, the photo of Hisham Hall?

3   A.   I did.

4   Q.   Was that an arrest shot?  Was that a kind of mug shot?

5   A.   They're all driver's license photos, I believe.

6   Q.   Has Hisham Hall ever been arrested or charged with any

7   terrorism crimes?

8   A.   I'm unaware of any arrests.

9   Q.   Okay.

10  A.   He has not been charged with a terrorism crime.

11  Q.   Okay.  Another individual that you mentioned was Peshwaz

12  Waise.  I don't know how you say -- is "Waise" --

13  A.   I believe that's correct.

14  Q.   Okay.  Has -- and did you see his photograph published on

15  the screen up there?

16  A.   I did.

17  Q.   Okay.  Has Peshwaz Waise ever been arrested or charged

18  with terrorism?

19  A.   He's been arrested.

20  Q.   Has he been charged with terrorism crimes?

21  A.   I don't remember exactly what he was charged with, but he

22  was locally arrested in Texas for going into a government

23  building making statements related to jihad, I believe.

24  Q.   Statements, was it?

25  A.   I believe.

Caslen - Cross                                                          1124

1   Q.   Okay.  And T. J. Singh?  Did you see his photograph

2   published?

3   A.   I did.

4   Q.   And has he been arrested?

5   A.   Not to my knowledge.

6   Q.   And not charged with terrorism crimes?

7   A.   Not to my knowledge.

8   Q.   Okay.  There was another individual, Amine Khalifi.  You

9   recall him, correct?

10  A.   I do.

11  Q.   And his photograph was published on this TV screen?

12  A.   Yes.

13  Q.   Okay.  And Mr. Khalifi has been arrested and indicted with

14  terrorism charges, correct?

15  A.   He's been convicted of terrorism charges, not just

16  indicted.

17  Q.   Correct.  And at some point when you learned in your

18  investigation -- when you researched the case file into

19  Mr. Young, you learned that the undercover agent, Khalil, who

20  testified in this trial, introduced Mr. Young to Amine Khalifi,

21  correct?

22  A.   No.

23  Q.   You did not learn that?

24  A.   I did not learn that he introduced him, as stated -- as he

25  stated himself up here.

Caslen - Cross                                                    1125

1   Q.   Did you learn that Mr. Young was, encountered Amine

2   Khalifi because he was going out to dinner with the UCE Khalil?

3   A.   So what UCE had explained was there's circles of friends,

4   and a group of friends went out to dinner, and Khalifi was with

5   him, and at the dinner, the defendant was also there.

6   Q.   Correct.

7   A.   I do not recall that Khalil actually introduced him

8   together.

9   Q.   Yeah.   I believe he said he didn't ask him --

10           THE COURT:   Wait, wait.   It's not for you to be

11  testifying.

12  BY MR. SMITH:

13  Q.   So do you recall an individual, Liban Mohamed?

14  A.   I do.

15  Q.   And his picture was published on the screen, correct?

16  A.   That's correct.

17  Q.   Did there come a time when you were researching the

18  investigation into Mr. Young that you learned that the UCE

19  Khalil would indicate that Mr. Young had nothing to do with any

20  plots that were hatched by Liban Mohamed?

21  A.   That is correct.

22  Q.   Okay.   So at any time during the course of the

23  investigation into Mr. Young -- this was, this was a

24  counterterrorism investigation, correct, that started in

25  September 2010?

Caslen - Cross                                                    1126

1   A.    I don't recall the exact month it started, but yes, it was

2   a counterterrorism investigation.

3   Q.    But it was always a counterterrorism investigation.  It

4   wasn't an investigation into narcotics or any other sort of

5   type of federal crime?

6   A.    Well, the defendant was known to have --

7   Q.    No, I'm only asking you about whether you, your role in

8   this case as case agent is counterterrorism related.

9   A.    No, that's not correct.  If we're -- in the course of a

10  counterterrorism investigation, if we uncover other crimes, we

11  can investigate those as well.  We're FBI agents, so we can

12  investigate a wide variety of crimes, and it's not just

13  centralized on counterterrorism investigation.  If I find

14  something else related to another federal crime, I can

15  investigate that under the same case file, so yes.

16  Q.    That is true.  I am merely asking you whether the

17  investigation that led to the indictment in this case was a

18  counterterrorism investigation.

19          THE COURT:  It was.  For purposes of this case, it

20  was.

21          MR. SMITH:  Yes, thank you.  Thank you, Your Honor.

22  Q.    So at no point prior to the indictment in this case were

23  you investigating Mr. Young for a hate crime, correct?

24  A.    No.

25  Q.    What is -- do you know what a hate crime is?

Caslen - Cross                                                    1127

1   A.   It's -- I don't know the exact definition of it.

2   Q.   What is it -- just based on your knowledge as a --

3           MR. KROMBERG:  Objection, Judge.  Relevance.

4           THE COURT:  Sustained.

5   BY MR. SMITH:

6   Q.   So, Mr. Caslen, at trial, there were two witnesses for the

7   government, Ian Campbell and Police Officer McNulty.  Do you

8   recall that?

9   A.   It's "Ian" Campbell.

10  Q.   "Ian" Campbell.

11  A.   And Officer McNulty, correct.

12  Q.   Officer McNulty.

13          Before Mr. Young's -- when was Mr. Young indicted?

14  A.   I believe it was December of -- 2016?

15  Q.   Right.  At any point prior to December 2016, had you

16  interviewed Ian Campbell about the subject of his testimony?

17  A.   I don't recall when we interviewed Ian Campbell about the

18  subject of his testimony, but I did interview Ian Campbell.  I

19  can't remember if it was pre or post-indictment.

20  Q.   Was it after the -- was it after July of 2016?

21  A.   I just said I don't remember when it was.

22  Q.   Not even the year?

23  A.   I don't.  It could have been January 2017.  You asked me

24  if it was pre --

25  Q.   How about with Officer McNulty?  Do you recall vaguely

Caslen - Cross                                                      1128

1   when you first interviewed him?

2   A.    When I first interviewed -- when I personally first

3   interviewed him was just a couple weeks ago.

4   Q.    Okay.  Thank you.

5           So there came a time when -- upon your review of the

6   case file into Nicholas Young, you learned that there came a

7   time when the counterterrorism investigation into Mr. Young

8   learned that Mr. Young traveled to Libya in May of 2011,

9   correct?

10  A.    Yes.  We, we learned that he traveled to Libya, correct.

11  Q.    And at the time the counterterrorism investigation learned

12  that Mr. Young traveled to Libya, was it -- did the

13  counterterrorism investigation believe that Mr. Young had

14  traveled to Libya to join a terrorist organization?

15  A.    We were unsure why he traveled to Libya.

16  Q.    Well, did there come a time when the counterterrorism

17  investigation determined that Mr. Young traveled to Libya

18  probably not for reasons related to terrorism?

19  A.    I'm sorry, could you repeat the question?

20  Q.    Sure.  Did there come a time when the counterterrorism

21  investigation into Mr. Young determined that Mr. Young had not

22  traveled to Libya to join a terrorist organization?

23  A.    Determined?  No.

24  Q.    Sorry, can you clarify?  Did there come a time when the

25  FBI analyzed and assessed that it was unlikely Mr. Young had

Caslen - Cross                                                    1129

1   traveled to Libya to join a terrorist organization?

2   A.   There was a less-than-high-confidence assessment made that

3   it could have been for other reasons other than joining a

4   terrorist investigation.

5   Q.   And what were some of those other reasons?

6   A.   I don't recall exactly the other reasons.  Actually --

7            MR. KROMBERG:  Objection, Judge.  This is -- I think

8   it might be easier to approach the bench on this.

9            THE COURT:  All right.

10            (Bench conference on the record.)

11            MR. KROMBERG:  Judge, at some point over the years,

12   there was an assessment that said something about people we

13   don't know.

14            THE COURT:  Yeah, I've seen it.

15            MR. KROMBERG:  However, the agent testified on direct

16   that we only found out about Abu Salim Martyrs Brigade until

17   2015.  So to determine any relevance that might have to what

18   the FBI thought on the basis of incomplete information before

19   finding out about the Abu Salim Martyrs Brigade is irrelevant

20   to anything in this case.

21            MR. SMITH:  Your Honor, it's relevant because we're

22   disputing the statement the government has made repeatedly in

23   this case that Mr. Young traveled to Libya with the intent to

24   join Abu Salim Martyrs Brigade.  So documents from the

25   government indicating there were facts and circumstances to

Caslen - Cross                                                    1130

1   suggest that individuals traveling to Libya in this time period

2   could not have been doing it to join a terrorist organization,

3   it goes to predisposition, Your Honor.

4           THE COURT:  I'm not sure about that, but the problem

5   is you've got the wrong witness for that as well, so I'm going

6   to sustain the objection.  This is not going very well.  And

7   again, it gets the case mired down in what one particular agent

8   thought or didn't think.  It's not going to help in the case.

9           MR. SMITH:  Well, Your Honor, this -- the problem in

10  this case is that we believe the government has selected which

11  agents to present at trial in order to avoid certain documents.

12          THE COURT:  But then you had an ability to subpoena

13  any other witness that you thought you needed to subpoena.

14          MR. SMITH:  We didn't receive a witness list until

15  the government, the first day of trial.  We repeatedly asked

16  the government.

17          So, Your Honor, just for the sake of fairness, this

18  is, this is impeachment evidence.  This is refreshing

19  recollection.

20          THE COURT:  No, it's not, but here's the problem:

21  You got the 302s.  You had the names of the agents who were

22  interviewing people.

23          MR. SMITH:  They're often redacted, Your Honor.

24          MR. KROMBERG:  Not on the classified --

25          THE COURT:  Wait a minute.  I can't hear you.

Caslen - Cross                                                    1131

 1            MR. KROMBERG:  I'm sorry, the agents are not redacted

 2   from 302s that were classified, and they got them in both

 3   classified form and unclassified form.

 4            THE COURT:  Well, Ms. Moreno just got the names of

 5   the agents, didn't she, on the 302?

 6            MR. KROMBERG:  I believe that the names were on the

 7   302, but they certainly could have asked us if they were

 8   interested, and we would have come up with it.

 9            THE COURT:  No, I'm going to sustain the objection.

10            (End of bench conference.)

11   BY MR. SMITH:

12   Q.   Agent Caslen, you familiarized yourself with the items

13   seized from Mr. Young's home, correct?

14   A.   I did.

15            MR. SMITH:  So, Your Honor, we published some

16   photographs yesterday from a camera that was taken -- yeah,

17   from a camera that was seized from Mr. Young's home, and the

18   government produced it to us in a file called "The Libya

19   Camera."

20            THE COURT:  All right.

21   BY MR. SMITH:

22   Q.   Did you review the files in "The Libya Camera"?

23   A.   I remember that.

24   Q.   And so I'd like to publish some of these just to see if

25   you recall --

Caslen - Cross                                                      1132

1              THE COURT:  What are the exhibit numbers?

2              MR. SMITH:  Your Honor, the exhibit numbers are 2, 3,

3    4, 5, 6, 7, 8.

4              THE COURT:  Several of those are already in, correct?

5              MS. MORENO:  Yes.

6              MR. SMITH:  Yes, several of those are already in.

7    Actually, we published -- I think yesterday, we published 5, 7,

8    6 -- 4, 5 --

9              THE COURT:  Mr. Kromberg, do you have any objection

10   to 2 through 8?

11             MR. KROMBERG:  If there are new ones, I'd like to see

12   them first, but --

13             MR. SMITH:  I showed them to Mr. Kromberg a couple of

14   days ago.

15             MR. KROMBERG:  I have no doubt that Mr. Smith is

16   right, but I'd like to know what the exhibits are marked as at

17   this point.  It would be helpful if they had exhibit numbers on

18   them, Judge.

19             MR. SMITH:  Your Honor, our paralegal has them over

20   there.  He can walk over there and ask him.

21             MR. KROMBERG:  No objection, Judge.

22             MR. SMITH:  Okay.

23             THE COURT:  Do we have -- hold on a second.  What

24   numbers went in?

25             THE CLERK:  4, 5, 6, and 7.

Caslen - Cross                                                        1133

1          THE COURT:  Only 4, 5, 6, and 7 are here.

2          MR. SMITH:  Did you hand up the originals?

3          THE COURT:  2, 3, and 4 -- all right, do we have them

4   all?  Where are the defense exhibits?

5          MR. SMITH:  Did you hand the originals to the court

6   security officer?

7          MR. ENNS:  I gave them to him yesterday.

8          MR. SMITH:  Okay.  You have 4, 5, 6, and 7.  Can you

9   give the other originals to the Court?

10         THE COURT:  All right.  Where's 2, 3, and 4?

11         MR. SMITH:  And also, yeah, 2, 3, 4, 5, 6, 7, 8

12  should be with the court security officer.

13         THE COURT:  Just -- wait.  Show the originals to the

14  government so we're sure we're dealing all with the same thing.

15         MR. KROMBERG:  Thank you, Your Honor.

16         MR. SMITH:  And here is 8.  Here's 8.

17         MR. KROMBERG:  Thank you.  No objection, Judge.

18         THE COURT:  All right.  Defense Exhibits 2 through 8

19  are in evidence.

20         (Defendant's Exhibit Nos. 2, 3, and 8 were received

21  in evidence.)

22         MR. SMITH:  Okay.  Now, can you put up No. 2?

23  Q.   So, Agent Caslen, a witness has testified in this trial,

24  correct, that Mr. Young entered Libya through Egypt, correct,

25  in May of 2011?

Caslen - Cross                                                    1134

1    A.    Correct.

2    Q.    And what is your understanding of what Mr. Young was doing

3    in Egypt when he traveled through there into Libya?

4    A.    My understanding of when I saw this was that Mr. Young was

5    setting himself a guise of a tour before he went into Libya to

6    join the Abu Salim Martyrs Brigade, similar to what he told Mo

7    to do by touring Turkey.

8    Q.    I see.

9          Can you publish Exhibit No. 3?

10         Is this the guise of the tour that you're referring

11   to?  What is the guise of a tour, according to you?

12   A.    A guise would be going on a tour to make it look like

13   you're there to be on a tour rather than your true intentions.

14   Q.    I see.  So what, what do you see in Defense Exhibit 3?

15   What do you see?  Does it look like Mr. Young is in front of a

16   pyramid?

17   A.    It does.

18   Q.    Do you believe that Mr. Young is actually in front of a

19   pyramid in that picture, or is it not real?

20   A.    Oh, I do.

21   Q.    Okay.  So is this a guise of a tour, or is it a real tour?

22   A.    I'm not sure.

23   Q.    Not sure.  Okay.

24         Can you publish Exhibit No. 4?

25         So, Agent Caslen, you and, I think, a couple of other

Caslen - Cross                                                    1135

1   witnesses have testified that the government believes Mr. Young

2   traveled to Libya to join Abu Salim Martyrs Brigade, correct?

3   A.   That is correct.

4   Q.   And you agree that these photographs were found on a

5   camera that Mr. Young brought with him to Libya, correct?

6   A.   They were found on a camera, I believe, in the defendant's

7   truck.  Whether he brought the camera with him to Libya or the

8   SD card that was in it, it's my opinion that he brought the SD

9   card with him to Libya.

10  Q.   Right.  And you have previously told other agents that you

11  believe these are photos from Libya and they're interesting,

12  right?

13  A.   And that they're interesting?

14  Q.   Yeah.  You recall talking to other agents, saying, "Oh,

15  these are photos from Libya.  They're interesting"?

16  A.   I don't recall mentioning they were interesting to other

17  agents.

18        MR. SMITH:  Okay.  Can you go to Defense Exhibit 5?

19  Q.   Have you seen this photograph?

20  A.   I have.

21  Q.   And when did you review these photographs?

22  A.   After the SD card and the camera were seized.

23  Q.   Okay.  So when you saw these photographs, what was your

24  impression of the nature of Mr. Young's trip to Libya?

25  A.   Similar to what I said before.  I -- I'm sorry, are you

Caslen - Cross                                                      1136

1   asking me what I believed his trip to Libya was?

2   Q.   Yeah.  Would it be -- as an investigator, when you're

3   investigating whether Mr. Young traveled to Libya to join a

4   terrorist group, would, would documents like photographs from

5   the trip be important to the inquiry?

6   A.   Yes.

7   Q.   Okay.  So, so these photographs were important to the

8   inquiry about whether Mr. Young had joined a terrorist group in

9   Libya, right?

10  A.   Well, this one not so much in particular.

11  Q.   No?  Why not?  It looks like -- I don't know, it's hard to

12  say who's in here, but it looks like a couple of elderly people

13  that are on a beach, they're giving peace signs.

14          MR. KROMBERG:  Your Honor, the government will

15  stipulate that not every photograph taken by a person in Libya

16  going to a terrorist group has to be of members of a terrorist

17  group.

18          THE COURT:  All right.

19          MR. SMITH:  We appreciate that stipulation.

20          Can you go to Defense Exhibit No. 7?

21  Q.   Did you see that photograph?

22  A.   I did.  I saw it on the defendant's Facebook page as well,

23  I believe.

24  Q.   Oh, so he published his photos on Facebook from Libya?

25  A.   I believe so.

Caslen - Cross                                                    1137

1   Q.   Did that indicate to you as an investigator that he was

2   attempting to hide his travels there?

3   A.   No.

4   Q.   No?  Didn't Mr. Young publish on Facebook that he had

5   actually -- are you familiar on Facebook with the function that

6   allows you to indicate where you are at any given time

7   geographically?

8   A.   You put your, like, your hometown?  Is that what you're --

9   Q.   Right.

10  A.   I am, yes.

11  Q.   Your hometown or where you're visiting maybe?

12  A.   I don't know so much about visiting, but yes, the

13  hometown.

14  Q.   So in your review of the case file in this case, did you

15  ever see that Mr. Young had posted something about a hometown

16  in Libya?

17  A.   I did.  I believe his hometown on Facebook was Misrata.

18  Q.   Right.  So did that indicate to you as an investigator

19  that Mr. Young was attempting to hide his trip to Libya?

20  A.   No.

21  Q.   Agent Caslen, early in the trial, ICE Special Agent

22  Gervino testified about what Mr. Young told him on a reentry

23  interview in May of 2011, correct?

24  A.   I'm sorry, what he was what?

25  Q.   The ICE Agent Gervino, Special Agent Gervino testified in

Caslen - Cross                                                    1138

1   this trial about his reentry interview with Mr. Young in May of

2   2011, correct?

3   A.    Correct.

4   Q.    And you learned at some time that Mr. Young told Agent

5   Gervino that he went to Libya?

6   A.    Correct.

7   Q.    That he was in Benghazi, that he was in Misrata?

8   A.    I believe he said Benghazi and Misrata.

9   Q.    Okay.  So, Mr. Caslen, you've testified about these

10  e-mails you found in Mr. Young's possession from an individual

11  named Mohamed in Libya, and you've testified about how you sort

12  of uncovered the trail of what those, what those e-mails said,

13  right?

14  A.    Yes.

15  Q.    And one of the e-mails, you indicated, was an exchange

16  between Mohamed and Nicholas Young about night vision scopes,

17  right?

18  A.    Correct.

19  Q.    At what -- and do you recall what that exchange

20  essentially -- can you summarize that exchange?

21  A.    In summary, mohamed_2060, as we referred to him yesterday,

22  was asking the defendant to send variations of night vision

23  rifle scopes to him.  The defendant stated that he would have

24  to look into it, but he'd buy, I believe it was, $1,500 worth

25  if he could.  He found out that it was illegal to send them

Caslen - Cross                                                          1139

1   overseas, so he couldn't send them because they would be seized

2   by Customs, and rather -- in lieu of sending them, he offered

3   to bring money the next time he went back or purchase things in

4   Egypt and then bring them over.

5   Q.   So when did you first learn about that e-mail exchange

6   when an individual named Mo from Libya asked for night vision

7   scopes and Nick said, "No, I'm not going to do it.  It's

8   illegal"?  When, when did that come to your attention as the

9   case agent in this?

10  A.   To correct the question, it was actually Mohamed, not Mo.

11  Q.   Mohamed, right.  Mohamed_2060.

12  A.   Yes.  We're calling him mohamed_2060.

13          So we learned about that when we found the printed

14  e-mail that is a government exhibit in the center console of

15  defendant's pickup truck during the search of his vehicle.  We

16  found that e-mail, and then we subsequently received -- through

17  legal service received the rest of them.

18  Q.   Okay.  So you learned about this exchange after Mr. Young

19  was arrested for the charges in this case, correct?

20  A.   Correct.

21  Q.   Okay.  Now, did you determine who mohamed_2060 is?

22  A.   It was a contact of the defendant's in Libya, but I do not

23  know the identity of the individual.

24  Q.   So you do not know whether this individual was a member of

25  something that's being called the Abu Salim Martyrs Brigade?

Caslen - Cross                                                    1140

1   A.   I believe in some of the other e-mails that the defendant

2   said under the e-mail address MALIKtheAmerican, he referred to

3   other brothers in the brigade, so I believe that he was.

4   Q.   You're speculating, right?  Is that fair to say?

5   A.   I believe it's in, it's in the e-mail.

6   Q.   You're referring to an e-mail in which he says "brothers,"

7   correct?

8   A.   I believe so.

9   Q.   And do you have any e-mails indicating "brothers" means

10  mohamed_2060?

11  A.   I would have to see the e-mail to know the exact, the

12  exact content of what it was, but --

13  Q.   You testified --

14  A.   -- I believe that mohamed --

15          MR. KROMBERG:  Objection.

16          THE COURT:  Wait.  You're talking over the witness

17  again.

18          THE WITNESS:  The way I believe the MALIKtheAmerican

19  e-mails to go was that the defendant was referring to

20  mohamed_2060 and the other individuals that he e-mailed from

21  the MALIKtheAmerican e-mail address to be members of Shuhada

22  Brigade.

23  Q.   I'm only asking to confirm that that is your

24  interpretation of various e-mails, but you do not have a

25  document indicating a direct connection, correct?

Caslen - Cross                                                      1141

1    A.   I'd have to see the e-mail to see exactly how it was

2    phrased, because I think that may be a direct connection.

3    Q.   As you testify right now, you do not recall?

4    A.   I do not recall.

5    Q.   Thank you.

6            So after Mr. Young returned from Libya, there came a

7    time when the counterterrorism investigation learned that --

8    from a CBP officer that Mr. Young had complied with all of the

9    rules for moving body armor overseas, correct?

10   A.   I don't recall exactly which document you're speaking of.

11   Q.   I'll try to refresh your recollection.  Maybe I can

12   refresh it by just talking about it with you.  There came a

13   time when FBI agents learned from an individual, an officer

14   named Chrispen, a CBP officer named Chrispen that after

15   Mr. Young returned from Libya, he actually -- body armor was

16   seized, and then he returns to Customs to try to have it given

17   back to him.

18           Do you recall that sort of sequence of events?

19   A.   I don't recall him coming back to get it seized, but I do

20   recall, for example, the letter that the State Department sent

21   him yesterday about it.

22   Q.   Okay.  That's sufficient.  Thank you.

23           Now, when Mr. Young returned from Libya, he had an

24   interview with an individual, an agent on this investigation,

25   and Mr. Young tells the agent he was with migrant workers and

Caslen - Cross                                                    1142

1  black Africans in Libya during his trip in May 2011, correct?

2  A.    I don't recall exactly him saying that.

3  Q.    But do you recall an interview generally speaking, just to

4  speed this along, that there was an interview with an agent in

5  this case who we're calling Jones in this case after Mr. Young

6  returned from Libya, and Mr. Young described to Agent Jones the

7  types of people Mr. Young was with in Libya?

8  A.    I recall that happening.  I recall the document.  I do not

9  recall the interview because I was not here when that happened.

10 Q.    So seeing the pictures we looked at today, do you have any

11 reason to believe that Mr. Young was misleading Agent Jones

12 about the types of individuals he was with in Libya?

13 A.    I would say the physical descriptions of them are

14 correct --

15 Q.    Okay.  You can't --

16 A.    -- but I would say that the, the nature of who they were

17 and what he was doing over there, I don't think he was

18 forthright with.

19 Q.    So during that interview that I'm referring to with Agent

20 Jones which is after Mr. Young returns from Libya, Mr. Young is

21 telling Agent Jones about his trip, and fair to say, you know,

22 that's unusual for a police officer in the Washington, D.C.,

23 police force to be traveling to Libya, correct?

24 A.    Depends for what purpose.

25 Q.    What purpose would it be usual for?

Caslen - Cross                                                    1143

1   A.   I mean, if a Libyan police officer is on the D.C. Metro

2   Police Department and he goes home to visit family, I don't see

3   that as unusual.

4   Q.   Fair enough.  But for someone who is not a Libyan.

5   A.   For the purposes of what the defendant went over there

6   for, I would say it's unusual.

7   Q.   Okay.  All right.  So during this interview with Agent

8   Jones, after Mr. Young explains what he was doing in Libya,

9   Agent Jones inquired whether Mr. Young would have any interest

10  in being a confidential human source for the FBI, correct?

11  A.   So in speaking with Agent Jones, I understood that to be

12  more of a ruse to interview the defendant more than an actual

13  attempt to recruit him as an informant.

14  Q.   Okay.  Do you recall that after this meeting when they

15  discussed serving as a confidential human source in September

16  of 2011, Agent Jones met with the defendant on a, on a second

17  occasion?

18  A.   I believe there were two interviews afterwards.

19  Q.   And was the second one in Richmond?

20  A.   I don't recall where, but it was somewhere in Virginia.

21  Q.   So was the second meeting also a ruse, or was it actually

22  to discuss serving as a confidential human source?

23  A.   In my conversations with Agent Jones, I understand it to

24  also be similar to the purpose of the first one.

25  Q.   And, and do you understand that after that meeting, Agent

Caslen - Cross                                                    1144

1   Jones sent the defendant multiple texts to inquire whether he

2   was still interested in serving as a confidential human source?

3   I think it would have been, you know, September and October

4   2011?

5   A.   I recall seeing text messages when I was doing discovery

6   for you, but I don't recall the nature of the text messages.

7   Q.   And were those text messages ruses as well, or did you not

8   discuss that with Agent Jones?

9   A.   Again, I don't know the nature of the text message, so I

10  wouldn't be able to tell you.

11          MR. SMITH:  So, Your Honor, we're just going to

12  publish a document -- excuse me.  We're going to refresh

13  Mr. Caslen's recollection with a document.  We're not going to

14  publish it.  And I'm going to give it to the prosecution first

15  just to correct -- refresh the agent's recollection.

16          THE COURT:  Ladies and gentlemen, I'm going to give

17  you your break for 15 minutes, all right?  We'll reconvene at

18  quarter after.

19          (Recess from 11:01 a.m., until 11:18 a.m.)

20                  (Defendant and Jury present.)

21          THE COURT:  All right, Mr. Smith.

22          MR. SMITH:  Thank you, Your Honor.

23  Q.   So, Agent Caslen, we were just discussing Agent Jones's

24  attempt, a discussion with the defendant, Mr. Young, about

25  becoming an undercover informant.  I think you had testified

Caslen - Cross                                                      1145

1   that those discussions were a ruse designed to elicit an

2   interview with the defendant.

3   A.   To my understanding and based on my discussions with Agent

4   Jones.

5   Q.   Okay.  I'd just like to hand you a document to see if this

6   refreshes your recollection about those, the nature of the

7   conversations between Jones and the defendant.  It's an FBI

8   memorandum dated November 7, 2011.  It's not being published to

9   the jury.  So let me know if you, if you recognize that

10  memorandum after you review it.  It's one page.

11          Well, first, what does it -- have you ever seen that

12  memorandum?

13  A.   I recognize it.

14  Q.   And what's the date on that?

15  A.   It's dated November 7, 2011.

16  Q.   And does it indicate whether Agent Jones sincerely

17  attempted to recruit the defendant as a confidential human

18  source?  And by "sincerely," I mean --

19          MR. KROMBERG:  Objection, Judge.  If it's being

20  offered to refresh the agent's recollection --

21          THE COURT:  Sustained.

22  BY MR. SMITH:

23  Q.   I'm asking -- Agent Caslen, I'm asking you whether that

24  document refreshes your recollection as to whether the attempt

25  to recruit Mr. Young was a ruse or was a sincere effort.

Caslen - Cross                                                    1146

1          MR. KROMBERG:  Objection, Judge.  The witness has

2   never said that he failed to recall.  The witness said what he

3   said.  He didn't say he didn't remember.

4          THE COURT:  Well, wait.  Does that in any way refresh

5   your memory about your conversations with Agent Jones

6   concerning whether his approach to the defendant was a genuine

7   approach to enlist him as a confidential source or was a ruse?

8          THE WITNESS:  No, Your Honor.  I specifically

9   remember a phone call between myself and Agent Jones regarding

10  my prior testimony.

11         THE COURT:  Then the answer is it doesn't change his

12  testimony in that respect.

13         MR. SMITH:  Right.  Thank you.

14  Q.   In reviewing the case file into the investigation into

15  Mr. Young, did there come a time when you learned that

16  Mr. Young informed the FBI that he gave comments to the FBI

17  about his negative views of Anwar Awlaki?  Did you come a --

18  did there come a time when you learned that Mr. Young had said

19  something negative about Anwar Awlaki to the counterterrorism

20  investigators?

21  A.   I am unaware of that.

22  Q.   Can you remind us who Anwar Awlaki is?

23  A.   Anwar Awlaki was the imam at the Dar Al-Hijrah mosque

24  right after 9/11 who left the country to go, essentially landed

25  in Yemen and became a prominent figure in al Qaeda and the

Caslen - Cross                                                    1147

1    Arabian Peninsula.

2    Q.   And there's a document in evidence that was recovered from

3    Mr. Young's home that might have related to Anwar Awlaki,

4    correct?

5    A.   There were issues of *Inspire* magazine that were printed.

6    Q.   Okay.  So that would relate to Anwar Awlaki, would you

7    say?

8    A.   Correct.

9    Q.   Okay.  But there was also another piece of evidence,

10   wasn't there, like a disc, maybe something called The

11   Awakening?

12   A.   It was the Hereafter series.

13   Q.   Hereafter.

14   A.   There were two, volumes 1 and 2 in defendant's residence.

15   Q.   And what is the connection between the Hereafter series

16   and Anwar Awlaki?

17   A.   I believe Sheikh Anwar Awlaki was the one who recorded the

18   series.

19   Q.   Okay.  So I'm going to hand you a document to refresh your

20   recollection -- see if it refreshes your recollection.

21              MR. KROMBERG:   Objection.

22              THE COURT:  I don't think there was anything he said

23   he couldn't remember, so there's nothing to be refreshed at

24   this point.

25              MR. SMITH:  Your Honor, what he's -- what I'm

Caslen - Cross                                                    1148

1  refreshing is --

2          THE COURT:  Just ask the question.  The only way you

3  can refresh a memory is if the witness says, "I don't

4  remember."

5          MR. SMITH:  Your Honor, I did ask the question.  I

6  asked him whether he recalls if Mr. Young informed the FBI that

7  he had a negative view of Anwar Awlaki, and Mr. Caslen replied,

8  "I do not recall ever seeing that."

9          THE WITNESS:  That is correct.

10         MR. SMITH:  So I would like to refresh his

11 recollection as the case agent.

12         THE COURT:  All right, all right.

13 BY MR. SMITH:

14 Q.  It's September 29, 2011, and it's page No. 2.  It is an

15 FBI 302 memorandum, I believe.  I think it's with Agent Jones.

16 A.  I'm sorry, could you repeat the page number?

17 Q.  Page 2.

18 A.  Page 2?  Thank you.

19 Q.  And if you look to the bottom of page 2, let me know if

20 that conversation refreshes your recollection.

21 A.  So again, I don't doubt that the agent who wrote the --

22 Q.  I'm only asking you if it refreshes --

23 A.  It doesn't refresh my recollection of anything I

24 personally know the defendant to have said.

25 Q.  That's all I'm asking.  So you do not -- so you do not

Caslen - Cross                                                      1149

1   recall after reviewing that memorandum that Mr. Young said

2   Anwar Awlaki went off the deep end?

3              THE COURT:  He said he didn't remember it.  Let's

4   move on.

5   BY MR. SMITH:

6   Q.   Okay.  Do you recall that in the course of your review of

7   the case file in this investigation, that Mr. Young told one of

8   the case agents investigating Mr. Young that the Koran states

9   that killing one person is like killing the world, and Bin

10  Laden led to the murder of people, correct?

11             MR. KROMBERG:  Objection, Your Honor.  This is

12  calling for hearsay because it's not offered against the

13  party --

14             MR. SMITH:  State of mind, Your Honor.

15             MR. KROMBERG:  It's offered to establish that Mr. --

16  someone wrote that Mr. Young said something.  That's -- you

17  can't do that when you are representing Mr. Young.

18             THE COURT:  I'm sustaining the objection.  Let's move

19  on.

20             MR. SMITH:  And the objection is it's not offered for

21  its truth.  It's offered for the state of mind of the

22  individual whose predisposition is at issue in this case.

23             THE COURT:  I sustained the objection.

24  BY MR. SMITH:

25  Q.   Now, did there come a time in September of 2012 where

Caslen - Cross                                                      1150

1   Mr. Young gave an interview with Customs agents at the Canadian

2   border?  Do you recall that in your review of the case file?

3   A.   I recall there being an interview at the Canadian border.

4   The exact date I do not recall, though.

5   Q.   Do you recall what the nature of the interview was?

6   A.   I believe the defendant was reentering the country.

7   Q.   And what, what is significant about that date,

8   September 14, 2012, to you?  Is it, is it nearby a significant

9   date in terms of counterterrorism investigations?

10  A.   September 14?

11  Q.   September 14, 2012.

12  A.   It's a few days after September 11?

13  Q.   In September '12.  So are you familiar with the embassy

14  attack in Benghazi?

15  A.   Yes, I am.

16  Q.   Okay.  Do you believe that the, the attack on the Benghazi

17  Embassy which killed Ambassador Stevens in Benghazi, that

18  occurred on about September 11, 2012?

19  A.   I believe it was September 11, 2012, correct.

20  Q.   Okay.  And do you recall whether the CBP agents had an

21  interview with Mr. Young in which they inquired whether he

22  would share some of his information about his travels to Libya

23  to help them investigate the attack on the Benghazi Embassy?

24  A.   I don't recall the nature of that interview and what was

25  actually discussed.

Caslen - Cross                                                    1151

1              MR. SMITH:  Okay.  So I'd like to hand up a document

2     to see if it refreshes the agent's recollection.

3              THE COURT:  Yeah, we've had a complaint from one of

4     the jurors that when you move from the podium, they cannot hear

5     you.

6              MR. SMITH:  Sorry, Your Honor.

7              THE COURT:  You need to --

8              MR. SMITH:  I'd like to -- I'd like to move a

9     document -- I'd like to provide a document to Agent Caslen

10    dated September 14, 2012, and it's an FBI 302 memorandum

11    reflecting an interview at the Canadian border with Customs.

12    Q.   First you can just let me know if you've ever seen that

13    memorandum.

14    A.   I have.

15    Q.   You have?  And can you look at the bottom of page 2 to the

16    top of page 3?  I'm referring to the page numberings at the

17    bottom of the page, so I think it's the first -- the last full

18    paragraph on 2 and then continues up to the top of 3.

19             And you can just -- you don't have to read it.  You

20    can just let me know if that refreshes your recollection of the

21    review -- your prior review of that document.

22    A.   Yes.

23    Q.   Okay.  And now, do you recall that the CBP agents during

24    the interview on September 14, 2012, were interested in

25    Mr. Young's knowledge of Libya in connection with the recently

Caslen - Cross                                                    1152

1    conducted Benghazi attack on September 11, 2012?

2    A.   So again, as with the rest of the interviews that were

3    done outside my presence, I don't doubt the information in the

4    302, but my personal knowledge of what was asked of him, I

5    don't have any.

6    Q.   Do you recall whether Mr. Young offered to help in

7    connection with their investigation into Benghazi?

8    A.   Again, I wasn't there during the interview, so I wouldn't

9    know if that -- exactly how that was phrased.

10   Q.   Fair enough.

11        Now, Agent Caslen, did there come a time in your

12   review of the case file that you learned that at another point

13   in September 2012, the counterterrorism investigators in this

14   case, Agent Jones reached out to Mr. Young to discuss the

15   Benghazi attacks in September -- on September 11, 2012?

16   A.   I do recall an interview with Agent Jones around that

17   time.

18   Q.   And do you recall the subject matter that Agent Jones

19   discussed or was inquiring of Mr. Young about?

20   A.   I believe it was related to the attack.

21   Q.   And do you recall whether Agent Jones was interviewing

22   Mr. Young, doing his job as an investigator, what does this guy

23   know about Libya?  He's traveled there, the September 11

24   Benghazi attacks had just occurred, and Agent Jones wanted to

25   know if Young had some useful information.

Caslen - Cross                                                    1153

1              MR. KROMBERG:  Objection, Judge.  I think we need to

2      approach.

3              THE COURT:  Yes, let's go.

4              (Bench conference on the record.)

5              MR. KROMBERG:  Your Honor, I think Mr. Smith is doing

6      his job properly in the sense of the way he's asking questions.

7      However, the answers that he's - he's asking, "Is it a ruse or

8      not?" and he's pressing Special Agent Caslen, who's going to

9      say, "I think it was a ruse.  We wanted to keep our eye on him

10     because he was dangerous, and that's why we were talking to

11     him."

12             And if he keeps asking that question, we're

13     eventually going to get to that answer, which I thought we

14     don't want to get to.

15             MR. SMITH:  Your Honor, every time we try to use a

16     document to cross-examine the witness, they threaten to bring

17     up guns.  We're noting this for the record.  It's highly

18     inappropriate, 403.  This is law of the case on the guns.

19     Every time we have attempted to use a cross-examination

20     document with the witness --

21             THE COURT:  Look, the problem is this is a very

22     unusual and, I think, really improper cross-examination because

23     you don't have the right witness.  The correct witness in this

24     case are the witnesses who are interviewing the defendant, who

25     can then testify:  This is what I did, or this is -- this is,

Caslen - Cross                                                      1154

1   like, second- and third-hand hearsay.

2          MR. SMITH:  Your Honor, his testimony on direct, this

3   exact witness has testified in the exact areas Your Honor is

4   putting her finger on.  He has testified about what other

5   agents learned in this investigation.  We are merely attempting

6   to cross him on the same -- within the same parameters that the

7   government conducted direct on, and this is --

8          THE COURT:  All I can tell you is you ask a question.

9   If the answer is an appropriate answer to the question and not

10  trying to sneak something in that's not proper, but if it's

11  responsive to your question, you've asked the question.

12         MR. SMITH:  I'm only asking whether he recalls

13  something.  I'm not going to say, "Is it true?"

14         MR. KROMBERG:  Well, I think that perhaps Mr. Smith

15  is not focused on the problem.  The problem is that he asked

16  the question was this a ruse, was this another ruse.  Then the

17  answer may be yes, it was another ruse because, and then we

18  run --

19         THE COURT:  Then we'll see.

20         MR. SMITH:  Well, I'll stop there.  If he says this

21  is a ruse, then I will inquire no further.

22         THE COURT:  That's not the question right now.  All

23  right, let's go back.

24         MR. KROMBERG:  Thank you.

25         (End of bench conference.)

Caslen - Cross                                                    1155

BY MR. SMITH:

Q.    Okay.  So, Agent Caslen, I was asking you whether in your
review of the case file in the investigation of Mr. Young, you
came to learn about an interview conducted in September of 2012
by Agent Jones with Nicholas Young concerning the attacks in
Benghazi in September 2012.  Are you familiar with -- you said
you were familiar with that interview?

A.    I believe that was a topic discussed.

Q.    Okay.  And do you recall whether during this interview,
Mr. Young said he was shocked by the attacks in Benghazi on
Ambassador Stevens?

A.    I don't recall exactly what was said during the interview,
because again, I was not present for the interview.  I just
remember that in discussions I had with Agent Jones, that that
topic was discussed.

Q.    That topic was discussed.

A.    Yes.

Q.    Okay.

A.    And as far as the content of it, I don't know exactly what
was said between the parties.

Q.    Okay.  And do you recall that -- on a slightly separate
subject, do you recall that Mr. Young said that Ambassador
Stevens was well liked among the individuals he had met in
Benghazi -- excuse me, in Libya?

A.    Again, I don't remember the exact content of what was said

Caslen - Cross                                                          1156

1   because I was not present.

2          THE COURT:  Well, again, I just want to remind the

3   jury that when a lawyer makes a statement and the witness says,

4   "I don't know," or "I don't recall," the lawyer's statement is

5   not evidence.

6          MR. SMITH:  Now, we are just -- one more refreshing

7   of the recollection, and then we'll move on.

8   Q.   So this is a document dated October 9, 2012.  It's an FBI

9   302 memorandum with Agent Jones and Mr. Young.  And the

10  conversation is on the second page concerning --

11  A.   The back of the first page?

12  Q.   The back of the first page.  It's page 2.  There should be

13  a page 2 at the bottom of the page.  And you can see references

14  to Stevens, Benghazi.

15  A.   I see it.

16  Q.   And does that refresh your recollection?

17  A.   Again, I don't doubt the, the -- what was put in here by

18  Agent Jones himself, but I was not present during the

19  interview, so I don't know exactly how the defendant would have

20  phrased it.  The interview wasn't recorded.

21  Q.   Why wasn't it recorded?

22  A.   I do not know.

23  Q.   Okay.  Agent Caslen, you've testified about some of these

24  LiveLeak -- you testified about how you investigated the

25  defendant's LiveLeak account, correct?

Caslen - Cross                                                    1157

1   A.    I observed the defendant's LiveLeak account and read some

2   of the comments, correct.

3   Q.    And so when did you join the investigation again as the

4   case agent?  Which month was it again?

5   A.    October 2015.

6   Q.    October 2015.  Had there been any investigations into

7   analysis of Mr. Young's LiveLeak account prior to October 2015?

8   A.    I believe so.

9   Q.    And do you recall the nature of this analysis of

10  Mr. Young's LiveLeak account?

11  A.    Are you asking me at the time that I joined the

12  investigation, did I know, or --

13  Q.    Well, did there come a time when you learned about the --

14  you joined in October 2015, so did you learn about a prior

15  investigation prior to your arrival as the case agent on this

16  case?  Did you learn about a previous investigation -- analysis

17  of Mr. Young's LiveLeak account that had been conducted?

18  A.    After the defendant was arrested, in going through the

19  case file for discovery, I found a document where it had been

20  discussed.

21  Q.    And do you recall the key judgments from that memorandum?

22  A.    I do not.

23  Q.    Well, do you recall just generally what the memorandum was

24  analyzing?

25  A.    Comments that were placed onto the account by the

Caslen - Cross                                                    1158

1  defendant.

2  Q.   And, and what was the purpose of the analysis of the

3  comments that were placed on LiveLeak?

4  A.   Well, the document was written, if I recall correctly, by

5  one of our intelligence analysts, and the purpose of what they

6  do for the case team and the case agents is to provide guidance

7  to the case agents on things that they have observed, and they

8  put things in memorandums that help us make decisions later on.

9  Q.   Do you recall whether this analysis determined that Slow

10 Decline -- and Slow Decline is Mr. Young -- that he

11 consistently presents himself on LiveLeak as a conservative,

12 patriotic veterans supporter?

13          MR. KROMBERG:  Objection, Your Honor.

14          THE COURT:  Wait, wait, wait.

15          MR. KROMBERG:  We tried to get into the LiveLeak

16 Government Exhibits 8-501 and 502, and the Court barred us from

17 going into what was said on the LiveLeak account.  At this

18 point, it's wrong for the defense to be able to go into the

19 LiveLeak account, the comments made on the LiveLeak account,

20 when we were not allowed to go into the LiveLeak account.

21          MR. SMITH:  Your Honor will recall it was only

22 specific messages that Your Honor excluded, and Mr. Caslen just

23 testified about his investigation into the LiveLeak account.

24          THE COURT:  Well, I think if you're --

25          MR. SMITH:  This was on direct.

Caslen - Cross                                                      1159

1          THE COURT:  But on cross, if you're going to start

2    going into specific elements within that account, and I don't

3    quite know where that's all being tied up, the government then

4    has a right to ask if they can go into other comments on the

5    same account, so, I mean, you need to think about where you're

6    going with this.

7          MR. SMITH:  Your Honor, can I ask the government to

8    explain what it just meant by --

9          THE COURT:  Well, you know what's going on.  So ask

10   the question if you want to, or move on to something else.

11         MR. SMITH:  Your Honor, we need a bench conference.

12   Can we have that, please?

13         THE COURT:  No, we've had too many.  Let's go.

14   BY MR SMITH:

15   Q.   Okay.  So you're familiar with the entire case file from

16   the beginning of the investigation in September 2010 until the

17   arrest in August 2016, correct?

18   A.   I don't know the contents of every single document in

19   there, but after the defendant was arrested, I've reviewed the

20   case file and produced relevant documents in discovery as well.

21   Q.   So do you know, after -- upon your review of the entire

22   case file from September 2010 to August 2016, did you find any

23   evidence that the defendant ever actually spoke to a member of

24   ISIS?

25   A.   So there was no evidence that said that he had spoken

Caslen - Cross                                                      1160

1  directly to it, just the, the e-mails sent to individuals that

2  he had been in with Libya that he had later told Mo were

3  like-minded with the brothers that Mo was with.

4  Q.    Thank you.

5         So your testimony is that he's never directly spoken

6  with anyone in ISIS according to your information?

7         MR. KROMBERG:  Objection.  The testimony is what the

8  testimony is.

9         THE COURT:  I think that is correct.  Sustained.

10 BY MR. SMITH:

11 Q.    Now, upon your review of the case file between September

12 of 2010 and August 2016, did you find any evidence that

13 Mr. Young ever actually materially supported a member of ISIS?

14 A.    No.

15 Q.    So upon your review of the case file between September

16 2010 and August '16, is it fair to say that the ISIS connection

17 in this investigation was notional?

18 A.    I would, I would say that's not entirely accurate given

19 the fact that the defendant stated he was with brothers in

20 Libya that were -- he later told the notional Mo that those

21 brothers were like-minded with the brothers you are with, and

22 I'm wondering if they had pledged to your brothers.  So we've

23 never found any evidence that the defendant was able to confirm

24 whether or not that was true.

25 Q.    You testified earlier today that Mr. Young's exchanges

Caslen - Cross                                                    1161

1   with a Mo 2060 regarding night vision scopes, you discovered

2   that after you investigated Mr. Young, correct -- arrested

3   Mr. Young, correct?

4   A.    Correct.

5   Q.    Thank you.

6            And after you charged Mr. Young, correct?

7   A.    I can't remember if that was before or after indictment.

8   Q.    Okay.  So at some point during the investigation into

9   Mr. Young, you interviewed some of his colleagues that worked

10  at the Metro Transit?

11  A.    Correct.

12  Q.    Okay.  And do you recall an interview with a retired

13  Officer Eubanks?

14  A.    I do recall interviewing him.

15  Q.    And what did Mr. Eubanks say to you?

16            MR. KROMBERG:  Objection, Judge.

17            THE COURT:  Oh, that clearly would be hearsay, so

18  I'll sustain the objection.

19            MR. SMITH:  Your Honor, it's not being offered to

20  prove the truth of the matter asserted.

21            THE COURT:  What's it being offered to prove then?

22            MR. SMITH:  It's offered to be -- it's offered to be

23  proved that someone who worked with Mr. Young had stated --

24            THE COURT:  Wait, wait, wait, wait.  Approach the

25  bench on this one.

Caslen - Cross                                                    1162

 1              (Bench conference on the record.)

 2              THE COURT:  Go ahead.

 3              MR. SMITH:  The very fact that an officer working

 4   with Mr. Young made this statement to the FBI is irrelevant

 5   apart from its underlying truth.

 6              THE COURT:  What's the statement?

 7              MR. SMITH:  The statement is that he never knew

 8   Mr. Young to be radical in any way, he was shocked by the

 9   charges, he never had any relationship --

10              THE COURT:  You have got to call the person, Eubanks

11   himself, to put that in.

12              MR. SMITH:  Well, Your Honor, we've tried our

13   hardest, but we can't, so --

14              THE COURT:  No, you can't do it this way.  You're

15   offering it for the truth of its contents.  That's the only

16   point.  No.  Objection sustained.

17              (End of bench conference.)

18   BY MR. SMITH:

19   Q.   Upon your review of the case file into this investigation,

20   at what point did the investigators recover the Nazi items that

21   are in the evidence in this case?

22   A.   The photographs -- some of the photographs of the

23   defendant in his Nazi attire were uncovered in 2011.  The rest

24   of the physically seized items were seized post-arrest in 2016.

25   Q.   And so the items you introduced today were seized from

Caslen - Cross                                                        1163

1    Mr. Young's home in August of 2016, correct?

2              MR. KROMBERG:  Objection, Judge.  There's a lot of

3    items that were introduced today.  I'm not sure that that's

4    correct.

5              THE COURT:  Can you be more -- can you be more

6    specific as to what items you're talking about?

7    BY MR. SMITH:

8    Q.   His physical copies of the Nazi paraphernalia that you

9    have introduced into evidence were seized from Mr. Young's home

10   in August 2016.

11   A.   The physical copies, correct.  Correct.

12   Q.   So were those items a part of the case investigative file

13   before Mr. Young was arrested?

14   A.   Those specific items?

15   Q.   Yes, the physical copies of the Nazi evidence that you

16   have authenticated in this case.

17             MR. KROMBERG:  Objection, Judge.

18             THE COURT:  Go ahead.

19             MR. KROMBERG:  The question is, could only lead to

20   misleading answers.  If the question is the things you seized

21   after the arrest, were they part of the investigation before

22   the arrest --

23             MR. SMITH:  Your Honor, this is relevant because it

24   is an appropriate line of inquiry whether any of the Nazi

25   paraphernalia was a part of the investigation before Mr. Young

Caslen - Cross                                              1164

1   was indicted.

2         MR. KROMBERG:  And the witness just said yes, that

3   some of it was found in 2011.

4         THE COURT:  You need -- focus your questions more

5   appropriately.  This is not a good question.  I'll sustain the

6   objection.

7   BY MR. SMITH:

8   Q.   Agent Caslen, upon your review of the case file into the

9   investigative history of Nicholas Young, was there ever any

10  hate crime investigation into Mr. Young?

11  A.   No.

12  Q.   Were you prepared for your testimony today with the

13  government attorneys?

14  A.   Absolutely.

15  Q.   Okay.  And so when was the first time that you discussed

16  the Nazi evidence with the prosecutor in this case?

17  A.   Prior to the defendant's arrest, I believe we discussed

18  the evidence that we knew about from 2011.

19  Q.   You did.  So when the agents seized the items, the

20  physical items from Mr. Young's home in August 2016, did there

21  come a time when they called the prosecutor and asked whether

22  it would be appropriate to seize those Nazi items?

23  A.   I was not at the defendant's residence during the search;

24  I was on vacation; but I do believe they did call the

25  prosecutor.

Caslen - Cross                                                    1165

1  Q.   And did they call the prosecutor about the *Inspire*

2  magazines?

3  A.   I do not recall.

4  Q.   And why do you -- did there come a time when you learned

5  why the investigators who seized the Nazi items were uncertain

6  whether they should be seized?

7        MR. KROMBERG:  Objection, Judge.

8        THE COURT:  Sustained.

9  BY MR. SMITH:

10  Q.   Now, you conducted two interviews on December 3, 2015, and

11  December 5, 2015, with the defendant, correct?

12  A.   Correct, myself and Agent Smith.

13  Q.   Agent Smith.

14        Now, at the time you conducted these interviews with

15  Mr. Young, you testified that there was a grand jury proceeding

16  already pending into the defendant, correct?

17  A.   I'm sorry, could you repeat the question?

18  Q.   At the time you interviewed Mr. Young in December 2015, a

19  grand jury proceeding was currently pending in connection with

20  Mr. Young, correct?

21  A.   Correct.

22  Q.   During your interview with Mr. Young, two interviews in

23  December 2015, did you inform him that there was a grand jury

24  investigation into him?

25  A.   No, that's not common.  We wouldn't do that.

Caslen - Cross                                                    1166

1   Q.   Did he give any indication in the interview that he was

2   aware of the grand jury investigation into him?

3   A.   No.

4   Q.   Was there a grand jury investigation into the informant Mo

5   during -- at the time of your December 2015 interview?

6   A.   No.

7   Q.   Was there an FBI investigation?

8   A.   No.

9   Q.   Did there come a time when you learned during your review

10  of the case file into the investigation into Nicholas Young

11  that Mr. Young was aware of the grand jury investigation into

12  him?

13  A.   I'm sorry, could you repeat that question?

14  Q.   In your review of the case file when you came onto the

15  case, this investigation in October 2015, you reviewed the case

16  file, correct?

17  A.   Correct.

18  Q.   And did you learn from your review of the case file that

19  there was evidence to suggest that Mr. Young was aware of a

20  grand jury investigation into him?

21  A.   Not specifically a grand jury but there was evidence that

22  led us to believe he assumed that we were investigating him.

23  Q.   And what, what evidence was that?

24  A.   His conversations with Khalil that Khalil had testified

25  about.

Caslen - Cross                                                    1167

1   Q.   His conversations with Khalil in what year?

2   A.   I don't recall the specific year.

3   Q.   Well, do you recall Khalil's testimony that his meetings

4   with Mr. Young were in 2010 and 2011 and discontinued in April

5   2012?

6   A.   Yes.

7   Q.   And when was the first grand jury subpoena that you

8   mentioned in this case?

9   A.   So the grand jury subpoena list we put up was a sampling,

10  and I believe it was in 2011.  The one we listed was in 2011.

11  The exact date of the first grand jury subpoena, I don't, I

12  don't know that date.

13  Q.   Will you be providing a complete list of the grand jury

14  subpoenas?

15  A.   I don't know.  I believe so.

16  Q.   Okay.  So you mentioned that Mr. Young indicated he was

17  aware of an investigation into him in his conversations with

18  Khalil.  Can you tell me what you're referring to?

19  A.   Khalil's testimony where he testified that the defendant

20  believed that the FBI was --

21  Q.   -- listening to his communications, correct?

22  A.   Yes.

23  Q.   And so is that, is that the statement that you're saying

24  is the indication that Mr. Young knew that there was an

25  investigation into him?

Caslen - Cross                                                    1168

1   A.   That's an example of one, yes.

2   Q.   Can you give me some other examples?

3   A.   I mean, I believe that he mentioned to Khalil that he

4   believed that him and Saleh Al-Barmawi were also being

5   investigated.  That would be another example.

6   Q.   Did he say investigated, or did he say that he was being

7   spied on?

8   A.   I don't recall exactly how he said it.

9   Q.   Okay.

10  A.   But it led me to believe that he believed we were

11  investigating him.

12  Q.   Is it fair to say that that's the sum of the evidence

13  you've reviewed in the case file, that Mr. Young was aware of

14  an investigation into him?

15  A.   There was also the time when he was looking for counter-

16  surveillance outside of his house, when he believed we were

17  outside of his house, with the weapon pointed out the window.

18  Q.   You're referring to the occasion when he thought someone

19  might be spying on him, right?

20  A.   Correct.

21  Q.   And is your position that that is the piece of evidence in

22  the case file that indicates Mr. Young knew there was a

23  criminal investigation opened into him?

24  A.   That's, that's me saying that I -- it's my understanding

25  that the defendant knew that.  I'm not saying that that is

Caslen - Cross                                                    1169

1   concrete that he absolutely knew we were.

2   Q.   Oh, right.  So is there a piece of evidence that does

3   concretely indicate it upon your review of the case file?

4   A.   I would say his arrest.  That would be -- he may have

5   become aware that we were investigating after his arrest.

6   Q.   Which was on August 3, 2015, right?

7   A.   '16.

8   Q.   2016.

9        I guess I'm asking you whether there's a piece of

10  evidence -- so your interview with Mr. Young was on December 3,

11  2015, and December 5, 2015?

12  A.   Correct.

13  Q.   So I guess I'm asking you about whether upon your review

14  of the case file in this case, which goes back to September

15  2010, Mr. Young -- you had any evidence indicating Mr. Young

16  was aware of the investigation before December 3, 2015, or

17  before December 5, 2015?

18       MR. KROMBERG:  Objection, Judge.  Asked and answered.

19  The witness has already said he talked about Khalil's testimony

20  and Khalil's reports from 2010, '11, and '12.

21       THE COURT:  All right, both lawyers are making too

22  much -- are including too much in their discussions and in

23  their objections, but I'm going to sustain the objection

24  because it's already been asked and answered.

25  BY MR. SMITH:

Caslen - Cross                                                    1170

1   Q.   Now, Khalil has testified -- you were here during Khalil's

2   testimony, correct?

3   A.   I was.

4   Q.   Okay.  Now, Khalil has testified that the last meeting he

5   had with Nicholas Young was in April of 2012?

6   A.   I don't recall exactly what day it was, but I believe it

7   was --

8   Q.   Early, early 2012?

9   A.   It's fair to say.

10  Q.   Okay.  And is it fair to say that upon your review of the

11  case file, that there were no other confidential informants who

12  were tasked with reporting on Mr. Young between April 2012 and

13  May 2014, when he met -- when Mo testifies that he meets the

14  defendant?

15          MR. KROMBERG:  Objection, Judge.  It's irrelevant to

16  whether there were confidential informants other than Khalil or

17  anyone that's testified in the case.

18          THE COURT:  I'm going to sustain the objection.

19          MR. SMITH:  Your Honor, may I explain?

20          THE COURT:  No.  I'm sustaining the objection.

21  BY MR. SMITH:

22  Q.   Okay.  To the best of your knowledge, the first time

23  that -- upon your review of the case file, the first time that

24  the defendant encountered a confidential human source in the

25  course of the investigation was May 2014, correct?

Caslen - Cross                                                    1171

```
 1              MR. KROMBERG:  Objection, Judge.  Again, the defense
 2    attorney is asking who the -- is leading to whether there were
 3    confidential informants and tipsters in the case that have not
 4    been brought up in this case, and that cannot be gone into.
 5              THE COURT:  We're going to sustain the objection.
 6    Move on to something else, Mr. Smith.
 7    BY MR. SMITH:
 8    Q.   Agent Caslen, there was another individual who was
 9    referenced in connection with Mr. Young.  His name was Saleh
10    Al-Barmawi.  A couple of witnesses have testified about that
11    individual, Saleh Al-Barmawi, correct?
12    A.   Correct.
13    Q.   And his image was published on the screen?
14    A.   It was.
15    Q.   Has Saleh Al-Barmawi been indicted for terrorism charges?
16    A.   He has not.
17    Q.   Has he been arrested?
18    A.   He has not.
19              MR. SMITH:  Your Honor, one moment?
20              THE COURT:  All right, counsel, this is taking too
21    long.  Let's go.  Are there any other questions?
22              MR. SMITH:  Your Honor, we are just formally
23    objecting to the exclusion of the documents we attempted to
24    cross-examine the witness with, and we will rest.  We'll
25    discontinue our line of questioning right now.
```

Caslen - Cross                                                        1172

1              THE COURT:  All right.  Any --

2              MR. SMITH:  Actually, sorry, sorry, Your Honor.

3    There is one more line of cross, and we have some stipulated

4    documents that we'd like to publish to the jury.  So can we

5    start with Defense Exhibit 14?

6              MR. KROMBERG:  Can we see what it is that we're

7    stipulating to?

8              MR. SMITH:  The government's seen them already, but

9    we can show them again.

10             MR. KROMBERG:  It would be helpful when I know what

11   the exhibits are.

12             No objection, Judge.

13             THE COURT:  All right, what are the numbers for

14   these?

15             MR. SMITH:  It's 14, 15, 16, 17, 18, 19, 20, 21, 22,

16   23, 24.

17             THE COURT:  14 through 24.

18             MR. SMITH:  14 through 24.

19             THE COURT:  All right, that's fine.  They're in.

20             (Defendant's Exhibit Nos. 14 through 24 were received

21   in evidence.)

22             THE COURT:  Do you want them shown to the witness?

23             MR. SMITH:  We can publish them, Your Honor, but

24   let's just start with 14.

25   Q.   So, Agent Caslen, you were not at the, the search of

Caslen - Cross                                                    1173

1   Mr. Young's home in August 2013, correct?

2   A.   I was not.

3   Q.   But you've mentioned earlier in your testimony that there

4   came a time when you had conversations with the searching

5   agents about the search of Mr. Young's home, correct?

6   A.   That's correct.

7   Q.   And you've testified earlier that one of the agents had a

8   question about whether the Nazi material should be seized, and

9   they called the prosecutor, correct?

10  A.   I'm sorry, could you repeat that one?

11  Q.   You testified that you had a conversation with one of the

12  searching agents who searched Mr. Young's home on -- in August

13  2013?

14  A.   Correct.

15  Q.   2016.

16       And they indicated that they had a question about

17  whether to seize the Nazi materials, and they called the

18  prosecutor in the case, correct?

19  A.   They called the prosecutor about the Nazi materials, to

20  whether -- the nature of the call, I'm unaware.

21  Q.   All right.  So in your conversation with that agent who

22  called the prosecutor about the Nazi materials, did the agent

23  indicate whether there were other military objects in the home

24  separate from Nazi materials and white supremacism memorabilia?

25  A.   So I've seen these exhibits, and I have gone through --

Caslen - Cross                                                        1174

1    I've talked to that agent, and I've also gone through some of

2    the photographs we took at the defendant's residence to try and

3    ensure that some of these items were actually there, and some

4    of them were.

5    Q.    Okay.  So would you agree that Defense Exhibit No. 14 is

6    sort of -- this is not how it appeared.  This does not purport

7    to be -- this is not how the agent described the scene of the

8    arrest to you in August 2016, correct?

9    A.    That's correct.

10   Q.    And so would you say that these items are collectively

11   representing some military objects in Mr. Young's home that

12   were assembled after the search of Mr. Young's home in August

13   2016?

14   A.    I would, I would not say that because in my review of the

15   photographs as well as talking to some of the agents who were

16   there, they did not see all of this.  However, I did see some

17   of the items in the defendant's residence.  So I would not

18   characterize it as that these represent items that were in the

19   defendant's residence, but some of them were.

20   Q.    Okay.  So, for example, like, Defense Exhibit 15, they

21   describe, you know, Japanese artifacts, Japanese historical

22   artifacts?

23   A.    I recall seeing something similar to this in defendant's

24   vehicle.

25   Q.    Okay.

Caslen - Cross                                                      1175

1   A.   Not so much in the photographs from the defendant's

2   residence.

3   Q.   Okay.

4   A.   As well as a photograph of a kamikaze pilot on the

5   defendant's Facebook page that had something similar.

6   Q.   Okay.  How about 16?

7   A.   These are -- they're out of order, so --

8   Q.   There's a, there's a stamp on the bottom of 16.  And it's

9   published on the screen right next to you.

10  A.   Oh, I'm sorry.

11  Q.   So is this an item that you would -- would you say it's

12  fair to say that the agent who searched the home found a wide

13  range of historical memorabilia?

14  A.   Again, in my discussion with the agent as well as

15  personally going through the photographs, I did not see as wide

16  a variety as that's in these photographs, so I would not say

17  that that's correct.

18  Q.   How about 17?  These are airborne jump boots?

19  A.   I did not see that in the photographs as well, and I did

20  not hear that the -- from the agents that were there that they

21  were there, but not out of the realm of possibility to have

22  been there given the amount of shoes that were in the --

23  Q.   How about 18?

24  A.   Same as my last, the last photograph.  This was not seen

25  in any of the photographs, but there was a bookshelf, and there

Caslen - Cross                                                    1176

1   were a lot of books in the residence.

2   Q.   There were a lot of books in the residence?

3   A.   Yes.

4   Q.   What kind of books?

5   A.   Well, there were some Nazi books.

6   Q.   Right.  Well, we've seen those.

7          MR. KROMBERG:  Objection, Judge.  When the defense --

8   I think we have to approach.

9          THE COURT:  No.  Overruled.

10         MR. KROMBERG:  Well, then it's misstating the

11  evidence because we haven't seen the books.  We've seen the

12  cover of one book.

13         MR. SMITH:  I'm asking the witness a question.

14         THE COURT:  The witness just said he saw Nazi books.

15  That's the only answer that was made to the question, all

16  right?

17         MR. SMITH:  That was for some of the books he saw,

18  but I guess I'm eliciting whether that was all of the books.

19         THE COURT:  And you saw other books as well; is that

20  right?

21         THE WITNESS:  In the photographs, Your Honor, there's

22  other books as well on the bookshelves.

23         THE COURT:  That's fine, all right.

24  BY MR. SMITH:

25  Q.   Okay.  So let's go to No. 19.  Do you see that?

Caslen - Cross                                                      1177

1   A.    I see the exhibit.

2   Q.    You don't recall learning that that book was also there?

3   A.    I do not.

4   Q.    Okay.  How about 20?

5   A.    Same.  I do not recall seeing that in any photographs

6   or --

7   Q.    Do you recognize -- so if you look at No. 20, do you, do

8   you recognize the figure on that book?

9   A.    I do not.

10  Q.    You don't?

11          THE COURT:  All right, we're not getting into --

12          MR. SMITH:  Well, no, Your Honor.  This is a

13  predisposition issue.

14  Q.    Are you familiar with Libertarian politics?

15  A.    I am not.

16  Q.    Are you familiar with conservative politics?

17          MR. KROMBERG:  Objection.  Irrelevant.

18          THE COURT:  Sustained.  Sustained.

19          MR. SMITH:  Can you go to 21, please?

20  Q.    Did you find a series of Bibles in his home?

21  A.    Again, I was not present during the search, but again, in

22  my search of the photographs that were taken, I did not see a

23  photograph of the Bible.

24  Q.    All right.  Four Bibles?

25  A.    Of any Bible.

Caslen - Cross                                                    1178

1           MR. SMITH:  Okay.  Can you go to No. 22?

2    Q.   Do you have any reason to believe that there was a --

3    there wasn't a wide range of history books like this at the

4    home?

5    A.   I do not recognize that book as being in the residence via

6    the photographs that I reviewed.

7    Q.   How about Exhibit 23?

8    A.   Same with this one.

9    Q.   24?

10          So I guess the point here is, Agent Caslen, you have

11   no reason to believe that there wasn't a wide array of books in

12   the home that was not Nazi related, correct?

13   A.   I'm sorry, could you repeat that?

14   Q.   You have no reason to believe after your review of the

15   case file and speaking with the searching agents of Mr. Young's

16   home that there was not a wide range of books in the home?

17   A.   I did not see a wide-ranging view of these books in any of

18   the photographs that were taken at the residence.

19   Q.   You don't dispute these were, these were found in the

20   residence, right?

21   A.   I do dispute it because I did not -- I was not there, so

22   I'm not, I'm not comfortable in saying that they were in the

23   residence.

24          MR. SMITH:  Your Honor, we have a stipulation from

25   the government that these documents -- these items were found

Caslen - Redirect                                                    1179

1   in Mr. Young's home at the time of the search of Mr. Young's

2   home.

3           THE COURT:  The government didn't object.

4           MR. KROMBERG:  We don't oppose it, but I think the

5   problem is that Special Agent Caslen doesn't have any --

6           THE COURT:  Right.

7           MR. KROMBERG:  He's not in on stipulations that the

8   prosecutors made.

9           THE COURT:  All right.  So these exhibits are

10  pictures of items that were found in the home, all right.

11          MR. KROMBERG:  Right.

12          MR. SMITH:  That's it, Your Honor.

13          THE COURT:  All right.  Any redirect?

14          MR. KROMBERG:  Very briefly, Judge.

15                      REDIRECT EXAMINATION

16  BY MR. KROMBERG:

17  Q.   Special Agent Caslen, based on your review of the pictures

18  of the search, location, and your conversations with the agents

19  that were there, what framed portraits of political leaders of

20  the 20th Century were found in the home?

21  A.   Only that of Adolf Hitler.

22  Q.   What uniforms --

23          MR. SMITH:  Objection.  403, and we move for a

24  mistrial again.

25          THE COURT:  No, I think you got into the whole issue

1180

1    about what was found in the home, and I've overruled the

2    objection.  Thank you.

3            MR. KROMBERG:  All right, we have nothing further.

4    Thank you, Judge.

5            THE COURT:  All right.  Agent, you may step down.

6                        (Witness excused.)

7            THE COURT:  All right, any further evidence from the

8    United States?

9            MR. KROMBERG:  No, but as I said, we do ask for leave

10   to go over the exhibit lists with the clerk and make sure that

11   we have properly moved in the things we ought to move in.

12           THE COURT:  All right.

13           MR. KROMBERG:  But otherwise, we are done.  We close.

14           THE COURT:  And we still have an issue about 10-600,

15   the summary?

16           MR. KROMBERG:  Oh, I'm sorry, yes.

17           THE COURT:  We'll discuss that outside the presence

18   of the jury.  All right.  All right --

19           MR. KROMBERG:  And, Judge, by the way, that's 16- --

20           THE COURT:  Is it 16-whatever?

21           MR. KROMBERG:  002.

22           THE COURT:  That's it, yeah.

23           All right, do you-all need to approach the bench?

24           (Bench conference on the record.)

25           THE COURT:  Who's making the motion?

1181

1           MR. SMITH:  Which motion?

2           THE COURT:  Do you want to make a Rule 29 motion?

3           MR. SMITH:  We would like the time to draft a motion.

4           THE COURT:  No, we make it right now at the bench.

5           MR. SMITH:  Oh, the Rule 29 motion?  We would --

6           THE COURT:  Are you moving for judgment as a matter

7   of law at this point?

8           MR. SMITH:  Only on the obstruction counts, Your

9   Honor, but we would like an opportunity --

10          THE COURT:  The obstruction counts were more than

11  adequately made because the government now got into evidence

12  that there was, in fact, a grand jury investigation going on,

13  and one can draw from the evidence in this case reasonable

14  inferences in favor of the government that the defendant knew

15  or had reason to believe that there would be an active

16  investigation against him.  So I'm overruling the objection.

17          Now, on Count 1, you're not making a motion?

18          MR. SMITH:  Yes, we're making a formal motion.

19          THE COURT:  And again, there's more than enough

20  evidence at this point, drawing all inferences in favor of the

21  government, the plaintiff -- sorry, that the defendant

22  attempted to provide material support to a designated foreign

23  terrorist organization.

24          So let's get on with your case.  Thank you.

25          MR. SMITH:  Your Honor, there's a couple more items,

1182

1    if we could address with the Court?

2           We would like to --

3           THE COURT:  Wait a minute.  All right, go ahead.

4           MR. SMITH:  Evan Turgeon raised several questions

5    about the description of the charges in this case, and he's --

6    we'd like --

7           THE COURT:  We're at the point now where we want your

8    case in, all right?  We need to get the evidence to the jury.

9           MS. MORENO:  Your Honor, we are going to rest.

10          THE COURT:  You're going to rest?

11          MS. MORENO:  We're going to rest.

12          THE COURT:  Right now?

13          MS. MORENO:  Yes.

14          THE COURT:  I need to have the defendant -- I need to

15   make sure.

16          MS. MORENO:  Of course.  I understand.

17          THE COURT:  I'm going to excuse the jury for lunch at

18   this point, all right?

19          MR. SMITH:  And what is the next step, Your Honor?

20          THE COURT:  I'm sorry?

21          MR. SMITH:  And what's the next step if the defense

22   rests?

23          THE COURT:  If the defense rests, the case is over.

24          MR. SMITH:  Right.

25          THE COURT:  The next step will be that we will do the

1183

1  final charging conference.

2          MS. MORENO:  We also have an issue on the verdict

3  form.

4          THE COURT:  That's fine.  We'll discuss the verdict

5  form.  We'll have our charging conference, and I guess we're

6  going to get the case to the jury this afternoon.

7          MR. SMITH:  Your Honor, we would request until

8  Monday.  There are several things we have to -- we need to --

9          THE COURT:  Oh, no, no.  When we finish this early,

10  we're five hours ahead of schedule, I'm not going to waste the

11  time to get the case to the jury this afternoon.  That's

12  wonderful.  There's no reason not to.

13         MR. SMITH:  Your Honor, we want to review the

14  evidence submitted in this case more than two hours before --

15  one agent just finished testifying.

16         THE COURT:  I don't know where you practice,

17  Mr. Smith; we don't work that way in this court.  We don't

18  waste the jury's -- waste civilians' time on something like

19  that.

20         No, I'm going to let the jury go to lunch.  We'll do

21  our charging conference.  I don't think I've yet seen the

22  verdict form, so I'm going to give everybody a 15-minute break

23  so you can think about the verdict form, and we'll talk.

24         MR. KROMBERG:  And we also have one additional

25  instruction that we wanted to propose.

1184

1    THE COURT:  We'll have to have a charging conference.
2  We need to look at this proposed verdict form.

3    Do you have the verdict form?

4    THE LAW CLERK:  No.

5    THE COURT:  You need to get a verdict form.  Do you
6  have an alternate verdict form you want to discuss?

7    MS. MORENO:  We have no objection to your verdict
8  form.  They've changed it.

9    THE COURT:  All right.  Okay.  All right.  So we're
10 going to let the jury go.  I'm going to give them longer than
11 normal for lunch because I want to make sure we don't have a
12 problem.  We have to get all this exhibit stuff in, too.  So
13 I'm going to give them until 1:30, all right?

14    MR. KROMBERG:  Thank you, Judge.

15    (End of bench conference.)

16    THE COURT:  All right, ladies and gentlemen, we
17 actually are so far ahead of schedule that all the evidence is
18 in.  So what I'm going to do now, because it takes us a while
19 to get the exhibits organized and to have the instructions put
20 together in a format that will be of assistance to you, I'm
21 going to give you actually until 1:30 for lunch.

22    And you don't have to stay in the building, although
23 it's not terribly nice out there.  It's cold, but I don't think
24 it's snowing yet.

25    But in any case, when you come back at 1:30, what we

1185

1  will have are the closing arguments, and I will give you the

2  instructions.  Whether there's enough time for you to get

3  started deliberating tonight, because I had said that we would

4  stop at five, although, frankly, if the whole jury wants to

5  stay later than five, we'll just keep the heat on, and we can

6  let you do that as well, but in any case, do not begin making

7  up your minds about any issue because you have not heard the

8  closing arguments, and you have not gotten the instructions

9  from the Court.

10         But we would like you back here at 1:30.  Thank you.

11  We're going to stay in session.

12                         (Jury out.)

13         THE COURT:  All right, so the first order of business

14  is, number one, Mr. Kromberg, if you have an additional

15  instruction you want the Court to be considering, was a copy

16  given to the defense?

17         MR. KROMBERG:  May I pass this matter for Mr. Turgeon

18  to speak about?

19         THE COURT:  If you'd hand it up to us, please?  Do

20  you have one for the Court?

21         MR. TURGEON:  Yes, Your Honor.  This is Government's

22  Proposed Jury Instruction No. 57.  We've provided a copy to

23  defense counsel.

24         THE COURT:  All right, I want one for my law clerk,

25  too, if you have an extra one.

1186

1   MR. TURGEON:  Excuse me, Your Honor?

2   THE CLERK:  Do you have some for my court reporter

3   and for my law clerk?

4   MR. TURGEON:  Yes, absolutely.

5   And this is a jury instruction with regard to venue,

6   Your Honor, with the citations at the bottom.

7   MR. SMITH:  Your Honor, we would just note we

8   received this instruction this morning.  We have had no

9   opportunity to conduct any research, and we object.

10  THE COURT:  I don't even know if I need this

11  instruction.  Do I really?  We've established that the grand

12  jury was convened in the Eastern District of Virginia.  Again,

13  there's no dispute about venue.

14  MR. TURGEON:  Your Honor, okay.  That's okay.

15  THE COURT:  Is there a dispute about venue?

16  MR. SMITH:  There actually is a dispute about venue,

17  Your Honor.

18  THE COURT:  Well, all right, at the lectern.  Let me

19  hear what the dispute is.

20  MR. SMITH:  Your Honor, if Your Honor has a copy of

21  the indictment, you can see that Count 4 concerns a text

22  message that was sent from one location to -- from Mr. Young's

23  phone to the phone owned by the informant Mo.

24  I'm not sure why the government has decided to

25  produce this instruction for venue.  We simply had a

1187

1   conversation with the government outside the courtroom that,

2   inquiring whether the government had evidence indicating the

3   text was sent from Virginia, as opposed to Washington, D.C.,

4   where Mr. Young is employed -- was employed.

5           So I assume that's what's prompting this venue

6   instruction, but I'm just noting for the record that we

7   received this draft instruction just now.  We've had no

8   opportunity to research this issue.  We would like an

9   opportunity because we think it could be a significant issue.

10          And, Your Honor, while we're on the subject of venue,

11  there's been some testimony in this case from Agent Sikorski

12  that he may have received the gift cards at issue in this

13  case -- Agent Sikorski was the agent who was in control of the

14  alias Mo's e-mail account in about July 2016, and there is some

15  testimony from Agent Sikorski that he wasn't sure whether he

16  received -- it was actually his, his phone that he was

17  e-mailing the defendant with.

18          He has -- I think he has a residence in Virginia and

19  D.C., or he's working in D.C. and has a residence, so he didn't

20  recall whether he received the text message in Washington,

21  D.C., or Virginia, the Google Play message, but we do know and

22  can establish that Mr. Young -- the phone from which the gift

23  cards were sent was in Washington, D.C., in L'Enfant Plaza,

24  when the gift cards were sent.

25          Now, if Your Honor looks at the venue provisions,

1188

1   there could be an issue here.  That is Count 1, so we are not

2   sure why Count 2 and Count 4 -- now, just to be completely

3   frank, Mr. Gibbs stood up during Agent Sikorski's testimony and

4   said, "Well, isn't it true that the gift cards were purchased

5   at a Best Buy in Virginia?"

6           We haven't had the opportunity to look at these

7   nuances yet, but there could be an issue with Counts 1 and 4.

8           THE COURT:  Well, we don't play -- we're not going to

9   take the jury's time up while everybody runs around and tries

10  to put the case together.  The case has moved faster than

11  expected, and everybody who practices in this court knows

12  that's how we proceed.  As I said, it's 12:10, and we have

13  plenty of time left in the day to get this case to the jury.

14  I'll give you, you know, you've got a bit longer lunch period

15  if you can find something on this.

16          I will look at the Instruction 57 and look at the

17  source the government has provided for it.  Normally, venue

18  does not become an issue, it does in some cases, but the grand

19  jury was impaneled and was working in the Eastern District of

20  Virginia, and my experience with these types of offenses is if

21  the obstruction was intended to affect a proceeding in a

22  particular venue, that is sufficient basis for venue.  I think

23  that's solid law.

24          There could also be venue in other jurisdictions as

25  well.  You know, in federal cases, there could be multiple

1189

1  venues, but as long -- and the government did establish that.

2  I was listening for it because at one point, I thought 2 and 4

3  might go, but they've got that evidence in the record now.

4        So I think I see no problem with this, and frankly, I

5  mean, I will give the instruction if the defense feels that

6  it's going to be an issue, but I wasn't planning to put a venue

7  instruction in the case.

8        MR. SMITH:  Thank you, Your Honor.  There's one more

9  housekeeping issue that --

10       THE COURT:  Yeah.

11       MR. SMITH:  Evan Turgeon raised a supplementary

12  verdict form in the hearing before --

13       THE COURT:  I still don't have a copy.  Somebody give

14  me a copy of it so I can see what we're talking about.

15       MR. SMITH:  I'll let him speak first.

16       MR. TURGEON:  Yes.  Your Honor, as I mentioned a

17  moment ago, the government presented evidence on two theories

18  of guilt for Count 1, the first line, preventing material

19  support by lying to the FBI to conceal the whereabouts of Mo,

20  and second, sending gift cards to Mo, preventing material

21  support in that way, and it's the government's position that

22  there's evidence in the record sufficient for the jury to find

23  guilt, that the defendant was guilty under either theory on

24  Count 1, but as the verdict form currently stands, if the

25  defendant is convicted, we won't know whether the jury found

1190

1    him guilty under one theory or the other theory or both.

2          And the special verdict form that I just handed up

3    essentially asks the jury to tell us that, tell us what they

4    found, and there are certainly, as the Court can imagine,

5    potential benefits down the road to that.

6          THE COURT:  It usually helps both sides.  It helps

7    the defense, too.  If the case does go to appeal, they have a

8    clearer picture as to how the jury saw the case.

9          MR. SMITH:  Your Honor, if I may?

10         THE COURT:  Yes, Mr. Smith.

11         MR. SMITH:  Thank you, Your Honor.  So if Your Honor

12   sees in the verdict form -- in the new verdict form that

13   Mr. Evan Turgeon is referencing, the first, the first comment

14   here is as to Count 1, attempting to provide material support

15   to a foreign terrorist organization by attempting to provide

16   misleading information.

17         Now, if Your Honor looks at Count 1 in the

18   indictment, you'll see that it's a charge under 18 U.S.C.

19   2339(b), 2339(b), but the theory of liability here is providing

20   misleading information.

21         Your Honor, we think at some point, the government

22   may have realized or will soon realize they used the wrong

23   statute to charge a misleading -- a deception, a concealment

24   crime concerning terrorism.  The correct statute is 18 U.S.C.

25   2339(a), and, Your Honor, we would just -- we can put this

1191

```
 1   orally on the record, we'd also like to brief this, but there's
 2   a couple of moving parts here.
 3              THE COURT:  The cleaner way of doing this is just to
 4   do the second paragraph as to Count 1 because this case is a
 5   gift card case.
 6              MR. SMITH:  Exactly.
 7              THE COURT:  That's cleaner and simpler, and if this
 8   jury doesn't find on that, they're not going to find on the
 9   other.  You've got the others covered in Counts 2 and 4, but I
10   think this unnecessarily complicates the jury's analysis of
11   this case, and I don't see any reason why it benefits anybody
12   in making it more complicated than is necessary.
13              MR. SMITH:  Thank you.
14              THE COURT:  So my intention is actually to use a
15   revised verdict form, but it would only be the last three
16   counts there.
17              MR. SMITH:  Why would it be revised, Your Honor, if
18   it's just the last -- I think that's what --
19              THE COURT:  We'd get rid of the first paragraph
20   entirely because we're not talking about the providing.
21              MR. SMITH:  Then I think the next three are just what
22   Your Honor proposed originally.
23              THE COURT:  It's even cleaner this way because it
24   tells you specifically it's the gift cards.
25              MR. SMITH:  I see.
```

1192

1     THE COURT:  And it doesn't open up the door for it

2  becoming mucky about the other aspect of it, all right?

3     MR. TURGEON:  Your Honor, if I may, it's the

4  government's position, and I think the evidence bears this out,

5  that there can be no entrapment as to the first theory of

6  liability here.  That is legally sufficient.  The evidence is

7  legally sufficient under that theory to prove the defendant

8  guilty, but there has been no evidence of inducement, that the

9  defendant was induced in any way to lie to the FBI because the

10  government didn't ask him to lie.  No one asked him to lie.

11     THE COURT:  Then you'll get him on Counts 2 and 4,

12  but Count 1 is a cleaner, easier count for the jury to

13  understand on the gift card issue, and I think that's a better

14  way of doing it.  In other words, my original -- the original

15  instruction was just the general is he guilty of Count 1, all

16  right?

17     MR. TURGEON:  Yes, Your Honor.  As long as the

18  Court --

19     THE COURT:  But the way you've parsed it makes me

20  think since you're worried about the first element, that it's

21  even easier and even more specific to say this is the

22  government's real theory of the case.  The essence of Count 1

23  is the providing the gift cards or gift card codes to Mo, and

24  Counts 2 and 4 have to do with the misleading of the FBI.

25     MR. TURGEON:  Misleading is certainly essential to

1193

1  Counts 2 and 4; however, the misleading is also part of Count
2  1, Your Honor.
3         THE COURT:  Well, I'm going to make this simple.  I'm
4  going with my instinct on this one.  So I'm going to take the
5  verdict form you've proposed, I'm striking the first paragraph.
6  So it's going to just be -- and we'll give it to you again, but
7  that's how it's going to go.  Okay?
8         MR. TURGEON:  Thank you.
9         THE COURT:  All right.  Let me give you a ten-minute
10 break so I can pull together the instructions, because we are a
11 little bit ahead of ourselves on this, and tell you exactly
12 what you're going to get.  We had a pretty good, I thought,
13 charging conference before the case even got started, and I
14 want to just go through it with you one more time so you know
15 what's in and what's out, all right?  So we'll be back in ten
16 minutes.
17        (Recess from 12:20 p.m., until 12:48 p.m.)
18              (Defendant present, Jury out.)
19        THE COURT:  All right.  Now, before we get started on
20 the other matters, I need to put this on the record.
21 Mr. Young, go up to the lectern, please.
22        Mr. Young, I just want to make sure that you had
23 enough time to discuss with your counsel your options of
24 testifying as a witness in the case or of not testifying.  Have
25 you had enough time to discuss that decision?

1194

```
1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  All right.  Because I do know that from

3   prior press releases, you indicated you wanted to testify.

4   It's your absolute right to testify in the trial as a witness.

5   Do you understand that?

6              THE DEFENDANT:  Understood, Your Honor.

7              THE COURT:  All right.  Now, I assume you have made

8   the decision not to testify; is that correct?

9              THE DEFENDANT:  That's correct, Your Honor.

10             THE COURT:  And have you made that decision after

11  consulting with counsel?

12             THE DEFENDANT:  That's correct.

13             THE COURT:  And are you making that of your own free

14  will?  In other words, are you comfortable making that

15  decision?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  All right.  Because I need to make sure

18  that that is a voluntary and knowing waiver of the right to

19  testify.

20             And you're satisfied that you've had enough time to

21  make this consideration?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  All right, that's fine.  You may have a

24  seat.

25             All right.  Now, the next thing we have to do to get
```

1195

1   this case ready to go to the jury is to make sure that all of

2   the exhibits are in, so what I normally have is my very, very

3   good courtroom deputy is going to read to you what her records

4   show are the exhibits that have been entered into evidence, and

5   before we do that, I had said yesterday -- again, I may

6   misremember what was said yesterday, but I thought the time

7   estimate that I had gotten from counsel -- and I would never

8   fault anybody for moving faster than expected, but I thought

9   the anticipation was that the evidence would go throughout most

10  of today, and that's why we said we would then probably finish

11  the case up on Monday.

12          Again, I'm not going to waste the jury's time.  Since

13  they're here, we're going to get this case to them today, but

14  that may have put both sides at a little bit of a surprise,

15  although I suspect the defense kind of knew they would have

16  time today.

17          Does the government have its exhibit list ready for

18  the jury?  In other words, I had said I wanted an index.  The

19  defense doesn't have very many, so that's not a problem, I

20  think, for the defense.

21          MR. TURGEON:  Your Honor, I have prepared a list that

22  will be ready for the jury, but we need maybe half an hour to

23  get that in final shape.

24          THE COURT:  The jury may not be able to start at

25  1:30.  You-all need to get lunch and a little bit of extra time

1196

1    to prepare, but anyway, all right, I'm aware of that.  Let's

2    keep moving then.

3            So Ms. Guyton is now going to read her list of what

4    she believes are the exhibits that have been entered into

5    evidence, and the government needs to let us know and the

6    defense need to let us know if, number one, there are any

7    exhibits the government feels they thought should be in but are

8    not in, and then, obviously, if the defense feels that there

9    are exhibits that we're recording as being in that they think

10   were not formally admitted.

11           This is not the time to renew objections.  It's just

12   a time to reflect what the record should be showing, all right?

13           THE CLERK:  Exhibit No. 1-100 to 1-107, 108, 109

14   through 1-115.  So 1-100 to 1-115.

15           MS. MORENO:  Excuse me, I'm so sorry to interrupt.

16   These are all in?

17           THE COURT:  These are in, yes.

18           THE CLERK:  1-116, 1-200 to 1-222, also 1-210A, 1-300

19   to 301, 302, 303, 304, 305, 306, 307, 308, 1-401, 402, 403,

20   404, 405, 406, 407, 408, 410, 600, 701, 702.

21           THE COURT:  Wait, wait.  Slow down.  That's 1-600,

22   correct?

23           THE CLERK:  Yes.  And then 2-101, 102, 103, 2-104,

24   105, 106, 107, 108, 109, 110, 111, 112, 2-116, 2-118, 119, 120,

25   121, 122, 123, 2-125, 126, 127, 128, 129, 130.

1197

1    3-101, 102, 103, 104, 105, 3-108, 109, 110, 3-115,

2    117, 117A, 118, 118-A, 119, 119-A, 120, 120-A, 3-125.  I

3    skipped 3-121.  3-100 also I skipped.

4    3-200, 3-202, 203, 204, 205, 206, 207, 208, 3-209,

5    210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221,

6    222, 223, 224, 225, 226, 3-300, 302.

7    4-101, 102, 104, 105, 106, 107, 108, 109, 4-200,

8    4-203, 4-300.

9    5-101-1, 101-1T, 101-2, 101-2T, 101-3, 101-3T, 101-4,

10   101-4T, 101-5, 101-5T, 101-6, 101-6T, 101-7, 101-7T, 5-102,

11   102-T, 5-301-1, 301-2, 301-3, 301T1, 301T2, 301T3.

12   6-101-2, 601-2T, 6-102-2, 6-102-2T, 6-103-2,

13   6-103-2T, 6-103-3, 103-3T, 6-103-5, 6-103-5T, 6-103-6, 103-6T.

14   103-7, 103-7T, 6-104-2, 104-2T, 104-3, 104-3T, 6-105-1, 105-1T,

15   6-106-4, 106-4T, 6-107-1, 107-1T, 6-108-1, 108-1T, 108-2,

16   108-2T, 6-109 -4, 109-4T, 109-5, 109-5T, 109-6, 109-6T,

17   6-110-1, 110-1T, 6-201, 202, 203.

18   7-101, 101-1, 101-2, 101-3, 7-102, 7-201A, 7-201C,

19   7-202A, 7-204A, 205A, 205B, 7-207A, 207B, 7-209A, 209B, 7-211A,

20   211B, 211C, 7-212-A, 212B, 7-213A, 213B, 214A, 7-216A.

21   8-101, 102, 103, 104, 8-106, 8-107, 8-108, 8-109,

22   8-112, 113, 114, 115, 8-500.

23   9-101, 102, 103, 104, 105, 106, 107, 108.

24   10-000, 10-100, 10-101A, 10-103, 10-203, 10-204,

25   10-205, 10-208.  10-220, page 1 and 2 only.  10-230, 10-231,

1198

1   10-232, 10-236, 10-237, 10-238, 10-240, and I also have

2   10-202T.  10-241, 10-252, 10-303, 10-304, 10-305, 10-305T,

3   10-620, 10-650, 10-700.  10-701, cover only.  10-706, redacted.

4   10-7- --

5           THE COURT:  Hold on a second.  With 706, has that

6   redaction been done so that that's in the original report

7   that's going to go to the jury?

8           MR. KROMBERG:  Judge, should it be redacted to go to

9   the jury or only in the public -- in the copy that is filed

10  with the Court?

11          THE COURT:  Can you pull 706 for me?  I want to see

12  what the --

13          THE COURT SECURITY OFFICER:  7?

14          THE COURT:  706 -- I'm sorry, 10-706.

15          MR. KROMBERG:  The ones that we have filed publicly

16  have been redacted, but the ones that Your Honor examined in

17  court at the motions hearing was unredacted.

18          THE COURT:  These are the ones going to the jury.

19          Now, I thought we decided with 706, this is the list

20  of the Panzer grenade?  The only thing that's relevant on this

21  exhibit is the Düsselkamp name.  Otherwise, it has the names of

22  other people, with their home phone numbers and their

23  addresses, which I don't think is proper to go to the jury.

24          So unless there's an objection from the defense, my

25  position would be to not even give page 2 because that doesn't

1199

1    have anything with the plaintiff.  With page 1, we can white

2    all out except for it's the fourth paragraph on the first

3    column.

4            Is there any objection from the defense to do it that

5    way?

6            MS. MORENO:  No objection.

7            MR. KROMBERG:  And also not white-out the top, the

8    heading.

9            THE COURT:  The heading would be there and the

10   filigree around the side, but I don't want these other people's

11   names and addresses going out, all right?  We'll show it to

12   defense counsel before it's done.  I'm going to give this to my

13   courtroom deputy now to hold on to, but we will be redacting

14   then 706.  That's what will go to the jury, and that's what

15   will be in the official court file should anybody ever look at

16   it, all right, because the evidence now does become available.

17   All right.

18           THE CLERK:  Next would be 10-714; 10-715, page 2

19   only; 10-806; 10-807; 10-810; 10-814; 10-818; 10-821; 10-822;

20   823; 824; 825; 826; 827; 10-850; 10-860; 10-861; 10-863;

21   10-903.

22           11-220, 11-400, 11-401, 11-600.  I also have 11-202A.

23           12-001, 002, 003, 004, 005, 006, 007, 008, 009, 010,

24   011, 012, 013, 014, 015, 018, 019, 020, 021, 022, 027, 028,

25   029, 031, 032, 033, 034, 035, 036, 037, 038, 039, 040, 041,

1200

1    042.

2              13-101, 13-102, 13-103, 13-104, 13-105.

3              14-100, 14-101, 14-102, 14-103, 14-104, 14-105,

4    14-119, 14-140, 14-141, 14-180.

5              15-201.  16-000, revised version.  16-001, 16-101,

6    16-102, 16-103, 16-105, 16-106, 16-401, 16-402, and 18-100.

7              THE COURT:  I didn't hear the last one.  One zero --

8              THE CLERK:  I'm sorry?

9              THE COURT:  What's the 18?

10             THE CLERK:  100.

11             THE COURT:  Okay.  And then just for the record, the

12   defense exhibits that are in evidence, let's read those.

13             THE CLERK:  Defense exhibits are 2, 3, 4, 5, 6, 7, 8,

14   14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24.

15             MR. SMITH:  Your Honor?

16             THE COURT:  Yes.

17             MR. SMITH:  A couple of days ago, Your Honor

18   requested that we clean up the recordings we attempted to play

19   for the jury and then put them on one disc in a clip format, so

20   what we have done, we've notified the government of this a

21   couple days ago, is we've created Defense Exhibit 1, which is a

22   DVD with files from the recordings we attempted to play during

23   the testimony of the CHS Mo.

24             The dates of those recordings are May 31, 2014;

25   August 10, 2014; September 11, 2014; October 10, 2014; October

1201

1    16, 2014; October 17, 2014; and October 24, 2014.

2            Now, that sounds like a lot of dates, but actually,

3    the number of clips from each day is very limited, so I would

4    estimate that the total number of recorded minutes for the sum

5    of those days is probably on the order of 10 to 15 minutes.

6            THE COURT:  Those are the ones that were played in

7    court?

8            MR. SMITH:  Correct.

9            THE COURT:  All right.  Is the government satisfied

10   with that?

11           MR. KROMBERG:  Yes, Your Honor.

12           THE COURT:  All right, that's fine.  So Defense

13   Exhibit 1 is in evidence.

14           (Defendant's Exhibit No. 1 was received in evidence.)

15           THE COURT:  All right, so we'll need to hand that to

16   the court security officer.

17           Yes, Mr. Kromberg?

18           MR. KROMBERG:  Judge, our list is 99.9 percent the

19   same, but we have 7-201B, as in --

20           THE COURT:  All right, hold on.  You have 7-201B, as

21   in boy?

22           MR. KROMBERG:  Correct, and 7-201D, as in David.

23           THE COURT:  Let me take a look at them.  Which

24   witness would have put those in?

25           MR. KROMBERG:  That would have been Mr. Siegfried.

1202

1    This was FedEx still photos.

2              I'm sorry, Judge, Agent Caslen advised me that might

3    have been during Mo's testimony, but this is the still photos

4    of the 10 -- October 25 --

5              THE COURT:  Wait, I'm sorry, 7-20 what?

6              MR. KROMBERG:  201B, as in boy, and D, as in David.

7              THE COURT:  Well, in Siegfried's testimony, I had

8    202A through 216A going in.

9              MR. KROMBERG:  Yes.  And --

10             THE COURT:  Well, he may also have them in.  I

11   definitely have a marking that with Siegfried, they were

12   already in.  And I have Exhibits -- and my courtroom deputy is

13   correct -- also with Mo, I have 7-201A and I have 7-201C going

14   in with Mo at that point in his testimony.

15             But is there any objection to those in case for some

16   technical reason they weren't formally moved?  They were

17   certainly discussed.  Is there any objection?

18             MR. SMITH:  Your Honor, Ms. Moreno has the exhibit

19   list, so I'm not --

20             THE COURT:  All right.

21             MS. MORENO:  I'm so sorry, Your Honor, I was

22   distracted.

23             THE COURT:  That's all right.  We're talking about

24   two of the FedEx pictures.

25             MS. MORENO:  Yes.  No objection.

1203

1    THE COURT:  No objection?  All right, those two are
2  in.
3    (Government's Exhibit Nos. 7-201B and 7-201D were
4  received in evidence.)
5    MR. KROMBERG:  Thank you, Your Honor.
6    Now, on our list, we had the *Miranda* warning form
7  5-302, and I remember it was under discussion --
8    THE COURT:  I don't think it was necessary because
9  there was no issue about that, so that's out.
10   MR. KROMBERG:  That's fine.  Okay.  The two others
11 that came in, I believe, during Khalil's testimony -- I
12 shouldn't say two; one -- 11-500, and that was matched to
13 Government Exhibit 12-17, which is a stipulation for 11-500.
14   THE COURT:  Hold on a second.  11-500 is in.
15   MR. KROMBERG:  And 12-17 is the stipulation that
16 describes --
17   THE COURT:  There's no objection to the stipulations
18 being --
19   MR. KROMBERG:  Oh, okay.
20   THE COURT:  Is there?  I want to hear from the
21 defense.
22   MR. KROMBERG:  I'm sorry, I was confused.  12-17 is
23 in.  I wrote it on my note to let you know that 12-17 was in
24 about 11-500, but since it's in, that problem is solved.
25   THE COURT:  All right.  First of all, was there

1204

1 any -- we normally send the stipulations to the jury.  Is there

2 any issue from the defense about that?

3          MS. MORENO:  Our list shows that 11-500 is in as

4 well.

5          THE COURT:  Yeah.  So 11-500 is definitely in.

6          MR. KROMBERG:  And Government Exhibit 10-903 is in,

7 but there's a stipulation that states what it was, and I, I

8 must have forgotten to read the stipulation.  Stipulation

9 No. 24, which refers to Government Exhibit 10-903 as having

10 been found by FBI on a CD found in the course of searching the

11 residence of defendant Nicholas Young in August 2016.  And

12 that's Government Exhibit 12-24.

13          THE COURT:  Is there any objection to 12-24 going in?

14 Again, we normally let all of the stipulations go to the jury.

15          MS. MORENO:  12-24 is a stipulation?

16          THE COURT:  Yes.

17          MR. KROMBERG:  Well, Government -- Stipulation No. 24

18 is Government Exhibit 12-24.

19          THE COURT:  The 12 series are your stipulations,

20 correct, Mr. Kromberg?

21          MR. KROMBERG:  Yes, Your Honor.

22          MS. MORENO:  That's fine.

23          THE COURT:  Is there -- there's no objection?  All

24 right, that's fine.  That's in.

25          (Government's Exhibit No. 12-24 was received in

1205

1  evidence.)

2          MR. KROMBERG:  And all of the rest that we have are

3  the ones that the Court has.

4          THE COURT:  All right.  Well, the only issue, though,

5  that I don't think is yet totally resolved is that summary

6  exhibit.  I've not seen the revised one.

7          Has the defense received a copy of that?

8          MR. SMITH:  You're referring to the final Government

9  Exhibit 16-000 that --

10         THE COURT:  Correct.

11         MR. SMITH:  -- that was created on December 14 at

12  10:14 p.m.?

13         THE COURT:  Yes.

14         MR. SMITH:  Yes, we have received it, and we object

15  to its inclusion in evidence.

16         THE COURT:  All right, let me take a look at it.

17         MR. TURGEON:  Your Honor, the only -- for Your

18  Honor's reference, the only change in that from the copy Your

19  Honor has -- does Your Honor have a copy of this?

20         THE COURT:  Did you give me the revised one?  I have

21  the old one.

22         MR. TURGEON:  Here's the one from today.  Thank you.

23         The only difference other than the highlighting will

24  be removed from the final version and there's one entry that

25  will be taken out that I'm trying to find -- Your Honor, I

1206

1  believe the entry that will be taken out is the one that I

2  marked on your copy with an X, to the left of the highlighted

3  entry that's coming out, and that is -- and that is on page 4,

4  the entry for November 2, 2010, because I don't believe that

5  was admitted into evidence.

6          MR. SMITH:  And, Your Honor, however the Court rules,

7  we'd just like to note the particular subject matter of our

8  objection on the record.

9          THE COURT:  Go ahead.  Let me hear your objection.

10         MR. SMITH:  Okay.  So there's a couple of things we

11 object to here.  We don't dispute that this is a useful aid for

12 Agent Caslen's testimony.  It was very useful, including to the

13 defense, but the -- to introduce this into evidence creates a

14 misleading impression in the jury's mind possibly that this is

15 reflective of every activity Mr. Young has conducted in this

16 period, and it's just prejudicial after prejudicial after

17 prejudicial item.

18         You can see that it's in chronological order, so it

19 creates this view that is distorted.  It creates a kind of

20 selective, narrow view of what Mr. Young was doing during that

21 period, when if Your Honor looks at the dates, it's all

22 cherry-picked.

23         If you see that the dates in December 2007, almost

24 all of the, you know, the vast majority of the government's

25 predisposition evidence before 2010 was downloaded on the same

1207

1  day, Your Honor, so we think it's misleading.

2          The second objection we have is that some of the

3  highlighted additions to it include visits to Muslim countries.

4  To the extent this is being used to suggest a predisposition to

5  support terrorism, I don't know what, what sort of

6  constitutional question you want to raise here.

7          THE COURT:  I can shorten your argument.  This to me

8  would be like letting Agent Caslen's testimony be in the jury

9  room, which we don't do.  It's far too detailed.  It speaks too

10  much as if he were in the witness -- in the jury room speaking

11  the case to the jury.  The jury has to rely on their own

12  memory.

13          Had this been less detailed, just a more general, a

14  few blocks, I think it would be helpful to the jury, but it's

15  way too detailed.  It does include information, you know, it

16  has the exhibit number, the witness name.  It's basically

17  putting a government witness in the jury room.

18          I'm going to sustain the objection, and this exhibit

19  will not go in.

20          MR. SMITH:  Thank you, Your Honor.

21          THE COURT:  All right?  It was very helpful,

22  Mr. Kromberg, but it's too much for the jury.

23          MS. MORENO:  Your Honor?

24          THE COURT:  All right, yes, ma'am.

25          MS. MORENO:  There is one final defense exhibit that

1208

1    I've discussed with the government.

2              THE COURT:  All right.

3              MS. MORENO:  It's a photograph of Mr. Young with his

4    father on the day -- it's up on the screen now -- that he

5    graduated from the Police Academy.  We failed to introduce that

6    through any of the witnesses; however, the government is not

7    objecting to that; and if we need to reopen just to admit that,

8    we can do that.

9              THE COURT:  No.  Of course, you may have that in.

10   And what number are we putting on that?

11             MS. MORENO:  It would be Defense Exhibit No. 25, I

12   believe.

13             THE COURT:  25?

14             MS. MORENO:  Next in line.  25.

15             THE COURT:  Yes, 25.  All right.

16             (Defendant's Exhibit No. 25 was received in

17   evidence.)

18             THE COURT:  Now, is that -- is there a hard copy of

19   that in the folders yet?

20             MS. MORENO:  Is there a hard copy?

21             THE COURT:  Do you have a hard copy of it?

22             MR. SMITH:  No, we're publishing it.  We're just

23   publishing it on the screen.

24             THE COURT:  Well, I know, but how is the jury going

25   to see it?

1209

1    MR. SMITH:  The jury can --

2    THE COURT:  They're not going to be able to take it

3  back with them.

4    MS. MORENO:  It's going to be used during closing,

5  Your Honor.

6    MR. SMITH:  It's just a demonstrative for closing,

7  Your Honor.

8    THE COURT:  But you want the jury to have it as --

9    MR. SMITH:  We can, we can have it printed out.  Our

10  paralegal can have it printed out immediately.

11    THE COURT:  All right, you need to have it printed

12  out so when the evidence goes to the jury, they have it with

13  all of your other exhibits.  Other than the audiotapes, all of

14  your exhibits should be in hard copy so they'll go back with

15  the jury.

16    MR. SMITH:  All of the other exhibits are in hard

17  copy.

18    THE COURT:  All right, that's fine.  So we don't need

19  to reopen the case for that.

20    All right, in terms of the verdict form, I'm not sure

21  if we have a copy of that for you at this point or not.  The

22  verdict form is going to be, there should be no surprises on

23  it.  As I said, we've taken off the first paragraph that the

24  government had on their proposed one, so it's just going to be

25  the second, third -- what I'm calling second, third, and fourth

1210

1   paragraphs, all right?

2            In terms of the, of the jury charge, as I said, I

3   thought we had a pretty valuable pretrial charge, and not much

4   has changed during the case.  So let me tell you what I've

5   given you in terms of the Court's proposed final charge.

6            The first group of instructions that you've got there

7   are what I would call essentially boilerplate instructions.

8   They are mirror images of what the government had submitted in

9   their early instructions for which there was no objection,

10  other than Instruction No. 11, which is on page 12 of your

11  packet.  The defense did object to an instruction telling the

12  jury that the government's use of undercover agents and

13  informants is not a problem.

14           That's a standard instruction we've given before in

15  this type of case.  It is proper to give that to the jury, and

16  so I'm not -- I'm overruling that objection.

17           Now, since I've -- since I just struck 16-000, I'm

18  not even sure we need a demonstrative exhibit instruction --

19           MR. KROMBERG:  That's correct.

20           THE COURT:  -- because there are no other

21  demonstrative exhibits in this record; is that correct?

22           MR. SMITH:  Correct.

23           THE COURT:  All right.  I'm therefore going to remove

24  10, so you can remove 10 from your packet, all right?  And

25  we'll renumber these at some point.  Okay.

1211

1       MR. SMITH:  Did Your Honor say we will renumber them?

2       THE COURT:  I will renumber them because I eventually

3  give them to the jury after I've instructed them.  But 11 is

4  staying in because that is correct.

5       Now, in terms of the expert witness instruction, I

6  believe the government had a line in there about whether

7  there's other expert testimony that might be contradictory.

8  There was only one expert in the case, so we edited that

9  instruction, so that's not in there.

10       I gave my standard law enforcement witness

11  instruction, which is 14.

12       I went ahead and included an interest in outcome.  I

13  can take that out.  I don't know if that was in the

14  government's original instruction, but sometimes defense like

15  that in because either the informants, because you had the

16  issue about getting paid for successful whatever, I can take it

17  out because it wasn't within the government's group.  So let me

18  know if you want that in or out.

19       MR. SMITH:  Your Honor, we're fine with it.

20       THE COURT:  You're fine with that?

21       MS. MORENO:  Yeah.

22       THE COURT:  All right, we'll keep that in.

23       Instruction 18, inconsistent statement, that's a

24  pretty standard instruction, and there were inconsistent

25  statements here, so I'm leaving that in.

1212

1    And with 19, I will give B.  That's the alternative

2  instruction as to whether a defendant testifies or not.

3    Are you satisfied with that instruction, 19B?

4    MR. SMITH:  We're satisfied.

5    THE COURT:  All right.  On 20 is a general law about,

6  about the indictment, that it's not evidence, only the offense

7  charged, and each count gets considered separately.  Those

8  again are standard.  No objection?

9    MR. SMITH:  No objection.

10    THE COURT:  All right.  On or about, that's again a

11  standard instruction.  There shouldn't be any dispute about

12  that.

13    The explanation of disjunctive proof, which some day

14  we've got to get that figured out because it's terrible, but

15  that's a standard one.

16    Now, I decided since we have "attempt" running

17  through all three counts, that there ought to be a general

18  introduction to "attempt" before we even get into the counts.

19  So Instruction 23 is different only in structure, not in

20  content.

21    So it reads:  In Count 1, Nicholas Young is charged

22  with attempting to provide material support or resources to a

23  foreign terrorist organization.  In Counts 2 and 4, he's

24  charged with attempting to obstruct justice.

25    Then I'm defining "attempt."  An attempt means the

1213

1  defendant did some act that under the circumstances as he

2  believed them to be, which is language which the defense wanted

3  the Court to add, was a substantial step toward the commission

4  of the substantive crime.  For example, to show that Nicholas

5  Young is guilty of the offense charged in Count 1, the

6  government must prove beyond a reasonable doubt that he did

7  some act that, under the circumstances as he believed them to

8  be, was a substantial step toward the commission of a crime of

9  providing material support or resources to a foreign terrorist

10  organization.

11          MR. SMITH:  Correct.

12          THE COURT:  That incorporates your language.

13          And then the substantial step is defined.  There's a

14  little repetition here because when I go through the elements

15  for Count 1, some of that's repeated, but anyway, there was no

16  objection to what is now 24.  That is the nature of the

17  offense.

18          The fact that there's a -- that the government

19  added "as that term is defined" I don't think is a problem even

20  though the defense doesn't like it because we have the

21  definition further down.

22          Instruction 25, there was no objection to that.

23          MR. SMITH:  Your Honor, may I make one point before

24  the jury returns at 1:30?

25          THE COURT:  Yes.

1214

1    MR. SMITH:  So counsel haven't had a chance to eat

2  lunch or use the restroom since the Court just --

3    THE COURT:  Do you need a five-minute bathroom break?

4  We're going to -- we're going to break.  I'm going to give you

5  time to get a little bit of lunch, not a full hour, and to --

6  but if you need a break this morning, we'll take a break right

7  now.

8    MR. SMITH:  Not at this moment but when the jury

9  comes back at 1:30.

10    THE COURT:  We're going to tell them at 1:30 that

11  we're not ready and they'll get another half-hour.

12    MR. SMITH:  Thank you.

13    THE COURT:  So the statute, there's no issue about

14  that.  Then we go through the elements, and I don't recall that

15  there's any real dispute about the elements as the government

16  has laid them out here.

17    The first element for Count 1 is that the defendant

18  knowingly and intentionally attempted to provide material

19  support or resources to a designated foreign terrorist

20  organization; and two, that the defendant knew that ISIL, also

21  known as ISIS and the Islamic State, was a designated foreign

22  terrorist organization or had engaged or was engaging in

23  terrorist activity or terrorism; and three, that the defendant

24  did some act that was a substantial step in an effort to

25  provide material support or resources to ISIL, also known as

1215

1    ISIS or the Islamic State.

2              And then I redefine the substantial step.

3              MR. SMITH:  No objection, Your Honor.

4              THE COURT:  All right.  Then I'm giving the

5    government's proposed instruction on foreign terrorist

6    organization, and the defense does object, but I'm finding

7    based on the evidence in the record that I am going to instruct

8    the jury that on May 2014, the Secretary of State amended the

9    designation, etc.  In other words, I am going to basically

10   indicate that.

11             MR. SMITH:  And, Your Honor, we just object.  This

12   instruction appears to go further than what the government

13   originally requested, which I believe in the government's

14   original --

15             THE COURT:  Mr. Smith?

16             MR. SMITH:  The government's original instruction, it

17   said that al Qaeda in Iraq was designated by the Secretary of

18   State on October 15, 2004, as a foreign terrorist organization

19   and that the ISIS name was added as an alias in May of -- oh,

20   it says here:  I instruct you that in May of 2014, the

21   Secretary of State amended the designation to add the

22   alias . . . as the primary name of this . . . and added the

23   following . . . .

24             Okay.  And Your Honor is ruling on the basis of

25   Dr. Gartenstein-Ross's testimony?

1216

1    THE COURT:  Plus the Federal Register, all right?

2    MR. SMITH:  Okay.

3    THE COURT:  All right?

4    MR. SMITH:  Thank you, Your Honor.

5    THE COURT:  All right.  Then in terms of material

6  support, I think I may have told you yesterday, but I took out

7  some of the categories because they're absolutely unrelated to

8  this case, and there's no sense having them there.  Again, it's

9  not meant to be a primer on the law of terrorism.  It's meant

10 to be the law that they need to decide the case.

11    I did add at the defendant's request, although again,

12 I don't really think it's needed here, but the training and the

13 expert advice or assistance.

14    MR. SMITH:  Your Honor, we added those originally,

15 just in case the Court is curious, because we understood that

16 the government was going to attempt to charge a misleading

17 statement under Count 1 and that they charged the wrong

18 statute.  They should have used 2339(a).

19    So I included these to -- I included these to cover

20 the scenario where they would realize they would, you know,

21 they were trying to use 2339(b) and they would have to use the

22 assistance --

23    THE COURT:  Well, I think the training and expert

24 advice ought not to go to the jury.  I mean, I think it's

25 adding extraneous information.

1217

1    MR. KROMBERG:  We have no issue with -- we're fine

2  with it not going to the jury.

3    MR. SMITH:  We're fine with it as well.

4    THE COURT:  All right.  Then just so you know, we'll

5  give you a revised 28, but it will have the last two paragraphs

6  out, all right?

7    And for that matter, let's look at the rest of the

8  terms.  I mean, what's involved in this case is property,

9  intangible or tangible, including currency or monetary

10 instruments.  I think "training" should come out of that first

11 paragraph.

12   MR. SMITH:  No objection.

13   THE COURT:  What about from the government?

14   MR. KROMBERG:  No objection, Judge.

15   THE COURT:  All right.

16   MR. KROMBERG:  We never said this was a training

17 case.

18   THE COURT:  Right.  Expert advice or assistance?

19   MR. KROMBERG:  No.

20   THE COURT:  You-all agree with that?

21   MR. SMITH:  Agreed.

22   THE COURT:  It comes out.  Okay.

23   Communications equipment?  Arguably, the --

24 arguably -- I don't know how the government wants to put that.

25 I mean, the cards were --

1218

1    MR. KROMBERG:  It was communications equipment and
2  facilities, but it's not really what we're focused on, but it
3  is covered.
4    THE COURT:  It's the currency or monetary
5  instruments.  It's the cards --
6    MR. SMITH:  Yeah.
7    THE COURT:  -- it seems to me.
8    Yeah, I'm going to -- or personnel.  So how that
9  instruction is going to read then is:  The term "material
10  support or resources" includes any property, tangible or
11  intangible, or service, including currency or monetary
12  instruments.
13    MR. KROMBERG:  Judge, I think it should also be
14  personnel, though, because --
15    THE COURT:  Because using them to recruit.
16    MR. KROMBERG:  Correct.
17    THE COURT:  Or personnel, all right.  Other than
18  that, any objection?
19    MR. KROMBERG:  No objection, Judge.
20    THE COURT:  How about from the defense?
21    MR. SMITH:  We object to personnel.
22    THE COURT:  All right.  I'll leave it in, though,
23  because that was sort of the explanation as to why the cards
24  were needed, all right?  But that's all that one is going to
25  read as, all right?  All right.

1219

1          Then I believe --

2          MR. KROMBERG:  If Your Honor is looking at one that

3     says "provision of personnel" --

4          THE COURT:  Yeah.

5          MR. KROMBERG:  -- fine, we withdraw that.  Not

6     necessary.

7          THE COURT:  Let's take 29 out entirely.  Any --

8          MR. SMITH:  No objection.

9          THE COURT:  All right, that's out.  Okay.

10         All right, then I don't believe there was any

11    objection to how the government proposed the nature of the

12    offense for Count 2 and Count 4.

13         The definition in the statute, which is Instruction

14    32, there was no objection to that.  And I don't -- I think I

15    actually changed what the government had for the elements

16    because the first element should be that defendant unlawfully

17    and knowingly attempted to obstruct, influence -- I know how I

18    did it.  You had the -- your instruction originally had the

19    substantive offense or attempted to do it, and I decided why

20    put it that way?  So I've made it more direct.

21         If you compare it to what the government originally

22    submitted, which is --

23         MR. SMITH:  No objection, Your Honor.

24         THE COURT:  All right, so that's how 33 will go in.

25         Then factual impossibility is a correct statement of

1220

1    the law.

2           MR. SMITH:  Oh, actually, you know what?  Your Honor,

3    can we take one step back?  I didn't understand Your Honor's

4    point, but I just did.  So on Instruction No. 33 --

5           THE COURT:  Correct.

6           MR. SMITH:  -- I believe Your Honor ruled in the

7    charging conference that we had before the trial that the Court

8    was going to indicate that an FBI investigation is not an

9    official proceeding.

10          THE COURT:  Yeah, but we've got the grand jury in

11   here now.  I'm taking out the FBI business entirely.  That's

12   not in this instruction, though.

13          MR. SMITH:  But if the government attempts to prove

14   its case through the FBI investigation --

15          THE COURT:  But they're not, I don't believe.

16   They've got the grand -- because among other things, they've

17   clearly established there was a grand jury investigation.

18          MR. SMITH:  I believe their position is it's either.

19   I believe their position is it could be either an FBI

20   investigation or the grand jury.

21          MR. KROMBERG:  Your Honor, theoretically, we don't

22   want to waive the argument that in another case, there might be

23   a possibility of an FBI investigation.  In this case, there was

24   a grand jury investigation.

25          THE COURT:  I'm not taking -- the point is I'm not

1221

1  taking judicial notice that an FBI investigation --

2          MR. KROMBERG:  And that's fine.

3          THE COURT:  -- qualifies.

4          MR. KROMBERG:  It's not necessary in this case.

5          MR. SMITH:  And, Your Honor, here's why it should

6  become important whether we clarify in the instruction whether

7  an FBI investigation is an official proceeding:  Agent Caslen

8  just testified about some occasions in which Mr. Young gave an

9  indication he might have been under surveillance or under

10 investigation.

11         If an FBI investigation is separate in an official

12 proceeding category from a grand jury investigation, it's

13 easier for the --

14         THE COURT:  Let me stop you.  You're talking about

15 the wrong instruction.  This instruction is not your problem.

16 Your problem is 35.  So let's just take it one instruction at a

17 time.

18         MR. SMITH:  Okay.

19         THE COURT:  All I, all I want to make sure is

20 everybody is comfortable with 33 because I changed the literal

21 way in which the government presented 33 by putting "attempt"

22 first.

23         MR. SMITH:  No objection.

24         THE COURT:  All right.  And the government --

25         MR. KROMBERG:  That's fine.

1222

1    THE COURT:  All right.  Then 34 addresses the fact

2  that -- factual impossibility is not a defense, which is a

3  correct statement of the law.

4    35 has the definition of "official proceeding," and

5  there I'm taking it right from the statute.  You can't go wrong

6  on that.  That's what the statute says, and that's all we're

7  going to say.  You-all can argue to the jury however you want

8  to argue the case, but that's the law.

9    MR. SMITH:  Okay.  With respect --

10    THE COURT:  And if the jury -- now, if the jury comes

11  in with a question, we'll have to address it down the road, all

12  right?  If they say, well, is an FBI investigation alone

13  sufficient, then I'm going to have to wrestle with it because I

14  told you I thought the Ninth Circuit case was pretty strong on

15  this, but the bottom line is this is a direct quote from the

16  statute, so it cannot be a misstatement of the law.

17    MR. SMITH:  Your Honor, we understand the Court's

18  ruling.  We're just pro forma filing an objection to the extent

19  that we might not understand when the jury gets the question,

20  whether it's finding an official proceeding on an FBI

21  investigation or grand jury, we will not know, so the purpose

22  of the instruction would be to avoid the scenario where --

23    THE COURT:  All right.  I understand your position,

24  but I'm -- all right.

25    All right, the official proceeding need not be

1223

1  pending.  Again, I'm not even sure you need that since there's

2  no dispute in this evidence that there was an official

3  proceeding, that is, the grand jury.

4          MR. KROMBERG:  That is true.  We withdraw it.

5          THE COURT:  Is there any objection to that being

6  withdrawn?

7          MR. SMITH:  No objection.

8          THE COURT:  All right, so 36 is out.  We'll kill a

9  few fewer trees this way, all right.

10         Obstruction need not be successful.  That again is a

11  correct statement of the law.  I assume there's no objection to

12  37.

13         MR. SMITH:  No objection.

14         THE COURT:  All right.  38, that's a standard

15  definition of "corruptly."  Is there any issue with that?  I

16  don't think there was.

17         MR. SMITH:  No objection.

18         THE COURT:  All right.  39, knowingly, that's a

19  standard instruction.

20         MR. KROMBERG:  Judge, I lost track.

21         THE COURT:  Yeah.

22         MR. KROMBERG:  What instruction is No. 39?

23         THE COURT:  38 is corruptly.

24         MR. KROMBERG:  Okay.

25         THE COURT:  Now, we gave you a copy of what we're

1224

```
 1  going to do.  You're probably reading from your original
 2  instructions.
 3              MR. KROMBERG:  That's right.  I'm mostly following
 4  along, but I lost you at that point.
 5              THE COURT:  Okay.  Because the order in which you
 6  gave me your instructions didn't always in my view make logical
 7  sense, all right?
 8              All right.  Now, the 39 again is the standard
 9  knowingly instruction.  Is there any issue about that?
10              MR. SMITH:  No, Your Honor.
11              THE COURT:  All right.  And 40, the willfully
12  instruction, any dispute about that?
13              MR. KROMBERG:  Which one is 40, Judge?
14              MR. SMITH:  Willfully.
15              THE COURT:  Willfully.
16              You do have a set.  We gave you a set.
17              MR. TURGEON:  We don't, Your Honor.
18              THE COURT:  Sean, did we not give them?
19              THE LAW CLERK:  They definitely have a set there.
20              THE COURT:  You do.
21              MR. KROMBERG:  Oh, this makes it easier.
22              THE COURT:  Yeah.  All right, there's no problem with
23  40?
24              MR. SMITH:  No objection.
25              THE COURT:  All right.  These are new numbers.  41
```

1225

1   again is standard right out of the instruction books.  Proof of

2   knowledge or intent?

3              MR. SMITH:  Just to clarify, by instruction books,

4   Your Honor means the Fourth Circuit standard jury instructions?

5              THE COURT:  They've been used a million times and

6   never been reversed, never been questioned.  They're either

7   coming -- most of them come out from O'Malley, some of them

8   come out from Sand's, and they've all been -- these are

9   standard instructions.

10             MR. SMITH:  No objection.

11             THE COURT:  I'm not sure we need motive.  It's never

12  really been argued in this case.  Sometimes it goes in;

13  sometimes it doesn't.  Does anybody care about motive?

14             MR. KROMBERG:  I do, Judge.  The reason, if the

15  defense is sort of --

16             THE COURT:  Acting out of friendship?

17             MR. KROMBERG:  *The Washington Post* defense that was

18  floated in *The Washington Post*, if the closing argument is

19  that, well, he did it not because he was trying to support ISIS

20  but he was doing it because he was, wanted to help a friend --

21             THE COURT:  All right.

22             MR. KROMBERG:  -- I think it does --

23             THE COURT:  It is -- this is the standard

24  instruction, so the language in here is not a problem.  Do you

25  agree with giving it or not giving it?

1226

1     MR. SMITH:  Does the government take -- just to

2  clarify Mr. Kromberg's comment, does the government take the

3  position that it is a defense to the charge, Count 1 charge

4  that if Mr. Young had provided gift cards to the informant Mo

5  for the reason that he was his friend and not to support ISIS,

6  that is a defense to charge 1?

7     THE COURT:  A good motive doesn't excuse you from

8  committing a crime.

9     MR. SMITH:  Correct, Your Honor, but I understood

10  Mr. Kromberg to be saying that -- Mr. Kromberg referenced the

11  defense of indicating the gift cards had been sent to Mo

12  because he was his friend and not because he was in ISIS.

13     THE COURT:  In any case, we don't know what your

14  closing argument is going to be, so I could also hold this in

15  abeyance, but I think motive probably is not an improper

16  instruction to give in this case.

17     MR. KROMBERG:  I agree, so that in case that's what

18  the defense argument is, the jury will be properly instructed.

19     THE COURT:  All right.

20     MR. SMITH:  No objection.

21     THE COURT:  All right.  Now, the entrapment defense,

22  again, I've refined that, because that's why I asked you the

23  question earlier.  So the defense -- the defendant asserts as

24  to Count 1 that he was a victim of entrapment.  An entrapment

25  defense has two elements, and the elements, there's no dispute

1227

1  about those, but there's no entrapment defense as to Counts 2

2  and 4.

3          Everybody agree about that?

4          MR. SMITH:  Agreed, Your Honor.

5          THE COURT:  All right.  I think the instructions

6  you'll need to look at the most carefully are the entrapment

7  instructions.  The entrapment analysis, I think, is a correct

8  statement.  It's very close if not exactly what the government

9  did.  I can't recall now whether we made any changes to it.

10         And the only objection the defense had, as I recall

11 our earlier conference, about inducement is you didn't want

12 terms defined until the jury asked for it, and as I told you

13 back then and I'm not changing my position on this, you give

14 the jury as many definitions as you think they may need to

15 understand the case, and I don't recall there being any dispute

16 about the actual language of the explanation of what inducement

17 is.

18         And the next instruction, which is 46, is

19 predisposition.

20         MR. SMITH:  The next instruction is 45, Your Honor,

21 inducement?

22         THE COURT:  45 is inducement, is a definition of

23 "inducement."

24         MR. SMITH:  So we do object to this, but we've

25 already stated our reasons.

1228

1    THE COURT:  Right.  All right, so I'm overruling that

2  objection, and that will be that.

3    Now, 46 simply combines the three or four government

4  instructions on predisposition onto one page.  It makes it

5  easier for the jury to look at, and I think again those various

6  points of law are correct.

7    MR. SMITH:  So, Your Honor, the one objection we

8  would make here is that if Your Honor sees the first sentence

9  in predisposition, Instruction No. 46, it reads:

10  Predisposition refers to the defendant's statement before

11  government agents made any suggestion that he commit a crime.

12    And if Your Honor considers the *Jacobson* decision,

13  the rule of law is that predisposition refers to the

14  defendant's state of mind before first contact with a

15  government agent, which is not necessarily the same time the

16  government agents made the first solicitation to commit the

17  crime.

18    So -- and this is not just a semantic issue because

19  if you go back to the *Jacobson* decision, the Supreme Court

20  pegged the predisposition date to when Jacobson had first

21  contact with an undercover agent sending him inappropriate

22  materials.  It did not refer -- the predisposition point did

23  not refer to when the government first solicited Jacobson to

24  purchase the inappropriate materials.

25    So there's a -- we believe that this should read:

1229

1    Predisposition refers to the defendant's state of mind before

2    the defendant's first contact with government agents in the

3    investigation.  We can give you a pin cite for that.

4         THE COURT:  Mr. Kromberg, what's your position about

5    that?

6         MR. KROMBERG:  That sentence is a direct quote from

7    the 2014 decision of the Fourth Circuit in *McLaren*.  I think

8    that had Khalil solicited a crime, as happened in *Jacobson*,

9    when the first government agent solicited the crime, then it

10   would be a correct statement of law that you go to the first

11   solicitation of the crime, but I think that the Court is on

12   safe grounds by, by pointing out that this is directly from

13   *McLaren*.  It's what the Court gave, this Court gave in

14   *Carranza*, and this case is different from *Jacobson* because

15   Khalil was not soliciting the defendant for a crime.  He just

16   happens to be a government agent who had contact with the

17   defendant.

18        THE COURT:  I think the government is correct, that

19   it's only Mo who starts to talk at all about, you know, ISIS

20   and whether, ultimately whether or not to provide --

21        MR. SMITH:  If Mr. Kromberg were correct on that

22   point of law, we would agree.  He's not correct.  If Your Honor

23   does review the *Jacobson* decision, the first contact with

24   government agents does not involve the solicitation to commit a

25   crime.

1230

1    So, Your Honor, we think that this statement is being

2    pulled from *McLaren* in a context in which the Fourth Circuit

3    was not considering a very nuanced question that we're

4    considering now.  There are other cases that indicate that Your

5    Honor's previous ruling in this case that Mr. Khalil's meeting

6    with Mr. Young would be relevant for predisposition purposes

7    was a correct ruling.  We have circuit precedent from various

8    circuits indicating that the trigger point is the first contact

9    with government agents.

10    THE COURT:  Well, yeah, but I didn't get all

11    the evidence -- didn't see all the facts until I heard Khalil

12    testify.  There's nothing in any of Khalil's testimony that I

13    can recall that would indicate any suggestion on his part to

14    the defendant of getting involved in any kind of criminal

15    activity.

16    And again, as I recall this evidence, it's crystal

17    clear that your client was not a target when Khalil met him.

18    He met him because he was looking at Chesser and other people,

19    and your client just happened to be in that milieux.  After

20    that, they started to have some contact.

21    But I don't think the evidence is in this record that

22    supports that, so I'm going to go with this, with this

23    instruction.

24    MR. SMITH:  We just have one more fact for the

25    record.

1231

1          THE COURT:  All right.

2          MR. SMITH:  Your Honor said there's no evidence to

3    suggest it.  I don't have a transcript with me right now, but I

4    believe that Khalil testified that he did initiate a

5    conversation about the propriety of jihad in Kosovo with

6    Mr. Young.  That's one fact.  I believe that Ms. Moreno

7    elicited a couple more facts that are similar to that, but

8    again, I don't have a copy of the transcript.

9          THE COURT:  I'm not sure that would be sufficient

10   anyway.  So anyway, I'm going to go with this instruction.

11         MR. SMITH:  Okay.

12         THE COURT:  But as I said, recognize that it combines

13   all the other sort of, you know, one sentence other further

14   instructions.  So, for example, predisposition is not limited

15   only to crimes specifically contemplated by the defendant prior

16   to government's suggestion.  Instead, it is sufficient if the

17   defendant is of a frame of mind such that once his attention is

18   called to the criminal opportunity, his decision to commit the

19   crime is the product of his own preference and not the product

20   of government persuasion.

21         Predisposition may be found from a defendant's ready

22   response to the inducement offered.  A defendant's

23   predisposition must be determined as of the time he was first

24   approached by a government agent; however, inferences about

25   that predisposition may be drawn from events after the two

1232

1  parties came into contact.

2          I think it's all there.  *Jacobson* is adequately

3  covered in all of that, all right?

4          MR. SMITH:  Okay.

5          MR. KROMBERG:  That's fine, Judge.

6          THE COURT:  Now, the venue instruction, in addition

7  to what's here for Counts 2 and 4, is there going to be a venue

8  issue as to Count 1?  I've looked at some of the -- I did a

9  quick look at some of the books on this, and unless the defense

10 raises venue, often the government doesn't even have to get

11 into it, and at least during the questioning in this case, I'm

12 not sure a specific venue issue was ever raised.

13         But we've got for Counts 2 and 4 this instruction.

14 Do I need to put in an extra just general venue instruction?

15         MR. SMITH:  Your Honor, we would ask for the general

16 venue instruction because there has been cross-examination on

17 this issue.  We cross-examined Agent Sikorski on this issue.

18 There was a back-and-forth, again, we don't have the

19 transcripts handy, but there was back-and-forth about where

20 the, most of the codes were sent from and where they were

21 received, and there was also cross-examination of Mo about

22 where he received the text message.

23         THE COURT:  Well, an easier way of doing this may be

24 just something like this:  In addition to the foregoing

25 elements for Counts 1, 2, and 4, you must also consider whether

1233

 1   any act in furtherance of the crime occurred within the Eastern

 2   District of Virginia.  In this regard, the government need not

 3   prove that the crime itself was committed in this district or

 4   that the defendant himself was even present here.

 5         It is sufficient to satisfy this venue element if any

 6   act in furtherance of the crime occurred within this district.

 7   If you find that the government has failed to prove that, that

 8   any act in furtherance of the crime occurred within this

 9   district or if you have a reasonable doubt on this issue, you

10   must then acquit.

11         Now, that's -- for reasonable doubt, that's really

12   only a preponderance issue, but given the evidence in this

13   case, I don't see how there could be a reasonable doubt.

14         MR. KROMBERG:  Your Honor, if the defendant is making

15   an issue of venue, for Counts 2 and 4, we'd ask that you give

16   the instruction based on 18 U.S.C. 1512(i), which says that

17   venue is proper in the district in which the proceeding was

18   existence -- in existence.  If the defendant says now that he's

19   not making an issue of venue, then there's no need for the

20   instruction.

21         THE COURT:  For Counts 2 and 4.

22         MR. KROMBERG:  Correct.

23         THE COURT:  What about Count 1?

24         MR. KROMBERG:  I think what Your Honor said about

25   Count 1 was just exactly right.

1234

```
1              THE COURT:  All right.  Well, let me hear about
2    Counts 2 and 4.  I mean, there's no question that the law
3    provides that if the, if the proceeding is in this district,
4    there's, there's venue.
5              MR. SMITH:  Your Honor, this again raises the
6    question of what the proceeding is.  If there was no proceeding
7    at all --
8              THE COURT:  But there was.  I mean, the evidence is
9    unrefuted, is unrefuted that there was a grand jury
10   investigation.
11             MR. SMITH:  Your Honor, there was a grand jury
12   investigation, but as Your Honor knows, in order to prove
13   obstruction, the government has to prove Mr. Young knowingly
14   obstructed the proceeding.
15             THE COURT:  He doesn't have to know that there was a
16   proceeding.
17             MR. SMITH:  He doesn't have to know there was a
18   proceeding.  He has to know there was an investigation that
19   could lead to a proceeding.
20             THE COURT:  I don't think it goes that far, no.
21             All right, I'll --
22             MR. SMITH:  That's in the mens -- Your Honor, there's
23   a mens rea subsection in Section 1512, and that's -- I'm not
24   quoting it directly, but I'm paraphrasing it.
25             THE COURT:  All right.  We'll go ahead then, I'll
```

1235

1   have to cobble together what, what the government has given me.

2           What about for Count 1?  Is there any venue issue as

3   to Count 1?  If you're not raising it, I'm not giving it.

4           MR. SMITH:  Oh, Your Honor, we take the position it's

5   the government's burden.  The defense doesn't have any.

6           THE COURT:  I'm sorry?

7           MR. SMITH:  We take the position it's the

8   government's burden to establish venue.

9           THE COURT:  All right.  Then we'll put in, as I said,

10  I'm going to put venue all in one instruction, however, rather

11  than having two, all right?  So that one you haven't quite seen

12  yet, but it will have the government's -- or a version of

13  what's given to you as, I guess it's, I can't see the number

14  here, 47 or 48.

15          Presumption of innocence, that's the standard

16  instruction we always give in this court, and then the last

17  instruction is the unanimity requirement.

18          So that's what the charge looks like, all right?  So

19  I think the only thing I have to clean up is venue.

20          Anything else before I give you your break?  We'll

21  tell the jury that we're going to be a little bit later.

22          The government's index, you've got your index of

23  exhibits together or ready to go?

24          MR. TURGEON:  Again, Your Honor, we'll have it when

25  we reconvene.

1236

1       THE COURT:  All right, all right.  So I think half an

2  hour should be enough time to grab lunch and do whatever

3  you-all need to do.

4       MR. SMITH:  Your Honor, can we have 45 minutes?  We

5  haven't had one break since we started this morning, and we

6  haven't even had an opportunity to use the bathroom because

7  we've been using, we've been --

8       THE COURT:  All right, we'll tell the jury that

9  because of the amount of evidence, we just have another delay,

10  but we're going to definitely start up at 2:30, all right?

11       MR. KROMBERG:  Thank you, Your Honor.

12       THE COURT:  All right, we're in recess until 2:30.

13       (Recess from 1:50 p.m., until 2:36 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1237

1     A F T E R N O O N   S E S S I O N

2                    (Defendant present, Jury out.)

3         THE COURT:  All right, counsel, we've given you the

4  final set of instructions.  I just want you to know on page 9,

5  because there are no summaries or charts, I took that

6  instruction out but replaced it with one that neither one asked

7  for, which was tape recordings and typewritten transcripts, and

8  so I think they have to have that.  Not that they have

9  typewritten transcripts, but they have the printed transcripts

10  on those videos.

11         And I guess they do have some -- do they have

12  transcripts in paper?

13         MR. KROMBERG:  Yes, Your Honor.

14         THE COURT:  All right.  All right, in any case, they

15  need that instruction a second time.

16         All right, is there anything further before we bring

17  the jury in?

18         MR. SMITH:  Yes, Your Honor.  We just have one short

19  objection to the ruling Your Honor made about 45 minutes ago

20  indicating that the defense -- the predisposition standard in

21  this case would require the government to prove the defendant's

22  predisposition to commit the crime charged in

23  Count 1 before the solicitation of the crime, as opposed to

24  before Mr. Young's first contact with government agents.

25         We had believed we had a ruling from the Court on

1238

1   this before trial, and we understand that this ruling changed

2   about 45 minutes before our closing statements.  Our entire --

3   part of the entire structure of our argument in closing

4   depended on the law of the case, which was that the first

5   government contact with Mr. Young would be the trigger point

6   for proving predisposition to commit the charged crime.  So we

7   are objecting on due process grounds.

8           THE COURT:  Well, you've made your objection.  I

9   don't think actually the instruction is nearly as egregious as

10  you think it is.  I think it's there.  In any case, we're going

11  with the case as it is.

12          The government is always expected to protect its

13  record.  You've given me an instruction that I've used, and I

14  think that the law there is appropriate.  If the government

15  thinks there's any defect, you need to tell us now.

16          MR. KROMBERG:  Your Honor, we think that your

17  instructions are fine.  In fact, there is -- in one of your

18  instructions, you do say that if the predisposition occurs

19  before the first contact or it's measured, so I'm not sure what

20  Mr. Smith's problem is.

21          MR. SMITH:  The problem we're referring to, Your

22  Honor --

23          MR. KROMBERG:  If I may continue -- oh, I'm sorry --

24  but I think that everything that's needed is there.

25          MR. SMITH:  Your Honor, there was a conference we had

1239

1  before trial in which, it wasn't a charging conference, because

2  we just did that, but there was a kind of pretrial charging

3  conference in which Your Honor -- we don't have the transcripts

4  right now, but Your Honor read what it called the sort of

5  preliminary predisposition standard that would be used at

6  trial.

7            Ms. Moreno was in a colloquy with the Court about how

8  the defense was taking the position the government had to prove

9  predisposition beyond a reasonable doubt before December 2010,

10 when Khalil testified that he met Mr. Young, and --

11           THE COURT:  Well, here's what it says:

12 Predisposition refers to the defendant's state of mind before

13 government agents made any suggestion that he commit a crime.

14           MR. SMITH:  And, Your Honor, the solicitation in this

15 case is July 2016.  I believe the government agrees with that,

16 that date.

17           MR. KROMBERG:  Your Honor, if you go to the last

18 sentence in that very instruction, you say:  A defendant's

19 predisposition must be determined at the time he was first

20 approached by a government agent.

21           That's what the defense wants you to say.  I'm not

22 sure what the problem is here.

23           MR. SMITH:  We were just referring to the first

24 sentence.

25           THE COURT:  Well, but, I mean -- yeah, you're not

1240

1    reading these carefully enough.  It's all there.  You can still

2    make whatever argument you were going to make.

3              MR. SMITH:  Thank you, Your Honor.

4              THE COURT:  All right, that's great.

5              All right, 45 minutes.  The government's got 30 for

6    their opening and 15 for rebuttal; defense has 45.  All right,

7    are we ready to go?

8              MR. GIBBS:  Ready to go, Judge.

9              THE COURT:  Let's bring the jury in.

10                       (Jury present.)

11             THE COURT:  All right, ladies and gentlemen, I do

12   want to -- have a seat, please.  I do want to apologize for

13   the, the delay.  I hate wasting juries' time, but we had to get

14   a lot of exhibits together and organized for you-all.  We've

15   done that now, and so we now start the closing arguments.

16             As I told you at the beginning of the trial, the

17   government, because it has the burden of proof, gets to make

18   the first closing argument.  They have been given a half an

19   hour in which to do that.  Then the defense makes their closing

20   argument.  They have up to 45 minutes to make theirs.  The

21   government gets 15 minutes for rebuttal, and then I'll be

22   giving you the instructions, all right?

23             So we're starting now with the government's opening

24   closing argument.  Mr. Gibbs?

25

1241

```
 1                    CLOSING ARGUMENT

 2                    BY MR. GIBBS:

 3          Thank you, Your Honor.

 4          Ladies and gentlemen, as the judge just told you,

 5   this is the opportunity for the government to make its closing

 6   argument in this case, and what I will tell you is that when

 7   you go back to deliberate, you should find the defendant,

 8   Nicholas Young, who's seated back here, guilty of all three

 9   crimes in this case.

10          And I'll get to that more in a moment, but before I

11   talk about that, I want to thank you-all for your service in

12   this case.  I know that this is a busy time of year.  We've

13   worked long days since we started this trial.  You've looked at

14   a lot of evidence, heard from a lot of witnesses, and I think

15   everyone here in court recognizes how diligent and attentive

16   you've been, so for that I want to express my gratitude.

17          Now, I said a minute ago that you should find the

18   defendant, Nicholas Young, guilty of all three counts in the

19   indictment.  Why do I say that?  I say that because put quite

20   simply, the defendant is guilty and the evidence proves his

21   guilt beyond a reasonable doubt.

22          Now, let's start with Count 1 of the indictment.

23   That's the attempted material support to ISIS.  The defense is

24   claiming that the defendant was entrapped into committing that

25   offense.
```

1          So let's talk about friendship a little bit.  I

2    expect the defense to argue that their client was entrapped

3    into committing a violation of Count 1 by two government

4    agents, Khalil and Mo, who used their friendships with the

5    defendant to convince him to commit that offense.  So let's

6    start with Khalil.  What do we know about him?

7          We know that Khalil was around the defendant from

8    around 2010 to 2012, and the reason is because Young was

9    friends with Saleh, the guy that Khalil was actually targeting.

10   Remember Saleh, the guy that advocated jihad against Israel,

11   who said that the U.S. and Israel were his enemies?  Who

12   endorsed shahid and martyrdom?  Who expressed disgust at seeing

13   a woman in our coalition forces, and who was outspoken along

14   with the defendant in his disgust for Jews, calling them pigs?

15   The guy who would take secretive walks around the golf course

16   with Young and Khalil and who said jihad would solve a lot of

17   our problems?

18          That guy was Saleh.  He was the reason Khalil even

19   got to know Young in the first place.  And we know Khalil was

20   never directly targeting Young because after Amine El Khalifi,

21   yet another person in Young's circle, got arrested for plotting

22   to blow up the U.S. Capitol, Khalil left.  Would the FBI have

23   really removed him if they wanted to use him to target the

24   defendant?

25          But more importantly, Khalil couldn't have entrapped

1243

1    Young because that crime didn't occur until much later.  Do you

2    really think Khalil was asking Young in 2011 or 2012 to help

3    ISIS get Google Play gift cards in 2016?

4            There's another reason that Khalil couldn't have

5    entrapped Young, and that's because Young had figured out that

6    Khalil was a source.  Remember how paranoid and security

7    conscious Young was?  The guy was a cop, after all, for 13

8    years.

9            You heard that recording where Young told Mo all

10   about the Marine guy, who was clearly Khalil, and if Young was

11   using Khalil as an example and a cautionary tale to explain to

12   Mo to be careful about whom you befriend, how could Khalil have

13   successfully befriended and entrapped Young?  Young's

14   friendship with Khalil was not entrapment.

15           So then two more years go by until Young finally

16   meets Mo.  So how about him?  At least in his case, he was

17   targeting Young for at least some period of time, but what

18   exactly did that consist of?

19           The two of them were around each other for less than

20   six months, from May to October 2014.  By the end, Mo had made

21   it clear that he was leaving to go join ISIS, so the defendant

22   suggested setting up covert e-mail accounts so they could

23   communicate, and after that point when Mo allegedly left to go

24   join ISIS, the FBI used that covert account to impersonate Mo.

25           And there is no question that Young believed Mo had

1244

1    gone off to join ISIS.  Getting rid of the device for real.

2    Gonna eat the SIM card.

3         But the evidence you heard about their relationship

4    just doesn't sound like it was so deep or compelling that Mo

5    would have been able to convince Young to do anything he didn't

6    want to do.  They never visited each other's houses.  They got

7    together maybe 20 times or so.  Weeks or even months might pass

8    between e-mails from the Essa Kobayashi account.

9         Was Mo really a friend who could entrap a cop who had

10   served for 13 years and who was incredibly paranoid?

11   Incredibly paranoid.  Burner phones, thinking the FBI was

12   tapping his communications, take the battery out.  A woman

13   friend let him know that he was under investigation.

14        He told Mo there are 25,000 informants in mosques

15   around this country.  He said that a lot of the people being

16   arrested for terrorism crimes made a mistake, and what was

17   that?  Communicating online with people who turned out to be

18   agents or informants.

19        So perhaps we shouldn't limit the friendships in this

20   case that we look at to just Khalil and Mo.  Perhaps we should

21   widen it out a bit to look at the friends that Young spent a

22   lot more time with and knew a lot better than Khalil or Mo,

23   friends in addition to Saleh and Khalifi such as Liban Mohamed,

24   who, like Young, talked about how they should try to uncover

25   informants.  Friends like Farooque Ahmed, who was arrested for

1245

1    planning to blow up the Washington Metro.  Or Peshwaz, the guy

2    that Mo was targeting in that May recording where he talked

3    about jihad.

4            Or Hicham Hall or T.J. Singh, do you remember them?

5    Do you remember how Young showed Mo those ISIS videos and said,

6    "Hicham and T.J. watch these a lot"?  And remember Hicham on

7    that one recording from September where he told Mo about the

8    real jihad in Afghanistan where you can kill Americans who are

9    all Kevlared up?

10           Those were Young's friends.  Those were the people he

11   hung around with.  Those were the circles Nick Young ran in.

12           Now, when the defense gets the opportunity to give

13   their closing, I expect them to say that a big part of the

14   entrapment in this case was the rapport building that Khalil

15   and Mo did, but that's sort of the point, isn't it?  If you

16   have an undercover, they have to build up enough of a

17   relationship to gain the trust of the target so you can figure

18   out if the target is a threat or not, right?

19           It can't be the law that simply cultivating a

20   friendship like that is entrapment, and, in fact, the judge

21   will instruct you on the law, and what she will tell you

22   regarding Count 1 is this:  Simply cultivating the friendship

23   of a target in preparation to present a criminal opportunity is

24   not inducement to commit a crime.  Unless that friendship

25   involved coercion, threats, or pleas that would constitute more

1246

1  than just providing an opportunity to commit the crime, the

2  defendant's relationships with Mo and Khalil were not

3  inducement.

4        Let's talk a little bit more about inducement.  As

5  the judge will also tell you in her instructions, inducement

6  requires more than mere solicitation by the government.

7  "Inducement" is a term of art necessitating government

8  overreaching in conduct sufficiently excessive to implant a

9  criminal design in the mind of an otherwise innocent party.

10       So let's talk about these Google Play gift cards for

11 a minute.  Was there government overreaching in conduct

12 sufficiently excessive to implant a criminal design in the mind

13 of an otherwise innocent party?  Not even close, ladies and

14 gentlemen.

15       Let's think about what happened in this case.  It

16 wasn't until the summer of 2016 that this topic even came up,

17 and the defendant willingly agreed to send the codes without

18 any coercion or pressure:  Inshallah, more codes will come your

19 way.

20       Think back to those Threema messages.  The defendant

21 hadn't seen Mo in almost two years.  His only means of

22 communicating with the person he thought was Mo for most of

23 those two years was through the covert e-mail account that he

24 set up.  He only accessed that account sporadically.

25       Remember the surveillance photos of him casually

1247

1  strolling into the store so he could log on to the computer?

2  He wasn't being pressured by any government agent to do that.

3           And when you look at those Threema messages to the

4  defendant, they're barely a request, but don't take my word for

5  it.  When you get back in the jury room, take a look at all the

6  communications that the FBI sent where they brought up the

7  Google Play gift cards.

8           What you will see is that if those messages were

9  written out grammatically, you wouldn't even be able to insert

10  a question mark at the end of them:  What we need is more of

11  the Google codes.  We have two very trusted brothers in U.K.

12  who buy us Google gift cards.

13           The FBI employed about as light a touch with this

14  defendant as they possibly could because they knew that

15  anything overt would spook him.  Now, certainly they were

16  hoping that he would send the codes, and they gave him an

17  explanation for the codes that they thought would appeal to

18  him.

19           And what did they say?  Let's come back to that in a

20  minute because first I want to talk about the codes for a

21  second, and we need to put one issue to rest because you heard

22  the defendant's opening statement, and I expect a similar

23  argument in closing, and the thrust of it is this:  The

24  government spent all this time investigating our client, and

25  what do they have to show for it?  $240 worth of Google Play

1248

1    gift cards.

2          Putting aside the fact that that six-year figure is

3    really not right, what was the defendant told about these

4    codes?  He was told that each code represented an encrypted

5    communication platform, meaning two people could use it to

6    communicate secretly.  On one end was an ISIS recruiter, and on

7    the other end was a prospective ISIS fighter from the West.  So

8    with the investment of just $10 or $15, ISIS could bring a

9    fighter to Dawah.

10         How much did the defendant provide?  $245.  How many

11   fighters would that represent?  Fifteen, twenty?  Twenty

12   fighters that Officer Nicholas Young was willing to help send

13   to join a foreign terrorist organization that burns people in

14   cages, enslaves captured women, attacks western capitals, and

15   then brags all about it in the ISIS propaganda videos that the

16   defendant watched during his lunch break at work while serving

17   as a police officer.  I bet it tasted terrible, but no wonder

18   he ate that SIM card.

19         And the $245 figure is pretty interesting, too,

20   because did you ever see any instance of the FBI asking for a

21   specific amount?  The defendant could have sent $20 worth,

22   maybe enough for a couple of fighters, but on his own

23   initiative, he sent ten times that.

24         Now, let's go back to the explanation that the FBI

25   gave the defendant about where these fighters would be sent.

1   He was told that they were being pushed to Wilayat Sirte, in

2   Libya, and why would that appeal to the defendant?  Because

3   Libya was near and dear to his heart.  He was a Libya Civil War

4   vet from the seeds of Misrata in April and May 2011, just as

5   the bumper sticker on his car said.  He had fought with the Abu

6   Salim Martyrs Brigade.

7          And what do we know about that group?  Well, we heard

8   Dr. Gartenstein-Ross say they were founded by people with

9   connections to the Taliban and al Qaeda, and he even said that

10  ISIS and the Abu Salim Martyrs Brigade were rivals.

11         So it seems sort of odd that the defendant would be

12  sending money to buy secure apps to someone in ISIS, right?

13  Well, not really, because what did the defendant say in his

14  messages to Mo's account?  He said the brothers he was with

15  was, quote, like-minded with the brothers where you are.  He

16  said he wanted to see the division solved and the brothers

17  united.  He said that everyone needs to join under one banner

18  to repel them.

19         Who was "them"?  According to the defendant, it was

20  Russia and the puppet coalition in the West and all the

21  countries who were uniting to pummel ISIS.

22         And unlike his old friends in Libya, whom he was

23  e-mailing as Malik the American, Mo was responding to his

24  messages.

25         So consider the entrapment instruction.  What the FBI

1250

1     did with the Google Play gift cards simply doesn't rise to the

2     level of inducement because it was mere solicitation, asking

3     someone to commit a crime, and as the judge will tell you, the

4     fact that government agents initiated contact with the

5     defendant, suggested the crime, or furnished the ordinary

6     opportunity to commit it is insufficient to show inducement.

7     This was not inducement, and it's not even close.

8          Now, before we get to predisposition for Count 1, we

9     should quickly dispose of the last two counts of the

10    indictment.  Now, the defense is not claiming that Young was

11    entrapped into committing those two offenses.  Those are the

12    obstruction counts.  And there really aren't any factual

13    disputes about what happened.

14         In Count 2, it's alleged that he attempted to deceive

15    the FBI with respect to the destination and purpose of Mo's

16    trip.  Did he do that?  Of course he did.

17         As you heard in the recordings, it was the defendant

18    who first told Mo that he should pretend that he was going to

19    Turkey for a vacation.  The defendant prepped him on what to

20    say to Customs.  He told him what to pack.  He suggested how

21    much money to carry.  He told him the sorts of questions to

22    expect and what certain codes on his ticket meant.  And most

23    importantly, the defendant told him to stick with the story

24    that the defendant had given him and never waiver.

25         And you know what?  When the FBI came around in

1251

1   December 2015 to ask about Mo, the defendant stuck to that

2   story, too, but it was a lie, and most importantly, those were

3   lies that he came up with all on his own.

4           Now, the last count is the text message lie, and

5   that's the one where the defendant believed that Mo was going

6   to join ISIS, and he knew that was a really big deal.  It's a

7   federal crime.  It's also something that the FBI would have to

8   investigate fully and completely.

9           And the defendant knew from experience that such an

10  investigation would eventually lead back to him, and when the

11  FBI showed up, he was already thinking about what he could say

12  to make it look like he truly believed that Mo had gone to

13  Turkey for a vacation.  So in order to bolster that story and

14  knowing that the FBI would likely search Mo's phone and would

15  search his phone, the defendant sent a text message that made

16  it look as though he expected Mo back in the country by

17  November 20.

18          You saw that text message.  You saw the records from

19  the defendant's phone, where he sent the text at 11:01 p.m.,

20  and Mo forwarded it to John Minichello at 11:06 p.m.

21          You heard the defendant on tape saying that he was

22  going to do this and that it would be, quote, good for me.

23          The defendant is guilty of that crime.

24          Now, before we move on, there's one last point I do

25  need to make.  All three counts in this indictment are charged

1252

1    as attempts.  Why is that?  Because this was an undercover

2    investigation.  Mo was not really with ISIS, thankfully.

3            So even though the defendant wanted to provide

4    material support to ISIS, he was only attempting to do so since

5    the gift cards actually went to the FBI.  And even though he

6    lied about what Mo was doing, he was actually lying about an

7    FBI source.  And in her instructions to you, the judge will

8    explain the law of "attempt."

9            Predisposition.  Even though it's clear there was no

10   government inducement in this case, if there had been any

11   inducement, this still wouldn't be a case of entrapment because

12   the defendant was predisposed to commit these crimes.

13           As the judge will instruct you, it is not entrapment

14   where a person already has the readiness and willingness to

15   break the law, and the mere fact that government agents

16   provided what appears to be a favorable opportunity is not

17   entrapment.

18           Now, the defendant already had a readiness and a

19   willingness to break the law in this case, and you heard about

20   that.  You heard how the defendant, long before Khalil or Mo

21   came into the picture, way back in the early 2000s, tell Ian

22   Campbell, "Don't discount the Muslims' ability to fight the

23   Jews."

24           Young even kept photographs in his house depicting an

25   alliance between Islamists and the Nazis, and you saw that.

1253

1    That was Exhibit 10-230.  That was a poster that celebrated

2    this alliance.

3           You saw Exhibit 10-231.  That was a photograph that

4    the defendant kept showing a meeting between Hitler and the

5    Mufti of Jerusalem.

6           And Young himself, long before he met Khalil or Mo,

7    embodies this alliance.  He had a photograph of him dressed as

8    a Nazi, and that was Exhibit 10-903.  The creation date on that

9    was in 2007.

10          He had another photograph of himself where he was

11   dressed not in a Nazi uniform but in traditional Muslim garb

12   holding a gun, and that's 14-119.  That was in 2006, ladies and

13   gentlemen.

14          The defendant kept a photograph of belching

15   smokestacks on his phone for two years with words that read in

16   part, "Together we can finish what Hitler started."  And that

17   was 4-203.

18          He kept a photograph showing two burka-clad

19   individuals holding a sign saying, "God Bless Hitler."  In

20   fact, he could drive to his house in a truck with a bumper

21   sticker that read, "Boycott the Terrorist State of Israel," and

22   when he walked into his home, he could wipe his feet on an

23   Israeli flag that he used as a door mat.  That's 11-401.

24          When he and Mo set up the covert e-mail account so

25   they could communicate, he picked Hitler's birthday as his own.

1254

1    And you saw electronic versions and one paper version
2    of *Inspire* magazine that he kept, and you heard
3    Dr. Gartenstein-Ross explain what *Inspire* magazine was.  You
4    saw that photograph on the bumper of his truck that said "Libya
5    Civil War Vet."  You saw the Threema messages where he told
6    Mo -- or the person he thought was Mo -- how he had been in the
7    Abu Salim Martyrs Brigade back in 2011 and how he carried body
8    armor back from that trip.  And you saw the defendant describe
9    that group as being like-minded with ISIS in his e-mails.

10    Ladies and gentlemen, this is who the defendant is,
11    and this is who the defendant was long before he met Mo and
12    long before he met Khalil.  He was not entrapped by the
13    government into doing anything.  As careful as he was, as
14    security conscious as he was, as much of a trained law
15    enforcement officer as he was, he was also someone who was
16    drawn powerfully to the Islamist cause.

17    He didn't try to help Mo go join ISIS because he
18    really liked Mo.  He did it because he really liked ISIS.

19    ISIS was putting into practice all of the things that
20    he believed:  the beheadings, the burnings, the things that he
21    watched on the Light Revealed and the Light Reloaded videos
22    during his lunch breaks at work.  How did Dr. Gartenstein-Ross
23    describe it?  A winner's message.

24    All of the predisposition evidence in this case gives
25    a glimpse into who this defendant is and what is important to

1255

1    him.  This interest in Nazis, the National Alliance, and other

2    hate groups was not fleeting for the defendant.  It lasted for

3    a long time.  It predated Mo, and it predated Khalil.

4         And when his focus did shift, it shifted to things

5    like the Abu Salim Martyrs Brigade, ISIS, in trying to help Mo

6    get over to Syria to fight, and to send money so other fighters

7    could join in the cause, the cause of the Caliphate.

8         Friendship, inducement, predisposition.  Those

9    friendships with Khalil and Mo were nowhere near enough to

10   entrap this defendant into doing anything he didn't want to do.

11        Inducement.  The defendant was not induced into

12   committing Count 1.  There was no overreaching on the part of

13   the government.  There was no excessive conduct.  The defendant

14   was predisposed to commit Count 1 of this indictment.  He was

15   not coerced, and he was not entrapped.  He committed all three

16   crimes knowingly, willingly, and voluntarily, and because of

17   that, I would ask that you find the only just verdict in this

18   case:  a verdict of guilty on all three counts.

19        Thank you, ladies and gentlemen.

20        THE COURT:  All right, thank you.

21        Mr. Smith?

22             CLOSING ARGUMENT

23             BY MR. SMITH:

24        Good afternoon.  Ladies and gentlemen, the case you

25   just witnessed presents the jury with challenging issues that

1256

1    are not simple, and because we've tried to fit a six-year

2    undercover investigation into a few trial days, there are a

3    number of issues, and it's a lot of information to digest, but

4    one issue is the most important issue in this case that you

5    will consider:  Will we, the jury, allow the government's

6    evidence to play to our emotions, our fear, and our anger, or

7    will we tune out the noise and faithfully follow the rules as

8    they are described to us by the Court?

9             I've represented Mr. Young over a year now.  I've

10   gotten to know him.  I've had many conversations with him.

11   I've learned much of what I know about this case from him, and

12   I will confess to you that at some points, the noise has been

13   very loud.

14            Much of what happened in this case is very far

15   outside of our everyday experience -- handler agents, Libya,

16   undercover operations -- but I'm here today to argue to you as

17   best I can that justice requires tuning out the noise and

18   faithfully following the rules as they are described to you by

19   the Court.

20            Tuning out the noise and listening to the key parts

21   of the case can be hard here, admittedly.  It's kind of like

22   trying to hear Mr. Young's voice on one of the tapes I tried to

23   play for you at trial.  The signal and the noise is faint, but,

24   ladies and gentlemen, it is there.

25            You hear it in various parts of this case.  Police

1  Officer McNulty, Nicholas's old friend who described to you a
2  Nicholas that is very different from the government's
3  description.  He lived with Nick between 2004 and '7, and he
4  testified that he saw Nick as not as a racist person, as
5  supporting U.S. troops, as being in the ROTC with Nicholas, and
6  as patriotic.
7        Officer McNulty testified that he used to hang out
8  with Nicholas after 2007, that Nicholas had no racist views
9  when it came to his dating habits, that he never exemplified
10 racism around any of his friends or any of their mutual
11 acquaintances.  This was a government witness.
12       The testimony of Mo, the informant Mo in this case,
13 admits that you that Nicholas would in his own way suggest Mo
14 should not travel to Syria.  You've heard this evidence.  We've
15 also resubmitted an exhibit with a disc that includes clips
16 from all of the recordings we attempted to play at trial.  We
17 strongly urge the jury to review those clips before making any
18 decision in this case.
19       There are also questions in this case about why and
20 whether Mr. Young's early conversations with the informant Mo
21 were not recorded and what's behind redacted information in
22 certain government documents.
23       There are pictures of Nick's trip to Libya that
24 you've seen, the trip where the government alleges he joined
25 Abu Salim Martyrs Brigade.  This jury saw pictures of Mr. Young

1258

1    with families, children, on the beach.

2            Ladies and gentlemen, these points are what we call

3    reasonable doubt, reasonable doubt that before the government

4    made any efforts to induce Mr. Young to commit a crime,

5    Nicholas had a predisposition to materially support terrorism.

6            If the jury is able to disregard the noise, which is

7    very difficult, and follow the law, it will acquit Mr. Young of

8    the charges in this case, and on behalf of Nicholas and Linda,

9    we thank you for your service and your attention to our

10   arguments.

11           The government has put on some unusual evidence in

12   this trial.  The main charge is that in July 2016, Nicholas

13   attempted to materially support a terrorist group by agreeing

14   to send Google Play gift cards to an undercover agent who had

15   pretended to go to Syria.

16           Nicholas is not charged for possessing any of the

17   pictures, pamphlets, or books you've seen throughout the trial.

18   The First Amendment ensures that.  But to prove its gift card

19   case, the government has bombarded you with inflammatory

20   pictures and literature.  Many of these were not of militant

21   Islamism at all.  This is a travesty.

22           The government paid an expert witness to tell you

23   white supremacists are like Islamist terrorists in his expert

24   opinion.  2 plus 2 equals 5.  The government paid $16,000 to

25   tell you that.

1259

1    And the government subpoenaed Nicholas Young's old

2  friends to come to the trial against their will and try to

3  remember some off-color comments he might have made 10 years

4  ago, 15 years ago.

5    Why did the government's case look like this?  Why

6  was the government bombarding you with Nazi pictures?  It

7  looked like this because buried beneath this mountain of

8  inflammatory evidence that they have attempted to deceive you

9  with over the course of this trial, there are facts showing

10 Nicholas was entrapped.  Pay close attention to these facts.

11 They're often obscured in the government's case behind a lot of

12 Nazi prejudicial evidence.

13    One, this is a material support for terrorism case

14 without real ISIS terrorists.  Two, the government has shown

15 you no evidence Nicholas Young ever spoke to anyone actually in

16 ISIS.  Three, the government has shown you no evidence Nicholas

17 Young ever attempted to join the group ISIS.  Four, the

18 government has shown you no evidence he ever attempted to give

19 anything to the real ISIS at all.  Five, the government has

20 shown you no evidence ISIS does, in fact, request gift cards

21 from anyone in this country.

22    The six-year-plus investigation leading up to this

23 gift card charge involves government agents weaving a web of

24 deception about militant Islam around Nicholas Young for six

25 years.  Much of the evidence of this case is unquestionably

1260

1  offensive to many people.  That's not in dispute.  I'm one of

2  those people.

3          But Nicholas's defense of entrapment in this case

4  exists to prevent something more troubling than a Nazi picture

5  but also less immediately obvious.  The defense of entrapment

6  exists to prevent a world where the government can insert

7  undercover agents into people's lives for years, develop

8  relationships, and encourage crimes, all without having to show

9  the person was predisposed to commit those crimes beforehand.

10         And this particular sting operation raises special

11 concerns.  After the defendant succumbed to the government's

12 pressure to commit a crime and raise the defense of entrapment,

13 can the government now expose all the ugly parts of his life in

14 response to his efforts to defend himself?  Can the government

15 prove the defendant had a predisposition to commit the

16 government-induced crime by showing some ugly pictures and

17 literature he possessed, even when it doesn't have to directly

18 do with militant Islam at all?  And can the government

19 prosecute someone in this country through a series of

20 guilt-by-association implications?

21         Ladies and gentlemen, these are very serious

22 concerns, and the defense puts it to you that these are far

23 more serious than some pictures in the defendant's basement.

24         I'd like to walk through the facts we've learned at

25 trial, but let's first cover the charges.  The burden is on the

1261

1    government to prove the charges beyond a reasonable doubt.
2    Proof beyond a reasonable doubt is proof that leaves you firmly
3    convinced the defendant is guilty.
4         Count 1, as Mr. Gibbs explained, is in the
5    indictment, charges Nicholas with attempting to materially
6    support a foreign terrorist organization by sending Google Play
7    gift cards in July 2016 to someone he thought was a friend
8    named Mo but who was, in fact, an undercover agent who had
9    pretended to join ISIS in Syria.
10        To prove this count, the government must prove beyond
11   a reasonable doubt that Nicholas knowingly attempted to provide
12   material support and resources to a foreign terrorist
13   organization, knowing that the organization was a designated
14   terrorist organization or engages in terrorism.
15        Count 2 alleges that during his FBI interviews on
16   December 3rd and 5th, 2015, Nicholas attempted to obstruct the
17   fictitious investigation of Mo, the government's own informant,
18   and the investigation of Mr. Young himself for attempting to
19   provide material support to ISIS by attempting to mislead the
20   investigators about their informant's whereabouts.
21        To meet its burden on this charge, the government
22   must prove beyond a reasonable doubt that Nicholas attempted to
23   corruptly obstruct an official proceeding.  That is a special
24   term:  an official proceeding.
25        And Count 4 alleges that on November 20, 2014,

1262

1    Nicholas attempted to obstruct justice by sending a text to

2    Mo's cell phone in order to make it appear to the FBI that

3    their informant Mo had left the country to go to Turkey, when

4    Nicholas allegedly believed the informant Mo had gone to Syria,

5    but he didn't actually go to Syria because he was a government

6    informant.

7            All three charges are attempt crimes.  This means

8    that the government does not allege the charged crime was

9    committed, and that makes sense because the government has

10   acknowledged in its case through its witnesses that ISIS

11   members are not actually involved in this case.  That is why

12   all of the crimes at issue are called "attempt" because it

13   would have been impossible for Mr. Young to complete the crimes

14   given the nature of the witnesses involved.  There are no ISIS

15   members involved in this case.  There never have been.

16           To prove an attempt crime, the government must prove

17   beyond a reasonable doubt that Nicholas took some act that was

18   a substantial step towards the completion of the crime, a

19   substantial step towards a completion of the crime.  That is a

20   requirement on the government even though ISIS does not exist

21   in this case.  The government has to show he made -- the

22   defendant made a substantial step towards materially supporting

23   ISIS and misleading the government about the whereabouts of

24   their informant Mo.

25           Nicholas raises the defense of entrapment with

1263

1   respect to the material support for terrorism charge, and that

2   means that even if the government proves beyond a reasonable

3   doubt that Nicholas sent Google Play gift cards to an

4   undercover agent who he thought was his friend, knowing that Mo

5   was notionally but not really in ISIS, Nicholas may still be

6   acquitted if two conditions are met.

7          First, the jury must find that the government induced

8   Nicholas to send the gift cards to the undercover agent in July

9   of 2016.  This means not only that it was the government's idea

10  that the gift cards are sent, but there has to be a plus factor

11  as well.  Friendship alone is not enough.  However, friendship

12  with pleas, additional pleas are considered sufficient to

13  constitute an inducement.

14         Second, the government must prove beyond a reasonable

15  doubt that Nicholas had a predisposition to commit the crime,

16  material support for terrorism, before first being contacted by

17  government agents.  In this case, the first contact with

18  government agents was Nicholas Young's meeting with the

19  undercover informant Khalil in 2010.

20         If the jury finds that the government induced the

21  gift card crime and that the government failed to prove beyond

22  a reasonable doubt that Nicholas's predisposition to commit the

23  crime before meeting a government agent, then the jury must

24  acquit Nicholas of that count, Count 1.

25         The facts established at trial show the government

1264

1    has failed to prove these charges beyond a reasonable doubt and

2    that Nicholas Young was entrapped.  The trial firmly

3    established that the government induced Nicholas Young to send

4    the gift cards, and the government has failed to prove beyond a

5    reasonable doubt that Nicholas had a predisposition to

6    materially support ISIS before December of 2010.

7             What did we learn at trial?  That every step of this

8    six-year investigation is riddled with reasonable doubt about

9    Nicholas's predisposition to materially support ISIS.

10            Let's start in the middle.  We learned that on

11   May 22, 2014, Nicholas met the undercover informant Mo at the

12   Sully Adams mosque.  Mo would testify his relationship with

13   Nicholas lasted between May 22, 2014, and October 25, 2014.

14            Mo testified that he lied to the FBI in April 2014, a

15   month before he met ISIS -- a month before he met Nicholas.

16   And right out of the gate, Mo's testimony was off.  Mo

17   testified at first that the first time he recorded one of

18   Nicholas's meetings -- his meetings with Nicholas was July

19   2014, at some point in July 2014, but then we played one of his

20   audio recordings with Nicholas from May 2014.  Mo then appeared

21   to waiver on whether there were earlier recordings with himself

22   and Nicholas.

23            Special Agent Minichello, John Minichello, Mo's

24   handler, testified about why these potentially missing

25   recordings could be a significant issue.  Minichello

1265

 1    acknowledged that memoranda he drafted as Mo's handler

 2    concerning meetings with Nicholas between May and July of 2014

 3    were likely the first conversations he had -- Mo had with

 4    Nicholas, he wasn't sure, about ICE, the first conversations Mo

 5    had, the informant, with Nicholas about ISIS, but for some

 6    reason, Mo either wasn't recording these meetings or the tapes

 7    are now gone.

 8         Mo's credibility took another hit when he testified

 9    that he had never recorded a conversation with a target without

10    his handler's permission.  Special Agent Minichello had

11    testified right before Mo that Mo made such recordings.  Mo

12    likely perjured himself on the stand.

13         The serious questions concerning these potentially

14    missing tapes is itself reasonable doubt as to Nicholas's

15    predisposition to support ISIS.  These unrecorded conversations

16    with Mo allegedly concern the initial conversations between the

17    defendant and the informant about the subject matter of the

18    case.

19         Did Nicholas indicate he did not support ISIS in

20    these conversations?  That would have been consistent with

21    Nicholas's position on May 31, 2014, that the mujahideen

22    attempting to overthrow the Soviet government in Afghanistan

23    were criminals.  We played that recording for the jury.  That

24    statement appears to be misrepresented in a memorandum that

25    purports to summarize that conversation on May 31, 2014.

1266

1       And we learned from Mo that he was inducing Nicholas

2   to attempt to support ISIS continuously in this period.  Now,

3   the government argues that inducement can only happen in the

4   moments before the crime is committed.  That's not the case.

5   During this period that Mo was hanging out with Nicholas and

6   courting his friendship, between May 2014 and October 2014, Mo

7   would ask Nicholas what equipment he should bring to Syria,

8   whether he should go, what should Mo do with his truck, what

9   did Nicholas think about ISIS.

10      Mo testified on the stand he would try to exploit

11  Nicholas's interest in geopolitics to induce Nicholas to

12  discuss ISIS.  That is testimony in this case.

13      Many of Nicholas's responses to Mo's pro-ISIS

14  comments, as testified by Mo, indicated a lack of

15  predisposition to support ISIS before the gift cards were sent

16  in July 2016 and certainly before Mo met Khalil, the undercover

17  informant, in December 2010.

18      All of these comments constitute reasonable doubt

19  that Mr. Young had a predisposition to materially support ISIS

20  before the gift cards were sent in July 2016 and before he met

21  Khalil in December 2010.  This is the predisposition standard

22  the jury is required to follow by law.

23      On September 11, 2014, it was testified that Young

24  informed Mo, "I was against ISIS because of all the bad stuff I

25  was hearing about them."

1267

```
 1            On September 11, 2014, Young told Mo, "I saw
 2    Baghdadi's mug shot on the news, and I was like, oh, they sound
 3    like a bunch of criminals hungry for power and money."  This is
 4    reasonable doubt.
 5            Nicholas told Mo he wanted to help out Muslims
 6    without doing anything criminal or losing his job.  He also
 7    told that to Khalil, both of the undercover agents and
 8    informants in this case.  That's reasonable doubt.
 9            If -- Nicholas told Mo if he ever heard someone was
10    going to blow up a subway, he needed his help to stop them.
11    This is reasonable doubt.  Why did Nicholas Young refer to the
12    subway?  Nicholas Young is a police officer in the Metro
13    Transit subway system.  When Mo said he wanted to help out
14    militant Islam, Nick said, "Why now?" and told Mo, "They have a
15    good life in America, and Muslims are allowed to pray here
16    without hassle."  That's reasonable doubt.
17            On October 17, 2014, Nicholas told Mo he wanted to
18    help people stay in the U.S., take care of his parents.
19    Repeatedly in October 2014, the month that Mo pretended to
20    leave for Turkey and then possibly Syria, Nicholas told Mo to
21    follow his conscience repeatedly.  Mo testified that during
22    this period, Nicholas would tell Mo, "Follow your conscience,"
23    over and over and over.  Those are not the words of someone who
24    is predisposed to materially support ISIS.
25            On October 16, 2014, when Mo said the whole purpose
```

1268

1  of this booking the Turkey tour was to have a good story,

2  right, Nicholas said, "Mo, you should actually take the tour,

3  too."

4         The government doesn't explain that evidence in its

5  opening statement, which is why several of the counts fail.

6         On the night before Mo leaves, on October 24, 2014,

7  Nicholas tells Mo to keep his options open.  He's indicating to

8  Mo, "Perhaps you should not go to Syria."  Nicholas informs Mo,

9  "It would be okay if you change your mind.  Sometimes we get

10 stuck in one mindset out of pride."  That's October 24, 2014,

11 the day before Mo goes to Syria.

12        The government's presented evidence that Nicholas

13 discussed Mo's gear for the trip overseas and talked about Mo

14 with his trip and potentially going to Syria, but the positive

15 comments I've just read to you alone prevent the government

16 from proving beyond a reasonable doubt a predisposition to

17 materially support terrorism.

18        And Mo also -- let's talk about inducement because

19 the government is attempting to limit inducement to the moments

20 before the gift card was sent in July of 2016, but there were

21 many other facts in this record dealing with inducement.

22        Mo and Nicholas went to the same mosque together.

23 That's where they met, in a place of religious worship, where

24 Mo was sent to report on individuals and Nick Young.  They went

25 to the same college.  They had the same religious conflict at

1269

1    work.  Mo bought Nicholas gifts.  Nicholas bought Mo's meals.

2    Mo testified that he exploited Nicholas's interest in

3    geopolitics to get Nick talking about ISIS.  This is testimony

4    from Mo in this case.

5         Mo testified that he bonded with Nicholas over

6    discussions of their girlfriends, Nicholas's deceased father.

7    Nicholas and Mo shared friends in common, including Hicham

8    Hall, who Mo testified was very close to Nicholas.

9         So then around in October 2014 to about July 2016,

10   the government swaps in an agent for Mo, so the informant Mo is

11   no longer having conversations with Nicholas, but an agent

12   pretending to be Mo, who is pretending to be Nicholas's friend,

13   is now talking to Nicholas.

14        So the government repeatedly e-mails Nicholas,

15   pretending to be Mo from Syria, and the jury learned that in

16   the first couple of these e-mails, for a couple of months,

17   Nicholas didn't even respond.

18        In May 2016, an agent, Agent Sikorski, pretending to

19   be Mo, raises the idea of communicating on a secure app and

20   through the purchase of Google gift cards via e-mail to

21   Nicholas.  Nicholas doesn't respond to that e-mail for a month.

22        In July 2016, Agent Sikorski pretending to be Mo asks

23   Nick for gift cards on Threema.  Nick doesn't send them in

24   response to that first text.  Then the agent asks again a

25   second time before getting them, but inducement didn't start on

1270

1    Threema.  It started when Mo cultivated Nick's friendship

2    between May and October of 2014.  So that's inducement.

3          The government's burden at trial was to prove beyond

4    a reasonable doubt that Nicholas Young had a predisposition to

5    materially support ISIS before December 2010, and that's

6    because Khalil, the undercover agent, testified to you that's

7    when he first met Nicholas at a wedding.

8          Khalil told you he had a pretty good friendship with

9    Nicholas, implying that he might have been friends with him

10   even apart from his role as an undercover agent, but let's talk

11   about what the crime is here that the government has to prove

12   Nicholas had the predisposition to commit before December of

13   2010.  This isn't apparent in the government's argument.

14         The crime here is not possessing literature.  I don't

15   know what percentage of the government's case consisted of

16   dirty literature and pictures, but that's not the crime here.

17   The crime here is materially supporting ISIS, giving money or

18   other aid, material aid to the terrorist group.

19         The government cannot satisfy its burden in this case

20   that Nicholas Young had a predisposition to materially support

21   ISIS before December 2010 by showing you a bunch of pictures.

22   The pictures do not go one step further and show that the

23   defendant would be willing to open his pocket and provide money

24   to a terrorist organization.  The government has shown no

25   evidence that Nicholas Young has a predisposition to give money

1271

1    to ISIS.

2           So what has the government shown you?  In a material

3    support for terrorism case in 2017, the government has

4    introduced Nazi pictures and anti-Semitic pictures from

5    Mr. Young's computer.  This is a complete travesty.  White

6    supremacist memorabilia does not prove beyond a reasonable

7    doubt that Nicholas would materially support militant Islamic

8    terrorism.

9           The theory doesn't make sense.  And, ladies and

10   gentlemen, the theory is being offered to satisfy the

11   government's burden in this case.  It has to prove Mr. Young

12   had a predisposition to support ISIS before December 2010, so

13   the government made its theory fit the facts, but it did so in

14   a way that is particularly inappropriate.

15          White supremacists by definition do not support

16   non-whites, and most Muslims are not white.  The government's

17   expert, Gartenstein-Ross, testified on this subject, but

18   Gartenstein-Ross has no credibility on this issue.

19          Gartenstein-Ross has never published in a

20   peer-reviewed publication on the subject of his thesis of this

21   connection between white supremacism and militant Islam.  He's

22   written a couple arguments about this subject in popular press,

23   and this thesis was likely concocted in order to establish the

24   government's case here.  Gartenstein-Ross's thesis is based on

25   eight case studies.  This is not science.

1272

1    The case agent today testified that Mr. Young has not
2    been investigated for hate crimes on the basis of these
3    materials.  And besides, the government has not proven that
4    Nicholas's interest in these materials was political rather
5    than dress-up, reenactment.  Gartenstein-Ross told you that if
6    his eight case studies were, involved people who were not
7    politically supporting Nazism but were dressing up, his thesis
8    might have changed.

9    Officer Ian Campbell testified about a project for a
10   European racism class that Mr. Young was in.  Officer Campbell
11   testified that for a class at George Mason University, Nicholas
12   went to what he described as a British National Party meeting.
13   This is not serious evidence.

14   Officer McNulty testified that he was shocked by the
15   charges against Nick.  He couldn't have imagined that Nick
16   would be in this position.  Nick supported American troops.
17   Nick wasn't racist towards friends or girlfriends.  This is all
18   reasonable doubt.

19   A second subject of the government's predisposition
20   evidence are the *Inspire* magazines.  You'll notice that at
21   trial, we didn't object to the relevance of these magazines
22   because this is a material support for terrorism case.

23   ISIS *Inspire* magazines are relevant evidence, unlike
24   the Nazi evidence, but just because the evidence is relevant
25   doesn't mean the government has proven beyond a reasonable

1273

1    doubt that the fact that this information was found on Nicholas

2    Young's computer proves beyond a reasonable doubt that he would

3    materially support ISIS.

4            A great deal of these pictures, these Nazi pictures

5    and white supremacist pictures that were shown during trial

6    were all downloaded on the same day, December 7, 2007, not

7    spread out over time, but the presentation for the jury at

8    trial showed picture after picture after picture after picture,

9    sometimes consuming hours of trial testimony.  That created a

10    misleading impression with the jury.  The misleading impression

11    was that Mr. Young might have been downloading these materials

12    continuously over the course of the six-year investigation.

13            It's not a crime in this country to own radical

14    literature, and owning radical literature doesn't get the

15    government there.

16            Let me give you an example.  If I own a subscription

17    to a magazine, for example, the *National Geographic* magazine,

18    the government -- and the government raids my house and finds

19    the *National Geographic* magazine, the government may be able to

20    use that evidence to prove beyond a reasonable doubt that I

21    have an interest in wildlife.

22            What the government cannot do with that *National*

23    *Geographic* magazine after it raids my house is prove that I

24    have beyond a reasonable doubt, I have a predisposition to give

25    money to animals in Africa.  It cannot do that.  Owning

1274

1  literature does not prove beyond a reasonable doubt that

2  someone will give money and open their pockets to that cause.

3  The government has given you none of that evidence, none, zero.

4         Let's turn to Libya.  Libya is a big piece of the

5  government's predisposition case because the government is

6  arguing repeatedly that Nicholas Young traveled to Libya with

7  the intention of joining a terrorist group, the Abu Salim

8  Martyrs Brigade.

9         It troubles me to say this, but these are

10  misrepresentations.  There is no evidence in this case to

11  indicate that when Mr. Young traveled to Libya in May 2011, it

12  was his intent on traveling there to join something called the

13  Abu Salim Martyrs Brigade.  There's no evidence of that in this

14  case.  There are e-mails that follow his trip there.

15         But the government would later learn that Nicholas

16  did not break the law in traveling to Libya, that he acquired

17  the proper forms for bringing body armor there, that he told

18  government agents that he went there and had body armor.

19         We've shown you the pictures of Nicholas Young's trip

20  to Libya.  There are pictures of families on the beach.  At the

21  same time that this evidence exists, the government is trying

22  to argue to you that it can prove beyond a reasonable doubt

23  that Mr. Young had a predisposition to support ISIS because he

24  was with the Abu Salim Martyrs Brigade in Libya.  We've shown

25  you pictures of the trip to Libya.  That is reasonable doubt

1    alone.

2           Now, let's turn to the government's -- actually,

3    let's go back to Libya.  There's one more important piece.

4    This was a piece of the government's evidence.

5           The government testified, one of the case agents

6    testified that an individual Nicholas met in Libya, Mohammad,

7    had once asked Nicholas to send night vision scopes to Libya.

8    It wasn't explained what they were for in the e-mails.

9           Nicholas Young responded, "No.  I will not do that

10   because that is illegal."

11          Now, the case agent testified that he believed that

12   he probably didn't send those gift cards because he didn't want

13   to get caught.

14          Why Mr. Young wants to follow the law is not the

15   issue.  The issue is whether he has a predisposition to follow

16   the law, and this e-mail exchange is another piece of

17   reasonable doubt.  And in fact, it's closer than any other

18   piece of evidence in this case to what the underlying crime is.

19   The underlying crime is an attempt to materially support ISIS.

20          What this evidence shows is that when someone from a

21   foreign country, Libya, where the government alleges Abu Salim

22   Martyrs Brigade was running wild, sent an e-mail to Nicholas to

23   ask for night vision scopes, Nicholas said in writing, "No,

24   because that's illegal."  This by itself is reasonable doubt as

25   to Young's predisposition to materially support ISIS.

1276

1      And furthermore, this individual Mo, he wasn't an

2  informant.  This was the real world.

3      Let's discuss the dangerous associations that the

4  government has been trying to spin in this case.  The

5  government has presented what looked like mug shots on the TVs.

6  They're actually driver's license photos.

7      One of the government's witnesses testified about Zac

8  Chesser.  Government witnesses in this case have acknowledged

9  that Nick was not known to have met Chesser on that many

10  occasions.  Chesser was not known to be an acquaintance of

11  Nicholas Young's, a close friend.

12      The government has thrown up pictures of T.J. Singh.

13  T.J. Singh was never arrested.  The government has shown

14  pictures of Hicham Hall, a mug shot-looking picture.  This

15  individual was never arrested, either, and this is Mr. Young's

16  friend.  So the scary-looking photos certainly look like

17  they've been arrested.

18      Liban Mohamed, this was another individual who is

19  planning to attack, an act of terrorism.  The UCE Khalil

20  testified that Nicholas had nothing to do with Mohamed's plots.

21  Why are all of these photos being shown to the jury?  What are

22  these associations?  What is the government trying to imply?

23  These people were never arrested.

24      There are contradictions in the government's case,

25  the very structure of the investigation that suggests there can

1277

1    be no predisposition to materially support terrorism before the

2    gift cards were sent in 2016.  The government acknowledges that

3    after Mr. Young returned from Libya, there may have been an

4    attempt to recruit him as an undercover informant.  We don't

5    know whether that was a ruse or not, but it's possible that it

6    was an attempt to recruit him as an undercover informant.

7            And yet at the exact same time period, the government

8    is attempting to allege he had no -- he had a predisposition to

9    materially support terrorism.  So which is it?  Was he ripe

10   material to be an informant for the FBI at the same time that

11   he had a material support for terrorism?

12           Here's another contradiction:  The government is

13   suggesting to you that Mr. Young had a predisposition to

14   support terrorism between 2010, when the investigation into him

15   began, and 2016, and yet during this whole period, he remained

16   as a police officer on the force.

17           You have seen no evidence indicating that Mr. Young

18   ever performed inadequately on the job, was ever racist towards

19   any individuals he met on the job.  In fact, the government has

20   stipulated he received a commendation from the D.C. U.S.

21   Attorney's Office.

22           MR. KROMBERG:  Objection, Judge.  That is not in

23   evidence.

24           THE COURT:  All right, if it's not in evidence, the

25   jury has to disregard that statement.

1278

1    MR. SMITH:  If Mr. Young had a predisposition to

2  materially support terrorism between 2010 and 2016, what was he

3  doing on the force with a gun every day?  Why was he never

4  fired?  Why have you seen none of his colleagues from the WMATA

5  here today?  Where are they?

6    Now, each one of those facts could establish a

7  reasonable doubt.  All of them together establish that the

8  government has not proven beyond a reasonable doubt Nicholas

9  Young had a predisposition to materially support terrorism

10 before July 2016, but the government's burden is December 2010.

11    If the jury reviews the evidence that has been

12 submitted for the period before December 2010, it's just a

13 bunch of Web site clicks.  The witness Menzies testified that

14 Nicholas Young -- he remembers Nicholas Young making some

15 comment years and years and years ago.

16    Count 2 in this case alleges that Nicholas Young

17 attempted to mislead Agents Caslen and Smith on December 3,

18 2015, and December 5, 2015, about the whereabouts of Mo and his

19 purpose in traveling to Turkey, but you heard from Agents

20 Caslen and Smith that there was no criminal investigation into

21 Mo because Mo was an informant.  There was no grand jury

22 investigation into Mo.  That only leaves an investigation into

23 Mr. Young himself.

24    But Agent Smith testified that nobody told

25 Mr. Young during these two interviews on December 3, 2015, and

1279

1  December 5, 2015, that Mr. Young was under investigation.  In

2  fact, you'll recall the testimony was these questions that the

3  agents asked Mr. Young during these interviews were about

4  Peshwaz Waise and their own informant, Mo.  Mr. Young was never

5  told he was under investigation in that meeting.

6          The government's burden in this case is to show

7  beyond a reasonable doubt for this count that Mr. Young

8  knowingly obstructed justice.  So on the one hand, the

9  government's agents have acknowledged that there is no

10  investigation into Mo, so that can't be obstructed, but the

11  government on the other hand has said that Mr. Young was never

12  informed he was under investigation in this meeting.

13          Now, the case agent testified today about some of the

14  evidence that might show Mr. Young knew he was under

15  investigation when he was interviewed on December 3, 2015, and

16  December 5, 2015, but the evidence you heard was that in 2011,

17  Mr. Young was security conscious, and he might have told the

18  UCE Khalil that he thought he was under investigation.  That's

19  not reasonable doubt.  That's not beyond a reasonable doubt.

20  That the defendant made a statement about possibly being under

21  investigation four years before the meeting?

22          The government has failed to meet its burden for

23  Count 2 because it has not proven beyond a reasonable doubt

24  that Mr. Young knowingly obstructed any official proceeding.

25          On Count 4, the government alleges that Young

1280

1    obstructed justice by sending a text message to pretend to

2    Mo -- to pretend Mo, he sent a text message to pretend Mo on

3    November 20, 2014, that was designed to mislead the FBI about

4    Mo's whereabouts.

5              So again, let's step back.  The charge is that -- not

6    that Mr. Young misled the FBI.  That would have been impossible

7    because Mo was an agent -- was an informant of the FBI.

8    They're alleging that he attempted to, not that he actually

9    could mislead the FBI in any real way.

10             But even if we grant the government's fictitious

11   theory of an obstruction of justice charge based on their own

12   informant, the facts don't satisfy the case.  The facts don't

13   satisfy the charge here.

14             This text was sent on November 20, 2014, but the jury

15   heard testimony at the trial that in the days before Mo left,

16   Nicholas Young was repeatedly making inconsistent statements to

17   Mo about whether he knew he would actually be going on to Syria

18   from Turkey or not.

19             You heard testimony that Nicholas told Mo -- Mo said

20   to him, "This whole story about Turkey is a front, right?"

21             And Nicholas said, "Actually, I think you should go

22   to Turkey, too."

23             And then on October 24, 2014, the night before Mo

24   goes to Turkey, Nick says, "You know, maybe you'll change your

25   mind.  Maybe you'll take a trip to Turkey and come back."

1281

1          The government has shown you no evidence that between

2     that date and November 20, 2014, Nicholas Young knew to a

3     certainty that Mo would not be coming back from Turkey.  Of

4     course, he never went to Turkey, but hypothetically.  He did go

5     to Turkey for a day to take pictures with the agent.

6          So Nicholas said, "I think you actually should take

7     the trip to Turkey."

8          So the government's theory in Count 4 is that

9     Nicholas intended to obstruct justice by misleading the FBI

10     about whether Mo would go on to Syria.  When this text message

11     was sent, the government has not shown beyond a reasonable

12     doubt that Mr. Young knew he would go on to Syria.

13          The government has made a lot of statements about

14     Mr. Young's character and personality that have nothing to do

15     with the elements of the charges in this case.  The

16     government's prosecutor said, after reeling off a list of Nazi

17     evidence and anti-Semitism, of which I know something myself,

18     but perhaps I know not as much as the government's prosecutor,

19     that Mr. Young was -- this is who he is.  This is who he is.

20          I think the government is revealing more than it

21     knows when it makes that statement because in this country,

22     we're not prosecuted for being who we are.  In this country,

23     we're not prosecuted for owning literature.  We're not

24     prosecuted even if we have repellant views.  But this is

25     nothing new.  This was established in this country decades and

1282

1  decades ago.  The government's attorneys in this case haven't

2  caught up.

3           Ladies and gentlemen, these are the facts of the

4  case.  We respectfully request that you review the recordings

5  we have provided to you.  They're on a disc marked Defense

6  Exhibit 1.  They constitute all of the recordings we tried to

7  play in trial but could not.  They're easily accessible.

8  They'll back up some of the statements we've made in this

9  closing argument with recordings between the informant Mo and

10  Nicholas.

11          We respectfully request that you review them.

12  They're very short.  It's about five to ten minutes over the

13  course of five days, maybe ten to fifteen minutes.

14          So we respectfully request that you carefully review

15  and dispassionately consider the evidence and find Nick not

16  guilty of all three charges.  Thank you.

17          THE COURT:  All right.  Mr. Kromberg?

18                    REBUTTAL ARGUMENT

19                BY MR. KROMBERG:

20          Thank you, Your Honor.

21          Good afternoon, ladies and gentlemen.  So here we

22  are.  I get to speak to you again.  When I was speaking to you

23  during the opening statement, I laid out what we would prove.

24  I think that you'll see that what we did was what we said we'd

25  do.

1283

1    And apparently, there's now no dispute that Nicholas

2    Young knew that he -- or believed that he was sending money to

3    ISIS to help ISIS bring fighters to fight for ISIS.  That's

4    what he did, and that's what he's now not contesting that he

5    knew that's what he was doing.  He was sending money to ISIS to

6    help ISIS bring more fighters to ISIS.

7          Okay.  That part is settled.  He did that.  Put

8    that -- you don't have to spend any time in the jury room on

9    whether he did it or not.  That's now settled.  He did it.

10         When Mo -- fake Mo sent the text message to Nicholas

11   Young saying, "Thanks," Nicholas Young wrote back talking about

12   ISIS, talking about fighting, saying that I'd like to buy a

13   slave girl.  I hope that a bunch of Alawite women are going to

14   fall -- I gather that a bunch of Alawite women are going to

15   fall into the hands of the mujahideen.

16         And then he goes on to talk about this woman that he

17   met who doesn't believe in jihad the way that he does, and

18   you'll go and read that text message, the last text message, he

19   says, "Yeah, she believes in jihad of the pen, the internal

20   jihad, the struggles we put upon ourselves, all that stuff that

21   there's no evidence for."

22         What the judge is going to instruct you is that you

23   can measure someone's predisposition even from how they act

24   now.  Someone who acts that way now, you can use that to think

25   what was his predisposition before.

1284

1    What was it that you heard that Mo or Khalil said

2   that would induce a police officer in Washington, D.C., to say,

3   "I want to buy a slave"?  Or that jihad, internal jihad stuff,

4   there's no evidence for that.  Internal struggle, that's a

5   bunch of baloney.  The real jihad is fighting.

6    Did Khalil or Mo tell him to do that?  Did Khalil or

7   Mo induce him to that?

8    Can we -- could I have the clicker from the

9   PowerPoint?  Thank you.

10    So when you look back at this -- okay.  We'll start

11   there.  So you can see that this Nicholas Young in the center

12   and the driver's license photo of Saleh Al-Barmawi and the

13   driver's license photo of Amine El Khalifi, Khalifi is the guy

14   who wore the suicide vest trying to get to the U.S. Capitol.

15   Saleh Al-Barmawi is the guy that you heard from Khalil and

16   Menzies, Brian Menzies, that Barmawi is the guy that says Anwar

17   Awlaki is the man.  Muhammad Maqdisi is the man.  Those are the

18   guys you should follow.  Khalil didn't come into this picture

19   yet.

20    And then the Chesser.  So Chesser was there first,

21   and then -- excuse me, Al-Barmawi is there first with

22   Mr. Young, and then Chesser is there, and then El Khalifi is

23   there, and Liban Mohamed is there.  That's the circle he was

24   traveling in.

25    Do you think -- do you think it's Khalil that caused

1285

1  him to have the beliefs that he had?  Or maybe it was Zachary

2  Chesser and Saleh Al-Barmawi and Liban Mohamed and Amine El

3  Khalifi?  Or, hey, we can go to the guys from 2014, but I don't

4  have them on my PowerPoint.

5          See -- oh, there we go, a circle.

6          So the guys in 2014 that Mo is telling you about,

7  there was Tejpal Singh and Peshwaz Waise.  Peshwaz was the guy

8  who got arrested in Texas who you heard about, and he was the

9  guy that Mo was trying to get on the recording in the first

10 place.  That was the original target.

11         And then there's Hicham Hall, and you heard a clip

12 and saw a transcript for that time that Hicham Hall was saying,

13 "Hey, Mo, you should not go join ISIS.  Absolutely not.  You

14 should not go join ISIS.  You should go to Afghanistan and

15 fight against Americans in Afghanistan."

16         That's the crowd, that's the circle that Mr. Young

17 was traveling in.

18         Now, you also heard, I think the defense brought out

19 on cross-examination of Mo that Hicham Hall was -- told Mo that

20 if I hear you're going to ISIS and if I ever see you, I'm going

21 to physically harm you.  Good for Hicham Hall.

22         What about Police Officer Young?  Police Officer

23 Young didn't quite react that way, did he?  Police Officer

24 Young said, "Hey, you want a ride to the airport?"

25         Defense talks about that text message that Officer

1286

1    Young sent in November 2014, that they're not proof of what

2    Officer Young knew at that time.  You don't have to think about

3    it.  We know why he sent the message.  You heard the tape, the

4    recording.  You saw the transcript.

5            And as I explained in the opening statement, Officer

6    Young tells Mo, "Hey, Mo, a couple of weeks after you leave,

7    I'm going to send you a text message.  Don't respond."

8            Mo says, "Don't respond?"

9            Officer Young says, "Don't respond.  The FBI is going

10   to come looking for you, and they're going to be -- once they

11   find out you're gone, they're going to be investigating the

12   people who are in contact with you.  That would be me --

13   actually, this is Officer Young thinking, That would be me.

14           So he says, "I'm going to send you this text message

15   to make it look like I don't know that you're really going to

16   try and join ISIS.

17           Okay.  That's the proof.  So what inference can you

18   draw from that?  The defense would have you draw the inference

19   that that text message was, was sent maybe for some other

20   reason.  Well, maybe, maybe Officer Young really wanted to get

21   together with Mo for lunch.

22           You don't need to draw that inference.  You have what

23   Officer Young said.  Officer Young said, "I'm sending you that

24   so when the FBI comes and investigates and they look to see if

25   I" -- Officer Young -- "knew you were going, it's going to make

1287

1    me look like I didn't know that you were going."

2          Okay.  What's the next inference you can draw from

3    that?  Perhaps that Officer Young expected there would be an

4    investigation into Officer Young's own conduct?  That's why

5    Officer Young wanted it to look good for Officer Young.

6          And if Officer Young expected there would be an

7    investigation into his own conduct, what would Officer Young, a

8    police officer for 13 years, think would be involved in the

9    investigation?  Perhaps a grand jury?  I mean, he is after all

10   a cop for 13 years.  Presumably cops know that people who get

11   arrested and charged are indicted by a grand jury sometimes.

12         So what, what the defense didn't mention, what the

13   judge is going to say is that -- is going to instruct you, I

14   predict, is that the existence of the grand jury investigation

15   did not have to be known to the defendant.  It had to be

16   foreseeable to him.

17         You think that an officer with 13 years of

18   experience, it might be foreseeable to him that a grand jury

19   might be involved in the investigation, when he knows, he's

20   expecting the investigation to happen?

21         Defense just mentioned that, oh, he was -- he

22   performed his job adequately.  See, defense is hoping that you

23   don't remember the evidence enough putting the pieces together.

24         When Khalil testified, Khalil said, "Yeah, there was

25   that time that Officer Young told me he had been stopped for a

1  traffic violation, and Officer Young said to Khalil, 'I didn't

2  tell the cop that I was a cop myself and maybe try to get out

3  of the ticket because I was afraid that he would call my

4  department, and that would be bad because I had already called

5  in saying I was on duty when I wasn't.'"

6          And you heard from, from Joanne Dill, the retired

7  Metro officer, said the officers were on their honor to, to be

8  on patrol where they were supposed to be on patrol and that

9  Officer Young apparently called in to say, "Yeah, I got that

10  covered.  I'm at the Metro station.  If anything happens, I'm

11  there."

12          Well, that's what we know about how Officer Young

13  conducted his job as a police officer:  calling in to say he's

14  on the job when he wasn't.

15          There is -- there are gobs of evidence of

16  predisposition to support terrorism before 2010.

17          Could you bring up 14-119?

18          So defense doesn't -- says that Nazi stuff, that's

19  just the government trying to smear the guy.  Well, who are you

20  going to believe, the defense or your own eyes?

21          You heard Ian Campbell say walking out of the

22  neo-Nazi rally -- or, excuse me, meeting, "Hey, don't discount

23  the idea of an alliance with the Muslims to combat the Jews."

24          Well, the defense says it's impossible.  How could a

25  neo-Nazi support Islamists?

1289

1    Well, okay.  There's 14-119, and the metadata on that

2  picture is from 2006.  That was four years before the defendant

3  met Khalil.

4    And then we have -- 10-203, please?

5    10-203, which will pop up on your screen in a moment,

6  was a terrorism manual.  You heard Daveed Gartenstein-Ross talk

7  about that.  That was downloaded onto his, you know,

8  Mr. Young's computer in 2007, three years before he met Khalil.

9    And how about Government Exhibit 14-100, the *Book of*

10  *Jihad*?  You heard about that from Daveed Gartenstein-Ross.

11  That was downloaded in November 2010.  That was only a month

12  and a half before he met Khalil.

13    Then you have all the *Inspire* magazines which we went

14  through.  You probably don't want me to show them to you again.

15  They were all before he met Khalil.  Make a bomb in the kitchen

16  of your mom; the ultimate mowing machine:  Drive your car and

17  knock people down; how to use encrypted communications.  All

18  that stuff on his computer and in hard copy, one issue in hard

19  copy, all before he ever met Khalil.

20    So don't let the smoke screen fool you about whether

21  there's a relationship between Nazi terrorism and Islamic

22  terrorism.

23    But -- can I have 10-701?

24    THE COURT:  You've got five minutes left.

25    MR. KROMBERG:  Thank you, Your Honor.

1    Mr. Young knew that the SS, the Nazi SS was Hitler's

2  instrument of terror, that's his book, and yet he has a tattoo

3  of an SS guy.  He has a license plate of the FRI KRP.  He has

4  the prayer list where the people he's praying for include his

5  family, it's a wonderful thing, and his friends, and those

6  great political leaders of the 20th and 21st Century:  Hitler,

7  Mussolini and Sadam and the Mufti of Jerusalem.

8    When Mr. Gibbs was speaking, you saw the Alliance

9  poster.  Now, that looked like a World War II vintage poster,

10  and yet it said 1939 to 2004, the Alliance Between Islamists

11  and Nazis.  That wasn't a World War II thing.  That was a 2004

12  thing, six years before he met Khalil.

13    And 4-203, "Finish what Hitler Started," had that on

14  his phone for a couple of years before the phone was seized.

15    Could we have 10-863?

16    Let's talk about music.  Okay.  You're going to --

17  that's a picture, but you're going to have the actual document

18  before you in the jury room.  That's the white power music,

19  your source for white power music.  Well, it is -- in case the

20  music really changed, let's go to 10-303.

21    Jihad nasheeds.  You heard what nasheeds are.

22  Nasheeds are songs.  As Mr. Gibbs said, this is who he was, and

23  this is who he is.  He yearned to be a terrorist.

24    Nobody convinced him.  It certainly wasn't Khalil or

25  Mo.  Go back and think, what was it that Khalil or Mo did that

1291

1   convinced Nicholas Young to be a terrorist or to want to

2   support terrorists?  No, this is who he was.

3          Go to 3-302, please.

4          That's the photo from 12/27/15.  So that's, that's

5   years after he met, he met Khalil.

6          Okay.  Let's go back a couple years.  How about

7   8-103?  That's his Facebook profile picture.  He takes the

8   picture of a jihadi from overseas and makes that his Facebook

9   profile picture.  What more do you have to have in order to

10  determine that this is what he wanted to be, if he could only

11  have the opportunity where he wouldn't get caught?

12         Ladies and gentlemen, think back on what Khalil said.

13  He wanted to attack the FBI.  He said peaceful protest was

14  useless.  You have to take things by force.  If you were

15  attacking a federal building, you couldn't do it with one

16  person, but if you had multiple people, it would be different.

17  He had body armor to outfit a team.

18         What more do you need to -- well, when he's -- now --

19  we now know he did it.  He sent the money to bring the ISIS

20  fighters over to help ISIS.  What more do you need?

21         I guess my final point is that the defense says,

22  well, but he was equivocal.

23         Could we have 16-106, please?

24         That's his oath of office.  He was equivocal.

25         And he told Mo sometime in 2014 that, you know, maybe

1292

1    it's not a great thing to do.

2           Okay.  Dr. Gartenstein-Ross said, explained that the

3    attraction of ISIS varied depending on ISIS's success because

4    the more ISIS succeeded, the more it appeared they really were

5    the actual Caliphate.

6           So the fact that Young was equivocal in 2014 really

7    doesn't have anything to do with what he believed in 2016, when

8    ISIS was in a much different position.  Hicham Hall would have

9    hit Mo for trying to join ISIS.

10          THE COURT:  Mr. Kromberg, your time is up.

11          MR. KROMBERG:  Officer Young helped.

12          Thank you, ladies and gentlemen.

13          THE COURT:  All right, we're going to take a

14   five-minute recess to reset the courtroom because people cannot

15   come and go when we're instructing the jury.

16          When you-all come back in, folks, the people I can't

17   see, if you'll now all sit down towards the far end, the other

18   end?  Because I like to be able to watch your faces while I'm

19   giving the instructions, all right?

20          We'll take a five-minute recess.

21          (Recess from 4:04 p.m., until 4:16 p.m.)

22          THE COURT:  All right, ladies and gentlemen, now that

23   you have heard all of the evidence that is to be received in

24   this trial and each of the arguments of counsel, it becomes my

25   duty to give you the final instructions of the Court as to the

1293

1   law that is applicable to this case.  You should use these

2   instructions to guide you in your deliberations.

3           All of the instructions of law given to you by the

4   Court, that is, those given to you at the beginning of the

5   trial, during the course of the trial, and now in these final

6   instructions, must guide and govern your deliberations.

7           It is your duty as jurors to follow the law as stated

8   in all of the instructions of the Court and to apply these

9   rules of law to the facts as you find them to be from the

10  evidence received during the trial.

11          Counsel have quite properly referred to some of the

12  applicable rules of law to you in their closing arguments.  If,

13  however, any difference appears to you between the law as

14  stated by counsel and that as stated by the Court in these

15  instructions, you, of course, are to be governed by the

16  instructions given to you by the Court.  You are not to single

17  out any one instruction alone as stating the law but must

18  consider all of the instructions as a whole in reaching your

19  decisions.

20          Neither are you to be concerned with the wisdom of

21  any rule of law stated by the Court.  Regardless of any opinion

22  you may have as to what the law ought to be, it would be a

23  violation of your sworn duty to base any part of your verdict

24  upon any other view or opinion of the law than that being given

25  to you in these instructions, just as it would be a violation

1294

1    of your sworn duty as judges of the facts to base your verdict

2    upon anything but the evidence received in this case.

3            You were chosen as jurors for this trial in order to

4    evaluate all of the evidence received and to decide each of the

5    factual questions presented by the allegations brought by the

6    government in the indictment and the not guilty plea of the

7    defendant.  In resolving the issues presented to you for

8    decision in this trial, you must not be persuaded by bias,

9    prejudice, or sympathy for or against any of the parties to

10   this case or by any public opinion.

11           Justice through trial by jury depends upon the

12   willingness of each individual juror to seek the truth from the

13   same evidence presented to all the jurors here in the courtroom

14   and then to arrive at a verdict by applying the same rules of

15   law as are now being given to each of you in these

16   instructions.

17           Now, during this trial, I permitted you to take

18   notes, and I believe several of you did, and many courts do not

19   permit note-taking by jurors, so a word of caution is in order.

20   There is always a tendency to place undue importance to matters

21   which one has written down.  Some testimony which is considered

22   unimportant at the time presented and thus not written down may

23   take on greater importance later in the trial in light of all

24   of the evidence presented.

25           Therefore, you are instructed that your notes are

1295

1   only a tool to aid your own individual memory, and you should

2   not compare your notes with other jurors in determining the

3   content of any testimony or in evaluating the importance of any

4   evidence.  Your notes are not evidence and are by no means a

5   complete outline of the proceedings or a list of the highlights

6   of the trial.  Above all, it is your memory which should be the

7   greatest asset when it comes time to deliberate and render a

8   decision in this case.

9        Moreover, I want to remind you that you are coequal

10  judges of the facts, and each juror's memory of and opinion

11  about the evidence is worthy of consideration by all the other

12  jurors.  That a juror may have taken extensive notes does not

13  mean that his or her memory or opinion is worthy of more

14  consideration than that memory or opinion of any juror who took

15  few notes or none at all.

16       Now, there is nothing particularly different in the

17  way that a juror should consider the evidence in a trial from

18  that in which any reasonable and careful person would deal with

19  any very important question that must be resolved by examining

20  facts, opinions, and evidence.  You are expected to use your

21  good sense in considering and evaluating the evidence in the

22  case.  Use the evidence only for those purposes for which it

23  has been received, and give the evidence a reasonable and fair

24  construction in the light of your common knowledge of the

25  natural tendencies and inclinations of human beings.

1296

1    If the defendant be proved guilty beyond a reasonable

2  doubt, say so.  If not proved guilty beyond a reasonable doubt,

3  say so.

4    Keep constantly in mind that it would be a violation

5  of your sworn duty to base a verdict upon anything other than

6  the evidence received in the case and the instructions of the

7  Court.  Remember as well that the law never imposes upon the

8  defendant in a criminal case the burden or duty of calling any

9  witnesses or producing any evidence because the burden of

10  proving guilt beyond a reasonable doubt is always with the

11  government.

12    Now, the evidence in this case consists of the sworn

13  testimony of the witnesses, regardless of who may have called

14  them, all exhibits received in evidence, regardless of who may

15  have produced them, and all facts which may have been agreed to

16  or stipulated to or judicially noticed.

17    Now, when the attorneys on both sides stipulate or

18  agree as to the existence of a fact, you may accept the

19  stipulation as evidence and regard that fact as proved.  You

20  are not required to do so, however, since you are the sole

21  judges of the facts.

22    Any proposed testimony or proposed exhibit to which

23  an objection was sustained by the Court and any testimony or

24  exhibit ordered stricken by the Court must be entirely

25  disregarded by you.  Anything you may have seen or heard

1297

1   outside the courtroom is not evidence and must be entirely

2   disregarded.

3           The questions, objections, statements, and arguments

4   of counsel are not evidence in the case unless made as an

5   admission or stipulation of fact.

6           Now, you are to base your verdict only on the

7   evidence received in the case.  However, in your consideration

8   of the evidence received, you are not limited to the bald

9   statements of the witnesses or to the bald assertions in the

10  exhibits.  In other words, you are not limited solely to what

11  you see and hear as the witness testifies or as the exhibits

12  are admitted.  Instead, you are permitted to draw from the

13  facts which you find have been proved such reasonable

14  inferences as you feel are justified in the light of your

15  experience and common sense.

16          Inferences are simply deductions or conclusions which

17  reason and common sense lead the jury to draw from the evidence

18  received in the case.

19          If any reference by the Court or by counsel to

20  matters of testimony or exhibits does not coincide with your

21  own recollection of that evidence, it is your recollection

22  which should control during your deliberations and not the

23  statements of the Court or of counsel.

24          Testimony or an exhibit can be admitted into evidence

25  during a trial only if it meets certain criteria or standards.

1298

1    It is the sworn duty of the attorney on each side of a case to

2    object when the other side offers testimony or an exhibit which

3    that attorney believes is not properly admissible under the

4    rules of law.  Only by raising an objection can a lawyer

5    request and then obtain a ruling from the Court on the

6    admissibility of the evidence being offered by the other side.

7    You should not be influenced against any attorney or his or her

8    client because the attorney has made an objection.

9            Moreover, do not attempt to interpret my rulings on

10   objections as somehow indicating how I think you should decide

11   the case.  I am simply making a ruling on a legal question

12   regarding the particular piece of testimony or exhibit.

13           It is the duty of the Court to admonish an

14   attorney -- and I think in this case, I did it to both sides --

15   who out of zeal for his or her cause does something which I

16   feel is not in keeping with the rules of evidence or procedure.

17   You are to draw absolutely no inference against the side to

18   whom an admonition of the Court may have been addressed during

19   the trial of this case.

20           And during the course of the trial, I occasionally

21   asked questions of a witness.  Do not assume that I hold any

22   opinion on the matters to which my questions may have related.

23   The Court may ask a question simply to clarify a matter, not to

24   help one side of the case or to hurt the other.

25           Now, there are two types of evidence which are

1299

1    generally presented during a trial, and these are called direct

2    evidence and circumstantial evidence.  Direct evidence is the

3    testimony of a person who asserts or claims to have actual

4    knowledge of a fact, such as an eyewitness.  Circumstantial

5    evidence is proof of a chain of facts and circumstances

6    indicating the existence of a fact.

7            And let me give you an example of circumstantial

8    evidence.  You leave your home at noon on a cold February day.

9    At that time, your front yard is bare.  It starts to snow, you

10   return at 5 p.m., and you see a footprint in the snow that now

11   covers your yard.

12           From the facts I've just given you, that is, the fact

13   that you left your home at noon, returned at 5 p.m., you see

14   the footprint, and you know from common experience that human

15   beings normally are associated with footprints, you can infer

16   that there was a person in your yard sometime between noon and

17   5 p.m.  If you had actually seen a person, that would be direct

18   evidence of that fact.

19           Now, the law makes no distinction between the weight

20   or value to be given to either direct or circumstantial

21   evidence.  Nor is a greater degree of certainty required of

22   circumstantial evidence than of direct evidence.  Your job is

23   to weigh all the evidence in the case in making your decisions.

24           Tape recordings of conversations have been received

25   in evidence and have been played for you.  I'm sorry, tape

1300

1  recordings of conversations have been received in evidence, and

2  they've been played for you, and typewritten transcripts of

3  these tape-recorded conversations have been furnished to you

4  solely for your convenience in assisting you in following the

5  conversation or in identifying the speakers.

6          The tapes themselves, however, are the evidence in

7  the case, and the typewritten transcripts are not evidence.

8  What you hear on the tapes is evidence; what you read on the

9  transcript is not.  So if you perceive any variation between

10  the two, you must be guided solely by the tapes and not by the

11  transcripts.

12          If you cannot, for example, determine from the tape

13  recording that particular words were spoken or if you cannot

14  determine from the tape recording who said a particular word or

15  words, you must disregard the transcripts insofar as those

16  words or that speaker are concerned.

17          Now, your decision on the facts of this case should

18  not be determined by the number of witnesses testifying for or

19  against a party or by the number of exhibits introduced by one

20  side or the other.  You should consider all the facts and

21  circumstances in evidence to determine which of the witnesses

22  you choose to believe or not believe and which of the exhibits

23  have more or less value.

24          You may find that the testimony of a smaller number

25  of witnesses on one side is more credible than the testimony of

1301

1    a greater number of witnesses on the other side, or that one or

2    two exhibits may have more significance to your evaluation of

3    the case as against numerous exhibits which you find have less

4    significance.

5            To sum up this instruction, always consider the

6    quality of the evidence rather than the quantity of the

7    evidence.

8            You have heard testimony from an undercover agent and

9    an informant who were involved in the government's

10   investigation in this case.  Law enforcement officials may

11   engage in stealth and deception, such as the use of informants

12   and undercover agents, in order to investigate criminal

13   activities.  Undercover agents and informants may use false

14   names and appearances and assume the roles of members in

15   criminal organizations.

16           Now, you as jurors are the sole and exclusive judges

17   of the credibility of each of the witnesses called to testify

18   in this case, and only you determine the importance or weight,

19   if any, that their testimony deserves.  And the word

20   "credibility" simply means the degree to which you're going to

21   believe somebody.

22           After making your assessment concerning the

23   credibility of a witness, you may decide to believe all of that

24   witness's testimony, only a portion of it, or none of it at

25   all.

1302

1    In making your assessment of that witness, you should

2    carefully scrutinize all of the testimony given by that

3    witness, the circumstances under which each witness has

4    testified, and all of the other evidence which tends to show

5    whether a witness in your opinion is worthy of belief.

6    Consider each witness's intelligence, motive to falsify, state

7    of mind, and appearance and manner while on the witness stand.

8    Consider the witness's ability to observe the matters as to

9    which he or she has testified, and consider whether he or she

10   impresses you as having an accurate memory or recollection of

11   these matters.

12   Consider also any relation a witness may bear to

13   either side of the case, the manner in which each witness might

14   be affected by your verdict, and the extent to which, if at

15   all, each witness is either supported or contradicted by other

16   evidence in the case.

17   Now, inconsistencies or discrepancies in the

18   testimony of a witness or between the testimony of different

19   witnesses may or may not cause you to disbelieve or discredit

20   such testimony.  Two or more persons witnessing an incident or

21   a transaction may simply see or hear it differently.  Innocent

22   misrecollection, like failure of recollection, is not an

23   uncommon human experience.  However, in weighing the effect of

24   a discrepancy, always consider whether it relates to a matter

25   of importance or to an insignificant detail, and consider

1303

1  whether the discrepancy results from innocent error or from

2  intentional falsehood.

3        After making your own judgment or assessment

4  concerning the believability of a witness, you can then attach

5  such importance or weight to that testimony, if any, that you

6  feel it deserves.  You will then be in a position to decide

7  whether the government has proven the charges beyond a

8  reasonable doubt.

9        Now, as I told you during the trial, the rules of

10 evidence ordinarily do not permit witnesses to testify as to

11 their own opinions or their own conclusions about important

12 questions in a trial.  An exception to this rule exists as to

13 those witnesses who are described as expert witnesses.  An

14 expert witness is someone who by education or by experience may

15 have become knowledgeable in some technical, scientific, or

16 very specialized area.  If such knowledge or experience may be

17 of assistance to you in understanding some of the evidence or

18 in determining a fact, an expert witness in that area may state

19 an opinion as to a matter in which he or she claims to be an

20 expert.

21       You should consider each expert opinion received in

22 evidence in this case and give it such weight as you may think

23 it deserves.  You should consider the testimony of an expert

24 witness just as you consider other evidence in this case.  If

25 you should decide that the opinion of an expert witness is not

1304

1   based upon sufficient education or experience, or if you should

2   conclude that the reasons given in support of the opinion are

3   not sound, or if you should conclude that the opinion is

4   outweighed by other evidence in the case, you may disregard the

5   opinion in part or in its entirety.  Again, you, the jury, are

6   the sole judges of the facts of this case.

7          Now, you have heard the testimony of law enforcement

8   officers.  The fact that a witness may be employed by the

9   government as a law enforcement official does not mean that his

10  testimony is necessarily deserving of more or less

11  consideration or greater or lesser weight than that of an

12  ordinary witness.

13         At the same time, it is quite legitimate for defense

14  counsel to try and attack the credibility of a law enforcement

15  witness on the ground that his testimony may be colored by a

16  personal or professional interest in the outcome of the case.

17         It is your decision, after reviewing all the

18  evidence, whether to accept the testimony of the law

19  enforcement witness and give to that testimony of the law

20  enforcement witness such weight, if any, as you feel it

21  deserves.

22         In evaluating credibility of the witnesses, you

23  should take into account any evidence that the witness who

24  testified may benefit in some way from the outcome of the case.

25  Such an interest in the outcome creates a motive to testify

1305

1    falsely and may sway the witness to testify in a way that

2    advances his own interests.  Therefore, if you find that any

3    witness whose testimony you are considering may have an

4    interest in the outcome of this trial, then you should bear

5    that in mind when evaluating the credibility of his or her

6    testimony and accept it with great care.

7              This is not to suggest that every witness who has an

8    interest in the outcome of a case will testify falsely.  It is

9    for you to decide to what extent, if at all, the witness's

10   interest has affected or colored his or her testimony.

11             The testimony of a witness may also be discredited,

12   or as we sometimes say, impeached, by showing that the witness

13   previously made statements which are different than or

14   inconsistent with his or her testimony here in court.  The

15   earlier inconsistent or contradictory statements are admissible

16   only to discredit or impeach the credibility of the witness and

17   not to establish the truth of these earlier statements made

18   somewhere other than here during the trial.  It is the province

19   of the jury to determine the credibility of a witness who has

20   made prior inconsistent or contradictory statements.

21             If a person is shown to have knowingly testified

22   falsely concerning any important or material matter, you

23   obviously have a right to distrust the testimony of such a

24   person concerning other matters.  You may reject all of the

25   testimony of that witness or give it such weight or credibility

1306

1    as you may think it deserves.

2              Now, the defendant in a criminal case has an absolute

3    right under our Constitution not to testify.  The fact that the

4    defendant, Nicholas Young, did not testify must not be

5    discussed or considered in any way when deliberating and in

6    arriving at your verdict.  No inference of any kind may be

7    drawn from the fact that a defendant decided to exercise his

8    privilege under the Constitution and did not testify.

9              As stated several times before, the law never imposes

10   upon a defendant in a criminal case the burden or duty of

11   calling any witnesses or of producing any evidence, and that is

12   because the burden of proof is always on the government.

13             Now, the next series of instructions are going to

14   address the structure of the indictment and the actual charges

15   that are at issue in this case.  I first of all want to make

16   sure I have told you that an indictment is only a formal method

17   used by the government to accuse a person of a crime.  It is

18   not evidence of any kind against Nicholas Young, who is

19   presumed to be innocent of the crimes charged.  Even though

20   this indictment has been returned against him, he begins this

21   trial with absolutely no evidence against him.

22             Nicholas Young has pleaded not guilty to this

23   indictment, and therefore, he denies that he is guilty of the

24   charges.

25             And Mr. Young is not on trial for any act or any

1307

1    conduct not specifically charged in the indictment.

2         A separate crime is charged in each count of the

3    indictment, and there are three counts in this case.  Each

4    charge and the evidence pertaining to it should be considered

5    separately by the jury.  The fact that you may find the

6    defendant guilty or not guilty as to one of the counts should

7    not control your verdict as to any other count.

8         Now, the indictment charges that the offenses alleged

9    were committed on or about a certain date.  Although it is

10   necessary for the government to prove beyond a reasonable doubt

11   that each offense was committed on a date reasonably near the

12   dates alleged in the indictment, it is not necessary for the

13   government to prove that the offense was committed precisely on

14   the dates charged.

15        Before I discuss the elements of the offenses charged

16   in the indictment, I need to instruct you on the meaning of the

17   word "and" as it is used in the charging language in the

18   indictment.  And "and" is a-n-d, the ordinary "and" word that

19   you-all know.

20        Where a statute, that is, where a law is worded in

21   the disjunctive, that is, it uses the word "or," you do X or Y

22   or Z, that's a disjunctive structure, so where a statute is

23   worded in the disjunctive, meaning it uses the word "or,"

24   federal pleading requirements require that the government

25   charge in the conjunctive, meaning that it uses the word "and,"

1308

1  so it would say X and Y and Z.  Where a statute specifies

2  several alternative ways in which an offense may be committed,

3  if only one of those alternatives is proved beyond a reasonable

4  doubt, that is sufficient for conviction.

5        Now, all three of the charges in this case are

6  attempt charges, so I'm going to give you now a general

7  explanation of what we mean by "attempt."  In Count 1, Nicholas

8  Young is charged with attempting to provide material support or

9  resources to a foreign terrorist organization.  In Counts 2 and

10 4, he is charged with attempting to obstruct justice.

11       An "attempt" means the defendant did some act that,

12 under the circumstances as he believed them to be, was a

13 substantial step toward the commission of the substantive

14 crime.  For example, to show that Nicholas Young is guilty of

15 the offense charged in Count 1, the government must prove

16 beyond a reasonable doubt that he did some act that, under the

17 circumstances as he believed them to be, was a substantial step

18 toward the commission of the crime of providing material

19 support or resources to a foreign terrorist organization.

20       A substantial step is a direct act in a course of

21 conduct planned to culminate in the commission of a crime that

22 is strongly corroborative of the defendant's criminal purpose.

23 A substantial step is more than mere preparation but less than

24 completion of the crime.

25       So now we're going to go into the specific counts.

1309

```
 1   Count 1 of the indictment charges that between on or about
 2   December 3, 2015, and on or about August 2 of 2016, in Fairfax
 3   County, in the Eastern District of Virginia and elsewhere, the
 4   defendant did knowingly and unlawfully attempt to provide
 5   material support and resources, as that term is defined in
 6   Title 18 of the United States Code, Section 2339A(b), including
 7   personnel, money, property, and services, to a foreign
 8   terrorist organization, to wit:  the Islamic State of Iraq and
 9   the Levant, ISIL, which at all relevant times was designated by
10   the Secretary of State as a foreign terrorist organization,
11   knowing that ISIL had been designated as a foreign terrorist
12   organization, and knowing that ISIL had engaged in and was
13   engaging in terrorist activity and terrorism.
14           Now, the statute that's involved in Count 1 is
15   Section 2339B of Title 18 of the United States Code, and it
16   defines the offense of attempting to provide material support
17   or resources to a foreign terrorist organization as follows:
18   "Whoever knowingly provides material support or resources to a
19   foreign terrorist organization, or attempts or conspires to do
20   so, shall be fined under this title or imprisoned . . ..  To
21   violate this paragraph, a person must have knowledge that the
22   organization is a designated terrorist organization, that the
23   organization has engaged or engages in terrorist activity, as
24   defined by law, or that the organization has engaged or engages
25   in terrorism as defined by law."
```

1310

1    Now, every federal crime have what are called

2    essential elements.  These are particular components, and the

3    burden is on the government to prove -- in order for them to

4    prove a person guilty of a particular crime, they have to prove

5    each and every one of the elements beyond a reasonable doubt.

6    That means, therefore, for example, if you have a crime with

7    four essential elements and let's say the government proves

8    three of those beyond a reasonable doubt but the jury has a

9    reasonable doubt about the fourth element, you cannot convict

10   on that particular offense.  So it's an all-or-nothing

11   proposition for the government.

12   So the elements for Count 1.  As I said, Section

13   2339B of Title 18 makes it a crime for any person to attempt to

14   commit this offense, that is, to provide material support or

15   resources to a foreign terrorist organization, knowing that the

16   foreign terrorist organization is designated by the United

17   States as such or that the terrorist organization had engaged

18   or was engaging in terrorist activity or terrorism.

19   To sustain its burden of proof for the crime of

20   attempting to provide material support and resources to a

21   foreign terrorist organization, the government must prove the

22   following three essential elements beyond a reasonable doubt:

23   First, that the defendant knowingly and intentionally

24   attempted to provide material support or resources to a

25   designated foreign terrorist organization.  So that's number

1    one;

2         Two, that the defendant knew that ISIL, also known as

3    ISIS and the Islamic State, was a designated foreign terrorist

4    organization or had engaged or was engaging in terrorist

5    activity or terrorism; and

6         Three, that the defendant did some act that was a

7    substantial step in an effort to provide material support or

8    resources to ISIL, also known as ISIS and the Islamic State.

9         And again, a substantial step is a direct act in a

10   course of conduct planned to culminate in the commission of a

11   crime that is strongly corroborative of the defendant's

12   criminal purpose.  A substantial step is more than mere

13   preparation but less than completion of the crime.

14        Now, as explained in that previous instruction, you

15   must find as one of the elements beyond a reasonable doubt that

16   the defendant knew that ISIL, also known as ISIS and the

17   Islamic State, was a designated foreign terrorist organization

18   or had engaged or was engaging in terrorist activity or

19   terrorism.

20        The term "foreign terrorist organization" has a

21   particular meaning under this statute.  In order for an

22   organization to qualify as a foreign terrorist organization,

23   the organization must have been designated as such by the

24   Secretary of State through a process established by law.  I

25   instruct you as a matter of law that ISIL has been designated a

1312

1  foreign terrorist organization by the United States Secretary

2  of State and was so designated under a previous name of

3  al-Qaeda in Iraq by the Secretary of State on October 15, 2004.

4        I further instruct you that in May of 2014, the

5  Secretary of State amended the designation to add the alias

6  Islamic State of Iraq and the Levant, that is, ISIL, I-S-I-L,

7  as the primary name of this foreign terrorist organization, and

8  added the following aliases to the ISIL listing, among others:

9  the Islamic State of Iraq and al-Sham, that's ISIS; the Islamic

10 State of Iraq and Syria, also ISIS; and Daesh, D-a-e-s-h.

11       The term "terrorist activity" includes any activity

12 that, if it had been committed in the United States, would be

13 unlawful under the laws of the United States or any state and

14 that involves a threat, attempt, or conspiracy to use any

15 explosive, firearm, or other weapon or dangerous device other

16 than for mere personal monetary gain, with the intent to

17 endanger, directly or indirectly, the safety of one or more

18 individuals or to cause substantial damage to property.

19       The term "terrorism" means premeditated, politically

20 motivated violence perpetrated against noncombatant targets by

21 subnational groups or clandestine agents.

22       The term "material support or resources" includes

23 among other things any property, tangible or intangible, or

24 service, including currency or monetary instruments, and

25 personnel.

1313

1      Now, Count 2 alleges that between on or about

2 December 3, 2015, and December 5 of 2015, in Fairfax County, in

3 the Eastern District of Virginia, the defendant, Nicholas

4 Young, did knowingly, unlawfully, and corruptly attempt to

5 obstruct and impede an official proceeding, in specific, that

6 he knew that the FBI was investigating the circumstances of

7 what Young believed to be the attempt of an individual referred

8 to in this trial as "Mo" to travel to join ISIL, a designated

9 foreign terrorist organization.  Nevertheless, in an attempt to

10 thwart the investigation and prosecution of Mo and of Nicholas

11 Young, himself, for attempting to provide material support to

12 ISIL, Nicholas Young attempted to deceive investigators with

13 respect to the destination and purpose of what Young believed

14 to be Mo's travel overseas in 2014.

15      And Count 4 charges another violation of the same

16 statute, and this one is that on or about November 20 of 2014,

17 in Fairfax County, in the Eastern District of Virginia and

18 elsewhere, the defendant, Nicholas Young, did knowingly,

19 unlawfully, and corruptly attempt to obstruct, influence, and

20 impede an official proceeding of the grand jury; in specific,

21 that Nicholas Young sent a text message to a cell phone that

22 Young believed to be used by an individual referred to in this

23 trial as "Mo" in order to make it falsely appear to the FBI

24 that Mo had left the United States to go on a vacation tour in

25 Turkey when, instead, Nicholas Young believed that Mo had gone

1314

1    to Turkey to go from there to Syria in order to join and fight

2    for the designated foreign terrorist organization known as

3    ISIL.

4            Now, the statute involved in Counts 2 and 4 is

5    Section 1512(c)(2) of Title 18 of the United States Code, and

6    that provides in pertinent part that:  "Whoever corruptly . . .

7    obstructs, influences, or impedes any official proceeding, or

8    attempts to do so . . . shall be fined under this title or

9    imprisoned . . .."

10           There are two essential elements for the -- for

11   Counts 2 and 4, so to sustain its burden of proof for the crime

12   of attempted obstruction of justice, the government must prove

13   the following elements:

14           One, that the defendant unlawfully and knowingly

15   attempted to obstruct, influence, or impede an official

16   proceeding; and

17           Two, that the defendant did so corruptly.

18           The fact that the defendant was dealing with

19   undercover government agents rather than real members of the

20   Islamic State, that is, with ISIS or ISIL, is not a defense to

21   any charge in this indictment.

22           The term "official proceeding" includes a proceeding

23   before a judge or court of the United States, a United States

24   magistrate judge, a federal grand jury, or a proceeding before

25   a federal government agency which is authorized by law.

1315

1    The government does not need to prove that the

2    defendant was successful in obstructing, influencing, or

3    impeding an official proceeding.  An attempt to do so is

4    sufficient for Counts 2 and 4.

5    To act "corruptly," as this term is used in these

6    instructions, means to act with an improper purpose, personally

7    or by influencing another, including making a false or

8    misleading statement, or withholding, concealing, altering, or

9    destroying a document or other information.

10    The term "knowingly" as used throughout these

11    instructions describes the alleged state of mind of the

12    defendant, and it means that he was conscious and aware of his

13    actions, realized what he was doing or what was happening

14    around him, and did not act or fail to act because of

15    ignorance, mistake, or accident.

16    The government is not required to prove that the

17    defendant knew that his acts were unlawful.

18    The term "willfully," as used in these instructions

19    to describe the alleged state of mind of the defendant, means

20    that he knowingly performed an act, failed to act, deliberately

21    and intentionally, that means on purpose, as contrasted with

22    accidentally, carelessly, or unintentionally.

23    Now, the intent of a person or the knowledge that a

24    person possesses at any given time may not ordinarily be proved

25    directly because there is no way of directly scrutinizing the

1316

1  workings of the human mind.  In determining the issue of what a

2  person knew or what a person intended at a particular time, you

3  may consider any statements made or acts done or omitted by

4  that person and all other facts and circumstances received in

5  evidence which may aid in your determination of that person's

6  knowledge or intent.

7       You may infer, but you are certainly not required to

8  infer, that a person intends the natural and probable

9  consequences of acts knowingly done or knowingly omitted.  It

10  is entirely up to you, however, to decide what facts to find

11  from the evidence received during the trial.

12       Now, intent and motive are different concepts and

13  should never be confused.  Motive is what prompts a person to

14  act or fail to act.  Intent refers only to the state of mind

15  with which the act is done or omitted.

16       Personal advancement and financial gain, for example,

17  are two well-recognized motives for human conduct.  These

18  praiseworthy motives, however, may prompt one person to

19  voluntary acts of good while prompting another person to

20  voluntary acts of crime.

21       Good motive alone is never a defense where the act

22  done or omitted is a crime.  The motive of the defendant is

23  therefore immaterial except insofar as evidence of motive may

24  aid in the determination of state of mind or the intent of the

25  defendant.

1317

1    Now, the defendant asserts as to Count 1 that he was

2 a victim of entrapment.  An entrapment defense has two

3 elements.

4    The first element is that the government -- I'm

5 sorry, the first element is the government inducement of the

6 crime, and the defendant's lack of predisposition to engage in

7 the criminal conduct.

8    Where a person has no previous predisposition, that

9 is, intent or purpose to violate the law, but is induced or

10 persuaded by law enforcement officers or their agents to commit

11 a crime, that person is a victim of entrapment, and the law as

12 a matter of policy forbids that person's conviction.

13    On the other hand, where a person already has the

14 readiness and willingness to break the law, the mere fact that

15 government agents provide what appears to be favorable

16 opportunity is not entrapment.  For example, it is not

17 entrapment for a government agent to pretend to be someone else

18 and to offer either directly or through an informer or other

19 decoy to engage in an unlawful transaction.

20    If then you should find beyond a reasonable doubt

21 from the evidence in the case that before anything at all

22 occurred respecting the alleged offense involved in this case,

23 the defendant was ready and willing to commit a crime such as

24 the one charged in the indictment, even if not the exact crime

25 charged, whenever opportunity was afforded, and the government

1318

1    officers or their agents did no more than offer the

2    opportunity, then you should find that the defendant is not a

3    victim of entrapment.

4           On the other hand, if the evidence in the case should

5    leave you with a reasonable doubt whether the defendant had the

6    previous intent or purpose to commit an offense of the

7    character charged, apart from the inducement or persuasion of

8    some officer or agent of the government, then it is your duty

9    to find the defendant not guilty.  Remember, the burden is on

10   the government to prove beyond a reasonable doubt that the

11   defendant was not entrapped.

12          Inducement requires more than mere solicitation by

13   the government.  "Inducement" is a term of art necessitating

14   government overreaching and conduct sufficiently excessive to

15   implant a criminal design in the mind of an otherwise innocent

16   party.  For purposes of entrapment, the word "inducement" means

17   solicitation plus some overreaching or improper conduct on the

18   part of the government.

19          Simply cultivating the friendship of a target in

20   preparation to present a criminal opportunity is not inducement

21   to commit a crime unless that friendship involves coercion,

22   threats, or pleas that would constitute more than just

23   providing an opportunity to commit the crime.

24          The fact that government agents initiated contact

25   with the defendant, suggested the crime, or furnished the

1319

1    ordinary opportunity to commit it is insufficient to show

2    inducement.

3            Now, the term "predisposition" refers to the

4    defendant's state of mind before government agents made any

5    suggestion that he commit a crime.  The focus on the

6    predisposition inquiry is on whether the defendant was an

7    unwary innocent or instead an unwary criminal who readily

8    availed himself of the opportunity to perpetrate the crime.

9    The government does not entrap a defendant even if he does not

10   specifically contemplate the criminal conduct before the

11   government agent makes any suggestion that he commit the crime,

12   if his decision to commit the crime is the product of his own

13   preference and not the product of government persuasion.

14           Predisposition is not limited only to crimes

15   specifically contemplated by the defendant prior to government

16   suggestion.  Instead, it is sufficient if the defendant is of a

17   frame of mind such that once his attention is called to the

18   criminal opportunity, his decision to commit the crime is the

19   product of his own preference and not the product of government

20   persuasion.

21           Predisposition may be found from a defendant's ready

22   response to the inducement offered.  A defendant's

23   predisposition must be determined as of the time he was first

24   approached by a government agent; however, inferences about

25   that predisposition may be drawn from events after the two

1320

1    parties came into contact.

2         Now, in addition to the foregoing elements for the

3    three offenses -- three counts we've discussed, the government

4    must also prove with respect to Count 1 -- to each of these

5    counts that it has venue for the offense.  So for Count 1, they

6    have to be able to prove that it is more likely true than not

7    true that at least one act in furtherance of the crime occurred

8    in the Eastern District of Virginia.  If the government has not

9    proven that it is more likely true than not true that at least

10   one act in furtherance of the crime of attempted provision of

11   material support or resources to a foreign terrorist

12   organization occurred in the Eastern District of Virginia, then

13   you must find the defendant, Nicholas Young, not guilty as to

14   Count 1.

15        In addition to the foregoing elements as to Counts 2

16   and 4, the government must also prove with respect to these

17   counts that it is more likely true than not true that either

18   the official proceeding that was intended to be affected was in

19   the Eastern District of Virginia, or the conduct constituting

20   the alleged obstruction of justice occurred in the Eastern

21   District of Virginia.  If the government has not met this

22   burden, then you must find Nicholas Young not guilty as to

23   Count 2 and/or Count 4.  It's the same venue for both of those

24   counts.

25        This burden that the government has to prove venue is

1  not proof beyond a reasonable doubt.  It's what we call -- and

2  we're not using it here -- preponderance of the evidence, but

3  that simply means more likely true than not true.

4        Now, the last two instructions, I know these take a

5  while, I instruct you that you must presume the defendant to be

6  innocent of the crimes charged.  Thus, the defendant, although

7  accused of crime in the indictment, begins this trial with a

8  clean slate, that is, with no evidence against him.  The

9  indictment, as you already know, is not evidence of any kind.

10 The law permits nothing but legal evidence presented before the

11 jury in court to be considered in support of any charge against

12 the defendant.  The presumption of innocence alone therefore is

13 sufficient to acquit the defendant.

14       The burden is always upon the prosecution to prove

15 guilt beyond a reasonable doubt.  This burden never shifts to a

16 defendant because the law never imposes upon a defendant in a

17 criminal case the burden or duty of calling any witnesses or

18 producing any evidence.  The defendant is not even obligated to

19 produce any evidence by cross-examining the witnesses for the

20 government.

21       It is not required that the government prove guilt

22 beyond all possible doubt.  The test is one of reasonable

23 doubt.  And there's no fancy technical definition for that

24 term.  "Reasonable" and "doubt" are two ordinary English

25 language words.

1322

1    Unless the government proves beyond a reasonable

2  doubt that the defendant has committed each and every element

3  of the offenses charged in the indictment, you must find the

4  defendant not guilty of the offense.

5    Now, upon retiring to your jury room to begin your

6  deliberations, you must first elect one of your members to act

7  as the foreperson.  The foreperson will preside over your

8  deliberations, and he or she will be your spokesperson here in

9  court.

10    Your verdict must represent the collective judgment

11  of the jury.  In order to return a verdict, it is necessary

12  that each juror agree to it; in other words, it must be

13  unanimous.

14    It is your duty as jurors to consult with one another

15  and to deliberate with each other with a view towards reaching

16  an agreement if you can do so without violence to your

17  individual judgment.  Each of you must decide the case for

18  yourself, but do so only after an impartial consideration of

19  the evidence in the case with all the other jurors.  In the

20  course of your deliberations, do not hesitate to reexamine your

21  own views and to change your opinion if convinced it is

22  erroneous; however, do not surrender your honest conviction

23  solely because of the opinion of the other jurors or for the

24  mere purpose of being able to return a unanimous verdict.

25    Remember at all times you're not partisans.  You

1323

 1   don't represent the United States, and you don't represent

 2   Mr. Young.  Instead, you are judges, and your job is to judge

 3   the facts of the case, with your sole interest being to seek

 4   the truth from the evidence received during the trial.

 5          Now, your verdict must be based solely upon the

 6   evidence received in the case, and nothing you have seen or

 7   read outside of court may be considered.  Nothing that I have

 8   said or done during the course of this trial is intended in any

 9   way to somehow suggest to you what I think your verdict should

10   be.  Nothing said in these instructions and nothing in any form

11   of the verdict is to suggest or convey to you in any way what I

12   think your verdict should be.  What the verdict shall be is the

13   exclusive duty and responsibility of the jury.  As I have told

14   you so many times now, you are the sole judges of the facts of

15   this case.

16          Now, I don't recall if any of you have sat as a juror

17   in a Virginia court, and if you have, you might know that in

18   Virginia state court, the jury not only determines the issue of

19   guilt or innocence, but if a jury convicts, it also addresses

20   sentencing.  That is not how it works in the federal system.

21          So the punishment provided by law for the offenses

22   charged in the indictment is a matter exclusively within the

23   province of the Court and should never be considered by the

24   jury in any way in arriving at an impartial verdict as to the

25   offenses charged.

1324

1    Now, we've prepared a verdict form, if I can find it,

2    and this is the document on which the jury is going to report

3    its decision.  It has the caption of the case, United States of

4    America v. Nicholas Young, and then the verdict form reads as

5    follows:

6    As to Count 1, and then we've explained what it is,

7    attempting to provide material support to a foreign terrorist

8    organization by providing gift cards or gift card codes to Mo,

9    we, the jury, unanimously find beyond a reasonable doubt that

10   the defendant, Nicholas Young, is, and we have two lines:  Not

11   Guilty or Guilty.  You can use an X or a check, whatever

12   you-all want to do, to indicate your decision.

13   Then as to Count 2, attempt to obstruct justice, we,

14   the jury, unanimously find beyond a reasonable doubt that the

15   defendant, Nicholas Young, is, and again, Not Guilty or Guilty.

16   As to Count 4, attempt to obstruct justice, we, the

17   jury, unanimously find beyond a reasonable doubt that the

18   defendant, Nicholas Young, is, and then Not Guilty or Guilty.

19   Then we ask the foreperson to sign his or her

20   signature, and please print his or her name underneath because

21   we can't always read your signatures, and then the date that

22   the decision is made is also placed on the verdict form.

23   Now, when you go to the jury room, as I said, your

24   first business is going to be to select one of you to act as

25   the foreperson.  It will take us, unfortunately, because

1325

1    there's so much evidence in this case and we have to make sure

2    it's all in good condition, it's still going to take a bit of

3    time to get the exhibits in to you, but you will have the

4    verdict form, you'll have your notebooks you may take in with

5    you, and I am going to have a couple of copies of these jury

6    instructions made so you can refresh your memory about them.

7            Now, it's about 5 after five.  It's a very light snow

8    out there.  I don't think there's a problem on the roads, but I

9    think also as soon as you go into the jury room, you should

10   decide whether you want to continue deliberating -- or start

11   deliberating tonight or come back Monday morning.

12           Once the jury gets the case, it's basically you

13   control our schedule.  If the jury says they want to start

14   deliberating at eight o'clock in the morning, I'll make sure we

15   have the building open for you, although technically,

16   physically it doesn't really open until eight.  If a jury wants

17   to stay later in the evening, we let juries stay late in the

18   evening, although I can't guarantee we'll have heat unless I

19   know about it sufficiently in advance.

20           So I'm going to send you back in a minute, and as I

21   said, if you will decide who the foreperson is going to be and

22   how you want to proceed today, all right?

23           Anytime the jury wants to communicate with the Court,

24   it's done by sending a written note.  That's why you have your

25   notebooks, and if you need extra paper, we'll get it for you.

1326

1   You should never do it orally.

2          And in any communication you make with the Court, you

3   should never tell us how you're voting on any issue.  In other

4   words, we are not supposed to know what your -- how your

5   deliberations are going, but if you have a question or you have

6   a piece of information you want to give us, such as:  We're

7   taking a break at, you know, two o'clock or whatever, you write

8   that down in a note, the foreperson ought to sign it and date

9   it, and then you fold it over and you give it to my court

10  security officer to bring to court.

11         Now, I require the lawyers to stay in the courtroom

12  whenever a jury is deliberating, and that's because if you have

13  a question, I can't answer it without running it by the

14  attorneys.  That means if you're not working, if you're taking

15  your coffee break downstairs or going to lunch, I can let the

16  lawyers leave the floor.  So I do ask the jury foreperson to

17  make sure that you give us your schedule so I know if you're

18  going to take the coffee break at 11:00 Monday morning to

19  11:15, then I can let everybody go at that point, all right?

20         All right, counsel, approach the bench.

21         (Bench conference on the record.)

22         THE COURT:  Mr. Kromberg, is there any objection to

23  the charge?

24         MR. KROMBERG:  I have one, I guess it's my fault for

25  not raising it before, but we had the instruction entitled

1    "Official Proceeding Need Not Be Pending," and we agreed that

2    it wasn't necessary to the extent that there was no dispute

3    regarding whether there was a proceeding in effect, but the

4    second half of that instruction said that the standard for the

5    defendant was foreseeability.

6            So I do request that sentence in there because

7    otherwise, they're left with the defense arguing that they had

8    to know there was an official proceeding, and the law is it had

9    to be foreseeable.

10           MR. SMITH:  Your Honor actually ruled on this in a

11   hearing we had before trial.  This issue was raised, and it's

12   on the record.  Your Honor ruled that the foreseeability

13   language the government wanted to include was actually not

14   found in 18 U.S.C. 1512(f), and Your Honor, after considering

15   that subsection, I believe Your Honor ruled that that was not

16   appropriate to include the foreseeability language.  So I

17   believe that's law of the case.

18           THE COURT:  I'll keep that under consideration.

19   Anything else?

20           MR. KROMBERG:  Okay.  I think we -- I don't know if

21   you were going to do this anyway, but we have two alternates.

22           THE COURT:  Oh, I know.

23           MR. KROMBERG:  Okay.  That's all.  And everything

24   else is fine, Judge.

25           THE COURT:  All right.  Anything?

1328

1    MR. SMITH:  None.

2    THE COURT:  Okay.  Mr. Kromberg, we did consider

3  that.  We're leaving that out.  I think that is the law of the

4  case at this point.

5    MR. KROMBERG:  Okay.

6    THE COURT:  Wait, wait, wait.  As we said earlier,

7  we've got 14 people here.  Now we're going to select the two

8  alternates, so what happens is my courtroom deputy, Ms. Guyton,

9  is going to randomly pull two names.  The first name is

10  alternate No. 1; the second name is alternate No. 2.

11    What I then do is I keep those two under the same

12  admonition about not conducting an investigation, all right,

13  should we have to pull anyone back in, but they don't come back

14  to the courthouse in the meantime.  They go back to their

15  regular life.  We don't do that.  In my time, I've never had a

16  person come back in, all right?  So just so you know, all

17  right?

18    MR. SMITH:  Judge, are they going to be allowed to --

19  are they going back into the jury room now and deciding if

20  they're --

21    THE COURT:  I have to get the 12 first.

22    MR. SMITH:  Okay.

23    THE COURT:  All right, stay here.

24    Alternate No. 1 is No. 90, Garrett Wolf.

25    No. 2 is Justin Scuiletti, No. 70.

1329

1    All right?  You can go back.

2    (End of bench conference.)

3    THE COURT:  Now, ladies and gentlemen, some of you

4    may have wondered that there are 14 of you sitting in the box,

5    and what you've always heard is 12 people make up the jury.  It

6    turns out that we did have 14 of you seated because given the

7    length of the trial, and I did think it would go much further

8    into next week than it has, we had to have a couple of extra

9    jurors because a criminal trial has to have 12 people in the

10   jury box, so two of you have now been pulled as alternates, and

11   so who is Mr. Wolf?

12   Mr. Wolf, you are alternate No. 1.

13   And who is Mr. Scuiletti?  You are alternate No. 2.

14   Now, what that means is that you are not going to be

15   able to deliberate with the jury.  We're going to send you

16   home.  However, you must continue to follow my instructions;

17   that is, you cannot conduct any investigation about the case.

18   You can go to work on Monday.  That's fine.

19   But you're to conduct yourself just as if you were a

20   regular juror, all right?  Because if for some reason someone

21   gets ill or we're not able to get a decision and then one of

22   the jurors has to leave for some reason, we would first pull

23   you, Mr. Wolf, in, and then if we needed a second alternate,

24   Mr. Scuiletti.

25   We will call you as soon as the case is over to let

1330

1    you know you're no longer needed as an alternate, but you need

2    to make sure that you don't get yourself contaminated, all

3    right?  So what you should do is leave your notebooks here, and

4    then you gentlemen are free to go.

5            And the rest of you, if the remaining 12 jurors --

6    and I do want to thank both of you.  It's been a whole week of

7    your life.  I hope you realize you were a very important part

8    of the process, but we do have to let you go at this point, all

9    right?  So you, both of you may leave at this time.

10                        (Alternate Jurors excused.)

11           THE COURT:  So the remainder of the group, you are

12   now the jury that's going to decide this case.  So I will ask

13   that you go back to the jury room, decide who wants to be the

14   foreperson, decide what you want to do, whether you want to try

15   to start deliberating tonight, although, as I said, I can't get

16   the evidence yet to you tonight, it's going to take a while to

17   pull all of it together.

18           If you decide -- and obviously, you're going to have

19   to come back, I suspect, on Monday.  Decide what time you want

20   to start on Monday.  Just remember, however, that you can't

21   start until all 12 of you are here.

22           One last thing:  Whoever becomes the foreperson, jury

23   deliberation is a collective thinking process, so the opinions

24   and the memories of the 12 of you are very important because

25   you have to listen to each other.  So anytime a juror is out of

1331

1    the room, whether it's to use the restroom or to run downstairs

2    and grab a cup of coffee or something, you have to stop talking

3    about the case, because while that juror is away, he or she is

4    not hearing what you're all talking about, and so the

5    foreperson needs to really sort of control how things are done,

6    all right?

7            So we're going to let you-all go back into the jury

8    room, decide who's going to be the foreperson, and then write

9    down his or her name, please, on a slip of paper, and let us

10   know whether you do want to stay a bit tonight or if not, what

11   time you want to come back on Monday.  Then we'll bring you

12   back in here, all right?

13           We'll recess court to await the decision of the jury.

14               (Recess from 5:15 p.m., until 5:27 p.m.)

15                   (Defendant present, Jury out.)

16           THE COURT:  All right, we've got the most succinct

17   note I've ever seen from a jury:  "End now."  Let's bring the

18   jury in.

19                       (Jury present.)

20           THE COURT:  Mr. Hull, I've got to tell you, that's

21   the most succinct statement we've gotten from a jury:  "End

22   now."  So anyway, we got your message -- have a seat for just a

23   second -- so we're sending you home.

24           As I said, when you come in Monday morning, as soon

25   as everybody is here, you can start deliberating, all right?

1332

1    You will have -- at 9:30, when you come in, you will have three

2    sets of the jury instructions.  I think that should be enough

3    for you-all.  You can share them.  You will have a copy -- the

4    verdict form, and you will have all of the exhibits.

5              You're also going to have, because I asked the

6    parties to do this, sort of a list of the exhibits that have

7    been introduced, so if you're trying to find something, it will

8    help you find them.

9              If you need to replay any of the tapes, I'm not sure

10   whether we're going to have you listen to them here in the

11   courtroom, because here we could give you headsets.  We can't

12   work that out in the jury room.  So if that happens, we'll work

13   it out for you.  So if you need to listen to the tapes again,

14   we'll make sure you can do that.  And I think that's all you

15   need to know.

16             Again, it's really important that you continue very

17   carefully to follow my instructions.  Given the fact that we

18   ended early and that there were closing arguments, there may be

19   some media coverage about the trial, so it's very important

20   that you avoid any contamination of your thought process.

21             Have a good weekend.  I know we're getting close to

22   the holidays.  And I don't think we're going to have any

23   weather issues on Monday.  If for any reason any of you get

24   stuck and you're going to be late, it does help if you can

25   contact the Clerk's Office because then we can send the message

1333

1    to the other jurors, and you can't deliberate, but you could

2    get a longer coffee or something like that, all right?

3              Thank you again for your hard work this week.  We'll

4    see you-all on Monday.  I'm going to stay in session with

5    counsel.  I have a couple of housekeeping matters with them,

6    but you're all free to go home.  Thank you.

7                        (Jury out.)

8              THE COURT:  All right, since we have the luxury of a

9    little time, I am still concerned that we absolutely be

10   positive that all the right exhibits are going to the jury.  So

11   I put the burden on counsel to work with Ms. Guyton to make

12   sure that that's fine, but we need to have that all ready to

13   go.

14             The second thing is are both sides satisfied with the

15   list of exhibits?  You were supposed to do a list.

16             MR. KROMBERG:  We are, Your Honor.

17             THE COURT:  Have you looked at the government's list?

18             MR. SMITH:  We are, Your Honor.

19             THE COURT:  All right.

20             MR. SMITH:  The same as we went through with Your

21   Honor.

22             THE COURT:  No, no, no, I mean the physical one

23   they're going to send to the jury.  I asked --

24             MR. SMITH:  No, I haven't seen the physical one yet.

25             THE COURT:  All right.  I asked for the record for

1334

1  each side to initial the other side's so that there's no

2  dispute about somehow there's something that creeped in in

3  the -- on that list.

4         Before the government leaves, I want you to take all

5  your extra notebooks, all right?  So I'll make sure that you

6  get those.

7         And we only require one attorney per side.  I mean,

8  if you-all want to be here, that's fine, you're welcome to be

9  here, but just so you know, as long as there is one attorney

10 who can respond to any questions the jury might have, that is

11 sufficient, all right?

12        Ms. Moreno, you're from out of town, so that's

13 totally up to you.

14        And I think that should be it.  Are there any other

15 issues we need to address this evening?

16        MR. KROMBERG:  Not from the government, Judge.

17        THE COURT:  All right.  Anything further from the

18 defense?

19        MS. MORENO:  No, Your Honor.

20        THE COURT:  All right, then you-all have a good

21 weekend.  The two of you both got colds.  I hope it's not

22 running around the air system in the building.  But by Monday,

23 everyone should be healed.

24        All right, we'll recess court until 9:30 Monday

25 morning.

1335

1    (Recess from 5:31 p.m., until 9:30 a.m., December 18, 2017.)

2

3                    CERTIFICATE OF THE REPORTER

4        I certify that the foregoing is a correct transcript of

5    the record of proceedings in the above-entitled matter.

6

7

8                                    _____/s/_____

9                                         Anneliese J. Thomson

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1336

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .      Criminal No. 1:16cr265
                              .
      vs.                     .      Alexandria, Virginia
                              .      December 18, 2017
NICHOLAS YOUNG,               .      9:30 a.m.
                              .
            Defendant.        .
                              .
.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME VI

APPEARANCES:

FOR THE GOVERNMENT:          JOHN T. GIBBS, AUSA
                             GORDON D. KROMBERG, AUSA
                             EVAN N. TURGEON, SAUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314


FOR THE DEFENDANT:           NICHOLAS D. SMITH, ESQ.
                             David B. Smith, PLLC
                             108 North Alfred Street
                             Alexandria, VA 22314
                              and
                             LINDA MORENO, ESQ.
                             Linda Moreno P.A.
                             511 Avenue of the Americas
                             No. 2
                             New York, NY 10011


ALSO PRESENT:                SA NICHOLAS CASLEN
                             FABIAN VERA


(Pages 1336 - 1347)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1337

1    OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
2                                    401 Courthouse Square
                                     Alexandria, VA 22314
3                                    (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1338

1          P R O C E E D I N G S

2                    (Defendant present, Jury out.)

3          THE CLERK:  Criminal Case 16-265, United States of

4    America v. Nicholas Young.  Would counsel please note their

5    appearances for the record.

6          MR. KROMBERG:  Good morning, Your Honor.  Gordon

7    Kromberg for the United States.  With me at counsel table is

8    FBI Special Agent Nicholas Caslen and paralegal specialist

9    Fabian Vera.

10         THE COURT:  Good morning.

11         MR. SMITH:  Good morning, Your Honor.  Nicholas Smith

12   for defendant Nicholas Young, and with me is Ms. Moreno, Linda

13   Moreno.

14         THE COURT:  All right, good morning.  We've received

15   a question from the jury, which I'm sure you've all had a

16   chance to look at, and the question is the following:  The

17   first sentence of the predisposition instruction says,

18   "defendant's state of mind before agents suggested that he

19   commit a crime."

20         "The last sentence says, 'A defendant's

21   predisposition must be determined as of the time he was first

22   approached by government agent.'

23         "Does 'approached by the government agent' refer to

24   when the government suggested the crime or when a government

25   agent first met the defendant?"

1339

```
1              Again, this shows you how carefully our juries go
2      about thinking about these cases.  Although I really don't
3      think the Jacobson case is adequately nuanced, Jacobson and the
4      Fourth Circuit cases that follow it clearly in my view say that
5      a defendant's predisposition must be determined as of the time
6      he was first approached by a government agent, that that is the
7      correct statement of the law.
8              Mr. Smith?
9              MR. SMITH:  Yes, Your Honor, we agree that is a
10     correct statement of the law.
11             THE COURT:  Yeah.
12             MR. SMITH:  And we would just point out that in the
13     pretrial charging conference, we actually discussed this very
14     issue --
15             THE COURT:  I know.
16             MR. SMITH:  -- and it's a little eerie, but the
17     defense objected on the basis of the first sentence, and
18     Mr. Kromberg rightly noted that if the defense merely peered
19     down the page and looked at the last sentence, the correct
20     statement of law was there.
21             So Mr. Kromberg noted something to the effect of we
22     don't know why the defense is complaining because the statement
23     of law they want is in the last sentence, and so we would argue
24     that any argument to the contrary has been waived in light of
25     the government's --
```

1340

1    THE COURT:  All right.  Mr. Kromberg?  So I'm going

2    to tell the jury that's the answer unless there's some issue

3    you want to raise.

4        MR. KROMBERG:  No, Your Honor.

5        THE COURT:  All right, that's fine.  We'll bring the

6    jury in.

7                    (Jury present.)

8        THE COURT:  Please, ladies and gentlemen, have a

9    seat, and good morning.  Before we get started, I just want to

10   make sure, did any of you bump into the article in *The*

11   Washington Post over the weekend about the case?

12                    (Jurors shaking heads.)

13       THE COURT:  No?  Very good.  And you've continued to

14   following my instructions?

15                    (Jurors nodding heads.)

16       THE COURT:  Well, we've gotten a very astute question

17   from you, and obviously, there's a slight unclarity about

18   Instruction 43, so I want to make sure it's clear for you.  The

19   question you asked was that the first sentence in that

20   instruction about predisposition describes the defendant's

21   state of mind before agents suggested that he commit a crime.

22       "The last sentence says, 'A defendant's

23   predisposition must be determined as of the time he was first

24   approached by government agent.'

25       "Does 'as approached by the government agent' refer

1341

1    to when the government suggested the crime or when a government

2    agent first met the defendant?"

3              And the answer really is in the instruction.  It was

4    just not as clearly as it should be.  It's the very last

5    paragraph of that instruction.  So a defendant's predisposition

6    must be determined as of the time he was first approached by a

7    government agent, all right?

8              So we thank you for your question, and we'll let you

9    go back to continue your deliberations.  We'll recess court.

10              (Recess from 10:51 a.m., until 11:42 a.m.)

11                        (Defendant present, Jury out.)

12              THE COURT:  The question, this is an easy one:  "Do

13    you have a headset that will plug into the laptop?"

14              What we have is, I'm holding up my hand, are ear

15    plugs, and I'm told that the way the computer works, they can

16    have -- two people could be listening, one in each ear.  So

17    they only asked for one headset, and this will be what we're

18    going to give them.

19              Is there any objection to that?

20              MR. GIBBS:  None from the government, Judge.

21              THE COURT:  Mr. Smith?

22              MR. SMITH:  Your Honor, I inquired, anticipating the

23    jury might have this question, I understand that there's a

24    whole slew of headsets right next to the computer on the desk

25    right here.  There are 12 for 12 jurors.

1342

```
 1              THE COURT:  There are not 12 holes in the laptop.

 2              MR. SMITH:  Oh, oh, but these are in case the jurors

 3   want to, I don't know, go and plug in individually?

 4              THE COURT:  Well, we're getting this from our IT

 5   people, that for the particular laptop that they have got in

 6   the jury room on which they're able to apparently play the

 7   tapes, that this is what our IT people are recommending.

 8              So I'm going to send this in.  If we get another

 9   note -- this jury is not shy about letting us know if they're

10   not happy with what they're getting -- we can revisit the issue

11   about whether these headsets will work, but my understanding

12   is, and I don't know if the jack is the same or not, but this

13   is what our IT people told us.

14              MR. SMITH:  Your Honor, are those earbuds?  I can't

15   really see what --

16              THE COURT:  They're earbuds.

17              MR. SMITH:  Earbuds, okay.  Like the kind you fold

18   down and listen to --

19              THE COURT:  That's correct.  And so one person could

20   put it in both ears, or two people with one bud in each ear,

21   two could listen at the same time.

22              MR. SMITH:  Okay.  Thank you, Your Honor.

23              THE COURT:  All right?  There's no objection?

24              MR. GIBBS:  Not from the government.

25              MR. SMITH:  No, Your Honor.
```

1343

1    THE COURT:  All right, we're just sending it in.  I'm

2  not bothering to bring the jury back in, all right?  So we'll

3  recess court to await the decision.  And remember, they're

4  going to lunch at one o'clock.

5        (Recess from 11:44 a.m., until 12:41 p.m.)

6                    (Defendant present, Jury out.)

7    THE COURT:  All right, let's bring the jury in.

8                    (Jury present.)

9    THE CLERK:  Mr. Foreperson, has the jury reached its

10  verdict?

11    THE FOREPERSON:  Yes, ma'am.

12    THE CLERK:  Can you hand it to the court security

13  officer, please?

14    THE COURT:  You-all may have a seat.

15    THE CLERK:  Will the defendant please stand to face

16  the jury?

17        In the Matter of Criminal Case 16-265, United States

18  of America v. Nicholas Young:

19        "As to Count 1, attempting to provide material

20  support to a foreign terrorist organization by providing gift

21  cards or gift card codes to Mo, we, the jury, unanimously find

22  beyond a reasonable doubt that the defendant, Nicholas Young,

23  is guilty.

24        "As to Count 2, attempt to obstruct justice, we, the

25  jury, unanimously find beyond a reasonable doubt that the

1344

1   defendant, Nicholas Young, is guilty.

2          "As to Count 4, attempt to obstruct justice, we, the

3   jury, unanimously find beyond a reasonable doubt that the

4   defendant, Nicholas Young, is guilty.

5          Signed "Foreperson Robert M. Hull, Jr., December 18,

6   2017."

7          Ladies and gentlemen, is this your unanimous verdict?

8          ALL JURORS:  Yes.

9          THE COURT:  Does either side want to have the jury

10  polled?

11         MR. SMITH:  No, Your Honor.

12         MR. GIBBS:  No, Your Honor.

13         THE COURT:  Ms. Moreno, that's correct, you don't

14  want the jury polled?

15         MS. MORENO:  That's correct, Your Honor.

16         THE COURT:  All right.  Then, ladies and gentlemen, I

17  want to thank you on behalf of the parties and the Court for

18  giving us six days of your very valuable time.  It is never

19  easy sitting in judgment of another human being.  It's a very

20  tough job, and we know because you-all came to court on time

21  and you asked a very intelligent question that you went about

22  this job in a serious fashion.

23         Sitting as jurors is one of the most important civic

24  duties that we all have, and you should all feel very satisfied

25  that you have upheld that obligation well, but your service to

1345

1  the Court is now complete, and so you'll be able to leave now.

2          We will advise your two former colleagues that the

3  verdict has been reached.

4          I do also want to tell you that we have a local rule

5  that prohibits the attorneys in the case from contacting any of

6  you.  Now, you-all have a First Amendment right to discuss your

7  jury experience if you wish to.  I'm not gagging any of you.  I

8  would, however, advise you to be respectful of your fellow and

9  sister jurors in anything that you might say.

10         But your service to the Court is complete.  You can

11  check out with the Jury Office as you leave the building.

12  Thank you, ladies and gentlemen.  We'll stay in session.

13                       (Jury excused.)

14         THE COURT:  All right, I will enter the jury's

15  verdict, and we need to set this case for sentencing.  How is

16  Friday, March 10, for everybody?  I'm sorry, March 9, 2018.

17         MR. SMITH:  Your Honor, there are going to be a few

18  motions before sentencing.

19         THE COURT:  I will set a date for filing motions, but

20  our practice in this court is normally to hear motions --

21  posttrial motions at the same time as sentencing.

22         MS. MORENO:  Your Honor, if I may address the date?

23         THE COURT:  Yeah.

24         MS. MORENO:  I begin a trial March 1 in the Middle

25  District of Florida that is supposed to go four to six weeks.

1346

1    Would the Court entertain the last week of February?  I would

2    like to be here for the sentencing.

3              THE COURT:  I would -- I just want to make sure that

4    the Probation Office has enough time to really work this up.

5              MS. MORENO:  If I boldly ask for the first week in

6    April, but we've been instructed that --

7              THE COURT:  That's too far.

8              MS. MORENO:  -- we will be in trial the entire month

9    of March.

10             THE COURT:  I'll set it for February 23, which would

11   be that last Friday that we have in February, and if we get a

12   pushback from the Probation Office, we'll let you know.  That

13   will be at nine o'clock.

14             MS. MORENO:  Thank you, Your Honor.

15             THE COURT:  I will direct that any posttrial motions

16   be filed within 14 days, which is the normal time frame, and we

17   will see whether or not we need to have -- as I said, normally

18   we don't have argument before the motion -- before the

19   sentencing date.

20             Anything further on this case?

21             MR. GIBBS:  No, Judge.  Thank you.

22             THE COURT:  Anything further from the defense?

23             MS. MORENO:  No, Your Honor.

24             THE COURT:  All right, defendant is remanded.  We'll

25   recess court for the day.

1347

```
1               (Which were all the proceedings

2                  had at this time.)

3

4           CERTIFICATE OF THE REPORTER

5      I certify that the foregoing is a correct transcript of

6  the record of proceedings in the above-entitled matter.

7

8

9                          _____
                                      /s/
10                         Anneliese J. Thomson
```

| **From:** | Essa Kobayashi <Essakobayashi@mail.com> |
|-----------|------------------------------------------|
| **Sent:** | Wednesday, December 17, 2014 4:18 PM |
| **To:** | Vx Vendetta <V4Vendetta@mail.com> |
| **Subject:** | Re: Safe |

V-

WaAlikom Salam!  Glad to hear it brother.  I hope things were not too difficult on you getting to where you needed to be.  My sincere apologies for not responding/checking earlier.  I was dreading seeing you in some news story :-/ or something here the last couple months and probably was waiting for something like that or to get a text from you saying that you were back.  In the end, I have no excuse though and am sorry for not checking up on you earlier. Rest assured you have been on my mind and in my prayers.  Some brothers were asking where you are and if I have heard from you ect.  So, you have been missed by your brothers here.  I have been following the news of the region closely as usual.  Glad to hear that the trip didn't take too long.  I was expecting that you would have been in a holding pattern, sitting in some town for a good number of weeks at least.

Yes, have seen the news from that part of north africa, I'm not sure such a developement there is timed the best as it will give more of an excuse for oppression and return to the rule of the Taghut...but even before that the brothers there have been getting pressed, anyway, enough of politics...so I trust in God's plan and pray things work out for the people the best.

I'm curious, the internet there...are people able to get on via smartphones or is just over desktops/laptops?

How is the weather there?  I have heard there is fuel oil shortages.  I hope the winter will not be too hard on you.

-Essa

> **Sent:** Thursday, November 20, 2014 at 6:55 PM
> **From:** "Vx Vendetta" <V4Vendetta@mail.com>
> **To:** essakobayashi@mail.com
> **Subject:** Safe
>
> Essa,
>
> Salaam Alaykum. I made it to dawlah!  Mashallah words cant explain!  The trip was easier then I thought but it was really nervous when i got closer.  The internet is spotty but im able to get on sometimes.  Things are hard hear but the brothers have good hearts.  The brothers look like they are making progress in Derna mashallah.  I do not know when I might write again but make duaa for me brother.
>
> -V

GOVERNMENT
EXHIBIT
**1-201**
1:16-cr-265



GOVERNMENT
EXHIBIT
3-110
1:16-cr-265



The time has come that we, as a nation of Earth, as a people, must rise up and take responsibility for this world has become. Together, we can finish what Hitler started.

GOVERNMENT
EXHIBIT
4-203
1:16-cr-265

Name: IMG_3609.png

Created Date: 1/28/2014 7:46:17 PM(UTC+0)



GOVERNMENT
EXHIBIT
**4-300**
1:16-cr-265



GOVERNMENT
EXHIBIT
**10-231**
1:16-cr-265

Name: muftihitler.jpg

Created Date: 12/7/2007 4:05:57 PM (2007-12-07 21:05:57 UTC)

GOVERNMENT
EXHIBIT
**10-241**
1:16-cr-265

GOD BLESS HITLER

Name: LiveLeak-dot-com-50243-aHitler.jpg_thumb.jpg

Created Date: 12/7/2007 4:05:55 PM (2007-12-07 21:05:55 UTC)



GOVERNMENT
EXHIBIT
10-252
1:16-cr-265

Name: 304733_733_avatar.jpg

Created Date: 12/7/2007 4:05:53 PM (2007-12-07 21:05:53 UTC)



GOVERNMENT
EXHIBIT
**10-700**
1:16-cr-265



# THE SS: HITLER'S INSTRUMENT OF TERROR

*THE FULL STORY FROM STREET FIGHTERS TO THE WAFFEN-SS*

ON WILLIAMSON

GOVERNMENT
EXHIBIT
**10-701**
1:16-cr-265

## 5. Kompanie B 19. Panzergrenadier Rgt.

### Alert Roster



Strm. Klaus Düsselkamp
Nicholas Young
~~12711 Sabastian Drive~~ 12312 Oak Creek Lane
~~Fairfax, VA 22030~~ FAIRFAX VA
~~Home: 703-815-6666~~ 22033
Cell : 571-275-3813
E-mail: NY12O3@aol.com

GOVERNMENT
EXHIBIT
**10-706**
1:16-cr-265



415M-WF-2426 ?

Item 284

12737 Heron Ridge Dr. Fairfax, VA

Location: Room C; immediately past
garage door, stack of plastic drawers,
first drawer

Description: Small Booklet in German
and KKK imagery on paper advertising
White Power music

Located by: TFO Andrea Weston

Witnessed by: SA Ralph L. Bruns, Jr.

GOVERNMENT
EXHIBIT
10-863
1:16-cr-265





Name: IMG_7222.JPG

Created Date: 11/17/2007 10:58:53 PM (2007-11-18 03:58:53 UTC)

GOVERNMENT
EXHIBIT
10-903
1:16-cr-265



GOVERNMENT
EXHIBIT
11-401
1:16-cr-265











DEFENDANT'S
EXHIBIT
6
tabbies.











SICILIA

DEFENDANT'S EXHIBIT



DEFENDANT'S
EXHIBIT
17
tabbies®



# Victory in Europe

## D–Day to VE Day In Full Color

Text by Max Hastings

Photographs by George Stevens

Introduction by George Stevens, Jr

DEFENDANT'S EXHIBIT

tabbies®



DEFENDANT'S EXHIBIT
19
tabbles

USCA4 Appeal: 18-4138      Doc: 24-4      Filed: 11/2018      Pg: 336 of 518





HOLY BIBLE

NEW REVISED STANDARD VERSION

DEFENDANT'S EXHIBIT

tabbies®



DEFENDANT'S EXHIBIT

tabbies.

# IMPOSSIBLE VICTORIES

## Ten Unlikely Battlefield Successes

### BRYAN PERRETT



REVOLUTIONARY WAR SPY JOHN ANDRÉ ◆ SUB-BUSTING HEDGEHOG

# MILITARY HISTORY

**ALEXANDER THE GREAT**
LONE STAND IN INDIA

Firsthand Account
**D-DAY: FROM UTAH BEACH TO HEDGEROW HELL**

**ANTIETAM'S BLOODY BURNSIDE BRIDGE**

**FIRST GREAT CAPTAIN OF THE THIRTY YEARS' WAR**

**TRIALS AND TRIUMPHS ON MAO'S LONG MARCH**

www.TheHistoryNet.com

Did Ike and Patton Cheat at War College?

0 70989 30296 9

RETAILER: Display Until June 14

U.S.: $4.99; CAN.: $5.99

**JUNE 2004**

DEFENDANT'S EXHIBIT



FILED
IN OPEN COURT

DEC 1 8 2017

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA          )
                                  )
                                  )
          v.                      )
                                  )          No. 1:16-cr-265 (LMB)
                                  )
NICHOLAS YOUNG,                   )
                                  )
          Defendant.              )

## VERDICT FORM

As to Count 1 (Attempting to Provide Material Support to a Foreign Terrorist Organization by providing gift cards or gift card codes to Mo), we the jury unanimously find beyond a reasonable doubt that the defendant, Nicholas Young, is

          Not Guilty _____          Guilty __✓__

As to Count 2 (Attempt to Obstruct Justice), we the jury unanimously find beyond a reasonable doubt that the defendant, Nicholas Young, is

          Not Guilty _____          Guilty __✓__

As to Count 4 (Attempt to Obstruct Justice), we the jury unanimously find beyond a reasonable doubt that the defendant, Nicholas Young, is

          Not Guilty _____          Guilty __✓__

_____
          Foreperson (signature)

_____
          Foreperson (printed)

Date: _12-/8-17_

<u>INSTRUCTION NO. __</u>

<u>Introduction to the final charge—Province of the court and of the jury</u>

Members of the Jury:

Now that you have heard all of the evidence that is to be received in this trial and each of the arguments of counsel it becomes my duty to give you the final instructions of the Court as to the law that is applicable to this case.  You should use these instructions to guide you in your decisions.

All of the instructions of law given to you by the Court—those given to you at the beginning of the trial, those given to you during the trial, and these final instructions—must guide and govern your deliberations.

It is your duty as jurors to follow the law as stated in all of the instructions of the Court and to apply these rules of law to the facts as you find them to be from the evidence received during the trial.

Counsel have quite properly referred to some of the applicable rules of law in their closing arguments to you.  If, however, any difference appears to you between the law as stated by counsel and that as stated by the Court in these instructions, you, of course, are to be governed by the instructions given to you by the Court.

You are not to single out any one instruction alone as stating the law, but must consider the instructions as a whole in reaching your decisions.

Neither are you to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base any part of your verdict upon any other view or opinion of the law than that given in these instructions of the Court just as it would be a violation of your sworn

1

duty, as the judges of the facts, to base your verdict upon anything but the evidence received in the case.

You were chosen as jurors for this trial in order to evaluate all of the evidence received and to decide each of the factual questions presented by the allegations brought by the government in the indictment and the not guilty plea by the defendant.  In resolving the issues presented to you for decision in this trial you must not be persuaded by bias, prejudice, or sympathy for or against any of the parties to this case or by any public opinion.

Justice—through trial by jury—depends upon the willingness of each individual juror to seek the truth from the same evidence presented to all the jurors here in the courtroom and to arrive at a verdict by applying the same rules of law as now being given to each of you in these instructions of the Court.

INSTRUCTION NO. ___

Note-taking

During this trial, I permitted you to take notes. Many courts do not permit note-taking by jurors, and a word of caution is in order. There is always a tendency to place undue importance to matters which one has written down. Some testimony which is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented. Therefore, you are instructed that your notes are only a tool to aid in your own individual memory and you should not compare your notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial. Above all, your memory should be your greatest asset when it comes time to deliberate and render a decision in this case.

Moreover, you are coequal judges of the facts and each juror's memory of and opinion about the evidence is worthy of consideration by all the other jurors. That a juror may have taken extensive notes does not mean that his or her memory or opinion is worthy of more consideration than the memory or opinion of a juror who took few or no notes.

3

<u>INSTRUCTION NO. __</u>

<u>Judging the evidence</u>

There is nothing particularly different in the way that a juror should consider the evidence in a trial from that in which any reasonable and careful person would deal with any very important question that must be resolved by examining facts, opinions, and evidence. You are expected to use your good sense in considering and evaluating the evidence in the case. Use the evidence only for those purposes for which it has been received and give the evidence a reasonable and fair construction in the light of your common knowledge of the natural tendencies and inclinations of human beings.

If the defendant be proved guilty beyond a reasonable doubt, say so. If not proved guilty beyond a reasonable doubt, say so.

Keep constantly in mind that it would be a violation of your sworn duty to base a verdict upon anything other than the evidence received in the case and the instructions of the Court. Remember as well that the law never imposes upon the defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence because the burden of proving guilt beyond a reasonable doubt is always with the government.

4

INSTRUCTION NO. __

Evidence received in the case—Stipulations and inferences permitted

The evidence in this case consists of the sworn testimony of the witnesses—regardless of who may have called them—all exhibits received in evidence—regardless of who may have produced them—all facts which may have been agreed to, stipulated, or judicially noticed.

When the attorneys on both sides stipulate or agree as to the existence of a fact, you may accept the stipulation as evidence and regard that fact as proved. You are not required to do so, however, since you are the sole judge of the facts.

Any proposed testimony or proposed exhibit to which an objection was sustained by the Court and any testimony or exhibit ordered stricken by the Court must be entirely disregarded by you.

Anything you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded.

Questions, objections, statements, and arguments of counsel are not evidence in the case (unless made as an admission or stipulation of fact).

You are to base your verdict only on the evidence received in the case. In your consideration of the evidence received, however, you are not limited to the bald statements of the witnesses or to the bald assertions in the exhibits. In other words, you are not limited solely to what you see and hear as the witnesses testify or as the exhibits are admitted. You are permitted to draw from the facts which you find have been proved such reasonable inferences as you feel are justified in the light of your experience and common sense.

Inferences are simply deductions or conclusions which reason and common sense lead the jury to draw from the evidence received in the case.

INSTRUCTION NO. ___

Jury's recollection controls

If any reference by the Court or by counsel to matters of testimony or exhibits does not coincide with your own recollection of that evidence, it is your recollection which should control during your deliberations and not the statements of the Court or of counsel.

<u>INSTRUCTION NO. __</u>

<u>Objections and rulings</u>

Testimony and/or an exhibit can be admitted into evidence during a trial only if it meets certain criteria or standards. It is the sworn duty of the attorney on each side of a case to object when the other side offers testimony or an exhibit which that attorney believes is not properly admissible under the rules of law. Only by raising an objection can a lawyer request and then obtain a ruling from the Court on the admissibility of the evidence being offered by the other side. You should not be influenced against an attorney or his or her client because the attorney has made an objection.

Do not attempt, moreover, to interpret my rulings on objections as somehow indicating how I think you should decide this case. I am simply making a ruling on a legal question regarding that particular piece of testimony or exhibit.

<u>Court's comments to counsel</u>

It is the duty of the Court to admonish an attorney who, out of zeal for his or her cause, does something which I feel is not in keeping with the rules of evidence or procedure.

You are to draw absolutely no inference against the side to whom an admonition of the Court may have been addressed during the trial of this case.

<u>Court's questions to witnesses</u>

During the course of a trial, I may occasionally have asked questions of a witness. Do not assume that I hold any opinion on the matters to which my questions may relate. The Court may ask a question simply to clarify a matter—not to help one side of the case or hurt the other side.

7

INSTRUCTION NO. __

Direct and circumstantial evidence

There are two types of evidence which are generally presented during a trial – direct evidence and circumstantial evidence. Direct evidence is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating the existence of a fact. An example of circumstantial evidence is the following: You leave your house at noon on a cold February day. Your front yard is bare at that time. It starts to snow, you return at 5:00 p.m. and see a footprint in the snow that now covers your yard. From the facts that you left your home at noon, returned at 5:00 p.m., see the footprint and know from common experience that human beings are associated with footprints, you can infer that there was a person in your yard sometime between noon and 5:00 p.m. If you had actually seen a person that would be direct evidence of that fact. The law makes no distinction between the weight or value to be given to either direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should weigh all the evidence in the case in making your decisions.

<u>INSTRUCTION NO. __</u>

<u>Tape recordings and typewritten transcripts</u>

Tape recordings of conversations have been received in evidence and have been played for you. Typewritten transcripts of these tape recorded conversations have been furnished to you solely for your convenience in assisting you in following the conversation or in identifying the speakers.

The tapes themselves, however, are evidence in the case and the typewritten transcripts are not evidence. What you hear on the tapes is evidence. What you read on the transcript is not. If you perceive any variation between the two, you will be guided solely by the tapes and not by the transcripts.

If you cannot, for example, determine from the tape recording that particular words were spoken or if you cannot determine from the tape recording who said a particular word or words, you must disregard the transcripts insofar as those words or that speaker are concerned.

INSTRUCTION NO.     .

Quality of the evidence

Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party or by the number of exhibits introduced by one side or the other.

You should consider all the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe and which of the exhibits have more or less value.  You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side, or that one or two exhibits may have more significance to your evaluation of the case as against numerous exhibits which you find have less significance.

To sum up this instruction, always consider the quality of the evidence rather than the quantity of the evidence.

<u>INSTRUCTION NO. __</u>

<u>Government's use of undercover agents and informants</u>

You have heard testimony from an undercover agent and an informant who were involved in the government's investigation in this case.  Law enforcement officials may engage in stealth and deception, such as the use of informants and undercover agents, in order to investigate criminal activities.  Undercover agents and informants may use false names and appearances and assume the roles of members in criminal organizations.

USCA4 Appeal: 18-4138    Doc: 24-4    Filed: 06/21/2018    Pg: 354 of 518

## INSTRUCTION NO.    .

### Credibility of witnesses—Generally

You, as jurors, are the sole and exclusive judges of the credibility of each of the witnesses called to testify in this case and only you determine the importance or the weight, if any, that their testimony deserves.  After making your assessment concerning the credibility of a witness, you may decide to believe all of that witness's testimony, only a portion of it, or none of it.

In making your assessment of that witness you should carefully scrutinize all of the testimony given by that witness, the circumstances under which each witness has testified, and all of the other evidence which tends to show whether a witness, in your opinion, is worthy of belief.  Consider each witness's intelligence, motive to falsify, state of mind, and appearance and manner while on the witness stand.  Consider the witness's ability to observe the matters as to which he or she has testified and consider whether he or she impresses you as having an accurate memory or recollection of these matters.  Consider also any relation a witness may bear to either side of the case, the manner in which each witness might be affected by your verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to disbelieve or discredit such testimony.  Two or more persons witnessing an incident or a transaction may simply see or hear it differently.  Innocent misrecollection, like failure of recollection, is not an uncommon human experience.  In weighing the effect of a discrepancy, however, always consider whether it pertains to a matter of importance or an insignificant detail and consider whether the discrepancy results from innocent error or from intentional falsehood.

After making your own judgment or assessment concerning the believability of a witness, you can then attach such importance or weight to that testimony, if any, that you feel it deserves. You will then be in a position to decide whether the government has proven the charge beyond a reasonable doubt.

<u>INSTRUCTION NO. __</u>

<u>Opinion evidence—The expert witness</u>

The rules of evidence ordinarily do not permit witnesses to testify as to their own opinions or their own conclusions about important questions in a trial. An exception to this rule exists as to those witnesses who are described as "expert witnesses." An "expert witness" is someone who, by education or by experience, may have become knowledgeable in some technical, scientific, or very specialized area. If such knowledge or experience may be of assistance to you in understanding some of the evidence or in determining a fact, an "expert witness" in that area may state an opinion as to a matter in which he or she claims to be an expert.

You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. You should consider the testimony of expert witnesses just as you consider other evidence in this case. If you should decide that the opinion of an expert witness is not based upon sufficient education or experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you should conclude that the opinion is outweighed by other evidence, you may disregard the opinion in part or in its entirety. You – the jury – are the sole judges of the facts of this case.

14

## INSTRUCTION NO. ___

### Law enforcement witnesses

You have heard the testimony of law enforcement officials.  The fact that a witness may be employed by the government as a law enforcement official does not mean that his testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

At the same time, it is quite legitimate for defense counsel to try and attack the credibility of a law enforcement witness on the ground that his testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement witness and give to that testimony of the law enforcement witness weight, if any, you find it deserves.

## INSTRUCTION NO.     .

### Interest in outcome

In evaluating credibility of the witnesses, you should take into account any evidence that the witness who testified may benefit in some way from the outcome of this case.  Such an interest in the outcome creates a motive to testify falsely and may sway the witness to testify in a way that advances his own interests.  Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it with great care.

This is not to suggest that every witness who has an interest in the outcome of a case will testify falsely.  It is for you to decide to what extent, if at all, the witness' interest has affected or colored his or her testimony.

16

<u>INSTRUCTION NO. __</u>

<u>Credibility of witnesses—Inconsistent Statement</u>

The testimony of a witness may be discredited or, as we sometimes say, impeached by showing that he or she previously made statements which are different than or inconsistent with his or her testimony here in court. The earlier inconsistent or contradictory statements are admissible only to discredit or impeach the credibility of the witness and not to establish the truth of these earlier statements made somewhere other than here during this trial. It is the province of the jury to determine the credibility of a witness who has made prior inconsistent or contradictory statements.

If a person is shown to have knowingly testified falsely concerning any important or material matter, you obviously have a right to distrust the testimony of such a person concerning other matters. You may reject all of the testimony of that witness or give it such weight or credibility as you may think it deserves.

17

<u>INSTRUCTION NO. __</u>

<u>Effect of the defendant's failure to testify</u>

The defendant in a criminal case has an absolute right under our Constitution not to testify.

The fact that the defendant, Nicholas Young, did not testify must not be discussed or considered in any way when deliberating and in arriving at your verdict. No inference of any kind may be drawn from the fact that a defendant decided to exercise his privilege under the Constitution and did not testify.

As stated before, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or of producing any evidence.

USCA4 Appeal: 18-4138   Doc: 24-4        Filed: 06/21/2018        Pg: 361 of 518

<u>INSTRUCTION NO. __</u>

<u>The indictment is not evidence</u>

An indictment is only a formal method used by the government to accuse defendant of a crime.  It is not evidence of any kind against Nicholas Young, who is presumed to be innocent of the crimes charged.  Even though this indictment has been returned against him, he begins this trial with absolutely no evidence against him.

Nicholas Young has pleaded "Not Guilty" to this indictment and, therefore, he denies that he is guilty of the charge.

<u>Consider only the offense charged</u>

The defendant is not on trial for any act or any conduct not specifically charged in the indictment.

<u>Consider Each Count Separately</u>

A separate crime in charged in each count of the Indictment. Each charge, and the evidence pertaining to it, should be considered separately by the jury. The fact that you may find a defendant guilty or not guilty as to one of the counts should not control your verdict as to any other count.

INSTRUCTION NO. __

"On or about"—Explained

The indictment charges that the offenses alleged were committed "on or about" a certain date.

Although it is necessary for the government to prove beyond a reasonable doubt that each offense was committed on a date reasonably near the dates alleged in the indictment, it is not necessary for the government to prove that the offense was committed precisely on the dates charged.

USCA4 Appeal: 18-4138    Doc: 24-4         Filed: 06/21/2018    Pg: 363 of 518

<u>INSTRUCTION NO. __</u>

<u>Disjunctive proof—Explained</u>

Before I discuss the elements of the offenses charged in the indictment, I want to instruct you on the meaning of the word "and" as it is used in the charging language in the indictment. Where a statute is worded in the disjunctive—meaning it uses the word "or"—federal pleading requires the government to charge in the conjunctive—meaning it must use the word "and." Where a statute specifies several alternative ways in which an offense may be committed, if only one of those alternatives is proved beyond a reasonable doubt, that is sufficient for conviction.

21

<u>INSTRUCTION NO. __</u>

<u>Attempt defined</u>

In Count 1, Nicholas Young is charged with attempting to provide material support or resources to a foreign terrorist organization. In Counts 2 and 4, he is charged with attempting to obstruct justice.

An "attempt" means the defendant did some act that, under the circumstances as he believed them to be, was a substantial step toward the commission of the substantive crime. For example, to show that Nicholas Young is guilty of the offense charged in Count 1, the government must prove beyond a reasonable doubt that he did some act that, under the circumstances as he believed them to be, was a substantial step toward the commission of the crime of providing material support or resources to a foreign terrorist organization.

A substantial step is a direct act in a course of conduct planned to culminate in commission of a crime that is strongly corroborative of the defendant's criminal purpose. A substantial step is more than mere preparation but less than completion of the crime.

<u>INSTRUCTION NO. __</u>

<u>Nature of the offense—Count One</u>

Count One of the Indictment charges that:

Between on or about December 3, 2015, and on or about August 2, 2016, in Fairfax County in the Eastern District of Virginia and elsewhere, the defendant did knowingly and unlawfully attempt to provide "material support and resources," as that term is defined in Title 18, United States Code, Section 2339A(b), including personnel, money, property and services, to a foreign terrorist organization, to wit, the Islamic State of Iraq and the Levant (ISIL), which at all relevant times was designated by the Secretary of State as a foreign terrorist organization, knowing that ISIL had been designated as a foreign terrorist organization, and knowing that ISIL had engaged in, and was engaging in, terrorist activity and terrorism.

(All in violation of Title 18, United States Code, Section 2339B.)

23

INSTRUCTION NO. ___

Statute defining offense—Count One

Title 18, United States Code, Section 2339B defines the offense of Attempting to Provide

Material Support or Resources to a Foreign Terrorist Organization.  The statute provides in

pertinent part:

> "Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned …. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined [by law]), or that the organization has engaged or engages in terrorism (as defined [by law])."

<u>INSTRUCTION NO.__</u>

<u>Elements of the offense – Count 1</u>

Section 2339B of Title 18 makes it a crime for any person to attempt to commit this offense, that is to provide material support or resources to a foreign terrorist organization, knowing that the foreign terrorist organization is designated by the United States as such or that the terrorist organization had engaged or was engaging in terrorist activity or terrorism.

In order to sustain its burden of proof for the crime of attempting to provide material support and resources to a foreign terrorist organization, the government must prove the following essential elements beyond a reasonable doubt:

First, that the defendant knowingly and intentionally attempted to provide material support or resources to a designated foreign terrorist organization; and

Second, that the defendant knew that ISIL, also known as ISIS and the Islamic State, was a designated foreign terrorist organization or had engaged or was engaging in terrorist activity or terrorism; and

Third, that the defendant did some act that was a substantial step in an effort to provide material support or resources to ISIL, also known as ISIS and the Islamic State.

A substantial step is a direct act in a course of conduct planned to culminate in commission of a crime that is strongly corroborative of the defendant's criminal purpose.  A substantial step is more than mere preparation but less than completion of the crime.

INSTRUCTION NO. __

Designated foreign terrorist organization and terrorist activity and terrorism

As explained above, you must find beyond a reasonable doubt that the defendant knew that ISIL, also known as ISIS and the Islamic State, was a designated foreign terrorist organization or had engaged or was engaging in terrorist activity or terrorism.

The term "foreign terrorist organization" has a particular meaning under this statute. In order for an organization to qualify as a "foreign terrorist organization," the organization must have been designated as such by the Secretary of State through a process established by law. I instruct you as a matter of law that ISIL has been designated a foreign terrorist organization by the United States Secretary of State, and was so designated under a previous name -- "al-Qaeda in Iraq" -- by the Secretary of State on October 15, 2004. I instruct you that in May 2014, the Secretary of State amended the designation to add the alias Islamic State of Iraq and the Levant ("ISIL") as the primary name of this foreign terrorist organization, and added the following aliases to the ISIL listing, among others: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), and Daesh.

The term "terrorist activity" includes any activity that, if it had been committed in the United States, would be unlawful under the laws of the United States or any State and that involves a threat, attempt, or conspiracy to use any explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with the intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

The term "terrorism" means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents.

INSTRUCTION NO. ___

Material support or resources defined

The term "material support or resources" includes any property, tangible or intangible, or service, including currency or monetary instruments, and personnel (one or more individuals).

INSTRUCTION NO. __

Nature of the offense—Count Two

Between on or about December 3, 2015, and December 5, 2015, in Fairfax County, in the Eastern District of Virginia, defendant NICHOLAS YOUNG did knowingly, unlawfully, and corruptly attempt to obstruct and impede an official proceeding.  In specific, NICHOLAS YOUNG knew that the FBI was investigating the circumstances of what YOUNG believed to be the attempt of an individual referred to in this trial as "Mo" to travel to join ISIL, a designated foreign terrorist organization.  Nevertheless, in an attempt to thwart the investigation and prosecution of Mo and of NICHOLAS YOUNG, himself, for attempting to provide material support to ISIL, NICHOLAS YOUNG attempted to deceive investigators with respect to the destination and purpose of what YOUNG believed to be Mo's travel overseas in 2014.

(In violation of Title 18, United States Code, Section 1512(c)(2).)

28

**-1691-**

<u>INSTRUCTION NO. __</u>

<u>Nature of the offense—Count Four</u>

On or about November 20, 2014, in Fairfax County in the Eastern District of Virginia and elsewhere, defendant NICHOLAS YOUNG did knowingly, unlawfully, and corruptly attempt to obstruct, influence, and impede an official proceeding of the Grand Jury.  In specific, NICHOLAS YOUNG sent a text message to a cell phone that YOUNG believed to be used by an individual referred to in this trial as "Mo" in order to make it falsely appear to the FBI that Mo had left the United States to go on a vacation tour in Turkey when, instead, NICHOLAS YOUNG believed that Mo had gone to Turkey to go from there to Syria in order to join and fight for the designated foreign terrorist organization known as ISIL.

(In violation of Title 18, United States Code, Section 1512(c)(2).)

29

INSTRUCTION NO. ___

Statute defining offense—Counts Two and Four

Title 18, United States Code, Section 1512(c)(2) provides in pertinent part that:

> Whoever corruptly . . . obstructs, influences, or impedes any official
> proceeding, or attempts to do so . . . shall be fined under this title or
> imprisoned . . . .

INSTRUCTION NO. ___

Elements of the offense—Counts Two and Four

In order to sustain its burden of proof for the crime of obstruction of justice, the government must prove the following essential elements beyond a reasonable doubt:

First, that the defendant unlawfully and knowingly attempted to obstruct, influence, or impede an official proceeding, and

Second, that the defendant did so corruptly.

<u>INSTRUCTION NO. ___</u>

<u>Factual impossibility is not a defense</u>

The fact that the defendant was dealing with undercover government agents, rather than real members of the Islamic State (or ISIS or ISIL), is not a defense to any charge in the Indictment.

32

INSTRUCTION NO.___

Official proceeding defined

The term "official proceeding" includes a proceeding before a judge or court of the

United States, a United States magistrate judge, a federal grand jury, or a proceeding before a

Federal Government agency which is authorized by law.

33

INSTRUCTION NO. ___

Obstruction need not be successful

The government does not need to prove that the defendant was successful in obstructing, influencing, or impeding an official proceeding; an attempt to do so suffices.

INSTRUCTION NO. ___

Corruptly defined

To act "corruptly," as that term is used in these instructions, means to act with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or  destroying a document or other information.

35

INSTRUCTION NO. ___

"Knowingly"—Defined

The term "knowingly," as used in these instructions to describe the alleged state of mind of the defendant, means that he was conscious and aware of his actions, realized what he was doing or what was happening around him, and did not act, or fail to act, because of ignorance, mistake, or accident.

The government is not required to prove that the defendant knew that his acts were unlawful.

INSTRUCTION NO. __

"Willfully"—Defined

The term "willfully," as used in these instructions to describe the alleged state of mind of

the defendant, means that he knowingly performed an act, failed to act, deliberately and

intentionally ["on purpose"] as contrasted with accidentally, carelessly, or unintentionally.

37

USCA4 Appeal: 18-4138    Doc: 24-4         Filed: 06/21/2018    Pg: 380 of 518

<u>INSTRUCTION NO. __</u>

<u>Proof of knowledge or intent</u>

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly, because there is no way of directly scrutinizing the workings of the human mind.  In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done or omitted by that person and all other facts and circumstances received in evidence, which may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.  It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.

38

INSTRUCTION NO. __

Motive—Explained

Intent and motive are different concepts and should never be confused.

Motive is what prompts a person to act or fail to act. Intent refers only to the state of mind with which the act is done or omitted.

Personal advancement and financial gain, for example, are two well-recognized motives for much of human conduct.  These praiseworthy motives, however, may prompt one person to voluntary acts of good while prompting another person to voluntary acts of crime.

Good motive alone is never a defense where the act done or omitted is a crime.  The motive of the defendant is, therefore, immaterial except insofar as evidence of motive may aid in the determination of state of mind or the intent of the defendant.

INSTRUCTION NO. ___

The entrapment defense

The defendant asserts as to Count 1 that he was a victim of entrapment.  An entrapment defense has two elements:

(1)  The government inducement of the crime; and

(2)  The defendant's lack of predisposition to engage in the criminal conduct

INSTRUCTION NO. ___

Entrapment Analysis

Where a person has no previous predisposition, that is intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, that person is a victim of entrapment, and the law as a matter of policy forbids that person's conviction.

On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that government agents provide what appears to be a favorable opportunity is not entrapment.

For example, it is not entrapment for a government agent to pretend to be someone else and to offer either directly or through an informer or other decoy to engage in an unlawful transaction.

If then, you should find beyond a reasonable doubt from the evidence in the case that before anything at all occurred respecting the alleged offense involved in this case, the defendant was ready and willing to commit a crime such as charged in the indictment--even if not the exact crime charged--whenever opportunity was afforded, and the government officers or their agents did no more than offer the opportunity, then you should find that the defendant is not a victim of entrapment.

On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or persuasion of some officer or agent of the government, then it is your duty to find the defendant not guilty.

Remember, the burden is on the government to prove beyond a reasonable doubt that the defendant was not entrapped.

<u>INSTRUCTION NO. __</u>

<u>Inducement</u>

Inducement requires more than mere solicitation by the government.  Inducement is a term of art necessitating government overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party.  For purposes of entrapment, "inducement" means solicitation plus some overreaching or improper conduct on the part of the government.

Simply cultivating the friendship of a target in preparation to present a criminal opportunity is not inducement to commit a crime, unless that friendship involved coercion, threats, or pleas that would constitute more than just providing an opportunity to commit the crime.

The fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement.

42

<u>INSTRUCTION NO. __</u>

<u>Predisposition</u>

"Predisposition" refers to the defendant's state of mind before government agents made any suggestion that he commit a crime. The focus of the predisposition inquiry is on whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime.  The government does not entrap a defendant, even if he does not specifically contemplate the criminal conduct before the government agent's making any suggestion that he commit the crime, if his decision to commit the crime is the product of his own preference and not the product of government persuasion.

Predisposition is not limited only to crimes specifically contemplated by the defendant prior to government suggestion.  Instead, it is sufficient if the defendant is of a frame of mind such that, once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion.

Predisposition may be found from a defendant's ready response to the inducement offered.

A defendant's predisposition must be determined as of the time he was first approached by a government agent; however, inferences about that predisposition may be drawn from events after the two parties came into contact

USCA4 Appeal: 18-4138    Doc: 24-4    Filed: 06/21/2018    Pg: 386 of 518

INSTRUCTION NO. __

Venue

In addition to the foregoing elements, the government must also prove with respect to Count 1 that it is more likely true than not true that at least one act in furtherance of the crime occurred in the Eastern District of Virginia. If the government has not proven that it is more likely true than not true that at least one act in furtherance of the crime of attempted provision of material support or resources to a foreign terrorist organization occurred in the Eastern District of Virginia, then you must find Nicholas Young not guilty as to Count 1.

In addition to the foregoing elements, the government must also prove with respect to Count 2 that it is more likely true than not true that either (1) the official proceeding that was intended to be affected was in the Eastern District of Virginia; or (2) the conduct constituting the alleged obstruction of justice occurred in the Eastern District of Virginia. If the government has not met this burden, then you must find Nicholas Young not guilty as to Count 2.

In addition to the foregoing elements, the government must also prove with respect to Count 4 that it is more likely true than not true that either (1) the official proceeding that was intended to be affected was in the Eastern District of Virginia; or (2) the conduct constituting the alleged obstruction of justice occurred in the Eastern District of Virginia. If the government has not met this burden, then you must find Nicholas Young not guilty as to Count 4.

This standard is a lower standard than proof beyond a reasonable doubt. Circumstantial evidence can be sufficient to make this showing.

<u>INSTRUCTION NO. __</u>

<u>Presumption of innocence—Burden of proof</u>

I instruct you that you must presume the defendant to be innocent of the crime charged. Thus the defendant, although accused of crime in the Indictment, the defendant begins the trial with a "clean slate"—with no evidence against him. The Indictment, as you already know, is not evidence of any kind. The law permits nothing but legal evidence presented before the jury in court to be considered in support of any charge against a defendant. The presumption of innocence alone, therefore, is sufficient to acquit the defendant.

The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defendant for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. The defendant is not even obligated to produce any evidence by cross-examining the witnesses for the government.

It is not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt.

Unless the government proves, beyond a reasonable doubt, that the defendant has committed each and every element of the offense charged in the Indictment, you must find the defendant not guilty of the offense.

INSTRUCTION NO. \_\_

Verdict—Election of foreperson—Duty to deliberate—Unanimity—Punishment—Form of

verdict—Communication with the Court

Upon retiring to your jury room to begin your deliberation, you must elect one of your members to act as your foreperson.  The foreperson will preside over your deliberations and will be your spokesperson here in court.

Your verdict must represent the collective judgment of the jury.  In order to return a verdict, it is necessary that each juror agree to it.  Your verdict, in other words, must be unanimous.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so without violence to individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with all the other jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and to change your opinion if convinced it is erroneous; however, do not surrender your honest conviction solely because of the opinion of the other jurors or for the mere purpose of being able to return a unanimous verdict.

Remember at all times that you are not partisans.  You are judges—judges of the facts of this case.  Your sole interest is to seek the truth from the evidence received during the trial.

Your verdict must be based solely upon the evidence received in the case.  Nothing you have seen or read outside of court may be considered.  Nothing that I have said or done during the course of this trial is intended in any way to somehow suggest to you what I think your verdict should be.  Nothing said in these instructions and nothing in any form of verdict, is to

46

suggest or convey to you in any way or manner any intimation as to what verdict I think you should return.  What the verdict shall be is the exclusive duty and responsibility of the jury.  As I have told you many times, you are the sole judges of the facts.

The punishment provided by law for the offense charged in the Indictment is a matter exclusively within the province of the Court and should never be considered by the jury in any way in arriving at an impartial verdict as to the offense charged.

A verdict form has been prepared for your convenience and reads as follows:

[The verdict or a summary can be read to the jury]

You will take this form to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson write your verdict on the form, date and sign the form, and then return with your verdict to the courtroom.

If it becomes necessary during your deliberations to communicate with the Court, you may send a note, signed by your foreperson or by one or more members of the jury, through the bailiff.  No member of the jury should ever attempt to communicate with the Court by any means other than a signed writing and the Court will never communicate with any member of the jury concerning the evidence, your opinions, or the deliberations other than in writing or orally here in open court.

You will note from the oath about to be taken by the bailiffs that they too, as well as all other persons, are forbidden to communicate in any way or manner with any member of the jury concerning the evidence, your opinions, or the deliberations.

Bear in mind also that you are never to reveal to any person—not even to the Court—how the jury stands, numerically or otherwise, on the question of whether or not the government has sustained its burden of proof until after you have reached a unanimous verdict.

Case 1:16-cr-00265-LMB   Document 219   Filed 02/16/18   Page 1 of 31 PageID# 2997

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No.: 16cr265 (LMB) |
| | ) |
| NICHOLAS YOUNG, | ) |
| | ) |
| Defendant. | ) |

<u>**SENTENCING MEMORANDUM OF NICHOLAS YOUNG**</u>

I.      INTRODUCTION

Some six years before Nicholas Young's arrest in August 2016, the FBI opened a counterterrorism investigation into him.  Following year-long pretrial discovery and a trial, it remains unclear what factors triggered the probe.  It seems reasonably likely that the investigation began due to an employment dispute between Young, who was a police officer, and his superiors at the Washington Metro Transit Authority concerning his beard length and his disorderly workspace, where he kept a copy of the Quran.  The Bureau had also learned that Young's cell phone contacts included the terrorism convict Zachary Chesser, who, like Young, attended George Mason University.[1]  Whatever its origin, the government then investigated Young, whom it codenamed Slow Decline, for over half a decade through extensive surveillance and the surreptitious use of undercover agents and informants.  During this period it also attempted to recruit Young as a paid informant.  He declined.

In July 2016, Young sent $245 in Google Play gift cards to an undercover agent, posing as a paid informant, who, in turn, had pretended to befriend Young and, later, to join ISIS in Syria.  There has never been any allegation Young has ever communicated – or attempted to communicate –  with any person in fact in Syria, or in ISIS, at any point in his life.  There has never been any allegation Young has ever traveled to Syria – or made plans to travel there – at any point in his life.  There has never been any allegation Young has ever given material support – or attempted to give material support – to any terrorism-associated person who is not a government agent or informant.  At trial, roughly half of the government's case consisted of

---

[1] The government would later learn that Young and Chesser were barely acquaintances.  Chesser himself would later write that, on campus, it was widely known that Young was a conservative police officer who appeared averse to militant Islam.

1

inflammatory Nazi images and tchotchkes seized from the defendant's home for the first time following his arrest.  A jury found Young guilty of attempting to materially support terrorism.

Young's presentence report puts his sentencing guidelines range at thirty to sixty years in prison.  That is, the Sentencing Commission of the United States recommends that Young, now thirty-seven years old, remain in prison until he is between sixty-seven and ninety-seven years of age: or roughly a day in prison for every penny Young gave to the government – at its request. This is the sentencing range even though Young has no criminal history, and this was not a crime of violence: under the guidelines, a defendant's criminal history is automatically enhanced to the highest category, Category VI, on account of the terrorism-crime charge the government chose to bring.  In that sense, the government itself picked the sentence severity even before it solicited the crime.

Sentencing in that range would be to break a butterfly on a wheel because, among other reasons, the government's six-year counterterrorism investigation involved no terrorists, no violence, and no criminal conspiracy.  After *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007) – and pursuant to the factors set out in 18 U.S.C. § 3553(a) – a downward variance to three to four years of incarceration is appropriate.  *See also* Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 5 (2017).  Attached to this memorandum are letters from Nicholas's friends, family, former colleagues, and interested parties.

## II.    GOVERNING PRINCIPLES

As the U.S. Supreme Court established in *Booker*, *Gall*, and *Kimbrough*, a sentencing court has broad discretion to consider nearly every aspect of a particular case, and a particular

2

defendant, in fashioning an appropriate sentence. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). It is axiomatic that *Booker* rendered the U.S. Sentencing Guidelines ("Guidelines") advisory rather than mandatory. *Booker*, 543 U.S. at 264.

Following *Gall* and *Booker*, federal appellate review of district court criminal sentences is now limited to determining whether they are reasonable. *See*, *e.g.*, *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008) ("[T]he question [is] . . . [i]n light of the facts and circumstances of the offense and offender, is the sentence so unreasonably high or unreasonably low as to constitute an abuse of discretion by the district court?"). The *Gall* Court held that appellate courts may not presume that a sentence outside the Guideline range is unreasonable. To the contrary, as the Court of Appeals observed in *Gardellini*, district court sentencing decisions are reviewed under a deferential standard limited to identifying an abuse of discretion regardless of whether a challenged sentence is "within or outside the Guidelines." *Id.*

The *Kimbrough* Court stressed that the sentencing judge is not bound by the Guidelines or Guidelines Policy Statements; rather, the court may make its own policy judgments, even if those judgments are different than those provided for in the Guidelines. *Kimbrough*, 552 U.S. at 101; *see also Spears v. United States*, 555 U.S. 261, 264–65 (2009) ("That was indeed the point of *Kimbrough*: a recognition of district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized

3

determination that they yield an excessive sentence in a particular case. The latter proposition was already established pre-*Kimbrough*." (emphasis in original)); *Gardellini*, 545 F.3d at 1092 (After *Kimbrough*, "district courts are free in certain circumstances to sentence outside the Guidelines based on policy disagreements with the Sentencing Commission—and . . . appeals courts must defer to those district court policy assessments").

It is of course well-settled that *Booker* and its progeny rendered the Guidelines "truly *advisory*," permitting district courts to sentence differently: "differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Gardellini*, 545 F.3d at 1096 (emphasis in original).

The primary federal statutes governing sentencing in the federal district courts are 18 U.S.C. § 3553(a) and 18 U.S.C. § 3661. Section 3553(a) contains an introductory portion and seven subsections. The introductory portion directs the sentencing court, in determining a particular sentence, to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from future crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the Guidelines; (5) Guidelines Policy Statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution.  18 U.S.C. § 3553(a).

The introductory portion of § 3553(a) also directs the sentencing court to "impose a

4

sentence sufficient but not greater than necessary" to comply with the purposes of subsection

(2). This "parsimony provision" embodies "the overarching goal in federal sentencing."

*Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011). Notably, § 3553(a)'s sufficient-but-

not-greater-than-necessary clause sets an independent and certain limit on the sentence that a

court may impose to meet the goals of sentencing. *See, e.g., United States v. Terrell*, 696 F.3d

1257, 1263 (D.C. Cir. 2012) ("The district court's statement that a 188–month sentence was

'just as serious' as a 210–month sentence [] calls into question whether the court believed the

210–month sentence it ultimately imposed was truly 'sufficient, but not greater than necessary,'

[under § 3553(a)]."); *see also United States v. Baker*, 655 F.3d 677, 683 (7th Cir. 2011) (stating

that the sentencing court is to impose "a minimally sufficient sentence"); *United States v.*

*Rodriquez*, 527 F.3d 221, 228 (1st Cir. 2008) (explaining that a district court evaluating a

variant sentence request should consider all relevant § 3553(a) factors as a group and strive to

construct a sentence that is minimally sufficient to achieve the broad goals of sentencing");

*United States v. Kikumura,* 918 F.2d 1084, 1111 (3d Cir. 1990) (characterizing the command as

a statutory duty to impose a "minimally sufficient" sentence).

        Of crucial importance, 18 U.S.C. § 3661 makes it clear that "no limitation shall be

placed on the information concerning the background, character, and conduct of a person

convicted of an offense which a court of the United States may receive and consider for the

purpose of imposing an appropriate sentence." Put simply, in addition to the § 3553(a)

sentencing factors, the court may receive and consider *any* information concerning the

defendant's background, character, and conduct in imposing a sentence. The Supreme Court

recently highlighted the centrality of this concept: "In particular, we have emphasized that

'[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the

5

possession of the fullest information possible concerning the defendant's life and

characteristics.' Permitting sentencing courts to consider the widest possible breadth of

information about a defendant 'ensures that the punishment will suit not merely the offense but

the individual defendant.'" *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (internal

citations omitted).

Appellate courts across the country have accordingly upheld significant downward

variances predicated on various § 3553(a) factors, including for family and mental-health related

reasons. In *United States v. Cole*, for example, the Eighth Circuit affirmed a district court's

decision to downwardly vary from a Guidelines range of 135-168 months imprisonment to

probation. --- F.3d ----, 2014 WL 4251596, at *1 (8th Cir. Aug. 29, 2014). There, the criminal

defendant was convicted for her role in a fraud and tax evasion scheme that stole approximately

$33 million from the electronics retailer Best Buy over a four year period. *Id.* This scheme the

sentencing court described as "one of the largest corporate frauds in Minnesota history." *Id.* Yet

the Court of Appeals upheld the district court's sentence of probation because the defendant

"had no prior contact with law enforcement," was not "a consummate fraudster, [or] a

pathological liar," and a probationary sentence would allow the defendant to work and earn

money to make restitution to the victims of the fraud.  *Id.*

Similarly, in *United States v. Sayad*, 589 F.3d 1110 (10th Cir. 2009), the sentencing

court calculated Sayad's sentencing range for his drug trafficking offense at the Guidelines

maximum of 60 months based on his PSR. Nevertheless, the sentencing court imposed, and the

Tenth Circuit affirmed, a sentence of five years probation, citing the § 3553(a) factors, and

noting Sayad's "supporting and loving family," the "necessity for [Sayad] to be with his family

considering his father's health and their ability to survive, if not prosper, in the very demanding

6

business of running a restaurant," Sayad's naiveté and immaturity, Sayad's expression of

anguish over his criminal conduct, his good physical health, his lack of any substance abuse

history, and the potential for his rehabilitation outside of imprisonment. *Id*. at 1114-1115.

Analogous decisions that affirm, and pay significant deference to, downward variances

based on § 3553(a) factors are legion. *See*, *e.g.*, *United States v. Howe*, 543 F.3d 128, 130 (3d

Cir. 2008) (affirming downward variance from Guidelines range of 18 to 24 months'

imprisonment to probation on account of defendant's role as a "devoted husband, father, and

son," and because defendant made an "isolated mistake" and was "remorseful at sentencing");

*United States v. Lovato*, 798 F. Supp. 2d 1257, 1259 (D.N.M. 2011) (imposing probation

notwithstanding a Guidelines range of 21 to 27 months' imprisonment because defendant

suffered from mental illness); *United States v. Davis*, No. 07 Cr. 727 (HB), 2008 U.S. Dist.

LEXIS 44030, at *1, 18 (S.D.N.Y. June 6, 2008) (rejecting the Guidelines sentencing range of

18 to 24 months' imprisonment and, based on the § 3553(a) factors, sentencing the defendant to

"time served, supervised release, and 200 hours of community service").

Sentencing courts may not *presume* the Guidelines range is reasonable. *United States v.

Milstead*, 509 F. App'x 5, 6 (D.C. Cir. 2013) (citing *Gall*, 522 U.S. at 50). Instead, the

sentencing court's assessment should include a review of the § 3553(a) sentencing factors,

aided by the arguments of the prosecution and the defense. *Terrell*, 696 F.3d at 1262 ("[W]ith

respect to each individual defendant, the court must evaluate how well the applicable Guideline

effectuates the purposes of sentencing enumerated in 18 U.S.C. § 3553(a).") (internal citations

omitted).  To the contrary, sentencing courts are free to impose sentences outside the

recommended range wherever the district court determines that the Guidelines

7

range does not effectively serve the purposes set forth in Section 3553(a). *Terrell*, 696 F.3d at 1262 (reversing trial court for holding that it had the power to depart from the Guidelines range only if it found "compelling reasons" to do so).

To adequately explain its sentence, the district court must provide a statement of reasons, or else the "sentence is imposed in violation of law." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008) (reversing sentencing decision under plain error standard where district court "gave no explanation at all for choosing a sentence of eighteen months"). As the Court of Appeals explained in *In re Sealed Case*, the sentencing court's failure to provide a fulsome statement of reasons is plain error:

> Even when the length of the resulting sentence would otherwise be reasonable. . .
> . The absence of a statement of reasons is prejudicial in itself because it precludes
> appellate review of the substantive reasonableness of the sentence, thus seriously
> affecting the fairness, integrity or public reputation of judicial proceedings.

*Id.* at 193 (internal citations and quotations omitted).

## III.    THE TWO-LEVEL "VIOLENT ACT" ENHANCEMENT DOES NOT APPLY UNDER USSG §2M5.3(b)(1)(E)

Before reaching the § 3553(a) factors, we address first the PSR's suggestion that the Court should find a two-level increase in Young's offense level because "the offense involved the provision of funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." USSG §2M5.3(b)(1)(E).

That enhancement does not apply in this case. No facts were offered at trial showing that Young provided the Google Play gift cards to the paid informant, "knowing" they would be used to commit or assist in the commission of a violent act. In the first place, and most obviously, the entire crime was the exclusive creation of the government: there was no possibility whatsoever

8

the gift cards would be used to aid in the commission of a violent act. That eliminates any possibility of the defendant's "knowledge" the cards would be so used. As for the defendant's "intention" that the cards would be so used – even if that intent was objectively impossible to effect – the government offered no evidence at trial that Young gave the cards to the informant "Mo" to aid an act of violence, as opposed to some other motive, such as misplaced friendship. The government's evidence at trial focused on whether the defendant sent the gift cards, and what words the informant used to solicit them, not on what the defendant may or may not have been thinking when they were sent.

## IV.   THE TWO-LEVEL ADJUSTMENT FOR OBSTRUCTION OF JUSTICE DOES NOT APPLY UNDER USSG § 3C1.1

The government contends the Court should find a two-level adjustment to the Count 1 offense level for obstruction of justice under USSG § 3C1.1. It is mistaken.

USSG Section 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

USSG § 3C1.1.

First, Section 3C1.1 does not apply here since the charge to which it would apply – Count 1, attempted material support for terrorism, 18 U.S.C. § 2339B – concerned criminal conduct that occurred in July 2016. By contrast, the government alleges that the defendant's obstruction of justice occurred, respectively, in November 2014 (Count 4) and December 2015 (Count 2). (ECF No. 38.) Accordingly, by its terms, Section 3C1.1 does not apply because the defendant's alleged obstruction was not – and by definition, could not have been – directed toward "the administration of justice *with respect to the investigation, prosecution, or*

9

*sentencing of the **instant offense of conviction**.*" USSC § 3C1.1 (emphasis added).  The
government offered no evidence, nor could it have, showing that Mr. Young attempted to
obstruct an investigation into a future crime which the government had yet to even solicit.

Second, for similar reasons, Section 3C1.1 does not apply because the government did
not offer substantial evidence at trial proving beyond a reasonable doubt that Defendant Young
attempted to obstruct justice.  Young submitted this argument in connection with post-trial Rule
29 briefing. And even if the government did offer substantial evidence of obstruction of justice,
applying a Section 3C1.1 enhancement to Count 1 would constitute impermissible double-
counting given that the independent obstruction of justice counts would be included within the
offense level.

## V.     THE THREE-LEVEL INCHOATE CRIME DECREASE APPLIES UNDER USSG § 2X1.1

Section 2X1.1 of the sentencing guidelines provides:

(b) Specific Offense Characteristics

 (1) If an attempt, decrease by 3 levels, unless the defendant completed all the
acts the defendant believed necessary for successful completion of the
substantive offense or the circumstances demonstrate that the defendant was
about to complete all such acts but for apprehension or interruption by some
similar event beyond the defendant's control.

USSG §2X1.1(b)(1).

The application note, in the Background section, further provides that "sometimes,
however, the arrest occurs well before the defendant or any co-conspirator has completed the
acts necessary for the substantive offense.  Under such circumstances, a reduction of three
levels is provided under §2X1.1(b)(1) or (2)." USSG §2X1.1, Application notes.

In this case, the substantive offense on which Count 1 was based is providing material
support to a person in fact associated with a designated foreign terrorist organization.  18
U.S.C. § 2339B.  Of course, providing material support to a FBI agent is not a complete crime

10

under Section 2339B.  The government offered no evidence to show the defendant was

anywhere near "complet[ing] the acts necessary for the substantive offense," i.e., providing

material support to a person in fact associated with an FTO.  Indeed, the government offered no

evidence that the defendant ever even communicated with any person in an FTO.  Accordingly,

the three-level decrease under Section 2X1.1(b)(1) applies.

## VI.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE CALL FOR A DOWNWARD VARIANCE (§ 3553(a)(1))

This Court is familiar with the nature and circumstances of the offense, from the

Indictment as well as trial.  In connection with the circumstances of the offense, we note the

following:

1.    The defendant had – and has – no real-world connection to any foreign terrorist

organization whatsoever.  There has never been any allegation Young has ever communicated –

or attempted to communicate –  with any person in fact in Syria, or in ISIS, at any point in his

life.  There has never been any allegation Young has ever traveled to Syria – or made plans to

travel there – at any point in his life.  There has never been any allegation Young has ever given

material support – or attempted to give material support – to any terrorism-associated person

who is not a government agent or informant.  There has never been any allegation Young

agitated for the material support of ISIS on social media (though there *was* evidence Young

agitated *against* the group on the Liveleak website between 2014-2016).  There has never been

any allegation that Young planned any sort of terroristic violence.

All of this stands in marked contrast to the case of *United States v. Harris Qamar*, 16-cr-

227 (E.D. Va. 2016).  This Court sentenced Qamar, who was charged with attempted material

support for ISIS, to 102 months' incarceration with credit for time served.  (ECF No. 44.)

Qamar's case is orders of magnitude more dangerous than Young's.  Unlike Young, Qamar: (1)

11

attempted to join ISIS in Syria, and *before* being approached by any government agent (ECF No. 2, ¶ 35).; (2) undertook concrete actions to join ISIS, *unsolicited by the government*, such as buying plane tickets and seeking a new passport to travel to Syria (*Id*. at ¶ 36); (3) aided in the creation of an ISIS-inspired propaganda video by proposing locations that might be attacked by terroristic violence and actually taking the photographs of cased sites himself (*Id*. at ¶¶ 55-66); (4) incessantly agitated for ISIS on social media (*Id.* at ¶¶ 9-23); and (5) demonstrated, over a significant span of time, a pathological fixation on nihilistic violence that he was planning to perpetrate. (*Id.* at ¶ 29.)

In short, Qamar's case was a model of undercover investigative work compared to Young's. First, the defendant's proclivity for materially supporting the very FTO in question was amply demonstrated *before* the government initiated the national-landmark-targeting crime solicitation.  (ECF No. 2, ¶¶ 35, 55.)  This was shown both by Qamar taking concrete steps, unbidden by the government, to travel to Syria to join ISIS but also through unequivocal agitation for the group on social media.  Not only are those factors missing in this case, *in the very same period he was being investigated, between 2014-2016, Defendant Young came out against, and criticized, ISIS on social media*.

Second, the undercover informant met Qamar in September 2015 and the crime-solicitation for the propaganda video occurred in May 2016 – less than a year later.  During this period, Qamar was consistently agitating for ISIS and sincerely declaring his willingness to engage in gruesome violence in support of that group.  (*Id.* at ¶¶ 21, 55.)  A year earlier he had tried to join ISIS.  That is, the government recognized the risk, devised a crime solicitation, and the defendant unsurprisingly bit at the first opportunity (which his parents had previously denied him by taking his passport), all within fewer than twelve months.  Young's case is completely

12

different.  Young was investigated *for over six years*.  During this span of time, Young: (1) was offered *paid work* for the FBI as an informant; (2) demonstrated such a lack of predisposition to support an FTO that the Bureau's investigation into him went virtually dormant; (3) demonstrated his lack of proclivity to support an FTO simply by virtue of remaining on the police force and carrying out his duties over the entire time he was investigated without incident.

2.      So Qamar's case offers a counterpoint to Young's in terms of sentencing factors, but it also neatly illustrates the line dividing entrapment from proper conviction.  Here, a jury found Young guilty of attempted material support for terrorism.  However, unlike in *Qamar*, the government offered no evidence of Young's inclination to *materially* support any FTO before the start of its six-year-long investigation.  To the contrary, the government uncovered evidence, following the defendant's arrest, showing Young refusing to provide night-vision scopes to a Libyan national after determining such a transfer would be against federal law.  The government heavily relied on inflammatory and prejudicial Nazi and white supremacist imagery to carry its evidentiary burden.  This makes it virtually impossible to untangle the extent to which the jury's verdict rested on undue prejudice.  Although the jury did not find entrapment here, the Court can and should consider these facts in downwardly varying from the guidelines range.

3.      Another mitigating factor is Young's motive.  As evidence at trial demonstrated, the informant Mo had befriended Young for years before soliciting the crime.  The paid informant cultivated this friendship by appealing to Young's sentimental side, engaging in intimate conversations about girlfriends and Nicholas's deceased father.  When the informant repeatedly solicited the gift cards, Nicholas did not send them out of his ideological support for ISIS, as in the case of Qamar.  He did so because he believed he was helping someone who had

13

been his friend.  Of course, his decision to help a friend who had pretended to join ISIS was

patently poor judgment and certainly unethical.  But there remains a material moral difference

between sending the gift cards with the aim of bolstering a terror group and sending them out of

a misplaced desire to help a dubious friend.

## VII.  THE HISTORY, CHARACTERISTICS, BACKGROUND, CHARACTER, AND CONDUCT OF NICHOLAS YOUNG JUSTIFY A DOWNWARD VARIANCE (§ 3553(a)(1))

### A.  First Offender/Atypical Conduct

Young is a first-time offender.  His life and employment history are at odds with the

unlawful conduct charged in this case.  A *Booker-Gall-Kimbrough* downward variance is

therefore warranted based on atypical conduct.

As a general matter, first-offender status is, in and of itself, an appropriate basis for a

downward variance.  *See*, *e.g.*, *United States v. Huckins*, 529 F.3d at 1317 (10th Cir. 2008)

(affirming that district court's downward variance of 60 to 79 months below the calculated

Guidelines range was reasonable and permissibly took into account the Defendant's lack of a

criminal record); *United States v. Munoz-Nava*, 524 F.3d at 1142-43 (10th Cir. 2008)

(downward variance to one year imprisonment and one year home confinement from

recommended Guidelines range of 65-78 months imprisonment supported by district court's

finding of several factors including that defendant had no felony criminal record and his offense

was "highly out of character"); *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009)

(affirming probationary sentence based partly on defendant's "negligible criminal history").

But beyond his first-offender status, Young served as a police officer with the

Washington Metro Transit Authority for thirteen years.  He served with distinction.  Among

other examples, at one point he was awarded a commendation from the U.S. Attorney's Office

14

in the District of Columbia for apprehending a burglar, armed with a long knife, without having

recourse to his firearm.  In short, his career was dedicated to preventing crime, not participating

in it.  And, significantly, this was true throughout the entire length of the government's six-year

counterterrorism investigation.

### B.    Young's Good Deeds, Character and Background

When Young was arrested in August 2016 and charged with a terrorism crime, there was

only one reaction among his family, friends and colleagues: complete shock.  This astonishment

arose from the fact that the man they knew, his character, was and is inconsistent with a

criminal mind in general and the conduct charged in this case in particular.  Young's good

works, and the character they exemplify, are in and of themselves a factor that the Court must

consider in determining a sentence.  The numerous letters submitted on Young's behalf testify

to his loyalty to friends and family; hardworking nature; service to others; and a demonstrated

acceptance of people from all backgrounds which is completely inconsistent with the evidence

selectively presented at trial.

One of those letters is from **Joy Young**, Nicholas's mother.  Joy is an administrative

assistant at Mt. Eagle Elementary school in Alexandria, Virginia.  Or she was until recently.

She immediately retired the day the jury found her son guilty of a terrorism crime, her heart

broken.  From the time she left fulltime employment with the CIA in order raise Nicholas to the

present, Joy offers examples of Nicholas's patriotism, his admiration for those who serve in the

armed forces (such as his grandfather), his kindheartedness, and his acceptance of all races and

creeds.

As regards the Nazi paraphernalia presented by the government, Joy supplies some

biographical information concerning Nicholas which offers a further proof – if one were

15

necessary – of the bottomless inappropriateness of the government's racism evidence in this case. The defense chose not to raise this issue in this case because the suggestion that these facts are somehow necessary to demonstrate the manifest unfair prejudice of the government's Nazi evidence is offensive.

**Ashley Young** writes in support of her brother. Ashley knows the defendant better than anyone else. And she does not recognize the person portrayed by the prosecution. Nicholas loves his country, what it stands for, and its constitution, she writes. She notes that this past week marks the eleventh anniversary of their father's death, which affected Nicholas so much. "When our father died," she writes, "I saw the light inside Nick go dim. At some points that light was just a flicker. I had hoped that the career my brother had made for himself or the love of his girlfriend would make him happy again. I prayed many nights that he would not live in regret or sadness. I'm not sure if he will ever get over the loss of our dad."

Another letter comes from **Tom McNulty**, the father of Officer Kenneth James McNulty, once Nicholas's best friend. The government subpoenaed Officer McNulty to testify at trial against Nicholas. Tom, who was a defense contractor for ten years in Iraq, Afghanistan and Kuwait, notes Nicholas's time in the ROTC, as well as his "strong belief in our government and demonstrat[ions of] a patriotic enthusiasm." Tom has "always viewed Nick as a close and trustworthy friend, and still do[es]. He has been to my home on numerous occasions, and I would welcome him back any time."

Despite the stigma and fears of career repercussions, multiple colleagues from the Metro Transit system have written in support. One, **Henry Marrow**, was a station manager with Washington Metro Transit Authority (WMATA) who has known Nicholas since 2003, when he first came to WMATA as a transit officer. Marrow, an African American who served in the

16

U.S. Navy aboard three aircraft carriers during the Vietnam conflict, observes that Nicholas "was well respected among the passengers.  He was always cordial and helpful.  He was just a very good officer – Caucasian, Negro, Asian, Latino – race did not matter to Officer Young. That is why this story is incredible.  The customers at the Takoma Park Station used to call him 'Officer Friendly' because of his interactions with the riders of the rail."

Another, **Derrick Stokes**, has served as an African American officer with WMATA for twelve years.  Stokes met Nicholas very early in his career and worked side-by-side with him for several years.  Stokes writes:

> Nicholas is the most genuine person that I have ever met.  He is willing to do anything for the people that he considers his friends, even if providing that help would put him in a bad situation.  I can only speak of my experiences with him, but he has always been an honest and dependable person. . . .
>
> In my personal opinion, I don't believe that Nick posed a threat to anyone.  Not the department, the transit system, or the community.  I base this on the time I spent with Nick beyond just work.  He has been to my family's baby showers, home warming, etc.  The person portrayed in the media is not the same person that I have come to know over the years. . . .
>
> When it became common knowledge that he was a Muslim, he was ostracized by many of his co-workers.  But he never let it bother him, and just kept moving forward.  Even through the constant harassment from those around him, he showed a strength of character that is rare in most people.
>
> During the times we worked the same beat together, I never saw him treat people unfairly or without respect.[2]

Another current WMATA officer, **LaTesia Christian**, also African American, has written in support of Nicholas's character.  Christian, who had served as an officer with

---

[2] Mr. Stokes writes that he "was kind of surprised that [he] wasn't called upon to speak on [Nicholas's] behalf [at trial]." Unfortunately, as with a number of Young's other colleagues and WMATA's human resources department, messages delivered to Mr. Stokes went unanswered for months.  It is apparent that the stigma of a terrorism trial scared many of Mr. Young's colleagues and friends away.

17

Nicholas for years, writes that he was a "fair, reliable, kind-hearted, caring, loyal, and honest

friend who would be there for a person in a time of need." Nicholas, she adds, "took the steps to

make sure [people he encountered on the beat as an officer] were dealt with fairly."

Many of Nicholas's friends outside of work have submitted letters. **Stefanie Tolosa**, a

radiology administrator at Inova Mr. Vernon Hospital, grew up with Nicholas, who "has always

been like the brother [she] never had." When Mrs. Tolosa heard about Nicholas's arrest, she

knew that it "had to be some kind of horrible mistake. There is no way the man I've loved as a

brother for the past 28 years committed the crimes he's being accused of." Early on, she writes:

> Nicholas developed a strong interest in the military [] and would have joined after high
> school if his dad had let him. He excelled in Boy Scouts, ROTC, and loved to do WWII
> reenactments. We used to make fun of him always dressing up, thinking it was nerdy. . . .
> I never thought in a million years that later on in his life that would be used as a slander
> against him to call him a neo-Nazi. Nick had friends and girlfriends from all different
> walks of life, race, and religions, including Jewish. . . .
>
> This has really shaken my confidence in [government]. I feel like he was tricked. He
> was put in a situation that he never would have been in on his own. It's like the FBI
> watched him for so long and couldn't find anything, so they set him up to do something
> he wouldn't have done on his own so they could get him in trouble. They chose to focus
> on items found in his home to portray him a specific way to make their case. Almost all
> of those things are irrelevant and have nothing to do with the type of person he is or what
> he believes in.

**Lourdes Castro** has known Nicholas for nearly 25 years. Nicholas, whom she considers

family, has always been a "kind-hearted, straight-laced and responsible law-abiding citizen."

She adds:

> Nick's maturity, disciplined behavior and respect for authority continued well into
> adulthood. He always showed respect for the law and for his fellow citizens in his
> everyday life and in his career as a proud law-enforcement police officer. Nick always
> followed the rules while policing, and never used intimidation or showed disrespect to
> anybody. Nick treats everyone with respect. He does not look down on, or discriminate
> against, anyone. I am outraged that Nick's military reenactment hobby (that I used to
> make fun of him for as a teen) was used to slander and paint him as a neo-Nazi. Nick is
> not, and never has been, anti-Semitic or racist in any way. He has always had friends and
> girlfriends of all races and religions, and was in a serious long- term relationship with a

18

Jewish woman whom he loved very much.

**Anthony Babin**, another longtime friend of Nicholas's who is also African American,

writes:

> Nick is not a neo-Nazi. He is a good guy, and does not discriminate against anyone!
> There was always a very diverse group of people at Joy's Christmas dinners. We joked it
> was like the United Nations, with a white Muslim (Nick), a Hispanic guy, a Jewish guy,
> me and another black guy along with Ashley and Joy. Nick and his family are very good
> people, and I am blessed to have them in my life. The last time I saw Nick, my wife and I
> announced to him that we were having a baby. He was so happy for us. I am very sad that
> Nick may not ever get a chance to meet my daughter. He is not dangerous; he is not a
> terrorist. He is my friend; he is my brother. Nick Young is a good man.

**Sayma Maqsodi**, who has known Nicholas for approximately twenty years, recalls how,

at George Mason University, Nicholas would help her "prepare for [her] exams. He was always

teaching [her] about history, religion, and math. He was someone who always volunteered a

helping hand even if you didn't ask for it. I was amazed by how much a 20-year-old guy knew

so much about so many different topics. He not only loved teaching others what he knew but

also wanted to absorb as much information about others' culture, religion and language." She

concludes: "I've read all the articles and seen the charges set against him and in my heart I don't

believe he is a terrorist or a supporter of terrorism."

Similarly, **Heather Hogan**, who has known Nicholas for twenty years, informs the Court

that he was, and remains, "a kind-hearted, intelligent man, who does his best to act thoughtfully

in a world where most people clamor through like bulls in china shops." **Laura Holland** agrees,

writing about Nicholas as a "kind, intelligent and gentle person who loves to read."

Nicholas's extended family has submitted letters in support. So have Nicholas's former

teachers. They are unified in expressing their shock at the charges, which are so inconsistent

with the man they knew. Also included among the letters are those submitted by interested third-

19

parties, such as members of civil liberties groups following this case.  (All letters attached hereto as **Exhibit A**.)

> ### C.    Diagnosed Mental Illness

In December 2016, a clinical psychologist retained by the defense determined the defendant suffers from Major Depressive Disorder, anxiety and trauma-related disorders. (Report of Sara E. Boyd, Ph.D, attached hereto as **Exhibit B**.)  Dr. Boyd concluded that these illnesses predated the death of his father in 2007, "but were substantially aggravated by his father's unexpected death and the feelings of guilt that Mr. Young felt in response."

By way of recommendations, the psychologist proposed "ongoing psychiatric consultation and medication management [as] vital for the purpose of treatment [] He would also benefit from an evidence-based PTSD treatment, such as Prolonged Exposure or Cognitive Processing Therapy. [] To the extent that appropriate psychological treatment is available in incarceration settings, Mr. Young will be able to participate and make some gains toward recovery.  However, the psychotherapy interventions that are likely to produce improvement are most effectively delivered in community settings."

It is both necessary and appropriate that the Court weigh these considerations in imposing a sentence.  *See*, *e.g.*, *United States v. Miranda*, 505 F.3d 785, 794 (7th Cir. 2007); *Lovato*, 798 F. Supp. 2d at 1259; *United States v. Flowers*, 946 F. Supp. 2d 1295, 1298 (M.D. Ala. 2013).

> ### D.    Family Circumstances and Support, and Dependents

As discussed above, Joy Young, the defendant's mother, retired the day after verdict in this case.  It seems clear to undersigned counsel that she cannot support herself with retirement checks alone.  Nicholas Young's ability to earn income to support himself and his mother upon his release from incarceration is unquestionably a ground for a downward variance in the post-

20

*Gall/Kimbrough* era. *Sayad*, 589 F.3d at 1117-18 (varying downward based partly on the "necessity for [defendant] to be with his family considering his father's health and their ability to survive, if not prosper, in the [their] business"); *see also United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997).

In addition, as the Court can glean from the letters and testimonials submitted on Nicholas's behalf, there is a good deal of family support for him.  The financial and emotional support on the outside that a defendant can be expected to receive from family and community members is another valid basis for a downward variance.  *See*, *e.g.*, *Sayad*, 589 F.3d at 1114-1115; *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance).

**E.      Strong History of Employment**

From his time in high school to his arrest, there has hardly been a time when Young was not gainfully employed.  Of course, he was employed as a police officer with the Washington Metro Transit Authority for thirteen years leading up to his arrest.  This is a factor that the Court may consider in imposing a sentence and in granting a downward variance. *United States v. Ruff*, 535 F.3d 999, 1001 (9th Cir. 2008); *see also Tomko*, 562 F.3d at 570-72.

**F.      Remorse**

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance.  *See*, *e.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

Here, as Young's letter to the Court will demonstrate, he is remorseful for the crime he committed.  His sincerity may be measured in part by his desire to continually edit and perfect

21

his letter to the Court. The defense has submitted this memorandum today in order to file it a week in advance of the sentencing hearing. Mr. Young's letter will be filed promptly.

## VIII. CONSIDERATION OF THE REMAINING § 3553(a) FACTORS CALLS FOR A MODERATE SENTENCE

### A.    Section 3553(a)(6)

Title 18 U.S.C. § 3553(a)(6) directs that the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" be considered when imposing sentence.

In addition to the *Qamar* case, discussed above, another companion case was *United States v. Amri*, 17-cr-50 (E.D. Va. 2017). Again, the defendant Haris Qamar in fact attempted to join ISIS in Syria, unlike Young. In *Amri*, the defendant was aware of Qamar's attempt and falsely told FBI agents he was not. (ECF No. 2, p. 5.) Further, Amri allegedly told an informant that, after the FBI interview, Amri advised Qamar to be careful because the FBI was asking about who supported ISIS. Amri later corrected his representation with agents, but also advised that he gave Qamar $50 for basic necessities after Qamar was unable to get a refund for his $700 airline ticket to Turkey. (*Id.* at 6.) Amri, who was over thirty years old, was found guilty of a violation of 18 U.S.C. § 1001. He was sentenced to **24 months' imprisonment**.

In contrast to Amri's case, Young did not know anyone who actually traveled to Syria or actually joined a Foreign Terrorist Organization. Young never attempted at any point to communicate with anyone in ISIS, and did not know anyone who had. Unlike Amri's case, Young's investigation was built entirely on fictional representations by undercover agents. Unlike in Amri's case, there was no risk whatsoever that any of Young's comments to FBI agents would interfere with any terrorism investigation at all.

22

The following comparable cases involve sting operations, with informants, resulting in material support for terrorism charges:

| | | | |
|---|---|---|---|
| *U.S. v. Erick Wotulo*, 16-cr-416 | District of Maryland | Attempted material support to FTO in the form of state-of-the-art firearms | 30 months' incarceration |
| *U.S. v. Hanifa bin Osman*, 16-cr-416 | District of Maryland | Attempted material support to FTO in the form of state-of-the-art firearms | 37 months' incarceration |
| *U.S. v. Mark Robert Walker*, 04-cr-2701 | Western District of Texas | Attempted material support to FTO in Somalia in the form of weapons, financial support, creation of websites | 24 months' incarceration |
| *U.S. v. Lamont Ranson*, 05-cr-16 | Southern District of Mississippi | Attempted material support to FTO in the form of false identification documents | 29 months' incarceration |
| *U.S. v. Romero-Panchano*, 03-cr-182 | Southern District of Texas | Attempted material support for FTO through soliciting members of terrorist group in weapons-for-drugs deal | 36 months' incarceration |
| *U.S. v. Jasminka Ramic*, 15-cr-49 | Eastern District of Missouri | Attempted material support for ISIS including military supply gear | 36 months' incarceration |

**B.    Section 3553(a)(2)(A)**

The Court must consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. The Court must apply these concepts to Young's specific situation and articulate its thinking in some fashion. The Court is permitted to weigh and discount these factors against other statutory factors

23

that it is considering, and to give different weights to different factors in the particular

circumstances of Young's case.

Terrorism crimes are – certainly as a general matter – serious in nature.  But, as the

defense has noted above, this was a terrorism investigation with no terrorists, no violence, and no

criminal conspiracy.  Unlike other terrorism-crime defendants sentenced by this Court, there is

no allegation here that Young ever communicated with any person associated with ISIS, ever

attempted to travel to Syria, or ever attempted to give material support to any terrorism-

associated person who was not a government informant or agent.

These are significant mitigating factors.  The Court can certainly demonstrate the

seriousness of real-life terrorism offenses, promote respect for the law, and provide just

punishment by imposing three to four years' incarceration with supervised release.  Young has

already been branded for life as a convicted supporter of terrorism.  As if that were not enough,

he has been savagely, irrelevantly, and unfairly tarred in the press as a neo-Nazi.  A sentence

such as the one outlined in this memorandum will certainly send a strong message regarding

respect for the law and just punishments.

C.    Section 3553(a)(2)(B)

The Court must consider the need for the sentence to afford adequate deterrence to

criminal conduct.  The Court is also permitted to weigh this factor against other factors that it is

considering.  For the same reasons noted above, a sentence of three to four years' incarceration

can serve the purpose of general deterrence in Young's case.  The Court and jury have

determined that it is permissible for the government to investigate a man for six years,

including through constant intrusive surveillance, and the surreptitious use of undercover

informants and agents, and justify it when the defendant succumbs to a sting operation

24

involving about $250 in gift cards.  If that does not deter people in similar positions, it is difficult to imagine how far a police state would need to reach to create more deterrence.

### D.    Section 3553(a)(2)(C)

The Court must consider the need for the sentence to protect the public from further crimes of Nicholas Young.  Based on the information made available to the Court, there is no reason at all to believe that incarcerating Nicholas is required in order to protect the public from any potential future crimes on his part.  Indeed, he has never been charged with any crime except for where the government has solicited the sending of gift cards.

In fact, considering Young's record as a police officer in the Metro Transit system – including a commendation from the D.C. U.S. Attorney for apprehending an armed robber – one might even say that a sentence of incarceration is less likely to protect the public than no sentence at all.  The offense is atypical of Nicholas's life as a whole.  And even if he had some inclination to commit a crime in the future, the suffering he has endured as a result of this case would be sufficient to deter him for the rest of his life and then some.

### E.    Section 3553(a)(2)(D)

The Court must consider the need for the sentence imposed to provide Young with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  As for medical treatment, as mentioned above, a clinical psychologist retained by the defense has found that Young suffers from Major Depressive Disorder, anxiety and trauma-related disorders.

She also determined that "ongoing psychiatric consultation and medication management [are] vital for the purpose of treatment [] He would also benefit from an evidence-based PTSD treatment, such as Prolonged Exposure or Cognitive Processing Therapy. [] To the extent that

25

appropriate psychological treatment is available in incarceration settings, Mr. Young will be able

to participate and make some gains toward recovery.  However, the psychotherapy interventions

that are likely to produce improvement are most effectively delivered in community settings."

This medical opinion warrants downward variance from the guidelines range.

      **F.**      **Section 3553(a)(4),(5)**

   As noted above, the Court must consult and consider applicable Guideline provisions

and Guidelines Policy Statements, but is now permitted "to tailor the sentence in light of other

statutory concerns as well, *see* § 3553(a)." *Booker*, 543 U.S. at 245.  Under *Booker-Gall-*

*Kimbrough* and their progeny, the Court is fully empowered to disagree with the Guidelines

and Guidelines Policy Statements.  The Supreme Court only requires that any such

disagreement, and any deviation from the Guidelines range, must be acknowledged and

explained by the sentencing court, typically in reference to the § 3553(a) factors.

   The guidelines range in this case – between thirty to sixty years of incarceration – is a

miscarriage of justice on its face.  The guidelines for violations of 18 U.S.C. § 2339B do not

distinguish between supporting violent attacks on civilians and population centers, on the one

hand, and the delivery of a gift card to a paid informant, on the other. Both automatically trigger

a base offense level of 26 points, plus the 12-level terrorism crime enhancement under USSG §

3A1.4(a).

   To apply the same set of guidelines to a terror bombing and to a gift-card case involving

no real terrorists, no violence, and no criminal conspiracy is to break a butterfly on a wheel.

Attention has increasingly turned to the hatchet-over-scalpel effect of these guidelines in terror

crimes.  *See*, *e.g.*, Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American*

*Muslims in the War on Terror*, 126 Yale L.J. 5 (2017) (comparing sentencing in the War on

26

Drugs with the War on Terror and analyzing, among other points, the history of the "terrorism enhancement" under USSG § 3A1.4).[3]  Ahmed notes:

> Criminal conduct subject to the Terrorism Enhancement varies significantly: from planning and participating in a violent attack that kills hundreds of people to making false statements to law enforcement officials. Yet the Terrorism Enhancement does not take into account this broad range of conduct, and the resulting Guidelines range is often inconsistent with the actual statutes that criminalize the underlying conduct in the first place. For example, the material support for terrorism statutes prohibit providing "material support"—such as money, training, expert advice, and assistance—to terrorists. Unlike the Enhancement, these statutes recognize that different levels of support require different punishments. While 18 U.S.C. § 2339A permits a maximum sentence of fifteen years, if death is caused by the support provided, the maximum increases to life imprisonment. Furthermore, under section 2339C, if financial support is provided with the intent to fund an act of terrorism, the maximum sentence is twenty years. But if someone only conceals such financial support, the maximum is reduced to ten years. Contrary to these varying levels of punishment, the minimum sentence under the Terrorism Enhancement is 17.5 years, regardless of the type of material support provided. Therefore, while the material support statutes demonstrate that Congress indicated that sentences should be "proportional to the culpability of the conduct, to the injury that can be directly attributed to a defendant's actions, and to the nature of the organization's actions," the Terrorism Enhancement treats those who provide any type of material support to a terrorist as harshly as the terrorist who commits the violent act.

> Others have recognized that the seriousness of terrorism offenses differs based on the underlying conduct. Christina Parajon Skinner, for example, divides offenders into "hard core" and "soft core" groups.  Hard-core defendants are those that have committed "terroristic acts or attempts, [when] there are no mitigating circumstances to consider." As an example, Skinner provides Zacarias Moussaoui, the "twentieth hijacker," who received a life sentence for his role in the 9/11 attacks and never demonstrated remorse for his actions. For these individuals, long sentences "are proportional to the threat they pose."

> On the other hand, soft-core defendants include individuals "whose conduct has less directly threatened U.S. interests," such as those convicted of providing material support or in sting operations initiated by government informants.

> The Terrorism Enhancement also does not take into account the individual characteristics of each defendant. The young American Muslims analyzed in this Feature all have little to no criminal history, and but for the Terrorism Enhancement would have been placed in Category I instead of VI, which could have reduced their potential Guidelines sentence by fifteen years or more. The Sentencing Commission has recognized that individuals with no criminal record have the lowest rate of recidivism. One study determined that 93.2% of

---

[3] Available at: http://www.yalelawjournal.org/feature/is-history-repeating-itself-sentencing-young-american-muslims-in-the-war-on-terror

27

first-time offenders did not recidivate. In other situations for defendants with no criminal history, courts have given sentences below the advisory Guidelines range, recognizing that a lesser term of incarceration is still a substantial punishment and deterrent for someone who has never experienced prison before. However, such considerations do not apply for most terrorism defendants.

Ahmed, 126 Yale L.J. 5.

In other words, the guidelines for terrorism crimes are qualitatively and quantitatively different from nearly all other federal crimes.  And yet the severity of terrorism sentences does not rest on any empirical foundation.  As Ahmed concludes, as of 2017, "neither the Sentencing Commission nor the courts applying the Terrorism Enhancement have provided any empirical evidence to support the presumption that terrorism defendants are uniquely dangerous.  The legitimacy of the Guidelines is derived from the belief that they are based on reliable data and principles.  However, when the Terrorism Enhancement was promulgated, no statistically sound evidence was used to substantiate that all terrorism defendants were so different to necessitate such a large increase in the Guidelines range." *Id.*  In fact, studies have tentatively shown the opposite to be true.  The limited available data suggest that "individuals convicted of terrorism offenses do *not* recidivate at higher rates than those convicted of other crimes.  Of the more than 300 prisoners who have completed their terrorism sentences since 2001, 'Justice Department officials and outside experts could identify only a handful of cases in which released inmates had been rearrested, a rate of relapse far below that for most federal inmates.'" Ahmed, 126 Yale L.J. 5.

The lack of any empirical support for the guidelines range in this case – and the failure of the guidelines to rationally distinguish between violent and nonviolent conduct – is itself a ground for a significant downward variance.  *Spears v. United States*, 555 U.S. 261, 264–65 (2009) (holding that when the Commission fails to fulfill its institutional role, a district court can

28

vary from the guidelines "based on policy disagreement with them, and not simply based on an

individualized determination that they yield an excessive sentence in a particular case").

**IX.    CONCLUSION**

For all of the foregoing reasons, Defendant Young respectfully submits that a significant

downward variance from the guidelines range is appropriate here.

Dated: February 16, 2018.

Respectfully submitted.

*/s/ Nicholas D. Smith*
Nicholas D. Smith (VA. Bar. 79745)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
nds@davidbsmithpllc.com

29

## <u>Certificate of Service</u>

I hereby certify that on the 16th day of February, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> AUSA Gordon D. Kromberg
> AUSA John Gibbs
> U.S. Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> gordon.kromberg@usdoj.gov
> john.gibbs@usdoj.gov

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> _/s/ Nicholas D. Smith_
> Nicholas D. Smith
> VA Bar No. 79745
> David B. Smith, PLLC
> 108 North Alfred Street
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> nds@davidbsmithpllc.com

30

USCA4 Appeal: 18-4138    Doc: 24-4         Filed: 06/21/2018       Pg: 422 of 518

# EXHIBIT A

Joy C. Young

███████████████

February 14, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE:  U.S. vs Nicholas E. Young

Dear Judge Brinkema:

I am Nicholas Young's mother, and I'm writing to give you some background information about Nicholas that I hope you'll read and take into consideration before sentencing.

Nicholas' father and I purchased a home in a new community in Fairfax County before our children were born.  Most of our new neighbors were just like us – married only a few years and ready to start families.  It was a wonderful community to raise a family.  Nicholas was our first-born child.  He was a happy, inquisitive baby, and a quick learner.  I was fortunate to be able to leave my job with the CIA and stay home with my children until they were in school full time. Most of the other moms did the same thing.  There were many playmates right on our street, and he continues to be friends with many of them to this day. Nicholas was reading by the time he entered Kindergarten, did well in school, and was placed in gifted classes.  He did all the usual things in elementary school – joined scouts, went to CCD classes, played baseball and soccer, joined chorus, and enjoyed performing during after-school programs.  We had a membership at a local pool, where we spent as much time as possible during the summer, along with many of our neighbors.  The children learned to swim, dive, play tennis and putt-putt golf.

Every summer we would rent a condo at the beach for a week, along with one or two other families and their children.  My parents lived in Southern California, so we spent part of each summer there as well.  My sister and her children often joined us there.  We enjoyed visits to Disneyland and Sea World for years.  Nicholas loved being around his grandparents and extended family, and still does.  My father was a retired military officer, and Nicholas always tried to make him proud.  Even in high school and beyond, they would correspond with each other.  Nicholas still treasures my father's military medals, and saved his letters.  He took an interest in our family history at a young age.  We are a very patriotic family, and Nicholas loved being on military bases, attending the Military

Air Shows each year, and seeing the history of the United States reenacted at Spirit of America shows which performed in D.C. every year.

Here at home, there were many visits to his father's parent's house in the Shenandoah Valley.  All the aunts, uncles and cousins lived close by, so the children got to know them well also.  They learned about growing their own vegetables, canning them for the winter months, and raising cows and pigs for food.  Nicholas' grandfather would take him to the edge of their property to fish in the Shenandoah River.  He was always surrounded by love – at home, during visits to both sides of the family, and at the homes of friends.

My ex-husband, Will, was a popular social studies teacher at the kids' high school, and Nicholas shared his father's love of history.  He didn't mind that his father taught at the same high school he attended.  Nicholas was a good student, was never in fights or in trouble, and his teachers enjoyed having him in class. He especially enjoyed his JROTC and Law Enforcement classes.  He loved going on ride-alongs with the Alexandria City Police.  As he got older, Nicholas preferred reading to sports.  He is knowledgeable on so many subjects. Nicholas has always been responsible, and as soon as he was old enough, he got a job at our local Exxon gas station.  During his senior year, military recruiters constantly went by his job trying to sign him up.  Nicholas would have loved to follow in my father's footsteps, and wanted to join the Army right out of high school, but his father and I said no.

At George Mason University, Nicholas continued ROTC classes, and was still involved in law enforcement.  He had been interested in war reenactment groups for a long time, and eventually joined a group.  George Mason University is where Nicholas was exposed to Islam.  There were many Muslim students with whom he became friends.  All of Nicholas' schools have had very diverse populations.  We have never discriminated against any different race or ethnic background.  Everyone was always welcome in both his father's home and in mine.  Nicholas studied a wide variety of religions, but chose Islam.  I'm often flabbergasted at the depth of his knowledge on so many subjects, but especially politics, history and different religions.  If I have a question in any of these areas, I know Nicholas will have an answer for me.  I didn't argue with Nicholas when he converted.  We each have to make our own decisions on how to worship.  We have cousins who have converted to Judaism and Buddhism.  We welcome them all.

Sitting in court during the trial was the hardest thing I've ever had to do. How dare the government slander my son, painting a picture of him as a neo-Nazi, white supremacist and a supporter of terrorism.  It was all lies, but the jury was bombarded with this misinformation daily.  The Washington Post reporter did the same thing in her articles right before the trial started.  She and a government attorney stood right beside me more than once when court was recessed, talking and laughing about the case.  The WWII reenactment group Nicholas belonged

to is part of the Historical Reenactment Society.  They often perform on United States military bases, and all of their equipment is authentic: uniforms, weapons, tanks, airplanes and other vehicles.  The government said that because Nicholas is a Muslim convert he is a neo Nazi.  A government attorney said, "The common enemy is hatred of the Jews".  Really?  We have Jewish DNA in my family.  My sweet maternal grandfather was Jewish.  All of his siblings died in the Holocaust.  It was never brought up in court that the love of Nicholas' life is a young lady who is Jewish.  Most of the officers of MTPD with whom Nicholas was closest to are black.

Nicholas is a gentle, kind-hearted, intelligent man.  He is soft spoken, non confrontational, has a quirky sense of humor and is generous to a fault.  He goes out of his way to help others, because he cares deeply, and can't stand to see human suffering.  His greatest wish was to be married and have children with this Jewish woman.  Nicholas was stalked for six years, with no results.  We heard his voice on tape telling 'Mo' not to join ISIS, that it's illegal, and he should stay here and get a job.  The agent in charge of the case said, "Let's defibrillate this" (kick it into high gear).  Finally, after doing nothing about 'Mo's' request for Google Play Cards, he started to receive emails from 'Mo' ,pleading for them, so he could call his family members.  Only then did Nicholas finally purchase them.  This case should never have been allowed to be brought before the court.

I implore you to take everything I have written into consideration, Your Honor, and be lenient in sentencing my son.  Please make a downward departure from sentencing guidelines.  He has already served one and a half years.  Would you also please make a recommendation that he be placed in a minimum security facility close to home?  My little family is now down to two.  My daughter and I have taken a huge financial blow with expenses so far.  My health is not good, and traveling to see my son will be a huge hardship.

Sincerely,

Joy C. Young

Joy C. Young

Ashley Young



The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

Dear Judge Brinkema:

It's been a year and a half since my brother's arrest and I still cringe every evening when
he calls and the recording comes on to tell me I have a call from an "inmate." I still can't
get the image out of my head of my brother being walked into court on the day of his
arrest - shackled and in his police uniform pants. It shook me to my core that day, sitting
alone in the courtroom. I still cannot believe this is my family's reality. It takes
everything I have each week to stomach my brother's pain and keep going. My heart
breaks a thousand ways each day but there is nothing in the world that will keep me
from fighting for him and supporting him with all the strength of my heart. I told him
early on that I promise him this will not define his life or this family.

Much of this last year and a half has been trying to be of comfort and counsel to my
brother. He spent months in solitary upon his arrest and weeks again upon verdict. He
has been alone with his thoughts and his sadness many hours while locked away from
me. I have listened hours upon hours to him reflect on his arrest and the time leading up
to it. He has ruminated much on what he could be doing in life for the betterment of
humanity instead of sitting in jail. I pray that he will still have the chance to be
contributing member of society.

We were lucky to grow up in a household where individualism was praised. We were
allowed to be who we wanted and were given the freedom to think as we pleased. We
were lucky to see the world in a broad spectrum. My mom was from a military family
and grew up overseas. My father was from a poor town, growing up in a house with no
running water. My grandfather had only a 4th grade education. My mom was more
conservative, my dad more liberal. One thing I realized is that my core family has all
been attracted to life careers in what I consider to be noble professions. My dad, a public
high school teacher – all the kids loved him, he was "Mr. Cool". My mom worked at a
public elementary school helping families of students from large immigrant populations.
As for me, I am an animal activist, working at city shelters. And my brother, the cop,
helping people in one of the most diversified cities in America.

My dad once told me a story about how he came home one day to a bunch of kids circled
in our front yard. He jumped out of his car thinking Nick was in a fight but came to find
me – jumping up and throwing punches at a guy several years older than I, yelling "Take
back what you said about my brother!" This defines Nick to this day. He is non-

confrontational and will stand up for someone else before he stands up for himself.  Nick was, and still is, soft spoken and a pacifist.  I was always concerned with being popular and being friends with everyone, while superficial teenage things did not seem to bother Nick.  To this day, I've never so much as heard my brother raise his voice.  When I would be mad, screaming and cursing over the phone, Nick would tell me that he was going to hang up and that I should call him back when I "can articulate myself better."  These kinds of things make me laugh.

I do not know the person portrayed by the prosecution.

The last time I saw Nick before his arrest, he came bearing gifts for my dog who was dying of cancer.  He sat quietly with my dog, her nuzzled in between his legs, scratching her head and speaking to her softly.  It would be the last time they would see each other.  He spoke gently to her with tears in his eyes.  This is the brother I know.

Nick has traveled to well over a dozen countries and could have chosen to live in anyone of them but chose America because this is the country he loves. He loves the constitution of our country and what our country stands for. Officer McNulty's testimony demonstrates how much of a patriot Nick is.  Nick would make it a point to reach out and send texts and messages to all his veteran friends on Veterans Day because of their service to our country.

Although Nick is Muslim and spiritual, he never preaches to anyone and is always welcoming of other faiths and ideas. Religion is personal to him and believes everyone finds their own path. He fell in love and was going to marry a Jewish woman but was unable to because of his case. He also chose a Jewish cleric to run lead our father's funeral.  Being called a neo-Nazi / white supremacist / terrorist / our enemy was the most hurtful to him because these ideologies were the most antithetical to everything he stood for and represented.  He has dated and loved women of every ethnicity and he has friends from all walks of life.

Nick had made a good life for himself.  He planned to retire from the force, a job he loved very much.  He chose to be a beat cop on foot patrol because he preferred being out among the people and patron, not sitting behind some desk.

This past week would mark eleven years since our dad died.  He left us in the most unexpected way - he was walking the dog before work, came home and had a massive and fatal heart attack.  He held out until all of us were with him at the hospital, even until I arrived off a flight from New York.  Sitting in the hospital that night, I watched my brother pull out a Quran and pray over our dad.  It wouldn't be until a few years later that Nick would announce to our mom and our only living grandparent that he had converted and made Hajj.  He was so happy and proud.  There were so many things my brother did not get to say to my dad during the living years and to this day, that eats away at him.  When our father died, I saw the light inside Nick go dim...at some points, that light was just a flicker.  I had hoped that the career my brother had made for himself or the

Case 1:16-cr-00265-LMB   Document 219-1   Filed 02/16/18   Page 7 of 53 PageID# 3034

love of his girlfriend would make him happy again.  I prayed many nights that he would not live in regret and sadness.  I'm not sure if he will ever get over the loss of our dad.

My mom is the same age my dad was when he died...and after my mom leaves us, my brother will be my only family.  Your honor, he means the world to me and I stand beside him because I believe he has been wronged.  I accept the verdict that has been handed down not because I agree with it, but because I have no other choice. Your honor, I beg for your mercy.  I beg for you to find it in your heart to give my brother a lenient sentence.  He is a kind man, a simple man.  He wants nothing more than to have a wife and family of his own.  He has always wanted to be the good he sees in the world.  This has not changed.  One of the big things that Nick has had to come to terms with in jail is that not only is he not able to help himself, but he's not able to help anyone else as he would wish.  It is of no benefit to society for Nick to be behind bars. Please give my brother a chance to do not only do good for his self, but more importantly, for others again.

My brother and I have spent many hours discussing what the two of us will do when this is all over.  I want the court to know that we are both dedicated to picking up and moving forward with our lives in a positive way and I am personally committed to do everything in my power to assure that Nick is able to make a good life for himself again.

Respectfully submitted,

Ashley Young

Tom McNulty

██████████████

February 6, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE:  U.S. vs Nicholas E. Young

Dear Judge Brinkema:

My name is Tom McNulty and I am a defense contractor who has spent 10 years in Iraq, Afghanistan and Kuwait. I came to know Nick Young in September of 1992 very soon after my son, Kenneth James McNulty entered 7th Grade at Carl Sandburg Middle School in Alexandria / Fairfax County, Virginia.  They quickly became best friends, and a part of my family.  Nick was best man at my son's wedding on September 15, 2007.  The last time I saw Nick was mid-May of  2013, but we have spoken from time to time since then.

While attending West Potomac High School, Nick and my son joined ROTC, and both exhibited a strong belief in our government and demonstrated a patriotic enthusiasm. It was no surprise when, after graduating they took a summer job together as security guards, then at George Mason pursued degrees in Criminal Justice. After graduating, Nick became a Metro Transit Police Officer and my son a Fairfax County Sheriff's Deputy.  Nick bought a townhouse and my son moved in and rented a room from him.

While I was deployed, the basement of our house flooded and during renovation, there was no power.  Nick moved my wife and daughter into his townhouse free of charge and allowed them to live with him until our house was safe to return to.

I have always viewed Nick as a close and trustworthy friend, and still do. He is intelligent, good natured and kind.  He has been to my home on numerous occasions, and I would welcome him back anytime. I was always

Pg: 429 of 518     Filed: 06/21/2018     Doc: 24-4     USCA4 Appeal: 18-4138

fascinated by Nick's stories of the reenactments that he would participate in. He had a vast knowledge of history. I believe that he even appeared in a couple of films made for the History channel. His choice of Islam was surprising to me, but I felt that it was more because of its ancient feel that drew him, and it was that he wanted to explore. Despite the government's depiction of him as Jew-hater, a neo-Nazi and a terrorist, Nick was none of those things. To the contrary, I firmly believe the government presented to the jury a portrait of Nick that was based on a deliberately twisted, exaggerated, and distorted version of his character. My heart fell through the floor when the jury failed to see that Nick was a victim of entrapment. The jury, a selection of my peers, my fellow man failed to see through the character assassination. I can't blame them for being misled, but what they were not allowed to know was that several other law enforcement individuals had been placed on Nick's trail to watch and observe since 2010, and several came back and said that there was nothing to report. Squeaky clean, their words. Nick is not a terrorist, and he certainly didn't buy gift cards for ISIS.

Your Honor, I pray that my words may inspire you to perhaps dig a bit deeper before you sentence him. I have to believe that you would never knowingly do the wrong thing. Please, go light, and place him close to home. Those of us that love Nick have suffered greatly at his incarceration. Placing him far away would inhumanely punish us.

I was with Nick on a few occasions when he wore his thawb (robe-like garment), and sported his beard, and I asked him about them. The beard, while it was not a requirement of Islam was a suggestion by the prophet Mohammed. Trim your moustache, but let your beard grow. Having a great deal of experience in and among Muslims from my time in Iraq, Afghanistan and Kuwait, I came to learn that it differentiated them to a degree between Shiite and Sunni. Sunni wore an untrimmed beard. Nick helped me to see Muslims in a different light than the one I came home with.

Respectfully,

Charles Thomas McNulty

Henry Marrow

February 6, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA  22314

RE:  U.S. vs Nicholas E. Young

Dear Judge Brinkema,

My name is Henry Marrow.  I'm a retired Station Manager of Washington Metropolitan Area Transit Authority (WMATA).  I also served in the U.S. Navy aboard three aircraft carriers during the Vietnam conflict.  I have known Nicholas "Nick" Young since 2003 when he first came to WMATA as a Transit Officer.

As a Station Manager, I worked closely with the Transit Police to ensure the safety and security of customers and employees.  Officer Young always presented himself as a professional.  We had long discussions about race relations, violence in the United States, and other various subjects.

As a Transit Officer, Nicholas was well respected among the passengers.  He was always cordial and helpful.  He was just a very good officer – Caucasian, Negro, Asian, Latino – race did not matter to Officer Young.  This is why this story is incredible. The customers at the Takoma Park Station used to call him 'Officer Friendly' because of his interactions with the riders of the rail.

It's very unfortunate that Transit Officers and other employees who wanted to visit with and write a letter for Officer Young 'froze' because of fear of the government.

What he is accused of is unbelievable in the sense that this officer would not do this. I realize that he has been tagged as guilty, but people were allowed to lie and were not challenged. Because of that, and more, my friend is now a condemned officer who gave his best to WMATA.

Your Honor, I realize what I said may sound critical of the system, but, Your Honor, I am African American and Nicholas is Caucasian, but he's my friend. Please Your Honor, have mercy on Officer Young. He truly does not deserve this.

I hope you can find it in your heart to be as lenient in sentencing as you can. To be honest Your Honor, time served and six years supervised probation would be a fair sentence, I think. Please don't take all of his life/freedoms away. I beg for mercy for my friend, Officer Nicholas Young.

Can you suggest that he be sent close to home in Virginia where his family can visit? Sending him far away would only damage his mother's, Joy, and sister's, Ashley, hearts forever. What if this was your son in this situation, Your Honor? Visitation is a comfort to a broken heart.

If you have questions, I can be reached at ███████.

Sincerely,

*Henry Marrow*

Henry Marrow

February 11, 2018

RE:  U.S. vs Nicholas E. Young

Dear Judge Brinkema:

My name is Derrick Stokes, and I have been an Officer with the Metro Transit Police Department for 12 years. I met Nick Young very early in my career and even worked side by side with him for several of those years. In that time, I've learned that Nick is the most genuine person that I have ever met. He is willing to do anything for the people that he considers his friends, even if providing that help would put him in a bad situation. I can only speak of my experiences with him, but he has always been an honest and dependable person.

Out of all of his co workers, I feel that I know him better than anyone else, and was kind of surprised that I wasn't called upon to speak on his behalf, especially after the FBI called me to their office to speak about him. In my personal opinion, I don't believe that Nick posed a threat to anyone. Not the department, the transit system, or the community. I base this on the time I spent with Nick beyond just work. He has been to my family's baby showers, home warming, etc. The person portrayed in the media is not the same person that I have come to know over the years. Nick has always stood apart from the crowd. Unfortunately, most people view things that are different in a negative light. When it became common knowledge that he was Muslim, he was ostracized by many of his co workers. I would even advise him to go to HR and make a complaint. But he never let it bother him, and just kept moving forward. Even through the constant harassment from those around him, he showed a strength of character that is rare in most people.

During the times we worked the same beat together, I never saw him treat people unfairly or without respect. I don't even recall him having a violent encounter with anyone. He could find a common ground with the person he made contact with and that made the job easier for everyone else around him. I honestly can't recall him having a negative interaction with the public while on the job.

Case 1:16-cr-00265-LMB   Document 219-1   Filed 02/16/18   Page 13 of 53 PageID# 3040

I was asked to provide the letter on very short notice and didn't really have time to get all my thoughts together. But I will proudly state that Nick Young is good man that got caught up in a bad situation in an attempt to help someone that he thought was his friend. I hope that he finds the strength to make it through this without it breaking him. He will always be a friend and a Brother to me.

Sincerely,

*Derrick Stokes*

Derrick Stokes

Case 1:16-cr-00265-LMB   Document 219-1   Filed 02/16/18   Page 14 of 53 PageID# 3041

Dear Judge Brinkema:

I am writing in reference to Nick Young whom I knew as a co-worker and friend.  I had the chance to get know Nick for a few years because of work.  We've worked together long enough to where, if we had the same beat we would walk out beats together talk and laugh together just as I would with any other co-worker.  I have always known Nick as a fair, reliable, and a kind-hearted person.  I had the opportunity to observe Nick deal with people on a day to day basis and he took the steps to make sure the persons he had contact with were dealt with fairly.  To me Nick showed that he was caring, loyal and honest friend who would be there for a person in a time of need. I truly believe that's the kind of heart he has.

Thanks for taking the time to read my thoughts on Nick Young.

LaTesia Christian

Stefanie L. Tolosa

███████████████

February 8th, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE:  US vs Nicholas E. Young

The Honorable Judge Brinkema,

My name is Stefanie Tolosa (Phillips was my maiden name).  I am the Imaging Informatics Administrator for Radiology at Inova Mt. Vernon Hospital and have worked there for the past 14 years.  I have been best friends with Ashley, Nick's sister, since the second grade and her family is like an extension of my own.  I only have a sister as a sibling, so Nick has always been like the brother I never had.

I know that Nick has been convicted and found guilty of material support to terrorism and obstruction of justice.  My life stood still August 3rd, 2016 when I heard the news on the radio about Nick's arrest.  I immediately called Ashley knowing that this had to be some kind of horrible mistake. There is no way the man I've loved as a brother for the past 28 years committed the crimes he's being accused of.  I felt sick to my stomach back then, and still do to this day when I think about what him and his family are going through.  I have been following his case ever since that day, and am aware of all the circumstances and events surrounding it.  I have supported him and his family through this entire ordeal and have seen how much he has suffered because of his actions.

As I stated earlier, the Young family is like an extension of my own.  Growing up, I spent just as much time at their house as I did my own.  I even tagged along on summer vacations to the beach every year. My mom asked me when I was younger which aunt of mine I wanted to live with if something ever happened to her and my dad.  I told her neither, I wanted to live with Ashley's family.  They treated me like one of their own and always made sure I was taken care of.  The Young family had the perfect blend of support to help you succeed, and encouragement to be your own person.  Nick never shunned Ashley or I like some other older brothers did.  We were always allowed in his room to play the Super Nintendo and whenever Ashley and I sang karaoke he was always there to listen and laugh and play air guitar or backup drums for us.  Nick also was a big softie when it came to animals, especially the family pets. Ashley and I would walk past his room sometimes and see him and Winston, the family's Boston terrier, curled up around each other napping.  It would always make us laugh because Winston's head was on the pillow right next to Nick's.  They also had a pet Parakeet named Rubia that Nick would talk to in a hilarious voice that was reserved just for her.

As Ashley and I got older, Nick never became too cool to talk to us.  He was two years our senior, but always stopped to chat with me at school if he saw me in the hallway.  Will Young, Nick and Ashley's father, was one of the most wonderful people I have ever known.  He was a government teacher at our high school and was loved by all of his students.  Because of him, The Young's were a very patriotic family and Nick developed a strong interest in the military early on and would have joined after high school if his dad had let him.   He excelled in Boy Scouts, ROTC, and loved to do WWII reenactments. We used to make fun of him always dressing up thinking it was nerdy.  He never got upset, just gave us a little smirk whenever we poked fun.  I never thought in a million years that later on in his life that would

be used as slander against him to call him a neo Nazi. Nick had friends and girlfriends from all different walks of life, race, and religions, including Jewish. It wasn't a surprise to me that he became a police officer. He was always successful in everything he did, and having a career in law enforcement gave him the opportunity to help people.

Up until Nick's arrest I had never questioned our government. This has really shaken my confidence in it. I feel like he was tricked. He was put in a situation that he never would have been in on his own. It's like the FBI watched him for so long and couldn't find anything, so they set him up to do something he wouldn't have done on his own so they could get him in trouble. They chose to focus on items found in his home to portray him a specific way to make their case. Almost all of those things are irrelevant and have nothing to do with the type of person he is or what he believes in.

Nick has an amazing family and friends who love and support him and just want to see him free. He is a good person through and through. All the years I've known him, I have never even heard him raise his voice. It hurts to know that someone like him, who has a lot of good to give this world still, is locked up. Nick had built a great life for himself; nice home, nice career, and was looking to hopefully find someone to settle down with soon and start a family. I feel like that opportunity has now been taken from him. I'm hoping that somehow it can still happen, and that it is just temporarily put on hold. When he is finally released, I can't wait to help him in whatever way I can to start rebuilding his life. He deserves to have a second chance. He's not a violent person; he never tried to hurt anyone. He is in this situation for trying to help someone he thought was a friend. Nick's compassion and kindheartedness was exploited. The FBI knew that was his weakness and used that against him. He is not a Terrorist. His intent was never to hurt people.

Nick and his family have already suffered enough. He is the one being sentenced but his mom, Joy, and sister, Ashley, are being dragged down right along with him. The amount of time, worry, and money they have spent over the last two years fighting for him has taken a serious toll on their personal and financial wellbeing. These two strong, beautiful women look like a shell of what they used to. I beg you to please make a recommendation to the Federal Bureau of Prisons that Nick be moved to a facility close to his home and mom and sister. I also ask that you include a recommendation that he not be sent to a high security / restrictive unit such as a CMU (Communications Management Unit.) Nick is a gentle and peaceful person and doesn't belong with hardened criminals. I worry about how other inmates would react to having a former police officer sharing space with them and the violence they might direct towards him.

Judge Brinkema, thank you for taking the time to read and consider my letter. My hope is that I have been able to show you the real Nicholas Young and what a good person he is, not the terrorist that the FBI is making him out to be. He has already personally suffered a great deal for his actions, and through this all, holds no ill will or resentment towards the people involved in his arrest. Please consider leniency with his sentencing so that he can perhaps have a second chance at making a life for himself and starting a family one day.

Respectfully,

Stefanie Tolosa

Case 1:16-cr-00265-LMB   Document 219-1   Filed 02/16/18   Page 17 of 53 PageID# 3044

Lourdes Castro

February 8th, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

Dear Judge Brinkema,

My name is Lourdes Castro, and I am writing this letter on behalf of Nicholas Young. Nick's sister, Ashley, is my best friend. I have known them both for nearly 25 years, and consider them like family. I have always known Nick to be a kind-hearted, straight-laced and responsible law-abiding citizen, so I was very shocked to learn of his arrest and conviction of material support to terrorism and obstruction of justice. Nick is physically and emotionally sick with grief knowing his family is suffering due to the regrettable decisions he made. Since the day of the arrest, I have done everything I can to provide emotional support to Nick and his family, including visiting Nick in jail and attending his trial in December.

Nick was just 14 when I met first met him. I had just befriended his sister, Ashley, who like me, was 12 at the time. Their parents had recently divorced, and they were living primarily with their father, Willis, while spending weekends at their mother's house nearby. We spent many days and nights hanging out at their father's house, playing with their dog Winston, at the park, watching movies - just being regular care-free kids having fun. Nick was funny, although much more serious than me and his little sister.

Ashley and I loved playing jokes on her older brother and his friends. Poor Nick.  We would annoy him to no end - making fun of his love of history, his participation in the JROTC, and his nerdy military reenactment hobby. No matter how bratty and obnoxious we were, Nick never lost his cool. He never even raised his voice at us once, even when our behavior warranted it. The only time I ever saw Nick remotely angry was the summer his sister and I cut the line at Space Mountain. The Young family invited me, along with Nick's friend Kenneth McNulty (who testified at Nick's trial), on a trip to Disney World. When Nick saw Ashley and I cutting the line, he scolded us (without raising his voice) for unfairly cutting in front of hundreds of people, and even gave us the silent treatment for the rest of the day. Even as a teenager, Nick was more concerned with following the rules than he was with having fun.

Nick's maturity, disciplined behavior and respect for authority continued well into adulthood. He always showed respect for the law and for his fellow citizens in his everyday life and in his career as a proud law-enforcement police officer. Nick always followed the rules while policing, and never used intimidation or showed disrespect to anybody. Nick treats everyone with respect. He does not look down on, or discriminate against, anyone. I am outraged that Nick's military reenactment hobby (that I used to make fun of him for as a teen) was used to slander and paint him as a Neo Nazi. Nick is not, and never has been, anti-Semitic or racist in any way. He has always had friends and girlfriends of all races and religions, and was in a serious long-term relationship with a Jewish woman whom he loved very much.

Case 1:16-cr-00265-LMB   Document 219-1   Filed 02/16/18   Page 18 of 53 PageID# 3045

I, along with Nick's family and friends, will continue to support him during and after his sentence. I plan to continue visiting, writing and speaking with Nick. Nick loves and worries about his sister very much. I have promised him that I will be there for Ashley in every way possible and provide her with emotional support every day. Knowing that his sister has supportive friends looking out for her will ease Nick's worries and help him to maintain his focus on rebuilding his life.

Nick's arrest and conviction have taken a drastic toll on his mother and sister in every area of their lives. The overwhelming stress and anxiety they both suffer has visibly aged them several years, and has negatively affected their performances at work, their personal relationships, their emotional and mental well-being and their physical health. Since the arrest they have put all of their time, energy, money and resources into helping Nick, leaving them financially drained and causing them to neglect their own physical and mental health. Nick and his family are still heart broken and reeling from the tragic and unexpected death of their loving father in 2007. The devastating loss continues to be a painful daily struggle.

I ask that you to please make a recommendation to the Federal Bureau of Prisons to move Nick to a facility close to his mother and sister. Nick's mother and sister plan to visit him as often as possible. Having him moved to a nearby facility will help the family out tremendously by reducing the time and money spent traveling, and the number of hours they have to take off of work. I also ask that you please also include a recommendation that Nick not be sent to a high security/restrictive unit. Nick is a non-violent offender, and as he is also a former law enforcement officer, I fear his safety, physical and emotional health will be jeopardized residing with violent criminals.

I hope I was able to shed some light on Nick and his family, and ask for leniency when imposing Nick's sentence. I am very concerned about the sentencing guidelines and possible sentencing enhancements of his charges. I ask that you please make a downward departure from the sentencing guidelines for Nick. Nick is not a threat to society. He has learned his lesson and deserves a second chance at life.

Thank you for taking the time to read and consider my letter.


Sincerely,

Lourdes Castro

Case 1:16-cr-00265-LMB    Document 219-1    Filed 02/16/18    Page 19 of 53 PageID# 3046

Anthony Babin

February 11th, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

Dear Judge Brinkema,

My name is Anthony Babin, and I am writing in regard to the sentencing of Nick Young. I attended middle school and high school with his sister, Ashley, and have known them both since 1995. I became very close friends with Ashley towards the end of high school, and consider her entire family to be my family. Nick and Ashley even joke that I am their black brother. Their mother, Joy, is like a mom to me. She even let me live at her house for a year, and I have spent several holidays with Nick and his family.

I am aware that Nick has been charged and convicted of material support to terrorism and obstruction of justice. I learned of his arrest on TV that morning, and called Ashley immediately, who had not yet heard the news. Had I not called Ashley when I did, she would not have been able to make it to the courthouse in time for his appearance that day. Nick is not a neo-Nazi. He is a good guy, and does not discriminate against anyone! There was always a very diverse group of people at Joy's Christmas dinners. We joked it was like the United Nations, with a white Muslim (Nick), a Hispanic guy, a Jewish guy, me and another black guy along with Ashley and Joy. Nick and his family are very good people, and I am blessed to have them in my life. The last time I saw Nick, my wife and I announced to him that we were having a baby. He was so happy for us.

I am very sad that Nick may not ever get a chance to meet my daughter. He is not dangerous; he is not a terrorist. He is my friend; he is my brother. Nick Young is a good man, and I ask that you please give him a lenient sentence.

Sincerely,

Anthony Babin

Sayma Saleem Maqsodi
February 12, 2018

RE: US vs Nick E. Young

Dear Judge Brinkema,

My name is Sayma Maqsodi and I am writing this note on behalf of Nick Young. I recently found out he may be sentenced to 60 years of prison for supporting ISIS.  I hope you will take a moment to read this letter and any others you may receive to heart and reduce Nick's sentencing.

I have known Nick for approximately 20 years. I first very briefly met him in high school where he was well known because of his father, who was an amazing history teacher. Although I did not spend much time getting to know him at West Potomac High School, he was always thought of as Mr. Young's kind, thoughtful son. I heard it all the time.  Finally when I was in college I got the chance to actually get to know Nick and it was true, everything I had heard about him was very obvious in the short time I got to know him.

At George Mason University, I spent a lot of time with the local West Potomac students. Nick was one of them. I remember spending time with him while he would help me prepare for my exams. He was always teaching me about history, religion, even math! He was someone who always volunteered a helping hand even if you didn't ask for it. I was amazed by how much a 20 year old guy knew so much about so many different topics. He not only loved teaching others what he knew but also wanted to absorb as much information about others' culture, religion, and language. There was nothing he wasn't interested in.

As the years rolled on and life took us different places, we all still found time to enjoy each other's company. We would do birthday dinners with mutual friends or try to get together for summer picnics. One of our most laughed at evenings was when we all went bowling and we realized Nick couldn't bowl at all! And as much as we would try to help him get the ball down the lane he would just laugh and we'd all tease each other. There was never a time I felt unsafe or unsure about him. So much so that I used to invite my sisters and her young kids to come enjoy the time with us. If there were any question of doubt who Nick was, I would never allow myself or my family to be near him. But this was never the case.  I got married in 2011 and Nick attended my wedding. He wore a beautiful Islamic gown and I loved the gesture, as it was a Muslim wedding. He took so much pride in making others feel comfortable.

So now, when I hear this man that I used to know is going to prison for supporting ISIS shocks and saddens me. I've read all the articles and seen the charges set against him and in my heart I don't believe he is a terrorist or a supporter of terrorism. He loved his job; he loves his friends and family. He was always positive.

Case 1:16-cr-00265-LMB   Document 219-1   Filed 02/16/18   Page 21 of 53 PageID# 3048

So please Judge, if there is anything you can do to help reduce his sentencing please find it in your heart to do so. He is a good person and going to jail will take his life away. His family already lost a father and husband at a young age but to lose a son and brother would be heartbreaking.

Thank you Judge Brinkema for reading through this letter. I'm sorry I rambled on but I just wanted you to know that the Nick I know isn't the Nick behind bars.

Sincerely,

Sayma Maqsodi

February 11, 2018

The Honorable Judge Brinkema
Alexandria Federal Courthouse
401Courthouse Sq.
Alexandria, Va. 22314

Re: Nicholas Young

Your Honor,

My name is Heather Hogan. I am a practicing coach in Brooklyn, New York,
utilizing my training in psychology and neuroscience to aid clients in the
creation and maintenance of healthier lives. I have known Nicholas Young
for 20 years. His sister Ashley and I were great friends in high school, and
remain close to this day. I was first introduced to Nick when his sister
showed me his room one day after school, when he was not around. The
opportunity to observe an individual's private space can tell you a lot about
them. There was an orderliness about his room that was unique, a far cry
from the room of your average teenage boy. There was thoughtful
organization of his space, and a clear reverence for the few things he had
in his room— books, small collectible items, baseball posters, etc. I recall
there being a game of Risk spread out on the floor, and Ashley rolling her
eyes (as little sisters are wont to do) saying "he's a total history nerd."

Most of our encounters for the first few years were polite, passing
conversations here and there. Nothing really speak of. My step-father died
when I was 16. Ashley had already gone way to college and I was
floundering, trying to adjust to my new life after the loss of a parent. I got a
job and surprisingly, Nick would stop by to check in on me. He was always
kind, inquisitive and funny. His gentle nature made him easy to talk to, to
share with, and to connect to. He came by my job, picking up where his
sister had left off, delivering a dose of supportive friendship and genuine
care, when he sensed my need of those things. He proved himself to be
the thoughtful individual that his room indicated him to be. While over the
years we did not remain close, I always inquired after him when meeting
with his sister. The updates were mostly that Nick was doing well, excelling
at his job with the DC Metro Police, at one point receiving commendation
for his efforts by the DC US Attorney. My experience with Nick is that he
was, and remains to be, a kind-hearted, intelligent man, who does his best

to act thoughtfully in a world where most people clamor through like bulls in china shops.

While I understand that the court has found Nick guilty, I am writing to ask for leniency in his sentencing. My work as a coach has given me the opportunity to understand the value that spirituality, religion and the belief in a higher power can lend to the human experience. One cannot help but feel as though Nick's spiritual journey and the subsequent cultural misconceptions about what it is to be Muslim, have been an influencing factor in this case. The effects of these misguided perceptions are out of our hands, but the intensity of their impact can be mitigated, with your support. I am offering my support to Nick now, in his time of need, when the rug has been pulled out from underneath him, just as he offered support to me.

In a time when the world seems to be a violent, dangerous and sometimes hopeless place, we are presented with the opportunity to choose to meet those fear-fueled emotions with kindness, support and compassion, allowing our humanness to prevail. I do not mean to undercut the seriousness of the changes against Nick, as we all understand the importance of, and need for safety and security in the world. I ask that you consider a holistic view of the man, taking into account his gentle nature, kindness, and dedication, exhibited in both his personal and professional life.

Thank you in advance for your compassion and consideration.

Respectfully,

Heather Hogan



Laura M. Holland

February 5, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

Dear Judge Brinkema,

My name is Laura Holland and I am a close family friend of Nick Young's. I am his sister
Ashley's best friend, and have personally known Nick for the last five years. I am a marketing
consultant, and I've worked for the National Press Club and The White House Communications
Agency in Washington DC.

I understand that Nick has been charged and convicted of material support to terrorism and
obstruction of justice. I have been closely following his case since the arrest, I've attended the
trial, and have written and spoken to Nick on many occasions since his arrest. This situation has
thrown his family into a tailspin. It has been isolating, and completely disorienting. Nick is utterly
remorseful for the pain he has caused his family and friends.

I've always known Nick to be a kind, intelligent and gentle person who loves to read. Nick and
his sister Ashley were raised by two loving parents in Alexandria, VA. When they were still in
grade school their parents divorced, and Ashley and Nick lived primarily with their father, a
respected government teacher at West Potomac High School where they both attended. I
preface with this information because I became close with this family a few years after their dad
passed away in 2007. I never had the chance to meet him, but I know that no matter how much
time had passed the loss of their father in their 20s still deeply affects their lives. Nick's love of
history, world wars, and religious studies all stems from his beloved father.

To me, Nick is an exceptional person. As a 13-year veteran of the metro transit police he
avoided the use of force, preferring de-escalation methods. He always kept his cool. He is soft
spoken, with a witty sense of humor. He loves his family. I attended his Nana's 90th birthday
celebration in La Hoya, CA in 2013 with Nick and the rest of his family. I sat next to Nick at the
luncheon, walked along the La Hoya cliffs with him and his sister, and we watched the sunset.
He was sweet, funny, and personable throughout the weekend. The luncheon for his Nana had
about 60 attendees from all backgrounds and ethnicities. Nick was courteous and friendly to
every single person at the event. Many family friends and family members sparked up
conversation with Nick and he openly talked about his life and his interests when asked. Nick
enthusiastically talked about his job as a police officer, and his interest in a fantasy book series
that he was reading and game he was playing that goes along with the book series.

Nick is not "mainstream"-- this is why he is so exceptional. He never seems to need approval
from others, and marches to the beat of his own drum. He is an individual in a world where
individualism is looked up on. He never seemed to be concerned with what anyone
thought of him, or his interests, he is a curious being that never let the mainstream social
pressures get the best of him.

1

Nick has a small but good support system that plans to be there during his imprisonment and after his release. My family owns a small business in Fredericksburg, VA and would be willing to hire Nick as an employee when he is released.

Nick's arrest and conviction has been most devastating on his sister, Ashley, and his mother, Joy. They have suffered physically, mentally, and emotionally. They are skinny, shaken, and stressed with worry over their family member. They have put their futures on hold, fallen into serious debt, and deep depression. This family does not deserve this pain. They have suffered right along with Nick. Although they were not charged with a crime, it feels as though they have also been convicted and imprisoned. They are already doing what they can to make ends meet. Keeping Nick close to where they live would help significantly improve their lives. I know Ashley will see Nick every chance she can get, and if he is in closer proximity she will be able to maintain her life in a more manageable way.

Judge Brinkema, I am writing to ask for leniency for Nick Young at his sentencing. As I mentioned, I know Nick is gentle, smart, and generally passive. He has and will always use conflict resolution techniques, over violence, or anger. I ask that Nick not be sent to a high security or restrictive unit because I know how violent the criminals in these units can be, especially to a former convicted police officer. Nick is not a violent criminal. It shakes me to my core thinking Nick could be sent to a prison meant for violent offenders that have committed heinous physical harm to other people, because that is a cruel juxtaposition to the person that Nick truly is.

I am very concerned about Nick facing 60 years in prison for his crimes. 60 years over $240 in google play cards seems like something out of a dystopian totalitarian novel. I hope for leniency from you. Nick still has a chance to contribute more good into this world, and I know there's nothing more he wants to do than just that. He has learned a harsh lesson, and does not hold a grudge. He understands his predicament and respects our laws and justice system. He is an American, a patriot, a son, a brother, and a good friend.

I stand very firm and committed in my belief that Nick is a good person and will always remain a good person. He has no criminal history, and is a distinguished veteran police officer of our Nations Capitol. I urge the court to show leniency in the sentencing.


Respectfully,


Laura M. Holland

2

Mrs. Cynthia Buck

███████████████████████

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE:  U.S. vs Nicholas E. Young

Dear Judge Brinkema:

It is my pleasure to write this letter to provide a character reference for Mr. Nicholas E.
Young and his immediate family (Ms. Joy Young, mother, and Ms. Ashely Young, sister)
who I have known for many years through the Fairfax County Public Schools. I am a
retired elementary school principal from Fairfax County Public Schools. I worked in this
school district for 32 years.

Both Mr. Nicholas E. Young and his sister Ashley attended Groveton Elementary School
where I served as principal and assistant principal.  I have known Mr. Nicholas Young
since second grade. He was an excellent student. He was an honor roll student, and he
participated in our school-based gifted and talented program. He was a very pleasant
student and was never involved in any altercations (physically or verbally). He got along
well with his peers, our community, and our school staff. I followed him and his sister
throughout their high school, college and adult years.

I have known Ms. Joy Young, their mother since her children were in elementary school.
She was involved in school activities where she volunteered and served on the PTA. I
recommended her for positions in our school district. Ms. Young served successfully in
our school district well as an administrative assistant, school secretary and registrar. Our
paths continue to meet and she worked as the school secretary registrar at one of three
schools where I served as principal (Mount Eagle Elementary School). We have always
kept in close contact throughout the years.  I can recall how proud she was when her son
and daughter graduated from high school, attended college and pursued career
appointments.

Mr. Nicholas Young, in my opinion, is a very reserved, quiet young man who never
caused physical or emotional problems to his fellow man. He was in the ROTC in high
school and college.  I feel that he is an asset to the Washington Metropolitan area and our
country.  The schools and college he attended served diverse populations. He served the
Metropolitan Transit Authority for thirteen years. His mother and sister were proud of
this accomplishment.  Mr. Nicholas Young father is deceased. I attended the funeral and
conversed with Mr. Nicholas Young at the time of his accomplishments.  His friends that
attended were from all backgrounds. He never showed any racial bias was well respected

1

by his peers. His late father, whom I knew was a high school teacher. He liked many history buffs, was an avid reader, member of the historical society, and participated in historical war reenactments.

Mr. Nicholas E. Young continues to have the full support of his family, his family's friends, colleagues, spiritual leaders and person such as myself through prayer calls, notes of encouragement and personal written and verbal words of encouragement for him and his family not to despair, rely on their faith, and to take care of their mental, physical, and spiritual selves.

 I am fully aware of his charges and conviction as I write this letter (material support to terrorism and obstruction of justice) of which he has been found guilty. Since I have known Mr. Nicholas E. Young since childhood and his mother quite well, I have been following the case and taken aback of the arrest.

 His imprisonment will have a tremendous impact on the family, which is just two his mother and sister.  I have seen the toil, stress emotional on them and ask that you the Judge for his mom and sister's sake make a recommendation to the Federal Bureau of Prisons that he be moved to a location nearby to his home – mother and sister.

In closing, I thank you for your consideration of this letter. I hope and pray that I have been able to shed light of this family that I have meant so much to me, particularly his mother, who has been a support and advocate of so many persons that she has encountered in the school district and her life. Ms. Young and her daughter are so fragile and the emotional and financial impact has been more than words can express or possibly imagine.

Sincerely,

*Cynthia Buck*

Mrs. Cynthia Buck, retired Educational Administrator, Fairfax County Public Schools VA and Prince Georges County Public Schools MD

2

Sharon E. Stinnette

████████████████

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE:  U.S. vs Nicholas E. Young

Dear Judge Brinkema:

I am Sharon Stinnette.  I am retired from Fairfax County Public Schools.  I
worked in several office support positions before retiring as an Administrative
Assistant II, which is the secretary to the principal and finance technician. I have
known Nicholas' mother, Joy, for thirty years.  We started working at Mount Eagle
Elementary School the same year and became friends.  We both left Mount Eagle
at separate times, but both also returned and were co-workers once again.  We
remained in touch and would get together when we could.

We often shared stories about our children, as we both had a son and a
daughter.  When Nicholas was younger, elementary age, I would see him and his
sister, Ashley, with Joy at the neighborhood pool.  Joy would also bring them to
school with her occasionally to help on teacher work days or to play basketball in
the gym after school.  Nicholas was always very polite and seemed to enjoy doing
the things children at that age like to do.  From talking to Joy, Nicholas also liked
school and did well.  He never had discipline issues or trouble with classmates or
teachers.

As our children got older, we shared our joys and fears as they went out into
the world on their own.  Fears turned to pride as we shared their successes in their
journey's.  Joy was very proud of Nicholas' accomplishments, especially when he
joined the Metro Transit Police.  She was very proud of the man he had grown to
be; purchasing his own house and enjoying the job he had worked hard for.

Joy, Nicholas and Ashley are a very close family.  Joy is always happy when
their work schedules allow them all to spend time together, especially during the
holidays.  Joy has always been available to help her children with whatever they

needed. She is very supportive and proudly talks about all that they do, from employment choices to their personal interests.

The charges that Nicholas has been convicted of are putting a terrible strain on his family, both emotionally and financially. Joy has, and will continue, to support Nicholas as much as she can through this sad time. She is also dealing with the declining health of her elderly mother, who lives in Florida. I worry about Joy and the affect this additional worry is having on her health. I am trying to be as supportive as I can, without treading on her privacy.

I first learned of Nicholas' arrest on the news. I was stunned that this had happened and was sure that there had to be some mistake! The charges brought against Nicholas were so out of character for the young man I knew of through my friendship with his mother. I have followed his case through news reports, articles in the newspaper, and updates from Joy when she had time and was up to talking about it. When I heard that he was convicted of the charges I was shocked. I still can't help but think that this is some horrible mistake.

I pray for leniency when he is sentenced and ask that you make a recommendation to the Federal Bureau of Prisons to have him moved to a facility that is close to home. Nicholas is suffering for the actions he has been convicted of, but his family is suffering as well. Being placed in a facility closer to home would help ease some of the already extensive financial and emotional burden they are dealing with.

Thank you for considering my letter. I hope it has given you some insight to Nicholas and his family.

Sincerely,

Sharon E. Stinnette

Sharon E. Stinnette



**HUMANE
RESCUE
ALLIANCE**
Animals. People. Community.

Rebecca E. Stern
484-802-6817
bstern@humanerescuealliance.org

February 12th, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

The Honorable Judge Brinkema,

I first met Nicholas Young's sister Ashley Young in 2014, when I began working with the Humane Rescue Alliance (then called the Washington Humane Society). In the last three and a half years, Ashley has become so much more than just a coworker – I consider her to be one of my closest friends, and among the most significant people in my life.

Anyone who knows Ashley will tell you that she is fiercely loyal and loves deeply, especially when it comes to her close friends and family. This is abundantly clear in the connection she still feels to her father. Though he passed away a few years ago, his presence and influence lingers strongly in hers and Nick's lives. She tells stories about him, the role model he was, and the life lessons he handed down whether by actions or words. I first got to know Nick through these anecdotes about Ashley's father and her childhood – Nick was the protective older brother, the loyal friend, the pacifist, the smart one, the funny one, the police officer, the patriot... the outcast. I felt like I knew him, even though for years we never met in person.

I finally met Nick after his arrest in 2016. There has always been a glass partition between us, an uncomfortable plastic chair, a phone, a clock ticking down the visitation time. But even in this surrealistic setting, it was immediately clear that Nick was exactly the man I felt I already knew, by way of his sister's stories. Nick is genuine, he welcomes open conversation with an unabashed sense of humor, and his quiet intelligence is utterly apparent in every sentence he speaks. He loves to read, a saving grace for him in the struggle to stay mentally active in the conditions he has endured since his arrest.

I've now spent countless hours visiting Nick, and have only grown more confused and disappointed at the accusations lofted against him. Not once was I faced by a Nazi sympathizer, nor did I feel afraid to discuss my own upbringing in a Jewish family. At no point did I see a radical extremist. I was never suspicious of Nick's intentions towards his country. Erase the glass partition that has always existed between us, and I promise you my feelings would not change. I do not know the man that the media coverage and the trial has portrayed – that man nauseates me, and he is not Nicholas Young. The conviction of this intelligent, kind, passive individual was built on emotional manipulation and. People fear what they do not understand, and in 2018 we are faced with an American culture that penalizes any contradiction of sociocultural norms, norms ordained not by of society itself but instead of those who wish to control it. I refuse to let this control, this fear, send an undeserving man to prison alongside violent criminals.

I work in a field that exposes the darkest depths of humanity on a daily basis. In any given week, we encounter purposeful mutilation and torture of animals, animal cruelty cases involving neglected children

USCA4 Appeal: 18-4138     Doc: 24-4     Filed: 06/21/2018     Pg: 451 of 518



and domestic abuse, and government re-appropriation of neighborhoods that forces families out of their homes and into the street. The people involved in these cases deserve a strict sentence, Nick Young does not.

I have been following Nick's case since August 2016, and have done a significant amount of personal research into similar cases. I attended his recent trial and understand the charges fully, but my understanding does not equate to an agreement with his conviction. 60 years in prison is not justice – it is cruel and incompatible to the alleged crime. I urge you to consider a downward departure from the sentencing guidelines, and implement leniency in a final decision. He would benefit significantly from placement at a facility close to his friends and family. I cannot emphasize strongly enough how much well-being depends on this, as does the well-being of Ashley, their mother, and everyone else in his support system. I sincerely appreciate Your Honor's consideration of this information and subsequent requests.

Respectfully,

Rebecca E. Stern

Rebecca E. Stern

Pg: 452 of 518        Filed: 06/21/2018        Doc: 24-4        USCA4 Appeal: 18-4138

February 1, 2018

Honorable Judge Brinkema
United States Federal District Courts
401 Courthouse Square
Alexandria VA 22314

RE:  Nicholas Young. Case No.

Dear Honorable Judge Brinkema,

 As a concerned US citizen and a resident of New York, I am very saddened to hear about the verdict on Nicholas Young's case over which you presided. I became familiar with the case that has devastated his family from the media. I am writing to kindly request Your Honor to consider a just and fair sentence for Nicholas on February 23, 2018 by sentencing him to time served or to the shortest possible sentence in accordance with the Federal Sentencing Guidelines.

 Nicholas is a peaceful, loving and caring person who is looking forward to a life with his family and his community. He has also been an active service member in the greater District of Columbia Metro Transit Police Force for 13 years.  A well-respected member of the metro law enforcement community for which he received a Commendation from the DC US Attorney's Offices, Nicholas is a man of dignity, truth and conscientious person who valued and deeply respected the law and the US Constitution. I would love to have him as my neighbor and work with him as a devoted community member. I believe Nicholas is a great asset to our larger community and society as a whole and he deserves to be free.

 Nicholas has not hurt anyone and would not hurt anyone because he is a passionate patriot who loves his country, fellow citizens and all human beings.  Please consider sentencing him to time served as these past years of pre-trial imprisonment has provided ample time to reflect on life direction. I respectfully urge Your Honor to consider time served for Nicholas Young, an American patriot.

 I, and many others in the community at large, will be very grateful to Your Honor for a favorable sentencing, ensuring that our justice system is fair to this peaceful, loving, and caring young man.

Sincerely,

Dr. Sharmin Sadequee

February 6, 2018


The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE: U.S. vs Nicholas E. Young


Dear Judge Brinkema:


My name is Elizabeth DePalma and I am a family friend of Nicholas Young, his
sister, Ashley Young, and their Mother, Joy Young. I have known the Young
family since 1996 when meeting Joy at Mount Eagle Elementary School in
Alexandria, VA where she worked. Joy and I became fast friends and ultimately
co-workers at Mount Eagle and worked side by side for 10 years. We had a lot in
common. We were hardworking and devoted Mothers of two. Joy's son Nicholas
was in the 11th grade at West Potomac High School, and her daughter, Ashley, was
in the 9th grade. Their father, Will, was a teacher at West Potomac High
School. Working so closely together each and every day, Joy & I became very
close and shared our lives on a day-to-day basis. Although Will & Joy had
divorced, they firmly believed in raising their children jointly and both had very
active roles in Nicholas' and Ashley's lives. Will & Joy lived about a mile apart
and the children could easily navigate between both households. At the time,
Nicholas was a member of the ROTC, was a model student, and held part-time job
at a local restaurant.


Nichols comes from a family of people who choose to serve others. His
grandfather was career military. His father was a career educator. His mother
served her community, peers and children as a school secretary for 30 years. His
sister Ashley has been involved in animal welfare and rescue for most of her adult
life. It came as no surprise that Nicholas career choice was to proudly to serve in
the Metropolitan Transit Police Department. His mother shared that he was the
recipient of commendations. She was very proud of his career choice and always
spoke highly of him. When Nicholas was arrested last year, it was absolute shock
and awe to those of us that knew the family.

I followed the trial. Offered what moral support I could to the family. Watched them get swallowed up in the horrifying and unfamiliar nightmare of an arrest, jail, trial and subsequent guilty verdict. Joy and Ashley did <u>everything</u> they could to gather information, funds and stand strong to support Nicholas during this process. They shared that during his solitary confinement they worried all the time about his diminishing mental health and toll it was taking on him. The saving grace was that they could at least visit with him on Sundays near their respective homes in Alexandria and Washington DC. It is my sincere hope that you will show leniency in his sentencing and also kindly make a recommendation to the Federal Bureau of Prisons that he be moved to a facility close to his home so that his family of two, (mother & sister) can continue to visit and offer emotional support & love during his incarceration.

Thank you for time and consideration. I hope that these meager words offer some insight to the family that is affected by this circumstance and those of us to care about them and want to do whatever we can to help.

Respectfully,

*Elizabeth F. DePalma*

Elizabeth F. DePalma

Anthony F. Digiovanni

February 3, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE: U.S. vs. Nicholas E. Young

Dear Judge Brinkema,

My name is Tony Digiovanni and I have known the defendant, Nicholas Young from birth.  From 1970 through 1984, I was married to Nicholas' aunt, Susan DeCandio.  To this day, I remain close to my ex-wife's family, and to Nicholas' mother, Joy Young, his sister, Ashley, and to Nicholas personally.

I have always known Nicholas to be a gentle soul.  From his earliest developmental years, Nicholas was always a quiet, shy individual who enjoyed his own family, as well as his extended family of aunts, uncles, and cousins.  My children grew up alongside Nicholas and Ashley and always enjoyed their company.  As Nicholas matured, I was pleased to see him start his career with the D.C. Metro Transit Police, and work diligently for the last 13 years, with good performance reviews to support his service.

While I understand that Nicholas has already been convicted of the charges, I know also that Nicholas has shown remorse for what he has done, and that his family has suffered greatly, both emotionally and financially. His mother, Joy and sister, Ashley will never again be the same happy, enthusiastic individuals that I've known for most of my life.

I ask that you take into consideration the remorse of Nicholas, and the suffering of his family, and recommend that Nicholas be placed in a facility close to his home and his mother and sister.  I'm confident that Nicholas, and every important family member around him is already working to make amends for his actions and facilitate his reentry back into our society to contribute to our greater community once again.

Thank You for your consideration,

*Tony Digiovanni*

Tony Digiovanni

Geraldine Scalia

February 2, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE: U.S. vs Nicholas E. Young

Dear Judge Brinkema:

I have known Nicholas' family since I was about 12 years old.  That is over 50 years.  His mother, Joy, and I are cousins, and spent spring holidays together. His family—parents, grandparents, and aunts came from an upbringing that was conservative, kind and mild mannered, and Nick inherited most of these traits. His grandfather, Eugene Calafato, was an extremely intelligent career military man with a warm personality and great sense of humor.  It was always an enjoyable experience when our families were together.   Nick's family came to our house for Thanksgiving for many years, a tradition we continued for years.  It was an extension of our mothers' closeness; we all just really liked each other and felt comfortable together.  I even went to visit them in Alexandria when I was in undergraduate school in Richmond where I studied Find Arts.  I am a visual artist and educator.  I am still close to Nick's grandmother (my aunt), his mother (Joy), and his aunt's family.

As a child, and as an adult, Nick was always quiet and polite with the sweetest smile.  As he grew older he developed an interest in world history.  It very much touched my heart to see him at my father's memorial.

I learned that Nicholas converted to Muslimism while in university.  We come from a country founded on religious freedom.  Although not a religious belief of my choice, it was my cousin's choice.  He never proselytized or ranted or denigrated other religions or beliefs, but seemed to quietly follow his religion. This, I don't believe is a transgression.  Who am I to judge another's spiritual choice just because it is different than mine?

I was impressed when Nicholas joined the police force, and learned that he liked being a policeman. This, in itself, was exemplary, and it fit into his personality of being responsible.  I observed Nick to be a mild-mannered, pleasant, smart young man who never exhibited any maliciousness.  I have read reports pertaining to Nick's trial. These articles and judgments were not only a surprise; I believe they are downright incorrect and a misrepresentation.  Nicholas is patriotic, which is one of the reasons he joined the ROTC, and his character was exemplary for joining the police department.

Like his father, Will, who was a highly respected teacher, Nick was a history buff. If reenacting Historical War games categorizes someone as a Nazi or terrorist, perhaps these games played by thousands should be removed from toy stores and similar outlets. Nick is not, and never was, a Nazi.  I see them as childlike "manly games".

I think Nick temporarily walked down the wrong road.  It was a road that was falsely represented, by a couple of unscrupulous men who misrepresented themselves as helping their "brothers".  He thought he was doing something helpful, i.e.: enabling someone to call his sick parent.  Nicholas strongly opposed ISIS and anything illegal.  Nick is honest, perhaps a little too trusting. I truly believe he can get on the right path again.  My ear is always open to my cousin Nick, and I am willing to offer help as from my professional and personal experience in the healing arts. I am available upon his or the authority's request.

I know Nicholas Young has been found guilty, and personally feel Nicholas has suffered the consequences and has been punished enough—months in prison gives someone more then enough time for self-examination.  Please believe that Nick has not only regretted, but also repented, for what he has done wrong and his conscience is a good one.

The imprisonment, the location of the prison, the whole thing has been an emotional and financial hardship on his mother and sister—the distance in itself has been upsetting and stressful on a family of two.  I earnestly request that you recommend to the FOP to move Nicholas close to his home.

Please consider what I have written, especially about Nicholas' character.  Judge Brinkema, in considering Nicholas Young's sentence, on behalf of his family and Nicholas himself, I personally request that you choose leniency.

I have been praying for Nicholas since his arrest and through his trials and hearings, and I will continue to pray.

Sincerely,

Geraldine Scalia

Philip Scalia

January 29, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE:  U.S. vs Nicholas E. Young

Dear Judge Brinkema:

I am a professional photographer and artist for nearly forty years, making my home in New York State. Nicholas Young is the son of my first cousin (Joy Young, né Calafato), so according to Google that makes him my "first cousin once removed," on my maternal side.

Over the years, at various family gatherings, I got to know Nick a little bit, and still have a drawing that he made and gave to me, at one of these get-togethers. He was probably around eight years old at the time. He was a sweet kid. The last time I saw him was September, 2003, at my father's funeral. He would have been about twenty-three; it had been some years since I had seen him. He still had a sweetness, a gentleness about him, was quiet and polite, smiled sincerely, had nice eyes. In a word, he was very... boyish.

Knowing Nick in this way, I was of course stunned to hear that he had been arrested. I followed the trial as best as possible, from NY. I am convinced that Nick's problems stem not from an intent to do harm but rather from a naiveté that is inseparable from his character. This naiveté is a family trait on his maternal side, that I frankly found exasperating in my mother (his grandmother's sister). This naiveté is in me too, though I have traveled a bit, and been out in the world to an extent that opened my eyes to the dangers of being too childlike. But I used to take a razzing from some of my more worldly friends. Nicholas is perhaps too "wet behind the ears," naive to the point of foolishness no doubt, but the INTENT to do harm is not in this boy-man, in my opinion.

His work records show that he was a cop who eschewed violence. He was not a Nazi, he dressed up like a Nazi for war games. There is a big difference. Nicholas has girlfriends who are Jewish and non-Caucasian. This is not the love-life of a racist. He fell for Mo's sad story about a pregnant wife and poor mother. Once again, we have an overarching gullibility, but we do not have malice. This is not to minimize his guilt, at some point naiveté becomes unacceptable; nevertheless, there are many shades of evil. If we place someone like Bin Laden in the blackest of these shades, Nicholas would dwell in a very light gray shade. I say this as a photographer, and an observer of human nature and character traits.

Case 1:16-cr-00265-LMB   Document 219-1   Filed 02/16/18   Page 39 of 53 PageID# 3066

I am asking that in your sentencing, if you see fit to confine Nicholas, that it be as light a sentence as possible, and that he please be placed at a facility close enough to DC-NY so that he can be visited by his sister and mother, who are understandably devastated by all of this. If you can release Nicholas, I will do everything in my power to communicate with him in a positive manner in an effort to offer guidance and rehabilitation. Thank you for taking these thoughts into consideration.

Sincerely,

Philip Scalia

Case 1:16-cr-00265-LMB   Document 219-1   Filed 02/16/18   Page 40 of 53 PageID# 3067

Joel DeCandio

5 February 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE: U.S. vs Nicholas E. Young

Dear Judge Brinkema:

My name is Joel DeCandio; I am a cousin of Nicholas Young's.  I am twenty-six years old, and I
have known him all my life.  I spent many summers visiting Nick and his family, even living
with my aunt for a time while I was in school in the area.  Nick has always been a kind and sweet
person.  He has always tried to do what's right, and I know he regrets what has happened.  Nick
has both the love and support of our whole family.

I have been following the trial since it began and am in full awareness of both sides of the case.  I
understand that Nicholas has been found guilty, and I have faith in and respect for whatever your
decision may be.  I do want to appeal that wherever Nick is sent, he is close to Joy and Ashley,
for both their sakes and his.  We all believe he has suffered a great deal already, and it would be
most beneficial for his and our family's recovery to be near his home.  This tragedy has had an
enormous impact on our family, and we all are working to overcome it.  I know Nicholas is, as
well.

Sincerely,

*Joel DeCandio*

Joel DeCandio

Susan DeCandio


The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE:  U.S. vs Nicholas E. Young

Dear Judge Brinkema:

My name is Susan DeCandio.  I am Nicholas Young's aunt.  My sister, Joy
Young, is Nicholas' mother.  I am writing to you on Nicholas' behalf.  The past
year and a half have obviously been traumatic for both Nicholas and the family. I
am the one who had to call my sister to tell her of Nicholas' arrest (she was
already at her job in an Alexandria elementary school) after my 94 year old
mother heard it on CNN early that morning.

As a young child, Nicholas was sweet, playful and happy.  He always had a smile
on his face.  As he grew up, the happy smile was there to greet us when we
would see him at various family gatherings.  Nicholas was involved in
extracurricular activities growing up and had numerous good friends.   He was
very proud of his chosen career path with the Metro Police Department and
enjoyed his work.  Nicholas would never intentionally do anything to disgrace or
dishonor his family or his country.  Nicholas is kind hearted and a gentle soul.
His father died of a sudden heart attack in 2007.  Nicholas was close to his father
and had difficulty expressing his loss.  This loss may have been a catalyst when
in early adulthood, Nicholas developed an interest in learning about various
religions, and chose to convert to Muslim.  I believe it was the simplicity and
peacefulness of it's doctrine that spoke to Nicholas' gentle soul.  I know he has
had to draw on his beliefs often to give him strength this past year and a half.
The time he had to spend in solitary confinement was extremely difficult
emotionally for Nicholas, as well as his mother and sister.  Through occasional
letters, I have told Nicholas that he is daily in my thoughts and prayers and that I
love him.  He will definitely have the family's support to rebuild his life and to stay
strong after this ordeal.

I have closely followed Nicholas' case and am fully aware of the charges with which he has been convicted. I know that Nicholas finds it very painful to realize the hurt and anguish his trial and conviction have caused his mother and sister. My sister has suffered a great deal of emotional stress and has not been able to visit him often because of the distance where he was imprisoned and that the visiting hour was during the work day. Coupled with the emotional toll is the financial toll for her, from which I fear she will not be able to recover at our age.

Your honor, it is my hope that you will make a recommendation to the Federal Bureau of Prisons that Nicholas be moved to a facility close to his home, mother and sister. Thank you for your consideration in this matter, and for taking the time to read my letter.

Respectfully,

Susan DeCandio

Michael DeCandio

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE:  U.S. vs Nicholas E. Young

Your Honor:

My name is Michael DeCandio.  I am the uncle of Nicholas Young who will
appear before you for sentencing in a few weeks.  Nothing I can and would say
should be interpreted as excusing the actions that brought him into your
courtroom.  However, there are some facts that I hope you will consider in your
ultimate decision on Nicholas' future.

My wife is sister to Nicholas' mother, Joy Young.  Susan and Joy grew up in a
military family.  Their father was a career officer in the United States Air Force.  I
too had the benefit of being the son of a career officer in the United States Army.
I say benefit because Susan, Joy and I all were exposed to people and places
that made us grateful to be Americans.

Nicholas grew up in that environment as well.  Independence Day, Veterans Day
and Memorial Day were and remain special in our families lives.  I never had
reason to doubt they had the same meaning for Nick.

When he was growing up there was always a quiet joy in him, always a smile.
When his father died unexpectedly, I believe he lost part of his map for navigating
life.  Thereafter he seemed to be searching for something that neither he nor any
of his family members could identify.  I recall several occasions when he would sit
with my father discussing a career in the armed services.  When he joined the
police force I hoped he had found his anchor.  Yet, he still seemed to be
searching for something.  When he began studying the Islamic faith it took all of
us by surprise, but his obvious devotion and his explanation to us of his faith
were positive.  It all appeared to be both intellectually and spiritually that anchor
he had been seeking.  To what extent it led to his entry into the justice system I
can only speculate.  I do believe to this day that Nicholas would do nothing
intentional to cause harm to his country, and frankly, to anyone.  He is an outside
looking in person, not a pro-active fomenter of wrong.

Your honor, I am a concerned family member.  But, I wish for you to know that I am a former probation officer, prosecutor and career attorney.  I have prior military service.  I love my country.

With those meager credentials and my years of knowing Nicholas Young, I ask that you try to picture the young man I have known as well as the person described in his trial.  I trust in your judgement with respect to sentencing.  I do pray that the court will favorably respond to this request:  please recommend that any incarceration be in a location near to his mother and sister in Northern Virginia.  He and they will need as much continued contact as possible to minimize the damage already inflicted on the family.

Respectfully submitted,

Michael J. DeCandio

STEPHEN F. DOWNS, Esq.
26 Dinmore Rd
Selkirk, NY 12158

swdowns68@aol.com
518-767-0102

February 5, 2018

Judge Leona Brinkema
Federal District Court Judge

Re:  Nicholas Young Sentencing

Dear Judge Brinkema

I am a lawyer and a co-author of a report, *Inventing Terrorists*, on the US Government's attempt to entrap Muslims in manufactured terrorist schemes even when the defendants have no apparent inclination to violence.  You can read a copy of the report at http://www.projectsalam.org/database.html

 I am also acquainted with Ashley Young, the defendant's sister, and through her with the facts of the Nicholas Young case.  I am very troubled by the apparent desire of the Government to treat the defendant as a terrorist who is prone to violence, when there is nothing in his background or crime which would indicate that.  He gave someone who he thought was his good friend a few hundred dollars, believing, apparently, that his friend (who was actually an FBI informant) might use the money to join a terrorist organization.  He should not have done that and deserves some punishment.  But surely it is clear that he gave his friend the money out of friendship and not out of a desire that the money be used to hurt anyone.  If he had intended to hurt people he certainly would have given much more.  It is common that friends do things of which we do not approve, but we may still try to help them personally in order to maintain the friendship, not to support illegal activity.  That seems to be the substance of Nicholas Young's crime.

Nothing in Nicholas Young's life indicates that he had any tendency toward violence or hate.  I am frankly shocked that the prosecution would point toward the defendant's interest in historical war memorabilia and war reenactments as evidence of his potential for violence.  Many people who are committed to peace, including myself, have engaged in reenactments of historical battles and have collect war memorabilia.  My father died in World War II and I have read extensively about this period in order to better understand the sacrifice that he made.  How does my interest in this subject indicate a potential for violence?  Rather it indicates a desire to understand conflict in order to avoid it.

The defendant has served his country honorably as a police officer and deserves to have this service count heavily in his favor. I know his family and believe them to be honest and loyal Americans who would never betray the United States or seek to engage in violence.  The

defendant's crime is that he put friendship over good judgment about his supposed friend. I see nothing more.

I am inclined to believe that if the Government assigned informants to become our best friends and follow us around for months trying to induce us to say or do something illegal, they would have little difficulty in finding a basis to charge us all with crimes. But this kind of targeted entrapment is characteristic of police states and not the America I believe in or the America my father died to defend.   I ask the Court to be lenient in its sentencing of Nicholas Young and treat him as it would any other American and not on the basis of his religion.

Sincerely yours

*Stephen F. Downs*

Stephen F. Downs

# KATHY MANLEY, ATTORNEY AT LAW

26 Dinmore Road
Selkirk, New York 12158
(518) 635-4005 (phone & fax)
mkathy1296@gmail.com
KathyManleyLawOffice.com

February 8, 2018

Hon. Leonie Brinkema
Alexandria Federal Courthouse
401 Courthouse Sq
Alexandria VA 22314

**United States v. Nicholas Young**

Dear Judge Brinkema:

I am the legal director of the National Coalition to Protect Civil Freedoms, which supports the rights of people charged in terrorism-related prosecutions, particularly sting operations such as the instant case. I met Mr. Young's sister, Ashley Young, last fall at our Family Conference, and she let us know about her brother's case.

I am requesting that the Court give Nicholas Young a very lenient sentence. He was charged after having been hounded for years by someone he thought was his friend – but who turned out to be a government informant – and he eventually succumbed and gave the man a google play card, apparently knowing it was to be used to support terrorists. I believe he never would have done anything to support terrorism had he not been targeted in this sting operation.

Mr. Young has no prior criminal history, and in fact has a stellar record as a Metro Transit Police Officer – he did this for 13 years and was very well respected by the department as well as by the members of the public with whom he interacted.

Please take these factors into consideration and sentence Nicholas Young as leniently as possible. Thank you.

Respectfully,

By:

Kathy Manley
26 Dinmore Road
Selkirk, New York 12158
(518) 635-4005
Mkathy1296@gmail.com

Case 1:16-cr-00265-LMB   Document 219-1   Filed 02/16/18   Page 49 of 53 PageID# 3076

Dear Honorable Judge Brinkema                    February 11, 2018

RE:  Sentencing of Nicholas Young

I am an 87 year old Irish Catholic mother of six,  Clinical Social Worker, grandmother of many and speaking for all.

I have been moved to tears over the story of Nicholas Young and as a still practicing psychotherapist, I realize that I am being influenced by my past experiences:

1. For over 19 years, we lived in the Muslim world  in Nigeria, Egypt and Iran.  I remember their friendliness/ hospitality, devotion to their extended family and friends, respect for Judaism and Christianity, ability to have fun without liquor -- in general their humanity.

2.  Nicholas is a young man who made a poor decision in giving his friend a gift. Looking back on my life, I am amazed (and sometimes amused) by my numerous stupid decisions (part of being human).  It is hard for me to believe that Nicholas was thinking at the time "I am donating to the cause of Terrorism".

3.  He has already been severely punished by having "supported terrorism" on his record.  How will he ever get a job/housing/friends?

4.  The cost to the taxpayer for keeping Nicholas in prison?  Will more time in prison make him into a more responsible citizen?

We respectfully ask that you consider giving Nicholas Young the minimum sentence.

Thank you for your consideration,


Patricia Muth, LCSW

January 29, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

RE:  U.S. vs Nicholas E. Young

Dear Judge Brinkema,

Your Honor,  my name is Robert Merle Rohrbach Jr., and I am writing you this letter to act as a character witness for the defendant Nicholas Young.

I met Mr. Young while I was serving time for a probation violation back in 2016. When I first met him I could see he was very quiet and kept to himself, and he didn't cause any trouble. We started associating with one another through a fellow inmate who reached out and befriended us both.

He never went into details about what he was incarcerated for, and I didn't push the issue, although he did make vague hints saying things like "if the people in here knew what I was in here for, they would probably try to hurt me".

At first I wasn't sure what to think about his allusions to his charges, but I tried not to think much about it because, to be quite honest, he was, and is, the type of person I get along with very well.

I knew him and talked with him for upwards of three months, and during that time we had many discussions that would sometimes go on for hours at a time. We talked about jobs, relationships, regrets, family, and eventually I felt I could trust him enough to tell him my charges, which is something I do not do lightly, for like him, my charges could very easily be taken the wrong way and certain people could have the desire to hurt me over my past mistake.

One day I overheard someone discussing his charges, and I was a little taken aback when I heard the rumors, so when we had a quiet moment alone I asked him if the rumors were true. He said yes, that he was being accused of those particular charges, but that he was also innocent of them. He told me the full story, and when I heard it, I was shocked and amazed at the same time.

I do not believe Mr. Young is guilty of the charges against him. I know that does not change the fact that he has been found guilty in a court of law, but as I just stated he is innocent in my eyes.

Your honor, I have seen a lot of different people in jail, I can tell when someone is lying to me, and Mr. Young was not lying to me.

The man I saw when I was locked away from the world was a compassionate man who cared about other people and felt bad when he caused others pain.  He cried about what this has done to his family, and sometimes I had a hard time convincing him to even get out of bed to eat because of how depressed he was over the hurt he had caused.  He was intelligent, soft spoken, easy to get along with, and someone you could rely on.

I have never met anyone with a heart as big and caring as his in my entire life. He was always kind to every new person who came into the block we were housed in. He didn't judge race, religion, or sexual preferences. He accepted people for who they are, and didn't try to change them or force them to see things his way, instead allowing people to think what they want to think and be who they wanted to be.

He told me numerous stories about how, when he was a police officer, he would walk up to people on the street who were hurting and ask them if they were okay, because to him that job meant more that he was able to help people than to have authority over them.

The crime itself was him having compassion for a man who wanted to call his family and buying that man a phone card. A man who cares for his fellow man no matter who they are or what walks of life they belong to is a true man, and an amazing individual. It is sad to see such a man treated as this.

He is not a terrorist, nor is he a bad man. Your honor, I trust this man with my entire life, and he does not deserve any of this. I only ask you take the words I have said to heart as you think on your decision.

I thank you for your time,

Robert Merle Rohrbach Jr.



**COALITION FOR CIVIL FREEDOMS**

P.O. Box 66301 Washington, D.C. 20035
CivilFreedoms.org

January 30, 2018

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square, 3rd Floor
Alexandria, VA 22314

Dear Judge Brinkema:

On behalf of the Coalition for Civil Freedoms, an umbrella organization of over
fifteen national civil liberties groups, I am writing to humbly request a lenient
sentence for Nicholas Young on February 23.   In my fifteen years of monitoring
national security cases, I have seen that enhanced sentencing in terror cases
can lead to some excessively harsh sentences that do not appear to be
warranted by the crime.  In many cases, the conviction itself is based on
unpopular speech.

As you know, Mr. Young has never been in trouble before, and he faithfully
served as a police officer with DC's Metro Transit Police Department for 13
years.  During these 13 years, he never resorted to the use force, he never once
had a complaint filed against him, and he was never investigated for an
allegation of misconduct.

During the eight years of pursuit by the FBI informant, Nicholas never committed
an act of violence despite repeated prodding to do so. In fact, he urged the man
he thought was his close friend to abstain from any such illegal activities.

Through CCF, we got to know Nicholas' sister Ashley quite well. She is an animal
rights advocate who works in the nonprofit sector. We believe this family is driven
by a socially conscious ethic and an intellectual curiosity.  Ashley described her
brother as a history buff who collected figurines and enjoyed participating in
World War II reenacts at exclusive rotary clubs. We are convinced that the
government's narrative that this ordinary American hobby somehow implicated
Nicholas as an alleged Nazi sympathizer and an extremist is totally false.

Coalition for Civil Freedoms | P.O. Box 66301 Washington, D.C. 20035 | CivilFreedoms.org | CivilFreedoms@gmail.com

Case 1:16-cr-00265-LMB   Document 219-1   Filed 02/16/18   Page 53 of 53 PageID# 3080

We have worked with many prisoners who have been preemptively prosecuted in the so-called "war on terror", and witnessed the devastating impact enhanced sentences have on the families of the prisoners, as well as on the prisoners themselves. If rehabilitation is the goal, it is extremely unlikely that a 60-year sentence will accomplish that goal.

In light of this information, we feel that a lengthy sentence for Nicholas would not benefit anyone. It would cost the taxpayers a great deal of money, and it would destroy the life of a promising young man. Therefore, we urge you to consider giving Nicholas Young a lenient sentence.

Sincerely,

Mel Underbakke, Ph.D.
Executive Director

Case 1:16-cr-00265-LMB   Document 219-2   Filed 02/16/18   Page 1 of 9 PageID# 3081

# EXHIBIT B



December 5, 2016

Nicholas Smith, Esq.
David P. Smith PLLC
7 East 20th Street
New York, New York 10003

       Re:              *United States v. Nicholas Young*

       Case no.       *1:16mj 355*

Mr. Smith,

At your request, I have completed a diagnostic psychological evaluation of your client, Nicholas Young. This letter provides a report of my evaluation procedures and findings.

At the beginning of the evaluation, I informed Mr. Young regarding the nature, scope, and purpose of the evaluation, including the relevant limits on confidentiality and privilege. I explained that a copy of the ensuing report would be sent to his attorneys and likely later provided to Court personnel. He stated that he understood the purpose of evaluation and agreed to participate.

SOURCES OF INFORMATION

I interviewed Mr. Young on three occasions. I met with him on September 23, 2016, at the Alexandria Adult Detention Center (ADC) for approximately one and one-half hours. On September 28, 2016, my colleague Sahair Monfared, Psy.D., took Mr. Young's history and proctored administration of the Personality Assessment Inventory at the Alexandria ADC. On October 4, 2016, I met with Mr. Young at the Alexandria ADC for approximately one and one-half hours. On November 22, 2016, I interviewed Mr. Young at the Northern Neck Regional Jail for approximately two hours. On November 28, 2016, and December 4, 2016, I conducted telephone interviews of his sister, Ashley Young, for approximately one hour and thirty minutes in total.

In addition to interviews I reviewed the following:

1) Copy of order appointing expert to conduct psychological evaluation, dated September 22, 2016.

2) Copy of criminal complaint for case number 1:16mj 355, filed August 2, 2016.

3) Copy of handwritten notes by Mr. Young, detailing aspects of his history and observations related to defense strategy.

IDENTIFYING INFORMATION

Nicholas Young is a 36 year-old man who with a pending charge of attempting to provide material support to a designated foreign terrorist organization. Prior to his arrest on the pending charge he had worked as a police officer for more than a decade. He had a mental health history including diagnoses of Major Depressive Disorder and Attention Deficit Hyperactivity Disorder, and he reported trauma-related symptoms. Aside from his pending charge, his legal history was unremarkable.

BACKGROUND

Regarding developmental history, Mr. Young stated that he was not aware of any problems with his mother's pregnancy, his delivery, or his early infancy. He said he believed his birth weight was approximately 8 pounds, which is somewhat heavy but not classified as High Birth Weight. Mr. Young stated that he was not aware of any significant medical problems in his early childhood, or developmental delays.

Mr. Young stated that he was born and raised in the Fairfax area of Virginia. He said that he lived in his childhood home until he was in his early 20s, and then lived in the Fairfax area as a young adult. His household consisted of his father, his mother, and his sister who is three years younger than him. He described his parents' marriage as "tumultuous." He said he could recall that his father worked a lot and there was open conflict between his parents, but they never discussed it with him and his sister. He recalled "pushing, shoving," between his parents but no severe physical violence and he could not remember any times when police were called to the home. Mr. Young's sister said she could not recall a time period when their parents' marriage seemed happy. Like Mr. Young, she remarked that in retrospect it was odd and problematic that her parents did not discuss the open conflict or subsequent divorce with her and her brother. She said she recalled being confused and distressed by their separation. Both Mr. Young and his sister described their sibling relationship in positive terms, and both observed that they had become closer in recent years. Aside from the distress of witnessing his parents' arguments, and a normative degree of disruption during his parents' separation and divorce, Mr. Young did not report other types of major stressors in the home, such as neglect, physical abuse, sexual abuse, emotional abuse, or major housing instability.

Approximately 10 years ago Mr. Young's father died unexpectedly. In recounting his father's death, Mr. Young became markedly distressed and was tearful; he said that his grief about his father's death was complicated by his feelings of guilt. Specifically, both he and his sister reported he had not sought to

USCA4 Appeal: 18-4138    Doc: 24-4    Filed: 06/21/2018    Pg: 478 of 518

spend as much time with his father, and exerted as much effort cultivating his relationship with his father, as he perhaps could have. Mr. Young's sister chalked up the quality of the relationship to Mr. Young's past immaturity, and she noted that he has matured significantly since their father's death. She stated, "he hated himself when [his father] died."

Regarding temperament, Mr. Young and his sister both described him as intensely intellectually curious, and open to experiences. His sister stated, "He likes learning about things. He gets fascinated with things. He's been like that since he was a kid. I remember him sitting in his room with a flashlight, reading, after we were supposed to be in bed." She described him as sociable, but "a little bit more reserved" compared to other people. A few years ago, Mr. Young converted to Islam, but he reported that he was not an intensely religious person and never had been. For her part, his sister said that she was not particularly surprised that he converted, and she said she was happy for him at the time. His curiosity about other cultures in communities reportedly motivated him to travel to Canada, Mexico, Denmark, Sweden, Japan, Greece, and Libya.

Mr. Young reported that there was little that was remarkable in his medical history, and he said, "For all intents and purposes I was relatively healthy." He stated that he had had minor procedures such as a colonoscopy and had never been placed on long-term medications or had major illnesses or injuries. He did not report any significant head injuries.

Regarding education, Mr. Young said, "It was fine. I always kind of disliked it. Felt like I was wasting my time; it didn't seem relevant." He described himself as intellectually curious, but not strongly motivated by grades. He did not report any major academic problems, such as an unusual degree of difficulty learning to read or write, repeated grades, or evaluations for learning disability and/or special education. He reportedly graduated from high school 1998. He entered George Mason University in the fall of 1998, and attended for four years, but did not obtain a degree. He said he was indecisive about his area of study, and "flipped back and forth between Government and International Politics and Psychology." He entered the Reserve Officers' Training Corps while in college, but did not complete it. He stated that after leaving the program he had a "lack of focus." He was uncertain about what to pursue professionally, and in retrospect he observed, "If I had a brain in my head, I would've followed my father's advice and become a teacher."

Mr. Young described himself as relatively introverted, generally preferring to spend most of his social time with "just one or two good friends." He said that he has not had difficulty making friends, but has struggled to sustain relationships due to poor motivation to maintain social contact. He attributed this poor motivation to his symptoms of depression, but said that he had not appreciated the role of depression in his social functioning until relatively recently. He did not report significant difficulty meeting women and establishing dating relationships, and described a few serious dating relationships in the past. His sister said that Mr. Young typically treated his girlfriends very well, and she said that at times she had concerns that he was investing too much in his girlfriends in terms of his time, energy, and finances. Neither she nor Mr. Young reported that volatility was a pattern in his dating relationships or friendships.

Employment history was stable and consistent. As a teenager, Mr. Young reportedly assisted his father with construction and painting work. From ages 16 to 18, he worked at a gas station. While he was in college, he worked as a bus boy in a restaurant. Mr. Young said that during his last semester at college he was working for security company and that after leaving school he applied to the Fairfax County Police Department. He explained that he was told he had to wait a year because he had speeding tickets on his record. Instead of waiting a year, approximately six months later he applied to the transit police in Washington, DC. His training to become a police officer consisted of approximately nine months of formal training and then 10 weeks "on the street." After obtaining work at the transit police, Mr. Young remained at that job until the time of his arrest on the pending charge. Mr. Young lost his job as a police officer once the allegations related to his pending charge came to light. Outside of losing his job recently, Mr. Young stated that he had no prior significant disciplinary problems in his employment history. In the months prior to his arrest, Mr. Young had reportedly been working many extra hours in an effort to become debt-free.

**Mental Health History**: Mr. Young reportedly did not have mental health treatment or formal evaluation as a child. He was reportedly diagnosed with Attention Deficit Hyperactivity Disorder and Depression, and he has long-standing insomnia for which he has been treated with sedative and hypnotic medications. He described having symptoms of Post Traumatic Stress Disorder (PTSD), and said that he was worried that he may have schizophrenia. His PTSD reportedly stemmed from "survivor's guilt" arising from experiences he had when he traveled to Libya a few years ago. He has reportedly been prescribed stimulant medications and antidepressants.

Regarding specific symptoms, Mr. Young reported that he had had difficulties with focus, controlling impulses, sad mood, low energy and motivation, social withdrawal, sleep disruption, negative emotions, and a tendency toward a negative or pessimistic outlook at times. He described cognitive symptoms such as difficulty concentrating, difficulty finishing tasks, inability to sustain attention during conversations, distractibility, and impulsivity. He said that his trauma related symptoms caused him to use "well over 300 hours of sick leave" in less than a year. His trauma related symptoms disrupted sleep and his appetite, resulting in him losing more than 15 pounds by his account. He reported intrusive thoughts about a father and 15-year-old son he met in Libya, who were later captured and killed. To cope with his symptoms, he reportedly abused alcohol and illicit drugs. His sister described him is working excessively, and she speculated that his devotion to work may have been a form of avoidance and a symptom of depression. Mr. Young reported infrequent but disturbing perceptual distortions such as hearing his name and hearing the faucet running or the sound of footsteps or creaking when he was alone. He also stated that he had seen movement and shadows out of the corner of his eye. He reported pervasive feelings of concern that people were "out to get [him]." He said that he was aware that the symptoms were not normal and potentially signs of major psychiatric disorder, and as a result he often doubted his perceptions and concerns as possibly distorted and not reality-based. He has had treatment, but it was medication management rather than counseling. Both Mr. Young and his sister described their father's death as a trigger for a noticeable increase in his depression symptoms, though it appears that some of his symptoms predated his father's death.

Family mental health history reportedly included anxiety, restlessness, and depression symptoms in Mr. Young's paternal grandfather, and alcoholism in his maternal grandfather, according to Mr. Young's sister.

His sister, too, reported that she had a history of of Major Depression that had been disabling at various times in her life. She said that she disclosed about her history of depression and her mental health treatment to Mr. Young approximately eight years ago. She said that she recognized depression symptoms in Mr. Young; she offered, "I have thought for a long time that Nick struggles with sadness."

As described in the foregoing, Mr. Young acknowledged alcohol and illicit drug use. In his account of the substance abuse, Mr. Young reported that he utilized substances to cope with is insomnia and other psychiatric symptoms. He did not report significant negative life consequences, such as relationship conflicts or loss of employment, arising from his substance use.

CLINICAL ASSESSMENT AND RESULTS

**Mental Status and Behavioral Observations:** I interviewed Mr. Young on several occasions at the Alexandria ADC and at Northern Neck Regional Jail. When I evaluated him in Alexandria, he was mildly unkempt. He had a hunched, sad posture. His affect (emotional expressiveness) was sad, somewhat flat, and mildly inappropriate[1] at times. Eye contact and social communication were normal. Interpersonally, initially he was guarded and cautious but over time he became more talkative and engaged in the interview process. He impressed as anxious to convey his concerns and to provide detailed answers to my questions. His speech was normal in tone and pace; he was soft-spoken. His thought processes, as illustrated by the speech, were distractible, mildly circumstantial, and occasionally perseverative (i.e., to inappropriately persist in repeating a thought, action, or utterance beyond a relevant or useful point). His statements were generally logical and reality-based. His concentration was variable. His memory was sufficiently intact for purpose of interview. He did not report or show signs of active major perceptual distortions or delusions (i.e., fixed false beliefs). He did frequently look over his shoulder during interviews, but this is not an uncommon behavior when interviews are conducted in incarceration settings. His intelligence, as evidenced by his vocabulary, fund of information, and reasoning, impressed as above average.

Mr. Young's appearance and clinical presentation was strikingly different when I interviewed him at Northern Neck Regional Jail, compared to how he presented at the Alexandria ADC. His grooming was much improved, as was his concentration and ability to remain focused on interview questions. When I met with him in Alexandria, he was tearful nearly continuously throughout both of my interviews with him. He frequently used his sleeve to wipe streaming tears from his face, though he was able to continue to answer interview questions. Queries related to his father and his feelings of survivor's guilt appeared to evoke the most intense emotional responses. In contrast, at Northern Neck Regional Jail I observed tearfulness only twice during interview, and though his affect remained sad it was milder in comparison to prior interviews. His posture was also noticeably more upright. When I remarked on the change in his appearance, he attributed his improvement to being out of segregation (he was in segregation for much of the time incarcerated in Alexandria).

---

[1] *Inappropriate affect* refers to a person expressing emotions that do not match the content of their statements or the situation, such as smiling and laughing when nothing humorous has occurred. Inappropriate affect is most commonly associated with  mood, autism spectrum, and psychosis-spectrum disorders.

At the time of my last interview. Mr. Young's sleep was improved and his appetite was reportedly stable. He said that his medication had recently been changed from Remeron to Zoloft, and he was taking Trazadone for sleep.

**Psychological Testing Results:** In the course of my evaluation of Mr. Young, I administered and interpreted the Personality Assessment Inventory (PAI). The PAI is a 344-item self-report inventory of adult personality, pathology, and clinical concerns. The examinee's responses are compared to large normative samples to assess psychopathology and personality, and the PAI provides information relevant to diagnosis and treatment planning.  The PAI also includes validity scales, designed to assess whether the examinee was approaching the test in a forthright and attentive manner.  Inspection of the PAI validity scales indicates that Mr. Young paid attention to item content and answered consistently. His testing results showed that Mr. Young was reporting symptoms that are unusual and potentially indicative of serious mental illness, such as unusual perceptual experiences and deep mistrust and suspiciousness of other people; such results can indicate the person is exaggerating their problems: but but such results are also relatively common among people with trauma-related disorders. Overall, Mr. Young's validity scales fell within the normal range.

Mr. Young' s clinical scale results indicated that he was reporting symptoms related to anxiety, depressed mood, suspiciousness, traumatic stress, thought processing problems, unusual beliefs and ideas, sleep disturbance, perceptual abnormalities, drug abuse, and interpersonal difficulties. Individuals who obtain testing results similar to Mr. Young often report difficulty establishing close interpersonal relationships and have a tendency to be preoccupied with fears of abandonment and rejection. They also describe uncertainty about major life decisions and a struggle to find a sense of direction or purpose in their lives. He acknowledged impulsivity, and a limited ability to effectively regulate his emotions. He endorsed items showing that he is unusually sensitive in his interactions with others and tends to be hypervigilant for signs of disloyalty or questionable motives in the people around him. The PAI clinical scale results were generally consistent with Mr. Young's self-report.

**Diagnostic Considerations:** Based on the information I have reviewed thus far, including records, interviews with Mr. Young, interviews with his sister, in psychological testing results, Mr. Young meets criteria for Major Depressive Disorder and PTSD. He may meet criteria for a separate anxiety disorder diagnosis, but it's also possible that his anxiety symptoms are sufficiently captured by the PTSD diagnosis. It is unclear if a substance use disorder diagnosis would be appropriate at this time. Some ADHD symptoms are apparently active/persisting.

The symptoms reflecting possible paranoia and perceptual distortions are concerning. Given Mr. Young's legal circumstances and events in the years preceding his arrest, it is challenging to extricate relatively normative reactions from a more stable, long-standing clinical condition. Mr. Young also reported rather severe insomnia; prolonged bouts of insomnia can increase the likelihood that people will experience perceptual abnormalities and problems thinking clearly. I would not rule out the potential for the Schizophrenia Spectrum Disorder, or a mood disorder with psychotic features. However, in my opinion Mr. Young will need to be psychiatrically monitored over a longer period of time (at least months, if not years) to more precisely discern which psychiatric disorder labels apply. The

timing of symptom emergence and lack of family history for psychotic disorders strongly influenced my decision to withhold these more severe psychiatric disorder diagnoses at this time.

SUMMARY AND RECOMMENDATIONS

Nicholas Young is a 36 year-old man who with a pending charge of attempting to provide material support to a designated foreign terrorist organization. Prior to his arrest on the pending charge he had worked as a police officer for more than a decade. He had a mental health history including diagnoses of Major Depressive Disorder and Attention Deficit Hyperactivity Disorder, and he reported trauma-related symptoms. Aside from his pending charge, his legal history was unremarkable.

Results of the present psychological evaluation show that Mr. Young has prominent symptoms of depression, anxiety, and trauma related disorders. He reported a history of substance abuse, but his substance use may be better understood as a maladaptive strategy for coping with his other psychological problems rather than a separate disorder. It appears that his depression symptoms predated the death of his father, but were substantially aggravated by his father's unexpected death and the feelings of guilt that Mr. Young felt in response. He reported symptoms that raised my concern he may have or be developing psychotic disorder, but in light of the information I have at this time I am holding off on making a diagnosis of a disorder such as Schizophrenia, or mood disorder with psychotic features.

In terms of recommendations, ongoing psychiatric consultation and medication management are vital for the purpose of treatment and to monitor Mr. Young's psychiatric symptoms over time. He would also benefit from an evidence-based PTSD treatment, such as Prolonged Exposure or Cognitive Processing Therapy. Cognitive Behavioral Therapy is a standard intervention for depression and anxiety, and in my opinion Mr. Young would also be an excellent candidate for Acceptance and Commitment Therapy. In addition to pursuing treatment goals aimed at decreasing his depression and anxiety symptoms, Mr. Young and his treatment provider should also address bereavement. I recommend conjoint sessions, as needed, with his mother and sister to strengthen his family relationships as well as his overall social functioning. To the extent that appropriate psychological treatment is available in incarceration settings, Mr. Young will be able to participate and make some gains toward recovery. However, the psychotherapy interventions that are likely to produce improvement are most effectively delivered in community settings. Based on my evaluation of Mr. Young, the decision to move him out of solitary confinement contributed to the noticeable improvement that I observed at the time of my last interview with him. Given his demonstrated vulnerability to exacerbation of his mental health problems when placed in solitary confinement, I strongly discourage against future solitary segregation.

Please contact me if you have further questions or concerns.

USCA4 Appeal: 18-4138    Doc: 24-4    Filed: 06/21/2018    Pg: 483 of 518

Respectfully submitted,

Sara E. Boyd, Ph.D.
Licensed Clinical Psychologist

The Honorable Leonie M. Brinkema
United States District Court
401 Courthouse Square
Alexandria, VA 22314

Dear Judge Brinkema:

I apologize for the charged conduct: to the Court, my family, my friends, and all of those whom I have let down, including the Washington Metropolitan Area Transit Authority. It stemmed from a lack of good judgment on my part, and common sense. This is not the first time my emotions have led me into error. I sent the gift cards not because my criticism of ISIS had somehow turned into genuine support for its immoral belief system, but out of a misplaced desire to support someone I thought was a friend. I would like to give the Court some background information before turning to the gift cards.

As inappropriate as my violation was, it is an aberration out of sync with the previous four decades of my life. I have had many plans and goals in my life: to finish school, obtain a stable career from which I would retire, and become part of a large family to which I would devote my energy, and more. Nowhere in these plans and goals of mine could I have foreseen myself ultimately running afoul of the law (and, anyway, certainly not of the type charged). As inappropriate as my violation was, it is not something that accurately reflects my past, who I am today, or who I wish to be in the future.

I have led most of my life in a socially acceptable manner. I saw myself continuing JROTC training into college and, ultimately, a military career. After graduation I intended to put my international politics studies into use in the State Department. To that end, I avoided any social activities that could possibly lead to trouble, and even abstained from alcohol from high school through much of college. After leaving college ROTC, and deciding not to pursue a military career, I found myself without direction, rudderless, and quickly losing my struggle against depression.

After some time, careful social decisions, coupled with interests in history and politics, began to pay off. Most of my friends were decades older than I was, and were involved in law enforcement. At their urging, and the prompting of my father, I decided to pursue that career as well. I settled in quickly, finding a sense of purpose and emotional security I had lost. I grew to love the responsibility of helping others with their problems, and enjoyed exercising discretion in the manner I enforced laws in my daily routine. Because of my department's lack of manpower, I often found myself alone during most of the course of the workday. I enjoyed it, becoming a well-known and recognizable presence in the areas I patrolled. My work relationships with other Metro employees turned into warm friendships, despite being told many times not to befriend non-officers. And I was fairly well-regarded in the communities I policed, fostering mutual respect and consideration to resolve most problems I encountered. I followed an older model of policing, not buying into the Us versus Them mentality so prevalent in law enforcement today.

So how did I transition from this career path, of proud law enforcement, to the situation I find myself in today? Your Honor, I lost my way. Sincerely I do not know how the person as

described to you by Officer McNulty at trial found himself text messaging with an undercover informant about a terrorist group, about attacks in Paris, and about other inappropriate subject matter. Reflecting on these points now, I am ashamed. But there is one thing that the government has not proven and will never prove: that I do not love my country and what it stands for. Indeed, that is precisely why the government created backgrounds for the informants and undercover agents in this case involving U.S. military service.

I have never desired or encouraged any act of terrorism in this country, not now, not ever. How could a patriotic cop engage in conversations about ISIS with an informant? That is the issue in this case. Your Honor, as anyone who knows me will tell you, for my whole life I have always had an interest in politics, history, international relations, and foreign cultures. And I have always given every argument a hearing. I have always been open to the possibility that both sides to every argument contain their own truth. For better or worse, I am a contrarian, and more often than not, to a fault. This case is no exception. But the Court has my word that my willingness to engage with a friend on any subject matter under the sun, no matter how controversial, has never led me even to consider engaging in or supporting any act of terrorism against this country.

Out of all the people I have hurt in this, I have failed my father the most, by nullifying his hard work and the sacrifice he made for my benefit right up until the end. I have failed by not being able to look after my sister in all the ways I had before this happened, as my father expected. He deserved much more from me, and I should have been able to hold the ground after he died. I have failed for my extreme disservice to my mother, who has supported me throughout this ordeal, at great expense to her health and well-being. I am aggrieved and ashamed by the trouble and stress I have brought to the people who love me.

I do not know what my future will look like. I understand my conviction will preclude me from ever serving in law enforcement again and from participating in the daily routine that gave purpose to my life. But there is one thing about the future of which I am certain. That is that I will never again find myself in this situation, not the charges in this case, or any other charges. Although employment opportunities will be significantly curtailed on my release, the Court has my word that, as an able-bodied worker, I will do whatever it takes to make a positive contribution to society upon my release, and to help support the family who has suffered so much through this ordeal.

Respectfully submitted,

*Nicholas Young*
Nicholas Young

(As dictated to counsel)

1

UNITED STATES DISTRICT COURT.
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA        .        Criminal No. 1:16cr265
                                .
    vs.                         .        Alexandria, Virginia
                                .        February 23, 2018
NICHOLAS YOUNG,                 .        9:30 a.m.
                                .
            Defendant.          .
                                .
. . . . . . . . . . .

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:             JOHN T. GIBBS, AUSA
                                GORDON D. KROMBERG, AUSA
                                EVAN N. TURGEON, SAUSA
                                United States Attorney's Office
                                2100 Jamieson Avenue
                                Alexandria, VA 22314

FOR THE DEFENDANT:              NICHOLAS D. SMITH, ESQ.
                                David B. Smith, PLLC
                                108 North Alfred Street
                                Alexandria, VA 22314
                                  and
                                LINDA MORENO, ESQ.
                                Linda Moreno P.A.
                                511 Avenue of the Americas
                                No. 2
                                New York, NY 10011

ALSO PRESENT:                   SA NICHOLAS CASLEN

OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                U.S. District Court, Fifth Floor
                                401 Courthouse Square
                                Alexandria, VA 22314
                                (703)299-8595

(Pages 1 - 25)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

P R O C E E D I N G S

(Defendant present.)

THE CLERK:  Criminal Case 16-265, United States of
America v. Nicholas Young.  Will counsel please note their
appearances for the record.

MR. KROMBERG:  Good morning, Your Honor.  Gordon
Kromberg, John Gibbs, and Evan Turgeon for the United States.
With us at counsel table is FBI Special Agent Nicholas Caslen.

THE COURT:  Good morning.

MR. SMITH:  Good morning, Your Honor.  Nicholas Smith
for defendant Nicholas Young, and with me is Ms. Linda Moreno.

MS. MORENO:  Good morning.

THE COURT:  Good morning.

All right, this matter comes on first of all, we have
two pending motions from the defense:  defendant's motion for a
new trial and defendant's motion for acquittal on Counts 2 and
4.  Both parties have extensively briefed these motions, and I
don't need to hear a whole lot of argument.

Mr. Smith or Ms. Moreno, who's going to argue the
defense motions?

MS. MORENO:  Mr. Smith, Your Honor.

THE COURT:  All right.  Mr. Smith, is there anything
you want to add to your motion for a new trial?

MR. SMITH:  No.

THE COURT:  All right.  Basically, you've argued in

3

1    that motion that the case should go for a new trial because

2    your client suffered undue prejudice from the evidence that was

3    introduced, including the evidence about his involvement with

4    white supremacists and Nazi groups, any relationship that that

5    might have to radical Islam; that the Court made errors in

6    admitting hearsay evidence; that your client was prejudiced by

7    pretrial publicity; and the fact that the Court did not allow a

8    jury questionnaire; and that various evidence was kept out that

9    you felt would help your client.

10         The government has, obviously, filed an objection to

11   that motion, and I'm fully satisfied that there's nothing

12   raised in your motion that would justify a new trial.  You

13   know, we addressed many of these issues before the case itself.

14   In terms of the pretrial publicity, as the government properly

15   points out, some of that was at your own doing because of the

16   extensive interviews that the defendant was engaged in.

17         There's no requirement for a jury questionnaire, and

18   I do point out, and I think this is a significant fact, that

19   the Court gave the defense an additional peremptory, so you had

20   11 peremptory strikes, and you only used six of them, so the

21   jury pool itself was found to be unobjectionable based on the

22   record in this case.  So I don't find there's any basis to

23   grant a new trial, and the motion is denied.

24         In terms of the motion for a judgment of acquittal on

25   Counts 2 and 4, you raise an interesting legal argument, and I

4

1    don't dispute that there's case law especially in the Ninth

2    Circuit that supports your argument that an FBI investigation

3    does not qualify as an official proceeding for purposes of a

4    1512(c)(2) prosecution.

5           First of all, this case is not covered by *Amri*,

6    because *Amri* involved a different portion of the obstruction

7    statute, but in looking at the language of 1512, including the

8    language in subsection (f)(1) which talks about the fact that

9    an official proceeding does not have to actually be pending at

10   the time, the government, I think, has correctly argued,

11   although I think one can debate the issue, but has correctly

12   argued that there was sufficient evidence from which a

13   reasonable jury could draw the conclusion that the defendant

14   would have known that a grand jury investigation was either

15   ongoing or anticipated to be ongoing, and therefore, I'm

16   satisfied again that the motion for judgment of acquittal on

17   Counts 2 and 4 should be denied.

18          So your motions are denied, and we'll proceed to

19   sentencing.

20          MR. SMITH:  Thank you, Your Honor.

21          THE COURT:  Wait.  While you're there, who's going to

22   handle the sentencing?

23          MR. SMITH:  Ms. Moreno.

24          THE COURT:  All right.  Ms. Moreno, come on up to the

25   lectern.  Have you had enough time yourself to go over the

5

1  pre-sentence report and to go over it thoroughly with

2  Mr. Young?

3         MS. MORENO:  Your Honor, with respect to specific

4  questions about the PSR, I think Mr. Smith handled that with,

5  with our client, so if there are specific questions about the

6  PSR --

7         THE COURT:  Well, in terms of all the objections that

8  were made to the pre-sentence report, which the probation

9  officer at the end of the report, of course, listed and then

10 explained why they were not being granted or -- I've looked at

11 all of those, and the argument that evidence is in the

12 pre-sentence report that might not have come in at trial is

13 really not appropriate.

14        In fact, in your sentencing memo, you point to

15 section 3661 of Title 18, which says there's no limitation on

16 the information, background, character, or conduct of the

17 defendant.  So the Probation Office not only has to help inform

18 the Court as to the basis for a sentencing decision, but also,

19 as you know, those pre-sentence reports inform the Bureau of

20 Prisons in terms of making an appropriate judgment call as to

21 the best way to incarcerate an individual.

22        And so all of -- to the extent that those objections

23 are based upon, well, this wasn't evidence that may have come

24 up at trial, even if that were the case, I'm satisfied that

25 those were proper matters to have in the pre-sentence report,

6

1   so those various objections are denied -- or overruled, all

2   right?

3              So the Probation Office calculated the offense level

4   here as a level 42.  The -- because of the nature of the

5   offenses, that bumps the criminal history, and I think this is

6   one of those artificial things in the guidelines, all right?

7   So I don't mind telling you that, but your client, who

8   otherwise would have a criminal history I, gets a criminal

9   history VI, and that then makes the guideline range 360 to 720

10  months, even though the mandatory max -- statutory max for each

11  offense, I believe, is 20 years.

12             The fine range is $50,000 to $250,000.  There are

13  three counts of conviction, so there's $300 of special

14  assessments.  And those are the guidelines we have to work

15  with, all right?

16             I have read all the letters, including Mr. Young's

17  letter, so I want to make sure you know that, but let me hear

18  then first from the United States as to its position on

19  sentencing.

20             MR. KROMBERG:  Thank you, Your Honor.  The first

21  point I'd like to make is that what happened in July 2016 was

22  not an aberration.  It wasn't something -- it was not an

23  isolated example.  It wasn't something that was out of

24  character for the defendant because you've got to -- before you

25  even think about what the appropriate punishment is for what

7

1   happened in July 2016, so in December 2015, that obstruction of

2   justice, that was designed to protect what Mr. Young believed

3   to be an ISIS fighter.

4           In that sense, it was nothing like the *Amri* and *Queen*

5   case because Amri and Queen didn't think that Qamar at the time

6   was a threat, was doing anything wrong, but in December of

7   2015, Mr. Young, a police officer, knew or believed that Mo was

8   an ISIS fighter, and he lied to the FBI about it.  He tried to

9   lie to the FBI about it, tried to mislead the FBI about it.

10          And then a year before that, November 2014, when he

11  obstructed justice then by sending that ruse text message, that

12  wasn't to protect Mo, so that was something different.  That

13  November 2014 text message was designed to deceive the FBI

14  about Mr. Young himself.

15          And then in February 2012, when the FBI was

16  investigating the *Amine El Khalifi* case, Khalifi was the guy

17  who wore a suicide vest, he was going to blow himself up in the

18  U.S. Capitol, you heard Khalil testify that, well, yeah, we

19  were sitting at dinner, and we were talking about Khalifi being

20  arrested, and Mr. Young told me that, you know, the FBI is

21  going to come talk to you because they came and talked to me

22  after Chesser was arrested, and they're going to ask you

23  questions.  Don't answer all their questions.

24          And here's a police officer telling someone not to

25  answer the FBI's questions about someone who was trying to blow

8

1    himself up in the U.S. Capitol Building.

2            So that's -- I think it's important to keep in mind

3    that nearly four years -- four years? -- more than four years

4    before the events that led to the, the material support case

5    came up, the police officer is telling someone not to tell the

6    FBI anything -- or not to tell the FBI certain facts about an

7    investigation of an al Qaeda plot to bomb the U.S. Capitol.

8            The second thing I wanted to make sure that I can try

9    to get the Court to focus on is that the $245 of gift cards is

10   not -- I mean, it's a small amount in relative -- in absolute

11   terms, obviously, but ISIS didn't need the $245.  What they

12   needed was the gift card codes.

13           You might -- the Court probably recalls that in the

14   *Haris Qamar* case, Qamar had to be implored to send anything,

15   and Qamar sent something like $40 of his own money and $40 of

16   the CHS's money to buy $80 worth of gift card codes.

17           When Mo in this case asked for the gift card codes,

18   he didn't say any amount in particular.  He said, "We need gift

19   cards," and Mr. Young immediately went and got seventeen $10

20   gift cards and five $15 gift cards and sent them off.

21           He wasn't -- he didn't say, "This is all I'm going to

22   do.  I'm not going to do anything else."  He wasn't asked to do

23   anything else.  He sent those cards, and that was it.  But

24   those $245 worth of gift cards were going to be used for

25   Threema accounts to communicate with fighters who were going to

9

1    come to join ISIS, and as Mr. Young knew from buying his own

2    Threema account, the Threema account only costs $3.

3            We talked in the sentencing pleading about the

4    difference between Mr. Qamar and Mr. Young.  Mr. Qamar was, I

5    think, the last somewhat similar case that the Court has

6    handled, and Qamar, as scary as he sounded online, he was an

7    immature guy living with his parents who when offered the

8    chance by the informant to go join ISIS, he said, "No, I'm not

9    going to go."

10            And he did -- he went and -- and he went and took the

11   photographs that were going to be used for video, which was a

12   really bad thing, but he was -- I think the Court saw him as

13   living in a video game world, that he was a fantasist.

14            Mr. Young is completely different.  Mr. Young

15   traveled thousands of miles to go fight.  He now claims that he

16   has PTSD.  He has -- he talked about, you heard from Khalil,

17   the plot to smuggle weapons into this courthouse, the plot --

18   the plan to attack an FBI building, and the defense says, well,

19   but he wasn't planning on doing it.  He just talked about this

20   stuff.

21            And that might be true.  And that might be true.  He

22   might get -- some people might get the benefit of the doubt on

23   that, but do you get the benefit of the doubt on that when you

24   also have ten ballistic vests and 18,000 rounds of ammunition

25   and 21 firearms and explosives, and you have PTSD?

10

1          And the only time we know he was ever asked to help
2     ISIS, he accepted.  Maybe someone else would get the benefit of
3     the doubt that, well, okay, yes, he's just speculating.  When
4     he talked about kidnapping and torturing an FBI agent, you
5     know, that's just a bad sense of humor, but when it comes to
6     figuring out the appropriate punishment for this defendant, he
7     shouldn't get the benefit of the doubt.
8          One of the reasons is, Judge, that even now, he has
9     not been honest with the Court or the public or his friends.
10    The first thing is the psychologist's report, the psychologist
11    says that Mr. Young suffers from particular symptoms,
12    including -- and he reported that he had these perceptual
13    distortions and it might be PTSD, and when the psychologist
14    asked him about his use of drugs, he said, "Well, yeah, I used
15    illicit drugs to cope with insomnia and other psychiatric
16    symptoms."
17         We had evidence, and the Court said that it wasn't
18    going to come into evidence for the trial, but that he's been
19    using steroids since 2004, and the search of his house in 2016,
20    we found steroid equipment.  It happens to be that depression
21    and suicidality are the most common long-term neuropsychiatric
22    side effects of the use of -- long-term use of anabolic
23    steroids.  I have a peer-reviewed study that talks about that
24    which I'll pass up to the Court.  This is not something --
25              THE COURT:  Mr. Van Roekel?

11

1        MR. KROMBERG:  This is something that had it been

2  mentioned to the psychologist, might have made a difference.

3  Long-term use of steroids leads to paranoia, leads to

4  depression, leads to insomnia.

5        But even more than that, the Court has these letters,

6  and it's awful what happens to Mr. Young's family as a result

7  of Mr. Young.  I mean, it's terrible, but what he told his

8  family, he had his family submit letters based on lies.

9        MR. SMITH:  Objection.

10       THE COURT:  Mr. Smith, how many times have I told you

11  you have to stand up when you speak to the Court?  And this is

12  a sentencing hearing.  You'll be able to rebut anything that's

13  said.

14       MR. KROMBERG:  Robert Rohrbach, Jr.'s letter to the

15  Court:  "I met the defendant in 2016.  He told me the full

16  story.  The crime itself was him having compassion for a man

17  who wanted to call his family and buy that man a phone card."

18       The defendant's mother:  "Finally, after doing

19  nothing about Mo's request for Google Play cards, he started to

20  receive e-mails from Mo pleading for them so he could call his

21  family members.  Only then did Nicholas finally purchase them."

22       Geraldine Scalia:  "He thought he was doing something

23  helpful, enabling someone to call his sick parents."

24       Philip Scalia:  "He fell for Mo's sad story about a

25  pregnant wife and poor mother."

12

1          Where could that story have come from?  Because this

2    is not a case where there's a confidential informant who tells

3    one story and the defendant who tells another.  This is, this

4    is a case where every single communication between Mo and the

5    defendant was written down and introduced into evidence, every

6    single one.

7          MR. SMITH:  Objection, Your Honor.  There were

8    actually many communications that were never produced by

9    government, and there has been a suspicion of spoliation, which

10   we can present to Your Honor, but --

11         THE COURT:  No, we don't need to go into that.

12         MR. KROMBERG:  The text -- the Threema text messages

13   when Mo said, "Can you please send the gift cards?" was very

14   clear.  "We have lost a lot of fighters recently, and we need

15   to bring in more, and we need Threema apps so we can

16   communicate with them."  That -- there was nothing about

17   calling families, not a word, and the defense knows it.

18         And yet the defense even now submits letters from the

19   family members saying, oh, this was about enabling Mo to call

20   his family.  That's cynical, and it's manipulative, and it

21   means that the defendant has not accepted responsibility for

22   his actions.

23         So, Judge, when the Court imposes sentence on the

24   defendant, he should be punished for his obstruction of justice

25   in December of 2015, trying to protect an ISIS fighter from

13

1    being found by the U.S. government; in November 2014 for trying

2    to protect himself from being found for having helped the ISIS

3    fighter; in February 2012 for trying to thwart an FBI

4    investigation into an al Qaeda plot to bomb the U.S. Capitol;

5    and in July 2016 for trying to send gift cards to ISIS so they

6    can bring more fighters to ISIS.

7         The defendant was a police officer, sworn to protect

8    people in this community.  He did the opposite, and he should

9    be punished for it.

10        Thank you, Your Honor.

11        THE COURT:  All right.  Ms. Moreno?

12        MS. MORENO:  May it please the Court, Your Honor.

13        THE COURT:  Yes, ma'am.

14        MS. MORENO:  We're not here to relitigate the case.

15   I wanted to make some general comments to the Court.  I know

16   this Court has read all the letters, including Mr. Young's

17   letter, including every single motion that was filed, and paid

18   close attention to the trial.  The defense obviously has a

19   different view of what happened and why Nicholas Young did what

20   he did, and nonetheless, we stand convicted.

21        I'm not going to get into a debate with the

22   prosecutor about motives, but it is clear and the evidence was

23   brought out that what he did was send gift cards to someone he

24   thought was his friend.  Of course, this was not true.  And

25   this was a misguided, one-sided friendship, and he made a

14

1   terrible mistake.

2           And in the context of what was going on in the

3   back-and-forth, if the Court remembers, Mo was talking about

4   many things, including his pregnant wife, the death of children

5   that he was seeing in the conflict, etc.  This is context; this

6   is not an excuse.  And I think the Court has to look

7   holistically at this.

8           We do say that this was also borne out of Nick

9   Young's source of loneliness and connecting to another guy with

10  a history and experience and love of the military.

11          Who is Nick Young, Your Honor?  And that's who we

12  would like you to focus on in this case.  You can see part of

13  it through his own letter, which we believe -- I will tell you

14  as a defense lawyer who's been doing this for a long time, I

15  thought it was one of the best letters I've read, the most

16  sincere.  He -- it's contrite.  It's a recognition of the lack

17  of good judgment.  It's a confession of his shame.  It tries to

18  give context to what he did, and it tells the Court he hopes

19  that there is hope after this sentencing.  And it also asserts,

20  I think most importantly, his love for this country, no matter

21  what the government can argue.

22          Judge, this is not a typical terrorism case where we

23  see around the United States the facts of defendants talking

24  about their hatred of America, their encouraging violence

25  against American citizens.  You know, some of this, I believe,

15

1  could rise to the level of criticism of foreign policies on

2  which we all disagree.  Some of the language certainly was

3  rhetoric, provocative, inflammatory, but given who Nick Young

4  was for the last almost four decades, his involvement in school

5  in the ROTC program, I, I think that there's no question that

6  when Nick Young says that he loves his country, that we should

7  believe him, and that when he says he made a terrible mistake

8  and he is willing to pay for that mistake, we should believe

9  him, too.

10         Sufficient but not greater than.  So he's lost a lot

11 already.  He acknowledges that in his letter, Your Honor.  The

12 question is how long -- how much longer in prison is sufficient

13 but not greater, but not greater than.

14         We can also glean who Nick was from the character

15 letters that were submitted on his behalf, letters of enduring

16 lifetime friendships, not people who met him 5 years ago but 25

17 years ago, 30 years ago, his elementary school principal, law

18 enforcement officers who thankfully at this point came forward

19 and told the Court what he was really like on the job.

20         And, Judge, he shouldn't be sentenced and punished

21 because he was a law enforcement officer.  He served with

22 distinction for ten years before he made this terrible mistake.

23 We say to the Court you should take that into consideration and

24 credit him for that.

25         Representing Nick Young for me has been a privilege.

16

1    Since Dr. Al-Arian's case 15 years ago, I've done a lot of

2    these cases around the country and consulted on numerous

3    terrorism cases here and the United Kingdom, and Nick stands

4    out, Judge.  He stands out to me as a client.  I'm not going to

5    relitigate all the things that are not in this case that we see

6    in all these other cases that I've personally seen as a defense

7    lawyer:  no real connection to a foreign terrorist

8    organization, traveling to fight not for a terrorist

9    organization, which is the insinuation for -- by the

10   government.

11         He doesn't fit the profile, Judge.  He doesn't fit

12   the profile that we too often see.

13         And I will say this:  Reading the government's

14   sentencing brief was a bit troubling to me because I will

15   assert to the Court that in conversations I had with learned

16   counsel across the table when we talked about this case, that

17   Mr. Kromberg actually made the comment that he thought it was a

18   two-year sentencing case.  That was at a certain point in the

19   case, but I thought it was interesting to me that that comment

20   was made at a time when he knew all the worst facts about

21   Nicholas Young, all the case history much better than I did

22   because I was brought in late to the case, as the Court well

23   knows.

24         So when I read the government's sentencing brief, I

25   thought, well, I don't know, they're not asking for a

17

1  particular number, but they're sort of leaving, leaving it out

2  there that the Court should just throw away the key on Nick

3  Young.  That's exactly what Your Honor should not do.

4       Not even the PSR assigns a significant value to a

5  betrayal of trust in terms of the fact that he was a law

6  enforcement officer and perhaps violated his, his mandate,

7  which he didn't do, Judge.  We say he didn't do that.

8       "Wisdom comes alone through suffering," Aeschylus.

9  Mr. Young has suffered.  He will continue to suffer his whole

10 life.  We ask that it not be greater but just sufficient, and

11 we ask for a significant downward variance.  Thank you.

12      THE COURT:  All right.  Mr. Young, come up to the

13 lectern.  This is your chance to say anything you would like

14 the Court to consider.  I have read your letter several times,

15 but obviously, you have a right to say anything else you'd like

16 the Court to consider.

17      THE DEFENDANT:  Yes, Your Honor.  I'll keep this

18 short.  You know, the prosecution's brought up quite a few

19 times about the amount of body armor I had in my house.  All

20 but one of those pieces was purchased after they had already

21 expired, after they had already expired.  The dates that are on

22 them are from, like, the mid-'90s.  It's -- they just don't

23 have the same use, you know, being so old.  You know, it's for

24 collector's value.

25      The important thing I'd like to say is that when I

18

1    declined the government's offer to spy on other Muslims in the

2    mosque, I had offered them services that I thought were more

3    important than that.  They declined.  That's in their

4    paperwork.  And it would have been at significant risk to

5    myself, and I was never contacted about that again after I made

6    the offer.

7         All I'd like to say now is I'm very sorry for letting

8    my friends down, letting my family down.  Those people in my

9    life deserved better from me, and they'll get better from me.

10        That's all, Your Honor.

11        THE COURT:  All right.  Well, Mr. Young, you present

12   a very difficult case for the Court because on the one hand,

13   you strike everybody as a very mild-mannered person.  You've

14   represented yourself as a patriot, that you've been devoted to

15   the United States, and that you are not a risk.

16        The problem the Court has is, you know, we can't look

17   inside a human being and really judge what is true.  As I told

18   the jury at the end of the trial, it's never easy sitting in

19   judgment of another human being, but that's what some of us

20   have to do, and so I have to look at the evidence before me,

21   and I have to draw what would be considered in my view

22   reasonable inferences from that evidence, and one of the -- two

23   of the main concerns in sentencing is -- are deterrence.  We

24   want to deter an individual from reengaging in the criminal

25   activity and also send messages to others who might be thinking

19

1    about engaging in such activity.

2           But if you think about why do we worry about

3    deterrence, we worry about deterrence because we're concerned

4    about protecting the community from future similar criminal

5    conduct.  Your case is particularly troublesome because we not

6    only have the specific crimes for which you were convicted, but

7    there's this other additional evidence that strikes the Court

8    as indicating that there is a real danger from someone like

9    yourself.

10          The amount of weaponry and armament you had in your

11   home differentiates your case from that of Qamar, for example.

12   The number of firearms, 18,000 rounds of ammunition, 60

13   knife-type instruments, some of which were of polymer, which

14   means they could get by a lot of metal detectors, and those

15   were not one-inch pocket knives, the fact that you had

16   grenade-related and explosive-related items in your home,

17   videos on how to make a bomb, that kind of stuff is very, very

18   troubling to the Court.

19          When you combine that type of weaponry in your home,

20   whether you're calling it for collecting purposes or not, I

21   still have to look at that as real.  Then we have the issue of

22   now mental health, which, of course, can be a very dangerous

23   component when combined with weaponry.

24          We have the uncontested evidence that you were a

25   consumer of very violent videos.  The government submitted

20

1  several of those pieces of evidence.  You had bookmarked ISIS

2  videos assassinating people, and then we have the rhetoric.

3  Whether it was meant in jest, whether it was not intended to be

4  real, we still have your own words both in e-mail messages and

5  then through the testimony of Khalil and Mo.

6          You definitely had animosity towards the FBI.  Now,

7  the FBI is not equivalent to the United States of America, but

8  many people consider it, you know, our bastion federal law

9  enforcement agency, and that anti-FBI animus coupled with these

10  other factors is another indicator that someone may, in fact,

11  be posing a real threat.

12         All of these things combined, plus, unlike many of

13  these cases we have involving material support where the

14  government has been involved, you did take two trips to Libya.

15  And, you know, it's interesting that during the trial, you

16  know, you introduced photographs that made it look like it was

17  almost like a tourism visit, but your psychologist now, as the

18  government pointed out, says you may have posttraumatic stress

19  syndrome from what you experienced in Libya.

20         All that goes into the mix that the Court has to

21  consider in determining what is the appropriate sentence here,

22  and having considered those various factors, I'm satisfied, and

23  it's still going to be a variant sentence, that a sentence of

24  180 months in the custody of the Bureau of Prisons, with credit

25  for time served, to be imposed concurrently on Counts 1, 2, and

21

1  4, is sufficient but not greater than necessary to achieve the

2  purposes of 3553(a).

3         When you've finished the 180-month sentence, you'll

4  serve fifteen years of supervised release on Count 1 and three

5  years of supervised release on Counts 2 and 4.  The supervised

6  release on Counts 2 and 4 is concurrent with each other and

7  concurrent with the 15 years on Count 1.

8         Now, in terms of the conditions of supervision, you

9  must first of all be of uniform good behavior, which means you

10  cannot violate any federal, state, or local laws.  Do you

11  understand that?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Secondly, you have to follow all the

14  conditions of supervision, which will be printed on the

15  judgment order and explained to you by the Probation Office.

16  Do you understand that?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  As additional and special conditions of

19  supervision, you are first of all required to submit to such

20  drug testing, because you must be drug free, so you'll have to

21  submit to such drug testing and such in- or outpatient drug

22  treatment as directed by the Probation Office.  You'll be

23  required to pay the costs for the testing and treatment to the

24  extent that you are able, and you will have to waive any

25  privacy rights that you have to the drug testing program so the

22

1    Probation Office can monitor your compliance.

2              Do you understand that?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Secondly, you must satisfactorily

5    participate in such mental health evaluation and treatment,

6    including the taking of any medication or any in- or outpatient

7    treatment, as directed by the Probation Office.

8              Do you understand that?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Again, you'll be required to pay the

11   costs to the extent you are able, and you will have to waive

12   any privacy rights that you have so that the Probation Office

13   can monitor your progress.  Do you understand that?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  You are barred from having any

16   communications whatsoever, and that means in person, by

17   telephone, e-mail, etc., with any known terrorists or terrorist

18   organizations.  Do you understand that?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  And lastly, you'll have to comply with

21   the requirements of the computer monitoring program of the

22   Probation Office, and you will have to consent to the

23   installation of computer monitoring software on any software --

24   any computer to which you have access, and that will be

25   performed by a Probation Office, and there will be restrictions

23

1    on what you can do on your computer.  There will be a notice

2    placed on the computer at the time of installation to warn

3    others of the existence of the monitoring software, and you'll

4    have to notify others of the software monitoring.

5              Do you understand that?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  And you'll not be able to remove or

8    tamper with that in any respect.

9              The Court finds based upon your financial situation

10   that you don't have the costs for incarceration, any other

11   costs of supervision, or the statutory fines.  However, there

12   are $300 of special assessments that must be made.

13             Do you understand that?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  Was there any forfeiture in this case,

16   Mr. Kromberg?

17             MR. KROMBERG:  There was not, Your Honor.

18             THE COURT:  All right.  Now, because you pled not

19   guilty and went to trial, you have a right to appeal both your

20   convictions and your sentence.  If you plan to file an appeal,

21   such appeal must be noticed within 14 days of today's date.

22             You have the right to be represented by counsel

23   during your appeal.  If you are unable to afford appellate

24   counsel, you'll need to apply to the Court of Appeals, the

25   Fourth Circuit, to have counsel appointed for you, and they

24

1    will appoint counsel for you.

2              Do you understand?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Now, was there any request in terms of a

5    recommendation for a facility?

6              MR. SMITH:  Your Honor, we would -- we were about to

7    ask for a prison camp in Virginia --

8              THE COURT:  Well, I'm not going to put a camp for

9    this type of an offense.  I will recommend a facility as close

10   to this area as possible, all right?

11             MR. SMITH:  We would request a minimum security

12   facility.

13             THE COURT:  I will recommend to the Bureau of Prisons

14   a facility as close to this area as possible.

15             MR. SMITH:  Thank you.

16             THE COURT:  It's up to the Bureau of Prisons to make

17   those decisions.

18             Was there anything further from the United States?

19             MR. KROMBERG:  Judge, in the condition of supervised

20   release, could the defendant be required to notify the

21   probation officer if he's going to possess more than personal

22   use quantities of body armor or cutting instruments?  Because

23   it just seems that 70 pieces of body armor is not necessary for

24   someone on supervised release, but maybe he has a right to

25   something, but not enough to --

25

1          THE COURT:  Well, all right.  I mean, obviously, the

2    law now is he cannot possess any firearms.

3          MR. KROMBERG:  Or ammunition.

4          THE COURT:  I'm going to add weapons or any weapons

5    of destruction or any significant knives.  I mean, you know,

6    you can cook but some of these knives.

7          MR. KROMBERG:  And I think the body armor may be more

8    troubling than the -- than even some of the knives, Judge.

9          THE COURT:  I can't see any reason for body armor.

10   I'll include that, yes.

11          All right, anything further?

12                         (No response.)

13          THE COURT:  The defendant is remanded.  Thank you.

14          MR. KROMBERG:  Thank you, Your Honor.

15                         (Which were all the proceedings

16                          had at this time.)

17

18              CERTIFICATE OF THE REPORTER

19      I certify that the foregoing is a correct transcript of

20   the record of proceedings in the above-entitled matter.

21

22

23    _____        /s/_____

24                         Anneliese J. Thomson

25

AO 245 S (Rev. 2/99)(EDVA rev.1) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

UNITED STATES OF AMERICA

       v.                          Case Number 1:16CR00265-001

**NICHOLAS YOUNG,**

Defendant.

## JUDGMENT IN A CRIMINAL CASE

The defendant, NICHOLAS YOUNG, was represented by Nicholas D. Smith and Linda Moreno, Esquires.

The defendant was found guilty after a trial by Jury as to Counts 1, 2, and 4 of the Indictment. Accordingly, the defendant is adjudged guilty of the following count(s), involving the indicated offense(s)

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. §2339B | **Attempt to Provide Material Support to a Designated Foreign Terrorist Organization (Felony)** | 10/15/2004 | 1 |
| 18 U.S.C. §1512(c)(2) | **Attempt to Obstruct Justice (Felony)** | 12/05/2015 | 2 |
| 18 U.S.C. §1512(c)(2) | **Attempt to Obstruct Justice (Felony)** | 11/20/2014 | 4 |

On motion of the United States, the Court has dismissed Count 3 of the Indictment.

As pronounced on February 23, 2018, the defendant is sentenced as provided in pages 2 through 7* of this Judgment.   The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Signed this _23rd_ day of _February_, 2018.

/s/

Leonie M. Brinkema
United States District Judge

* Page 7 of this document contains sealed information

AO 245 S (Rev. 2/99)(EDVA rev.1) Sheet 2 - Imprisonment

Defendant:  NICHOLAS YOUNG
Case Number:    1:16CR00265-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of ONE HUNDRED AND EIGHTY (180) MONTHS as to each of Counts 1, 2, and 4, all counts to run concurrent with each other; with credit for time served.

The Court makes the following recommendations to the Bureau of Prisons:

The defendant to be designated to a facility as close to this area as possible.

The defendant is remanded into the custody of the United States Marshal.

## RETURN

I have executed this Judgment as follows:

_____
_____
_____

Defendant delivered on _____ to _____
at _____, with a certified copy of this Judgment.

c: P.O. (2) (3)
   Mshl. (4) (2)
   U.S.Atty.                          _____
   U.S.Coll.                              United States Marshal
   Dft. Cnsl.          By
   PTS                                _____
   Financial                              Deputy Marshal
   Registrar
   ob

Case 1:16-cr-00265-LMB   Document 224   Filed 02/23/18   Page 3 of 5 PageID# 3143
AO 245 S (Rev. 2/99)(EDVA rev.1) Sheet 3 - Supervised Release

Judgment--Page 3 of 7

Defendant:  NICHOLAS YOUNG
Case Number:    1:16CR00265-001

### SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of FIFTEEN (15) YEARS, as to Count 1 and THREE (3) YEARS concurrent as to each of Counts 2 and 4, to run concurrent with Count 1.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of supervised release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

While on supervised release, the defendant shall not commit another federal, state, or local crime.

While on supervised release, the defendant shall not illegally possess a controlled substance.

While on supervised release, the defendant shall not possess a firearm or destructive device.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties   sheet of this judgment.

### STANDARD CONDITIONS OF SUPERVISED RELEASE

The defendant shall comply with the standard conditions that have been adopted by this Court (set forth below):
1) The defendant shall not leave the judicial district without the permission of the Court or probation officer.
2) The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month.
3) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
4) The defendant shall support his or her dependents and meet other family responsibilities.
5) The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.
6) The defendant shall notify the Probation Officer within 72 hours, or earlier if so directed, of any change in residence.
7) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by physician.
8) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered.
9) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
10) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer.
11) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.
12) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court.
13) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

-1834-

USCA4 Appeal: 18-4138    Doc: 24-4    Filed: 06/21/2018    Pg: 514 of 518

AO 245 S (Rev. 3/99)(EDVA rev.) Sheet 3 (cont'd) - Supervised Release

Defendant:  NICHOLAS YOUNG
Case Number:    1:16CR00265-001

## SPECIAL CONDITIONS OF SUPERVISION

While on supervised release, pursuant to this Judgment, the defendant shall also comply with the following additional conditions:

1)  The defendant must remain drug free and submit to mandatory drug testing. The defendant must satisfactorily participate in, and complete, any inpatient or outpatient drug treatment to which defendant is directed by the probation officer. The defendant shall waive all rights of confidentiality regarding drug treatment to allow the release of information to the United States Probation Office and authorize communication between the probation officer and the treatment provider. The defendant to pay all costs as able, as directed by the probation officer.

2)  The defendant shall undergo a mental health evaluation and, if recommended, participate in a program approved by the United States Probation Office for mental health treatment, which program may include residential treatment and testing, all as directed by the probation officer. The defendant shall take all medications as prescribed and waive all rights of confidentiality regarding mental health treatment to allow the release of information to the United States Probation Office and authorize communication between the probation officer and the treatment provider. The defendant to pay all costs as able, as directed by the probation officer.

3)  The defendant shall be barred from associating or communicating with any known terrorists or terrorist organization, including any individuals involved in the instant offense. All communications, including electronic or telephonic with such individuals or groups, are prohibited.

4)  The defendant shall comply with the requirements of the Computer Monitoring Program as administered by the Probation Office. The defendant shall consent to the installation of computer monitoring software on any computer to which the defendant has access. Installation shall be performed by the probation officer. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. The defendant shall also notify others of the existence of the monitoring software. The defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software. The costs of the monitoring shall be paid by the defendant.

5)  The defendant shall not possess any destructive weapons, firearms, knives, or body armor.

AO 245 S (Rev. 3/99)(EDVA rev.) Sheet 5 - Financial Penalties

Judgment--Page 5 of 7

Defendant:  NICHOLAS YOUNG
Case Number:    1:16CR00265-001

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total monetary penalties in accordance with the schedule of payments set out below.

| Count | Special Assessment | Fine |
|-------|--------------------|------|
| 1 | $100.00 | $0.00 |
| 2 | $100.00 | 0.00 |
| 4 | $100.00 | 0.00 |
| **Total** | **$300.00** | **$0.00** |

### FINE

No fines have been imposed in this case.

### SCHEDULE OF PAYMENTS

Payments shall be applied in the following order:   (1) assessment; (2) restitution; (3) fine principal; (4) cost of prosecution; (5) interest; (6) penalties.

The special assessment is due in full immediately.   If not paid immediately, the Court authorizes the deduction of appropriate sums from the defendant's account while in confinement in accordance with the applicable rules and regulations of the Bureau of Prisons.

Any special assessment, restitution, or fine payments may be subject to penalties for default and delinquency.

If this judgment imposes a period of imprisonment, payment of Criminal Monetary penalties shall be due during the period of imprisonment.

All criminal monetary penalty payments are to be made to the Clerk, United States District Court, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program.

### FORFEITURE

Forfeiture has not been ordered in this case.

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA     )
                       )
                       )
     v.                  )
                       )   No. 1:16-cr-265 (LMB)
                       )
NICHOLAS YOUNG,          )
                       )
     Defendant.      )

ORDER

For the reasons stated in open court, it is hereby

ORDERED that defendant's Motion for Acquittal [Dkt. No. 205] and Motion for a New

Trial [Dkt. No. 206] be and are DENIED.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 23rd day of February, 2018.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,

     v.

                               CRIMINAL NO.  16-cr-265

NICHOLAS YOUNG

NOTICE OF APPEAL

Notice is hereby given that _____ NICHOLAS YOUNG _____ above named,

hereby appeals to the United States Court of Appeals for the Fourth Circuit from the Orders

entered in this action on the 23rd day of February 2018 (Judgment & Sentence);

on the 23rd day of February 2018 (Motion for Acquittal & Motion for New Trial);

on the 8th day of December 2017 (Jury instructions)

on the 5th day of December 2017 (Motions to Strike Witnesses);

on the 1st day of December 2017 (Motion to Strike Expert Witnesses);

on the 27th day of October 2017 (Motion In Limine);

on the 26th day of September 2017 (Jury Questionnaire);

on the 9th day of May 2017 (Motion to Suppress FISA-collected information);

on the 9th day of May 2017 (Motion for Reconsideration of 3/10/17 Order);

on the 10th day of March 2017 (Motion to Suppress Evidence).

Dated: February 28, 2018

                              _____

                              Nicholas Smith

                              Counsel to Defendant (VA Bar #79745)

                              108 North Alfred St., Alexandria VA 22314

                              nds@davidbsmithpllc.com

Case 1:16-cr-00265-LMB   Document 228   Filed 02/28/18   Page 2 of 2 PageID# 3189

**<u>Certificate of Service</u>**

I hereby certify that on the 28th day of February, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> AUSA Gordon D. Kromberg
> AUSA John Gibbs
> U.S. Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> gordon.kromberg@usdoj.gov
> john.gibbs@usdoj.gov

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> */s/ Nicholas D. Smith*
> Nicholas D. Smith
> VA Bar No. 79745
> David B. Smith, PLLC
> 108 North Alfred Street
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> nds@davidbsmithpllc.com